**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE RESIDEO TECHNOLOGIES, INC. SECURITIES LITIGATION | Case No. 0:19-cv-02863 (WMW/KMM) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................6

    A.    The Parties ...............................................................................................6

    B.    Honeywell Spin-Off of Resideo.............................................................7

    C.    Pre-spin Disclosed "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements"..................................................................10

    D.    Resideo's First Earnings Report as a Stand-alone Company (Third Quarter of 2018)............................................................................................12

    E.    Resideo Announces Full-year 2018 Results and Releases 2019 Guidance ...........13

    F.    Resideo Announces First Quarter 2019 Results, Reaffirms 2019 Guidance.........15

    G.    Resideo Announces Second Quarter 2019 Results, Reaffirms 2019 Guidance ......................................................................................................18

    H.    Resideo Announces Preliminary Third Quarter 2019 Results, Revises 2019 Guidance ........................................................................................20

    I.    Resideo Announces Third Quarter 2019 Results and Expands On Issues Prompting Guidance Revision ..................................................................21

    J.    Resideo's Post-Class Period Assessment of Lowered EBITDA Guidance ...........22

ARGUMENT ...........................................................................................................................23

I.    PLAINTIFFS' ALLEGATION OF "UNDISCLOSED COMPANYWIDE PROBLEMS" IS FATALLY DEFICIENT. .................................................................24

    A.    Plaintiffs' Allegations of Fraud by Hindsight Is Fatally Defective. ......................25

    B.    The "Undisclosed" Problems Were All Disclosed. ...............................................29

    C.    Plaintiffs' Allegations Attributed To Confidential Witnesses Are Unreliable And Lack Credibility And Therefore Should Be Disregarded ...........33

II.    NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE PLED WITH PARTICULARITY .........................................................................................................41

    A.    Resideo's Forward-Looking Statements Were Accompanied by Meaningful Cautionary Language and Therefore Fall Within The PSLRA's Safe Harbor and Bespeaks Caution Doctrine ......................................42

    B.    Resideo's Statements of Corporate Optimism and Opinion Are Not Actionable .............................................................................................................49

    C.    Plaintiffs Fail to Plead the Materiality of the Remaining Challenged Statements in Light of Comprehensive Risk Disclosures and Contemporaneous Circumstances. ..................................................................52

i

III.    NO STRONG INFERENCE OF SCIENTER IS PLED WITH PARTICULARITY........56

IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a) OF THE
        EXCHANGE ACT.................................................................................................65

V.    CONCLUSION....................................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2007 Novastar Fin. Inc. Sec. Litig.*,
   579 F.3d 878 (8th Cir. 2009) ...............................................................................................23

*In re AMDOCS Ltd. Sec. Litig.*,
   390 F.3d 542 (8th Cir. 2004) ...........................................................................6, 40, 53, 54

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229, 1235-36 (10th Cir. 2016) .........................................................................64

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)................................................................................59

*Carter v. Furniture Brands Int'l, Inc.*,
   No. 4:13CV1600 HEA, 2015 WL 357076 (E.D. Mo. Jan. 27, 2015)..................................37

*City of Livonia Emps' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) .......................................................................................38, 39

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
   621 F.3d 800 (8th Cir. 2010) .......................................................................................57, 59

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008) .......................................................................................41, 58

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ..............................................................................................62

*In re Fusion-io, Inc. Sec. Litig.*,
   No.: 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015)...............................37

*In re Gander Mountain Co. Sec. Litig.*,
   No. CIV. 05-183DWFAJB, 2006 WL 140670 (D. Minn. Jan. 17, 2006).............................56

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
   580 F.3d 755 (8th Cir. 2009) ............................................................................36, 37, 57, 64

*In re Hutchinson Tech., Inc., Secs. Litig.*,
   536 F. 3d 952 (8th Cir. 2008) ........................................................................................28, 40, 50

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
   958 F. Supp. 2d 1065 (D. Minn. 2013).........................................................................43, 45

iii

*Institutional Invs. Grp. v. Avaya, Inc.,*
  565 F.3d 242 (3d Cir. 2009).................................................................................46

*Julianello v. K-V Pharm Co.,*
  791 F.3d 915 (8th Cir. 2015) ............................................................42, 43, 46, 47

*In re K-Tel Int'l Sec. Litig.,*
  300 F.3d 881 (8th Cir. 2002) ........................................................................57, 62

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011)............................................................................45, 53, 54

*In re Medtronic Inc., Sec. Litig.,*
  618 F. Supp. 2d 1016 (D. Minn. 2009).................................................................59

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.,*
  641 F.3d 1023 (8th Cir. 2011) ....................................................................... *passim*

*In re Navarre Corp. Sec. Litig.,*
  299 F.3d 735 (8th Cir. 2002) ........................................................................23, 25

*In re NVE Corp. Sec. Litig.,*
  551 F. Supp. 2d 871 (D. Minn. 2007)................................................................. *passim*

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
  575 U.S. 175 (2015)............................................................................4, 50, 51, 52

*Parnes v. Gateway 2000, Inc.,*
  122 F.3d 539 (8th Cir. 1997) .......................................................................43, 49, 50

*In re Patterson Cos.,*
  479 F. Supp. 2d 1014 (D. Minn. 2007)......................................................29, 59, 61

*Podraza v. Whiting,*
  790 F.3d 828 (8th Cir. 2015) ...............................................................................56

*Pound v. Stereotaxis, Inc.,*
  8 F. Supp. 3d 1157 (E.D. Mo. 2014).........................................................34, 35, 42

*Rand-Heart of N.Y., Inc. v. Dolan,*
  812 F.3d 1172 (8th Cir. 2016) .............................................................................43

*Rochester Laborers Pension Fund v. Monsanto Co.,*
  883 F. Supp. 2d 835 (E.D. Mo. 2012).................................................................48

*Schiro v. Cemex, S.A.B. de C.V.,*
  396 F. Supp. 3d 283 (S.D.N.Y. 2019).................................................................37

*Shields v. Citytrust Bancorp Inc.,*
  25 F.3d 1124 (2d Cir. 1994)..................................................................................50

*Shoemaker v. Cardiovascular Sys., Inc.,*
  300 F. Supp. 3d 1046 (D. Minn. 2018)............................................................33, 65

*Shoemaker v. Cardiovascular Sys., Inc.,*
  Civil No. 16-568, 2017 WL 1180444 (D. Minn. Mar. 29, 2017) .....................33, 36

*In re Stratasys Ltd. S'holder Sec. Litig.,*
  864 F.3d 879 (8th Cir. 2017) ...........................................................................4, 49, 56

*In re Synovis Life Techs., Inc. Sec. Litig.,*
  2005 U.S. Dist. LEXIS 18187 (D. Minn. 2005) ...............................................57, 62

*In re Target Corp. Sec. Litig.,*
  275 F. Supp. 3d 1063 (D. Minn. 2017)................................................................ 23

*In re Target Corp. Sec. Litig.,*
  955 F.3d 738 (8th Cir. 2020) ........................................................................ *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007).......................................................................................... *passim*

*W. Washington Laborers-Emp'rs Pension Tr. v. Panera Bread Co.,*
  No. 4:08CV00120 ERW, 2009 WL 3756619 (E.D. Mo. Nov. 6, 2009) ...............................43

*W. Washington Laborers-Emp'rs Pension Tr. v. Panera Bread Co.,*
  697 F. Supp. 2d 1081 (E.D. Mo. 2010).......................................................42, 46, 48

*Yellen v. Hake,*
  437 F. Supp. 2d 961 (S.D. Iowa 2006) .................................................................44

**Statutes**

15 U.S.C. § 78u-4 .................................................................................................4, 23

15 U.S.C. § 78u-4(b)(1) ............................................................................................41

15 U.S.C. § 78u-4(b)(2) ............................................................................................56

15 U.S.C. § 78u-5 .....................................................................................................42

15 U.S.C. § 78u-5(i)(1)(B)........................................................................................45

F.R.C.P. Rule 8(a)(2) ................................................................................................23

F.R.C.P. Rule 9(b) ...................................................................................................................23

Securities Exchange Act of 1934 ............................................................................................23

Defendants Resideo Technologies, Inc. ("Resideo" or the "Company"), Michael G. Nefkens, Joseph D. Ragan III, and Niccolo de Masi submit this memorandum of law in support of Defendants' Motion to Dismiss the Consolidated Amended Complaint.

## PRELIMINARY STATEMENT

This is a putative securities class action lawsuit arising from the spin-off of Resideo, a leading provider of temperature control, security, and other in-home and business technology solutions, from non-party Honeywell International Inc. ("Honeywell"), one of the largest industrial companies in the world. The Complaint alleges that since the spin-off, Resideo has struggled, facing "undisclosed companywide problems" with its business that caused it to underperform in 2019. (¶90.)[1] While the Complaint is long on words, length and prolixity cannot substitute for the clear pleading requirements imposed by Congress in the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), including the statutory requirement that fraud be pled with particularity. The Complaint is deficient because it fails to so plead and is dismissible for that reason and a plethora of others, all of which are set out below.

Prior to the spin-off, Honeywell (*not* Resideo) issued financial guidance that set an expectation in the market that in 2019, Resideo would earn $500M in EBITDA (earnings before interest, taxes, depreciation, and amortization), a key measure of corporate profitability. On October 29, 2018, the spin-off closed and Resideo began trading as an independent public company. On March 7, 2019, Resideo announced *its* first 2019

---

[1] Paragraph citations are to the Consolidated Amended Complaint (the "Complaint").

EBITDA guidance of $410M to $430M, which was met as a disappointment given the expectations set by Honeywell before the spin-off. As 2019 progressed, however, Resideo's performance deteriorated as revenue declined and inventory was written down. Accordingly, on October 22, 2019, Resideo reduced its full-year 2019 EBITDA guidance to $330M to $350M. That "corrective disclosure" prompted a stock drop, changes to Resideo's management team, and this lawsuit.

The crux of the Complaint is that Resideo's failure to meet its EBITDA guidance amounts to securities fraud. But when it comes to explaining what the "fraud" was here, Plaintiffs' allegations are woefully inadequate. That is because the core allegation—that Resideo was facing pervasive business difficulties that prevented it from meeting its guidance and projections—amounts to a classic claim of fraud by hindsight. Even if true, it would constitute inactionable ***mismanagement, and not fraud***. Indeed, this case presents clear parallels to *In re Target Corp. Sec. Litig.*, where the Eighth Circuit affirmed dismissal of a securities action alleging unduly optimistic earnings updates that concealed problems about supply chain and inventory management because "[t]he PSLRA does not allow pleading fraud by hindsight." 955 F.3d 738, 743 (8th Cir. 2020) (citation omitted).

In an attempt to turn a garden-variety guidance reduction into a fraud, Plaintiffs seize upon after-the-fact explanations provided by Resideo. Plaintiffs posit that these *post hoc* explanations—the scattershot way Honeywell cobbled together Resideo, its lack of "value engineers," supply chain mismanagement, loss of "sourcing leverage," failures of its "TCC App," failure to deliver on a large "OEM" contract, and lack of technical expertise—should have been obvious to management from the spin-off. But in the absence

- 2 -

of well-pled allegations that Resideo's projections and other challenged statements were false *when they were made*, this is a prototypical case of "fraud by hindsight."  And while Plaintiffs allege that these pervasive "companywide problems" were "undisclosed," that is demonstrably false:  as shown below, they were all disclosed by Resideo either as risks or as they materialized.

With no contemporaneous allegations of falsity or scienter, Plaintiffs attempt to bolster the Complaint with 15 so-called "Confidential Witnesses" or "CWs."  This well-worn tactic in class action lawsuits to save a deficient complaint is not new;  courts within this Circuit have been rightly suspicious of such gambits and have dismissed complaints under Rule 12(b)(6) where, as here, the CW allegations are not probative of anything germane to the Complaint.  The CWs, most of whom were low-level employees working for an unrelated business unit, are most notable for what they do *not* allege.  There are no allegations that management had access to private guidance forecasts that contradicted their public statements or harbored doubts about whether the forecasts were obtainable.  Indeed, on the key issue in the case—Resideo's 2019 EBITDA projections—the CWs have nothing to say.  And Plaintiffs' headline "WhatsApp" allegation that employees were instructed to conceal negative information about certain projects by using that messaging platform amounts to triple hearsay and speculation, lacks corroboration, and should be disregarded.

In a distinctively haphazard way, the Complaint takes this allegation of "undisclosed companywide problems" and then attacks many of the statements Resideo made about its business and prospects during the class period, specifically:  (1) Resideo's 2019 EBITDA projections as well as other forward-looking statements about the Company's business

plans and prospects; (2) statements of corporate optimism and opinion made by Resideo management; and (3) specific statements by Resideo regarding competitive positioning or business initiatives.  But as to each, Plaintiffs fail to plead a false statement with the particularity required by the PSLRA.

First, none of Resideo's forward-looking statements are actionable under the PSLRA.  That Resideo lowered its EBITDA guidance for 2019 is uncontested.  But public companies reduce guidance all the time for any number of reasons that do not imply a fraud—such as adverse business developments, poor execution, or alleged mismanagement.  For that reason, Congress created a "Safe Harbor" in the PSLRA for forward-looking statements.  *See* 15 U.S.C. § 78u-4.  Such statements are protected so long as they are "accompanied by meaningful cautionary language." *Id.*  And all the forward-looking statements here were accompanied by such warnings.  Accordingly, the Safe Harbor, along with the "bespeaks caution" doctrine, applies here.

Second, most of the comparatively few statements challenged by Plaintiffs that are *not* forward-looking statements constitute inactionable statements of corporate optimism or opinion.  As Eighth Circuit law makes clear, generic statements of corporate optimism, like those challenged by Plaintiffs here, are not actionable under the securities laws because they are deemed immaterial as a matter of law.  *See, e.g.*, *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879 (8th Cir. 2017).  Nor, for that matter, are opinion statements actionable barring allegations that the speaker did not actually hold or misrepresented the basis of the opinion—allegations absent here.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175 (2015).

- 4 -

Third, Plaintiffs' remaining allegations quibbling with statements by Resideo about the Company's competitive positioning and specific business initiatives such as Project GRIP or Project STORM fail to state a claim because they challenge statements that are immaterial as a matter of law in light of the Company's disclosures, allege the concealment of facts that were actually disclosed, or attempt to establish a contradiction by relying on the speculations of Plaintiffs' CWs.

Just as fundamentally, Plaintiffs fail to plead the cogent theory of scienter required by the PSLRA. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Stepping back, there is a disconnect between the theory alleged in the Complaint—that Resideo executives issued aggressive EBITDA projections and other business plans that they *knew* the Company would never be able to meet to pump the stock following the spin-off from Honeywell—and the reality of Resideo's experience in 2019. Over the course of 2019, Resideo management first announced earnings guidance in March *below* consensus estimates, warned investors about adverse developments, and then reduced earnings guidance further in October. And the trajectory of Resideo's stock price does not track that of a typical securities fraud case: indeed, even *before* the so-called "corrective disclosure" in October, Resideo's stock was down over *46%* from the spin-off. All of these facts, of which the Court can take judicial notice, are undisputed. Thus the contention that there was a scheme to inflate Resideo's stock price strains credulity. Nor does this case have any hallmarks of a fraud, such as insider trading by corporate executives.

Given that there are no allegations that Resideo executives were aware of facts contradicting their public statements at the time those statements were made, a much more

- 5 -

plausible inference from the Complaint is that Resideo struggled in the wake of its spin-off from Honeywell, as many newly independent companies have done following a corporate spin, facing supply chain, cost, personnel, and inventory management issues that resulted in underperformance and caused profitability to decline in 2019.  While that outcome may be disappointing to investors, it does not give rise to an actionable securities claim under the PSLRA.  Accordingly, the Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[2]

### A.    The Parties

Defendant Resideo is a "leading global provider of critical comfort, residential thermal solutions and security solutions primarily in residential environments," with over 13,000 employees in over 200 locations around the globe.  (Ex. A at 3, 6-7.)  Resideo is comprised of two largely independent business segments:  (i) Product & Solutions ("P&S"), which designs and manufactures consumer products such as thermostats, home security systems, and water and air heating components; and (ii) ADI Global Distribution ("ADI"), a wholesale distributor of security and low voltage electronic products.  (*Id.* at 3-4.)  These two segments operate as separate businesses with distinct business plans, organizational structures, finance figures, and locations of operations.  (*Id.* at 8-12.)  Resideo became an independent company as a result of a spin-off by Honeywell on October 29, 2018 (the "Spin-Off" or "Spin").  (¶49.)

---

[2] The facts, which are taken from the allegations of the Complaint, are assumed to be true solely for purposes of this motion.  *See In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, (8th Cir. 2004).  The exhibits can be considered on a motion to dismiss for the reasons set forth in Defendants' request for judicial notice filed herewith.

Defendants Michael G. Nefkens, Joseph D. Ragan III, and Niccolo de Masi are former Resideo executives (collectively, the "Individual Defendants"). Defendant Nefkens served as Resideo's President, Chief Executive Officer, and director from the date of the Spin-off until May 27, 2020, when he stepped down. (Ex. B at 1; ¶50.) Defendant Ragan served as Resideo's Executive Vice President and Chief Financial Officer from the Spin-Off until October 22, 2019, when he was replaced by interim CFO Bob Ryder, who was replaced thereafter by Anthony Trunzo on May 29, 2020. (Ex. C (Item 5.02) at 2; Ex. D at 1; ¶51.) Defendant de Masi served on Resideo's board of directors from the Spin-Off date and was the Company's President of P&S from the Spin-Off until January 6, 2020. (¶52.) De Masi also served as Resideo's Chief Innovation Officer from February 2019 until his departure in April 2020. (*Id*.)

The Gabelli Funds, GAMCO, and Naya Funds are investment management companies and pooled investment funds that were appointed "Lead Plaintiffs" on January 27, 2020, and purport to "have purchased Resideo common stock during the Class Period." (¶¶45-47.) Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Fire") is an additional class representative that purports to have "purchased Resideo common stock during the Class Period." (¶48.)

### B.    <u>Honeywell Spin-Off of Resideo</u>

On October 10, 2017, Honeywell announced its intention to spin off portions of its Homes and Global Distribution businesses into a stand-alone, publicly traded company called "Resideo." (¶78.) From the outset, Honeywell disclosed that Resideo was being constructed from disparate product lines from various Honeywell divisions that, prior to

the announcement of the Spin-Off, did not have separate profits and loss statements ("P&Ls") or a history of being operated together as a unitary business. (Ex. E (October 10, 2017 Honeywell Conference Call) at 3, 8 (Honeywell noted that it planned to "prepare Home and Building Technologies for a reorganization to form separate P&Ls for the Homes business as well as the remaining businesses" and that it "*physically [had] to create the[] Homes and buildings [profit and losses ("P&Ls")] within HBT*. . . because those P&Ls in essence and the organizations will get created in Q4" (emphasis added)); Ex. F (April 20, 2018 Honeywell Q1 2018 Earnings Call) at 4 (Honeywell made clear that it "changed the HBT [Honeywell Building Technologies] organization structure to segregate the Homes business from the rest of the portfolio that will remain with Honeywell after the spinoff")). Honeywell repeatedly underscored the new organization of its HBT segment for investors. (Ex. G (April 20, 2018 Honeywell Q1 2018 Earnings Call Presentation) at 6; Ex. E at 3; ¶¶91-92.)

In particular, Honeywell differentiated the business segments that were remaining part of Honeywell following the Spin ("Buildings") from the business segments that were being spun off to form Resideo ("Homes"). As one April 2018 presentation highlighted:

## Home and Building Technologies – New Organization








**Buildings (~$5.3B)**

**Building Products**

**Fire controls** Software, and systems including panels, detectors, emergency notification, aspirating fire detection and voice alarms

**Commercial Security** Detection systems and software including intrusion, access control, video surveillance and alarm verification

**Air and Water** Monitoring and control for indoor air quality through air purification and ventilation, and water quality through filter and purification and related software

**Connected Buildings**

Precision controls of energy usage, heating, cooling, humidity, space utilization, and related building management software

**Building Solutions**

Integrated software and hardware offering for complex buildings and structures, focusing on installation, integration and service

**Homes (~$4.5B)**

**Comfort and Care**

Precision controls of heating, cooling, and humidity, home health monitoring, and related software

**Safety and Security**

Self-monitored solutions and software for intrusion alarms and home video surveillance, water leak detection and prevention controls

Professionally installed and monitored intrusion alarm systems

**Distribution**

Wholesale distributor of security and low voltage products including video surveillance, intrusion and fire detection, and access control systems

*Sales as of 2017*

1Q 2018 Earnings Release
April 20, 2018

**New Structure Supports Homes and Global Distribution Spin-Off**

(Ex. G at 6.)  Following the announcement of the Spin-Off, Honeywell began reporting separate P&Ls for Resideo business lines.  (Ex. H at 8.)

Just before the Spin-Off, on October 10, 2018, Honeywell, in the name of Resideo, filed a Form 8-K with the Securities and Exchange Commission ("SEC"), which included a presentation providing an overview of Resideo's businesses.  (Ex. I; ¶207.)  In this presentation, Honeywell announced full-year 2018 revenue guidance for Resideo of $4.770B-$4.830B and pro forma adjusted EBITDA of $465M-$475M.[3]  (Ex. I at 40.) Honeywell did not release earnings estimates for 2019; however, it projected revenue organic growth of "4%+" and an adjusted EBITDA margin of "~10%."  (*Id*. at 47; ¶209.) These projections, created by Honeywell, set an expectation heading into the Spin that

---

[3] This figure and future references to adjusted EBITDA account for $140M in annual indemnification payments to Honeywell, the maximum required by the Indemnification and Reimbursement Agreement.  (*See* ¶82.)

Resideo would earn about $500M in adjusted EBITDA in 2019. (*E.g.*, Ex. J (Oppenheimer Analyst Report (Oct. 31, 2018)) at 1 (estimating 2019 adjusted EBITDA as $504M); Ex. K (WhiteSand Research Analyst Report (Jan. 16, 2019)) at 1 (estimating 2019 adjusted EBITDA as $498M); Ex. L (Imperial Capital Analyst Report (Dec. 11, 2018) at 1 (estimating 2019 adjusted EBITDA as $487M).)

**C.    Pre-Spin Disclosed "Risk Factors" And "Cautionary Statement Concerning Forward-Looking Statements"**

In connection with the Spin-Off, Honeywell filed an amended Registration Statement in the name of Resideo on SEC Form 10. (Ex. M (October 2, 2018 Form 10); ¶196.) The Registration Statement included a *32-page* disclosure of "Risk Factors" and a detailed "Cautionary Statement Concerning Forward-Looking Statements." (Ex. M at 25-56, 57-58; ¶201.) The first risk in the disclosure read:

> *We have no operating history as an independent, publicly traded company, and our historical combined financial information is not necessarily representative of the results we would have achieved as an independent, publicly traded company and may not be a reliable indicator of our future results.*

(¶201.)

Resideo further cautioned that costs may be higher than expected post-Spin due to lost efficiencies, unforeseen challenges, and costs as a result of no longer operating "as part of Honeywell's broader corporate organization." (¶201.) The Risk Factors elaborated that "[a]s part of Honeywell, [Resideo] enjoyed certain benefits from Honeywell's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we may lose these benefits after the Spin-Off," and that "[a]s a stand-

alone company, . . . we *may be unable to obtain goods and services at the prices and terms obtained prior to the Spin-Off, which could decrease our overall profitability*." (¶201; Ex. M at 25, 31 (emphasis added).)  It was made plain to investors that Resideo had never "operated with a residential 'Comfort & Care, Security & Safety, or home solutions business focus, nor combined that with a distribution business,'" and that, as a result, it "may not be successful in continuing to operate and grow [the] business with a narrower focus and outside the Honeywell operating environment."  (¶201.)

Resideo also provided detailed disclosures of risk factors associated with, *inter alia*:

- The highly competitive markets in which Resideo operates, including the market for connected home solutions which is "*fragmented highly competitive, continually evolving and subject to disruptive technologies*," cautioning that its "*future results and growth are largely dependent upon our ability to develop new technologies and introduce new products that achieve market acceptance*" (Ex. M at 27, 28 (emphasis in original));

- Profitability is "dependent upon the efficiency of [Resideo's] supply chain; hence, "[a]n inefficient or ineffective supply chain strategy or operations could increase operational costs, reduce profit margins and adversely affect [Resideo's] business, financial condition, results of operations and cash flows" (*id*. at 36);

- Relationships with large original equipment manufacturers ("OEMs")—large customers that "contribute significantly to [Resideo's] net sales and operating income."  (*Id.* at 39.)  "By virtue of our largest customers' size and the significant portion of revenue that [it] derive[s] from them, they are able to exert *significant influence* in the negotiation of our commercial agreements and the conduct of our business with them" (*id.* (emphasis added)); and

- Dependence "*on the recruitment and retention of qualified personnel*" in markets in which "[c]ompetition for qualified personnel . . . is intense" such that Resideo "may not be successful in attracting or retaining qualified personnel;" and that "[t]he loss of key employees, [Resideo's] inability to attract new qualified employees or adequately train employees, or the delay in hiring key personnel could negatively affect [Resideo's] business, financial condition, results of operations and cash flows" (*id*. at 41 (emphasis in original).)

- 11 -

In the detailed "Cautionary Statement Concerning Forward-Looking Statements," Resideo explained that forward-looking statements "can be identified by the fact that they do not relate strictly to historical or current facts, but rather are based on current expectations, estimates, assumptions and projections about [Resideo's] industry and [its] business and financial results." (*Id*. at 57.) Resideo also cautioned that "undue reliance should not be placed on any forward-looking statement." (*Id.*)

These warnings, while issued by Honeywell in the Form 10 prior to the Spin, were adopted by Resideo following the Spin and incorporated into its public disclosures and updated during the class period. (*See infra* at 12-21.)

### D.     Resideo's First Earnings Report As A Stand-alone Company (Third Quarter of 2018)

Honeywell completed the Spin-Off of Resideo on October 29, 2018. (¶1.) On November 13, 2018, Resideo released its first earnings report covering the period ending September 30, 2018 (during which entire period Resideo operated as part of Honeywell), and hosted its first earnings conference call the following day. (¶216.) The earnings report contained cautionary language pertaining to "forward-looking statements," which, in part, directed investors to the detailed "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" described in Resideo's Form 10, discussed *supra*. (Ex. N at 17.) Resideo reiterated the significant qualifications regarding its forward-looking statements at the beginning of its earnings call. (Ex. O at 4.)

For its third quarter in 2018, Resideo reported pro forma adjusted EBITDA of $110M, and reaffirmed its full-year 2018 pro forma adjusted EBITDA guidance at the high

- 12 -

end of the range of $465M-$475M announced by Honeywell in the pre-Spin Investor Showcase.  (Ex. N at 1, 4, 13; Ex. I at 40.)  Resideo did not issue adjusted EBITDA guidance for full-year 2019.  (Ex. N at 4; ¶216.)

In the press release announcing its Q3 2018 financial results, Resideo disclosed that its "[p]roducts segment performance was impacted by temporary supply chain issues as a result of the spin-off, which Resideo is actively resolving."  (Ex. N at 2; ¶218.)  On the Q3 earnings call the next day, Resideo's CEO disclosed that Resideo "experienced some spin-related supply chain issues that temporarily increased [its] backlog" along with "additional spin related cost[s] that negatively impacted [its] revenue and EBITDA for the quarter," as it had warned investors about in its earlier Form 10 "Risk Factors" disclosure.  (Ex. O at 5; ¶219.)  Later during the call, Resideo's then Chief Financial Officer reiterated that "supply chain issues drove downward pressure on [Resideo's] EBITDA as well as other spin related costs."  (Ex. O at 6.)  Though the Company believed its supply-chain issues were "short-term," Resideo made clear that it was still "actively addressing" the issue.  (¶¶22, 219.)

Resideo's stock price closed at $21.26 per share following the announcement of the Q3 2018 financial results—a $6.74 decline (~24%) from the share price at opening bell ($28) on October 29, 2018, the first day the stock was publicly traded.  (¶1; Ex. P at 1.)

### E.    Resideo Announces Full-Year 2018 Results And Releases 2019 Guidance

On March 7, 2019, Resideo announced financial results for Q4 2018 (its first partial quarter post-Spin) and full-year 2018.  (¶229.)  Resideo reported full-year 2018 revenue of $4.827B with a 7% growth rate and a pro-forma adjusted EBITDA of $476M.  (Ex. Q at

1.) Both of these figures fell in the top end of the previously announced guidance, demonstrating strong performance. (Ex. I at 40; Ex. N at 4.)

Resideo also released full-year 2019 EBITDA guidance for the first time, projecting a range of $410M to $430M. (Ex. Q at 4.) In releasing this guidance, Resideo again provided detailed cautionary language as to its forward-looking statements, pointing investors to the exhaustive discussion of Resideo's "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" provided in the Form 10, discussed *supra*. (*Id*. at 20; Ex. R (March 7, 2019 Earnings Call) at 1; Ex. S (Earnings Call Investor and Analyst Presentation) at 1.)

Resideo also disclosed a number of factors that were putting "downward pressure on [] near term EBITDA." (Ex. R at 4, 8; Ex. Q at 1; Ex. S at 11; ¶232.) Ragan discussed "moderating housing metrics, shifting portfolio mix[4]. . . and increased growth investment" as drivers informing the Company's 2019 EBITDA guidance. (Ex. Q at 4.) The corresponding earnings call slide-deck included a chart showing these factors causing $30 million, $20 million, and $30 million hits to 2019 EBITDA, respectively. (Ex. S at 11.)

Resideo also updated investors on the roll-out of its next generation security platform: Global Residential Intrusion Platform ("GRIP"). (Ex. R at 8-9.) In the press release, Resideo stated that it had "beg[un] customer deliveries [to ADT] of its next-generation security platform . . . in December 2018" and that the general market roll-out

---

[4] The shifting portfolio mix refers to the Company's balance of higher and lower margin products, across its different lines. As discussed *supra*, Resideo disclosed its product mix concerns regularly throughout 2018 and 2019.

would occur "[o]ver the year ahead." (¶235.) Nefkens, however, included cautionary language on the earnings call, stating that the "rollout is progressing very [] well with our first customers," (namely ADT), but that Resideo was "going to need very strong performance[s] from our teams in the second half of the year in GRIP." (Ex. R at 8-9.)

The market met the 2019 EBITDA guidance as a disappointment. (Ex. T (Imperial Capital Analyst Report (March 5, 2019)) at 1 (predicting guidance pre-release at $487M); Ex. U (Oppenheimer Analyst Report (March 7, 2019)) at 1 ("2019 Guidance Below Expectations").) As one analyst remarked on the earnings call, the 2019 guidance "was not exactly what we were expecting." (Ex. R at 6.) Following the earnings call, Resideo's common stock price declined $5.79 per share to close at $18.96. (¶¶28, 395.) This marked a $9.04 decline (~32%) in share price from the stock's opening price on October 29, 2018. (¶1.)[5]

**F.   Resideo Announces First-Quarter 2019 Results, Reaffirms 2019 Guidance**

On May 8, 2019, Resideo announced its financial results for Q1 2019, the first quarter the entirety of which it operated as a stand-alone company. (¶254.) Though the company saw a 4% increase in overall sales to $1.216B as compared to the same quarter the prior year, it announced a 27% decline in adjusted EBITDA to $92M, driven largely by a 30% decline in the P&S adjusted EBITDA. (Ex. V at 3.) Nevertheless, Resideo still

---

[5] On March 18, 2019, Resideo filed its Form 10-K for 2018, which reiterated the numerous warnings that were previously disclosed in the October 2, 2018 Form 10, discussed *supra*, but updated them to account for the closing of the Spin, including: (i) 30 pages of Risk Factors; (ii) Cautionary Language Concerning Forward-Looking Statements; and (iii) Financial Statement Disclosures. (Ex. A at 20-49, 53-54; ¶245.)

beat expectations and stated that—as in previous years—it expected to see accelerated sales numbers as the year progressed due to seasonality, with 60% of revenue "weighted to the back half of the year." (*Id.*; Ex. W (Earnings Call) at 2, 5; ¶254.) With this context, Resideo reaffirmed its previously announced 2019 guidance of 2% to 5% organic revenue growth and $410M to $430M in adjusted EBITDA. (¶254.)

As before, Resideo included detailed cautionary language about its "forward-looking statements," specifically referring investors to the recently filed Form 10-K for 2018, discussed *supra*, and again cautioning that such statements "involve known and unknown risks, uncertainties, and other factors, which may cause the actual results or performance of the company to be materially different from any future results or performance expressed or implied by such forward-looking statements." (Ex. V at 12.)

Resideo began the corresponding earnings call by cautioning that the "presentation contains forward-looking statements," and that "[a]ctual results may differ materially from those in the forward-looking statements as a result of a number of factors, including those described from time to time in Resideo's filings with the Securities and Exchange Commission." (Ex. W at 1.) Nefkens and Ragan then highlighted a number of challenges Resideo faced in Q1 that were to continue through the year. Nefkens cautioned that the company was being "negatively impacted by shift in portfolio mix, specifically the introduction of our new security platform [GRIP] and volume increase in connected [thermostat] products" as well as "higher-than-planned product and solution overhead costs." (*Id.* at 2.) Specific to Resideo's line of thermostats, Nefkens relayed that Resideo was gaining market in the low-margin connected market and only maintaining market share

in the high-margin non-connected market, causing substantial product mix and hampering EBITDA. (*Id.* at 2-3; ¶¶267, 273.) And though P&S had seen "tangible improvement in supply chain execution," Nefkens stated that Resideo was still "work[ing] through spin-related headwinds from the past two quarters." (¶279.) The corresponding investor presentation included a "walk" from Resideo's actual 2018 adjusted EBITDA results ($476M) to the top-end of Resideo's updated estimate ($430M), highlighting, in part, an estimated $30 million decline in EBITDA due to "Product Mix," which was attributed to "[g]rowing new security platform and connected thermostats faster than expected" and "[p]ost spin inventory cleanup." (Ex. X at 7.)

Nefkens underscored that the GRIP rollout to ADT "has lower price points" than the prior ADT product and that Resideo had "not come up the scale from a manufacturing perspective," further compressing margins. (Ex. W at 7-8; ¶¶257, 260.) Nefkens also conveyed Resideo's anticipated timelines (consistent with prior public comments[6]) for the rollout of GRIP and STORM—Resideo's "super connected" thermostat. (Ex. W at 2, 6, 9.) Nefkens stated Resideo did not expect GRIP shipments to ADT "to be at full capacity across our customer base [until] the first half of 2020." (*Id.* at 2; ¶¶238, 347.) Nefkens continued, stating that GRIP "roll [] out to the rest of our customers" would require the company to "integrate, not only the hardware, but the hardware with our software," which was not expected until "the end of the year, beginning of next year." (¶261.) As to Project

---

[6] Ex. Q (March 7, 2019 Form 8-K) at 2, 5; ¶235; Ex. R (March 7, 2019 Resideo Earnings Call) at 8-9.

STORM, Nefkens cautioned that it was still "in the works right now and we expect to be shipping those next year at the first half of 2020."  (¶268.)[7]

Following the announcement, Resideo's stock opened at $23.02.  (Ex. P at 6.)  This marked a cumulative $4.98 decline (~18%) in share price from the stock's initial opening price.  (¶1.)

**G.      Resideo Announces Second Quarter 2019 Results, Reaffirms 2019 Guidance**

On August 7, 2019, Resideo released its earnings results for Q2 2019.  (¶¶31, 294.) Similarly to Q1, the Company saw an increase in sales of 4% as compared to the same quarter the prior year, but a 32% decline in adjusted EBITDA, driven by a 36% decline in P&S adjusted EBITDA due to "unfavorable product mix, production cost increases, and the impact of acquisition expenses."  (Ex. AA at 2-3; ¶¶31, 294.)  Citing to a continued expectation of "seasonality," Resideo reaffirmed its 2019 guidance of 2% to 5% organic revenue growth and $410M to $430M adjusted EBITDA.  (Ex. AA at 3; ¶295.)  Again, Resideo included detailed cautionary language concerning its forward-looking statements, including reference to the "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" contained in the Company's Form 10-K for 2018.  (Ex. AA at 12.)

---

[7] In a June 6, 2019 presentation at the Baird Global Consumer, Technology Services Conference, Ragan reiterated the "cost issues that [Resideo] got post-spin" and Resideo's "[m]argin compression due to mix headwinds."  (Ex. Y at 6; Ex. Z at 9, 12.)  The second slide of Ragan's presentation included detailed cautionary language on forward-looking statements mirroring language from previous Resideo presentations, discussed *supra*, and referring investors to Resideo's "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" in its recently filed Form 10-K for 2018.  (*Id*. at 1.)

On the earnings call, Resideo management discussed multiple factors that were negatively impacting EBITDA. As mentioned in the previous two earnings releases, Nefkens stated that "both comfort and security [were] seeing margin pressures due to product mix headwinds specifically the ramp up of our new security platform [GRIP] and lower margins on connected thermostats." (Ex. BB at 2; Ex. CC (corresponding Investor and Analyst Presentation) at 3-4.) Ragan similarly emphasized that Resideo "expect[ed] margin pressure to continue" throughout the year, but that anticipated increased sales allowed for them to "maintain our EBITDA outlook." (Ex. BB at 3.) The presentation also highlighted "post spin inventory cleanup" as another contributor to product mix. (Ex. CC at 7.) Nefkens remarked on Resideo's previously disclosed issues with "supply chain headwinds pre and post spin," and stated that Resideo had installed new supply chain leadership and made process changes to address these issues. (Ex. BB at 2.) Echoing statements made at the June Baird Global Consumer conference, Nefkens additionally explained that a "slowdown in the RTS OEM channel"[8] of water heater purchases forced the Company to "adjust[] the market growth of the RTS segment down." (*Id*. at 2-3.)

Resideo's common stock fell from $17.50 per share at open on August 8, 2019, to $14.01 per share at close on August 15, 2019, a $13.99 decline (~50%) in Resideo's opening share price. (¶¶31-32; Ex. P at 9.)

---

[8] RTS' OEM channel refers to Resideo's network of distributors – specifically, the original equipment manufacturers – within its Products & Solutions division. (*See* Ex. GG (August 7, 2019 Form 10-Q) at 30.)

**H.    Resideo Announces Preliminary Third Quarter 2019 Results, Revises 2019 Guidance**

In the lead-up to the Company's third-quarter earnings announcement, Resideo began to see that results were coming in below expectations. (¶¶36, 176, 308.) This prompted an operational review, the hiring of third-party consultants, and ultimately the decision to pre-announce Q3 results and revise its 2019 guidance downward. (Ex. C (Form 8-K, Ex. 99.1) at 1-2.) The day before the guidance revision, Resideo's stock closed at $15.13, down nearly 46% from the initial opening price on October 29, 2018. (Ex. P at 11.) On October 22, 2019, Resideo revised its revenue growth guidance from 2% to 5% down to a range of 2% to 4%, and reduced its full-year adjusted EBITDA from $410M to $430M, down to a range of $330M to $350M. (¶¶35-36, 312.) As it had in every prior instance of releasing earnings guidance and results, Resideo included detailed cautionary language pertaining to its forward-looking statements and pointed investors to its "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" in its SEC filings. (Ex. C (Ex. 99.1) at 3.)

At the same time, Resideo announced it would be conducting a comprehensive financial and operational review of its business "focused on improving gross margins and optimizing its organizational footprint." (¶¶173, 305.) On the same day, Resideo announced that Bob Ryder would replace Ragan as the Interim CFO of the company. (Ex. C (Item 5.02) at 2; ¶¶174, 306.) Following these announcements, Resideo's common stock declined $5.73 per share, closing at $9.50 per share on October 23, an $18.50 decline (~66%) in Resideo's opening share price. (¶178.)

### I.    Resideo Announces Third Quarter 2019 Results and Expands On Issues Prompting Guidance Revision

On November 6, 2019, Resideo announced its Q3 2019 financial results, which were largely in line with the preliminary results, with sales increasing 2% as compared to the same quarter the prior year and a 32% decline in adjusted EBITDA to $79M, driven by a 38% decline in P&S adjusted EBITDA.  (Ex. EE (Form 8-K) at 1, 4; ¶179.)

On Resideo's earnings call—after the end of the class period—Nefkens highlighted certain drivers for the lower-than-expected adjusted EBITDA in 2019.  (Ex. FF at 2-3; ¶¶313-320.)   Nefkens elaborated on the RTS slowdown, which had been previously disclosed at the June 6 Baird Conference and during the Q2 earnings release in August.[9] (Ex. FF at 2; ¶¶38, 365.)  Nefkens identified additional factors that contributed to EBITDA decline in Resideo's P&S segment, including "gross margin compression" based on an increase in the price of raw materials and loss of value engineers to optimize such costs; the loss of some of Resideo's "sourcing leverage" in its supply chain;  "margin drop associated with the competitive renewal of a contract from a large OEM security customer [ADT];" difficulty competing in the smart thermostat market leading to lower-than-expected sales; and "post-spin inventory write-downs."  (¶¶37, 181-84, 315, 319-20.)

In the corresponding earnings call presentation, Resideo included a slide presenting the change in EBITDA guidance from its March 2019 guidance to the revised October guidance.  (Ex. GG at 6.)   This chart displayed that more than half of the decline in

---

[9] *See* Ex. Y at 7; Ex. BB at 2-3; Ex. CC at 4, 5.

EBITDA could be attributed to declining revenue, 66% of which was due to falling thermostat sales in Comfort. (*Id.*) Another 25% was due to inventory write-offs. (*Id.*)

### J.      Resideo's Post-Class Period Assessment Of Lowered EBITDA Guidance

On December 11, 2019, *after the class period had closed*, Resideo's newly appointed Interim CFO, Bob Ryder, gave a presentation to investors at the Imperial Capital 16th Annual Security Investor Conference. (¶¶324-25.) During the presentation, Ryder shared his initial thoughts from the ongoing operational review. Namely, he reiterated the challenges posed by the "lack of preexisting stand-alone business," made clear his opinion that the "Honeywell mandatory spin obligations really exacerbate the situation," and highlighted several other challenges, such as "a lot of management turnover," "a lot of [Transition Service Agreements with Honeywell]," issues with "new product introduction," and issues with Resideo having too many [stock keeping units ("SKUs")], and being "in too many places." (Ex. HH at 4-6, 8-9; ¶¶11, 96, 97, 187, 188, 226-7, 247, 325, 379.) Ryder also shared that Resideo was in the process of "revamping" its product launches, as he opined that some of Resideo's recently launched products were not performing well, prompting inventory write-offs. (Ex. HH at 8; ¶¶12, 188, 325, 379, 388.)[10] Ryder's retrospective on Resideo's business forms a significant part of Plaintiffs' claim that Defendants' engaged in securities fraud during the class period. As shown

---

[10] Some additional explanations for Resideo's difficulties in 2019 were provided during the Q4 2019 earnings call on February 27, 2020. In particular, one of Resideo's independent directors—Andy Teich—answered a question from an analyst about replenishing the Company's product development personnel: "There was an opportunity for talent improvement in product development areas of P&S, and some of that lack of that was manifested in our results in 2019." (¶¶190, 328, 383.)

below, it does nothing of the sort and, in fact, underscores why the pleading is little more than the type of fraud by hindsight case that the Eighth Circuit has repeatedly proscribed. *See Target*, 955 F.3d at 743.

## ARGUMENT

To state a claim for securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, a plaintiff must establish the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id*. at 742.

To survive a motion to dismiss, a Section 10(b) claim must meet the heightened pleading requirements of the PSLRA. 15 U.S.C. § 78u-4; *Id*. Its provisions "go[] beyond the ordinary pleading requirements described in Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure." *In re 2007 Novastar Fin. Inc. Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009). Specifically, "the PSLRA requires that both falsity and scienter be pleaded with particularity." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002). The PSLRA pleading standards "are unique to securities and were adopted in an attempt to curb abuses of securities fraud litigation." *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1070 (D. Minn. 2017) (quoting *Navarre Corp.*, 299 F.3d at 741). One of those abuses is "the practice of pleading fraud by hindsight." *Id*. (quoting *Navarre Corp.*, 299 F.3d at 742). The PSLRA thus serves "[a]s a check against abusive litigation by private parties." *Tellabs,* 551 U.S. at 313.

- 23 -

Ultimately, none of the dozens of statements that Plaintiffs challenge in the Complaint is actionable under the PSLRA because they fall into one of three categories: they (1) are forward-looking statements that were accompanied by meaningful cautionary language, thereby falling under the PSLRA Safe Harbor and protected by the "bespeaks caution" doctrine (*e.g.*, ¶¶20-22, 29, 197, 201, 207, 209, 211, 212, 216, 219, 220, 224, 232, 235, 236, 239, 254, 260, 261, 268, 278, 281, 294, 296, 300, 302, 310, 313); (2) are examples of puffery, optimism, and opinion that are likewise nonactionable under the PSLRA (*e.g.*, ¶¶20, 22, 31, 192, 193, 197, 206, 207, 210, 212, 216, 219, 229, 230, 234, 248, 250, 257, 261, 264, 285, 287); or (3) are otherwise immaterial in that they are not false or, in any event, do not significantly alter the "total mix" of information made available by Resideo both before and throughout the class period (*e.g.*, ¶¶192, 193, 194, 197, 201, 210, 222, 226, 243, 246, 248, 251, 253, 256, 257, 265, 267, 268, 273, 277, 279, 285, 287, 289-90, 298.)

## I. PLAINTIFFS' ALLEGATION OF "UNDISCLOSED COMPANYWIDE PROBLEMS" IS FATALLY DEFICIENT

Foundational to the Complaint is the contention that Resideo faced a series of "undisclosed companywide problems" that rendered its earnings guidance impossible to meet and all the other statements challenged during the class period materially false and misleading.  (¶¶6, 26.)  This overarching allegation of "undisclosed companywide problems," touched on by virtually all aspects of the Complaint, cannot withstand the scrutiny required by the PSLRA because:  (1) it reflects an attempt by Plaintiffs to plead falsity by citing explanations provided by the Company after the class period, an approach most recently rejected by the Eighth Circuit as "fraud by hindsight" in *Target*; (2) these

"undisclosed" problems were, in fact, disclosed, either contemporaneously as they emerged and/or as risk warnings; and (3) Plaintiffs attempt to plead that these problems existed and management was aware of them by relying on the allegations of unreliable "Confidential Witnesses."

### A.   Plaintiffs' Allegations Of Fraud By Hindsight Is Fatally Defective

Plaintiffs' allegations are based on the very theory of "fraud by hindsight" that the PSLRA was designed to prevent. *See Navarre*, 299 F.3d at 742.  Plaintiffs latch onto post-class period statements made by the CEO (Nefkens) and the newly appointed interim CFO (Ryder) intended to explain Resideo's reduced earnings guidance and attempt to bootstrap them into a Section 10(b) claim, without pleading any facts to show that the challenged statements were known or believed to be false ***when they were made***—or in other words, Plaintiffs allege nonactionable "fraud by hindsight."

Plaintiffs' Section 10(b) claim is predicated on the existence of "undisclosed companywide problems," which primarily include:  (1) problems caused by Resideo's formation from "unrelated businesses that lacked both operating history together and individual P&L statements from which management could reasonably estimate performance or earnings" (¶¶6, 26, 91-92, 95, 98); (2) Honeywell's retention of Resideo's "value engineers," which drove up costs and caused margin deterioration (¶¶6, 25, 30, 99-101, 172); (3) "[p]ervasive supply chain issues" (¶¶6, 25, 26, 99-116, 172, 188); (4) "the significant decline in sourcing leverage after the Spin-Off (¶¶6, 25, 26, 30, 117-119, 172); (5) issues with "aging" or failing technology affecting its thermostat and security products (¶¶6, 25, 26, 120, 156-61, 165, 170, 172); (6) "[c]hronic failures in . . . the Total Connect

Comfort application" (¶¶6, 25, 120-33, 163, 184); (7) "slow moving products" (¶¶26, 172, 184, 188); (8) "[f]ailure to deliver on obligations to large Original Equipment Manufacturer ('OEM') customers and related contractual penalties" (¶¶6, 25, 26, 134-41, 172); and (9) the "lack of technology or expertise to correct these problems or to deliver on new products being touted to investors" (¶¶6, 25, 26, 141-55, 157-58, 163, 169, 172.)

Throughout the Complaint, Plaintiffs then recycle this litany of "undisclosed companywide problems" and offer them, in whole or in part, as the putative explanations for *why* challenged statements were allegedly misleading.[11]  For instance, Plaintiffs allege that Resideo's press release on May 8, 2019, reiterating its full-year adjusted EBITDA guidance of $410M to $430M, was materially misleading because of, *inter alia*, "Resideo's product problems and delays, . . . sources of margin pressure, including a depleted value engineering team and loss of sourcing leverage, significant risks of lost earnings because of a contract provision providing for large penalties with a large customer, and the difficulties, inefficiencies and uncertainty resulting from the aggregation of disparate divisions that had never operated as separate businesses before."  (¶¶254-55.)  In other

---

[11]  *E.g.*, ¶¶21, 91-93, 95, 98, 187, 195, 200, 202-03, 205, 206, 217, 226-27, 247, 278, 280, 282-83, 292, 297, 301, 313 (Resideo's formation from unrelated businesses); 30, 99-101, 172, 195, 200, 221, 225, 233, 247, 255, 282-83, 301, 311, 313 (value engineers); 96-97, 101-16, 172, 188, 195, 199, 205, 208, 213, 221, 225, 231, 233, 246-47, 277, 280, 282-83, 292, 297, 299, 311 (supply chain issues); 30, 117-19, 172, 183, 195, 204, 221, 225, 233, 255, 282-83, 301, 313 (sourcing leveraging); 21, 120, 156-65, 170, 172, 195; 198, 199, 208, 214, 223, 234, 242, 249, 269, 271-72, 274-75, 278, 282-83, 287-88, 289-90, 297, 313 (aging or failing technology); 120-133, 163, 184, 195, 214, 223, 240-42, 270, 282-83, 313 (TCC App); 172, 184, 188, 198, 231, 255, 277, 313 (slow moving products); 134-42, 172, 223, 237, 238, 251, 258-59, 282-83, 286, 301, 303, 313 (OEM penalties and delays); 141-46, 147-50,151-55, 157-58, 163, 169, 172, 195, 199, 208, 215, 217, 223, 225, 231, 237, 242, 249, 251, 262, 282-83, 303, 313 (lack of technology or expertise).

instances, Plaintiffs attempt to explain why various statements were allegedly false or misleading simply by cross-referencing wide swaths of the Complaint with little to no explanation. For example: "This representation was materially false or misleading and omitted material facts for at least the same reasons stated in ¶¶91-170."[12]

But this list of "undisclosed companywide problems" was simply lifted from the after-the-fact explanations Nefkens, Ryder, and Teich provided at the end of the class period to explain why Resideo had reduced its 2019 earnings guidance.[13] (*E.g.*, ¶¶11-12, 37, 95-97, 181, 183-184, 187-188, 190, 249, 259, 315-316, 319-320, 325, 328, 368, 370, 372, 374-375, 377, 379, 381-383, 387-388, 415-416; *see also supra* at Statement of Facts H-I.) Put another way, Plaintiffs assume that what was true at the end of the class period must have been true all along (and known to be true all along), and therefore these "undisclosed companywide problems" contradicted virtually everything Resideo said about its business or prospects during the class period. But this is classic nonactionable

---

[12] ¶206; *see also* ¶¶195, 198, 199, 200, 208, 209, 213, 217, 221, 223, 231, 233, 234, 247, 280, 282, 283, 313.

[13] Three "undisclosed companywide problems" were not cited by Resideo in the post-class period as explanations for the reduced guidance, but none supports an inference of fraud. Nefkens, Ryder, and Teich never made any statements regarding the alleged "aging" or failing technology affecting thermostat and security products as contributing to the reduced guidance, nor was there any mention of the "[c]hronic failures" in the TCC App. (¶¶6, 25, 26.) And though Nefkens did point to the "competitive renewal of a contract from a large OEM security customer [*i.e.*, ADT]" and the "rebates associated with this contract" as a cause for the earnings reduction, he made no mention of supposed delays or contractual penalties, because in fact there were no ADT penalties levied. (¶¶37, 259, 372.) Irrespective, Plaintiffs fail to plead that company executives knew that these problems existed and would prevent Resideo from meeting its projections.

fraud by hindsight. The Eighth Circuit's decision in *In re Target,* where the court affirmed dismissal of the complaint, is instructive.

The Eighth Circuit dismissed a virtually identically-pled complaint in *Target* for similar reasons. The defendant in that case had sought to expand the retailer's presence in Canada and faced a series of complications with its supply chain and inventory. 955 F.3d at 741. Like Resideo is alleged to have done here, Target allegedly "understat[ed] the seriousness of [its problems], overstat[ed] [its] ability to correct them, and ma[de] unrealistic projections about [its] profitability." *Id.* Just as Plaintiffs here have done in their Complaint, the plaintiffs in *Target* alleged "fraud based on later statements describing the response to problems with Target Canada's supply chain and IT infrastructure as they became more apparent." *Id*. at 742. The Eighth Circuit concluded that these allegations amounted to impermissible "fraud by hindsight," as the plaintiffs failed to "plead facts showing a company's statements were false or misleading ***when made***." *Id*. at 743-744 (citations omitted). The Court further explained that "fatal to the investors' case" was the "more compelling inference. . . that Target executives did not understand the magnitude of the problems they faced." *Id*. at 743.

That holding in *Target* is supported by a mountain of Eighth Circuit law. *See, e.g., In re Hutchinson Tech., Inc., Secs. Litig.*, 536 F. 3d 952, 961 (8th Cir. 2008) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."); *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1029 (8th Cir. 2011) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim

of securities fraud."); *In re Patterson Cos.*, 479 F. Supp. 2d 1014, 1031 (D. Minn. 2007) ("Misguided corporate strategy, or internal strategies that d[id] not come to fruition, do not equate securities fraud."). Likewise, here, Plaintiffs allegations do not show that Defendants' statements were false *when made* and thus do not give rise to securities fraud. *Target*, 955 F. 3d. at 743.

## B.    The "Undisclosed" Problems Were All Disclosed.

Undermining Plaintiffs' allegations even further is the fact that the supposed "undisclosed companywide problems" *were, in fact, disclosed by Resideo either in real-time or as risks on numerous occasions both prior to and throughout the class period*. As detailed below, these disclosures took the form of numerous detailed warnings to investors on earnings calls during the class period, contemporaneous SEC filings, as well as 30-plus pages of specific, detailed risk disclosures and robust cautionary language concerning the Company's forward-looking statements included in Resideo's initial Form 10 publicly filed before the class period and in the later Form 10-K filed in March 2019.

To summarize where these "problems" were disclosed:

| Alleged "Undisclosed" Problem | Resideo's Disclosure of Risk[14] |
|---|---|
| Problems caused by Resideo's formation from "unrelated businesses that lacked both operating history together and individual P&L statements from which management could reasonably estimate performance for earnings." <br><br> (*See*, *e.g.*, ¶¶6, 26.) | Resideo disclosed that it lacked "operating history as an independent publically traded company," and the unreliability of "combined financial information" for indicating future results; and Honeywell disclosed the business lines being grouped to form Resideo. <br><br> • Ex. M (October 2, 2018, Form 10, Information Statement) at 25, (*supra* at 10-11.) <br><br> • Ex. A (March 18, 2019 Form 10-K) at 20-22, 27, (*supra* at 15 n.5.) <br><br> • Ex. E (October 10, 2017 Conference Call) at 3, 8 (*supra* at 7-8.) |
| Honeywell's retention of Resideo's "value engineers." <br><br> (*See*, *e.g.*, ¶¶6, 25.) | Resideo disclosed the risk of its "inability to recruit and retain qualified individuals." <br><br> • Ex. M at 2, 20, 25, 28, 31, 41, 57 (*supra* at 11.) <br><br> • Ex. A at 20, 22, 24, 27, 38 (*supra* at 15 n.5.) |

---

[14] When appropriate, Resideo not only disclosed the risk of potential problems but also disclosed that certain problems were materializing. (*See, e.g.,* Ex. N (Nov. 13, 2018 Form 8-K) at 2, Ex. O (Nov. 14, 2018 Resideo Earnings Call) at 4-6, Ex. BB (August 8, 2019 Q2 2019 Earnings Call) at 2 (disclosing Resideo had "supply chain headwinds pre and post spin" *supra* at 13); Ex. Q (Mar. 7, 2019, Form 8-K) at 4; Ex. W (May 9, 2019 Resideo Earnings Call) at 2; Ex. X (May 9, 2019 Earnings Conference Call Investor & Analyst Presentation) at 7; Ex. AA (Aug. 7, 2019 Form 8-K) at 2-3 (disclosing Resideo's "unfavorable product mix," signaling difficulties selling its new products, *supra* at 14); Ex. R (Mar. 7, 2019 Resideo Earnings Call) at 4, 8 (disclosing Resideo's "cost base came in higher than expected," *supra* at 14-15.)

| | |
|---|---|
| "Pervasive Supply Chain Issues."<br><br>(*See*, *e.g.*, ¶¶6, 25, 26.) | Resideo disclosed risks associated with "supply chain disruptions."<br><br>• Ex. M at 31, 35, 36 (*supra* at 10-11.)<br><br>• Ex. A at 27, 31-33 (*supra* at 15 n.5.) |
| "[T]he significant decline in sourcing leverage after the Spin-Off."<br><br>(*See*, *e.g.*, ¶¶6, 25, 26.) | Resideo disclosed that as a stand-alone company it may not have the same "purchasing power, . . . access to capital markets," and "may be unable to obtain goods and services" at the same price.<br><br>• Ex. M at 20, 25, 31 (*supra* at 10-11.)<br><br>• Ex. A at 22, 24, 25, 27, 31, 39 (*supra* at 15 n.5.) |
| Aging or failing technology affecting its thermostat and security products.<br><br>(*See*, *e.g.*, ¶¶6, 25, 26.) | Resideo disclosed its future results depended on its "ability to successfully develop new technologies and introduce new products."<br><br>• Ex. M at 26-28, 31 (*supra* at 10-11.)<br><br>• Ex. A at 20, 23, 24, 27 (*supra* at 15 n.5.) |
| "Chronic failures in . . . the Total Connect Comfort application."<br><br>(*See*, *e.g.*, ¶¶6, 25.) | Resideo disclosed that the success of its operation required "substantial investment in technology infrastructures systems," which it may not be able to fund.<br><br>• Ex. M at 20, 25, 28-29, 31, 57 (*supra* at 10-11.)<br><br>• Ex. A at 24, 25, 27-28 (*supra* at 15 n.5.) |

| | |
|---|---|
| "[S]low moving products."<br><br>(*See*, *e.g.*, ¶26.) | Resideo disclosed that its success depended upon its ability to "bring compelling new products to market quickly and cost effectively."<br><br>• Ex. M at 28 (*supra* at 10-11.)<br><br>• Ex. A at 20, 23, 24 (*supra* at 15 n.5.) |
| "Failure to deliver on obligations to large [OEM] customers and related contractual penalties."<br><br>(*See*, *e.g.*, ¶¶6, 25, 26.) | Resideo disclosed that its "inability to comply with customer specifications and manufacturing requirements or delays or other problems with existing or new products (including program launch difficulties) could result in financial penalties."<br><br>• Ex. M at 36 (*supra* at 10-11.)<br><br>• Ex. A at 20, 35 (*supra* at 15 n.5.) |
| The "lack of technology or expertise to correct these problems or to deliver on new products being touted to investors."<br><br>(*See*, *e.g.*, ¶¶6, 25, 26.) | Resideo disclosed that to be successful it would have to sufficiently "attract and retain qualified people to operate [its] systems," and to "expand and improve them."<br><br>• Ex. M at 28, 31, 41 (*supra* at 10-11.)<br><br>• Ex. A at 20, 24, 27, 28, 38 (*supra* at 15 n.5.) |

Ultimately then, Plaintiffs' allegations fail because they depend on hindsight statements addressing pre-disclosed risk factors that materialized in certain instances at the end of a tumultuous first year for Resideo as it struggled post-Spin. These warnings not only refute that there were alleged "undisclosed companywide problems" at Resideo, but

also, as discussed *infra* at Section II.A, render Resideo's forward-looking statements nonactionable under the PSLRA Safe Harbor and bespeaks caution doctrine.

### C. Plaintiffs' Allegations Attributed To Confidential Witnesses Are Unreliable And Therefore Should Be Disregarded

Plaintiffs attempt to bolster the allegation of purported concealed problems by relying on 15 Confidential Witnesses and then speculate that "Defendants had ***actual knowledge*** of [] systemic, undisclosed problems at Resideo." (¶¶7, 57–72.) While the CWs have nothing to say on the Company's 2019 EBITDA projections (and thus their allegations are largely beside the point), "[u]nlike other factual allegations in a complaint," it is well-established in the Eighth Circuit that for purposes of ruling on a motion to dismiss, "courts are not required to wholly accept as true statements from a confidential witness." *Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1055 (D. Minn. 2018) (citing *Minneapolis Firefighters*, 641 F.3d at 1030).

At the outset, courts recognize that allegations made by sources who choose to remain unnamed may be exaggerated or entirely false, and therefore should be heavily discounted. *See Minneapolis Firefighters,* 641 F.3d at 1030 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.")). "Recognizing that confidential witnesses could have a variety of reasons for speaking to plaintiff's counsel, courts routinely evaluate and disregard the statements on a motion to dismiss." *Shoemaker v. Cardiovascular Sys. Inc.*, 2017 WL 1180444, at \*8 (D. Minn. Mar. 29, 2017) (citing *Minneapolis Firefighters*, 641 F.3d at 1030).

When a plaintiff relies upon unnamed sources, "a court must conduct an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 881-83 (D. Minn. 2007), aff'd, 527 F.3d 749 (8th Cir. 2008) (disregarding confidential witness allegations that did not meet this test) (quotation omitted).  The 15 CWs lack the requisite indicia of reliability and therefore should be disregarded.

> i. *The Allegations Attributed to CW3, a Former Low-Level Employee, Lack a Sufficient Basis Of Knowledge and Reflect Other Indicia of Unreliability*

Plaintiffs center on the allegations of an unnamed witness referred to as "CW3," who Plaintiffs concede was a low-level employee at Resideo until he[15] was fired by the Company in March 2019.  (¶60.)  The primary allegation attributed to CW3 is his claim that a Vice President at Resideo, Scott Harkins, told him and others during a crowded breakout meeting in January 2019, that "to ensure [] negative product news, including all negative information about STORM and TCC, was not leaked outside Resideo, that all communications would be on WhatsApp.com." (¶166.)  Plaintiffs claim CW3 heard that Harkins stated that this request "came from the 'leadership team.'" (¶333.)

CW3 is an unreliable source as Plaintiffs concede he was a junior employee who was fired in March 2019, with no apparent basis for the company-wide earnings knowledge

---

[15] Because the identities of the CWs are unknown, they are referred to using male pronouns for ease of the reader.

that is the subject of Plaintiffs' securities fraud claim. (¶60.) Even while at the Company, he was apparently at least two reporting levels below the senior executives. (¶333 (having been allegedly instructed by a mid-level vice president who supposedly reported to a higher up "leadership team.").) In fact, Plaintiffs nowhere plead that CW3 ever had direct contact with any of the Individual Defendants, despite him opining, for instance, that Project STORM was the CEO's "fake project." *See, e.g., Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014) (holding that CWs were not in a position to reliably plead facts about misleading backlog reporting where CWs were three reporting levels below Defendants and only alleged anecdotal information regarding customer complaints).

CW3 is made even more unreliable by the fact that he was fired early in the class period, (¶60), making it all too likely that he has an "axe to grind" with Resideo. *Minneapolis Firefighters,* 641 F.3d at 1030 (quoting *Higginbotham*, 495 F.3d at 757). CW3's early termination also means that he lacks context and information about what happened at Resideo in the months between March and October 2019, when the majority of the challenged statements were made and when products CW3 criticizes were further developed. *See, e.g., Pound*, 8 F. Supp. 3d at 1166 (dismissing CW statements as unreliable where CWs were not employed by defendant company during the class period). Several of CW3's allegations claim knowledge of events that occurred *after* his termination. For example, CW3 conjectures that "Resideo was [] not in a place to ramp up production of GRIP in any way" in May 2019, despite being fired in March 2019 and therefore absent from the company as it continued to develop and finalize the product. (¶140.)

- 35 -

Plaintiffs fail to plead sufficient basis of CW3's knowledge for many other of his allegations. For example, Plaintiffs plead no basis for knowledge to support CW3's allegation that "the delayed rollout of GRIP hurt Resideo's relationship with ADT" or that "the delay…cost Resideo millions of dollars in revenue." (¶141.) The Complaint is bereft of any specific facts to support such vague and conclusory statements. Plaintiffs' pleading that CW3 was "aware of and had seen the ADT contract" does nothing to establish that CW3 had any knowledge of Resideo's relationship with ADT after the contract was executed, Resideo's ADT-related revenue, or whether Resideo suffered any contract penalties after the fact (and after CW3 was fired) as he incorrectly opines. (*See* ¶141.) Courts routinely dismiss as unreliable statements by confidential witnesses where, as here, plaintiffs fail to "allege in detail how the confidential witness came to possess the information." *Shoemaker*, 2017 WL 1180444, at *9; *see also Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009) ("The allegation is not strong and compelling. . . because it does not provide the sources' basis of knowledge.").

> ii. *CW3's "WhatsApp" allegation relies on triple hearsay and, even if taken as true, has nothing to do with Plaintiffs' allegations of fraudulent projections*

CW3's "WhatsApp" allegation is unreliable in and of itself because it is uncorroborated by any of the other supposed attendees or anything else in the Complaint and also because it relies on three levels of hearsay: an undefined member of the "leadership team" (supposedly) relayed a directive to use WhatsApp to Harkins who relayed it to CW3 who, in turn, relayed it to Plaintiffs.

Unsurprisingly, courts routinely find that CW statements relying on hearsay are unreliable. *See, e.g.*, *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at \*18 (N.D. Cal. Feb. 12, 2015) ("Where, as here, a confidential witness relies on hearsay, courts accord the account of that witness little weight."); *Carter v. Furniture Brands Int'l, Inc.*, 2015 WL 357076, at \*7 (E.D. Mo. Jan. 27, 2015) (same). Moreover, CW3's assertion that the "leadership team" Harkins supposedly referenced "could only refer to Nefkens and Ragan, as well as Defendants de Masi, Vice President Flink, and possibly the Board of Directors" is nothing more than bare conjecture in a company with over 13,000 employees. (¶333); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 306 (S.D.N.Y. 2019) ("[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA].") (citations omitted).

Furthermore, Plaintiffs allege that this WhatsApp directive was issued at the "annual meeting" in Orlando, Florida in or around January 2019. (¶330.) But there was no "annual meeting" at that location in 2019.[16] Whatever meeting CW3 supposedly described is characterized so imprecisely in the Complaint that Resideo, and this Court, cannot determine whether such a meeting ever took place and, if so, whether Harkins attended. This lack of specificity renders the allegation unreliable, if not inaccurate, and should thus be disregarded. *Cf. Horizon Asset Mgmt.*, 580 F.3d at 764 (the credibility of all statements by a CW is weakened when the CW makes inaccurate allegations in the complaint).

---

[16] Resideo's "annual meeting" of shareholders occurred on June 12, 2019, and took place virtually, not in Orlando, Florida. (*See* Ex. II, Notice of 2019 Annual Meeting of Shareholders and Proxy Statement.)

What's more, even if the WhatsApp allegation were credible, Plaintiffs' attempt to use it to buttress allegations of securities fraud is unavailing.  (*E.g.*, ¶¶9, 330-34.)  For instance, CW3 does not link the use of WhatsApp to any putative concerns at Resideo about its ability to meet 2019 earnings guidance.  A much more plausible explanation of the supposed directive to use WhatsApp is that someone within the Company suggested using a single, secure platform instead of communicating across the wide variety of different platforms available at the time, such as Skype, text, iMessage, Slack, and email. (*Id.*)  There are legitimate reasons, *short of concealing securities fraud*, that a company would want to centralize communication in a single platform or mitigate the risk of inadvertent disclosure.  *See Tellabs,* 551 U.S. at 322-23 (holding that court must consider plausible opposing inference).  This is thus the prototypical confidential witness allegation requiring a "heavy discount."  *City of Livonia Emps' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013) ("The sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement or inducing more favorable settlement terms.").

### iii. The Allegations Attributed To The Remaining Confidential Witnesses Are Similarly Unreliable And Should Be Disregarded

The unreliable allegations made by the remaining CWs should also be discounted and disregarded because while these CW statements range in subject—from the supply chain to Project STORM—all of the statements suffer the same fatal flaws:  they are nothing more than (1) conclusory statements about management-level topics into which

low-level employees would have little to no insight and (2) confirmations of publicly disclosed information regarding Resideo's challenges in its first year post-Spin.

Every CW relied on in the Complaint, save CW9, was fired or left Resideo during the class period. (*See* ¶¶61, 63, 68, 70, 71 (CW11 and CW13 left in February 2019); (CW14 left in July 2019); (CW6 left in January 2019).) As such, many of these CWs may have "axes to grind," *Minneapolis Firefighters*, 641 F.3d at 1030, or may be "acting from spite rather than knowledge" and therefore are of questionable reliability. *City of Livonia Emps' Ret. Sys.*, 711 F.3d at 759. Even so, these witnesses were not present for, and thus would have no basis of knowledge of, events that took place during large portions of the class period.

Additionally, because of their localized job responsibilities, all 15 CWs lacked access to the requisite financial information, management personnel, and strategic discussions to be able to provide any reliable basis into Plaintiffs' allegations of securities fraud. In a company over 13,000 employees, not one of the CWs rose above the level of lower-tier management. (*See, e.g.*, ¶¶55 (CW1 worked as a  Distribution Representative), 71 (CW14 worked as an Insider Sales Representative), 66 (CW9 was a Channel Marketing Manager responsible for marketing home comfort and HVAC products).) Of the 15 CWs, only one (CW2) claims to have ever directly interacted with any of the Individual Defendants. (¶59.) Seven of CWs were employees from the ADI division of Resideo, which operates as a ***completely separate business unit*** than Resideo's P&S division, the division from which Resideo's disappointing results stemmed. (*See* ¶¶61, 62, 64, 68-71.)

- 39 -

Given the CWs' positions within the Company, their allegations necessarily rely on local observations that do not form a credible basis of knowledge for company-wide allegations. The localized basis for the CWs' allegations is plainly pled—*e.g.*, Plaintiffs plead that "CW12 . . . believes that Resideo's shipping costs had greatly increased based on CW12's observation of an increase in shipping in and out of CW12's location," (¶108), and that Resideo's customer base was unhappy given CW1's experience with particular customers in his role as a "local territory representative." (¶¶114, 58.) CW9, who worked in marketing, only claims to have attended a meeting early on in the class period where issues with Project STORM were raised, and from that claims to be able to draw the generalized opinion that the STORM rollout date was picked arbitrarily. But as the Eighth Circuit found in *Hutchinson*, allegations by several CWs pertaining to excessive customer returns of the company's product at a plant should be disregarded because "[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard." 536 F.3d at 959-60 (citing *AMDOCS,* 390 F.3d at 549-50 (Wollman, J., concurring) (a complaint that described problems on individual projects and a number of general impressions shared by lower-level employees was not enough to show that the defendant's representations about strong demand were false)).

Many of the CWs' "allegations" consist of only generalized opinions and bare speculation as to certain problems Resideo was facing, all of which track the Company's public disclosures. (*See supra* at I.B.) For example, CWs 1, 2, 5, 6, 7, 11, 12, 13, and 14 provide generalized allegations about Resideo supply chain issues caused by the Spin-Off, which Resideo disclosed on numerous occasions. (¶¶105-16.) Allegations attributed to

- 40 -

CWs 4 and 11 that Resideo's thermostats "were relatively dated" and not performing well are generalized and conclusory, and do nothing to satisfy Plaintiffs' requirements to plead that Resideo's challenged statements about its overall performance and earnings expectations were materially false when made. (¶¶168-70.) Likewise, the allegations of CW8 that "senior executives likely knew" GRIP would ship late and the allegations of CW15 who "strongly believes" senior leadership was made aware of TCC App issues amount to mere speculation. (¶¶143-46, 129.) CW7's statement that the Security division had "problems with availability" before and after the Spin because "[y]ou can't switch manufacturing processes that quick" are the type of statements by confidential witnesses that courts routinely ignore as vague, conclusory, and mere opinion. (¶¶105, 106.) *See, e.g., NVE Corp.*, 551 F. Supp. 2d at 882 (dismissing as "too vague to take into account" CW statements that defendant CEO was a "spin doctor" or that "people had taken issue" with his statements about the company).

## II.    NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE PLED WITH PARTICULARITY

Under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). A well-pleaded complaint must allege that the statements in question were ***misleading at the time they were uttered*** and that contemporaneous "information that had actually been provided to defendants" demonstrated the falsity of the challenged statements. *See Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008). Even if the Court credits that during the class period Resideo was suffering from "undisclosed companywide

problems," which, as discussed *supra*, it should not, Plaintiffs' allegations fail because they do not sufficiently plead any materially false or misleading statements with the particularity required by the PSLRA.

### A. Resideo's Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language And Therefore Fall Within The PSLRA's Safe Harbor And Bespeaks Caution Doctrine

Much of the Complaint centers on Resideo's "statements of financial guidance and projections of future performance," which are considered "quintessential forward-looking statements." *See Pound*, 8 F. Supp. at 1165 (quoting *W. Washington Laborers-Emp'rs Pension Tr. v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1093 (E.D. Mo. 2010)). Under the PSLRA's Safe Harbor, these statements, accompanied by meaningful cautionary language, are not actionable.

Congress expressly limited the liability for forward-looking statements by creating a Safe Harbor provision in the PSLRA for forward-looking statements. *See* 15 U.S.C. § 78u-5. The PSLRA Safe Harbor "protects defendants from liability when: (1) they have made forward-looking statements accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the statement is made without actual knowledge that it was false or misleading." *Julianello v. K-V Pharm Co.*, 791 F.3d 915, 920-21 (8th Cir. 2015) (citing U.S.C. § 78u-5(c)(1)). Common forward-looking statements include: "'projections of revenues, income (including income loss), earnings (including earnings loss) per share,' 'a statement of the plans and objectives of management for future operations,' 'a statement of future economic performance,' and 'any statement of the assumptions underlying or relating to' any of the statements described above." *IBEW*

*Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, n.4 (D. Minn. 2013) (quoting 15 U.S.C. § 78u-5(i)).

Forward-looking statements accompanied by meaningful cautionary language are also protected by the common-law "bespeaks caution" doctrine, which was one of the bases of the Safe Harbor. *See W. Washington Laborers-Emp'rs Pension Tr. v. Panera Bread Co.*, 2009 WL 3756619, at *3 (E.D. Mo. Nov. 6, 2009) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir.1997)). Similar to the Safe Harbor, the bespeaks caution doctrine provides that when "forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors." *NVE*, 551 F. Supp. at 890 (quoting *Parnes*, 122 F.3d at 548). Sufficient cautionary language "renders the alleged omissions or misrepresentations immaterial as a matter of law" independent of the Safe Harbor. *Id.*

To be meaningful, "[c]autionary language must be extensive, specific, and directly related to the alleged misrepresentation." *Julianello*, 791 F.3d at 921 (quotation omitted). Moreover, the language should include "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances," rather than "merely a boilerplate litany of generally applicable risk factors." *Id.* (quotation omitted). "Cautionary language which relate[d] directly to that which the Plaintiffs claim to have been mis[leading], if sufficient, renders the alleged misrepresentation or omissions immaterial as a matter of law." *Rand-Heart of N.Y. v. Dolan*, 812 F.3d 1172, 1177 (8th Cir. 2016). But, "the language need not explicitly refer to the risk that ultimately causes

- 43 -

the projection to differ from the actual results, so long as the language actually used warned of risks of a significance similar to that actually realized." *Yellen v. Hake*, 437 F. Supp. 2d. 961, 964 (S.D. Iowa 2006) (citation and quotation omitted).

> i.   *Resideo's Forward-Looking Statements Are Protected By The Safe Harbor and Bespeaks Caution Doctrine*

The challenged statements pertaining to Resideo's projected future revenues, earnings, income, and growth are all clearly forward-looking. Such statements include Resideo's challenged statements made during the Q3 2018 earnings call on November 14, 2018 (¶¶216, 220, 224 (*e.g.*, "[W]e expect the powerful combination of scale, steady growth and market position will give us margin expansion and significant equity valuation uplift going forward.")), the March 7, 2019 Form 8-K, at 3 (*supra* at 14 (projecting full-year 2019 guidance for the first time at a range of $410M to $430M)), the Q4 2018 earnings call on March 7, 2019 (¶232 ("[w]ith respect to EBITDA margins, we're expecting approximately 11% excluding the Honeywell reimbursement agreement payment, and 8% including.")), the May 8, 2019 Form 8-K, (*supra* at 15-16 (reaffirming the previously announced 2019 guidance)), the Q1 2019 earnings call on May 9, 2019 (¶¶254, 256, 278, 281 (*e.g.*, "[w]e've reiterated our guidance for growth in a range of 2% to 5% as we gather more visibility into 2019.")), and the Q2 2019 earnings call on August 8, 2019 (¶¶294-296, 300 (*e.g.*, "I would expect continued SG&A improvement as we take costs out of that structure, and you should see some improvement on the gross margin line as well.").) These "statement[s] of future economic performance" are

prototypical examples of forward-looking statements protected under the PSLRA.  *See Best Buy*, 958 F. Supp. 2d at 1073, n.4.

Similarly protected predictions were also made at the June 6, 2019 Baird Conference (¶¶285, 291 ("As we go through the year, we'll get margin expansion as we get additional volume and scale there")), and in Resideo's October 22, 2019 Press Release (¶¶310, 313 ("[T]he press release boasted that the financial and operational review would 'build upon the previously announced cost optimization program, which is on track to achieve approximately $15 million in realized savings in 2019 and $50 million in [] 2020.'").)

Other challenged statements are forward looking as they are "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services."  *See* 15 U.S.C. § 78u-5(i)(1)(B).  Resideo made numerous statements regarding its plans and objectives to launch new products, including the rollout of the GRIP platform.  These statements include those in the Q4 earnings call on March 7, 2019 (¶¶235-236, 239 ("Resideo will roll out next generation platforms in both its security [GRIP] and comfort division [STORM].")),[17] the Q1 earnings call on May

---

[17]  Plaintiffs erroneously argue that Resideo made contradictory statements regarding the rollout of GRIP, first by saying that "the rollout of [GRIP] started in December," (¶236), and later stating that "[v]olume shipments began for our largest customer in February," (¶238.)  These statements do not contradict each other:  the first referred to a general rollout of the product, while the second was specific to volume shipments to Resideo's largest customer.  Even accepting Plaintiffs' characterization as correct (which it is not), no facts are pled to support that this distinction was material to investors.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (defining materiality as requiring "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having ***significantly altered the 'total mix' of information made available***").

9, 2019 (Ex. W; ¶¶260-261, 268 (*e.g.*, "as we roll this out to the rest of our customers, being able to integrate not only the hardware but the hardware with our software, is going to be key for us.")), the Q2 earnings call on August 8, 2019 (Ex. BB; ¶302 ("[W]e will be rolling out our new Pro series platform to the general market in Q4.")), and the October 22, 2019 Press Release (Ex. C; ¶310 (*e.g.*, "these products have yet to benefit from lifecycle value engineering, adversely impacting full-year 2019 Products & Solutions gross margins.").)   Like the statements at issue in *Julianello*, these statements are forward looking because they detail the "future launch" of new products "and the anticipated results."   791 F.3d at 921.   Moreover, "the veracity of the statements could only be determined after they were made." *Id.*

To the extent that any of these statements were written in the present tense, that does not impact the analysis.   (*See, e.g.*, ¶¶20, 31, 206, 230, 248.)   The veracity of these statements was only discernible after they were made, which is the "determinative factor" to identify a forward-looking statement. *Julianello*, 791 F.3d at 921 (quoting *Panera Bread Co.*, 697 F. Supp. 2d at 1093).   Moreover, when these statements are read in context, any mention of the present condition "cannot meaningfully be distinguished from the future projection of which they are apart." *Institutional Invs. Grp. v. Avaya, Inc.*, 565 F.3d 242, 256 (3d Cir. 2009) (concluding that defendants' statements that it was "on track" and that certain circumstances "position [them]" to meet goals was protected by the safe harbor provision).   For example, in a March 7, 2019 Press Release, Resideo commented that "[t]he disruption from the spin is mostly behind us."   (¶29.)   Although this statement is in the

- 46 -

present tense, it is in substance a prediction that future spin disruptions would not be significant.

### ii. *Resideo's Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language*

Accompanying every challenged forward-looking statements was detailed cautionary language informing investors that forward-looking statements "involve known and unknown risks, uncertainties, and other factors, which may cause the actual results of performance of the company to be materially different from any future results or performance expressed or implied by such forward-looking statements," and more specifically, pointing investors to the robust, detailed disclosures of "Risk Factors" and "Cautionary Language Concerning Forward-Looking Statements" in Resideo's public SEC filings.[18]  (*See, e.g.*, Ex. M at 25-56, 57-58 (*supra* at 10); Ex. N at 17 (*supra* at 12); Ex. Q at 20 (*supra* at 13); Ex. R at 1 (*supra* at 14); Ex. S at 1 (*supra* at 14); Ex. A at 20-49, 53-54 (*supra* at 6); Ex. V at 12 (*supra* at 15); Ex. W at 1 (*supra* at 15); Ex. AA at 12 (*supra* at 18); Ex. C (Ex. 99.1) at 3 (*supra* at 7).)

As discussed in Section II(b), *supra*, these risk factors highlighted the risks that materialized and thus, "warned [investors] of precisely the risk about which they now complain." *Julianello*, 791 F.3d at 922.  Plaintiffs' allegations that the 30-plus pages of Risk Factors were "entirely generic, could apply to any corporate spin-off, and disclosed none of the material product, supply chain and governance issues that had already occurred,

---

[18] As the Eighth Circuit explained in *Julianello*, "cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements."  791 F.3d at 921 (quotation omitted).

including Honeywell's decision to throw together business units with no prior relationship to form Resideo," are, as demonstrated *supra,* patently false.

"The presence of these cautions, referring in general terms to the specific risks that ultimately materialized," distinguishes Resideo's risk factors from mere boilerplate language. *Panera Bread Co.*, 697 F. Supp. 2d at 1092. "Requiring more would, in effect transform the cautionary statement requirement into a requirement that every forward-looking statement be accompanied by a lengthy, detailed analysis of all the company's plans or strategies and every potential risk associated with them—something that courts have been clear the safe harbor does not require." *Id.* (citing *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004)).

For example, in *Rochester Laborers Pension Fund v. Monsanto Co.*, the court granted defendants' motion to dismiss, in part, because "[a]lmost all of the statements being challenged . . . [were] forward-looking statements." 883 F. Supp. 2d 835, 853 (E.D. Mo. 2012). The court additionally found Monstanto's accompanying cautionary language, which pointed investors to its more comprehensive warnings in its Form 10-K, to be meaningful because it was "substantive and addresse[d] risks specific to Monsanto's business." *Id.* Because the challenged statements were identified as forward-looking and were accompanied by meaningful cautionary language, the court concluded they were "not actionable under the safe harbor provision of the Act." *Id.* at 854.

- 48 -

### B.    Resideo's Statements of Corporate Optimism and Opinion Are Not Actionable

Many of Resideo's remaining alleged misstatements are classic statements of optimism and opinion that are nonactionable under the federal securities laws.

#### i.    *Certain of the Challenged Statements Amount To Mere Puffery Not Actionable Under Rule 10b-5*

Plaintiffs challenge optimistic statements that are nonactionable under the federal securities laws.  Plaintiffs, for example, challenge optimistic rhetoric regarding Resideo's business operations and future prospects, such as statements that Resideo was "strongly positioned to provide products that enhance consumers' comfort, convenience and sense of security . . ." and had "an attractive financial profile," (¶197); was "Positioned to Drive Shareholder Value Well Into the Future," (¶207); had "great growth prospects," (¶20); and was a "clear leader"; (¶273; *see also* ¶¶20, 31, 192, 193, 194, 206, 212, 216, 248, 250, 257, 256.) Plaintiffs also take issue with characterizations of Resideo and Honeywell products as "iconic," (¶¶197, 248), "Best-in class," (¶210), "terrific," (¶234), "top-of-the-line," (¶268), "[e]xciting and extensive" and representative of "innovation," (¶212; *see also* ¶¶193, 194, 248, 251, 257.)

Such statements of "corporate optimism," often referred to as "puffery," are not material misrepresentations under Section 10(b) and Rule 10b-5 as a matter of law.  *See Stratasys*, 864 F.3d at 883.  Such statements are necessarily immaterial because "[n]o reasonable investor would rely on 'soft, puffing statements'—which encompass 'optimistic rhetoric' and 'promotional phrase[s] used to champion the company but [ ] devoid of any substantive information.'"  *Id.* at 882 (quoting *Parnes*, at 122 F.3d at 546-

- 49 -

47).  Puffery is not, therefore, actionable as a misleading statement under Rule 10b-5 because it is not "subject to verification by proof."  *Target,* 955 F.3d at 743 n.2.

In *Parnes*, for example, the Eighth Circuit held that statements projecting "significant growth" and other similar statements were immaterial "puffing" statements and affirmed the lower court's dismissal of those claims.  122 F.3d at 547.  Optimistic statements about the state of a company's business operations have similarly been dismissed as immaterial.  *See NVE Corp.*, 551 F. Supp. at 898 (statements that the company had made "remarkable progress" and was "leading the race" not actionable).

The Eighth Circuit has also deemed optimistic statements about a company's products to be nonactionable.  In *Hutchinson*, for example, the court found that the defendant CEO's statement, "[w]e believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months," was merely inactionable optimism.  536 F.3d at 960; *see also NVE Corp.*, 551 F. Supp. 2d at 903 (statements that products were "remarkable devices" and "revolutionary" not material).  The same reasoning follows here.  No reasonable investor would have relied on the generic, optimistic statements challenged by Plaintiffs.  Indeed, corporate officers are "expected to be confident about their stewardships and the prospects of the business that they manage."  *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).

> ii.    *Plaintiffs Fail To Allege Resideo's Statements Of Opinion Are Actionable Under* Omnicare

Even if any of the challenged statements discussed *supra* can be considered more than mere puffery, they are nonactionable opinions because Plaintiffs fail to plead facts

alleging that Resideo or its officers disbelieved their own statements or mischaracterized the bases for their opinions. An honestly held opinion is not an "untrue statement of material fact," even when it later proves incorrect. *Omnicare*, 575 U.S. at 186. Pure statements of opinion are actionable only where (1) the speaker does not sincerely believe her own statement at the time of utterance, or (2) the statement conveys underlying facts about how the opinion was formed, and "the real facts are otherwise." *See id.* at 184, 189.

To allege an opinion reflects a material omission, plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. "An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189. As the Supreme Court emphasized in *Omnicare*, pleading a material omission in an opinion "is no small task for an investor." *Id.*

Here, Plaintiffs challenge multiple statements that are clearly nonactionable opinions. A number of the relevant statements begin with "we believe" or otherwise demonstrably express the speaker's personal opinion. (*See, e.g.*, ¶¶197, 212.) For example, in a March 2019 earnings call, Nefkens opined that Resideo was "on schedule, and in some cases, ahead of schedule, when I compare to previous spins I've been [a] part of." (¶230.) This was clearly an opinion. Other statements expressing subjective belief, such as the challenged statement that Resideo's "performance as part of Honeywell over the past three years demonstrates a well-run business that is on-track to deliver continued

- 51 -

growth in 2018 and beyond," are also clearly opinions.  (¶216; *see also* ¶¶211, 220, 229, 230, 257.)  However, none of these opinions are actionable under federal securities laws because Plaintiffs do not plead sufficient facts to show that the speakers did not subjectively believe their opinions **when the statements were made**.  *See Omnicare*, 575 U.S. at 184.  Nor do Plaintiffs adequately plead that Resideo and its officers misled investors as to the factual bases for their opinions.  *Id.* at 188.  For example, Plaintiffs' claim that Nefkens' opinion that Resideo's "performance as part of Honeywell . . . demonstrates a well-run business," was materially false because he failed to explain that "the Products and Solutions division was comprised of disparate business units within separate Honeywell divisions that had never operated independently with a separate P&L or operational or governance structures."  However, as demonstrated in Section I.A-B., this claim, like Plaintiffs' challenges to other opinion statements, ignores that the explanation for why the opinion was misleading amounts to fraud-by-hindsight, and Resideo's public disclosures predating Nefkens' statement disclosed the very facts alleged to have been concealed.

> **C.    Plaintiffs Fail To Plead The Materiality Of The Remaining Challenged Statements In Light Of Comprehensive Risk Disclosures And Contemporaneous Circumstances**

Plaintiffs have failed to plead sufficient facts to show that the remainder of the challenged statements were material, especially when viewed in light of the robust risk disclosures made prior to and throughout the class period.  These allegations, while scattershot, pertain to specific business initiatives being undertaken during the class period or present-tense statements concerning Resideo's business and competitive positioning,

such as (1) vague and insignificant statements accompanied by detailed cautionary language (¶¶222, 223, 225, 243); (2) statements claimed to be materially false based solely on the false premise that certain facts had not been previously disclosed (¶¶22, 225, 246-7, 280, 299); (3) fraud-by-hindsight allegations based on *ex post* statements by Resideo officers (¶¶267, 275, 276, 289-90); and (4) statements based on unreliable, vague, and impermissibly conclusory opinions attributed to confidential witnesses (¶¶287-8, 309.)

"To present an actionable claim for securities fraud, the alleged misstatements must be material." *AMDOCS*, 390 F.3d at 547 (citation omitted). Alleged misrepresentations are immaterial as a matter of law when they (1) "are of such common knowledge that a reasonable investor can be presumed to understand them;" (2) "present or conceal such insignificant data that, in the total mix of information, it simply would not matter;" (3) "are so vague and of such obvious hyperbole that no reasonable investor would rely upon them;" or (4) "are accompanied by sufficient cautionary language." *Id*. at 548. The materiality requirement is satisfied only when "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having ***significantly altered the 'total mix' of information made available***." *Matrixx Initiatives*, 563 U.S. at 38 (citation and quotation omitted).

First, many of the challenged statements are so vague and insignificant, especially when read in light of "the total mix of information made available," that they do not qualify as material. (¶¶223, 243.) For example, in November 2018, Nefkens commented on Resideo's competitors, stating that "they don't have product solutions or connectivity that sits behind the wall, which is really the core of any smart home. That's what makes us

- 53 -

different." (¶222.)  Plaintiffs claim this is somehow materially false because at the time Resideo was experiencing issues and delays with some of its products.  (¶223.)  Yet, this comment, if not considered mere puffery or an inactionable opinion, made in the first month of Resideo's existence, which was accompanied by cautionary language pointing to Resideo's robust warnings about the "fragmented highly competitive" market it operated in (*supra* at 11), could not be said to have any substantial likelihood that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives*, 563 U.S. at 38.  The same goes for Nefkens' statement in March 2019 that Resideo had "heard very clearly from our customers that they are excited about Resideo, they love our products, but they want us to move faster," (¶243), which was so lacking in specificity that "in the total mix of information, it simply would not matter." *AMDOCS*, 390 F.3d at 548.

Second, Plaintiffs challenge numerous statements based on the false premise that certain facts had not been previously disclosed, when in fact they were the subject of numerous public disclosures prior to and throughout the class period.  (¶¶22, 218-9, 225, 246-7, 280, 299.)  For example, Plaintiffs claim that certain statements hid the fact that Honeywell had formed Resideo from an "agglomeration" of its various home consumer segments. (¶¶225-7 (claiming that Ragan's reference to Resideo's progress in reducing the number of factories it operates compared to "10 years ago" would somehow mislead investors into thinking Resideo had in fact existed separate from Honeywell), ¶247 (challenging certain statements in Resideo's March 2019 Form 8-K for failing to disclose that it was hampered by "a lack of pre-existing stand-alone business").)  Yet, Honeywell

- 54 -

made this clear ever since it announced the Spin, and Resideo reiterated it in numerous filings with the SEC (s*upra* at 8-9.) Likewise, Plaintiffs claim that Resideo improperly omitted warnings about its supply chain challenges (¶¶22, 218-9, 280, 299), when in fact it had on numerous occasions (*supra* at 11, 13.) Thus, none of these challenged statements can be said to have significantly altered the "total mix" of information.

Third, Plaintiffs' claim that certain statements were materially false based solely on ex post statements by Nefkens and Ryder. (¶¶267 (conclusory allegation that Resideo's statements regarding 10% connected thermostat growth were materially false or misleading); 275, 289-90 (complaining that Resideo's earlier statements about its leadership in the nontraditional thermostat market were materially false because it later realized the market was not as lucrative as it had expected), 277 (alleging that Resideo's earlier statements about its leadership in the RTS market were materially false because it later realized that it had stocked up on too much inventory in anticipation of a regulatory change, a risk it had previously disclosed), 279.) In other words, Plaintiffs allege "fraud by hindsight," which is the very type of allegation the PSLRA is intended to prevent. (*See supra* at Point I.A.)

Fourth, Plaintiffs challenge other statements based on unreliable, vague, and impermissibly conclusory opinions attributed to the CWs. (¶¶287-8, 309.) For example, Plaintiffs claim that Resideo's statement that it was "#2" in connected thermostats was materially false based on CW3's statement that he does not know how they got that number and "would like to see the source data." (¶287-8.) This speculative opinion does nothing to show that the statement in question was false when made. Similarly, Plaintiffs claim

- 55 -

Nefkens' description of the Company's comprehensive operational review being conducted after it lowered its 2019 earnings was materially false, solely based on CW3's vague and conclusory opinion that its review was a "smokescreen" and "misdirection" (even though the review had been initiated and was underway), that does nothing to establish the statement's material falsity. *See, e.g., In re Gander Mountain Co. Sec. Litig.*, 2006 WL 140670, at *10 (D. Minn. Jan. 17, 2006) (disregarding CW's statement that the CEO's "strategy for increasing comparable store sales by increasing inventory" was a "trick" was less of an allegation than an opinion).

## III.  NO STRONG INFERENCE OF SCIENTER IS PLED WITH PARTICULARITY

Plaintiffs fail to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," as required by the PSLRA.  15 U.S.C. § 78u-4(b)(2) (emphasis added); *Stratasys*, 864 F.3d at 883 ("a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind.") (quotation omitted).  "Scienter requires a showing of reckless or intentional wrongdoing," which can be established in three ways: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Podraza v. Whiting*, 790 F.3d 828, 836 (8th Cir. 2015) (quotation omitted).[19]  "To establish scienter through recklessness, Plaintiffs must demonstrate 'highly unreasonable omissions

---

[19] In respect of Resideo's forward-looking statements, per the PSLRA Safe Harbor, Plaintiffs must plead that each such statement was made with *actual knowledge* that it was false or misleading.  *See* U.S.C. § 78u-5(c)(1).

or misrepresentations involving an extreme departure from the standards of ordinary care, and . . . presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *In re Synovis Life Techs., Inc. Sec. Litig.*, 2005 WL 2063870, *14 (D. Minn. 2005) (quoting *In re K-Tel Int'l Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002)).

A "strong inference" is "an inference of scienter [that is] more than merely plausible or reasonable—it must be cogent and ***at least as compelling as any opposing inference of nonfraudulent intent***." *Tellabs*, 551 U.S. at 314 (emphasis added). Thus, *Tellabs* requires the Court's consideration of "plausible, nonculpable explanations for the defendant's conduct." *Id.* at 323-24. Conclusory assertions of knowledge do not meet this standard. *See Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 808 (8th Cir. 2010). Plaintiffs must "raise a strong inference of scienter for each defendant and with respect to each alleged misrepresentation," *Horizon Asset Mgmt.*, 580 F.3d at 761, but they have failed to do so here.

## A. Plaintiffs' Allegations Of Scienter Are Deficient As to Each Defendant

Lacking any allegations supporting that Resideo executives were aware of facts contradicting their public statements at the time they were made (e.g., internal projections contradicting Resideo's public EBITDA guidance), Plaintiffs offer a hodgepodge of different theories in the hopes of creating a "compelling" inference of scienter. (¶¶329-88.) Plaintiffs' scienter allegations are deficient and fatal to the Complaint.

First, Plaintiffs' headline allegation of scienter comes from CW3's unreliable "WhatsApp" allegation. (¶¶332-333.) As discussed above. this allegation should be

- 57 -

disregarded and, even if it is not disregarded outright, it is not sufficient to create a strong inference of scienter in view of plausible, nonculpable explanations. (*See supra* at 37-38.)

Second, Plaintiffs allege that Nefkens attended a "skip-level meeting" during the Spin-Off where, according to CW4, another junior employee stated "the thermostat product line had not been performing well sales-wise," and that there had been additional unspecified meetings where Nefkens would have been informed of ongoing supply chain problems, the extent of which, according to a low-level unnamed witness, "should have been visible upfront." (¶335.) But Plaintiffs do not allege that these purported statements, even if true, would have rendered Resideo's guidance and other projections impossible to achieve. *See NVE*, 551 F. Supp. 2d at 883 (finding allegations of problems in development of certain technology were insufficient to establish that ultimate development was impossible and therefore did not show that public statements regarding the technology were false or misleading). Additionally, the allegation that certain issues "should have been visible upfront" is too speculative and attenuated to create a strong inference of scienter. *Elam*, 544 F.3d at 930 (finding plaintiffs' assertion that "this information must have existed and must have been known" was speculation "plainly insufficient to support an inference of scienter").

Third, Plaintiffs allege that Nefkens and Ragan had direct access to "data and facts" because they were "hands-on managers" and that Nefkens was previously employed at Honeywell. (*See* ¶¶349, 336.) But that amounts to saying that scienter should be inferred because of Defendants' management-level positions. Under the PSLRA, however, a general allegation of "access to data" or "hands-on management style," without more, is

insufficient to plead a strong inference of scienter.  *See In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1034 (D. Minn. 2009), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010); *Patterson*, 479 F. Supp. 2d at 1032.  While it is unsurprising that executives would have access to "data and facts," tellingly, Plaintiffs fail to allege that Defendants knew of such data or facts that ***actually contradicted*** their public statements.

Fourth, Plaintiffs allege that Nefkens had knowledge of Project STORM delays because CW3 stated that Nefkens was present at a meeting in January or February 2019, where another individual (the Chief Technology Officer) was told that the STORM time frame could not be met.  (¶338.)  Plaintiffs also allege that certain managers that reported to Nefkens were made aware of delays and that Defendant de Masi was informed by employees in April 2019 that the original internal deadline of December 2019 for Project STORM "could not be met" and attended a meeting "possibly" in December 2018 or January 2019 where "it became apparent, by inference," that there were expected delays in STORM.  (¶¶337, 339, 341.)  At the outset, Plaintiffs fail to allege that any purported delays in Project STORM had anything to do with Resideo's reduced guidance in October 2019.  Hence, at most, these allegations implicate only the statements made about Project STORM.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (explaining that pleading scienter for one category of alleged misstatements does not support scienter for another).  Even so, the crux of this allegation rests on the hearsay opinions of three CWs, two of whom left before the end of the Class Period and before Resideo further developed and rolled out Project STORM—and thus should be

- 59 -

disregarded.  (*See supra* at Section I.C.)  Further, none of these allegations establish that the rollout date was impossible or that Nefkens *knew* it was impossible.  If anything, CW3's allegation that Nefkens insisted, "This is what I'm promising the market, so we need to make it happen," **negates** an inference of scienter, since it shows he intended to push the Company to meet its deadline.  And most significantly, Plaintiffs' reliance on CW statements alleging problems or delays in the development of Project STORM in the early stages prove only that Project STORM was experiencing problems in the development process, nothing more, and thus do not amount to a strong inference of scienter.  *See NVE Corp.*, 551 F. Supp. at 883.

Fifth, Plaintiffs allege that Nefkens *likely* knew his statements about the general market GRIP rollout were false because there were issues with GRIP production prior to June 2019.  (¶¶343-45.)  Again, as with the Project STORM allegations, the Project GRIP allegations can give rise to no compelling inference of scienter on statements about subjects **other than** Project GRIP and, even then, only amount to nonactionable, localized concerns expressed by unreliable low-level employees.  *See NVE Corp.*, 551 F. Supp. at 883.  CW8's allegation that "senior executives **likely knew** ahead of time if GRIP was not going to ship on time" does not show a strong inference of scienter as it is speculation based on three levels of hearsay.  (¶344 (emphasis added) ("the leaders of these daily meetings were Eric Oh and Legris, and that Legris, in turn, reported to CTO Edgar Tu" who in turn reported to Nefkens).)  Moreover, CW8's allegations provide no context regarding time.  Plaintiffs plead no facts as to when these alleged conversations took place or when Nefkens would have been made aware of them.

- 60 -

Sixth, Plaintiffs make a blanket assertion that the Defendants "necessarily had to be aware" of delays in GRIP for ADT. (¶¶346-48.) Like the allegations of the general market GRIP, these are far too speculative and bare of particular facts to support any inference of scienter. *Patterson*, 479 F. Supp. 2d at 1032. Plaintiffs plead no other facts to establish that Defendants had knowledge of delays. Plaintiffs attempt to show an inconsistency between statements made in the March 7, 2019 press release and May 9, 2019 earnings call to establish scienter, but no inconsistency exists. (¶347.) The earlier press release is about ***deliveries*** while the earnings call is about ***volume shipments***. (*Supra* at 45 n.17.)

Seventh, Plaintiffs allege that Nefkens and Ragan made statements after the class period that demonstrate their knowledge during the class period. (¶¶359-83.) This is the quintessential "fraud by hindsight" allegation that the PSLRA forbids. Indeed, that this is "fraud by hindsight" is openly admitted in the Complaint. (¶359 (describing explanations at end of class period and then alleging that these problems "could not possibly have escaped [Defendants'] attention" during class period).) As described above, that does not create a compelling inference of scienter. (*See supra* at Point I.A.)

Eighth, Plaintiffs allege that after the class period, the newly appointed interim CFO "quickly uncovered" the problems that led to Resideo's October guidance revision and assert that this shows that other officers must also have been aware of such problems when they made the challenged statements during the class period. (¶386-88.) This is just a variant of the same "fraud by hindsight" allegation discussed above and a particularly attenuated one at that: what Ryder "uncovered" after the class period says nothing about what Nefkens, Ragan, or de Masi knew during the class period.

Ninth, Plaintiffs allege that Nefkens' and Ragan's "sudden departure" supports a strong inference of scienter. (¶384-85.) Despite Plaintiffs' claims, the departure of an executive does not support an inference of scienter as "senior corporate officers often resign or are terminated" following the fall in a company's stock price or if their division of the corporation performs poorly. *Synovis,* 2005 WL 2063870, at *16.

Finally, as to de Masi, Plaintiffs do not even try to allege facts tying him to any of the alleged misstatements. Indeed, the Complaint's principal section about the Individual Defendants' purported knowledge does not even mention de Masi. (*See* ¶¶349-358.)

## B. Plaintiffs Do Not Allege A Plausible Motive Or Opportunity

The Eighth Circuit has underscored that motive or opportunity, while not per se required by the PSLRA, is "relevant," and "particularly important to establishing scienter is a showing of unusual or heightened motive to meet the [PSLRA] standard." *In re K-tel,* 300 F.3d at 894 (quotation omitted). "[W]ithout a showing of motive or opportunity 'other allegations tending to show scienter would have to be particularly strong in order to meet the [PSLRA] standard.'" *Id.*

Plaintiffs plead no relevant motive for Defendants' alleged fraud. The Complaint is devoid of any allegations of insider trading by Resideo executives—the quintessential motive to commit securities fraud. *See Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 656 (8th Cir. 2001). Plaintiffs' general allegations that the Company and its officers intended to cause Plaintiffs "to purchase Resideo common stock at artificially inflated prices," (¶441), are "insufficient as a matter of law." *K-tel Int'l,* 300 F.3d at 894 , *Green Tree,* 270 F.3d at 664 (finding a desire "universally held among

corporations and their executives . . . does not contribute significantly to an inference of scienter"). And that "motive" cannot withstand even passing scrutiny. Plaintiffs do not allege that Resideo *sold them* or other investors stock at inflated prices—that is to say, there is no allegation Resideo conducted a securities offering during the class period. Why Nefkens, Ragan, and others would have had a personal incentive to commit fraud to allow *other investors* to sell Plaintiffs stock at allegedly inflated prices is never explained and is therefore insufficient to create a strong inference of scienter.

### C. Plaintiffs' Fatally Deficient Complaint Also Fails To Account For Opposing Inferences Of Non-Fraudulent Intent As Required Under *Tellabs*

Even assuming *arguendo* that Plaintiffs' allegations could give rise to a plausible inference of scienter, the allegations must nonetheless be dismissed under *Tellabs*. The Supreme Court instructed in *Tellabs* that in "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Minneapolis Firefighters*, 641 F.3d at 1029 (citing *Tellabs*, 551 U.S. at 322-323). Here, the allegations of the Complaint, taken together, support a far more "compelling . . . opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Prior to the start of the class period, Honeywell, *not Resideo*, created a market expectation that Resideo would earn approximately $500M in adjusted EBITDA in 2019. (*See supra* at 1.) Both prior to and immediately following the Spin, the business units constituting Resideo performed well, negating any inference that there were undisclosed company-wide problems from inception. (*See supra* at 12-14.) Even so, when Resideo first announced its 2019 EBITDA guidance in March 2019, it did so at a range below the

expectation created by Honeywell.  (*See supra* at 14.)  This news was met by the market as a disappointment.  (*See supra* at 15.)  Then, throughout the class period, Resideo warned investors of potential risks and disclosed adverse events as they became visible, such as difficulties in the supply chain, concerning trends in the P&S portfolio mix, and poor performance by the RTS unit (*see supra* at 13-14, 19.)  This too undermines an inference of scienter.  *See Horizon Asset Mgmt.*, 580 F.3d at 764 (explaining that Defendant's "continued disclosures" weakened the inference of scienter).  Following that development, Resideo announced an operational review and changes to the management team and provided ex post explanations for the Company's troubles.  That all of this amounted to some fruitless "scheme" to pump the stock price is inconceivable, as Resideo's stock chart confirms.  (*See* Ex. P at 1 (*supra* at 13).)

This fact pattern is not unique.  In *Anderson v. Spirit Aerosystems Holdings, Inc.*, Spirit encountered problems with a series of new projects and periodically reported these problems while also expressing optimism for the success of the project and the company as a whole.  827 F.3d 1229, 1235-36 (10th Cir. 2016).  When Spirit eventually announced a substantial loss related to the projects, its stock price plummeted.  *Id*. at 1236.  While plaintiffs alleged that "executives intentionally misrepresented or recklessly ignored economic realities," the court held that it was "more probable that the Spirit executives were overly optimistic and failed to give adequate weight to financial red flags."  *Id*. at 1238.  As in *Anderson*, the much more plausible inference here is that Resideo struggled in its first year as an independent company following the Spin-Off.  And while management issued earnings guidance, made various forward-looking statements, and expressed

- 64 -

optimism and opinions regarding the ultimate success of the Company, even while warning investors and disclosing bad news, these problems ultimately proved more significant than management had appreciated, causing the Company to lower its earnings guidance in October 2019. While that prompted changes to the management team and an operational review at the Company, it does not equate to a fraud. Absent any indicia of fraud, the inference of nonfraudulent intent is much more compelling. *Tellabs*, 551 U.S. at 314.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT

Plaintiffs also assert violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) against individual Defendants Nefkens, Ragan, and de Masi. (¶¶450-455.) Crucially, "[a] claim under Section 20(a) for control person liability is derivative of a primary claim, and therefore the failure to satisfactorily plead a Section 10(b)/Rule 10b-5 claim also precludes a Section 20(a) claim." *Shoemaker, Inc.*, 300 F. Supp. 3d at 1055-56 (dismissing 20(a) claims as 10(b)(5) claims were dismissed). Here, Plaintiffs' Section 20(a) claim necessarily fails given Plaintiffs' failure to sufficiently plead the underlying Section 10(b)(5) claims with the level of particularity required by the PSLRA. *Supra* at 23.

## V.   CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

DATED: July 10, 2020

 */s/ Jerry W. Blackwell*
Jerry W. Blackwell (MN #186867)
G. Tony Atwal (MN #331636)

- 65 -

**BLACKWELL BURKE P.A.**
431 South Seventh Street
Suite 2500
Minneapolis, MN 55415
Telephone: (612) 343-3200
blackwell@blackwellburke.com
tatwal@blackwellburke.com

*Defendants' Liaison Counsel*

 */s/ Tariq Mundiya*
Tariq Mundiya (*pro hac vice*)
Charles D. Cording (*pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
tmundiya@willkie.com
ccording@willkie.com

*Counsel for Defendants Resideo Technologies, Inc., Michael Nefkens, Joseph Ragan III, and Niccolo de Masi*

- 66 -