## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE RESIDEO TECHNOLOGIES, INC. SECURITIES LITIGATION | Case No. 19-cv-02863 (WMW/KMM) <br><br> **CLASS ACTION** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 8

     A.     Honeywell Creates Resideo as a Dumping Ground for Its Failing
            Products and Massive Environmental Liabilities.......................................... 8

     B.     October 2018:  Defendants Make Untrue Statements About
            Resideo's Operating History as Part of Honeywell ................................... 11

     C.     November and December 2018: Defendants Make Untrue
            Statements about Resideo's Performance as Part of Honeywell ............... 12

     D.     November and December 2018: Defendants Make Untrue
            Statements about Resideo's Supply Chain.................................................. 12

     E.     March 2019: Earnings Fall Due to the Undisclosed Supply Chain
            Issues, While Defendants Make False Countervailing Statements
            About the Supply Chain, the T9 and T10 Connected Thermostats
            and the Launch of Project GRIP ................................................................ 14

     F.     May 2019 and June 2019: Defendants Make More Untrue
            Statements about Project STORM and GRIP (Commercial and
            Consumer Version)..................................................................................... 15

     G.     Resideo Instructs Employees to Use WhatsApp to Hide
            Communications About Known and Debilitating Problems from
            Later Discovery ......................................................................................... 16

     H.     August 7, 2019: Defendants Make Untrue Statements that Resideo's
            Supply Chain Issues Had Been Resolved .................................................. 17

     I.     October 2019 and November 2019: Resideo Begins to Reveal the
            Truth About Problems with Its Supply Chain and Products ...................... 17

LEGAL STANDARDS ................................................................................................. 19

ARGUMENT................................................................................................................. 20

I.     DEFENDANTS MADE ACTIONABLE UNTRUE STATEMENTS AND
       OMISSIONS OF MATERIAL FACT .................................................................. 20

     A.     Defendants' Untrue Statements and Omissions Regarding Resideo's
            History as Part of Honeywell Are Actionable............................................ 21

B.     Defendants' Untrue Statements and Omissions Regarding Resideo's Supply Chain Are Actionable ..................................................................24

      1.     Defendants Touted Resideo's Supply Chain while Concealing that Honeywell Retained its Critical Components ..........................24

      2.     Defendants Lied About Their Efforts to Repair the Supply Chain ..................................................................................................28

C.     Defendants' Untrue Statements and Omissions About Its New Product Launches (GRIP and Project STORM) Are Actionable ...............30

      1.     Commercial GRIP for ADT ................................................................31

      2.     Project STORM and the Consumer Version of GRIP .....................33

D.     Resideo's Earnings Guidance Lacked a Reasonable Basis Given the Myriad Undisclosed Problems ......................................................................36

II.     THE COMPLAINT ADEQUATELY ALLEGES SCIENTER .............................37

A.     The Complaint Demonstrates Intent to Deceive .........................................38

      1.     Defendants Instructed Employees Not to Use "Easily Discoverable" Email .........................................................................39

      2.     Defendants' Statements Were Not Even *Remotely* True ................40

      3.     The Departures of Nefkens, Ragan and de Masi were Suspicious........................................................................................41

B.     The Complaint Pleads Severe Recklessness ...............................................41

C.     The Complaint Alleges Motive and Opportunity........................................42

D.     Defendants' Attempt to Decontextualize the Allegations Fails..................44

III.     THE COMPLAINT EASILY SATISFIES THE EIGHTH CIRCUIT STANDARD FOR CONFIDENTIAL WITNESS ALLEGATIONS....................47

A.     CW3 Was Demonstrably Not a "Junior Employee" ..................................50

B.     CW9's Observations Were Specific and First-Hand ................................52

C.     CW4 and CW11 Knew Facts About Poor Sales ........................................54

D.     CW 15 Confirmed Problems with the TCC App .......................................54

E.    CW7 and CW8 Did Not Speculate.................................................55

IV.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION.................56

V.    THE COMPLAINT ADEQUATELY PLEADS CONTROL PERSON
       CLAIMS ................................................................................................57

CONCLUSION .................................................................................................58

# TABLE OF AUTHORITIES

**Cases**

*Angres v. Smallworldwide PLC*,
    94 F. Supp. 2d 1167 (D. Colo. 2000) ..................................................... 30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................... 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................... 19

*Campbell v. Transgenomic, Inc.*,
    916 F.3d 1121 (8th Cir. 2019) ............................................................... 20

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) .................................................. 29

*City of Warren Police & Fire Ret. Sys.v. World Wrestling Entm't Inc.*,
    No. 20-cv-2031 (JSR), 2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020) ................... 23

*Cummings v. Paramount Partners, LP*,
    715 F. Supp. 2d 880  (D. Minn. 2010) .................................................. 40

*Dura Pharm. V. Broudo*,
    544 U.S. 336 (2005) ............................................................................... 57

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .......................................................... passim

*Freedman v. Saint Jude Med., Inc.*,
    4 F. Supp. 3d 1101 (D. Minn. 2014) ....................................... 25, 38, 43

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) ........................................................... 32, 35

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) .................................................. 29

*Herbst v. Givaudan Flavors Corp.*,
    341 F. Supp. 3d 1006 (N.D. Iowa 2018) .............................................. 40

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ................................................................. 48

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
    958 F. Supp. 2d 1065 (D. Minn. 2013) ........................................................ 29, 37

*In re Avon Sec. Litig*,
    No. 19 Civ. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ............. 52

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................ 46

*In re CenturyLink Sales Practices & Sec. Litig.*,
    403 F. Supp. 3d 712 (D. Minn. 2019) ........................................................ passim

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................. 49

*In re First Merchants Acceptance Corp. Sec. Litig.*,
    No. 97 C 2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ............................... 42

*In re Grand Casinos, Inc. Sec. Litig.*,
    988 F. Supp. 1273 (D. Minn. 1997) ....................................................... 26, 27, 33

*In re K-V Pharm. Co. Sec. Litig.*,
    No. 4:11CV01816 AGF, 2014 WL 1272452 (E.D. Mo. Mar. 27, 2014). ............. 36

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV04–1255–AA, 2006 WL 538756 (D. Or. Jan. 3, 2006) ............................ 43

*In re McLeodUSA Inc., Sec. Litig.*,
    No. C02–001–MWB, 2004 WL 1070570 (N.D. Iowa Mar. 31, 2004) ................. 40

*In re Medtronic Inc., Sec. Litig.*,
    618 F. Supp. 2d 1016 (D. Minn. 2009),
    *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
    621 F.3d 800 (8th Cir. 2010) .............................................................................. 45

*In re Meta Fin. Grp., Inc.,*
    No. C 10–4108–MWB, 2011 WL 2893625 (N.D. Iowa July 18, 2011) ............... 50

*In re Mylan N.V. Sec. Litig.*,
    No.16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ............... 27

*In re NationsMart Corp. Sec. Litig.*,
    130 F.3d 309 (8th Cir. 1997) .............................................................................. 24

*In re Navarre,*
    299 F.3d 735 (8th Cir. 2002) .............................................................................. 43

v

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008)................................................................42

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007) ..................................................................44

*In re Reliance Sec. Litig.*,
91 F. Supp. 2d 706 (D. Del. 2000) .......................................................................42

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ...........................................................passim

*In re Stellent, Inc. Sec. Litig.*,
326 F. Supp. 2d 970 (D. Minn. 2004) ..............................................................21, 40

*In re Synovis Life Techs., Inc. Sec. Litig.*,
No. CIV. 04-3008ADMAJB, 2005 WL 2063870 (D. Minn. Aug. 25, 2005)........41

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020)................................................................................24

*In re UnitedHealth Group PSLRA Litig.*,
No. 06-CV-1691(JMR/FLN), 2007 WL 1621456 (D. Minn. Jan. 1, 2007)...........20

*Jensen v. Thompson*,
No. 17–CV–4014–LLP, 2018 WL 1440329 (D. S.D. Mar. 22, 2018).............42, 43

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009)...............................................................................29

*Lustgraaf v. Behrens*,
619 F.3d 867 (8th Cir. 2010)...............................................................................20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008)...............................................................44, 48, 51

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
641 F.3d 1023 (8th Cir. 2011)..............................................................................48

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)...............................................................................45

*Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
873 F. Supp. 2d 1070 (D. Minn. 2012) ...............................................................20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................................ 22

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012) .................................................... 30

*Plymouth Cty. Ret. Sys. v. Patterson Cos., Inc.*,
    No. 18-cv-871 (MJD/SER), 2019 WL 3336119 (D. Minn. July 25, 2019) ........... 39

*Pound v. Stereotaxis, Inc.*,
    8 F. Supp. 3d 1157 (E.D. Mo. 2014) ...................................................... 52

*Rand-Heart of N.Y., Inc. v. Dolan*,
    812 F.3d 1172 (8th Cir. 2016) ............................................... 19, 35, 40, 42

*Roberts v. Zuora, Inc.*,
    No. 19-cv-03422-SI, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .................... 52

*Sanchez v. Centene Corp.*,
    407 F. Supp. 3d 831 (E.D. Mo. 2019) .............................................. passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................... passim

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    57 F. Supp. 3d 950 (D. Minn. 2014) .................................................. 28, 30

*W. Wa. Laborers-Employers Pension Tr. v. Panera Bread Co.*,
    697 F. Supp. 2d 1081 (E.D. Mo. 2010) ................................................... 35

**Statutes**

15 U.S.C. § 78u ........................................................................................... 37

Plaintiffs oppose Defendants' motion to dismiss (ECF 69, 71) the April 10, 2020 consolidated amended complaint (ECF 51) (the "Complaint" or "¶__").

## PRELIMINARY STATEMENT

This case arises from a carefully orchestrated scheme by non-party Honeywell International Inc. ("Honeywell") to offload billions of dollars in legacy environmental liabilities and a kludge of aging, money-losing and disparate product lines and pieces of existing businesses onto unsuspecting shareholders in the form of a stand-alone publicly traded company that Honeywell named Resideo Technologies, Inc. ("Resideo" or the "Company").

From inception, Defendants (all handpicked by Honeywell), embraced the sham of Resideo's putative operating, organizational history and businesses – repeatedly touting Resideo's "prior operating history" as part of Honeywell, its "strong management operating system and attractive financial profile," its "revolutionary" new products and technology purportedly ready to roll out to customers, a robust supply chain, a lucrative portfolio of contracts, a deep bench of relevant talent, and a history of financial success and organic growth. But none of this was true.

In truth, Resideo had *no* prior operating history within Honeywell, *no* management operating system, *no* independent supply chain, *no* launchable new technology or products, *no* lucrative portfolio of contracts, *little or no* relevant engineering talent, and *no* history of financial success and organic growth.

Indeed, Resideo simply did not exist as a discrete business unit (or units) before the Spin-Off process. As Resideo's interim CFO has admitted, Honeywell's cast offs were

simply thrown together, including: failing and outdated product lines from several Honeywell divisions dumped into a newly-created business unit named "Products & Solutions" comprised of product lines Defendants knew had been stripped of their product engineers and critical manufacturing facilities (all of which were retained by Honeywell).[1]

As set forth in exacting detail in the Complaint, Resideo, then-CEO (Defendant Nefkens), then-CFO (Defendant Joseph Ragan) and then-Chief Innovation Officer and Director (Defendant Niccolo de Masi) told investors a plethora of lies, large and small. Defendants lied both about the historical existence of a Products & Solutions business within Honeywell, referring to historical performance and infrastructure going back three, five and even ten years, and about the current state of its supply chain, product development, product launches, cost control, and other crucial parts of its business.

For example, Defendants repeatedly made misstatements to investors about, among other things:

- Products & Solutions' Operating History, including that its "***performance as part of Honeywell over the past three years demonstrates a well-run business***," (¶¶21, 216-217) even though Products & Solutions had *never* operated as a unit within Honeywell, had *no* dedicated manufacturing facilities, inventory, corporate governance, or discrete financial results (as the new CFO eventually admitted, Honeywell ***"kind of picked individual pieces up and kind of threw them together*** and called that Products & Solutions") (¶¶91, 95, 98, 217);

---

[1] "Products & Solutions" was paired with an existing, but unrelated, Honeywell distribution business, ADI, to form "Resideo." Tellingly, the Spin-Off was not only an operational scam, but an organizational charade. Honeywell installed its own Assistant General Counsel as Resideo's President. (¶81). The conflicted President then "negotiated" and signed all separation documents, purportedly on Resideo's behalf (*id.*), including the onerous indemnification and reimbursement agreement that Defendant Michael G. Nefkens – Resideo's then-CEO – eventually admitted was a "mechanism" to "enhance the return from the spin for Honeywell." (¶82).

- Resideo's Supply Chain, variously mischaracterized as "***Mature, Integrated***," and "***strategically positioned in low cost regions [] to reduce delivery time***," (¶¶210-211) but in fact ***did not exist*** because Honeywell kept for itself the key manufacturing facilities and engineers needed to maintain any existing supply chain or build and optimize a new one (¶¶99-116);

- Resideo's Global Residential Intrusion Platform ("GRIP"), which they (i) falsely claimed in early 2019 that Resideo "***began customer deliveries of [it] in December 2018***" (¶235), when in fact Resideo had ***not even completed GRIP*** at that time (¶237); (ii) in May of 2019 (effectively admitting the falsity of their prior statements about December 2018 deliveries) falsely claimed the GRIP product "began rollout in Q1" 2019 (¶257) and "***[v]olume shipments began for our largest customer in February [2019]***," (¶238) even though GRIP was still undergoing beta testing and *volume shipments had not begun even as of May 2019* (¶¶139-140); and (iii) falsely represented the direct-to-consumer version of GRIP would be shipped by year end (¶261), despite the fact that the team charged with getting it "over the finish line" was dealing with major issues on a daily basis that Defendants knew would necessarily delay the project (¶262);

- "Project STORM," which they claimed was a "pioneering platform with recurring services that integrate all dimensions of home wellness" (¶147) – even though STORM was a *"fake project"* that Defendants were informed at least four times *was years away* because Resideo lacked the technology to develop it (¶¶147-150, 262);

- Resideo's T-Series line of Connected Thermostats, which Defendants falsely touted as "***reliab[le]***" and "***easy to purchase, install and deploy***" (¶¶197, 248), despite internal documents confirming the software necessary to use the signature remote control feature of these thermostats (*i.e.*, the Total Connected Comfort application (the "TCC App") suffered chronic failures that rendered them useless and caused customer dissatisfaction and diminished demand (¶¶120-133); and

- Resideo's Earnings Guidance, which, because of these and other factors, lacked any reasonable basis (¶¶171-172).

The problems Resideo was experiencing with its current products and those under development were so extensive and severe that Company employees were instructed to use

3

WhatsApp (a messaging platform) to discuss Resideo's undisclosed problems, because WhatsApp was "less discoverable" than Company email. This allegation by itself demonstrates Defendants' affirmative and express intent to deceive investors. (¶¶166, 231).

The fraud was so egregious and pervasive that it began to unravel the first time Resideo announced financial results – *less than five months* after the Spin-Off. On March 7, 2019, Resideo was forced to announce a 20% decrease in Products & Solutions revenue, reflecting the undisclosed pervasive problems with the "thrown together" division, precipitating a stock price decline of $5.79, or 23%. However, whenever Resideo made an announcement of adverse results, Defendants made countervailing statements to obscure the truth from investors. For example, contemporaneously with the March 7, 2019 disclosure, Defendants falsely attributed Resideo's earnings problems to "temporary" and easily reparable failures of Resideo's supply chain and told investors that the issues were "mostly resolved" disruptions from the Spin-Off, when, in fact, the failures were so pervasive and intractable that the Company could not or had not yet begun to address them. (*See, e.g.,* ¶¶218-221, 226, 265, 279-280, 298-301).

Defendants also hid these fully materialized problems by making a series of misstatements about the progress of Resideo's new product launches. For example, in early 2019 Defendant Nefkens falsely represented that Resideo "began deliveries" of its purportedly pioneering home security GRIP Platform in "December 2018" (¶235) even though Nefkens and the other Defendants *knew at the time* deliveries had not yet begun. In fact, development was so delayed that that the product was still "not close to done" even

4

as of May 2019, resulting in millions of dollars in contractual penalties.  (¶¶137-146, 262).

Defendant Nefkens also repeatedly and quite falsely touted the development and upcoming

launch of "Project STORM" – Resideo's application to integrate GRIP with other comfort

products referred to as Nefkens' "fake project" by CW3 (the Resideo Employee

responsible for managing the financials and programs of all software aspects of all

categories of the Company's products (¶141), including  Project GRIP and Project STORM

financials) because Resideo was not even close to having the technology needed to

complete it (¶¶149, 355).

Over time, the house of lies and falsehoods came tumbling down around

Defendants.  During Resideo's November 7, 2019 announcement of third quarter financial

results, and related earnings call, Defendants finally publicly admitted the facts they knew

but had nevertheless hidden from investors from the inception of the Spin-Off including:

- During the Spin-Off, Honeywell kept for itself supply chain-optimizing value engineers that Resideo needed to develop and maintain an independent supply chain and control costs *and* critical manufacturing facilities, both of which had a serious and sustained impact on EBITDA margins, inventory and product delays;

- The problems with Resideo's products had existed prior to the Spin-Off and pervaded Resideo's business at all times thereafter, referring to "inventory write-downs and slow-moving products" that began "postspin" (¶184), and stating that Resideo suffered not just a paucity of value engineering, but that "the talent . . . engineering that came over was very small compared to what was required" (¶181), a problem that destroyed supply chain efficacy, resulted in chronic product performance failures in Resideo's connected products, and caused delays in development and launch of new products;

- The delay in launching GRIP had caused Resideo to materially breach a purportedly lucrative contract they touted to investors, requiring Resideo to pay millions of dollars in penalties they mischaracterized as rebates; and

5

- Lower sales volume in non-connected thermostats was attributable to poor "pre-spin cutover" from the prior generation – meaning that whatever market share Resideo's products had was based on an outdated generation soon to be discontinued.

In total, in merely thirteen months following the Spin-Off, Resideo's stock price fell by more than *39 percent*, costing investors more than *$1.3 billion*.   These disclosures also cost Defendants CEO Nefkens and CFO Ragan their jobs.

Post-Class-Period events further confirmed Defendants' fraud.  Just weeks after arriving, Resideo's new CFO Bob Ryder, immediately cut Resideo's guidance by 35%, and revealed during a December 11, 2019 investor conference that Resideo's Products & Solutions business was nothing more than "*various businesses within divisions of Honeywell*" and Honeywell "*kind of picked individual pieces up and kind of threw them together.*"

Ryder further revealed that Resideo's *supply chain suffered terminal problems* from Honeywell's retention of the key manufacturing facilities resulting in "too many [products]" in "too many places," and that, contrary to Defendants' representations, Resideo's *new products were "not completely launched,*" "*weren't really accepted by customers*" and "*weren't really competitive*" – *i.e.*, "nobody wanted to buy it."   (¶188).  Ryder's admissions were further confirmed during a February 27, 2020 earnings call by lead independent director Andy Teich.  (¶190).

Ignoring these admissions, Defendants futilely attempt to recast their malfeasance as "garden variety" failure to meet earnings guidance or, alternatively, that Resideo merely "struggled" and that they engaged only in "mismanagement."  (ECF 71. at 2).  This is

6

absurd.  The Complaint details Defendants' admitted contemporaneous ***actual knowledge*** of Resideo's undisclosed supply chain, operational, and new product development problems, many of which were reported directly to Defendant Nefkens and other senior executives (including Defendant de Masi) just as it details Defendants' numerous blatant misstatements about product delivery (Project GRIP), development (Project STORM), performance (the chronic and unresolved failures of the connected thermostats), and demand (the lack of demand for legacy products like unconnected thermostats)—all confirmed by Defendants' post-Class Period admissions, internal Resideo documents, and ***fifteen*** separate witnesses who worked in key positions across both Honeywell and Resideo before and after the Spin-Off.  In so doing, the Complaint details a scheme manifestly beyond mismanagement and pleads in great detail that Defendants made false and misleading statements with actual knowledge of falsity.  *In re Nash Finch Co.*, 502 F.Supp.2d 861, 881 (D. Minn. 2007).

Defendants' attempts to isolate and decontextualize the Complaint's well-pled facts – contrary to the Supreme Court's admonition that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) – are equally wanting.  The same is true for Defendants' misguided and pointless effort to employ the oft-rejected, time-worn strategy of claiming baskets of statements are variously puffery, opinion or forward-looking all while ignoring the context and content that made them misstatements of admittedly known *present fact*s.  Equally ill-fated is Defendants' quixotic argument that because much of the fraud was revealed to the public after it occurred – *as fraud always is*

– that Plaintiffs plead "fraud by hindsight."  This of course misses the point.  Defendants' admissions place the significant known, undisclosed problems (and the related misstatements), at or before the beginning of the Class Period, making clear Defendants knew or were reckless in not knowing the misstatements were false *at the time they made them*.

Finally, Defendants ignore that courts in this Circuit routinely credit confidential witnesses at the motion to dismiss stage where, as here, the Complaint describes the witnesses with sufficient particularity to support the probability they possessed the information alleged, they were employed by the defendant during some point in the Class Period, their job titles and duties are described with particularity, and their accounts are corroborated by each other (and here by post-Class-Period admissions by Defendants and Mr. Ryder).[2]

## STATEMENT OF FACTS

**A.    Honeywell Creates Resideo as a Dumping Ground for Its Failing Products and Massive Environmental Liabilities**

Honeywell cobbled together a basket of underperforming product lines from across its Home and Building Technologies ("HBT") and Safety & Productivity Solutions ("SP&S") businesses into Resideo shortly before the Spin-Off.  Those product lines had no integrated operating history, financial results, independent supply chain or cohesive governance and operational structure.  Honeywell kept the best performing product lines from the old HBT and SP&S and transferred the core value and product engineers and

---

[2] *See*, *e.g.*, *Nash*, 502 F. Supp. 2d at 874.

8

manufacturing facilities to the newly created Honeywell Building Technologies.  (¶¶20, 73-5,78, 91-92).



Most of the product lines swept into Resideo's Products & Solutions division were selected for the Spin-Off because they already suffered from undisclosed supply chain problems (¶¶102, 104-107, 109, 111, 114-116).  These issues, admittedly known to Defendants at the time, were exacerbated by the fact that, post Spin-Off, Honeywell retained key supplier relationships (¶¶103-116), value and product engineers and manufacturing facilities (¶¶99-101).  For example, Honeywell's overseas Residential Thermal Solutions ("RTS") business – cast off to Resideo – began experiencing severe

9

supply chain problems by Autumn of 2017 (well before the Spin-Off) due to Honeywell's inability to source microprocessors from Asia, drastically impacting margins for that segment. (¶¶25, 116). Honeywell's residential security sensors and intrusion panels – also cast off to Resideo – suffered from chronic backorder and inventory problems causing delivery delays and customer attrition. (¶¶102, 104-106, 109, 115).

Other product lines were chosen for the Spin-Off because the technology was outdated or nonfunctional. For example, Honeywell used the Spin-Off to offload its residential HVAC segment because the T-Series line of thermostats was aging technology, and the software that supported it (the TCC App) suffered from chronic failures. (¶¶120-133). Indeed, a team commissioned by Honeywell in September 2018 – *prior* to the Spin-Off – correctly projected an imminent collapse of the TCC App that occurred less than a month after the Spin-Off (November 2018). (¶¶121-122). Likewise known to Defendants, but undisclosed, T-Series thermostats were chronically late to market and were losing out to competition (¶¶156-158) and the supposedly "market leading" non-connected thermostats were outdated (¶159).

Compounding these undisclosed problems, Honeywell kept manufacturing facilities previously shared with product lines cast off to Resideo, leaving Resideo with a non-existent supply chain. (¶103). Making matters worse, Honeywell stripped and retained for itself critical value engineering personnel Resideo needed to affordably produce its products. (¶¶99-103). As Defendant Nefkens would later admit, value engineers were crucial to Resideo's ability to meet earnings targets because "product costs like components, raw materials and packaging will need to be optimized every year to keep

10

gross margin strong," "*we basically did not have the right people on the pitch post spin to continue to value engineer those products,*" and "the value engineering that should have been done 12 to 24 months ago we would have started to see the impact now."  (¶¶37, 99, 315-318).

### B.     October 2018:  Defendants Make Untrue Statements About Resideo's Operating History as Part of Honeywell

The Spin-Off documents falsely stated that Resideo had demonstrable history as an entity within Honeywell.  For example, Resideo's October 2, 2018 Information Statement represented that Resideo "delivered strong net sales growth over the period from 2013 to 2017, during which our net sales grew at a CAGR of 3.7%."  (¶197).  This was obviously false given Resideo did not exist as a unit within Honeywell at any point.[3]

Likewise, the purported "Risk Factors" contained in the Registration Statement mischaracterized Resideo's operating history as part of Honeywell, stating: "[p]rior to the Spin-Off, we operated as part of Honeywell's broader corporate organization."  (¶¶201-202).  And while the Risk Factors conceded that Resideo did not have a history "operating as an independent, publicly traded company," it in fact it had *no* history operating as anything at all.  (¶¶201-205).  Similarly, while Resideo represented in the Risk Factors that the Company had not operated with a Comfort & Care or Security & Safety "focus," it did

---

[3] Defendants' suggestion that pre-class period conduct cannot support a fraud claim has consistently been rejected by this Court.  *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 891 (D. Minn. 2011) (channel stuffing before the Class Period became fraudulent when Defendants reported sales and growth rates data boosted by that scheme).

not disclose that these business units were themselves purely creations of the Spin-Off thrown together from various other pieces of Honeywell's business.  (¶203).

### C. November and December 2018: Defendants Make Untrue Statements about Resideo's Performance as Part of Honeywell

On November 13, 2018, in a press release announcing its financial results, Defendant Nefkens said: "Our performance as part of Honeywell over the past three years demonstrates a well-run business that is on-track to deliver continued growth in 2018 and beyond."  (¶¶21, 216-127).  Nefkens made the same misrepresentation on the earnings call the next day.  (¶21).

On December 12, 2018, Defendant Ragan expanded upon Nefkens' foundational lie that Products & Solutions had a long operating history within Honeywell: "We have done a significant amount of work on the factory rationalization. 10 years ago, there were 50 factories and somehow Michael got from 50 to 18 and doubled revenue, which is spectacular . . . the company is incredibly efficient from a manufacturing supply chain perspective." (¶226).  In truth, Resideo did not exist ten years prior within Honeywell, had not operated under Nefkens (who was installed by Honeywell in April of 2018) for a decade (*id.*), and was not "incredibly efficient from a manufacturing supply chain perspective" because Honeywell kept the factories Resideo needed to operate (¶227).

### D. November and December 2018: Defendants Make Untrue Statements about Resideo's Supply Chain

Defendants knew, but failed to disclose, that the Spin-Off exacerbated preexisting supply chain problems due to the split in manufacturing facilities and Resideo's inability to secure raw materials.  (¶¶102-116).  Defendants misled investors by falsely attributing

these problems to short-term, easily correctable issues (¶¶218-221, 230-231, 298-299) that were only the result of the Spin-Off (¶¶218-221, 279-280), while omitting facts showing that they were pre-existing, pervasive and intractable (¶¶195, 221, 231, 280) – including that Honeywell's retention of Resideo product inventory caused severe post Spin-Off shortages and that supply chain problems afflicting the HVAC, security and RTS business continued unabated after the Spin-Off (¶¶107, 109, 112, 114, 116, 195, 221, 231, 280).

In stark contrast to these known-undisclosed systemic failures, Defendants blatantly misrepresented just a week post-Spin-Off that Resideo had a "Mature, Integrated Supply Chain with Continued Application of Best-in-Class Honeywell Operating System" (¶210) that was "strategically positioned" (¶211), both patently false statements that concealed that the Spin-Off fragmented the already strained supply chain for Resideo's products (¶213).

Ryder's admissions that even a year post-Spin-Off Resideo still had "too many [products]" in "too many places" and "our manufacturing facilities aren't in the right places with the right freight lanes" (¶¶188, 213, 227) revealed the utter falsity of Defendants' supply chain statements – including those made after the Spin-Off in Resideo's third quarter 2018 press release attributing Resideo's poor initial performance to "temporary supply chain issues as a result of the spinoff" – while assuring that management was "actively resolving" those issues and that the supply chain would be "full power by the beginning of 2019" (¶218). As well as those during the related earnings call on November 14, 2018, that Resideo was "actively addressing [] supply-chain issues . . . already seeing

13

product flows moving back towards normal volumes" and that "supply chain challenges" were "[s]hort-term."  (¶¶22, 219-20).

### E. March 2019: Earnings Fall Due to the Undisclosed Supply Chain Issues, While Defendants Make False Countervailing Statements About the Supply Chain, the T9 and T10 Connected Thermostats and the Launch of Project GRIP

On March 7, 2019, Resideo disclosed a 20% drop in Products & Solutions revenue and lowered guidance of "2 to 5 percent," causing Resideo's stock price to decline by an additional $5.79 per share – a decline of 23%.  (¶28).  To blunt the impact of the earnings failures, Defendants touted the: (i) launch of Resideo's supposedly "industry-leading T9 and T10" connected thermostats (¶234) that, by then were already outdated and 18 months late to the market because Resideo lacked the necessary software developers and product engineers (¶249); and (ii) the putative rollout of the "pioneering" GRIP platform that purportedly enabled users to wirelessly control a variety of security devices – which by that point was delayed (¶¶134, 136, 138).

Indeed, Resideo claimed it "began customer deliveries of [GRIP] in December 2018" (¶236) and that it "launched some terrific products in the fourth quarter, including our market-moving next-generation security platform [commercial version of GRIP]" (¶234).  These were bald-faced lies.  In truth GRIP had not been "launched" or shipped to customers in 2018.  (¶139).  Resideo had not even completed GRIP as of the press release because it lacked the technology to make it work.  (¶145).  Indeed, by February 2019, Resideo had only sent one customer (ADT) the GRIP product and *only* for *beta testing*. (¶139).  By May 2019, Resideo was still not in a position to ramp up production of GRIP

14

(*i.e.* begin volume shipments) (¶140) and investors would not learn until after the Class Period that Resideo's failure to timely deliver the GRIP product to ADT resulted in millions of dollars in lost revenue and contractual penalties (¶141).[4]

On the March 7, 2019 earnings call, Nefkens also misrepresented that Products & Solutions "saw tangible improvement in supply chain execution as we work through spin-related headwinds from the past 2 quarters" and claimed, "[w]e're also starting to move beyond some of the supply chain and cost spin burdens." (¶279). But Resideo's supply chain execution had not improved (¶280) because supply chain problems were partially caused by Resideo's missing value engineers who had still not been replaced by the end of the Class Period (¶¶37, 99, 280, 315-318). Nefkens' statements also falsely implied that the supply chain issues plaguing Resideo's products did not pre-date the Spin-Off. (¶¶195, 221, 231, 280).

**F.    May 2019 and June 2019: Defendants Make More Untrue Statements about Project STORM and GRIP (Commercial and Consumer Version)**

On May 8, 2019, Resideo announced first quarter earnings and again reduced earnings guidance for the year. In the accompanying press release and earnings call with investors, Resideo stated that the commercial version of GRIP "began rollout [to ADT] in Q1" and "Volume shipments began for our largest customer [ADT] in February." (¶257). This was both contrary to Nefkens' prior representation that GRIP had rolled out in December 2018, and patently false because GRIP was still being developed and had not,

---

[4] When Defendant Nefkens eventually cited the contractual penalties as one reason for Resideo's poor performance (even then, he continued to lie about them by falsely referring to the penalties as "rebates") (¶259).

15

and could not be, shipped in volume to *anyone*. (¶¶139-145). Nefkens also claimed that Resideo would roll out the higher margin direct-to-consumer version of GRIP "by the end of the year" – despite the fact it was not close to completion. (¶¶262, 139-145).[5]

Nefkens also claimed Resideo was preparing to roll out Project STORM, the platform that would purportedly integrate GRIP and comfort products such as smart thermostats. (¶¶25, 261). In truth, Project STORM was "Nefkens' *fake project*" – Resideo lacked the technological expertise necessary to complete it. (¶¶147, 262). Indeed, in early 2019, Resideo's CTO Edgar Tu and VP Scott Harkins were told by CW3 that STORM would not be ready for two to three years and that even the plastic housing and hardware were years from being developed. (*Id*). Another witness (CW15) attended an April 15, 2019 meeting in Minneapolis wherein Defendant de Masi was informed it would be at least another year, and possibly more to complete STORM, and that the manufacturing capabilities for STORM was "not feasible" by December 2019 because the needed software was not developed. (¶¶148-150).

### G.    Resideo Instructs Employees to Use WhatsApp to Hide Communications About Known and Debilitating Problems from Later Discovery

To hide the ongoing blatant falsehoods about the debilitating problems affecting the Company, including: competitive challenges; loss of major channel partners; "customer churn" in the security business; Project GRIP delays, the abject lack of progress on Project

---

[5] At a June 6, 2019, global investor conference, Defendant Ragan stated Resideo had "won a large contract with ADT" and had "rolled out and started to deliver" GRIP, which was "going great as far as the adoption." (¶285). Ragan's statements were false because a fully deployable version of GRIP had not been delivered to ADT and the Company had already breached the contract and incurred penalties thereunder. (¶¶139-140, 145, 286).

STORM; and the TCC App chronic service outages from discovery by outsiders, Resideo's senior management instructed employees, including Vice Presidents, during a Company meeting in Orlando, Florida in early 2019, that they should only communicate about those and any new problems via WhatsApp rather than Company emails to prevent the truth from "leaking" and because emails were "easily discoverable." (¶¶9, 162-65, 332).

### H. August 7, 2019: Defendants Make Untrue Statements that Resideo's Supply Chain Issues Had Been Resolved

On August 7, 2019, Resideo released its financial results for the Second Quarter of 2019 stating that Products & Solutions EBITDA had decreased 36% as a result of "unfavorable product mix, production cost increases, and the impact of acquisition expenses." Resideo's stock price declined 2.4 percent. To blunt the impact of this news, Nefkens touted "the incredible strides we've made on improving our supply chain" – including appointing "new supply chain leadership and process changes" (¶298) – despite knowing Resideo's lack of value engineers and loss of manufacturing facilities had not yet been addressed and this made meaningful improvement of the supply chain during the Class Period impossible. (¶¶37, 99, 102-116, 315-318).

### I. October 2019 and November 2019: Resideo Begins to Reveal the Truth About Problems with Its Supply Chain and Products

On October 22, 2019, Resideo cut earnings guidance by $80 million and announced a "comprehensive operational and financial review" focused on, among other things, "optimizing its organizational footprint" and "simplify[ing] its internal processes" with the assistance of "industry-recognized experts in supply chain optimization." (¶305). This was the first time Resideo even hinted at the crippling impact of its supply chain problems,

17

lack of any product and value engineers, manufacturing issues, inability to solve chronic and catastrophic TCC outages, declining demand for legacy manual thermostats and other outdated-legacy products, the contractual penalties from Resideo's late delivery of GRIP, and unrealized Project STORM. (¶411). Simultaneously, Resideo announced the unexpected departure of its CFO, Defendant Ragan. (¶306).

The market's reaction to these disclosures was swift: the price of Resideo's stock dropped by $5.37 per share, over 37%, in the ensuing trading day. (¶412). Moreover, Bank of America issued a report directly questioning Defendants' candor: "we believe *management credibility has become a significant challenge* for the stock" and that "any new CFO will have a heavy load to bear in turning the company around." *Id.*

On the November 7, 2019, third quarter 2019 earnings call, Defendant Nefkens finally admitted five factors for the Company's failures that *directly contradicted Defendants' prior Class Period statements and unequivocally established their knowing falsity*:

- "Most of our value engineering stopped prior to our Spin-Off from Honeywell. In a company like ours, product costs like components, raw materials and packaging need to be optimized every year to keep gross margin strong. Value engineering teams do that. Before we spun off from Honeywell, these teams were largely depleted, and we are seeing the effects of that in our gross margins" and that it would "take 12 to 24 months" to see any benefit from efforts to rebuild those teams" (¶180-81);[6]

- "The second factor is sourcing. We lost some sourcing leverage in direct and indirect materials following the Spin-Off. We've been working with our suppliers for several months now to rectify that" (¶183);

---

[6] Interspersed with these revelations was the fact that beyond value engineering, "the talent . . . engineering that came over was very small compared to what was required." (¶181).

- "The third factor is a margin drop associated with the competitive renewal of a contract from a large OEM security customer [ADT]. This contract was secured in 2017 and first deliveries began a year later, with volume ramp-up in 2019. Contractual customer rebates [penalties] associated with this contract drove further margin decline this year" (¶37);

- "The fourth factor is the previously mentioned T-Series thermostat transition" attributable to "poor pre-spin cutover from the prior generation of non-connected thermostats to the T-Series line [which] impacted the adoption of mid-level T-Series thermostats," meaning that its T-Series thermostats were selling poorly and whatever market share Resideo's non-connected thermostat products had was based on an outdated generation that would soon be discontinued (¶176); and

- "Finally, ***post-spin*** inventory write-downs and slow-moving products impacted our EBITDA as well" (¶184).

Resideo's stock declined an additional 10% in the ensuing trading days, from $10.02 per share on November 6, 2019 to close at $9.02 per share on November 11, 2019. (¶39). Collectively, investors lost more than $1.3 billion as a result of the disclosures in March, August, October and November. (¶40).

## LEGAL STANDARDS

On a Rule 12(b)(6) motion to dismiss, the Complaint must simply contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1176 (8th Cir. 2016). The Complaint is plausible where, as here, it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Complaint "should not be dismissed for failure to state a claim where there is a 'reasonably founded

19

hope that the [discovery] process will reveal relevant evidence' to support plaintiffs' claims." *In re UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691(JMR/FLN), 2007 WL 1621456, at *1 (D. Minn. Jan. 1, 2007).

The PSLRA demands a heightened pleading standard only regarding Plaintiffs' falsity and scienter allegations. *Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1075-76 n.3 (D. Minn. 2012). At the motion to dismiss stage, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 313.

## ARGUMENT

### I.    DEFENDANTS MADE ACTIONABLE UNTRUE STATEMENTS AND OMISSIONS OF MATERIAL FACT

A plaintiff satisfies the PSLRA's pleading requirements for falsity, by "plead[ing] the who, what, when, where and how of the misleading statements or omissions." *St. Jude Med.*, 836 F. Supp. 2d at 887. A plaintiff "need only allege facts sufficient to support an inference that statements were false or misleading when made." *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 840 (E.D. Mo. 2019) (citing *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010)). The issue of "whether a public statement is misleading is a mixed question of law and fact for the jury" and can be resolved as a matter of law *only* "when reasonable minds could not differ." *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124 (8th Cir. 2019) (quotation omitted).

Where, as here, Defendants made both affirmative untrue statements and omitted (and concealed) facts undercutting their statements, the omissions are also actionable

because "if one speaks, he must speak the whole truth . . . to make the full disclosure of known facts necessary to avoid making such statements misleading." *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985 (D. Minn. 2004) (citation omitted).[7]

### A. Defendants' Untrue Statements and Omissions Regarding Resideo's History as Part of Honeywell Are Actionable

From shortly after the Spin-Off, Defendants repeatedly made false statements to the effect that Resideo's "*performance as part of Honeywell over the past three years demonstrates a well-run business on track to deliver continued growth in 2018 and beyond*" (¶216 *and see relatedly* ¶¶192, 197, 201, 206, 216, 226, 250, 289) – despite the fact Resideo had never been operated as a stand-alone business within Honeywell. (¶91).

Defendants' assertion this allegation is fraud by hindsight (ECF 71 at 59) defies logic – Nefkens was a former employee of Honeywell, assisted in structuring the Spin-Off, and knew his repeated statements touting Resideo's past performance within Honeywell were false when made. That this duplicity was admitted by Defendants post-Class Period is neither surprising nor does it somehow transform it into fraud by hindsight, just as the statement is not puffery or opinion. (ECF 71 at 58-59). The actionable falsehood here is not that the Company was "well-run," but that it was a stand-alone business with a record of "performance as part of Honeywell" that could demonstrate a well-run business or suggest it was on track to deliver growth in 2018 when Resideo had no history of

---

[7] The specific reasons why each alleged misstatement was false or misleading when made are set forth in the Complaint and summarized for the Court's convenience in Exhibit A to Declaration of Andrew J. Entwistle in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Entwistle Declaration"), filed contemporaneously herewith.

performance as a unit of Honeywell and no separate governance, operational structure or financial metrics.  It is well settled that factual assertions may be embedded within statements of opinion.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015).[8]

Defendants do not now dispute that Resideo was in reality a collection of products that had been "thrown together."  How could they?  Resideo's former Interim CFO Ryder admitted as much to investors just weeks after arriving when he conceded that "the whole Products & Solutions business was various businesses within divisions of Honeywell" and that "***they kind of picked individual pieces up and kind of threw them together*** and called that Products & Solutions."  (¶¶95, 187).

Rather than contest Mr. Ryder's admissions, Defendants rewrite history by suggesting they adequately disclosed Resideo's lack of operating history.  However, the disclosures they point to reveal no such thing, and indeed were themselves misleading because they implied the *opposite*.

For example, Defendants point to the statements in the Registration Statement that Resideo had "no operating history as an *independent, publicly traded* company" whose "historical combined financial information is not necessarily representative of the results we would have achieved as an *independent, publicly traded* company and may not be a reliable indicator of our future results." (ECF 71 at 17) (emphasis added).  But the purpose

---

[8] *See also Nash*, 502 F. Supp. 2d at 879 (statements that would be puffing in isolation lent support to more specific allegations of false statements and fraud on the market and were thus actionable and not immaterial puffery); *St. Jude Med.*, 836 F. Supp. 2d at 888 (same).

of the Registration Statement was to cause Resideo to become an "independent and publicly traded company." Indeed, the use of the modifiers "independent" and "publicly traded" implies that Resideo had operated as a cohesive unit within Honeywell. Otherwise the modifiers are meaningless surplusage – indeed, Defendants could have simply said, "we have no operating history" but they did not and may not now suggest their statements should be read as if they did so. *City of Warren Police & Fire Ret. Sys.v. World Wrestling Entm't Inc.*, No. 20-cv-2031 (JSR), 2020 WL 4547217, at *7 (S.D.N.Y. Aug. 6, 2020) ("some of the language that defendants suggest is cautionary . . . only implies more strongly" a misleading impression).

Defendants also misleadingly paraphrase another portion of the Registration Statement to argue that Resideo's true nature was adequately disclosed because it stated that Resideo had never "operated with a residential 'Comfort & Care, Security & Safety, or home solutions business focus, nor combined that with a distribution business,'" or "outside the broader Honeywell operating environment." (ECF 71 at 18). But Defendants' arguments are undone by their own admissions. The admitted truth is Comfort & Care and Security & Safety were *themselves* thrown together from various underperforming product lines from Honeywell's Environmental & Energy Solutions and Security and Fire businesses (among others which had also never operated together). (¶¶201-03).[9]

In short, Defendants' non-specific and misleading warnings do nothing to correct the misstatements elsewhere in the Registration Statement and Defendants' subsequent

---

[9] The fact that Resideo included an unrelated distribution business that had not previously been combined with Products & Solutions forms no part of Plaintiffs' claim.

misrepresentations that Resideo had a prior operating history as part of Honeywell – much less that said operating history could form a basis for the related financial and operational misstatements.  *See In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 317–18 (8th Cir. 1997); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 650 (8th Cir. 2001).

### B.   Defendants' Untrue Statements and Omissions Regarding Resideo's Supply Chain Are Actionable

#### 1.   Defendants Touted Resideo's Supply Chain while Concealing that Honeywell Retained its Critical Components

Defendants' November 8, 2018 statement that the Company had a "***Mature, Integrated Supply Chain with Continued Application of Best-in-Class Honeywell Operating System***" (¶¶210-211) was foundationally untrue.  In reality, Resideo needed to build a supply chain anew because, as Defendants have since admitted, the Spin-Off deprived Resideo's products of their critical manufacturing facilities and relevant engineers, decimating any existing supply chain.  (¶¶99, 101, 316, 317, *See* Ryder's and Nefkens' related admissions at ¶¶104-116, 176-184 188, 213, 227 – making clear both Defendants' knowledge of debilitating supply chain issues from inception and that the problems were intractable).[10]

---

[10] Defendants' reliance on *Target* is inapt.  *Target* involved "financial deterioration alone" where defendants "did not understand the magnitude of the problems they faced."  *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743-44 (8th Cir. 2020).  The facts in Target are wholly at variance to those pleaded in the Complaint here which include, among other things, Defendants' admitted knowledge of falsity and their remarkable direction to conceal the misrepresented facts by using WhatsApp for internal communications to keep the misrepresented facts from discovery by outsiders.  (¶¶ 8-12, 37, 166-168, 315-316, 330-345, 359-383).

24

Defendants' related misstatements during the November 2018 Baird conference presentation and again in the 2018 10-K that the supply chain was strategically positioned to reduce delivery times (¶¶211, 246), and Defendant Ragan's claim at the Imperial Capital conference on December 12, 2018 that "10 years ago there were 50 factories and somehow Michael got from 50 to 18 and doubled revenue, which is spectacular . . . the company is incredibly efficient from a manufacturing supply chain perspective" (¶226) are admittedly false and misleading for the same reasons – Resideo did not exist before the Spin process, and Honeywell had stripped away the manufacturing facilities, critical value and product engineers and inventory for the cut-over product lines.

The Complaint demonstrates Defendants knew, as Ryder later admitted, Resideo was unable to meet its guidance because it had "too many [products]" in "too many places," without "the right freight lanes." (¶¶ 96, 188, 213, 227, 247, 325, 379).[11]  Simply put, the statements created the impression Resideo had a supply chain adequate for its business, which it did not.  *Sanchez*, 407 F. Supp. 3d at 840; *Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1111–12 (D. Minn. 2014) (statements about robustness of internal controls actionable where company omitted facts that it had been cited for violations four times by FDA regulators).

---

[11] Defendants unavailingly characterize this allegation as pleading "fraud by hindsight," arguing that the poor placement of their factories was not apparent when Ragan touted their "strategically position[ing]" and that they were "incredibly efficient from a manufacturing supply chain perspective."  But that argument ignores both Ryder's admissions to the contrary and that there is no indication that the manufacturing facilities or freight lanes or sources or destinations moved or changed after the misstatements were uttered. *Id.*

25

Facing the allegations, Defendants argue that Resideo disclosed supply chain problems in the Company's risk factors. (ECF 71 at 36-40). Not so. Defendants never disclosed during the Class Period what they later conceded, that Honeywell had retained key manufacturing facilities and engineers needed to optimize Resideo's supply chain, resulting in pervasive and intractable supply chain issues. (¶¶101, 108, 316, 317).

Defendants' argument that they "warned" against possible future events are similarly ill-fated because they knew when making the purported "risk factors" that catastrophic setbacks that had already occurred. *See*, *e.g.*, *Nash*, 502 F. Supp. 2d at 873 ("if Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized . . . then their forward-looking statements are not protected by the safe harbor."). For these reasons Resideo's putative warnings that "Disruptions, or the need to relocate any of our facilities, *could* significantly disrupt our business" and the "failure to attract and retain such personnel *could* adversely affect our business, financial condition, results of operations and cash flows," were misleading because Honeywell's stripping of critical manufacturing facilities and retention of inventory and core value and product engineers had *already* resulted in pervasive and intractable supply chain failures. (¶¶22, 101, 108). *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1273, 1279–80 (D. Minn. 1997) ("Though defendants' disclosures warned investors that the Stratosphere project may experience construction cost overruns . . . and may not open on time, such forward-looking cautionary language does not render

26

immaterial presently known facts regarding cost overruns and other construction difficulties.").[12]

Likewise, Resideo's purported warning that "If our third party suppliers and manufacturers fail to deliver products, parts and components of sufficient quality on time and at reasonable prices, we could have difficulties fulfilling our orders or stocking our distribution centers" (besides being general corporate boilerplate), was itself false and misleading because issues with third-party suppliers (including with regard to sourcing microprocessors) predated the Spin-Off (¶116), causing Resideo to negotiate new contracts on less favorable terms for "a lot of electronics – thousands of parts and supplies that went into product lines for Resideo" (¶118).

In sum, Resideo's purported "disclosure" that supply chain issues *may* occur was no disclosure at all because, as Defendants admitted, they knew at the time that Resideo's product lines suffered from existing intractable supply chain problems. *Grand Casinos*, 988 F. Supp. at 1278, 1283; *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 726 (D. Minn. 2019). "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Mylan N.V. Sec. Litig.*, No.16-CV-7926 (JPO), 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) (citation omitted).[13]

---

[12] Defendants make similar arguments about their other purported disclosures of risk in the form of a chart. (ECF 71 at 30-32). A chart summarizing Plaintiffs' responses to Defendants' risk-disclosure arguments is attached as Exhibit B to the Entwistle Declaration.

[13] It does not matter whether Resideo may have also faced the short-term disruptions because Defendants have an obligation to speak truthfully and to not obscure the truth

### 2.    Defendants Lied About Their Efforts to Repair the Supply Chain

Even as Defendants began to attribute Resideo's poor results to temporary and correctable supply chain issues, they continued to deceive the public by making countervailing statements that downplayed or wholly mischaracterized the debilitating supply chain problems, including:

- The statement in the November 13 press release that Resideo was "impacted by *temporary* supply chain issues as a result of the spinoff" but was "*actively resolving*" those issues (¶218);

- Nefkens' statements on November 14, 2018 that "with the spin behind us, operationally, our team is focused and back on track," and was "*already seeing product flows moving back towards normal volumes*" (¶219);

- Defendant Ragan's characterization of "supply chain challenges" as *"[s]hort-term*" (¶219);

- Defendant Nefkens' statement "*most of them are believe or not are [sic] administrative items*" attributable in part to "plant shifts [] in Europe" (¶220);

- Defendant Nefkens' statement "*we'll be fully back and running here by Q1*" and that "*we're very comfortable that we're on the other side of it now*." (¶219) and, when an Oppenheimer analyst followed up, "So, *full power by the beginning of 2019*?" (*i.e.* one-and-a-half months later) Nefkens responded "*That's correct*" (¶219);

- Defendants' touting "*[i]mprovement* in supply chain execution" during Resideo's first quarter 2019 investor presentation (¶265);

- Defendant Nefkens' statement on Resideo's First Quarter 2019 earnings call that "[t]he product segment also saw *tangible improvement* in supply chain execution as we work through spin-related headwinds from the past 2

---

about fundamental, pervasive and intractable supply chain problems. *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.,* 57 F. Supp. 3d 950, 968 (D. Minn. 2014) ("even absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects.").

quarters" and "[w]e're also starting to *move beyond* some of the supply chain and cost spin burdens" (¶279); and

- Defendant Nefkens' remark on August 7, 2019, that "[a]s you may know, we had some supply chain headwinds pre- and post-spin. But due to new supply chain leadership and process changes, we're delivering *more on time than ever before and our delivery metrics are the best they've been in 5 years*" (¶289).

All these statements are actionable.[14]    Courts routinely find that corporate statements assuring investors that a problem has been mostly solved are actionable statements of current condition. *See IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 958 F. Supp. 2d 1065, 1076 (D. Minn. 2013) (statements that company was "on track to meet or exceed our annual guidance" actionable); *Nash*, 502 F. Supp. 2d at 881 ("[i]ntegration . . . is proceeding according to plan"); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 472 (S.D. Tex. 2016) ("downplaying the extent and duration of the [] problems" gave false impression of "a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul")*; Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159 (N.D. Cal. 2015) (yield problems "behind us"); *Pa. Pub. Sch.*

---

[14] Defendants' repeated citations to *Target* do nothing to help their cause. As noted above in fn 7, the general ignorance plead in *Target* is nothing like Defendants' admitted knowledge of falsity here regarding, among other things, the debilitating supply chain issues described above and their efforts to hide those facts from discovery by directing employees to use WhatsApp rather than company email. (¶¶181-2, 188); *Sanchez* 407 F. Supp. 3d at 843 (possession of adverse facts rendered contrary public statements materially false or misleading"); *See Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (defendants' later admissions proved they knew at the time their statements were false").

*Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 354 (S.D.N.Y. 2012) ("the worst of the crisis is behind us").[15]

And here, of course, Defendants' countervailing statements are contradicted by the now admitted facts regarding the pervasive and intractable issues still plaguing Resideo, including that it would take 18-24 months to replace and train value engineers (such that Resideo's supply chain could not materially improve for two years) and that  Honeywell had retained both the facilities making components for the product lines cast off to Resideo, and existing inventory of components and finished cast off products.  (¶¶104-116); *See, e.g., W. Va. Pipe Trades*, 57 F. Supp. 3d at 973.

### C.      Defendants' Untrue Statements and Omissions About Its New Product Launches (GRIP and Project STORM) Are Actionable

Courts likewise routinely sustain claims that investors were misled about the status of new product launches.  *See, e.g. Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167, 1173 (D. Colo. 2000) (denying motion to dismiss where defendants discussed product launches and capabilities in present tense and plaintiffs alleged "[d]efendants did not disclose that [company's products] were not fully developed, fully tested, nor ready for shipment as a fully operational product to customers").   Here, Defendants' public statements to investors concerning the launches of GRIP and Project STORM were demonstrably false and contrary to their actual knowledge.

---

[15] Defendants' incongruous argument to the contrary (ECF 71 at 54), ignores the admitted falsity of the statement here and the overwhelming Eighth Circuit authority – including this Court's opinion in *Best Buy* – holding such language actionable.

### 1.     Commercial GRIP for ADT

Defendants' actionable statements regarding the delivery of GRIP to ADT included

the following:

- Resideo's March 7, 2019 Press Release stating "[t]he company began customer deliveries of its next-generation security platform (Global Residential Intrusion Platform/GRIP) in December 2018" (¶235);

- Defendant Nefkens' statement on Resideo's March 7, 2019 first quarter earnings call that "[w]e have the rollout of our new Global Intrusion Platform [GRIP], started in December. That rollout is progressing very, very well with our first customers" (¶236);

  - Resideo's inconsistent statement in its May 8, 2019 press release that it "began rollout [of GRIP for ADT] in Q1 [2019]" (¶257);

  - Defendant Nefkens' statement in Resideo's May 2019 earnings call that "[v]olume shipments began for our largest customer in February" even though GRIP had still only been sent to ADT as samples for beta testing, and this delay had cost Resideo millions of dollars in contractual penalties to ADT alone (¶238); and

- Defendant Ragan's claim during the June 2019 Baird conference that GRIP was "going great as far as adoption" even though GRIP had not been even close to shipping the month before (¶286).

As detailed above and in the Complaint, Defendants admittedly knew these

statements were knowingly false when made, admissions corroborated by the detailed

statements from the various CWs including that by January 2019, GRIP was "not close to

done," the backend technology was not finished and, by February 2019, Resideo had only

sent ADT an unfinished product for beta testing.  (¶¶138-145, 235, 236, 251, 257, 260-261,

285).

Defendants argue without elaboration that their misstatements about GRIP were

immaterial.  (ECF 71 at 12).  But they are wrong.  The Complaint plainly pleads, based on

31

analyst reports and Defendants' own statements, that GRIP was integral to Resideo's portfolio. Resideo repeatedly touted the GRIP product and its rollout to OEM customers and Resideo itself stated it was the subject of a contract worth one billion dollars. (¶¶138, 235, 236, 251, 257, 260-261, 285). Indeed, Resideo's 36% drop in EBITDA on August 7, 2019 constituted a partial materialization of the undisclosed but known risk associated with, *inter alia*, contract penalties accrued because of the late delivery of GRIP. (¶400).

Accordingly, Resideo's statements regarding the timely rollout of GRIP – including whether it was rolled out in 2018 or 2019, whether it was delivered in volume or as beta sample, whether it was even finished, whether it was delivered to "customers" or a single customer, etc. – would unquestionably "be[] viewed by the reasonable investor as substantially altering the mix of information available." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003). In any event, Defendants' lukewarm materiality argument is premature because "[o]rdinarily materiality is a question of fact for the jury" and Defendants have failed to demonstrate the false information was "so insignificant" that it would "not have mattered to a reasonable investor." *Id*.

Defendants also argue without support that Defendant Nefkens' March 7, 2019 statement that Resideo was "going to need very strong performance from our teams in the second half of the year in GRIP" somehow constitutes "cautionary language." (ECF 71 at 22). But Defendants do not even attempt to explain how this statement corrects the false statements that customer deliveries of GRIP for commercial OEM customers had occurred in December 2018 when in fact the commercial version was still undergoing beta testing when the March 2019 statement was made (not to mention that the GRIP product for the

32

direct consumer market was far from ready and was hampered by a "poorly scoped" and generally, and continuously, dysfunctional and disorganized development process that made acceleration of the rollout of the product into 2019 unlikely). (¶¶237, 302). *Grand Casinos*, 988 F. Supp. at 1283.

Defendants discrepantly argue their statements that "the rollout of [GRIP] started in December" and "[v]olume shipments began for our largest customer in February" do not contradict each other because the first was a "general" rollout while the second was "specific to volume shipments." (ECF 71 at 52). This argument ignores that the product was still in beta testing in February (and was thus unfinished), the inconsistent May press release, and Defendant Ragan's categorical statement in June of 2019 that "***we rolled out [GRIP] and started delivery this year***" (referring to commercial GRIP for OEM's like ADT). (¶238).

### 2.    Project STORM and the Consumer Version of GRIP

Project STORM, which Defendants told investors "is redefining the industry" by integrating all aspects of home comfort and security was, in fact, a "fake project." (¶¶261, 262). Defendants spoke publicly of Project STORM in the present tense and told investors in May 2019 Resideo would have the resulting capability by "the end of the year, beginning of next year." (¶261). This was simply untrue. The technology did not yet exist and would take two to three years to develop. (¶¶147-150). And both Defendants Nefkens and de Masi knew it. CW15 recounted how Defendant de Masi was told at an April 15, 2019 meeting in Minneapolis, Minnesota – *before* the May 2019 statement – that STORM would not be ready by December 2019. (¶150). CW3 recalled in response to the protestation of

33

subordinates that the goal was impossible (*before* the misstatement was made), Defendant Nefkens replied: "This is what I'm promising the market."  (¶¶338-339).  In other words, Defendants Nefkens and de Masi were told that STORM could not be completed in the timeframe represented to investors, but ignored this information, proposed no solution or additional resources and recklessly proceeded to "promis[e] the market" something they knew Resideo was unable to deliver.  *See St. Jude Med.*, 836 F. Supp. 2d at 892-93 (false financial forecasts actionable where "contemporaneous 'internal' and presumably undisclosed forecasting data and sales reports contradicted the public statements [defendants] provided the market, investors, and analysts").

In fact, Defendants anticipated litigation resulting from, among other things, the misstatements about Project STORM.  Resideo's "leadership team" which included Defendants Nefkens and Ragan, instructed Resideo personnel not to discuss problems with project STORM by company email, and to use WhatsApp instead because messages on WhatsApp would be "less discoverable."  (¶¶9, 333).

Likewise, Defendants' statements that the consumer version of GRIP would be ready by the end of 2019 were false and misleading because, as noted above, the project was poorly scoped and not close to done, and there were no internal milestones or plans to complete it.  (¶143).

Defendants argue, again without elaboration, that the misstatements about Project STORM and the consumer version of GRIP are immaterial in light of the Company's disclosures. (ECF 71 at 12).  But Defendants can point to no disclosure or risk factor that could have possibly warned investors that Project STORM was a "fake project" that

34

Resideo lacked the technology to develop or that the Consumer version of GRIP was poorly scoped and not close to finished. In any case, as with the commercial version of GRIP, Defendants cannot possibly demonstrate on a motion to dismiss that these statements were "so insignificant" they would "not have mattered to a reasonable investor." *Gebhardt*, 335 F.3d at 829. Indeed, Nefkens himself clearly deemed it so material he knowingly promised delivery over the objections of his senior engineering staff. (¶148).

Defendants also argue their deceptive statements about Project STORM and the consumer version of GRIP were forward-looking. (ECF 71 at 52). But forward-looking statements cannot be protected where, as here, Defendants' actual knowledge of their falsity is demonstrated by the engineers' statements to Defendants Nefkens and de Masi that development of STORM were impossible because Resideo did not have the technology to make it work (¶¶147-150), and the engineering team working on the consumer version of GRIP repeatedly stated that fundamental problems preventing progress were not being addresses (¶¶143-146) [16] – not to mention their efforts to shield the evidence from discovery in anticipated litigation. *Rand-Heart*, 812 F.3d at 1178 (forward-looking statements not protected where the complaint sufficiently alleged defendant "had actual knowledge that the statements were, at least, misleading").[17]

---

[16] The only source that Defendants would have had relating to the GRIP for direct customer product rollout was the daily meetings with the team CW8 led. (¶143).

[17] In *Panera Bread*, on which defendants erroneously rely, actual knowledge was "not at issue." *W. Wa. Laborers-Employers Pension Tr. v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1089 (E.D. Mo. 2010). While some courts in other districts have deemed forward-looking statements protected despite the speaker's knowledge of falsity, all of these

35

**D.     Resideo's Earnings Guidance Lacked a Reasonable Basis Given the Myriad Undisclosed Problems**

Defendants pointlessly attempt to characterize the Complaint as alleging claims based on nothing more than "run of the mill" earnings misses.  They are simply wrong.  Defendants issued and reaffirmed aggressive earnings guidance based on Resideo's claimed "momentum" and purported margin uplift both from product introductions – including GRIP – as well as from supply chain cost reductions.  (¶300).  Yet the Complaint pleads facts demonstrating Defendants knew there was no reasonable basis for the pre-Spin or post-Spin guidance and margin statements because Resideo had no operating history on which to base those statements.  Defendants knew that the new products were either still in development, were delayed or, in the case of the controlled thermostats, were already outdated and could not be operated successfully by the TCC App, and because intractable and pervasive supply chain issues – including retrofitting factories and hiring legions of value and product engineers and finding new raw materials and microprocessor suppliers – would require enormous investments of capital and take years to accomplish, making the realization of supply chain savings impossible during the Class Period and beyond.  (¶¶25, 99-103, 104-115 116, 127, 131-132, 158, 249).

Defendants' contemporaneous knowledge of adverse information afflicting multiple aspects of Resideo's business is more than enough to establish their forecasts are actionable.  *See, e.g., St. Jude Med.*, 836 F. Supp. 2d at 892 (forecasts actionable where

---

decisions predate the Eighth Circuit's *Rand-Heart* decision.  *In re K-V Pharm. Co. Sec. Litig.*, No. 4:11CV01816 AGF, 2014 WL 1272452, at *10 (E.D. Mo. Mar. 27, 2014).

contemporaneous "internal and presumably undisclosed forecasting data and sales reports contradicted [Defendants'] public statements").

Relying on out-of-circuit cases, Defendants suggest statements of present condition are immunized under the safe harbor if combined with statements of future condition. (ECF 71 at 54). But the opposite is true. *See CenturyLink*, 403 F. Supp. 3d at 729 ("Combining false or misleading statements about past or present facts with forward-looking statements does not invoke the safe harbor"). Equally unavailing is Defendants' argument that earnings guidance is protected by the safe harbor (ECF 71 at 51) which ignores these types of statements are regularly sustained in this Circuit. *See, e.g., Best Buy Co.*, 958 F. Supp. 2d at 1076 (statements that company is "on track to meet or exceed our annual guidance" not forward-looking or within PSLRA safe harbor).[18]

## II.     THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

Plaintiffs must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The inference "need not be irrefutable, *i.e.*, of the smoking gun variety, or even the most plausible of competing inferences." *St. Jude Med.*, 836 F. Supp. 2d at 895 (quoting *Tellabs,* 551 U.S. at 323-24).

---

[18] Defendants point out Honeywell, not Resideo, issued the initial post-Spin-Off guidance. But the fact that Honeywell issued Resideo's initial guidance helps them not at all. Leaving aside that Defendant Nefkens structured the Spin-Off and was assuredly involved in the initial earnings guidance, Nefkens and the other Defendants left it uncorrected and reaffirmed it post-Spin despite knowing it was false and misleading. Resideo issued its third quarter 2018 results on November 13, 2018, just days after the Spin-Off, reiterating that for full-year 2019, it was expecting "4 percent organic revenue growth [and an] adjusted EBITDA margin of 13 percent" (¶216). From at least that point forward Defendants "owned" the knowingly false earnings guidance.

Courts will only credit a competing, nonfraudulent inference proposed by defendants if it outweighs the fraudulent inference pleaded. *Id.* at 907. The inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–239.[19]

A plaintiff may plead a strong inference in *any* of three ways: (1) facts demonstrating a mental state embracing an intent to deceive or defraud; (2) conduct rising to the level of severe recklessness; *or* (3) motive and opportunity. *Nash*, 502 F. Supp. 2d at 881. Here Plaintiffs demonstrate each.

### A.    The Complaint Demonstrates Intent to Deceive

"One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *CenturyLink*, 403 F. Supp. 3d at 730. That is precisely the situation here, where Defendants' post-Class Period admissions confirm their knowledge of the falsity of the statements when made. (¶¶315-322, 359-383).[20]

---

[19] Defendants claim Plaintiffs offer "different theories in the hopes of creating a 'compelling' inference of scienter" (ECF 71 at 64), but this is precisely what Plaintiffs are required to do under *Tellabs*. For the same reason, Defendants' atomization of the scienter allegations (ECF 71 at 64-69) should be rejected. *Freedman*, 4 F. Supp. 3d at 1122 ("the Defendants isolate the [complaint's] factual allegations from one another and articulate a plausible, innocent explanation for each of them," but seen holistically, and given that "the inference of scienter need not be irrefutable to be adequately pleaded," the court found the scienter allegations sufficient).

[20] The individual Defendants' scienter is imputed to Resideo. *See St. Jude*, 836 F. Supp. 2d at 896 ("The knowledge and scienter of a corporate officer . . . may of course be imputed to the corporate entity."); *Plymouth Cty. Ret. Sys. v. Patterson Cos., Inc.*, No. 18-cv-871

Moreover, the Complaint details the many ways Defendants were informed of the nature and extent of Resideo's problems. (¶335). For example, CW4 explained Defendant Nefkens was informed of poorly performing thermostats at one "skip-level" meeting (¶335), while CW15 explained Nefkens was one of the executives deciding what would be disclosed to the public about TCC outages (¶127). Defendant de Masi was explicitly told during an April 2019 meeting related to Project STORM that the deadline could not be met because of hardware manufacturing delays, among other things. (¶339). CW2 recalled at least two meetings attended by Defendant Nefkens and at least one attended by Defendant Ragan during which they were advised of the impact of delays in microprocessors on sales and the decline in the RTS business. (¶335). These allegations by themselves are more than enough to give rise to a strong inference of scienter. *Green Tree*, 270 F.3d at 665; *CenturyLink*, 403 F. Supp. 3d at 730, 731.

### 1.    Defendants Instructed Employees Not to Use "Easily Discoverable" Email

Defendants, through Scott Harkins, instructed Resideo personnel not to discuss "adverse news" and "potentially damaging" information about Resideo's undisclosed problems other than through WhatsApp because emails were "easily discoverable." (¶¶330, 332). The directive came in response to a breakout session during a Company meeting in Orlando in early 2019 during which Resideo's severe new product challenges were discussed. (¶330). This is *prima facie* evidence of intent to deceive. *See Herbst v.*

---

(MJD/SER), 2019 WL 3336119, at *20 (D. Minn. July 25, 2019) (plaintiffs can "establish corporate scienter by adequately alleging the scienter of individual corporate officers").

*Givaudan Flavors Corp.*, 341 F. Supp. 3d 1006, 1014 (N.D. Iowa 2018) (evidence of concealment implies intent to deceive); *Stellent*, 326 F. Supp. 2d  984, n.6 ("allegations that Defendants consciously misled investors are strong enough that the Court need not delve into the parties' motive and opportunity arguments").

### 2.      Defendants' Statements Were Not Even *Remotely* True

Defendants' intent to deceive is underscored by the chasm between the actual state of Resideo's business and the picture they presented to investors.   The facts pled demonstrate an effort by Resideo's top management, including the individual Defendants, to hide these pervasive intractable problems.  (¶¶101, 316, 317).  At the pleading stage, the Court can infer Defendants were aware of major undisclosed problems.  *CenturyLink*, 403 F. Supp. 3d at 729-30 ( "at the motion to dismiss stage, it is reasonable to assume that top management [is] aware of matters central to [a] business's operation"); *St. Jude Med.*, 836 F. Supp. 2d at 899 ("this Court is satisfied that Plaintiffs have alleged, with sufficient particularity, that the critical facts . . . could be imputed to the Individual Defendants"); *Cummings v. Paramount Partners, LP*, 715 F. Supp. 2d 880, 902  (D. Minn. 2010) (scienter pleaded where defendant "had access to information that contradicted the statements he was making in soliciting future investors"); *In re McLeodUSA Inc., Sec. Litig.*, No. C02–001–MWB, 2004 WL 1070570, at *6 (N.D. Iowa Mar. 31, 2004) (should assume "individuals in top management . . . are aware of matters central to that business's operation"); *Rand-Heart,* 812 F.3d at 1178 ("Taking these allegations as true, DiscoverReady's financial instability caused by the decline in Bank of America was, at the

40

least, so obvious that [the individual defendant] must have been aware of it. The facts pleaded are sufficient to survive a motion to dismiss") (quotation and citation omitted).

### 3.    The Departures of Nefkens, Ragan and de Masi were Suspicious

Ragan was terminated simultaneously with Resideo's launch of an operational and financial review on October 22, 2019 (¶¶174, 306, 384); less than two months later, Nefkens was forced out (¶186, 385) and de Masi was removed from the Board in January 2020 (¶52).  These departures of Defendants on the heels of an operational and financial review and in the face of emerging truth also support scienter.  *See, e.g.*, *Nash*, 502 F. Supp. 2d at 882 (D. Minn. 2007) (resignations of two senior executives "heighten the suspicion" of fraud); *CenturyLink*, 403 F. Supp. 3d at 734 ("in the context of the other evidence and coupled with evidence of timing, such as [the defendant's] early retirement several weeks after" the announcement of an internal investigation, supported strong inference of scienter).[21]

### B.    The Complaint Pleads Severe Recklessness

Scienter can alternatively be established by allegations of conduct evincing "an extreme departure from the standards of ordinary care, and that present[s] a danger of misleading buyers or sellers which is either known to defendant or is so obvious that the defendant must have been aware of it."  *Green Tree*, 270 F.3d at 654.  Here Mr. Ryder's

---

[21] Defendants inaptly rely on *In re Synovis Life Techs., Inc. Sec. Litig.,* No. CIV. 04-3008ADMAJB, 2005 WL 2063870, at *1 (D. Minn. Aug. 25, 2005), but that case stands for the unremarkable proposition that the resignation of one senior executive following a stock decline is not sufficient by itself to establish scienter.  Here each of the individual Defendants departed within a year of the Spin-Off.

41

immediate discovery of Resideo's severe undisclosed problems upon arrival as interim CFO (¶¶94-98) demonstrates Defendants acted with at least severe recklessness. *See*, *e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) (Rapid discovery by new officer (CEO) supported scienter); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 725 (D. Del. 2000) (same (CFO)); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *11 (N.D. Ill. Nov. 4, 1998) (same). Unsurprisingly, Defendants disagree but cite no authority.

Defendants alternatively suggest that perhaps "Resideo struggled in the wake of its Spin-Off from Honeywell . . ." (ECF 71 at 6). But even if this were true, Defendants still recklessly decided to keep the admittedly known truth from investors. (*See, e.g.*, ¶¶211, 226, 246, 294-295).

### C. The Complaint Alleges Motive and Opportunity

Plaintiffs need not plead motive. "Because the complaint's allegations must be considered collectively, 'the absence of a motive allegation is not fatal.'" *Tellabs,* 551 U.S. at 325. Nor are Plaintiffs required to plead a "'concrete and personal benefit' to the individual Defendants." *Sanchez*, 407 F. Supp. 3d at 845 (quoting *Green Tree*, 270 F.3d at 656-60); s*ee also Rand-Heart,* 812 F.3d at 1178; *Jensen v. Thompson,* No. 17–CV–4014–LLP, 2018 WL 1440329, at *14 (D. S.D. Mar. 22, 2018); *St. Jude Med.*, 836 F. Supp. 2d at 898.

Indeed, because Plaintiffs sufficiently allege that Defendants "knew or had access to information suggesting that their public statements were materially inaccurate," they satisfy the scienter requirement without consideration of the adequacy or lack of motive

allegations.  *Freedman*, 4 F. Supp. 3d at 1122, *quoting In re Navarre,* 299 F.3d 735, 746 (8th Cir. 2002); *see also Nash*, 502 F. Supp. 2d at 882-3 ("Although Stewart is not alleged to have conducted any insider trading, she is alleged to have made a statement about the smooth process of the integration at the same time that she knew or had access to information suggesting that the integration was not going as planned").[22]

Nonetheless, the Complaint adequately pleads motive.  Two individual Defendants were former Honeywell employees, and all three agreed to take high-ranking positions in a company Honeywell created as a means of casting off unprofitable product lines and businesses and hundreds of million dollars of environmental liabilities.  (¶¶50-52, 77).  And Nefkens and Ragan at least were awarded restricted stock units potentially worth millions if they remained at the company for at three years post Spin-Off (¶¶384, 385).[23]

Crucially, this theory of motive does not depend on the likelihood that the scheme would succeed.  *Green Tree,* 270 F.3d at 662 (sustaining theory of scienter under which defendants may have hoped change in economy would ameliorate problem before it was discovered); *St. Jude Med.,* 836 F. Supp. 2d at 907 ("The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with

---

[22] *See also Jensen,* 2018 WL 1440329, at *14 (motive allegations not needed where plaintiffs "specifically alleged how each Management Defendant had access to information which would render statements attributed to them materially misleading"); *Sanchez,* 407 F. Supp. 3d at 847.

[23] While motives to earn valuable compensation over time and keep their positions may ordinarily be too general to create an strong inference of scienter by themselves, "when viewed in the totality of all the other allegations, [they] add additional weight to the inference of scienter."  *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04–1255–AA, 2006 WL 538756, at *19 (D. Or. Jan. 3, 2006).

43

its having been a considered, though because of the risk a reckless, gamble") (quoting

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir. 2008)).

### D.    Defendants' Attempt to Decontextualize the Allegations Fails

Ignoring the clear mandate of *Tellabs,* to view the allegations holistically, (551 U.S. at 322-239), Defendants attempt to isolate and decontextualize the Complaint's well pleaded allegations.  For example, Defendants argue the "WhatsApp allegation" should be "disregarded" because it was revealed by a confidential witness.  But Defendants ignore the fact that CW3 had first-hand knowledge of the direction.   Defendants go on to pointlessly suggest that there are plausible non-culpable explanations for this clear direction to hide the truth, but they never articulate a plausible non-culpable reason why Defendants instructed employees to use WhatsApp instead of email to make the communications "less discoverable."   Defendants' hail-Mary suggestion that *maybe* "someone within the Company suggested using a single, secure platform instead of communicating across the wide variety of different platforms available at the time, such as Skype, text, iMessage, Slack, and email" also does not pass the smell test.[24]

Defendants likewise argue that Plaintiffs do not allege CW4's statements regarding information shared during a skip-level meeting would have rendered Resideo's guidance "impossible" to achieve.  But Defendants erroneously take the allegation in isolation *and* misstate the holding in *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 884 (D. Minn. 2007).   The *NVE* Court did not, as Defendants suggest, require plaintiffs to allege

---

[24] Defendants' mountain of exhibits for judicial notice lacks any suggestion WhatsApp is more secure than Resideo's internal email system (or any other platform).

knowledge that a touted goal was "impossible," but merely held that "Plaintiffs must allege that Defendants knew the difficulties . . . were insurmountable *or particularly significant*" – a standard more than met by the allegations here. That Plaintiffs provided examples of what Defendants learned rather than everything they learned is also irrelevant. *See, e.g., No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943, n.21 (9th Cir. 2003) (defendants' attendance at board meetings supported scienter where it was "absurd to suggest" the subject of the case was not discussed).

Defendants' argument that their access to data, "without more," does not support a strong inference of scienter (ECF 71 at 65-66) does nothing to advance their cause, particularly given the allegations in the Complaint that the concealed information went to the very heart of the viability of the Company's Products & Solutions division (¶¶330-334). In this regard, even the cases Defendants cite acknowledge that a court "may infer that individuals in top management of a corporation are aware of matters central to that business' operation." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1034 (D. Minn. 2009), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010) (quotation and citation omitted).

Incredibly*,* Defendants next suggest that the first-hand accounts that Defendant Nefkens was told Project STORM could not launch in 2019 but insisted on "promising the market" it would establishes *only one* Defendant's scienter *on one* lie. But, of course, the Complaint establishes that the problems with Project STORM were well known and the lie at issue was part of a scheme to divert investors' attention from the missed guidance.

45

(¶¶147-150). Common sense dictates that Defendant Nefkens' acknowledged lie about Project STORM while he was making false statements about other issues demonstrates it is more likely he was deliberately deceiving the public about the other problems.[25]

Defendants also absurdly argue that the allegations of their knowledge of GRIP's delays is speculation. But, as discussed above, GRIP was a central piece of Resideo's business plan, the subject of a billion-dollar contract with Resideo's largest customer (¶132) and the subject of analyst questioning and reports (¶¶ 232, 236, 302, 304) as Defendants assured the market that this was a higher-margin product (¶257). Far from speculation, their knowledge of these critical aspects of Resideo's business is properly presumed at this stage. And even if Defendants somehow did not know their GRIP and STORM statements were false, they recklessly made those statements without making proper inquiry which would have revealed the falsehood.

Defendants go on to make the hollow argument that their post-Class-Period admissions are somehow not probative of their scienter during the class period. (ECF 71 at 68). But their admissions that certain undisclosed problems existed throughout the Class Period establish the contemporaneous falsity of Defendants' Class Period statements.[26]

---

[25] Defendants mistakenly rely on the *BISYS* decision from the Southern District of New York for the unremarkable proposition that knowledge of one fraud does not ***necessarily*** demonstrate knowledge of a prior separate fraud. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005). But here the Complaint clearly alleges the various misstatements underpinned a unified scheme.

[26] Defendants' "eighth" and "ninth" argument (that sudden departure of top management and quick discovery by new management do not support scienter) are contrary to decisional authority and dealt with in Subsection A, *supra*.

46

Finally, Defendants unavailingly argue as to Defendant de Masi that "Plaintiffs do not even try to allege facts tying him to any of the alleged misstatements." (ECF 71 at 62). But Defendants ignore that the Complaint alleges that "de Masi signed the Company's Annual Report on Form 10-K, that the Company filed on March 18, 2019, that contained material misstatements or omissions as set forth below." (¶52). Defendant de Masi was also responsible for the October 10, 2018 Form 8-K, as a senior officer and director of Resideo (¶¶206-210), and the Complaint also alleges he was included within the leadership group on whose behalf Harkins provided his directive to only communicate on WhatsApp as to avoid the disclosure of adverse information that was "potentially damaging." (¶333). Defendant de Masi also attended the meetings in December 2018, January 2019 and April 2019 wherein the impossibility of launching Project STORM in 2019 was discussed. (¶¶339, 341).

## III.    THE COMPLAINT EASILY SATISFIES THE EIGHTH CIRCUIT STANDARD FOR CONFIDENTIAL WITNESS ALLEGATIONS

The Complaint establishes the fifteen witnesses: (1) worked at Resideo during the Class Period and stated they had personal knowledge of the information provided (¶¶57-72); (2) had job titles and responsibilities supportive of their claims of personal knowledge (*Id.*); (3) corroborate one another; and (4) are corroborated by other facts, including Defendants' own admissions. (¶¶37, 99, 315-318).[27] These facts perfectly comport with

---

[27] A chart summarizing relevant allegations ascribed to each confidential witness, along with their attendant basis for knowledge, is summarized for the Court's convenience in the attached Exhibit C to the Entwistle Declaration.

the standards to credit confidential witnesses in this Circuit.  *St. Jude Med.,* 836 F. Supp.

2d at 900; *Nash,* 502 F. Supp. 2d at 874; *see also CenturyLink*, 403 F. Supp. 3d at 732.

Defendants state that unnamed witness allegations should be discounted because

they may be false (ECF 71 at 40), but do not offer evidence to support such speculation as

required by the case law, which also flies in the face of the holding in *Green Tree*, 270 F.3d

645 at 668.  Defendants' citation to *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec.

Materials, Inc.,* 641 F.3d 1023, 1030 (8th Cir. 2011), offers no support because the

complaint at issue there contained just ***two paragraphs*** of general confidential witness

allegations alleging defendant "was actively involved in day-to-day operations and knew

any production problems would adversely affect [its] stock price."  *Id*.[28]

Defendants claim that the CWs only offer "generalized allegations about Resideo's

supply chain issues."  But specific allegations abound.  *See, e.g*. ¶107 (CW11 stated there

were problems getting certain Honeywell products, particularly contacts and PIR Motion

Detectors: "They would be on backorder for weeks on end." He stated that this was a long-

standing issue that became particularly acute toward the end of his tenure in 2019); ¶114

---

[28] Although *Minneapolis Firefighters* quoted out-of-circuit *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007), the Eighth Circuit has never applied a per se "deep discount" to confidential witness allegations, and, the Seventh Circuit itself soon sharply retreated from *Higginbotham* in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-12 (2008) in light of the Supreme Court's command that "the case will fall within the jury's authority to assess the credibility of witnesses" in  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Notably, approximately six months after *Minneapolis Firefighters* this Court credited confidential witness accounts without applying a discount. *St. Jude Med.*, 836 F. Supp. 2d at 900.

48

(CW1 stated that one month before the Spin-Off, in September 2018, Honeywell began to experience supply chain issues with the residential HVAC segment, which then grew progressively worse. CW1 recounted conversations with upset customers throughout CW1's time at Resideo because of these issues); ¶113 (CW14 noted that Honeywell customers left for the competition, such as DSC, Interlogix Global Security Products, and Alarm.com and the inventory backorder issues were often raised during weekly meetings); ¶116 ("CW2 explained that this was driven by the steep increase that Resideo's RTS business in EMEA had to pay for microprocessors, which normally cost between 80 cents to $2.50 each, but jumped to $9.00 to $15.00").

In the same vein, CW1, CW2, CW6 and CW14 "described similar supply chain problems with respect to the same and other Products & Solutions products." (¶¶111-116). Courts in this Circuit and elsewhere have credited corroborating witness accounts. *CenturyLink*, 403 F. Supp. 3d at 731 (citing *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059 (C.D. Cal. 2008) for its holding that "scienter was established when witness accounts tell 'the same story . . . from markedly different angles'"); *see also Nash*, 502 F. Supp. 2d at 875 ("the CW's accounts corroborate each other").[29]

---

[29] Additionally, former employees of the ADI division – CW5, CW7, CW11, CW12 and CW13 – "separately discussed the supply chain issues that Honeywell's security products faced, with most confirming that they had pre-existed the Spin-Off, most that they included backorder and inventory problems, and that these issues continued or intensified following the Spin-Off." (¶¶104-110). Similarly, other former employees of Resideo – CW1, CW2, CW6 and CW14 – "described similar supply chain problems with respect to the same and other Products & Solutions products." (¶¶111-113, 115).

The witness accounts are also corroborated by Resideo executives' post-Class Period admissions, including:

- Defendant Nefkens' admission that since its inception, Resideo had no value engineers, an asset critical to businesses like Resideo "to keep gross margin strong" (¶¶99, 315);

- Mr. Ryder's admission that Resideo was "in too many places" and "our manufacturing facilities aren't in the right places with the right freight lanes" (¶188); and

- Defendant Nefkens' admission that "[w]e lost some sourcing leverage in direct and indirect materials following the Spin-Off. We've been working with our suppliers for several months now to rectify that" (¶319).

*See In re Meta Fin. Grp., Inc.,* No. C 10–4108–MWB, 2011 WL 2893625, at \*7 (N.D. Iowa, July 18, 2011) ("More importantly, the actions of the OTS corroborate and support the reliability of the confidential witnesses' allegations").[30]

Defendants' individual challenges to the most damning confidential witnesses similarly fail, as follows.

### A.   CW3 Was Demonstrably Not a "Junior Employee"

Defendants devote *five pages* to attacks on CW3.  *First*, Defendants say CW3 was a "junior employee" without "sufficient basis of [] knowledge."  But the Complaint clearly alleges CW3 had "responsibility for a portfolio of software development for products for the Company's Residential Thermal Solutions, home comfort and security systems

---

[30] Defendants' malapropos arguments that the witness allegations are (1) "confirmations of publicly disclosed information regarding Resideo's challenges in its first year post-Spin," ECF 71 at 46, or (2) "necessarily rely on local observations that do not form a credible basis of knowledge for company-wide allegations" (*Id*. at 40),  ignore detailed allegations to the contrary.  (*See, e.g.*, ¶¶ 59-60, 65, 141, 143-150, 259, 343-344).

segments." (¶60). The Complaint also alleges CW3's "responsibilities…included managing the financials and programs of all software aspects of all categories of the Company's products." including Project GRIP and Project STORM, and the internal analysis of the ability of the TCC App servers to keep up with demand resulting in chronic outages. (¶¶ 60, 121, 141).

Defendants argue that CW3 could not know whether "the delayed rollout of GRIP hurt Resideo's relationship with ADT," that "the delay . . . cost Resideo millions of dollars in revenue," or "whether Resideo suffered any contract penalties," because, they claim, all of this would have been "after the fact." ECF 71 at 43. But CW3 personally reviewed the contract (¶259), which provided that GRIP was supposed to be ready for rollout to ADT in *February* 2019, a month **before** CW3 departed the Company (¶138). CW3 further stated that by February 2019, Resideo had only sent the GRIP product to ADT for beta testing, and ADT employees did not start beta testing on the product until February or March. (¶139).[31] So, CW3 was in position to know that the contract had been breached, that pursuant to the relevant contractual provisions Resideo was assessed penalties, that the delay hurt Resideo's relationship with ADT and, given the money it could have earned if it had timely delivered the product, the delay also cost Resideo millions of dollars in

---

[31] *See Makor*, 513 F.3d at 706, 712 (Notwithstanding an announcement by the defendant company that a new product was "available now" and that "Sprint had signed a multiyear, $100 million contract to buy" the product, confidential witnesses stated that "in fact no sales pursuant to the contract closed until after the period covered by the complaint," as "it was still in the beta stage").

51

revenue.  Similarly, CW3 was in a position to know that, as of March 2019, Resideo was not in a position to ramp up production of GRIP by May 2019.

Defendants' reliance on *Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157 (E.D. Mo. 2014) is misplaced.  There the court evaluated witnesses who left the company eight to twelve months before the class period and were not in a position to know about the state of an inventory backlog during the class period.  This is a far cry from CW3, who was responsible for a major project that he knew was more than two months away from ramping up at the time he left the Company.  *See Roberts v. Zuora, Inc.*, No. 19-cv-03422-SI, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) ("the Court is not persuaded by defendants' assertion that the CW allegations are deficient because the CWs did not work at Zuora for the entire class period . . . Moreover, the CWs' personal knowledge of integration projects and customer feedback comes as a direct result of their positions in Zuora").[32]

### B.   CW9's Observations Were Specific and First-Hand

Defendants contend that CW9's observation that Resideo management had a pattern of picking arbitrary rollout dates, regardless of feasibility, that would be reported to the public was, citing *Hutchinson and AMDOCS,* just another localized "general impression[]" that should be disregarded.  ECF 71 at 47.  But the context for CW9's statement was the report that this witness provided of a meeting in December 2018 or January 2019 in which

---

[32] Defendants are also wrong in asserting that "Plaintiffs nowhere plead that CW3 ever had direct contact with any of the Individual Defendants" (*see* ¶148, recounting meeting attended by CW3 and Nefkens).  And, in any event, "[t]he notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law." *In re Avon Sec. Litig*, No. 19 Civ. 01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019).

engineers told Harkins and Defendant de Masi, among others, that Project STORM would not be ready for years. Unlike in Defendants' cases, the witness account here describes firsthand the particular information conveyed to a Defendant (and another Defendant's direct report) contradicting the public statements.  And Defendants fail to note that each of CW9, CW3 and CW15 *independently* report attending separate meetings of engineers with members of management and *each report the same factual statements made at those meetings as to the same significant problems* with Project STORM.[33]  Defendants also ignore that CW9's characterization of Defendants' failure to consider the engineers' concerns as instructions to "just make it happen," is strikingly similar to CW3's report that, at a separate meeting, Nefkens responded to the same information: "This is what I'm promising the market, so we need to make it happen." (¶338).  Nor is CW9's understanding of the instruction speculation; it is the conclusion the witness drew from the interaction, in which Harkins, a non-engineer, did not offer a reason why the date might be feasible, or any practical or technical advice or direction.

---

[33] *See* ¶147 ("CW 3 continued that various managers, including CW3, explained to Tu and Harkins that all elements of STORM – including the plastics that housed everything, and *the hardware* (which CW3 referred to as the 'guts') and software involved – were a few years from being developed"); ¶149 (to CW9 "it was apparent, by inference from the statements made to the members of management present, that Resideo did not as yet have *the hardware* to make the Project STORM product work and that the engineers present at the meeting advised that it would not be available for as many as five years because the hardware had not yet been developed to make it work"); ¶150 (CW15 noted that among "[t]he reasons they stated were that the connected home and security sides would not be ready, that manufacturing of *the hardware* was behind and not even close to being ready, and that a vision of the final product was lacking").

53

### C.    CW4 and CW11 Knew Facts About Poor Sales

Defendants also contend that "[a]llegations CWs 4 and 11 make that Resideo's thermostats 'were relatively dated' and not performing well are generalized and conclusory." ECF 71 at 47-48. But CW4 directly reported what Nefkens was told about poor thermostat sales (¶168), and CW11, who sold both Resideo products and competing products, could easily compare the relative modernity of the products and observe that Resideo's products were not selling well by comparison ("could not compete") (¶¶68, 170).

Notably, Defendants ignore that both CWs stated precisely what Resideo belatedly disclosed as one of the material reasons for the significantly missed margin and EBITDA estimates: "poor pre-spin cutover" – meaning even before the beginning of the Class Period – "from the prior generation of non-connected thermostats to the T-Series line [which] impacted the adoption of mid-level T-Series thermostats." (¶176; *see also* ¶188 ("We had the inventory. And unfortunately, nobody wanted to buy it, which is why we had these inventory write-offs, okay?"). CW3 also corroborated the discussion of these topics at the breakout meeting in Orlando. (¶162).[34]

### D.    CW 15 Confirmed Problems with the TCC App

CW15 recalled participating in "hundreds of meetings" on the TCC problems from December 31, 2018 until the end of his tenure, in June 2019. (¶128). CW15 estimated that when there was one outage per week, at 3 to 4 hours per occurrence, the customer care team handled around 100 customer complaints per hour. (¶123). CW15's statements are

---

[34] CW3 gave lack of touch screen products as one reason it was behind the competition. (¶165).

corroborated not only by other witnesses and post-Class-Period admissions, but by contemporaneous internal emails, all of which Defendants ignore.  (*E.g.,* ¶¶124, 126).

CW15 also corroborated the allegations of longstanding extreme problems that support the allegations of diminished sales and earnings from the thermostat line.  (¶¶120-146).  CW15's statements on this issue are based on his direct observations as "he had been assigned to a team of 15-20 people to work on solving the outage problem" with the TCC App beginning in December 2018.  (¶127).

Defendants challenge as mere speculation the assertion by CW15 that he "strongly believes" (¶129) that "senior leadership" which he defined as Tu, and Defendants de Masi and Nefkens – were made aware of the ongoing severe TCC issues significantly impacting on Resideo consumers.  ECF 71 at 48.  But CW15 specifically detailed the deep involvement Tu (who reported to Nefkens) had in these issues, allegations corroborated by contemporaneous documents (¶¶124, 127, 128).  And CW3 corroborates that Defendants Nefkens, de Masi and Ragan were aware of the problem, because it was one of the many issues discussed at the Orlando breakout meeting (¶¶163, 166), which Harkins directed, on behalf of his few superiors, which included those three Defendants.[35]

### E.    CW7 and CW8 Did Not Speculate

Defendants similarly label as "pure speculation" both the allegation of CW8 that "senior executives likely knew" GRIP [referring to the version for consumers] would ship

---

[35] Consistent with these allegations is that the TCC severe problems were of long duration, ¶¶123, 223, 270, still existing when CW15 left in June 2019, and 85% of all connected thermostats Resideo sold were controlled by the TCC app.  ¶120.

late (ECF 71 at 48) and CW7's statement that "the Security division had 'problems with availability' before and after the Spin because "'[y]ou can't switch manufacturing processes that quick.'" *Id.* First, Defendants ignore that CW8's team was the only source for information as to the GRIP product's progress, (¶¶143, 146), and CW8 provided detailed reasons, (¶¶144-45), why the project was  extremely poorly run, with numerous impediments to completion, and that this had not changed by the time he left the Company in June 2019. (¶143). Second, Defendants ignore that virtually the same problems alleged by CW7 relating to backorders and lack of availability of the Security division products were confirmed by at least CW 5 (¶105), 11 (¶107), ¶13 (¶¶107-110) and CW 14 (¶113) and that the view by CW7 as to the inability to "switch manufacturing processes that quick" was clearly based on what CW7 was experiencing at Resideo while Defendants were claiming  to have overcome this problem (¶106).

## IV.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

Defendants do not explicitly dispute that the Complaint pleads loss causation. However, they suggest that various misstatements (about GRIP, STORM and Resideo's supply chain) are not related to Resideo's failure to meet its earning guidance and that the corrective disclosures were solely about the earnings "miss."

Defendants are wrong for two main reasons.  *First*, some alleged corrective disclosures, including the final one, were contemporaneous with partial revelations about the supply chain issues and delayed product launches.  (*See*, *e.g.* ¶37).  *Second*, the so-called "earnings miss" was itself partially corrective of the misstatements about the supply chain and the late (and non-existent) product launches.  Obviously, the supply chain issues

56

in 2019 and the delay of "pioneering" products that were supposed to be delivered (and generate revenue) in 2019 would impact earnings, and indeed, Defendants explicitly attributed Resideo's low earnings to these factors, among others. (¶¶ 408-422).

In fact, Defendants' own brief, (ECF 71 at 28), contradicts their argument in this regard: "additional factors that contributed to EBITDA decline in Resideo's P&S segment, including 'gross margin compression' based on an increase in the price of raw materials and loss of value engineers to optimize such costs the loss of some of Resideo's 'sourcing leverage' in its supply chain; 'margin drop associated with the competitive renewal of a contract from a large OEM security customer [ADT/GRIP];' difficulty competing in the smart thermostat market leading to lower-than expected sales; and 'post-spin inventory write-downs.'"

The Complaint ties revelation of the fraud to these corrective disclosures, thereby easily surpassing *Dura*'s requirement to provide defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm. V. Broudo*, 544 U.S. 336, 346-47 (2005); *see also St. Jude* 836 F.Supp.2d at 910 ("a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline" is not required.)

## V.    THE COMPLAINT ADEQUATELY PLEADS CONTROL PERSON CLAIMS

Defendants challenge the Section 20(a) claims only for the reasons they challenge Plaintiffs' allegations of the primary violations of Section 10(b) and SEC Rule 10b-5 (ECF 71 at 72). That argument fails for the reasons set forth in Sections I-IV above.

## CONCLUSION

Plaintiffs respectfully request the Court deny Defendants' Motion in its entirety.


DATED:  October 9, 2020

/s/ Bryan L. Bleichner
Karl L. Cambronne (MN #14321)
Bryan L. Bleichner (MN #0326689)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South,
Suite 1700
Minneapolis, MN 55401-2138
Telephone: (612) 339-7300
kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com


*Plaintiffs' Liaison Counsel*

/s/ Andrew J. Entwistle
Andrew J. Entwistle (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
Frost Bank Tower
401 Congress Avenue, Suite 1170
Austin, Texas 78701
Telephone: (512) 710-5960
aentwistle@entwistle-law.com

*Lead Counsel for The Gabelli Plaintiffs*
*and Co-Lead Counsel for the Class*


/s/ Ira A. Schochet
Ira A. Schochet (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
ischochet@labaton.com

*Lead Counsel for the Naya Group*
*and Co-Lead Counsel for the Class*


/s/ X. Jay Alvarez
X. Jay Alvarez (*pro hac vice*)
Steven W. Pepich (*pro hac vice*)
**ROBBINS GELLER RUDMAN**
**& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
jaya@rgrdlaw.com
stevep@rgrdlaw.com

*Counsel for Additional Plaintiff Oklahoma*
*Firefighters Pension and Retirement System*