**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE RESIDEO TECHNOLOGIES, INC. SECURITIES LITIGATION | Case No. 0:19-cv-02863 (WMW/KMM) |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 5

I.      NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE PLED
        WITH PARTICULARITY ........................................................................... 5

        A.      Plaintiffs' Fraud By Hindsight Allegations And Claims Of
                "Undisclosed Problems" Were In Fact Disclosed And Do Not Show
                Falsity ........................................................................................... 5

        B.      The Large Majority Of The Challenged Statements Are Forward-
                Looking Statements Accompanied By Meaningful Cautionary
                Language ....................................................................................... 9

                1.      Plaintiffs Misstate The PSLRA's Safe Harbor For Forward-
                        Looking Statements Accompanied By Meaningful Cautionary
                        Language ........................................................................... 11

                2.      Resideo's Statements Written In The Future And Present
                        Tenses Qualify As Forward-Looking .................................. 12

        C.      Resideo's Statements Of Corporate Optimism And Opinion Are
                Likewise Inactionable .................................................................. 14

        D.      Defendants' Statements Concerning Projects GRIP And STORM
                Are Not False Or Material ............................................................ 15

II.     PLAINTIFFS' ATTEMPTS TO BOLSTER THE CREDIBILITY OF
        THEIR CW ALLEGATIONS ARE UNAVAILING ...................................... 17

III.    PLAINTIFFS FAIL TO DEMONSTRATE A STRONG INFERENCE OF
        SCIENTER ............................................................................................... 21

IV.     CONCLUSION ......................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*Angres v. Smallworldwide PLC,*
  94 F. Supp. 2d 1167 (D. Colo. 2000).................................................... 16, 17

*Carlton v. Cannon,*
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ...................................................... 13

*In re CenturyLink Sales Practices & Secs. Litig.,*
  403 F. Supp. 3d 712 (D. Minn. 2019)........................................ 12, 19, 23, 24

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.,*
  621 F.3d 800 (8th Cir. 2010) ................................................................... 23

*Florida State Board of Administration v. Green Tree Financial Corp.,*
  270 F.3d 645 (8th Cir. 2001) ............................................................. 18, 24

*Fox v. Am. Airlines, Inc.,*
  No. 02-2069 (RMU), 2003 WL 21854800 (D.D.C. Aug. 5, 2003),
  *aff'd*, 389 F.3d 1291 (D.C. Cir. 2004) ...................................................... 10

*Horizon Asset Mgmt. Inc. v. H&R Block, Inc.,*
  580 F.3d 755 (8th Cir. 2009) ................................................................... 21

*IBEW Local 98 Pension Fund v. Best Buy Co.,*
  958 F. Supp. 2d 1065 (D. Minn. 2013)................................................. 11, 13

*Julianello v. K-V Pharm. Co.,*
  791 F.3d 915 (8th Cir. 2015) ............................................................. 11, 16

*In re Level 3 Commc'ns, Inc. Sec. Litig.,*
  667 F.3d 1331 (10th Cir. 2012) ............................................................... 24

*In re Medtronic Inc., Sec. Litig.,*
  618 F. Supp. 2d 1016 (D. Minn. 2009)..................................................... 23

*Minneapolis Firefighters Relief Ass'n v. MEMC Elec. Materials, Inc.,*
  641 F.3d 1023 (8th Cir. 2011) ................................................................. 18

*In re Nash Finch Co.,*
  502 F. Supp. 2d 861 (D. Minn. 2007)....................................................... 24

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000)......................................................................................25

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*
575 U.S. 175 (2015)................................................................................................ 3

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.,*
874 F. Supp. 2d 341 (S.D.N.Y. 2012)...................................................................... 13

*Pound v. Stereotaxis, Inc.,*
8 F. Supp. 3d 1157 (E.D. Mo. 2014)......................................................................... 10

*Rand-Heart of N.Y. Inc. v. Dolan Inc.,*
812 F.3d 1172 (8th Cir. 2016) ................................................................................. 12

*Rochester Laborers Pension Fund v. Monsanto Co.,*
883 F. Supp. 2d 835 (E.D. Mo. 2012)...................................................................... 11

*Shoemaker v. Cardiovascular System, Inc.,*
300 F. Supp. 3d 1046(D. Minn. 2018)...................................................................... 18

*St. Jude Medical, Inc. Securities Litigation.,*
836 F. Supp. 2d 878 (D. Minn. 2011).............................................................. 6, 18, 23

*In re Stratasys Ltd. Shareholder Securities Litigation,*
864 F.3d 879 (8th Cir. 2017) ................................................................................... 4

*In re Synovis Life Techs., Inc. Sec. Litig.,*
No. 04-3008ADMAJB, 2005 WL 2063870 (D. Minn. Aug. 25, 2005) ..................... 23

*In re Target Corp. Sec. Litig.,*
275 F. Supp. 3d 1063 (D. Minn. 2017)..................................................................... 6

*In re Target Corp. Sec. Litig.,*
955 F.3d 738 (8th Cir. 2020) .......................................................................... 1, 21, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007)................................................................................................ 5

*Yellen v. Hake,*
437 F. Supp. 2d 941 (S.D. Iowa 2006) ..................................................................... 11

**Statutes**

15 U.S.C. § 78u-4 ........................................................................................................ 3

15 U.S.C. § 78u-4(b)(2) ............................................................................................ 21

15 U.S.C. § 78u-5 ........................................................................................................ 9

Defendants Resideo Technologies, Inc. ("Resideo" or the "Company"), Michael G. Nefkens, Joseph D. Ragan III, and Niccolo de Masi submit this reply memorandum of law in response to Plaintiffs' Opposition to Defendants' Motion to Dismiss (the "Opposition" or "Opp.") and in further support of Defendants' Motion to Dismiss the Consolidated Amended Complaint (the "Motion to Dismiss" or "Mot.").[1]

## **PRELIMINARY STATEMENT**

Plaintiffs' Opposition repeats in rote fashion what is in the Complaint and confirms that the Complaint rests on "fraud by hindsight" allegations that have repeatedly been found insufficient in this Circuit.  The Complaint seizes upon the fact that, following its October 2018 spin-off from non-party Honeywell (the "Spin-Off"), Resideo twice issued guidance that fell below the market's expectations, and then quotes back at Resideo the very explanations its executives provided after the Class Period to account for Resideo's disappointing results, alleging that they amount to admissions of pervasive "companywide problems" that should have been apparent from the Spin-Off.  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and an unbroken line of authority from this Circuit, that is woefully inadequate.  Most recently, the Eighth Circuit affirmed that dismissal is warranted when plaintiffs, as here, plead "fraud by hindsight." *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 (8th Cir. 2020).

The Motion to Dismiss established that this attempt to weaponize Resideo's *ex post* explanations for its 2019 results should be rejected not only because it amounts to

---

[1] Capitalized terms not defined herein shall have the same meanings ascribed to them in the Motion to Dismiss.

impermissible fraud by hindsight, but also because these undisclosed "companywide problems" were disclosed. And the Motion to Dismiss demonstrated that Plaintiffs' attempt to use these supposed "companywide problems" to attack virtually everything Resideo said about its business during the Class Period is insufficient to plead either contemporaneous falsity or scienter with particularity, as required by the heightened pleading standards imposed by the PSLRA.

In their Opposition, Plaintiffs—despite effectively granting themselves 30 pages of argument above the Court-authorized word count limit[2]—failed to meaningfully engage with these issues. As discussed *infra*, many of Defendants' arguments for dismissal remain unrebutted. Instead, Plaintiffs doubled down, arguing that "[t]he Complaint details Defendants' admitted ***contemporaneous actual knowledge*** of Resideo's undisclosed supply chain, operational, and new product development problems . . . all confirmed ***by Defendants' post-Class Period admissions***, internal Resideo documents, and fifteen separate witnesses who worked in key positions across both Honeywell and Resideo before and after the Spin-Off." (Opp. at 7 (emphasis added).) But the claim that "***contemporaneous***" knowledge is proven by "***post-Class Period***" explanations is a non-sequitur and demonstrates that this is a case of fraud by hindsight. Moreover, it is inaccurate to characterize these after-the-fact explanations as "admissions." As detailed in the Motion to Dismiss, while Resideo acknowledged that some of its difficulties dated back

---

[2] Even after the Court granted an increase of the word count limits, Plaintiffs nonetheless appended to the Opposition nearly 30 pages of additional argument in Exhibits A-C and did not count them against the Court-imposed word limit. Defendants append brief responses to the Exhibits where necessary.

to the Spin-Off, it certainly did not "admit" that Resideo had been **aware of** these "companywide problems" from the Spin-Off so as to render everything it said about its business following the Spin-Off intentionally false.  (Mot. at 20-23.)  To the contrary, Resideo's explanations were based on an ongoing "comprehensive operational and financial review" (Opp. at 17), conducted after the Class Period, to assess the root causes of its 2019 performance (Mot. at 20).  If Plaintiffs are correct, any retrospective review of disappointing business performance by management could automatically trigger liability under Section 10(b).  That is not—and should not be—the law.

Nor is the Complaint salvaged by reliance on "internal Resideo documents," which barely feature in the Complaint at all, or Plaintiffs' supposed "fifteen Confidential Witnesses," who, if credited at all (and they should not be), cannot sustain a claim for fraud because their allegations are localized, speculative, and fail to actually contradict anything Resideo said during the Class Period, let alone demonstrate scienter.

Equally unavailing is Plaintiffs' contention that the Motion to Dismiss represents a "misguided and pointless effort to employ the oft-rejected, time-worn strategy of claiming baskets of statements are various puffery, opinion, or forward-looking[.]"  (Opp. at 7.) That is an unusually cavalier way to describe a **statutory safe harbor** enacted by Congress through the PSLRA to shield defendants from liability in cases like this one.  *See* 15 U.S.C. § 78u-4.  And it is unduly dismissive of Supreme Court and Eighth Circuit precedent, holding that (i) opinion statements are not actionable barring allegations that the speaker did not actually hold or misrepresented the basis of the opinion, *see Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 188 (2015);

and (ii) generic statements of corporate optimism are immaterial as a matter of law, *see In re Stratasys Ltd. Shareholder Securities Litigation*, 864 F.3d 879, 882 (8th Cir. 2017).

With little else to go on, Plaintiffs devote significant attention to attacking ***Honeywell***, arguing that "[t]his case arises from a carefully orchestrated scheme by non-party [Honeywell] to offload billions of dollars in legacy environmental liabilities and a kludge of aging, money-losing and disparate product lines and pieces of existing businesses onto unsuspecting shareholders[.]"    (Opp. at 1.)    Whatever claim Plaintiffs may contemplate against ***Honeywell***, which is not a defendant in this action, it certainly does not give rise to a claim for securities fraud against ***Resideo***.  Adding to the confusion, the "fraud" here supposedly arises from the fact that "Resideo simply did not exist as a discrete business unit (or units) before the Spin-Off process."  (Opp. at 1.)  But both before and after the Spin-Off, Honeywell and Resideo disclosed which business subcomponents would be spun off to form Resideo—disclosures detailed in the Motion to Dismiss that Plaintiffs simply ignore.

With this as their starting point, it is no wonder Plaintiffs struggle to show any cohesive theory of an intentional fraud by Resideo.  As Plaintiffs would have it, following the Spin-Off, Resideo, at least initially "embraced the sham of Resideo's putative operating, organizational history and businesses," but the "fraud was so egregious and pervasive that it began to unravel the first time Resideo announced financial results." (Opp. at 1, 4.)  But that self-defeating "fraud" cannot be squared with the facts of the Complaint. Resideo set 2019 EBITDA guidance ***below*** the expectation created by Honeywell prior to the Spin-Off and, as operational and other problems mounted, repeatedly disclosed these

- 4 -

adverse developments, while the stock fell further from the Spin-Off price. In October 2019, Resideo further decreased its 2019 EBITDA guidance, prompting a further stock drop, changes to the Resideo management team, and a comprehensive review to assess the root causes of Resideo's 2019 results. None of this plausibly amounts to a fraud.

The Complaint here ultimately sounds in poor performance, not fraud. Plaintiffs offer little, therefore, in response to Resideo's earnings forecasts—the central focus of the Complaint—being absolutely protected as forward-looking statements by the PSLRA safe harbor and bespeaks caution doctrine. Instead, they pivot focus on allegations concerning new product launches, such as Project GRIP and Project STORM, which, as the very after-the-fact assessments on which Plaintiffs rely made clear, had nothing to do with the 2019 earnings miss. And while Plaintiffs emphasize all the things that they are not required to do to plead scienter, the fact remains that the case is utterly lacking in any indicia of a fraud. As such, the Complaint, taken as a whole, fails to plead any inference of scienter, much less the "compelling" inference required by the Supreme Court. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## ARGUMENT

### I. NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE PLED WITH PARTICULARITY

#### A. Plaintiffs' Fraud By Hindsight Allegations And Claims Of "Undisclosed Problems" Were In Fact Disclosed And Do Not Show Falsity

In the Opposition, Plaintiffs primarily contend that Defendants knowingly misled investors about Honeywell using the Spin-Off of Resideo as a "dumping ground" for its "cobbled together" and "underperforming product lines," and that this fact was only

revealed by CFO Bob Ryder's post-class-period statements. (Opp. at 8–11.) Even to the extent this could conceivably give rise to a claim against Resideo, rather than Honeywell,[3] Plaintiffs ignore the numerous statements both pre- and post-Spin-Off in which Honeywell and Resideo disclosed the various components from which the Company was formed. (*See* Mot. at 7-12.) The allegedly concealed information—depicted in Plaintiffs' chart (*see* Opp. at 9; ¶91)—was all disclosed by Honeywell pre-Spin-Off, including the nine subcomponents that would allegedly be "cobbled together" to form Resideo, as shown below:[4]

| # | Component | Exhibit | Disclosure |
|---|-----------|---------|------------|
| 1. | Residential HVAC | Ex. F[5] at 4. | "Homes is roughly a $4.5 billion business that comprises Comfort and Care, |

[3] Plaintiffs' citation to a single case, *St. Jude Medical, Inc. Securities Litigation.*, 836 F. Supp. 2d 878 (D. Minn. 2011), as precedent that pre-class-period conduct can give rise to a claim for securities fraud is unavailing. In that case, the fraudulent activity was the defendants' failure to *disclose* the potential impact of certain pre-class-period activity during the class period. 836 F. Supp. 2d at 891. Statements made by Honeywell, *not* Resideo, prior to the start of the Class Period, indeed prior to Resideo's existence as a public company, are not actionable against Resideo under Rule 10b-5 as a matter of law. *See In re Target Corp. Sec. Litig.,* 275 F. Supp. 3d 1063, 1069 n.3 (D. Minn. 2017) ("A defendant . . . is liable only for those statements made during the class period.") (quotation omitted).

[4] Thus, Plaintiffs merely split hairs by arguing that Ragan committed fraud when he stated in December 2018, two months after the Spin-Off, that Resideo had worked to reduce the number of factories it operated by suggesting that Resideo "did not exist before the Spin process." (Opp. at 25.) Resideo had, in fact, existed as a standalone company pre-Spin-Off. (Opp. at 25.) To wit, even Plaintiffs' CWs refer to pre-Spin-Off conduct by "Resideo," when it is obvious they are referring to the individual subcomponents that ultimately came to form Resideo following the Spin-Off. (*See, e.g.*, ¶116 ("CW2[] explained that 'supply chain issues were relevant' in ***Resideo's*** global RTS business *going back until at least as early as Autumn 2017, when the RTS business was still a part of Honeywell.*") (emphasis added).)

[5] Citations Exhibits ("Ex.") refer to the Exhibits in the Motion to Dismiss.

| # | Component | Exhibit | Disclosure |
|---|-----------|---------|------------|
| | | Ex. M (Ex. 99.1) at 7. | including our residential thermostats and HVAC controls[.]"<br><br>"*Temperature and Humidity Control Solutions*: Devices to control air conditioners and heating equipment, thermostats and zoning devices."<br><br>"*Thermal Solutions*: Devices to control heating and cooling equipment, such as water heaters, boilers, furnaces, heat pumps and air heaters and combustion critical components." |
| 2. | Connected Homes | Ex. M (Ex. 99.1) 27-28. | "[O]ur connected home solutions business . . ."<br><br>"Our connected solutions platform allows for integration and connection to third party solutions." |
| 3. | Smart Meters | Ex. M (Ex. 99.1) at 104. | Describing 2015 acquisition of Elster Division of Melrose Industries plc, "a leading provider of . . . gas, water and electricity meters, including smart meters." |
| 4. | Gas Detectors | Ex. M (Ex. 99.1) at 7. | "*Sensors*: Devices that detect . . . smoke, carbon monoxide and water and transmit a signal to a security panel." |
| 5. | Residential Access Control | Ex. M (Ex. 99.1) at 9. | "*Access Control*: Access control panels and software, readers, credentials, locking hardware, gate control, intercoms, and related system accessories." |
| 6. | Residential Sensors | Ex. M (Ex. 99-1) at 8. | "*Awareness Solutions*: Self-installed and self-monitored systems that include a home gateway/hub, cameras and awareness sensors to detect motion and sounds, opening and closing of doors, entry and exit of known users of the system." |

| # | Component | Exhibit | Disclosure |
|---|-----------|---------|------------|
| 7. | Intrusion Detection | Ex. M (Ex. 99-1) at 7. | "*Sensors*: Devices that detect intrusion (for example, motion, opening of doors and windows and breaking of glass)." |
| 8. | Fire Alarm | Ex. M (Ex. 99-1) at 9. | "*Fire and Life Safety*: Fire alarm control panels, fire detection equipment, fire notification equipment, manual call points/stations and related system accessories." |
| 9. | ADI | Ex. E at 3. | "We intend to spin off our Homes and *ADI Global Distributions* businesses, collected -- referred to as Homes, and our Transportation Systems business into 2 stand-alone public companies." (Emphasis added). |
| | | Ex. F at 4. | "Homes is roughly a $4.5 billion business that comprises Comfort and Care . . . and distribution, which is the global ADI business." |

Despite these pre-Spin-Off disclosures, Plaintiffs allege that Resideo somehow hid that it had "*no* history operating" prior to the Spin-Off. (Opp. at 11 (citing ¶¶201-05) (emphasis in original).) Yet, Honeywell disclosed as early as October 10, 2017, that it was "prepar[ing] Home and Building Technologies for a reorganization to form separate P&Ls for the Homes business as well as the remaining businesses" and that it "*physically [had] to create the [] Homes and buildings [profit and losses ("P&Ls")] within HBT*. . . because those P&Ls in essence and the organizations will get created in Q4." (Ex. E at 3, 8 (emphasis added); *see also* Ex. F at 4.) And Honeywell did, prior to the Spin-Off, create P&Ls and began reporting financial performance for the "Homes" business, the subcomponents combined to create Resideo. (Ex. F at 5; Ex. G at 13; Ex. H at 8.) Honeywell and Resideo also repeatedly reiterated Resideo's lack of "prior operating

history" and the unpredictable impacts of the Spin-Off on Resideo's future performance. (Mot. at 10-11, 30-32.) Thus, Ryder's hindsight statements do nothing to demonstrate that any of Defendants' prior statements on this point were false when made.

As to Resideo's disclosures concerning its supply chain and value engineers, Plaintiffs disingenuously claim that October 22, 2019 was "the first time Resideo *even hinted at* the crippling impact of its supply chain problems, lack of any product and value engineers." (Opp. at 17-18 (emphasis added).) The reality differs starkly, as Honeywell, and later Resideo, made numerous disclosures of supply chain issues and retention-related risk factors prior to and after the Spin-Off. (Mot. at 11, 13, 17, 19, 30-32.)

**B.**  **The Large Majority Of The Challenged Statements Are Forward-Looking Statements Accompanied By Meaningful Cautionary Language**

The Opposition does not dispute, in any real sense, that the majority of the challenged statements are forward-looking statements accompanied by meaningful cautionary language, and are therefore protected by the PSLRA's Safe Harbor and the "bespeaks caution" doctrine. *See* 15 U.S.C. § 78u-5. Defendants identified thirty-five such statements. (Mot. at 24, 44–47, citing to ¶¶20, 29, 197, 201, 206, 207, 209, 211, 212, 216, 219, 220, 224, 230, 232, 235, 236, 239, 248, 254, 256, 260, 261, 268, 278, 281, 285, 291, 294, 295, 296, 300, 302, 310, 313.) Each was accompanied by meaningful cautionary language. (Mot. at 47–48.) In their Opposition, Plaintiffs only dispute that one of these statements is not forward-looking. (Opp. at 33, citing to ¶261.) Plaintiffs also use their Exhibit A to attempt to rebut eighteen additional statements on the grounds that they are not forward-looking. (Opp. Ex. A, addressing ¶¶20, 29, 197, 206, 207, 211, 212, 216, 220,

230, 232, 235, 236, 248, 256, 268, 278, 302).  However, Plaintiffs fail entirely to address Defendants' assertions that the Safe Harbor applies to fifteen of the thirty-five statements (¶¶209, 254, 281, 295, 296, 300, 310, 313[6] and ¶¶201, 219, 224, 239, 260, 285, 291, 294), and thus concede that they are inactionable.[7]

As to the nineteen forward-looking statements in dispute, Plaintiffs claim that eleven (¶¶20, 29, 206, 207, 211, 212, 230, 236, 256, 261, 302) are not forward-looking because they are statements of present fact or mixed statements of current condition, while contending that eight (¶¶197, 216, 220, 232, 235, 248, 268, 278) are both statements of present facts and were made with Defendants' actual knowledge of falsity.[8]  However, Plaintiffs (1) misread the Safe Harbor to require inquiry into scienter when a statement is forward-looking and accompanied by meaningful cautionary language; and (2) improperly conclude that present-tense statements are *per se* not forward-looking.

---

[6] As to these eight, Plaintiffs only argue that Defendants lacked a reasonable basis to make such statements.  However, as discussed *infra*, this argument misinterprets the Safe Harbor, which protects forward-looking statements accompanied by meaningful cautionary language, irrespective of any reasonable basis.

[7] *See, e.g.*, *Fox v. Am. Airlines, Inc.*, No. 02-2069 (RMU), 2003 WL 21854800, at *2 (D.D.C. Aug. 5, 2003), *aff'd*, 389 F.3d 1291 (D.C. Cir. 2004) (arguments not addressed in motion to dismiss opposition are conceded).

[8] Plaintiffs also erroneously assert that Resideo's earnings guidance is not protected by the Safe Harbor.  (Opp. at 37.)  But this blatantly ignores the clear statutory language of 15 U.S.C. § 78u-5(i), defining forward-looking statements as, *inter alia*, statements of "future economic performance"; and Eighth Circuit case law confirming that "statements of financial guidance and projections of future performance"—*i.e.*, EBITDA projections, *are "quintessential forward-looking statements"* protected by the Safe Harbor.  *Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1165 (E.D. Mo. 2014) (quoting *W. Washington Laborers-Emp'rs Pension Tr. v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1093 (E.D. Mo. 2010)).

1.      *Plaintiffs Misstate The PSLRA's Safe Harbor For Forward-Looking Statements Accompanied By Meaningful Cautionary Language*

Plaintiffs attempt to overcome the Safe Harbor by contending that it does not apply where they allege that Defendants had actual knowledge that the statements lacked a reasonable basis, even where such statements were accompanied by meaningful cautionary language.  (Opp. at 7, 30-31, 35-37.)  This misstates the PSLRA.  The Eighth Circuit has held that when a forward-looking statement is accompanied by meaningful cautionary language, ***it is not actionable as a basis for securities fraud, regardless of scienter***.[9] *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 922 (8th Cir. 2015) ("[Defendant]'s statements fall within the PSLRA's safe-harbor provision as forward-looking statements accompanied by meaningful cautionary language and are not actionable as a basis for a securities fraud action. . . . [Therefore], we need not consider whether the plaintiffs adequately pled scienter."); *see also IBEW Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, 1074 (D. Minn. 2013) (finding the Safe Harbor protected earnings guidance that was accompanied by meaningful cautionary language without inquiry into scienter); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 894 (E.D. Mo. 2012) (concluding that challenged statements were forward-looking and accompanied by meaningful cautionary language and therefore the "record reveal[ed] no actionable statements").

---

[9] This interpretation is consistent with canons of statutory construction as the Safe Harbor is clearly written disjunctively.  *See Yellen v. Hake*, 437 F. Supp. 2d 941, 961-62 (S.D. Iowa 2006) (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B)) (collecting cases).

Plaintiffs misstate *Rand-Heart of N.Y. Inc. v. Dolan Inc.*, 812 F.3d 1172 (8th Cir. 2016), to argue that, in the Eighth Circuit, pleading actual knowledge of falsity defeats application of the Safe Harbor.  (Opp. at 35-36 n.17.)  *Rand-Heart* does not remotely support this conclusion.  Rather, the court inquired into the defendant's actual knowledge only because it found that the forward-looking statements were ***not*** accompanied by meaningful cautionary language.  *Rand-Heart*, 812 F.3d at 1178.  *Rand-Heart*, in fact, reaffirms the Eighth Circuit's holding in *K-V Pharm*.  *Id*.  Accordingly, Plaintiffs' arguments regarding Defendants' knowledge at the time the statements were made are irrelevant as to all thirty-five of the forward-looking statements that were accompanied by meaningful cautionary language (which Plaintiffs do not contest).

### 2. *Resideo's Statements Written In The Future And Present Tenses Qualify As Forward-Looking*

Plaintiffs attempt to narrow the Safe Harbor's applicability by arguing that all statements that are written in the present tense necessarily contain or integrate present facts.[10]  (Opp. at 30, 33, 37.)  This is not the law.  "In determining whether a statement is truly forward-looking, the determinative factor ***is not the tense of the statement***; instead, the key is whether its truth or falsity is discernible only after it is made." *In re CenturyLink Sales Practices & Secs. Litig.*, 403 F. Supp. 3d 712, 729 (D. Minn. 2019) (quoting *K-V Pharm. Co.*, 791 F.3d at 920-21) (emphasis added).  Although statements that merely discuss "what had already happened" or "what was happening" are not forward-looking,

---

[10] Plaintiffs contend the following statements include statements of present facts:  ¶¶20, 29, 197, 206, 207, 211, 212, 216, 220, 230, 232, 235, 236, 248, 256, 261, 268, 278, 302.

the same is not true for statements that "predict future production, yields or costs." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016) (cited in Opp. at 29). That is precisely the case here: because these blended statements constituted predictions of future performance, their truth or falsity was discernible only after they were made.

Resideo's statement on March 7, 2019, that "[o]ver the year ahead . . . [i]n comfort, Resideo is launching a pioneering platform with recurring services that integrate all dimensions of home wellness [STORM]" (¶235) was a mixed statement of present/future condition that was a prediction of a future production that could not be verified at the time it was made. The same goes for the other forward-looking statements Plaintiffs argue should not be protected because they used present tense, even though they pertain to future events and are therefore protected. *See, e.g.*, ¶¶20, 206 (predicting a "bright future"); ¶¶197, 207, 211–12, 248 (predicting future ability to leverage demand); ¶¶29, 220, 230 (predicting when Spin-Off disruptions would cease in the future)[11]; ¶¶216, 232 (predicting

---

[11] Plaintiffs' attempts to bolster their argument that such statements are present facts by analogizing to other cases are unavailing. (Opp. at 29-30 (citing *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159 (N.D. Cal. 2015) (court did not address the "behind us" statement, and specifically did not include it in list of present-tense statements))); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 354-55 (S.D.N.Y. 2012) (court did not apply Safe Harbor because statements were not accompanied by meaningful cautionary language, *not* because they were not forward looking). Moreover, Plaintiffs' reliance on *Best Buy* is misplaced. The statement at issue in *Best Buy* indicated that the defendants were "on track to" deliver and exceed specific annual guidance, while Nefkens' statement in ¶216, that Resideo was "on-track to deliver *continued growth in 2018 and beyond*," and that Resideo's "first priority is to deliver results for our stakeholders, and we're inspired by the support and optimism of our customers and suppliers," expressed a far more generalized hope for the future that made no indication of its current condition. *See Best Buy*, 958 F. Supp. 2d at 1076; Ex. N (Ex. 99.1) at 1.

future EBITDA margins); ¶¶235–36, 261, 268, 278, 302 (predicting future launch of new technology).  Despite use of the present tense, these statements are forward looking and, thus, protected by the Safe Harbor.

### C.    Resideo's Statements Of Corporate Optimism And Opinion Are Likewise Inactionable

Statements of "corporate optimism," or "puffery," and statements conveying honestly held opinions are inactionable.  (Mot. at 49-52.)  Of the twenty-two challenged statements Defendants identified as inactionable corporate optimism or opinion (Mot. at 51-52, citing ¶¶20, 31, 192, 193, 194, 197, 206, 207, 210, 211, 212, 216, 220, 229, 230, 234, 248, 250, 251, 256, 257, 273), Plaintiffs only address five (Opp. at 21-22, addressing ¶¶192, 197, 206, 216, 250), thereby conceding that the rest are inactionable.

As to these five, all predicated on the same alleged misrepresentation, Plaintiffs argue that the statement on November 13, 2018, that Resideo's "performance as part of Honeywell over the past three years demonstrates a well-run business that is on track to deliver continued growth in 2018 and beyond," (¶¶192, 197, 206, 216, 250), is not puffery or opinion because it was false when made.  *Id.*  But contending that the opinion was wrong is not enough:  Plaintiffs fail to plead facts sufficient to show that the speakers did not *subjectively* believe their opinions when the statements were made or that the statements did more than express the type of "optimistic rhetoric" that no reasonable investor would rely on, and as such, fail to distinguish these statements from the statements of corporate optimism and opinion protected under *Stratasys* and *Omnicare*.

**D.      Defendants' Statements Concerning Projects GRIP And STORM Are Not False Or Material**

While the Complaint focuses on Resideo's 2019 EBITDA guidance, in the Opposition, Plaintiffs pivot and argue at length that Defendants made materially false statements about the supposed delayed rollout of Projects GRIP and STORM—two business initiatives that had nothing to do with the 2019 earnings reductions.  (Opp. at 3-5, 7, 14-16 n.4, 18-19, 30-35, 46.)  But Plaintiffs mistakenly interpret statements about the GRIP rollout as contradictory (when they are not), conflate terms used by Defendants to argue falsity, and ignore the forward-looking nature of other statements.

As to the purportedly "contradictory" statements about GRIP, Defendants stating that "[w]e have the rollout of our new Global Intrusion Platform [GRIP], started in December [2018]," that "Resideo's new next-generation pro series security platform began rollout in Q1 [2019]," that "*[v]olume* shipments began for our largest customer in February," and that "[GRIP] is going great as far as the adoption," merely reflects different stages of a multi-month roll-out that includes delivering prototypes, beta testing, initial volume shipments of the finished product, and finally a ramp of deliveries.  (Opp. at 31; ¶¶236, 257, 238, 285.)  Plaintiffs' conflation of a "roll out" of a product with "volume shipments" is comparing apples to oranges.  (*See* Mot. at 45 n.17.)

Plaintiffs' only attempt to demonstrate materiality relies on the unfounded opinion of CW3 regarding supposed contractual penalties he claims were related to a GRIP delay.  (Opp. at 14-15, 51-52; ¶¶139-41.)  By CW3's admission, any such penalties would have been incurred months *after* he was fired.  CW3's only claim of knowledge of such penalties

- 15 -

is based on his interpretation of the ADT contract when it was first entered into, meaning he would have no personal knowledge of intervening events, such as Resideo meeting its later GRIP deadlines or other efforts to mitigate or prevent any such penalties. (Mot. at 35–36; ¶140–41.) And while CW3, a low-level non-lawyer, may have "personally reviewed" the contract, his interpretation of a complex legal document is speculative and manifestly unreliable. (Opp. at 51.)

Plaintiffs go even further in their attempt to buttress CW3's unfounded claim of GRIP-related penalties by falsely claiming that Nefkens "eventually cited the contractual penalties as one reason for Resideo's poor performance (even then, he continued to lie about them by falsely referring to the penalties as 'rebates.')." (Opp. at 15 n.4) Plaintiffs substitute their own words for what was actually said—Nefkens did not say that there were "contractual penalties" associated with GRIP, but rather that there were "contractual customer rebates" associated with a "competitive renewal of a contract from [ADT]." (Opp. at 19; Mot. at 27 n.13; ¶¶172, 259, 372.) As Nefkens explained, these rebates kicked in due to "volume ramp-up [of sales to ADT] in 2019," not because of a delayed product launch. (Opp. at 19; Mot. at 27 n.13; ¶¶37, 372.)

The remaining challenged GRIP-related statements (¶¶235-36, 260-61, 302, 345; Opp. at 31, 35) are forward-looking and were accompanied by meaningful cautionary language, and are therefore protected by PSLRA's Safe Harbor provisions. *See* Section I.B. *supra*; *K-V Pharm.* 791 F.3d at 921 (finding statements regarding the "future launch" of new products and "the anticipated results" to be inherently forward-looking). Plaintiffs cite *Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167 (D. Colo. 2000), for the

proposition that courts routinely sustain claims involving statements about the status of new product launches. However, the statements at issue in *Angres* were not claimed to be forward-looking. *Id.* at 1173-74. And they were deemed material because the delayed launch was specifically cited by the defendants as the cause of their downward guidance revision, a crucial fact absent here. *Id.* at 1171.

Here, unlike in *Angres*, nearly all of the challenged statements concerning Project STORM are forward looking and were accompanied by meaningful cautionary language. (*See* Mot. at 45–46) (¶¶235-36, 239 ("Resideo *will roll out* next generation platforms in both its . . . comfort division [STORM].") (emphasis added); ¶260-61 ("we'll have the capability *by the end of the year, beginning of next year*.").) Plaintiffs attempt to rebut this point by citing the hyperbolic claims of unreliable CWs (two of whom left Resideo early in STORM's development), who describe Project STORM as a "fake project" with "impossible" timelines. (¶25, 62, 72, 147, 163, 262, 331, 337-38; Mot. at 34-35, 39-40, 59-60.) But this does nothing to change the protected status of such statements under the Safe Harbor. At most this testimony demonstrates potential difficulties in STORM's future development, not a deception by management. (Mot. at 59-60.) Even so, like those from GRIP, earnings from STORM did not factor into Resideo's earnings guidance during the Class Period and so any related statements are immaterial. (Mot. at 4, 59-60.)

## II. PLAINTIFFS' ATTEMPTS TO BOLSTER THE CREDIBILITY OF THEIR CW ALLEGATIONS ARE UNAVAILING

The statements of the 15 CWs cited in the Complaint are unreliable, immaterial, and lack credibility for the reasons discussed in Defendants' Motion to Dismiss, and therefore

should be disregarded.  (*See* Mot. at 33-41.)  Further, as Plaintiffs do not contest the unreliability of CWs 4 and 10, their statements should be disregarded.

Plaintiffs press on whether the remaining CWs should be "deeply discounted" or just "discounted."  (Opp. at 48 n.28.)  Specifically, Plaintiffs misstate Eighth Circuit case law and contend that this District has moved away from the "deep discount" standard in *Minneapolis Firefighters Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011), by citing *St. Jude Medical*, 836 F. Supp. 2d at 900.  (Opp. at 48 n.28.)  But *St. Jude Medical* does not support the point.  In that case, the reliability of the CWs was not in dispute; instead, the court considered whether the CW allegations included enough particularized detail to establish scienter.  *Id*. at 900–02.  Thereafter, the "deep discount" standard for CW allegations was reaffirmed in *Shoemaker v. Cardiovascular System, Inc.*, which cites to *Minneapolis Firefighters* in holding that "[u]nlike other factual allegations in a complaint, courts are not required to wholly accept as true statements from a confidential witness."  300 F. Supp. 3d 1046, 1055 (D. Minn. 2018).[12]

Plaintiffs also argue that certain CWs are reliable because their statements are "corroborated" by the statements of other CWs.  (Opp. at 47-50.)  However, the referenced statements are not actually corroborative—there is not a single example of two CWs saying

---

[12] Plaintiffs also misread *Florida State Board of Administration v. Green Tree Financial Corp.*, 270 F.3d 645, 667 (8th Cir. 2001) to suggest that Defendants must provide evidence to demonstrate that a CW's claim is false.  To the contrary, *Green Tree* holds only that plaintiffs are not required under the PSLRA to identify CWs to meet the PSLRA's particularity requirement.  *Id.* at 667-68.  Even so, Defendants did offer incontrovertible evidence that no "annual meeting" took place in Orlando, Florida in January 2019, where Plaintiffs claim CW3 heard the "WhatsApp" allegation.  (¶330; Mot. at 37; *infra* Section III.)

that the same event happened or that the same thing was stated at the same meeting, unlike the corroborated statements at issue in *CenturyLink*, 403 F. Supp. 3d at 731 (two CWs reported the same thing: "that they were instructed to cram during training sessions").

At best, the CW statements merely speak on the same general topics, including supply chain issues within ADI, a division and supply chain discrete from the P&S division from which Resideo's disappointing results stemmed. (Mot. at 6, 39.)  For example, Plaintiffs' argument that CW1, CW2, CW6 and CW14 corroborate each other's statements (Opp. at 49), comes up short, as each of these witnesses referenced different events/observations entirely.  CW2 made a statement about pre-Spin-Off delays resulting from difficulties obtaining microprocessors.  (¶116.)  CW6, a "retail channel marketing leader" (Compl. Appx. C), alludes to unspecified "supply chain issues" as to thermostats, humidifiers, and air filters.  (¶115.)  CW1 stated that Honeywell had supply chain issues with its HVAC segment, and that while at Resideo it heard from customers about back orders (without specifying which products, over what time period, or how many customers complained).  (¶114.)  CW14 "said that Resideo had a 'very hard time stocking certain items'" and that some customers left for the competition (again without specifying how many customers, over what time period, or related to which products).  (¶113.)

Furthermore, Plaintiffs' assertion that CW3 was "demonstrably not a 'junior employee'" (Opp. at 50-51) is belied by their Complaint: "CW3 had responsibility for a portfolio of software development for products for the Company's Residential Thermal Solutions, home comfort and security systems segments." (¶60.)  CW3's job description does not encompass hiring and firing, setting strategy, or other indicia of seniority,

including playing any role in the preparation of financial projections or public company disclosures. Nor do any of his statements show that he had contact with any senior management at Resideo, including any of the Individual Defendants.

Plaintiffs also attempt to buttress the reliability of their CWs by pointing to "specific" statements. (Opp. at 48-49.) However, these purported specific statements only demonstrate that they are the type of CW allegation that are too localized to form a credible basis for companywide allegations concerning Resideo's overall earnings which are at the heart of the Complaint. (Mot. at 40.) For example, CW1, a local territory representative, states that he had conversations with upset customers over supply chain issues. (¶114.) CWs 11 and 14, both sales representatives, likewise only provide micro-observations of one-off incidents with inventory that say nothing about the companywide earnings reports. (¶¶107, 112-13.) The same goes for CW2's statement that during his tenure the price of microprocessors increased from "80 cents to $2.50 each, [] to $9.00 to $15.00," without any indication of the actual impact this price increase had on overall earnings performances. (¶116.)

Finally, the CWs are not made any more credible by the Plaintiffs' few and oblique references to "internal Resideo documents" which are silent on earnings guidance, mention only one-off localized problems, such as an email forwarding an "example experience from a frustrated contractor" (¶126), do not touch on Resideo's EBITDA projections, and are not alleged to involve any Individual Defendants.[13] (¶¶124-26, 130-32.)

---

[13] Plaintiffs did not attach any of these documents to the Complaint or to their Opposition.

## III.    PLAINTIFFS FAIL TO DEMONSTRATE A STRONG INFERENCE OF SCIENTER

Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."    15 U.S.C. § 78u-4(b)(2).    None of Plaintiffs' allegations—lacking any coherent theory of a fraud— gives rise to a strong inference of scienter.

*First*, it is axiomatic that scienter cannot be shown through "fraud by hindsight." *Target*, 955 F.3d at 743.    Yet, Plaintiffs argue exactly that in their Opposition: "Defendants' post-Class Period admissions confirm their knowledge of the falsity of the statements when made." (Opp. at 38.)  The Eighth Circuit's decision in *Target* rejected nearly identical claims of "fraud based on later statements describing the response to problems with Target Canada's supply chain and IT infrastructure as they became more apparent."    955 F.3d at 742.    Moreover, to the extent Defendants became aware of challenges, they **warned** investors of potential risks and disclosed adverse events as they became visible (Mot. at 10-23), further undermining any inference of scienter.  *See Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009) (explaining that Defendant's "continued disclosures" weakened the inference of scienter).[14]

*Second*, Plaintiffs claim they have demonstrated scienter through the CWs (Opp. at 39-40), even though all of those allegations are sourced from isolated conversations having nothing to do with financial projections.  (Mot. at 57-62.)  Yet, given their positions, not a

---

[14] Plaintiffs' fallback position—that Ryder's "discovery" of Resideo's problems somehow demonstrated severe recklessness—is just another variation on this same allegation of fraud by hindsight.  (*See* Opp. at 41-42.)

- 21 -

single CW has anything to say about the intentions of senior-level executives at the Company (including the Individual Defendants) and convey nothing beyond speculation. The CWs' allegations are riddled with phrases like:  the issues "*should* have been visible upfront," ¶116 (emphasis added); the CWs "*believe*[]" or "*strongly believe*[]" that executives were made aware of issues, ¶¶147, 129 (emphasis added); or "senior executives *likely* knew," ¶146 (emphasis added).  CW 15, who "did not have a role in Project STORM," offered his impression of the project's timeline based on his attendance at a single meeting.  (¶150.) Even more egregiously, Plaintiffs now claim CW9 said, "engineers told Harkins and Defendant de Masi, among others, that Project STORM would not be ready for years," (Opp. at 52-53), when in actuality the Complaint cites CW9 as stating that "it became *apparent*, by *inference*, from the statements made to members of management in attendance, that Resideo did not have the hardware to make the Project STORM project." (¶341) (emphasis added).  This is textbook speculation that does not show any strong inference of scienter.

*Third*, Plaintiffs argue that the unreliable "WhatsApp" allegation is "*prima facie* evidence of intent to deceive."  (Opp. at 39.)  But Plaintiffs failed to engage with Defendants' arguments that this allegation is entirely unreliable, based on multiple levels of hearsay, and riddled with errors.  (*See* Mot. at 36-38.)  Furthermore, the comment was originally alleged to have been made at "[the Company's] *annual meeting* in Orlando, Florida around January 2019," ¶162 (emphasis added), a demonstrably false assertion which Plaintiffs have since backed away from.  (*See* Opp. at 39, redefining the relevant meeting as a "breakout session during *a Company meeting* in Orlando in early 2019"

- 22 -

(emphasis added); Opp. Jud. Not. (Dkt. 78) at 1, 6, redefining it as an "***internal company meeting***".)  Moreover, even if credited, the allegation does not come anywhere close to establishing scienter *for securities fraud.*  (Mot. at 38.)

*Fourth*, Plaintiffs' conclusory allegations regarding Defendants' purported knowledge of certain alleged facts based on their executive positions (and access to information) do not pass muster under the PSLRA.  *See Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 808 (8th Cir. 2010) ("blanket assertions the appellees should or must have known of each of the allegedly significant facts" insufficient to show scienter); *Target*, 955 F.3d at 744-45 (allegations of scienter insufficient even where executives were informed of inventory problems at biweekly meetings); *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1034 (D. Minn. 2009) (no scienter in the absence of an allegation that defendants "actually studied the sales and performance data").

In contrast to the localized allegations made by CWs, the cases cited by Plaintiffs assume such knowledge where the company was engaged in a large-scale improper practice that directly affected the company's companywide accounting and financial statements.  *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 731 (company's longstanding practice of cramming "heavily impacted" a significant segment of company's business); *St. Jude Med.*, 836 F. Supp. 2d at 891 (company's longstanding practice of channel-stuffing and improperly accounting for sales).  No large-scale accounting or other fraudulent scheme is alleged here, just projections that allegedly lacked a reasonable basis.

*Fifth*, the departures of Nefkens, Ragan, and de Masi do not support an inference of the intent to deceive investors.  *See, e.g.*, *In re Synovis Life Techs., Inc. Sec. Litig.*, No. 04-

- 23 -

3008ADMAJB, 2005 WL 2063870, at *16 (D. Minn. Aug. 25, 2005) (corporate officer's resignation after stock price fell does not give rise to an inference of scienter). In both *Nash* and *CenturyLink*, relied on by Plaintiffs (Opp. at 41), executives resigned or were terminated following allegations of fraudulent practices, giving rise to the inference that their resignation was connected to the practices in question. *CenturyLink*, 403 F. Supp. 3d at 734 (resignation following investigation into cramming); *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 882 (D. Minn. 2007) (resignation after insider trading). Here, no such inference can be drawn because the three executives at issue left Resideo over a period of seven months following disappointing earnings, with Nefkens only fully departing in May 2020: hardly the unexpected and immediate departures that would suggest a fraud. (Mot. at 6-7; ¶50-52.)

*Finally*, Plaintiffs fail to plead any allegations of improper motive. In the absence of such allegations, "other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard." *Green Tree*, 270 F.3d at 660. At the outset, Plaintiffs offer no response to Defendants' argument that general allegations that the Company and its officers intended to cause Plaintiffs "to purchase Resideo common stock at artificially inflated prices," ¶441, are "insufficient as a matter of law." (Mot. at 62-63.) Plaintiffs also improperly argue that motive, and therefore scienter, can be demonstrated by Nefkens' and Ragan's ownership of restricted stock. (Opp. at 43.) But possession of stock options and restricted stock are "common among executives at publicly traded companies and does not ordinarily indicate scienter." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012). At most,

- 24 -

possession of restricted stock shows that defendants were motivated to remain employed, which is hardly demonstrative of the strong inference of scienter required by the PSLRA. *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). Plaintiffs' failure to allege facts sufficient to demonstrate any specific and non-universally held motive makes plain that Plaintiffs' entire endeavor serves as a stock drop in search of a fraud.

## IV.    CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

DATED: November 9, 2020

   */s/ Jerry W. Blackwell*
Jerry W. Blackwell (MN #186867)
G. Tony Atwal (MN #331636)
**BLACKWELL BURKE P.A.**
431 South Seventh Street
Suite 2500
Minneapolis, MN 55415
Telephone: (612) 343-3200
blackwell@blackwellburke.com
tatwal@blackwellburke.com

*Defendants' Liaison Counsel*

 */s/ Tariq Mundiya*
Tariq Mundiya (*pro hac vice*)
Charles D. Cording (*pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
tmundiya@willkie.com
ccording@willkie.com

Nicholas Reddick (*pro hac vice submitted*)
**WILLKIE FARR & GALLAGHER LLP**
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1000
nreddick@willkie.com

*Counsel for Defendants Resideo Technologies, Inc., Michael Nefkens, Joseph Ragan III, and Niccolo de Masi*