# EXHIBIT A

# Section 1: 10-K (10-K)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**FORM 10-K**

(Mark One)

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2018

or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number 001-38635

# Resideo Technologies, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 82-5318796 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1985 Douglas Drive North<br>Golden Valley, Minnesota | 55422 |
| (Address of principal executive offices) | (Zip Code) |

(763) 954-5204

Registrant's telephone number, including area code

Securities registered pursuant to Section 12(b) of the Act:

Title of each class

Name of each exchange on which registered

Common Stock, par value $0.001 per share New York Stock Exchange

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2018, the registrant's common stock was not publicly-traded.

The number of shares outstanding of the Registrant's common stock, par value $0.001 per share as of March 11, 2019 was 122,686,190 shares.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's proxy statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A in connection with the registrant's 2019 Annual Meeting of Stockholders, which will be filed subsequent to the date hereof, are incorporated by reference into Part III of this Form 10-K. Such proxy statement will be filed with the Securities and Exchange Commission not later than 120 days following the end of the registrant's fiscal year ended December 31, 2018.

**TABLE OF CONTENTS**

| | **Item** | | **Page** |
|---|---|---|---|
| **Part I.** | 1. | **Business** | **3** |
| | 1A. | **Risk Factors** | **20** |
| | 1B. | **Unresolved Staff Comments** | **49** |
| | 2. | **Properties** | **50** |
| | 3. | **Legal Proceedings** | **50** |
| | 4. | **Mine Safety Disclosure** | **50** |
| **Part II.** | 5. | **Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities** | **51** |
| | 6. | **Selected Financial Data** | **51** |
| | 7. | **Management's Discussion and Analysis of Financial Condition and Results of Operations** | **53** |
| | 7A. | **Quantitative and Qualitative Disclosures About Market Risk** | **67** |
| | 8. | **Financial Statements and Supplement Data** | **67** |
| | 9. | **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure** | **110** |
| | 9A. | **Controls and Procedures** | **110** |
| | 9B. | **Other Information** | **110** |
| **Part III.** | 10. | **Directors and Executive Officers of the Registrant** | **111** |
| | 11. | **Executive Compensation** | **111** |
| | 12. | **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters** | **111** |
| | 13. | **Certain Relationships and Related Transactions** | **111** |
| | 14. | **Principal Accounting Fees and Services** | **112** |
| **Part IV.** | 15. | **Exhibits, Financial Statement Schedules** | **113** |
| | 16. | **Form 10-K Summary** | **116** |
| **Signatures** | | | |

**RESIDEO TECHNOLOGIES, INC.**

**PART I.**

**Item 1.        Business**

In this Annual Report on Form 10-K, unless the context otherwise dictates, references to "Resideo", "the Company", "we," "us" or "our" means Resideo Technologies, Inc. and its consolidated subsidiaries.

This Annual Report includes industry and market data that we obtained from various third party industry and market data sources. While we believe the projections of the industry sources referenced in this Annual Report are reasonable, forecasts based upon such data involve inherent uncertainties, and actual results are subject to change based upon various factors beyond our control. All such industry data is available publicly or for purchase and was not commissioned specifically for us. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, forecasts based upon such data involve inherent uncertainties, and actual results regarding the subject matter of such forecasts are subject to change based upon various factors, including those beyond our control and those discussed under the headings "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" in this Annual Report.

**Separation from Honeywell**

The Company was incorporated in Delaware on April 24, 2018. We separated from Honeywell International Inc. ("Honeywell") on October 29, 2018, becoming an independent publicly traded company as a result of a pro rata distribution of our common stock to shareholders of Honeywell (the "Spin-Off"). We filed our last amended Form 10 describing the Spin-Off with the Securities and Exchange Commission ("SEC") on October 2, 2018 (the "Form 10") which was declared effective by the SEC on October 3, 2018. On October 29, 2018, Honeywell's shareholders of record as of October 16, 2018 (the "Record Date") received one share of our common stock, par value $0.001 per share, for every six shares of Honeywell's common stock, par value $1.00 per share, held as of the Record Date, and cash for any fractional shares of our common stock. We began trading "regular way" under the ticker symbol "REZI" on the New York Stock Exchange on October 29, 2018. The Spin-Off is further described in Note 1 to the Consolidated and Combined Financial Statements included in Item 8 of this Form 10-K.

**Description of Business**

Resideo is a leading global provider of critical comfort, residential thermal solutions and security solutions primarily in residential environments. Our products consist of solutions in Comfort, Residential Thermal Solutions (RTS) and Security categories and include temperature and humidity control, thermal, water and air solutions and remote patient monitoring software solutions as well as security panels, sensors, peripherals, wire and cable, communications devices, video cameras, awareness solutions, cloud infrastructure, installation and maintenance tools and related software. Our ADI Global Distribution business is the leading wholesale distributor of security and low voltage electronic products which include video surveillance, intrusion, access control, fire and life safety, wire, networking and professional audio visual systems.

Our critical comfort, residential thermal and security solutions have a presence in over 150 million homes globally Our products, which benefit from the trusted, well-established Honeywell brand, are installed in over 15 million homes annually, allowing us to launch innovative technologies and services at scale. These products are now marketed and sold under the Honeywell Home brand pursuant to a license agreement with Honeywell (the "Trademark License Agreement"). We have a long-standing leadership position in the traditional/non-connected products space that contributes significantly to our net revenue. Our growing portfolio of connected home solutions is one of the largest and most comprehensive in the market. Our connected solutions are supported by software platforms that allow consumers and channel partners to easily install, use and maintain our solutions and third-party devices. These platforms interact with other ecosystems to control ours and others' home automation devices. Over 5.6 million of our customers are connected, providing access to control, monitoring and alerts, and we have approximately 32 million installed sensors generating more than 400 billion data transmissions annually. Our broad portfolio of innovative products is supported by approximately 3,000 worldwide active and pending patents, delivered through a comprehensive network of over 110,000 professional contractors, more than 3,000 distributors and over 1,200 original equipment manufacturers ("OEMs"), as well as major retailers and online merchants.

**RESIDEO TECHNOLOGIES, INC.**

Our ADI Global Distribution business ("ADI") is the leading wholesale distributor of low voltage security products, and is independently recognized for superior customer service. Through over 200 stocking locations in 17 countries, ADI distributes more than 350,000 products from over 1,000 manufacturers to a customer base of over 100,000 contractors. We believe this global footprint gives us distinct scale and network advantages in our core products over our competitors. Further, we believe our customers derive great value from the advice and recommendations of our knowledgeable design specialists allowing our customers to better meet the technical and systems integration expertise requirements to install and service professional security systems. We continue to be a leader in the industry with value-added services including presales system design, 24/7 order pick-up, and the selective introduction of new product categories such as professional audio visual. Additionally, ADI has long been an important channel to market for our security products, providing a level of end-customer intimacy that drives our ability to develop successful new products at an accelerated rate and insights into current market trends that help us quickly adapt our product portfolio to meet evolving customer needs. Similarly, ADI is an important channel to market for third party manufacturers, whose products represent a significant majority of ADI's net revenue.

We intend to expand and market our extensive portfolio and distribution base in several ways. We view our long-standing, mutually beneficial relationships with professional contractors in the Do It For Me ("DIFM") and OEM channels as a key differentiator in our Products and Solutions segment and plan to continue to invest in and grow with these channel partners. We believe the global connected home market is in the early stages of broad consumer adoption, with Gartner Inc. ("Gartner") projecting in February 2017 that connected things will grow from over 7 billion in 2018 to approximately 13 billion in 2020. We intend to expand our connected solutions and services offerings to capitalize on this trend. We also intend to expand ADI's geographic footprint, product categories and services to drive overall revenue, including our security products business.

**Industry Overview**

*Our Markets*

Our business operations are conducted through two segments, Products and Solutions and Global Distribution, serving multiple customer segments through a variety of channels. We separate our Products and Solutions segment into Comfort, Residential Thermal Solutions ("RTS") and Security. Through ADI, we are a distributor of security and low voltage products such as video surveillance, intrusion, access control, and fire and life safety.

*Trends and Drivers*

We believe our addressable markets benefit from several favorable trends:

- **Growth in Residential Construction and Renovation and Remodeling ("R&R")**. Recent years in the U.S. have been characterized by rising new housing starts and an increase in investment in residential construction. According to the U.S. Census Bureau, new housing starts reached a seasonally adjusted annual rate ("SAAR") of 1.256 million units in 2018, growing at a CAGR of approximately 10% since 2010. However, new housing starts remain significantly below the long term annual median of 1.5 million units since 1960, and we believe this represents significant growth potential over the next several years. The National Association of Home Builders projects that new housing starts will grow at a rate of approximately 1% through 2019. Additionally, per the Bureau of Economic Analysis ("BEA"), R&R spend, as measured by U.S. residential private fixed investment ("RPFI"), has grown at a CAGR of approximately 10% since 2010 to reach SAAR of approximately $798 billion in 2018. U.S. RPFI as a percentage of U.S. gross domestic product ("GDP") reached 3.8% in 2018, but remains below the long term median of 4.5% since 1960, which we believe represents significant growth potential over the next several years. Continued growth in residential housing spending has the potential to generate increased demand for home comfort and security products and services.
- **Energy Efficiency and Safety Megatrends**. Higher energy efficiency standards, driven by legislation, industry and consumer preferences, are leading to faster adoption of advanced energy control devices for furnaces, boilers and cooling equipment. Similarly, legislation in fire safety is driving greater use of smoke and carbon monoxide detection and monitoring.

4

**RESIDEO TECHNOLOGIES, INC.**

- **Internet of Things and Proliferation of Connected Devices**. The connectivity driven by the Internet and various communication protocols and technologies, such as Wi-Fi, Bluetooth, Z-Wave and Zigbee, has led to a massive expansion in the number of connected devices and enables the expansion of Do It Yourself ("DIY") and DIFM solutions available to homeowners. According to Statista.com, the Internet of Things ("IoT") installed base worldwide is expected to grow from 23 billion connected devices in 2018 to over 75 billion connected devices in 2025. The desire to monitor and control devices remotely through cloud based applications is creating a growing market for connected solutions.
- **Mobile Lifestyle and Ubiquity of Broadband**. The proliferation of smartphones, tablets, and high speed, high bandwidth data networks including 4G, LTE, next generation 5G and other wireless technologies have changed the way people communicate, use information and manage various applications in their lives. Consumers are increasingly expecting a similarly convenient and mobile experience to manage their homes and businesses.
- **Cloud and Connectivity Infrastructure**. Advances in cloud technologies, software and wireless technologies have improved reliability and enabled efficient scale in a way that facilitates delivery of connected home services at an exponential rate. The ability to provide such services at an affordable price is helping grow the connected solution market.
- **Big Data and Data Analytics Capabilities**. The increasing number of connected devices, combined with the decreasing cost of connectivity, results in the generation of vast amounts of data related to equipment operation and consumer interaction with these devices. Synthesizing this information provides useful insight for manufacturers, contractors and service providers to diagnose and fix problems quickly, schedule preventive maintenance, and provide better customer service.
- **Need for Technical Expertise and Training**. New technologies, fueled by the proliferation of connected devices, require greater technical know-how to design, install and maintain. Contractors, therefore, increasingly rely on distribution partners and manufacturers to provide design services, product and services consultation and training to support their business needs.
- **Demand for Same Day Order Fulfillment**. Contractors are increasingly being asked to install complex inter-connected systems. As a result, they tend to place frequent orders across a broad range of low voltage technologies and depend on distributors and manufacturers to stock these products locally for immediate fulfillment.
- **Non-Residential Construction and Equipment Replacement**. Most of our distribution sales are to non-residential end markets, driven by investment in construction and equipment replacement. Adjusted for inflation, total non-residential construction remains 16% below peak levels according to IHS. According to IHS, annual non-residential construction is expected to grow at a CAGR of approximately 4.3% through 2019. Sustained strength and further growth in new and replacement non-residential construction could lead to increased demand for low voltage products.

*Addressable Markets*

*Products and Solutions*

The addressable market for Comfort solutions and RTS is analyzed by IHS, Navigant Consulting and the Building Services Research and Information Association. Based on our analysis of these sources, we believe that the addressable market is approximately $10.5 billion in annual sales for 2019 in the markets and geographies that we compete in, of which $0.6 billion is comprised of services associated with Comfort solutions and RTS which includes demand management and telehealth. The addressable market for Security solutions is analyzed by IHS. Based on our analysis of this source, we believe that the addressable market is approximately $5.2 billion in annual sales for 2019 in the markets and geographies that we compete in, of which $1.4 billion is services associated with Security solutions including security monitoring services and remote video services.

*Global Distribution*

Based on IHS, we estimate that the global addressable market for the security and low voltage products (which includes video surveillance, intrusion, access control and fire and life safety) distribution market is approximately $20.6 billion in sales in 2019 in the markets and geographies in which we participate.

**RESIDEO TECHNOLOGIES, INC.**

*Materials and Suppliers*

Purchased materials in our manufacture of products include copper, steel, aluminum, plastics, printed circuit boards, semiconductors and passive electronics. Purchased materials cover a wide range of supplier value-add from raw materials and single components to subassemblies and complete finished goods, and there are considerable expenditures on both commercial off-the-shelf and make-to-print items. Although execution of material substitutions or supplier changes may be resource intensive, alternatives usually exist in the event that a supplier becomes unable to provide material. Unforeseen shortages and supply disruptions occur from time to time but are typically manageable such that adverse impact to customers can be avoided. Raw material price fluctuations, the ability of key suppliers to meet quality and delivery requirements, and catastrophic events can increase the cost of our products and services, impact our ability to meet commitments to customers.

*Inventory*

Our inventory levels vary by distribution channel. We typically maintain approximately three to five weeks of inventory for retail distribution, one to two weeks of inventory for professional installer and distributors and two to four weeks of inventory for OEMs. In addition, ADI operates over 200 stocking locations globally and is contractually obligated to maintain four weeks of inventory for certain customers.

*Customers*

The end-users for our products are residential and commercial consumers throughout the world. We reach these end-users through sales to professional installers and OEMs, and through retail distribution including e-commerce. The global end-user customer base for the Products and Solutions segment includes over 150 million homes globally and greater than 15 million installations annually. Our products and solutions are carried by major distributors in our relevant industries across North America and Western Europe, including our ADI business. Our retail products are carried by the top retailers in their respective markets, including, in the Americas, The Home Depot, Lowe's and Amazon.com, and in Europe, the Middle East and Africa ("EMEA"), Kingfisher and Pflieger. We also have relationships with over 1,200 OEMs.

In the distribution segment, ADI has a customer base of over 100,000 contractors and covers a variety of product categories comprising of over 350,000 products from over 1,000 leading manufacturers.

*Regulatory and Environmental Compliance*

We are subject to various federal, state, local and foreign government requirements relating to the protection of the environment. We believe that, as a general matter, our policies, practices and procedures are properly designed to prevent unreasonable risk of environmental damage and personal injury and that our handling, manufacture, use and disposal of hazardous substances are in accordance with environmental and safety laws and regulations. However, mainly because of past operations and operations of predecessor companies, we, like other companies engaged in similar businesses, have incurred and will continue to incur and manage remedial response and voluntary cleanup costs for site contamination. Lawsuits, claims and costs involving environmental matters may arise in the future.

As of December 31, 2018, we have recorded a liability for environmental investigation and remediation of approximately $20 million. We do not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and we cannot determine either the timing or the amount of the ultimate costs associated with environmental matters, which could be material to our combined results of operations and operating cash flows in the periods recognized or paid. However, considering our past experience and existing reserves, we do not expect that environmental matters will have a material adverse effect on our combined financial position.

Furthermore, we are required to indemnify Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising following the consummation of the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection

**RESIDEO TECHNOLOGIES, INC.**

with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. As of December 31, 2018 we have recorded a liability of approximately $616 million in relation to our environmental obligation to Honeywell under the Honeywell Reimbursement Agreement. See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for a description of the material terms thereof.

### Employees

As of December 31, 2018, we employ approximately 13,000 employees. Of this total, approximately 10.5% of our employees were covered by collective bargaining agreements and represented worldwide by numerous unions and works councils. We believe that our relations with our employees and labor unions have generally been good.

### Seasonality

Our business experiences a moderate level of seasonality. Sales activity is generally lowest during the first calendar quarter when it is winter in the majority of our geographical markets.

### Backlog

In general, we do not manufacture our products against a backlog of orders and do not consider backlog to be a significant indicator of the level of future sales activity. Therefore, we believe that backlog information is not material to understanding our overall business and should not be considered a reliable indicator of our ability to achieve any particular level of revenue or financial return.

### Research and Development ("R&D") and Intellectual Property

We have software centers of excellence in Austin, Texas and Bengaluru and Madurai, India. In addition, our laboratories are certified to meet various industry standards, such as through UL, enabling us to test products internally. We also have a user experience design group that consists of researchers and product and user experience designers across three studios in Golden Valley, Minnesota; Bracknell, United Kingdom; and Bengaluru, India. As of December 31, 2018, we employed over 1300 engineers.

Our deep domain expertise, proprietary technology and brands are protected by a combination of patents, trademarks, copyrights, trade secrets, non-disclosure agreements and contractual provisions. We own approximately 3,000 worldwide active patents and pending patent applications to protect our R&D investments in new products and services. We have and will continue to protect our products and technology by asserting our intellectual property rights against third party infringers. See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for more information.

### Trademarks and Patents

We own or have rights to various trademarks, logos, service marks and trade names that we use in connection with the operation of our business (including the Honeywell Home trademark used under license from Honeywell International Inc.). We also own or have the rights to copyrights that protect the content of our products. Solely for convenience, certain of our trademarks, service marks, trade names and copyrights referred to in this Form 10-K are listed without the ™, ® or © symbols, but such references do not constitute a waiver of any rights that might be associated with the respective trademarks, service marks, trade names and copyrights included or referred to in this Form 10-K.

### Acquisitions

In March 2016, we completed the acquisition of RSI Video Technologies ("RSI"), a leading provider of wireless battery-powered motion detectors, for an aggregate price of $124 million in cash and $2 million in contingent consideration. RSI was acquired to enhance our ability to meet increasing global customer need for video verification.

7

**RESIDEO TECHNOLOGIES, INC.**

*Competition*

Our industries and markets are highly competitive. In our Products and Solutions segment we compete with global, national, regional and local providers of our products, services and solutions, including established manufacturers, distributors and service providers, as well as new entrants, in particular in connected home and smart products. In our Global Distribution segment we compete against manufacturer direct sales, other distributors and other sellers, including retail and e-commerce. The most significant competitive factors we face are product and service innovation, our reputation and the reputation of our brands, sales and marketing programs, product performance, quality of product training and events, product availability, speed and accuracy of delivery, service and price, technical support, credit availability and product reliability and warranty. In addition to current competitive factors, there may be new market entrants with non-traditional business and customer service models or disruptive technologies and products, resulting in increased competition and changing industry dynamics.

**Segments**

We manage our business operations through two segments, Products and Solutions and Global Distribution, which contributed 48% and 52%, respectively, of our net revenue before intersegment eliminations for the year ended December 31, 2018. The Products and Solutions segment offerings include our Comfort, RTS, and Security products, which, consistent with our industry, has a higher margin profile in comparison to the Global Distribution segment.

*Products and Solutions*

We estimate that our net revenue generated from our Products and Solutions segment are primarily from residential end-markets. Included in our Products and Solutions segment are traditional products, as well as connected products, which we define as any device with the capability to be monitored or controlled from a remote location by an end-user or service provider. Products and Solutions consist of solutions in the following Comfort, RTS and Security categories:

- **Comfort:** Our Comfort solutions have historically been marketed and sold primarily under the Honeywell brand, and following the Spin-Off, these products and solutions are now marketed and sold under the Honeywell Home brand. These solutions include home products, services and technologies including:
    - *Temperature and Humidity Control Solutions:* Products to control air conditioners and heating equipment, thermostats and zoning devices, control panels, dampers and actuators, through brands and product families such as Lyric, Prestige, RedLINK, TSeries, TrueZone, FocusPro and VisionPro.
    - *Water Solutions:* Products to control hydronic heating, cooling, and potable water solutions, including control panels, zone valves, balancing valves, thermostatic radiator valves, temperature valves, floor temperature sensors and accessories, pressure regulators, backflow preventers and potable water care products to filter, clean and soften water, through brands and product families such as SmartT and Aquatrol.
    - *Air Solutions:* Products to control air quality, such as whole home humidifiers and dehumidifiers, air filters, air purification and odor control solutions and ventilation systems and controls, through brands and product families such as TrueEASE, Micro Defense and TrueDRY.
    - *Remote Patient Monitoring Software Solutions (telehealth):* Systems that record, organize and transmit patient health data to health service providers to monitor patient well-being, helping patients continue treatment and recovery in their homes under remote supervision, through brands and product families such as Life Stream and Life Care Solutions.
    - *Software Solutions:* Global software platforms and mobile applications that provide contractors and consumers with access to services such as demand response, energy management, auto-replenishment services and predictive appliance diagnostics, through brands and product families such as Lyric and Total Connect Comfort.

**RESIDEO TECHNOLOGIES, INC.**

- **RTS:** Our RTS solutions are marketed and sold primarily under the Honeywell Home brand as part of our portfolio. These solutions include:
  - *Boiler Products:* Solutions that provide safe and efficient combustion for standard and high efficiency Boiler Systems. Key technology in gas adaptivity, gas pre-mix, and diagnostics used in critical components such as gas valves, electronic and ignition controls through brands such as SCOT.
  - *Storage Gas Water Heating Solutions*: Solutions that provide safe and efficient combustion for Water Heating Systems. Key technology in gas pressure regulation, set-point control, and temperature accuracy used in critical components such as gas valves, electronic and ignition controls.
  - *Ducted Solutions:* Solutions that provide safe and efficient combustion for Warm Air Furnaces. Key technology in ignition, gas pressure regulation, fan control, and system monitoring used in critical components such as air pressure switches, gas valves and ignition controls.
  - *Thermal Adjacency Solutions*: Solutions that provide safe and efficient combustion for other gas burning appliances. Key technology in gas ignition and gas pressure regulation used in critical components such as air pressure switches, gas valves, electronic and ignition controls for use in Agricultural heaters, Commercial Cooking gas appliances, Pool heaters, Unit and Duct heaters. In addition, agricultural heaters, equipped with our gas valve, electronic and ignition control, are sold through the Ermaf brand.

- **Security:** Our Security solutions are sold under the Honeywell Home brand. They include professionally-installed and monitored intrusion and life safety detection and alarm systems, as well as self-installed and self-monitored awareness solutions including:
  - *Security Panels:* Product solutions that communicate with sensors that receive event or condition signals and send those signals to a monitoring station and cloud infrastructure, through brands and product families such as Vista, Lyric and Lynx.
  - *Sensors:* Product solutions that detect intrusion (for example, motion, opening of doors and windows and breaking of glass), smoke, carbon monoxide and water and transmit a signal to a security panel, through brands and product families such as 5800 and SiX.
  - *Peripherals*: Accessory solutions that interact with security systems, such as keypads and key-fobs, through brands and product families such as 5800 and Videofied.
  - *Wire and Cable:* Low voltage electrical wiring and category cable, through brands and product families such as Genesis Series.
  - *Software Solutions:* Global software platforms and mobile applications that provide contractors and consumers with access to services such as alarm monitoring, communication, automation and video services. In addition, we provide our contractors with data analytics tools, through our AlarmNet 360 software suite. These solutions are sold through brands and product families such as Total Connect 2.0 and AlarmNet 360.
  - *Communications:* Solutions that transmit notifications and security information from security systems to monitoring stations, such as cellular radios and internet and telephone line communicators, through brands and product families such as LTE radio.
  - *Video Cameras:* Battery-operated indoor and outdoor video motion viewers that detect motion and enable live "look-in" remotely, and Wi-Fi cameras for indoor and outdoor use, through brands and product families such as Videofied and Total Connect cameras.
  - *Awareness:* Self-installed and self-monitored systems that include a home gateway/hub, cameras and awareness sensors to detect motion and sounds, opening and closing of doors, entry and exit of known users of the system (facial recognition) and provide alerts to the user via a mobile app, through brands and product families such as Honeywell Smart Home System and Lyric.
  - *Cloud Infrastructure:* Network operating center that routes signals between home and monitoring station and enables secured, remote data transmissions, through brands and product families such as AlarmNet and Total Connect.
  - *Installation and Maintenance:* Software tools and applications to enable security contractors to install, program and maintain security systems, through brands and product families such as AlarmNet 360 and Compass.

9

**RESIDEO TECHNOLOGIES, INC.**

Eleven of the top twelve most appealing smart home use cases reported by Parks Associates, Inc. include comfort, residential thermal solutions, security and safety solutions that are directly addressed by our product offerings, and a number of our end-to-end solutions have applications across Comfort, RTS and Security products. We are strongly positioned to provide products that enhance consumers' comfort, convenience and sense of security and work together to contribute to a connected home ecosystem. Some of these cross-product offerings include:

<u>**Home Comfort: Total Connect Comfort App and RedLINK Wireless Products**</u>

From the WiFi 8000 Thermostat to the RedLINK Prestige IAQ suite of products, the Total Connect Comfort ("TCC") platform offers global solutions for comfort with a large portfolio of products for both professional installers and DIYers.

RedLINK Technology uses a proprietary wireless system to help professional contractors solve home comfort challenges. Beyond just thermostats, RedLINK includes a wide variety of wireless accessories including the remote temperature monitor, ventilation boost and the Residential Internet Gateway. The TCC app is available in the iOS and Android™ app stores as well as through a web portal and enables users to:

- View and change their Comfort system settings (Heat, Cool, Off, Fan, Auto, Emergency/Back-Up Heat, Dehumidifier, Humidifier).
- View and set the temperature.
- View indoor humidity.
- View outdoor temperature and humidity.
- Access multiple thermostats if the system is zoned.
- Access multiple locations if more than one system is connected.
- Receive temperature and humidity alerts via e-mail.
- Access over 90 system alerts via the web.
- Get automatic upgrades as new features are available

<u>**Home Security: Total Connect Remote Services**</u>

Total Connect 2.0 is an interactive security solution for home and business that provides users control of their security systems, the ability to receive push notifications, email, SMS/text and video alerts, and the ability to view live video and control such features as video doorbell activity, view events, control thermostats, lighting and locks. This solution works with AlarmNet's Cloud Infrastructure and provides 24/7 emergency response through monitoring centers. The capabilities associated with this solution include:

- **Mobile Control:** Remote security system management and user control through the web, iOS or Android™ mobile apps.
- **Real-Time Awareness:** Geofence alert and real-time status of events through push notifications, emails, SMS/text messaging and video alerts. Users may view past events and search for specific occurrences.
- **Event History:** System event notifications with 90-day history and 7 or 30-day video storage plans.
- **Multi-Site and Enhanced User Management:** View 100+ locations with a single login, add multiple users and assign access rights, customize settings and notification preferences.
- **Secure Platform:** Personal data encryption, secure password rules, arming and disarming with user codes, fingerprint biometric login on iOS and Android™ devices.

10

**RESIDEO TECHNOLOGIES, INC.**

<u>**Automation and Energy Management Solutions**</u>

Remote control of Z-Wave® or Wi-Fi devices such as thermostats, locks, lights, shades, garage doors, water, leak detectors and video doorbells, bringing all connected home and business solutions into one platform.

- **Smart Scenes:** Using highly flexible rules, triggers and schedules, personalize the connected devices in the home or business. Users create automation rules by device, user, time of day and day of week to fit any schedule or lifestyle.
- **Energy Savings:** Maximizing comfort and saving money on energy and utility bills by conserving resources through the creation of smart heating, cooling, shades and lighting schedules.
- **Mobile Control:** Remotely controlling doors, locks, temperature, garage door, lights for security and convenience.

<u>**Video Solutions: Remotely view high definition live and recorded video events**</u>

- **Live Streaming:** Access live video through the mobile apps.
- **HD Cameras:** Include up to eight cameras per location, indoor or outdoor.
- **Video Doorbell Service:** Control video doorbell activity on the Total Connect 2.0 iOS app and Android™ app.
- **Video Notifications:** Receive video notifications via email, SMS/text messaging or push notifications based on security system events, motion detection or time of day.
- **Cloud Storage:** 7 or 30-day storage plans.
- **Recorded Events:** 30-second video clips with no gaps.
- **Video Alarm Verification:** Cloud-based central station video interface that enables monitoring personnel to view video clips and see what triggered an alarm.

<u>**Monitoring Stations and Security Dealers Solutions with AlarmNet 360**</u>

AlarmNet 360 is a business management cloud platform that improves monitoring stations and security dealers operational customer service and account creation efforts by programming security and software accounts and providing remote knowledge of hardware and software diagnostics and analytics.

<u>**Business Management**</u>

Our programming, support tools and apps help our service providers more efficiently install and service their connected home and business customers.

- **Cloud-Based:** Remotely access AlarmNet 360 from any PC or mobile device, onsite or remotely.
- **Programming:** Quickly program and create accounts.
- **Control Employee Access:** Securely manage and control employee access rights to customer accounts.
- **Customer Service:** Easily support all customer accounts from a single user interface with account maintenance, system health checks and remote updates.

<u>**Business Analytics**</u>

- **Interactive:** Dashboard with insight into customer behavior to improve operational efficiency, grow business, find complementary services and generate more recurring monthly revenue.
- **Filter Data:** Data enabling customers to pinpoint critical issues and service customers quickly and efficiently. Easily sort data by account age and period of time and export it to a spreadsheet.
- **Map View:** Interactive maps provide account status and location making service calls and sales more efficient.
- **Engagement:** Customer account metrics and analysis enabling improved customer retention and reduced attrition.

**RESIDEO TECHNOLOGIES, INC.**

*Global Distribution*

ADI, our Global Distribution segment, is the leading wholesale distributor of security and low voltage electronics products, which include security, safety and audio visual products and related accessories. These products, which are commonly referred to as "low voltage", are traditionally defined as products operating at or below 24 volts. According to IHS Markit (Information Handling Services, "IHS") data, ADI has the leading global market share in security equipment distribution. ADI operates through a distribution network of over 200 stocking locations throughout the world, delivering to over 100,000 contractors.

Through ADI, we distribute a broad selection of our products as well as third party products to meet customer needs, including:

- **Security products**
  - *Video Surveillance:* Internet protocol ("IP") and high-definition analog cameras, recording and storage devices, video management and analytics software, and related system accessories.
  - *Intrusion:* Residential and commercial alarm systems, keypads, detection and sensing devices, alarm communication equipment, and related systems accessories.
  - *Access Control:* Access control panels and software, readers, credentials, locking hardware, gate control, intercoms and related system accessories.

- **Other products**
  - *Fire and Life Safety:* Fire alarm control panels, fire detection equipment, fire notification equipment, manual call points/stations and related system accessories.
  - *Wire, networking and professional audio visual systems.*

In addition to our own Security products which make up 14% of total ADI product line revenue, ADI distributes products from industry-leading manufacturers including Assa Abloy, Axis Communications, Honeywell, DSC and Nortek Security & Control, and carries a line of private label products. We sell these products to contractors that service non-residential and residential end-users. Management estimates that in 2018 approximately two-thirds of ADI net revenue were attributed to non-residential end markets and one-third to residential end markets.

**History of Innovation**

We have a long history of innovation and industry firsts in our Comfort, RTS and Security markets and a reputation for providing trusted, tested and proven products and solutions. We trace some of our innovations as far back as the 1880s when we invented the predecessor to the modern thermostat. From the first clock thermostats to the world's first gas burner control, we have consistently driven progress and innovation in home comfort and security, including the introduction of the iconic T-86 "Round" thermostat in 1952. In 2000, we acquired the ADEMCO business, a leader in monitored burglary and fire alarm systems with roots back to 1929 and the early days of wired burglar alarms, expanding our presence in fire and security systems.

In the 1980s, ADEMCO developed the first reliable wireless security system and sensor and the AlarmNet radio technology that served as the first affordable alternative to alarm transmission over telephone lines. Through ADI, we introduced high volume, wholesale security products distribution enabling contractors of all sizes count on ADI for convenient access and financing of low voltage security products, local inventory, ecommerce ordering, as well as product training and the extension of credit.

We were the first company to introduce professionally-monitored residential smoke and carbon monoxide detection systems. We also invented the popular Dual Tech which enables the detection of both motion and heat from an intruder. Additionally, we were the first to widely deploy an alarm platform with cloud services to consumers and a mobile application for home security monitoring. As the world becomes more connected and mobile, we believe we are well positioned to extend our track record of delivering leading solutions for the home by combining our experience and expertise in hardware and sensor technology with a focus on world-class excellence in software and wholesale product distribution.

12

**RESIDEO TECHNOLOGIES, INC.**

**Competitive Strengths**

We believe we benefit from the following competitive strengths:

**I. Global Leader with Iconic Brand and Unparalleled Presence in the Home**

The iconic Honeywell brand is globally recognized for quality, innovation, security and reliability. Our products and solutions are present in over 150 million homes worldwide and we believe, based on management estimates, that we have the leading global market position in thermostats, residential security products, and in security products distribution. Our solutions are installed in more than 150 million homes annually, allowing us to launch innovative technologies and services at scale. Our leading position extends to our connected platform, where we currently have over 5.6 million connected customers and 32 million sensors generating over 400 billion data transmissions annually.

The brand recognition associated with our installed base provides an additional opportunity for expansion with new connected products and solutions under the Honeywell Home brand. We are actively facilitating the transition of our customers and end-users from traditional to connected products by transforming our product portfolio, educating professional installers, creating value for OEMs, and engaging consumers. In 2018, approximately 34% of our product sales were generated by connected solutions. In February 2017 Gartner estimated approximately 5.2 billion connected things in use worldwide in 2017, and growing to approximately 13 billion in 2020.

**II. Broadest Portfolio Providing Innovative End-to-End Solutions Across Comfort, RTS and Security with Domain and Regulatory Standards Expertise and Differentiated Technology**

Our comprehensive Products portfolio provides end-to-end solutions focusing on critical needs within the home, where product reliability and ease of use are of utmost importance. This portfolio is comprised of traditional product offerings as well as a growing connected offering. Our deep domain expertise allows us to consistently provide trusted, tested and proven solutions that meet standards for cybersecurity and regulatory, as well as certification standards for devices addressing critical life safety needs. Our brand product portfolio and distribution distinguishes us from our competitors, most of whom focus on niche solutions within the home. We provide solutions that address multiple consumer connected home needs under a common platform. As new devices and use-cases emerge, we believe the continuing development of our common platform across devices and all levels of connectivity (device, software, cloud, analytics and consumer interface) will become vital to ensure a seamless and reliable experience. Our extensive product portfolio also enables us to achieve profitable economies of scale in production, distribution and speed to market while making us a "go to" partner in the smart home ecosystem.

Our innovation is supported by the Resideo User Experience design group, which creates value by understanding and translating the needs of consumers and channel partners to develop intuitive, desirable and brand differentiated end-to-end experiences. Our products are regularly recognized in professionally judged international design competitions and we have won the highly coveted iF Design Award, Red Dot Design Award and the IDEA Design Award over a dozen times since 2015.

We believe our product quality philosophy, which combines rigorous internal testing with external certification of our products, gives us a competitive advantage. Our laboratories are certified for testing to meet various industry standards, including Underwriters Laboratories ("UL"), CSA Group and Intertek, combining our internal testing resources with the global recognition of these agencies' we substantially reduce time-to-market for our new solutions and help ensure quality and reliability.

Our Secure Software Development Lifecycle initiative sets a robust protocol for establishing and enhancing product and system cybersecurity throughout all phases of product development and in response to potential vulnerabilities in existing products.

**RESIDEO TECHNOLOGIES, INC.**

We have over 1,300 engineers creating innovative solutions in software centers of excellence located in Austin, Texas, Bengaluru and Madurai, India and other locations. Our deep domain expertise, proprietary technology and brands are protected by a combination of patents, trademarks, copyrights, trade secrets, non-disclosure agreements and contractual provisions. We have approximately 3,000 proprietary worldwide active patents and pending patent applications.

### III. Major Player in the Connected Home, Providing Solutions that Seamlessly Integrate with Leading Smart Home Players

Our broad suite of connected solutions allows end customers to control their thermostats, security systems, cameras and home automation devices such as electronic locks, lights and garage doors from our mobile applications. We currently service over 5.6 million connected customers, including more than two million security systems that are monitored for security and life safety events. Future adoption rates of our connected home solutions will depend on a number of factors, including development of competitive and attractive products and the cost to customers of installation of new solutions or upgrade or renovation from older connected platforms or products. We are well positioned to leverage the growing demand for connected home solutions with our innovative products that are easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio. We expect to benefit from the over 15% compound annual growth rate ("CAGR") projected by Navigant for connected thermostats over the next five years. Beyond that, our expanding portfolio of self-installed and self-monitored solutions such as the Smart Home Security System and Lyric Cameras are well positioned to participate in the growth of DIY security unit sales which according to IHS are expected to grow at a CAGR of 15% from 2017 through 2022 (inclusive of analog/network bundles and standalone cameras). In security, we continue to see strong adoption of our professionally-installed and monitored solutions.

Our systems integrate easily with the most widely used home automation systems, including Amazon Alexa®, Apple HomeKit®, Google Home®, and Samsung SmartThings®. We have one of the widest portfolios of Apple HomeKit enabled connected products and were the first company whose security system communicated with the Apple HomeKit ecosystem. We plan to continue expanding our ecosystem partners through, among other things, the "Works with Honeywell Home" program which currently has 3,000 third party developers creating mobile applications that integrate with our solutions. Approximately one in six of our users already connect their systems to partner APIs (application programming interfaces) or solutions from other manufacturers through this program, and we believe that the openness of our architecture and adaptability of our products reduce contractor training and installation time further enhancing end-user demand for our products.

### IV. Well Positioned to Serve Professional, OEM and Consumer Channels

Our multi-channel strategy to serve end-users through our professional contractors, OEMs, retail and e-commerce partners allows end-users and consumers to purchase our products in ways that suit their needs, whether directly for DIY or through a professional installer.

Our Security, Comfort and RTS solutions are generally installed professionally, and our channel partners rely on our high-quality OEM parts for repair and remodel services to meet their customers' needs. We have deep and long-standing relationships with our global contractor base, many of which extend over 20 years, with our global contractor base, and we continually strengthen and renew these relationships through various channel management and training programs. For example, our Contractor Pro (loyalty program) has over 29,000 participants and has been a leading industry program for 14 years. Our training programs include Homes University (technical training) and S.T.E.P.S. (sales training).

14

**RESIDEO TECHNOLOGIES, INC.**

Some of these training offerings include:

- CONNECT is the largest independent dealer event in the security market. For more than 25 years, we have hosted this event to bring together independent dealers from around Americas to take part in education, networking and celebration. With approximately 1,000 customers in attendance, CONNECT is an important annual dealer event. Our Authorized Dealers look forward to this event each year and depend on it to keep them informed of the latest trends in our industry, solutions and best practices from security companies from around the country.
- LiveWell is an indoor air quality training program for Comfort contractors. The program, focused on indoor air quality thought leadership, is designed to train contractors not only on indoor air quality ("IAQ") but also deliver comfort for the whole home using our products and services. The program includes on-line training courses, videos, demonstrations and eLearning, designed to enable contractors to provide expert advice and solutions to customers to improve IAQ and comfort in the home, ultimately driving better engagement with customers and growing their business.
- The Resideo Premier Security Dealer program is the largest independent network of security and fire dealers, with over 300 member companies across the U.S., Canada and Latin America. Structured with a tiered reward program, the program rewards dealers based on their commitment to the program and our portfolio of products. From the power of the Honeywell Home brand, to specially designed training, networking events, co-op advertising, and marketing development funds, members receive extensive support and the opportunity to network with the foremost independent security dealers.
- For over twenty-five years, the ADI Expo program has been the industry's largest one-day educational and sales event dedicated to providing ADI customers with the tools, education and resources they need to grow their business. Free of charge to all industry professionals, ADI Expos provide the opportunity for our customers to meet and learn from a broad range of industry vendors, attend seminars, and earn continuing education credits. In 2018, ADI held over 80 Expos, providing a full day of educational seminars, product exhibits, networking opportunities and Expo day-only specials on technology from leading industry manufacturers.
- S.T.E.P.S. is a sales-focused program designed to teach residential and light commercial contractor professionals how to engage their customer base by providing customized product and service offerings that their customers want, need and will pay for. The objective of the S.T.E.P.S. to Success Program is increased accessory sales, higher-end system installations and more service enhancements, as well as to assist contractors that attend the program with generating more business, increasing their average ticket price and securing long-lasting customer relationships.
- Contractor Pro is a loyalty program for contractors. Members of Contractor PRO earn rebate points on every qualifying Resideo product purchase. With Contractor PRO, contractors enjoy a variety of benefits including: exclusive tech support, online referrals, free sales literature, personal use product discounts, regular communications about promotions and account upgrades. This program is designed to enable contractors to drive engagement and generate more revenue.
- Homes University is a three-day, hands-on training course designed to show contractors and distributors the benefits of our products. The course educates managers, sales representatives, counter staff, and installers about selling the appropriate product features and benefits, install and wire product solutions, and identify opportunities to meet the needs of consumers. The course is taught by experienced instructors including our technical product specialists and Comfort industry experts and consists of lecture discussion, hands-on lab exercises and advanced multimedia presentations for maximum learning effectiveness.

We also have long-standing relationships with important OEMs and service providers such as ADT Security Services, United Technologies and A.O. Smith Corporation. A number of these relationships extend more than 25 years, including some spanning over 40 years. These deep partnerships are possible because OEMs value our design capabilities, innovation, domain expertise, supply chain capabilities and product quality, and our commitment to working with them to grow their businesses by way of the Resideo/Honeywell Home platform and suite of products.

15

**RESIDEO TECHNOLOGIES, INC.**

Our DIY and self-install products are sold through retail channels including direct-to-consumer, e-commerce and brick and mortar locations, such as The Home Depot, Lowe's, Amazon.com, Walmart and Kingfisher. Our award-winning thermostats are our most iconic products and we market certain models directly to end consumers.

**V. Preeminent Global Distributor of Security, Safety and Other Low Voltage Products**

According to IHS, ADI has the leading global market share in low voltage security equipment distribution. ADI distributes a wide offering of low voltage product categories comprised of over 350,000 products from over 1,000 manufacturers, all supported by a disciplined category management process to ensure our offerings are comprehensive and meet the needs of important customer segments. ADI's sizable market position, coupled with its breadth of inventory, enables security contractors to identify and purchase complementary ADI product offerings. ADI has over 200 stocking locations across 17 countries and a customer friendly e-commerce platform serving a customer base of over 100,000 contractors. Our extensive global footprint, combined with our strategic supplier relationships and focus on customer service, enables ADI to effectively serve both local and national customers with a range of product and service solutions. Serving as the leading global low voltage security equipment distributor offers ADI procurement efficiencies, together with its line of private label products which further enhances its margin profile.

*Manufacturers/Suppliers*

ADI is an important channel to market for third party manufacturers, whose products represent the majority of ADI's net revenue. Through our global network of branches, inventory stocking programs and over 1,000 sales representatives, each of whom are highly trained in the brands and products that we distribute, we help manufacturers grow their business by facilitating direct and relevant engagement with our customers. We provide manufacturers the ability to offer in-store selling tools, such as interactive product displays and demonstration equipment that help contractors evaluate products before purchase. We also offer branch stocking programs, which manufacturers use to make their products available in local markets, and provide local market inventory to serve contractors who require same day fulfillment. This strong value proposition supports our position as a preferred channel to the market for leading industry manufacturers.

*Contractors/Customers*

ADI's global presence enables the delivery of supply chain services that help contractors reduce procurement costs, better manage working capital through credit solutions, and operate more efficiently. We offer services such as job kitting and staging, IP device programming, 24/7 pick-up anytime lockers and one-hour pick up service at ADI branches for online orders. We also offer convenient electronic ordering options, which accounted for over 17% of our ADI net revenue for the fiscal year ended December 31, 2018. These services and convenient ordering options, combined with our global presence of more than 200 stocking locations, allow us to serve a range of customers across multiple geographies, and be a single source of supply for contractors in the industry. We also help our customers grow their businesses through services such as pre-sales technical support, product certifications and trainings, project support and knowledgeable sales specialists including third party certified systems design specialists. In 2018, we offered more than 1500 manufacturer and industry association led training opportunities. Many of our trainings were conducted at ADI Expos, which are a series of one-day product showcase and training events in the security industry where manufacturers present the latest technology to our customers. In 2018, we held more than 80 ADI Expos globally, delivering more than 300 Continuing Education Unit accredited programs.

**VI. Consistent Revenue Growth and Strong Segment Performance Supported by Best-in-Class Operating System ("OS")**

Our attractive financial profile includes diversified revenue streams, strong segment profits and limited capital expenditure needs. In addition, our business is not capital intensive and over the past three years, our capital expenditures have averaged approximately 1% of our net revenue.

16

**RESIDEO TECHNOLOGIES, INC.**

Our financial performance is underpinned by our implementation of the Operating System ("OS"). OS is integral to our organization, and was founded on the lean and six sigma principles of continuous improvement in quality, delivery, cost, growth and innovation. We have continued to execute the OS model following the Spin-Off, resulting in improved manufacturing productivity, more rapid product innovation and increased cost efficiencies. Important parts of our supply chain are strategically positioned in low cost regions located in or near key markets, consistent with a strategy of optimizing our supply chain and reducing delivery times. We have extended OS concepts beyond lean manufacturing to our Global Distribution business, customer service and product development areas. We are applying these practices to develop global platforms to drive standardization for scale and cost efficiency, while incorporating key technologies and functionalities to drive speed and faster innovation for our contractor partners and end-user customers.

**Growth Strategies**

### I.    Continue to Develop Innovative New Products and Solutions

We are developing new, innovative products and solutions across Comfort, RTS and Security to grow our core business and differentiate ourselves from our competitors. Over the past three years, we have launched over 200 new products such as the Lyric family of connected home solutions, which includes thermostats, water leak detectors and awareness cameras. We launched our next generation alarm systems with a large customer in late 2018. We have also launched cloud service offerings including AlarmNet 360 and Total Connect 2.0 that allow consumers to control their systems remotely and contractors to provide efficient installation, maintenance and support services.

We plan to further expand our portfolio by bringing to market an extensive set of new, connected solutions for everyday problems, including remote furnace and boiler monitoring, smart vents, shut-off valve solutions, battery-operated video motion cameras and a residential global intrusion system. We collaborate with complementary consumer driven technology companies such as August (door lock) to provide our customers with a seamless experience that supports customer acquisition and retention. Our systems are compatible with the most widely used home automation systems, including Amazon Alexa®, Apple HomeKit®, Google Home® and Samsung SmartThings®. Our compatibility with these platforms has helped us sell devices to millions of homes around the world, and we expect these relationships to continue driving growth in the future.

We employ Agile methods for software development, and are developing a single mobile application which, together with our global platforms, is designed to enable faster introduction of new products and implementation of new features while driving cost efficiencies through our global scale. At the same time, our Secure Software Development Lifecycle initiative sets a robust protocol for establishing and enhancing product and system cybersecurity at the outset of, and throughout, product development and for responding to potential vulnerabilities in existing products.

### II.    Continue to Invest in and Grow with Professional and OEM Channel Partners

Our professional channel partners are an integral part of our sales and go to market strategy, and we invest in their growth to help drive our product sales. While the DIY and e-commerce markets for our solutions continue to grow, the vast majority of our products are installed professionally through our contractor and OEM channels, which we refer to as the DIFM channel. We plan to continue to extend growth in these professional channels through channel partner marketing programs, designing solutions with simplified installation and maintenance, and by helping contractors provide better service to the end customer.

We plan to continue investing in these programs and providing enhanced sales and technical training, hiring, and talent development for our contractors. For example, we host the annual CONNECT national conference, the largest independent dealer event in the security industry which gives security contractor partners the opportunity to share best practices and participate in specialized trainings. In addition, we plan to continue developing new relationships with leading channel partners and expanding our presence in the market in all regions. We plan to continue collaborating with OEM channel partners to provide design services, bring to market new technologies and deliver innovative, connected solutions that increase the lifetime value of their equipment. For example, delivery of remote diagnostic capabilities for furnaces and water heaters that will enable technicians to resolve problems quickly and improve equipment uptime.

17

**RESIDEO TECHNOLOGIES, INC.**

**III. Leverage Connected Home Expertise to Grow Software and Services Revenue**

We are well positioned to benefit from the growing demand for connected solutions in homes due to our breadth of offerings, customer reach and strong brand. As consumer preferences drive increasing demand for connected home solutions, we believe our portfolio of end-to-end solutions will become increasingly important. Compelling connected home use cases require careful orchestration of multiple solutions to create an ecosystem that can be reliably accessed by consumers on a common platform. A seamless experience is a key differentiator relative to single-purpose product providers.

We plan to further enhance the customer value proposition by expanding remote functionality and real-time access to information and analytics that help the end-user control their home environment. We also intend to support this effort by extending our suite of proprietary service offerings as well as the range of options for controlling our devices in conjunction with third party systems. These innovations require that we navigate a complex and changing technological and regulatory landscape.

We have recently launched Software as a Service ("SaaS") subscription services to consumers and intend to add additional services including video storage, energy management and automated replenishment services. We also provide Platform as a Service ("PaaS") offerings including AlarmNet and Total Connect as fee-based, remote management service for the professional DIFM channel to enable control and monitor security systems. We plan to provide Honeywell Home, a global cloud and application platform for use by both consumers and professional channel partners. By consolidating our service offerings under the Honeywell Home brand, we will increase scale efficiencies, improve time to market with new features and enhancements and to drive global expansion of connected offerings and services. This platform will enable easier integration of our solutions for partners and allow us to host third party connected products in our cloud. This will result in faster implementation of new connected device products and the availability of enhanced services including demand response and security monitoring and energy saving services providing customers with greater peace of mind. This platform will enable meaningful new services for our professional channels, our connected consumers and third parties that value the insights derived from data. Increased availability of connected solutions also enables data analytics and Data-as-a-Service ("DaaS"), which allows service technicians to provide post-sales remote diagnostics and preventive maintenance services. Furthermore, our LifeCare telehealth DaaS enables remote patient monitoring and assists hospitals in significantly reducing readmission rates. We believe analytics provide a growing service revenue opportunity.

**IV. Expand Presence of Product Portfolio Through Alternative Channels and Geographies**

According to IHS, DIY and self-installed security unit sales are expected to grow at a CAGR of 15% from 2017 through 2022 (inclusive of analog/network bundles and standalone cameras). We are increasing our presence in retail and e-commerce channels by expanding our range of partners and the breadth of products with self-install capabilities, such as Lyric Thermostats and Cameras and the Honeywell Smart Home Security System.

We are developing new relationships with utilities, insurance providers, telecom and cable companies, homebuilders and property managers for multifamily residences, all of which are looking to provide value-added services to their customer base. For example, utilities offer our connected thermostats for energy demand management and insurance companies offer water leak detectors for risk mitigation of property damage and to reduce claims. Our connected home solutions help property managers remotely manage heating and cooling to reduce energy costs and help homebuilders improve the commercial value of new homes.

We plan to expand our presence in certain high growth regions ("HGRs") as favorable macro trends such as urbanization, improving living standards and growing internet and smartphone usage support adoption of our solutions. As large, growing markets, China and India present near-term opportunities to grow with our professional and OEM channel partners. Local legislation, driven by safety and security concerns, should also provide an opportunity to expand our presence in the Middle East and Latin American regions. We expect to localize our portfolio in HGRs, primarily by investing in tailored solutions to be competitive in local markets.

18

**RESIDEO TECHNOLOGIES, INC.**

**V.    Grow ADI by Expanding Geographic Footprint, Product Categories and Services**

We intend to increase our geographic footprint for distribution by expanding our presence in markets where we already operate and entering selected new geographies within established distribution markets. We plan to implement this by opening new branches, deploying field sales and telesales teams, and taking advantage of e-commerce opportunities. For example, we have established a strong foundation in India, where according to IHS we already have a market share of approximately 18% and the distribution market is expected to grow at an approximate 11% CAGR from 2016 through 2021.

We intend to continue expanding our portfolio of core and adjacent products that are relevant and attractive to our customers to drive incremental sales across our existing footprint. In 2016, we added professional audio visual products, a growing and attractive product category to respond to customer demand and since then we have added many well-recognized brands to supplement our core product lines, including Kantech® access control systems, Code Blue® emergency communications, Seagate® storage solutions, Sonos® wireless audio, and LG® professional displays. We have also added a line of new ADI private label products.

We intend to continue introducing new value-added services and electronic ordering options to deepen relationships with our contractors. Recently, we launched the "Shop My Branch" feature, which allows customers to shop and place orders for products specifically available in their local branch, along with a one-hour pick up service for orders placed online or through the ADI application. We will continue improving our capabilities in electronic data interchange ("EDI") through our customized integration with Sedona Office, a leading business management software for security companies, further enabling contractors to establish electronic data transmission with ADI without significant IT support.

**VI.   Accelerate Growth Through Selective Strategic Acquisitions**

We intend to selectively pursue acquisitions that will broaden our product portfolio, provide access to new technologies, expand our geographic footprint and enhance our position in strategic market segments. Our 2016 acquisition of RSI Video Technologies, a company manufacturing battery-powered motion viewers, allowed us to offer security solutions combining video clips and motion sensors to provide video alarm verification in support of improved emergency service response times.

**Other Information**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports are available free of charge on our website (www.resideo.com) under the heading Investors (see SEC Filings) immediately after they are filed with, or furnished to, the SEC. All of the reports that we file or furnish with the SEC are also available on the SEC's website at www.sec.gov. In addition, in this Form 10-K, we incorporate by reference certain information from parts of our Proxy Statement for the 2019 Annual Meeting of Stockholders and which will also be available free of charge on our website. Information contained on, or connected to, our website does not and will not constitute part of this Form 10-K.

We are a Delaware corporation incorporated on April 24, 2018. Our principal executive offices are located at 1985 Douglas Drive, Golden Valley, MN 55422-3935. Our telephone number is (763) 954-6100. Our website address is www.resideo.com.

We disclose public information to investors, the media and others interested in our Company through a variety of means, including our investor relations website (https://investor.resideo.com), press releases, SEC filings, blogs, public conference calls and presentations, webcasts and social media, in order to achieve broad, non-exclusionary distribution of information to the public. We use these channels to communicate with our stockholders and the public about our Company, our products, solutions and other issues. It is possible that the information we post on social media could be deemed to be material information. We encourage investors, the media and others interested in our Company to review the information we post on our website and the social media channels listed below. The list of social media channels we use may be updated from time to time on our investor relations website.

The Company's News Page (https://www.resideo.com/news)

The Company's Facebook Page (www.facebook.com/resideo)

The Company's Twitter Feed (https://twitter.com/resideo)

The Company's LinkedIn Feed (https://www.linkedin.com/company/resideo1/)

19

**RESIDEO TECHNOLOGIES, INC.**

References to our website and other social media channels are made as inactive textual references and information contained on them is not incorporated by reference into this Annual Report.

**Item 1A.        Risk Factors**

**Cautionary Statement Concerning Forward-Looking Statements**

This Form 10-K contains "forward-looking statements" that involve risks and uncertainties. These statements can be identified by the fact that they do not relate strictly to historical or current facts, but rather are based on current expectations, estimates, assumptions and projections about our industry and our business and financial results. Forward-looking statements often include words such as "anticipates," "estimates," "expects," "projects," "forecasts," "intends," "plans," "continues," "believes," "may," "will," "goals" and words and terms of similar substance in connection with discussions of future operating or financial performance. As with any projection or forecast, forward-looking statements are inherently susceptible to uncertainty and changes in circumstances. Our actual results may vary materially from those expressed or implied in our forward-looking statements. Accordingly, undue reliance should not be placed on any forward-looking statement made by us or on our behalf. Although we believe that the forward-looking statements contained in this Form 10-K are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in such forward-looking statements, including but not limited to:

- lack of operating history as an independent, publicly traded company and unreliability of historical combined financial information as an indicator of our future results;
- the level of competition from other companies;
- ability to successfully develop new technologies and introduce new products;
- changes in prevailing global and regional economic conditions;
- natural disasters or inclement or hazardous weather conditions, including, but not limited to cold weather, flooding, tornadoes and the physical impacts of climate change;
- failure to achieve and maintain a high level of product and service quality;
- ability to operate as an independent publicly traded company without certain benefits available to us as a part of Honeywell;
- dependence upon investment in information technology;
- failure or inability to comply with the European Union's General Data Protection Regulation ("GDPR");
- technical difficulties or failures;
- work stoppages, other disruptions, or the need to relocate any of our facilities;
- economic, political, regulatory, foreign exchange and other risks of international operations;
- changes in legislation or government regulations or policies;
- our growth strategy is dependent on expanding our distribution business;
- inability to obtain necessary production equipment or replacement parts;
- the significant failure or inability to comply with the specifications and manufacturing requirements of our OEM customers or by increases or decreases to the inventory levels maintained by our customers;
- difficulty collecting receivables;
- the failure to protect our intellectual property or allegations that we have infringed the intellectual property of others;
- our inability to maintain intellectual property agreements;
- the failure to increase productivity through sustainable operational improvements;
- inability to grow successfully through future acquisitions;
- inability to recruit and retain qualified personnel;
- the operational constraints and financial distress of third parties;
- changes in the price and availability of raw materials that we use to produce our products;
- labor disputes;
- our ability to borrow funds and access capital markets;
- the amount of our obligations pursuant to the Honeywell Reimbursement Agreement;
- potential material environmental liabilities;

20

**RESIDEO TECHNOLOGIES, INC.**

- potential material losses and costs as a result of warranty claims, including product recalls, and product liability actions that may be brought against us;
- potential material litigation matters;
- unforeseen U.S. federal income tax and foreign tax liabilities;
- U.S. federal income tax reform;
- the potential suspension in the future of our dividend program; and
- certain factors discussed elsewhere in this Form 10-K.

These and other factors are more fully discussed in the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections and elsewhere in this Form 10-K. These risks could cause actual results to differ materially from those implied by forward-looking statements in this Form 10-K. Even if our results of operations, financial condition and liquidity and the development of the industry in which we operate are consistent with the forward-looking statements contained in this Form 10-K, those results or developments may not be indicative of results or developments in subsequent periods.

Any forward-looking statements made by us in this Form 10-K speak only as of the date on which they are made. We are under no obligation to, and expressly disclaim any obligation to, update or alter our forward-looking statements, whether as a result of new information, subsequent events or otherwise.

## Risk Factors

You should carefully consider all of the information in this Form 10-K and each of the risks described below, which we believe are the principal risks that we face. Some of the risks relate to our business, others to the Spin-Off. Some risks relate principally to the securities markets and ownership of our common stock.

Any of the following risks, as well as other risks not currently known to us or that we currently consider immaterial, could materially and adversely affect our business, financial condition, results of operations and cash flows and the actual outcome of matters as to which forward-looking statements are made in this Form 10-K.

The following risk factors are not necessarily presented in order of relative importance and should not be considered to represent a complete set of all potential risks that could affect us.

## Risks Relating to Our Business

*We have limited operating history as an independent, publicly traded company, and our historical consolidated and combined financial information is not necessarily representative of the results we would have achieved as an independent, publicly traded company and may not be a reliable indicator of our future results.*

We derived the historical combined financial information for periods prior to the Spin-Off included in this Form 10-K from Honeywell's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent, publicly traded company during the periods presented, or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Honeywell's broader corporate organization, and Honeywell performed various corporate functions for us. Our historical combined financial information prior to the Spin-Off reflects allocations of corporate expenses from Honeywell for these and similar functions. These allocations may not reflect the costs it will incur for similar services in the future as an independent publicly traded company.
- We have entered into transactions with Honeywell that did not exist prior to the Spin-Off, such as Honeywell's provision of transition and other services and brand licensing agreements, and have undertaken indemnification obligations, which will cause us to incur new costs. See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for more information.

21

**RESIDEO TECHNOLOGIES, INC.**

- Our historical combined financial information prior to the Spin-Off does not reflect changes that we have or expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our business. As part of Honeywell, we enjoyed certain benefits from Honeywell's operating diversity, size, purchasing power, borrowing leverage and available capital for investments. As an independent entity, we may be unable to purchase goods, services and technologies, such as computer software licenses, or access capital markets on terms as favorable to it as those obtained as part of Honeywell prior to the Spin-Off, and our business, financial condition, results of operations and cash flows may be adversely affected. In addition, our historical combined financial data does not include an allocation of interest expense comparable to the interest expense we will incur as a result of the Spin-Off, including interest expense in connection with the incurrence of indebtedness at our Company.

Furthermore, while the individualized businesses or their predecessors have a history of product development going back over 100 years, we have a limited operating history with a residential Comfort, RTS, Security, or home solutions business focus, or in combination with a distribution business, and we may not be successful in continuing to operate and grow our business with a narrower focus and outside the broader Honeywell operating environment. We may face operational inefficiencies as we continue to integrate our business after the Spin-Off. We are responsible for the additional costs and demands on management's time associated with being an independent, publicly traded company, including costs and demands related to corporate governance, investor and public relations and public reporting. In addition, while we have been profitable as part of Honeywell, we cannot assure you that our profits will continue at a similar level when we are an independent, publicly traded company. For additional information about our past financial performance and the basis of presentation of our Consolidated and Combined Financial Statements, see "Selected Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical Consolidated and Combined Financial Statements, and the Notes thereto, included elsewhere in this Form 10-K.

*We operate in highly competitive markets.*

We operate in highly competitive markets and compete directly with global, national, regional and local providers of our products, services and solutions including manufacturers, distributors, service providers, retailers and online commerce providers. The most significant competitive factors we face are product and service innovation, reputation of our Company and brands, sales and marketing programs, product performance, quality of product training and events, product availability, speed and accuracy of delivery, service and price, technical support, furnishing of customer credit and product reliability and warranty, with the relative importance of these factors varying among our segments and products. In addition to current competitive factors, there may be new market entrants with non-traditional business and customer service models or disruptive technologies and products, resulting in increased competition and changing business dynamics. See "Risks Relating to Our Business— The market for connected home solutions is fragmented, highly competitive, continually evolving and subject to disruptive technologies." Existing or future competitors may seek to gain or retain market share by reducing prices, and we may be required to lower prices or may lose business, which could adversely affect our business, financial condition, results of operations and cash flows. Also, to the extent that we do not meet changing customer preferences or demands or other market changes, or if one or more of our competitors introduces new products, becomes more successful with private label products, online offerings or establishes exclusive supply relationships, our ability to attract and retain customers could be adversely affected.

We also have long-standing relationships with customers whose business models may be subject to the risks articulated above. For example, changes in the security system market, such as a shift away from subscription monitoring services, could adversely impact certain of our large customers or cause them to change their business models in ways that adversely impact our business and cash flows. As new market entrants emerge there can be no guarantee that we will be successful in developing customer relationships with them, or that such relationships will be as mutually beneficial as our current relationships. Furthermore, if new technologies or business models become ascendant in our customers' markets our relationships and service commitments with incumbent businesses may become a disadvantage.

22

**RESIDEO TECHNOLOGIES, INC.**

To remain competitive, we will need to invest continually in product development, marketing, customer service and support, manufacturing and our distribution networks. We may not have sufficient resources to continue to make such investments and we may be unable to maintain our competitive position. In addition, we anticipate that we may have to reduce the prices of some of our products or solutions to stay competitive, potentially resulting in a reduction in the profit margin for, and inventory valuation of, these products. It is possible that competitive pressures resulting from consolidation, including customers taking manufacturing or distribution in house, moving to a competitor and consolidation among our customers, could affect our growth and profit margins. In addition, competitors in certain high growth regions may have lower costs than we do due to lower local labor costs and favorable government regulation. Countries in high growth regions may have differing codes and standards impacting the cost of doing business and may have fewer protections for, or offer less ability to utilize, existing intellectual property. We may not be able to compete effectively with new competitors from such regions. Existing or future competitors also may seek to compete with us for acquisitions, which could have the effect of increasing the price for, and reducing the number of, suitable acquisitions.

***Our competitors may have more substantial resources than we do.***

Our current and potential competitors may have greater resources, access to capital, including greater research and development or sales and marketing funds, more customers, and more advanced technology platforms, particularly with our newly-launched products and services in connected services and in our newer geographic regions. Many of our competitors may be able to develop offerings that have alternate income streams such as data and advertising revenue which we may not have, and therefore may be able to offer their service products for a lower price or for free and offset any business losses with profits from the rest of their broad product portfolios. Some of our competitors may also be able to deliver their service solutions more quickly to market than we can by capitalizing on technology developed in connection with their substantial existing service models. In addition, some of our competitors have significant bases of customer adoption in other services and in online content, which they could use as a competitive advantage in the growing connected home solutions services market or otherwise in our product or distribution businesses. New entrants into the wholesale distribution business or products business could include companies with significant presence in residential environments and could put us at a competitive disadvantage if they enter the market. Current and future competitive pressures may cause us to reduce our prices or lose market share, or could negatively affect our cash flow, all of which could have an adverse effect on our business, financial condition, results of operations and cash flows.

***The market for connected home solutions is fragmented, highly competitive, continually evolving and subject to disruptive technologies.***

The market for connected home solutions is fragmented, highly competitive, continually evolving and subject to disruptive technologies. Cable and telecommunications companies actively focusing on competing in connected home solutions and expanding into the monitored security space, and large technology companies expanding into connected home solutions, could result in pricing pressure, a shift in customer preferences towards the services of these companies and a reduction in our market share. Many of these companies already have significant presence in residential environments and may be able to leverage this presence into the connected home solution. New market entrants with non-traditional business and customer service models or disruptive technologies and products could result in increased competition and changing business dynamics. Continued pricing pressure from these competitors or other new entrants, failure to successfully partner with these companies or failure to achieve pricing based on competitive advantages could prevent us from maintaining competitive price points for our products and services resulting in loss of customers or in our inability to attract new customers and have an adverse effect on our business, financial condition, results of operations and cash flows. Based on these or other factors described herein, we may not be able to grow our connected home solutions business as anticipated.

***Competition in the distribution business is significant.***

If end customers of our distribution business are not convinced of the reputation of our Company and brands and of our ability to compete on product performance, quality of product training and events, product availability, speed and accuracy of delivery, service and price, technical support, credit availability and product reliability and warranty, we could lose business, which could have an adverse effect on our business, financial condition, results of operations and cash flows. In addition, most of our products are available from several sources and our customers tend to have relationships with several distributors. Furthermore, if retail outlets, including online

23

**RESIDEO TECHNOLOGIES, INC.**

commerce or big box stores were to increase their participation in wholesale distribution markets, or if buying patterns for our products become more retail or e-commerce based through these outlets, we may not be able to effectively compete, which could have an adverse effect on our business, financial condition, results of operations and cash flows. Also, other sources of competition are buying groups that consolidate purchasing power, which if successful could have an adverse effect of our business, financial condition, results of operations and cash flows. The security industry is also undergoing consolidation as many residential and commercially-focused companies combine to leverage product and vertical market expertise and expand their service footprint. In recent years, this trend of consolidation has accelerated, and many of our customers have combined with companies with whom we have little or no prior relationship. In addition, if manufacturers of products sold through our distribution business increase their direct-to-customer or retail distribution, it could have an adverse effect on our business, financial condition, results of operations and cash flows.

***Growth of the retail market and e-commerce market could adversely affect our business.***

Our solutions are primarily sold through a network of professional contractors, distributors, OEMs, retailers and online merchants. Growth of the retail market, including the self-installed or do-it-yourself retail markets and e-commerce markets could affect our business by attracting new competitors, some of whom may be larger and have more resources than we do. In addition, growth of these retail markets relative to the professional installation markets may negatively impact our margins, which could negatively affect our cash flow and have an adverse effect on our business, financial condition and results of operations and cash flows.

***Technology in our markets is changing rapidly and our future results and growth are largely dependent upon our ability to develop new technologies and introduce new products that achieve market acceptance.***

Technology in our markets is in a continuing and often rapid state of change as new technologies and enhancements to existing technologies continue to be introduced both in our traditional and connected product markets. There is increasing customer demand for connected home solutions and the development of new technologies as well as increasing emphasis on product efficiency in our traditional products. Our future results depend upon a number of factors, including our ability to (i) identify emerging technological trends, (ii) develop and maintain competitive products, in part by adding innovative features that differentiate our products from those of our competitors and prevent commoditization of our products, (iii) grow our market share, (iv) develop, manufacture and bring compelling new products to market quickly and cost-effectively, (v) find and effectively partner with and continue to partner with home connected device platforms and (vi) attract, develop and retain individuals with the requisite technical expertise and understanding of customers' needs to develop new technologies and introduce new products.

We can offer no assurance that we will be able to keep pace with technological developments. It is also possible that one or more of our competitors could develop a significant technical advantage or breakthrough that allows them to provide additional or superior products or services, or to lower their price for similar products or services, that could put us at a competitive disadvantage. Our inability to predict the growth of and respond in a timely way to customer preferences and other developments could have an adverse effect on our business, financial condition, results of operations and cash flows.

Our customer service model has historically been based largely around individualized product support, primarily through telephone communications. Although this allows a high degree of personalized and interactive dialogue, it differs from the highly-scalable and rapid electronic response systems pioneered by technology companies that operate in or may enter our markets. As such, we may be disadvantaged in terms of cost and overall customer satisfaction if we are unable to successfully adapt our support model to changes in customer expectations for our products.

Our connected solutions platform allows for integration and connection to third party solutions and for application designs. This interoperability is designed to reduce the barriers to using our software and panels with different devices, but could also have the effect of encouraging competitors to produce devices that operate on our platform, which could lower sales of our products. Adoption rates of our connected home solutions will also depend on a number of factors, including development of competitive and attractive products and the cost to customers of installation of new solutions or upgrade or renovation from older connected platforms or products. In addition to our application products, we rely on third party designers to create applications connecting our products to other platforms. If developers choose not to develop on our system, the accessibility of our solutions across other systems, devices and platforms might not expand in line with our competitors.

24

**RESIDEO TECHNOLOGIES, INC.**

In addition, if we are unable to effectively protect our trade secreted or proprietary technology from third parties or other competitors that may have access to our technology through our open architecture model, our business and competitive position may be harmed.

We expect that the growth of our business may depend on our development of new technologies in response to legislation and regulation related to efficiency standards, safety and security and environmental concerns. Agreement on legislation and regulation may be slow and implementation of any such reforms may take many years. As a result, any growth related to solutions that are responsive to such reforms may be delayed.

*Our connected solutions and other products and services rely on enabling technology, connectivity, software and intellectual property that in certain instances we do not own or control.*

Our operations depend upon third party technologies, software and intellectual property. Additionally, our connected solutions and our security monitoring services may be accessed through the Internet and using connectivity infrastructures (for example, 4G, LTE and next generation 5G and other wireless technologies) and cloud-based technologies. We rely on cellular and other telecommunications and network providers to communicate signals to and from customers using our connected solution applications in a timely, cost-efficient and consistent manner.

The failure of one or more of these providers or technologies to transmit and communicate signals in a timely manner could affect our ability to provide services to our customers or for our connected solution products to work as designed. There can be no assurance that third party telecommunications and network providers and signal-processing centers will continue to transmit and communicate signals to or from our third party providers and the monitoring stations without disruption. Any such disruption, particularly one of a prolonged duration, could have an adverse effect on our business, financial condition, results of operations and cash flows. In addition, failure to renew contracts with existing providers or licensors of technology, software, intellectual property or connectivity solutions, or to contract with other providers or licensors on commercially acceptable terms or at all may adversely impact our business, financial condition, results of operations and cash flows.

*Market and economic conditions may adversely affect the economic conditions of our customers, demand for our products and services and our results of operations.*

As a global provider of Comfort, RTS and Security products, services and technologies for the home, as well as a worldwide wholesale distributor of security and low voltage electronics products, our business is affected by the performance of the global new and repair and remodel construction industry. Our markets are sensitive to changes in the regions in which we operate and are also influenced by cyclical factors such as interest rates, inflation, availability of financing, consumer spending habits and confidence, employment rates and other macroeconomic factors over which we have no control and which could adversely affect our business, financial condition, results of operations and cash flows. For example, downward changes in the housing market would be expected to depress sales to professional contractors and result in substantially all of our professional contractor and OEM customers lowering production schedules, which would have a direct impact on our business, financial condition, results of operations and cash flows.

Our sales are also affected by fluctuations in demand for Internet-connected devices. If the market for connected home solutions grows more slowly than anticipated, whether as a result of unfavorable economic conditions, uncertain geopolitical environments, budgetary constraints of our consumers or other factors, we may not be able to increase our revenue and earnings.

*Portions of our revenue and cash flow are seasonal, which could cause our financial results and liquidity to fluctuate.*

A portion of our revenue is seasonal, which impacts the comparison of our financial condition and results of operations on a quarter-by-quarter basis. Sales activity is generally lowest during the first calendar quarter when it is winter in the majority of our geographical markets.

25

**RESIDEO TECHNOLOGIES, INC.**

*Global climate change could negatively affect our business.*

Responses to climate change may cause a shift away from fossil fuels to alternative power sources. Many of our thermal solutions are designed for application with oil and gas systems. A shift away from fossil fuels could affect our OEM customers' business and result in a loss of business for them and for us. If we fail to adapt our solutions to alternative power sources, it could have an adverse effect on our business, financial condition, results of operations and cash flows.

Cooler than normal summers and warmer than normal winters may depress our sales. In addition, stable temperatures may result in less wear and tear on cooling and heating equipment which may depress Comfort and RTS sales. Demand for our products and our services, particularly our products and solutions geared toward the home construction repair and remodel industry, including our Comfort and RTS businesses, is seasonal and strongly affected by the weather. Cooler than normal summers depress our sales of replacement controls for heating, ventilation, cooling and water heating equipment in certain larger markets. Similarly, warmer than normal winters have the same effect on our heating products and services. Increased public awareness and concern regarding global climate change have led to our development of social responsibility, sustainability and other business policies, which in some instances are more restrictive than current laws and regulations. In light of the current regulatory environment, we also face uncertainty with respect to future climate change initiatives, including regional and/or federal requirements to reduce greenhouse gas emissions.

Moreover, climate change itself creates financial risk to our business. Unseasonable weather conditions may impact the availability and cost of materials needed for manufacturing and increase insurance and other operating costs and, especially in the case of disruptions at our ADI stores, our ability to make sales during the pendency of site closures. These factors may influence our decisions to construct new facilities or maintain existing facilities in areas that are prone to physical climate risks. We could also face indirect financial risks passed through the supply chain, and process disruptions due to physical climate changes could result in price modifications for our products and the resources needed to produce them.

*We could be adversely affected by any violations of the U.S. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act, and other foreign anti-bribery laws.*

We are subject to the U.S. Foreign Corrupt Practices Act ("FCPA") and other laws that prohibit improper payments or offers of payments to foreign government officials and political parties for the purpose of obtaining or retaining business or otherwise securing an improper business advantage. We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials. We face the risk of unauthorized payments or offers of payments by one of our employees, contractors or consultants. Our existing safeguards and any future improvements may prove to be less than effective in preventing such unauthorized payments, and our employees and consultants may engage in conduct for which we might be held responsible. Any such violation, even if prohibited by our policies, could subject us and such persons to criminal and/or substantial civil penalties or other sanctions, which could have a material adverse effect on our business, financial condition, cash flows, and reputation.

*If our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings.*

We test, at least annually, the carrying value of goodwill for impairment, as discussed in Note 2 of the Notes to the Consolidated and Combined Financial Statements included herein. The estimates and assumptions about future results of operations and cash flows made in connection with the impairment testing could differ from future actual results of operations and cash flows. If the assumptions used in our analysis are not realized, it is possible that an impairment charge may need to be recorded in the future. Any such charges may have a material negative impact on our operating results. There were no impairment charges taken during the years ended 2018, 2017, and 2016.

26

**RESIDEO TECHNOLOGIES, INC.**

***Failure to achieve and maintain a high level of product and service quality could damage our image with customers and negatively impact our results.***

Product and service quality issues could result in a negative impact on customer confidence in our Company and our brand image. If our product and service offerings do not meet applicable safety standards or our customers' expectations regarding safety or quality, we could experience lost sales and increased costs and be exposed to legal, financial and reputational risks. Actual, potential or perceived product safety concerns could expose us to litigation as well as government enforcement action. In addition, in the event that any of our products fail to perform as expected, we may face direct exposure to warranty and product liability claims or may be required to participate in a government or self-imposed recall involving such products which could result in costly product recalls and other liabilities. As a result, our reputation as a manufacturer and distributor of high quality products and services could suffer and impact customer loyalty.

We maintain strict quality controls and procedures, including the testing of raw materials and safety testing of selected finished products. However, we cannot be certain that our testing will reveal latent defects in our products or the materials from which they are made, which may not become apparent until after the products have been sold into the market. We also cannot be certain that our suppliers will always eliminate latent defects in products we purchase from them. Accordingly, there is a risk that product defects will occur, which could require a product recall. Product recalls can be expensive to implement, and, if a product recall occurs during the product's warranty period, we may be required to replace the defective product. In addition, a product recall may damage our relationship with our customers and we may lose market share with our customers.

In many jurisdictions, product liability claims are not limited to any specified amount of recovery. If any such claims or contribution requests exceed our available insurance or if there is a product recall, there could be an adverse impact on our results of operations. In addition, a recall claim could require us to review our entire product portfolio to assess whether similar issues are present in other product lines, which could result in significant disruption to our business and could have a further adverse impact on our business, financial condition, results of operations and cash flows. We cannot assure you that we will not experience any material warranty or product liability claim losses in the future or that we will not incur significant costs to defend such claims. There can be no assurance that we will have adequate reserves to cover any recalls, repair and replacement costs. Our customers that are not end-users of our products, including our OEM customers, may face similar claims or be obliged to conduct recalls of their own, which could result in lost business to us, or these customers may seek contribution from us for defects.

***As an independent, publicly traded company, we may not enjoy the same benefits that we did as a segment of Honeywell.***

We are a smaller and less diversified company than Honeywell, and do not have access to financial and other resources comparable to those of Honeywell prior to the Spin-Off. As a stand-alone company, we do not have the same product diversity or scale and may not have similar purchasing power or access to capital markets, and we may be unable to obtain goods and services at the prices and terms obtained prior to the Spin-Off, which could decrease our overall profitability. Uncertainty related to the Spin-Off may lead customers and other parties with whom we currently do business or may do business in the future to terminate or attempt to negotiate changes in our existing business relationships, or cause them to consider entering into business relationships with parties other than us.

***Our business is dependent upon substantial investment in information technology.***

The efficient operation of our business requires substantial investment in technology infrastructure systems, including enterprise resource planning ("ERP") systems, supply chain management systems, digital commerce systems and connected solutions platforms. The inability to fund, acquire and implement these systems may impact our ability to respond effectively to changing customer expectations, manage our business, scale our solutions effectively or impact our customer service levels, which may put us at a competitive disadvantage and negatively impact our financial results. Repeated or prolonged interruptions of service, due to problems with our systems or third party technologies, whether or not in our control, could have a significant negative impact on our reputation and our ability to sell products and services.

27

**RESIDEO TECHNOLOGIES, INC.**

We are highly dependent upon a variety of internal computer and telecommunication systems to operate our business. In order to support our continued operational ability and growth, we must maintain and continuously upgrade our ERP and other information systems, which are critical to our operational, accounting and financial functions. Failure to properly or adequately invest in and maintain these systems could result in the diversion of management's attention and resources and could materially adversely affect our operating results and impact our ability to efficiently manage our business. Our existing information systems may become obsolete, requiring us to transition our systems to a new platform. Such a transition would be time consuming and costly, and would require management resources in excess of those we currently have.

Further, as we are dependent upon our ability to gather and promptly transmit accurate information to key decision makers, our business, results of operations, financial condition and cash flows may be adversely affected if our information systems do not allow us to transmit accurate information, even for a short period. Failure to properly or adequately address these issues could impact our ability to perform necessary business operations, which could adversely affect our reputation, competitive position, business, results of operations, financial condition and cash flows.

We must attract and retain qualified people to operate our systems, expand and improve them, integrate new programs effectively with our existing programs, and convert to new systems efficiently when required. Any disruption to our business due to such issues, or an increase in our costs to cover these issues that is greater than what we have anticipated, could have an adverse effect on business, financial condition, results of operations and cash flows. Our customers rely increasingly on our electronic ordering and information systems as a source for product information, including availability and pricing. There can be no assurance that our systems will not fail or experience disruptions, and any significant failure or disruption of these systems could prevent us from making sales, ordering and delivering products and otherwise conducting our business. Many of our customers use our website to check real-time product availability, see their customized pricing and place orders, and to access our connected solution platforms. Any material disruption of our website, our connected solution applications, or the Internet in general could impair our order processing or prevent our manufacturers and customers from accessing information and cause us to lose business or damage our reputation.

***Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial condition, results of operations and cash flows.***

Our business depends on the processing of data (some of which contains personal data), including the transfer of data between our affiliated entities, to and from our business partners and customers, and with third-party service providers. The laws and regulations relating to personal data constantly evolve, as federal, state and foreign governments continue to adopt new measures addressing data privacy and processing (including collection, storage, transfer, disposal and use) of personal data. Moreover, the interpretation and application of many existing or recently enacted privacy and data protection laws and regulations in the European Union, the U.S. and elsewhere are uncertain and fluid, and it is possible that such laws and regulations may be interpreted or applied in a manner that is inconsistent with our existing data management practices or the features of our products and services. Any such new laws or regulations, any changes to existing laws and regulations and any such interpretation or application may affect demand for our products and services, impact our ability to effectively transfer data across borders in support of our business operations, or increase the cost of providing our products and services. Additionally, any actual or perceived breach of such laws or regulations may subject us to claims and may lead to administrative, civil or criminal liability, as well as reputational harm to us or our employees. We could also be required to fundamentally change our business activities and practices, or modify our products and services, which could have an adverse effect on our business, financial condition, results of operations and cash flows.

In the U.S., various laws and regulations apply to the collection, processing, transfer, disposal, unauthorized disclosure and security of personal data. For example, data protection laws passed by most states within the U.S. require notification to users when there is a security breach for personal data. Additionally, the Federal Trade Commission ("FTC") and many state attorneys general are interpreting federal and state consumer protection laws as imposing standards for the online collection, use, transfer and security of personal data. In particular, our privacy policy and other statements we publish provide promises and assurances about privacy and security that could subject us to potential regulatory action or other liabilities if such statements are found to be deceptive or misrepresentative of our privacy and data security practices. The U.S. Congress and state legislatures, along with federal regulatory authorities have recently increased their attention to matters concerning personal data, and this may result in new legislation which could increase the cost of compliance.

**RESIDEO TECHNOLOGIES, INC.**

In California, for example, the California Consumer Privacy Act of 2018 (CCPA), which comes into effect in 2020, grants California residents new data privacy rights and regulates the security of connected devices.

In addition to government regulation, privacy advocacy and industry groups may propose new and different self-regulatory standards that either legally or contractually apply to us or our customers.

In the European Union, some of our operations are subject to the European Union's GDPR, which took effect from May 25, 2018. The GDPR introduced a number of new obligations for subject companies and we will need to continue dedicating financial resources and management time to GDPR compliance in the future. The GDPR enhances the obligations placed on companies that control or process personal data of residents of the European Union including, for example, expanded disclosures about how personal data is to be used, the mandatory obligation to provide fair processing notices at the time when personal data is obtained, new mechanisms for obtaining consent from data subjects, new controls for data subjects with respect to their personal data (including by enabling them to exercise rights to erasure, right to restrict processing of personal data, and data portability), limitations on retention of personal data and mandatory data breach notifications. Additionally, the GDPR places companies under new obligations relating to data transfers and the security of the personal data they process, as well as in relation to third-party data processors they use. The GDPR provides that supervisory authorities in the European Union may impose administrative fines for certain infringements of the GDPR of up to EUR 20,000,000 or 4% of a company's total, worldwide, annual turnover of the preceding financial year, whichever is higher. Individuals who have suffered damage as a result of a subject company's non-compliance with the GDPR also have the right to seek compensation from such company. Given the breadth of the GDPR, compliance with its requirements is likely to continue to require significant expenditure of resources on an ongoing basis, and there can be no assurance that the measures we have taken for the purposes of compliance will be successful in preventing breach of the GDPR. Given the potential fines, liabilities and damage to our reputation in the event of an actual or perceived breach of the GDPR, such a breach may have an adverse effect on our business, financial condition, results of operations and cash flows.

Outside of the U.S. and the European Union, many jurisdictions have adopted or are adopting new data privacy laws that may impose further onerous compliance requirements, such as data localization, which prohibits companies from storing outside the jurisdiction data relating to resident individuals. The proliferation of such laws within the jurisdictions in which we operate may result in conflicting and contradictory requirements, particularly in relation to evolving technologies. Any failure to successfully navigate the changing regulatory landscape could result in legal liability or impairment to our reputation in the marketplace, which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

Privacy-related claims or lawsuits initiated by governmental bodies, customers or other third parties, whether meritorious or not, could be time consuming, result in costly regulatory proceedings, litigation, penalties and fines, or require us to change our business practices, sometimes in expensive ways, or other potential liabilities. Unfavorable publicity regarding our privacy practices could injure our reputation, harm our ability to keep existing customers or attract new customers or otherwise adversely affect our business, assets, revenue, brands and reputation which may have an adverse effect on our business, financial condition, results of operations and cash flows.

29

**RESIDEO TECHNOLOGIES, INC.**

*Cyber or other security incidents, could disrupt our internal systems causing service failures, disrupt our business operations, result in the loss of critical and confidential information, and adversely impact our reputation, our business, financial condition, results of operations and cash flows. Our connected products potentially expose our business to cybersecurity threats.*

We create, deploy and maintain information technology ("IT") and engineering systems, some of which involve sensitive information, including personal data, trade secrets and other proprietary information. In addition, our connected products potentially expose our business to cybersecurity threats. As a result, we are subject to systems, service or product failures, not only resulting from our own failures or the failures of third party service providers, natural disasters, power shortages or terrorist attacks, but also from exposure to cyber or other security threats. Most of the jurisdictions in which we operate have laws and regulations relating to data security and protection of information. See "Risks Relating to Our Business—Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial condition, results of operations and cash flows." We are taking proactive measures to help assess our cybersecurity capabilities being provided under the TSA by Honeywell and establish a risk prioritized strategic roadmap in support of implementing our own independent capabilities to provide a broad cybersecurity operating model. Additionally, we have certain measures to protect our information systems and products against unauthorized access and disclosure of personal information and of our confidential information and trade secrets and confidential information and trade secrets belonging to our customers. However, there is no assurance that the security measures we have put in place will be effective in every case.

Global cybersecurity threats and incidents can range from uncoordinated individual attempts to gain unauthorized access to IT, payment and other systems to sophisticated and targeted measures known as advanced persistent threats directed at us, our products, our customers, vendors and/or our third party service providers, including cloud providers and Honeywell arising out of its provision of IT services under the TSA, which extends through April 2020. There has been an increase in the frequency and sophistication of cyber and other security threats we face, and our customers are increasingly requiring cyber and other security protections and standards in our products, and we may incur additional costs to comply with such demands. We have experienced, and expect to continue to experience, these types of threats and incidents.

We sell security and life safety solutions, which are designed to secure the safety of our subscribers and their residences or commercial properties. If these solutions fail for any reason, including due to defects in our software, a carrier outage, a failure of our network operating center, a failure on the part of one of our service provider partners, user error or cybersecurity incident, we could be subject to liability and reputational damage for such failures and our business could suffer.

We seek to deploy comprehensive measures to deter, prevent, detect, respond to and mitigate these threats, including identity and access controls, data protection, vulnerability assessments, product software designs that we believe are less susceptible to cyber-attacks, security and operational monitoring of our IT networks and systems and maintenance of backup and protective systems. Despite these efforts, cyber and other security incidents, depending on their nature and scope, could potentially result in the misappropriation, destruction, corruption, misuse or unavailability of personal data, company assets, critical data and confidential or proprietary information (our own or that of third parties), product failure and the disruption of business operations. Moreover, employee error or malfeasance, faulty password management or other intentional or inadvertent non-compliance with our security protocols and policies subject us to breaches of our information systems. Our efforts to protect our company data and the information we receive may also be unsuccessful due to software "bugs," system errors or other technical deficiencies, or vulnerabilities of our vendors and service providers. Cyber and other security incidents aimed at the software embedded in our products could lead to third party claims that our product failures have caused a similar range of damages to our customers, and this risk is enhanced by the increasingly connected nature of our products.

The potential consequences of a material cyber or other security incident include financial loss, reputational damage, negative media coverage, litigation with third parties, including class-action litigation, regulatory investigations or actions, theft of intellectual property, fines, diminution in the value of our investment in research, development and engineering, and increased cyber and other security protection and remediation costs due to the increasing sophistication and proliferation of threats, which in turn could adversely affect our competitiveness, business, financial condition, results of operations and cash flows. In addition to any costs resulting from contract performance or required corrective action, these incidents could generate increased costs or loss of revenue if our customers choose to postpone or cancel previously scheduled orders or decide not to renew any of our existing

30

**RESIDEO TECHNOLOGIES, INC.**

contracts. Breaches in security could also result in a negative impact for our customers and thus affect our relations with our customers, injure our reputation and harm our ability to keep existing customers and to attract new customers. Some jurisdictions have enacted law requiring companies to notify individuals of data security breaches involving certain types of personal data. Such mandatory disclosures could lead to negative publicity and may cause our current and prospective customers to lose confidence in the effectiveness of our data security measures.

We have cybersecurity insurance (subject to specified retentions or deductibles) related to a breach event covering expenses for items such as notification, credit monitoring, investigation, crisis management, public relations and legal advice. We also maintain product liability insurance (subject to specified retentions or deductibles) that may cover certain physical damage or third-party injuries caused by potential cybersecurity incidents associated with our products. However, damage and claims arising from such incidents may not be covered or may exceed the amount of any insurance available.

We could incur significant costs in protecting our data centers, servers, applications, and cloud environments against, or remediating, security vulnerabilities or breaches and cyber-attacks. Additionally, the costs related to cyber or other security incidents may not be fully insured or indemnified by other means. The successful assertion of a large claim against us with respect to a cyber or other security incident could seriously harm our business. Even if not successful, these claims could result in significant legal and other costs and may be a distraction to our management and harm our customer relationships and reputation.

*The failure of our network operations centers and data backup systems could put our users at risk.*

Many of our solutions operate with a hosted architecture, and we update our solutions regularly while our solutions are operating. If our solutions and/or upgrades fail to operate properly, our solutions could stop functioning for a period of time, which could put our users at risk. Our ability to keep our business operating is highly dependent on the proper and efficient operation of our network operations centers and data backup systems. Although our network operations centers have back-up computer and power systems, if there is a catastrophic event, adverse weather conditions, natural disaster, terrorist attack, security breach or other extraordinary event, we may be unable to provide our subscribers with uninterrupted monitoring service. Furthermore, because data backup systems are susceptible to malfunctions and interruptions (including those due to equipment damage, power outages, human error, computer viruses, computer hacking, data corruption and a range of other hardware, software and network problems), we cannot guarantee that we will not experience data backup failures in the future. A significant or large-scale, security breach, malfunction or interruption of our network operations centers or data backup systems could adversely affect our ability to keep our operations running efficiently. If a malfunction or security breach results in a wider or sustained disruption, it could have an adverse effect on our reputation, business, financial condition, results of operations or cash flows. See "Risks Relating to Our Business—Internal system or service failures, including as a result of cyber or other security incidents, could disrupt business operations, result in the loss of critical and confidential information, and adversely impact our reputation, our business, financial condition, results of operations and cash flows. Our connected products potentially expose our business to cybersecurity threats."

*Disruptions, or the need to relocate any of our facilities, could significantly disrupt our business.*

We manufacture many of products at single-location production facilities and rely on certain suppliers who also may concentrate production in single locations. A disruption, including work stoppage, supply chain failures, natural disasters, weather-related disruptions, or other disruptions at one or more of our production facilities could have adverse effects on our business, financial condition, results of operations and cash flows. Moreover, due to unforeseen circumstances or factors beyond our control, we may be forced to relocate our operations from one or more of our existing facilities to new facilities and may incur substantial costs, experience program delays and sacrifice proximity to customers and geographic markets as a result, potentially for an extended period of time. Any significant interruption in production at one or more of these facilities could negatively impact our ability to deliver our products to our customers.

A significant disruption in the supply of a key component due to a work stoppage or other disruption at one of our suppliers or any other supplier could impact our ability to make timely deliveries to our customers and, accordingly, have an adverse effect on our business, financial condition, results of operations and cash flows. Where a manufacturer halts production because of another supplier failing to deliver on time, or as a result of a work stoppage or other disruption, it is unlikely we will be fully compensated, if at all.

31

**RESIDEO TECHNOLOGIES, INC.**

***We rely on certain suppliers of materials and components for our products.***

Certain of the materials and components for products we manufacture and those manufactured on our behalf are supplied by single or limited source suppliers. Our business, results of operations, financial condition and cash flows could be adversely affected by disruptions in supply from our third party suppliers, whether from supply chain disruptions or if suppliers lack sufficient quality control or if there are significant changes in their financial or business condition or otherwise. See "Business—Materials and Suppliers."

If our third party suppliers and manufacturers fail to deliver materials, products, parts and components of sufficient quality on time and at reasonable prices, we could have difficulties fulfilling our orders or stocking our distribution centers on similar terms or at all, sales and profits could decline, and our commercial reputation could be damaged. Our ability to manage inventory and meet delivery requirements may be constrained by our suppliers' inability to scale production and adjust delivery of long-lead-time products during times of volatile demand. Our inability to fill our supply needs would jeopardize our ability to fulfill obligations which could, in turn, result in reduced sales and profits, contract penalties or terminations, and damage to customer relationships.

Certain of our suppliers provide us with cloud based services which we rely on to support our products and solutions and serve our customers and consumers. These types of relationships with cloud based service providers are expected to increase over time. If their services fail, the operation and maintenance of our products and solutions, installed based as well as new sales, may be adversely impacted.

If we fail to adequately assess the creditworthiness and operational reliability of existing or future suppliers, if there is any unanticipated deterioration in their creditworthiness and operational reliability, or if our suppliers do not perform or adhere to our existing or future contractual arrangements, any resulting inability to otherwise obtain the supplies or our inability to enforce the terms of the contract or seek other remedies could have an adverse effect on our financial condition and results of operations and could cause us to incur significant liabilities.

***We obtain many of the products for our ADI distribution business from third parties.***

Most of the low voltage products we distribute through our ADI business are manufactured by third parties. As a result, terminations of supply or services agreements or a change in terms or conditions of sale from one or more of our key manufacturers could negatively affect our operating margins, net revenue or the level of capital required to fund our operations. We have standard distribution contracts with our manufacturers which are subject to renegotiation or non-renewal. Our dependence on third party manufacturers leaves us vulnerable to having an inadequate supply of demanded products, price increases, late deliveries and poor product quality.

Our ability to obtain particular products or product lines in the required quantities and our ability to fulfill customer orders on a timely basis is critical to our success. Our manufacturers have experienced product supply shortages from time to time due to the inability of certain of their suppliers to supply certain products on a timely basis. As a result, we have experienced, and may in the future continue to experience, short-term shortages of specific products. We cannot provide any assurances that manufacturers will be able to maintain an adequate supply of products to fulfill all of our customer orders on a timely basis. Our reputation, sales and profitability may suffer if manufacturers are not able to provide us with an adequate supply of products to fulfill our customer orders on a timely basis or if we cannot otherwise obtain particular products or a product lines.

Manufacturers who currently distribute their products through us may decide to shift to or substantially increase their existing distribution with other distributors, their own dealer networks, or directly to resellers or end-users. Increasingly, our manufacturers are combining, leaving us with fewer alternative sources. This could result in more intense competition as distributors strive to secure distribution rights with these manufacturers, which could have an adverse impact on our business, financial condition, results of operations and cash flows. If we are unable to maintain an adequate supply of products, or if manufacturers do not regularly invest in, introduce to us, and/or make new products available to us for distribution, our net revenue and gross profit could suffer considerably.

32

**RESIDEO TECHNOLOGIES, INC.**

*Raw material price fluctuations, the ability of key suppliers to meet quality and delivery requirements, or catastrophic events can increase the cost of our products and services, impact our ability to meet commitments to customers and cause us to incur significant liabilities.*

The cost and availability of raw materials (such as copper, steel, aluminum, plastics, printed circuit boards, semiconductors and passive electronics) is a key factor in the cost of our products. Our inability to offset material price inflation through increased prices to customers, formula or long-term fixed price contracts with suppliers, productivity actions or through commodity hedges could adversely affect our business, financial condition, results of operations and cash flows. Supply interruptions could arise from shortages of raw materials, effects of economic, political or financial market conditions on a supplier's operations, labor disputes or weather conditions affecting products or shipments, transportation disruptions, information system disruptions or other reasons beyond our control.

The profitability of our business is also dependent upon the efficiency of our supply chain. An inefficient or ineffective supply chain strategy or operations could increase operational costs, reduce profit margins and adversely affect our business, financial condition, results of operations and cash flows. Short- or long-term capacity constraints or financial distress at any point in our supply chain could disrupt our operations and adversely affect our financial performance, particularly when the affected suppliers and manufacturers are the sole sources of products that we require or that have unique capabilities, or when our customers have directed us to use those specific suppliers and manufacturers. We incur significant freight expenses related to the purchase of products for distribution and fluctuations in fuel costs may cause us to incur additional expense.

*We are subject to the economic, political, regulatory, foreign exchange and other risks of international operations.*

Our international revenues are approximately 32% of our net revenue for the year ended December 31, 2018. Our international geographic footprint subjects us to many risks including: exchange control regulations; wage and price controls; antitrust/competition and environmental regulations; employment regulations; foreign investment laws; monetary and fiscal policies and protectionist measures that may prohibit acquisitions or joint ventures, establish local content requirements, or impact trade volumes; import, export and other trade restrictions (such as embargoes); violations by our employees of anti-corruption laws (despite our efforts to mitigate these risks); changes in regulations regarding transactions with state-owned enterprises; nationalization of private enterprises; natural and man-made disasters, hazards and losses; backlash from foreign labor organizations related to our repositioning or restructuring actions; violence, civil and labor unrest; acts of terrorism; and our ability to hire and maintain qualified staff and maintain the safety of our employees in these regions. For more information on our international footprint, see "Item 2. Properties." Additionally, certain of the markets in which we operate have adopted increasingly strict data privacy and data protection requirements or may require local storage and processing of data or similar requirements. See "Risks Relating to Our Business —Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial condition, results of operations and cash flows."

Instabilities and uncertainties arising from the global geopolitical environment can negatively impact our business. The U.K.'s referendum to leave the European Union, commonly known as "Brexit," has caused and may continue to cause interest rate, exchange rate and other market and economic volatility. As negotiations relating to the future terms of the U.K.'s relationship with the European Union proceed, our manufacturing operations and the businesses of our customers and suppliers could be negatively impacted if tariffs, new compliance requirements or other restrictions (such as embargoes) are imposed on the free flow of goods to and from the U.K. In the event that the U.K. leaves the European Union with no agreement, there may be further and unanticipated adverse effects to global economic conditions that would likely have an adverse impact on labor costs, trade and foreign exchange risk. Similarly, the implementation of more restrictive trade policies or the renegotiation of existing trade agreements in the U.S. or other countries where we sell or manufacture large quantities of products and services or procure supplies and other materials incorporated into our products could negatively impact our business results of operations, cash flows and financial condition. For example, a government's adoption of "buy national" policies or retaliation by another government against such policies, such as tariffs or quotas, could have a negative impact on our results of operations.

33

**RESIDEO TECHNOLOGIES, INC.**

Tariffs, sanctions and other barriers to trade could adversely affect the business of our customers and suppliers, which could in turn negatively impact our net revenue and results of operations. In addition, a substantial volume of our Comfort and RTS products benefit from the favorable tariff rates established under the North American Free Trade Agreement, replacement of which, the newly negotiated U.S. Mexico Canada Trade Agreement, requires passage by three countries legislative branches to ensure continuation of significant trade benefits. These and other instabilities and uncertainties such as BREXIT arising from the global geopolitical environment, along with the cost of compliance with increasingly complex and often conflicting regulations worldwide, can impair our flexibility in modifying product, marketing, pricing or other strategies for growing our businesses, as well as our ability to improve productivity and maintain acceptable operating margins.

As a result of our global presence, a portion of our net revenue are denominated in currencies other than the U.S. Dollar, whereas a significant amount of our payment obligations, including pursuant to the Honeywell Reimbursement Agreement and Tax Matters Agreement are denominated in U.S. Dollars, which exposes us to foreign exchange risk. We monitor and seek to reduce such risk through hedging activities; however, foreign exchange hedging activities bear a financial cost and may not always be available to us or be successful in eliminating such volatility. Finally, we generate significant amounts of cash outside of the United States that is invested with financial and non-financial counterparties. While we employ comprehensive controls regarding global cash management to guard against cash or investment loss and to ensure our ability to fund our operations and commitments, a material disruption to the counterparties with whom we transact business could expose us to financial loss.

We operate in many high-growth regions that require modifications to our products based on local building codes, regulations, standards, certifications and other factors, which may impact our cost to serve and profitability as we continue our penetration into these regions.

*We operate in regulated markets.*

Many of our products, technologies and services, in particular products implicating life safety, are subject to regulatory agency oversight, such as the U.S. Consumer Product Safety Commission, the FTC, the Federal Communications Commission ("FCC"), the U.S. Environmental Protection Agency, the European Union's CE mark ("CE"), the European Community directive "Waste Electrical and Electronic Equipment Directive" ("WEEE Directive"), the regulation Registration, Evaluation, Authorization and Restriction of Chemicals ("REACH"), the Gulf Mark standard for low voltage electric products required in Gulf Member States ("G Mark"), the EurAsian Conformity Mark for member countries of Customs Union ("EAC"), the China Compulsory Certification ("CCC") and the Regulatory Compliance Mark for Australia which may contribute to our compliance expenses. Many state regulators, such as the California Department of Toxic Substances Control, also have an impact on our markets. For example, 23 states have specific mercury thermostat regulations which require business compliance due to decades of sales of thermostats containing mercury. Mandatory collection requirements, penalties and federal legislation can have an impact on the expense. It is also important that our products comply with various third party standards, such as those of UL.

In addition, the FCC recently repealed net neutrality rules. We do not yet know the impact it may have on our business. Interference with our services or higher charges to customers by broadband service providers for using our products and services could cause us to lose existing subscribers, impair our ability to attract new subscribers and adversely affect our business, financial condition, results of operations and cash flows.

In addition, telecommunication service providers are subject to extensive regulation in the markets where we operate or may expand in the future. The FTC and the FCC have issued regulations that place restrictions on, among other things, unsolicited automated telephone calls to residential and wireless telephone subscribers by means of automatic telephone dialing systems and the use of prerecorded or artificial voice messages. If our service provider partners were to take actions in violation of these regulations, such as telemarketing to individuals on the "Do Not Call" registry, we could be subject to fines, penalties, private actions or enforcement actions by government regulators. Although we have taken steps to insulate ourselves from any such wrongful conduct by our service provider partners and require our service provider partners to comply with these laws and regulations, no assurance can be given that we will not be exposed to liability as result of our service provider partners' conduct. Changes in the applicable laws, regulations and technology affecting telecommunication services could require us to change the way we operate, which could increase costs or otherwise disrupt our operations, which in turn could adversely affect our business, financial condition, results of operations and cash flows.

34

**RESIDEO TECHNOLOGIES, INC.**

Some local governments impose assessments, fines, penalties and limitations on either customers or companies for false alarms. Certain municipalities have adopted ordinances under which both permit and alarm dispatch fees are charged directly to companies. Service providers generally pass these charges on to customers but may not be able to collect if customers are unwilling or unable to pay them, and this may require the service provider to suspend or terminate service and as a result adversely affect our business, financial condition, results of operations and cash flows. Furthermore, our customers may elect to terminate or not renew services if assessments, fines, or penalties for false alarms become significant. If more local governments were to impose assessments, fines or penalties or requirements for response such as video verification, it could adversely affect our customer base, business, financial condition, results of operations and cash flows.

The net revenue and margins of our business are directly impacted by government regulations, including safety, performance and product certification regulations, particularly those driven by customer demands and national approvals, as well as changes in trade agreements and environmental and energy efficiency standards. Growth within emerging markets may be adversely impacted by the inability to acquire and retain qualified employees where local employment law mandates may be restrictive.

*Part of our growth strategy is dependent on expanding our distribution business.*

Part of our growth strategy is to expand our geographic footprint and to increase the types and number of products sold through ADI. Our ability to open new ADI locations in both existing and new markets could be affected by local regulations and the availability of suitable real estate. We may not be able to acquire from manufacturers certain product lines that we are interested in adding to our distribution business, and if we are able to add products, they may not result in sales as expected and may not be profitable. If we are unable to execute on any part of our growth strategy, our business, financial condition, results of operations and cash flows could be adversely affected.

*Our profitability and results of operations may be adversely affected by a significant failure or inability to comply with the specifications and manufacturing requirements of our OEM customers.*

We generally have to qualify, and are required to maintain our status, as a supplier for each of our OEM customers. This is a lengthy process that involves the inspection and approval by a customer of our engineering, documentation, manufacturing and quality control procedures before that customer will place volume orders. If we are successful in qualifying, there is no assurance that any OEM will purchase products from us. Given the length of this qualification process, the risk that our business, operating results and financial condition would be adversely affected by the loss of, or any reduction in orders by, any of our significant OEM customers is increased. Accordingly, the success of our business depends on OEMs continuing to outsource the manufacturing of critical products to us. It would be difficult to replace lost revenue resulting from the loss of, or the reduction, cancellation or delay in purchase orders by, any one of these customers, whether due to their decision to not continue to outsource all or a portion of their critical parts for their capital equipment, their giving market share to our competitors or otherwise. A significant failure or inability to comply with customer specifications and manufacturing requirements or delays or other problems with existing or new products (including program launch difficulties) could result in financial penalties, cancelled orders, increased costs, loss of sales, loss of customers or potential breaches of customer contracts, which could have an adverse effect on our profitability and results of operations. We have in the past lost business from OEM customers who have taken the manufacturing of our products in-house or given market share to our competitors. If we are unable to replace revenue from lost OEM customers it could have an adverse impact on our financial position, results of operation and cash flows. In addition, if we are unable to obtain additional business from OEMs the potential growth of our business results could be adversely affected.

*We may not be able to retain or expand relationships with certain large customers.*

A number of our customers are large and contribute significantly to our net revenue and operating income. Consolidation or change of control, particularly among our OEM customers, or a decision by any one or more of our customers to outsource all or most manufacturing work to a single equipment manufacturer, may concentrate our business in a limited number of customers and expose us to increased risks relating to dependence on a smaller number of customers. By virtue of our largest customers' size and the significant portion of revenue that we derive from them, they are able to exert significant influence in the negotiation of our commercial agreements and the conduct of our business with them. Furthermore, there is significant consolidation of companies focused on security products, and we have had customers combine with companies with whom we have little or no prior relationship, putting us at risk of loss of sales. If we are unable to retain and expand our business with these large customers on favorable terms, our business, financial condition, results of operations and cash flows will be adversely affected.

35

**RESIDEO TECHNOLOGIES, INC.**

*We have credit exposure to our customers.*

Any adverse trends in our customers' businesses could cause us to suffer credit losses. As is customary in our markets, we extend credit to our customers. A portion of our customers are small contractors with inconsistent cash flow. As such, they rely on us to provide their businesses with credit and to carry specified inventory to support their operations. We may be unable to collect on receivables if our customers experience decreases in demand for their products and services, do not manage their businesses adequately, or otherwise become less able to pay due to adverse economic conditions or refinancing events. While we evaluate our customers' qualifications for credit and monitor our extensions of credit, these efforts cannot prevent all credit losses, and credit losses negatively impact our performance. In addition, for financial reporting purposes, we establish reserves based on our historical experience of credit losses. To the extent that our credit losses exceed those reserves, our financial performance will be negatively impacted beyond what is expected. If there is deterioration in the collectability of our receivables, or we fail to take other actions to adequately mitigate such credit risk, our earnings, cash flows and our ability to utilize receivable-based financing could deteriorate. In addition, if we are unable to extend credit to our customers, we may experience loss of certain contracts or business.

Extending credit to international customers involves additional risks. It is often more difficult to evaluate credit of a customer or obtain credit protections in our international operations. Also, credit cycles and collection periods are typically longer in our international operations. We are also subject to credit risk associated with customer concentration. If one or more of our largest customers were to become bankrupt or insolvent, or otherwise were unable to pay for our products, we may incur significant write-offs of accounts that may have an adverse effect on our business, financial condition, results of operations and cash flows. As a result of these factors and other challenges in extending credit to international customers, we generally face greater credit risk from sales internationally compared to domestic sales.

*Failure to protect our intellectual property could adversely affect our business, financial condition and results of operations and cash flows.*

We rely on a combination of patents, copyrights, trademarks, trade names, trade secrets and other proprietary rights, as well as contractual arrangements, including licenses, to establish, maintain and protect our intellectual property rights. Effective intellectual property protection may not be available in every country in which we do business. We may not be able to acquire or maintain appropriate registered or unregistered intellectual property in all countries in which we do business. Companies that license intellectual property we own or use, especially, the Honeywell brand, also may take actions that diminish the value of our intellectual property or harm our reputation.

Our intellectual property rights may not be sufficient to permit us to take advantage of some business opportunities. As a result, we may be required to change our plans or acquire the necessary intellectual property rights, which could be costly. Furthermore, our ability to enforce our intellectual property rights in emerging markets may be limited by legal or practical considerations that have not historically affected our business in markets with more established intellectual property protection systems.

The protection of our intellectual property may be expensive and time-consuming. There can be no assurance that the steps we take to maintain and protect our intellectual property will be adequate, or that third parties will not infringe, circumvent, misappropriate or violate our intellectual property. If our efforts to protect our intellectual property are not adequate, the value of our goods and services may be harmed, which could have an adverse effect on our business, financial condition, results of operations and cash flows. Any impairment of our intellectual property, including due to changes in U.S. or worldwide intellectual property laws or the absence of effective legal protection or enforcement measures, could adversely impact our business, financial condition, results of operations and cash flows.

**RESIDEO TECHNOLOGIES, INC.**

*We may incur material losses and costs as a result of intellectual property infringement actions that may be brought against us.*

As we adopt new technology, we face an inherent risk of exposure to the claims of others that we have allegedly violated their intellectual property rights. Successful claims that we infringe on the intellectual property rights of others could require us to enter into royalty or licensing agreements on unfavorable terms, incur substantial monetary liability, be prohibited preliminarily or permanently from further use of the intellectual property in question or require us to change our business practices to stop the infringing use, which could limit our ability to compete effectively. In addition, our customer agreements can require us to indemnify the customer for infringement. The time and expense of defending against these claims, whether meritorious or not, may have a material and adverse impact on our profitability and can be time-consuming and costly and divert management's attention and resources away from our businesses. Furthermore, the publicity we may receive as a result of infringing intellectual property rights may damage our reputation and adversely impact our existing customer relationships and our ability to develop new business.

We cannot assure you that we will not experience any material intellectual property claim losses in the future or that we will not incur significant costs to defend such claims.

*Failure to increase productivity through sustainable operational improvements, as well as an inability to successfully execute repositioning projects or to effectively manage our workforce, may reduce our profitability or adversely impact our businesses.*

Our profitability and margin growth are dependent upon our ability to drive sustainable improvements. In addition, we seek productivity and cost savings benefits through repositioning and other projects, such as consolidation of manufacturing facilities, transitions to cost-competitive regions, workforce reductions, asset impairments, product line rationalizations and other cost-saving initiatives. Risks associated with these actions include delays in execution of the planned initiatives, additional unexpected costs, realization of fewer than estimated productivity improvements and adverse effects on employee morale. We may not realize the full operational or financial benefits we expect and the recognition of these benefits may be delayed and these actions may potentially disrupt our operations. In addition, organizational changes, attrition, labor relations difficulties, or workforce stoppage could have an adverse effect on our business, reputation, financial condition, results of operations and cash flows.

*We may not be able to successfully acquire and integrate other products, technologies or businesses or realize the anticipated benefits of acquisitions.*

We actively evaluate acquisitions and strategic investments in products or technologies and businesses that could complement or expand our business or otherwise offer growth or cost-saving opportunities. From time to time, we may enter into letters of intent with companies with which we are negotiating for potential acquisitions or investments, or as to which we are conducting due diligence. An investment in, or acquisition of, complementary businesses, products or technologies in the future could materially decrease the amount of our available cash or require us to seek additional equity or debt financing. We may not be successful in negotiating the terms of any potential acquisition, conducting thorough due diligence, financing the acquisition or effectively integrating the acquired business, product or technology into our existing business and operations. Our due diligence may fail to identify all of the problems, liabilities or other shortcomings or challenges of an acquired business, product or technology, including issues related to intellectual property, product quality or product architecture, regulatory compliance practices, revenue recognition or other accounting practices or employee or customer issues.

In connection with any acquisitions we complete, we may have difficulty integrating the acquired business, may not achieve the synergies or other benefits we expected to achieve, and we may incur unanticipated expenses, write-downs, impairment charges or unforeseen liabilities that could negatively affect our business, financial condition, results of operations and cash flows. Further, contemplating or completing an acquisition and integrating an acquired product or technology or business could divert management and employee time and resources from other matters.

**RESIDEO TECHNOLOGIES, INC.**

***We depend on the recruitment and retention of qualified personnel, and our failure to attract and retain such personnel could adversely affect our business, financial condition, results of operations and cash flows.***

Due to the complex nature of our business, our future performance is highly dependent upon the continued services of our employees and management who have significant industry expertise, including our engineering and design personnel and trained sales force. Our performance is also dependent on the development of additional personnel and the hiring of new qualified engineering, design, manufacturing, marketing, sales and management personnel for our operations. Competition for qualified personnel in our markets is intense, and we may not be successful in attracting or retaining qualified personnel. The loss of key employees, our inability to attract new qualified employees or adequately train employees, or the delay in hiring key personnel could negatively affect our business, financial condition, results of operations and cash flows.

***Our operations require substantial capital and we may not be able to obtain additional capital that we need in the future on favorable terms or at all.***

We may require additional capital in the future to finance our growth and development, upgrade and improve our manufacturing capabilities, implement further marketing and sales activities, fund ongoing R&D activities, satisfy regulatory and environmental compliance obligations and national approvals requirements, satisfy obligations under the Honeywell Reimbursement Agreement, and meet general working capital needs. Our capital requirements will depend on many factors, including acceptance of and demand for our solutions, the extent to which we invest in new technology and R&D projects and the status and timing of these developments. If our access to capital were to become constrained significantly, or if costs of capital increased significantly, due to lowered credit ratings, prevailing business conditions, the volatility of the capital markets or other factors, our business, financial condition, results of operations and cash flows could be adversely affected.

We are responsible for obtaining and maintaining sufficient working capital and other funds to satisfy our cash requirements, and debt or equity financing may not be available to us on terms we find acceptable, if at all. Even if we are able to obtain financing or access the capital markets, incurring additional debt may significantly increase our interest expense and financial leverage, and our level of indebtedness could restrict our ability to fund future development and acquisition activities. Also, regardless of the terms of our debt or equity financing, our agreements and obligations under the Tax Matters Agreement that address compliance with Section 355 of the Internal Revenue Code of 1986, as amended (the "Code"), may limit our ability to issue stock. See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for more information. We believe that we have adequate capital resources to meet our projected operating needs, capital expenditures and other cash requirements, including payments to Honeywell under the Honeywell Reimbursement Agreement. However, we may need additional capital resources in the future and if we are unable to obtain sufficient resources for our operating needs, capital expenditures and other cash requirements for any reason, our business, financial condition and results of operations could be adversely affected. See "—Risks Relating to the Spin-Off—We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent, publicly traded company, and we may experience increased costs."

***We are subject to risks associated with the Honeywell Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities.***

In connection with the Spin-Off, we entered into the Honeywell Reimbursement Agreement (as defined below), pursuant to which we have an obligation to make cash payments to Honeywell in amounts equal to 90% of payments, which include amounts billed ("payments"), with respect to certain environmental claims, remediation and hazardous exposure or toxic tort claims, in each case including consequential damages (the "liabilities") in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales (the "recoveries"). The amount payable by us in respect of such liabilities arising in any given year is subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). Payments in respect of the liabilities arising in a given year will be made quarterly throughout such year on the basis of an estimate of the liabilities and

38

**RESIDEO TECHNOLOGIES, INC.**

recoveries provided by Honeywell. Following the end of any such year, Honeywell will provide us with a calculation of the amount of payments and the recoveries received. Subject to the aforementioned cap, if the amount of payments (net of recoveries) is greater than the previously provided estimate, we will pay Honeywell the amount of such difference (the "true-up payment") and, if the amount of the previously provided estimate is greater than the amount of payments (net of recoveries), we will receive a credit in the amount of such difference that will be applied to future payments. If a true-up payment exceeds $30 million, such true-up payment will be made in equal installments, payable on a monthly basis following the date the true-up payment is due.

For example, if in any given year, Honeywell's estimated annual payments that are within the scope of the Honeywell Reimbursement Agreement totaled $140 million, and if Honeywell's estimated associated recoveries totaled $20 million, then our quarterly payment obligations in respect of that year would be 90% of the net amount (or $108 million) divided by four, or $27 million. If, for such year, Honeywell's annual payments actually totaled $165 million, and if Honeywell's associated recoveries actually totaled $10 million, our additional true-up payment obligation in respect of that year would be 90% of the net amount (or $139.5 million) minus the sum of our quarterly payments, or $108 million, resulting in an aggregate payment in respect of such year of $31.5 million, which, because it exceeds $30 million, would be made in equal installments, payable on the true-up date and on a monthly basis following the date the true-up payment is due. However, if in any given year, Honeywell's estimated annual payments totaled $175 million, and the estimated associated recoveries totaled $5 million, then our quarterly payment obligations in respect of that year would be capped at $35 million even though 90% of the net amount (or $153 million) divided by four is higher at $38.25 million, resulting in an aggregate maximum payment for such year equal to the cap of $140 million (regardless of whether or not actual liabilities (net of recoveries) exceeded the previously provided estimates).

Historically, Honeywell's environmental claim and remediation payments in respect of the sites that are within the scope of the Honeywell Reimbursement Agreement for the years 2018, 2017 and 2016, including any legal fees, were approximately $179 million, $200 million and $221 million, respectively, and Honeywell's associated receipts for insurance and amounts received by Honeywell in connection with affirmative claims, contributions and property sales for 2017 and 2016 were approximately $2 million and $10 million, respectively. There were no associated receipts for insurance and amounts received by Honeywell in connection with affirmative claims, contributions and property sales in 2018. At December 31, 2018 we have recorded a liability to Honeywell of approximately $616 million in relation to our environmental obligation to Honeywell under the Honeywell Reimbursement Agreement.

In the event that Honeywell completes a transfer to a third party in respect of a portion of the remediation liabilities that are within the scope of the Honeywell Reimbursement Agreement, we will be obligated to pay 90% of the amount paid or payable by Honeywell in connection with such liability transfer, less any applicable recoveries. Amounts payable in respect of liability transfers for any given year are paid in the year following the year in which they occur, at the time that the true-up payment is made. If the amounts payable in respect of a liability transfer, together with any true-up payment, exceeds $30 million, such amounts will be made in equal installments, payable on the true-up date and on a monthly basis following the date the true-up payment is due. While any amount in respect of a liability transfer is outstanding, the annual payment by us to Honeywell will be first allocated towards the liabilities described above relating to environmental claims, remediation, hazardous exposure and toxic tort claims arising outside of the scope of the liability transfer, and then towards the liability transfer payment. The amount payable by us in respect of (i) any such liability transfers and (ii) the liabilities described above relating to environmental claims, remediation, hazardous exposure and toxic tort claims arising in any given year, is subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum).

The scope of our current environmental remediation obligations subject to the Honeywell Reimbursement Agreement relates to approximately 230 sites or groups of sites that are undergoing environmental remediation under U.S. federal or state law and agency oversight for contamination associated with Honeywell legacy business operations. The ongoing environmental remediation is designed to address contaminants at upland and sediment sites, which include, among others, metals, organic compounds and polychlorinated biphenyls, through a variety of methods, which include, among others, excavation, capping, in-situ stabilization, groundwater treatment and dredging. In addition, our obligations subject to the Honeywell Reimbursement Agreement will include certain liability with respect to (i) hazardous exposure or toxic tort claims associated with the specified sites that arise after the Spin-Off, if any, (ii) currently unidentified releases of hazardous substances at or associated with the specified sites, (iii) other environmental claims associated with the specified sites and (iv) consequential damages.

39

**RESIDEO TECHNOLOGIES, INC.**

Payment amounts under the Honeywell Reimbursement Agreement will be deferred to the extent that the payment thereof would cause a specified event of default under certain indebtedness, including our principal credit agreement, or cause us to not be compliant with certain financial covenants in certain indebtedness, including our principal credit agreement on a pro forma basis, including the maximum total leverage ratio (ratio of debt to EBITDA, which excludes any amounts owed to Honeywell under the Honeywell Reimbursement Agreement), and the minimum interest coverage ratio. A 5% late payment fee will accrue on all amounts that are not otherwise entitled to be deferred under the terms of the Honeywell Reimbursement Agreement, without prejudice to any other rights that Honeywell may have for late payments. In each calendar quarter, our ability to pay dividends and repurchase capital stock in such calendar quarter will be restricted until any amounts payable under the Honeywell Reimbursement Agreement in such quarter (including any deferred payment amounts) are paid to Honeywell and we will be required to use available restricted payment capacity under our debt agreements to make payments in respect of any such deferred amounts. Payment of deferred amounts and certain other amounts could cause the amount we are required to pay under the Honeywell Reimbursement Agreement in respect of liabilities arising in any given calendar year to exceed $140 million (exclusive of any late payment fees up to 5% per annum). All amounts payable under the Honeywell Reimbursement Agreement will be guaranteed by certain of our subsidiaries that act as guarantors under our principal credit agreement, subject to certain exceptions. Under the Honeywell Reimbursement Agreement, we will also be subject to certain of the affirmative and negative covenants to which we are subject under our principal credit agreement. Further, pursuant to the Honeywell Reimbursement Agreement, our ability to (i) amend or replace our principal credit agreement, (ii) enter into another credit agreement and make amendments or waivers thereto, or (iii) enter into or amend or waive any provisions under other agreements, in each case, in a manner that would adversely affect the rights of Honeywell under the Honeywell Reimbursement Agreement, will be subject to Honeywell's prior written consent. This consent right will significantly limit our ability to engage in many types of significant transactions on favorable terms (or at all), including, but not limited to, equity and debt financings, liability management transactions, refinancing transactions, mergers, acquisitions, joint ventures and other strategic transactions. See the section titled "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Honeywell Reimbursement Agreement" in the Form 10 for more information.

The Honeywell Reimbursement Agreement may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net revenue. The Honeywell Reimbursement Agreement may also require us to accrue significant long-term liabilities on our consolidated balance sheet, the amounts of which will be dependent on factors outside our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. This may have a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations may be materially adversely affected and the value of your investment in our company may decline. The Honeywell Reimbursement Agreement also includes other obligations that may impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests. See the section titled "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Honeywell Reimbursement Agreement" in the Form 10 for more information.

Although we will have access to information regarding these liabilities as we may reasonably request for certain purposes, as well as the ability to participate in periodic standing meetings with Honeywell's remediation management team responsible for management of the underlying claims, including outside litigation or environmental counsel if necessary, the payment obligations under the Honeywell Reimbursement Agreement relate to legal proceedings and remediation efforts that we will not control, and we accordingly do not expect to be able to make definitive decisions regarding settlements or other outcomes that could influence our potential related exposure.

Independent of our payments under the Honeywell Reimbursement Agreement, we will have ongoing liability for certain environmental claims which are part of our going forward business. For the year ended December 31, 2018, these payments totaled $1 million.

40

**RESIDEO TECHNOLOGIES, INC.**

***Our operations and the prior operations of predecessor companies expose us to the risk of material environmental liabilities.***

We are subject to potentially material liabilities related to the investigation and cleanup of environmental hazards and to claims of personal injuries or property damages that may arise from hazardous substance releases and exposures. These liabilities arise out of our current and past operations and the operations and properties of predecessor companies (including off site waste disposal). We entered into the Honeywell Reimbursement Agreement, pursuant to which we have an obligation to make cash payments to Honeywell related to certain of Honeywell's environmental-related liabilities. See "Risks Relating to Our Business—We are subject to risks associated with the Honeywell Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities."

We are also subject to potentially material liabilities related to the compliance of our operations with the requirements of various federal, state, local and foreign governments that regulate the discharge of materials into the environment and the generation, handling, storage, treatment and disposal of and exposure to hazardous substances. We believe that, as a general matter, our policies, practices and procedures are properly designed to prevent unreasonable risk of environmental damage and personal injury and that our handling, manufacture, use and disposal of hazardous substances are in accordance with environmental and safety laws and regulations. However, if we are found to be in violation of these laws and regulations, we may be subject to substantial fines, criminal sanctions, trade restrictions, product recalls, public exposure and be required to install costly equipment or make operational changes to achieve compliance with such laws and regulations.

In addition, changes in laws, regulations or government enforcement of policies concerning the environment, the discovery of previously unknown contamination or new technology or information related to individual contaminated sites, the establishment of stricter state or federal toxicity standards with respect to certain contaminants, or the imposition of new clean-up requirements or remedial techniques, could require us to incur additional currently unanticipated costs in the future that would have a negative effect on our business, financial condition, results of operations and cash flows.

***We cannot predict with certainty the outcome of litigation matters, government proceedings and other contingencies and uncertainties.***

In the ordinary course of business, we may make certain commitments, including representations, warranties and indemnities relating to current and past operations, including those related to divested businesses, and issue guarantees of third party obligations. We are subject to various lawsuits, investigations and disputes arising out of the conduct of our business, including matters relating to commercial transactions, government contracts, product liability, prior acquisitions and divestitures, employee benefit plans, intellectual property, and environmental, health and safety matters. Our potential liabilities are subject to change over time due to new developments, changes in settlement strategy or the impact of evidentiary requirements, and we may become subject to or be required to pay damage awards or settlements that could have an adverse effect on our business, financial condition, results of operations and cash flows. If we were required to make payments, such payments could be significant and could exceed the amounts we have accrued with respect thereto, adversely affecting our business, financial condition, results of operations and cash flows. While we maintain insurance for certain risks, the amount of our insurance coverage may not be adequate to cover the total amount of all insured claims and liabilities and we may have to satisfy insurance retentions. The incurrence of significant liabilities for which there is no or insufficient insurance coverage could adversely affect our liquidity and financial condition, results of operations and cash flows.

***Our effective tax rate will be affected by factors including changes in tax rules, and in the interpretation and application of those rules, in the countries in which we operate.***

Our future results of operations could be adversely affected by changes in the effective tax rate as a result of a change in the mix of earnings in countries with differing statutory tax rates, changes in tax laws, regulations and judicial rulings (or changes in the interpretation thereof), changes in generally accepted accounting principles, changes in the valuation of deferred tax assets and liabilities, changes in the amount of earnings permanently reinvested offshore, the results of audits and examinations of previously filed tax returns and continuing assessments of our tax exposures and various other governmental enforcement initiatives. Our tax expense includes estimates of tax reserves and reflects other estimates and assumptions, including assessments of our future earnings which could

41

**RESIDEO TECHNOLOGIES, INC.**

impact the valuation of our deferred tax assets. Changes in tax laws or regulations, including multi-jurisdictional changes enacted in response to the guidelines provided by the Organization for Economic Co-operation and Development ("OECD") to address base erosion and profit shifting, and the interpretation and application of comprehensive U.S. tax reform legislation enacted in December of 2017, commonly referred to as the Tax Cuts and Jobs Act (the "TCJA"), will increase tax uncertainty and may adversely impact our provision for income taxes. As noted under "—Risks Relating to Our Business—We are subject to risks associated with the Honeywell Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured by reference to estimates by Honeywell of certain of its liabilities."

*U.S. federal income tax reform could adversely affect us.*

The TCJA made fundamental changes to the U.S. taxation of multinational corporations. Significant changes include the provision of an exemption for certain active foreign earnings (subject to a cap determined by reference to a specified return on tangible assets), a minimum tax on foreign earnings in excess of the cap, expansion of the current anti-deferral rules, and new measures to deter base erosion. The TCJA also introduced a reduction in the corporate tax rate to 21%, repeal of the corporate alternative minimum tax, expensing of certain capital investment, and limitation of the deduction for interest expense. Although the TCJA was generally effective January 1, 2018, U.S. GAAP required recognition of the tax effects of new legislation during the reporting period that includes the enactment date, which was December 22, 2017. The impact on the year ended December 31, 2018 was, and the impact on future years may be, material to our financial statements. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Years Ended December 31, 2018, 2017 and 2016—Tax Expense." We continue to examine the impact this tax reform legislation may have on our business.

*We may be required to make significant cash contributions to our defined benefit pension plans.*

We sponsored defined benefit pension plans under which certain eligible Company employees will earn pension benefits following the Spin-Off as if they remained employed by Honeywell. We have plans in several countries including the U.S. The Federal Pension Protection Act of 2006, which is generally applicable to U.S. defined benefit pension plans, generally requires that defined benefit pension plans maintain certain capitalization levels. Changes in discount rates and actual asset returns different than our anticipated asset returns can result in significant non-cash actuarial gains or losses. With regard to cash pension contributions, funding requirements for our pension plans are largely dependent upon interest rates, actual investment returns on pension assets and the impact of legislative or regulatory changes related to pension funding obligations. Our pension contributions may be material and could adversely impact our financial condition, cash flow and results of operations. We plan to make pension contributions during 2019 and in future periods sufficient to satisfy funding requirements.

**Risks Related to the Spin-Off**

Completion of the Spin-Off was conditioned on Honeywell's receipt of separate written opinions from Cleary Gottlieb Steen & Hamilton LLP and KPMG LLP to the effect that the Spin-Off should qualify for non-recognition of gain and loss under Section 355 and related provisions of the Code.

The opinions do not address any U.S. state or local or foreign tax consequences of the Spin-Off. The opinions assume that the Spin-Off was completed according to the terms of the Separation and Distribution Agreement and rely on the facts as stated in the Separation and Distribution Agreement, the Tax Matters Agreement, the other ancillary agreements, the Information Statement filed as Exhibit 99.1 to the Form 10 and a number of other documents. In addition, the opinions are based on certain representations as to factual matters from, and certain covenants by, Honeywell and us. The opinions cannot be relied on if any of the assumptions, representations or covenants are incorrect, incomplete or inaccurate or are violated in any material respect.

The opinions are not binding on the Internal Revenue Service (the "IRS") or the courts, and there can be no assurance that the IRS or a court will not take a contrary position. If the conclusions expressed in the opinions are challenged by the IRS, and if the IRS prevails in such challenge, the tax consequences of the Spin-Off could be materially less favorable. Honeywell did not as part of the Spin-Off request a ruling from the IRS regarding the U.S. federal income tax consequences of the Spin-Off.

**RESIDEO TECHNOLOGIES, INC.**

If the Distribution were determined not to qualify for nonrecognition of gain or loss under Section 355 and related provisions of the Code, then a U.S. Holder who received our common stock in the Spin-Off generally would be treated as receiving a distribution in an amount equal to the fair market value of our common stock received. The distribution would be treated as: (1) a taxable dividend to the extent of the holder's pro rata share of Honeywell's current or accumulated earnings and profits; (2) a reduction in the holder's basis (but not below zero) in Honeywell common stock to the extent the amount received exceeds the holder's share of Honeywell's earnings and profits; and (3) taxable gain from the exchange of Honeywell common stock to the extent the amount received exceeds the sum of the holder's share of Honeywell's earnings and profits and its basis in its Honeywell common stock. See below and the section titled "The Spin-Off—Material U.S. Federal Income Tax Consequences of the Spin-Off" in the Form 10 for more information.

***We agreed in the Tax Matters Agreement not to take actions that could affect Honeywell's tax treatment. The need to comply with these provisions of the Tax Matters Agreement could reduce our strategic and operating flexibility. If we fail to comply with them, or breach representations or covenants made in the Tax Matters Agreement or in connection with the receipt of the tax opinion, we could incur material indemnification obligations to Honeywell, which could adversely affect our business, financial condition, results of operations and cash flows.***

If one or more persons acquire a 50% or greater interest (measured by vote or value) in the stock of Honeywell or Resideo, directly or indirectly (including through acquisitions of stock after the completion of the Transactions), as part of a plan or series of related transactions that includes the Spin-Off, then the Spin-Off would be taxable to Honeywell, but not to Honeywell stockholders. Current law generally creates a presumption that any direct or indirect acquisition of stock of Honeywell or Resideo within two years before or after the Spin-Off is part of a plan that includes the Spin-Off, although the parties may be able to rebut that presumption in certain circumstances. The process for determining whether an acquisition is part of a plan under these rules is complex, inherently factual in nature, and subject to a comprehensive analysis of the facts and circumstances of the particular case. We have entered into covenants not to engage in specified transactions for two years after the Spin-Off without Honeywell's prior consent (which Honeywell may grant or withhold in its sole discretion), and have agreed to indemnify Honeywell for any costs that it may incur as a result of our failure to comply with those covenants. These obligations may limit our ability to pursue strategic transactions or engage in new business or other transactions, such as a share repurchase program, that may maximize the value of our business, and may discourage or delay a strategic transaction that our shareholders may consider favorable, including limiting our ability to use our equity to raise capital or fund acquisitions. Any payments required under these obligations could be significant and could materially adversely affect our business, financial condition, results of operations and cash flows. See the section titled "Certain Relationships and Related Party Transactions— Agreements with Honeywell—Tax Matters Agreement" in the Form 10 for more information.

***We are subject to numerous restrictions to preserve the non-recognition treatment of the Spin-Off, which may reduce our strategic and operating flexibility.***

We are subject to covenants in the Tax Matters Agreement and indemnification obligations that address compliance with Section 355 of the Code and are intended to preserve the tax-free nature of the Spin-Off. These covenants include certain restrictions on our activity for a period of two years following the Spin-Off, unless Honeywell gives its consent for us to take a restricted action, which Honeywell is permitted to grant or withhold at its sole discretion. These covenants and indemnification obligations may limit our ability to pursue strategic transactions or engage in new businesses or other transactions that may maximize the value of our business, and might discourage or delay a strategic transaction that our stockholders may consider favorable. See the section titled "Certain Relationships and Related Party Transactions—Agreements with Honeywell— Tax Matters Agreement" in the Form 10 for more information.

***We may be unable to achieve some or all of the benefits that we expect to achieve from the Spin-Off.***

The transition to operating as an independent, publicly traded company following the Spin-Off has required significant amounts of our management's time and effort, which may divert management's attention from operating and growing our business. If we fail to achieve some or all of the benefits that we expect to achieve as an independent company, or do not achieve them in the time we expect, our business, financial condition, results of operations and cash flows could be adversely affected.

43

**RESIDEO TECHNOLOGIES, INC.**

*We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent, publicly traded company, and we may experience increased costs after the Spin-Off.*

Honeywell currently provides certain transitional corporate services under agreements with us. A description of the material terms and conditions of such agreements with Honeywell can be found in the section titled "Certain Relationships and Related Party Transactions" of our Company's Information Statement filed as Exhibit 99.1 to the Form 10. These services do not include every service that we received from Honeywell while we were part of Honeywell, and Honeywell is only obligated to provide the transition services for limited periods described in the agreements. We rely on Honeywell to satisfy its performance and payment obligations under any transition services agreements and other agreements related to the Spin-Off, and if Honeywell does not satisfy such obligations, we could incur operational difficulties or losses.

Our ability to position and market ourselves as a provider of connected home technology could be adversely affected by our loss of access to Honeywell's development platforms. If we fail to obtain the quality of services necessary to operate effectively or incur greater costs in obtaining these services, our business, financial condition, results of operations and cash flows may be adversely affected.

*As we build our information technology infrastructure and transition our data to our own systems, we could incur substantial additional costs and experience temporary business interruptions, and our accounting and other management systems and resources may not be adequately prepared to meet the financial reporting and other requirements to which we will be subject following the Spin-Off.*

Following the Spin-Off, we installed and implemented information technology infrastructure to support certain of our business functions, including payment systems, ERP systems, accounting and reporting, manufacturing process control, customer service, inventory control and distribution. Such transition must also comply with applicable personal data privacy laws. See "Risks Relating to Our Business—Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial condition, results of operations and cash flows." If we are unable to transition effectively, we may incur temporary interruptions in business operations. Any delay in implementing, or operational interruptions suffered while implementing, our new information technology infrastructure could disrupt our business and have an adverse effect on our business, financial condition, results of operations and cash flows.

In addition, if we are unable to replicate or transition certain systems, our ability to comply with regulatory requirements could be impaired. We are subject to reporting and other obligations under the U.S. Securities and Exchange Act of 1934, as amended (the "Exchange Act"). Beginning with our second required Annual Report on Form 10-K, we intend to comply with Section 404 of the Sarbanes Oxley Act of 2002, as amended (the "Sarbanes Oxley Act"), which will require annual management assessments of the effectiveness of our internal control over financial reporting and a report by our independent registered public accounting firm addressing these assessments. These reporting and other obligations may place significant demands on management, administrative and operational resources, including accounting systems and resources.

The Exchange Act requires that we file annual, quarterly and current reports with respect to our business and financial condition. Under the Sarbanes Oxley Act, we are required to maintain effective disclosure controls and procedures and internal controls over financial reporting. To comply with these requirements, we may need to upgrade our systems, implement additional financial and management controls, reporting systems and procedures and hire additional accounting and finance staff. We expect to incur additional annual expenses for the purpose of addressing these, and other public-company reporting, requirements. If we are unable to upgrade our financial and management controls, reporting systems, information technology systems and procedures in a timely and effective fashion, our ability to comply with financial reporting requirements and other rules that apply to reporting companies under the Exchange Act could be impaired. Any failure to achieve and maintain effective internal controls could have an adverse effect on our business, financial condition, results of operations and cash flow. See "—Risks Relating to Our Common Stock and the Securities Market."

44

**RESIDEO TECHNOLOGIES, INC.**

**We incurred new indebtedness in connection with the Spin-Off, and our leverage could adversely affect our business, financial condition and results of operations.**

In connection with the Spin-Off, we incurred indebtedness in an aggregate principal amount of approximately $1,225 million in the form of senior secured term loans and senior unsecured notes, the net proceeds of which were used by the Company to (i) repay intercompany indebtedness to Honeywell or a subsidiary of Honeywell of approximately $1.2 billion, (ii) to pay fees, costs and expenses related to the senior notes offering and the senior credit facilities and (iii) for general corporate purposes. We also entered into a revolving credit facility to be used for our working capital and other cash needs in an aggregate principal amount of $350 million.

We are responsible for obtaining and maintaining sufficient working capital and other funds to satisfy our cash requirements. After the Spin-Off, our access to and cost of debt financing are different than it would have been as a part of Honeywell. Differences in access to and cost of debt financing may result in differences in the interest rate charged to us on financings, as well as the amount of indebtedness, types of financing structures and debt markets that may be available to us.

Our ability to make payments on and to refinance our indebtedness, including the debt incurred in connection with the Spin-Off, as well as any future debt that we may incur, will depend on our ability to generate cash in the future from operations, financings or asset sales. Our ability to generate cash is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control, as well as the risk factors set forth herein.

***The terms of our indebtedness restrict our current and future operations, particularly our ability to incur debt that we may need to fund initiatives in response to changes in our business, the industries in which we operate, the economy and governmental regulations.***

The terms of the indebtedness include a number of restrictive covenants that impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests. These may restrict our and our subsidiaries' ability to take some or all of the following actions:

- incur or guarantee additional indebtedness or sell disqualified or preferred stock;
- pay dividends on, make distributions in respect of, repurchase or redeem capital stock;
- make investments or acquisitions;
- sell, transfer or otherwise dispose of certain assets;
- create liens;
- enter into sale/leaseback transactions;
- enter into agreements restricting the ability to pay dividends or make other intercompany transfers;
- consolidate, merge, sell or otherwise dispose of all or substantially all of our or our subsidiaries' assets;
- enter into transactions with affiliates;
- prepay, repurchase or redeem certain kinds of indebtedness;
- issue or sell stock of our subsidiaries; and/or
- significantly change the nature of our business.

On October 25, 2018, we entered into a Credit Agreement, which provides for (i) a seven-year senior secured first-lien term B loan facility in an aggregate principal amount of $475 million (the "Term B Facility"); (ii) a five-year senior secured first-lien term A loan facility in an aggregate principal amount of $350 million (the "Term A Facility" and, together with the Term B Facility, the "Term Loan Facilities"); and (iii) a five-year senior secured first-lien revolving credit facility in an aggregate principal amount of $350 million (the "Revolving Credit Facility" and, together with the Term Loan Facilities, the "Senior Credit Facilities"). The Senior Credit Facilities currently use LIBOR as a benchmark for establishing the interest rate. LIBOR is the subject of recent proposals for reform. These reforms and other pressures may cause LIBOR to disappear entirely or to perform differently than in the past. The consequences of these developments with respect to LIBOR cannot be entirely predicted but could result in an increase in the cost of our variable rate debt, which could adversely affect our financial condition and results of operations.

45

**RESIDEO TECHNOLOGIES, INC.**

Furthermore, the lenders of this indebtedness may require that we pledge our assets as collateral as security for our repayment obligations or that we abide by certain financial or operational covenants. Our ability to comply with such covenants and restrictions may be affected by events beyond our control, including prevailing economic, financial and industry conditions. If market or other economic conditions deteriorate, our ability to comply with these covenants may be impaired. A breach of any of these covenants, if applicable, could result in an event of default under the terms of this indebtedness. If an event of default occurred, the lenders would have the right to accelerate the repayment of such debt, and the event of default or acceleration could result in the acceleration of the repayment of any other debt to which a cross-default or cross-acceleration provision applies. We might not have, or be able to obtain, sufficient funds to make these accelerated payments, and lenders could then proceed against any collateral. Any subsequent replacement of the agreements governing such indebtedness or any new indebtedness could have similar or greater restrictions. The occurrence and ramifications of an event of default could adversely affect our business, financial condition, results of operations and cash flows. Moreover, as a result of all of these restrictions, we may be limited in how we conduct our business and pursue our strategy, unable to raise additional debt financing to operate during general economic or business downturns or unable to compete effectively or to take advantage of new business opportunities.

*The commercial and credit environment may adversely affect our access to capital.*

Our ability to issue debt or enter into other financing arrangements on acceptable terms could be adversely affected if there is a material decline in the demand for our products or in the solvency of our customers or suppliers or if there are other significantly unfavorable changes in economic conditions. Volatility in the world financial markets could increase borrowing costs or affect our ability to access the capital markets. These conditions may adversely affect our ability to obtain targeted credit ratings.

*Our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that our financial stability on a stand-alone basis is sufficient to satisfy their requirements for doing or continuing to do business with them.*

Some of our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that our financial stability on a stand-alone basis is sufficient to satisfy their requirements for doing or continuing to do business with them. Any failure of parties to be satisfied with our financial stability could have an adverse effect on our business, financial condition, results of operations and cash flows.

*We may have potential business conflicts of interest with Honeywell with respect to our past and ongoing relationships.*

Conflicts of interest may arise with Honeywell in a number of areas relating to our past and ongoing relationships, including:

- labor, tax, employee benefit, indemnification and other matters arising from our separation from Honeywell;
- intellectual property matters;
- employee recruiting and retention; and
- business combinations involving our Company.

We may not be able to resolve any potential conflicts, and, even if we do so, the resolution may be less favorable to us than if we were dealing with an unaffiliated party

*Certain of our directors and employees may have actual or potential conflicts of interest because of their financial interests in Honeywell.*

Because of their former positions with Honeywell, certain of our executive officers and directors, including the chairman of the Board, own equity interests in Honeywell. Continuing ownership of Honeywell shares and equity awards could create, or appear to create, potential conflicts of interest if our Company and Honeywell face decisions that could have implications for both our Company and Honeywell.

46

**RESIDEO TECHNOLOGIES, INC.**

**Risks Relating to Our Common Stock and the Securities Market**

*No market for our common stock existed prior to the Spin-Off and, as a result, our stock price may fluctuate significantly.*

There was no public market for our common stock prior to the Spin-Off. Following the Spin-Off, the market price of our common stock may fluctuate widely, depending on many factors, some of which may be beyond our control, including:

- actual or anticipated fluctuations in our results of operations due to factors related to our business;
- success or failure of our business strategies;
- competition and industry capacity;
- changes in interest rates and other factors that affect earnings and cash flow;
- our level of indebtedness, our ability to make payments on or service our indebtedness and our ability to obtain financing as needed;
- our indemnification obligations to Honeywell;
- our ability to retain and recruit qualified personnel;
- our quarterly or annual earnings, or those of other companies in our industry;
- announcements by us or our competitors of significant acquisitions or dispositions;
- changes in accounting standards, policies, guidance, interpretations or principles;
- the failure of securities analysts to cover, or positively cover, our common stock after the Spin-Off;
- changes in earnings estimates by securities analysts or our ability to meet those estimates;
- the operating and stock price performance of other comparable companies;
- investor perception of our Company and our industry;
- overall market fluctuations unrelated to our operating performance;
- results from any material litigation or government investigation;
- changes in laws and regulations (including tax laws and regulations) affecting our business;
- changes in capital gains taxes and taxes on dividends affecting stockholders; and
- general economic conditions and other external factors.

Our stock could sustain periods of low trading volume, which would amplify the effect of the above factors on our stock's price volatility.

Should the market price of our shares drop significantly, stockholders may institute securities class action lawsuits against us. A lawsuit against us could cause us to incur substantial costs and could divert the time and attention of our management and other resources.

*Our ability to pay cash dividends to our stockholders is subject to the discretion of our Board and may be limited by the terms of our indebtedness and the Honeywell Reimbursement Agreement; there is no guarantee we will initiate dividends, or that once initiated, that we will continue paying dividends.*

We have never declared or paid any cash dividends on our common stock and we currently do not intend to pay cash dividends. We currently expect to retain any future earnings to fund the operation and expansion of our business and payback debt obligations. The Board's decision regarding any future payment of dividends will depend on the consideration of many factors, including our financial condition, earnings, sufficiency of distributable reserves, opportunities to retain future earnings for use in the operation of our business and to fund future growth, capital requirements, debt service obligations, obligations under the Honeywell Reimbursement Agreement, legal requirements, regulatory constraints and other factors that the Board deems relevant. Additionally, the terms of the indebtedness we incurred in connection with the Spin-Off, obligations under the Honeywell Reimbursement Agreement and other amounts owed to Honeywell under the Transition Services, Tax Matters, Employee Matters, Trademark License and Patent Cross-License Agreements, will limit our ability to pay cash dividends.

**RESIDEO TECHNOLOGIES, INC.**

***Stockholder's percentage ownership in our Company may be diluted in the future.***

A stockholder's percentage ownership our Company may be diluted in the future because of common stock-based equity awards that we have granted and expect to grant in the future to our directors, officers and other employees. Prior to completion of the Spin-Off, we approved the 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates, as may be amended from time to time (the "Stock Incentive Plan") for the benefit of certain of our current and future employees and other service providers, as well as an equity plan for our non-employee directors. In addition, we may issue equity as all or part of the consideration paid for acquisitions and strategic investments that we may make in the future or as necessary to finance our ongoing operations.

In addition, our Amended and Restated Certificate of Incorporation authorizes us to issue, without the approval of our stockholders, one or more classes or series of preferred stock having such designation, powers, preferences and relative, participating, optional and other special rights, including preferences over our common stock with respect to dividends and distributions, as our Board may generally determine. The terms of one or more classes or series of preferred stock could dilute the voting power or reduce the value of our common stock. For example, we could grant the holders of preferred stock the right to elect some number of the members of our Board in all events or upon the happening of specified events, or the right to veto specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences that we could assign to holders of preferred stock could affect the residual value of our common stock. See the section titled "Description of Our Capital Stock" in the Form 10 for more information.

From time-to-time, we may opportunistically evaluate and pursue acquisition opportunities, including acquisitions for which the consideration thereof may consist partially or entirely of newly-issued shares of our common stock and, therefore, such transactions, if consummated, would dilute the voting power and/or reduce the value of our common stock. We issued debt securities in connection with the Spin-Off that are be convertible into equity securities of our Company and therefore do not have a dilutive effect on our common stockholders' percentage ownership in Resideo.

***Certain provisions in our Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws and Delaware law may discourage takeovers.***

Several provisions of our Amended and Restated Certificate of Incorporation, Amended and Restated Bylaws and Delaware law may discourage, delay or prevent a merger or acquisition. These include, among others, provisions that:

- provide for staggered terms for directors on our board for a period following the Spin-Off;
- do not permit our stockholders to act by written consent and require that stockholder action must take place at an annual or special meeting of our stockholders, in each case except as such rights may otherwise be provided to holders of preferred stock;
- establish advance notice requirements for stockholder nominations and proposals;
- limit the persons who may call special meetings of stockholders; and
- limit our ability to enter into business combination transactions.

These and other provisions of our Amended and Restated Certificate of Incorporation, Amended and Restated Bylaws and Delaware law may discourage, delay or prevent certain types of transactions involving an actual or a threatened acquisition or change in control of our Company, including unsolicited takeover attempts, even though the transaction may offer our stockholders the opportunity to sell their shares of our common stock at a price above the prevailing market price. See the section titled "Description of Our Capital Stock" in the Form 10 for more information.

48

**RESIDEO TECHNOLOGIES, INC.**

*Our Amended and Restated Certificate of Incorporation designates the courts of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or other employees.*

Our Amended and Restated Certificate of Incorporation provides that, in all cases to the fullest extent permitted by law, unless we consent in writing to the selection of an alternative forum, the Court of Chancery located within the State of Delaware will be the sole and exclusive forum for any derivative action or proceeding brought on behalf of us, any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or stockholder of our Company to the Company or our Company's stockholders, any action asserting a claim arising pursuant to the Delaware General Corporate Law ("DGCL") or as to which the DGCL confers jurisdiction on the Court of Chancery located in the State of Delaware or any action asserting a claim governed by the internal affairs doctrine or any other action asserting an "internal corporate claim" as that term is defined in Section 115 of the DGCL. However, if the Court of Chancery within the State of Delaware does not have jurisdiction, the action may be brought in any other state or federal court located within the State of Delaware. Any person or entity purchasing or otherwise acquiring or holding any interest in shares of our capital stock will be deemed to have notice of and to have consented to these provisions. This provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits. Alternatively, if a court were to find this provision of our Amended and Restated Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions.

*If we fail to maintain proper and effective internal controls, our ability to produce accurate and timely financial statements could be impaired and investors' views of us could be harmed.*

The Sarbanes-Oxley Act requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. During 2019, we must perform system and process evaluation and testing of our internal control over financial reporting to allow management and our independent registered public accounting firm to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, with auditor attestation of the effectiveness of our internal controls, beginning with our second required annual report on Form 10-K. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our independent registered public accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of shares of common stock could decline and we could be subject to sanctions or investigations by the U.S. Securities and Exchange Commission (the "SEC") or other regulatory authorities, which would require additional financial and management resources.

Our ability to successfully implement our business plan and comply with Section 404 requires us to be able to prepare timely and accurate financial statements. Any delay in the implementation of, or disruption in the transition to, new or enhanced systems, procedures or controls, may cause our operations to suffer, and we may be unable to conclude that our internal control over financial reporting is effective and to obtain an unqualified report on internal controls from our auditors as required under Section 404 of the Sarbanes-Oxley Act. Moreover, we cannot be certain that these measures would ensure that we implement and maintain adequate controls over our financial processes and reporting in the future. Even if we were to conclude, and our auditors were to concur, that our internal control over financial reporting provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, because of its inherent limitations, internal control over financial reporting might not prevent or detect fraud or misstatements. This, in turn, could have an adverse impact on trading prices for our shares of common stock, and could adversely affect our ability to access the capital markets. See "—Risks Relating to the Spin-Off—As we build our information technology infrastructure and transition our data to our own systems, we could incur substantial additional costs and experience temporary business interruptions, and our accounting and other management systems and resources may not be adequately prepared to meet the financial reporting and other requirements to which we are subject following the Spin-Off."

**Item 1B.       Unresolved Staff Comments.**

None.

49

**RESIDEO TECHNOLOGIES, INC.**

**Item 2.        Properties**

Our corporate headquarters currently is located in Golden Valley, Minnesota.

We own or lease 17 manufacturing sites, 37 other sites, including offices, engineering and lab sites, 201 stocking locations and three warehouses. The following table shows the regional distribution of these sites:

|  | Americas | Asia Pacific | EMEA | India |
|---|---|---|---|---|
| Sites | 136 | 6 | 98 | 18 |

We also lease or sub-lease one manufacturing site, ten other sites, including offices, engineering, and lab sites and two warehouses from Honeywell. We contract with fifteen warehouses that are owned and operated by third parties. In addition, Honeywell leases or subleases four manufacturing sites and three other sites, including offices and engineering sites, from us. Honeywell is expected to use certain limited space in certain of our facilities under one or more services agreements.

For information on the lease by our ADI business of an administrative office building in Melville, New York, see "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Other Arrangements."

We believe our properties are adequate and suitable for our business as presently conducted and are adequately maintained.

**Item 3.        Legal Proceedings**

We are subject to various lawsuits, investigations and disputes arising out of the conduct of our business, including matters relating to commercial transactions, government contracts, product liability, prior acquisitions and divestitures, employee benefit plans, intellectual property, and environmental, health and safety matters. We recognize a liability for any contingency that is probable of occurrence and reasonably estimable. We continually assess the likelihood of adverse judgments of outcomes in these matters, as well as potential ranges of possible losses (taking into consideration any insurance recoveries), based on a careful analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts. We do not currently believe that such matters are material to our results of operations.

Additionally, in connection with our entry into the Honeywell Reimbursement Agreement, we will be required to make payments to Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements.

**Item 4.        Mine Safety Disclosure**

Not applicable.

**RESIDEO TECHNOLOGIES, INC.**

PART II.

**Item 5.        Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our common stock is traded on the New York Stock Exchange under the symbol "REZI". On December 31, 2018, there were 41,859 holders of record of our common stock and the closing price of our common stock on the New York Stock Exchange was $20.55 per share. As of December 31, 2018, 122,498,794 shares of our Common Stock and 0 shares of our preferred stock were outstanding.

As described in Item 1, on October 29, 2018, Honeywell completed the separation of Resideo Technologies Inc. Following the Spin-Off, our authorized capital stock consisted of 700,000,000 shares of common stock, par value $0.001 per share, and 100,000,000 shares of preferred stock, par value $0.001 per share. The Spin-Off is further described in Note 1 to the Consolidated and Combined Financial Statements included in Item 8 of this Form 10-K.

Prior to the Spin-Off, our Board adopted, and Honeywell, as our sole stockholder, approved, the 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Stock Incentive Plan"), as may be amended from time to time. On or about December 21, 2018, our Board adopted the Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates. The Stock Incentive Plan provides for the grant of Stock Options, Stock Appreciation Rights, Restricted Stock Units, Restricted Stock, Other Stock-Based Awards and Cash-Based Awards. The maximum aggregate number of shares of our common stock that may be issued under the restricted stock units granted under the Stock Incentive Plan is 15,000,000. The Stock Incentive Plan is further described in Note 20. Stock-Based Compensation Plans to the Consolidated and Combined Financial Statements included in Item 8 of this Form 10-K.

*Dividend*

We have never declared or paid any cash dividends on our common stock and we currently do not intend to pay cash dividends. We currently expect to retain any future earnings to fund the operation and expansion of our business and payback debt obligations. The Board's decision regarding any future payment of dividends will depend on the consideration of many factors, including our financial condition, earnings, sufficiency of distributable reserves, opportunities to retain future earnings for use in the operation of our business and to fund future growth, capital requirements, debt service obligations, obligations under the Honeywell Reimbursement Agreement, legal requirements, regulatory constraints and other factors that the Board deems relevant. Additionally, the terms of the indebtedness we incurred in connection with the Spin-Off, obligations under the Honeywell Reimbursement Agreement and other amounts owed to Honeywell under the Transition Services, Tax Matters, Employee Matters, Trademark License and Patent Cross-License Agreements, will limit our ability to pay cash dividends.

**Item 6.        Selected Financial Data**

**Selected Historical Consolidated and Combined Financial Data**

The following tables present certain selected historical consolidated and combined financial information as of and for each of the years in the five-year period ended December 31, 2018. The selected historical consolidated and combined financial data as of December 31, 2018 and 2017, and for each of the years in the three year period ended December 31, 2018 are derived from our historical audited Consolidated and Combined Financial Statements included elsewhere in this Annual Report. The selected historical combined financial data as of December 31, 2016 and for the year then ended are derived from our historical audited Combined Financial Statements not included in this Annual Report. The selected historical combined financial data as of and for the years ended December 31, 2015 and 2014, are derived from our historical unaudited combined financial statements not included in this Annual Report.

51

**RESIDEO TECHNOLOGIES, INC.**

The selected historical consolidated and combined financial data presented below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical Consolidated and Combined Financial Statements and the accompanying Notes thereto included elsewhere in this Annual Report. For each of the periods presented, our business was wholly owned by Honeywell through October 29, 2018. The financial information included herein may not necessarily reflect our financial position, results of operations and cash flows in the future or what our financial position, results of operations and cash flows would have been had we been an independent, publicly-traded company during the periods presented. In addition, for periods prior to our Spin-Off, our historical consolidated and combined financial information does not reflect changes that we expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, operations, cost structure and personnel needs of our business. Further, the historical consolidated and combined financial information includes allocations of certain Honeywell corporate expenses, as described in "Note 5–Related Party Transactions with Honeywell" to the historical Consolidated and Combined Financial Statements. We believe the assumptions and methodologies underlying the allocation of these expenses are reasonable. However, such expenses may not be indicative of the actual level of expenses that we would have incurred if we had operated as an independent, publicly-traded company or of the costs expected to be incurred in the future.

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| | (Dollars in millions except share and per share data) | | | | |
| **Selected Statement of Operations Information:** | | | | | |
| Net Revenue | $ 4,827 | $ 4,519 | $ 4,455 | $ 4,154 | $ 4,125 |
| Net Income (Loss) (1) | 405 | (394) | 177 | 147 | 112 |
| **Selected Balance Sheet Information at Year-End:** | | | | | |
| Total assets | $ 4,972 | $ 4,473 | $ 4,294 | $ 4,096 | $ 3,922 |
| Long-term obligations | 1,950 | 723 | 338 | 335 | 347 |
| Total liabilities | 3,439 | 1,870 | 1,420 | 1,377 | 1,432 |
| Total equity | 1,533 | 2,603 | 2,874 | 2,719 | 2,490 |
| **Earnings (Loss) Per Common Share** | | | | | |
| Basic: | $ 3.31 | $ (3.22) | $ 1.44 | $ 1.20 | $ 0.91 |
| Diluted: | 3.30 | (3.22) | 1.44 | 1.20 | 0.91 |
| **Weighted Average Common Shares (2) (in thousands)** | | | | | |
| Basic: | 122,499 | 122,499 | 122,499 | 122,499 | 122,499 |
| Diluted: | 122,624 | 122,499 | 122,499 | 122,499 | 122,499 |

1) Net Income (loss) attributable to Resideo and Earnings (Loss) Per Common Share for 2018 and 2017 were impacted by U.S. Tax Reform; see Note 9 Income Taxes of Notes to Consolidated Financial Statements for further details.

2) On October 29, 2018, the date of consummation of the Spin-Off, 122,498,794 shares of our Common Stock were distributed to Honeywell stockholders of record as of October 16, 2016. Basic and Diluted Earnings (Loss) Per Share for all periods prior to the Spin-Off reflect the number of distributed shares, or 122,498,794 shares. For the 2018 year to date calculations, these shares are treated as issued and outstanding from January 1, 2014 for purposes of calculating historical basic earnings per share. No dividends have been paid from October 29, 2018 through December 31, 2018.

**RESIDEO TECHNOLOGIES, INC.**

**Item 7.**        **Management's Discussion and Analysis of Financial Condition and Results of Operations**

**(Dollars in millions, except per share amounts)**

The following Management's Discussion and Analysis of Financial Condition and Results of Operations is intended to help you understand the results of operations and financial condition of Resideo Technologies, Inc. and its consolidated subsidiaries ("Resideo" or "the Company", "we", "us" or "our") for the three years ended December 31, 2018 and should be read in conjunction with the Consolidated and Combined Financial Statements and the notes thereto contained elsewhere in this Form 10-K.

**Overview and Business Trends**

We are a leading global provider of critical comfort, residential and thermal solutions and security solutions primarily in residential environments. Our products consist of solutions in Comfort, Residential Thermal Solutions and Security categories and include temperature and humidity control, thermal, water and air solutions and remote patient monitoring software solutions as well as security panels, sensors, peripherals, wire and cable, communications devices, video cameras, awareness solutions, cloud infrastructure, installation and maintenance tools and related software. Our ADI Global Distribution business is the leading wholesale distributor of security and low voltage electronic products which include video surveillance, intrusion, access control, fire and life safety, wire, networking and professional audio visual systems. We manage our business operations through two segments, Products and Solutions and Global Distribution. The Products and Solutions segment offerings include our Comfort, Residential Thermal Solutions and Security products, which, consistent with our industry, has a higher gross and operating margin profile in comparison to the Global Distribution segment.

Our financial performance over the last three years has been supported by several macro trends. Steady growth in residential and non-residential construction and growth in renovation and remodeling in the United States has had a positive impact on the growth of our Products and Solutions and Global Distribution businesses. The financial performance of our Products and Solutions business has further benefited from increasing penetration of wireless connectivity and the proliferation of connected devices. The financial performance of our Global Distribution business has been further aided by increasing contractor needs for training and technical expertise, and increasing demand for same day order fulfilment.

**Recent Developments**

*Separation from Honeywell*

The Company was incorporated in Delaware on April 24, 2018. We separated from Honeywell International Inc. ("Honeywell") on October 29, 2018 (the "Distribution Date"), becoming an independent publicly traded company as a result of a pro rata distribution of our common stock to shareholders of Honeywell (the "Spin-Off"). On October 29, 2018, Honeywell's shareholders of record as of October 16, 2018 (the "Record Date") received one share of our common stock, par value $0.001 per share, for every six shares of Honeywell's common stock, par value $1.00 per share, held as of the Record Date. We began trading "regular way" under the ticker symbol "REZI" on the New York Stock Exchange on October 29, 2018.

In connection with the Spin-Off, we entered into certain agreements with Honeywell, such as the Honeywell Reimbursement Agreement, the Trademark License Agreement, Tax Matters Agreement, Employee Matters Agreement, Patent Cross-License Agreement and Transition Services Agreement, which will cause us to incur new costs. See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for a description of the material terms thereof.

**Basis of Presentation**

Our Consolidated Balance Sheet as of December 31, 2018 consists of the consolidated balances of Resideo as prepared on a stand-alone basis. Our Combined Balance Sheet as of December 31, 2017, and Consolidated and Combined Statements of Operations, Comprehensive Income (Loss), Equity, and Cash Flows for the years ended December 31, 2018, 2017 and 2016, have been prepared on a "carve-out" basis for the periods and dates prior to the Spin-Off and include stand-alone results for the period subsequent to the date of Spin-Off. Prior to the separation,

53

**RESIDEO TECHNOLOGIES, INC.**

these Consolidated and Combined Financial Statements were derived from the consolidated financial statements and accounting records of Honeywell. These Consolidated and Combined Financial Statements reflect our consolidated historical financial position, results of operations and cash flows as the business was historically managed in conformity with Generally Accepted Accounting Principles in the United States ("U.S. GAAP"). The historical combined financial information prior to the Spin-Off may not be indicative of our future performance and does not necessarily reflect what our consolidated and combined results of operations, financial condition and cash flows would have been had we operated as a separate, publicly traded company during the periods presented, particularly because of changes that we have experienced and may continue to experience as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our Company.

The Combined Financial Statements prior to the Spin-Off include certain assets and liabilities that were held at the Honeywell corporate level but were specifically identifiable or otherwise attributable to us. Additionally, Honeywell historically provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of us. The cost of these services were allocated to us on the basis of the proportion of net revenue. Actual costs that would have been incurred if we had been a stand-alone company for the entire period being presented would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Both we and Honeywell consider the basis on which the expenses were allocated during the period before the Spin-Off to be a reasonable reflection of the utilization of services provided to or the benefits received by us during the periods presented.

Since the completion of the Spin-Off, we have incurred and expect to continue to incur expenditures consisting of employee-related costs, costs to start up certain stand-alone functions and information technology systems and other one-time transaction related costs. Recurring stand-alone costs include establishing the internal audit, treasury, investor relations, tax and corporate secretary functions as well as the annual expenses associated with running an independent publicly traded company including listing fees, compensation of non-employee directors, related board of director fees and other fees and expenses related to insurance, legal and external audit.

Our environmental expenses prior to Spin-Off and our Honeywell reimbursement expenses are reported within Other expense, net in our Consolidated and Combined Statements of Operations, which reflect an estimated liability for resolution of pending and future environmental-related liabilities. Prior to the Spin-Off, this estimated liability was calculated as if we were responsible for 100% of the environmental-liability payments associated with certain sites. See Environmental Matters and Honeywell Reimbursement Agreement in Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for additional information. In connection with our's separation from Honeywell, we became a party to the Honeywell Reimbursement Agreement, which was entered into on October 14, 2018, pursuant to which we agreed to indemnify Honeywell in amounts equal to 90% of payments which include amounts billed with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages (the "liabilities"), in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. Pursuant to the Honeywell Reimbursement Agreement, we are responsible for paying to Honeywell such amounts, up to a cap of $140 million in respect of liabilities arising in any given calendar year (exclusive of any late payment fees up to 5% per annum). See "Certain Relationships and Related Party Transactions-Agreements with Honeywell-Honeywell Reimbursement Agreement".

**Components of Operating Results**

Our fiscal year ends on December 31. The key elements of our operating results include:

54

**RESIDEO TECHNOLOGIES, INC.**

*Net Revenue*

We globally manage our business operations through two reportable segments, Products and Solutions and Global Distribution:

*Products and Solutions.* We generate the majority of our Product net revenue primarily from residential end-markets. Our Products and Solutions segment includes traditional products, as well as connected products, which we define as any device with the capability to be monitored or controlled from a remote location by an end-user or service provider. Our products are sold through a network of distributors (e.g. HVAC, Plumbing, Security, Electrical), OEMs, and service providers such as HVAC contractors, Security dealers and Plumbers including our ADI business. We also sell some products via retail and online channels.

*Global Distribution.* We generate revenue through the distribution of security and low voltage fire protection products that are delivered through a comprehensive network of professional contractors, distributors and original equipment manufacturers ("OEMs"), as well as major retailers and online merchants. In addition to our own Security products, ADI distributes products from industry-leading manufacturers including Assa Abloy, Axis Communications, Honeywell and Nortek Security & Control, and ADI also carries a line of private label products. We sell these products to contractors that service non-residential and residential end-users. 14% of ADI's net revenue is supplied by our Products and Solutions Segment. Management estimates that in 2018 approximately two-thirds of ADI's net revenue were attributed to non-residential end markets and one-third to residential end markets.

*Cost of Goods Sold*

*Products and Solutions:* Cost of goods sold includes costs associated with raw materials, assembly, shipping and handling of those products; costs of personnel-related expenses, including pension benefits, and equipment associated with manufacturing support, logistics and quality assurance; costs of certain intangible assets; and costs of research and development. Research and development expense consists primarily of development of new products and product applications.

*Global Distribution:* Cost of goods sold consists primarily of inventory-related costs and includes labor and personnel-related expenses.

*Selling, General, and Administrative Expense*

Selling, general and administrative expense includes trademark royalty expenses, sales incentives and commissions, professional fees, legal fees, promotional and advertising expenses, and personnel-related expenses, including stock based compensation and pension benefits. In addition, prior to the Spin-Off our selling general and administrative expense included an allocated portion of general corporate expenses.

*Other Expense, Net*

Other expense, net consists primarily of Honeywell reimbursement expenses for certain environmental claims related to approximately 230 sites or groups of sites that are undergoing environmental remediation under U.S. federal or state law and agency oversight for contamination associated with Honeywell legacy business operations. Prior to the Spin-Off other expenses also included the environmental expenses related to these same sites. For further information see "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations - Honeywell Reimbursement Agreement" and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Environmental Matters".

*Interest Expense*

Interest expense consists of interest on our short and long-term obligations, including our senior notes and term credit facility. Interest expense on our obligations includes contractual interest, amortization of the debt discount and amortization of debt issuance costs.

55

**RESIDEO TECHNOLOGIES, INC.**

*Tax Expense*

Provision for income taxes includes both domestic and foreign income taxes at the applicable tax rates adjusted for non-deductible expenses, research and development tax credits and other permanent differences.

**Results of Operations**

The following table sets forth our selected consolidated statements of operations for the periods presented:

**Consolidated Statements of Operations**

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| | (Dollars in millions except share and per share data) | | | | | |
| Net revenue | $ | 4,827 | $ | 4,519 | $ | 4,455 |
| Cost of goods sold | | 3,461 | | 3,203 | | 3,090 |
| Gross Profit | | 1,366 | | 1,316 | | 1,365 |
| Selling, general and administrative expenses | | 873 | | 871 | | 870 |
| Other expense, net | | 369 | | 279 | | 185 |
| Interest expense | | 20 | | - | | - |
| | | 1,262 | | 1,150 | | 1,055 |
| Income before taxes | | 104 | | 166 | | 310 |
| Tax expense (benefit) | | (301) | | 560 | | 133 |
| Net income (loss) | $ | 405 | $ | (394) | $ | 177 |
| **Weighted Average Number of Common Shares Outstanding** | | | | | | |
| Basic (in thousands) | | 122,499 | | 122,499 | | 122,499 |
| Diluted (in thousands) | | 122,624 | | 122,499 | | 122,499 |
| **Earnings (Loss) Per Share** | | | | | | |
| Basic net income (loss) per share | $ | 3.31 | $ | (3.22) | $ | 1.44 |
| Diluted net income (loss) per share | $ | 3.30 | $ | (3.22) | $ | 1.44 |

**Results of Operations for the Years Ended December 31, 2018, 2017 and 2016**

*Net Revenue*

| | 2018 | | 2017 | | 2016 | |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Net revenue | $ | 4,827 | $ | 4,519 | $ | 4,455 |
| % change compared with prior period | | 7% | | 1% | | |

The change in net revenue compared to prior year period is attributable to the following:

| | 2018 | 2017 |
|---|---|---|
| Volume | 4% | 1% |
| Price | 2% | 0% |
| Acquisitions | 0% | 0% |
| Foreign currency translation | 1% | 0% |
| % change compared with prior period | 7% | 1% |

A discussion of net revenue by segment can be found in the Review of Business Segments section of this Management's Discussion and Analysis of Financial Condition and Results of Operations.

**RESIDEO TECHNOLOGIES, INC.**

*Cost of Goods Sold*

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| | (Dollars in millions) | | | | | |
| Cost of goods sold | $ | 3,461 | $ | 3,203 | $ | 3,090 |
| % change compared with prior period | | 8% | | 4% | | |
| Gross profit percentage | | 28% | | 29% | | 31% |

### *2018 compared with 2017*

Cost of goods sold for 2018 was $3,461 million, an increase of $258 million, or 8%, from $3,203 million in 2017.

This increase was primarily driven by $145 million in higher revenue in both the Global Distribution and Products and Solutions segments, $44 million of material and labor inflation, net of productivity and $43 million of foreign currency translation.

The decrease in gross profit percentage was primarily driven by the impact of net direct material and labor inflation (approximately 20bps impact) partially offset by higher sales prices (approximately 100bps impact).

### *2017 compared with 2016*

Cost of goods sold for 2017 was $3,203 million, an increase of $113 million, or 4%, from $3,090 million in 2016.

This increase was primarily driven by $92 million in higher direct material costs in the Global Distribution Segment (driven by higher sales of $122 million) and approximately $25 million of investments in research and development, primarily in the connected homes product offerings.

The decrease in gross profit percentage was primarily driven by the impact of unfavorable mix between products and distribution (approximately 130bps impact) and investments in research and development (approximately 50bps impact), partially offset by higher sales prices (approximately 20bps impact).

*Selling, General and Administrative Expense*

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| | (Dollars in millions) | | | | | |
| Selling, general and administrative expense | $ | 873 | $ | 871 | $ | 870 |
| % of revenue | | 18% | | 19% | | 20% |

### *2018 compared with 2017*

Selling, general and administrative expense for 2018 was $873 million, essentially flat from $871 million in 2017, with the impact of foreign currency, higher corporate allocations, labor cost inflation and investment being offset by savings attributed to restructuring actions and lower selling costs.

### *2017 compared with 2016*

Selling, general and administrative expense for 2017 was $871 million, essentially flat from $870 million in 2016, with the impact of higher corporate allocations, labor cost inflation and investment being offset by savings attributed to restructuring actions and lower selling costs.

57

**RESIDEO TECHNOLOGIES, INC.**

*Other Expense, Net*

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Other expense, net | $ 369 | $ 279 | $ 185 |

### 2018 compared with 2017

Other expense, net for 2018, was $369 million, an increase of $90 million from $279 million in 2017. This increase mainly relates to the cost of certain environmental remedial actions agreed to with the regulators. Following the Spin-Off, these environmental expenses are now subject to the Honeywell Reimbursement Agreement where cash payments are capped at $140 million per year.

### 2017 compared with 2016

Other expense, net for 2017, was $279 million, an increase of $94 million from $185 million in 2016. This increase mainly relates to the cost of certain environmental remedial actions agreed to by the regulators.

*Tax Expense (Benefit)*

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Tax expense (benefit) | $ (301) | $ 560 | $ 133 |
| Effective tax rate | (289%) | 337% | 43% |

### 2018 compared with 2017

The effective tax rate decreased in 2018 compared to 2017. The decrease was primarily due to tax benefits attributable to the internal restructuring of our business in advance of its anticipated spin-off, adjustments to the provisional tax amount related to U.S. Tax Reform, adjustments to income tax reserves, partially offset by tax expense related to Global Intangible Low Taxed Income ("GILTI").Our non-U.S. effective tax rate was (95)%, a decrease compared to 2017. The year-over-year decrease in the non-U.S. effective tax rate was primarily driven by increased tax benefits attributable to internal restructuring of our business and a change in assertion to permanently reinvest unremitted earnings.

On December 22, 2017, the U.S. enacted H.R.1, formerly known as the TCJA, that instituted fundamental changes to the taxation of multinational corporations. The TCJA includes changes to the taxation of foreign earnings by implementing a dividend exemption system, expansion of the current anti-deferral rules, a minimum tax on low-taxed foreign earnings and new measures to deter base erosion. The TCJA also imposes a one-time mandatory transition tax on the historical earnings of foreign affiliates and implements a territorial-style tax system. Changes to the TCJA provisional charges were the primary driver of the decrease in the effective tax rate in 2018. Non-deductible expenses had a material impact on the current effective tax rate and management estimates non-deductible expenses will have a material impact on the future effective tax rate.

### 2017 compared with 2016

The effective tax rate increased in 2017 compared to 2016. The increase was primarily attributable to the provisional impact of U.S. tax reform (see "the Tax Act" further discussed below) and an increase in non-deductible expenses. Our non-U.S. effective tax rate was 128.6%, an increase compared to 2016. The year-over-year increase in the non-U.S. effective tax rate was primarily driven by our change in assertion regarding foreign unremitted earnings in connection with the Tax Act. On December 22, 2017, the U.S. enacted H.R.1, formerly known as the TCJA, that instituted fundamental changes to the taxation of multinational corporations. The TCJA includes changes to the taxation of foreign earnings by implementing a dividend exemption system, expansion of the current anti-deferral rules, a minimum tax on low-taxed foreign earnings and new measures to deter base erosion. The TCJA also permanently reduces the corporate tax rate from 35% to 21%, imposes a one-time mandatory transition tax on the historical earnings of foreign affiliates and implements a territorial-style tax system. The primary changes, which are

**RESIDEO TECHNOLOGIES, INC.**

reflected in the 2017 tax expense, resulted from provisional charges of approximately $314 million due to our change in assertion regarding foreign unremitted earnings and $156 million due to the mandatory transition tax. These charges are subject to adjustment given the provisional nature of the charges. The TCJA provisional charges were the primary driver of the increase in the effective tax rate in 2017.

Most of the $314 million provisional charge described above relates to non-U.S. withholding taxes that will be payable at the time of the actual cash distribution and is based on the legal entity structure that existed at December 31, 2017. Changes to the legal entity structure or changes in future management's intent whether to permanently reinvest our foreign undistributed earnings could result in a significantly different tax liability.

*Review of Business Segments*

We operate two segments: Products and Solutions and Global Distribution. Management evaluates segment performance based on segment profit. Segment profit is measured as segment income (loss) before taxes excluding other expense, net (primarily environmental cost now subject to the Honeywell Reimbursement Agreement), interest expense, pension expense, environmental expense related to our owned sites and repositioning charges.

*Products and Solutions*

| | 2018 | 2017 | % Change | 2016 | % Change |
|---|---|---|---|---|---|
| Total revenue | $ 2,474 | $ 2,379 | | $ 2,471 | |
| Less: Intersegment revenue | 305 | 337 | | 371 | |
| External revenue | 2,169 | 2,042 | 6% | 2,100 | (3)% |
| Cost of products and services sold | 1,248 | 1,149 | | 1,145 | |
| Gross profit | 921 | 893 | 3% | 955 | (6)% |
| *Gross margin* | *42 %* | *44 %* | | *45 %* | |
| Selling general and administrative and other expenses | 540 | 540 | | 529 | |
| Segment profit | $ 381 | $ 353 | 8% | $ 426 | (17)% |

| | 2018 vs. 2017 | | 2017 vs. 2016 | |
|---|---|---|---|---|
| Factors Contributing to Year-Over-Year Change | Revenue (%) | Segment Profit (%) | Revenue (%) | Segment Profit (%) |
| Constant Currency Growth (Decline)/Operational segment profit | 5% | 6% | (3)% | (18)% |
| Foreign currency translation | 1% | 2% | 0% | 1% |
| Total % Change | 6% | 8% | (3)% | (17)% |

*2018 compared with 2017*

Products and Solutions revenue increased by 6% primarily due to an increase in external sales volume and higher prices in the Comfort and RTS product lines, and the impact of favorable currency translation.

Products and Solutions segment profit increased by 8%, moderated by the impact of higher corporate cost assessments of $18 million. Excluding this impact Products and Solutions segment profit increased 13% primarily due to volume growth, the impact of higher prices, and favorable currency translation, partially offset with inflation net of productivity and adverse product mix impact.

*2017 compared with 2016*

Products and Solutions revenue decreased by 3% primarily due to a decrease in external sales volume in the Comfort product line, partially offset by the impacts of higher prices.

**RESIDEO TECHNOLOGIES, INC.**

Products and Solutions segment profit decreased by 17% due to a decrease in sales volume, investment in research and development, higher corporate allocations and unfavorable product mix driven by lower sales in the Comfort product line, partially offset by productivity net of inflation and higher price.

***Global Distribution***

| | 2018 | 2017 | % Change | 2016 | % Change |
|---|---|---|---|---|---|
| Total revenue | $ 2,658 | $ 2,477 | | $ 2,355 | |
| Less: Intersegment revenue | - | - | | - | |
| External revenue | 2,658 | 2,477 | 7% | 2,355 | 5% |
| Cost of products and services sold | 2,186 | 2,032 | | 1,939 | |
| Gross profit | 472 | 445 | 6% | 416 | 7% |
| *Gross margin* | *18 %* | *18 %* | | *18 %* | |
| Selling general and administrative and other expenses | 324 | 314 | | 312 | |
| Segment profit | $ 148 | $ 131 | 13% | $ 104 | 26% |

| | 2018 vs. 2017 | | 2017 vs. 2016 | |
|---|---|---|---|---|
| Factors Contributing to Year-Over-Year Change | Revenue (%) | Segment Profit (%) | Revenue (%) | Segment Profit (%) |
| Constant Currency Growth/Operational segment profit | 6% | 13% | 5% | 26% |
| Foreign currency translation | 1% | 0% | 0% | 0% |
| Total % Change | 7% | 13% | 5% | 26% |

*2018 compared with 2017*

Global Distribution sales increased by 7% primarily due to volume growth across all of our key geographic markets.

Global Distribution segment profit increased by 13% primarily due to higher sales volumes, and productivity net of inflation.

*2017 compared with 2016*

Global Distribution sales increased by 5% primarily due to volume growth across all of our key geographic markets.

Global Distribution segment profit increased by 26% primarily due to higher sales volumes, and productivity net of inflation, partially offset by higher corporate allocations.

**Capital Resources and Liquidity**

Our liquidity is primarily dependent on our ability to continue to generate positive cash flows from operations. Additional liquidity may also be provided through access to the financial capital markets and a committed global credit facility. The following is a summary of our liquidity position:

- As of December 31, 2018, total cash and cash equivalents were $265 million, of which 62% were held by foreign subsidiaries. At December 31, 2018, there were no borrowings and $19 million of letters of credit issued under our $350 million Credit Facility.
- Historically, we have delivered positive cash flows from operations. Operating cash flows from continuing operations were $462 million, $37 million and $151 million for the three years ended December 31, 2018, respectively.

**RESIDEO TECHNOLOGIES, INC.**

*Liquidity prior to the Spin-Off*

Prior to the Spin-Off from Honeywell, we were dependent upon Honeywell for all of our working capital and financing requirements. Honeywell uses a centralized approach to cash management and financing of its operations. The majority of the Business's cash was transferred to Honeywell daily and Honeywell funded our operating and investing activities as needed. This arrangement was not reflective of the manner in which we would have been able to finance our operations had it been a stand-alone business separate from Honeywell during all periods presented.

Prior to the Spin-Off, cash and cash equivalents held by Honeywell at the corporate level are not specifically identifiable to us and therefore were not allocated for any of the periods presented. Honeywell third party debt and the related interest expense were not allocated for any of the periods presented as Honeywell's borrowings were not directly attributable to us.

*Liquidity subsequent to the Spin-Off*

Our future capital requirements will depend on many factors, including the rate of sales growth, market acceptance of our products, the timing and extent of research and development projects, potential acquisitions of companies or technologies and the expansion of our sales and marketing activities. We believe our existing cash, cash equivalents, investments and credit under our Credit Facilities are sufficient to meet our capital requirements through at least the next 12 months, although we could be required, or could elect, to seek additional funding prior to that time. We may enter into acquisitions or strategic arrangements in the future which also could require us to seek additional equity or debt financing.

*Credit Agreement*

On October 25, 2018, we entered into a Credit Agreement, which provides for (i) a seven-year senior secured first-lien term B loan facility in an aggregate principal amount of $475 million (the "Term B Facility"); (ii) a five-year senior secured first-lien term A loan facility in an aggregate principal amount of $350 million (the "Term A Facility" and, together with the Term B Facility, the "Term Loan Facilities"); and (iii) a five-year senior secured first-lien revolving credit facility in an aggregate principal amount of $350 million (the "Revolving Credit Facility" and, together with the Term Loan Facilities, the "Senior Credit Facilities"). We incurred indebtedness under the Term Loan Facilities in an aggregate principal amount of approximately $825 million on October 25, 2018, and relied on the Revolving Credit Facility to support working capital needs during the quarter. As of December 31, 2018 there were no borrowings and $19 million of Letters of Credit outstanding under the Revolving Credit Facility.

We are obligated to make quarterly principal payments throughout the term of the Term Loan Facilities according to the amortization provisions in the Credit Agreement and in addition to paying interest on outstanding borrowings under the Revolving Credit Facility, we are required to pay a quarterly commitment fee based on the unused portion of the Revolving Credit Facility. Borrowings under the Credit Agreement can be prepaid at our option without premium or penalty other than a 1.00% prepayment premium that may be payable in connection with certain repricing transactions within a certain period of time after the closing date. Up to $75 million may be utilized under the Revolving Credit Facility for the issuance of letters of credit to the Borrower or any of our subsidiaries. Letters of credit are available for issuance under the Credit Agreement on terms and conditions customary for financings of this kind, which issuances will reduce the available funds under the Revolving Credit Facility.

The Senior Credit Facilities are subject to an interest rate and interest period which we will elect. If we choose to make a base rate borrowing on an overnight basis, the interest rate will be based on the highest of (1) the rate of interest last quoted by The Wall Street Journal as the "prime rate" in the United States, (2) the greater of the federal funds effective rate and the overnight bank funding rate, plus 0.5% and (3) the one month adjusted LIBOR rate, plus 1.00% per annum. If we choose to make a LIBOR borrowing on a one, two, three or six-month basis, the interest rate will be based on an adjusted LIBOR rate (which shall not be less than zero) based on the interest period for the borrowing. The applicable margin for the Term B Facility is currently 2.00% per annum (for LIBOR loans) and 1.00% per annum (for base rate loans). The applicable margin for each of the Term A Facility and the Revolving Credit Facility varies from 2.00% per annum to 1.50% per annum (for LIBOR loans) and 1.00% to 0.50% per annum (for base rate loans) based on our leverage ratio. Accordingly, the interest rates for the Senior Credit Facilities will fluctuate during the term of the Credit Agreement based on changes in the base rate, LIBOR or future changes in our leverage ratio. Interest payments with respect to the borrowings are required either on a quarterly basis (for base rate loans) or at the end of each interest period (for LIBOR loans) or, if the duration of the applicable interest period exceeds three months, then every three months.

61

**RESIDEO TECHNOLOGIES, INC.**

The Credit Agreement contains certain affirmative and negative covenants customary for financings of this type that, among other things, limit our and our subsidiaries' ability to incur additional indebtedness or liens, to dispose of assets, to make certain fundamental changes, enter into restrictive agreements, to make certain investments, loans, advances, guarantees and acquisitions, to prepay certain indebtedness and to pay dividends, to make other distributions or redemptions/repurchases, in respect of our and our subsidiaries' equity interests, to engage in transactions with affiliates or amend certain material documents. In addition, the Credit Agreement also contains financial covenants requiring the maintenance of a consolidated total leverage ratio of not greater than 4.00 to 1.00 (with step-downs to (i) 3.75 to 1.00 starting in the fiscal quarter ending December 31, 2019, (ii) 3.50 to 1.00 starting in the fiscal quarter ending December 31, 2020 and (iii) 3.25 to 1.00 starting in the fiscal quarter ending December 31, 2021), and a consolidated interest coverage ratio of not less than 2.75 to 1.00. The Credit Agreement contains customary events of default, including with respect to a failure to make payments under the Senior Credit Facilities, cross-default, certain bankruptcy and insolvency events and customary change of control events.

All obligations under the Senior Credit Facilities are or will be unconditionally guaranteed jointly and severally, by: (a) our Company and (b) substantially all of the direct and indirect wholly owned subsidiaries of our Company that are organized under the laws of the United States, any state thereof or the District of Columbia (collectively, the "Guarantors"). The Guarantors entered into a guarantee under the Credit Agreement concurrently with the effectiveness of the Credit Agreement. Subject to certain limitations, the Senior Credit Facilities are or will be secured on a first priority basis by: (x) a perfected security interest in the equity interests of each direct subsidiary of the Borrower and each Guarantor under the Senior Credit Facilities (subject to certain customary exceptions) and (y) perfected, security interests in, and mortgages on, substantially all tangible and intangible personal property and material real property of the Borrower and each of the Guarantors under the Senior Credit Facilities, subject, in each case, to certain exceptions. The Borrower and the Guarantors entered into security documents concurrently with effectiveness of the Credit Agreement.

We incurred approximately $16 million in debt issuance costs related to the Term Loans and $5 million in costs related to the Revolving Credit Facility. The debt issuance costs associated with the Term Loans were recorded as a reduction of the principal balance of the debt, and the Revolving Credit Facility costs were capitalized in Other assets. The issuance costs are being amortized through Interest expense for the duration of each respective debt facility.

*Senior Notes*

In October of 2018, we issued $400 million in principal amount 6.125% senior unsecured notes due in 2026 (the "Senior Notes"). The Senior Notes guarantees are unsecured senior debt obligations of the Senior Notes guarantors. The net proceeds from the borrowings under the Senior Credit Facilities and the offering of the Senior Notes were used as part of financing the Spin-Off.

We incurred approximately $8 million in debt issuance costs related to the Senior Notes. The debt issuance costs associated with the Senior Notes are recorded as a reduction of the principal balance of the debt.

The interest expense for the Senior Notes and Credit Agreement during the year ended December 31, 2018 was $13 million, which includes the amortization of debt issuance cost and debt discounts.

*Honeywell Reimbursement Agreement*

In connection with the Spin-Off, we entered into the Honeywell Reimbursement Agreement (as defined below), pursuant to which we have an obligation to make cash payments to Honeywell in amounts equal to 90% of payments, which include amounts billed ("payments"), with respect to certain environmental claims, remediation and, following the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages (the "liabilities") in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales (the "recoveries"). The amount payable by us in respect of such liabilities arising in any given year is subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). Payments in respect of the liabilities arising in a given year will be made quarterly throughout such year on the basis of an estimate of the liabilities and recoveries provided by Honeywell. Following the end of any such year, Honeywell will provide us with a calculation of the amount of payments and the recoveries actually received. Subject to the

62

**RESIDEO TECHNOLOGIES, INC.**

aforementioned cap, if the amount of payments (net of recoveries) is greater than the previously provided estimate, we will pay Honeywell the amount of such difference (the "true-up payment") and, if the amount of the previously provided estimate is greater than the amount of payments (net of recoveries), we will receive a credit in the amount of such difference that will be applied to future payments. If a true-up payment exceeds $30 million, such true-up payment will be made in equal installments, payable on a monthly basis following the date the true-up payment is due.

*Cash Flow Summary for the Years Ended December 31, 2018, 2017 and 2016*

Our cash flows from operating, investing and financing activities for the years ended December 31, 2018, 2017 and 2016, as reflected in the audited Consolidated and Combined Financial Statements are summarized as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| Cash provided by (used for): | | | |
| Operating activities | $ 462 | $ 37 | $ 151 |
| Investing activities | (74) | (51) | (191) |
| Financing activities | (167) | 21 | 4 |
| Effect of exchange rate changes on cash | (12) | 2 | 1 |
| Net increase (decrease) in cash and cash equivalents | $ 209 | $ 9 | $ (35) |

*2018 compared with 2017*

Cash provided by operating activities for 2018 increased by $425 million, primarily due to higher payments for income taxes of approximately $233 million in 2017 due to expenses related to U.S. Tax Reform. Cash from operating activities also increased due to a decrease in net working capital driven primarily by an increase in accounts payable due to timing of payments under our TSA with Honeywell partially offset by an increase in inventory related to new product lines and increased sales.

Cash used for investing activities increased by $23 million, primarily due to an increase in expenditures on property, plant and equipment and software related to becoming an independent company.

Net cash used for financing activities increased by $188 million. The increase in usage was primarily due to a $1.4 billion distribution to Honeywell in connection with Spin-Off partially offset by $1.2 billion in proceeds received on long-term debt.

*2017 compared with 2016*

Cash provided by operating activities decreased by $114 million, primarily driven by payments to Honeywell in relation to the provisional impact of U.S. tax reform which was settled as part of our cash pooling arrangements and an increase in non-deductible expenses offset by favorable impacts from working capital of approximately $57 million, with reduced purchases of raw materials and finished goods inventory for Products and Solutions due to sales of inventory built in the prior period for new product launches, and higher receivables collections on increased sales volumes.

Cash used for investing activities decreased by $140 million, primarily due to a decrease in cash paid in 2016 for the RSI acquisition of $120 million net of cash acquired of $4 million and a decrease of cash used for expenditures on property, plant and equipment of $11 million.

Net cash provided by financing activities increased by $17 million. The increase in usage was primarily due to an increase in invested equity of $18 million.

**RESIDEO TECHNOLOGIES, INC.**

*Contractual Obligations and Probable Liability Payments*

Following is a summary of our significant contractual obligations and probable liability payments at December 31, 2018:

| | Payments by Period | | | | |
|---|---|---|---|---|---|
| | Total (1) | 2019 | 2020-2021 | 2022-2023 | Thereafter |
| | (Dollars in millions) | | | | |
| Long-term debt (2) | $ 1,225 | $ 22 | $ 62 | $ 289 | $ 852 |
| Interest payments on long-term debt (3) | 445 | 69 | 135 | 124 | 117 |
| Indemnity payments (4) | 616 | 140 | 280 | 196 | - |
| Estimated environmental liability payments (5) | 20 | 2 | 3 | 3 | 12 |
| Minimum operating lease payments | 154 | 39 | 61 | 37 | 17 |
| Purchase obligations (6) | 763 | 286 | 477 | - | - |
| | $ 3,223 | $ 558 | $ 1,018 | $ 649 | $ 998 |

1) The table excludes tax liability payments, including those for unrecognized tax benefits. See Note 9. Income Taxes.
2) Assumes all long-term debt is outstanding until scheduled maturity.
3) Interest payments are estimated based on the interest rate applicable as of December 31, 2018
4) On October 29, 2018, in connection with the Spin-Off, we entered into the Honeywell Reimbursement Agreement with Honeywell pursuant to which we have an obligation to make cash payments to Honeywell in amounts equal to 90% of payments, which include amounts billed ("payments"), less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales (the "recoveries"). The amount payable by us in respect of such liabilities arising in respect of any given year will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum).
5) Represents estimated environmental liability payments for sites which we own and are directly responsible for.
6) Purchase obligations are entered into with various vendors in the normal course of business and are consistent with our expected requirements.

*Environmental Matters*

Expenses for environmental matters deemed probable and reasonably estimable were $340 million, $282 million and $190 million in 2018, 2017 and 2016, respectively. In addition, in 2018, 2017 and 2016 we incurred operating costs for ongoing businesses of approximately $17 million, $1 million, and $2 million, respectively, relating to compliance with environmental regulations.

Spending related to environmental matters was $179 million, $198 million and $211 million in 2018, 2017 and 2016, respectively. We do not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our consolidated and combined results of operations and operating cash flows in the periods recognized or paid.

See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for further discussion of our environmental matters.

*Capital Expenditures*

We believe our capital spending in recent years has been sufficient to maintain efficient production capacity, to implement important product and process redesigns and to expand capacity to meet increased demand. Productivity projects have freed up capacity in our manufacturing facilities and are expected to continue to do so. We expect to continue investing to expand and modernize our existing facilities and to create capacity for new product development. Capital expenditures for full year 2019 are expected to be $135 million of which, $74 million relates to costs associated with investments in infrastructure as a stand alone company.

64

**RESIDEO TECHNOLOGIES, INC.**

*Off-Balance Sheet Arrangements*

We do not engage in any off-balance sheet financial arrangements that have or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, net revenue or expenses, results of operations, liquidity, capital expenditures or capital resources.

*Critical Accounting Policies*

The preparation of our Consolidated and Combined Financial Statements in accordance with generally accepted accounting principles is based on the selection and application of accounting policies that require us to make significant estimates and assumptions about the effects of matters that are inherently uncertain. We consider the accounting policies discussed below to be critical to the understanding of our Consolidated and Combined Financial Statements. Actual results could differ from our estimates and assumptions, and any such differences could be material to our Consolidated and Combined Financial Statements.

*Revenue* — Product and service revenues are recognized when or as the Company transfers control of the promised products or services to the customer, in an amount the Company expects to receive in exchange for transferring goods or providing services. Each distinct performance obligation within a contract is identified, and a contract's transaction price is then allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied.

In the sale of products, the terms of a contract or the historical business practice can give rise to variable consideration due to, but not limited to, discounts, bonuses, and the right of return. The Company estimates variable consideration at the most likely amount that will be received from customers and reduce revenues recognized accordingly. The Company includes estimated amounts in the transaction price to the extent it is probable that a significant reversal of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is resolved. The estimates of variable consideration and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of our anticipated performance and all information (historical, current and forecasted) that is reasonably available to the Company.

*Environmental* — We accrue costs related to environmental matters for our owned sites for which we are directly responsible when it is probable that we have incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental-related expenses are presented within Cost of goods sold for operating sites in the Consolidated and Combined Statements of Operations. For additional information, see Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements included herein for additional detail.

*Honeywell Reimbursement Agreement* — In connection with the Spin-Off, we entered into the Honeywell Reimbursement Agreement with Honeywell on October 14, 2018, pursuant to which we have an obligation to make cash payments to Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case, including consequential damages (the "liabilities") in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. The amount payable by us in respect of such liabilities arising in any given year is subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum).

Through the Honeywell Reimbursement Agreement we are subject to a number of environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims. We continually assess the likelihood of any adverse judgments or outcomes related to the Honeywell Reimbursement Agreement, as well as potential amounts or ranges of probable losses, and recognize a liability, if any, for these contingencies based on a thorough analysis of each matter with the assistance of outside legal counsel and Honeywell, and, if applicable, other experts. Such analysis includes making judgments concerning matters such as the costs associated with environmental matters, the outcome of negotiations, the number and cost of pending and future claims related to the sites covered by the Honeywell Reimbursement Agreement, and the impact of evidentiary requirements. Because most contingencies are resolved over long periods of time, we do not currently possess sufficient information to reasonably estimate the amounts of the Honeywell Reimbursement Agreement liabilities to be recorded upon future

65

**RESIDEO TECHNOLOGIES, INC.**

completion of studies, litigations or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters, can be determined. Expenses related to the indemnification are presented within Other expense, net in the Consolidated and Combined Statement of Operations. See Note 21. Commitments and Contingencies for a discussion of management's judgment applied in the recognition and measurement of our environmental liabilities.

*Goodwill* — Goodwill has an indefinite life and is not amortized, but is subject to annual, or more frequent if necessary, impairment testing. In testing goodwill, the fair value of each reporting unit is estimated utilizing a discounted cash flow approach utilizing cash flow forecasts in our five year strategic and annual operating plans adjusted for terminal value assumptions. These impairment tests involve the use of accounting estimates and assumptions, changes in which could materially impact our financial condition or operating performance if actual results differ from such estimates and assumptions. To address this uncertainty we perform sensitivity analysis on key estimates and assumptions.

*Income Taxes* — Our provision for income tax expense is based on our income, the statutory tax rates and other provisions of the tax laws applicable to us in each of these various jurisdictions. These laws are complex, and their application to our facts is at times open to interpretation. The process of determining our consolidated and combined income tax expense includes significant judgments and estimates, including judgments regarding the interpretation of those laws. Our provision for income taxes and our deferred tax assets and liabilities incorporate those judgments and estimates, and reflect management's best estimate of current and future income taxes to be paid.

Deferred tax assets and liabilities relate to temporary differences between the financial reporting and income tax bases of our assets and liabilities, as well as the impact of tax loss carryforwards or carrybacks. Deferred income tax expense or benefit represents the expected increase or decrease to future tax payments as these temporary differences reverse over time. Deferred tax assets are specific to the jurisdiction in which they arise, and are recognized subject to management's judgment that realization of those assets is "more likely than not." In making decisions regarding our ability to realize tax assets, we evaluate all positive and negative evidence, including projected future taxable income, taxable income in carryback periods, expected reversal of deferred tax liabilities, and the implementation of available tax planning strategies.

Significant judgment is required in evaluating tax positions. We establish additional reserves for income taxes when, despite the belief that tax positions are fully supportable, there remain certain positions that do not meet the minimum recognition threshold. The approach for evaluating certain and uncertain tax positions is defined by the authoritative guidance which determines when a tax position is more likely than not to be sustained upon examination by the applicable taxing authority. In the normal course of business, we are examined by various federal, state and foreign tax authorities. We regularly assess the potential outcomes of these examinations and any future examinations for the current or prior years in determining the adequacy of our provision for income taxes. We continually assess the likelihood and amount of potential adjustments and adjust the income tax provision, the current tax liability and deferred taxes in the period in which the facts that give rise to a change in estimate become known.

For period prior to the Spin-Off, the tax provision is presented on a separate company basis as if we were a separate filer. The effects of tax adjustments and settlements from taxing authorities are presented in our Consolidated and Combined Financial Statements in the period to which they relate as if we were a separate filer. Prior to the Spin-Off, our current obligations for taxes were settled with Honeywell on an estimated basis. All income taxes that were due to or due from Honeywell that were not settled or recovered by the end of the period were reflected in invested equity within the Consolidated and Combined Financial Statements. We are subject to income tax in the United States (federal, state and local) as well as other jurisdictions in which we operate.

*Pension Benefits* — We have a defined benefit plan covering certain employees. The benefits are accrued over the employees' service periods. We use actuarial methods and assumptions in the valuation of defined benefit obligations and the determination of net periodic pension income or expense. Differences between actual and expected results or changes in the value of defined benefit obligations and plan assets, if any, are not recognized in earnings as they occur but rather systematically over subsequent periods when net actuarial gains or losses are in excess of 10% of the greater of the fair value of plan assets or the plan's projected benefit obligation.

A 25 basis point increase in the discount rate would result in a decrease of approximately $0.4 million to the net periodic benefit cost for 2018, while a 25 basis point decrease in the discount rate would result in an increase

66

**RESIDEO TECHNOLOGIES, INC.**

of approximately $0.3 million. The resulting impact on the pension benefit obligation would be a decrease of $1.3 million and an increase of $1.4 million, respectively.

**Other Matters**

*Litigation and Environmental Matters*

See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for a discussion of environmental and other litigation matters.

*Recent Accounting Pronouncements*

See Note 2. Summary of Significant Accounting Policies of Notes to Consolidated and Combined Financial Statements for a discussion of recent accounting pronouncements.

**Item 7A.        Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risk from foreign currency exchange rates and interest rates, which could affect operating results, financial position and cash flows. We manage our exposure to these market risks through our regular operating and financing activities and, when appropriate, through the use of derivative financial instruments.

*Interest Rate Risk*

As of December 31, 2018, $825 million of our total debt of $1,201 billion carried variable interest rates, including the effect of pay variable interest rate swaps, if any. The fair market values of our fixed-rate financial instruments are sensitive to changes in interest rates. At December 31, 2018, a 100 basis point change in market interest rates would change the fair values of such financial instruments by approximately 5%.

*Foreign Currency Exchange Rate Risk*

We are exposed to market risks from changes in currency exchange rates. These exposures may impact future earnings and/or operating cash flows. Our exposure to market risk for changes in foreign currency exchange rates arises from transactions arising from international trade, foreign currency denominated monetary assets and liabilities, and international financing activities between subsidiaries. We rely primarily on natural offsets to address our exposures and may supplement this approach from time to time by entering into forward and option hedging contracts.

*Commodity Price Risk*

While we are exposed to commodity price risk, we attempt to pass through significant changes in component and raw material costs to our customers based on the contractual terms of our arrangements. In limited situations, we may not be fully compensated for such changes in costs.

**Item 8.        Financial Statements and Supplement Data**

**RESIDEO TECHNOLOGIES, INC.**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of Resideo Technologies, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated and combined balance sheets of Resideo Technologies, Inc. and subsidiaries (the "Company") as of December 31, 2018 and 2017, the related consolidated and combined statements of operations, comprehensive income, cash flow, and equity for each of the three years in the period ended December 31, 2018, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of a Matter**

As described in Note 1, prior to October 29, 2018, the accompanying combined financial statements have been derived from the separate records maintained by Honeywell International, Inc. The combined financial statements also include expense allocations for certain corporate functions historically provided by Honeywell International, Inc. These allocations may not be reflective of the actual expense which would have been incurred had the Company operated as a separate entity apart from Honeywell International, Inc. during the periods prior to October 29, 2018. A summary of transactions with Honeywell International, Inc. is included in Note 5 to the consolidated and combined financial statements.

/s/ Deloitte & Touche LLP

Minneapolis, Minnesota
March 18, 2019

We have served as the Company's auditor since 2018.

68

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED STATEMENT OF OPERATIONS**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | **(Dollars in millions except share and per share data)** | | |
| Net revenue | $ 4,827 | $ 4,519 | $ 4,455 |
| Cost of goods sold | 3,461 | 3,203 | 3,090 |
| Gross profit | 1,366 | 1,316 | 1,365 |
| Selling, general and administrative expenses | 873 | 871 | 870 |
| Other expense, net | 369 | 279 | 185 |
| Interest expense | 20 | - | - |
| | 1,262 | 1,150 | 1,055 |
| Income before taxes | 104 | 166 | 310 |
| Tax (benefit) expense | (301) | 560 | 133 |
| Net income (loss) | $ 405 | $ (394) | $ 177 |
| **Weighted Average Number of Common Shares Outstanding** | | | |
| Basic (in thousands) | 122,499 | 122,499 | 122,499 |
| Diluted (in thousands) | 122,624 | 122,499 | 122,499 |
| **Earnings (Loss) Per Share** | | | |
| Basic net income (loss) per share | $ 3.31 | $ (3.22) | $ 1.44 |
| Diluted net income (loss) per share | $ 3.30 | $ (3.22) | $ 1.44 |

The Notes to Consolidated and Combined Financial Statements are an integral part of this statement.

69

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED**
**STATEMENT OF COMPREHENSIVE INCOME (LOSS)**

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| | (Dollars in millions) | | | | | |
| Net income (loss) | $ | 405 | $ | (394) | $ | 177 |
| Other comprehensive income (loss), net of tax | | | | | | |
| Foreign exchange translation adjustment | | (77) | | 70 | | (46) |
| Pension actuarial loss | | (7) | | - | | - |
| Changes in fair value of effective cash flow hedges | | - | | (1) | | - |
| Total other comprehensive income (loss), net of tax | | (84) | | 69 | | (46) |
| Comprehensive income (loss) | $ | 321 | $ | (325) | $ | 131 |

The Notes to Consolidated and Combined Financial Statements are an integral part of this statement.

70

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED BALANCE SHEET**

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| | (Dollars in millions) | |
| **ASSETS** | | |
| Current assets: | | |
|     Cash and cash equivalents | $ 265 | $ 56 |
|     Due from related parties, current | - | 23 |
|     Accounts receivables – net | 821 | 779 |
|     Inventories | 628 | 465 |
|     Other current assets | 95 | 69 |
|       Total current assets | 1,809 | 1,392 |
| Property, plant and equipment – net | 300 | 265 |
| Goodwill | 2,634 | 2,648 |
| Other intangible assets – net | 133 | 140 |
| Deferred income taxes | 84 | 5 |
| Other assets | 12 | 23 |
|     Total assets | $ 4,972 | $ 4,473 |
| **LIABILITIES** | | |
| Current liabilities: | | |
|     Accounts payable | $ 964 | $ 678 |
|     Due to related parties, current | - | 60 |
|     Current maturities of long-term debt | 22 | - |
|     Accrued liabilities | 503 | 409 |
|       Total current liabilities | 1,489 | 1,147 |
| Long-term debt | 1,179 | - |
| Deferred income taxes | 25 | 377 |
| Pension obligations | 88 | - |
| Obligations payable to Honeywell | 629 | - |
| Other liabilities | 29 | 346 |
| **COMMITMENTS AND CONTINGENCIES (Note 21)** | | |
| **EQUITY** | | |
| Common stock, $0.001 par value, 700,000,000 shares authorized, 122,498,794 and 122,966,558 shares issued and outstanding, respectively | - | - |
| Additional paid-in capital | 1,720 | - |
| Retained earnings | 2 | - |
| Invested equity | - | 2,703 |
| Accumulated other comprehensive (loss) | (189) | (100) |
|     Total equity | 1,533 | 2,603 |
|     Total liabilities and equity | $ 4,972 | $ 4,473 |

The Notes to Consolidated and Combined Financial Statements are an integral part of this statement.

71

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED STATEMENT OF CASH FLOW**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | (Dollars in millions) | | |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 405 | $ (394) | $ 177 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation | 45 | 57 | 57 |
| Amortization | 21 | 10 | 7 |
| Repositioning charges | 5 | 23 | 19 |
| Net payments for repositioning charges | (9) | (17) | (18) |
| Stock compensation expense | 20 | 16 | 13 |
| Pension expense | 11 | 16 | 16 |
| Deferred income taxes | (323) | 297 | (4) |
| Other | 11 | 3 | 4 |
| Changes in assets and liabilities: | | | |
| Accounts, notes and other receivables | (62) | (31) | (106) |
| Inventories | (172) | (17) | (49) |
| Other current assets | (27) | (17) | 1 |
| Other assets | (4) | - | 2 |
| Accounts payable | 231 | 11 | 61 |
| Accrued liabilities | 65 | (5) | (11) |
| Pension obligations | 5 | - | - |
| Obligations payable to Honeywell | 24 | - | - |
| Other Liabilities | 216 | 85 | (18) |
| Net cash provided by operating activities | 462 | 37 | 151 |
| **Cash flows used for investing activities:** | | | |
| Expenditures for property, plant and equipment | (64) | (49) | (60) |
| Expenditures for software | (17) | (2) | (11) |
| Payments related to amounts due from related parties | - | (13) | (12) |
| Cash paid for acquisitions, net of cash acquired | - | - | (120) |
| Proceeds received related to amounts due from related parties | 7 | 13 | 12 |
| Net cash used for investing activities | (74) | (51) | (191) |
| **Cash flows from financing activities:** | | | |
| Proceeds from long-term debt | 1,225 | - | - |
| Payment of debt issuance costs | (24) | - | - |
| Payment of revolving credit facility fees | (5) | - | - |
| Distribution to Honeywell in connection with Spin-Off | (1,415) | - | - |
| Net increase in invested equity | 39 | 19 | 1 |
| Non-operating obligations from Honeywell, net | 26 | - | - |
| Proceeds received related to amounts due from related parties | - | 1 | 2 |
| Payments related to amounts due to related parties | - | (4) | (2) |
| Net cash flow from (used by) cash pooling | (13) | 5 | 3 |
| Net cash (used for) provided by financing activities | (167) | 21 | 4 |
| Effect of foreign exchange rate changes on cash and cash equivalents | (12) | 2 | 1 |
| Net increase (decrease) in cash and cash equivalents | 209 | 9 | (35) |
| Cash and cash equivalents at beginning of period | 56 | 47 | 82 |
| Cash and cash equivalents at end of period | $ 265 | $ 56 | $ 47 |
| **Supplemental Cash Flow Information:** | | | |
| Income taxes paid (net of refunds) | 28 | 261 | 136 |
| Capital expenditures in accounts payable | 23 | 14 | 14 |

The Notes to Consolidated and Combined Financial Statements are an integral part of this statement.

72

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED STATEMENT OF EQUITY**

| (Dollars in millions) | Common Stock Shares | Amount | Additional Paid-In Capital | Retained Earnings | Invested Equity | Accumulated Other Comprehensive (Loss) | Total Equity |
|---|---|---|---|---|---|---|---|
| Balance at December 31, 2015 | - | $ - | $ - | $ - | $ 2,842 | $ (123) | $ 2,719 |
| Net income | - | - | - | - | 177 | - | 177 |
| Other comprehensive income (loss), net of tax | - | - | - | - | - | (46) | (46) |
| Change in invested equity | - | - | - | - | 24 | - | 24 |
| Balance at December 31, 2016 | - | - | - | - | 3,043 | (169) | 2,874 |
| Net (loss) | - | - | - | - | (394) | - | (394) |
| Other comprehensive income (loss), net of tax | - | - | - | - | - | 69 | 69 |
| Change in invested equity | - | - | - | - | 54 | - | 54 |
| Balance at December 31, 2017 | - | - | - | - | 2,703 | (100) | 2,603 |
| Net income | - | - | - | 2 | 403 | - | 405 |
| Other comprehensive income (loss), net of tax | - | - | - | - | - | (84) | (84) |
| Change in invested equity | - | - | - | - | (1,398) | - | (1,398) |
| Issuance of common stock and reclassification of invested equity | 122,499 | - | 1,713 | - | (1,708) | (5) | - |
| Stock-based compensation | - | - | 4 | - | - | - | 4 |
| Other | - | - | 3 | - | - | - | 3 |
| Balance at December 31, 2018 | 122,499 | $ - | $ 1,720 | $ 2 | $ - | $ (189) | $ 1,533 |

The Notes to Consolidated and Combined Financial Statements are an integral part of this statement.

73

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

**Note 1. Organization, Operations and Basis of Presentation**

*Business Description*

Resideo Technologies, Inc. ("Resideo" or "the Company"), is a global provider of products, software, solutions and technologies that help owners of homes stay connected and in control of their comfort, security and energy use. The Company is a leader in the home heating, ventilation and air conditioning controls and security markets, and a leading global distributor of security and fire protection products.

*Separation from Honeywell*

The Company was incorporated in Delaware on April 24, 2018. The Company separated from Honeywell International Inc. ("Honeywell") on October 29, 2018, becoming an independent publicly traded company as a result of a pro rata distribution of the Company's common stock to shareholders of Honeywell ( "Spin-Off"). Exhibit 99.1 to Amendment No. 2 to the Company's Registration Statement on Form 10 as filed with the Securities and Exchange Commission ("SEC") on October 2, 2018 (the "Form 10") was declared effective by the SEC on October 3, 2018. On October 29, 2018 ("Spin-Off Date"), Honeywell's shareholders of record as of October 16, 2018 ( "Record Date") received one share of the Company's common stock, par value $0.001 per share, for every six shares of Honeywell's common stock, par value $1.00 per share, held as of the Record Date, and cash for any fractional shares of the Company's common stock. The Company began trading "regular way" under the ticker symbol "REZI" on the New York Stock Exchange on October 29, 2018.

In connection with the separation, Resideo and Honeywell entered into a Separation and Distribution Agreement, an Employee Matters Agreement, a Tax Matters Agreement, a Transaction Services Agreement, a Trademark License Agreement and a Patent Cross-License Agreement. The agreements govern the relationship between Resideo and Honeywell following the separation and provide for the allocation of various assets, liabilities, rights and obligations. These agreements also include arrangements for transition services to be provided by Honeywell to Resideo and by Resideo to Honeywell.

*Basis of Presentation*

The Consolidated Balance Sheet as of December 31, 2018 consists of the consolidated balances of Resideo as prepared on a stand-alone basis. The Combined Balance Sheet as of December 31, 2017, and Consolidated and Combined Statements of Operations, Comprehensive Income (Loss), Equity, and Cash Flows for the years ended December 31, 2018, 2017 and 2016, have been prepared on a "carve-out" basis for the periods and dates prior to the Spin-Off and include stand-alone results for the period subsequent to the date of Spin-Off. Prior to the separation, these Consolidated and Combined Financial Statements were derived from the consolidated financial statements and accounting records of Honeywell. These Consolidated and Combined Financial Statements reflect the Company's consolidated historical financial position, results of operations and cash flows as they have been historically managed in conformity with Generally Accepted Accounting Principles in the United States ("U.S. GAAP").

All intracompany transactions have been eliminated for all periods presented. As described in Note 5. Related Party Transactions with Honeywell, all significant transactions between the Company and Honeywell occurring prior to the Spin-Off have been included in these Consolidated and Combined Financial Statements.

Prior to the Spin-Off, transactions between the Company and Honeywell were reflected in the Consolidated and Combined Balance Sheet as Due from related parties, current or Due to related parties, current. In the Consolidated and Combined Statements of Cash Flows, the cash flows related to related party notes receivables presented in the Consolidated and Combined Balance Sheet in Due from related parties, current are reflected as investing activities since these balances represent amounts loaned to Honeywell. The cash flows related to related party notes payables presented in the Combined Balance Sheet in Due to related parties, current are reflected as financing activities since these balances represent amounts financed by Honeywell.

74

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

While the Company was owned by Honeywell, a centralized approach to cash management and financing was used. Prior to the consummation of the Spin-Off, the majority of the Company's cash was transferred to Honeywell daily and Honeywell funded the Company's operating and investing activities as needed. Cash transfers to and from Honeywell's cash management accounts are reflected in the Combined Balance Sheet as Due to and Due from related parties, current and in the Consolidated and Combined Statements of Cash Flows as net financing activities.

The Combined Financial Statements prior to the Spin-Off include certain assets and liabilities that have historically been held at the Honeywell corporate level but were specifically identifiable or otherwise attributable to the Company. The cash and cash equivalents held by Honeywell at the corporate level were not specifically identifiable to the Company and therefore were not attributed for any of the periods presented. Honeywell third-party debt and the related interest expense were not allocated for any of the periods presented as Honeywell's borrowings were not directly attributable to the Company.

Prior to the consummation of the Spin-Off, Honeywell provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Company. The cost of these services has been allocated to the Company on the basis of the proportion of net revenue. The Company and Honeywell consider these allocations to be a reasonable reflection of the benefits received by the Company. However, the financial information presented in these Consolidated and Combined Financial Statements may not reflect the consolidated and combined financial position, operating results and cash flows of the Company had the Company been a separate stand-alone entity during the periods presented. Actual costs that would have been incurred if the Company had been a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Both Resideo and Honeywell consider the basis on which the expenses have been allocated to be a reasonable reflection of the utilization of services provided to or the benefits received by the Company during the periods presented. After the Spin-Off, a number of the above services have continued under a transition service agreement with Honeywell, which the Company will expense as incurred based on the contractual pricing terms.

**Note 2. Summary of Significant Accounting Policies.**

*Accounting Principles*—The financial statements and accompanying notes are prepared in accordance with accounting principles generally accepted in the United States of America. The following is a description of Resideo's significant accounting policies.

*Principles of Consolidation*—The Consolidated and Combined Financial Statements include the accounts of Resideo Technologies, Inc. and all of its subsidiaries in which a controlling interest is maintained. All intercompany transactions and balances are eliminated in consolidation.

*Cash and Cash Equivalents*—Cash and cash equivalents include cash on hand and highly liquid investments having an original maturity of three months or less.

*Trade Receivables and Allowance for Doubtful Accounts*—Trade accounts receivable are recorded at the invoiced amount as a result of transactions with customers. The Company maintains allowances for doubtful accounts for estimated losses as a result of customers' inability to make required payments. The Company estimates anticipated losses from doubtful accounts based on days past due as measured from the contractual due date and historical collection history. The Company also takes into consideration changes in economic conditions that may not be reflected in historical trends, for example customers in bankruptcy, liquidation or reorganization. Receivables are written-off against the allowance for doubtful accounts when they are determined uncollectible. Such determination includes analysis and consideration of the particular conditions of the account, including time intervals since last collection, customer performance against agreed upon payment plans, solvency of customer and any bankruptcy proceedings.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

*Inventories*—Inventories in the Products and Solutions business are stated at the lower of cost or net realizable value, determined on a first-in, first-out basis, including direct material costs and direct and indirect manufacturing costs, or net realizable value. Inventories in the Global Distribution business are stated at average cost. Reserves are maintained for obsolete, inactive and surplus items.

*Property, Plant and Equipment*—Property, plant and equipment are recorded at cost, less accumulated depreciation. For financial reporting, the straight-line method of depreciation is used over the estimated useful lives of 10 to 50 years for buildings and improvements, 3 to 16 years for machinery and equipment and 3 to 10 years for tooling equipment.

*Goodwill*—Goodwill is subject to impairment testing annually as of October 1, and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. This testing compares carrying values to fair values and, when necessary, the carrying value of these assets is impaired. The Company completed its annual goodwill impairment test as of the Spin-Off date and determined that no impairment was necessary. No impairment indicators have been identified since the last impairment test date.

*Other Intangible Assets with Determinable Lives*—Other intangible assets with determinable lives consist of customer lists, technology, patents and trademarks and software intangibles and are amortized over their estimated useful lives, ranging from 4 to 15 years.

*Warranties and Guarantees*—Expected warranty costs for products sold are recognized based on an estimate of the amount that eventually will be required to settle such obligations. These accruals are based on factors such as past experience, length of the warranty and various other considerations. Costs of product recalls, which may include the cost of the product being replaced as well as the customer's cost of the recall, including labor to remove and replace the recalled part, are accrued as part of the warranty accrual at the time an obligation becomes probable and can be reasonably estimated. These estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

*Revenue Recognition*—Product and service revenues are recognized when or as the Company transfers control of the promised products or services to the customer. Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods or providing services.

In the sale of products, the terms of a contract or the historical business practice can give rise to variable consideration due to, but not limited to, discounts and bonuses. The Company estimates variable consideration at the most likely amount that will be received from customers and reduce revenues recognized accordingly. The Company includes estimated amounts in the transaction price to the extent it is probable that a significant reversal of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is resolved. The estimates of variable consideration and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of our anticipated performance and all information (historical, current and forecasted) that is reasonably available to the Company.

The Company adopted the revenue recognition standard as of January 1, 2018 (see Note 6 Revenue Recognition and Contracts with Customers). Prior to adoption, product and service revenues were recognized when there was evidence of a sales agreement, delivery of goods had occurred or services had been rendered, the sales price was fixed or determinable, and the collectability of revenue was reasonably assured. Service sales, principally representing network subscription services, were recognized over the contractual period or as services were rendered. Revenues from contracts with multiple element arrangements were recognized as each element was earned based on the relative fair value of each element provided the delivered elements had value to customers on a stand-alone basis. Amounts allocated to each element were based on its objectively determined fair value, such as the sales price for the product or service when it was sold separately or competitor prices for similar products or services.

Sales incentives and allowances were recognized as a reduction to revenue at the time of the related sale.

76

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

Sales, use and value added taxes collected by the Company and remitted to various government authorities were not recognized as revenues and are reported on a net basis.

Shipping and handling fees billed to customers were included in Cost of goods sold.

*Royalty*—The Company and Honeywell entered into a 40-year Trademark License Agreement ("the Trademark Agreement") that authorizes the Company's use of certain licensed trademarks in the operation of Resideo's business for the advertising, sale and distribution of certain licensed products. In exchange, the Company will pay a royalty fee of 1.5% of net revenue of the licensed products to Honeywell which is recorded in Selling, general and administrative expense on the Consolidated and Combined Statement of Operations.

*Environmental*—The Company accrues costs related to environmental matters when it is probable that it has incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental costs are presented within Cost of goods sold for operating sites and Other expense, net for non-operating sites in the Consolidated and Combined Statements of Operations. For additional information, see Note 21. Commitments and Contingencies.

*Honeywell Reimbursement Agreement*—In connection with the Spin-Off, the Company entered into an Indemnification and Reimbursement Agreement with Honeywell (the "Honeywell Reimbursement Agreement") on October 14, 2018, pursuant to which it has an obligation to make cash payments to Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case, including consequential damages (the "liabilities") in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. The amount payable in respect of such liabilities arising in any given year is subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). Honeywell reimbursement expenses are presented within Other expense, net in the Consolidated and Combined Statement of Operations and within Accrued liabilities and Obligations payable to Honeywell in the Consolidated and Combined Balance Sheet. For additional information, see Note 21. Commitments and Contingencies.

*Tax Indemnification Agreement*—The Tax Matters Agreement provides that Resideo is required to indemnify Honeywell for any taxes (and reasonable expenses) resulting from the failure of the Spin-Off and related internal transactions to qualify for their intended tax treatment under U.S. federal, state and local income tax law, as well as foreign tax law, where such taxes result from (a) breaches of covenants and representations we make and agree to in connection with the Spin-Off, (b) the application of certain provisions of U.S. federal income tax law to these transactions or (c) any other action or omission (other than actions expressly required or permitted by the Separation and Distribution Agreement, the Tax Matters Agreement or other ancillary agreements) we take after the consummation of the Spin-Off that gives rise to these taxes. As of December 31, 2018, the Company has indemnified Honeywell for $153 million. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Tax Matters Agreement."

*Research and Development*—The Company conducts research and development ("R&D") activities, which consist primarily of the development of new products and product applications. R&D costs are charged to expense as incurred. Such costs are included in Cost of goods sold and amount to $105 million, $120 million and $106 million for the years ended December 31, 2018, 2017 and 2016, respectively.

*Stock-Based Compensation Plans*—The principal awards issued under Resideo's stock-based compensation plans, which are described in Note 20. Stock-Based Compensation Plans, are restricted stock units. The cost for such awards is measured at the grant date based on the fair value of the award. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods (generally the vesting period of the equity award) and is included in Selling, general and administrative expenses in the Consolidated and Combined Statements of Operations. Forfeitures are estimated at the time of grant to recognize expense for those awards that are expected to vest and are based on historical forfeiture rates.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

*Pension Benefits*— The guidance requires that the Company disaggregates the service cost component of net benefit costs and report those costs in the same line item or items in the Consolidated Statement of Operations as other compensation costs arising from services rendered by the pertinent employees during the period. The other non-service components of net benefit costs are required to be presented separately from the service cost component and outside of income from operations.

The Company has recorded the service cost component of Pension ongoing (income) expense in Costs of goods sold and Selling, general and administrative expenses. The remaining components of net benefit costs within Pension ongoing (income) expense, primarily interest costs and assumed return on plan assets, are recorded in Other expense, net. The Company recognizes net actuarial gains or losses in excess of 10% of the greater of the fair value of plan assets or the plans' projected benefit obligation (the corridor) annually in the fourth quarter each year (MTM Adjustment). The MTM Adjustment will also be reported in Other expense, net.

*Foreign Currency Translation*—Assets and liabilities of operations outside the United States with a functional currency other than U.S. Dollars are translated into U.S. Dollars using year-end exchange rates. Revenue, costs and expenses are translated at the average exchange rates in effect during the year. Foreign currency translation gains and losses are included as a component of Accumulated other comprehensive income (loss).

*Income Taxes*—Significant judgment is required in evaluating tax positions. The Company establishes additional reserves for income taxes when, despite the belief that tax positions are fully supportable, there remain certain positions that do not meet the minimum recognition threshold. The approach for evaluating certain and uncertain tax positions is defined by the authoritative guidance which determines when a tax position is more likely than not to be sustained upon examination by the applicable taxing authority. In the normal course of business, the Company and its subsidiaries are examined by various federal, state and foreign tax authorities. The Company regularly assesses the potential outcomes of these examinations and any future examinations for the current or prior years in determining the adequacy of its provision for income taxes. The Company continually assesses the likelihood and amount of potential adjustments and adjust the income tax provision, the current tax liability and deferred taxes in the period in which the facts that give rise to a change in estimate become known.

*Earnings (Loss) Per Share*—Basic earnings (loss) per share is based on the weighted average number of common shares outstanding. Diluted earnings (loss) per share is based on the weighted average number of common shares outstanding and all dilutive potential common shares outstanding. For additional information, see Note 3. Earnings Per Share.

*Use of Estimates*—The preparation of the Company's Consolidated and Combined Financial Statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts in the Consolidated and Combined Financial Statements and related disclosures in the accompanying Notes. Actual results could differ from those estimates. Estimates and assumptions are periodically reviewed and the effects of changes are reflected in the Consolidated and Combined Financial Statements in the period they are determined to be necessary. Estimates are used when accounting for, stock-based compensation, pension benefits, contingent consideration, indemnification liabilities, goodwill and intangible assets, and valuation allowances for receivables and inventory reserves, deferred tax assets, and the amounts of revenue and expenses reported during the period.

*Reclassification*—A reclassification of a prior period amount has been made to conform to the presentation adopted for the current period. For the years ended December 31, 2017 and December 31, 2016 we reclassified $(2) and $(3) million respectively from Interest to Other expense, net in the Consolidated and Combined Statement of Operations to conform with the current period presentation. This reclassification had no impact on Income before taxes and Net income (loss), the Consolidated and Combined Balance Sheet or Consolidated and Combined Statement of Cash Flows during the respective periods. Refer to Note 8. Other Expense, Net for further details.

78

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

*Recent Accounting Pronouncements*—The Company considers the applicability and impact of all recent accounting standards updates ("ASUs") issued by the Financial Accounting Standards Board ("FASB"). ASUs not listed below were assessed and determined to be either not applicable or are expected to have an immaterial impact on the combined financial position or results of operations.

In February 2016, the FASB issued new guidance on accounting for leases, which was further amended in July 2018 and December 2018. The new guidance requires lessees to recognize most leases on their balance sheets for the rights and obligations created by those leases, but does not significantly impact the manner in which expense is recognized on the income statement. Enhanced disclosures regarding the amount, timing, and uncertainty of cash flows arising from leases are also required. Lessor accounting is substantially unchanged from existing guidance. The Company adopted the new guidance effective January 1, 2019, and will apply the changes prospectively, recognizing a cumulative-effect adjustment to the beginning balance of retained earnings as of the adoption date. The primary impact upon adoption of the new guidance is the recognition of right of use assets and lease liabilities for qualifying operating leases on the Company's balance sheet, predominantly related to real estate. Upon adoption, the Company currently expects to recognize an aggregate lease liability ranging from $105 million to $117 million, with a corresponding right of use asset, calculated based on the present value of the remaining minimum lease payments for qualifying leases as of January 1, 2019. The adoption of the new guidance is not expected to have a material impact to the consolidated statements of operations, stockholders' equity, and cash flows. The new guidance also provides practical expedients and policy elections for an entity's ongoing accounting. The Company will elect the short-term lease exception for qualifying leases, which excludes those leases that qualify as short-term leases from lease liability and right of use asset recognition. The Company also currently expects to elect the practical expedient to not separate lease and non-lease components for its real estate and automobile leases.

In October 2016, the FASB issued an accounting standard update which requires an entity to recognize the income tax consequences of an intra- entity transfer of an asset, other than inventory, at the time the entity transfer occurs rather than when the asset is ultimately transferred to a third party, as required under current U.S. GAAP. The guidance is intended to reduce diversity in practice, particularly for transfers involving intellectual property. Subsequent to 2017 fiscal year, the Company adopted the accounting standard update as of January 1, 2018. The guidance requires application on a modified retrospective basis. The adoption of this guidance increases the Company's deferred tax assets by approximately $0.2 million with a cumulative-effect adjustment to retained earnings of the same amount.

In January 2017, the FASB issued guidance which eliminates the two-step process that required identification of potential impairment and a separate measure of the actual impairment. The annual assessment of goodwill impairment will be determined by using the difference between the carrying amount and the fair value of the reporting unit. The standard is effective for annual and interim impairment tests performed in periods beginning after December 15, 2019 and is to be applied on a prospective basis. The Company early adopted this standard as of Spin-Off date. The adoption had no impact on the consolidated financial statements as of the date of adoption or for the year ended December 31, 2018.

In February 2018, the FASB issued guidance that allows for an entity to elect to reclassify the income tax effects on items within accumulated other comprehensive income resulting from the U.S. Tax Cuts and Jobs Act ("U.S. Tax Reform") to retained earnings. The guidance is effective for fiscal years beginning after December 15, 2018 with early adoption permitted, including interim periods within those years. Upon adoption, the Company does not expect to elect to reclassify the stranded income tax effects of U.S. Tax Reform from accumulated other comprehensive income to retained earnings.

In August 2018, the FASB issued guidance which amends the current disclosure requirements regarding defined benefit pensions and other post retirement plans and allows for the removal of certain disclosures, while adding certain new disclosure requirements. This standard is effective for fiscal years beginning after December 15, 2020 and allows for early adoption. The Company does not expect this new standard to have a significant impact to its disclosures.

79

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

**Note 3. Earnings Per Share**

On October 29, 2018, the date of consummation of the Spin-Off, 122,498,794 shares of the Company's Common Stock, par value $0.001 per share, were distributed to Honeywell shareholders of record as of October 16, 2018. This share amount is being utilized for the calculation of basic and diluted earnings per share for all periods presented prior to the Spin-Off as no common stock was outstanding prior to the date of the Spin-Off. For the 2018 year to date calculations, these shares are treated as issued and outstanding from January 1, 2018 for purposes of calculating historical basic earnings per share. For all periods presented, this calculation excludes 467,764 treasury shares that Resideo received from Honeywell at no cost as part of the Spin-Off.

The details of the earnings per share calculations for the years ended December 31, 2018, 2017 and 2016 are as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| **Basic:** | **2018** | **2017** | **2016** |
| Net income (loss) | $ 405 | $ (394) | $ 177 |
| Weighted average common shares outstanding (in thousands) | 122,499 | 122,499 | 122,499 |
| Earnings (Loss) Per Share - Basic | $ 3.31 | $ (3.22) | $ 1.44 |

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| **Diluted:** | **2018** | **2017** | **2016** |
| Net income (loss) | $ 405 | $ (394) | $ 177 |
| Weighted average common shares outstanding - Basic (in thousands) | 122,499 | 122,499 | 122,499 |
| Dilutive effect of unvested RSUs | 125 | - | - |
| Weighted average common shares outstanding - Diluted (in thousands) | 122,624 | 122,499 | 122,499 |
| Earnings (Loss) Per Share - Diluted | $ 3.30 | $ (3.22) | $ 1.44 |

Diluted Earnings (Loss) Per Share is computed based upon the weighted average number of common shares outstanding for the year plus the dilutive effect of common stock equivalents using the treasury stock method and the average market price of our common stock for the period from the spin-off date to December 31, 2018.

**Note 4. Acquisitions**

In March 2016, the Company completed the acquisition of RSI Video Technologies ("RSI"), a leading provider of wireless battery-powered motion detectors, for an aggregate value of $124 million in cash and $2 million in contingent consideration. $42 million in net assets were assumed at the acquisition date using fair value estimates, including $38 million in intangible assets and $84 million of goodwill. RSI was acquired to enhance the Company's ability to meet increasing global customer need for video verification and the acquisition was attributed to the Products and Solutions Segment.

**Note 5. Related Party Transactions with Honeywell**

The Consolidated and Combined Financial Statements have been prepared on a stand-alone basis and, for periods prior to the Spin-Off, are derived from the Consolidated Financial Statements and accounting records of Honeywell.

Prior to consummation of the Spin-Off, Honeywell was a related party that provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Company. The cost of these services has been allocated to the Company on the basis of the proportion of net revenue. The Company and Honeywell consider the allocations to be a reasonable reflection of the benefits received by the Company.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

During the period from January 1, 2018 until October 29, 2018 and the years ended December 31, 2017 and 2016, the Company was allocated $228 million, $289 million and $264 million, respectively, of general corporate expenses incurred by Honeywell and such amounts are included within Selling, general and administrative expenses in the Consolidated and Combined Statements of Operations. As certain expenses reflected in the Consolidated and Combined Financial Statements include allocations of corporate expenses from Honeywell, these statements could differ from those that would have been prepared had the Company operated on a stand-alone basis.

All significant intercompany transactions between the Company and Honeywell have been included in these Consolidated and Combined Financial Statements. Sales to Honeywell during the period from January 1, 2018 until October 29, 2018 and the years ended December 31, 2017 and 2016 were $24 million, $36 million and $50 million, respectively. Costs of goods sold to Honeywell during the period from January 1, 2018 until October 29, 2018 and the years ended December 31, 2017 and 2016 were $19 million, $29 million and $38 million, respectively. Purchases from Honeywell during the period from January 1, 2018 until October 29, 2018 and the years ended December 31, 2017 and 2016 were $212 million, $213 million and $205 million, respectively. The total net effect of the settlement of these intercompany transactions is reflected in the Consolidated and Combined Statements of Cash Flows as a financing activity and in the Consolidated and Combined Balance Sheets as invested equity.

Prior to the consummation of the Spin-Off, Honeywell managed the Company's hedging activity which included centrally hedging its exposure to changes in foreign exchange rates principally with forward contracts. Certain contracts were specifically designated to and entered on behalf of the Company with Honeywell as a counterparty and were used to hedge known or probable anticipated foreign currency sales and purchases. The Company designated these hedges as cash flow hedges. These hedges were marked-to-market with the effective portion of the changes in fair value of the derivatives recorded in Accumulated other comprehensive income (loss) and subsequently recognized in earnings when the hedged items impacted earnings. See Note 8. Other Expense, Net and Note 19. Accumulated Other Comprehensive Income (Loss), for the net impact of these economic foreign currency hedges in Other expense, net and Accumulated other comprehensive income, respectively, and Note 17. Financial Instruments and Fair Value Measures, for further details of these financial instruments. Resideo has no hedging activity as of December 31, 2018.

The following two tables presents related party activity prior to the consummation of the Spin-Off: As Honeywell is no longer a related party, there are no balances as of December 31, 2018.

Due from related parties, current consists of the following:

|  | December 31, 2017 |
|---|---|
| Cash pooling and short-term notes receivables | $ 10 |
| Related party note receivables, current | 7 |
| Receivables from related parties | 6 |
|  | $ 23 |

Due to related parties, current consists of the following:

|  | December 31, 2017 |
|---|---|
| Cash pooling and short-term notes payables | $ 23 |
| Payables to related parties | 36 |
| Related parties notes payables, current | 1 |
|  | $ 60 |

81

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

While the Company was owned by Honeywell, a centralized approach to cash management and financing of operations was used. Prior to consummation of the Spin-Off, the Company's cash was transferred to Honeywell daily and Honeywell funded the Company's operating and investing activities as needed. Net transfers to and from Honeywell are included within Invested equity on the Consolidated and Combined Statements of Equity. The components of the net transfers to and from Honeywell as of December 31, 2018, 2017 and 2016 are as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| General financing activities | $ (383) | $ (547) | $ (384) |
| Distribution to Honeywell in connection with Spin-Off | (1,415) | - | - |
| Net contribution of assets and liabilities upon Spin-Off | 81 | - | - |
| Unbilled corporate allocations | 228 | 260 | 240 |
| Purchases from Honeywell | 161 | 168 | 160 |
| Mandatory transition tax | (85) | 156 | - |
| Sales to Honeywell | (12) | (13) | (18) |
| Stock compensation expense and other compensation awards | 16 | 16 | 13 |
| Unbilled pension expense | 11 | 14 | 13 |
| Net increase (decrease) in invested equity | $ (1,398) | $ 54 | $ 24 |

**Note 6. Revenue Recognition**

Recently Adopted Accounting Pronouncement

On January 1, 2018, the Company adopted new guidance on revenue from contracts with customers using the modified retrospective method applied to contracts that were not completed as of January 1, 2018. As a result of adopting the new guidance, the Company determined there are no material impacts on the Consolidated and Combined Financial Statements as the Company's previous revenue recognition was consistent with the new standard.

**Disaggregated Revenue**

Revenues by channel are as follows:

| | **2018** |
| --- | --- |
| U.S. and Canada | $ 2,147 |
| EMEA (1) | 456 |
| India | 55 |
| Global Distribution | 2,658 |
| Comfort | 1,114 |
| Security | 479 |
| RTS | 576 |
| Products and Solutions (2) | 2,169 |
| Net revenue | $ 4,827 |

(1)  EMEA represents Europe, the Middle East and Africa.
(2)  Products and Solutions sales channel naming convention changed from what was disclosed in the 10-Q. Comfort & Care was broken out into Comfort and RTS.

The Company recognizes the majority of its revenue from performance obligations outlined in contracts with its customers that are satisfied at a point in time. Less than 3% of the Company's revenue is satisfied over time.

82

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

**Contract Balances**

The timing of revenue recognition, billings and cash collections results in billed accounts receivable and unbilled receivables (contract assets), reported in Accounts, notes and other receivables - net, and customer advances and deposits (contract liabilities), reported in Accrued Liabilities, on the Consolidated and Combined Balance Sheet. As of December 31, 2018, contract assets and liabilities are not material.

**Performance Obligations**

A performance obligation is a promise in a contract to transfer a distinct good or service to the customer, and is defined as the unit of account. A contract's transaction price is allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied. For product sales, typically each product sold to a customer represents a distinct performance obligation.

The majority of the Company's performance obligations are satisfied as of a point in time. Performance obligations are supported by contracts with customers, providing a framework for the nature of the distinct goods, services or bundle of goods and services. The timing of satisfying the performance obligation is typically indicated by the terms of the contract. All performance obligations are expected to be satisfied within one year.

The timing of satisfaction of the Company's performance obligations does not significantly vary from the typical timing of payment. For some contracts, the Company may be entitled to receive an advance payment.

The Company has applied the practical expedient to not disclose the value of remaining performance obligations for (i) contracts with an original expected term of one year or less or (ii) contracts for which it recognizes revenue in proportion to the amount it has the right to invoice for services performed.

**Note 7. Repositioning Charges**

A summary of repositioning charge follows:

|  | Years Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|---|---|---|---|
| Severance | $ 4 | $ 23 | $ 21 |
| Asset impairments | 1 | 1 | - |
| Reserve adjustments | - | (1) | (2) |
| Total net repositioning charge | $ 5 | $ 23 | $ 19 |

The following table summarizes the pretax distribution of total net repositioning charges by statement of operations classification:

|  | Years Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|---|---|---|---|
| Cost of goods sold | $ 4 | $ 17 | $ - |
| Selling, general and administrative expenses | 1 | 6 | 19 |
|  | $ 5 | $ 23 | $ 19 |

All of the pretax impact of total net repositioning charges are related to the Products and Solutions segment for the years ended December 31, 2018, 2017 and 2016.

83

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The Company recognized repositioning charges totaling $5 million, $24 million, and $21 million for the years ended December 31, 2018, 2017 and 2016, respectively, mainly for severance costs related to workforce reductions. The workforce reductions were primarily related to cost savings actions taken in connection with the Company's productivity and ongoing functional transformation initiatives; factory transitions to more cost-effective locations and site consolidations and organizational realignments.

The following table summarizes the status of total repositioning reserves related to severance cost:

|  | Total |
|---|---|
| Balance at December 31, 2015 | $ 13 |
| 2016 Charges | 21 |
| 2016 Usage – cash | (18) |
| 2016 Usage – noncash | - |
| Adjustments | (2) |
| Foreign currency translation | 1 |
| Balance at December 31, 2016 | 15 |
| 2017 Charges (a) | 24 |
| 2017 Usage – cash | (17) |
| 2017 Usage – noncash (a) | (1) |
| Adjustments | (1) |
| Foreign currency translation | 2 |
| Balance at December 31, 2017 | 22 |
| 2018 Charges | 5 |
| 2018 Usage – cash | (9) |
| 2018 Usage – noncash | - |
| Other | (4) |
| Foreign currency translation | (1) |
| Balance at December 31, 2018 | $ 13 |

(a)   Includes asset impairment of $1 million

Certain repositioning projects in each of the reportable operating segments in 2018, 2017 and 2016 included exit or disposal activities, the costs related to which will be recognized in future periods when the actual liability is incurred. The remaining exit and disposal costs relating to repositioning actions as of December 31, 2018 is expected to be $7 million.

**Note 8. Other Expense, Net**

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| Environmental expense | $ 323 | $ 281 | $ 188 |
| Honeywell reimbursement agreement expense | 49 | - | - |
| Other, net | (3) | (2) | (3) |
|  | $ 369 | $ 279 | $ 185 |

Refer to Note 21. Commitments and Contingencies for further details on environmental and Honeywell reimbursement expense.

84

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

**Note 9. Income Taxes**

Prior to the consummation of the Spin-Off, Resideo's operating results were included in Honeywell's various consolidated U.S. federal and state income tax returns, as well as non-U.S. filings. For the purposes of the Company's Consolidated and Combined Financial Statements for periods prior to the Separation, income tax expense and deferred tax balances have been recorded as if the Company filed tax returns on a standalone basis separate from Honeywell. The Separate Return Method applies the accounting guidance for income taxes to the standalone financial statements as if the Company was a separate taxpayer and a standalone enterprise prior to the separation from Honeywell.

**Income before taxes**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| U.S. | $ (169) | $ (107) | $ 47 |
| Non-U.S. | 273 | 273 | 263 |
| | $ 104 | $ 166 | $ 310 |

**Income tax expense (benefit)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Tax expense (benefit) consists of: | | | |
| **Current:** | | | |
| U.S. | $ (26) | $ 215 | $ 88 |
| Non-U.S. | 48 | 48 | 49 |
| | $ 22 | $ 263 | $ 137 |
| **Deferred:** | | | |
| U.S. | $ (15) | $ (6) | $ 2 |
| Non-U.S. | (308) | 303 | (6) |
| | (323) | 297 | (4) |
| | $ (301) | $ 560 | $ 133 |

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| The U.S. federal statutory income tax rate is reconciled to the effective income tax rate as follows: | | | |
| U.S. federal statutory income tax rate | 21.0 % | 35.0 % | 35.0 % |
| Taxes on non-U.S. earnings below U.S. tax rate | (7.3) | (33.4) | (15.2) |
| U.S. state income taxes | 6.4 | 3.4 | 2.5 |
| Reserves for tax contingencies | (4.3) | 3.2 | 0.8 |
| U.S. Tax Reform and related items | (385.1) | 273.1 | - |
| GILTI/FDII | 6.0 | - | - |
| Non-deductible expenses | 75.4 | 58.8 | 20.5 |
| Tax credits | (2.1) | (1.4) | (1.0) |
| All other items – net (a) | 0.6 | (1.4) | 0.3 |
| | (289.4) % | 337.3 % | 42.9 % |

(a)  Prior years adjusted to separately state "Tax Credits".

85

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The effective tax rate decreased in 2018 compared to 2017. The decrease was primarily attributable to tax benefits attributable to the internal restructuring of Resideo's business in advance of its anticipated spin-off, adjustments to the provisional tax amount related to U.S. Tax Reform, adjustments to income tax reserves, partially offset by tax expense related to Global Intangible Low Taxed Income ("GILTI"). The Company's non-U.S. effective tax rate was (95.2)%, a decrease compared to 2017. The year-over-year decrease in the non-U.S. effective tax rate was primarily driven by increased tax benefits attributable to internal restructuring of Resideo's business and a change in assertion to permanently reinvest unremitted earnings.

The effective tax rate increased in 2017 compared to 2016. The increase was primarily attributable to the provisional impact of U.S. tax reform (see "the Tax Act" further discussed below) and an increase in non-deductible expenses. The Company's non-U.S. effective tax rate was 128.6%, an increase compared to 2016. The year-over-year increase in the non-U.S. effective tax rate was primarily driven by Honeywell's change in assertion regarding foreign unremitted earnings in connection with the Tax Act.

**Deferred tax assets (liabilities)**

The tax effects of temporary differences and tax carryforwards which give rise to future income tax benefits and payables are as follows:

| | Years Ended December 31, | |
| --- | --- | --- |
| | **2018** | **2017** |
| **Deferred tax assets:** | | |
| Pension | $ 25 | $ - |
| Other asset basis differences | 73 | - |
| Accruals and reserves | 34 | 11 |
| Net operating and capital losses | 31 | 38 |
| Gross deferred tax assets | 163 | 49 |
| Valuation allowance | (29) | (36) |
| Total deferred tax assets | $ 134 | $ 13 |
| **Deferred tax liabilities:** | | |
| Intangibles | $ (53) | $ (55) |
| Property, plant and equipment | (16) | (14) |
| Unremitted earnings of foreign subsidiaries | - | (314) |
| Other | (6) | (2) |
| Total deferred tax liabilities | (75) | (385) |
| Net deferred tax asset / (liability) | $ 59 | $ (372) |

**Deferred tax assets:**

Gross deferred tax assets include $134 million related to non-U.S. operations comprised principally of deductible temporary differences attributable to fixed assets and intangibles. The Company maintains a valuation allowance of $29 million against a portion of the non-U.S. gross deferred tax assets. The change in the valuation allowance resulted in increases (decrease) of $(1) million, $4 million and $9 million to tax expense in 2018, 2017 and 2016, respectively. The remaining reduction of $6 million to valuation allowance as compared to 2017 relates to the reversal of net operating losses recorded in the pre-spin period in accordance with the separate return method. These losses were fully valued and the reversal did not impact income tax expense. In the event the Company determines that it will not be able to realize its net deferred tax assets in the future, it will reduce such amounts through an increase to tax expense in the period such determination is made. Conversely, if the Company determines that it will be able to realize net deferred tax assets in excess of the carrying amounts, it will decrease the recorded valuation allowance through a reduction to tax expense in the period that such determination is made.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The Company has not provided deferred taxes on unremitted earnings of its foreign affiliates that exist at December 31, 2018 as the earnings are considered permanently reinvested. The Company intends to continue to reinvest these earnings in international operations. If the Company determines at a later date to distribute these earnings to the U.S., the Company would be required to provide the net tax effects on these distributions. The Company estimates the total tax effect of these distributions would be approximately $18 million under current enacted tax laws.

As of December 31, 2018, net operating loss, capital loss and tax credit carryforwards were as follows:

| Jurisdiction | Expiration Period | Net Operating Loss Carryforwards |
|---|---|---|
| Non-U.S. | 2023 | $ 11 |
| Non-U.S. | Indefinite | 104 |
| | | $ 115 |

Many jurisdictions impose limitations on the timing and utilization of net operating loss carryforwards. In those instances where the net operating loss or tax credit carryforward will not be utilized in the carryforward period due to the limitation, the deferred tax asset and amount of the carryforward have been reduced.

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| Change in unrecognized tax benefits: | | | |
| Balance at beginning of year | $ 20 | $ 20 | $ 19 |
| Gross increases related to current period tax positions | - | 2 | 2 |
| Gross increases related to prior periods tax positions | 2 | 4 | 1 |
| Gross decreases related to prior periods tax positions | - | (3) | - |
| Decrease related to resolutions of audits with tax authorities | (2) | (4) | (1) |
| Expiration of the statute of limitations for the assessment of taxes | - | - | (1) |
| Reclass to indemnity payable | (18) | - | - |
| Foreign Currency Translation | - | 1 | - |
| Balance at end of year | $ 2 | $ 20 | $ 20 |

As of December 31, 2018, 2017 and 2016 there were $2 million, $20 million and $20 million of unrecognized tax benefits, respectively, that if recognized would be recorded as a component of income tax expense.

Unrecognized tax benefits for examinations in progress were $- million, $7 million and $8 million, as of December 31, 2018, 2017 and 2016, respectively. Estimated interest and penalties related to the underpayment of income taxes are classified as a component of Tax expense in the Consolidated and Combined Statement of Operations and totaled $(1) million of expense, $1 million of expense and $2 million expense for the years ended December 31, 2018, 2017 and 2016, respectively. Accrued interest and penalties were $1 million, $7 million and $7 million, as of December 31, 2018, 2017 and 2016, respectively.

**U.S. Tax Reform**

On December 22, 2017, the U.S. government enacted U.S. Tax Reform, which included changes to the taxation of foreign earnings by implementing a dividend exemption system, expansion of the current anti-deferral rules, a minimum tax on low-taxed foreign earnings and new measures to deter base erosion. The U.S. Tax Reform also included a permanent reduction in the corporate tax rate, repeal of the corporate alternative minimum tax, expensing of capital investment, and limitation of the deduction for interest expense. Furthermore, as part of the transition to the new tax system, a one-time transition tax was imposed on a U.S. shareholder's historical undistributed earnings of foreign affiliates.

87

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

As described in the Combined Financial Statements for the year ended December 31, 2017, the Company reasonably estimated certain effects of U.S. Tax Reform and, therefore, recorded provisional amounts, including the deemed repatriation transition tax and withholding taxes on undistributed earnings. For the year ended December 31, 2018, the Company recorded an adjustment to the provisional tax amount related to the deemed repatriation transition tax and taxes on undistributed earnings of $(85.4) million and $(234.7) million, respectively. This adjustment results in a decrease to the effective tax rate for the year ended December 31, 2018 of 307.8%. The adjustment reflects the revised determination of the fair value of assets and liabilities of legal entities included in the Company's business. The Company has finalized the accounting for the tax effects within the prescribed measurement period.

**Corporate Tax Rate Change**—The Company recorded a total tax benefit of approximately $17 million due to the decrease in the corporate statutory tax rate from 35% to 21%. The tax benefit from the change in tax rates results from the Company's deferred tax liability position as of December 31, 2017 for the excess of its net book value over its tax basis of its U.S. assets and liabilities that will generate future taxable income in excess of book income. This additional taxable income will be subject to tax at a lower corporate tax rate, consequently reducing the Company's deferred tax liability. There was no measurement period adjustment related to the Corporate Tax Rate Change.

**Mandatory Transition Tax**—The Company recorded a total tax charge of approximately $70.6 million due to the imposition of the mandatory transition tax ("MTT") on the deemed repatriation of undistributed foreign earnings. The amount reflects a provisional charge of $156 million decreased by a measurement period adjustment of approximately $85.4 million recorded during 2018. The change in the provisional estimate primarily relates to the revised determination of the fair value of assets and liabilities of legal entities included in the Company's business, which is utilized to allocate earnings and profit for purposes of calculating the deemed repatriation tax.

**Undistributed Foreign Earnings**— The Company recorded a total tax charge of approximately $79.3million due to Honeywell's intent at December 31, 2017 to no longer permanently reinvest the historical unremitted earnings of its foreign affiliates that existed as of December 31, 2017. This amount includes a provisional charge of $314 million decreased by measurement period adjustment of $234.7 million recorded as a reduction to tax expense. The change in the provisional estimate primarily relates to the revised determination of the fair value of assets and liabilities of legal entities included in the Company's business, which is utilized to allocate earnings and profit for purposes of calculating the undistributed foreign earnings prior to the spin and the Company's decision, after the separation, to permanently reinvest the historical unremitted earnings of its foreign affiliates.

**Global Intangible Low Taxed Income**—U.S. Tax Reform imposes a U.S. tax on global intangible low taxed income ("GILTI") that is earned by certain foreign affiliates owned by a U.S. shareholder. GILTI is generally intended to impose tax on the earnings of a foreign corporation that are deemed to exceed a certain threshold return relative to the underlying business investment. The Company has made a policy election to treat future taxes related to GILTI as a current period expense in the reporting period in which the tax is incurred.

**Note 10. Accounts Receivables—Net**

|  | December 31, | |
| --- | --- | --- |
|  | **2018** | **2017** |
| Accounts receivables, net | $ 833 | $ 792 |
| Less - Allowance for doubtful accounts | (12) | (13) |
|  | $ 821 | $ 779 |

88

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

**Note 11. Inventories**

|  | December 31, | | |
|  | **2018** | | **2017** |
|---|---|---|---|
| Raw materials | $ | 167 | $ | 108 |
| Work in process | | 34 | | 21 |
| Finished products | | 427 | | 336 |
| | $ | 628 | $ | 465 |

**Note 12. Property, Plant and Equipment—Net**

|  | December 31, | | |
|  | **2018** | | **2017** |
|---|---|---|---|
| Land and improvements | $ | 6 | $ | 6 |
| Machinery and equipment | | 510 | | 532 |
| Buildings and improvements | | 246 | | 245 |
| Construction in progress | | 64 | | 39 |
| Others | | 27 | | 16 |
| | | 853 | | 838 |
| Less - Accumulated depreciation | | (553) | | (573) |
| | $ | 300 | $ | 265 |

Depreciation expense was $45 million, $57 million and $57 million in 2018, 2017 and 2016, respectively.

**Note 13. Goodwill and Other Intangible Assets—Net**

The change in the carrying amount of goodwill for the years ended December 31, 2018 and 2017 by segment is as follows:

|  | Global Distribution Goodwill | | Products and Solutions Goodwill | | Total | |
|---|---|---|---|---|---|---|
| Balance as of December 31, 2016 | $ | 629 | $ | 1,965 | $ | 2,594 |
| Acquisitions/Divestitures | | - | | 4 | | 4 |
| Currency translation adjustment | | 16 | | 34 | | 50 |
| Balance as of December 31, 2017 | | 645 | | 2,003 | | 2,648 |
| Acquisitions/Divestitures | | - | | - | | - |
| Currency translation adjustment | | (6) | | (8) | | (14) |
| Balance as of December 31, 2018 | $ | 639 | $ | 1,995 | $ | 2,634 |

89

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

Other intangible assets with finite lives are comprised of:

| | December 31, 2018 | | | December 31, 2017 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Determinable life intangibles: | | | | | | |
| Patents and technology | $ 27 | $ (16) | $ 11 | $ 25 | $ (11) | $ 14 |
| Customer relationships | 170 | (95) | 75 | 178 | (89) | 89 |
| Trademarks | 9 | (6) | 3 | 9 | (6) | 3 |
| Software | 122 | (78) | 44 | 105 | (71) | 34 |
| | $ 328 | $ (195) | $ 133 | $ 317 | $ (177) | $ 140 |

Intangible assets amortization expense was $21 million, $10 million and $7 million in 2018, 2017 and 2016, respectively. Estimated intangible asset amortization expense for each of the next five years approximates $18 million in 2019, $17 million in 2020, $13 million in 2021, $11 million in 2022 and $9 million in 2023.

**Note 14. Accrued Liabilities**

| | December 31, | |
|---|---|---|
| | 2018 | 2017 |
| Obligations payable to Honeywell | $ 140 | $ - |
| Taxes payable | 76 | - |
| Compensation, benefit and other employee related | 73 | 65 |
| Customer rebate reserve | 59 | 49 |
| Product warranties and performance guarantees | 26 | 17 |
| Repositioning | 13 | 22 |
| Environmental costs | 2 | 204 |
| Other (primarily operating expenses) | 114 | 52 |
| | $ 503 | $ 409 |

Refer to Note 21. Commitments and Contingencies for further details on environmental and Honeywell reimbursement expense.

**Note 15. Long-term Debt and Credit Agreement**

The Company had no debt outstanding as of December 31, 2017. The Company's debt at December 31, 2018 consisted of the following:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| 6.125% notes due 2026 | $ 400 | $ - |
| Five year variable rate term loan A due 2023 | 350 | |
| Seven year variable rate term loan B due 2025 | 475 | - |
| Unamortized debt issuance costs | (24) | - |
| Total outstanding indebtedness | 1,201 | - |
| Less: amounts due within one year | (22) | - |
| Total long-term debt due after one year | $ 1,179 | $ - |

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

Scheduled principal repayments under the Senior Credit Facilities (defined below) and Senior Notes (defined below) subsequent to December 31, 2018 are as follows:

|  | December 31, 2018 |
|---|---|
| 2019 | $ 22 |
| 2020 | 22 |
| 2021 | 40 |
| 2022 | 57 |
| 2023 | 232 |
| Thereafter | 852 |
|  | 1,225 |
| Less: amounts due within one year | (22) |
|  | $ 1,203 |

*Senior Notes*

In October of 2018, the Company issued $400 million in principal amount 6.125% senior unsecured notes due in 2026 (the "Senior Notes"). The Senior Notes are senior unsecured and unsubordinated obligations of Resideo and rank equally with all of Resideo's existing and future senior unsecured debt and senior to all of Resideo's subordinated debt.

Resideo may at its option, redeem the Senior Notes in whole or part prior to November 1, 2021, at a redemption price equal to 100% of the principal amount of the Senior Notes redeemed, plus accrued and unpaid interest, if any, plus a "make- whole" premium. On or after November 1, 2021 Resideo may at its option, redeem the Senior Notes in whole or in part plus accrued and unpaid interest, plus a fixed redemption percentage on the principal amount of the Senior Notes redeemed of (i) 104.594% if redeemed during the twelve-month period beginning on November 1, 2021 (ii) 103.063% if redeemed during the twelve-month period beginning on November 1, 2022, (iii) 101.531% if redeemed during the twelve-month period beginning on November 1, 2023, (iv) 100% if redeem on or after November 1, 2024.

The Company incurred approximately $8 million in debt issuance costs related to the Senior Notes. The debt issuance costs associated with the Senior Notes are recorded as a reduction of the principal balance of the debt. All issuance costs are being amortized through interest expense for the duration of each respective debt facility.

*Credit Agreement*

On October 25, 2018, in connection with the consummation of the Spin-Off, the Company as the borrower, entered into a Credit Agreement with JP Morgan Chase Bank N.A. as administrative agent (the "Credit Agreement").

In October of 2018, the Company incurred substantial indebtedness in the form of a seven-year LIBOR plus 2.00% senior secured first-lien term B loan facility in an aggregate principal amount of $475 million (the "Term B Facility") and a five-year LIBOR plus 2.00% senior secured first-lien term A loan facility in an aggregate principal amount of $350 (the "Term A Facility" and, together with the Term B Facility, the "Term Loan Facilities"). The Term Loan Facilities interest rate for the period ending December 31, 2018 was 4.49%. The Company is obligated to make quarterly principal payments throughout the term of the Term Loan Facilities according to the amortization provisions in the Credit Agreement. Borrowings under the Credit Agreement are able to be prepaid at the Company's option without premium or penalty other than a 1.00% prepayment premium that may be payable in connection with certain repricing transactions within a certain period of time after the closing date. Amounts repaid or prepaid in respect of Term Loan Facilities may not be re-borrowed.

91

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

In October of 2018, the Company established a five-year senior secured first-lien revolving credit facility to be used for the Company's working capital and other cash needs from time to time in an aggregate principal amount of $350 million (the "Revolving Credit Facility" and, together with the Term Loan Facilities, the "Senior Credit Facilities"). The interest rate on the Revolving Credit Facility borrowings, are based on, at the option of the Company, either, (i) the rate of interest last quoted by The Wall Street Journal as the "prime rate" in the United States, (ii) the greater of the federal funds effective rate and the overnight bank funding rate, plus 0.5% and (iii) the one month adjusted LIBOR rate, plus 1.00% per annum. If the Company chooses to make a LIBOR borrowing on a one, two, three or six-month basis, the interest rate will be based on an adjusted LIBOR rate (which shall not be less than zero) based on the interest period for the borrowing. The applicable margin for the Term B Facility is currently 2.00% per annum (for LIBOR loans) and 1.00% per annum (for base rate loans). The applicable margin for each of the Term A Facility and the Revolving Credit Facility varies from 2.00% per annum to 1.50% per annum (for LIBOR loans) and 1.00% to 0.50% per annum (for base rate loans) based on the Company's leverage ratio. Accordingly, the interest rates for the Senior Credit Facilities will fluctuate during the term of the Credit Agreement based on changes in the base rate, LIBOR or future changes in our leverage ratio. Interest payments with respect to the borrowings are required either on a quarterly basis (for base rate loans) or at the end of each interest period (for LIBOR loans) or, if the duration of the applicable interest period exceeds three months, then every three months. The Revolving Credit Facility has a quarterly commitment fee based on the unused portion, which is determined by the Company's leverage ratio and ranges from 0.25% to 0.35% per annum. At December 31, 2018, there were no borrowings and $19 million of letters of credit issued under the $350 million Credit Facility.

The Company incurred approximately $16 million in debt issuance costs related to the Term Loans and $5 million in costs related to the Revolving Credit Facility. The debt issuance costs associated with the Term Loans were recorded as a reduction of the principal balance of the debt, and the Revolving Credit Facility costs were capitalized in Other assets. The issuance costs are being amortized through Interest expense for the duration of each respective debt facility.

The net proceeds from the borrowings under the Credit Agreement and the offering of the Senior Notes were used as part of the financing for the Spin-Off. The interest expense for the Senior Notes and Credit Agreement during the year ended December 31, 2018 was $13 million, which includes the amortization of debt issuance cost and debt discounts.

The Credit Agreement and Senior Notes contain customary covenants limiting the ability of the Company and its subsidiaries to, among other things, pay cash dividends, incur debt or liens, redeem or repurchase stock of the Company, enter into transactions with affiliates, make investments, make capital expenditures, merge or consolidate with others or dispose of assets. The Credit Agreement also contains financial covenants that require the Company to maintain a Consolidated Interest Coverage Ratio (as defined in the Credit Agreement) of not less than 2:75 to 1:00 and to maintain a Consolidated Total Leverage Ratio of (i) 4:00 to 1:00 or less for the fiscal quarter ending December 31, 2018, through and including the fiscal quarter ending September 30, 2019, (ii) 3:75 to 1:00 or less for the fiscal quarter ending December 31, 2019, through and including the fiscal quarter ending September 31, 2020, (iii) 3:50 to 1:00 or less for the fiscal quarter ending December 31, 2020, through and including the fiscal quarter ending September 30, 2021 and (iv) 3:25 to 1:00 or less for the fiscal quarter ending December 31, 2021, and each fiscal quarter thereafter. As of December 31, 2018, the Company was in compliance with all covenants related to the Credit Agreement and Senior Notes.

92

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

**Note 16. Lease Commitments**

Future minimum lease payments under operating leases having initial or remaining non cancellable lease terms in excess of one year are as follows:

|  | At December 31, 2018 |
|---|---|
| 2019 | $ 39 |
| 2020 | 33 |
| 2021 | 28 |
| 2022 | 22 |
| 2023 | 15 |
| Thereafter | 17 |
|  | $ 154 |

Rent expense was $39 million, $39 million and $38 million in 2018, 2017 and 2016, respectively.

**Note 17. Financial Instruments and Fair Value Measures**

*Credit and Market Risk*—The Company continually monitors the creditworthiness of its customers to which it grants credit terms in the normal course of business. The terms and conditions of credit sales are designed to mitigate or eliminate concentrations of credit risk with any single customer.

*Deferred Incentive Compensation Plan*—Represents investments held in a deferred incentive compensation plan, which are included in Other assets on the accompanying Consolidated and Combined Balance Sheet. The fair value of the assets held in the funded deferred incentive compensation plan is based on quoted market prices.

*Foreign Currency Risk Management*—The Company conducts its business on a multinational basis in a wide variety of foreign currencies. It is exposed to market risks from changes in currency exchange rates. These exposures may impact future earnings and/or operating cash flows. The exposure to market risk for changes in foreign currency exchange rates arises from transactions arising from international trade, foreign currency denominated monetary assets and liabilities, and international financing activities between subsidiaries. The Company relies primarily on natural offsets to address the exposures and may supplement this approach from time to time by entering into forward and option hedging contracts. As of December 31, 2018 there were no forward or hedging contracts.

*Senior Notes and Credit Agreement*—As of December 31, 2018, the Company assessed the amount recorded under the Term Loans, the Senior Notes, and the Revolving Credit Facility and determined such amounts approximated fair value. The fair values of the debt are based on the quoted inactive prices and are therefore classified as Level 2 within the valuation hierarchy.

The carrying value of cash and cash equivalents, account receivables, due from related parties, account payables and due to related parties contained in the Consolidated and Combined Balance Sheet approximates fair value.

93

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

*Fair Value of Financial Instruments*—The FASB's accounting guidance defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (exit price). The FASB's guidance classifies the inputs used to measure fair value into the following hierarchy:

Level 1    Quoted prices in active markets for identical assets or liabilities;

Level 2    Observable inputs other than the quoted prices in active markets for identical assets and liabilities; and

Level 3    Unobservable inputs for which there is little or no market data, which require the Company to develop assumptions of what market participants would use in pricing the asset or liability.

Financial and nonfinancial assets and liabilities are classified in their entirety based on the lowest level of input that is significant to the fair value measurement.

**Note 18. Other Liabilities**

| | Years Ended December 31, | |
| --- | --- | --- |
| | **2018** | **2017** |
| Environmental | $ 18 | $ 333 |
| Other | 11 | 13 |
| | $ 29 | $ 346 |

Refer to Note 21. Commitments and Contingencies for further details on environmental and Honeywell reimbursement expense

**Note 19. Accumulated Other Comprehensive Income (Loss)**

The changes in Accumulated other comprehensive income (loss) are provided in the tables below.

94

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

*Changes in Accumulated Other Comprehensive Income (Loss) by Component*

| | Foreign Exchange Translation Adjustment | Pension Adjustments | Changes in Fair Value of Effective Cash Flow Hedges | Total Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance at December 31, 2016 | $ (170) | $ - | $ 1 | $ (169) |
| Other comprehensive income (loss) before reclassifications | 70 | - | (3) | 67 |
| Amounts reclassified from accumulated other comprehensive (loss) (a) | - | - | 2 | 2 |
| Net current period other comprehensive income (loss) | 70 | - | (1) | 69 |
| Balance at December 31, 2017 | $ (100) | $ - | $ - | $ (100) |
| Other comprehensive income (loss) before reclassifications (b) | (77) | (7) | (4) | (88) |
| Amounts reclassified from accumulated other comprehensive (loss) (a) | - | - | 4 | 4 |
| Net current period other comprehensive income (loss) | (77) | (7) | - | (84) |
| Pension transfers (c) | - | (5) | - | (5) |
| Balance at December 31, 2018 | $ (177) | $ (12) | $ - | $ (189) |

(a) Amount reclassified to net revenue
(b) The Pension adjustment of $7 million is shown net of a $2 million tax benefit
(c) Transferred at the spin date and is shown net of a $3 million tax benefit

**Note 20. Stock-Based Compensation Plans**

On October 29, 2018, the Board adopted, and Honeywell, as the Company's sole shareholder, approved, the 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates, as may be amended from time to time (the "Stock Incentive Plan"). On or about December 21, 2018, our Board adopted the Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates. The Stock Incentive Plan provides for the grant of Stock Options, Stock Appreciation Rights, Restricted Stock Units, Restricted Stock, Other Stock-Based Awards and Cash-Based Awards. The maximum aggregate number of shares of the Company's common stock that may be issued under the restricted stock units granted under the Stock Incentive Plan is 15,000,000.

*Summary of Restricted Stock Unit Activity*

Restricted stock unit ("RSU") awards entitle the holder to receive one share of common stock for each unit when the units vest. RSUs are issued to certain key employees and to non-employee directors. RSUs typically become fully vested over periods ranging from 1 to 7 years and are payable in Resideo common stock upon vesting. As of December 31, 2018 11,661,816 shares were available to be granted as RSUs under the Stock Incentive Plan.

Since the Spin-Off on October 29, 2018, the Company has granted the following awards:

• 1,809,644 RSUs were granted to employees of Resideo with 4 year vesting periods in accordance with the Stock Incentive Plan

95

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

- Honeywell stock options, RSUs, and performance based awards held by certain of the key employees who would otherwise forfeit prior Honeywell awards as a result of the Spin-Off were issued replacement grants in the amount of 1,411,395 RSUs with substantially the same vesting schedule as the forfeited awards. Compensation expense for these awards will continue to be recognized ratably over the remaining term of the unvested awards, which ranged from 1 to 4 years as of the date of the Spin-Off
- 117,145 RSUs were granted to members of the Board of Directors for annual director compensation with 1 to 4 year vesting periods in accordance with the Stock Incentive Plan

The following table summarizes RSU activity related to the Stock Incentive Plan:

| | RSUs | |
|---|---|---|
| | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value Per Share |
| Non-vested as of October 30, 2018 | - | $ - |
| Granted | 3,338,184 | 24.05 |
| Vested | - | - |
| Forfeited | - | - |
| Non-vested as of December 31, 2018 | 3,338,184 | $ 24.05 |

As of December 31, 2018, there was approximately $55 million of total unrecognized compensation cost related to non-vested RSUs granted under the Stock Incentive Plan, which is expected to be recognized over a weighted-average period of 3.53 years.

*Summary of Stock-Based Compensation*

The following table summarizes stock-based compensation expense and the related tax benefits under the Company's plans:

| | 2018 |
|---|---|
| Stock-based compensation expense before income taxes | $ 20 |
| Less income tax benefit | (5) |
| Stock-based compensation expense, net of income taxes | $ 15 |

Certain share-based compensation expense relates to stock based awards awarded to key employees of the Company as part of Honeywell's incentive compensation plans prior to the Spin-Off. Such share-based compensation expense was $16 million, $16 million and $13 million for the period from January 1, 2018 until October 29, 2018 and the years ended December 31, 2017 and 2016, respectively, of which approximately $6 million, $5 million and $3 million, respectively, are specifically identifiable to the Company's employees, and $10 million, $11 million and $10 million, respectively, are attributable to shared employees not specifically identifiable to the Company.

96

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

**Note 21. Commitments and Contingencies**

*Environmental Matters*

The Company is subject to various federal, state, local and foreign government requirements relating to the protection of the environment. It believes that, as a general matter, its policies, practices and procedures are properly designed to prevent unreasonable risk of environmental damage and personal injury and that its handling, manufacture, use and disposal of hazardous substances are in accordance with environmental and safety laws and regulations. The Company has incurred remedial response and voluntary cleanup costs for site contamination and are a party to lawsuits and claims associated with environmental and safety matters, including products containing hazardous substances. Additional lawsuits, claims and costs involving environmental matters are likely to continue to arise in the future.

With respect to environmental matters involving site contamination, the Company continually conducts studies, individually or jointly with other potentially responsible parties, to determine the feasibility of various remedial techniques. It is its policy to record appropriate liabilities for environmental matters when remedial efforts or damage claim payments are probable and the costs can be reasonably estimated. Such liabilities are based on the best estimate of the undiscounted future costs required to complete the remedial work. The recorded liabilities are adjusted periodically as remediation efforts progress or as additional technical, regulatory or legal information becomes available. Given the uncertainties regarding the status of laws, regulations, enforcement policies, the impact of other potentially responsible parties, technology and information related to individual sites, the Company does not believe it is possible to develop an estimate of the range of reasonably possible environmental loss in excess of our recorded liabilities. The Company expects to fund expenditures for these matters from operating cash flow. The timing of cash expenditures depends on a number of factors, including the timing of remedial investigations and feasibility studies, the timing of litigation and settlements of remediation liability, personal injury and property damage claims, regulatory approval of cleanup projects, remedial techniques to be utilized and agreements with other parties.

The Company accrues costs related to environmental matters when it is probable that it has incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental-related expenses are presented within Cost of goods sold for operating sites and Other expense, net for non-operating sites in the Combined Statements of Operations.

The following table summarizes information concerning the recorded liabilities for environmental costs. On October 29, 2018, upon the consummation of the Spin-Off, certain environmental liabilities became subject to the Honeywell Reimbursement Agreement and were reclassified to Obligations payable to Honeywell. For additional information, see Honeywell Reimbursement Agreement below.

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| Beginning of year | $ | 537 | $ | 453 | $ | 474 |
| Accruals for environmental matters deemed probable and reasonably estimable | | 340 | | 282 | | 190 |
| Environmental liability payments | | (179) | | (198) | | (211) |
| Less: Change due to the Honeywell Reimbursement Agreement Payments | | (86) | | - | | - |
| Less: Liabilities subject to the Honeywell Reimbursement Agreement Payments | | (592) | | - | | - |
| End of year | $ | 20 | $ | 537 | $ | 453 |

97

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The $86 million change due to the Honeywell Reimbursement Agreement represents a reduction in the estimated liability driven by the terms of Honeywell Reimbursement Agreement at October 29, 2018. Pursuant to the Honeywell Reimbursement Agreement, the Company is responsible to indemnify Honeywell in amounts equal to 90% of the environmental-liability payments of certain sites, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. Prior to the Spin-Off our estimated liability for resolution of the same pending and future environmental-related liabilities was calculated as if it was responsible for 100% of the environmental-liability payments. In addition, prior to Spin-Off, these costs were calculated on the gross basis, excluding any insurance receipts or proceeds received by Honeywell.

Environmental liabilities are included in the following balance sheet accounts:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2018** | | **2017** | |
| Accrued liabilities | $ | 2 | $ | 204 |
| Other liabilities | | 18 | | 333 |
| | $ | 20 | $ | 537 |

The Company does not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our combined results of operations and operating cash flows in the periods recognized or paid.

*Honeywell Reimbursement Agreement*

On October 29, 2018, in connection with the Spin-Off, the Company entered into the Honeywell Reimbursement Agreement with Honeywell pursuant to which the Company has an obligation to make cash payments to Honeywell in amounts equal to 90% of payments for certain Honeywell environmental-liability payments, which include amounts billed ("payments"), less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales (the "recoveries"). The amount payable by the Company in respect of such liabilities arising in respect of any given year will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). The scope of the Company's current environmental remediation obligations subject to the Honeywell Reimbursement Agreement relates to approximately 230 sites or groups of sites that are undergoing environmental remediation under U.S. federal or state law and agency oversight for contamination associated with Honeywell legacy business operations. The ongoing environmental remediation is designed to address contaminants at upland and sediment sites, which include, among others, metals, organic compounds and polychlorinated biphenyls, through a variety of methods, which include, among others, excavation, capping, in-situ stabilization, groundwater treatment and dredging. In addition, the company obligations subject to the Honeywell Reimbursement Agreement will include certain liability with respect to (i) hazardous exposure or toxic tort claims associated with the specified sites that arise after the Spin-Off, if any, (ii) currently unidentified releases of hazardous substances at or associated with the specified sites, (iii) other environmental claims associated with the specified sites and (iv) consequential damages.

Payments in respect of the liabilities arising in a given year will be made quarterly throughout such year on the basis of an estimate of the liabilities and recoveries provided by Honeywell. Following the end of any such year, Honeywell will provide the company with a calculation of the amount of payments and the recoveries actually received.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

Payment amounts under the Honeywell Reimbursement Agreement will be deferred to the extent that a specified event of default has occurred and is continuing under certain indebtedness, including under the Company's principal credit agreement, or the payment thereof causes the Company to not be compliant with certain financial covenants in certain indebtedness, including the Company's principal credit agreement on a pro forma basis, including the maximum total leverage ratio (ratio of consolidated debt to consolidated EBITDA, which excludes any amounts owed to Honeywell under the Honeywell Reimbursement Agreement), and the minimum interest coverage ratio. A 5% late payment fee will accrue on all amounts that are not otherwise entitled to be deferred under the terms of the Honeywell Reimbursement Agreement, without prejudice to any other rights that Honeywell may have for late payments.

The obligation will continue until the earlier of: (1) December 31, 2043; or (2) December 31 of the third consecutive year during which the annual reimbursement obligation (including in respect of deferred payment amounts) has been less than $25 million.

The following table summarizes information concerning our Honeywell Reimbursement Agreement liabilities:

|  | Year Ended December 31, 2018 |
|---|---|
| Beginning of year | $ - |
| Liabilities subject to the Honeywell Reimbursement Agreement Payments | 592 |
| Accruals for indemnification liabilities deemed probable and reasonably estimable | 49 |
| Indemnification payment | (25) |
| End of year | $ 616 |

Honeywell Reimbursement Agreement liabilities are included in the following balance sheet accounts:

|  | Year Ended December 31, 2018 |
|---|---|
| Accrued liabilities | $ 140 |
| Obligations payable to Honeywell | 476 |
|  | $ 616 |

The Company does not currently possess sufficient information to reasonably estimate the amounts of indemnification liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our combined results of operations and operating cash flows in the periods recognized or paid.

Independent of the company's payments under the Honeywell Reimbursement Agreement, the company will have ongoing liability for certain environmental claims which are part of the Company's going forward business.

*Tax Matters Agreement*

On October 29, 2018, in connection with the Spin-Off, the Company entered into a Tax Matters Agreement (the "Tax Matters Agreement") with Honeywell pursuant to which it is responsible and will indemnify Honeywell for all taxes, including income taxes, sales taxes, VAT and payroll taxes, relating to our business for all periods, including periods prior to the consummation of the Spin-Off. In addition, the Tax Matters Agreement addresses the allocation of liability for taxes that are incurred as a result of restructuring activities undertaken to effectuate the Spin-Off.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

In addition, the Tax Matters Agreement provides that the Company is required to indemnify Honeywell for any taxes (and reasonable expenses) resulting from the failure of the Spin-Off and related internal transactions to qualify for their intended tax treatment under U.S. federal, state and local income tax law, as well as foreign tax law, where such taxes result from (a) breaches of covenants and representations it makes and agrees to in connection with the Spin-Off, (b) the application of certain provisions of U.S. federal income tax law to these transactions or (c) any other action or omission (other than actions expressly required or permitted by the Separation and Distribution Agreement, the Tax Matters Agreement or other ancillary agreements) the Company takes after the consummation of the Spin-Off that gives rise to these taxes. As of December 31, 2018, the Company has indemnified Honeywell for $153 million, which is included in Obligations payable to Honeywell.

The Tax Matters Agreement imposes certain restrictions on us and our subsidiaries (including restrictions on share issuances, redemptions or repurchases, business combinations, sales of assets and similar transactions) that are designed to address compliance with Section 355 of the Internal Revenue Code of 1986, as amended, and are intended to preserve the tax-free nature of the Spin-Off. Under the Tax Matters Agreement, these restrictions will apply for two years following the consummation of the Spin-Off, unless Honeywell gives its consent for us to take a restricted action, which it is permitted to grant or withhold at its sole discretion. Even if Honeywell does consent to our taking an otherwise restricted action, the Company will remain liable to indemnify Honeywell in the event such restricted action gives rise to an otherwise indemnifiable liability. These restrictions may limit the Company's ability to pursue strategic transactions or engage in new businesses or other transactions that may maximize the value of its business, and might discourage or delay a strategic transaction that stockholders may consider favorable.

*Trademark Agreements*

The Company and Honeywell entered into a 40-year Trademark License Agreement ("the Trademark Agreement") that authorizes the Company's use of certain license trademarks in the operation of Resideo's business for the advertising, sale and distribution of certain licensed products. In exchange, the Company will pay a royalty fee of 1.5% on net revenue to Honeywell related to such licensed products which is recorded in Selling, general and administrative expense on the Consolidated and Combined Statements of Operations. For the period ended December 31, 2018, royalty fees were $4 million, net of a one-time credit of $2 million received for inventory on hand as of the Spin-Off.

*Other Matters*

The Company is subject to other lawsuits, investigations and disputes arising out of the conduct of its business, including matters relating to commercial transactions, government contracts, product liability, prior acquisitions and divestitures, employee benefit plans, intellectual property, and environmental, health and safety matters. The Company recognizes a liability for any contingency that is probable of occurrence and reasonably estimable. The Company continually assesses the likelihood of adverse judgments of outcomes in these matters, as well as potential ranges of possible losses (taking into consideration any insurance recoveries), based on a careful analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts. To date, no such matters are material to the Consolidated and Combined Statements of Operations.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

*Warranties and Guarantees*

In the normal course of business the Company issues product warranties and product performance guarantees. It accrues for the estimated cost of product warranties and performance guarantees based on contract terms and historical experience at the time of sale. Adjustments to initial obligations for warranties and guarantees are made as changes to the obligations become reasonably estimable. Product warranties and product performance guarantees are included in Accrued liabilities. The following table summarizes information concerning recorded obligations for product warranties and product performance guarantees.

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| Beginning of year | $ 17 | $ 24 | $ 27 |
| Accruals for warranties/guarantees issued during the year | 17 | 10 | 7 |
| Adjustment of pre-existing warranties/guarantees | (1) | (4) | - |
| Settlement of warranty/guarantee claims | (7) | (13) | (10) |
| End of year | $ 26 | $ 17 | $ 24 |

**Note 22. Pension**

Prior to the Spin-Off, certain of Resideo's employees participated in multiple U.S. and non-U.S. defined benefit pension plans (the "Shared Plans") sponsored by Honeywell which includes participants of other Honeywell subsidiaries and operations. The Company accounted for participation in the Shared Plans as a multiemployer benefit plan. Accordingly, it did not record an asset or liability to recognize the funded status of the Shared Plans. The related pension expense was allocated based on annual service cost of active participants and reported within Costs of goods sold and Selling, general and administrative expenses in the Consolidated and Combined Statements of Operations. The pension expense related to participation in the Shared Plan for the period from January 1, 2018 until October 29, 2018 and years ended December 31, 2017 and 2016 was $11 million, $16 million and $16 million, respectively.

As of the date of separation from Honeywell, these employees' and certain former Honeywell employees' entitlement to benefits in Honeywell's plans were transferred to Resideo sponsored plans.

The Resideo defined benefit pension plans have substantially similar benefit formulas as the Honeywell defined benefit pension plans. Moreover, vesting service, benefit accrual service and compensation credited under the Honeywell defined benefit pension plans apply to the determination of pension benefits under the Resideo defined benefit pension plan.

The Company sponsors multiple funded and unfunded U.S. and non-U.S. defined benefit pension plans. Pension benefits for many of its U.S. employees are provided through non-contributory, qualified and non-qualified defined benefit plans. It also sponsors defined benefit pension plans which cover non-U.S. employees who are not U.S. citizens, in certain jurisdictions, principally Germany, Austria, Belgium and Switzerland.

101

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The following tables summarize the balance sheet impact, including the benefit obligations, assets and funded status associated with the significant pension plans.

| | Pension Benefits | | | |
|---|---|---|---|---|
| | U.S. Plans | | Non-U.S. Plans | |
| Change in benefit obligation: | | | | |
| Benefit obligation at October 29, 2018 (Spin-Off) | $ | 279 | $ | 95 |
| Service cost | | 1 | | 1 |
| Interest cost | | 2 | | - |
| Actuarial (gains) losses | | 5 | | (3) |
| Benefits paid | | (1) | | - |
| Foreign currency translation | | - | | - |
| Benefit obligation at December 31, 2018 | $ | 286 | $ | 93 |
| Change in plan assets: | | | | |
| Fair value of plan assets at October 29, 2018 (Spin-Off) | $ | 279 | $ | 20 |
| Actual loss on plan assets | | (4) | | - |
| Company contributions | | - | | - |
| Benefits paid | | (1) | | - |
| Foreign currency translation | | - | | - |
| Fair value of plan assets at December 31, 2018 | | 274 | | 20 |
| Funded status of plans | $ | (12) | $ | (73) |
| Amounts recognized in the Balance Sheet consist of: | | | | |
| Accrued pension liabilities - noncurrent (1) | $ | (12) | $ | (73) |
| Net amount recognized | $ | (12) | $ | (73) |

(1) Included in Pension obligations

Amounts recognized in Accumulated other comprehensive (income) loss associated with significant pension plans at December 31, 2018 are as follows:

| | Pension Benefits | | | |
|---|---|---|---|---|
| | U.S. Plans | | Non-U.S. Plans | |
| Prior service credit | $ | (4) | $ | - |
| Net actuarial loss | | 16 | | 5 |
| Net amount recognized | $ | 12 | $ | 5 |

102

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The components of net periodic benefit cost and other amounts recognized in Comprehensive (income) loss for significant pension plan include the following components:

| | Pension Benefits | | | | | |
| | U.S. Plans | | | Non-U.S. Plans | | |
| | 2018 | 2017 | 2016 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|---|
| **Net Periodic Benefit Cost** | | | | | | |
| Service cost | $ 1 | $ - | $ - | $ 1 | $ - | $ - |
| Interest cost | 2 | - | - | - | - | - |
| Expected return on plan assets | (3) | - | - | - | - | - |
| Amortization of prior service (credit) cost | - | - | - | - | - | - |
| Actuarial losses | - | - | - | - | - | - |
| Net periodic benefit cost | $ - | $ - | $ - | $ 1 | $ - | $ - |

The components of net periodic benefit cost other than the service cost are included in Other expense, Net in the Consolidated and Combined Statements of Operations for the years ended December 31, 2018, 2017 and 2016, respectively.

| | Pension Benefits | | | | | |
| | U.S. Plans | | | Non-U.S. Plans | | |
| | 2018 | 2017 | 2016 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|---|
| **Other Changes in Plan Assets and Benefits Obligations Recognized in Other Comprehensive (Income) Loss** | | | | | | |
| Actuarial losses (gains) | $ 12 | $ - | $ - | $ (3) | $ - | $ - |
| Prior service (credit) | - | - | - | - | - | - |
| Foreign currency translation | - | - | - | - | - | - |
| Total recognized in other comprehensive loss (income) | $ 12 | $ - | $ - | $ (3) | $ - | $ - |
| Total recognized in net periodic benefit cost and other comprehensive income (loss) | $ 12 | $ - | $ - | $ (2) | $ - | $ - |

The estimated prior service (credit) for pension benefits that will be amortized from Accumulated other comprehensive (income) loss into net periodic benefit (income) cost in 2019 are expected to be $(1) million and $- million for U.S. and non-U.S. pension plans.

103

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

Significant actuarial assumptions used in determining the benefit obligations and net periodic benefit (income) cost for benefit plans are presented in the following table as weighted averages.

| | Pension Benefits | |
| --- | --- | --- |
| | 2018 | |
| | U.S. Plans | Non-U.S. Plans |
| Actuarial assumptions used to determine benefit obligations as of December 31: | | |
| Discount rate | 4.5% | 1.9% |
| Expected annual rate of compensation increase | 3.4% | 2.3% |
| Actuarial assumptions used to determine net periodic benefit (income) cost for the two months ended December 31: | | |
| Discount rate - benefit obligation | 4.5% | 1.9% |
| Expected rate of return on plan assets | 5.7% | 3.3% |
| Expected annual rate of compensation increase | 3.4% | 2.3% |

The discount rate for the U.S. pension plan reflects the current rate at which the associated liabilities could be settled at the measurement date of December 31. To determine discount rates for the U.S. pension plan, the Company uses a modeling process that involves matching the expected cash outflows of its benefit plans to a yield curve constructed from a portfolio of high quality, fixed-income debt instruments. The Company uses the single weighted-average yield of this hypothetical portfolio as a discount rate benchmark.

The expected rate of return on U.S. plan assets of 5.7% is a long-term rate based on historical plan asset returns over varying long-term periods combined with current market conditions and broad asset mix considerations. The Company reviews the expected rate of return on an annual basis and revise it as appropriate.

For non-U.S. benefit plans actuarial assumptions reflect economic and market factors relevant to each country.

Pension Benefits

The following amounts relate to significant pension plans with accumulated benefit obligations exceeding the fair value of plan assets.

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | U.S. Plans | | Non-U.S. Plans | |
| Projected benefit obligation | $ | 286 | $ | 93 |
| Accumulated benefit obligation | $ | 281 | $ | 80 |
| Fair value of plan assets | $ | 274 | $ | 20 |

The Company has retained Aon as its Outsourced Chief Investment Officer; however, the Company has appointed an internal fiduciary committee that monitors adherence to the investment guidelines Aon will follow.

The Company employs an investment approach whereby a mix of equities and fixed income investments are used to maximize the long-term return of plan assets for a prudent level of risk. Risk tolerance is established through careful consideration of plan liabilities and plan funded status. The investment portfolio contains a diversified blend of equity and fixed income investments. Furthermore, equity investments are diversified across U.S. and non-U.S. stocks, as well as growth, value and small and large capitalizations. Other assets such as real estate and hedge funds, may be used to improve portfolio diversification.

104

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The non-U.S. investment policies are different for each country as local regulations, funding requirements, and financial and tax considerations are part of the funding and investment allocation process in each country.

The fair values of both U.S. and non-U.S. pension plans assets by asset category are as follows:

| | U.S. Plans | | | |
|---|---|---|---|---|
| | December 31, 2018 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
| Equities: | | | | |
| U.S. equities | $ 45 | $ 45 | $ - | $ - |
| Non-U.S. equities | 48 | 48 | - | - |
| Real estate investment funds | 26 | 26 | - | - |
| Fixed Income: | | | | |
| Short term investments | 12 | 12 | - | - |
| Corporate bonds | 143 | 143 | - | - |
| Total assets at fair value | $ 274 | $ 274 | $ - | $ - |

| | Non-U.S. Plans | | | |
|---|---|---|---|---|
| | December 31, 2018 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
| Equities: | | | | |
| U.S. equities | $ 1 | $ 1 | $ - | $ - |
| Non-U.S. equities | 3 | 3 | - | - |
| Real estate investment funds | 2 | 2 | - | - |
| Fixed Income: | | | | |
| Short term investments | 4 | 4 | - | - |
| Government securities | 1 | 1 | - | - |
| Corporate bonds | 2 | 2 | - | - |
| Insurance contracts | 6 | - | - | 6 |
| Direct investments: | | | | |
| Other | 1 | 1 | - | - |
| Total assets at fair value | $ 20 | $ 14 | $ - | $ 6 |

The following table summarizes changes in the fair value of Level 3 assets for both U.S. and Non-U.S. plans:

| | U.S. Plans | Non-U.S. Plans |
|---|---|---|
| Balance at October 29, 2018 | $ - | $ 5 |
| Actual return on plan assets: | | |
| Relating to assets still held at year-end | - | 1 |
| Relating to assets sold during the year | - | - |
| Purchases, sales and settlements, net | - | - |
| Balance at December 31, 2018 | $ - | $ 6 |

105

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

Common stocks, preferred stocks, real estate investment trusts, and short-term investments are valued at the closing price reported in the active market in which the individual securities are traded. Corporate bonds, mortgages, asset-backed securities, and government securities are valued either by using pricing models, bids provided by brokers or dealers, quoted prices of securities with similar characteristics or discounted cash flows and as such include adjustments for certain risks that may not be observable such as credit and liquidity risks. Certain securities are held in collective trust funds which are valued using net asset values provided by the administrators of the funds. Investments in private equity, debt, real estate funds and direct investments are valued at estimated fair value based on quarterly financial information received from the investment advisor and/or general partner. Valuation estimates are periodically supplemented by third party appraisals.

The Company's general funding policy for qualified defined benefit pension plans is to contribute amounts at least sufficient to satisfy regulatory funding standards. In 2018, it was not required to make contributions to the U.S. pension plans and no contributions were made. It will not be required to make any contributions to the U.S. pension plans in 2019. In 2018, contributions of less than $1 million were made to the non-U.S. pension plans to satisfy regulatory funding requirements. In 2019, the Company expects to make contributions of cash and/or marketable securities of approximately $1 million to the non-U.S. pension plans to satisfy regulatory funding standards. Contributions for both the U.S. and non-U.S. pension plans do not reflect benefits paid directly from Company assets.

Benefit payments, including amounts to be paid from Company assets, and reflecting expected future service, as appropriate, are expected to be paid as follows:

|  | U.S. Plans | | Non-U.S. Plans | |
|---|---|---|---|---|
| 2019 | $ | 13 | $ | 1 |
| 2020 | $ | 17 | $ | 1 |
| 2021 | $ | 18 | $ | 2 |
| 2022 | $ | 18 | $ | 2 |
| 2023 | $ | 20 | $ | 2 |
| 2024-2028 | $ | 106 | $ | 13 |

**Note 23. Segment Financial Data**

The Company globally manages its business operations through two reportable operating segments, Products and Solutions and Global Distribution:

**Products and Solutions**—The Products and Solutions business is a leading global provider of residential security and intrusion products, consumer thermostats, consumer HVAC and consumer awareness systems, residential thermal solutions and residential water controls that allow owners of homes to stay connected and in control of their comfort, security and energy use.

**Global Distribution**—The Global Distribution business is a leading global distributor of security and low voltage fire protection products. Segment information is consistent with how management reviews the businesses, makes investing and resource allocation decisions and assesses operating performance.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The Company's CODM evaluates segment performance based on segment profit. Segment profit is measured as segment income (loss) before taxes excluding other expense, net (primarily environmental cost now subject to the Honeywell Reimbursement Agreement), interest expense, pension expense, environmental expense related to Resideo's owned sites and repositioning charges.

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Revenue | | | | | | |
| Total Products and Solutions revenue | $ | 2,474 | $ | 2,379 | $ | 2,471 |
| Less: Intersegment revenue | | 305 | | 337 | | 371 |
| External Products and Solutions revenue | | 2,169 | | 2,042 | | 2,100 |
| External Global Distribution revenue | | 2,658 | | 2,477 | | 2,355 |
| Total revenue | $ | 4,827 | $ | 4,519 | $ | 4,455 |

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Depreciation and amortization | | | | | | |
| Products and Solutions | $ | 55 | $ | 57 | $ | 53 |
| Global Distribution | | 11 | | 10 | | 11 |
| Total | $ | 66 | $ | 67 | $ | 64 |

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Segment profit | | | | | | |
| Products and Solutions | $ | 381 | $ | 353 | $ | 426 |
| Global Distribution | | 148 | | 131 | | 104 |
| Total | $ | 529 | $ | 484 | $ | 530 |

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Capital expenditures | | | | | | |
| Products and Solutions | $ | 73 | $ | 44 | $ | 60 |
| Global Distribution | | 8 | | 7 | | 11 |
| Total | $ | 81 | $ | 51 | $ | 71 |

A reconciliation of segment profit to consolidated and combined income from continuing operations before taxes is as follows:

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Segment profit | $ | 529 | $ | 484 | $ | 530 |
| Pension expense | | (13) | | (16) | | (16) |
| Repositioning | | (5) | | (23) | | (19) |
| Other expense, net (1) | | (369) | | (279) | | (185) |
| Interest expense | | (20) | | - | | - |
| Environmental expense | | (18) | | - | | - |
| Income before taxes | $ | 104 | $ | 166 | $ | 310 |

(1)   Includes $2 million of pension expense for the year ended December 31, 2018.

107

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

The Company's CODM does not use segment assets information to allocate resources or to assess performance of the segments and therefore, total segment assets have not been disclosed.

**Note 24. Geographic Areas—Financial**

| | Net Revenue (1) Years Ended December 31, | | | Long-lived Assets (2) December 31, | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2018 | 2017 | 2016 |
| United States | $ 3,289 | $ 3,074 | $ 3,047 | $ 184 | $ 162 | $ 163 |
| Europe | 1,138 | 1,063 | 1,051 | 91 | 82 | 70 |
| Other International | 400 | 382 | 357 | 25 | 21 | 28 |
| | $ 4,827 | $ 4,519 | $ 4,455 | $ 300 | $ 265 | $ 261 |

(1) Revenue between geographic areas approximate market and are not significant. Net revenue are classified according to their country of origin. Included in United States net revenue are export sales of $31 million, $29 million and $43 million in 2018, 2017 and 2016, respectively.
(2) Long-lived assets are comprised of property, plant and equipment—net.

**Note 25. Unaudited Quarterly Financial Information**

The following tables show selected unaudited quarterly results of operations for 2018 and 2017. The quarterly data have been prepared on the same basis as the audited annual financial statements and include all adjustments, which include only normal recurring adjustments, necessary for the fair statement of the results of operations for these periods.

| | 2018 | | | | |
|---|---|---|---|---|---|
| | March 31 | June 30 | September 30 (b) (c) | December 31 | Year Ended December 31, |
| Net Revenue | $ 1,165 | $ 1,196 | $ 1,200 | $ 1,266 | $ 4,827 |
| Gross Profit | 343 | 346 | 347 | 330 | 1,366 |
| Net Income | 45 | 33 | 311 | 16 | 405 |
| Earnings per share -basic (a) | 0.37 | 0.27 | 2.54 | 0.13 | 3.31 |
| Earnings per share - diluted (a) | 0.37 | 0.27 | 2.54 | 0.13 | 3.30 |

| | 2017 | | | | |
|---|---|---|---|---|---|
| | March 31 | June 30 | September 30 (b) | December 31 (c) | Year Ended December 31, |
| Net Revenue | $ 1,062 | $ 1,096 | $ 1,152 | $ 1,209 | $ 4,519 |
| Gross Profit | 311 | 308 | 336 | 361 | 1,316 |
| Net Income (Loss) | 16 | 16 | 23 | (449) | (394) |
| Earnings (loss) per share - basic (a) | 0.13 | 0.13 | 0.19 | (3.67) | (3.22) |
| Earnings (loss) per share - diluted (a) | 0.13 | 0.13 | 0.19 | (3.67) | (3.22) |

(a) On October 29, 2018, the date of the Spin-Off, 122,498,794 shares of the Company's Common Stock were distributed to Honeywell stockholders of record as of October 16, 2018. Basic and Diluted EPS for all periods prior to Spin-Off reflect the number of distributed shares, or 122,498,794 shares.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**

(b)  Basic and diluted EPS for the three months ended September 30, 2018 and September 30, 2017 has been revised from the third quarter 10-Q to correctly reflect the exclusion of 467,764 treasury shares received by Resideo as part of the Spin-Off. This increased earnings per share by $0.01 and $0.02 for the three and nine months ended September 30, 2018, respectively, and had no impact on earnings per share for the three and nine months ended September 30, 2017.

109

**Item 9.**          **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not Applicable.

**Item 9A.**          **Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

We maintain a system of disclosure controls and procedures designed to give reasonable assurance that information required to be disclosed in the Company's reports filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to management to allow timely decisions regarding required disclosures.

Management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives. Because there are inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud have been or will be detected.

Our Chief Executive Officer and Chief Financial Officer, with the assistance of other members of our management, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based upon such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable assurance level as of the end of the period covered by this Annual Report on Form 10-K.

*Management's Report on Internal Control over Financial Reporting*

This Form 10-K does not include a report of management's assessment regarding internal control over financial reporting or an attestation report of the Company's registered public accounting firm due to a transition period established by rules of the SEC for newly public companies.

*Changes in Internal Control Over Financial Reporting*

During the fourth quarter of 2018, under the supervision and with the participation of our management, including our principal executive officers and principal financial officer, management planned and prepared for new controls implemented over new material agreements and new Company entity level controls, to support our financial reporting requirements and internal control over financial reporting. Management has not identified any other changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**          **Other Information**

None.

**PART III.**

**Item 10.        Directors and Executive Officers of the Registrant**

The information required by this item will be included in our Proxy Statement to be filed pursuant to Regulation 14A within 120 days after our year ended December 31, 2018 in connection with our 2019 Annual Meeting of Stockholders, or the 2019 Proxy Statement, and is incorporated herein by reference.

**Item 11.        Executive Compensation**

Information relating to executive compensation is contained in the Proxy Statement referred to above in Item 10. Directors and Executive Officers of the Registrant, and such information is incorporated herein by reference.

**Item 12.        Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Information relating to certain beneficial ownership of certain stockholders and management, as well as certain other information required by this Item 12, will be contained in the Proxy Statement referred to above in Item 10. Directors and Executive Officers of the Registrant, and such information is incorporated herein by reference.

**Equity Compensation Plans**

As of December 31, 2018, information about our equity compensation plans is as follows:

| Plan Category | Number of Shares to be Issued Upon Exercises of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column) (c) |
|---|---|---|---|
| Equity compensation plan approved by security holders | 3,217,508 | - | 12,782,492 |
| Equity compensation plan not approved by security holders | - | - | - |
| Total | 3,217,508 | - | 12,782,492 |

(1)  Equity compensation plans approved by stockholders in column (a) of the table includes the 2018 Stock Incentive Plan for Resideo Technologies, Inc. and its Affiliates as well as the 2018 Stock Plan For Non-Employee Directors of Resideo Technologies, Inc. RSUs included in column (a) of the table represent the full number of RSUs awarded or converted from Honeywell awards at spin-off of Resideo and outstanding whereas the number of shares of Common Stock to be issued upon vesting will be lower than what is reflected on the table because the value of shares required to meet employee tax withholding requirements are not issued.

(2)  No stock options were outstanding at December 31, 2018 and there is no exercise price for full value awards that were outstanding.

**Item 13.        Certain Relationships and Related Transactions and Director Independence**

Information relating to certain relationships and related transactions, as required by this Item 13, will be contained in the Proxy Statement referred to above in Item 10. Directors and Executive Officers of the Registrant, and such information is incorporated herein by reference.

111

**Item 14.         Principal Accounting Fees and Services**

Information relating to fees paid to and services performed by Deloitte & Touche LLP and our Audit Committee's pre-approval policies and procedures with respect to non-audit services are contained in the Proxy Statement referred to above in Item 10. Directors and Executive Officers of the Registrant, and such information is incorporated herein by reference.

112

**PART IV.**

**Item 15.        Exhibits, Financial Statement Schedules**

(a)(1) **Financial Statements**

The consolidated and combined financial statements and related notes, together with the report of Deloitte & Touche LLP, Independent Registered Public Accounting Firm, appear in Part II Item 8. *Financial Statements and Supplementary Data* of this Form 10-K.

(a)(2) **Financial Statements Schedules**

All schedules have been omitted because they are not required or because the required information is given in the Consolidated and Combined Financial Statements or Notes thereto.

(a)(3) **Exhibits**

The Exhibits listed below on the Exhibit Index are filed or incorporated by reference as part of this Form 10-K.

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Description |
| --- | --- |
| 2.1 | Indemnification and Reimbursement Agreement, dated October 14, 2018, between New HAPI Inc. and Honeywell International Inc.* (incorporated by reference to Exhibit 2.1 to Resideo's Form 8-K filed on October 15, 2018, File No. 001-38635) |
| 2.2 | Separation and Distribution Agreement, dated October 19, 2018, between Honeywell International Inc. and Resideo Technologies, Inc.* (incorporated by reference to Exhibit 2.1 to Resideo's Form 8-K filed on October 19, 2018, File No. 001-38635) |
| 2.3 | Transition Services Agreement, dated October 19, 2018, between Honeywell International Inc. and Ademco Inc., a subsidiary of Resideo Technologies, Inc.* (incorporated by reference to Exhibit 2.2 to Resideo's Form 8-K filed on October 19, 2018, File No. 001-38635) |
| 2.4 | Tax Matters Agreement, dated October 19, 2018, between Honeywell International Inc. and Resideo Technologies, Inc.* (incorporated by reference to Exhibit 2.3 to Resideo's Form 8-K filed on October 19, 2018, File No. 001-38635) |
| 2.5 | Employee Matters Agreement, dated October 19, 2018, between Honeywell International Inc. and Resideo Technologies, Inc.* (incorporated by reference to Exhibit 2.4 to Resideo's Form 8-K filed on October 19, 2018, File No. 001-38635) |
| 2.6 | Patent Cross-License Agreement, dated October 19, 2018, between Honeywell International Inc. and Resideo Technologies, Inc.* (incorporated by reference to Exhibit 2.5 to Resideo's Form 8-K filed on October 19, 2018, File No. 001-38635) |
| 2.7 | Trademark License Agreement, dated October 19, 2018, between Honeywell International Inc. and Resideo Technologies, Inc.* (incorporated by reference to Exhibit 2.6 to Resideo's Form 8-K filed on October 19, 2018, File No. 001-38635) |

113

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Resideo Technologies, Inc. (incorporated by reference to Exhibit 3.1 to Resideo's Form 8-K filed on October 29, 2018, File No. 001-38635) |
| 3.2 | Amended and Restated By-laws of Resideo Technologies, Inc. (incorporated by reference to Exhibit 3.2 to Resideo's Form 8-K filed on October 29, 2018, File No. 001-38635) |
| 4.1 | Indenture, dated as of October 19, 2018, among Resideo Funding Inc., Resideo Technologies, Inc., the other guarantors named therein, and Deutsche Bank Trust Company Americas, as trustee. (incorporated by reference to Exhibit 4.1 to Resideo's Form 8-K filed on October 19, 2018, File No. 001-38635) |
| 4.2 | Form of Resideo Technologies, Inc.'s 6.125% Notes due 2026 (included in Exhibit 4.1) |
| 10.01 | Offer Letter of Michael G. Nefkens (incorporated by reference to Exhibit 10.01 to Resideo's Form 10 filed on August 23, 2018, File No. 001-38635) |
| 10.02 | Offer Letter of Joseph D. Ragan III (incorporated by reference to Exhibit 10.02 to Resideo's Form 10 filed on August 23, 2018, File No. 001-38635) |
| 10.03 | Form of Internal Hire Offer Letter (incorporated by reference to Exhibit 10.03 to Resideo's Form 10 filed on August 23, 2018, File No. 001-38635) |
| 10.04 | Form of External Hire Offer Letter (incorporated by reference to Exhibit 10.04 to Resideo's Form 10 filed on August 23, 2018, File No. 001-38635) |
| 10.05 | Resideo Technologies Supplemental Savings Plan (filed herewith) |
| 10.06 | Resideo Technologies, Inc. Severance Plan for Designated Officers (filed herewith) |
| 10.07 | Resideo Technologies, Inc. Severance Plan For Designated Officers as amended on November 15, 2018 (filed herewith) |
| 10.08 | Credit Agreement, dated as of October 25, 2018, by and among Resideo Technologies, Inc. Resideo Holding Inc., Resideo Intermediate Holding Inc., Resideo Funding Inc., the Lenders and Issuing Banks party thereto, and JPMorgan Chase Bank, N.A., as administrative agent. (incorporated by reference to Exhibit 10.1 to Resideo's Form 8-K/A filed on October 29, 2018, File No. 001-38635) |
| 10.09 | 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates.‡ (incorporated by reference to Exhibit 4.3 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.10 | 2018 Stock Plan for Non-Employee Directors of Resideo Technologies, Inc.‡ (incorporated by reference to Exhibit 4.4 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.11 | 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Stock Option Award Agreement.‡ (incorporated by reference to Exhibit 4.5 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |

| Exhibit Number | Exhibit Description |
|---|---|
| 10.12 | 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Restricted Stock Unit Agreement.‡ (incorporated by reference to Exhibit 4.6 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.13 | 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Restricted Stock Unit Agreement (for replacement awards).‡ (incorporated by reference to Exhibit 4.7 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.14 | 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Performance Stock Unit Agreement.‡ (incorporated by reference to Exhibit 4.8 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.15 | 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Performance Unit Agreement.‡ (incorporated by reference to Exhibit 4.9 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.16 | 2018 Stock Plan for Non-Employee Directors of Resideo Technologies, Inc. Form of Stock Option Award Agreement.‡ (incorporated by reference to Exhibit 4.10 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.17 | 2018 Stock Plan for Non-Employee Directors of Resideo Technologies, Inc. Form of Restricted Stock Unit Agreement.‡ (incorporated by reference to Exhibit 4.11 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.18 | Resideo Technologies UK Sharebuilder Plan.‡ (incorporated by reference to Exhibit 4.12 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 10.19 | Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates. (filed herewith) |
| 10.20 | Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Stock Option Award Agreement. (filed herewith) |
| 10.21 | Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Restricted Stock Unit Agreement. (filed herewith) |
| 10.22 | Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Performance Stock Unit Agreement. (filed herewith) |
| 10.23 | Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates Form of Performance Unit Agreement. (filed herewith) |
| 10.24 | Resideo Supplemental Pension Plan (filed herewith) |
| 10.25 | Bonus Plan of Resideo Technologies, Inc. (incorporated by reference to Exhibit 10.1 to Resideo's Form 8-K filed on February 14, 2019, File No. 001-38635) |
| 21.1 | List of subsidiaries of the registrant (filed herewith) |
| 23.1 | Consent of Deloitte & Touche LLP, independent registered public accounting firm (filed herewith) |

| Exhibit Number | Exhibit Description |
|---|---|
| 24.1 | Powers of Attorney (incorporated by reference to Exhibit 24.1 to Resideo's Form S-8 filed on December 6, 2018, File No. 333-228687) |
| 31.1 | Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 31.2 | Certification of Principal Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 32.1 | Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 32.2 | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 101.INS | XBRL Instance Document (filed herewith) |
| 101.SCH | XBRL Taxonomy Extension Schema (filed herewith) |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase (filed herewith) |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase (filed herewith) |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase (filed herewith) |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase (filed herewith) |

\*      Certain schedules and similar attachments have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company hereby undertakes to furnish copies of any of the omitted schedules and similar attachments upon request by the U.S. Securities and Exchange Commission.

‡      Indicates management contracts or compensatory plans or arrangements.

**Item 16.**    **Form 10-K Summary**

The Company has elected not to include a Form 10-K summary under this Item 16.

116

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Company Name

Date: March 18, 2019

By:/s/ Joseph D. Ragan III

Joseph D. Ragan III
Executive Vice President and Chief Financial
Officer (on behalf of the Registrant and as the
Registrant's Principal Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this annual report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the date indicated:

| Name | Title | Date |
|---|---|---|
| /s/ Michael G. Nefkens | Chief Executive Officer (Principal Executive Officer) | March 18, 2019 |
| Michael G. Nefkens | | |
| /s/ Joseph D. Ragan III | Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) | March 18, 2019 |
| Joseph D. Ragan III | | |
| * | Chairman of the Board | March 18, 2019 |
| Roger B. Fradin | | |
| * | Director | March 18, 2019 |
| Niccolo Mcleod De Masi | | |
| * | Director | March 18, 2019 |
| Paul F. Deninger | | |
| * | Director | March 18, 2019 |
| Jack R. Lazar | | |
| * | Director | March 18, 2019 |
| Nina L. Richardson | | |
| * | Director | March 18, 2019 |
| Andrew C. Teich | | |
| * | Director | March 18, 2019 |
| Sharon Wienbar | | |

*By:       /s/ Joseph D. Ragan III
          (Joseph D. Ragan III, Attorney-in-Fact)

March 18, 2019

117

([Back To Top])

# Section 2: EX-10.05 (EX-10.05)

**Exhibit 10.05**

# Resideo Technologies Supplemental Savings Plan

October 29, 2018

IMPORTANT NOTE

This document has not been approved by the Department of Labor, Internal Revenue Service or any other governmental entity. An adopting Employer must determine whether the Plan is subject to the Federal securities laws and the securities laws of the various states. An adopting Employer may not rely on this document to ensure any particular tax consequences or to ensure that the Plan is "unfunded and maintained primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees" under Title I of the Employee Retirement Income Security Act of 1974, as amended, with respect to the Employer's particular situation. Fidelity Employer Services Company, its affiliates and employees cannot provide you with legal advice in connection with the execution of this document. This document should be reviewed by the Employer's attorney prior to execution.

March 2018

**TABLE OF CONTENTS**

**PREAMBLE**


**ARTICLE 1 – GENERAL**
**1.1**    Plan
**1.2**    Effective Dates
**1.3**    Amounts Not Subject to Code Section 409A


**ARTICLE 2 – DEFINITIONS**
**2.1**    Account
**2.2**    Administrator
**2.3**    Adoption Agreement
**2.4**    Beneficiary
**2.5**    Board or Board of Directors
**2.6**    Bonus
**2.7**    Change in Control
**2.8**    Code
**2.9**    Compensation
**2.10**   Director
**2.11**   Disability
**2.12**   Eligible Employee
**2.13**   Employer
**2.14**   ERISA
**2.15**   Identification Date
**2.16**   Key Employee
**2.17**   Participant
**2.18**   Plan
**2.19**   Plan Sponsor
**2.20**   Plan Year
**2.21**   Related Employer
**2.22**   Retirement
**2.23**   Separation from Service
**2.24**   Unforeseeable Emergency
**2.25**   Valuation Date
**2.26**   Years of Service


**ARTICLE 3 – PARTICIPATION**
**3.1**    Participation
**3.2**    Termination of Participation


**ARTICLE 4 – PARTICIPANT ELECTIONS**
**4.1**    Deferral Agreement

**4.2**     Amount of Deferral
**4.3**     Timing of Election to Defer
**4.4**     Election of Payment Schedule and Form of Payment

**ARTICLE 5 – EMPLOYER CONTRIBUTIONS**
**5.1**     Matching Contributions
**5.2**     Other Contributions

**ARTICLE 6 – ACCOUNTS AND CREDITS**
**6.1**     Establishment of Account
**6.2**     Credits to Account

**ARTICLE 7 – INVESTMENT OF CONTRIBUTIONS**
**7.1**     Investment Options
**7.2**     Adjustment of Accounts

**ARTICLE 8 – RIGHT TO BENEFITS**
**8.1**     Vesting
**8.2**     Death
**8.3**     Disability

**ARTICLE 9 – DISTRIBUTION OF BENEFITS**
**9.1**     Amount of Benefits
**9.2**     Method and Timing of Distributions
**9.3**     Unforeseeable Emergency
**9.4**     Payment Election Overrides
**9.5**     Cashouts of Amounts Not Exceeding Stated Limit
**9.6**     Required Delay in Payment to Key Employees
**9.7**     Change in Control
**9.8**     Permissible Delays in Payment
**9.9**     Permitted Acceleration of Payment

**ARTICLE 10 – AMENDMENT AND TERMINATION**
**10.1**    Amendment by Plan Sponsor
**10.2**    Plan Termination Following Change in Control or Corporate Dissolution
**10.3**    Other Plan Terminations

**ARTICLE 11 – THE TRUST**
**11.1**    Establishment of Trust
**11.2**    Rabbi Trust
**11.3**    Investment of Trust Funds

**ARTICLE 12 – PLAN ADMINISTRATION**

**12.1**    Powers and Responsibilities of the Administrator
**12.2**    Claims and Review Procedures
**12.3**    Plan Administrative Costs

**ARTICLE 13 – MISCELLANEOUS**

**13.1**    Unsecured General Creditor of the Employer
**13.2**    Employer's Liability
**13.3**    Limitation of Rights
**13.4**    Anti-Assignment
**13.5**    Facility of Payment
**13.6**    Notices
**13.7**    Tax Withholding
**13.8**    Indemnification
**13.9**    Successors
**13.10**    Disclaimer
**13.11**    Governing Law

iii

**PREAMBLE**

The Plan is intended to be a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" within the meaning of Sections 201(2), 301(a)(3) and 401(a)(1) of the Employee Retirement Income Security Act of 1974, as amended, or an "excess benefit plan" within the meaning of Section 3(36) of the Employee Retirement Income Security Act of 1974, as amended, or a combination of both. The Plan is further intended to conform with the requirements of Internal Revenue Code Section 409A and the final regulations issued thereunder and shall be interpreted, implemented and administered in a manner consistent therewith.

**ARTICLE 1 – GENERAL**

**1.1**   **Plan.** The Plan will be referred to by the name specified in the Adoption Agreement.

**1.2**   **Effective Dates.**

(a)   Original Effective Date. The Original Effective Date is the date as of which the Plan was initially adopted.

(b)   Amendment Effective Date. The Amendment Effective Date is the date specified in the Adoption Agreement as of which the Plan is amended and restated. Except to the extent otherwise provided herein or in the Adoption Agreement, the Plan shall apply to amounts deferred and benefit payments made on or after the Amendment Effective Date.

(c)   Special Effective Date. A Special Effective Date may apply to any given provision if so specified in Appendix A of the Adoption Agreement. A Special Effective Date will control over the Original Effective Date or Amendment Effective Date, whichever is applicable, with respect to such provision of the Plan.

**1.3**   **Amounts Not Subject to Code Section 409A**

Except as otherwise indicated by the Plan Sponsor in Section 1.01 of the Adoption Agreement, amounts deferred before January 1, 2005 that are earned and vested on December 31, 2004 will be separately accounted for and administered in accordance with the terms of the Plan as in effect on December 31, 2004.

1-1

## ARTICLE 2 – DEFINITIONS

Pronouns used in the Plan are in the masculine gender but include the feminine gender unless the context clearly indicates otherwise. Wherever used herein, the following terms have the meanings set forth below, unless a different meaning is clearly required by the context:

**2.1** **"Account"** means an account established for the purpose of recording amounts credited on behalf of a Participant and any income, expenses, gains, losses or distributions included thereon. The Account shall be a bookkeeping entry only and shall be utilized solely as a device for the measurement and determination of the amounts to be paid to a Participant or to the Participant's Beneficiary pursuant to the Plan.

**2.2** **"Administrator"** means the person or persons designated by the Plan Sponsor in Section 1.05 of the Adoption Agreement to be responsible for the administration of the Plan. If no Administrator is designated in the Adoption Agreement, the Administrator is the Plan Sponsor.

**2.3** **"Adoption Agreement"** means the agreement adopted by the Plan Sponsor that establishes the Plan.

**2.4** **"Beneficiary"** means the persons, trusts, estates or other entities entitled under Section 8.2 to receive benefits under the Plan upon the death of a Participant.

**2.5** **"Board" or "Board of Directors"** means the Board of Directors of the Plan Sponsor.

**2.6** **"Bonus"** means an amount of incentive remuneration payable by the Employer to a Participant.

**2.7** **"Change in Control"** means the occurrence of an event involving the Plan Sponsor that is described in Section 9.7.

**2.8** **"Code"** means the Internal Revenue Code of 1986, as amended.

**2.9** **"Compensation"** has the meaning specified in Section 3.01 of the Adoption Agreement.

**2.10** **"Director"** means a non-employee member of the Board who has been designated by the Employer as eligible to participate in the Plan.

**2.11** **"Disability"** means a determination that the Participant is eligible for benefits under the Employer's long-term disability plan provided, however, that a "Disability" for purposes of such payment shall not be deemed to have occurred unless the disability also satisfies the requirements of Treasury Regulation Section 1.409A-3.

**2.12**    **"Eligible Employee"** means an employee of the Employer who satisfies the requirements in Section 2.01 of the Adoption Agreement.

**2.13**    **"Employer"** means the Plan Sponsor and any other entity which is authorized by the Plan Sponsor to participate in and, in fact, does adopt the Plan.

**2.14**    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**2.15**    **"Identification Date"** means the date as of which Key Employees are determined which is specified in Section 1.06 of the Adoption Agreement.

**2.16**    **"Key Employee"** means an employee who satisfies the conditions set forth in Section 9.6.

**2.17**    **"Participant"** means an Eligible Employee or Director who commences participation in the Plan in accordance with Article 3.

**2.18**    **"Plan"** means the unfunded plan of deferred compensation set forth herein, including the Adoption Agreement and any trust agreement, as adopted by the Plan Sponsor and as amended from time to time.

**2.19**    **"Plan Sponsor"** means the entity identified in Section 1.03 of the Adoption Agreement or any successor by merger, consolidation or otherwise.

**2.20**    **"Plan Year"** means the period identified in Section 1.02 of the Adoption Agreement.

**2.21**    **"Related Employer"** means the Employer and (a) any corporation that is a member of a controlled group of corporations as defined in Code Section 414(b) that includes the Employer and (b) any trade or business that is under common control as defined in Code Section 414(c) that includes the Employer.

**2.22**    **"Retirement"** has the meaning specified in 6.01(f) of the Adoption Agreement.

**2.23**    **"Separation from Service"** means the date that the Participant dies, retires or otherwise has a termination of employment with respect to all entities comprising the Related Employer. A Separation from Service does not occur if the Participant is on military leave, sick leave or other bona fide leave of absence if the period of leave does not exceed six months or such longer period during which the Participant's right to re- employment is provided by statute or contract. If the period of leave exceeds six months and the Participant's right to re-employment is not provided either by statute or contract, a Separation from Service will be deemed to have occurred on the first day following the six-month period. If the period of leave is due to any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than six months, where the impairment causes the Participant to be unable to perform the duties of his or her position of employment or any substantially similar position of employment, a 29 month period of absence may be substituted for the six month period.

2-2

Whether a termination of employment has occurred is based on whether the facts and circumstances indicate that the Related Employer and the Participant reasonably anticipated that no further services would be performed after a certain date or that the level of bona fide services the Participant would perform after such date (whether as an employee or as an independent contractor) would permanently decrease to no more than 20 percent of the average level of bona fide services performed (whether as an employee or an independent contractor) over the immediately preceding 36 month period (or the full period of services to the Related Employer if the employee has been providing services to the Related Employer for less than 36 months).

An independent contractor is considered to have experienced a Separation from Service with the Related Employer upon the expiration of the contract (or, in the case of more than one contract, all contracts) under which services are performed for the Related Employer if the expiration constitutes a good-faith and complete termination of the contractual relationship.

If a Participant provides services as both an employee and an independent contractor of the Related Employer, the Participant must separate from service both as an employee and as an independent contractor to be treated as having incurred a Separation from Service. If a Participant ceases providing services as an independent contractor and begins providing services as an employee, or ceases providing services as an employee and begins providing services as an independent contractor, the Participant will not be considered to have experienced a Separation from Service until the Participant has ceased providing services in both capacities.

If a Participant provides services both as an employee and as a member of the board of directors of a corporate Related Employer (or an analogous position with respect to a noncorporate Related Employer), the services provided as a director are not taken into account in determining whether the Participant has incurred a Separation from Service as an employee for purposes of a nonqualified deferred compensation plan in which the Participant participates as an employee that is not aggregated under Code Section 409A with any plan in which the Participant participates as a director.

If a Participant provides services both as an employee and as a member of the board of directors of a corporate related Employer (or an analogous position with respect to a noncorporate Related Employer), the services provided as an employee are not taken into account in determining whether the Participant has experienced a Separation from Service as a director for purposes of a nonqualified deferred compensation plan in which the Participant participates as a director that is not aggregated under Code Section 409A with any plan in which the Participant participates as an employee.

2-3

All determinations of whether a Separation from Service has occurred will be made in a manner consistent with Code Section 409A and the final regulations thereunder.

**2.24**    **"Unforeseeable Emergency"** means a severe financial hardship of the Participant resulting from an illness or accident of the Participant, the Participant's spouse, the Participant's Beneficiary, or the Participant's dependent (as defined in Code Section 152, without regard to Code section 152(b)(1), (b)(2) and (d)(1)(B); loss of the Participant's property due to casualty; or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant.

**2.25**    **"Valuation Date"** means each business day of the Plan Year that the New York Stock Exchange is open.

**2.26**    **"Years of Service"** means each one year period for which the Participant receives service credit in accordance with the provisions of Section 7.01(d) of the Adoption Agreement.

2-4

**ARTICLE 3 – PARTICIPATION**

**3.1**   **Participation.** The Participants in the Plan shall be those Directors and employees of the Employer who satisfy the requirements of Section 2.01 of the Adoption Agreement.

**3.2**   **Termination of Participation.** The Administrator may terminate a Participant's participation in the Plan in a manner consistent with Code Section 409A. If the Employer terminates a Participant's participation before the Participant experiences a Separation from Service the Participant's vested Accounts shall be paid in accordance with the provisions of Article 9.

## ARTICLE 4 – PARTICIPANT ELECTIONS

**4.1**    **Deferral Agreement.** If permitted by the Plan Sponsor in accordance with Section 4.01 of the Adoption Agreement, each Eligible Employee and Director may elect to defer his Compensation within the meaning of Section 3.01 of the Adoption Agreement by executing in writing or electronically, a deferral agreement in accordance with rules and procedures established by the Administrator and the provisions of this Article 4.

A new deferral agreement must be timely executed for each Plan Year during which the Eligible Employee or Director desires to defer Compensation. An Eligible Employee or Director who does not timely execute a deferral agreement shall be deemed to have elected zero deferrals of Compensation for such Plan Year.

A deferral agreement may be changed or revoked during the period specified by the Administrator. Except as provided in Section 9.3 or in Section 4.01(c) of the Adoption Agreement, a deferral agreement becomes irrevocable at the close of the specified period.

**4.2**    **Amount of Deferral.** An Eligible Employee or Director may elect to defer Compensation in any amount permitted by Section 4.01(a) of the Adoption Agreement.

**4.3**    **Timing of Election to Defer.** Each Eligible Employee or Director who desires to defer Compensation otherwise payable during a Plan Year must execute a deferral agreement within the period preceding the Plan Year specified by the Administrator. Each Eligible Employee who desires to defer Compensation that is a Bonus must execute a deferral agreement within the period preceding the Plan Year during which the Bonus is earned that is specified by the Administrator, except that if the Bonus can be treated as performance based compensation as described in Code Section 409A(a)(4)(B)(iii), the deferral agreement may be executed within the period specified by the Administrator, which period, in no event, shall end after the date which is six months prior to the end of the period during which the Bonus is earned, provided the Participant has performed services continuously from the later of the beginning of the performance period or the date the performance criteria are established through the date the Participant executed the deferral agreement and provided further that the compensation has not yet become 'readily ascertainable' within the meaning of Reg. Sec 1.409A-2(a)(8). In addition, if the Compensation qualifies as 'fiscal year compensation' within the meaning of Reg. Sec. 1.409A-2(a)(6), the deferral agreement may be made not later than the end of the Employer's taxable year immediately preceding the first taxable year of the Employer in which any services are performed for which such Compensation is payable.

4-1

Except as otherwise provided below, an employee who is classified or designated as an Eligible Employee during a Plan Year or a Director who is designated as eligible to participate during a Plan Year may elect to defer Compensation otherwise payable during the remainder of such Plan Year in accordance with the rules of this Section 4.3 by executing a deferral agreement within the thirty (30) day period beginning on the date the employee is classified or designated as an Eligible Employee or the date the Director is designated as eligible, whichever is applicable, if permitted by Section 4.01(b)(ii) of the Adoption Agreement. If Compensation is based on a specified performance period that begins before the Eligible Employee or Director executes his deferral agreement, the election will be deemed to apply to the portion of such Compensation equal to the total amount of Compensation for the performance period multiplied by the ratio of the number of days remaining in the performance period after the election becomes irrevocable and effective over the total number of days in the performance period. The rules of this paragraph shall not apply unless the Eligible Employee or Director can be treated as initially eligible in accordance with Reg. Sec. 1.409A-2(a)(7).

**4.4      Election of Payment Schedule and Form of Payment.**

All elections of a payment schedule and a form of payment will be made in accordance with rules and procedures established by the Administrator and the provisions of this Section 4.4.

(a)       If the Plan Sponsor has elected to permit annual distribution elections in accordance with Section 6.01(h) of the Adoption Agreement the following rules apply. At the time an Eligible Employee or Director completes a deferral agreement, the Eligible Employee or Director must elect a distribution event (which includes a specified time) and a form of payment for the Compensation subject to the deferral agreement from among the options the Plan Sponsor has made available for this purpose and which are specified in 6.01(b) of the Adoption Agreement. Prior to the time required by Reg. Sec. 1.409A-2, the Eligible Employee or Director shall elect a distribution event (which includes a specified time) and a form of payment for any Employer contributions that may be credited to the Participant's Account during the Plan Year. If an Eligible Employee or Director fails to elect a distribution event, he shall be deemed to have elected Separation from Service as the distribution event. If he fails to elect a form of payment, he shall be deemed to have elected a lump sum form of payment.

(b)       If the Plan Sponsor has elected not to permit annual distribution elections in accordance with Section 6.01(h) of the Adoption Agreement the following rules apply. At the time an Eligible Employee or Director first completes a deferral agreement but in no event later than the time required by Reg. Sec. 1.409A-2, the Eligible Employee or Director must elect a distribution event (which includes a specified time) and a form of payment for amounts credited to his Account from among the options the Plan Sponsor has made available for this purpose and which are specified in Section 6.01(b) of the Adoption Agreement. If an Eligible Employee or Director fails to elect a distribution event, he shall be deemed to have elected Separation from Service in the distribution event. If the fails to elect a form of payment, he shall be deemed to have elected a lump sum form of payment.

4-2

**ARTICLE 5 – EMPLOYER CONTRIBUTIONS**

**5.1**    **Matching Contributions.** If elected by the Plan Sponsor in Section 5.01(a) of the Adoption Agreement, the Employer will credit the Participant's Account with a matching contribution determined in accordance with the formula specified in Section 5.01(a) of the Adoption Agreement. The matching contribution will be treated as allocated to the Participant's Account at the time specified in Section 5.01(a)(iii) of the Adoption Agreement.

**5.2**    **Other Contributions.** If elected by the Plan Sponsor in Section 5.01(b) of the Adoption Agreement, the Employer will credit the Participant's Account with a contribution determined in accordance with the formula or method specified in Section 5.01(b) of the Adoption Agreement. The contribution will be treated as allocated to the Participant's Account at the time specified in Section 5.01(b)(iii) of the Adoption Agreement.

**ARTICLE 6 – ACCOUNTS AND CREDITS**

**6.1**  **Establishment of Account.** For accounting and computational purposes only, the Administrator will establish and maintain an Account on behalf of each Participant which will reflect the credits made pursuant to Section 6.2, distributions or withdrawals, along with the earnings, expenses, gains and losses allocated thereto, attributable to the hypothetical investments made with the amounts in the Account as provided in Article 7. The Administrator will establish and maintain such other records and accounts, as it decides in its discretion to be reasonably required or appropriate to discharge its duties under the Plan.

**6.2**  **Credits to Account.** A Participant's Account will be credited for each Plan Year with the amount of his elective deferrals under Section 4.1 at the time the amount subject to the deferral election would otherwise have been payable to the Participant and the amount of Employer contributions treated as allocated on his behalf under Article 5.

6-1

**ARTICLE 7 – INVESTMENT OF CONTRIBUTIONS**

**7.1** **Investment Options.** The amount credited to each Account shall be treated as invested in the investment options designated for this purpose by the Administrator.

**7.2** **Adjustment of Accounts.** The amount credited to each Account shall be adjusted for hypothetical investment earnings, expenses, gains or losses in an amount equal to the earnings, expenses, gains or losses attributable to the investment options selected by the party designated in Section 9.01 of the Adoption Agreement from among the investment options provided in Section 7.1. If permitted by Section 9.01 of the Adoption Agreement, a Participant (or the Participant's Beneficiary after the death of the Participant) may, in accordance with rules and procedures established by the Administrator, select the investments from among the options provided in Section 7.1 to be used for the purpose of calculating future hypothetical investment adjustments to the Account or to future credits to the Account under Section 6.2 effective as of the Valuation Date coincident with or next following notice to the Administrator.  Each Account shall be adjusted as of each Valuation Date to reflect: (a) the hypothetical earnings, expenses, gains and losses described above; (b) amounts credited pursuant to Section 6.2; and (c) distributions or withdrawals.  In addition, each Account may be adjusted for its allocable share of the hypothetical costs and expenses associated with the maintenance of the hypothetical investments provided in Section 7.1.

**ARTICLE 8 – RIGHT TO BENEFITS**

**8.1**    **Vesting.** A Participant, at all times, has a 100% nonforfeitable interest in the amounts credited to his Account attributable to his elective deferrals made in accordance with Section 4.1.

A Participant's right to the amounts credited to his Account attributable to Employer contributions made in accordance with Article 5 shall be determined in accordance with the relevant schedule and provisions in Section 7.01 of the Adoption Agreement. Upon a Separation from Service and after application of the provisions of Section 7.01 of the Adoption Agreement, the Participant shall forfeit the nonvested portion of his Account.

**8.2**    **Death.** The Plan Sponsor may elect to accelerate vesting upon the death of the Participant in accordance with Section 7.01(c) of the Adoption Agreement and/or to accelerate distributions upon Death in accordance with Section 6.01(b) or Section 6.01(d) of the Adoption Agreement. If the Plan Sponsor does not elect to accelerate distributions upon death in accordance with Section 6.01(b) or Section 6.01(d) of the Adoption Agreement, the vested amount credited to the Participant's Account will be paid in accordance with the provisions of Article 9.

A Participant may designate a Beneficiary or Beneficiaries, or change any prior designation of Beneficiary or Beneficiaries in accordance with rules and procedures established by the Administrator.

A copy of the death notice or other sufficient documentation must be filed with and approved by the Administrator. If upon the death of the Participant there is, in the opinion of the Administrator, no designated Beneficiary for part or all of the Participant's vested Account, such amount will be paid to his estate (such estate shall be deemed to be the Beneficiary for purposes of the Plan) in accordance with the provisions of Article 9.

**8.3**    **Disability.** If the Plan Sponsor has elected to accelerate vesting upon the occurrence of a Disability in accordance with Section 7.01(c) of the Adoption Agreement and/or to permit distributions upon Disability in accordance with Section 6.01(b) or Section 6.01(d) of the Adoption Agreement, the determination of whether a Participant has incurred a Disability shall be made by the Administrator in its sole discretion in a manner consistent with the requirements of Code Section 409A.

**ARTICLE 9 – DISTRIBUTION OF BENEFITS**

**9.1**    **Amount of Benefits.** The vested amount credited to a Participant's Account as determined under Articles 6, 7 and 8 shall determine and constitute the basis for the value of benefits payable to the Participant under the Plan.

**9.2**    **Method and Timing of Distributions.** Except as otherwise provided in this Article 9, distributions under the Plan shall be made in accordance with the elections made or deemed made by the Participant under Article 4. Subject to the provisions of Section 9.6 requiring a six month delay for certain distributions to Key Employees, distributions following a payment event shall commence at the time specified in Section 6.01(a) of the Adoption Agreement. If permitted by Section 6.01(g) of the Adoption Agreement, a Participant may elect, at least twelve months before a scheduled distribution event, to delay the payment date for a minimum period of sixty months from the originally scheduled date of payment, provided the election does not take effect for at least twelve months from the date on which the election is made. The distribution election change must be made in accordance with procedures and rules established by the Administrator. The Participant may, at the same time the date of payment is deferred, change the form of payment but such change in the form of payment may not effect an acceleration of payment in violation of Code Section 409A or the provisions of Reg. Sec. 1.409A-2(b). For purposes of this Section 9.2, a series of installment payments is always treated as a single payment and not as a series of separate payments.

**9.3**    **Unforeseeable Emergency.** A Participant may request a distribution due to an Unforeseeable Emergency if the Plan Sponsor has elected to permit Unforeseeable Emergency withdrawals under Section 8.01(a) of the Adoption Agreement. The request must be in writing and must be submitted to the Administrator along with evidence that the circumstances constitute an Unforeseeable Emergency. The Administrator has the discretion to require whatever evidence it deems necessary to determine whether a distribution is warranted, and may require the Participant to certify that the need cannot be met from other sources reasonably available to the Participant. Whether a Participant has incurred an Unforeseeable Emergency will be determined by the Administrator on the basis of the relevant facts and circumstances in its sole discretion, but, in no event, will an Unforeseeable Emergency be deemed to exist if the hardship can be relieved: (a) through reimbursement or compensation by insurance or otherwise, (b) by liquidation of the Participant's assets to the extent such liquidation would not itself cause severe financial hardship, or (c) by cessation of deferrals under the Plan. A distribution due to an Unforeseeable Emergency must be limited to the amount reasonably necessary to satisfy the emergency need and may include any amounts necessary to pay any federal, state, foreign or local income taxes and penalties reasonably anticipated to result from the distribution. The distribution will be made in the form of a single lump sum cash payment. If permitted by Section 8.01(b) of the Adoption Agreement, a Participant's deferral elections for the remainder of the Plan Year will be cancelled upon a withdrawal due to an Unforeseeable Emergency. If the payment of all or any portion of the Participant's vested Account is being delayed in accordance with Section 9.6 at the time he experiences an Unforeseeable Emergency, the amount being delayed shall not be subject to the provisions of this Section 9.3 until the expiration of the six month period of delay required by section 9.6.

9-1

**9.4**    **Payment Election Overrides.** If the Plan Sponsor has elected one or more payment election overrides in accordance with Section 6.01(d) of the Adoption Agreement, the following provisions apply. Upon the occurrence of the first event selected by the Plan Sponsor, the remaining vested amount credited to the Participant's Account shall be paid in the form designated to the Participant or his Beneficiary regardless of whether the Participant had made different elections of time and /or form of payment or whether the Participant was receiving installment payments at the time of the event.

**9.5**    **Cashouts Of Amounts Not Exceeding Stated Limit.** If the vested amount credited to the Participant's Account does not exceed the limit established for this purpose by the Plan Sponsor in Section 6.01(e) of the Adoption Agreement at the time he incurs a Separation from Service for any reason, the Employer shall distribute such amount to the Participant at the time specified in Section 6.01(a) of the Adoption Agreement in a single lump sum cash payment following such Separation from Service regardless of whether the Participant had made different elections of time or form of payment as to the vested amount credited to his Account or whether the Participant was receiving installments at the time of such termination.  A Participant's Account, for purposes of this Section 9.5, shall include any amounts described in Section 1.3.

**9.6**    **Required Delay in Payment to Key Employees**. Except as otherwise provided in this Section 9.6, a distribution made on account of Separation from Service (or Retirement, if applicable) to a Participant who is a Key Employee as of the date of his Separation from Service (or Retirement, if applicable) shall not be made before the date which is six months after the Separation from Service (or Retirement, if applicable).

(a)    A Participant is treated as a Key Employee if (i) he is employed by a Related Employer any of whose stock is publicly traded on an established securities market, and (ii) he satisfies the requirements of Code Section 416(i)(1)(A)(i), (ii) or (iii), determined without regard to Code Section 416(i)(5), at any time during the twelve month period ending on the Identification Date.

(b)    A Participant who is a Key Employee on an Identification Date shall be treated as a Key Employee for purposes of the six month delay in distributions for the twelve month period beginning on the first day of a month no later than the fourth month following the Identification Date. The Identification Date and the effective date of the delay in distributions shall be determined in accordance with Section 1.06 of the Adoption Agreement.

9-2

(c)        The Plan Sponsor may elect to apply an alternative method to identify Participants who will be treated as Key Employees for purposes of the six month delay in distributions if the method satisfies each of the following requirements. The alternative method is reasonably designed to include all Key Employees, is an objectively determinable standard providing no direct or indirect election to any Participant regarding its application, and results in either all Key Employees or no more than 200 Key Employees being identified in the class as of any date. Use of an alternative method that satisfies the requirements of this Section 9.6(c ) will not be treated as a change in the time and form of payment for purposes of Reg. Sec. 1.409A-2(b).

(d)        The six month delay does not apply to payments described in Section 9.9(a),(b) or (d) or to payments that occur after the death of the Participant. If the payment of all or any portion of the Participant's vested Account is being delayed in accordance with this Section 9.6 at the time he incurs a Disability which would otherwise require a distribution under the terms of the Plan, no amount shall be paid until the expiration of the six month period of delay required by this Section 9.6.

**9.7**     **Change in Control.** If the Plan Sponsor has elected to permit distributions upon a Change in Control, the following provisions shall apply. A distribution made upon a Change in Control will be made at the time specified in Section 6.01(a) of the Adoption Agreement in the form elected by the Participant in accordance with the procedures described in Article 4. Alternatively, if the Plan Sponsor has elected in accordance with Section 11.02 of the Adoption Agreement to require distributions upon a Change in Control, the Participant's remaining vested Account shall be paid to the Participant or the Participant's Beneficiary at the time specified in Section 6.01(a) of the Adoption Agreement as a single lump sum payment. A Change in Control, for purposes of the Plan, will occur upon a change in the ownership of the Plan Sponsor, a change in the effective control of the Plan Sponsor or a change in the ownership of a substantial portion of the assets of the Plan Sponsor, but only if elected by the Plan Sponsor in Section 11.03 of the Adoption Agreement. The Plan Sponsor, for this purpose, includes any corporation identified in this Section 9.7. All distributions made in accordance with this Section 9.7 are subject to the provisions of Section 9.6.

If a Participant continues to make deferrals in accordance with Article 4 after he has received a distribution due to a Change in Control, the residual amount payable to the Participant shall be paid at the time and in the form specified in the elections he makes in accordance with Article 4 or upon his death or Disability as provided in Article 8.

9-3

Whether a Change in Control has occurred will be determined by the Administrator in accordance with the rules and definitions set forth in this Section 9.7. A distribution to the Participant will be treated as occurring upon a Change in Control if the Plan Sponsor terminates the Plan in accordance with Section 10.2 and distributes the Participant's benefits within twelve months of a Change in Control as provided in Section 10.3.

(a)    **Relevant Corporations.** To constitute a Change in Control for purposes of the Plan, the event must relate to (i) the corporation for whom the Participant is performing services at the time of the Change in Control, (ii) the corporation that is liable for the payment of the Participant's benefits under the Plan (or all corporations liable if more than one corporation is liable) but only if either the deferred compensation is attributable to the performance of services by the Participant for such corporation (or corporations) or there is a bona fide business purpose for such corporation (or corporations) to be liable for such payment and, in either case, no significant purpose of making such corporation (or corporations) liable for such payment is the avoidance of federal income tax, or (iii) a corporation that is a majority shareholder of a corporation identified in (i) or (ii), or any corporation in a chain of corporations in which each corporation is a majority shareholder of another corporation in the chain, ending in a corporation identified in (i) or (ii).  A majority shareholder is defined as a shareholder owning more than fifty percent (50%) of the total fair market value and voting power of such corporation.

(b)    **Stock Ownership.** Code Section 318(a) applies for purposes of determining stock ownership. Stock underlying a vested option is considered owned by the individual who owns the vested option (and the stock underlying an unvested option is not considered owned by the individual who holds the unvested option). If, however, a vested option is exercisable for stock that is not substantially vested (as defined by Treasury Regulation Section 1.83-3 (b) and (j)) the stock underlying the option is not treated as owned by the individual who holds the option.

(c)    **Change in the Ownership of a Corporation.** A change in the ownership of a corporation occurs on the date that any one person or more than one person acting as a group, acquires ownership of stock of the corporation that, together with stock held by such person or group, constitutes more than fifty percent (50%) of the total fair market value or total voting power of the stock of such corporation. If any one person or more than one person acting as a group is considered to own more than fifty percent (50%) of the total fair market value or total voting power of the stock of a corporation, the acquisition of additional stock by the same person or persons is not considered to cause a change in the ownership of the corporation (or to cause a change in the effective control of the corporation as discussed below in Section 9.7(d)). An increase in the percentage of stock owned by any one person, or persons acting as a group, as a result of a transaction in which the corporation acquires its stock in exchange for property will be treated as

9-4

an acquisition of stock. Section 9.7(c) applies only when there is a transfer of stock of a corporation (or issuance of stock of a corporation) and stock in such corporation remains outstanding after the transaction. For purposes of this Section 9.7(c), persons will not be considered to be acting as a group solely because they purchase or own stock of the same corporation at the same time or as a result of a public offering. Persons will, however, be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the corporation. If a person, including an entity, owns stock in both corporations that enter into a merger, consolidation, purchase or acquisition of stock, or similar transaction, such shareholder is considered to be acting as a group with other shareholders in a corporation only with respect to ownership in that corporation prior to the transaction giving rise to the change and not with respect to the ownership interest in the other corporation.

(d) **Change in the effective control of a corporation.** A change in the effective control of a corporation occurs on the date that either (i) any one person, or more than one person acting as a group, acquires (or has acquired during the twelve month period ending on the date of the most recent acquisition by such person or persons) ownership of stock of the corporation possessing thirty percent (30%) or more of the total voting power of the stock of such corporation, or (ii) a majority of members of the corporation's board of directors is replaced during any twelve month period by directors whose appointment or election is not endorsed by a majority of the members of the corporation's board of directors prior to the date of the appointment or election, provided that for purposes of this paragraph (ii), the term corporation refers solely to the relevant corporation identified in Section 9.7(a) for which no other corporation is a majority shareholder for purposes of Section 9.7(a). In the absence of an event described in Section 9.7(d)(i) or (ii), a change in the effective control of a corporation will not have occurred. A change in effective control may also occur in any transaction in which either of the two corporations involved in the transaction has a change in the ownership of such corporation as described in Section 9.7(c) or a change in the ownership of a substantial portion of the assets of such corporation as described in Section 9.7(e). If any one person, or more than one person acting as a group, is considered to effectively control a corporation within the meaning of this Section 9.7(d), the acquisition of additional control of the corporation by the same person or persons is not considered to cause a change in the effective control of the corporation or to cause a change in the ownership of the corporation within the meaning of Section 9.7(c). For purposes of this Section 9.7(d), persons will or will not be considered to be acting as a group in accordance with rules similar to those set forth in Section 9.7(c) with the following exception. If a person, including an entity, owns stock in both corporations that enter into a merger, consolidation, purchase or acquisition of stock, or similar transaction, such shareholder is considered to be acting as a group with other shareholders in a corporation only with respect to the ownership in that corporation prior to the transaction giving rise to the change and not with respect to the ownership interest in the other corporation.

9-5

(e)     **Change in the ownership of a substantial portion of a corporation's assets.** A change in the ownership of a substantial portion of a corporation's assets occurs on the date that any one person, or more than one person acting as a group (as determined in accordance with rules similar to those set forth in Section 9.7(d)), acquires (or has acquired during the twelve month period ending on the date of the most recent acquisition by such person or persons) assets from the corporation that have a total gross fair market value equal to or more than forty percent (40%) of the total gross fair market value of all of the assets of the corporation immediately prior to such acquisition or acquisitions. For this purpose, gross fair market value means the value of the assets of the corporation or the value of the assets being disposed of determined without regard to any liabilities associated with such assets. There is no Change in Control event under this Section 9.7(e) when there is a transfer to an entity that is controlled by the shareholders of the transferring corporation immediately after the transfer. A transfer of assets by a corporation is not treated as a change in ownership of such assets if the assets are transferred to (i) a shareholder of the corporation (immediately before the asset transfer) in exchange for or with respect to its stock, (ii) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the corporation, (iii) a person, or more than one person acting as a group, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all the outstanding stock of the corporation, or (iv) an entity, at least fifty (50%) of the total value or voting power of which is owned, directly or indirectly, by a person described in Section 9.7(e)(iii). For purposes of the foregoing, and except as otherwise provided, a person's status is determined immediately after the transfer of assets.

**9.8**     **Permissible Delays in Payment.** Distributions may be delayed beyond the date payment would otherwise occur in accordance with the provisions of Articles 8 and 9 in any of the following circumstances as long as the Employer treats all payments to similarly situated Participants on a reasonably consistent basis.

(a)     The Employer may delay payment if it reasonably anticipates that its deduction with respect to such payment would be limited or eliminated by the application of Code Section 162(m).  Payment must be made during the Participant's first taxable year in which the Employer reasonably anticipates, or should reasonably anticipate, that if the payment is made during such year the deduction of such payment will not be barred by the application of Code Section 162(m) or during the period beginning with the Participant's Separation from Service and ending on the later of the last day of the Employer's taxable year in which the Participant separates from service or the 15th day of the third month following the Participant's Separation from Service. If a scheduled payment to a Participant is delayed in accordance with this Section 9.8(a), all scheduled payments to the Participant that could be delayed in accordance with this Section 9.8(a) will also be delayed.

9-6

(b)      The Employer may also delay payment if it reasonably anticipates that the making of the payment will violate federal securities laws or other applicable laws provided payment is made at the earliest date on which the Employer reasonably anticipates that the making of the payment will not cause such violation.

(c)      The Employer reserves the right to amend the Plan to provide for a delay in payment upon such other events and conditions as the Secretary of the Treasury may prescribe in generally applicable guidance published in the Internal Revenue Bulletin.

**9.9**      **Permitted Acceleration of Payment.** The Employer may permit acceleration of the time or schedule of any payment or amount scheduled to be paid pursuant to a payment under the Plan provided such acceleration would be permitted by the provisions of Reg. Sec. 1.409A- 3(j)(4), including the following events:

(a)      **Compliance with Ethics Agreements and Legal Requirements.** A payment may be accelerated as may be necessary to comply with ethics agreements with the Federal government or as may be reasonably necessary to avoid the violation of Federal, state, local or foreign ethics law or conflicts of laws, in accordance with the requirements of Code Section 409A.

(b)      **De Minimis Amounts.** A payment will be accelerated if (i) the amount of the payment is not greater than the applicable dollar amount under Code Section 402(g)(1)(B), (ii) at the time the payment is made the amount constitutes the Participant's entire interest under the Plan and all other plans that are aggregated with the Plan under Reg. Sec. 1.409A-1(c)(2).

(c)      **FICA Tax.** A payment may be accelerated to the extent required to pay the Federal Insurance Contributions Act tax imposed under Code Sections 3101, 3121(a) and 3121(v)(2) of the Code with respect to compensation deferred under the Plan (the "FICA Amount"). Additionally, a payment may be accelerated to pay the income tax on wages imposed under Code Section 3401 of the Code on the FICA Amount and to pay the additional income tax at source on wages attributable to the pyramiding Code Section 3401 wages and taxes. The total payment under this subsection (d) may not exceed the aggregate of the FICA Amount and the income tax withholding related to the FICA Amount.

(d)      **Section 409A Additional Tax.** A payment may be accelerated if the Plan fails to meet the requirements of Code Section 409A; provided that such payment may not exceed the amount required to be included in income as a result of the failure to comply with the requirements of Code Section 409A.

9-7

(e)     **Offset.** A payment may be accelerated in the Employer's discretion as satisfaction of a debt of the Participant to the Employer, where such debt is incurred in the ordinary course of the service relationship between the Participant and the Employer, the entire amount of the reduction in any of the Employer's taxable years does not exceed $5,000, and the reduction is made at the same time and in the same amount as the debt otherwise would have been due and collected from the Participant.

(f)     **Other Events.** A payment may be accelerated in the Administrator's discretion in connection with such other events and conditions as permitted by Code Section 409A.

9-8

**ARTICLE 10 – AMENDMENT AND TERMINATION**

10.1    **Amendment by Plan Sponsor.** The Plan Sponsor reserves the right to amend the Plan (for itself and each Employer) through action of its Board of Directors. No amendment can directly or indirectly deprive any current or former Participant or Beneficiary of all or any portion of his Account which had accrued and vested prior to the amendment.

10.2    **Plan Termination Following Change in Control or Corporate Dissolution.** If so elected by the Plan Sponsor in 11.01 of the Adoption Agreement, the Plan Sponsor reserves the right to terminate the Plan and distribute all amounts credited to all Participant Accounts within the 30 days preceding or the twelve months following a Change in Control as determined in accordance with the rules set forth in Section 9.7. For this purpose, the Plan will be treated as terminated only if all agreements, methods, programs and other arrangements sponsored by the Related Employer immediately after the Change in Control which are treated as a single plan under Reg. Sec. 1.409A-1(c)(2) are also terminated so that all participants under the Plan and all similar arrangements are required to receive all amounts deferred under the terminated arrangements within twelve months of the date the Plan Sponsor irrevocably takes all necessary action to terminate the arrangements. In addition, the Plan Sponsor reserves the right to terminate the Plan within twelve months of a corporate dissolution taxed under Code Section 331 or with the approval of a bankruptcy court pursuant to 11 U. S. C. Section 503(b)(1)(A) provided that amounts deferred under the Plan are included in the gross incomes of Participants in the latest of (a) the calendar year in which the termination and liquidation occurs, (b) the first calendar year in which the amount is no longer subject to a substantial risk of forfeiture, or (c) the first calendar year in which payment is administratively practicable.

10.3    **Other Plan Terminations.** The Plan Sponsor retains the discretion to terminate the Plan if (a) all arrangements sponsored by the Plan Sponsor that would be aggregated with any terminated arrangement under Code Section 409A and Reg. Sec. 1.409A-1(c)(2) are terminated, (b) no payments other than payments that would be payable under the terms of the arrangements if the termination had not occurred are made within twelve months of the termination of the arrangements, (c) all payments are made within twenty-four months of the date the Plan Sponsor takes all necessary action to irrevocably terminate and liquidate the arrangements,

(d) the Plan Sponsor does not adopt a new arrangement that would be aggregated with any terminated arrangement under Code Section 409A and the regulations thereunder at any time within the three year period following the date of termination of the arrangement, and (e) the termination does not occur proximate to a downturn in the financial health of the Plan sponsor. The Plan Sponsor also reserves the right to amend the Plan to provide that termination of the Plan will occur under such conditions and events as may be prescribed by the Secretary of the Treasury in generally applicable guidance published in the Internal Revenue Bulletin.

**ARTICLE 11 – THE TRUST**

**11.1**     **Establishment of Trust.** The Plan Sponsor may but is not required to establish a trust to hold amounts which the Plan Sponsor may contribute from time to time to correspond to some or all amounts credited to Participants under Section 6.2. In the event that the Plan Sponsor wishes to establish a trust to provide a source of funds for the payment of Plan benefits, any such trust shall be constructed to constitute an unfunded arrangement that does not affect the status of the Plan as an unfunded plan for purposes of Title I of ERISA and the Code. If the Plan Sponsor elects to establish a trust in accordance with Section 10.01 of the Adoption Agreement, the provisions of Sections 11.2 and 11.3 shall become operative.

**11.2**     **Rabbi Trust.** Any trust established by the Plan Sponsor shall be between the Plan Sponsor and a trustee pursuant to a separate written agreement under which assets are held, administered and managed, subject to the claims of the Plan Sponsor's creditors in the event of the Plan Sponsor's insolvency. The trust is intended to be treated as a rabbi trust in accordance with existing guidance of the Internal Revenue Service, and the establishment of the trust shall not cause the Participant to realize current income on amounts contributed thereto. The Plan Sponsor must notify the trustee in the event of a bankruptcy or insolvency.

**11.3**     **Investment of Trust Funds.** Any amounts contributed to the trust by the Plan Sponsor shall be invested by the trustee in accordance with the provisions of the trust and the instructions of the Administrator. Trust investments need not reflect the hypothetical investments selected by Participants under Section 7.1 for the purpose of adjusting Accounts and the earnings or investment results of the trust need not affect the hypothetical investment adjustments to Participant Accounts under the Plan.

11-1

**ARTICLE 12 – PLAN ADMINISTRATION**

**12.1** **Powers and Responsibilities of the Administrator.** The Administrator has the full power and the full responsibility to administer the Plan in all of its details, subject, however, to the applicable requirements of ERISA.  The Administrator's powers and responsibilities include, but are not limited to, the following:

(a) To make and enforce such rules and procedures as it deems necessary or proper for the efficient administration of the Plan;

(b) To interpret the Plan, its interpretation thereof to be final, except as provided in Section 12.2, on all persons claiming benefits under the Plan;

(c) To decide all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(d) To administer the claims and review procedures specified in Section 12.2;

(e) To compute the amount of benefits which will be payable to any Participant, former Participant or Beneficiary in accordance with the provisions of the Plan;

(f) To determine the person or persons to whom such benefits will be paid;

(g) To authorize the payment of benefits;

(h) To comply with the reporting and disclosure requirements of Part 1 of Subtitle B of Title I of ERISA;

(i) To appoint such agents, counsel, accountants, and consultants as may be required to assist in administering the Plan;

(j) By written instrument, to allocate and delegate its responsibilities, including the formation of an Administrative Committee to administer the Plan.

**12.2** **Claims and Review Procedures.**

(a) Claims Procedure.

If any person believes he is being denied any rights or benefits under the Plan, such person may file a claim in writing with the Administrator. If any such claim is wholly or partially denied, the Administrator will notify such person of its decision in writing. Such notification will contain (i) specific reasons for the denial, (ii) specific reference to pertinent Plan provisions, (iii) a description of any additional material or information necessary for such person to perfect such claim and an

explanation of why such material or information is necessary, and (iv) a description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the person's right to bring a civil action following an adverse decision on review. If the claim involves a Disability, the denial must also include the standards that governed the decision, including the basis for disagreeing with any health care professionals, vocational professionals or the Social Security Administration as well as an explanation of the scientific or clinical judgement underlying the denial. Such notification will be given within 90 days (45 days in the case of a claim regarding Disability) after the claim is received by the Administrator. The Administrator may extend the period for providing the notification by 90 days (30 days in the case of a claim regarding Disability, which may be extended an additional 30 days) if special circumstances require an extension of time for processing the claim and if written notice of such extension and circumstance is given to such person within the initial 90 day period (45 day period in the case of a claim regarding Disability). If such notification is not given within such period, the claim will be considered denied as of the last day of such period and such person may request a review of his claim.

(b)     Review Procedure.

Within 60 days (180 days in the case of a claim regarding Disability) after the date on which a person receives a written notification of denial of claim (or, if written notification is not provided, within 60 days (180 days in the case of a claim regarding Disability) of the date denial is considered to have occurred), such person (or his duly authorized representative) may (i) file a written request with the Administrator for a review of his denied claim and of pertinent documents and (ii) submit written issues and comments to the Administrator. The Administrator will notify such person of its decision in writing. Such notification will be written in a manner calculated to be understood by such person and will contain specific reasons for the decision as well as specific references to pertinent Plan provisions. The notification will explain that the person is entitled to receive, upon request and free of charge, reasonable access to and copies of all pertinent documents and has the right to bring a civil action following an adverse decision on review. The decision on review will be made within 60 days (45 days in the case of a claim regarding Disability). The Administrator may extend the period for making the decision on review by 60 days (45 days in the case of a claim regarding Disability) if special circumstances require an extension of time for processing the request such as an election by the Administrator to hold a hearing, and if written notice of such extension and circumstances is given to such person within the initial 60-day period (45 days in the case of a claim regarding Disability). If the decision on review is not made within such period, the claim will be considered denied.

12-2

If the claim is regarding Disability, and the determination of Disability has not been made by the Social Security Administration or the Railroad Retirement Board, the person may, upon written request and free of charge, also receive the identification of medical or vocational experts whose advice was obtained in connection with the denial of a claim regarding Disability, even if the advice was not relied upon.

Before issuing any decision with respect to a claim involving Disability, the Administrator will provide to the person, free of charge, the following information as soon as possible and sufficiently in advance of the date on which the response is required to be provided to the person to allow the person a reasonable opportunity to respond prior to the due date of the response:

- Any new or additional evidence considered, relied upon, or generated by the Administrator or other person making the decision; and

- A new or addition rationale if the decision will be based on that rationale.

(c)    Exhaustion of Claims Procedures and Right to Bring Legal Claim

No action at law or equity shall be brought more than one (1) year after the Administrator's affirmation of a denial of a claim, or, if earlier, more than four (4) years after the facts or events giving rising to the claimant's allegation(s) or claim(s) first occurred.

**12.3    Plan Administrative Costs.** All reasonable costs and expenses (including legal, accounting, and employee communication fees) incurred by the Administrator in administering the Plan shall be paid by the Plan to the extent not paid by the Employer.

12-3

**ARTICLE 13 – MISCELLANEOUS**

**13.1**   **Unsecured General Creditor of the Employer.** Participants and their Beneficiaries, heirs, successors and assigns shall have no legal or equitable rights, interests or claims in any property or assets of the Employer. For purposes of the payment of benefits under the Plan, any and all of the Employer's assets shall be, and shall remain, the general, unpledged, unrestricted assets of the Employer. Each Employer's obligation under the Plan shall be merely that of an unfunded and unsecured promise to pay money in the future.

**13.2**   **Employer's Liability.** Each Employer's liability for the payment of benefits under the Plan shall be defined only by the Plan and by the deferral agreements entered into between a Participant and the Employer. An Employer shall have no obligation or liability to a Participant under the Plan except as provided by the Plan and a deferral agreement or agreements. An Employer shall have no liability to Participants employed by other Employers.

**13.3**   **Limitation of Rights.** Neither the establishment of the Plan, nor any amendment thereof, nor the creation of any fund or account, nor the payment of any benefits, will be construed as giving to the Participant or any other person any legal or equitable right against the Employer, the Plan or the Administrator, except as provided herein; and in no event will the terms of employment or service of the Participant be modified or in any way affected hereby.

**13.4**   **Anti-Assignment.** Except as may be necessary to fulfill a domestic relations order within the meaning of Code Section 414(p), none of the benefits or rights of a Participant or any Beneficiary of a Participant shall be subject to the claim of any creditor.  In particular, to the fullest extent permitted by law, all such benefits and rights shall be free from attachment, garnishment, or any other legal or equitable process available to any creditor of the Participant and his or her Beneficiary. Neither the Participant nor his or her Beneficiary shall have the right to alienate, anticipate, commute, pledge, encumber, or assign any of the payments which he or she may expect to receive, contingently or otherwise, under the Plan, except the right to designate a Beneficiary to receive death benefits provided hereunder.  Notwithstanding the preceding, the benefit payable from a Participant's Account may be reduced, at the discretion of the administrator, to satisfy any debt or liability to the Employer.

**13.5**   **Facility of Payment.** If the Administrator determines, on the basis of medical reports or other evidence satisfactory to the Administrator, that the recipient of any benefit payments under the Plan is incapable of handling his affairs by reason of minority, illness, infirmity or other incapacity, the Administrator may direct the Employer to disburse such payments to a person or institution designated by a court which has jurisdiction over such recipient or a person or institution otherwise having the legal authority under State law for the care and control of such recipient. The receipt by such person or institution of any such payments therefore, and any such payment to the extent thereof, shall discharge the liability of the Employer, the Plan and the Administrator for the payment of benefits hereunder to such recipient.

**13.6**    **Notices.** Any notice or other communication to the Employer or Administrator in connection with the Plan shall be deemed delivered in writing if addressed to the Plan Sponsor at the address specified in Section 1.03 of the Adoption Agreement and if either actually delivered at said address or, in the case or a letter, 5 business days shall have elapsed after the same shall have been deposited in the United States mails, first-class postage prepaid and registered or certified.

**13.7**    **Tax Withholding.** If the Employer concludes that tax is owing with respect to any deferral or payment hereunder, the Employer shall withhold such amounts from any payments due the Participant or from amounts deferred, as permitted by law, or otherwise make appropriate arrangements with the Participant or his Beneficiary for satisfaction of such obligation. Tax, for purposes of this Section 13.7 means any federal, state, local or any other governmental income tax, employment or payroll tax, excise tax, or any other tax or assessment owing with respect to amounts deferred, any earnings thereon, and any payments made to Participants under the Plan.

**13.8**    **Indemnification.** (a) Each Indemnitee (as defined in Section 13.8(e)) shall be indemnified and held harmless by the Employer for all actions taken by him and for all failures to take action (regardless of the date of any such action or failure to take action), to the fullest extent permitted by the law of the jurisdiction in which the Employer is incorporated, against all expense, liability, and loss (including, without limitation, attorneys' fees, judgments, fines, taxes, penalties, and amounts paid or to be paid in settlement) reasonably incurred or suffered by the Indemnitee in connection with any Proceeding (as defined in Subsection (e)).  No indemnification pursuant to this Section shall be made, however, in any case where (1) the act or failure to act giving rise to the claim for indemnification is determined by a court to have constituted willful misconduct or recklessness or (2) there is a settlement to which the Employer does not consent.

(b)        The right to indemnification provided in this Section shall include the right to have the expenses incurred by the Indemnitee in defending any Proceeding paid by the Employer in advance of the final disposition of the Proceeding, to the fullest extent permitted by the law of the jurisdiction in which the Employer is incorporated; provided that, if such law requires, the payment of such expenses incurred by the Indemnitee in advance of the final disposition of a Proceeding shall be made only on delivery to the Employer of an undertaking, by or on behalf of the Indemnitee, to repay all amounts so advanced without interest if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified under this Section or otherwise.

(c)        Indemnification pursuant to this Section shall continue as to an Indemnitee who has ceased to be such and shall inure to the benefit of his heirs, executors, and administrators. The Employer agrees that the undertakings made in this Section shall be binding on its successors or assigns and shall survive the termination, amendment or restatement of the Plan.

(d)        The foregoing right to indemnification shall be in addition to such other rights as the Indemnitee may enjoy as a matter of law or by reason of insurance coverage of any kind and is in addition to and not in lieu of any rights to indemnification to which the Indemnitee may be entitled pursuant to the by-laws of the Employer.

13-2

(e)    For the purposes of this Section, the following definitions shall apply:

(1)    "Indemnitee" shall mean each person serving as an Administrator (or any other person who is an employee, director, or officer of the Employer) who was or is a party to, or is threatened to be made a party to, or is otherwise involved in, any Proceeding, by reason of the fact that he is or was performing administrative functions under the Plan.

(2)    "Proceeding" shall mean any threatened, pending, or completed action, suit, or proceeding (including, without limitation, an action, suit, or proceeding by or in the right of the Employer), whether civil, criminal, administrative, investigative, or through arbitration.

**13.9    Successors**. The provisions of the Plan shall bind and inure to the benefit of the Plan Sponsor, the Employer and their successors and assigns and the Participant and the Participant's designated Beneficiaries.

**13.10   Disclaimer.** It is the Plan Sponsor's intention that the Plan comply with the requirements of Code Section 409A. Neither the Plan Sponsor nor the Employer shall have any liability to any Participant should any provision of the Plan fail to satisfy the requirements of Code Section 409A.

**13.11   Governing Law.** The Plan will be construed, administered and enforced according to the laws of the State specified by the Plan Sponsor in Section 12.01 of the Adoption Agreement.

13-3

# ADOPTION AGREEMENT

**1.01    PREAMBLE**

By the execution of this Adoption Agreement the Plan Sponsor hereby [complete (a) or (b)]

(a) ☒ adopts a new plan as of October 29, 2018. This Plan is established for the benefit of certain employees of Resideo Technologies, Inc. and its affiliates who were participating or had a balance in the Honeywell Deferred Incentive Compensation Plan ("DICP") and the Honeywell Excess Benefit Plan and Honeywell Supplemental Savings Plan ("SSP") as of October 29, 2018. Account balances and associated distribution elections under the DICP and the SSP are transferred into this Plan effective as of October 29, 2018, or as soon as administratively feasible following such date. Current deferral elections under the DICP and/or the SSP for the 2018 plan year are transferred to this Plan and shall continue for the remainder of the 2018 plan year under this Plan. Deferral and distribution elections for periods after December 31, 2018 shall be made in accordance with the provisions of this Plan as provided herein. The Appendix of this Plan includes copies of the DICP and the SSP and all relevant historical provisions are incorporated into this Plan document.

(b) ☐ amends and restates its existing plan as of [month, day, year] which is the Amendment Restatement Date. Except as otherwise provided in Appendix A, all amounts deferred under the Plan prior to the Amendment Restatement Date shall be governed by the terms of the Plan as in effect on the day before the Amendment Restatement Date.

Original Effective Date:[month, day, year]

Pre-409A Grandfathering:          ☐ Yes          ☐ No

**1.02    PLAN**

Plan Name:Resideo Technologies Supplemental Savings Plan
Plan Year:calendar

**1.03    PLAN SPONSOR**

| | |
|---|---|
| Name: | Resideo Technologies, Inc. |
| Address: | 2 Corporate Center Drive, Melville NY 11747 |
| Phone # : | |
| EIN: | 82-5318796 |
| Fiscal Yr: | December 31 |

Is stock of the Plan Sponsor, any Employer or any Related Employer publicly traded on an established securities market?

☒ Yes          ☐ No

-1-

March 2018

**1.04    EMPLOYER**

The following entities have been authorized by the Plan Sponsor to participate in and have adopted the Plan (insert "Not Applicable" if none have been authorized):

| Entity | Publicly Traded on Est. Securities Market | |
|---|---|---|
| | Yes | No |
| _____ | ☐ | ☐ |
| _____ | ☐ | ☐ |
| | ☐ | ☐ |
| _____ | ☐ | ☐ |
| | ☐ | ☐ |
| _____ | ☐ | ☐ |

**1.05    ADMINISTRATOR**

The Plan Sponsor has designated the following party or parties to be responsible for the administration of the Plan:

Name:        VP Compensation and Benefits
Address:    2 Corporate Center Drive, Melville NY 11747

Note:    The Administrator is the person or persons designated by the Plan Sponsor to be responsible for the administration of the Plan. Neither Fidelity Employer Services Company nor any other Fidelity affiliate can be the Administrator.

**1.06    KEY EMPLOYEE DETERMINATION DATES**

The Identification Date shall be determined by the Vice President – Compensation and Benefits (or his delegate) in accordance with the provisions of Sections 416(i) and 409A of the Code and the regulations issued thereunder.

In the absence of a designation, the Identification Date is December 31.

The Employer has designated April 1 as the effective date for purposes of applying the six month delay in distributions to Key Employees.

In the absence of a designation, the effective date is the first day of the fourth month following the Identification Date.

-2-

March 2018

**2.01    PARTICIPATION**

(a) ☒ Employees [complete (i), (ii) or (iii)]

    (i)   ☒   Eligible Employees are selected by the Employer

    (ii)  ☐   Eligible Employees are those employees of the Employer who satisfy the following criteria:

    _____
    _____
    _____
    _____
    _____

    (iii) ☐   Employees are not eligible to participate.

(b) ☐   Directors [complete (i), (ii) or (iii)]

    (i)   All Directors are eligible to participate.

    (ii)  Only Directors selected by the Employer are eligible to participate.

    (iii) ☒   Directors are not eligible to participate.

**3.01    COMPENSATION**

For purposes of determining Participant contributions under Article 4 and Employer contributions under Article 5, Compensation shall be defined in the following manner [complete (a) or (b) and select (c) and/or (d), if applicable]:

(a)  ☐      Compensation is defined as:

    _____
    _____
    _____
    _____
    _____
    _____

(b) ☒      Compensation as defined in the Resideo Technologies 401(k) Plan without regard to the limitation in Section 401 (a)(17) of the Code for such Plan Year.

(c)        Director Compensation is defined as:

    _____
    _____
    _____

(d)        Compensation shall, for all Plan purposes, be limited to $\_\_\_\_\_.

(e)        Not Applicable.

-3-

March 2018

**3.02**   **BONUSES**

Compensation, as defined in Section 3.01 of the Adoption Agreement, includes the following type of bonuses that will be the subject of a separate deferral election:

| Type | Will be treated as Performance Based Compensation | |
|---|---|---|
| | Yes | No |
| Annual Incentive Compensation as defined by the Plan Sponsor | ☐ | ☒ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| ☐    Not Applicable. | | ☐ |

-4-

March 2018

**4.01    PARTICIPANT CONTRIBUTIONS**

If Participant contributions are permitted, complete (a), (b), and (c). Otherwise complete (d).

**(a)    Amount of Deferrals**

A Participant may elect within the period specified in Section 4.01(b) of the Adoption Agreement to defer the following amounts of remuneration. For each type of remuneration listed, complete "dollar amount" and / or "percentage amount".

(i)    Compensation Other than Bonuses [do not complete if you complete (iii)]

| Type of Remuneration | Dollar Amount | | % Amount | | Increment |
|---|---|---|---|---|---|
| | Min | Max | Min | Max | |
| (a) SSP Employee | | | 0% | 50% | 1% |
| (b) | | | | | |
| (c) | | | | | |

Note: The increment is required to determine the permissible deferral amounts. For example, a minimum of 0% and maximum of 20% with a 5% increment would allow an individual to defer 0%, 5%, 10%, 15% or 20%.

(ii)    Bonuses [do not complete if you complete (iii)]

| Type of Bonus | Dollar Amount | | % Amount | | Increment |
|---|---|---|---|---|---|
| | Min | Max | Min | Max | |
| (a) Annual Incentive Compensation | | | 1% | 100% | 1% |
| (b) | | | | | |
| (c) | | | | | |

(iii)    Compensation [do not complete if you completed (i) and (ii)]

| Dollar Amount | | % Amount | | Increment |
|---|---|---|---|---|
| Min | Max | Min | Max | |
| | | | | |

(iv)    Director Compensation

| Type of Compensation | Dollar Amount | | % Amount | | Increment |
|---|---|---|---|---|---|
| | Min | Max | Min | Max | |
| Annual Retainer | | | | | |
| Meeting Fees | | | | | |
| Other: | | | | | |
| Other: | | | | | |

March 2018

**(b)    Election Period**

   (i)  Performance Based Compensation
      A special election period

      ☐     Does     ☒     Does Not

      apply to each eligible type of performance based compensation referenced in Section 3.02 of the Adoption Agreement.

      The special election period, if applicable, will be determined by the Employer.

   (ii)  Newly Eligible Participants

      An employee who is classified or designated as an Eligible Employee during a Plan Year

      ☐     May     ☒     May Not

      elect to defer Compensation earned during the remainder of the Plan Year by completing a deferral agreement within the 30 day period beginning on the date he is eligible to participate in the Plan.

**(c)    Revocation of Deferral Agreement**

   A Participant's deferral agreement

   ☐     Will
   ☒     Will Not

   be cancelled for the remainder of any Plan Year during which he receives a hardship distribution of elective deferrals from a qualified cash or deferred arrangement maintained by the Employer to the extent necessary to satisfy the requirements of Reg. Sec. 1.401(k)-1(d)(3). If cancellation occurs, the Participant may resume participation in accordance with Article 4 of the Plan.

**(d)    No Participant Contributions**

   ☐  Participant contributions are not permitted under the Plan.

**(e)    Transferred Deferral Elections**

   Notwithstanding any provision in this Plan to the contrary, the deferral election of any Participant of this Plan for 2018 under the DICP and/or the SSP shall continue under this Plan for the remainder of 2018.

March 2018

**5.01    EMPLOYER CONTRIBUTIONS**

If Employer contributions are permitted, complete (a) and/or (b). Otherwise complete (c).

**(a)    Matching Contributions (SSP Employer)**

(i)    Amount

For each Plan Year, the Employer shall make a Matching Contribution on behalf of each Participant who defers Compensation for the Plan Year and satisfies the requirements of Section 5.01(a)(ii) of the Adoption Agreement equal to [complete the ones that are applicable]:

(A)    ☐  [insert percentage] of the Compensation the Participant has elected to defer for the Plan Year

(B)    ☒  An amount determined by the Employer in its sole discretion

(C)    ☐  Matching Contributions for each Participant shall be limited to $ and/or % of Compensation.

(D)    ☐  Other:

(E)    ☐  Not Applicable [Proceed to Section 5.01(b) of the Adoption Agreement]

(ii)  Eligibility for Matching Contribution

A Participant who defers Compensation for the Plan Year shall receive an allocation of Matching Contributions determined in accordance with Section 5.01(a)(i) of the Adoption Agreement provided he satisfies the following requirements [complete the ones that are applicable]:

(A) ☐    Describe requirements:

(B) ☒    Is selected by the Employer in its sole discretion to receive an allocation of Matching Contributions

(C) ☐    No requirements

-7-

March 2018

(iii) Time of Allocation

Matching Contributions, if made, shall be treated as allocated [select one]:

(A) ☐    As of the last day of the Plan Year

(B) ☒    At such times as the Employer shall determine in it sole discretion

(C) ☐    At the time the Compensation on account of which the Matching Contribution is being made would otherwise have been paid to the Participant

(D) ☐    Other:
_____
_____

**(b)    Other Contributions**

(i)  Amount

The Employer shall make a contribution on behalf of each Participant who satisfies the requirements of Section 5.01(b)(ii) of the Adoption Agreement equal to [complete the ones that are applicable]:

(A) ☐    An amount equal to_[insert number] % of the Participant's Compensation

(B) ☐    An amount determined by the Employer in its sole discretion

(C) ☐    Contributions for each Participant shall be limited to $

(D) ☐    Other:
_____
_____
_____

(E) ☒    Not Applicable [Proceed to Section 6.01 of the Adoption Agreement]

-8-

March 2018

(ii)  Eligibility for Other Contributions

A Participant shall receive an allocation of other Employer contributions determined in accordance with Section 5.01(b)(i) of the Adoption Agreement for the Plan Year if he satisfies the following requirements [complete the one that is applicable]:

(A)  ☐    Describe requirements:

_____

_____

(B)  ☐    Is selected by the Employer in its sole discretion to receive an allocation of other Employer contributions

(C)  ☐    No requirements

(iii)  Time of Allocation

Employer contributions, if made, shall be treated as allocated [select one]:

(A)  ☐    As of the last day of the Plan Year

(B)  ☐    At such time or times as the Employer shall determine in its sole discretion

(C)  ☐    Other:

_____

_____

**(c)    No Employer Contributions**

☐  Employer contributions are not permitted under the Plan.

-9-

March 2018

**6.01    DISTRIBUTIONS**

The timing and form of payment of distributions made from the Participant's vested Account shall be made in accordance with the elections made in this Section 6.01 of the Adoption Agreement except when Section 9.6 of the Base Plan document requires a six month delay for certain distributions to Key Employees of publicly traded companies.

**(a) Timing of Distributions**

(i)     All distributions other than those on account of Death shall commence in accordance with the following (in the event of Death, payment will be made as soon as administratively feasible):

(A)  ☐ As soon as administratively feasible following the distribution event but in no event later than the time prescribed by Treas. Reg. Sec. 1.409A-3(d).

(B)  ☐ Monthly on specified day [insert day]

(C)  ☒ Annually on specified month and day January 14th

(D)  ☐ Calendar quarter on specified month and day [month of quarter (insert 1,2 or 3); day (insert day)]

(ii)    The timing of distributions as determined in Section 6.01(a)(i) of the Adoption Agreement shall be modified by the adoption of:

(A)  ☐ Event Delay – Distribution events other than those based on Specified Date or Specified Age will be treated as not having occurred for months [insert number of months].

(B)  ☐ Hold Until Next Year – Distribution events other than those based on Specified Date or Specified Age will be treated as not having occurred for twelve months from the date of the event if payment pursuant to Section 6.01(a)(i) will thereby occur in the next calendar year or on the first payment date in the next calendar year in all other cases.

(C)  ☐ Immediate Processing – The timing method selected by the Plan Sponsor under Section 6.01(a)(i) shall be overridden for the following distribution events [insert events]:

_____

_____

(D)  ☒ Not applicable.

-10-

**(b) Distribution Events**

Participants may elect the following payment events and the associated form or forms of payment. If multiple events are selected, the earliest to occur will trigger payment. For installments, insert the range of available periods (e.g., 5-15) or insert the periods available (e.g., 5,7,9).

| | | | Lump Sum | Installments |
|---|---|---|---|---|
| (i) | ☒ | Specified Date | X | 2-5 years |
| (ii) | ☐ | Specified Age | | ____ years |
| (iii) | ☒ | Separation from Service | X | 2-5 years |
| (iv) | ☐ | Separation from Service plus 6 months | | ____ years |
| (v) | ☐ | Separation from Service plus ___ months [not to exceed ___ months] | | ____ years |
| (vi) | ☐ | Retirement | | ____ years |
| (vii) | ☐ | Retirement plus 6 months | | ____ years |
| (viii) | ☐ | Retirement plus ___ months [not to exceed months] | | ____ years |
| (ix) | ☐ | Disability | | ____ years |
| (x) | ☐ | Death | | ____ years |
| (xi) | ☐ | Change in Control | | ____ years |

The minimum deferral period for Specified Date or Specified Age event shall be 2 years.

Installments may be paid [select each that applies]

☐ Monthly
☐ Quarterly
☒ Annually

**(c)** Specified Date and Specified Age elections may not extend beyond age Not Applicable [insert age or "Not Applicable" if no maximum age applies].

**(d)** Payment Election Override

Payment of the remaining vested balance of the Participant's Account will automatically occur at the time specified in Section 6.01(a) of the Adoption Agreement in the form indicated upon the earliest to occur of the following events [check each event that applies and for each event include only a single form of payment]:

-11-

March 2018

| EVENTS | FORM OF PAYMENT | | |
|---|---|---|---|
| ☐ Separation from Service | ____ Lump sum | ____ | Installments |
| ☐ Separation from Service before Retirement | ____ Lump sum | ____ | Installments |
| ☒ Death | X Lump sum | ____ | Installments |
| ☐ Disability | ____ Lump sum | ____ | Installments |
| ☐ Not Applicable | | | |

**(e)** Involuntary Cashouts

☐ If the Participant's vested Account at the time of his Separation from Service does not exceed the current Internal Revenue Code Section 402 (g)(1) limit [$18,500 in 2018], distribution of the vested Account shall automatically be made in the form of a single lump sum in accordance with Section 9.5 of the Base Plan document.

☒ There are no involuntary cashouts.

**(f)** Retirement

☐ Retirement shall be defined as a Separation from Service that occurs on or after the Participant [insert description of requirements]:

☒ No special definition of Retirement applies.

**(g)** Distribution Election Change A Participant

☒ Shall

☐ Shall Not

be permitted to modify a scheduled distribution date and form of payment for Specified Date elections only in accordance with Section 9.2 of the Base Plan document.

A Participant shall generally be permitted to elect such modification  99  number of times.

Administratively, allowable distribution events will be modified to reflect all options necessary to fulfill the distribution change election provision.

**(h)** Frequency of Elections The Plan Sponsor

☒ Has

☐ Has Not

Elected to permit annual elections of a time and form of payment for amounts deferred under the Plan. If a single election of a time and/or form of payment is required, the Participant will make such election at the time he first completes a deferral agreement which, in all cases, will be no later than the time required by Reg. Sec. 1.409A-2.

-12-

**6.02**    <u>**PRIOR DISTRIBUTION ELECTIONS**</u>

Notwithstanding anything in this Plan to the contrary, distribution elections made under the Honeywell DICP or Honeywell SSP pursuant to amounts transferred into this Plan as of October 29, 2018 or deferred during 2018 under this Plan shall remain in full force and effect.

-13-

March 2018

**7.01**   <u>**VESTING**</u>

**(a) Matching Contributions**

The Participant's vested interest in the amount credited to his Account attributable to Matching Contributions shall be based on the following schedule:

| Years of Service | Vesting % | |
|---|---|---|
| 0 | 100 | (insert '100' if there is immediate vesting) |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |

☐   Other:

_____
_____

☐   Class year vesting applies.

_____

☐   Not applicable.

**(b) Other Employer Contributions**

The Participant's vested interest in the amount credited to his Account attributable to Employer contributions other than Matching Contributions shall be based on the following schedule:

☐   
| Years of Service | Vesting % | |
|---|---|---|
| 0 | | (insert '100' if there is immediate vesting) |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |

☐   Other:_____
_____

☐   <u>Class year vesting applies.</u>

☒   Not applicable.

-14-

**(c) Acceleration of Vesting**

A Participant's vested interest in his Account will automatically be 100% upon the occurrence of the following events: [select the ones that are applicable]:

(i)  ☐  Death

(ii)  ☐  Disability

(iii)  ☐  Change in Control

(iv)  ☐  Eligibility for Retirement

(v)  ☐  Other: _____

(vi)  ☒  Not applicable.

**(d) Years of Service**

(i)  A Participant's Years of Service shall include all service performed for the Employer and

☐  Shall
☐  Shall Not

include service performed for the Related Employer.

(ii)  Years of Service shall also include service performed for the following entities:

_____
_____
_____
_____
_____
_____

(iii) Years of Service shall be determined in accordance with (select one)

(A)  ☐  The elapsed time method in Treas. Reg. Sec. 1.410(a)-7

(B)  ☐  The general method in DOL Reg. Sec. 2530.200b-1 through b-4

(C)  ☐  The Participant's Years of Service credited under [insert name of plan]

(D)  ☐  Other: _____

(iv) ☒ Not applicable.

-15-

March 2018

**8.01    UNFORESEEABLE EMERGENCY**

(a)  A withdrawal due to an Unforeseeable Emergency as defined in Section 2.24 of the Base Plan document:

☐    Will
☒    Will Not [if Unforeseeable Emergency withdrawals are not
permitted, proceed to Section 9.01 of the Adoption Agreement]

be allowed.

(b)  Upon a withdrawal due to an Unforeseeable Emergency, a Participant's deferral election for the remainder of the Plan Year:

☐    Will
☐    Will Not

be cancelled. If cancellation occurs, the Participant may resume participation in accordance with Article 4 of the Plan.

**9.01    INVESTMENT DECISIONS**

Investment decisions regarding the hypothetical amounts credited to a Participant's Account shall be made by [select one]:

(a)  ☐    The Participant or his Beneficiary
(b)  X     The Employer

-16-

March 2018

**10.01  <u>TRUST</u>**

The Employer [select one]:

☐   Does
☒   Does Not

intend to establish a rabbi trust as provided in Article 11 of the Plan.

-17-

March 2018

**11.01  TERMINATION UPON CHANGE IN CONTROL**

The Plan Sponsor

☐    Reserves
☒    Does Not Reserve

the right to terminate the Plan and distribute all vested amounts credited to Participant Accounts upon a Change in Control as described in Section 9.7 of the Base Plan document.

**11.02  AUTOMATIC DISTRIBUTION UPON CHANGE IN CONTROL**

Distribution of the remaining vested balance of each Participant's Account

☐    Shall
☒    Shall Not

automatically be paid as a lump sum payment upon the occurrence of a Change in Control as provided in Section 9.7 of the Base Plan document.

**11.03  CHANGE IN CONTROL**

A Change in Control for Plan purposes includes the following [select each definition that applies]:

(a)    ☒    A change in the ownership of the Employer as described in Section 9.7(c) of the Base Plan document.

(b)    ☒    A change in the effective control of the Employer as described in Section 9.7(d) of the Base Plan document.

(c)    ☒    A change in the ownership of a substantial portion of the assets of the Employer as described in Section 9.7(e) of the Base Plan document.

(d)    ☐    Not Applicable.

-18-

March 2018

**12.01  GOVERNING STATE LAW**

The laws of <u>Delaware</u> shall apply in the administration of the Plan to the extent not preempted by ERISA.

-19-

March 2018

The Plan Sponsor has caused this Adoption Agreement to be executed this
*::25*       day of *October*        . 20 2018  •        .

PLAN SPONSER:Resideo technologies, Inc. _____
By:ERICH BARNES _____
Title:VP, Compensation -Benefits _____

-20-

March 2018

**APPENDIX A**

1. The Honeywell Excess Benefit Plan and Honeywell Supplemental Savings Plan (the "SSP") is attached hereto for the purpose of incorporating into this Plan document all relevant historical provisions that govern deferral amounts that were transferred into this Plan as of October 29, 2018.

2. The Honeywell Deferred Incentive Compensation Plan ("DICP") is attached hereto for the purpose of incorporating into this Plan document all relevant historical provisions that govern deferral amounts that were transferred into this Plan as of October 29, 2018.

3. Notional amounts credited to employer stock accounts under the SSP and DICP were adjusted to take into account the value of the Resideo Technologies, Inc. stock dividend, and then valued and converted to notional units in the Fidelity U.S. Bond Index Fund – Institutional Premium Class (FXNAX) immediately following the Resideo Technologies, Inc. spin off. Such accounts shall be valued after the spin off by reference to the Fidelity U.S. Bond Index Fund - Institutional Premium Class (FXNAX) and shall be distributed in cash (not employer stock) on the applicable distribution date.

4. For amounts transferred to this Plan from the SSP and DICP, the distribution and in-service withdrawal provisions of the SSP and the DICP remain in effect.

-21-

March 2018

**HONEYWELL EXCESS BENEFIT PLAN AND
HONEYWELL SUPPLEMENTAL SAVINGS PLAN
(amended and restated effective April 1, 2018)**

1.        History. Honeywell International Inc. (the "Corporation") initially established an excess benefit plan effective January 1, 2006 when the Supplemental Non-Qualified Savings Plan For Highly Compensated Employees Of Honeywell International Inc. And Its Subsidiaries (Career Band 5 and Below) was merged with and into the Supplemental Non-Qualified Savings Plan for Highly Compensated Employees of Honeywell International Inc. and its Subsidiaries (Career Band 6 and above) and the resulting plan from this merger became known as the Supplemental Non-Qualified Savings Plan for Highly Compensated Employees of Honeywell International Inc. and its Subsidiaries.

        Effective July 1, 2015, the Supplemental Non-Qualified Savings Plan for Highly Compensated Employees of Honeywell International Inc. and its Subsidiaries was then separated into two separate plans for all legal purposes in order to ensure its qualification as an excess benefit plan within the meaning of Rule 16b-3 under the Securities Exchange Act of 1934, as amended. The following provisions constitute and govern the terms of those two plans as follows:

        (a)        The Excess Benefit Plan of Honeywell International Inc. and its Subsidiaries (the "Excess Benefit Plan") provides only for the benefits and contributions that would be provided under the Qualified Savings Plans but for any benefit or limitations set forth in the Code, including any amounts credited to each Participant's Account as of July 1, 2015, that would have been so characterized at the time such amounts were credited, and including (for purposes of clarity) all Employer Matching Contributions described in Subparagraph 5(b). The Excess Benefit Plan shall consist of, be governed by, and be subject to, the terms set forth below excluding Clause 5(a)(ii) and the other provisions of the Plan to the extent relating to Clause 5(a)(ii).

        (b)        The Supplemental Non-Qualified Savings Plan for Highly Compensated Employees of Honeywell International Inc. and its Subsidiaries (the "Supplemental Savings Plan") provides for all other benefits and contributions under the Plan. The Supplemental Savings Plan shall consist of, be governed by, and be subject to, the terms set forth below excluding Clause 5(a)(i) and Subparagraph 5(b) and the other provisions of the Plan to the extent relating to Clause 5(a)(i) and Subparagraph 5(b).

        (c)        Both the Excess Benefit Plan and the Supplemental Savings Plan are now part of a plan named the "Honeywell Excess Benefit Plan and the Honeywell Supplemental Savings Plan" and, unless the context specifically states otherwise, are collectively referred to herein as the "Plan."

        (d)        The Plan was last amended and restated, effective as of January 1, 2009, to implement changes required pursuant to and consistent with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and the corresponding regulations. The Plan is hereby amended and restated, effective as of April 1, 2018, to implement changes required or desired to reflect a change in the amount of Employer Matching Contributions, a change in the Plan record keeper, and to change the collective Plan name. This Plan document covers any Participant (as defined below) who was entitled to receive a benefit from the Plan as of March 31, 2018, but did not receive full payment of such benefit under the Plan as of such date, as well as any individual who becomes a Participant in the Plan on or after April 1, 2018. Plan benefit payments commencing before April 1, 2018 are governed by the terms of Plan as they existed before this amendment and restatement and are either grandfathered from the requirements of Section 409A of the Code or payable pursuant to a fixed schedule as required by, and in compliance with, Section 409A of the Code.

2.        Eligibility. Any employee of the Corporation and its participating affiliates who is (i) the Chief Executive Officer of the Corporation or designated by the Corporation as an "officer" of the Corporation (an "Officer"), during the designated election period (the "Open Enrollment Period") that occurs before the beginning of the applicable Plan Year (as defined below), or (ii)

(A) an Executive level employee but not an Officer at any time during the Open Enrollment Period that occurs before the beginning of the applicable Plan Year, and (B) whose year-to-date Base Annual Salary (as defined in Subparagraph 4(a)(i)) that is paid and posted to the Plan's electronic recordkeeping system as of the last paydate in September of the Plan Year immediately preceding the applicable Plan Year exceeds the dollar limit for a highly compensated employee for the Plan Year under Section 414(q) of the Code, shall be eligible (an "Eligible Employee") to participate in the Plan (subject to the limitations set forth in the following paragraph) and elect deferrals of Base Annual Salary for such Plan Year effective as of the first paydate of such Plan Year that follows the Open Enrollment Period.

       Notwithstanding the foregoing, an Eligible Employee may only participate in the Plan for a Plan Year if such employee is eligible to participate in the Honeywell 401(k) Plan (formerly the Honeywell Savings and Ownership Plan) or any other savings plan designated as included by the Corporation from time to time (the "Qualified Savings Plans"), and has made an irrevocable election during the applicable Open Enrollment Period to defer Base Pay to the applicable Qualified Savings Plan. For purposes of this Plan, the "Plan Year" shall mean the calendar year.

3.        Definitions.        Capitalized terms not otherwise defined in the Plan have the respective meanings set forth in the applicable Qualified Savings Plans.

4.        Participation.

        (a)        Time and Form of Election.

                (i)        Each Eligible Employee who wishes to participate in the Plan for a particular Plan Year (a "Participant"), must file a timely deferral election (the "Election") with the Plan Administrator during the applicable Open Enrollment Period. Such Eligible Employee shall designate in the Election that a portion (determined in accordance with Subparagraph 5(a)) of the Eligible Employee's Base Pay as defined in the Qualified Savings Plan without regard to any benefit or contribution limitations under the Code or the applicable Qualified Savings Plan and inclusive of salary deferred for the Plan Year under this Plan ("Base Annual Salary"), which would have been payable to such Eligible Employee during such Plan Year, in lieu of such payment, be credited to a deferred compensation account maintained under the Plan as an unfunded book entry account stated as a cash balance (the "Account"). On a Participant's Election, the Participant shall also indicate the form of payment for all deferrals credited to the Participant's Account, as described in Paragraph 7 below, and shall indicate if he wishes to change the default Change in Control election, as described in Paragraph 10 below.

        (b)        Election Changes. A Participant may not modify his deferral election for a particular Plan Year at any time during that Plan Year.

2

5.    Contributions to Participants' Accounts.

(a)    Participant Deferred Contributions. For a particular Plan Year, a Participant may elect to defer an aggregate amount equal to (i) the difference between the maximum percentage of Base Annual Salary that the Participant may contribute for the Plan Year as Pre-tax Contributions and/or Roth Contributions under the Qualified Savings Plans (8% for 2018), without regard to any other limitations that may apply under the Code or the Qualified Savings Plans, and the actual Pre-tax Contributions and/or Roth Contributions the Participant contributes to the Qualified Savings Plans for the Plan Year, and/or (ii) from 1% to 25% (in whole percentages) of such Participant's Base Annual Salary, without regard to any other limitations that may apply under the Code (collectively, "Participant Deferred Contributions"); provided, however, that a Participant who elects to defer any amount hereunder shall be required to make the maximum Pre-tax Contributions and/or Roth Contributions permissible under the Qualified Savings Plans for the applicable Plan Year (after giving effect to deferrals under the Plan or otherwise).

For the avoidance of doubt, all Participant Deferred Contributions to the Plan shall be deferred on a pre-tax basis. No after-tax contributions (such as Roth 401(k) contributions) shall be permitted. For purposes of any "spillover" of deferrals from the Qualified Savings Plans to the Excess Benefit Plan, any amounts that were contributed as Roth Contributions to the Qualified Savings Plans shall be contributed as pre-tax contributions to the Plan.

(b)    Plan Employer Contributions. There shall be credited to the Participant's Account employer contributions under the Plan ("Plan Employer Contributions") in an aggregate amount equal to the difference between (i) the maximum Employer Matching Contributions that could be contributed for the Plan Year under the Qualified Savings Plans, without regard to any limitations that may apply under the Code or the Qualified Savings Plans, and (ii) the total amount of Employer Matching Contributions actually contributed to the Participant's account under the Qualified Savings Plans.

Notwithstanding the foregoing:

(A)    beginning April 1, 2018, the Plan Employer Contributions described in this Paragraph shall be credited to a Participant's Account only if the Participant is actively employed by the Corporation or an affiliate on December 15th of the Plan Year, has died while actively employed by the Corporation or an affiliate during the Plan Year, or has incurred a Disability while actively employed by the Corporation or an affiliate during the Plan Year, and

(B)    only Participant Deferred Contributions described in Clause 5(a)(i) shall be used in determining the amount of Plan Employer Contributions to be credited to an Account for a Plan Year.

(c)    Vesting. Participant Deferred Contributions and Plan Employer Contributions (collectively "Total Contribution Amounts") and all amounts accrued with respect to Total Contribution Amounts in accordance with Paragraph 6, shall be vested at the time such amounts are credited to the Participant's Account.

3

(d)    <u>Timing of Contributions</u>. Effective for Plan Years beginning on and after January 1, 2017, the Participant Deferred Contributions described in Clause 5(a)(i) shall be credited to a Participant's Account once the Participant has contributed the maximum Pre-tax Contributions and/or Roth Contributions for the Plan Year to the Qualified Savings Plans. The Participant Deferred Contributions described in Clause 5(a)(ii) shall be credited to a Participant's Account each pay period during the Plan Year. The Plan Employer Contributions described in Section 5(b) shall be credited to a Participant's Account at the same time Employer Matching Contributions are credited to the Participant account under the applicable Qualified Savings Plans.

6.    <u>The Participant's Account</u>.

(a)    <u>Types of Accounts</u>. A Participant's Account shall consist of two sub-accounts, as applicable: (1) a sub-account which consists of Participant Deferred Contributions and Plan Employer Contributions, and interest and earnings thereon, for amounts that were earned and vested as of December 31, 2004 (the "<u>Grandfathered Account</u>"), and (2) a sub-account which consists of Participant Deferred Contributions and Plan Employer Contributions, and interest and earnings thereon, for amounts that are earned and vested on or after January 1, 2005 (the "<u>Non-Grandfathered Account</u>").

(b)    <u>Participant Deferred Contributions</u>.

(i)    Participant Deferred Contributions shall be credited to the Participant's Account under the Plan as unfunded book entries stated as cash balances.

(ii)    Participant Deferred Contributions credited to the Participant's Account after December 31, 2004, and all Participant Deferred Contributions credited to a Participant's Account under the Supplemental Non-Qualified Savings Plan For Highly Compensated Employees Of Honeywell International Inc. And Its Subsidiaries (Career Band 5 and Below) before January 1, 2006, shall accrue amounts (to be posted on the Valuation Date) equivalent to interest, compounded daily, at a rate based upon the cost to the Corporation of borrowing at a fixed rate for a 15-year term; provided, however, that for 2005, Participant Deferred Contributions credited to the Supplemental Non-Qualified Savings Plan for Highly Compensated Employees of Honeywell International Inc. and its Subsidiaries (Career Band 6 and above) between January 1, 2005 and December 31, 2005 shall accrue amounts (to be posted each Valuation Date) equivalent to interest, compounded daily, at a rate equal to 8%. The interest rate described in this paragraph is subject to change from Plan Year to Plan Year and shall be determined annually by the Chief Financial Officer of the Corporation in consultation with the Treasurer of the Corporation before January 1 of each Plan Year.

(iii)    Participant Deferred Contributions credited to the Participant's Account under the Supplemental Non-Qualified Savings Plan for Highly Compensated Employees of Honeywell International Inc. and its Subsidiaries (Career Band 6 and above) before January 1, 1994 or after the Participant has terminated employment shall accrue amounts (to be posted each Valuation Date) equivalent to interest, compounded daily, at a rate based upon the cost to the Corporation of borrowing at a fixed rate for a 15-year term. The interest rate described in this paragraph is subject to change from Plan Year to Plan Year and shall be determined annually by the Chief Financial Officer of the Corporation in consultation with the Treasurer of the Corporation before January 1 of each Plan Year.

4

(iv)    Participant Deferred Contributions credited to the Participant's Account under the Supplemental Non-Qualified Savings Plan for Highly Compensated Employees of Honeywell International Inc. and its Subsidiaries (Career Band 6 and above) between January 1, 1994 and December 31, 2004, but before a Participant terminates employment, shall accrue amounts (to be posted each Valuation Date) equivalent to interest, compounded daily, at a rate that was determined annually by the Management Development and Compensation Committee (the "Committee") of the Board of Directors of the Corporation (the "Board"). This rate, once established for a Plan Year, remains in effect with respect to all Participant Deferred Contributions credited to the Participant's Account during such Plan Year until such amounts are distributed.

(c)    Plan Employer Contributions. Plan Employer Contributions shall be credited to the Participant's Account under the Plan as unfunded book entries stated as shares of Common Stock (including fractional shares). The number of shares of Common Stock credited to a Participant's Account shall be determined by dividing the equivalent cash amount (as determined under Subparagraph 5(b)) by the closing price of Common Stock on the day that such Plan Employer Contributions are credited to the Participant's Account. Amounts equivalent to the dividends that would have been payable in respect of the Common Stock shall be credited to the Participant's Account as if reinvested in Common Stock, with the number of shares credited determined by dividing the equivalent cash dividend amount by the closing price of Common Stock on the date the dividends would have been payable. Amounts credited to the Participant's Account shall accrue amounts equivalent to interest and dividends, as the case may be, until distributed in accordance with the Plan.

(d)    Grandfathered and Non-Grandfathered Accounts. The aggregate amount of the Participant's Deferred Contributions, plus interest and earnings credited thereon pursuant to this Paragraph 6 (collectively, the "Participant Deferred Contribution Amounts"), and the aggregate number of shares of Common Stock representing the Plan Employer Contributions, plus dividends reinvested pursuant to this Paragraph 6 (collectively the "Plan Employer Contribution Amounts," and together with Participant Deferred Contribution Amounts, the "Total Contribution Amounts") credited to the Participant's Grandfathered Account pursuant to this Paragraph 6, will hereinafter be referred to as "Grandfathered Contribution Amounts." Total Contribution Amounts credited to a Participant's Non-Grandfathered Account will hereinafter be referred to as "Non-Grandfathered Contribution Amounts."

7.    Distribution from Accounts.

(a)    Form and Timing of Payment.

(i)    Participant Deferred Contributions.

(A)    2006 Plan Year and Later. The aggregate amount of the Participant's Participant Deferred Contribution Amounts credited to the Participant's Non- Grandfathered Account for Plan Years beginning on or after January 1, 2006 shall be paid in one lump-sum in cash in the January of the Plan Year that follows the Plan Year in which the Participant has a Separation from Service (as defined in Section 409A(a)(2)(A)(i) of the Code and its corresponding regulations) with the Corporation and its affiliates, unless the Participant elects in his Election for any such Plan Year that his Participant Deferred Contribution Amounts for such Plan Year be paid in substantially equal annual installments (not to exceed ten (10)) if his Separation from Service occurs on or after he attains age 55 and has completed ten (10) Years of Service (as defined below), in which case the first installment shall be paid in the January of the Plan Year that follows the Plan Year in which he has a Separation from Service and each remaining installment will be paid in each succeeding January.

5

Notwithstanding the foregoing, if the Participant is a "Specified Employee" (as defined below) at his Separation from Service, the payments provided in the immediately preceding paragraph shall be paid (or begin for installments) in (i) the January of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service occurs before July 1 of such Plan Year, or (ii) the July of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service occurs after June 30 of such Plan Year. If the Participant elected to receive his distribution in installments, after the first payment is made, each subsequent installment will be paid in the January of each Plan Year that follows until all installments are paid to the Participant.

(B)      For purposes of this Plan, the term (i) "<u>Years of Service</u>" shall be determined using the Participant's most-recent adjusted service date, as reflected at the Participant's Separation from Service in the Company's records, and (ii) "<u>Specified Employee</u>" shall mean any Participant who, at any time during the twelve (12) month period ending on the identification date, is a specified employee under Section 409A of the Code, which determination of "specified employees," including the number and identity of persons considered "specified employees" and the identification date, shall be made by the Vice President – Compensation and Benefits (or his delegate) in accordance with the provisions of Sections 416(i) and 409A of the Code and the regulations issued thereunder.

(C)      <u>2005 Plan Year</u>. For the 2005 Plan Year only, the Participant Deferred Contribution Amounts credited to the Participant's Non-Grandfathered Account for such Plan Year shall be paid in one lump-sum in cash in January of the Plan Year immediately following the Plan Year in which the Participant has a Separation from Service with the Corporation and its affiliates.

Notwithstanding the foregoing, if the Participant is a Specified Employee at his Separation from Service, the payment provided in the immediately preceding paragraph shall be paid in (i) the January of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service occurs before July 1 of such Plan Year, or (ii) the July of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service occurs after June 30 of such Plan Year.

(D)      <u>Plan Years Before January 1, 2005</u>. Each Participant made an election when he made a deferral election for Plan Years beginning before January 1, 2005, with respect to the distribution of the Participant Deferred Contribution Amounts credited to the Participant's Grandfathered Account pursuant to such election. A Participant elected to receive such amount in one lump-sum or in a number of annual installments (up to fifteen (15)). The lump-sum payment or the first installment shall be paid in cash as soon as practicable during the month of January of such future calendar year as the Participant may designate or, if the Participant so elects, as soon as practicable during the month of January of the calendar year immediately following the year in which the Participant last contributed to the Plan or the year in which the Participant terminates employment with the Corporation and its affiliates. Subsequent installments shall be paid in cash as soon as practicable during the month of January of each succeeding calendar year until the entire amount of the Participant Deferred Contribution Amounts credited to the Participant's Grandfathered Account has been paid.

(ii)      <u>Plan Employer Contributions</u>. The distribution form and timing that apply to the Participant's Deferred Contribution Amounts for a Plan Year pursuant to Subparagraph 7(a)(i) above shall also apply to the form and timing of the distribution of the Plan Employer Contribution Amounts credited to the Participant's Account. Except to the extent otherwise provided with respect to fractional shares, all distributions of Plan Employer Contribution Amounts shall be made in Common Stock. Installments after the first installment payment, if applicable, shall be paid in the January of each succeeding calendar year until the entire amount of the Plan Employer Contribution Amounts has been paid. Any fractional shares of Common Stock shall be paid in an equivalent cash amount.

6

(iii) <u>Calculation of Installment Payments</u>. If installment payments are to be made to a Participant for any Plan Year, the amount of each installment shall be determined by (A) multiplying the balance of the Participant Deferred Contribution Amounts credited to the Participant for such Plan Year by a fraction, the numerator of which is one and the denominator of which is (x) the number of installments elected, reduced by (y) one for each annual installment previously received, and (B) multiplying the balance of the Plan Employer Contribution Amount as of the day before installment payments are processed each Plan Year by a fraction, the numerator of which is one and the denominator of which is (x) the number of installments elected, reduced by (y) one for each annual installment previously received, and then rounding down to the next whole share of Common Stock; provided, however, the amount of the last installment shall consist of the amount remaining in the Participant's Account on the distribution date.

(b) <u>Adjustment of Form of Distribution</u>.

(i) <u>2005 Plan Year and Later</u>. For Plan Years beginning on or after January 1, 2005, a Participant may not change the timing or payment form of distribution of the Non- Grandfathered Contribution Amounts credited to his Non-Grandfathered Account unless otherwise permitted by the Plan Administrator in its sole and absolute discretion in accordance with Code section 409A and its corresponding regulations.

(ii) <u>2004 Plan Year and Earlier</u>. For Plan Years beginning before January 1, 2005, a Participant may change the timing and/or form of distribution of all or any portion of the Participant's Grandfathered Account only in accordance with Clause 7(c)(i).

(iii) <u>Distribution Default for Amounts Credited to the Participant's Grandfathered Account</u>.

(A) <u>Distribution Default for Participant Deferred Contribution Amounts</u>. Any Participant Deferred Contribution Amounts credited to a Participant's Grandfathered Account that are not covered by a timely distribution election shall be distributed to the Participant in one lump-sum in cash as soon as practicable during the month of January of the calendar year immediately following the later of the calendar year in which the Participant last contributed to the Plan or the year in which the Participant terminates his employment with the Corporation and its affiliates; provided, however, if the Participant has made an election pursuant to Subparagraphs 10(a), 10(b) or 10(c), the lump sum payment shall be made within the ninety (90) day period following a Change in Control, as defined in Subparagraph 10(e).

(B) <u>Distribution Default for Plan Employer Contribution Amounts</u>. Any Plan Employer Contribution Amounts credited to a Participant's Grandfathered Account that are not covered by a timely distribution election shall be distributed to the Participant in Common Stock as soon as practicable during the month of January of the calendar year immediately following the later of the calendar year in which the Participant last contributed to the Plan or the calendar year in which the Participant terminates his employment with the Corporation and its affiliates; provided, however, if the Participant has made an election pursuant to Subparagraphs 10(a), 10(b) or 10(c), the distribution shall be made within the ninety (90) day period following a Change in Control, as defined in Subparagraph 10(e). Any fractional shares of Common Stock shall be paid in an equivalent cash amount.

7

(c)    Changing Distribution Elections for Plan Years Before January 1, 2005.

(i)    For Total Contribution Amounts credited to the Participant's Grandfathered Account, the Plan Administrator may from time to time allow a Participant to request new elections (other than with respect to any such amounts for which distributions have already commenced). The Plan Administrator shall reserve the right to accept or reject any such request at any time and such election shall be subject to such restrictions and limitations as the Plan Administrator shall determine in its sole discretion, provided that any new election shall generally be required to be made at least twelve (12) months before any scheduled payment date.

(ii)    For Total Contribution Amounts credited to the Participant's Grandfathered Account, the Plan Administrator may allow a Participant to request an immediate distribution of all or a portion of such Participant's Grandfathered Account (including any portion for which distributions have already commenced). Any such immediate distribution shall be subject to a penalty equal to six percent (6%) of the amount requested to be distributed and shall be subject to the approval of the Plan Administrator and such other restrictions or conditions as may be established by the Plan Administrator from time to time.

8.    Distribution on Death.

(a)    Participant Deferred Contribution Amounts. If a Participant dies before all Participant Deferred Contribution Amounts credited to the Participant's Non-Grandfathered Account have been paid, the balance of the Participant Deferred Contribution Amounts in the Non-Grandfathered Account shall be paid in cash within sixty (60) days following the date of the Participant's death to the beneficiary designated by the Participant and filed with the Plan Administrator in the form and manner prescribed by the Plan Administrator. If a Participant dies before all Participant Deferred Contribution Amounts credited to the Participant's Grandfathered Account have been paid, the balance of the Participant Deferred Contribution Amounts in the Grandfathered Account shall be paid in cash as soon as practicable following the Participant's death to the beneficiary designated by the Participant and filed with the Plan Administrator in the form and manner prescribed by the Plan Administrator; provided, however, if the Participant made an election pursuant to Subparagraphs 10(a), 10(b) or 10(c) for Participant Deferred Contribution Amounts credited to the Participant's Grandfathered Account, such amount shall be paid within the ninety (90) day period following a Change in Control, as defined in Subparagraph 10(e). If (i) no beneficiary designation has been made, or (ii) the designated beneficiary has predeceased the Participant and no further designation has been made, then such balance shall be paid to the Participant's estate. A Participant may change the designated beneficiary at any time during the Participant's lifetime by filing a subsequent designation with the Plan Administrator in the form and manner prescribed by the Plan Administrator.

(b)    Plan Employer Contribution Amounts. If a Participant dies before all Plan Employer Contribution Amounts credited to the Participant's Non-Grandfathered Account have been paid, the balance of the Plan Employer Contribution Amounts in such Participant's Non-Grandfathered Account shall be paid in Common Stock within sixty (60) days following the date of the Participant's death to the beneficiary designated by the Participant and filed with the Plan Administrator in the form and manner prescribed by the Plan Administrator. If a Participant dies before all Plan Employer Contribution Amounts credited to the Participant's Grandfathered Account have been paid, the balance of the Plan Employer Contribution Amounts in such Participant's Grandfathered Account shall be paid in Common Stock as soon as practicable following the Participant's death to the beneficiary designated by the Participant and filed with the Plan Administrator in the form and manner prescribed by the Plan Administrator; provided, however, if the Participant has made an election pursuant to Subparagraphs 10(a), 10(b) or 10(c) for Plan Employer Contribution Amounts credited to the Participant's Grandfathered Account, such amount

8

shall be paid within the ninety (90) day period following a Change in Control, as defined in Subparagraph 10(e). If (i) no such beneficiary designation has been made, or (ii) the designated beneficiary has predeceased the Participant and no further designation has been made, then such balance shall be paid to the Participant's estate. A Participant may change the designated beneficiary at any time during the Participant's lifetime by filing a subsequent designation with the Plan Administrator in the form and manner prescribed by the Plan Administrator. Any fractional shares of Common Stock shall be paid in an equivalent cash amount.

9.      Payment in the Event of Hardship.

      (a)      Non-Grandfathered Account. For Plan Years beginning on or after January 1, 2005, a Participant may not receive a distribution in the event of hardship or unforeseeable emergency from his Non-Grandfathered Account unless otherwise permitted by the Plan Administrator in its sole and absolute discretion in accordance with Code section 409A and its corresponding regulations.

      (b)      Grandfathered Account. Upon receipt of a request from a Participant delivered in writing to the Plan Administrator along with a Certificate of Unavailability of Resources form, the Plan Administrator or his designee may cause the Corporation to accelerate payment of all or any part of the amount credited to the Participant's Grandfathered Account if it finds in its sole discretion that payment of such amounts in accordance with the Participant's prior Election would result in severe financial hardship to the Participant, and such hardship is the result of an unforeseeable emergency caused by circumstances beyond the control of the Participant. Acceleration of payment may not be made to the extent that such hardship is or may be relieved

(a) through reimbursement or compensation by insurance or otherwise, or (b) by liquidation of the Participant's assets, to the extent the liquidation of assets would not itself cause severe financial hardship. Any distribution of Participant Deferred Contribution Amounts pursuant to this Subparagraph shall be made in cash, while any distribution of Plan Employer Contribution Amounts pursuant to this Subparagraph shall be made in Common Stock. Any fractional shares of Common Stock shall be paid in an equivalent cash amount.

10.     Change in Control.

      (a)      Initial Lump-Sum Payment Election.

            (i)      Non-Grandfathered Contribution Amounts. Notwithstanding any election made pursuant to Paragraph 4 hereof, for Participant Deferred Contributions attributable to each Plan Year beginning on or after January 1, 2007, a Participant may designate as part of his Election during the Open Enrollment Period for a Plan Year to have his Participant Deferred Contributions and corresponding Plan Employer Contributions for such Plan Year paid in a lump sum as soon as practicable following a Change in Control, but in no event later than ninety (90) days after such Change in Control (as defined below); provided however that if the event that constitutes a Change in Control does not qualify as a change in ownership or effective control of the Corporation, or in the ownership of a substantial portion of the assets of the Corporation, within the meaning of Section 409A(a)(2)(A)(v) of the Code and its corresponding regulations, a Change in Control shall not be deemed to have occurred for purposes of this clause (i).

            (ii)      Grandfathered Contribution Amounts. Notwithstanding any election made pursuant to Paragraph 4 for Grandfathered Contribution Amounts, each Participant filed a written election with the Plan Administrator as part of his Election to have his Grandfathered Contribution Amount paid in one lump-sum as soon as practicable following a Change in Control (as defined below), but in no event later than ninety (90) days after such Change in Control.

9

(iii)    <u>Form of Consideration</u>. Any distribution of Participant Deferred Contribution Amounts pursuant to this Paragraph 10 shall be made in cash, while any distribution of Plan Employer Contribution Amounts pursuant to this Paragraph 10 shall be made in Common Stock (or the common stock of any successor corporation issued in exchange for, or with respect to, Common Stock incident to the Change in Control). Any fractional shares of Common Stock (or the common stock of any successor corporation issued in exchange for, or with respect to, Common Stock incident to the Change in Control) shall be paid in an equivalent cash amount.

(b)    <u>Subsequent Lump-Sum Payment Election</u>. For Grandfathered Contribution Amounts only, a Participant who did not make an election pursuant to Subparagraph 10(a)(ii) or who has revoked, pursuant to Subparagraph 10(c), an election previously made under Subparagraph 10(a)(ii) or this Subparagraph 10(b) may, before the earlier of a Change in Control or the beginning of the calendar year in which the election is to take effect, elect to have the aggregate amount credited to the Participant's Grandfathered Account for all calendar years commencing with the first calendar year beginning after the date the election is made, paid in one lump-sum as soon as practicable following a Change in Control, but in no event later than ninety (90) days after such Change in Control.

(c)    <u>Revocation of Prior Change in Control Payment Elections</u>. For Grandfathered Contribution Amounts only, a Participant may, before a Change in Control, revoke any election made pursuant to Subparagraphs 10(a)(ii) or 10 (b) or file a new lump sum payment election under this Paragraph 10 with respect to amounts previously credited to the Participant's Grandfathered Account. Any such revocation or new election shall be made at the time specified by the Plan Administrator and shall be subject to such restrictions and limitations as the Plan Administrator shall determine from time to time.

(d)    <u>Interest Equivalents</u>. Notwithstanding anything to the contrary in the Plan, after a Change in Control, the Plan may not provide, or be amended to provide, interest accruals with respect to Participant Deferred Contributions at rates lower than the rates in effect under Paragraph 6 immediately before the Change in Control.

(e)    <u>Definition of Change in Control</u>. For Plan Years beginning after April 1, 2018 and for purposes of the Plan, "Change in Control" means (a) any one person, or more than one  person acting as a group (as defined under U.S. Department of Treasury Regulation ("Treasury Regulation") § 1.409A-3(i)(5)(v)(B)) acquires ownership of stock of the Corporation that, together with stock held by such person or group, constitutes more than 50 percent of the total fair market value or total voting power of the stock of the Corporation; or (b) any one person, or more than one person acting as a group (as defined under Treasury Regulation § 1.409A- 3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) ownership of stock of the Corporation possessing 30 percent or more of the total voting power of the stock of the Corporation; or (c) a majority of members of the Board of Directors of the Corporation (the "<u>Board</u>") is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the members of the Board before the date of the appointment or election; or (d) any one person, or more than one person acting as a group (as defined in Treasury Regulation § 1.409A-3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets from the Corporation and its subsidiaries on a consolidated basis that have a total gross fair market value equal to or more than 40 percent of the total gross fair market value of all of the assets of the Corporation and its subsidiaries on a consolidated basis immediately before such acquisition or acquisitions. For purposes of clause (d), "gross fair market value" means the value of the assets of the Corporation and its subsidiaries on a consolidated basis, or the value of the

10

assets being disposed of, determined without regard to any liabilities associated with such assets. The foregoing clauses (a) through (d) shall be interpreted in a manner that is consistent with the Treasury Regulations promulgated pursuant to Section 409A of the Code so that all, and only, such transactions or events that could qualify as a "change in control event" within the meaning of Treasury Regulation § 1.409A-3(i)(5)(i) shall be deemed to be a Change in Control for purposes of this Plan.

11.      Administration.

(a)      Plan Administrator. The Plan Administrator and "named fiduciary" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") shall be the Senior Vice President-Human Resources and Communications of the Corporation (or the person acting in such capacity in the event such position is abolished, restructured or renamed). The Plan Administrator shall have the authority to appoint one (1) or more other named fiduciaries of the Plan and to designate persons, other than named fiduciaries, to carry out fiduciary responsibilities under the Plan, pursuant to Section 405(c)(1)(B) of ERISA. Any person acting on behalf of the Plan Administrator shall serve without additional compensation. The Plan Administrator shall keep or cause to be kept such records and shall prepare or cause to be prepared such returns or reports as may be required by law or necessary for the proper administration of the Plan.

(b)      Powers and Duties of Plan Administrator. The Plan Administrator shall have the full discretionary power and authority to construe and interpret the Plan (including, without limitation, supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan); to determine all questions of fact arising under the Plan, including questions as to eligibility for and the amount of benefits; to establish such rules and regulations (consistent with the terms of the Plan) as it deems necessary or appropriate for administration of the Plan; to delegate responsibilities to others to assist it in administering the Plan; to retain attorneys, consultants, accountants or other persons (who may be employees of the Corporation and its affiliates) to render advice and assistance as it shall determine to be necessary to effect the proper discharge of any duty for which it is responsible; and to perform  all other acts it believes reasonable and proper in connection with the administration of the Plan. The Plan Administrator shall be entitled to rely on the records of the Corporation and its subsidiaries in determining any Participant's entitlement to and the amount of benefits payable under the Plan. Any determination of the Plan Administrator, including interpretations of the Plan and determinations of questions of fact, shall be final and binding on all parties.

(c)      Indemnification. To the extent permitted by law, the Corporation shall indemnify the Plan Administrator from all claims for liability, loss, or damage (including payment of expenses in connection with defense against such claims) arising from any act or failure to act in connection with the Plan.

11

12.       Claims Procedures and Appeals.

(a)       A written request for a Plan benefit is a claim and the person making such claim is a claimant. Any claim must be made in writing and shall be deemed to be filed by a claimant when a written request is made by the claimant or the claimant's authorized representative which is reasonably calculated to bring the claim to the attention of the Plan Administrator.

(b)       The Plan Administrator shall provide notice in writing to any claimant when a claim for benefits under the Plan has been denied in whole or in part. Such notice shall be provided within ninety (90) days of the receipt by the Plan Administrator of the claimant's claim or, if special circumstances require, and the claimant is so notified in writing, within one hundred eight (180) days of the receipt by the Plan Administrator of the claimant's claim. The notice shall be written in a manner calculated to be understood by the claimant and shall:

(i)       set forth the specific reasons for the denial of benefits;

(ii)      contain specific references to Plan provisions relative to the denial;

(iii)     describe any material and information, if any, necessary for the claim for benefits to be allowed, that had been requested, but not received by the Plan Administrator;

(iv)      advise the claimant that any appeal of the Plan Administrator's adverse determination must be made in writing to the Plan Administrator within sixty (60) days after receipt of the initial denial notification, and must set forth the facts upon which the appeal is based; and

(v)       advise the claimant of his right to bring a civil action under Section 502(a) of ERISA, following an adverse benefit determination on review.

(c)       When a claimant receives notice of denial of a claim or does not receive notification of acceptance or denial within ninety (90) days after submitting a claim, the claimant, either in person or by duly authorized representative, may:

(i)       request, in writing, a review of the claim by the Plan Administrator;

(ii)      review pertinent documents relating to the denial;

(iii)     submit issues and comments in writing; and

(iv)      request, in writing, a hearing with the Plan Administrator; provided that the claimant takes appropriate action within sixty (60) days after receiving notice of denial.

(d)       The Plan Administrator shall make its decision with respect to a claim review promptly, but not later than sixty (60) days after receipt of the request. Such sixty (60) day period may be extended for another period of sixty (60) days if the Plan Administrator reviewing the claim finds that special circumstances require an extension of time for processing.

12

(e)        The final decision of the Plan Administrator shall be in writing, (i) give specific reason(s) for the adverse decision, (ii) make specific references to the pertinent Plan provisions on which the decision is based, (iii) include a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits, and (iv) a statement describing any voluntary appeals procedures offered by the Plan and the claimant's right to obtain information about such procedures, and a statement of the claimant's right to bring an action under Section 502(a) of ERISA. All interpretations, determinations and decisions of the Plan Administrator in respect of any claim shall be made in its sole discretion based on the applicable Plan documents and shall be final, conclusive and binding on all parties.

(f)        A claimant or potential claimant must file a claim with the Plan Administrator no later than one (1) year after the claimant or potential claimant knows, or should have known, the principal facts upon which their claim is based. Any legal action in connection with the Plan must be brought in the Federal District Court of New Jersey within the six (6) month period beginning on the date the claimant's claim and appeal rights are exhausted.

13.    Miscellaneous.

(a)        Anti-Alienation. The right of a Participant to receive any amount credited to the Participant's Account shall not be transferable or assignable by the Participant, except by will or by the laws of descent and distribution. To the extent that any person acquires a right to receive any amount credited to a Participant's Account hereunder, such right shall be no greater than that of an unsecured general creditor of the Corporation. Except as expressly provided herein, any person having an interest in any amount credited to a Participant's Account under the Plan shall not be entitled to payment until the date the amount is due and payable. No person shall be entitled to anticipate any payment by assignment, pledge or transfer in any form or manner before actual or constructive receipt thereof.

(b)        Section 409A. The Plan is intended to comply with the applicable requirements of Section 409A of the Code and its corresponding regulations and related guidance with respect to Non-Grandfathered Contribution Amounts credited to the Participant's Account, and shall be administered in accordance with Section 409A of the Code with respect to such Non- Grandfathered Contribution Amounts. Notwithstanding anything in the Plan to the contrary, elections to defer Non-Grandfathered Contribution Amounts under the Plan, and distributions of Non-Grandfathered Contribution Amounts, may only be made in a manner and upon an event permitted by Section 409A of the Code. To the extent that any provision of the Plan would cause a conflict with the requirements of Section 409A of the Code, or would cause the administration of the Plan to fail to satisfy the requirements of Section 409A of the Code, such provision shall be deemed null and void to the extent permitted by applicable law. Other than a valid Election, in no event shall a Participant, directly or indirectly, designate the Plan Year of payment with respect to Non-Grandfathered Accounts. For the avoidance of doubt, deferrals under the Plan are maintained on a Plan Year basis.

13

(c)         Unsecured General Creditor. Neither the Corporation nor any of its subsidiaries shall be required to reserve or otherwise set aside funds, Common Stock or other assets for the payment of its obligations hereunder. However, the Corporation or any subsidiary may, in its sole discretion, establish funds for payment of its obligations hereunder. Any such funds shall remain assets of the Corporation or such subsidiary, as the case may be, and subject to the claims of its general creditors. Such funds, if any, shall not be deemed to be assets of the Plan. The Plan is intended to be unfunded for tax purposes and for purposes of Title I of ERISA.

(d)         Withholding. The Corporation shall withhold from any distribution made from Participant Deferred Contribution Amounts the amount necessary to satisfy applicable federal, state and local tax withholding requirements. With respect to distributions of Plan Employer Contribution Amounts, the delivery of the shares of Common Stock shall be delayed until the Participant makes arrangements, pursuant to procedures to be adopted by the Plan Administrator, to satisfy the applicable federal, state and local tax withholding requirements. Each Participant, however, shall be responsible for the payment of all individual tax liabilities relating to any such benefits.

(e)         Offset. To the maximum extent permitted under Section 409A of the Code and its corresponding regulations, if a Participant becomes entitled to a distribution of benefits under the Plan, and if at such time the Participant has outstanding any debt, obligation, or other liability representing an amount owing to the Corporation or any participating affiliate, then the Corporation may offset such amount owed to the Corporation or the participating affiliate against the amount of benefits otherwise distributable. Such determination shall be made by the Plan Administrator.

(f)         Termination and Amendment. The Corporation may at any time amend or terminate the Plan, subject to the requirements of Section 409A of the Code with respect to the Non-Grandfathered Amounts. Notwithstanding the foregoing, and unless such amendment is required by Section 409A of the Code, the Plan may not, without the consent of an affected Participant, be amended in any manner which would adversely affect such Participant's rights and expectations with respect to deferral amounts credited to such Participant's Account immediately before such amendment (including, but not limited to, any amendment which would adversely affect the rights or features applicable to, or any of the components that are taken into account in determining, the deferral amounts of any Participant hereunder).

(g)         Benefit Statements. Each Participant shall receive periodic statements (not less frequently than annually) regarding the Participant's Account. Each such statement shall indicate the amount of the balances credited to the Participant's Account as of the end of the period covered by such statement.

(h)         Legal Interpretation. This Plan and its provisions shall be construed in accordance with the laws of New Jersey to the extent such New Jersey law is not inconsistent with the provisions of ERISA. The text of this Plan shall, to the extent permitted by law, govern the determination of the rights and obligations created or referred to herein. Headings to the Sections, Paragraphs and Subparagraphs are for reference purposes only and do not limit or extend the meaning of any of the Plan's provisions.

(i)         Gender; Number. All pronouns and any variations thereof shall be deemed to  refer to the masculine, feminine, or neuter, as the identity of the person or persons may require. As the context may require, the singular may read as the plural and the plural as the singular.

14

(j)      Employment. The adoption and maintenance of this Plan shall not be deemed to constitute a contract between the Corporation or its subsidiaries and any employee or to be a consideration for or condition of employment of any person. No provision of the Plan shall be deemed to give any employee the right to continue in the employ of the Corporation or its subsidiaries or to interfere with the right of the Corporation or its subsidiaries to discharge any employee at any time without regard to the effect which such discharge might have upon the employee's participation in the Plan or benefits under it.

(k)      Fiduciary Capacities. Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan. For purposes of this Subparagraph 13(k), the term "fiduciary" shall have the same meaning as in ERISA.

(l)      Participants Subject to Section 16. Notwithstanding anything herein to the contrary, if any request and subject to Section 409A of the Code, election or other action under the Plan affecting a Participant subject to Section 16 of the Securities Exchange Act of 1934 should require the approval of the Committee to exempt such request, election or other action from potential liability under Section 16, then the approval of the Committee shall be obtained in lieu of the approval of the Plan Administrator.

15

**HONEYWELL DEFERRED INCENTIVE COMPENSATION PLAN**
**(amended and restated effective April 1, 2018)**

1.      History. Honeywell International Inc. (the "Corporation") previously established this supplemental non-qualified Honeywell Deferred Incentive Compensation Plan (formerly the Salary and Incentive Award Deferral Plan for Selected Employees of Honeywell International Inc. and its Affiliates) (the "Plan") and has amended the Plan several times since its initial effective date, including an amendment and restatement effective January 1, 2009 to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and corresponding rules and regulations under Section 409A of the Code. This Plan document covers any Participant (as defined below) who was entitled to receive a benefit from the Plan as of March 31, 2018, but who did not receive full payment of such benefit under the Plan as of such date, as well as any individual who becomes a Participant in the Plan on or after April 1, 2018. Plan benefit payments commencing before April 1, 2018 are governed by the terms of the Plan as they existed prior to this amendment and restatement and are either grandfathered from the requirements of Section 409A of the Code or payable pursuant to a fixed schedule as required by, and in compliance with, Section 409A of the Code.

2.      Eligibility. Any employee of the Corporation and its participating affiliates who is designated by the Corporation as an Executive level employee during the designated election period (the "Open Enrollment Period") for the applicable Plan Year (as defined below) shall be eligible (an "Eligible Employee") to participate in the Plan and elect deferrals of compensation (as described in Paragraph 4 below) for such Plan Year effective as of the January 1 of the Plan Year that follows the Open Enrollment Period. The Management Development and Compensation Committee (or its designee) (the "Committee") shall designate the period prior to the applicable Plan Year that shall constitute the Open Enrollment Period, in its sole discretion; provided, however, in no event shall such Open Enrollment Period end later than the December 31 that precedes the Plan Year for which the election to participate in the Plan applies. For purposes of this Plan, the "Plan Year" shall mean the calendar year.

3.      Participation. Each Eligible Employee who wishes to participate in the Plan for a particular Plan Year (a "Participant") must file a deferral election (the "Election") with the Committee during the Open Enrollment Period in the form and manner determined by the Committee, which election shall designate the portion of the compensation elements (as described in Paragraph 4 below) to be deferred for such Plan Year and the form in which such deferral amounts, and interest thereon, shall be distributed (as described in Paragraph 8 below). The compensation elements deferred for a particular Plan Year shall be credited to an unfunded deferred compensation account maintained for the Participant under the Plan (the "Participant Account" or "Account"). Except as otherwise may be permitted by Section 409A of the Code and the Committee, a Participant may not modify his or her deferral election for a Plan Year at any time during the Plan Year.

1

4.        Contributions to Participant Accounts.

(a)        Incentive Awards. During the Open Enrollment Period, an Eligible Employee may elect on his Election to defer up to 100% of the cash bonus payable (with such deferral in a whole percentage and 10% increment) to such Eligible Employee under the Honeywell International Inc. Incentive Compensation Plan for Executive Employees (or any successor plan), the Honeywell Capital Management LLC Incentive Compensation Plan (or any successor plan), the Honeywell Connected Enterprise Incentive Compensation Plan (or any successor plan), or any other similar annual incentive compensation plan covering Executive level employees that is designated by the Corporation as eligible for deferrals under this Plan (each an "Incentive Award"), for the performance period under the applicable incentive plan that begins in the Plan Year that commences after the Open Enrollment Period.

(b)        Base Annual Salary. For Plan Years beginning before January 1, 2006, an Eligible Employee who was employed in Career Band 6 and above (or an Eligible Employee who occupied a position equivalent thereto) was permitted prior to the beginning of the applicable Plan Year (and with respect to a newly Eligible Employee, within 30 days after first becoming so eligible) to elect to defer an aggregate amount of base annual salary otherwise payable in such Plan Year (or with respect to a newly Eligible Employee, in the remainder of the Plan Year), exclusive of any bonus or any other compensation or allowance paid or payable by the Corporation or its affiliates (the "Base Annual Salary"). The amount deferred under this Paragraph 4(b) was not permitted to be greater than 50% of the Eligible Employee's Base Annual Salary for any pay period. Effective July 29, 2005, no new deferral elections were permitted under this Paragraph 4(b) for the remainder of the Plan Year beginning January 1, 2005. For Plan Years beginning on and after January 1, 2006, no Eligible Employee may elect to defer any portion of his Base Annual Salary under the Plan.

(c)        Deferral Amounts. All amounts determined under this Paragraph 4 which are the subject of an Election (the "Deferral Amounts") shall, in accordance with the relevant Participant direction, be credited to the relevant Participant Account maintained under the Plan on the same day the Base Annual Salary or Incentive Award would otherwise have been payable.

(d)        A Participant's Account shall consist of two sub-accounts, as applicable: (1) a sub-account which consists of (A) Base Annual Salary earned and vested as of December 31, 2001 and any earnings thereon, and (B) Incentive Awards earned as of December 31, 2001 and vested as of December 31, 2004 and any earnings thereon (with the total amounts described in (A) and (B) referred to as the "Grandfathered Account"), and (2) a sub-account which consists of (X) Base Annual Salary earned and vested on or after January 1, 2002 and any earnings thereon, and (Y) Incentive Awards earned on or after January 1, 2002 and vested on or after January 1, 2005 and any earnings thereon (with the amounts described in (X) and (Y) referred to as the "Non-Grandfathered Account"). Base Annual Salary, Incentive Awards and any earnings thereon that were earned in the Plan Years beginning January 1, 2002, January 1, 2003 and January 1, 2004 and that are credited to a Participant's Non-Grandfathered Account will be referred to herein as "2002-2004 Deferrals".For the avoidance of doubt, the Grandfathered Account consists of deferrals and earnings attributable to Plan Years (also referred to as class years) beginning on or before January 1, 2001 and the Non-Grandfathered Account consists of deferrals and earnings attributable to Plan Years beginning on or after January 1, 2002.

2

5.    Deferral Requirements.

(a)    Plan Years Beginning On or After January 1, 2006. A Participant's Deferral Amounts under the Plan for Plan Years beginning on or after January 1, 2006 will be paid in one lump-sum payment to such Participant in the January of the Plan Year that follows the Plan Year in which the Participant has a Separation from Service (as defined in Section 409A(a)(2)(A)(i) of the Code and its corresponding regulations) with the Corporation and its affiliates, unless the Participant elects as part of his Election during the Open Enrollment Period that the Deferral Amounts for the Plan Year will instead be paid in substantially equal annual installments (not to exceed ten) if he has a Separation from Service with the Corporation and its affiliates on or after he attains age 55 and has completed ten Years of Service (as defined below), in which case the first installment shall commence in the January of the Plan Year that follows the Plan Year in which the Participant has a Separation from Service and each remaining installment will be paid to the Participant in each succeeding January.

Notwithstanding the foregoing, if at the time of the Participant's Separation from Service, the Participant is a Specified Employee (as defined below) the payments provided in the preceding paragraph shall be paid (or commence in the case of installments) in (i) the January of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service with the Corporation and its affiliates occurs prior to July 1 of such Plan Year, or (ii) the July of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service with the Corporation and its affiliates occurs after June 30 of such Plan Year. If the Participant elected to receive his distribution in the form of installment payments, after the first payment is made pursuant to the immediately preceding sentence, each subsequent installment will be paid to the Participant in the January of each Plan Year that follows until all installments are paid to the Participant.

Notwithstanding the foregoing, if the Participant dies after the Separation from Service but before the end of the Plan Year in which the Separation from Service occurs, or if a Specified Employee dies before the payment date described in the preceding paragraph, the Participant's beneficiary will receive the payment or payments in a lump sum within 60 days of the date of the Participant's death.

For purposes of this Plan, the term (i) "Years of Service" shall be determined using the Participant's most-recent adjusted service date, as reflected at the Participant's Separation from Service in the Company's records, and (ii) "Specified Employee" shall mean any Participant who, at any time during the twelve (12) month period ending on the identification date, is a specified employee under Section 409A of the Code, which determination of "specified employees," including the number and identity of persons considered "specified employees" and the identification date, shall be made by the Vice President – Compensation and Benefits (or his delegate) in accordance with the provisions of Sections 416(i) and 409A of the Code and the regulations issued thereunder.

(b)    2005 Plan Year. For the 2005 Plan Year, a Participant's Deferral Amounts under the Plan for such Plan Year will be paid in one lump-sum payment to such Participant in the January of the Plan Year that follows the Plan Year in which the Participant has a Separation from Service with the Corporation and its affiliates, unless the Participant elected on his Election during the Open Enrollment Period that the Deferral Amounts for such Plan Year will instead be paid to such Participant at a Specified Time (as such term is defined in Section 409A(a)(2)(A)(iv) of the Code and its corresponding regulations), provided that the Specified Time is no sooner than January of the 2009 Plan Year (unless the Committee approved at the time of such election a shorter period of deferral) and in up to 15 annual installments.

3

Notwithstanding the foregoing, if at the time of the Participant's Separation from Service the Participant is entitled to payment of the amounts deferred for the 2005 Plan Year because of his Separation from Service (and not because of the Specified Time designated, if any) and the Participant is a Specified Employee, the payments provided in the immediately preceding sentence on account of Separation from Service shall be paid (or commence payment in the case of installments) in (i) the January of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service with the Corporation and its affiliates occurs prior to July 1 of such Plan Year, or (ii) the July of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service with the Corporation and its affiliates occurs after June 30 of such Plan Year. Payment on account of a Specified Time shall be paid (or commence payment in the case of installments) to the Participant in January of the Plan Year elected by the Participant.

If the Participant elected to receive his distribution in the form of installment payments, after the first payment is made pursuant to the immediately preceding paragraph, each subsequent installment will be paid to the Participant in the January of each Plan Year that follows until all installments are paid to the Participant. Notwithstanding anything to the contrary in this Paragraph 5(b), if the Participant dies after the Separation from Service, but before the end of the Plan Year in which the Separation from Service occurs or if a Specified Employee dies before the payment date described in the preceding paragraph, the Participant's beneficiary will receive the payment or payments in a lump sum within 60 days of the date of the Participant's death.

    (c)    <u>Plan Years Beginning Before January 1, 2005</u>.

    (i)    <u>Grandfathered Accounts</u>. A Participant's Deferral Amounts credited to a Participant's Grandfathered Account under the Plan for Plan Years beginning before January 1, 2005 shall be paid as soon as practicable during the month of January following the calendar year in which the Participant terminates employment; provided, however, amounts deferred under the Plan may be paid at such other date permitted to be designated by the Participant that provides for a minimum period of deferral of at least three years or such shorter period as may be approved by the Committee, which election was made at the time the Participant made the deferral election for such Plan Years. The Participant also elected at such time to receive such distribution in one lump-sum payment or in a number of substantially equal annual installments (provided the payment period may not include more than 30 such installments).

The lump-sum or the first installment shall be paid as soon as practicable during the month of January of the calendar year following termination of employment or such other calendar year validly designated by the Participant. Except as otherwise provided in Paragraphs 9, 10, and 11, all installment payments following the initial installment payment shall be paid in cash as soon as practicable during the month of January of each succeeding calendar year until the entire amount in the Account shall have been paid.

Notwithstanding the foregoing, in the event a Participant's employment with the Corporation is terminated either voluntarily (other than on account of retirement as defined in the qualified pension plan in which the Participant participates or for "good reason" under any applicable severance plan of the Corporation) or for "gross cause" (as defined in the AlliedSignal Inc. Severance Plan for Senior Executives), the Participant's Deferral Amounts for performance years beginning after 1997 for amounts deferred under Paragraph 4(a)

4

hereof or after 1998 for amounts deferred under Paragraph 4(b) hereof (including any notional interest credited thereto) shall be distributed in a lump sum as soon as practicable in January of the calendar year following such termination of employment. Except as otherwise provided in Paragraph 5(d) or Paragraphs 9 or 10 or as approved by the Committee, no amount shall be withdrawn from a Participant's Account prior to the last day of the calendar year in which the Deferral Amounts were earned; the date the Participant reaches normal retirement age and is eligible to receive a benefit under a pension plan of the Corporation or one of its affiliates; the date of the Participant's death; or the date the Participant ceases to be employed by the Corporation or any of its affiliates.

   (ii)  Non-Grandfathered Accounts. A Participant's 2002-2004 Deferrals shall be paid during the month of January following the calendar year in which the Participant has a Separation from Service; provided, however, a Participant's 2002-2004 Deferrals may be paid at a Specified Time designated by the Participant that provides for a minimum period of deferral of at least three years or such shorter period as may have been approved by the Committee, which election was made prior to January 1 for the applicable Plan Year. The Participant also elected at such time to receive such distribution in one lump-sum payment or in a number of substantially equal annual installments (not exceeding 15).

   Notwithstanding the foregoing, if at the time of the Participant's Separation from Service the Participant is entitled to payment of the 2002-2004 Deferrals because of his Separation from Service (and not because of the Specified Time designated, if any) and the Participant is a Specified Employee, the payments provided in the immediately preceding sentence on account of Separation from Service shall be paid (or commence payment in the case of installments) in (i) the January of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service with the Corporation and its affiliates occurs prior to July 1 of such Plan Year, or (ii) the July of the Plan Year that follows the Plan Year in which the Participant's Separation from Service with the Corporation and its affiliates occurs, if the Participant's Separation from Service with the Corporation and its affiliates occurs after June 30 of such Plan Year. Payment on account of a Specified Time shall be paid (or commence payment in the case of installments) to the Participant in January of the Plan Year elected by the Participant.

   If the Participant elected to receive his distribution in the form of installment payments, after the first payment is made pursuant to the immediately preceding paragraph, each subsequent installment will be paid to the Participant in the January of each Plan Year that follows until all installments are paid to the Participant. Notwithstanding anything to the contrary in this subparagraph 5(c)(ii), if the Participant dies after the Separation from Service, but before the end of the Plan Year in which the Separation from Service occurs or if a Specified Employee dies before the payment date described in the preceding paragraph, the Participant's beneficiary will receive the payment or payments in a lump sum within 60 days of the date of the Participant's death.

  (d)  In-Service Withdrawal. A Participant may request an immediate withdrawal of all or a portion of the Deferral Amounts credited to a Participant's Grandfathered Account prior to the date described in subparagraph 5(c)(i) or prior to the date such portion of the Grandfathered Account has been completely withdrawn, provided that such a request and withdrawal shall be subject to the approval of the Corporation and such penalties, restrictions or conditions as may be established by the Corporation from time to time. The penalty shall be a percentage of the amount requested to be withdrawn, calculated as the difference between (a) 6%, and (b) 50% of the amount, if any, by which 10% exceeds the interest rate on 10-year U.S. Treasury Bonds on the first business day of the calendar quarter during which the withdrawal request is made.

5

6.     Interest Equivalents. Deferral Amounts shall accrue additional amounts equivalent to interest ("Interest Equivalents"), compounded daily, from the date the Deferral Amount is credited to the Account to the date of distribution as set forth in this Paragraph 6.

(a)     Non-Grandfathered Deferral Amounts.

(i)     Deferral Amounts Credited for Plan Years On and After January 1, 2006. Deferral Amounts credited to a Participant's Non-Grandfathered Account for Plan Years beginning on or after January 1, 2006, and Deferral Amounts under Paragraph 4(a) credited to a Participant's Non-Grandfathered Account in 2006 for the Election filed by the Participant for the 2005 Plan Year, shall accrue Interest Equivalents at an annual rate based upon the cost to the Corporation of borrowing at a fixed rate for a 15-year term. Such rate is subject to change from Plan Year to Plan Year with respect to amounts credited to a Participant's Non-Grandfathered Account for a particular Plan Year and shall be determined annually by the Chief Financial Officer of the Corporation in consultation with the Treasurer of the Corporation prior to January 1 of each Plan Year. Interest Equivalents described in this clause (i) shall be vested at the time such amounts are credited to the Participant's Non-Grandfathered Account. All Interest Equivalents credited to the Participant's Non-Grandfathered Account pursuant to this clause (i) shall be paid at the same time and in the same form as the corresponding Deferral Amounts for which the Interest Equivalents relate. The rate of notional interest established hereunder is set forth on Schedule A attached hereto and made a part hereof.

(ii)     Deferral Amounts Credited for the 2005 Plan Year. Deferral Amounts under Paragraph 4(b) credited to a Participant's Non-Grandfathered Account in the 2005 Plan Year for the Election filed by the Participant for the 2005 Plan Year shall accrue Interest Equivalents at a single rate established by the Committee, in its sole discretion. Such rate is subject to change from Plan Year to Plan Year with respect to amounts credited to a Participant's Non-Grandfathered Account for the 2005 Plan Year and shall be determined annually by the Chief Financial Officer of the Corporation in consultation with the Treasurer of the Corporation prior to January 1 of each Plan Year.

The rate of notional interest established hereunder is set forth on Schedule A attached hereto and made a part hereof. Any portion of such rate designated as the "Contingent Rate" became nonforfeitable only if the Participant was still employed by the Corporation or any affiliate at the end of the third full calendar year in which the Deferral Amount related; provided, however, if a Participant terminated employment with the Corporation or an affiliate prior to such date for reasons other than gross cause, the Committee treated such portion as nonforfeitable if the Participant's employment with the Corporation or an affiliate was involuntarily terminated (including a termination for "good reason" under any applicable severance plan of the Corporation or an affiliate) or terminated for such reasons as the Committee determined from time to time in its sole discretion. All Interest Equivalents credited to the Participant's Non-Grandfathered Account pursuant to this clause (ii) shall be paid at the same time and in the same form as the corresponding Deferral Amounts for which the Interest Equivalents relate.

6

(iii)    2002-2004 Deferrals. 2002-2004 Deferrals shall accrue Interest Equivalents at a single rate established by the Committee, in its sole discretion. The rate established by the Committee did not exceed the greater of (i) 10% or (ii) 200% of the 10-year U.S. Treasury Bond rate at the time of determination. Such Interest Equivalents, once established for a Plan Year, shall remain in effect with respect to Deferral Amounts credited to the Participant's Non-Grandfathered Account for each such Plan Year until the Deferral Amounts are distributed.

The rate of notional interest established hereunder is set forth on Schedule A attached hereto and made a part hereof. Any portion of such rate designated as the "Contingent Rate" became nonforfeitable only if the Participant was still employed by the Corporation or any affiliate at the end of the third full calendar year in which the Deferral Amount related, provided, however, if a Participant had a Separation from Service with the Corporation or an affiliate before such date for reasons other than gross cause, the Committee treated such portion as nonforfeitable if the Participant's employment with the Corporation or an affiliate was involuntarily terminated (including a termination for "good reason" under any applicable severance plan of the Corporation or an affiliate) or was terminated for such reasons as the Committee determined from time to time in its sole discretion.

Notwithstanding the preceding sentence, if a Participant withdrew any portion of the Deferral Amount before the end of the third full calendar year following the calendar year to which the Deferral Amount relates, the amount of Contingent Rate interest credited with respect to such Deferral Amount at the time of withdrawal remains credited to such Account subject to the provisions of the preceding sentence but shall not be credited with any Interest Equivalents after such date ("Frozen Contingent Interest"). Notwithstanding anything in the Plan to the contrary, from and after the occurrence of a Change in Control (as defined below), the rate at which Deferral Amounts accrue Interest Equivalents may not be decreased.

(b)    Grandfathered Deferral Amounts. Deferral Amounts credited to a Participant's Grandfathered Account shall accrue Interest Equivalents at a single rate established by the Committee, in its sole discretion, for all Deferral Amounts credited to such Grandfathered Account in each calendar year. The rate established by the Committee did not exceed the greater of (i) 10% or (ii) 200% of the 10-year U.S. Treasury Bond rate at the time of determination. Such Interest Equivalents, once established for a Plan Year, shall remain in effect with respect to Deferral Amounts credited to the Participant's Grandfathered Account during such Plan Year until the Deferral Amounts are distributed.

The rate of notional interest established hereunder is set forth on Schedule A attached hereto and made a part hereof. Any portion of such rate designated as the "Contingent Rate" became nonforfeitable only if the Participant was still employed by the Corporation or any affiliate at the end of the third full calendar year in which the Deferral Amount relates, provided, however, if a Participant terminated employment with the Corporation or an affiliate before such date for reasons other than gross cause, the Committee treated such portion as nonforfeitable if the Participant's employment with the Corporation or an affiliate was involuntarily terminated (including a termination for "good reason" under any applicable severance plan of the Corporation or an affiliate) or was terminated for such reasons as the Committee determined from time to time in its sole discretion.

7

Notwithstanding the preceding paragraph, if a Participant withdrew any portion of the Deferral Amount before the end of the third full calendar year following the calendar year to which the Deferral Amount relates, the amount of Contingent Rate interest credited with respect to such Deferral Amount at the time of withdrawal became Frozen Contingent Interest. Notwithstanding anything in the Plan to the contrary, from and after the occurrence of a Change in Control, the rate at which Deferral Amounts accrue Interest Equivalents may not be decreased.

7.    <u>Participant Accounts</u>. All amounts credited to a Participant's Account pursuant to Paragraphs 4 and 6 shall be unfunded general obligations of the Corporation, and no Participant shall have any claim to or security interest in any asset of the Corporation on account thereof.

8.    <u>Distribution from Accounts</u>.

(a)    <u>Plan Years Beginning On and After January 1, 2006</u>. Deferral Amounts and corresponding Interest Equivalents for Plan Years beginning on and after January 1, 2006 shall be paid to the Participant at the time and in the form as elected by the Participant on his Election for such Plan Year in accordance with the requirements of Paragraph 5(a).

(b)    <u>2005 Plan Year</u>. Deferral Amounts and corresponding Interest Equivalents for the Plan Year beginning on January 1, 2005 shall be paid to the Participant at the time and in the form as elected by the Participant on his Election for such Plan Year in accordance with the requirements of Paragraph 5(b).

(c)    <u>Plan Years Beginning Prior to January 1, 2005</u>.

(i)    <u>Grandfathered Accounts</u>. Deferral Amounts and corresponding Interest Equivalents credited to a Participant's Grandfathered Account shall be paid to a Participant at the time and in the form as elected by the Participant on his Election for such Plan Years in accordance with the requirements of subparagraph 5(c)(i).

(ii)    <u>Non-Grandfathered Accounts</u>. 2002-2004 Deferrals shall be paid to a Participant at the time and in the form as elected by the Participant on his Election for such Plan Years in accordance with the requirements of subparagraph 5(c)(ii).

(iii)    <u>Special Election Change Applicable to Grandfathered Accounts</u>. The Corporation may from time to time allow Participants to request new elections with respect to the distribution of Deferral Amounts and Interest Equivalents credited to their Grandfathered Accounts (other than any such amounts currently payable to a Participant). The Corporation shall reserve the right to accept or reject any such request at any time and such election shall be subject to such restrictions and limitations as the Corporation shall determine in its sole discretion, provided that any new election shall generally be required to be made at least 12 months prior to any scheduled payment date.

(d)    <u>Type of Distribution</u>. All distributions from this Plan shall be paid in cash.

9.　　　Distribution on Death. If a Participant dies after payments under this Plan have commenced but before all amounts credited to the Participant's Account have been distributed, the balance in the Account shall be paid as soon as practicable thereafter to the beneficiary designated in writing by the Participant, but not later than 60 days after the date of the Participant's death. Payment to a beneficiary pursuant to a designation by a Participant shall be made in one lump sum cash payment. Such beneficiary designations shall be effective when received by the Corporation, and shall remain in effect until rescinded or modified by the Participant by an appropriate written direction.

Separate beneficiary designations shall be made for Incentive Awards deferred under Paragraph 4(a) and Interest Equivalents credited on such amounts and for Base Annual Salary deferred under Paragraph 4(b) and Interest Equivalents credited on such amounts. If no beneficiary is properly designated by the Participant for one or both portions of the Account, or  if the designated beneficiary has predeceased the Participant, such balance in the applicable portion of the Account shall be paid to the estate of the Participant.

10.　　　Payment in the Event of Hardship. For Deferral Amounts and Interest Equivalents credited to a Participant's Grandfathered Account, upon receipt of a request from a Participant, delivered in writing to the Corporation along with a hardship distribution form and supporting documentation of the hardship, the Senior Vice President – Human Resources and Communications (or his designee), may cause the Corporation to accelerate (or require the subsidiary of the Corporation which employs or employed the Participant to accelerate) payment of all or any part of the Deferral Amount and Interest Equivalents credited to the Participant's Account, if it finds in its sole discretion that payment of such amounts in accordance with the Participant's prior election under Paragraph 4 hereof would result in severe financial hardship to the Participant and such hardship is the result of an unforeseeable emergency caused by circumstances beyond the control of the Participant. An "unforeseeable emergency" means a severe financial hardship to the Participant resulting from (1) an illness or accident that occurs to the Participant, the Participant's spouse or the Participant's dependent (as defined in section 152(a) of the Code, (2) loss of the Participant's property due to casualty, or (3) other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the Participant's control. The amount withdrawn cannot exceed the amount necessary to satisfy the emergency and estimated taxes the Participant will incur as a result of such distribution. Acceleration of payment may not be made under this Paragraph 10 to the extent that such hardship is or may be relieved (i) through reimbursement or compensation by insurance or otherwise, or (ii) by liquidation of the Participant's assets, to the extent the liquidation of assets would not itself cause severe financial hardship.

11.　　　Change in Control.

(a)　　　Initial Lump Sum Election. Notwithstanding any election made pursuant to Paragraphs 4 and 5 hereof, a Participant (i) may file a written election with the Corporation to have the Deferral Amounts and Interest Equivalents credited to the Participant's Grandfathered Account paid in one lump-sum payment as soon as practicable following a Change in Control (as defined below), but in no event later than 90 days after such Change in Control, and (ii) may designate in his Election during the Open Enrollment Period for a particular Plan Year that Deferral Amounts and Interest Equivalents credited to the Participant's Non-Grandfathered Account for such Plan Year be paid in one lump-sum payment within 90 days after such Change in Control. The Interest Equivalents on any Deferral Amount payable pursuant to this Paragraph 11(a) shall include the "Contingent Rate" credited to such Deferral Amount without regard to whether such amount has become nonforfeitable as provided in Paragraph 6 at the time the applicable Change in Control occurs.

9

(b)        <u>Revocation of Lump-Sum Election</u>. A Participant may revoke an election made pursuant to clause (i) of Paragraph 11(a) (including an election not to be paid in one lump sum upon a Change in Control), but only for amounts credited to a Participant's Grandfathered Account, by filing an appropriate written notice with the Corporation. A revocation notice filed pursuant to this Paragraph 11(b) shall be subject to such terms and conditions as the Corporation shall establish and shall be effective with respect to all of the Deferral Amounts and Interest Equivalents credited to a Participant's Grandfathered Account. Any such election shall be subject to such restrictions and limitations as the Corporation shall determine in its sole discretion.

(c)        <u>Limitations on Elections</u>. For purposes of a Participant's election with respect to amounts covered by clause (i) of Paragraph 11(a) or a revocation of such election pursuant to Paragraph 11(b), such election shall not be effective unless filed with the Corporation at least 90 days prior to a Change in Control.

(d)        <u>Definition of Change in Control</u>. For Plan Years beginning after April 1, 2018  and for purposes of the Plan, "Change in Control" means (a) any one person, or more than one person acting as a group (as defined under U.S. Department of Treasury Regulation ("Treasury Regulation") § 1.409A-3(i)(5)(v)(B)) acquires ownership of stock of the Corporation that, together with stock held by such person or group, constitutes more than 50 percent of the total fair market value or total voting power of the stock of the Corporation; or (b) any one person, or more than one person acting as a group (as defined under Treasury Regulation § 1.409A- 3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) ownership of stock of the Corporation possessing 30 percent or more of the total voting power of the stock of the Corporation; or (c) a majority of members of the Board of Directors of the Corporation (the "<u>Board</u>") is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the members of the Board before the date of the appointment or election; or (d) any one person, or more than one person acting as a group (as defined in Treasury Regulation § 1.409A-3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets from the Corporation and its subsidiaries on a consolidated basis that have a total gross fair market value equal to or more than 40 percent of the total gross fair market value of all of the assets of the Corporation and its subsidiaries on a consolidated basis immediately before such acquisition or acquisitions. For purposes of clause (d), "gross fair market value" means the value of the assets of the Corporation and its subsidiaries on a consolidated basis, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets. The foregoing clauses (a) through (d) shall be interpreted in a manner that is consistent with the Treasury Regulations promulgated pursuant to Section 409A of the Code so that all, and only, such transactions or events that could qualify as a "change in control event" within the meaning of Treasury Regulation § 1.409A-3(i)(5)(i) shall be deemed to be a Change in Control for purposes of this Plan.

12.    <u>Administration</u>.

(a)        <u>Plan Administrator</u>. The Plan Administrator and "named fiduciary" for purposes of the Employee Income Retirement Security Act of 1974, as amended ("<u>ERISA</u>") shall be the Senior Vice President-Human Resources and Communications of the Corporation (or the person acting in such capacity in the event such position is abolished, restructured or renamed). The Plan Administrator shall have the authority to appoint one or more other named fiduciaries of the Plan and to designate persons, other than named fiduciaries, to carry out fiduciary responsibilities under the Plan, pursuant to Section 405(c)(1)(B) of ERISA. Any person acting on behalf of the Plan Administrator shall serve without additional compensation. The Plan Administrator shall keep or cause to be kept such records and shall prepare or cause to be prepared such returns or reports as may be required by law or necessary for the proper administration of the Plan.

(b)        Powers and Duties of Plan Administrator. The Plan Administrator shall have the full discretionary power and authority to construe and interpret the Plan (including, without limitation, supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan); to determine all questions of fact arising under the Plan, including questions as to eligibility for and the amount of benefits; to establish such rules and regulations (consistent with the terms of the Plan) as it deems necessary or appropriate for administration of the Plan; to delegate responsibilities to others to assist it in administering the Plan; to retain attorneys, consultants, accountants or other persons (who may be employees of the Corporation or its subsidiaries) to render advice and assistance as it shall determine to be necessary to effect the proper discharge of any duty for which it is responsible; and to perform  all other acts it believes reasonable and proper in connection with the administration of the Plan. The Plan Administrator shall be entitled to rely on the records of the Corporation and its subsidiaries in determining any Participant's entitlement to and the amount of benefits payable under the Plan. Any determination of the Plan Administrator, including interpretations of the Plan and determinations of questions of fact, shall be final and binding on all parties.

(c)        Indemnification. To the extent permitted by law, the Corporation shall indemnify the Plan Administrator from all claims for liability, loss, or damage (including payment of expenses in connection with defense against such claims) arising from any act or failure to act in connection with the Plan.

13.    Claims Procedures and Appeals.

(a)        A written request for a Plan benefit is a claim and the person making such claim is a claimant. Any claim must be made in writing and shall be deemed to be filed by a claimant when a written request is made by the claimant or the claimant's authorized representative which is reasonably calculated to bring the claim to the attention of the Plan Administrator.

(b)        The Plan Administrator shall provide notice in writing to any claimant when a claim for benefits under the Plan has been denied in whole or in part. Such notice shall be provided within 90 days of the receipt by the Plan Administrator of the claimant's claim or, if special circumstances require, and the claimant is so notified in writing, within 180 days of the receipt by the Plan Administrator of the claimant's claim. The notice shall be written in a manner calculated to be understood by the claimant and shall:

(i)        set forth the specific reasons for the denial of benefits;

(ii)        contain specific references to Plan provisions relative to the denial;

(iii)        describe any material and information, if any, necessary for the claim for benefits to be allowed, that had been requested, but not received by the Plan Administrator;

(iv)        advise the claimant that any appeal of the Plan Administrator's adverse determination must be made in writing to the Plan Administrator within 60 days after receipt of the initial denial notification, and must set forth the facts upon which the appeal is based; and

(v)        advise the claimant of his right to bring a civil action under Section 502(a) of ERISA, following an adverse benefit determination on review.

11

(c)    When a claimant receives notice of denial of a claim or does not receive notification of acceptance or denial within 90 days after submitting a claim, the claimant, either in person or by duly authorized representative, may:

    (i)    request, in writing, a review of the claim by the Plan Administrator;

    (ii)    review pertinent documents relating to the denial;

    (iii)    submit issues and comments in writing; and

    (iv)    request, in writing, a hearing with the Plan Administrator; provided that the claimant takes appropriate action within 60 days after receiving notice of denial.

(d)    The Plan Administrator shall make its decision with respect to a claim review promptly, but not later than 60 days after receipt of the request. Such 60-day period may be extended for another period of 60 days if the Plan Administrator reviewing the claim finds that special circumstances require an extension of time for processing.

(e)    The final decision of the Plan Administrator shall be in writing, (i) give specific reason(s) for the adverse decision, (ii) make specific references to the pertinent Plan provisions on which the decision is based, (iii) include a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits, and (iv) a statement describing any voluntary appeals procedures offered by the Plan and the claimant's right to obtain information about such procedures, and a statement of the claimant's right to bring an action under Section 502(a) of ERISA. All interpretations, determinations and decisions of the Plan Administrator in respect of any claim shall be made in its sole discretion based on the applicable Plan documents and shall be final, conclusive and binding on all parties.

(f)    A claimant or potential claimant must file a claim with the Plan Administrator no later than one (1) year after the claimant or potential claimant knows, or should have known, the principal facts upon which their claim is based. Any legal action in connection with the Plan must be brought in the Federal District Court of New Jersey within the six (6) month period beginning on the date the claimant's claim and appeal rights are exhausted.

14.    Miscellaneous.

(a)    No Alienation of Benefits. Except insofar as may otherwise be required by law, no amount payable at any time under the Plan shall be subject in any manner to alienation by anticipation, sale, transfer, assignment, bankruptcy, pledge, attachment, charge, or encumbrance of any kind nor in any manner be subject to the debts or liabilities of any person and any attempt to so alienate or subject any such amount, whether presently or thereafter payable, shall be void. If any person shall attempt to, or shall alienate, sell, transfer, assign, pledge, attach, charge, or otherwise encumber any amount payable under the Plan, or any part thereof, or if by reason of such person's bankruptcy or other event happening at any such time such amount would be made subject to the person's debts or liabilities or would otherwise not be enjoyed by that person, then the Corporation, to the extent permitted under Section 409A of the Code, if it so elects, may direct that such amount be withheld and that same or any part thereof be paid or applied to or for the benefit of such person, the person's spouse, children or other dependents, or any of them, in such manner and proportion as the Corporation may deem proper.

12

(b)      No Right or Interest in Corporation's Assets. Neither the Corporation nor any of its affiliates shall be required to reserve or otherwise set aside funds for the payment of obligations arising under this Plan. The Corporation may, in its sole discretion, establish funds, segregate assets or take such other action as it shall determine necessary or appropriate to secure the payment of its obligations arising under this Plan. This Plan is intended to be unfunded for tax purposes and for purposes of Title I of the ERISA. Nothing contained herein, and no action taken pursuant to the provisions of this Plan shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Corporation and any Participant or any other person. To the extent that any person acquires a right to receive payments under this Plan, such right shall be no greater than the right of an unsecured creditor of the Corporation.

(c)      Amendment. The Corporation may amend, modify or terminate the Plan at any time, or from time to time; provided, however, that no change to the Plan shall impair the right of any Participant with respect to amounts then credited to an Account; and further provided that during a Potential Change in Control Period (as defined in Paragraph 14 (i) hereof) and from and after the occurrence of a Change in Control, the Plan may not, without the consent of the Participant, be amended in any manner which would adversely affect such Participant's rights and expectations with respect to Deferral Amounts credited to such Participant's Account immediately prior to such amendment, unless an amendment is required to comply with the requirements of Section 409A of the Code.

(d)      Accounting. Each Participant shall receive periodic statements (not less frequently than annually) setting forth the cumulative Deferral Amounts and Interest Equivalents credited to, and any distributions from, the Participant's Account.

(e)      Facility of Payments. If the Corporation shall find that any person to whom any amount is payable under the Plan is unable to care for his affairs because of illness or accident, or is a minor, or has died, then any payment due the person or the person's estate (unless a prior claim therefore has been made by a duly appointed legal representative), may, if the Corporation so elects in its sole discretion, be paid to the person's spouse, a child, a relative, an institution having custody of such person, or any other person deemed by the Corporation to be a proper recipient on behalf of such person otherwise entitled to payment. Any such payment shall be a complete discharge of the liability of the Corporation and the Plan therefore.

(f)      Offset. To the maximum extent permitted under Section 409A of the Code and its corresponding regulations, if a Participant becomes entitled to a distribution of benefits under the Plan, and if at such time the Participant has outstanding any debt, obligation, or other liability representing an amount owing to the Corporation or any participating affiliate, then the Corporation may offset such amount owed to the Corporation or the participating affiliate against the amount of benefits otherwise distributable. Such determination shall be made by the Plan Administrator.

(g)      Governing Law. The Plan is intended to constitute an unfunded deferred compensation arrangement for a select group of management or highly compensated personnel and all rights thereunder shall be governed by and construed in accordance with the laws of New Jersey.

13

(h)    <u>Withholding Taxes</u>. The Corporation may make such provisions and take such action as it may deem necessary or appropriate for the withholding of any taxes which the Corporation or one if its affiliates is required by any law or regulation of any governmental authority, whether Federal, state, local or foreign, to withhold in connection with any benefits under the Plan, including, but not limited to, the withholding of appropriate sums from any amount otherwise payable to the Participant (or his beneficiary). Each Participant, however, shall be responsible for the payment of all individual tax liabilities relating to any such benefits.

(i)    <u>Potential Change in Control Period</u>. A "<u>Potential Change in Control Period</u>" shall commence when: (i) the Corporation enters into an agreement, the consummation of which would result in the occurrence of a Change in Control; (ii) the Corporation or any person or group publicly announces an intention to take or to consider taking actions which, if consummated, would result in a Change in Control; (iii) any person or group (other than the Corporation, any subsidiary or any savings, pension or other benefit plan for the benefit of employees of the Corporation or its subsidiaries) becomes the beneficial owner, directly or indirectly, of securities of the Corporation representing 15% or more of either the then outstanding shares of common stock of the Corporation or the combined voting power of the Corporation's then outstanding securities (not including in the securities beneficially owned by such person or group any securities acquired directly from the Corporation or its affiliates); or (iv) the Board adopts a resolution to the effect that, for purposes of the Plan, a Potential Change in Control Period has commenced. The Potential Change in Control Period shall continue until the earlier of (A) a Change in Control, or (B) the adoption by the Board of a resolution stating that, for purposes of the Plan, the Potential Change in Control Period has expired.

(j)    <u>Section 409A</u>. The Plan is intended to comply with the applicable  requirements of Section 409A of the Code and its corresponding regulations and related guidance with respect to amounts credited to the Non-Grandfathered Accounts of Participants, and shall be administered in accordance with Section 409A of the Code with respect to such Accounts. Notwithstanding anything in the Plan to the contrary, elections to defer compensation into Non- Grandfathered Accounts under the Plan, and distributions of Non-Grandfathered Accounts, may only be made in a manner and upon an event permitted by Section 409A of the Code. To the extent that any provision of the Plan would cause a conflict with the requirements of Section 409A of the Code, or would cause the administration of the Plan to fail to satisfy the requirements of Section 409A of the Code, such provision shall be deemed null and void to the extent permitted by applicable law. Other than a valid Election, in no event shall a Participant, directly or indirectly, designate the calendar year of payment with respect to Non-Grandfathered Accounts. For avoidance of doubt, deferrals under the Plan are maintained on a Plan Year basis.

14

## SCHEDULE A NOTIONAL INTEREST RATES

### Deferred Incentive Awards

The following chart applies to: (A) Executive level employees for awards earned and deferred in and after 2014, (B) all employees for awards earned and deferred between 2003 and 2013, and (C) Band 6 and above employees for awards earned and deferred before 2003.

| Year Award Earned | Vested Rate | Contingent Rate | Total Rate |
|---|---|---|---|
| 1975 – 1992 | Treasury bills + 3%* | N/A N/A | Treasury bills + 3%* |
| 1993 – 1997 | 10% | N/A | 10% |
| 1998 – 2000 | 8% | 3% | 11% |
| 2001- 2002 | 7% | 3% | 10% |
| 2003 | 3% | 5% | 8% |
| 2004 initial rate | 3% | 5% | 8% |
| 2005 initial rate ** | 8%** | N/A | 8%** |
| 2006 initial rate ** | 5.8%** | N/A | 5.8%** |
| 2007 initial rate ** | 5.8%** | N/A | 5.8%** |
| 2008 initial rate ** | 6.3%** | N/A | 6.3%** |
| 2009 initial rate ** | 7.2%** | N/A | 7.2%** |
| 2010 initial rate ** | 4.8%** | N/A | 4.8%** |
| 2011 initial rate ** | 3.84%** | N/A | 3.84%** |
| 2012 initial rate ** | 3.65%** | N/A | 3.65%** |
| 2013 initial rate ** | 2.90%** | N/A | 2.90%** |
| 2014 initial rate ** | 4.09%** | N/A | 4.09%** |
| 2015 initial rate ** | 3.66%** | N/A | 3.66%** |
| 2016 initial rate ** | 3.64%** | N/A | 3.64%** |
| 2017 initial rate ** | 2.69%** | N/A | 2.69%** |
| 2018 initial rate ** | 3.38%** | N/A | 3.38%** |

*/Three-month Treasury bill average rate for the immediately preceding calendar quarter as reported by the Federal Reserve Bank; rate changes each calendar quarter.

**/For periods on and after January 1, 2006, rate is based on the Corporation's 15-year borrowing

15

rate and is subject to change annually.

## Deferred Incentive Awards

The following chart applies to all employees other than Band 6 and above for awards earned and deferred before 2003.

| Year Award Earned | Vested Rate | Contingent Rate | Total Rate |
|---|---|---|---|
| 1975 – 1997 | Treasury bills + | N/A | Treasury bills + |
|  | 3%* | N/A | 3%* |
| 1998 - 2002 | 6% | 3% | 9% |

*/Three-month Treasury bill average rate for the immediately preceding calendar quarter as reported by the Federal Reserve Bank; rate changes each calendar quarter.

## Deferred Salary (Band 6 and Above)

| Year Salary Earned | Vested Rate | Contingent Rate | Total Rate |
|---|---|---|---|
| 1994 – 1998 | 10% | N/A | 10% |
| 1999 – 2001 | 8% | 3% | 11% |
| 2002 - 2002 | 7% | 3% | 10% |
| 2003 | 3% | 5% | 8% |
| 2004 | 3% | 5% | 8% |
| 2005 initial rate** | 3% | 5% | 8% |

**/For periods on and after January 1, 2006, rate is subject to change.

16

**SCHEDULE B PROVISIONS RELATING TO
HONEYWELL INC. EXECUTIVE DEFERED COMPENSATION PLAN**

1.        History. Honeywell Inc., a predecessor of the Corporation, previously established a supplemental non-qualified plan named the Honeywell Executive Deferred Compensation Plan (the "Honeywell Plan"). The Honeywell Plan was created to establish rules for the deferral and payment of deferred compensation earned under the Honeywell Inc. bonus plans named the "Honeywell Corporate Executive Compensation Plan," the "Honeywell Senior Management Performance Incentive Plan," and the "Multi-Year Incentive Program."

The Honeywell Plan was last amended and restated effective June 1, 1999. This Schedule B covers any participant in the Honeywell Plan who has not received full payment of his benefit under the Honeywell Plan as of April 1, 2018. Benefit payments commencing before April 1, 2018 are governed by the terms of the Honeywell Plan as they existed prior to this amendment and restatement and are grandfathered from the requirements of Section 409A of the Code.

2.        Definitions. For purposes of this Schedule B, the following definitions shall apply:

(a)        Account shall mean an unfunded, bookkeeping account maintained for a participant including amounts originally deferred under the Honeywell Plan and interest credits made pursuant to Section 3 of this Schedule B (or comparable provisions of the Honeywell Plan).

3.        Interest Credits. An interest credit shall be made to the participant's Account as of (a) each February 15, and (b) the date as of which any distribution is made from the participant's Account, for the year or portion thereof then ended based on the average daily balance of the Account for such year or portion thereof. The rate of interest shall be 120% of the long-term Applicable Federal Rate published under section 1274(d) of the Code for the month in which the interest credit is made to the Account.

4.        Distributions. The following provisions shall apply to distributions under this Schedule B.

(a)        Commencement. A participant's Account shall be paid or commenced as of March 31 of the year specified by the Participant and in effect as of December 31, 2004. Actual payment shall occur as soon as administratively feasible thereafter.

(b)        Forms of Payment. Subject to the provisions herein, an Account shall be paid under this Schedule B in a series of ten (10) substantially equal annual installments. The participant may elect to receive any benefit payable under this Schedule B in an optional form of payment; provided, however, that such election will not be effective until the lapse of thirteen (13) months following the date on which the election is accepted by the Plan Administrator. The optional distribution forms under this Schedule B are a single lump sum or a series of substantially equal annual installments of any number from two (2) to nine (9). To be effective, the election of an optional distribution form must be made in the form and manner prescribed by the Plan Administrator and must be accepted by the Plan Administrator. Notwithstanding the foregoing, distribution shall be made in a single lump sum payment if the participant's termination of employment occurs before the date the participant has both reached age fifty-five (55) and has accrued ten (10) years of credited service for vesting as defined in the Honeywell Retirement Benefit Plan (Supplement T) portion of the Honeywell Retirement Earnings Plan or its applicable predecessor plan.

17

(c)      <u>Acceleration of Distribution with Forfeiture</u>. A participant or beneficiary who is receiving distributions under this Schedule B may at any time elect to receive the remaining Account balance in a lump sum payment less ten percent (10%) which shall be forfeited. Lump sum payments under this Section 4(c) shall be made within sixty (60) days after the election to accelerate distribution is received by the Plan Administrator.

(d)      <u>Financial Hardships</u>. If a participant incurs an unforeseeable emergency, the participant may make a written request to the Plan Administrator for a hardship withdrawal from the participant's Account. An unforeseeable emergency is a severe financial hardship to the participant resulting from a sudden and unexpected illness or accident of the participant or a dependent (as defined in section 152(a) of the Code) of the participant, loss of the participant's property due to casualty, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the participant and which cannot be relieved through reimbursement or compensation by insurance or otherwise or by liquidation of the participant's assets, to the extent that the liquidation of such assets would itself cause severe financial hardship. Withdrawals of amounts because of an unforeseeable emergency are only permitted to the extent reasonably needed to satisfy the emergency need. The existence of severe financial hardship shall be determined consistent with sections 1.457-2(h)(4) and (5) of the Treasury Regulations.

5.      <u>Survivor Benefits</u>.

(a)      <u>Survivor Benefits</u>. If a participant dies after termination of employment but before distribution commences under this Schedule B, the Account shall be paid to the participant's designated beneficiary or beneficiaries at the time and in the form the Account would have been payable to the participant if the participant had survived until the date distribution would have commenced. If a participant dies after distribution commences under this Schedule B (or the terms of the prior Honeywell Plan), the participant's designated beneficiary shall be paid the unpaid installments, if any, under the form of distribution elected by the participant.

(b)      <u>Designation of Beneficiary</u>. A participant or surviving beneficiary may designate, in the manner required by the Plan Administrator, a beneficiary or beneficiaries to receive the Account under this Schedule B in the event of the participant's (or surviving beneficiary's) death. The participant (or surviving beneficiary) may change or revoke any such designation from time to time. No designation or revocation shall be effective unless executed by the participant (or surviving beneficiary) and actually received by the Plan Administrator before the participant's (or surviving beneficiary's) death. If the participant or surviving beneficiary dies without an effective beneficiary designation for the Account under this Schedule B, payment shall be made to the beneficiary or beneficiaries determined under the rules in the Honeywell 401(k) Plan governing failure of beneficiary designation. The Plan Administrator shall be the sole judge of the content, interpretation and validity of a purported beneficiary designation.

18

(<u>Back To Top</u>)

# Section 3: EX-10.06 (EX-10.06)

**Exhibit 10.06**

**RESIDEO TECHNOLOGIES, INC. SEVERANCE PLAN FOR<br>DESIGNATED OFFICERS**

Effective as of

**GENERAL PROVISIONS**

## 1.        Purpose and Scope

The purpose of the Resideo Technologies, Inc. Severance Plan for Designated Officers (the "Plan") is to provide severance related benefits to select eligible employees of Resideo Technologies, Inc. and its participating divisions, subsidiaries and affiliates who are employed in a position that is designated as being an officer of Resideo by the Board and whose employment relationship is involuntarily terminated at the initiative of the Company for reasons other than Cause and who are thereafter, as a result of such termination, no longer employed by the Company or any successor thereto.

This Plan is intended to be an unfunded "welfare benefit plan" within the meaning of Section 3(1) of ERISA and is being maintained as a "top hat" plan for a select group of management or highly compensated employees.

The terms of this Plan are intended to, and shall be interpreted so as to, comply in all respects with the provisions of Section 409A of the Code, and the regulations and rulings promulgated thereunder (collectively, "Code Section 409A") and, if necessary, any provision of the Plan shall be held null and void to the extent such provision (or any part thereof) fails to comply with Code Section 409A.

This Plan is comprised of Part I--Provisions Prior to a Change in Control, and Part II--Special Provisions That Become Effective Only Upon a Change in Control.

## 2.        Effective Date

The Plan is effective as of November 1, 2018, with respect to Participants whose employment is terminated by the Company on or after such date.

### PART I
### PROVISIONS PRIOR TO A CHANGE IN CONTROL

## 3.        Definitions

As used throughout the Plan unless otherwise clearly or necessarily indicated by context:

(a)        **"Annual Base Salary"** means an amount equal to the product of (i) Base Salary, and (ii) twelve (12).

(b)        **"Annual Incentive Compensation"** means, except as provided in Section 23(a), an amount equal to the product of the Participant's (i) Incentive Award Target Percentage for the calendar year in which Participant's Covered Termination occurs, and (ii) Annual Base Salary.

(c)        **"Base Salary"** means the highest monthly base salary payable to a Participant during the thirty-six (36) month period preceding a Covered Termination.

(d)        **"Board"** means Resideo's Board of Directors.

(e)        **"Cause"** means any of the following: (i) clear and convincing evidence of a significant violation of the Company's Code of Business Conduct; (ii) the misappropriation, embezzlement or willful destruction of Company property of significant value; (iii)(A) the willful failure to perform, (B) gross negligence in the performance of, or (C) intentional misconduct in the performance of, significant duties that results in material harm to the business of the Company; (iv) the conviction (treating a nolo contendere plea as a conviction) of a felony (whether or not any right to appeal has been or may be exercised); (v) the failure to cooperate fully in a Company investigation or the failure to be fully truthful when providing evidence or testimony in such investigation; or (vi) clear and convincing evidence of the willful falsification of any financial records of the Company that are used in compiling the Company's financial statements or related disclosures, with the intent of violating Generally Accepted Accounting Principles or, if applicable, International Financial Reporting Standards. In the case of a determination under Part I of the Plan, Cause shall be determined by the Chief Executive Officer of the Company, with the concurrence of the Board and with the advice of the Company's functional leaders with expertise in such matters.

(f)        **"Change in Control"** is deemed to occur at the time (i) when any entity, person or group (other than the Company or any savings, pension or other benefit plan maintained for the benefit of the Company's employees) that theretofore beneficially owned less than 30% of the Common Stock then outstanding, acquires shares of Common Stock in a transaction, or series of transactions, which results in such entity, person or group, directly or indirectly, owning beneficially 30% or more of the outstanding Common Stock, (ii) of the purchase of shares of Common Stock pursuant to a tender offer or exchange offer (other than an offer by Resideo) for all, or any part of, the Common Stock, (iii) of a merger in which Resideo will not survive as an independent, publicly owned corporation, (iv) of a consolidation, or a sale, exchange or other disposition of all or substantially all of Resideo's assets, (v) of a substantial change in the composition of the Board during any period of two consecutive years, such that individuals who, at the beginning of such period, were members of the Board cease for any reason to constitute at least a majority thereof, unless the election, or the nomination for election by the shareowners of Resideo, of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the beginning of the period, or (vi) of any transaction or other event which the Management Development and Compensation Committee of the Board, in its discretion, determines to be a Change in Control for purposes of this Plan.

(g)        **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

(h)        **"Common Stock"** means the common stock of Resideo or such other stock into which the common stock may be changed as a result of split-ups, recapitalizations, reclassifications and any similar transaction.

(i)        **"Company"** means Resideo and its subsidiaries and affiliated entities, as well as their respective successors.

(j)        **"Covered Termination"** means, except as provided in Section 23(b), a termination event giving rise to Severance Benefits under this Plan, as detailed in Section 7 hereof.

(k)        **"Determination Year"** means the calendar year with respect to which performance is measured for purposes of determining the amount of a Participant's Incentive Award.

Page **2** of **17**

(l)         **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time, together with applicable final regulations thereunder.

(m)         **"Resideo"** means Resideo Technologies, Inc., a Delaware corporation.

(n)         **"Incentive Award"** means the short-term incentive compensation award payable and determined pursuant to the Company's short-term incentive compensation plan, and shall not include any other performance or incentive award.

(o)         **"Incentive Award Target Percentage"** means the Participant's short-term incentive compensation target percentage, as maintained in the Company's executive compensation records.

(p)         **"Last Day of Active Employment"** means a Participant's final day of employment with the Company (typically the day prior to the date the Participant would be eligible to commence the receipt of Severance Benefits), and shall be the date on which the Participant's active employment with the Company is severed within the meaning of Code Section 409A.

(q)         **"Medical Leave of Absence"** means an absence from active employment due to a Participant's inability to perform the functions of his or her job, provided that during such absence the Participant (i) is receiving short-term disability benefits, (ii) is receiving long-term disability benefits, (iii) is on a medical leave of absence granted by the Company, or (iv) any combination of (i)-(iii).

(r)         **"Participant"** means Resideo's Chief Executive Officer, a Section 16 Officer Participant or a Non-Section 16 Officer Participant.

(i)         **"Section 16 Officer Participant"** means an individual who is a reporting officer of Resideo under Section 16 of the Exchange Act of 1934.

(ii)         **"Non-Section 16 Officer Participant"** means an individual who is designated as an officer of Resideo by the Board, but who is not a Section 16 Officer Participant.

(s)         **"Pay Continuation"** means the component of the Severance Benefit described in Section 5 (a)(i).

(t)         **"Plan Administrator"** means the person defined in Section 10(a).

(u)         **"Pro Rata Factor"** means (i) for the Determination Year in which a Covered Termination occurs, a fraction the numerator of which is equal to the number of calendar months which have elapsed from the first day of the calendar month following the Covered Termination through December 31st of the Determination Year, and the denominator of which is twelve, and (ii) for any subsequent Determination Year, a fraction the numerator of which is equal to the Severance Pay Factor, reduced by the number of calendar months which have elapsed from the first day of the calendar month following the Covered Termination through December 31st of the year preceding the Determination Year, and the denominator of which is twelve; provided, however, that the Pro Rata Factor shall never be greater than 1.0.

(v)        **"Prorated Annual Incentive Compensation"** means the component of the Severance Benefit described in Section 5(a)(ii).

**"Release"** has the meaning set forth in Section 5(b) of the Plan.

(x)        **"Severance Benefit"** means the severance benefit described in Section 5(a) of the Plan.

(w)

(y)        **"Severance Pay Factor"** means, with respect to any Participant, the number of months of Pay Continuation to which a Participant is entitled as specified in Section 5(a)(i).

(z)        **"Severance Period"** means the period during which a Participant is receiving Pay Continuation or, but for a lump sum payment of Pay Continuation benefits after a Change in Control in accordance with Section 24(a), would be receiving Pay Continuation.

## 4.        Participation

A Participant shall continue to be a eligible for Severance Benefits under this Plan until the earlier of (i) the date the employment relationship with the Company is severed for reasons other than a Covered Termination, or (ii) the date the Participant ceases to satisfy the definition of Participant hereunder; provided, however, any Participant who ceases to satisfy the definition of Participant hereunder on or after a Change in Control shall nevertheless continue to be a Participant in the Plan. A Participant who is at any time the subject of a Covered Termination shall continue to be a Participant until all of the benefits to which he or she is entitled under the Plan, if any, have been paid.

## 5.        Amount and Payment of Severance Benefits

(a)        Eligibility for Benefits. Subject to subparagraphs (b) – (e) below, a Participant who is the subject of a Covered Termination shall receive the benefits described in this subparagraph (a).

(i)        Pay Continuation.

(A)        Resideo's Chief Executive Officer shall receive a benefit in an amount equal to twenty-four (24) months of Base Salary or, following a Change in Control, thirty-six (36) months.

(B)        A Section 16 Officer Participant shall receive a benefit in an amount equal to eighteen (18) months of Base Salary or, following a Change in Control, twenty (24) months of Base Salary.

(C)        A Non-Section 16 Officer Participant shall receive a benefit in an amount equal to twelve (12) months of Base Salary.

(ii)        Prorated Annual Incentive Compensation. During the Severance Period, Resideo's Chief Executive Officer or a Section 16 Officer Participant shall receive an amount equal to his or her Annual Incentive Compensation multiplied by the applicable Pro Rata Factor. No

Prorated Annual Incentive Compensation shall be payable for any Determination Year with respect to which the Pro Rata Factor is less than or equal to zero.

(iii)        Benefit Continuation. To the extent otherwise provided in the applicable plan documents and policies, Participants shall be eligible to continue their employee benefits during the Severance Period at active employee coverage levels and active employee contribution rates, if any.

(b)        Benefits Conditioned on Release. Notwithstanding anything in this Section 5 to the contrary, all benefits under this Plan (except benefits provided pursuant to Part II) shall be provided in consideration for, and conditioned upon, (i) the execution and non-revocation of a release by the Participant of all claims, known or unknown, arising on or before the date of the release against the Company and its officers, directors and employees in the form and manner prescribed by the Company (which release may include cooperation, nondisclosure, non-competition, non-disparagement and confidentiality covenants) (the "Release"), (ii) the affirmation or initial agreement (as the case may be), in a form and manner prescribed by the Company, of the Participant's obligations under confidentiality, non-solicitation and intellectual property covenants in favor of the Company (which affirmation/initial agreement may be made part of the Release), (iii) the execution of a non-competition agreement by the Participant in favor of the Company in a form and manner prescribed by the Company (which non-competition agreement may be made part of the Release),
(iv) the repayment of any amounts due to the Company, and (iv) the return by the Participant to the Company of all property of the Company, including any and all electronic devices, documents, electronic data, trade secrets, proprietary and confidential information in the Participant's possession, custody or control.

A Participant must execute all required documents, including the Release, not later than sixty (60) days after the Participant's Last Day of Active Employment. If a Participant fails to execute such documents within the required time period, the Participant shall not be entitled to receive Severance Benefits under this Plan.

Notwithstanding anything herein to the contrary, if the period during which a Participant has to sign and revoke the Release begins in one taxable year of the Participant and ends in the Participant's subsequent taxable year, any amounts payable under the Plan will commence in the subsequent taxable year.

(c)        Suspension of Benefits. The Company may, in its sole discretion, terminate or suspend all Plan benefits upon learning, or having good reason to believe, that the Participant has violated the conditions and covenants described in Section 5(b). In such case, any consideration received by a Participant prior to the date of such cessation or suspension of Plan benefits shall be considered adequate consideration for the Release and other covenants hereunder. The Company's right to suspend or terminate Plan benefits hereunder shall not preclude the Company from pursuing other remedies for such violations, including, without limitation, seeking injunctive relief.

(d)        Nonduplication of Benefits. Any benefit determined to be payable to a Participant under this Plan shall, subject to and consistent with Code Section 409A, be reduced by the amount of any similar severance, redundancy or employment termination benefit payable to the Participant under (i) any other severance plan sponsored or funded by the Company, (ii) any agreement between the Company and the Participant, whether oral or written, express or implied, relating to termination

Page **5** of **17**

related benefits, or (iii) any statutory or court mandated entitlement (including entitlements under foreign law), regardless of whether the benefit determined under such other plan, agreement, statutory or court mandated entitlement is payable at an earlier or a later date than payments under the Plan, it being the intention of this subparagraph (d) to protect the Company from the payment of duplicative severance, redundancy or employment termination benefits.

**6.        Form and Timing of Benefit Payments**

Except as provided in Section 24, any Pay Continuation shall be paid in substantially equal periodic installments corresponding to the Participant's normal payroll period commencing after the Participant's Last Day of Active Employment. Any Prorated Annual Incentive Compensation shall be paid annually in accordance with the Company's normal practices with respect to the payment of incentive compensation awards. Notwithstanding the foregoing, the Company may, at its sole discretion, delay the commencement of Severance Benefits until the Participant has executed a Release and the time period for revoking such Release, if applicable, has expired. In such case, the Company shall commence Severance Benefits upon the receipt of the Release or the expiration of the revocation period, as applicable, and any arrearages paid as part of the next payroll period.

Payment of Severance Benefits shall cease in the event a Participant (i) accepts re-employment with the Company, or (ii) commences the receipt of his or her pension benefits from a Company- sponsored defined benefit pension plan.

**7.        Covered Terminations**

In order to be eligible for Severance Benefits under Section 5, a Participant must be the subject of a Covered Termination. A Covered Termination generally means an involuntary termination of employment initiated by the Company. In no event, however, shall the following events constitute a Covered Termination:

(a)        an involuntary termination for Cause;

(b)        the death of a Participant during active employment;

(c)         the Participant's failure to timely return to work upon expiration of an authorized leave of absence. Such a Participant will be treated as having voluntarily resigned from the Company;

(d)        a termination of employment initiated as a result of a Participant's refusal to accept a transfer to another Company location; provided, however, a Participant whose employment is terminated within two (2) years following a Change in Control solely as a result of his or her refusal to transfer to another Company location that is more than 50 miles from his or her work location immediately prior to a Change in Control shall be treated as having been subject to a Covered Termination;

(e)        in the case of a sale or other disposition of the Participant's subsidiary, division or other business unit or operation, a termination of employment initiated as a result of a Participant's refusal to accept an offer of employment with the successor entity; provided, however, in such case a Covered Termination shall be deemed to have occurred only if the Participant is not offered

Page **6** of **17**

substantially comparable employment with the successor entity, as determined by the Plan Administrator, in its sole discretion. Notwithstanding the preceding sentence, a Participant whose employment is terminated within two (2) years following a Change in Control solely as a result of his or her refusal to accept employment with the successor entity at a location that is more than 50 miles from his or her work location immediately prior to a Change in Control shall be treated as having been subject to a Covered Termination; or

(f)         if the Participant does not return to active employment within eighteen (18) months of commencing a Medical Leave of Absence; provided, however, if a Participant is medically cleared to return to work (with documentation reasonably acceptable to the Company) before the conclusion of such eighteen (18) month period and is ready and willing to do so but does not return to active employment because (i) no comparable job for which the Participant is qualified is available, or (ii) such Participant is unable to locate another comparable Company position within thirty (30) days following his or her return to work, then such Participant shall be treated as having been subject to a Covered Termination.

## 8.        **<u>Forfeiture of Benefits</u>**

Notwithstanding anything in the Plan to the contrary and except as provided in Section 24(b), the Company reserves the right in its sole and absolute discretion to cancel all benefits under this Plan in the event a Participant engages in any activity that the Company considers detrimental to its interests, as determined by Resideo's General Counsel or Chief Human Resources Officer, or their delegees. Activities that the Company considers detrimental to its interests include, but are not limited to:

(a)         any effort on the part of a Participant, either directly or indirectly, to recruit or solicit employees of the Company for employment with another company without the written approval of Resideo's Chief Human Resources Officer, or his delegee;

(b)         any effort on the part of a Participant, either directly or indirectly, to recruit or solicit customers of the Company;

(c)         the disclosure of any Company confidential or proprietary information, or the breach of any obligations under the Participant's agreements relating to intellectual property and confidential information;

(d)         any intentional misconduct substantially damaging to the property or business of the Company;

(e)         the commission of a fraud or misappropriation of property, proprietary information, intellectual property or trade secrets of the Company for personal gain or for the benefit of another party;

(f)         knowingly making false or misleading statements about the Company or its products, officers or employees to competitors or customers or potential customers of the Company, or to current or former employees of the Company;

Page **7** of **17**

(g)      a Participant's holding himself or herself out as an active employee of the Company; or

(h)      breaching any of the terms of the Release or any IP, confidentiality or noncompetition agreement or covenant.

## 9.    <u>Payment of Benefits Upon Death</u>

If a Participant dies after signing and returning the Release, without revoking the Release, and before all Severance Benefits have been paid, the balance of such payments will be paid to the Participant's estate in a lump sum within sixty (60) days following the Participant's death.

## 10.    <u>Administration</u>

(a)      <u>Plan Administration</u>. Except as provided in Section 25, the Plan shall be administered by the Plan Administrator, who shall have the powers and authorities as described in this Section 10. The Plan Administrator shall be the Company's Chief Human Resources Officer, or his designee.

The Plan Administrator shall serve without additional compensation. The Plan Administrator shall keep or cause to be kept such records and shall prepare or cause to be prepared such returns or reports as may be required by law or necessary for the proper administration of the Plan.

(b)      <u>Powers and Duties of Plan Administrator</u>. The Plan Administrator shall have the full discretionary power and authority to (i) construe and interpret the Plan (including, without limitation, supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan); (ii) determine all questions of fact arising under the Plan, including questions as to eligibility for and the amount of benefits; (iii) establish such rules and regulations (consistent with the terms of the Plan) as it deems necessary or appropriate for administration of the Plan; (iv) delegate responsibilities to others to assist it in administering the Plan; and (v) perform all other acts it believes reasonable and proper in connection with the administration of the Plan. The Plan Administrator shall be entitled to rely on the records of the Company in determining any Participant's entitlement to, and the amount of, Severance Benefits under the Plan. Any determination of the Plan Administrator, including interpretations of the Plan and determinations of questions of fact, shall be final and binding on all parties.

The Plan Administrator may retain attorneys, consultants, accountants or other persons (who may be employees of the Company) to render advice and assistance and may delegate any of the authorities conferred on him under this Plan to such persons as he shall determine to be necessary to effect the discharge of his duties hereunder. The Plan Administrator, the Company and its officers and directors shall be entitled to rely upon the advice, opinions and determinations of any such persons. Any exercise of the authorities set forth in this Section 10, whether by the Plan Administrator or his delegee, shall be final and binding upon the Company and all Participants.

(c)      <u>Additional Discretionary Authority</u>. The Plan Administrator may, in his sole and absolute discretion, waive the requirement that a Participant execute a Release or confidentiality, non-competition, non-disparagement, non-solicitation and intellectual property covenants in order to receive Severance Benefits.

(d)        Indemnification. To the extent permitted by law, the Company shall indemnify the Plan Administrator from all claims for liability, loss, or damage (including payment of expenses in connection with defense against such claims) arising from any act or failure to act in connection with the Plan.

## 11.    Claims and Appeals Procedures

Except as provided in Section 25, the Plan's benefit claims and appeals procedures shall be as follows:

(a)        Any request or claim for Plan benefits shall be deemed to be filed when a written request is made by the claimant or the claimant's authorized representative that is reasonably calculated to bring the claim to the attention of the Plan Administrator.

(b)        The Plan Administrator, or his designee, shall respond, in writing, to any claimant's claim for benefits under the Plan. Such response shall be provided within 90 days of its receipt by the Plan Administrator or, if special circumstances require and the claimant is so notified, in writing, before the expiration of the initial 90-day period, within 180 days of its receipt by the Plan Administrator. If the extension is necessary because the claimant has failed to submit the information necessary to decide the claim, the Plan Administrator's period for responding to such claim shall be tolled until the date that the claimant responds to the request for additional information. The response shall be written in a manner calculated to be understood by the claimant and shall, in the case of an adverse benefit determination:

(i)                set forth the specific reasons for the adverse benefit determination;

contain specific references to Plan provisions relative to the adverse benefit determination;

(ii)

(iii)    describe any material and information, if any, necessary for the claim for

benefits to be perfected, and an explanation of why such material or information is necessary; and

(iv)                advise the claimant that any appeal of an adverse benefit determination must be made, in writing, to the Plan Administrator within 60 days after receipt of such adverse benefit determination, and must set forth the facts upon which the appeal is based.

(c)        If the claimant fails to appeal the Plan Administrator's adverse benefit determination, in writing, within 60 days after its receipt by the claimant (or within 60 days after a deemed denial of the claim), the Plan Administrator's determination shall become final and conclusive.

(d)        If the claimant appeals the Plan Administrator's adverse benefit determination in a timely fashion, the Plan Administrator shall re-examine all issues relevant to the original denial of benefits. Any such claimant or his or her duly authorized representative may review any pertinent documents and records, including documents and records that were relied upon in making the benefit determination, documents submitted, considered or generated in the course of making the benefit determination (even if such documents were not relied upon in making the benefit determination), and documents that demonstrate compliance, in making the benefit determination,

Page **9** of **17**

with the Plan's required administrative processes and safeguards. In addition, the claimant or his duly authorized representative may submit, in writing, any documents, records, comments or other information relating to such claim for benefits. In the course of his review, the Plan Administrator shall take into account all comments, documents, records and other information submitted by the claimant or his duly authorized representative relating to such claim, regardless of whether it was submitted or considered as part of the initial benefit determination.

(e)  The Plan Administrator shall advise the claimant and such claimant's representative, in writing, of its decision within 60 days of receipt of the written appeal, unless special circumstances require an extension of such 60-day period for not more than an additional 60 days. Where such extension is necessary, the claimant shall be given written notice of the delay before the expiration of the initial 60-day period, which notice shall set forth the reasons for the delay and the date the Plan Administrator expects to render its decision. In the event of an adverse benefit determination on appeal, the Plan Administrator shall advise the claimant, in a manner calculated to be understood by the claimant, of (i) the specific reasons for the adverse benefit determination, and (ii) the specific Plan provisions on which the adverse benefit determination was based. The Plan Administrator's written notice will advise the claimant of his or her right to receive, upon request and free of charge, copies of all documents, records and other information relevant to such claim.

(f)  In the event of an adverse benefit determination after the Plan Administrator's review, the claimant's sole remedy shall be to file an action in court.

The Plan's claims procedures do not create any independent rights to Plan benefits. A current or former Participant who files a claim for Plan benefits must satisfy all Plan requirements, including the requirements of Section 5(b), in order to be entitled to benefits.

12.  **Time Period for Filing a Claim or a Lawsuit Against the Plan, the Company or Plan Fiduciaries; Restrictions on Venue**

(a)  Any claim for Plan benefits must be filed in writing with the Plan Administrator within sixty (60) days after the current or former Participant knew or should have known of his/her putative right to Plan benefits. However, in no event will any claim be considered timely if it is filed more than one hundred eighty (180) days after the date a current or former Participant's employment with the Company is terminated. Requests or claims submitted more than sixty (60) days after a current or former Participant knew or should have know of his/her potential right to Plan benefits, or one-hundred eighty (180) days after the date his/her employment with the Company is terminated, are deemed waived by the claimant and considered time-barred

(b)  Any lawsuit against the Plan, the Company, the Plan Administrator, or any other Plan fiduciary, must be filed no later than the six (6) month anniversary of the following, as applicable: (i) the date the claim or appeal is denied by the Plan Administrator, or (ii) the date the claimant knows, or should reasonably know, that the claim has been, or is treated as being, denied (e.g., if the claim, or the appeal in the case of an adverse benefit determination, is not denied within the time limits described in Section 11 above).

(c)  Any action in connection with the Plan must be filed in the Federal District Court of New York.

Page **10** of **17**

**13.**      **Unfunded Obligation**

All benefits payable under this Plan shall constitute an unfunded obligation of the Company. Payments shall be made, as due, from the general funds of the Company. This Plan shall constitute solely an unsecured promise by the Company to pay severance benefits to Participants to the extent provided herein.

**14.**      **Inalienability of Benefits**

No Participant shall have the power to transfer, assign, anticipate, mortgage or otherwise encumber any rights or any amounts payable under this Plan; nor shall any such rights or amounts payable under this Plan be subject to seizure, attachment, execution, garnishment or other legal or equitable process, or for the payment of any debts, judgments, alimony, or separate maintenance, or be transferable by operation of law in the event of bankruptcy, insolvency, or otherwise. In the event a person who is receiving or is entitled to receive benefits under the Plan attempts to assign, transfer or dispose of such right, or if an attempt is made to subject such right to such process, such assignment, transfer or disposition shall be null and void.

**15.**      **Withholding**

The Company shall have the right to withhold any taxes required to be withheld with respect to any benefits due under this Plan.

**16.**      **Amendment or Termination**

Except to the extent otherwise provided in Section 26, Resideo reserves the right to amend or terminate the Plan at any time without prior notice to or the consent of any employee. No amendment or termination shall adversely affect the rights of any Participant whose employment terminated prior to such amendment or termination. However, except as provided in Section 26, any Participant whose employment continues after amendment of the Plan shall be governed by the terms of the Plan as so amended. Any Participant whose employment continues after termination of the Plan shall have no right to a benefit under the Plan. Any amendment or termination of the Plan must comply with all applicable legal requirements including, without limitation, compliance with Code Section 409A, securities, tax or other laws, rules, regulations or regulatory interpretations thereof that apply to the Plan.

**17.**      **Plan Not a Contract of Employment**

Nothing contained in this Plan shall give an employee the right to be retained in the employment of the Company. This Plan is not a contract of employment between the Company and any employee.

**18.**      **Action by the Company**

Unless expressly indicated to the contrary herein, any action required to be taken by an entity may be taken by action of its governing body or by any appropriate officer or officers traditionally responsible for such determination or actions, or such other individual or individuals as may be designated by such governing body, officer or employee.

19.        **Governing Law**

The Plan is an employee welfare benefit plan within the meaning of Section 3(1) of ERISA, and will be construed in accordance with the provisions of ERISA and the laws of the State of New York.

20.        **Severability**

If any provision of this Plan (other than Section 5(b)) shall be held illegal or invalid for any reason, said illegality or invalidity shall not affect the remaining parts of this Plan, but this Plan shall be construed and enforced as if said illegal or invalid provision had never been included herein. If Section 5(b) shall be held illegal or invalid for any reason, said illegality or invalidity shall nullify the remainder of this Plan with respect to the affected Participants.

21.        **Code Section 409A**

(a)        Notwithstanding any provision of the Plan to the contrary, if required by Code Section 409A and if a Participant is a "Specified Employee" (as defined below), no benefits shall be paid under this Plan during the "Postponement Period" (as defined below). If a Participant is a Specified Employee and payment of benefits is required to be delayed for the Postponement Period under Code Section 409A, the accumulated amounts withheld on account of Code Section 409A shall be paid in a lump sum payment within 30 days after the end of the Postponement Period and no interest or other adjustment shall be made for the delayed payment. If the Participant dies during the Postponement Period prior to the payment of benefits, the amounts withheld on account of Code Section 409A shall be paid to the Participant's estate within sixty (60) days after the Participant's death.

(b)        This Plan is intended to meet the requirements of the "short-term deferral" exception, the "separation pay" exception and other exceptions under Code Section 409A. Notwithstanding anything in the Plan to the contrary, if required by Code Section 409A, payments may only be made under this Plan upon an event and in a manner permitted by Code Section 409A, to the extent applicable. For purposes of Code Section 409A, the right to a series of payments under the Plan shall be treated as a right to a series of separate payments. All reimbursements and in-kind benefits provided under the Plan shall be made or provided in accordance with the requirements of Code Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses eligible for reimbursement during the period of time specified in the Plan; (ii) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits provided in any other calendar year; (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (iv) the right to reimbursement or in-kind benefit is not subject to liquidation or exchange for another benefit. In no event may a Participant designate the year of payment for any amounts payable under the Plan.

(c)        Notwithstanding any provision of the Plan to the contrary, any payments of Severance Benefits under this Plan that (i) are, or may be, deferred compensation subject to Code Section 409A ("409A Severance Benefits"), and (ii) are subject to a Release, where the period for execution and non-revocation of the Release spans more than one calendar year, any payment of 409A Severance Benefits that is contingent on the execution of the Release shall not be paid until the second calendar year, or later if required by the applicable terms of the Plan. In no event may a

Participant, either directly or indirectly, designate the calendar year of payment of any 409A Severance Benefits.

     (d)     For purposes of this Section 21, the following definitions apply:

     (i)     "Specified Employee" means a Participant who, at any time during the 12- month period ending on the identification date, is a "specified employee" under Code Section 409A, as determined by the Vice President – Compensation and Benefits (or his delegee), which determination of "specified employees," including the number and identity of persons considered "specified employees" and identification date, shall be made by the Vice President – Compensation and Benefits (or his delegee) in accordance with the provisions of Code Sections 416(i) and 409A.

     (ii)     "Postponement Period" means, for a Specified Employee, the period of six months after the Specified Employee's Last Day of Active Employment (or such other period as may be required by Code Section 409A) during which deferred compensation may not be paid to the Specified Employee under Code Section 409A.

Page **13** of **17**

## PART II
## SPECIAL PROVISIONS THAT BECOME EFFECTIVE ONLY UPON
## CHANGE IN CONTROL

22.      **Applicability**

(a)      Except to the extent otherwise indicated, the provisions of this Part II apply only to Resideo's Chief Executive Officer and Section 16 Officer Participants (collectively "CIC Participants"). Such provisions become effective upon a Change in Control and, in addition to the provisions of Part I that are not superseded by provisions of this Part II, shall control (i) the determination of eligibility for, the amount of, and the time of payment of benefits under the Plan to any CIC Participant who is the subject of a Covered Termination that occurs within the two (2) year period following the Change in Control, and (ii) the terms of payment for any CIC Participant whose Severance Period extends beyond the Change in Control.

(b)      It is intended that this Part II will assure that CIC Participants will not be adversely affected by the unique circumstances that may exist following a Change in Control. The provisions of this Part II will have no effect whatsoever prior to a Change in Control.

23.      **Definitions**

(a)      **"Annual Incentive Compensation"** means, notwithstanding the provisions of Section 3(b), the product of (i) Annual Base Salary, and (ii) the greater of (A) the Incentive Award Target Percentage for the most recent Determination Year ended prior to the Change in Control, or (B) the average of the Incentive Award Target Percentages applied in determining the CIC Participant's Incentive Award in the last three Determination Years prior to the date of Covered Termination (or such lesser period as the CIC Participant may have been employed).

(b)      **"Cause"** has the same meaning as under Part I; provided, however, in the case of a determination under Part II of the Plan, Cause shall be determined by the New Plan Administrator.

(c)      **"Covered Termination"** means, in addition to the circumstances described in Section 3(i), a severance of the employment relationship at the initiative of a CIC Participant for Good Reason.

(d)      **"Good Reason"** means any one or more of the following:

(i)      A material change in the CIC Participant's position, duties and/or responsibilities as they existed in the period immediately preceding the Change in Control;

(ii)      Any significant reduction in the CIC Participant's Base Salary or Annual Incentive Compensation;

(iii)      Any significant reduction in the economic value of awards granted under any Company long-term incentive plans in which the CIC Participant participated prior to a Change in Control, or the successors thereto;

Page **14** of **17**

(iv)                    Any geographic relocation of the CIC Participant's position to a new location that is more than fifty (50) miles from the location of the CIC Participant's position immediately prior to a Change in Control;

(v)                    Any action by the Company that, under applicable law, constitutes constructive discharge; or

(viii) The failure of any Resideo Employer that is a successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise) to expressly assume and agree to honor this Plan, if such assumption is legally required to make this Plan enforceable against the successor.

For purposes of this Section 23(c), the term "significant reduction" shall mean a reduction or series of reductions with respect to the same form of benefit or remuneration that are greater than 10%, or which do not affect substantially all persons covered by the plan or program in question.

Notwithstanding the foregoing, Good Reason shall not be deemed to have occurred unless the CIC Participant provides written notice to Resideo identifying the event or omission constituting the reason for a Good Reason termination within ninety (90) days following the first occurrence of such event or omission. Within thirty (30) days after such notice has been provided to Resideo, Resideo shall have the opportunity, but shall have no obligation, to cure such event or conditions that give rise to a Good Reason termination. If Resideo fails to cure the events or conditions giving rise to a CIC Participant's Good Reason termination by the end of the thirty (30) day cure period, the CIC Participant's employment shall be terminated effective as of the expiration of such thirty (30) day cure period unless the CIC Participant has withdrawn such Good Reason termination notice.

(e)          **"Resideo Employer"** means the Company and any other person, organization or entity that agrees in writing to be bound by the terms of the Plan for a period of time that extends at least through the two-year period following a Change in Control.

(f)          **"New Plan Administrator"** shall mean such person or persons appointed pursuant to Section 25 to administer the Plan upon the occurrence of a Change in Control.

## 24.      Benefit Payments and Forfeitures

(a)          Benefit Payments. Notwithstanding the provisions of Section 6, benefits that are determined to be payable to a CIC Participant under Sections 5(a)(i) and 5(a)(ii) on or after a Change in Control shall be paid within thirty (30) days following the later of the Change in Control or the Covered Termination, in a single payment equal to the sum of (i) the total amount of the benefit remaining payable under Section 5(a)(i), and (ii) the amount of the benefit remaining payable under Section 5(a)(ii) for all Determination Years which are coextensive, in whole or part, with the Severance Period; provided, however, that the single lump sum payment pursuant to this Section will only be paid if the Change in Control constitutes a "change in control event" under Section 409A of the Code. Otherwise, the payment shall be paid (or continue to be paid, if in pay status) in the same form and at the same times as provided under Section 5(a). The requirements of Section 5(b) shall have no application to benefits payable after a Change in Control. If any benefit is paid later than the time provided in this Section 24(a), such late payment shall be credited with interest for the period from the date payment should have been made to the date actually made at a rate

equal to the average quoted rate for three-month U.S. Treasury Bills for the week preceding the date of payment, as determined by the New Plan Administrator, plus six percentage points.

      (b)      <u>Forfeiture of Benefits</u>. Notwithstanding the provisions of Section 8, a CIC Participant receiving benefits or entitled to receive benefits under the Plan shall cease to receive such benefits under the Plan and the right to receive any benefits in the future under the Plan shall be forfeited, in the event the CIC Participant, as determined by the New Plan Administrator, (i) is convicted of a felony committed against a Resideo Employer, its property or business, (ii) commits any fraud or misappropriates property, proprietary information, intellectual property or trade secrets of a Resideo Employer for personal gain or for the benefit of another party, or (iii) actively recruits and offers employment to any management employee of a Resideo Employer.

## 25.      Administration

      (a)      <u>New Plan Administrator</u>. On or before a Change in Control, the Company shall appoint a person independent of the Company to be the New Plan Administrator upon the occurrence of a Change in Control and the Plan Administrator shall provide to the New Plan Administrator such information with respect to each CIC Participant in the Plan as shall be necessary to enable the New Plan Administrator to determine the amount of is the Severance Benefits that are then, or may thereafter become, payable to such CIC Participants. Upon a Change in Control, the New Plan Administrator shall have the authority invested in the Plan Administrator under Section 10(b), and claims for benefits shall be subject to the claims and appeals procedures outlined in Section 11.

      (b)      <u>Attorneys Fees and Costs</u>. If a CIC Participant is paid or is determined to be entitled to receive benefits by a court of competent jurisdiction, the Resideo Employer shall immediately pay or reimburse the affected CIC Participant for the full amount of any attorneys' fees and other expenses the affected CIC Participant incurred in pursuing his or her claim for benefits, including claims incurred during the claims and appeals portion of the process. The payment or reimbursement shall include the reasonable hourly rates charged by the CIC Participant's attorneys, any and all other expenses related to the action incurred by or on behalf of the affected CIC Participant, the costs and expenses of any experts utilized to prepare the claim, and any court costs assessed against the affected CIC Participant.

      (c)      <u>Declaratory Judgment</u>. CIC Participants may bring a claim under this Section 25 to assert the existence of Good Reason conditions that would enable a CIC Participant to trigger his own termination under this Part II without resigning his or her position with the Resideo Employer.

## 26.      Amendment or Termination

This Plan may not be amended or terminated after a Change in Control; provided, however, the Plan may be amended if the purpose of the amendment is to increase benefits hereunder or if the purpose of the amendment is to comply with Section 409A of the Code.

Page **16** of **17**

**27.**    <u>**No Waiver**</u>

No waiver by a CIC Participant at any time of any breach by a Resideo Employer of, or of any lack of compliance with, any condition or provision of this Plan to be performed by the Resideo Employer shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. In no event shall the failure by a CIC Participant to assert any right under the Plan (including, but not limited to, failure to assert the existence of Good Reason conditions that would enable a CIC Participant to trigger his own termination under this Part II) be deemed a waiver of such right or any other right provided under the Plan, it being intended that a CIC Participant who has perfected a right under the Plan (including, but not limited to, a CIC Participant's right to trigger his own Good Reason termination under this Part II) shall be entitled to assert that right in accordance with the terms of the Plan unless the CIC Participant affirmatively elects, in writing, to waive such right.

**28.**    <u>**Company Policies**</u>

All benefits granted under the Plan shall be subject to any applicable clawback or recoupment policies, share trading policies and other policies that may be implemented by the Board of Directors from time to time, including such policies set forth in the Company's Corporate Governance Guidelines, as such policies may be amended from time to time, subject to and consistent with Section 409A of the Code.

Page **17** of **17**

(Back To Top)

# Section 4: EX-10.07 (EX-10.07)

**Exhibit 10.07**

**RESIDEO TECHNOLOGIES, INC. SEVERANCE PLAN
FOR DESIGNATED OFFICERS**

Effective as of
November 15, 2018

**GENERAL PROVISIONS**

## 1.    Purpose and Scope

The purpose of the Resideo Technologies, Inc. Severance Plan for Designated Officers (the "Plan") is to provide severance related benefits to select eligible employees of Resideo Technologies, Inc. and its participating divisions, subsidiaries and affiliates and whose employment relationship is involuntarily terminated at the initiative of the Company for reasons other than Cause and who are thereafter, as a result of such termination, no longer employed by the Company or any successor thereto.

This Plan is intended to be an unfunded "welfare benefit plan" within the meaning of Section 3(1) of ERISA and is being maintained as a "top hat" plan for a select group of management or highly compensated employees.

The terms of this Plan are intended to, and shall be interpreted so as to, comply in all respects with the provisions of Section 409A of the Code, and the regulations and rulings promulgated thereunder (collectively, "Code Section 409A") and, if necessary, any provision of the Plan shall be held null and void to the extent such provision (or any part thereof) fails to comply with Code Section 409A.

This Plan is comprised of Part I--Provisions Prior to a Change in Control, and Part II--Special Provisions That Become Effective Only Upon a Change in Control.

## 2.    Effective Date

The Plan was originally established by Resideo effective November 1, 2018.  The Plan is hereby amended and restated effective as of November 15, 2018, with respect to Participants whose employment is terminated by the Company on or after such date.

**PART I**
**PROVISIONS PRIOR TO A CHANGE IN CONTROL**

## 3.    Definitions

As used throughout the Plan unless otherwise clearly or necessarily indicated by context:

(a)    **"Annual Base Salary"** means an amount equal to the product of (i) Base Salary, and (ii) twelve (12).

(b)    **"Annual Incentive Compensation"** means, except as provided in Section 23(a), an amount equal to the product of the Participant's (i) Incentive Award Target Percentage for the calendar year in which Participant's Covered Termination occurs, and (ii) Annual Base Salary.

(c)    **"Base Salary"** means the highest monthly base salary payable to a Participant during the thirty-six (36) month period preceding a Covered Termination.

(d)    **"Board"** means Resideo's Board of Directors.

Page **1** of **16**

(e)        **"Cause"** means any of the following: (i) clear and convincing evidence of a significant violation of the Company's Code of Business Conduct; (ii) the misappropriation, embezzlement or willful destruction of Company property of significant value; (iii)(A) the willful failure to perform, (B) gross negligence in the performance of, or (C) intentional misconduct in the performance of, significant duties that results in material harm to the business of the Company; (iv) the conviction (treating a nolo contendere plea as a conviction) of a felony (whether or not any right to appeal has been or may be exercised); (v) the failure to cooperate fully in a Company investigation or the failure to be fully truthful when providing evidence or testimony in such investigation; or (vi) clear and convincing evidence of the willful falsification of any financial records of the Company that are used in compiling the Company's financial statements or related disclosures, with the intent of violating Generally Accepted Accounting Principles or, if applicable, International Financial Reporting Standards. In the case of a determination under Part I of the Plan, Cause shall be determined by the Chief Executive Officer of the Company, with the concurrence of the Board and with the advice of the Company's functional leaders with expertise in such matters.

(f)        **"Change in Control"** is deemed to occur at the time (i) when any entity, person or group (other than the Company or any savings, pension or other benefit plan maintained for the benefit of the Company's employees) that theretofore beneficially owned less than 30% of the Common Stock then outstanding, acquires shares of Common Stock in a transaction, or series of transactions, which results in such entity, person or group, directly or indirectly, owning beneficially 30% or more of the outstanding Common Stock, (ii) of the purchase of shares of Common Stock pursuant to a tender offer or exchange offer (other than an offer by Resideo) for all, or any part of, the Common Stock, (iii) of a merger in which Resideo will not survive as an independent, publicly owned corporation, (iv) of a consolidation, or a sale, exchange or other disposition of all or substantially all of Resideo's assets, (v) of a substantial change in the composition of the Board during any period of two consecutive years, such that individuals who, at the beginning of such period, were members of the Board cease for any reason to constitute at least a majority thereof, unless the election, or the nomination for election by the shareowners of Resideo, of each new director was approved by a vote of at least two-thirds of the directors then still in office who were directors at the beginning of the period, or (vi) of any transaction or other event which the Management Development and Compensation Committee of the Board, in its discretion, determines to be a Change in Control for purposes of this Plan.

(g)        **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

(h)        **"Common Stock"** means the common stock of Resideo or such other stock into which the common stock may be changed as a result of split-ups, recapitalizations, reclassifications and any similar transaction.

(i)        **"Company"** means Resideo and its subsidiaries and affiliated entities, as well as their respective successors.

(j)        **"Covered Termination"** means, except as provided in Section 23(b), a termination event giving rise to Severance Benefits under this Plan, as detailed in Section 7 hereof.

(k)        **"Determination Year"** means the calendar year with respect to which performance is measured for purposes of determining the amount of a Participant's Incentive Award.

Page **2** of **16**

(l)        **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time, together with applicable final regulations thereunder.

(m)        **"Resideo"** means Resideo Technologies, Inc., a Delaware corporation.

(n)        **"Incentive Award"** means the short-term incentive compensation award payable and determined pursuant to the Company's short-term incentive compensation plan, and shall not include any other performance or incentive award.

(o)        **"Incentive Award Target Percentage"** means the Participant's short-term incentive compensation target percentage, as maintained in the Company's executive compensation records.

(p)        **"Last Day of Active Employment"** means a Participant's final day of employment with the Company (typically the day prior to the date the Participant would be eligible to commence the receipt of Severance Benefits), and shall be the date on which the Participant's active employment with the Company is severed within the meaning of Code Section 409A.

(q)        **"Medical Leave of Absence"** means an absence from active employment due to a Participant's inability to perform the functions of his or her job, provided that during such absence the Participant (i) is receiving short-term disability benefits, (ii) is receiving long-term disability benefits, (iii) is on a medical leave of absence granted by the Company, or (iv) any combination of (i)-(iii).

(r)        **"Participant"** means Resideo's Chief Executive Officer or a Section 16 Officer Participant.

(i)        **"Section 16 Officer Participant"** means an individual who is a reporting officer of Resideo under Section 16 of the Exchange Act of 1934.

(s)        **"Pay Continuation"** means the component of the Severance Benefit described in Section 5(a)(i).

(t)        **"Plan Administrator"** means the person defined in Section 10(a).

(u)        **"Pro Rata Factor"** means for the Determination Year in which a Covered Termination occurs, a fraction the numerator of which is equal to the number of calendar months which have elapsed from January 1st of such year through the end of the month in which the Covered Termination occurs, and the denominator of which is twelve.

(v)        **"Prorated Annual Incentive Compensation"** means the component of the Severance Benefit described in Section 5(a)(ii).

(w)        **"Release"** has the meaning set forth in Section 5(b) of the Plan.

(x)        **"Severance Benefit"** means the severance benefit described in Section 5(a) of the Plan.

Page **3** of **16**

(y)    **"Severance Pay Factor"** means, with respect to any Participant, the number of months of Pay Continuation to which a Participant is entitled as specified in Section 5(a)(i).

(z)    **"Severance Period"** means the period during which a Participant is receiving Pay Continuation or, but for a lump sum payment of Pay Continuation benefits after a Change in Control in accordance with Section 24(a), would be receiving Pay Continuation.

## 4.    Participation

A Participant shall continue to be a eligible for Severance Benefits under this Plan until the earlier of (i) the date the employment relationship with the Company is severed for reasons other than a Covered Termination, or (ii) the date the Participant ceases to satisfy the definition of Participant hereunder; provided, however, any Participant who ceases to satisfy the definition of Participant hereunder on or after a Change in Control shall nevertheless continue to be a Participant in the Plan. A Participant who is at any time the subject of a Covered Termination shall continue to be a Participant until all of the benefits to which he or she is entitled under the Plan, if any, have been paid.

## 5.    Amount and Payment of Severance Benefits

(a)    Eligibility for Benefits. Subject to subparagraphs (b) – (e) below, a Participant who is the subject of a Covered Termination shall receive the benefits described in this subparagraph (a).

(i)    Pay Continuation.

(A)    Resideo's Chief Executive Officer shall receive a benefit in an amount equal to twenty-four (24) months of Base Salary or, following a Change in Control an amount equal to twenty-four (24) months of Base Salary plus two times his or her Annual Incentive Compensation.

(B)    A Section 16 Officer Participant shall receive a benefit in an amount equal to eighteen (18) months of Base Salary or, following a Change in Control, an amount equal to twenty-four (24) months of Base Salary plus two times his or her Annual Incentive Compensation.

(ii)    Prorated Annual Incentive Compensation. Following a Change in Control, a Participant shall, in respect of the year in which the Covered Termination occurs, receive an amount equal to his or her Annual Incentive Compensation (as that term is defined in Section 23(a)) multiplied by the Pro Rata Factor.

(iii)    Benefit Continuation. To the extent otherwise provided in the applicable plan documents and policies, Participants shall be eligible to continue their employee benefits during the Severance Period at active employee coverage levels and active employee contribution rates, if any.

(b)    Benefits Conditioned on Release. Notwithstanding anything in this Section 5 to the contrary, all benefits under this Plan (except benefits provided pursuant to Part II) shall be provided in consideration for, and conditioned upon, (i) the execution and non-revocation of a release by the Participant of all claims, known or unknown, arising on or before the date of the release against the Company and its officers, directors and employees in the form and manner prescribed by the Company (which release may include cooperation, nondisclosure, non-competition,

non-disparagement and confidentiality covenants) (the "Release"), (ii) the affirmation or initial agreement (as the case may be), in a form and manner prescribed by the Company, of the Participant's obligations under confidentiality, non-solicitation and intellectual property covenants in favor of the Company (which affirmation/initial agreement may be made part of the Release), (iii) the execution of a non-competition agreement by the Participant in favor of the Company in a form and manner prescribed by the Company (which non-competition agreement may be made part of the Release), (iv) the repayment of any amounts due to the Company, and (iv) the return by the Participant to the Company of all property of the Company, including any and all electronic devices, documents, electronic data, trade secrets, proprietary and confidential information in the Participant's possession, custody or control.

A Participant must execute all required documents, including the Release, not later than sixty (60) days after the Participant's Last Day of Active Employment. If a Participant fails to execute such documents within the required time period, the Participant shall not be entitled to receive Severance Benefits under this Plan.

Notwithstanding anything herein to the contrary, if the period during which a Participant has to sign and revoke the Release begins in one taxable year of the Participant and ends in the Participant's subsequent taxable year, any amounts payable under the Plan will commence in the subsequent taxable year.

(c)     Suspension of Benefits. The Company may, in its sole discretion, terminate or suspend all Plan benefits upon learning, or having good reason to believe, that the Participant has violated the conditions and covenants described in Section 5 (b). In such case, any consideration received by a Participant prior to the date of such cessation or suspension of Plan benefits shall be considered adequate consideration for the Release and other covenants hereunder. The Company's right to suspend or terminate Plan benefits hereunder shall not preclude the Company from pursuing other remedies for such violations, including, without limitation, seeking injunctive relief.

(d)     Nonduplication of Benefits. Any benefit determined to be payable to a Participant under this Plan shall, subject to and consistent with Code Section 409A, be reduced by the amount of any similar severance, redundancy or employment termination benefit payable to the Participant under (i) any other severance plan sponsored or funded by the Company, (ii) any agreement between the Company and the Participant, whether oral or written, express or implied, relating to termination related benefits, or (iii) any statutory or court mandated entitlement (including entitlements under foreign law), regardless of whether the benefit determined under such other plan, agreement, statutory or court mandated entitlement is payable at an earlier or a later date than payments under the Plan, it being the intention of this subparagraph (d) to protect the Company from the payment of duplicative severance, redundancy or employment termination benefits.

## 6.     Form and Timing of Benefit Payments

Except as provided in Section 24, any Pay Continuation shall be paid in substantially equal periodic installments corresponding to the Participant's normal payroll period commencing after the Participant's Last Day of Active Employment. Any Prorated Annual Incentive Compensation shall be paid annually in accordance with the Company's normal practices with respect to the payment of incentive compensation awards. Notwithstanding the foregoing, the Company may, at its sole discretion, delay the commencement of Severance Benefits until the Participant has executed a Release

and the time period for revoking such Release, if applicable, has expired.  In such case, the Company shall commence Severance Benefits upon the receipt of the Release or the expiration of the revocation period, as applicable, and any arrearages paid as part of the next payroll period.

Payment of Severance Benefits shall cease in the event a Participant (i) accepts re-employment with the Company, or (ii) commences the receipt of his or her pension benefits from a Company-sponsored defined benefit pension plan.

## 7.        **Covered Terminations**

In order to be eligible for Severance Benefits under Section 5, a Participant must be the subject of a Covered Termination. A Covered Termination generally means an involuntary termination of employment initiated by the Company.  In no event, however, shall the following events constitute a Covered Termination:

(a)        an involuntary termination for Cause;

(b)        the death of a Participant during active employment;

(c)        the Participant's failure to timely return to work upon expiration of an authorized leave of absence.  Such a Participant will be treated as having voluntarily resigned from the Company;

(d)        a termination of employment initiated as a result of a Participant's refusal to accept a transfer to another Company location; provided, however, a Participant whose employment is terminated within two (2) years following a Change in Control solely as a result of his or her refusal to transfer to another Company location that is more than 50 miles from his or her work location immediately prior to a Change in Control shall be treated as having been subject to a Covered Termination;

(e)        in the case of a sale or other disposition of the Participant's subsidiary, division or other business unit or operation, a termination of employment initiated as a result of a Participant's refusal to accept an offer of employment with the successor entity; provided, however, in such case a Covered Termination shall be deemed to have occurred only if the Participant is not offered substantially comparable employment with the successor entity, as determined by the Plan Administrator, in its sole discretion.  Notwithstanding the preceding sentence, a Participant whose employment is terminated within two (2) years following a Change in Control solely as a result of his or her refusal to accept employment with the successor entity at a location that is more than 50 miles from his or her work location immediately prior to a Change in Control shall be treated as having been subject to a Covered Termination; or

(f)        if the Participant does not return to active employment within eighteen (18) months of commencing a Medical Leave of Absence; provided, however, if a Participant is medically cleared to return to work (with documentation reasonably acceptable to the Company) before the conclusion of such eighteen (18) month period and is ready and willing to do so but does not return to active employment because (i) no comparable job for which the Participant is qualified is available, or (ii) such Participant is unable to locate another comparable Company position within thirty (30) days following his or her return to work, then such Participant shall be treated as having been subject to a Covered Termination.

Page **6** of **16**

**8.      Forfeiture of Benefits**

Notwithstanding anything in the Plan to the contrary and except as provided in Section 24(b), the Company reserves the right in its sole and absolute discretion to cancel all benefits under this Plan in the event a Participant engages in any activity that the Company considers detrimental to its interests, as determined by Resideo's General Counsel or Chief Human Resources Officer, or their delegees.  Activities that the Company considers detrimental to its interests include, but are not limited to:

(a)      any effort on the part of a Participant, either directly or indirectly, to recruit or solicit employees of the Company for employment with another company without the written approval of Resideo's Chief Human Resources Officer, or his delegee;

(b)      any effort on the part of a Participant, either directly or indirectly, to recruit or solicit customers of the Company;

(c)      the disclosure of any Company confidential or proprietary information, or the breach of any obligations under the Participant's agreements relating to intellectual property and confidential information;

(d)      any intentional misconduct substantially damaging to the property or business of the Company;

(e)      the commission of a fraud or misappropriation of property, proprietary information, intellectual property or trade secrets of the Company for personal gain or for the benefit of another party;

(f)      knowingly making false or misleading statements about the Company or its products, officers or employees to competitors or customers or potential customers of the Company, or to current or former employees of the Company;

(g)      a Participant's holding himself or herself out as an active employee of the Company; or

(h)      breaching any of the terms of the Release or any IP, confidentiality or noncompetition agreement or covenant.

**9.      Payment of Benefits Upon Death**

If a Participant dies after signing and returning the Release, without revoking the Release, and before all Severance Benefits have been paid, the balance of such payments will be paid to the Participant's estate in a lump sum within sixty (60) days following the Participant's death.

**10.      Administration**

(a)      <u>Plan Administration</u>. Except as provided in Section 25, the Plan shall be administered by the Plan Administrator, who shall have the powers and authorities as described in this Section 10. The Plan Administrator shall be the Company's Chief Human Resources Officer, or his designee.

Page **7** of **16**

The Plan Administrator shall serve without additional compensation. The Plan Administrator shall keep or cause to be kept such records and shall prepare or cause to be prepared such returns or reports as may be required by law or necessary for the proper administration of the Plan.

(b)     <u>Powers and Duties of Plan Administrator</u>. The Plan Administrator shall have the full discretionary power and authority to (i) construe and interpret the Plan (including, without limitation, supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan); (ii) determine all questions of fact arising under the Plan, including questions as to eligibility for and the amount of benefits; (iii) establish such rules and regulations (consistent with the terms of the Plan) as it deems necessary or appropriate for administration of the Plan; (iv) delegate responsibilities to others to assist it in administering the Plan; and (v) perform all other acts it believes reasonable and proper in connection with the administration of the Plan. The Plan Administrator shall be entitled to rely on the records of the Company in determining any Participant's entitlement to, and the amount of, Severance Benefits under the Plan. Any determination of the Plan Administrator, including interpretations of the Plan and determinations of questions of fact, shall be final and binding on all parties.

The Plan Administrator may retain attorneys, consultants, accountants or other persons (who may be employees of the Company) to render advice and assistance and may delegate any of the authorities conferred on him under this Plan to such persons as he shall determine to be necessary to effect the discharge of his duties hereunder. The Plan Administrator, the Company and its officers and directors shall be entitled to rely upon the advice, opinions and determinations of any such persons. Any exercise of the authorities set forth in this Section 10, whether by the Plan Administrator or his delegee, shall be final and binding upon the Company and all Participants.

(c)     <u>Additional Discretionary Authority</u>. The Plan Administrator may, in his sole and absolute discretion, waive the requirement that a Participant execute a Release or confidentiality, non-competition, non-disparagement, non-solicitation and intellectual property covenants in order to receive Severance Benefits.

(d)     <u>Indemnification</u>. To the extent permitted by law, the Company shall indemnify the Plan Administrator from all claims for liability, loss, or damage (including payment of expenses in connection with defense against such claims) arising from any act or failure to act in connection with the Plan.

## 11.     <u>Claims and Appeals Procedures</u>

Except as provided in Section 25, the Plan's benefit claims and appeals procedures shall be as follows:

(a)     Any request or claim for Plan benefits shall be deemed to be filed when a written request is made by the claimant or the claimant's authorized representative that is reasonably calculated to bring the claim to the attention of the Plan Administrator.

(b)     The Plan Administrator, or his designee, shall respond, in writing, to any claimant's claim for benefits under the Plan. Such response shall be provided within 90 days of its receipt by the Plan Administrator or, if special circumstances require and the claimant is so notified, in writing, before the expiration of the initial 90-day period, within 180 days of its receipt by the Plan Administrator. If the extension is necessary because the claimant has failed to submit the information

Page **8** of **16**

necessary to decide the claim, the Plan Administrator's period for responding to such claim shall be tolled until the date that the claimant responds to the request for additional information. The response shall be written in a manner calculated to be understood by the claimant and shall, in the case of an adverse benefit determination:

        (i)      set forth the specific reasons for the adverse benefit determination;

        (ii)      contain specific references to Plan provisions relative to the adverse benefit determination;

        (iii)      describe any material and information, if any, necessary for the claim for benefits to be perfected, and an explanation of why such material or information is necessary; and

        (iv)      advise the claimant that any appeal of an adverse benefit determination must be made, in writing, to the Plan Administrator within 60 days after receipt of such adverse benefit determination, and must set forth the facts upon which the appeal is based.

        (c)      If the claimant fails to appeal the Plan Administrator's adverse benefit determination, in writing, within 60 days after its receipt by the claimant (or within 60 days after a deemed denial of the claim), the Plan Administrator's determination shall become final and conclusive.

        (d)      If the claimant appeals the Plan Administrator's adverse benefit determination in a timely fashion, the Plan Administrator shall re-examine all issues relevant to the original denial of benefits. Any such claimant or his or her duly authorized representative may review any pertinent documents and records, including documents and records that were relied upon in making the benefit determination, documents submitted, considered or generated in the course of making the benefit determination (even if such documents were not relied upon in making the benefit determination), and documents that demonstrate compliance, in making the benefit determination, with the Plan's required administrative processes and safeguards. In addition, the claimant or his duly authorized representative may submit, in writing, any documents, records, comments or other information relating to such claim for benefits. In the course of his review, the Plan Administrator shall take into account all comments, documents, records and other information submitted by the claimant or his duly authorized representative relating to such claim, regardless of whether it was submitted or considered as part of the initial benefit determination.

        (e)      The Plan Administrator shall advise the claimant and such claimant's representative, in writing, of its decision within 60 days of receipt of the written appeal, unless special circumstances require an extension of such 60-day period for not more than an additional 60 days. Where such extension is necessary, the claimant shall be given written notice of the delay before the expiration of the initial 60-day period, which notice shall set forth the reasons for the delay and the date the Plan Administrator expects to render its decision. In the event of an adverse benefit determination on appeal, the Plan Administrator shall advise the claimant, in a manner calculated to be understood by the claimant, of (i) the specific reasons for the adverse benefit determination, and (ii) the specific Plan provisions on which the adverse benefit determination was based. The Plan Administrator's written notice will advise the claimant of his or her right to receive, upon request and free of charge, copies of all documents, records and other information relevant to such claim.

Page **9** of **16**

(f)        In the event of an adverse benefit determination after the Plan Administrator's review, the claimant's sole remedy shall be to file an action in court.

The Plan's claims procedures do not create any independent rights to Plan benefits. A current or former Participant who files a claim for Plan benefits must satisfy all Plan requirements, including the requirements of Section 5(b), in order to be entitled to benefits.

**12.        Time Period for Filing a Claim or a Lawsuit Against the Plan, the Company or Plan Fiduciaries; Restrictions on Venue**

(a)        Any claim for Plan benefits must be filed in writing with the Plan Administrator within sixty (60) days after the current or former Participant knew or should have known of his/her putative right to Plan benefits. However, in no event will any claim be considered timely if it is filed more than one hundred eighty (180) days after the date a current or former Participant's employment with the Company is terminated. Requests or claims submitted more than sixty (60) days after a current or former Participant knew or should have know of his/her potential right to Plan benefits, or one-hundred eighty (180) days after the date his/her employment with the Company is terminated, are deemed waived by the claimant and considered time-barred

(b)        Any lawsuit against the Plan, the Company, the Plan Administrator, or any other Plan fiduciary, must be filed no later than the six (6) month anniversary of the following, as applicable: (i) the date the claim or appeal is denied by the Plan Administrator, or (ii) the date the claimant knows, or should reasonably know, that the claim has been, or is treated as being, denied (e.g., if the claim, or the appeal in the case of an adverse benefit determination, is not denied within the time limits described in Section 11 above).

(c)        Any action in connection with the Plan must be filed in the Federal District Court of New York.

**13.        Unfunded Obligation**

All benefits payable under this Plan shall constitute an unfunded obligation of the Company. Payments shall be made, as due, from the general funds of the Company. This Plan shall constitute solely an unsecured promise by the Company to pay severance benefits to Participants to the extent provided herein.

**14.        Inalienability of Benefits**

No Participant shall have the power to transfer, assign, anticipate, mortgage or otherwise encumber any rights or any amounts payable under this Plan; nor shall any such rights or amounts payable under this Plan be subject to seizure, attachment, execution, garnishment or other legal or equitable process, or for the payment of any debts, judgments, alimony, or separate maintenance, or be transferable by operation of law in the event of bankruptcy, insolvency, or otherwise. In the event a person who is receiving or is entitled to receive benefits under the Plan attempts to assign, transfer or dispose of such right, or if an attempt is made to subject such right to such process, such assignment, transfer or disposition shall be null and void.

**15.        Withholding**

Page **10** of **16**

The Company shall have the right to withhold any taxes required to be withheld with respect to any benefits due under this Plan.

**16.        Amendment or Termination**

Except to the extent otherwise provided in Section 26, Resideo reserves the right to amend or terminate the Plan at any time without prior notice to or the consent of any employee. No amendment or termination shall adversely affect the rights of any Participant whose employment terminated prior to such amendment or termination. However, except as provided in Section 26, any Participant whose employment continues after amendment of the Plan shall be governed by the terms of the Plan as so amended. Any Participant whose employment continues after termination of the Plan shall have no right to a benefit under the Plan. Any amendment or termination of the Plan must comply with all applicable legal requirements including, without limitation, compliance with Code Section 409A, securities, tax or other laws, rules, regulations or regulatory interpretations thereof that apply to the Plan.

**17.        Plan Not a Contract of Employment**

Nothing contained in this Plan shall give an employee the right to be retained in the employment of the Company.  This Plan is not a contract of employment between the Company and any employee.

**18.        Action by the Company**

Unless expressly indicated to the contrary herein, any action required to be taken by an entity may be taken by action of its governing body or by any appropriate officer or officers traditionally responsible for such determination or actions, or such other individual or individuals as may be designated by such governing body, officer or employee.

**19.        Governing Law**

The Plan is an employee welfare benefit plan within the meaning of Section 3(1) of ERISA, and will be construed in accordance with the provisions of ERISA and the laws of the State of New York.

**20.        Severability**

If any provision of this Plan (other than Section 5(b)) shall be held illegal or invalid for any reason, said illegality or invalidity shall not affect the remaining parts of this Plan, but this Plan shall be construed and enforced as if said illegal or invalid provision had never been included herein. If Section 5(b) shall be held illegal or invalid for any reason, said illegality or invalidity shall nullify the remainder of this Plan with respect to the affected Participants.

**21.**        **Code Section 409A**

(a)        Notwithstanding any provision of the Plan to the contrary, if required by Code Section 409A and if a Participant is a "Specified Employee" (as defined below), no benefits shall be paid under this Plan during the "Postponement Period" (as defined below). If a Participant is a Specified Employee and payment of benefits is required to be delayed for the Postponement Period under Code Section 409A, the accumulated amounts withheld on account of Code Section 409A shall be paid in a lump sum payment within 30 days after the end of the Postponement Period and no interest or other adjustment shall be made for the delayed payment. If the Participant dies during the Postponement Period prior to the payment of benefits, the amounts withheld on account of Code Section 409A shall be paid to the Participant's estate within sixty (60) days after the Participant's death.

(b)        This Plan is intended to meet the requirements of the "short-term deferral" exception, the "separation pay" exception and other exceptions under Code Section 409A. Notwithstanding anything in the Plan to the contrary, if required by Code Section 409A, payments may only be made under this Plan upon an event and in a manner permitted by Code Section 409A, to the extent applicable. For purposes of Code Section 409A, the right to a series of payments under the Plan shall be treated as a right to a series of separate payments. All reimbursements and in-kind benefits provided under the Plan shall be made or provided in accordance with the requirements of Code Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses eligible for reimbursement during the period of time specified in the Plan; (ii) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits provided in any other calendar year; (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (iv) the right to reimbursement or in-kind benefit is not subject to liquidation or exchange for another benefit. In no event may a Participant designate the year of payment for any amounts payable under the Plan.

(c)        Notwithstanding any provision of the Plan to the contrary, any payments of Severance Benefits under this Plan that (i) are, or may be, deferred compensation subject to Code Section 409A ("409A Severance Benefits"), and (ii) are subject to a Release, where the period for execution and non-revocation of the Release spans more than one calendar year, any payment of 409A Severance Benefits that is contingent on the execution of the Release shall not be paid until the second calendar year, or later if required by the applicable terms of the Plan. In no event may a Participant, either directly or indirectly, designate the calendar year of payment of any 409A Severance Benefits.

(d)        For purposes of this Section 21, the following definitions apply:

(i)        "Specified Employee" means a Participant who, at any time during the 12-month period ending on the identification date, is a "specified employee" under Code Section 409A, as determined by the Vice President – Compensation and Benefits (or his delegee), which determination of "specified employees," including the number and identity of persons considered "specified employees" and identification date, shall be made by the Vice President – Compensation and Benefits (or his delegee) in accordance with the provisions of Code Sections 416(i) and 409A.

(ii)        "Postponement Period" means, for a Specified Employee, the period of six months after the Specified Employee's Last Day of Active Employment (or such other period as may be required by Code Section 409A) during which deferred compensation may not be paid to the Specified Employee under Code Section 409A.

Page **12** of **16**

**PART II**
**SPECIAL PROVISIONS THAT BECOME EFFECTIVE**
**ONLY UPON CHANGE IN CONTROL**

**22.      Applicability**

(a)       Except to the extent otherwise indicated, the provisions of this Part II apply only to Resideo's Chief Executive Officer and Section 16 Officer Participants (collectively "CIC Participants"). Such provisions become effective upon a Change in Control and, in addition to the provisions of Part I that are not superseded by provisions of this Part II, shall control (i) the determination of eligibility for, the amount of, and the time of payment of benefits under the Plan to any CIC Participant who is the subject of a Covered Termination that occurs within the two (2) year period following the Change in Control, and (ii) the terms of payment for any CIC Participant whose Severance Period extends beyond the Change in Control.

(b)       It is intended that this Part II will assure that CIC Participants will not be adversely affected by the unique circumstances that may exist following a Change in Control. The provisions of this Part II will have no effect whatsoever prior to a Change in Control.

**23.      Definitions**

(a)       **"Annual Incentive Compensation"** means, notwithstanding the provisions of Section 3(b), the product of (i) Annual Base Salary, and (ii) the greater of (A) the Incentive Award Target Percentage for the most recent Determination Year ended prior to the Change in Control, or (B) the average of the Incentive Award Target Percentages applied in determining the CIC Participant's Incentive Award in the last three Determination Years prior to the date of Covered Termination (or such lesser period as the CIC Participant may have been employed).

(b)       **"Cause"** has the same meaning as under Part I; provided, however, in the case of a determination under Part II of the Plan, Cause shall be determined by the New Plan Administrator.

(c)       **"Covered Termination"** means, in addition to the circumstances described in Section 3(i), a severance of the employment relationship at the initiative of a CIC Participant for Good Reason.

(d)       **"Good Reason"** means any one or more of the following:

(i)       A material change in the CIC Participant's position, duties and/or responsibilities as they existed in the period immediately preceding the Change in Control;

(ii)       Any significant reduction in the CIC Participant's Base Salary or Annual Incentive Compensation;

(iii)       Any significant reduction in the economic value of awards granted under any Company long-term incentive plans in which the CIC Participant participated prior to a Change in Control, or the successors thereto;

Page **13** of **16**

(iv)        Any geographic relocation of the CIC Participant's position to a new location that is more than fifty (50) miles from the location of the CIC Participant's position immediately prior to a Change in Control;

(v)        Any action by the Company that, under applicable law, constitutes constructive discharge; or

(viii)        The failure of any Resideo Employer that is a successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise) to expressly assume and agree to honor this Plan, if such assumption is legally required to make this Plan enforceable against the successor.

For purposes of this Section 23(c), the term "significant reduction" shall mean a reduction or series of reductions with respect to the same form of benefit or remuneration that are greater than 10%, or which do not affect substantially all persons covered by the plan or program in question.

Notwithstanding the foregoing, Good Reason shall not be deemed to have occurred unless the CIC Participant provides written notice to Resideo identifying the event or omission constituting the reason for a Good Reason termination within ninety (90) days following the first occurrence of such event or omission. Within thirty (30) days after such notice has been provided to Resideo, Resideo shall have the opportunity, but shall have no obligation, to cure such event or conditions that give rise to a Good Reason termination. If Resideo fails to cure the events or conditions giving rise to a CIC Participant's Good Reason termination by the end of the thirty (30) day cure period, the CIC Participant's employment shall be terminated effective as of the expiration of such thirty (30) day cure period unless the CIC Participant has withdrawn such Good Reason termination notice.

(e)        **"Resideo Employer"** means the Company and any other person, organization or entity that agrees in writing to be bound by the terms of the Plan for a period of time that extends at least through the two-year period following a Change in Control.

(f)        **"New Plan Administrator"** shall mean such person or persons appointed pursuant to Section 25 to administer the Plan upon the occurrence of a Change in Control.

## 24.        Benefit Payments and Forfeitures

(a)        Benefit Payments. Notwithstanding the provisions of Section 6, benefits that are determined to be payable to a CIC Participant under Sections 5(a)(i) and 5(a)(ii) on or after a Change in Control shall be paid within thirty (30) days following the later of the Change in Control or the Covered Termination, in a single payment equal to the sum of (i) the total amount of the benefit remaining payable under Section 5(a)(i), and (ii) the amount of the benefit payable under Section 5(a)(ii); provided, however, that the single lump sum payment pursuant to this Section will only be paid if the Change in Control constitutes a "change in control event" under Section 409A of the Code. Otherwise, the payment shall be paid (or continue to be paid, if in pay status) in the same form and at the same times as provided under Section 5(a). The requirements of Section 5(b) shall have no application to benefits payable after a Change in Control. If any benefit is paid later than the time provided in this Section 24(a), such late payment shall be credited with interest for the period from the date payment should have been made to the date actually made at a rate equal to the average quoted rate for three-month U.S. Treasury Bills for the week preceding the date of payment, as determined by the New Plan Administrator, plus six percentage points.

Page **14** of **16**

(b)        Forfeiture of Benefits. Notwithstanding the provisions of Section 8, a CIC Participant receiving benefits or entitled to receive benefits under the Plan shall cease to receive such benefits under the Plan and the right to receive any benefits in the future under the Plan shall be forfeited, in the event the CIC Participant, as determined by the New Plan Administrator, (i) is convicted of a felony committed against a Resideo Employer, its property or business, (ii) commits any fraud or misappropriates property, proprietary information, intellectual property or trade secrets of a Resideo Employer for personal gain or for the benefit of another party, or (iii) actively recruits and offers employment to any management employee of a Resideo Employer.

## 25.        Administration

(a)        New Plan Administrator. On or before a Change in Control, the Company shall appoint a person independent of the Company to be the New Plan Administrator upon the occurrence of a Change in Control and the Plan Administrator shall provide to the New Plan Administrator such information with respect to each CIC Participant in the Plan as shall be necessary to enable the New Plan Administrator to determine the amount of is the Severance Benefits that are then, or may thereafter become, payable to such CIC Participants. Upon a Change in Control, the New Plan Administrator shall have the authority invested in the Plan Administrator under Section 10(b), and claims for benefits shall be subject to the claims and appeals procedures outlined in Section 11.

(b)        Attorneys Fees and Costs.  If a CIC Participant is paid or is determined to be entitled to receive benefits by a court of competent jurisdiction, the Resideo Employer shall immediately pay or reimburse the affected CIC Participant for the full amount of any attorneys' fees and other expenses the affected CIC Participant incurred in pursuing his or her claim for benefits, including claims incurred during the claims and appeals portion of the process. The payment or reimbursement shall include the reasonable hourly rates charged by the CIC Participant's attorneys, any and all other expenses related to the action incurred by or on behalf of the affected CIC Participant, the costs and expenses of any experts utilized to prepare the claim, and any court costs assessed against the affected CIC Participant.

(c)        Declaratory Judgment. CIC Participants may bring a claim under this Section 25 to assert the existence of Good Reason conditions that would enable a CIC Participant to trigger his own termination under this Part II without resigning his or her position with the Resideo Employer.

## 26.        Amendment or Termination

This Plan may not be amended or terminated after a Change in Control; provided, however, the Plan may be amended if the purpose of the amendment is to increase benefits hereunder or if the purpose of the amendment is to comply with Section 409A of the Code.

Page **15** of **16**

**27.    No Waiver**

No waiver by a CIC Participant at any time of any breach by a Resideo Employer of, or of any lack of compliance with, any condition or provision of this Plan to be performed by the Resideo Employer shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.  In no event shall the failure by a CIC Participant to assert any right under the Plan (including, but not limited to, failure to assert the existence of Good Reason conditions that would enable a CIC Participant to trigger his own termination under this Part II) be deemed a waiver of such right or any other right provided under the Plan, it being intended that a CIC Participant who has perfected a right under the Plan (including, but not limited to, a CIC Participant's right to trigger his own Good Reason termination under this Part II) shall be entitled to assert that right in accordance with the terms of the Plan unless the CIC Participant affirmatively elects, in writing, to waive such right.

**28.    Company Policies**

All benefits granted under the Plan shall be subject to any applicable clawback or recoupment policies, share trading policies and other policies that may be implemented by the Board of Directors from time to time, including such policies set forth in the Company's Corporate Governance Guidelines, as such policies may be amended from time to time, subject to and consistent with Section 409A of the Code.

Page **16** of **16**

(Back To Top)

# Section 5: EX-10.19 (EX-10.19)

**Exhibit 10.19**

**AMENDED AND RESTATED 2018 STOCK INCENTIVE PLAN**
**OF**
**RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES**

**ARTICLE I**
**ESTABLISHMENT AND PURPOSE**

1.1 ***Purpose***. The purpose of this Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (as amended and restated, the "Plan") is to enable the Company to achieve superior financial performance, as reflected in the performance of its Common Stock and other key financial or operating indicators by (a) providing incentives and rewards to certain Employees and Other Service Providers who are in a position to contribute materially to the success and long-term objectives of the Company, (b) aiding in the recruitment and retention of Employees and Other Service Providers of exceptional ability, (c) providing Employees and Other Service Providers an opportunity to acquire or expand equity interests in the Company, and (d) promoting the growth and success of the Company's business by aligning the financial interests of Employees and Other Service Providers with that of the other stockholders of the Company. Towards these objectives, the Plan provides for the grant of Stock Options, Stock Appreciation Rights, Restricted Stock Units, Restricted Stock, Other Stock-Based Awards and Cash-Based Awards.

1.2 ***Original Plan; Effective Date***. The original 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Original Plan") was effective as of the effective date of the Company's Registration Statement on Form 10 filed with the Securities and Exchange Commission in connection with the distribution of its Shares by Honeywell International Inc. (the "Effective Date").  The Board adopted the amended and restated Plan on December 21, 2018 (the "Restatement Date").  References contained herein to the "Plan" shall refer to the Original Plan, as amended and restated on the Restatement Date.

**ARTICLE II**
**DEFINITIONS**

For purposes of the Plan, the following terms have the following meanings:

2.1 **"*1933 Act*"** means the Securities Act of 1933, as amended, and the regulations and interpretations thereunder.

2.2 *"Affiliate"* means (a) any subsidiary of the Company of which at least 50 percent of the aggregate outstanding voting common stock or capital stock is owned directly or indirectly by the Company, (b) any other parent of a subsidiary described in clause (a), or (c) any other entity in which the Company has a substantial ownership interest and which has been designated as an Affiliate by the Committee in its sole discretion.

2.3 *"Award"* means any form of incentive or performance award granted under the Plan, whether singly or in combination, to a Participant by the Committee pursuant to any terms and conditions that the Committee may establish and set forth in the applicable Award Agreement. Awards granted under the Plan may consist of: (a) "Stock Options" awarded pursuant to Section 4.3; (b) "Stock Appreciation Rights" awarded pursuant to Section 4.3; (c) "Restricted Stock Units" awarded pursuant to Section 4.4; (d) "Restricted Stock" awarded pursuant to Section 4.4; (e) "Other Stock-Based Awards" awarded pursuant to Section 4.5; and (f) "Cash-Based Awards" awarded pursuant to Section 4.6.

2.4 *"Award Agreement"* means the document issued, either in writing or an electronic medium, to a Participant evidencing the grant of an Award and that sets out the terms and conditions of such Award.

2.5 *"Board"* means the Board of Directors of the Company.

2.6 *"Cash-Based Award"* means an award issued pursuant to Section 4.6.

2.7 *"Cause"* has the meaning assigned to such term in any severance plan of the Company or an Affiliate, in each case, that is applicable to such Participant as of immediately prior to the Termination of Service; *provided*, that if no such agreement exists, or if such term is not defined in such agreement, "Cause" means any of the following: (i) clear evidence of a significant violation of the Company's Code of Business Conduct; (ii) a fraud committed against the Company; (iii) the misappropriation, embezzlement or reckless or willful destruction of Company property; (iv) the willful failure to perform, or gross negligence in the performance of, duties; (v) the conviction (treating a nolo contendere plea as a conviction) of a felony (whether or not any right to appeal has been or may be exercised); (vi) the knowing falsification of any records or documents of the Company; (vii) a significant breach of any statutory or common law duty of loyalty to the Company; (viii) intentional and improper conduct significantly prejudicial to the business of the Company; (ix) the failure to cooperate fully in a Company investigation or the failure to be fully truthful when providing evidence or testimony in such investigation; or (x) the violation of Company rules and policies that, based on a single occurrence, might not meet the significance thresholds of (i), (vii) or (viii) above, but that shall, for purposes of such significance thresholds, be deemed to constitute a violation thereof in the event any such violation occurs more than once. Cause shall be determined by the Committee for Reporting Persons or by the Company for all other Participants, in its sole and absolute discretion.

2.8 *"Change in Control"* means (a) any one person, or more than one person acting as a group (as defined under U.S. Department of Treasury Regulation ("Treasury Regulation") § 1.409A-3(i)(5)(v)(B)) acquires ownership of stock of the Company that, together with stock held by such person or group, constitutes more than 50 percent of the total fair market value or total voting power of the stock of the Company; or (b) any one person, or more than one person acting as a group (as defined under Treasury Regulation § 1.409A-3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) ownership of stock of the Company possessing 30 percent or more of the total voting power of the stock of the Company; or (c) a majority of members of the Board is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the members of the Board before the date of the appointment or election; or (d) any

2

one person, or more than one person acting as a group (as defined in Treasury Regulation § 1.409A-3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets from the Company and its subsidiaries on a consolidated basis that have a total gross fair market value equal to or more than 40 percent of the total gross fair market value of all of the assets of the Company and its subsidiaries on a consolidated basis immediately before such acquisition or acquisitions. For purposes of clause (d), "gross fair market value" means the value of the assets of the Company and its subsidiaries on a consolidated basis, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets. The foregoing clauses (a) through (d) shall be interpreted in a manner that is consistent with the Treasury Regulations promulgated pursuant to Section 409A of the Code so that all, and only, such transactions or events that could qualify as a "change in control event" within the meaning of Treasury Regulation § 1.409A-3(i)(5)(i) shall be deemed to be a Change in Control for purposes of this Plan.

2.9 *"Code"* means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

2.10 *"Committee"* means the compensation committee of the Board or any successor committee or subcommittee of the Board or other committee or subcommittee designated by the Board, which committee or subcommittee is comprised solely of two or more persons who are Non-Employee Directors within the meaning of Rule 16b-3(b)(3) under the Exchange Act.

2.11 *"Common Stock"* means the common stock of the Company.

2.12 *"Company"* means Resideo Technologies, Inc. and its successors.

2.13 *"Disabled"* and *"Disability,"* with respect to a Participant, have the meanings assigned to such terms under the long-term disability plan maintained by the Company or an Affiliate in which such Participant is covered at the time the determination is made, and if there is no such plan, mean the permanent inability as a result of accident or sickness to perform any and every duty pertaining to such Participant's occupation or employment for which the Participant is suited by reason of the Participant's previous training, education and experience; *provided*, that, to the extent an Award subject to Section 409A of the Code shall become payable upon a Participant's Disability, a Disability shall not be deemed to have occurred for such purposes unless the circumstances would also result in a "disability" within the meaning of Section 409A of the Code, unless otherwise provided in an Award Agreement.

2.14 *"Dividend Equivalent"* means an amount equal to the cash dividend or the Fair Market Value of the stock dividend that would be paid on each Share underlying an Award if the Share were duly issued and outstanding on the date on which the dividend is payable.

2.15 *"Employee"* means any individual who performs services as an employee of the Company or an Affiliate.

2.16 *"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the regulations and interpretations thereunder.

3

2.17 *"Executive Level Employee"* means any individual who is designated as an officer of the Company by the Board, whether or not that individual is in a direct reporting relationship to the Company's Chief Executive Officer.

2.18 *"Exercise Price"* means the price of a Share, as fixed by the Committee, that may be purchased under a Stock Option or with respect to which the amount of any payment pursuant to a Stock Appreciation Right is determined.

2.19 *"Fair Market Value"* means, except as otherwise provided in the applicable Award Agreement, (a) with respect to any property other than Shares, the fair market value of such property determined by such methods or procedures as shall be established from time to time by the Committee and (b) with respect to Shares, as of any date, (i) the average (mean) of the highest and lowest sales prices of a Share, as reported on the New York Stock Exchange (or any other reporting system selected by the Committee, in its sole discretion) on the date as of which the determination is being made or, if no sale of Shares is reported on this date, on the most recent preceding day on which there were sales of Shares reported or (ii) in the event there shall be no public market for the Shares on such date, the fair market value of the Shares as determined in good faith by the Committee.

2.20 *"GAAP"* means U.S. generally accepted accounting principles.

2.21 *"Good Reason"* has the meaning assigned to such term in any written individual agreement between the Company or an Affiliate and the Participant in which such term is defined and in the absence of any such written agreement, has the meaning assigned to such term in any severance plan of the Company or an Affiliate, in each case, that is applicable to such Participant, in each case, as of immediately prior to the Change in Control (but assuming that a Change in Control has occurred for purposes of such agreement or plan); *provided*, that if no such agreement exists, or if such term is not defined in such agreement, "Good Reason" means, without the Participant's consent, (a) a material reduction in the Participant's base salary and, as to a Participant who is an Executive Level Employee, annual target bonus in effect immediately prior to the Change in Control (other than a reduction that is generally applicable to all salaried and non-union hourly employees of the Company); (b) the permanent elimination of the Participant's position, not including a transfer pursuant to the sale of a facility or line of business, *provided* the Participant is offered substantially comparable employment with the successor employer; (c) in the case of a Participant who is an Executive Level Employee, a material adverse change to the Participant's position, function, responsibilities or reporting level, or in the standard of performance required of the Participant, as determined immediately prior to a Change in Control; (d) a material change in the geographic location at which the Participant must perform his or her services from the location the Participant was required to perform such services immediately prior to a Change in Control; or (e) an action by the Company that under applicable law constitutes constructive discharge. Notwithstanding the foregoing, Good Reason shall not be deemed to have occurred unless the Participant provides written notice to the Company identifying the event or omission constituting the reason for a Good Reason termination within ninety (90) days following the first occurrence of such event or omission. Within thirty (30) days after such notice has been provided to the Company, the Company shall have the opportunity, but shall have no obligation, to cure such event or conditions that give rise to a Good Reason termination. If the Company fails to cure the events or conditions giving rise

4

to a Participant's Good Reason termination by the end of the thirty (30) day cure period, the Participant's employment shall be terminated effective as of the expiration of such thirty (30) day cure period unless the Participant has withdrawn such Good Reason termination notice.

2.22 *"Incentive Stock Option"* means a Stock Option granted under Section 4.3 of the Plan that meets the requirements of Section 422 of the Code and is designated in the Award Agreement to be an Incentive Stock Option.

2.23 *"Non-Employee Director"* means any member of the Board, elected or appointed, who is not an Employee. An individual who is elected to the Board at a meeting of the stockholders of the Company shall be deemed to be a member of the Board as of the date of the meeting.

2.24 *"Nonqualified Stock Option"* means any Stock Option granted under Section 4.3 of the Plan that is not an Incentive Stock Option.

2.25      *"Other Service Provider"* means an individual providing services to the Company as an independent contractor or consultant and who is not an Employee or a Non-Employee Director.

2.26 **"*Other Stock-Based Award*"** means an Award granted under Section 4.5 and denominated in Shares.

2.27 **"*Participant*"** means an Employee or Other Service Provider who has been granted an Award under the Plan.

2.28 *"Reporting Person"* means an Employee who is subject to the reporting requirements of Section 16(a) of the Exchange Act.

2.29 *"Restricted Stock"* means Shares issued pursuant to Section 4.4 that are subject to any restrictions that the Committee, in its discretion, may impose.

2.30 *"Restricted Stock Unit"* means a right granted under Section 4.4 to acquire Shares or an equivalent amount in cash that is subject to any restrictions that the Committee, in its discretion, may impose.

2.31  *"Retirement"* means, except as otherwise determined by the Committee or as required by local law applicable to a Participant, the Termination of Service on or after attainment of age 55 with 10 years of service with the Company and its Affiliates, other than on account of an involuntary Termination of Service for Cause, provided however, that the Participant has advised the Company's corporate secretary in writing no less than six (6) months prior to such Retirement that he or she is considering retirement. For purposes of this Section, "years of service" is determined using the Participant's most-recent adjusted service date, as reflected at the Participant's Termination of Service in the Company's records.  Notwithstanding any provision to the contrary in this Plan or any Award Agreement, any continued or extended vesting and/or exercise period that would otherwise be available upon a Participant's Retirement under an Award granted on or after the Restatement Date shall not apply to any such Awards granted to any Participant resident in Europe, the Middle East or Africa or any other country where a continued or extended vesting and/or exercise period due to Retirement would violate age discrimination rules and regulations.

5

2.32 *"Share"* means a share of Common Stock.

2.33 *"Stock Appreciation Right"* means a right granted under Section 4.3 to an amount in cash or a number of Shares with a Fair Market Value equal to the excess of the Fair Market Value of the Shares on the date on which the Stock Appreciation Right is exercised over the applicable Exercise Price (with any fractional Shares treated in accordance with Section 5.5).

2.34 *"Stock Option"* means a right granted under Section 4.3 to purchase from the Company a stated number of Shares at the applicable Exercise Price. Stock Options awarded under the Plan may be in the form of Incentive Stock Options or Nonqualified Stock Options.

2.35 *"Termination of Service"* means the date of cessation of a Participant's provision of services to the Company and its Affiliates for any reason, with or without Cause, as determined by the Company; *provided*, that a Participant will be deemed to have incurred a Termination of Service on the date that such Participant provides notice of termination to the Company and its Affiliates. Except as otherwise provided in an Award Agreement, (a) termination of service shall be determined without regard to any statutory or contractual notice periods for termination of employment, dismissal, redundancy, and similar events, and (b) if an Employee's employment is terminated under circumstances that entitle the Employee to severance benefits pursuant to any applicable severance plan of the Company or an Affiliate in which the Employee participates, the Employee's employment relationship with the Company and its Affiliates shall cease on the day prior to the date that severance benefits become payable under the terms of the applicable severance plan without regard to any delay in payment required by Section 409A of the Code. Notwithstanding the foregoing, (x) if an Affiliate ceases to be an Affiliate while an Award granted to a Participant who provides services to such Affiliate is outstanding, the Committee may, in its discretion, deem such Participant to have a Termination of Service on the date the Affiliate ceases to be an Affiliate or on a later date specified by the Committee; (y) the Committee shall make any determination described in clause (x) before or not more than a reasonable period after the date the Affiliate ceases to be an Affiliate; and (z) each such Participant's Termination of Service shall be treated as an involuntary termination not for Cause. For purposes of clarification, any non-qualified deferred compensation (within the meaning of Section 409A of the Code) payable to the Participant upon a Termination of Service pursuant to the terms and conditions of this Plan shall be paid to the Participant upon a "separation from service" as determined in accordance with Section 409A of the Code without the imposition of additional taxes or penalties.

6

## ARTICLE III
## ADMINISTRATION

3.1 ***The Committee***. The Plan shall be administered by the Committee.

3.2 ***Authority of the Committee***. The Committee shall have authority, in its sole and absolute discretion and subject to the terms of the Plan, to (a) interpret the Plan; (b) prescribe the rules and regulations that it deems necessary for the proper operation and administration of the Plan, and amend or rescind any existing rules or regulations relating to the Plan; (c) select Employees and Other Service Providers to receive Awards under the Plan; (d) determine the form of Awards, the number of Shares subject to each Award, all the terms and conditions of an Award including, without limitation, the conditions on exercise or vesting, the designation of Stock Options as Incentive Stock Options or Nonqualified Stock Options and the terms of Award Agreements; (e) determine whether Awards shall be granted singly, in combination or in tandem; (f) establish and administer performance criteria in respect of any Awards that are subject to performance-based vesting or settlement; (g) waive or amend any terms, conditions, restrictions or limitations on an Award, except that the prohibition on the repricing of Stock Options and Stock Appreciation Rights, as described in Section 4.3(g), may not be waived; (h) in accordance with Article V, make any adjustments to the Plan (including but not limited to adjustment of the number of Shares available under the Plan or any Award) and any Award granted under the Plan that may be appropriate; (i) provide for the deferred payment of Awards and the extent to which payment shall be credited with Dividend Equivalents; (j) determine whether Awards may be transferable to family members, a family trust, a family partnership or otherwise; (k) determine whether, to what extent and under what circumstances Awards may be settled in cash, Shares or other property; (l) interpret, administer, reconcile any inconsistency in, correct any default in and/or supply any omission in, the Plan and any instrument or agreement relating to (including any Award Agreement), or Award made under, the Plan; (m) waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate any Award; (n) accelerate the vesting or exercisability of, payment for or lapse of restrictions on, Awards; (o) establish any provisions that the Committee may determine to be necessary in order to implement and administer the Plan in foreign countries; and (p) take any and all other actions it deems necessary or advisable for the proper operation or administration of the Plan.

3.3 ***Effect of Determinations***. All determinations of the Committee shall be final, binding and conclusive on all persons having an interest in the Plan.

3.4 ***Delegation of Authority***. The Committee, in its discretion and consistent with applicable law and regulations, may delegate its authority and duties under the Plan to one or more subcommittees of the Committee or to the Chief Executive Officer of the Company or any other individual or committee as it deems to be advisable, under any conditions and subject to any limitations that the Committee may establish. Only the Committee (or a subset thereof), however, shall have authority to grant and administer Awards to Reporting Persons and any delegate of the Committee.

7

3.5 *Employment of Advisors*. The Committee may select and employ attorneys, consultants, accountants and other advisors at the Company's expense (and may determine the compensation thereof), and the Committee, the Company, and the officers and directors of the Company may rely upon the advice, opinions or valuations of the advisors employed.

3.6 *No Liability*. No member of the Committee, nor any person acting as a delegate of the Committee with respect to the Plan, shall be liable for any losses resulting from any action taken or omitted to be taken, interpretation or construction made in good faith with respect to the Plan or any Award granted under the Plan.

## ARTICLE IV
## AWARDS

4.1 *Eligibility*. All Employees, and such Other Service Providers as may be designated by the Committee from time to time, are eligible to receive Awards granted under the Plan, except as otherwise provided in this Article IV.

4.2 *Form of Awards*. Awards shall be in the form determined by the Committee, in its discretion, and shall be evidenced by an Award Agreement. Awards may be granted singly or in combination or in tandem with other Awards.

4.3 *Stock Options and Stock Appreciation Rights*. The Committee may grant Stock Options and Stock Appreciation Rights under the Plan to those Employees and Other Service Providers whom the Committee may from time to time select, in the amounts and pursuant to the other terms and conditions that the Committee, in its discretion, may determine and set forth in the Award Agreement, subject to the provisions below:

(a) *Form*. Stock Options granted under the Plan shall, at the discretion of the Committee and as set forth in the Award Agreement, be in the form of Incentive Stock Options, Nonqualified Stock Options, or a combination of the two. If an Incentive Stock Option and a Nonqualified Stock Option are granted to the same Participant under the Plan at the same time, the form of each shall be clearly identified, and they shall be deemed to have been granted in separate grants. In no event shall the exercise of one Award affect the right to exercise the other Award. Stock Appreciation Rights may be granted either alone or in connection with concurrently or previously issued Nonqualified Stock Options.

8

(b) *Exercise Price*. Other than with respect to Stock Options that are assumed, converted or substituted as a result of the acquisition of another company by the Company or an Affiliate or a combination of the Company or an Affiliate with another company, the Committee shall set the Exercise Price of Stock Options or Stock Appreciation Rights granted under the Plan at a price that is equal to or greater than the Fair Market Value of a Share on the date of grant, subject to adjustment as provided in Section 5.3. The Exercise Price of Incentive Stock Options, however, shall be equal to or greater than 110 percent of the Fair Market Value of a Share on the date of grant if the Participant receiving the Stock Options owns stock possessing more than 10 percent of the total combined voting power of all classes of stock of the Company or of any subsidiary or parent corporation of the Company, as defined in Section 424 of the Code. The Exercise Price of a Stock Appreciation Right granted in tandem with a Stock Option shall be equal to the Exercise Price of the related Stock Option. The Exercise Price of a Stock Option or Stock Appreciation Right shall be set forth in the Award Agreement.

(c) *Term and Timing of Exercise*. Except as otherwise provided in an Award Agreement, Stock Options and Stock Appreciation Rights shall lapse not later than 10 years after the date of grant, as determined by the Committee at the time of grant. Except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, each Stock Option or Stock Appreciation Right granted under the Plan shall be exercisable in whole or in part, subject to the following conditions:

(i) The date on which any Award of Stock Options or Stock Appreciation Rights to a Participant may first be exercised shall be set forth in the Award Agreement.

(ii) A Stock Appreciation Right granted in tandem with a Stock Option shall be subject to the same terms and conditions as the related Stock Option and shall be exercisable only to the extent that the related Stock Option is exercisable.

(iii) Stock Options and Stock Appreciation Rights shall vest and remain exercisable as follows, subject to Section 5.4:

9

| Event | Vesting | Exercise Period for Vested Awards |
|---|---|---|
| Death | Immediate vesting as of death (in the case of Awards made on or after the Restatement Date, including if death occurs during any post-Retirement continued vesting period). | Expires earlier of (i) original expiration date, or (ii) 3 years after death (in the case of Awards made on or after Restatement Date, clause (ii) shall include instances where death occurs during any post-Retirement continued vesting period). |
| Disability | Immediate vesting as of Termination of Service due to the incurrence of Disability. | Expires earlier of (i) original expiration date, or (ii) 3 years after Termination of Service due to Disability. |
| Retirement (Applicable to Awards granted prior to the Restatement Date) | Unvested Awards forfeited as of Retirement. | Expires earlier of (i) original expiration date or (ii) 3 years after Retirement. |
| Retirement* (Applicable to Awards granted on or after Restatement Date) | Unvested Awards continue to vest in accordance with original vesting schedule following Retirement. | Expires on the original expiration date. |
| Voluntary Termination of Service (other than covered by Retirement) | Unvested Awards forfeited as of Termination of Service. | Expires earlier of (i) original expiration date, or (ii) 30 days after Termination of Service. |
| Involuntary Termination of Service not for Cause | Unvested Awards forfeited as of Termination of Service | Expires earlier of (i) original expiration date, or (ii) 1 year after Termination of Service. |
| Involuntary Termination of Service for Cause | Unvested Awards forfeited as of Termination of Service | Vested Awards immediately cancelled. |

* Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in the continued vesting of such Award, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

10

(iv) Stock Options and Stock Appreciation Rights of a deceased Participant may be exercised only by the estate of the Participant or by the person given authority to exercise the Stock Options or Stock Appreciation Rights by the Participant's will or by applicable laws of descent and distribution. If a Stock Option or Stock Appreciation Right is exercised by the executor or administrator of a deceased Participant's estate, or by the person or persons to whom the Stock Option or Stock Appreciation Right has been transferred by the Participant's will or the applicable laws of descent and distribution, the Company shall be under no obligation to deliver Shares or cash until the Company is satisfied that the person exercising the Stock Option or Stock Appreciation Right is the duly appointed executor or administrator of the deceased Participant's estate or the person to whom the Stock Option or Stock Appreciation Right has been transferred by the Participant's will or by applicable laws of descent and distribution.

(d) *Payment of Exercise Price*. The Exercise Price of a Stock Option must be paid in full when the Stock Option is exercised. Stock certificates shall be registered and delivered only upon receipt of payment. Payment of the Exercise Price may be made in cash or by certified check, bank draft, wire transfer, or postal or express money order. No portion of the Exercise Price of a Stock Option may be paid from the proceeds of a loan of cash from the Company to the Participant. In addition, the Committee may also permit payment of all or a portion of the Exercise Price to be made by any other method, *provided*, that, for Awards to Reporting Persons, permissible methods shall be set forth in the applicable Award Agreement, including:

(i) Delivering a properly executed exercise notice to the Company or its agent, together with irrevocable instructions to a broker to deliver promptly to the Company the amount of sale proceeds with respect to the portion of the Shares to be acquired having a Fair Market Value on the date of exercise equal to the sum of the applicable portion of the Exercise Price being so paid; or

(ii) Tendering (actually or by attestation) to the Company previously acquired Shares that have been held by the Participant for at least six months, subject to paragraph (d)(v), and that have a Fair Market Value on the day prior to the date of exercise equal to the applicable portion of the Exercise Price being so paid; or

(iii) Instructing the Company to withhold Shares that would otherwise be issued having a Fair Market Value on the date of exercise equal to the applicable portion of the Exercise Price being so paid (*provided* such withholding has been expressly authorized by the Committee); or

(iv) Any combination of the methods described in paragraphs (i), (ii), and (iii).

(v) The Committee, in consideration of applicable accounting standards, may waive any holding period on Shares required to tender pursuant to paragraph (d)(ii) or prohibit withholding pursuant to paragraph (d)(iii).

11

(e) *Incentive Stock Options*. Incentive Stock Options granted under the Plan shall be subject to the following additional conditions, limitations, and restrictions:

(i) *Eligibility*. Incentive Stock Options may be granted only to Employees of the Company or an Affiliate that is a subsidiary or parent corporation of the Company, within the meaning of Section 424 of the Code.

(ii) *Timing of Grant*. No Incentive Stock Option shall be granted under the Plan after the 10-year anniversary of the date on which the Plan is adopted by the Board or, if earlier, the date on which the Plan is approved by the Company's shareowners.

(iii) *Amount of Award*. The aggregate Fair Market Value as of the date of grant of the Shares with respect to which the Incentive Stock Options awarded to any Participant first become exercisable during any calendar year may not exceed $100,000. For purposes of this $100,000 limit, the Participant's Incentive Stock Options under this Plan and all other plans maintained by the Company and its Affiliates shall be aggregated. To the extent any Incentive Stock Option would exceed the $100,000 limit, the Incentive Stock Option shall afterwards be treated as a Nonqualified Stock Option for all purposes.

(iv) *Timing of Exercise*. If the Committee exercises its discretion in the Award Agreement to permit an Incentive Stock Option to be exercised by a Participant more than three months after the Participant has ceased being an Employee (or more than 12 months if the Participant is permanently and totally disabled, within the meaning of Section 22(e) of the Code), the Incentive Stock Option shall be treated as a Nonqualified Stock Option for all purposes following the date that is three months after the Participant has ceased being an Employee (or 12 months after the Participant is determined to be permanently and totally disabled, within the meaning of Section 22(e) of the Code). For purposes of this paragraph (e)(iv), an Employee's employment relationship shall be treated as continuing intact while the Employee is on military leave, sick leave, or another approved leave of absence if the period of leave does not exceed 90 days, or a longer period to the extent that the Employee's right to reemployment with the Company or an Affiliate is guaranteed by statute or by contract. Where the period of leave exceeds 90 days and the Employee's right to reemployment is not guaranteed by statute or contract, the employment relationship shall be deemed to have ceased on the 91st day of the leave.

(v) *Transfer Restrictions*. In no event shall the Committee permit an Incentive Stock Option to be transferred by a Participant other than by will or the applicable laws of descent and distribution, and any Incentive Stock Option awarded under this Plan shall be exercisable only by the Participant during the Participant's lifetime.

12

(f) *Exercise of Stock Appreciation Rights*. Upon exercise, Stock Appreciation Rights may be redeemed for cash or Shares or a combination of cash and Shares, in the discretion of the Committee, and as described in the Award Agreement. Cash payments shall be equal to the excess of the Fair Market Value of a Share on the date of exercise over the Exercise Price for each Share for which a Stock Appreciation Rights was exercised. If the Stock Appreciation Right is redeemed for Shares, the Participant shall receive a number of Shares equal to the quotient of the cash payment amount divided by the Fair Market Value of a Share on the date of exercise (with any fractional Shares to be treated in accordance with Section 5.5).

(g) *Certain Prohibitions*. The following terms or actions shall not be permitted with respect to any Award of Stock Options or Stock Appreciation Rights:

(i) *No Repricing*. Except as otherwise provided in Section 5.3, in no event shall the Committee decrease the Exercise Price of a Stock Option or Stock Appreciation Right after the date of grant, or cancel outstanding Stock Options or Stock Appreciation Rights and grant replacement Stock Options or Stock Appreciation Rights with a lower Exercise Price than that of the replaced Stock Options or Stock Appreciation Rights or other Awards, or purchase underwater Stock Options from a Participant for cash or replacement Awards without first obtaining the approval of the Company's stockholders in a manner that complies with the rules of the New York Stock Exchange.

(ii) *No Dividend Equivalents*. The Committee shall not provide for the payment of Dividend Equivalents with respect to Stock Options or Stock Appreciation Rights.

(iii) *No Reload Options*. The Committee shall not grant Stock Options or Stock Appreciation Rights that have reload features under which the exercise of a Stock Option or Stock Appreciation Right by a Participant automatically entitles the Participant to a new Stock Option or Stock Appreciation Right.

(iv) *No Additional Deferral Features*. The Committee shall not grant Stock Options or Stock Appreciation Rights that have "additional deferral features" as described in Section 409A of the Code, thereby subjecting the Stock Option or Stock Appreciation Right to the requirements of Section 409A.

4.4 ***Restricted Stock Units and Restricted Stock***. The Committee may grant Restricted Stock Units and Restricted Stock under the Plan to those Employees and Other Service Providers whom the Committee may from time to time select, in the amounts and pursuant to the terms and conditions that the Committee, in its discretion, may determine and set forth in the Award Agreement, subject to the provisions below:

13

(a) *Grant of Restricted Stock Units*. The Committee may grant Restricted Stock Units to any Employee or Other Service Provider, which are denominated in, valued in whole or in part by reference to, or otherwise related to, Shares. The Committee shall determine, in its discretion, the terms and conditions that apply to Restricted Stock Units granted pursuant to this Section 4.4, including whether and how Dividend Equivalents shall be credited with respect to any Award. The terms and conditions of the Restricted Stock Units shall be set forth in the applicable Award Agreement.

(b) *Grant of Restricted Stock*. As soon as practicable after Restricted Stock has been granted, certificates for all Shares of Restricted Stock shall be registered in the name of the Participant and held for the Participant by the Company. The Participant shall have all rights of a stockholder with respect to the Shares, including the right to vote and to receive dividends or other distributions, except that the Shares may be subject to a vesting schedule and forfeiture and, except as otherwise provided in Section 7.1, may not be sold, transferred, assigned, pledged or otherwise encumbered or disposed until the restrictions are satisfied or lapse.

(c) *Dividends and Dividend Equivalents*. At the discretion of the Committee and as described in the Award Agreement, dividends issued on Shares of Restricted Stock may be paid immediately or withheld and deferred in the Participant's account. In the event of a payment of dividends on Common Stock, to the extent permissible under Section 409A of the Code, the Committee may credit Restricted Stock Units with Dividend Equivalents. Except as otherwise described in the Award Agreement or determined by the Committee, Dividend Equivalents may be withheld and deferred in the Participant's account subject to a vesting schedule, or used to credit additional Restricted Stock Units that vest on the same schedule and subject to any other conditions as the underlying Restricted Stock Units. The Committee shall determine any terms and conditions on deferral of Dividend Equivalents.

(d) *Vesting and Forfeiture*. The Committee may, in its discretion and as set forth in the Award Agreement, impose any restrictions on Restricted Stock Units and/or their related Dividend Equivalents or Restricted Stock that it deems to be appropriate, including conditioning the vesting or settlement of all or part of any such Awards on the achievement or satisfaction of performance criteria (any such Award, a "Performance Stock Unit" or "Performance Restricted Stock"). Except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, the Restricted Stock Units, related Dividend Equivalents and Restricted Stock granted to Participants shall be subject to the following restrictions:

  (i) *Vesting and Forfeiture*. Subject to Section 5.4, if the restrictions have not lapsed or been satisfied as of the Participant's Termination of Service, the Restricted Stock Units or Restricted Stock shall be forfeited by the Participant if the termination is for any reason other than death, Disability or, if the Restricted Stock Unit or Restricted Stock Award is granted on or after the Restatement Date, Retirement.

14

(ii) *Death or Disability.* Except for Restricted Stock Units and Restricted Stock granted subject to performance-based vesting conditions, all restrictions on Restricted Stock Units and any related Dividend Equivalents or Restricted Stock granted pursuant to this Section 4.4 shall lapse upon the Participant's death or Termination of Service due to Disability.

(iii) *Retirement.* Restricted Stock Units and Restricted Stock granted on or after the Restatement Date are subject to the following provisions:

  i. Except for Restricted Stock Units and Restricted Stock granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions on Restricted Stock Units and any related Dividend Equivalents or Restricted Stock granted pursuant to this Section 4.4 shall lapse in accordance with the original vesting schedule of the Award, subject to the immediate lapse of all restrictions upon a Participant's death.

  ii. With respect to Restricted Stock Units and Restricted Stock granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions will lapse on a pro rata portion of the Restricted Stock Units and any related Dividend Equivalents or Restricted Stock granted pursuant to this Section 4.4 that would otherwise have been determined by the Committee to have been earned as of the end of the applicable performance period if the Participant's service had continued, with such pro rata portion determined by dividing the number of days between the first day of the performance period and the Retirement date, by the number of days in the applicable performance period.

  iii. Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in an Award's continued vesting or pro rata vesting based on the Company's actual levels of achievement of the applicable performance metrics at the end of the performance period, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period or actual performance period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

15

(iv) *Legend*. To enforce any restrictions that the Committee may impose on Restricted Stock, the Committee shall cause a legend referring to the restrictions to be placed on all certificates for Shares of Restricted Stock. When restrictions lapse or are satisfied, a new certificate, without the legend, for the number of Shares with respect to which restrictions have lapsed or been satisfied shall be issued and delivered to the Participant.

(e) *Redemption of Restricted Stock Units*. Restricted Stock Units may be redeemed for cash or whole Shares, or a combination of cash and whole Shares, in the discretion of the Committee, when the restrictions lapse and any other conditions set forth in the Award Agreement have been satisfied; *provided,* that with respect to any Restricted Stock Units subject to Section 409A of the Code such redemption shall occur in a manner that complies with Section 409A of the Code. Each Restricted Stock Unit may be redeemed for one Share or an amount in cash equal to the Fair Market Value of a Share as of the date on which the Restricted Stock Unit vests.

(f) *Deferred Units*. Subject to Section 7.14 and to the extent determined by the Committee, Participants may be permitted to request the deferral of payment of vested Restricted Stock Units (including the value of related Dividend Equivalents) to a date later than the payment date specified in the Award Agreement, *provided*, that any such election be made in accordance with Section 409A of the Code. The Committee shall determine any terms and conditions on deferral.

4.5 **Other Stock-Based Awards**. The Committee may, from time to time, grant Awards (other than Stock Options, Stock Appreciation Rights, Restricted Stock Units or Restricted Stock) to any Employee or Other Service Provider that consist of, or are denominated in, payable in, valued in whole or in part by reference to, or otherwise related to, Shares. These Awards may include, among other things, phantom or hypothetical Shares. The Committee shall determine, in its discretion and subject to Section 7.14, the terms and conditions that will apply to Other Stock-Based Awards granted pursuant to this Section 4.5, including whether Dividend Equivalents will be credited with respect to any such Award in the event of a payment of dividends on Common Stock, and whether such Awards will be settled in cash or whole Shares, or a combination of cash and whole Shares, when the restrictions lapse and any other conditions set forth in the Award Agreement have been satisfied. The terms and conditions of Other Stock-Based Awards shall be set forth in the applicable Award Agreement and except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, the Other Stock-Based Awards granted to Participants shall be subject to the following restrictions:

(a) *Vesting*. Subject to Section 5.4, if the restrictions on Other Stock-Based Awards have not lapsed or been satisfied as of the Participant's Termination of Service, the Shares shall be forfeited by the Participant if the termination is for any reason other than death, Disability or, if the Other Stock-Based Award is granted on or after the Restatement Date, Retirement.

16

(b) *Death or Disability*. Except for Other Stock-Based Awards granted subject to performance-based vesting conditions, restrictions on Other Stock-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 shall lapse upon the Participant's death or Termination of Service due to Disability.

(c) *Retirement*.  Other Stock-Based Awards granted on or after the Restatement Date are subject to the following provisions:

(i) Except for Other Stock-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions on Other Stock-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 shall lapse in accordance with the original vesting schedule of the Award, subject to the immediate lapse of all restrictions upon a Participant's death.

(ii) With respect to Other Stock-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions will lapse on a pro rata portion of the Other Stock-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 that would otherwise have been determined by the Committee to have been earned as of the end of the applicable performance period if the Participant's service had continued, with such pro rata portion determined by dividing the number of days between the first day of the performance period and the Retirement date, by the number of days in the applicable performance period.

(iii) Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in an Award's continued vesting or pro rata vesting based on the Company's actual levels of achievement of the applicable performance metrics at the end of the performance period, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period or actual performance period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

4.6 *Cash-Based Awards*. The Committee may, from time to time, grant Awards to any Employee or Other Service Provider that are designated as Cash-Based Awards, with the expectation that these Awards will be settled in cash, however, such Cash-Based Awards may be settled in cash or whole Shares or a combination of cash and whole Shares, as determined by the Committee. The value of these Awards may be based in whole or in part or by reference to, or otherwise related to, Shares, and may be granted subject to the achievement of one or more performance goals as determined by the Committee from time to time. The Committee shall determine, in its discretion and subject to Section 7.14, the terms and conditions that will apply

17

to Cash-Based Awards granted pursuant to this Section 4.6. The terms and conditions of Cash-Based Awards shall be set forth in the applicable Award Agreement and except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, the Cash-Based Awards granted to Participants shall be subject to the following restrictions:

(a) *Vesting.* Subject to Section 5.4, if the restrictions on Cash-Based Awards have not lapsed or been satisfied as of the Participant's Termination of Service, the Cash-Based Awards shall be forfeited by the Participant if the termination is for any reason other than death, Disability or, if the Cash-Based Award is granted on or after the Restatement Date, Retirement.

(b) *Death or Disability.* Except for Cash-Based Awards granted subject to performance-based vesting conditions, restrictions on Cash-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.6 shall lapse upon the Participant's death or Termination of Service due to Disability.

(c) *Retirement.* Cash-Based Awards granted on or after the Restatement Date are subject to the following provisions:

(i) Except for Cash-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions on Cash-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 shall lapse in accordance with the original vesting schedule of the Award, subject to the immediate lapse of all restrictions upon a Participant's death.

(ii) With respect to Cash-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions will lapse on a pro rata portion of the Cash-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 that would otherwise have been determined by the Committee to have been earned as of the end of the applicable performance period if the Participant's service had continued, with such pro rata portion determined by dividing the number of days between the first day of the performance period and the Retirement date, by the number of days in the applicable performance period.

(iii) Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in an Award's continued vesting or pro rata vesting based on the Company's actual levels of achievement of the applicable performance metrics at the end of the performance period, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period or actual performance period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

18

4.7 ***Termination for Cause***. If a Participant incurs a Termination of Service for Cause, then all outstanding Awards shall immediately be cancelled, except as otherwise provided in an Award Agreement.

### ARTICLE V
### SHARES SUBJECT TO THE PLAN; ADJUSTMENTS

5.1 ***Shares Available***. The Shares issuable under the Plan shall be authorized but unissued Shares or Shares held in the Company's treasury. The total number of Shares with respect to which Awards may be issued under the Plan may equal but may not exceed 15,000,000, subject to adjustment in accordance with Section 5.3; *provided*, however, that from the aggregate limit, no more than 7,500,000 Shares may be available for grant in the form of Incentive Stock Options.

5.2 ***Counting Rules***.

(a) The following Shares related to Awards to be issued under this Plan shall not count against the limits set forth in Section 5.1:

 (i) Shares related to Awards paid in cash; and

 (ii) Shares related to Awards that expire, are forfeited or cancelled or terminate for any other reason without issuance of Shares; and

 (iii) Any Shares issued in connection with Awards that are assumed, converted or substituted as a result of the acquisition of another company by the Company or an Affiliate or a combination of the Company or an Affiliate with another company.

(b) For purposes of clarity, Shares that are tendered or withheld in payment of all or part of the Exercise Price of an Award or in satisfaction of withholding tax obligations, and Shares that are reacquired with cash tendered in payment of the Exercise Price of an Award, shall not be reincluded in or added back to the number of Shares available for issuance under the Plan. Upon the settlement of any Stock Appreciation Right issued under the Plan, only the gross number of Shares issued to the Participant or used to determine the settlement value will count against the number of Shares available for issuance under the Plan.

5.3 ***Adjustment Upon Certain Changes***.

(a) *Adjustments*. In the event of any change in corporate structure affecting outstanding Shares or the value thereof, including any dividend or distribution (whether in cash, Shares or other property), stock split, reverse stock split, spin-off, recapitalization, merger, reorganization, consolidation, combination or exchange of shares or similar transaction, such adjustments and other substitutions shall be made to the Plan and to outstanding Awards as the Committee, in its sole discretion, deems equitable or appropriate, including such adjustments in (i) the limitations set forth in Section 5.1, including the maximum aggregate number, class and kind of securities that may be

19

delivered under the Plan, and (ii) the number, class, kind and Exercise Price of securities subject to outstanding Awards granted under the Plan (including, if the Committee deems appropriate, the full or partial substitution of similar options to purchase the shares of, or other awards denominated in the shares of, another company).

(b) *Other Changes.* The Committee may make other adjustments in the terms and conditions of Awards in recognition of unusual or nonrecurring events (including, without limitation, the events described in Section 5.3(a)) affecting the Company, any Affiliate, or the financial statements of the Company or any Affiliate, or of changes in applicable laws, regulations, or accounting principles, whenever the Committee determines that such adjustments are appropriate in order to prevent dilution or enlargement of the benefits to be made available under the Plan.

(c) *No Other Rights or Changes*. Except as expressly provided in the Plan, no Participant shall have any rights by reason of any subdivision or consolidation of shares of stock of any class, the payment of any dividend, any increase or decrease in the number of shares of stock of any class or any dissolution, liquidation, merger or consolidation of the Company or any other corporation. Except as expressly provided in the Plan, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of shares or amount of other property subject to, or the terms related to, any Award. Except as expressly provided by this Section 5.3, and without limiting the generality of Section 6.1, no material adverse change may be made to the terms of an Award granted to a Participant as a result of an event described in this Section 5.3 without the consent of the Participant.

5.4 *Change in Control*.

(a) *Assumption Upon Change in Control; Accelerated Vesting Upon Certain Termination Events*. Unless otherwise provided in the applicable Award Agreement, in the event of a Change in Control, if the successor company assumes or substitutes for an outstanding Award (or in which the Company is the ultimate parent corporation and continues the Award), then such Award shall be continued in accordance with its applicable terms and vesting shall not be accelerated as described in Section 5.4(b). For the purposes of this Section 5.4(a), an Award shall be considered assumed or substituted for if, following the Change in Control, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash or other securities or property) received in the transaction constituting a Change in Control by holders of Shares for each Share held on the effective date of such transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); *provided*, however, that if such consideration received in the transaction constituting a Change in Control is not solely common stock of the successor company, the Committee may, with the consent of the successor company, provide that the consideration to be received upon the exercise or vesting of an Award, for each Share subject thereto, will be solely

20

common stock of the successor company or cash, in each case, substantially equal in fair market value (determined as of the date of the Change in Control) to the per share consideration received by holders of Shares in the transaction constituting a Change in Control. The determination of such substantial equality of value of consideration shall be made by the Committee in its sole discretion and its determination shall be conclusive and binding. Notwithstanding the foregoing, in the event of a Participant's Termination of Service involuntarily without Cause or voluntarily by the Participant for Good Reason in such successor company within two years following such Change in Control, the vesting of each Award held by such Participant at the time of the Change in Control shall be accelerated as described in Section 5.4(b) at such time. Notwithstanding the foregoing, no Award shall be assumed or substituted pursuant to this Section 5.4(a) to the extent such action would cause an Award not otherwise "deferred compensation" within the meaning of Section 409A of the Code to become "deferred compensation" within the meaning of Section 409A of the Code.

(b) *Acceleration of Vesting Upon Change in Control.* In the event of a Change in Control after the date of the adoption of the Plan, unless provision is made in connection with the Change in Control for the assumption, substitution or continuation of an outstanding Award in accordance with Section 5.4(a), then the vesting of such Award shall accelerate and all restrictions shall lapse as of immediately prior to the Change in Control, and (i) in the case of an outstanding Stock Option or Stock Appreciation Right, such Award shall be exercisable as of immediately prior to such Change in Control, or (ii) in the case of an Award other than a Stock Option or a Stock Appreciation Right, such Award shall be settled or otherwise paid to the applicable Participant as soon as practicable following such vesting. For purposes of determining vesting and payment under this Section 5.4(b), all performance criteria (i) if the performance period has been completed, shall be deemed achieved at actual levels of achievement determined by the Committee in its sole discretion as of the date of the Change in Control and (ii) otherwise, shall be deemed achieved at the target level of achievement. Notwithstanding any provision of this Section 5.4(b), unless otherwise provided in the applicable Award Agreement, if any amount payable pursuant to an Award constitutes deferred compensation within the meaning of Section 409A of the Code, in the event of a Change in Control that does not qualify as an event described in Section 409A(a)(2)(A)(v) of the Code, such Award (and any other Awards that constitute deferred compensation that vested prior to the date of such Change in Control but are outstanding as of such date) shall vest and cease to be forfeitable but shall not be settled until the earliest permissible payment event under Section 409A of the Code following such Change in Control. Notwithstanding any other provision of the Plan, the Committee, in its discretion, may determine that, upon the occurrence of a Change in Control, (i) each Stock Option and Stock Appreciation Right outstanding shall terminate within a specified number of days after notice to the Participant, and such Participant shall receive, with respect to each Share subject to such Stock Option or Stock Appreciation Right, an amount equal to the excess of the fair market value (as determined by the Committee, in its discretion, in a manner that complies with Section 409A of the Code) of such Share immediately prior to the occurrence of such Change in Control over the Exercise Price, as applicable, per Share of such Stock Option and/or Stock Appreciation Right; such amount to be payable in cash, in one or

21

more kinds of stock or property (including the stock or property, if any, payable in the transaction) or in a combination thereof, as the Committee, in its discretion, shall determine and (ii) each Stock Option and Stock Appreciation Right outstanding at such time with an Exercise Price per Share that exceeds the fair market value (as determined by the Committee, in its discretion, in a manner that complies with Section 409A of the Code) of such Share immediately prior to the occurrence of such Change in Control shall be canceled for no consideration.

5.5 *Fractional Shares*. No fractional Shares shall be issued under the Plan, and unless the Committee determines otherwise, an amount in cash equal to the Fair Market Value of any fractional Shares that would otherwise be issuable shall be paid in lieu of such fractional Shares. The Committee may, in its sole discretion, cancel, terminate, otherwise eliminate or transfer or pay other securities or other property in lieu of issuing any fractional Shares.

**ARTICLE VI**
**AMENDMENT AND TERMINATION**

6.1 *Amendment*. The Plan may be amended at any time and from time to time by the Board without the approval of stockholders of the Company, except that no revision to the terms of the Plan shall be effective until the amendment is approved by the stockholders of the Company if such approval is required by the rules of the New York Stock Exchange or such amendment materially increases the number of Shares that may be issued under the Plan (other than an increase pursuant to Section 5.3 of the Plan). No amendment of the Plan made without the Participant's written consent may materially adversely affect any right of a Participant with respect to an outstanding Award unless such amendment is necessary to comply with applicable law. The Plan may not be amended in any manner adverse to the interests of Participants during the two-year period following a Change in Control, unless such amendment is necessary to comply with applicable law.

6.2 *Termination*. The Plan shall terminate upon the adoption of a resolution of the Board terminating the Plan.

No Awards shall be granted under the Plan after it has terminated. The termination of the Plan, however, shall not alter or impair any of the rights or obligations of any Participant without such Participant's written consent under any Award previously granted under the Plan. After the termination of the Plan, any previously granted Awards shall remain in effect and shall continue to be governed by the terms of the Plan and the applicable Award Agreement.

**ARTICLE VII**
**GENERAL PROVISIONS**

7.1 *Nontransferability of Awards*. No Award under the Plan shall be subject in any manner to alienation, anticipation, sale, assignment, pledge, encumbrance or transfer, and no other persons shall otherwise acquire any rights therein, except as provided below.

(a)  Any Award may be transferred by will or by the applicable laws of descent or distribution.

22

(b) The Committee may provide in the applicable Award Agreement that all or any part of an Award (other than an Incentive Stock Option) may, subject to the prior written consent of the Committee, be transferred to one or more of the following classes of donees: a family member; a trust for the benefit of a family member; a limited partnership whose partners are solely family members; or any other legal entity set up for the benefit of family members. For purposes of this Section 7.1(b), a family member means a Participant and/or the Participant's spouse, children, grandchildren, parents, grandparents, siblings, nieces, nephews and grandnieces and grandnephews, including adopted, in-laws and step family members.

(c) Except as otherwise provided in the applicable Award Agreement, any Nonqualified Stock Option or Stock Appreciation Right transferred by a Participant pursuant to Section 7.1(b) may be exercised by the transferee only to the extent that the Award would have been exercisable by the Participant had no transfer occurred. Any transferred Award shall be subject to all of the same terms and conditions as provided in the Plan and in the applicable Award Agreement. The Participant or the Participant's estate shall remain liable for any withholding tax that may be imposed by any federal, state or local tax authority, and the transfer of Shares upon exercise of the Award shall be conditioned on the payment of any withholding tax. The Committee may, in its discretion, disallow all or a part of any transfer of an Award pursuant to Section 7.1(b) unless and until the Participant makes arrangements satisfactory to the Committee for the payment of any withholding tax. The Participant must immediately notify the Committee, in the form and manner required by the Committee, of any proposed transfer of an Award pursuant to Section 7.1(b). No transfer shall be effective until the Committee consents to the transfer in writing.

(d) Unless otherwise restricted by Company policy for Reporting Persons, Restricted Stock may be freely transferred after the restrictions lapse or are satisfied and the Shares are delivered; *provided*, however, that Restricted Stock awarded to an affiliate of the Company may be transferred only pursuant to Rule 144 under the 1933 Act, or pursuant to an effective registration for resale under the 1933 Act. For purposes of this Section 7.1(d), "affiliate" shall have the meaning assigned to that term under Rule 144.

(e) In no event may a Participant transfer an Incentive Stock Option other than by will or the applicable laws of descent and distribution.

7.2 *Withholding of Taxes*.

(a) *Stock Options and Stock Appreciation Rights*. Subject to Section 7.2(d), as a condition to the delivery of Shares pursuant to the exercise of a Stock Option or Stock Appreciation Right, the Committee may require that the Participant, at the time of exercise, pay to the Company by cash, certified check, bank draft, wire transfer or postal or express money order an amount sufficient to satisfy any applicable tax withholding obligations. The Committee may also, in its discretion, accept payment of tax withholding obligations through any of the Exercise Price payment methods described in Section 4.3(d).

23

(b) *Other Awards Payable in Shares*. Subject to Section 7.2(d), the Company shall satisfy a Participant's tax withholding obligations arising in connection with the release of restrictions on Restricted Stock Units, Restricted Stock and Other Stock-Based Awards by withholding Shares that would otherwise be available for delivery. The Company may also allow the Participant to satisfy the Participant's tax withholding obligations by payment to the Company in cash or by certified check, bank draft, wire transfer, or postal or express money order.

(c) *Cash Awards*. The Company shall satisfy a Participant's tax withholding obligation arising in connection with the payment of any Award in cash by withholding cash from such payment.

(d) *Withholding Amount*. The Committee, in consideration of applicable accounting standards, has full discretion to either (i) allow Participants to elect, or (ii) otherwise direct as a general rule, to have the Company withhold Shares for taxes at an amount that is not less than the applicable minimum statutory amount and not more than the applicable maximum statutory amount.

7.3 ***Forfeiture Provisions***. The Committee may, in its discretion, provide in an Award Agreement that an Award granted thereunder shall be canceled if the Participant, without the consent of the Company, while employed by or providing services to the Company or any Affiliate or for a period after Termination of Service, (a) violates a noncompetition, non-solicitation, non-disclosure, confidentiality, or non-disparagement covenant or agreement, (b) otherwise engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, as determined by the Committee in its sole discretion, or (c) to the extent applicable to the Participant, otherwise violates any policy adopted by the Company or any Affiliate relating to the recovery of compensation granted, paid, delivered, awarded or otherwise provided to any Participant by the Company or any Affiliate as such policy is in effect on the date of grant of the applicable Award or, to the extent necessary to address the requirements of applicable law (including Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as codified in Section 10D of the Exchange Act, Section 304 of the Sarbanes-Oxley Act of 2002 or any other applicable law), as may be amended from time to time. The Committee may also provide in an Award Agreement that (i) a Participant will forfeit any gain realized on the vesting or exercise of such Award if the Participant engages in any activity referred to in the preceding sentence, or (ii) a Participant must repay the gain to the Company realized under a previously paid Award if the Participant engages in any activity referred to in the preceding sentence or a financial restatement reduces the amount that would have been earned under such Award. Notwithstanding the foregoing, none of the non-disclosure restrictions in this Section 7.3 or in any Award Agreement shall, or shall be interpreted to, impair the Participant from exercising any legally protected whistleblower rights (including under Rule 21F under the Exchange Act).

7.4 ***Code Section 83(b) Elections***. The Company, the Affiliates, and the Committee have no responsibility for a Participant's election, attempt to elect or failure to elect to include the value of an Award of Restricted Stock or other Award subject to Section 83 of the Code in the Participant's gross income for the year of grant pursuant to Section 83(b) of the Code. Any Participant who makes an election pursuant to Section 83(b) of the Code shall promptly provide the Committee with a copy of the election form.

7.5 *No Implied Rights*. The establishment and operation of the Plan, including the eligibility of a Participant to participate in the Plan, shall not be construed as conferring any legal or other right upon any Participant for the continuation of service through the end of any vesting period or other applicable period. The Company and the Affiliates expressly reserve the right, which may be exercised at any time and in the Company's or an Affiliate's sole discretion, to discharge any individual or treat him or her without regard to the effect that discharge might have upon him or her as a Participant in the Plan. There is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards. The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant and may be made selectively among Participants, whether or not such Participants are similarly situated.

7.6 *No Obligation to Exercise Awards; No Right to Notice of Expiration Date*. The grant of a Stock Option or Stock Appreciation Right shall impose no obligation upon the Participant to exercise the Award. The Company, the Affiliates, and the Committee have no obligation to inform a Participant of the date on which a Stock Option or Stock Appreciation Right lapses except in the Award Agreement.

7.7 *No Rights as Stockholders*. A Participant granted an Award under the Plan shall have no rights as a stockholder of the Company with respect to the Award unless and until certificates for the Shares underlying the Award are registered in the Participant's name and delivered to the Participant. The right of any Participant to receive an Award by virtue of participation in the Plan shall be no greater than the right of any unsecured general creditor of the Company.

7.8 *Indemnification of Committee*. The Company shall indemnify, to the fullest extent permitted by law, each person made or threatened to be made a party to any civil or criminal action or proceeding by reason of the fact that the person, or the executor or administrator of the person's estate, is or was a member of the Committee or a delegate of the Committee.

7.9 *No Required Segregation of Assets*. Neither the Company nor any Affiliate shall be required to segregate any assets that may at any time be represented by Awards granted pursuant to the Plan.

7.10 *Nature of Payments*. All Awards made pursuant to the Plan are in consideration of services for the Company or an Affiliate. Any gain realized pursuant to Awards under the Plan constitutes a special incentive payment to the Participant and shall not be taken into account as compensation for purposes of any other employee benefit plan of the Company or any Affiliate, except as the employee benefit plan otherwise provides. The adoption of the Plan shall have no effect on Awards made or to be made under any other benefit plan covering an employee of the Company or an Affiliate or any predecessor or successor of the Company or an Affiliate.

7.11 *Awards in Foreign Countries*. The Committee has the authority to grant Awards to Employees and Other Service Providers who are foreign nationals or employed outside the United States on any different terms and conditions than those specified in the Plan that the Committee, in its discretion, believes to be necessary or desirable to accommodate differences in applicable law, tax policy, or custom, while furthering the purposes of the Plan. The Committee may also approve any supplements to the Plan or alternative versions of the Plan as it believes to

25

be necessary or appropriate for these purposes without altering the terms of the Plan in effect for other Participants; *provided*, however, that the Committee may not make any supplemental or alternative version that (a) increases limitations contained in Section 4.3(e); (b) increases the number of Shares available under the Plan, as set forth in Section 5.1; (c) causes the Plan to cease to satisfy any conditions under Rule 16b-3 under the Exchange Act or (d) otherwise contains terms that would require approval by the stockholders of the Company under the rules of the New York Stock Exchange.  A supplement to the Plan for grants of Restricted Stock Units to French employees is attached to, and made a part of this Plan, as Attachment A.

7.12 *Securities Matters*.

(a) The Company shall be under no obligation to effect the registration pursuant to the 1933 Act of any Shares to be issued hereunder or to effect similar compliance under any state laws. Notwithstanding anything herein to the contrary, the Company shall not be obligated to cause to be issued or delivered any certificates evidencing Shares pursuant to the Plan unless and until the Company is advised by its counsel that the issuance and delivery of such certificates is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which Shares are traded. The Committee may require, as a condition to the issuance and delivery of certificates evidencing Shares pursuant to the terms hereof, that the recipient of such Shares make such covenants, agreements and representations, and that such certificates bear such legends, as the Committee deems necessary or desirable.

(b) The exercise of any Award granted hereunder shall only be effective at such time as counsel to the Company shall have determined that the issuance and delivery of Shares pursuant to such exercise is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which Shares are traded. The Company may, in its sole discretion, defer the effectiveness of an exercise of an Award hereunder or the issuance or transfer of Shares pursuant to any Award pending or to ensure compliance under federal or state securities laws. The Company shall inform the Participant in writing of its decision to defer the effectiveness of the exercise of an Award or the issuance or transfer of Shares pursuant to any Award. During the period that the effectiveness of the exercise of an Award has been deferred, the Participant may, by written notice, withdraw such exercise and obtain the refund of any amount paid with respect thereto.

7.13 *Governing Law; Severability*. The Plan and all determinations made and actions taken under the Plan shall be governed by the internal substantive laws, and not the choice of law rules, of the State of Delaware and construed accordingly, to the extent not superseded by applicable U.S. federal law. If any provision of the Plan is held unlawful or otherwise invalid or unenforceable in whole or in part, the unlawfulness, invalidity or unenforceability shall not affect any other parts of the Plan, which shall remain in full force and effect.

26

7.14 ***Section 409A of the Code***. With respect to Awards subject to Section 409A of the Code, this Plan is intended to comply with the requirements of such Section, and the provisions hereof shall be interpreted in a manner that satisfies the requirements of such Section, and the Plan shall be operated accordingly. If any provision of this Plan or any term or condition of any Award would otherwise frustrate or conflict with this intent, the provision, term or condition shall be interpreted and deemed amended so as to avoid this conflict. Any reservation of rights or discretion by the Company or the Committee hereunder affecting the timing of payment of any Award subject to Section 409A of the Code shall only be as broad as is permitted by Section 409A of the Code.

7.15 ***Payments to Specified Employees***. Notwithstanding anything herein or in any Award Agreement to the contrary, if a Participant is a "specified employee" (within the meaning of Section 409A(2)(B) of the Code) as of the date of such Participant's separation from service (as determined pursuant to Section 409A of the Code), any Awards subject to Section 409A of the Code payable to such Participant as a result of his or her separation from service, shall be paid on the first business day of the first calendar month that begins after the six-month anniversary of the date of the separation from service, or, if earlier, the date of the Participant's death.

27

ATTACHMENT A

## 2018 STOCK INCENTIVE PLAN
### OF
### RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES

**French Sub-Plan for Restricted Stock Units**

This Sub-Plan to the 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Plan"), contains the rules which, together with the provisions of the Plan, govern the operation of the Plan insofar as it applies to Awards made to Employees of the Company or its affiliates in France provided the award document evidencing such Award refers to this Sub-Plan.

The terms and conditions of the Plan are modified by this Sub-Plan for France in order to comply with the provisions of Articles L. 225-197-1 to L. 225-197-6 of the French Commercial Code. This Sub-Plan shall be construed and operated with that intention.

Under this Sub-Plan, the Participants shall be awarded only Restricted Stock Units as defined hereinafter in Section 1.

This Sub-Plan has been established to enable the Restricted Stock Units to qualify for the favorable French income tax and social security regime set out in the French tax code (article 80 quaterdecies) and in the French social security code (article L. 242-1) applicable in France to "qualified" free-shares plan implemented after August 7, 2015 in accordance with the provisions of "*La loi pour la croissance, l'activité et l'égalité des chances économiques*", however nothing in this Sub-Plan shall be construed as a guarantee or an undertaking by the Company or any of its subsidiaries that such regime will effectively apply.

This Sub-Plan should be read in conjunction with the rules of the Plan and Awards granted under this Sub-Plan are subject to the terms and conditions of the Plan applicable to Restricted Stock Units except to the extent that the terms and conditions of the Plan differ from or conflict with the terms and conditions set out in this Sub-Plan, in which event, the terms set out in this Sub-Plan shall prevail.

Initially capitalized terms used herein and which are not defined in Section 1 below shall have the meanings ascribed to such terms in the Plan. Reference to the singular shall include reference to the plural.

An Award of Restricted Stock Units shall be subject to the terms of this Sub-Plan provided the applicable Award Agreement notifying of such Award refer specifically to this Sub-Plan.

The terms and conditions applicable to the Awards granted under this Sub-Plan are the terms and conditions set out in the rules of the Plan, modified as follows.

Attachment A-1

## 1.    DEFINITIONS

### 1.1.    Award

The term "*Award*" shall mean Restricted Stock Units granted pursuant to the terms and conditions of this Sub-Plan.

### 1.2.    Restricted Stock Units

The term "*Restricted Stock Units*" shall mean conditional rights to receive, for no consideration, Shares granted under the Plan as amended by this Sub-Plan.

### 1.3.    Disability

The term "*Disability*" shall mean a disability corresponding to the second or the third categories of Article L. 341-4 of the French Social Security Code.

### 1.4.    Employee

The term "*Employee*" shall mean a current salaried employee, as defined by French labor law.

### 1.5.    Participant

The term "*Participant*" shall mean an Employee of the Company or an Affiliate having a capital link as defined in Article L. 225-197-2 of the French Commercial Code.

Restricted Stock Units shall not be awarded to any Participant who is holding Shares representing 10% or more of the Company's capital at the date of the award or who may hold Shares representing 10% or more of the Company's capital due to the award of Restricted Stock Units.

## 2.    NUMBER OF SHARES GRANTED

Notwithstanding any other provision of the Plan, the total number of Shares granted freely under this Sub-Plan shall not exceed 10% of the Company's share capital.

## 3.    SETTLEMENT OF AWARDS

Notwithstanding any other provision of the Plan, the Awards shall only be settled by delivery of Shares and no cash shall be paid to Participants in connection with the settlement of an Award even in consideration of fractional shares.

## 4.    DIVIDEND EQUIVALENTS

Notwithstanding any other provision of the Plan and notably Section 4.4, the Awards granted under this Sub-Plan shall not give rise to the right to any Dividend Equivalent.

Attachment A-2

**5.      MINIMUM PERIOD BEFORE WHICH THE TRANSFER OF PROPERTY OF SHARES CANNOT OCCUR**

Notwithstanding any other provision of the Plan, the Restricted Stock Units granted pursuant to this Sub-Plan shall not vest and the Shares underlying the Awards shall not be delivered to Participants before the end of a minimum one-year period as from the grant date, except in the event of death as described below in Section 9.

**6.      SALE RESTRICTIONS**

Notwithstanding any other provisions of the Plan, and in the event the Shares are delivered to the Participant before the second anniversary of the grant date, the sale of Shares underlying the Restricted Stock Units granted under this Sub-Plan shall not occur prior to the second anniversary of the grant date, except in any event provided for under French law as an exception to this minimum time period before which the shares cannot be sold, and notably in the event of Disability and death as described below in Sections 8 and 9.

**7.      SPECIFIC CLOSED PERIODS DURING WHICH THE SHARES CANNOT BE DISPOSED OF**

Notwithstanding any other provision of the Plan, once definitively delivered, Shares may not be disposed of within the periods as set forth in Article L. 225-197-1, I of the French Commercial Code.

**8.      DISABILITY**

Notwithstanding any other provision of the Plan, in the event of Disability of a Participant during the restriction on sale restriction period, if any, Shares delivered shall become immediately disposable.

**9.      TRANSFER TO HEIRS**

Notwithstanding any other provision of the Plan, in the event of death of a Participant, his/her heirs are entitled to request that the numbers of Shares corresponding to the unvested Restricted Stock Units at the date of death be delivered, provided such request is made within six months as from the date of death. Shares delivered shall become immediately disposable.

**10.     ADJUSTMENT OF THE AWARD**

Notwithstanding any other provision of the Plan, the number of Awards, as well as the number of Shares to be delivered cannot be adjusted or modified except:

(i)      in cases which would be authorized or rendered compulsory under French law
(ii)     in the event of operations performed on the share capital of the Company before the delivery of the Shares; in which cases the Committee is authorized to adjust the number of Shares to be delivered but only in order to protect the rights of the Participant and to guarantee the neutrality of such operations.

Attachment A-3

## 11.     EXCHANGE OF SHARES DURING THE SALE RESTRICTION PERIOD

In the event of an exchange of Shares resulting from a public offer, a merger, a spin-off, a stock-split or a reverse stock split operation performed during the sale restrictions period described in Section 6 above, such sale restrictions, if any, remain applicable to the Shares received in the exchange for the time period remaining at the date of the exchange.

## 12.     DEFINITIVE DELIVERY OF THE SHARES

Notwithstanding any other provision of the Plan, once delivered to the Participant (or to his or her heirs), the Shares are definitively delivered and cannot be cancelled or rescinded and a Participant cannot be forced to return the Shares.

## 13.     NO SHARES WITHHOLDING

Notwithstanding any other provision of the Plan and notably Section 7.2, no Shares available for delivery shall be withheld to cover taxes.

## 14.     VOLUNTARY DEFERRAL OF THE AWARD

Notwithstanding any other provision of the Plan, the Committee cannot require or permit the Participants to defer the receipt or issuance or Shares.

## 15.     CHANGES TO THE PLAN AND SUB-PLAN

The Committee or the Board may at any time amend the Plan and Sub-Plan, provided that no such amendment shall adversely affect the rights of any Participant with respect to an Award granted under this Sub-Plan without such Participant's consent and provided that such amendments are not inconsistent with French law and, in particular, French legislation regarding the granting of free shares, as defined in Articles L. 225-197-1 to L. 225-197-6 of the French Commercial Code and French Labor law.

In the event the amendments are not permitted by French law and notably French legislation applicable to the grant of free shares as set forth, in Articles L. 225-197-1 to L. 225-197-6 of the French Commercial Code, such amendments shall not apply to Restricted Stock Units previously granted.

## 16.     PERIOD DURING WHICH RESTRICTED STOCK UNITS CAN BE GRANTED UNDER THIS SUB-PLAN

No Awards can be granted under this Sub-Plan more than 76 months after the date on which this Sub-Plan is approved.

Attachment A-4

## 17.     PARTICIPANT ACCOUNT

The Shares delivered under this Sub-Plan shall be recorded in an account in the name of the Participant with the Company or a broker or in such manner as the Committee may otherwise determine to ensure compliance with this Sub-Plan.

## 18.     NON-TRANSFERABILITY OF THE AWARD

Notwithstanding any other provision of the Plan, Awards shall not be transferred or otherwise disposed of, except in the event of death as described above in Section 9.

## 19.     SEVERABILITY

The terms and conditions provided in the Sub-Plan are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable under French law, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Attachment A-5

(Back To Top)

# Section 6: EX-10.20 (EX-10.20)

**Exhibit 10.20**

**AMENDED AND RESTATED 2018 STOCK INCENTIVE PLAN
OF RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES**

**FORM OF STOCK OPTION AWARD AGREEMENT**

STOCK OPTION AWARD AGREEMENT (this "Agreement") made as of the [DAY] day of [MONTH, YEAR] (the "Grant Date"), between Resideo Technologies, Inc. (the "Company") and [EMPLOYEE NAME] ("Participant").

1. **Grant of Option.** The Company has granted you an Option to purchase [NUMBER] Shares of Common Stock, subject to the provisions of this Agreement and the Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Plan"). This Option is a nonqualified Option for federal income tax purposes.

2. **Exercise Price.** The purchase price of the Shares covered by the Option will be [DOLLAR AMOUNT] per Share (the "Exercise Price").

3. **Vesting.** Except as otherwise provided in Sections 7 and 8 of this Agreement, the Option will become exercisable as provided on the attached Vesting Schedule Table, which is incorporated into, and made a part of, this Agreement.

4. **Term of Option.** The Option must be exercised prior to the close of the New York Stock Exchange ("NYSE") on the day before the seventh anniversary of the Grant Date (the "Expiration Date"), subject to earlier termination or cancellation as provided below. If the NYSE is not open for business on the Expiration Date, the Option will expire at the close of the NYSE on the business day immediately preceding the Expiration Date.

5. **Payment of Exercise Price.** You may pay the Exercise Price by cash, certified check, bank draft, wire transfer, postal or express money order, or any other alternative method specified in the Plan and expressly approved by the Committee. Notwithstanding the foregoing, you may not tender any form of payment that the Committee determines, in its sole and absolute discretion, could violate any law or regulation.

6. **Exercise of Option.** Subject to the terms and conditions of this Agreement, the Option may be exercised by contacting the [CONTACT DETAILS]. If the Option is exercised after your death, the Company will deliver Shares only after the Committee has determined that the person exercising the Option is the duly appointed executor or administrator of your estate or the person to whom the Option has been transferred by your will or by the applicable laws of descent and distribution.

7.  **Termination, Retirement, Disability or Death.** Subject to Section 8, this Option shall vest and remain exercisable as follows:

US.121152676.02

| Event | Vesting | Exercise Period for Vested Awards |
|---|---|---|
| Death | Immediate vesting as of death (including if death occurs during any post-Retirement continued vesting period). | Expires earlier of (i) original expiration date, or (ii) 3 years after death (including instances where death occurs during any post-Retirement continued vesting period). |
| Disability | Immediate vesting as of Termination of Service due to the incurrence of Disability. | Expires earlier of (i) original expiration date, or (ii) 3 years after Termination of Service due to Disability. |
| Retirement | Unvested portions of this Award continue to vest in accordance with original vesting schedule following Retirement. | Expires earlier of (i) original expiration date, or (ii) 3 years after Retirement. |
| Voluntary Termination of Service (other than as covered by Retirement) | Unvested portions of this Award forfeited as of Termination of Service. | Expires earlier of (i) original expiration date, or (ii) 30 days after Termination of Service. |

2

US.121152676.02

| | | |
|---|---|---|
| Involuntary Termination of Service not for Cause | [Unvested portions of this Award forfeited as of Termination of Service.] | Expires earlier of (i) original expiration date, or (ii) 1 year after Termination of Service. |
| | [Section 16 Officers: Pro rata vesting as of Termination of Service (determined by subtracting the number of Options previously vested under this Award from a number equal to the number of Options originally subject to this Award, multiplied by a fraction, the numerator of which is the number of days you were actively employed before your Termination of Service from the Award Date, and the denominator of which is the total number of days from the Award Date to the final scheduled vesting date).] | |
| Involuntary termination for Cause | Unvested portions of this Award forfeited as of Termination of Service. | Vested Awards immediately cancelled. |

If your Termination of Service due to Retirement occurs before the final scheduled vesting date described in Vesting Schedule Table, your unvested Award will continue to vest in accordance with the terms of this Agreement. If your Retirement results in this Award's continued vesting, as a condition thereof you hereby agree that for the remainder of any continued vesting period, you will (i) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of your pre-Termination of Service level of Service to the Company) and (ii) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

Except as expressly provided herein, all rights hereunder shall cease to accrue as of the date of your Termination of Service with the Company and its Affiliates and you will forfeit the unvested portion of any award and all rights to continue vesting in awards shall cease as of the date of your Termination of Service. Further, you will not be entitled to receive additional awards hereunder after your Termination of Service.

8. **Change in Control.** If you incur an involuntary Termination of Service not for Cause (as defined in Section 2 of the Plan) or a voluntary Termination of Service for Good Reason (as defined in Section 2 of the Plan) on or before the second anniversary of the date of a Change in Control, any portion of the Option that has not vested or terminated as of your Termination of Service shall vest as of your Termination of Service and become exercisable in full as of the date of such Termination of Service. Such a termination shall be considered an Involuntary Termination not for Cause or, if applicable, a Retirement, under Section 7 of this Agreement.

9. **Withholdings.** The Company or your local employer shall have the power and the right to deduct or withhold, or require you to remit to the Company or your local employer, an amount sufficient to satisfy taxes imposed under the laws of any country, state, province, city or other jurisdiction, including but not limited to income taxes, capital gain taxes, transfer taxes, and social security contributions, and National Insurance Contributions, that are required by law to be withheld with respect to the grant of the Option, any exercise of your rights under this Agreement, the sale of Shares acquired from the exercise of the Option, and/or payment of dividends on Shares acquired pursuant to the Option.

3

US.121152676.02

10. **Transfer of Option.** You may not transfer the Option or any interest in the Option except by will or the laws of descent and distribution [or except as otherwise permitted by the Committee and as specified in the Plan]. Any other attempt to dispose of your interest will be null and void.

11. [**Requirements for and Forfeiture of Award.**

    a. **General.** The Award is expressly contingent upon you complying with the terms, conditions and definitions contained in this Section 11 and in any other agreement that governs your noncompetition with the Company and its Affiliates, your nonsolicitation of employees, customers, suppliers, business partners and vendors of the Company and its Affiliates, and/or your conduct with respect to trade secrets and proprietary and confidential information of the Company and its Affiliates. For the avoidance of doubt, for purposes of this Section 11, the "Company and its Affiliates" shall include Resideo Technologies, Inc. and its predecessors, designees and successors, as well as its past, present and future operating companies, divisions, subsidiaries, affiliates and other business units, including businesses acquired by purchase of assets, stock, merger or otherwise.

    b. **Remedies.**

        1. You expressly agree and acknowledge that the forfeiture provisions of Section 11(b)(2) of this Agreement shall apply if, from the Grant Date until the date that is [twenty-four (24)] months after your Termination of Service for any reason other than Retirement, or in the case of Retirement only, the later of (A) [twenty-four (24)] months after your Termination of Service and (B) the last scheduled vesting date in the Vesting Schedule Table, for any reason, you (i) enter into an employment, consultation or similar agreement or arrangement (including any arrangement for service as an agent, partner, stockholder, consultant, officer or director) with any entity or person engaged in a business in which the Company or its Affiliates are engaged if the business is competitive (in the sole judgment of the Committee) with the Company or its Affiliates and the Committee has not approved the agreement or arrangement in writing, or (ii) make any statement, publicly or privately (other than to your spouse and legal advisors), which would be disparaging (as defined below) to the Company and its Affiliates or their businesses, products, strategies, prospects, condition, or reputation or that of their directors, employees, officers or members; provided, however, that nothing shall preclude you from making any statement in good faith which is required by any applicable law or regulation or the order of a court or other governmental body, or (iii) write or contribute to a book, article or other media publication, whether in written or electronic format, that is in any way descriptive of the Company or its Affiliates or your career with the Company or its Affiliates without first submitting a draft thereof, at least thirty (30) days in advance, to the Company's [Senior Vice President, General Counsel and Corporate Secretary] or his or her delegate, whose judgment about whether such

4

US.121152676.02

book, article or other media publication is disparaging shall be determinative; or such a book, article or other media publication is published after a determination that it is disparaging; provided, however, that nothing herein shall preclude you from reporting (in good faith) possible violations of federal law or regulation to any governmental agency or entity, including but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and/or any agency Inspector General, or making any other disclosures that are protected under the whistleblower provisions of federal or state law or regulation, or from otherwise making any statement (in good faith) which is required by any applicable law or regulation or the order of a court or other governmental body.

For purposes of this Section 11(b)(1), the term "disparaging" shall mean any statement or representation (whether oral or written and whether true or untrue) which, directly or by implication, tends to create a negative, adverse, or derogatory impression about the subject of the statement or representation or which is intended to harm the reputation of the subject of the statement or representation.

2. In addition to the relief described in any other agreement that governs your noncompetition with the Company or its Affiliates, your nonsolicitation of the employees, customers, suppliers, business partners and vendors of the Company or its Affiliates, and/or your conduct with respect to the trade secrets and proprietary and confidential information of the Company or its Affiliates, if the Committee determines, in its sole judgment, that you have violated the terms of any such agreement or you have engaged in an act that violates Section 11(b)(1) of this Agreement, (i) any portion of the Option you have not exercised (whether vested or unvested) shall immediately be cancelled, and you shall forfeit any rights you have with respect to the Option as of the date of the Committee's determination, and (ii) you shall immediately deliver to the Company Shares equal in value to the amount of any profit you realized upon an exercise of the Option during the period beginning twelve (12) months prior to your Termination of Service and ending on the date of the Committee's determination.

3. Notwithstanding anything in the Plan or this Agreement to the contrary, you acknowledge that the Company may be entitled or required by law, Company policy or the requirements of an exchange on which the Shares are listed for trading, to recoup compensation paid to you pursuant to the Plan, and you agree to comply with any Company request or demand for recoupment.][1]

---

[1] Section 11 or other similar terms may be included in individual grant agreements, as determined by the Committee at the time an Award is granted.

5

US.121152676.02

12. **Adjustments.** Any adjustments to the Option will be governed by Section 5.3 of the Plan.

13. **Restrictions on Exercise.** Exercise of the Option is subject to the conditions that, to the extent required at the time of exercise, (i) the Shares covered by the Option will be duly listed, upon official notice of issuance, upon the NYSE, and (ii) a Registration Statement under the Securities Act of 1933 with respect to the Shares will be effective. The Company will not be required to deliver any Common Stock until all applicable federal and state laws and regulations have been complied with and all legal matters in connection with the issuance and delivery of the Shares have been approved by counsel of the Company.

14. **Disposition of Securities**. By accepting the Award, you acknowledge that you have read and understand the Company's policy, and are aware of and understand your obligations under U.S. federal securities laws in respect of trading in the Company's securities, and you agree not to use the Company's "cashless exercise" program (or any successor program) at any time when you possess material nonpublic information with respect to the Company or when using the program would otherwise result in a violation of securities law. The Company will have the right to recover, or receive reimbursement for, any compensation or profit realized on the exercise of the Option or by the disposition of Shares received upon exercise of the Option to the extent that the Company has a right of recovery or reimbursement under applicable securities laws.

15. **Plan Terms Govern.** The exercise of the Option, the disposition of any Shares received upon exercise of the Option, and the treatment of any gain on the disposition of these Shares are subject to the terms of the Plan and any rules that the Committee may prescribe. The Plan document, as may be amended from time to time, is incorporated into this Agreement. Capitalized terms used in this Agreement have the meaning set forth in the Plan, unless otherwise stated in this Agreement. In the event of any conflict between the terms of the Plan and the terms of this Agreement, the Plan will control unless otherwise stated in this Agreement. By accepting the Award, you acknowledge receipt of the Plan and the prospectus, as in effect on the date of this Agreement.

16. **Personal Data.**

   a. By entering into this Agreement, and as a condition of the grant of the Option, you acknowledge that your personal data is collected, used, and transferred in view of the performance of this Agreement as described in this Section 16, which is to the full extent permitted by and in full compliance with applicable law.

   b. You understand that your local employer holds, by means of an automated data file, certain personal information about you, including, but not limited to, name, home address and telephone number, date of birth, social insurance number, salary, nationality, job title, any shares or directorships held in the Company, details of all options or other entitlement to shares awarded, canceled, exercised, vested, unvested, or outstanding in your favor, for the purpose of managing and administering the Plan ("Data").

6

US.121152676.02

c.  You understand that part or all of your Data may be also collected, used, or held by the Company or its Affiliates for the purpose of managing and administering this award or any previous award/incentive plans. Specifically, your Data is transferred to, and/or collected, used, or held by [the Compensation & Benefits Department (at the business and Corporate levels), your local, regional and SBG business managers, the Company's senior executives (e.g., SVP-HR, CEO), the Committee, and Morgan Stanley]. The Company stores your Data for this purpose [until the last vesting date described in this Agreement OR for a period of xx years / months / days].

d.  You understand that your local employer will transfer Data to the Company or its Affiliates among themselves as necessary for the purposes of implementation, administration, and management of your participation in the Plan, and that the Company or its Affiliates may transfer data among themselves, and/or each, in turn, further transfer data to any third parties assisting the Company in the implementation, administration, and management of the Plan (the "Data Recipients").

e.  You understand that the Company or its Affiliates, as well as the Data Recipients, are or may be located in your country of residence or elsewhere, such as the United States. You authorize the Company or its Affiliates, as well as the Data Recipients, to receive, possess, use, retain, and transfer Data in electronic or other form, for the purposes of implementing, administering, and managing your participation in the Plan, including any transfer of such Data, as may be required for the administration of the Plan and/or the subsequent holding of Shares on your behalf, to a broker or third party with whom the Shares may be deposited.

f.  You understand that you may show your opposition to the processing and transfer of your Data, and, may at any time, review the Data or request that any necessary amendments be made to it. To exercise your data privacy rights, refer to the Company's Data Privacy Global Policy [located on the Intranet / provide link to policy / otherwise describe how to find the policy].

g.  As soon as your Data is transferred to a third party Data Recipient (e.g., Morgan Stanley), (i) the Data Recipient becomes responsible for this Data (as a data controller), (ii) the Data will be subject to the Data Recipient's privacy statements and notices, (iii) the Company and its Affiliates will no longer be responsible for the transferred Data, and (iv) you should refer to the Data Recipient's statements and notices about its data protection policies and practices.

7

US.121152676.02

17. **Discretionary Nature and Acceptance of Award.** By accepting this Award, you agree to be bound by the terms of this Agreement and acknowledge that:

   a.  The Company (and not your local employer) is granting your Option. Furthermore, this Agreement is not derived from any preexisting labor relationship between you and the Company, but rather from a mercantile relationship.

   b.  The Company may administer the Plan from outside your country of residence and United States law will govern all options granted under the Plan.

   c.  Benefits and rights provided under the Plan are wholly discretionary and, although provided by the Company, do not constitute regular or periodic payments.

   d.  The benefits and rights provided under the Plan are not to be considered part of your salary or compensation under your employment with your local employer for purposes of calculating any severance, resignation, redundancy or other end of service payments, vacation, bonuses, long-term service awards, indemnification, pension or retirement benefits, or any other payments, benefits or rights of any kind. You waive any and all rights to compensation or damages as a result of the termination of employment with your local employer for any reason whatsoever insofar as those rights result, or may result, from the loss or diminution in value of such rights under the Plan or your ceasing to have any rights under, or ceasing to be entitled to any rights under, the Plan as a result of such termination.

   e.  The grant of the Option hereunder, and any future grant of an option under the Plan, is entirely voluntary, and at the complete discretion of the Company. Neither the grant of the Option nor any future grant by the Company will be deemed to create any obligation to make any future grants, whether or not such a reservation is explicitly stated at the time of such a grant. The Company has the right, at any time and/or on an annual basis, to amend, suspend or terminate the Plan; provided, however, that no such amendment, suspension, or termination will adversely affect your rights hereunder.

   f.  The Plan will not be deemed to constitute, and will not be construed by you to constitute, part of the terms and conditions of employment. Neither the Company nor your local employer will incur any liability of any kind to you as a result of any change or amendment, or any cancellation, of the Plan at any time.

   g.  Participation in the Plan will not be deemed to constitute, and will not be deemed by you to constitute, an employment or labor relationship of any kind with the Company.

8

US.121152676.02

18. **Limitations**. Nothing in this Agreement or the Plan gives you any right to continue in the employ of the Company or any of its Affiliates or to interfere in any way with the right of the Company or any Affiliate to terminate your employment at any time. Payment of Shares is not secured by a trust, insurance contract or other funding medium, and you do not have any interest in any fund or specific asset of the Company by reason of the Option. You have no rights as a shareowner of the Company pursuant to the Option until Shares are actually delivered you.

19. **Incorporation of Other Agreements.** This Agreement and the Plan constitute the entire understanding between you and the Company regarding the Option. This Agreement supersedes any prior agreements, commitments or negotiations concerning the Option.

20. **Severability.** The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of the other provisions of the Agreement, which will remain in full force and effect. Moreover, if any provision is found to be excessively broad in duration, scope or covered activity, the provision will be construed so as to be enforceable to the maximum extent compatible with applicable law.

21. **Governing Law.** The Plan, this Agreement, and all determinations made and actions taken under the Plan or this Agreement shall be governed by the internal substantive laws, and not the choice of law rules, of the State of Delaware and construed accordingly, to the extent not superseded by applicable federal law.

22. **Acknowledgements and Acceptance.** By accepting this Agreement, you agree to the following: (i) you have carefully read, fully understand and agree to all of the terms and conditions described in this Agreement, the Plan, the Plan's prospectus and all accompanying documentation; and (ii) you understand and agree that this Agreement and the Plan constitute the entire understanding between you and the Company regarding the Option, and that any prior agreements, commitments, or negotiations concerning the Option are replaced and superseded.

9

US.121152676.02

VESTING SCHEDULE TABLE

US.121152676.02
([Back To Top](#))

# Section 7: EX-10.21 (EX-10.21)

**Exhibit 10.21**

**AMENDED AND RESTATED 2018 STOCK INCENTIVE PLAN**
**OF**
**RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES**

**FORM OF RESTRICTED STOCK UNIT AGREEMENT**

RESTRICTED STOCK UNIT AGREEMENT (this "Agreement") as of the [DAY] day of [MONTH, YEAR] (the "Award Date") between Resideo Technologies, Inc. (the "Company") and [EMPLOYEE NAME] (the "Participant").

1.  **Grant of Award**. The Company has granted you [NUMBER] Restricted Stock Units, subject to the terms of this Agreement and the terms of the Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Plan"). The Company will hold the Restricted Stock Units in a bookkeeping account on your behalf until they become payable or are forfeited or cancelled.

2.  **Rights as a Shareholder.** The Participant shall have no rights as a stockholder of the Company with respect to any Shares of Common Stock covered by or relating to the Restricted Stock Units until such Shares are actually delivered to the Participant. For purposes of clarification, the Participant shall not have any voting or dividend rights with respect to the Shares of Common Stock underlying the Restricted Stock Units unless and until such Shares are actually delivered to the Participant.

3.  **Dividend Equivalents**. Except as otherwise determined by the Committee, in its sole discretion, the Participant will earn Dividend Equivalents in an amount equal to the value of any ordinary [cash or stock] dividends paid by the Company upon one Share of Common Stock for each unvested Restricted Stock Unit, which may be credited in cash or Common Stock as determined by the Committee in such manner as the Committee may determine from time to time and will be subject to the same vesting provisions as apply to the Restricted Stock Units to which such Dividend Equivalents relate.

4.  **Payment Amount**. Each Restricted Stock Unit represents one (1) Share of Common Stock.

5.  **Vesting**. Except as otherwise provided in Sections 8, 9 [or 10] of this Agreement, the Restricted Stock Units will vest as provided on the attached Vesting Schedule Table, which is incorporated into, and made a part of, this Agreement.  Each applicable vesting date of all or any portion of this Award shall be referred to herein as a "Vesting Date".

6.  **Form and Timing of Payment**. Except as otherwise determined by the Committee in its sole discretion or as provided in Section 9(a) of this Agreement, vested Restricted Stock Units will be redeemed solely for Shares. Payment of vested Restricted Stock Units will be made as soon as practicable, but no later than two and one-half (2-1/2) months following the applicable Vesting Date, and the Participant may not designate the taxable year in which such payment occurs.  As determined by the Company in its sole discretion prior to the final scheduled Vesting Date, any fractional Shares may be paid in cash or rounded up or down to the nearest whole Share.

US.121153585.02

7. **Termination of Service**. Except as otherwise provided in this Agreement, if your Termination of Service occurs for any reason other than death, Disability or Retirement before a scheduled Vesting Date, any unvested Restricted Stock Units will immediately be forfeited, and your rights with respect to these Restricted Stock Units will end.

8. **Retirement, Death or Disability**.  If your Termination of Service occurs due to death or due to the incurrence of a Disability before any scheduled Vesting Date described in Section 5 of this Agreement, all of your unvested Restricted Stock Units will vest as of your Termination of Service due to death or Disability, as applicable. If you are deceased, the Company will make a payment to your estate only after the Committee has determined that the payee is the duly appointed executor or administrator of your estate, subject to Section 7.14 of the Plan.  If your Termination of Service due to Retirement occurs before the final scheduled Vesting Date described in Section 5 of this Agreement, your unvested Restricted Stock Units will continue to vest in accordance with the terms of this Agreement. As a condition to such continued vesting, you hereby agree that for the remainder of the Award's scheduled vesting period, you will (i) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of your pre-Termination of Service level of Service to the Company) and (ii) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

9. **[Involuntary Termination of Service Not for Cause**.  Except as provided in Section 10, if you incur an involuntary Termination of Service not for Cause before any scheduled Vesting Date, a pro rated number of the unvested Restricted Stock Units subject to the Award will vest as of the date of your Termination of Service.  The number of Units subject to such accelerated vesting will be determined by subtracting the number of Restricted Stock Units previously vested under this Award from a number equal to the number of Restricted Stock Units originally subject to this Award multiplied by a fraction, the numerator of which is the number of days you were actively employed before your Termination of Service from the Award Date, and the denominator of which is the total number of days from the Award Date to the final scheduled Vesting Date.]

10. **Change in Control**. Notwithstanding anything herein to the contrary, in the event of a Change in Control (as defined in the Plan), the following provisions apply:

    a. **Cashout of Awards**. Unless this Award is assumed, substituted or continued in accordance with Section 5.4(a) of the Plan, the Restricted Stock Units that have not vested or terminated as of the date of the Change in Control shall vest as of immediately prior to the Change in Control. Unless otherwise determined by the Committee, no later than 15 days after the date of the Change in Control, you will receive for the Restricted Stock Units a single payment in [cash or Shares] equal to the product of the number of outstanding Restricted Stock Units as of the date of the Change in Control (including any Restricted Stock Units that vest pursuant to this Section 9) and an amount equal to the highest price per Share paid by the successor company in connection with such Change in Control, as determined by the Committee.

2

US.121153585.02

b. **Rollover of Awards**. If this Award is assumed, substituted or continued in accordance with Section 5.4(a) of the Plan, Restricted Stock Units that have not vested or terminated as of the date of the Change in Control will continue to vest in accordance with the schedule described in Section 5 of this Agreement (or as adjusted if more favorable); *provided*, however, that if you incur an involuntary Termination of Service not for Cause (as defined in Section 2 of the Plan) or a voluntary Termination of Service for Good Reason (as defined in Section 2 of the Plan) on or before the second anniversary of the date of the Change in Control, Restricted Stock Units that have not vested or terminated as of your Termination of Service will immediately vest in full and be settled no later than 15 days after the Termination of Service.

11. **Withholdings**. The Company or your local employer shall have the power and the right to deduct or withhold, or require you to remit to the Company or to your local employer, prior to any issuance or delivery of Shares underlying Restricted Stock Units, an amount sufficient to satisfy taxes imposed under the laws of any country, state, province, city or other jurisdiction, including but not limited to income taxes, capital gain taxes, transfer taxes, and social security contributions, and National Insurance Contributions, that are required by law to be withheld as determined by the Company or your local employer.

12. **Transfer of Award**. You may not transfer the Restricted Stock Units or any interest in such Units except by will or the laws of descent and distribution [or except as otherwise permitted by the Committee and as specified in the Plan]. Any other attempt to dispose of your interest will be null and void.

13. **[Requirements for and Forfeiture of Award**.

a. **General**. The Award is expressly contingent upon you complying with the terms, conditions and definitions contained in this Section [12][13] and in any other agreement that governs your noncompetition with the Company and its Affiliates, your nonsolicitation of employees, customers, suppliers, business partners and vendors of the Company and its Affiliates, and/or your conduct with respect to trade secrets and proprietary and confidential information of the Company and its Affiliates. For the avoidance of doubt, for purposes of this Section [12][13], the "Company and its Affiliates" shall include Resideo Technologies, Inc. and its predecessors, designees and successors, as well as its past, present and future operating companies, divisions, subsidiaries, affiliates and other business units, including businesses acquired by purchase of assets, stock, merger or otherwise.

b. **Remedies**.

1. You expressly agree and acknowledge that the forfeiture provisions of Section [12][13](b)(2) of this Agreement shall apply if, from the Award Date until the date that is [twenty-four (24)] months after your Termination of Service for any reason other than Retirement, or in the case of Retirement only, the later of (A) [twenty-four (24)] months after your Termination of Service and (B) the last scheduled Vesting Date, for

3

US.121153585.02

any reason, you (i) enter into an employment, consultation or similar agreement or arrangement (including any arrangement for service as an agent, partner, stockholder, consultant, officer or director) with any entity or person engaged in a business in which the Company or its Affiliates are engaged if the business is competitive (in the sole judgment of the Committee) with the Company or its Affiliates and the Committee has not approved the agreement or arrangement in writing, or (ii) make any statement, publicly or privately (other than to your spouse and legal advisors), which would be disparaging (as defined below) to the Company and its Affiliates or their businesses, products, strategies, prospects, condition, or reputation or that of their directors, employees, officers or members; *provided*, however, that nothing shall preclude you from making any statement in good faith which is required by any applicable law or regulation or the order of a court or other governmental body, or (iii) write or contribute to a book, article or other media publication, whether in written or electronic format, that is in any way descriptive of the Company or its Affiliates or your career with the Company or its Affiliates without first submitting a draft thereof, at least thirty (30) days in advance, to the Company's [Senior Vice President, General Counsel and Corporate Secretary] or his or her delegate, whose judgment about whether such book, article or other media publication is disparaging shall be determinative; or such a book, article or other media publication is published after a determination that it is disparaging; *provided*, however, that nothing herein shall preclude you from reporting (in good faith) possible violations of federal law or regulation to any governmental agency or entity, including but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and/or any agency Inspector General, or making any other disclosures that are protected under the whistleblower provisions of federal or state law or regulation, or from otherwise making any statement (in good faith) which is required by any applicable law or regulation or the order of a court or other governmental body.

For purposes of this Section [12][13](b)(1), the term "disparaging" shall mean any statement or representation (whether oral or written and whether true or untrue) which, directly or by implication, tends to create a negative, adverse, or derogatory impression about the subject of the statement or representation or which is intended to harm the reputation of the subject of the statement or representation.

2. In addition to the relief described in any other agreement that governs your noncompetition with the Company or its Affiliates, your nonsolicitation of the employees, customers, suppliers, business partners and vendors of the Company or its Affiliates, and/or your conduct with respect to the trade secrets and proprietary and confidential information of the Company or its Affiliates, if the Committee determines, in its sole judgment, that you have violated the terms of any such agreement or you

4

US.121153585.02

have engaged in an act that violates Section [12][13](b)(1) of this Agreement, (i) any Restricted Stock Units that have not vested under this Agreement shall immediately be cancelled, and you shall forfeit any rights you have with respect to such Units as of the date of the Committee's determination, and (ii) you shall immediately deliver to the Company Shares (or the cash equivalent) equal in value to the Restricted Stock Units you received during the period beginning twelve (12) months prior to your Termination of Service and ending on the date of the Committee's determination.

3. Notwithstanding anything in the Plan or this Agreement to the contrary, you acknowledge that the Company may be entitled or required by law, Company policy or the requirements of an exchange on which the Shares are listed for trading, to recoup compensation paid to you pursuant to the Plan, and you agree to comply with any Company request or demand for recoupment.][1]

14. **Restrictions on Payment of Shares**. Payment of Shares for your Restricted Stock Units is subject to the conditions that, to the extent required at the time of settlement, (i) the Shares underlying the Restricted Stock Units will be duly listed, upon official notice of redemption, upon the New York Stock Exchange (or any other securities exchange on which Shares may be listed), and (ii) a Registration Statement under the Securities Act of 1933 with respect to the Shares will be effective. The Company will not be required to deliver any Shares until all applicable federal and state laws and regulations have been complied with and all legal matters in connection with the issuance and delivery of the Shares have been approved by counsel for the Company.

15. **Adjustments**. Any adjustments to the Restricted Stock Units will be governed by Section 5.3 of the Plan.

16. **Disposition of Securities**. By accepting the Award, you acknowledge that you have read and understand the Company's policy, and are aware of and understand your obligations under applicable securities laws in respect of trading in the Company's securities. The Company will have the right to recover, or receive reimbursement for, any compensation or profit you realize on the disposition of Shares received for Restricted Stock Units to the extent that the Company has a right of recovery or reimbursement under applicable securities laws.

17. **Plan Terms Govern**. The vesting and redemption of Restricted Stock Units, the disposition of any Shares received for Restricted Stock Units, the treatment of gain on the disposition of these Shares, and the treatment of Dividend Equivalents are subject to the provisions of the Plan and any rules that the Committee may prescribe. The Plan document, as may be amended from time to time, is incorporated into this Agreement. Capitalized terms used in this Agreement have the meaning set forth in the Plan, unless otherwise stated in this Agreement. In the event of any conflict between the terms of the Plan and the terms of this Agreement, the Plan will control. By accepting the Award, you acknowledge that the Plan and the Plan prospectus, as in effect on the date of this Agreement, have been made available to you for your review.

---

[1] Section 12 or other similar terms may be included in individual grant agreements, as determined by the Committee at the time an Award is granted.

5

US.121153585.02

18. **Personal Data**.

    a. By entering into this Agreement, and as a condition of the grant of the Restricted Stock Units, you acknowledge that your personal data is collected, used, and transferred in view of the performance of this Agreement as described in this Section [17][18], which is to the full extent permitted by and in full compliance with applicable law.

    b. You understand that your local employer holds, by means of an automated data file, certain personal information about you, including, but not limited to, name, home address and telephone number, date of birth, social insurance number, salary, nationality, job title, any shares or directorships held in the Company, details of all restricted units or other entitlement to shares awarded, canceled, exercised, vested, unvested, or outstanding in your favor, for the purpose of managing and administering the Plan ("Data").

    c. You understand that part or all of your Data may be also collected, used, or held by the Company or its Affiliates for the purpose of managing and administering this award or any previous award/incentive plans. Specifically, your Data is transferred to, and/or collected, used, or held by [the Compensation & Benefits Department (at the business and Corporate levels), your local, regional and SBG business managers, the Company's senior executives (e.g., SVP-HR, CEO), the Committee, and Morgan Stanley]. The Company stores your Data for this purpose [until the last scheduled Vesting Date described in this Agreement OR for a period of xx years / months / days].

    d. You understand that your local employer will transfer Data to the Company or its Affiliates among themselves as necessary for the purposes of implementation, administration, and management of your participation in the Plan, and that the Company or its Affiliates may transfer Data among themselves, and/or each, in turn, further transfer Data to any third parties assisting the Company in the implementation, administration, and management of the Plan (the "Data Recipients").

    e. You understand that the Company or its Affiliates, as well as the Data Recipients, are or may be located in your country of residence or elsewhere, such as the United States. You authorize the Company or its Affiliates, as well as the Data Recipients, to receive, possess, use, retain, and transfer Data in electronic or other form, for the purposes of implementing, administering, and managing your participation in the Plan, including any transfer of such Data, as may be required for the administration of the Plan and/or the subsequent holding of Shares on your behalf, to a broker or third party with whom the Shares may be deposited.

US.121153585.02

f.   You understand that you may show your opposition to the processing and transfer of your Data, and, may at any time, review the Data or request that any necessary amendments be made to it. To exercise your data privacy rights, refer to the Company's Data Privacy Global Policy [located on the Intranet / provide link to policy / otherwise describe how to find the policy].

g.   As soon as your Data is transferred to a third party Data Recipient (e.g., Morgan Stanley), (i) the Data Recipient becomes responsible for this Data (as a data controller), (ii) the Data will be subject to the Data Recipient's privacy statements and notices, (iii) the Company and its Affiliates will no longer be responsible for the transferred Data, and (iv) you should refer to the Data Recipient's statements and notices about its data protection policies and practices.

19. **Discretionary Nature and Acceptance of Award**. By accepting this Award, you agree to be bound by the terms of this Agreement and acknowledge that:

a.   The Company (and not your local employer) is granting these Restricted Stock Units. This Agreement is not derived from any preexisting labor relationship between you and the Company, but rather from a mercantile relationship.

b.   The Company may administer the Plan from outside your country of residence and United States law will govern all Restricted Stock Units granted under the Plan.

c.   Benefits and rights provided under the Plan are wholly discretionary and, although provided by the Company, do not constitute regular or periodic payments.

d.   The benefits and rights provided under the Plan are not to be considered part of your salary or compensation under your employment with your local employer for purposes of calculating any severance, resignation, redundancy or other end of service payments, vacation, bonuses, long-term service awards, indemnification, pension or retirement benefits, or any other payments, benefits or rights of any kind. You waive any and all rights to compensation or damages as a result of the termination of employment with your local employer for any reason whatsoever insofar as those rights result, or may result, from the loss or diminution in value of such rights under the Plan or your ceasing to have any rights under, or ceasing to be entitled to any rights under, the Plan as a result of such termination.

e.   The grant of Restricted Stock Units hereunder, and any future grant of Restricted Stock Units under the Plan, is entirely voluntary, and at the complete discretion of the Company. Neither the grant of the Restricted Stock Units nor any future grant by the Company will be deemed to create any obligation to make any future grants, whether or not such a reservation is explicitly stated at the time of such a grant. The Company has the right, at any time and/or on an annual basis, to amend, suspend or terminate the Plan; *provided*, however, that no such amendment, suspension, or termination will adversely affect your rights hereunder.

7

US.121153585.02

    f.   The Plan will not be deemed to constitute, and will not be construed by you to constitute, part of the terms and conditions of employment. Neither the Company nor your local employer will incur any liability of any kind to you as a result of any change or amendment, or any cancellation, of the Plan at any time.

    g.   Participation in the Plan will not be deemed to constitute, and will not be deemed by you to constitute, an employment or labor relationship of any kind with the Company.

20. **Limitations**. Nothing in this Agreement or the Plan gives you any right to continue in the employ of the Company or any of its Affiliates or to interfere in any way with the right of the Company or any Affiliate to terminate your employment at any time. Payment of your Restricted Stock Units is not secured by a trust, insurance contract or other funding medium, and you do not have any interest in any fund or specific asset of the Company by reason of this Award or the account established on your behalf.

21. **Incorporation of Other Agreements**. This Agreement and the Plan constitute the entire understanding between you and the Company regarding the Restricted Stock Units. This Agreement supersedes any prior agreements, commitments or negotiations concerning the Restricted Stock Units. All capitalized terms used and not defined herein shall have the meaning given to such terms in the Plan.

22. **Severability**. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of the other provisions of the Agreement, which will remain in full force and effect. Moreover, if any provision is found to be excessively broad in duration, scope or covered activity, the provision will be construed so as to be enforceable to the maximum extent compatible with applicable law.

23. **Governing Law**. The Plan, this Agreement, and all determinations made and actions taken under the Plan or this Agreement shall be governed by the internal substantive laws, and not the choice of law rules, of the State of Delaware and construed accordingly, to the extent not superseded by applicable federal law.

24. **Agreement Changes**. The Company reserves the right to change the terms of this Agreement and the Plan without your consent to the extent necessary or desirable to comply with the requirements of Section 409A of the Code, the Treasury regulations and other guidance thereunder.

25. **Successors and Assigns of the Company**. The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Company and its successors and assigns.

26. **Acknowledgements**. By accepting this Agreement, you agree to the following: (i) you have carefully read, fully understand and agree to all of the terms and conditions described in this Agreement, the Plan, the Plan's prospectus and all accompanying documentation; and (ii) you understand and agree that this Agreement and the Plan constitute the entire understanding between you and the Company regarding the Restricted Stock Units, and that any prior agreements, commitments, or negotiations concerning the Restricted Stock Units are replaced and superseded.

US.121153585.02

27. **Award Acceptance**. To retain this Award, you must accept it by signing the Agreement below and, by signing this Agreement, you will be deemed to consent to the application of the terms and conditions set forth in this Agreement and the Plan. **Return the signed Agreement to [•].**

**I Accept:**

_____
Print Name                                          EID

_____
Signature                                           Date

9

US.121153585.02

VESTING SCHEDULE TABLE

US.121153585.02
([Back To Top](#))

# Section 8: EX-10.22 (EX-10.22)

**Exhibit 10.22**

**AMENDED AND RESTATED 2018 STOCK INCENTIVE PLAN**
**OF**
**RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES**

**FORM OF PERFORMANCE STOCK UNIT AGREEMENT**

PERFORMANCE STOCK UNIT AGREEMENT (this "Agreement") as of the [DAY] day of [MONTH, YEAR] (the "Award Date") between Resideo Technologies, Inc. (the "Company") and [EMPLOYEE NAME] (the "Participant").

1. **Grant of Performance Award.** The Company has granted you a target number of Restricted Stock Units subject to the satisfaction of performance conditions (the "Performance Stock Units" and the "Performance Award"), subject to the terms of this Agreement and the terms of the Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Plan"). The target number of Performance Stock Units granted to you and covered by this Agreement is [•] (the "Target Award").

   The Company will hold the Performance Stock Units in a bookkeeping account on your behalf until they become payable or are forfeited or cancelled.

   [The details for this grant can be found on [•]. The Company reserves the right to change or correct any information contained on the [•] website to reflect the terms of the Award actually made by the Company on the Award Date or the Plan.][1].

2. **Definitions.** For purposes of this Agreement, the following definitions apply:

   a. "Actual Award" means (A) the product of (i) the Plan Payout Percentage (as determined under Section 3), and (ii) your Target Award. Notwithstanding anything in this Agreement to the contrary, the Committee (as defined in the Plan) may reduce the amount of your Actual Award in its sole discretion.

   b. "Performance Cycle" means the [INSERT PERFORMANCE CYCLE DATES].

3. **Performance Measures.** The Plan Payout Percentage shall be determined based on

   [DESCRIBE PERFORMANCE MEASURES]

4. **Rights as a Shareholder.** The Participant shall have no rights as a stockholder of the Company with respect to any Shares of Common Stock covered by or relating to the Performance Stock Units until such Shares are actually delivered to the Participant. For purposes of clarification, the Participant shall not have any voting or dividend rights with respect to the Shares of Common Stock underlying the Performance Stock Units unless and until such Shares are actually delivered to the Participant.

---

[1] This information regarding the external plan administrator may be included in individual grants as applicable.

US.121149404.03

5.  **Dividend Equivalents**. Except as otherwise determined by the Committee, in its sole discretion, the Participant will earn Dividend Equivalents in an amount equal to the value of any ordinary [cash or stock] dividends paid by the Company upon one Share of Common Stock for each unvested Performance Stock Unit, which may be credited in cash or Common Stock as determined by the Committee in such manner as the Committee may determine from time to time and will be subject to the same vesting provisions as apply to the Performance Stock Units to which such Dividend Equivalents relate.

6.  **Payment Amount.** Each Performance Stock Unit represents one (1) Share of Common Stock. Your Actual Award will not exceed 200% of your Target Award.

7.  **Vesting and Payment.** Except as otherwise provided in this Agreement, the vesting and payment of an Actual Award is contingent upon (i) the achievement of a Plan Payout Percentage based on performance as described in Section 3, and (ii) you remaining actively employed by the Company on [DESCRIBE VESTING PROVISIONS] (the "Vesting Date").

    [DESCRIBE PAYMENT PROVISIONS, INCLUDING ANY AMOUNTS TO BE PAID IN CASH AND SHARES]

8.  **Termination of Service.** Except as otherwise provided in this Agreement, if your Termination of Service occurs for any reason other than death, Retirement or Disability before the Vesting Date, any unvested Performance Stock Units will immediately be forfeited and your rights with respect to future payments under this Agreement will end.

9.  **Death, Disability or Retirement.** If your Termination of Service occurs before the payment date because of your death, Retirement or Disability, you or your estate will receive the prorated value of your Actual Award. The prorated value of the Actual Award shall be determined by multiplying the Actual Award by a fraction, the numerator of which is the number of days you were actively employed before your death, Retirement or termination due to Disability from the first day of the Performance Cycle, and the denominator of which is the total number of days from the first day of the Performance Cycle to the last day of the Performance Cycle. Such prorated Actual Award stated in Shares, shall be multiplied by the Fair Market Value of the Shares on the last trading day of the Performance Cycle and paid in cash in a single lump sum following the Performance Cycle at the same time payments are made to other Performance Stock Unit grantees.  If your Retirement triggers the applicability of this Section 9, then as a condition thereof you hereby agree that for the remainder of any applicable continued vesting period or Performance Cycle, you will (i) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of your pre-Termination of Service level of Service to the Company) and (ii) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

10. **[Involuntary Termination of Service Not for Cause**.  Except as provided in Section 11, if your Termination of Service occurs before the payment date because of your involuntary Termination of Service not for Cause, you will receive the prorated value of your Actual Award. The prorated value of the Actual Award shall be determined by multiplying the Actual Award by a fraction, the numerator of which is the number of days you were actively

2

US.121149404.03

employed before your Termination of Service from the first day of the Performance Cycle, and the denominator of which is the total number of days from the first day of the Performance Cycle to the last day of the Performance Cycle. Such prorated Actual Award shall be paid in a single lump sum following the Performance Cycle at the same time payments are made to other Performance Stock Unit grantees.][2]

11. **Change in Control.** Notwithstanding anything herein to the contrary, in the event of a Change in Control (as defined in the Plan), the following provisions apply:

    a.  **Rollover of Performance Awards.** If adjusted or exchanged pursuant to the Plan, Performance Stock Units that have not vested or terminated as of the date of the Change in Control will continue to vest in accordance with the schedule described in Section 7 of this Agreement (or as adjusted if more favorable); *provided*, however, that (x) if you incur an involuntary Termination of Service not for Cause (as defined in Section 2 of the Plan) or a voluntary Termination of Service for Good Reason (as defined in Section 2 of the Plan) on or before the second anniversary of the date of the Change in Control and after the Performance Cycle has ended, your unpaid Actual Award will immediately vest in full and be settled no later than the earlier of 90 days after the Termination of Service or two and one-half months after the end of the calendar year in which the Termination of Service occurs, or (y) if you incur an involuntary Termination of Service not for Cause (as defined in Section 2 of the Plan) or a voluntary Termination of Service for Good Reason (as defined in Section 2 of the Plan) during the two-year period following the Change in Control and before the Performance Cycle has ended, an amount equal to the Target Award, pro-rated to reflect the portion of the Performance Cycle that elapsed before such Termination of Service, will be settled no later than the earlier of 90 days after the Termination of Service or two and one-half months after the end of the calendar year in which the Termination of Service occurs.

    b.  **Cashout of Performance Awards.** Unless adjusted or exchanged pursuant to the Plan, Performance Stock Units that have not vested or terminated as of the date of the Change in Control will immediately vest. If the Change in Control occurs after the Performance Cycle has ended, you will receive your unpaid Actual Award. If the Change in Control occurs before the Performance Cycle has ended, the Actual Award will be based on the Target Award or other level of substantially achieved performance, as determined by the Committee prior to the Change in Control. No later than the earlier of 90 days after the date of the Change in Control or two and one-half months after the end of the calendar year in which the Change in Control occurs, you will receive for the Performance Stock Units a single cash payment equal to the product of the number of vested and outstanding Performance Stock Units as of the date of the Change in Control (including any Performance Stock Units that vest pursuant to this Section [10][11]) and an amount equal to the greater of (i) the highest price per Share paid by the successor, as determined by the Committee, and (ii) the highest Fair Market Value during the period of 90

---

[2] Insert for Awards being made to Section 16 officers.

3

days that ends on the date of the Change in Control. Any securities or other property that is part or all of the consideration paid for Shares pursuant to the Change in Control will be valued at the higher of (x) the valuation placed on the securities or property by any entity that is a party with the Company to the Change in Control, or (y) the valuation placed on the securities or property by the Committee.

12. **Withholdings.** The Company or your local employer shall have the power and the right to deduct or withhold, or require you to remit to the Company or to your local employer, prior to any issuance or delivery of Shares, an amount sufficient to satisfy taxes imposed under the laws of any country, state, province, city or other jurisdiction, including but not limited to income taxes, capital gain taxes, transfer taxes, and social security contributions, and National Insurance Contributions, that are required by law to be withheld as determined by the Company or your local employer.

13. **Transfer of Performance Award.** You may not transfer the Performance Stock Units or any interest in such Units or any portion of your Actual Award except by will or the laws of descent and distribution [or except as permitted by the Committee and as specified in the Plan]. Any other attempt to dispose of your interest will be null and void.

14. **[Requirements for and Forfeiture of Performance Award.**

    a.  **General.** The Performance Award is expressly contingent upon you complying with the terms, conditions and definitions contained in this Section [13][14] and in any other agreement that governs your noncompetition with the Company and its Affiliates, your nonsolicitation of employees, customers, suppliers, business partners and vendors of the Company and its Affiliates, and/or your conduct with respect to trade secrets and proprietary and confidential information of the Company and its Affiliates. For the avoidance of doubt, for purposes of this Section [13][14], the "Company and its Affiliates" shall include Resideo Technologies, Inc. and its predecessors, designees and successors, as well as its past, present and future operating companies, divisions, subsidiaries, affiliates and other business units, including businesses acquired by purchase of assets, stock, merger or otherwise.

    b.  **Remedies.**

        1.You expressly agree and acknowledge that the forfeiture provisions of Section [13][14](b)(2) of this Agreement shall apply if, from the Award Date until the date that is [twenty-four (24)] months after your Termination of Service for any reason other than Retirement, or in the case of Retirement only, the later of (A) [twenty-four (24)] months after your Termination of Service and (B) the completion of the Performance Cycle, for any reason, you (i) enter into an employment, consultation or similar agreement or arrangement (including any arrangement for service as an agent, partner, stockholder, consultant, officer or director) with any entity or person engaged in a business in which the Company or its

4

US.121149404.03

Affiliates are engaged if the business is competitive (in the sole judgment of the Committee) with the Company or its Affiliates and the Committee has not approved the agreement or arrangement in writing, or (ii) make any statement, publicly or privately (other than to your spouse and legal advisors), which would be disparaging (as defined below) to the Company and its Affiliates or their businesses, products, strategies, prospects, condition, or reputation or that of their directors, employees, officers or members; *provided*, however, that nothing shall preclude you from making any statement in good faith which is required by any applicable law or regulation or the order of a court or other governmental body, or (iii) write or contribute to a book, article or other media publication, whether in written or electronic format, that is in any way descriptive of the Company or its Affiliates or your career with the Company or its Affiliates without first submitting a draft thereof, at least thirty (30) days in advance, to the Company's [Senior Vice President, General Counsel and Corporate Secretary] or his or her delegate, whose judgment about whether such book, article or other media publication is disparaging shall be determinative; or such a book, article or other media publication is published after a determination that it is disparaging; *provided*, however, that nothing herein shall preclude you from reporting (in good faith) possible violations of federal law or regulation to any governmental agency or entity, including but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and/or any agency Inspector General, or making any other disclosures that are protected under the whistleblower provisions of federal or state law or regulation, or from otherwise making any statement (in good faith) which is required by any applicable law or regulation or the order of a court or other governmental body.

For purposes of this Section [13][14](b)(1), the term "disparaging" shall mean any statement or representation (whether oral or written and whether true or untrue) which, directly or by implication, tends to create a negative, adverse, or derogatory impression about the subject of the statement or representation or which is intended to harm the reputation of the subject of the statement or representation.

2. In addition to the relief described in any other agreement that governs your noncompetition with the Company or its Affiliates, your nonsolicitation of the employees, customers, suppliers, business partners and vendors of the Company or its Affiliates, and/or your conduct with respect to the trade secrets and proprietary and confidential information of the Company or its Affiliates, if the Committee determines, in its sole judgment, that you have violated the terms of any such agreement or you have engaged in an act that violates Section [13][14](b)(1) of this Agreement, (i) any Performance Stock Units that have not vested under this Agreement shall immediately be cancelled, and you shall forfeit any rights you have with respect to such Units as of the date of the

5

US.121149404.03

Committee's determination, and (ii) you shall immediately deliver to the Company Shares (or the cash equivalent) equal in value to the Performance Stock Units you received during the period beginning twelve (12) months prior to your Termination of Service and ending on the date of the Committee's determination.

3. Notwithstanding anything in the Plan or this Agreement to the contrary, you acknowledge that the Company may be entitled or required by law, Company policy or the requirements of an exchange on which the Shares are listed for trading, to recoup compensation paid to you pursuant to the Plan, and you agree to comply with any Company request or demand for recoupment.][3]

15. **Restrictions on Payment of Shares.** Payment of Shares is subject to the conditions that, to the extent required at the time of exercise, (i) the Shares underlying the Performance Award and/or Actual Award shall be duly listed, upon official notice of redemption, upon the New York Stock Exchange, and (ii) a Registration Statement under the Securities Act of 1933 with respect to the Shares shall be effective. The Company shall not be required to deliver any Common Stock until all applicable federal and state laws and regulations have been complied with and all legal matters in connection with the issuance and delivery of the Shares have been approved by counsel for the Company.

16. **Adjustments.** Any adjustments to this Performance Award will be governed by Section 5.3 of the Plan.

17. **Disposition of Securities.** By accepting the Performance Award, you acknowledge that you have read and understand (i) the Company's policy, and are aware of and understand your obligations under applicable securities laws in respect of trading in the Company's securities, and (ii) the Company's stock ownership guidelines as they apply to this Performance Award. The Company shall have the right to recover, or receive reimbursement for, any compensation or profit you realize on the disposition of Shares received to the extent that the Company has a right of recovery or reimbursement under applicable securities laws.

18. **Plan Terms Govern.** This Award (including the vesting and redemption of Performance Stock Units, the disposition of any Shares received, the treatment of gain on the disposition of these Shares, and the treatment of Dividend Equivalents) are subject to the provisions of the Plan and any rules that the Committee may prescribe. The Plan document, as may be amended from time to time, is incorporated into this Agreement. Capitalized terms used in this Agreement have the meaning set forth in the Plan, unless otherwise stated in this Agreement. In the event of any conflict between the terms of the Plan and the terms of this Agreement, the Plan will control. By accepting the Performance Award, you acknowledge that the Plan and the Plan prospectus, as in effect on the date of this Agreement, have been made available to you for your review. Without limiting the generality of the foregoing, you agree that all determinations made by the Committee of the Performance Measures described

_____

[3] Section 14 or other similar terms may be included in individual grant agreements, as determined by the Committee at the time an Award is granted.

6

in Section 3 shall be final, binding and conclusive on you in accordance with Article III of the Plan.

19. **Personal Data.**

    a. By entering into this Agreement, and as a condition of the grant of this Award, you acknowledge that your personal data is collected, used, and transferred in view of the performance of this Agreement as described in this Section [18][19], which is to the full extent permitted by and in full compliance with applicable law.

    b. You understand that your local employer holds, by means of an automated data file, certain personal information about you, including, but not limited to, name, home address and telephone number, date of birth, social insurance number, salary, nationality, job title, any shares or directorships held in the Company, details of all Performance Stock Units or other entitlement to shares awarded, canceled, exercised, vested, unvested, or outstanding in your favor, for the purpose of managing and administering the Plan ("Data").

    c. You understand that part or all of your Data may be also collected, used, or held by the Company or its Affiliates for the purpose of managing and administering this award or any previous award/incentive plans. Specifically, your Data is transferred to, and/or collected, used, or held by [the Compensation & Benefits Department (at the business and Corporate levels), your local, regional and SBG business managers, the Company's senior executives (e.g., SVP-HR, CEO), the Committee, and Morgan Stanley]. The Company stores your Data for this purpose [until the last vesting date described in this Agreement OR for a period of xx years / months / days].

    d. You understand that your local employer will transfer Data to the Company or its Affiliates among themselves as necessary for the purposes of implementation, administration, and management of your participation in the Plan, and that the Company or its Affiliates may transfer data among themselves, and/or each, in turn, further transfer Data to any third parties assisting the Company in the implementation, administration, and management of the Plan (the "Data Recipients").

    e. You understand that the Company or its Affiliates, as well as the Data Recipients, are or may be located in your country of residence or elsewhere, such as the United States. You authorize the Company or its Affiliates, as well as the Data Recipients, to receive, possess, use, retain, and transfer Data in electronic or other form, for the purposes of implementing, administering, and managing your participation in the Plan, including any transfer of such Data, as may be required for the administration of the Plan and/or the subsequent holding of Shares on your behalf, to a broker or third party with whom the Shares may be deposited.

7

US.121149404.03

    f.   You understand that you may show your opposition to the processing and transfer of your Data, and, may at any time, review the Data or request that any necessary amendments be made to it. To exercise your data privacy rights, refer to the Company's Data Privacy Global Policy [located on the Intranet / provide link to policy / otherwise describe how to find the policy].

    g.   As soon as your Data is transferred to a third party Data Recipient (e.g., Morgan Stanley), (i) the Data Recipient becomes responsible for this Data (as a data controller), (ii) the Data will be subject to the Data Recipient's privacy statements and notices, (iii) the Company and its Affiliates will no longer be responsible for the transferred Data, and (iv) you should refer to the Data Recipient's statements and notices about its data protection policies and practices.

20. **Discretionary Nature and Acceptance of Performance Award.** By accepting this Performance Award, you agree to be bound by the terms of this Agreement and acknowledge that:

    a.   The Company (and not your local employer) is granting these Performance Stock Units. This Agreement is not derived from any preexisting labor relationship between you and the Company, but rather from a mercantile relationship.

    b.   The Company may administer the Plan from outside your country of residence and United States law will govern all Performance Stock Units granted under the Plan.

    c.   Benefits and rights provided under the Plan are wholly discretionary and, although provided by the Company, do not constitute regular or periodic payments.

    d.   The benefits and rights provided under the Plan are not to be considered part of your salary or compensation under your employment with your local employer for purposes of calculating any severance, resignation, redundancy or other end of service payments, vacation, bonuses, long-term service awards, indemnification, pension or retirement benefits, or any other payments, benefits or rights of any kind. You waive any and all rights to compensation or damages as a result of the termination of employment with your local employer for any reason whatsoever insofar as those rights result, or may result, from the loss or diminution in value of such rights under the Plan or your ceasing to have any rights under, or ceasing to be entitled to any rights under, the Plan as a result of such termination.

    e.   The grant of this Award, and any future grant of Performance Stock Units under the Plan, is entirely voluntary, and at the complete discretion of the Company. Neither the grant of the Performance Stock Units nor any future grant by the Company will be deemed to create any obligation to make any future grants, whether or not such a reservation is explicitly stated at the time of such a grant. The Company has the right, at any time and/or on an annual basis, to amend, suspend or terminate the Plan; *provided*, however, that no such amendment, suspension, or termination will adversely affect your rights hereunder.

8

f.  The Plan will not be deemed to constitute, and will not be construed by you to constitute, part of the terms and conditions of employment. Neither the Company nor your local employer will incur any liability of any kind to you as a result of any change or amendment, or any cancellation, of the Plan at any time.

g.  Participation in the Plan will not be deemed to constitute, and will not be deemed by you to constitute, an employment or labor relationship of any kind with the Company.

21. **Limitations.** Nothing in this Agreement or the Plan gives you any right to continue in the employ of the Company or any of its Affiliates or to interfere in any way with the right of the Company or any Affiliate to terminate your employment at any time. Payment of your Performance Stock Units is not secured by a trust, insurance contract or other funding medium, and you do not have any interest in any fund or specific asset of the Company by reason of this Performance Award or the account established on your behalf. You have no rights as a shareowner of the Company pursuant to the Performance Stock Units until Shares are actually delivered to you.

22. **Incorporation of Other Agreements.** This Agreement and the Plan constitute the entire understanding between you and the Company regarding the Performance Stock Units. This Agreement supersedes any prior agreements, commitments or negotiations concerning the Performance Stock Units. All capitalized terms used and not defined herein shall have the meaning given to such terms in the Plan.

23. **Severability.** The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of the other provisions of the Agreement, which will remain in full force and effect. Moreover, if any provision is found to be excessively broad in duration, scope or covered activity, the provision will be construed so as to be enforceable to the maximum extent compatible with applicable law.

24. **Governing Law.** The Plan, this Agreement, and all determinations made and actions taken under the Plan or this Agreement shall be governed by the internal substantive laws, and not the choice of law rules, of the State of Delaware and construed accordingly, to the extent not superseded by applicable federal law.

25. **Agreement Changes.** The Company reserves the right to change the terms of this Agreement and the Plan without your consent to the extent necessary or desirable to comply with the requirements of Section 409A of the Code, the Treasury regulations and other guidance thereunder.

26. **Acknowledgements.** By accepting this Agreement, you agree to the following: (i) you have carefully read, fully understand and agree to all of the terms and conditions described in this Agreement, the Plan, the Plan's prospectus and all accompanying documentation; and (ii) you understand and agree that this Agreement and the Plan constitute the entire understanding between you and the Company regarding this Award, and that any prior agreements, commitments, or negotiations concerning the Award are replaced and superseded.

US.121149404.03

27. **Award Acceptance.** To retain this Award, you must accept it by signing the Agreement below and, by signing this Agreement, you will be deemed to consent to the application of the terms and conditions set forth in this Agreement and the Plan. **Return the signed Agreement to [•].**

**I Accept:**

_____

Print Name                                    EID

_____

Signature                                     Date

10

US.121149404.03
([Back To Top](#))

# Section 9: EX-10.23 (EX-10.23)

**Exhibit 10.23**

**AMENDED AND RESTATED 2018 STOCK INCENTIVE PLAN
OF
RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES**

**FORM OF PERFORMANCE UNIT AGREEMENT**

PERFORMANCE UNIT AGREEMENT (this "Agreement") as of the [DAY] day of [MONTH, YEAR] (the "Award Date") between Resideo Technologies, Inc. (the "Company") and [EMPLOYEE NAME] (the "Participant").

1. **Grant of Performance Unit Award.** The Company has granted you performance units as an Award subject to the satisfaction of performance conditions (the "Performance Units"), subject to the terms of this Agreement and the terms of the Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Plan"). The number of Performance Units awarded to you represents a target award for the applicable Performance Cycle (as defined below) (the "Target Award").

   [The details for this grant can be found on [●]. The Company reserves the right to change or correct any information contained on the [●] website to reflect the terms of the Award actually made by the Company on the Grant Date or the Plan.][1]

2. **Definitions.** For purposes of this Agreement, the following definitions apply:

   a. "Actual Award" means (A) the product of (i) the Plan Payout Percentage (as determined under Section 3), and (ii) your Target Award. Notwithstanding anything in this Agreement to the contrary, the Committee may reduce the amount of your Actual Award in its sole discretion.

   b. "Performance Cycle" means the [INSERT PERFORMANCE CYCLE DATES].

3. **Performance Measures.** The Plan Payout Percentage shall be determined based on

   [DESCRIBE PERFORMANCE MEASURES].

4. **Target Value.** Each Performance Unit has a target value of $[●] (the "Target Value").

5. **Timing of Payments.** Except as otherwise provided in this Agreement, the vesting and payment of an Actual Award is contingent upon (i) the achievement of a Plan Payout Percentage based on the Performance Measures as described in Section 3, and (ii) you remaining actively employed by the Company on the payment date.

Thus, for example, if you are receiving pay from the Company but not actively performing services on the payment date (including, but not limited to, severance periods, notice periods, and grandfathered vacation periods), you will not be considered "active" for purposes of payment of the Actual Award.

---

[1]  This information regarding the external plan administrator may be included in individual grants as applicable.

US.121147516.02

If an Actual Award is earned, you will receive the resulting payout no later than [March 15th] of the year following the end of the Performance Cycle (subject, of course, to the active employment criteria described herein).

6. **Form of Payment.** The Actual Award shall be paid in a single lump sum, either in cash or shares of the Company's common stock ("Shares"), at the discretion of the Committee. Your Actual Award shall be expressed in U.S. dollars. Cash payment shall be made in the same currency as your pay ("Local Currency"). If you receive pay in more than one Local Currency, the currency used for payment will be at the discretion of the Company or your employer. The Company will convert your Actual Award from U.S. dollars to your Local Currency using the exchange rate in effect for the compensation planning cycle in the year of payment (i.e., the same rate used for converting annual bonuses to local currency in the first quarter of the year of payment). If your Actual Award is paid in Shares, the number of Shares shall be determined by dividing the Actual Award by the Fair Market Value (as defined in the Plan) of the Shares on the last day of the Performance Cycle. Fractional Shares will be paid in cash. No payments will be credited with interest, and you may not defer any portion of the Actual Award.

7. **Termination of Service.** Except as otherwise provided in this Agreement, if your Termination of Service occurs for any reason other than death, Disability or Retirement before the payment date, the Performance Units will immediately be forfeited and your rights with respect to future payments under this Agreement will end.

8. **Death, Disability or Retirement.** If your Termination of Service occurs before the payment date because of your death, Retirement or Disability, you or your estate will receive the prorated value of your Actual Award. The prorated value of the Actual Award shall be determined by multiplying the Actual Award by a fraction, the numerator of which is the number of days you were actively employed before your death, Retirement or termination due to Disability from the first day of the Performance Cycle, and the denominator of which is the total number of days from the first day of the Performance Cycle to the last day of the Performance Cycle. Such prorated Actual Award shall be paid in a single lump sum following the Performance Cycle at the same time payments are made to other Performance Unit grantees.  If your Retirement triggers the applicability of this Section 8, then as a condition thereof you hereby agree that for the remainder of any applicable continued vesting period or Performance Cycle, you will (i) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of your pre-Termination of Service level of Service to the Company) and (ii) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

9. **[Involuntary Termination of Service Not for Cause**.  Except as provided in Section 10, if your Termination of Service occurs before the payment date because of your involuntary Termination of Service not for Cause, you will receive the prorated value of your Actual Award. The prorated value of the Actual Award shall be determined by multiplying the Actual Award by a fraction, the numerator of which is the number of days you were actively employed before your Termination of Service from the first day of the Performance Cycle, and the denominator of which is the total number of days from the first day of the Performance Cycle to the last day of the Performance Cycle. Such prorated Actual Award

2

shall be paid in a single lump sum following the Performance Cycle at the same time payments are made to other Performance Unit grantees.][2]

10. **Change in Control.** Notwithstanding anything herein to the contrary, in the event of a Change in Control (as defined in the Plan), the following provisions apply:

   a. **Rollover of Performance Units.** If your Performance Units are adjusted or exchanged pursuant to the Plan (concerning rollover of outstanding awards in certain circumstances), then (x) if you incur an involuntary Termination of Service not for Cause (as defined in Section 2 of the Plan) or a voluntary Termination of Service for Good Reason (as defined in Section 2 of the Plan) on or before the second anniversary of the date of the Change in Control and after the Performance Cycle has ended, your unpaid Actual Award will be paid (in cash or Shares, as determined by the Committee) no later than the earlier of 90 days after the Termination of Service or two and one-half months after the end of the calendar year in which the Termination of Service occurs, or (y) if you incur an involuntary Termination of Service not for Cause (as defined in Section 2 of the Plan) or a voluntary Termination of Service for Good Reason (as defined in Section 2 of the Plan) during the two-year period following the Change in Control and before the Performance Cycle has ended, an amount equal to the Target Value, prorated to reflect the portion of the full Performance Cycle that elapsed before such Termination of Service, will be paid (in cash or Shares, as determined by the Committee) no later than the earlier of 90 days after the Termination of Service or two and one-half months after the end of the calendar year in which the Termination of Service occurs.

   b. **Cashout of Awards.** Unless adjusted or exchanged pursuant to the Plan, an amount equal to the Actual Award, determined based on achievement of the Performance Measures through the date of the Change in Control (as determined by the Committee prior to the Change in Control), and pro-rated to reflect the portion of the Performance Cycle that elapsed prior to the Change in Control, will be paid (in cash or Shares, as determined by the Committee) no later than the earlier of 90 days after your Termination of Service (if applicable) or two and one-half months after the end of the calendar year in which the Change in Control occurs.

11. **Change in Status.** If your role within the Company changes during the Performance Cycle such that you would no longer be eligible to receive Performance Units, this Agreement shall remain in full force and effect as if no such change had occurred.

12. **[Requirements for and Forfeiture of Award.**

   a. **General.** The Award is expressly contingent upon you complying with the terms, conditions and definitions contained in this Section [11][12] and in any other agreement that governs your noncompetition with the Company and its Affiliates, your nonsolicitation of employees, customers, suppliers, business partners and vendors of the Company and its Affiliates, and/or your conduct with respect to

---

[2]  Insert for Awards being made to Section 16 officers.

3

US.121147516.02

trade secrets and proprietary and confidential information of the Company and its Affiliates. For the avoidance of doubt, for purposes of this Section [11][12], the term "Company and its Affiliates" shall include Resideo Technologies, Inc. and its predecessors, designees and successors, as well as its past, present and future operating companies, divisions, subsidiaries, affiliates and other business units, including businesses acquired by purchase of assets, stock, merger or otherwise.

b. **Remedies.**

1. You expressly agree and acknowledge that the forfeiture provisions of Section [11][12](b)(2) of this Agreement shall apply if, from the Grant Date until the date that is [twenty-four (24)] months after your Termination of Service for any reason other than Retirement, or in the case of Retirement only, the later of (A) [twenty-four (24)] months after your Termination of Service and (B) the completion of the Performance Cycle, for any reason, you (i) enter into an employment, consultation or similar agreement or arrangement (including any arrangement for service as an agent, partner, stockholder, consultant, officer or director) with any entity or person engaged in a business in which the Company or its Affiliates are engaged if the business is competitive (in the sole judgment of the Committee) with the Company or its Affiliates and the Committee has not approved the agreement or arrangement in writing, or (ii) make any statement, publicly or privately (other than to your spouse and legal advisors), which would be disparaging (as defined below) to the Company and its Affiliates or their businesses, products, strategies, prospects, condition, or reputation or that of their directors, employees, officers or members; *provided*, however, that nothing shall preclude you from making any statement in good faith which is required by any applicable law or regulation or the order of a court or other governmental body, or (iii) write or contribute to a book, article or other media publication, whether in written or electronic format, that is in any way descriptive of the Company or its Affiliates or your career with the Company or its Affiliates without first submitting a draft thereof, at least thirty (30) days in advance, to the Company's [Senior Vice President, General Counsel and Corporate Secretary] or his or her delegate, whose judgment about whether such book, article or other media publication is disparaging shall be determinative; or such a book, article or other media publication is published after a determination that it is disparaging; *provided*, however, that nothing herein shall preclude you from reporting (in good faith) possible violations of federal law or regulation to any governmental agency or entity, including but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and/or any agency Inspector General, or making any other disclosures that are protected under the whistleblower provisions of federal or state law or regulation, or from otherwise making any statement (in good faith) which is required by any applicable law or regulation or the order of a court or other governmental body.

   For purposes of this Section [11][12](b)(1), the term "disparaging" shall mean any statement or representation (whether oral or written and whether true or

4

untrue) which, directly or by implication, tends to create a negative, adverse, or derogatory impression about the subject of the statement or representation or which is intended to harm the reputation of the subject of the statement or representation.

2. In addition to the relief described in any other agreement that governs your noncompetition with the Company or its Affiliates, your nonsolicitation of the employees, customers, suppliers, business partners and vendors of the Company or its Affiliates, and/or your conduct with respect to the trade secrets and proprietary and confidential information of the Company or its Affiliates, if the Committee determines, in its sole judgment, that you have violated the terms of any such agreement or you have engaged in an act that violates Section [11][12](b)(1) of this Agreement, (i) any payment that has not yet been vested, earned or paid under this Agreement shall immediately be cancelled, and you shall forfeit any rights you have with respect to such payment as of the date of the Committee's determination, and (ii) you shall immediately deliver to the Company cash equal in value to the gross Actual Award you received under this Agreement during the period beginning twelve (12) months prior to your Termination of Service and ending on the date of the Committee's determination.

3. Notwithstanding anything in the Plan or this Agreement to the contrary, you acknowledge that the Company may be entitled or required by law, Company policy or the requirements of an exchange on which the Shares are listed for trading, to recoup compensation paid to you pursuant to the Plan, and you agree to comply with any Company request or demand for recoupment.][3]

13. **Withholdings.** The Company or your local employer shall have the power and the right to deduct or withhold, or require you to remit to the Company or to your local employer, prior to any issuance or delivery of a payment, an amount sufficient to satisfy taxes imposed under the laws of any country, state, province, city or other jurisdiction, including but not limited to income taxes, capital gain taxes, transfer taxes, and social security contributions, and National Insurance Contributions, that are required by law to be withheld as determined by the Company or your local employer.

14. **Adjustments.** Any adjustments to the Performance Units will be governed by Section 5.3 of the Plan.

15. **Transfer of Awards.** You may not transfer any interest in your Performance Units or any portion of your Actual Award except by will or the laws of descent and distribution [or except as otherwise permitted by the Committee and as specified in the Plan]. Any other attempt to dispose of your interest will be null and void.

16. **Plan Terms Govern.** This award (including the vesting of and payment for Performance Units, the disposition of any Shares received for Performance Units, and the treatment of gain on the disposition of any such Shares) are subject to the provisions of the Plan and any

---

[3] Section 12 or other similar terms may be included in individual grant agreements, as determined by the Committee at the time an Award is granted.

5

US.121147516.02

rules that the Committee may prescribe. The Plan document, as may be amended from time to time, is incorporated into this Agreement. Capitalized terms used in this Agreement have the meaning set forth in the Plan, unless otherwise stated in this Agreement. In the event of any conflict between the terms of the Plan and the terms of this Agreement, the Plan will control. By accepting the Award, you acknowledge that the Plan and the Plan prospectus, as in effect on the date of this Agreement, have been made available to you for your review. Without limiting the generality of the foregoing, you agree that all determinations made by the Committee of the Performance Measures described in Section 3 shall be final, binding and conclusive on you in accordance with Article III of the Plan.

17. **Personal Data.**

    a.   By entering into this Agreement, and as a condition of the grant of the Performance Units, you acknowledge that your personal data is collected, used, and transferred in view of the performance of this Agreement as described in this Section [16][17], which is to the full extent permitted by and in full compliance with applicable law.

    b.   You understand that your local employer holds, by means of an automated data file, certain personal information about you, including, but not limited to, name, home address and telephone number, date of birth, social insurance number, salary, nationality, job title, any shares or directorships held in the Company, details of all restricted units or other entitlement to shares or cash awarded, canceled, exercised, vested, unvested, or outstanding in your favor, for the purpose of managing and administering the Plan ("Data").

    c.   You understand that part or all of your Data may be also collected, used, or held by the Company or its Affiliates for the purpose of managing and administering this award or any previous award/incentive plans. Specifically, your Data is transferred to, and/or collected, used, or held by [the Compensation & Benefits Department (at the business and Corporate levels), your local, regional and SBG business managers, the Company's senior executives (e.g., SVP-HR, CEO), the Committee, and Morgan Stanley]. The Company stores your Data for this purpose [until the last payment date described in this Agreement OR for a period of xx years / months / days].

    d.   You understand that your local employer will transfer Data to the Company or its Affiliates among themselves as necessary for the purposes of implementation, administration, and management of your participation in the Plan, and that the Company or its Affiliates may transfer data among themselves, and/or each, in turn, further transfer Data to any third parties assisting the Company in the implementation, administration, and management of the Plan (the "Data Recipients").

    e.   You understand that the Company or its Affiliates, as well as the Data Recipients, are or may be located in your country of residence or elsewhere, such as the United States.  You authorize the Company or its Affiliates, as well as the Data Recipients, to receive, possess, use, retain, and transfer Data in electronic or other form, for the purposes of implementing, administering, and managing your

6

US.121147516.02

participation in the Plan, including any transfer of such Data, as may be required for the administration of the Plan and/or the subsequent holding of Shares on your behalf, to a broker or third party with whom the Shares may be deposited.

f.  You understand that you may show your opposition to the processing and transfer of your Data, and, may at any time, review the Data or request that any necessary amendments be made to it. To exercise your data privacy rights, refer to the Company's Data Privacy Global Policy [located on the Intranet / provide link to policy / otherwise describe how to find the policy].

g.  As soon as your Data is transferred to a third party Data Recipient (e.g., Morgan Stanley), (i) the Data Recipient becomes responsible for this Data (as a data controller), (ii) the Data will be subject to the Data Recipient's privacy statements and notices, (iii) the Company and its Affiliates will no longer be responsible for the transferred Data, and (iv) you should refer to the Data Recipient's statements and notices about its data protection policies and practices.

18. **Discretionary Nature and Acceptance of Award**. By accepting this Award, you agree to be bound by the terms of this Agreement and acknowledge that:

a.  The Company (and not your local employer) is granting these Performance Units. This Agreement is not derived from any preexisting labor relationship between you and the Company, but rather from a mercantile relationship.

b.  The Company may administer the Plan from outside your country of residence and United States law will govern all Performance Units granted under the Plan.

c.  Benefits and rights provided under the Plan are wholly discretionary and, although provided by the Company, do not constitute regular or periodic payments.

d.  The benefits and rights provided under the Plan are not to be considered part of your salary or compensation under your employment with your local employer for purposes of calculating any severance, resignation, redundancy or other end of service payments, vacation, bonuses, long-term service awards, indemnification, pension or retirement benefits, or any other payments, benefits or rights of any kind.  You waive any and all rights to compensation or damages as a result of the termination of employment with your local employer for any reason whatsoever insofar as those rights result, or may result, from the loss or diminution in value of such rights under the Plan or your ceasing to have any rights under, or ceasing to be entitled to any rights under, the Plan as a result of such termination.

e.  The grant of Performance Units hereunder, and any future grant of Performance Units under the Plan, is entirely voluntary, and at the complete discretion of the Company. Neither the grant of the Performance Units nor any future grant by the Company will be deemed to create any obligation to make any future grants, whether or not such a reservation is explicitly stated at the time of such a grant. The Company has the right, at any time and/or on an annual basis, to amend,

7

US.121147516.02

suspend or terminate the Plan; *provided*, however, that no such amendment, suspension, or termination will adversely affect your rights hereunder.

 f. The Plan will not be deemed to constitute, and will not be construed by you to constitute, part of the terms and conditions of employment. Neither the Company nor your local employer will incur any liability of any kind to you as a result of any change or amendment, or any cancellation, of the Plan at any time.

 g. Participation in the Plan will not be deemed to constitute, and will not be deemed by you to constitute, an employment or labor relationship of any kind with the Company.

19. **Limitations.** Nothing in this Agreement or the Plan gives you any right to continue in the employ of the Company or any of its Affiliates or to interfere in any way with the right of the Company or any Affiliate to terminate your employment at any time. Payment of your Actual Award is not secured by a trust, insurance contract or other funding medium, and you do not have any interest in any fund or specific asset of the Company by reason of this Agreement. You have no rights as a shareowner of the Company unless and until Shares are actually delivered to you.

20. **Incorporation of Other Agreements.** This Agreement and the Plan constitute the entire understanding between you and the Company regarding the Performance Units. This Agreement supersedes any prior agreements, commitments or negotiations concerning the Performance Units. All capitalized terms used and not defined herein shall have the meaning given to such terms in the Plan.

21. **Severability.** The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of the other provisions of the Agreement, which will remain in full force and effect. Moreover, if any provision is found to be excessively broad in duration, scope or covered activity, the provision will be construed so as to be enforceable to the maximum extent compatible with applicable law.

22. **Governing Law.** The Plan, this Agreement, and all determinations made and actions taken under the Plan or this Agreement shall be governed by the internal substantive laws, and not the choice of law rules, of the State of Delaware and construed accordingly, to the extent not superseded by applicable federal law.

23. **Agreement Changes**. The Company reserves the right to change the terms of this Agreement and the Plan without your consent to the extent necessary or desirable to comply with the requirements of Section 409A of the Code, the Treasury regulations and other guidance thereunder.

24. **Acknowledgements**. By accepting this Agreement, you agree to the following: (i) you have carefully read, fully understand and agree to all of the terms and conditions described in this Agreement, the Plan, the Plan's prospectus and all accompanying documentation; and (ii) you understand and agree that this Agreement and the Plan constitute the entire understanding between you and the Company regarding this Award, and that any prior agreements, commitments, or negotiations concerning the Award are replaced and superseded.

US.121147516.02

25. **Award Acceptance**. To retain this Award, you must accept it by signing the Agreement below and, by signing this Agreement, you will be deemed to consent to the application of the terms and conditions set forth in this Agreement and the Plan. **Return the signed Agreement to [•].**

**I Accept:**

_____

Print Name                                                EID

_____

Signature                                                 Date


9

US.121147516.02
([Back To Top])

# Section 10: EX-10.24 (EX-10.24)

**Exhibit 10.24**

**Resideo Supplemental Pension Plan**
**(Effective October 29, 2018)**

## Article I - Purpose

Effective October 29, 2018, Resideo Technologies, Inc. adopted the Resideo Supplemental Pension Plan (the "Plan") to provide certain pension benefits as required by the terms of the spinoff of the Homes and ADI Distribution businesses from Honeywell International Inc.

The purpose of the Plan is to provide Active and Inactive Participants and their joint annuitants and beneficiaries under the Pension Plan with the amount of retirement income that is not provided under the Pension Plan because the Participant deferred compensation under one or more nonqualified deferred compensation plans of Resideo Technologies, Inc. by reason of the limits imposed by Section 415 and 401(a)(17) of the Code. The Plan is also intended to cover any contractual obligation Resideo has to pay pension benefits that cannot be provided under the provisions of the Pension Plan.

The provisions of this Plan are generally applicable only to Active Participants and Inactive Participants who participated in the Honeywell Retirement Earnings Plan immediately prior to October 29, 2018, are employed by Resideo or an Affiliate on or after October 29, 2018, and had their Honeywell Retirement Earnings Plan Accrued Pension Benefit transferred to the Resideo Pension Plan as of October 29, 2018. Except as otherwise provided in a retroactively effective provision of this Plan or required by law, the pension benefit amount, distribution options, and death benefits for any person who was a Terminated Participant as of October 29, 2018 shall be determined by the relevant Honeywell Supplemental Pension Plan in effect as of his termination of service, death or disability, as applicable, with the Honeywell Group before October 29, 2018.

Except to the extent otherwise indicated, and to the extent otherwise inappropriate, the Pension Plan and the provisions thereof are hereby incorporated by reference.

## Article II - Definitions

2.1    Accrued Pension Benefit - means the amount of retirement income payable under the Pension Plan to or with respect to a Participant at the date required by this Plan.

2.2    Actuarial Equivalent or Actuarially Equivalent – means, except as otherwise provided in the Plan, a benefit having the same actuarial value as the benefit it replaces, determined using the same assumptions and methods as are used for determining actuarial equivalency benefit under the Pension Plan.

2.3    Board of Directors - means the Board of Directors of Resideo Technologies, Inc.

2.4      Code - means the Internal Revenue Code of 1986, as amended from time to time.

2.5      Committee - means the Compensation Committee of Resideo Technologies, Inc.

2.6       Deferral Plan - means a salary or incentive compensation deferral plan that may be sponsored by Resideo Technologies, Inc. on or after October 29, 2018, as the same may be amended from time to time.

2.7       Earliest Retirement Date – means the earliest date as of which the Participant would be eligible to commence the receipt of his Pension Plan benefit, whether or not he elects to commence receipt of such Pension Plan benefit as of such date.

2.8       Resideo- means Resideo Technologies, Inc., a Delaware corporation and its Affiliates.

2.9       Incentive Plan - means the Resideo Incentive Compensation Plan for Executive Employees, and all successor plans.

2.10      Pension Plan - means the Resideo Pension Plan other than the portion of the Resideo Pension Plan providing benefits to Participants under the Pittway formula (Supplement A), union Participants under the Pension Equity formula (Supplement C), and Participants under the Honeywell Pension Plan Part A (unit benefit formula) (Supplement H) and Part B (cash balance formula) (Supplement I), and (iii) the [AlliedSignal Pension Plan for Contractual Obligations].

2.11      Plan - means the Resideo Supplemental Pension Plan.

2.12      Separation from Service Date – means the date on which the Participant's separation from service with Resideo and its Affiliates occurs within the meaning of Section 409A of the Code.  A Participant's Separation from Service Date occurs when the facts and circumstances indicate that Resideo and the Participant reasonably anticipate that no further services will be performed after a certain date or that the level of services the Participant will perform after such date will permanently decrease to no more than 20% of the average level of services performed over the immediately preceding 36-month period (or, if shorter, the entire period of the Participant's employment by Resideo and its Affiliates).

2.13      Specified Employee – means any Participant who, at any time during the twelve (12) month period ending on the identification date (as determined by the Vice President, Compensation and Benefits or his delegate), is a specified employee under Section 409A of the Code, as determined by the Vice President, Compensation and Benefits or his delegate, which determination of "specified employees" and identification date shall be made by the Vice President, Compensation and Benefits or his delegate in accordance with the provisions of Sections 416(i) and 409A of the Code and the regulations issued thereunder.

2.14      Supplemental Benefit - means the excess, if any, of (i) the retirement income payable to or with respect to a Participant under the Pension Plan that would have been accrued by the Participant (1) had the amount of deferred compensation awards under the Incentive Plan been compensation included for calculating benefits under the Pension Plan in the year the award would otherwise have been earned or payable as recognized by the Pension Plan, (2) had Participant-deferred contributions to the Supplemental Savings Plan been compensation included for calculating benefits under the Pension Plan in the year the compensation would otherwise have been earned or payable as recognized by the Pension Plan, (3) had the portion of base annual salary and incentive awards deferred by a Participant

under the terms of the Deferral Plan, been compensation included for calculating benefits under the Pension Plan in the year the compensation would otherwise have been earned or payable as recognized by the Pension Plan, (4) had the limits of Code Section 415 and 401(a)(17) not been incorporated in the Pension Plan, and (5) had the Participant met all the requirements for a benefit from the Pension Plan with respect to all other pension benefits which Resideo has become contractually obligated to pay to the Participant, over (ii) the Participant's Accrued Pension Benefit. A Participant's Supplemental Benefit shall include an estimate of any compensation or service that is required to be taken into account under the Pension Plan after the Participant receives payment of his Supplemental Benefit.

Notwithstanding the foregoing, in no event does this definition require the inclusion of deferred compensation, Participant-deferred contributions, base annual salary and incentive awards in a year when such amounts would not have been included under the Participant's applicable formula under the Pension Plan.

2.15    Supplemental Savings Plans – means a supplemental savings plan that may be sponsored by Resideo Technologies, Inc. on or after October 29, 2018, as the same may be amended from time to time.

**Article III - Participation**

Participation in the Plan shall be limited to:

(a)    those Active and Inactive Participants in the Pension Plan (and their joint annuitants and beneficiaries) who, as a result of having deferred an award under an Incentive Plan or compensation under a Supplemental Savings Plan or a Deferral Plan, receive or shall receive a lesser amount under the Pension Plan than would otherwise be paid or payable in the absence of such deferral;

(b)    those Active and Inactive Participants in the Pension Plan (and their joint annuitants and beneficiaries) who as a result of the limitations contained in Code Sections 415 or 401(a)(17) receive or will receive a lesser amount under the Pension Plan than would otherwise be paid or payable in the absence of such limitations; and

(c)    any Employee who has entered into a contractual agreement with Resideo under which Resideo shall, after the termination of employment of the Employee, provide a benefit in the form of a life annuity for the Employee (and the Employee's joint annuitant or beneficiary) as provided under the terms of the contractual agreement.

**Article IV - Supplemental Benefit**

4.01    Payment of Supplemental Benefit

(a)    Supplemental Benefits shall be payable directly to the Participant, or such Participant's joint annuitant or beneficiary, as applicable, from the general assets of Resideo and Resideo shall not be under any obligation to set aside any funds or other assets for the payment of the Supplemental Benefits under this Plan. Resideo may, in its sole discretion, establish funds for payment of these Supplemental Benefits. However, any and all such funds shall remain assets of Resideo and subject to the claims of creditors of the corporation. Such funds, if any, shall not be deemed to be assets of this Plan.

Notwithstanding the preceding paragraph, the Committee is authorized (but not required) to cause Resideo (or any successor thereto) to fund all or a part of the Supplemental Benefits for such Participant or Participants as it may select in its sole discretion from time to time. The amount of such funded Supplemental Benefits shall not be assets of Resideo and shall not be subject to the claims of creditors of Resideo. Such Participants, if any, and the amount of any funded Supplemental Benefits shall be designated in an appendix to this Plan and the Supplemental Benefits of any Participant not designated in a Plan appendix or the portion of any Supplemental Benefit not funded as designated in a Plan appendix shall not be so funded and shall remain subject to the provisions of the preceding paragraph of this Section 4.01(a). A Participant designated on a Plan appendix who is married on the date any funded Supplemental Benefits commence under Section 4.01(b) must obtain the written consent of the Participant's spouse in the form and manner prescribed by the Committee to the election of any form of payment of such funded Supplemental Benefits other than a 50% joint and survivor annuity with the Participant's spouse designated as the joint annuitant. The Committee is authorized to select, appoint and remove trustees or other entities or individuals, to enter into, amend and terminate trust or other agreements, to create trust or other secured funds, to cause Resideo to make contributions to such funds in such amounts as the Committee may determine from time to time and to take all other actions that it may determine to be necessary or helpful in implementing the funding, including providing for the payment of Supplemental Benefits in accordance with applicable law.

(b)     The following rules shall be used in determining the time and form of payment for a Participant's Supplemental Benefit:

(1)     Except as otherwise provided in this paragraph (b), the Actuarial Equivalent value of a Participant's Supplemental Benefit shall be paid in a single lump sum payment as of the first day of the month following 105 days after the later of the Participant's Separation from Service Date or Earliest Retirement Date. For purposes of this clause (1), the Earliest Retirement Date of a Participant who participates in the REP Formula of the Pension Plan shall be his Separation from Service Date.

(2)     A Participant who was provided a payment election for his Supplemental Benefit under the Honeywell Supplemental Pension Plan prior to January 1, 2009 other than a Participant described in clause (3) and who elected an annuity as his payment form shall, prior to his benefit commencement date, be entitled to elect from among the Actuarially Equivalent annuity forms of payment available to the Participant under the Pension Plan other than annuity forms with a level income option. Such payments will begin as of the first day of the month following 105 days after the later of the Participant's Separation from Service Date or Earliest Retirement Date. If a Participant fails to elect an annuity payment form by the required date, his Supplemental Benefit shall be paid in a single life annuity if he is unmarried on his benefit commencement date or in a joint and 50% survivor annuity, with his opposite sex spouse on his benefit commencement date as his contingent annuitant, if he is married on his benefit commencement date.

(3)        A Participant who is entitled to disability pension benefits under the Pension Plan that qualify as "ancillary benefits" shall continue to receive such benefits as required by the Pension Plan as long as the Participant satisfies the conditions applicable to such benefits.  The Actuarial Equivalent value of such Participant's Supplemental Benefit at retirement shall be paid as of the first day of the month following 105 days after the latest date the ancillary disability pension benefits could be paid, whether or not the ancillary disability pension benefits continue to be paid to such date. The form of payment shall be determined in accordance with clause (1) or (2) as applicable.

(c)        A Participant's Supplemental Benefit shall include an estimate of any service or compensation (such as during a severance period or Retirement Bridge Leave) following the Participant's benefit commencement date that is required to be taken into account in calculating a Participant's Supplemental Benefit.  In no event shall Resideo be required to recalculate or otherwise true up the Supplemental Benefit actually paid.

(d)        Except as otherwise provided on Appendix A in relation to Supplemental Benefits accrued under the Honeywell Retirement Benefit Plan formula (Supplement B), for the purpose of determining the Actuarial Equivalent present value of a Participant's accrued Supplemental Benefit, the "Applicable Mortality Table" and the "Applicable Interest Rate" shall be used, as defined below.

(1)        The "Applicable Mortality Table" means the mortality table prescribed by the Secretary of the Treasury pursuant to Code Section 417(e). Such table shall be based on the prevailing commissioners' standard table (described in Code Section 807(d)(5)(A)) used to determine reserves for group annuity contracts issued on the date as of which the present value is being determined (without regard to any other subparagraph of Code Section 807(d)(5)).

(2)        The "Applicable Interest Rate" means the average annual rate of interest on 30-year Treasury securities determined as of the third calendar month preceding the month during which the benefit commencement occurs.

(e)        If a Supplemental Benefit becomes payable and the relevant Pension Plan or agreement is terminated in accordance with its terms, then the Participant shall have a right to only the Supplemental Benefit accrued to the date of termination of the relevant Pension Plan or agreement. In such event, Resideo shall remain liable for the payment of the Supplemental Benefit and payment shall be made at such times and in such manner as provided in this Section 4.01.

(f)        Except to the extent that a Participant's Supplemental Benefit is funded as described in Section 4.01(a), the rights and interest of any Participant, joint annuitant, or beneficiary to a Supplemental Benefit under this Plan shall be the same as any other unsecured creditor of Resideo (or any successor thereto). In the event of any bankruptcy proceeding by or against Resideo, a Participant, joint annuitant or beneficiary shall be entitled to prove a claim for any unpaid portion of the benefit provided by the Plan.

(g)        No person shall have a right to acceleration of any payment under the Plan. No person shall be entitled to anticipate such benefit by assignment, pledge or transfer in any form or manner prior to actual or constructive receipt of payment.

(h)        Notwithstanding any provision of this Section 4.01 to the contrary, if a Participant is a Specified Employee at his Separation from Service Date and payment under this Section 4.01 is required to be made or commence within the 6-month period following his Separation from Service Date, such payment shall be delayed if it is to be made in a single lump sum payment or accumulated if it is to be made in an annuity until the earlier of the first day of the seventh month following the Separation from Service Date or the first day of the month following the Participant's death, with no interest or earnings accruing on the delayed payments.

4.02        Death Benefits

(a)        If a Participant receives his Supplemental Benefit in a single lump sum payment, no Supplemental Benefit shall be paid to his surviving spouse or beneficiary following his death.

(b)        If a Participant elects to receive his Supplemental Benefit in an annuity that provides a survivor annuity or death benefit, the Participant's surviving spouse or beneficiary, as applicable, shall receive the applicable survivor benefit or death benefit following the Participant's death.

(c)        If a Participant dies before he receives his Supplemental Benefit, his surviving spouse or beneficiary shall receive the Actuarial Equivalent value of any pre-retirement surviving spouse benefits or death benefits provided by the Pension Plan (1) in the form of the annuity required by the Pension Plan if the Participant elected to receive his Supplemental Benefits in an annuity, or (2) in all other cases, in the form of a single lump sum payment.  Such payment will be paid or begin to be paid as of the first day of the month following 105 days after the later of the Participant's death or the date that would have been the Participant's Earliest Retirement Date.

**Article V - Administration**

5.01        Plan Administrator - The Vice President, Compensation & Benefits shall be the Plan Administrator and shall serve without compensation. The Plan Administrator shall keep such records as necessary for the proper administration of the Plan and shall report to the Committee at such time or times as the Committee shall designate.

5.02    Benefit Determination - The Plan Administrator shall determine the amount and timing of any benefit paid under the Plan. The Plan Administrator shall rely on the records of Resideo in determining any Participant's eligibility for and amount of benefit under the Plan. In the event that the Plan Administrator's reliance on the records of Resideo causes a benefit to be over or under paid, the Plan Administrator shall adjust future payments to be increased or decreased as required. If such future payments are insufficient to recover any overpayment to a Participant, the Plan Administrator shall withhold any payments then due a Participant and take any action deemed appropriate to recover the balance of the overpayment.

5.03    Benefit Appeals - The Plan Administrator shall establish an appeals procedure as defined by U.S. Department of Labor regulations. Such procedures will provide that the Participant has sixty (60) days upon receipt of any benefits or denial of benefits to file an appeal with the Plan Administrator. The Plan Administrator must respond within sixty (60) days of receiving the appeal, in writing, specifically identifying those Plan provisions on which the benefit denial was based and indicating what information the Participant must supply in order to perfect a claim for benefits.

5.04    Nonduplication of Benefits - To avoid the duplication of benefits, the amount of any similar benefits under this Plan shall be offset and reduced by the amount of any similar benefit provided the Participant under other supplemental pension plans sponsored by Resideo or its Affiliates for which the Participant may be eligible, provided however that payment under all plans shall begin at the same time and in the same form of payment.

5.05    Compliance with Section 409A of the Code – The Plan is intended to comply with the applicable requirements of Section 409A of the Code, and will be administered in accordance with Section 409A of the Code to the extent that Section 409A of the Code applies to the Plan.  Notwithstanding any provision of the Plan to the contrary, distributions from the Plan may only be made in a manner, and upon an event, permitted by Section 409A of the Code.  If any payment or benefit cannot be provided or made at the time specified herein without incurring penalties under Code section 409A, then such benefit or payment will be provided in full at the earliest time thereafter when such penalties will not be imposed.  To the extent that any provision of the Plan would cause a conflict with the applicable requirements of Section 409A of the Code, or would cause the administration of the Plan to fail to satisfy the applicable requirements of Section 409A of the Code, such provision shall be deemed null and void to the extent permitted by applicable law.

## Article VI - Amendment and Termination

6.01    Plan Amendments – Resideo reserves the right to amend the Plan from time to time. The Plan may be amended by the Committee; provided however, that no amendment shall reduce any benefit being paid or then payable to a Participant. Further, no amendment shall reduce the benefits provided by the Plan to Participants or alter in any manner the rights of the Participants to benefits provided under this Plan.

6.02    Plan Termination – Resideo reserves the right to terminate the Plan. However, such termination shall not adversely affect the rights of Participants.

**APPENDIX A**

The lump sum of Supplemental Benefits accrued under the Honeywell Retirement Benefit Plan formula (Supplement B) shall be the present value of the Participant's Supplemental Benefit or remaining benefit as of the date the Plan is terminated using the following interest rate and mortality assumptions:

Interest: 8 1/2% per annum discount rate

Mortality: 1983 Group Annuity Mortality Table for Healthy Males

(Back To Top)

# Section 11: EX-21.1 (EX-21.1)

**Exhibit 21.1**

**RESIDEO TECHNOLOGIES, INC. SUBSIDIARIES OF THE REGISTRANT**

| Name | Country or State of Incorporation |
| --- | --- |
| Ackermann Limited | UK |
| Ademco (Pty) Ltd | South Africa |
| Ademco 1 B.V. | Netherlands |
| Ademco 1 GmbH | Germany |
| ADEMCO 1 LIMITED | UK |
| Ademco 2 B.V. | Netherlands |
| Ademco 2 GmbH | Germany |
| ADEMCO 2 LIMITED | UK |
| Ademco 2 S.r.l. | Italy |
| ADEMCO 3 LIMITED | UK |
| ADEMCO 4 LIMITED | UK |
| Ademco Australia Pty, Limited | Australia |
| Ademco Austria GmbH | Austria |
| ADEMCO Canada II Ltd. | Canada |
| Ademco Comercial y Centro de Investigación y Desarrollo, S. de R.L. de C.V. | Mexico |
| Ademco CZ s.r.o. | Czech Republic |
| Ademco FZE | UAE |
| Ademco Holding B.V. | Netherlands |
| Ademco I LLC | US |
| ADEMCO III Ltd. | Canada |
| Ademco Inc. | US |
| Ademco International Limited | UK |
| Ademco Korea Co., Ltd. | Korea |
| Ademco Manufacturing Holding Mexico, S. de R.L. de C.V. | Mexico |
| Ademco Otomasyon Limited Şirketi | Turkey |
| Ademco Smart Homes Technology (Tianjin) Co., Ltd. | China |
| Ademco sp.z o.o. | Poland |
| ADEMCO SRL | Argentina |
| Ademco Supply S.r.l. | Romania |
| ADI - Gardiner SAS | France |
| ADI Global Distribution AB | Sweden |
| ADI Global Distribution Denmark A/S | Denmark |
| ADI Global Distribution Finland Oy | Finland |
| ADI Global Distribution Norge AS | Norway |
| ADI of Puerto Rico, Inc. | Puerto Rico |
| ADI-GARDINER EMEA LIMITED | UK |
| ADI-Gardiner EMEA SAS | France |
| ADI-Gardiner Holding Limited | UK |
| ADI-Gardiner Ireland Limited | Ireland |
| ADI-Gardiner Limited | UK |
| ADI-GARDINER Netherlands B.V. | Netherlands |
| ADI-Gardiner NV | Belgium |
| AlarmExpress Limited | UK |

| | |
|---|---|
| BACOU UK Ltd. | UK |
| BACOUDEV 2 Sarl | France |
| bk-electronic GmbH | Germany |
| Cara C'Air BV | Netherlands |
| COM DEV Services India Private Limited | India |
| Eclipse Limited | UK |
| Eclipse Thermal Systems Limited | UK |
| Elmwood Sensors Limited | UK |
| EMS Acquisition Company Limited | UK |
| EnergyMGT UK Limited | UK |
| Enraf Ltd. | UK |
| EX-OR Holdings Limited | UK |
| Ex-Or Limited | UK |
| Exothermics Limited | UK |
| Honeywell Combustion Controls S.r.l. | Italy |
| Honeywell France E Sarl | France |
| Honeywell Hotechnikai Korlatolt Felelossegu Tarsasag | Hungary |
| Honeywell Laminate Systems SAS | France |
| Honeywell Manufacturas de Chihuahua, S. de R.L. de C.V. | Mexico |
| Honeywell s.r.o | Slovak Republic |
| Honeywell Security Espana, S.L. | Spain |
| Honeywell Security Italia S.r.l. | Italy |

| | |
|---|---|
| Honeywell Video Systems UK Limited | UK |
| Infratec Datentechnik GmbH | Germany |
| Inline Electronics Limited | UK |
| Instromet Mexicana, S. de R.L. de C.V. | Mexico |
| King's Safetywear (India) Pvt Ltd | India |
| LXE (UK) Ltd. | UK |
| LXE France Sarl | France |
| LXE Italia S.r.l. | Italy |
| Metrologic Instruments UK Limited | UK |
| Mexhon, S. de R.L. de C.V. | Mexico |
| Novar Building Products Limited | UK |
| Novar Dormant Holdings Company Limited | UK |
| Novar International Limited | UK |
| Novar Overseas Limited | UK |
| Novar Plumbing Limited | UK |
| Novar Projects Limited | UK |
| OOO System Sensor Fire Detectors | Russia |
| OTTER PORTUGUESA – INDÚSTRIA DE CALÇADO LDA | Portugal |
| Pittway 2 Sarl | Switzerland |
| Pittway 3 Sarl | Switzerland |
| Pittway BVBA | Belgium |
| Pittway GmbH | Austria |
| Pittway Holding GmbH | Switzerland |
| Pittway Homes Systems, S.L. | Spain |
| Pittway Sarl | Switzerland |
| Radio Systemes Ingénierie Video Technologies SAS (a/k/a RSI Video Technologies SAS) | France |
| RAE UK Limited | UK |
| Resideo Funding Inc. | US |
| Resideo Holding Inc. | US |
| Resideo Intermediate Holding Inc. | US |
| Resideo Life Care Solutions LLC (fka Honeywell HomMed LLC) | US |
| Resideo Technologies, Inc. | US |
| RSI Holding SA | France |
| RSI Participations SAS | France |
| RSI Video Technologies Limited | UK |
| RSI Video Technologies, Inc. (US) | US |
| Satamatics Global Limited | UK |
| Satcom1 Integration Services ApS | Denmark |
| Satronic Controls (U.K.) Limited | UK |
| Securite Communications SAS | France |
| Special Products Division Limited | UK |
| Sperian Protection Footwear Givors SAS | France |
| Stentorious SAS | France |
| Sutax Limited | UK |
| Ultrak Security Systems Sp.z o.o. | Poland |
| United Barcode Industries Ltd | UK |
| Video Controls Limited | UK |

(Back To Top)

# Section 12: EX-23.1 (EX-23.1)

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statement No. 333-228687 on Form S-8 of our report dated March 18, 2019, relating to the consolidated and combined financial statements of Resideo Technologies, Inc. and subsidiaries (which expresses an unqualified opinion and includes an emphasis of matter paragraph relating to the basis of presentation of the combined financial statements and referring to the expense allocation of certain corporate functions historically provided by Honeywell International, Inc.), appearing in this Annual Report on Form 10-K of Resideo Technologies, Inc. and subsidiaries for the year ended December 31, 2018.

/s/ Deloitte & Touche LLP

Minneapolis, Minnesota
March 18, 2019

(Back To Top)

# Section 13: EX-31.1 (EX-31.1)

**Exhibit 31.1**

CERTIFICATION PURSUANT TO
SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002

I, Michael G. Nefkens, certify that:

1.      I have reviewed this Annual Report on Form 10-K of Resideo Technologies, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 18, 2019

By: /s/ Michael G. Nefkens
Michael G. Nefkens
President and Chief Executive Officer

([Back To Top]())

# Section 14: EX-31.2 (EX-31.2)

**Exhibit 31.2**

CERTIFICATION PURSUANT TO
SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002

I, Joseph D. Ragan III, certify that:

1.      I have reviewed this Annual Report on Form 10-K of Resideo Technologies, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 18, 2019                                                    By: /s/Joseph D. Ragan III
                                                                       Joseph D. Ragan III
                                                                       Executive Vice President and Chief Financial Officer

(Back To Top)

# Section 15: EX-32.1 (EX-32.1)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Resideo Technologies, Inc. (the Company) on Form 10-K for the period ending December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Michael G. Nefkens, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

   (1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

   (2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 18, 2019                                                    By:    /s/ Michael G. Nefkens
                                                                       Michael G. Nefkens
                                                                       President and Chief Executive
                                                                       Officer

(Back To Top)

# Section 16: EX-32.2 (EX-32.2)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Resideo Technologies, Inc. (the Company) on Form 10-K for the period ending December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Joseph D. Ragan III, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 18, 2019

By:   /s/ Joseph D. Ragan III
       Joseph D. Ragan III
       Executive Vice President and Chief
       Financial Officer

(Back To Top)