# EXHIBIT M

# Section 1: 10-12B/A (FORM 10-12B/A)

**As filed with the Securities and Exchange Commission on October 2, 2018.**

**File No. 001-38635**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## Amendment No. 2
## to
## Form 10

**GENERAL FORM FOR REGISTRATION OF SECURITIES**
**PURSUANT TO SECTION 12(b) OR 12(g)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

# Resideo Technologies, Inc.

**(Exact name of registrant as specified in its charter)**

| **Delaware**<br>**(State or Other Jurisdiction of Incorporation or Organization)** | **82-5318796**<br>**(I.R.S. Employer Identification Number)** |
|---|---|
| **1985 Douglas Drive North, Golden Valley, Minnesota 55422**<br>**(Address of Principal Executive Offices)** | **07950**<br>**(Zip Code)** |

**Registrant's telephone number, including area code:**
**(763) 954-5204**

**Securities to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class to be so Registered | Name of Each Exchange on Which Each Class is to be Registered |
|---|---|
| Common Stock, par value $0.001 per share | New York Stock Exchange |

**Securities to be registered pursuant to Section 12(g) of the Act:**
None.

**Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company.**

**See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.**

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Resideo Technologies, Inc.**
**Information Required in Registration Statement**
**Cross-Reference Sheet between the Information Statement and Items of Form 10**

This Registration Statement on Form 10 incorporates by reference information contained in our Information Statement, which is **Exhibit 99.1** to this Registration Statement on Form 10.

| Item No. | Name of Item | Location in Information Statement |
|---|---|---|
| 1. | Business | See "Information Statement Summary," "Business," "The Spin-Off," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Where You Can Find More Information" |
| 1A. | Risk Factors | See "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" |
| 2. | Financial Information | See "Capitalization," "Selected Historical and Unaudited Pro Forma Combined Financial Data," "Unaudited Pro Forma Combined Financial Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" |
| 3. | Properties | See "Business—Properties" |
| 4. | Security Ownership of Certain Beneficial Owners and Management | See "Security Ownership of Certain Beneficial Owners and Management" |
| 5. | Directors and Executive Officers | See "Management and Board of Directors" |
| 6. | Executive Compensation | See "Management and Board of Directors" and "Compensation Discussion and Analysis" |
| 7. | Certain Relationships and Related Transactions, and Director Independence | See "Risk Factors," "Management and Board of Directors" and "Certain Relationships and Related Party Transactions" |
| 8. | Legal Proceedings | See "Business—Legal Proceedings" |
| 9. | Market Price of and Dividends on the Registrant's Common Equity and Related Shareholder Matters | See "The Spin-Off," "Dividend Policy," "Security Ownership of Certain Beneficial Owners and Management" and "Description of Our Capital Stock" |
| 10. | Recent Sales of Unregistered Securities | See "Description of Our Capital Stock" |
| 11. | Description of Registrant's Securities to be Registered | See "Description of Our Capital Stock" |
| 12. | Indemnification of Directors and Officers | See "Description of Our Capital Stock" and "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Separation and Distribution Agreement" |
| 13. | Financial Statements and Supplementary Data | See "Selected Historical and Unaudited Pro Forma Combined Financial Data," "Unaudited Pro Forma Combined Financial Statements" and "Index To Combined Financial Statements" and the financial statements referenced therein |
| 14. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | None |
| 15. | Financial Statements and Exhibits | (a) Combined Financial Statements<br>See "Index To Combined Financial Statements," "Unaudited Pro Forma Combined Financial Statements" and the financial statements referenced therein<br>(b) Exhibits<br>See the Exhibit Index of this Registration Statement on Form 10 |

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Description |
|---|---|
| 2.1 | Form of Separation and Distribution Agreement between Honeywell International Inc. and the registrant* |
| 2.2 | Form of Transition Services Agreement between Honeywell International Inc. and Ademco Inc., a subsidiary of the registrant+* |
| 2.3 | Form of Tax Matters Agreement between Honeywell International Inc. and the registrant* |
| 2.4 | Form of Employee Matters Agreement between Honeywell International Inc. and the registrant +* |
| 2.5 | Form of Patent Cross-License Agreement between Honeywell International Inc. and the registrant+ * |
| 2.6 | Form of Trademark License Agreement between Honeywell International Inc. and the registrant* |
| 2.7 | Form of Indemnification and Reimbursement Agreement by and between Honeywell International Inc. and New HAPI Inc., a subsidiary of the registrant* |
| 3.1 | Form of Amended and Restated Certificate of Incorporation of the registrant |
| 3.2 | Form of Amended and Restated By-Laws of the registrant+ |
| 10.01 | Offer Letter of Michael G. Nefkens+ |
| 10.02 | Offer Letter of Joseph D. Ragan III+ |
| 10.03 | Form of Internal Hire Offer Letter+ |
| 10.04 | Form of External Hire Offer Letter+ |
| 21.1 | List of subsidiaries of the registrant+ |
| 99.1 | Preliminary Information Statement |

\+ Previously filed.

* Certain schedules and similar attachments have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The registrant hereby undertakes to furnish copies of any of the omitted schedules and similar attachments upon request by the U.S. Securities and Exchange Commission.

**SIGNATURE**

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, the registrant has duly caused its Registration Statement on Form 10 to be signed on its behalf by the undersigned, thereunto duly authorized.

**RESIDEO TECHNOLOGIES, INC.**

**By:** /s/ Jacqueline Katzel
Name: Jacqueline Katzel
Title: President

**Dated: October 2, 2018**

(Back To Top)

# Section 2: EX-2.1 (EX-2.1)

**Exhibit 2.1**

Form of

SEPARATION AND DISTRIBUTION AGREEMENT

by and between

HONEYWELL INTERNATIONAL INC.

and

RESIDEO TECHNOLOGIES, INC.

Dated as of [ ], 2018

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 2 |
| Section 1.01 | Definitions | 2 |
| ARTICLE II THE SEPARATION | | 18 |
| Section 2.01 | Transfer of Assets and Assumption of Liabilities | 18 |
| Section 2.02 | Certain Matters Governed Exclusively by Ancillary Agreements | 21 |
| Section 2.03 | Termination of Agreements | 21 |
| Section 2.04 | Real Estate Separation Documents | 23 |
| Section 2.05 | Shared Contracts | 24 |
| Section 2.06 | Disclaimer of Representations and Warranties | 24 |
| Section 2.07 | Waiver of Bulk-Sale and Bulk-Transfer Laws | 25 |
| Section 2.08 | Cash Adjustment | 25 |
| ARTICLE III RECORDATION OF INTELLECTUAL PROPERTY RIGHTS ASSIGNMENT AGREEMENTS | | 25 |
| Section 3.01 | Recordation | 25 |
| ARTICLE IV CREDIT SUPPORT | | 26 |
| Section 4.01 | Replacement of Honeywell Credit Support | 26 |
| Section 4.02 | Replacement of SpinCo Credit Support | 27 |
| Section 4.03 | Manner of Indemnification | 28 |
| ARTICLE V ACTIONS PENDING THE DISTRIBUTION | | 28 |
| Section 5.01 | Actions Prior to the Distribution | 28 |
| Section 5.02 | Conditions Precedent to Consummation of the Distribution | 29 |
| ARTICLE VI THE DISTRIBUTION | | 30 |
| Section 6.01 | The Distribution | 30 |
| Section 6.02 | Fractional Shares | 31 |
| Section 6.03 | Sole Discretion of Honeywell | 31 |
| ARTICLE VII MUTUAL RELEASES; INDEMNIFICATION | | 32 |
| Section 7.01 | Release of Pre-Distribution Claims | 32 |
| Section 7.02 | Indemnification by SpinCo | 34 |
| Section 7.03 | Indemnification by Honeywell | 34 |
| Section 7.04 | Indemnification Obligations Net of Insurance Proceeds and Third-Party Proceeds | 35 |
| Section 7.05 | Procedures for Indemnification of Third-Party Claims | 35 |
| Section 7.06 | Additional Matters | 37 |
| Section 7.07 | Remedies Cumulative | 38 |
| Section 7.08 | Survival of Indemnities | 38 |
| Section 7.09 | Limitation on Liability | 38 |
| Section 7.10 | Management of Existing Actions | 38 |

ARTICLE VIII ACCESS TO INFORMATION; PRIVILEGE; CONFIDENTIALITY 39
Section 8.01 Agreement for Exchange of Information; Archives 39
Section 8.02 Ownership of Information 40
Section 8.03 Compensation for Providing Information 40
Section 8.04 Record Retention 40
Section 8.05 Accounting Information 41
Section 8.06 Limitations of Liability 42
Section 8.07 Production of Witnesses; Records; Cooperation 42
Section 8.08 Privileged Matters 43
Section 8.09 Confidential Information 46

ARTICLE IX INSURANCE 47
Section 9.01 Maintenance of Insurance 47
Section 9.02 Claims Under Honeywell Insurance Policies 47
Section 9.03 Claims Under SpinCo Insurance Policies 48
Section 9.04 Insurance Proceeds 49
Section 9.05 Claims Not Reimbursed 49
Section 9.06 D&O Policies 50
Section 9.07 Insurance Cooperation 50

ARTICLE X FURTHER ASSURANCES AND ADDITIONAL COVENANTS 50
Section 10.01 Further Assurances 50
Section 10.02 Non-Solicit 51

ARTICLE XI TERMINATION 52
Section 11.01 Termination 52
Section 11.02 Effect of Termination 52

ARTICLE XII MISCELLANEOUS 52
Section 12.01 Counterparts; Entire Agreement; Corporate Power 52
Section 12.02 Dispute Resolution 53
Section 12.03 Governing Law; Jurisdiction 53
Section 12.04 Waiver of Jury Trial 53
Section 12.05 Court-Ordered Interim Relief 54
Section 12.06 Specific Performance 54
Section 12.07 Assignability 54
Section 12.08 Third-Party Beneficiaries 55
Section 12.09 Notices 55
Section 12.10 Severability 56
Section 12.11 Publicity 56
Section 12.12 Expenses 56
Section 12.13 Headings 57
Section 12.14 Survival of Covenants 57
Section 12.15 Waivers of Default 57
Section 12.16 Amendments 57
Section 12.17 Interpretation 58

Schedules:


| | | |
|---|---|---|
| Schedule I | - | Plan of Reorganization |
| Schedule II | - | Honeywell Retained Assets |
| Schedule III | - | Honeywell Retained Liabilities |
| Schedule IV | - | SpinCo Equity Interests |
| Schedule V | - | SpinCo Assets |
| Schedule VI | - | SpinCo Copyrights |
| Schedule VII | - | SpinCo Domain Names |
| Schedule VIII | - | SpinCo IDs |
| Schedule IX | - | SpinCo Trademarks |
| Schedule X | - | SpinCo Liabilities |
| Schedule XI | - | SpinCo Real Property |
| Schedule XII | - | Transferred Sites |
| Schedule XIII | - | Shared Contracts |
| Schedule XIV | - | SpinCo Accounts |
| Schedule XV | - | Honeywell Accounts |
| Schedule XVI | - | Cash Adjustment |
| Schedule XVII | - | Real Estate Separation Documents |
| Schedule XVIII | - | Surviving Intercompany Agreements and Intercompany Accounts |
| Schedule XIX | - | Surviving Honeywell Credit Support Instruments |
| Schedule XX | - | Surviving SpinCo Credit Support Instruments |
| Schedule XXI | - | Mixed Actions |
| Schedule XXII | - | SpinCo-Managed Actions |
| Schedule XXIII | - | Honeywell-Managed Actions |
| Schedule XXIV | - | Jointly Managed Actions |
| Schedule XXV | - | Treatment of Expected Surviving Guarantees |
| Schedule XXVI | - | Forgiven Intercompany Balances |
| Schedule XXVII | - | Local Transfer Agreements |
| Schedule XXVIII | - | Services Agreements |

SEPARATION AND DISTRIBUTION AGREEMENT, dated as of [ ], 2018, by and between HONEYWELL INTERNATIONAL INC., a Delaware corporation ("Honeywell"), and RESIDEO TECHNOLOGIES, INC., a Delaware corporation ("SpinCo"). Capitalized terms used herein and not otherwise defined shall have the respective meanings assigned to them in Article I.

RECITALS

WHEREAS the board of directors of Honeywell has determined that it is in the best interests of Honeywell and its shareholders to create a new publicly traded company that will operate the SpinCo Business;

WHEREAS in furtherance of the foregoing, the board of directors of Honeywell has determined that it is appropriate and desirable to effect the transactions constituting the Reorganization, to transfer certain assets and liabilities to SpinCo, a wholly owned Subsidiary of Honeywell, on the terms and subject to the conditions of this Agreement and subsequently to distribute Honeywell's entire interest in SpinCo, by way of a dividend of stock to be made to holders of Honeywell Common Stock;

WHEREAS in furtherance of the foregoing, it is appropriate and desirable to effect the Spin-Off, as more fully described in this Agreement;

WHEREAS SpinCo has been incorporated solely for these purposes and has not engaged in activities except in preparation for the Spin-Off;

WHEREAS Honeywell and SpinCo have prepared, and SpinCo has filed with the Commission, the Form 10, which includes the Information Statement and sets forth appropriate disclosure concerning SpinCo and the Distribution;

WHEREAS Honeywell and SpinCo intend that certain steps of the Plan of Reorganization and the Distribution each qualify for its Intended Tax Treatment and for this Agreement to constitute a plan of reorganization within the meaning of Section 1.368-2(g) of the Treasury Regulations and a plan of liquidation within the meaning of Section 332 of the Code, as relevant; and

WHEREAS it is appropriate and desirable to set forth the principal corporate transactions required to effect the Spin-Off and certain other agreements that will govern certain matters relating to the Spin-Off and the relationship of Honeywell, SpinCo and their respective Subsidiaries following the Distribution.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I

# DEFINITIONS

Section 1.01 Definitions. For the purposes of this Agreement, the following terms shall have the following meanings:

"Action" means any claim, complaint, petition, hearing, charge, demand, action, suit, countersuit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority or any Federal, state, local, foreign or international arbitration or mediation tribunal.

"Adversarial Action" means (i) an Action by a member of the Honeywell Group, on the one hand, against a member of the SpinCo Group, on the other hand, or (ii) an Action by a member of the SpinCo Group, on the one hand, against a member of the Honeywell Group, on the other hand.

"Affiliate" of any Person means a Person that controls, is controlled by or is under common control with such Person. As used herein, "control" of any entity means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such entity, whether through ownership of voting securities or other interests, by Contract or otherwise; provided, however, that (i) SpinCo and the other members of the SpinCo Group shall not be considered Affiliates of Honeywell or any of the other members of the Honeywell Group and (ii) Honeywell and the other members of the Honeywell Group shall not be considered Affiliates of SpinCo or any of the other members of the SpinCo Group.

"Agent" means the distribution agent appointed by Honeywell to distribute to the Record Holders, pursuant to the Distribution, the shares of SpinCo Common Stock held by Honeywell.

"Agreement" means this Separation and Distribution Agreement, including the Schedules hereto.

"Ancillary Agreements" means the Tax Matters Agreement, the Employee Matters Agreement, the Patent License Agreement, the Data Transfer Agreement, the Trademark License Agreement, the Intellectual Property License Agreement, the TSA, the Indemnification Agreement and any other instruments, assignments, documents and agreements executed in connection with the implementation of the transactions contemplated by this Agreement.

"Assets" means all assets, properties and rights of every kind and nature (including goodwill), wherever located (including in the possession of vendors or other third parties or elsewhere), whether real, personal or mixed, tangible or intangible, or accrued or contingent, in each case whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of any Person, including the following:

(a) all accounting and other books, records and files, whether in paper, microfilm, microfiche, computer tape or disc, magnetic tape, electronic recording or any other form;

(b) all apparatus, computers and other electronic data processing equipment, fixtures, machinery, furniture, office and other equipment, including hardware systems, circuits and other computer and telecommunication assets and equipment, automobiles, trucks, aircraft, rolling stock, vessels, motor vehicles and other transportation equipment, special and general tools, test devices, prototypes and models and other tangible personal property;

(c) all inventories of materials, parts, raw materials, supplies, work-in-process and finished goods and products;

(d) all interests in real property of whatever nature, including buildings, land, structures, improvements and fixtures thereon, and all easements and rights-of-way appurtenant thereto, and all leasehold interests, whether as owner, mortgagee or holder of a Security Interest in real property, lessor, sublessor, lessee, sublessee or otherwise;

(e) all interests in any capital stock or other equity interests of any Subsidiary or any other Person; all bonds, notes, debentures or other securities issued by any Subsidiary or any other Person; all loans, advances or other extensions of credit or capital contributions to any Subsidiary or any other Person; all other investments in securities of any Person; and all rights as a partner, joint venturer or participant;

(f) all license agreements, leases of personal property, open purchase orders for raw materials, supplies, parts or services, unfilled orders for the manufacture and sale of products and other Contracts and all rights arising thereunder;

(g) all deposits, letters of credit, performance bonds and other surety bonds;

(h) all written technical information, data, specifications, research and development information, engineering drawings, operating and maintenance manuals and materials and analyses prepared by consultants and other third parties;

(i) all Intellectual Property Rights;

(j) all Contracts pursuant to which any license, option or similar right relating to Intellectual Property Rights has been granted or the use of Intellectual Property Rights is materially restricted (excluding, for the avoidance of doubt, Contracts terminated pursuant to the terms of this Agreement or any Ancillary Agreement);

(k) all websites, databases, content, text, graphics, images, audio, video, data and other copyrightable works or other works of authorship including all translations, adaptations, derivations and combinations thereof, in each case to the extent not included in clause (i) of this definition;

(l) all cost information, sales and pricing data, customer prospect lists, supplier records, customer and supplier lists, subscriber, customer and vendor data, correspondence and lists, product literature and other advertising and promotional materials, artwork, design, development and manufacturing files, vendor and customer drawings, formulations and specifications, server and traffic logs, quality records and reports and other books, records, studies, surveys, reports, plans, business records and documents, in each case to the extent not included in clause (i) of this definition;

(m) all prepaid expenses, trade accounts and other accounts and notes receivable (whether current or non-current);

(n) all claims or rights against any Person arising from the ownership of any other Asset, all rights in connection with any bids or offers, all Actions, judgments or similar rights, all rights under express or implied warranties, all rights of recovery and all rights of setoff of any kind and demands of any nature, in each case whether accrued or contingent, whether in tort, contract or otherwise and whether arising by way of counterclaim or otherwise;

(o) all rights under insurance policies and all rights in the nature of insurance, indemnification or contribution;

(p) all licenses (including radio and similar licenses), permits, consents, approvals and authorizations that have been issued by any Governmental Authority and all pending applications therefor;

(q) Cash, bank accounts, lock boxes and other deposit arrangements;

(r) interest rate, currency, commodity or other swap, collar, cap or other hedging or similar agreements or arrangements; and

(s) all goodwill as a going concern and other intangible properties.

"Cash" means cash, cash equivalents, bank deposits and marketable securities, whether denominated in United States dollars or otherwise.

"Cash Management Arrangements" means all cash management arrangements pursuant to which Honeywell or its Subsidiaries automatically or manually sweep cash from, or automatically or manually transfer cash to, accounts of SpinCo or any member of the SpinCo Group.

"Commission" means the Securities and Exchange Commission.

"Consents" means any consents, waivers, authorizations, ratifications, permissions, exemptions, or approvals from, or notification requirements to, any Person other than a member of either Group.

"Contract" means any contract, agreement or other legally binding instrument, including any note, bond, mortgage, deed, indenture, commitment, undertaking, promise, lease, sublease, license or sublicense or joint venture.

"Copyrights" means copyrights, rights in works of authorship (including all translations, adaptations, derivations and combinations thereof), mask works, designs and database rights, including, in each case, any registrations and applications therefor.

"Credit Support Instruments" has the meaning set forth in Section 4.01(a).

"Data Transfer Agreement" means the Data Transfer Agreement dated as of the date of this Agreement by and between the Parties hereto.

"Domain Names" means Internet domain names, including top level domain names and global top level domain names, URLs, social media identifiers, handles and tags.

"D&O Policies" has the meaning set forth in Section 9.06.

"Debt Incurrence" has the meaning set forth in Schedule I.

"Determination" has the meaning set forth in the Tax Matters Agreement.

"Dispute" has the meaning set forth in Section 12.02.

"Distribution" means the distribution by Honeywell to the Record Holders, on a pro rata basis, of all of the outstanding shares of SpinCo Common Stock owned by Honeywell on the Distribution Date.

"Distribution Date" means the date, determined by Honeywell in accordance with Section 6.03, on which the Distribution occurs.

"Employee Matters Agreement" means the Employee Matters Agreement dated as of the date of this Agreement by and between Honeywell and SpinCo.

"Exchange" means the New York Stock Exchange.

"Exchange Act" means the Securities Exchange Act of 1934, together with the rules and regulations promulgated thereunder.

"Expected Surviving Guarantees" has the meaning set forth in Schedule XXV.

"First Post-Distribution Report" has the meaning set forth in Section 12.11.

"Form 10" means the registration statement on Form 10 filed by SpinCo with the Commission to effect the registration of SpinCo Common Stock pursuant to the Exchange Act in connection with the Distribution, as such registration statement may be amended or supplemented from time to time.

"Former Business" means any terminated, divested or discontinued businesses or properties of either the Honeywell Group, the SpinCo Group, any of their respective members or any of their respective predecessors, in each case, prior to the Distribution; provided, that any discontinued product or service shall not, alone, constitute a "Former Business".

"Governmental Approvals" means any notices, reports or other filings to be given to or made with, or any Consents, registrations or permits to be obtained from, any Governmental Authority.

"Governmental Authority" means any Federal, state, local, foreign or international court, government, department, commission, board, bureau, agency, official or other legislative, judicial, regulatory, administrative or governmental authority.

"Group" means either the Honeywell Group or the SpinCo Group, as the context requires.

"Hazardous Materials" means (i) any natural or artificial substance (whether solid, liquid, gas or other form of matter, noise, microorganism or electromagnetic field) that could cause harm to human health or the environment, including petroleum, petroleum products and byproducts, asbestos-containing materials, perfluoroalkyl substances, urea formaldehyde foam insulation, carcinogens, endocrine disrupters, lead-based paint, electronic, medical or infectious wastes, polychlorinated biphenyls, radon gas, radioactive substances, greenhouse gases and ozone-depleting substances and (ii) any other chemical, material, substance or waste that could result in Liability under, or that is prohibited, limited or regulated by or pursuant to, any HSE Law.

"Honeywell" has the meaning set forth in the preamble.

"Honeywell Account" means any bank or brokerage account owned by Honeywell or any other member of the Honeywell Group, including the Honeywell Accounts listed or described on Schedule XV.

"Honeywell Assets" means (a) all Assets of the Honeywell Group (other than Intellectual Property Rights), (b) the Honeywell Retained Assets, (c) any Assets held by a member of the SpinCo Group that are determined by Honeywell, in good faith, to be primarily related to or used primarily in connection with the business or operations of the Honeywell Business (unless otherwise expressly provided in connection with this Agreement), (d) all interests in the capital stock of, or other equity interests in, the members of the Honeywell Group (other than Honeywell), (e) the rights related to the Honeywell Portion of any Shared Contract and (f) the Honeywell IP. Notwithstanding the foregoing, the Honeywell Assets shall not include the SpinCo Assets.

"Honeywell Business" means the businesses and operations as currently or formerly conducted (including business and operations not yet commercialized) by Honeywell and its predecessors and its Subsidiaries other than the SpinCo Business.

"Honeywell Common Stock" means the common stock, $1.00 par value per share, of Honeywell.

"Honeywell Credit Support Instruments" has the meaning set forth in Section 4.01(a).

"Honeywell Disclosure Sections" means all information set forth in or omitted from the Form 10 or Information Statement to the extent relating to (a) the Honeywell Group, (b) the Honeywell Liabilities, (c) the Honeywell Assets or (d) the substantive disclosure set forth in the Form 10 relating to Honeywell's board of directors' consideration of the Spin-Off, including the section entitled "Reasons for the Spin-Off."

"Honeywell Group" means Honeywell and each of its Subsidiaries, including any Person that becomes a Subsidiary of Honeywell as a result of transactions that occur following the Distribution in accordance with the Plan of Reorganization, but excluding any member of the SpinCo Group.

"Honeywell HSE Liabilities" means any HSE Liability, whether occurring or arising prior to, on or after the Distribution Date, to the extent (a) resulting from or otherwise relating to (i) any compliance or noncompliance with any HSE Law in connection with the operation of the Honeywell Business or any Honeywell Asset, (ii) any Release of any Hazardous Material at, on, under, from or to any real property constituting a Honeywell Asset (including any exposure to, or further Release to any other location of, such Hazardous Material), (iii) any Release, offsite transportation, storage, disposal, treatment or recycling (or arrangement for such activities) of Hazardous Material in connection with the operation of the Honeywell Business (including any exposure to, or further Release to any other location of, such Hazardous Material) or (iv) any alleged personal or property exposure to Hazardous Materials (including, without limitation, those contained in any products currently or formerly manufactured, sold, distributed or marketed) in connection with the operation of the Honeywell Business or any Honeywell Asset or (b) otherwise resulting from or relating to the Honeywell Business or Honeywell Asset.

"Honeywell Indemnitees" has the meaning set forth in Section 7.02.

"Honeywell IP" means all Intellectual Property Rights owned by any member of the Honeywell Group or the SpinCo Group as of immediately prior to the Distribution, other than the SpinCo IP, including all rights to prosecute and perfect the foregoing through administrative prosecution, registration, recordation, or other proceeding, and all causes of action and rights to sue or seek other remedies arising from or relating to the foregoing, including for any past or ongoing infringement, misuse, or misappropriation.

"Honeywell Liabilities" means, without duplication, the following Liabilities:

(a) all Liabilities of the Honeywell Group;

(b) all Liabilities to the extent relating to, arising out of or resulting from:

(i) the operation or conduct of the Honeywell Business as conducted at any time prior to the Distribution (including any Liability to the extent relating to, arising out of or resulting from any act or failure to act by any director, officer, employee, agent or representative (whether or not such act or failure to act is or was within such Person's authority), which act or failure to act relates to the Honeywell Business);

(ii) the operation or conduct of the Honeywell Business or any other business conducted by Honeywell or any other member of the Honeywell Group at any time after the Distribution (including any Liability relating to, arising out of or resulting from any act or failure to act by any director, officer, employee, agent or representative (whether or not such act or failure to act is or was within such Person's authority)); or

(iii) the Honeywell Assets;

(c) the Honeywell Retained Liabilities;

(d) all Honeywell HSE Liabilities;

(e) any obligations related to the Honeywell Portion of any Shared Contract;

(f) any Liabilities that are determined by Honeywell, in good faith prior to the Distribution, to be primarily related to the business or operations of the Honeywell Business (unless otherwise expressly provided in this Agreement); and

(g) all Liabilities to the extent relating to, arising out of or resulting from any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, with respect to the Honeywell Disclosure Sections.

Notwithstanding the foregoing, the Honeywell Liabilities shall not include the SpinCo Liabilities.

"Honeywell Policy Pre-Separation Insurance Claim" means any (a) claim made against the SpinCo Group or Honeywell Group and reported to the applicable insurer(s) prior to the Distribution Date in respect of an act or omission occurring prior to the Distribution Date that results in a Liability under a "claims-made-based" insurance policy of the Honeywell Group in effect prior to the Distribution Date or any extended reporting period thereof or (b) Action (whether made prior to, on or following the Distribution Date) in respect of a Liability occurring prior to the Distribution Date under an "occurrence-based" insurance policy of any member of the Honeywell Group in effect prior to the Distribution Date.

"Honeywell Portion" has the meaning set forth in Section 2.05(a).

"Honeywell Retained Assets" means the Assets to be retained by the Honeywell Group set forth on Schedule II.

"Honeywell Retained Liabilities" means the Liabilities to be retained by the Honeywell Group set forth on Schedule III.

"HSE Law" means any Law or Governmental Approvals, or any standard used by a Governmental Authority pursuant to any Law or Governmental Approvals, relating to (i) pollution, (ii) protection or restoration of the indoor or outdoor environment or natural resources, (iii) the transportation, treatment, storage or Release of, or exposure to, hazardous or toxic materials, (iv) the registration, manufacturing, sale, labeling or distribution of hazardous or toxic materials or products containing such materials (including the REACH Regulation and similar requirements), (v) process safety management or (vi) the protection of the public, worker health and safety or threatened or endangered species.

"HSE Liabilities" means all Liabilities relating to Hazardous Materials or relating to or arising under any applicable HSE Law or Governmental Approvals required or issued thereunder (including in either case any such Liability for corrective actions, removal, remediation or cleanup costs, investigation, monitoring or sampling obligations or costs, response

costs, financial assurance obligations or costs, natural resources damages, medical and other costs related to personal injuries, property damage, costs, fines, penalties or other sanctions).

"Indemnification Agreement" means the Indemnification and Reimbursement Agreement dated as of [ ], 2018 by and among (i) New HAPI Inc., a corporation organized under the Laws of the State of Delaware and (ii) Honeywell and the guarantee in respect of such Indemnification and Reimbursement Agreement entered into by each such party and the guarantor parties listed therein.

"Indemnifying Party" has the meaning set forth in Section 7.04(a).

"Indemnitee" has the meaning set forth in Section 7.04(a).

"Indemnity Payment" has the meaning set forth in Section 7.04(a).

"Information" means information, whether or not patentable, copyrightable or protectable as a trade secret, in written, oral, electronic or other tangible or intangible forms, stored in any medium now known or yet to be created, including studies, reports, records, books, Contracts, instruments, surveys, analyses, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, data, computer data, disks, diskettes, tapes, computer programs or other software, marketing plans, customer names, communications (including those by or to attorneys (whether or not subject to the attorney-client privilege)), memos and other materials (including those prepared by attorneys or under their direction (whether or not constituting attorney work product)) and other technical, financial, employee or business information or data, documents, correspondence, materials and files, in each case excluding any Intellectual Property Rights therein.

"Information Statement" means the Information Statement sent to the holders of Honeywell Common Stock in connection with the Distribution, as such Information Statement may be amended from time to time.

"Insurance Proceeds" means those monies:

(a) received by an insured (or its successor-in-interest) from an insurance carrier;

(b) paid by an insurance carrier on behalf of the insured (or its successor-in-interest); or

(c) received (including by way of setoff) from any third party in the nature of insurance, contribution or indemnification in respect of any Liability;

in any such case net of any applicable premium adjustments (including reserves and retrospectively rated premium adjustments), net of any costs or expenses incurred in the collection thereof and net of any Taxes resulting from the receipt thereof.

"Intellectual Property Rights" means any and all intellectual property rights existing anywhere in the world, whether registered or unregistered, including such rights in and to any and all (a) Patents, invention disclosures and inventions, (b) Trademarks, (c) Copyrights, (d) Domain Names, (e) Software and (f) Trade Secrets.

"Intended Tax Treatment" has the meaning set forth in the Tax Matters Agreement.

"Intellectual Property License Agreement" means the Intellectual Property License Agreement dated as of the date of this Agreement by and between the Parties hereto.

"Intercompany Accounts" has the meaning set forth in Section 2.03(a).

"Intercompany Agreements" has the meaning set forth in Section 2.03(a).

"Intercompany Leases" means the real property leases by and between (i) a member of the Honeywell Group, as lessor, and a member of the SpinCo Group, as lessee, or (ii) a member of the SpinCo Group, as lessor, and a member of the Honeywell Group, as lessee, in each case, as set forth on Schedule XVII under the caption "Leases."

"Intercompany Subleases" means the real property subleases (i) by and between a member of the Honeywell Group, as sublessor, and a member of the SpinCo Group, as sublessee, and (ii) by and between a member of the SpinCo Group, as sublessor, and a member of the Honeywell Group, as sublessee (if any), in each case as set forth on Schedule XVII under the caption "Subleases."

"Intercompany Real Estate Licenses" means the real property licenses by and between a member of the Honeywell Group and a member of the SpinCo Group set forth on Schedule XVII under the caption "Real Estate Licenses."

"IP Documentation" means all Intellectual Property Rights prosecution files, registration certificates, litigation files, and related opinions of counsel and correspondence relating thereto.

"Joint Actions" has the meaning set forth in Section 7.10(c).

"Key Role" has the meaning set forth in Section 10.02.

"Law" means any statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, Governmental Approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing by, any Governmental Authority, whether now or hereinafter in effect and, in each case, as amended.

"Lease Assignments" means the assignments of real property leases and subleases by and between a member of the Honeywell Group, as assignor, and a member of the SpinCo Group, as assignee, in each case as set forth on Schedule XVII under the caption "Lease Assignments".

"Liabilities" means any and all claims, debts, demands, actions, causes of action, suits, damages, fines, penalties, obligations, prohibitions, accruals, accounts payable, reckonings, bonds, indemnities and similar obligations, agreements, promises, guarantees, make-whole agreements and similar obligations, and other liabilities and requirements, including all contractual obligations, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, and including those arising under any Law, Action, threatened or contemplated Action or any award of any arbitrator or mediator of any kind, and those arising under any Contract, including those arising under this Agreement, in each case, whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of any Person. For the avoidance of doubt, Liabilities shall include attorneys' fees, the costs and expenses of all assessments, judgments, settlements and compromises, and any and all other costs and expenses whatsoever reasonably incurred in connection with anything contemplated by the preceding sentence (including costs and expenses incurred in investigating, preparing or defending against any such Actions or threatened or contemplated Actions).

"Local Transfer Agreement" means any agreement set forth on Schedule XXVII.

"Mixed Action" means (x) any Action identified on Schedule XXI or (y) any other Action in respect of which an Indemnifying Party may be obligated to provide indemnification pursuant to this Agreement that involves both Honeywell Assets or Honeywell Liabilities, on the one hand, and SpinCo Assets or SpinCo Liabilities, on the other hand.

"Ongoing Relationship Agreements" means the ADI Supply Agreement by and between Honeywell and Ademco Inc., the Products Supply Agreement by and between Honeywell and Ademco Inc., the Transition Manufacturing Agreement by and between Honeywell and Ademco Inc. and the Services Agreements, in each case, dated as of the date hereof, including all side letters or other agreements relating to each such agreement.

"Party" means either party hereto, and "Parties" means both parties hereto.

"Patent License Agreement" means the Patent Cross-License Agreement dated as of the date of this Agreement by and between the Parties hereto.

"Patents" means patents (including all reissues, divisionals, continuations, continuations-in-part, reexaminations, substitutions and extensions thereof), utility models, patent registrations and applications, including provisional applications and statutory invention registrations.

"Person" means an individual, a general or limited partnership, a corporation, a trust, a joint venture, an unincorporated organization, a limited liability company, any other entity and any Governmental Authority.

"Plan of Reorganization" has the meaning set forth in Section 2.01(a).

"REACH Regulation" means Regulation (EC) No. 1907/2006 on the Registration, Evaluation, Authorisation and Restriction of Chemicals, including any implementing legislation or regulations, in each case as may be amended.

"Real Estate Separation Documents" means the Intercompany Leases, the Intercompany Subleases, the Intercompany Real Estate Licenses and the Lease Assignments.

"Record Date" means the close of business on the date determined by the Honeywell board of directors as the record date for determining the shares of Honeywell Common Stock in respect of which shares of SpinCo Common Stock will be distributed pursuant to the Distribution.

"Record Holders" has the meaning set forth in Section 6.01(b).

"Release" means any actual or threatened release, spill, emission, discharge, flow (whether through constructed or natural ditches, pipes, watercourses, overland flows or other means of conveyance), leaking, pumping, pouring, dumping, injection, deposit, disposal, dispersal, leaching or migration into or through the indoor or outdoor environment (including ambient air, surface water, groundwater and surface or subsurface strata); provided that, for the avoidance of doubt, mere vehicular transportation from an initial location to an offsite location, without more, shall not be deemed to constitute a Release from that initial location to the offsite location.

"Reorganization" means the transactions described in the Plan of Reorganization.

"Representative" has the meaning set forth in Section 8.09.

"Security Interest" means any mortgage, security interest, pledge, lien, charge, claim, option, right to acquire, voting or other restriction, right-of-way, covenant, condition, easement, encroachment, restriction on transfer or other encumbrance of any nature whatsoever.

"Separation" means (a) the Reorganization and (b) any other transfers of Assets and assumptions of Liabilities, in each case, between a member of one Group and a member of the other Group, provided for in this Agreement or in any Ancillary Agreement.

"Services Agreements" means those agreements set forth on Schedule XXVIII.

"Shared Contract" means any Contract of any member of either Group with a third party that relates in any material respect to both the SpinCo Business and the Honeywell Business, including those set forth on Schedule XIII.

"Software" means any and all (a) computer programs and applications, including any and all software implementations of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) computerized databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, in each case, related to the items listed in the foregoing clause (a) and (d) all documentation including user manuals and other training documentation related to any of the items listed in the foregoing clause (a).

"Specified Liabilities" means Claims (as defined in the Indemnification Agreement).

"SpinCo" has the meaning set forth in the preamble.

"SpinCo Account" means any bank and brokerage account owned by SpinCo or any other member of the SpinCo Group, including the SpinCo Accounts listed or described in Schedule XIV.

"SpinCo Assets" means, without duplication, the following Assets:

(a) all Assets held by the SpinCo Group (other than Intellectual Property Rights);

(b) all interests in the capital stock of, or other equity interests in, the members of the SpinCo Group (other than SpinCo) and all other equity, partnership, membership, joint venture and similar interests set forth on Schedule IV under the caption "Joint Ventures and Minority Investments";

(c) all Assets (other than Intellectual Property Rights) reflected on the SpinCo Business Balance Sheet, and all Assets (other than Intellectual Property Rights) acquired after the date of the SpinCo Business Balance Sheet that, had they been acquired on or before such date and owned as of such date, would have been reflected on the SpinCo Business Balance Sheet if prepared in accordance with GAAP applied on a consistent basis, subject to any dispositions of such Assets subsequent to the date of the SpinCo Business Balance Sheet;

(d) the Assets listed or described on Schedule V;

(e) the rights related to the SpinCo Portion of any Shared Contract;

(f) the SpinCo Real Property;

(g) the SpinCo IP and any IP Documentation related exclusively thereto;

(h) all other Assets that are expressly provided by this Agreement or any Ancillary Agreement as Assets to be assigned to or retained by, or allocated to, any member of the SpinCo Group; and

(i) all Assets (other than Intellectual Property Rights or IP Documentation) held by a member of the Honeywell Group that are determined by Honeywell, in good faith prior to the Distribution, to be primarily related to or used or held for use primarily in connection with the business or operations of the SpinCo Business (unless otherwise expressly provided in connection with this Agreement).

Notwithstanding the foregoing, the SpinCo Assets shall not include (i) any Honeywell Retained Assets or (ii) any Assets that are determined by Honeywell, in good faith prior to the Distribution, to arise primarily from the business or operations of the Honeywell Business (unless otherwise expressly provided in this Agreement).

"SpinCo Business" means the provision of products, solutions, and technologies that control residential energy efficiency, safety, and security, with a portfolio of connected devices and software, as well as wholesale distribution of security and low voltage products, in each case, as conducted by Honeywell and its Affiliates prior to the Distribution, including as described in the Information Statement; provided that the SpinCo Business shall not include any Former Business.

"SpinCo Business Balance Sheet" means the balance sheet of the SpinCo Business, including the notes thereto, as of [ ], included in the Information Statement.

"SpinCo Common Stock" means the common stock, $0.001 par value per share, of SpinCo.

"SpinCo Copyrights" means (i) unregistered Copyrights that are owned by any member of the Honeywell Group or the SpinCo Group as of immediately prior to the Distribution and that are exclusively used in or related to the SpinCo Business and (ii) the registered or applied-for Copyrights identified on Schedule VI.

"SpinCo Credit Support Instruments" has the meaning set forth in Section 4.02(a).

"SpinCo Domain Names" means the Domain Names listed on Schedule VII.

"SpinCo Entities" means the entities, the equity, partnership, membership, limited liability, joint venture or similar interests of which are set forth on Schedule IV under the caption "Joint Ventures and Minority Investments."

"SpinCo Group" means (a) SpinCo, (b) each Person that will be a Subsidiary of SpinCo immediately prior to the Distribution, including the entities set forth on Schedule IV under the caption "Subsidiaries", (c) each Person set forth on Schedule IV under the caption "Other" and (d) each Person that becomes a Subsidiary of SpinCo after the Distribution, including in each case any Person that is merged or consolidated with or into SpinCo or any Subsidiary of SpinCo and any Person that becomes a Subsidiary of SpinCo as a result of transactions that occur following the Distribution in accordance with the Plan of Reorganization.

"SpinCo HSE Liabilities" means any HSE Liability, whether occurring or arising prior to, on or after the Distribution Date, (x) of the SpinCo Group or (y) to the extent (a) resulting from or otherwise relating to (i) any compliance or noncompliance with any HSE Law in connection with the operation of the SpinCo Business or any SpinCo Real Property, (ii) any Release, transportation, storage, disposal, treatment or recycling (or arrangement for such activities) of any Hazardous Material at, on, under, from or to any SpinCo Real Properties (regardless of the source, or location of the impact, of such Release), including any exposure to, or further Release to any other location of, such Hazardous Material, (iii) any Release, transportation, storage, disposal, treatment or recycling (or arrangement for such activities) of Hazardous Material at any third-party location in connection with the operation of the SpinCo Business (including any exposure to, or further Release to any other location of, such Hazardous Material), (iv) any exposure to Hazardous Materials (including those contained in any products manufactured, sold, distributed or marketed) in connection with the SpinCo Business or any SpinCo Asset, (v) compliance with the requirements of any real property transfer law associated with the Distribution or (vi) the transferred sites listed on Schedule XII or (b) otherwise resulting from or relating to the SpinCo Business or any SpinCo Asset; provided, that, for the avoidance of doubt, any HSE Liability that is a Specified Liability, regardless of whether or not such HSE Liability resulted from, related to or was in connection with the SpinCo Business shall not constitute a SpinCo HSE Liability.

"SpinCo IDs" means the invention disclosures listed or described on Schedule VIII.

"SpinCo Indemnitees" has the meaning set forth in Section 7.03.

"SpinCo IP" means (a) the SpinCo Patents, (b) the SpinCo Copyrights, (c) the SpinCo Domain Names, (d) the SpinCo Trade Secrets, (e) the SpinCo Trademarks, (f) the SpinCo IDs, (g) all other Intellectual Property Rights (other than Patents) owned by any member of the Honeywell Group or the SpinCo Group as of immediately prior to the Distribution that are exclusively used in or related to the SpinCo Business and (h) including in each case of the foregoing (a)-(g), all rights to prosecute and perfect the foregoing through administrative prosecution, registration, recordation, or other proceeding, and all causes of action and rights to sue or seek other remedies arising from or relating to the foregoing, including for any past or ongoing infringement, misuse, or misappropriation.

"SpinCo Liabilities" means, without duplication, the following Liabilities:

(a) all Liabilities of the SpinCo Group and the SpinCo Entities;

(b) all Liabilities to the extent relating to, arising out of or resulting from:

(i) the operation or conduct of the SpinCo Business as conducted at any time prior to the Distribution (including any Liability to the extent relating to, arising out of or resulting from any act or failure to act by any director, officer, employee, agent or representative (whether or not such act or failure to act is or was within such Person's authority), which act or failure to act relates to the SpinCo Business);

(ii) the operation or conduct of the SpinCo Business or any other business conducted by SpinCo or any other member of the SpinCo Group at any time after the Distribution (including any Liability relating to, arising out of or resulting from any act or failure to act by any director, officer, employee, agent or representative (whether or not such act or failure to act is or was within such Person's authority)); or

(iii) the SpinCo Assets;

(c) all Liabilities reflected as liabilities or obligations on the SpinCo Business Balance Sheet, and all Liabilities arising or assumed after the date of the SpinCo Business Balance Sheet that, had they arisen or been assumed on or before such date and been existing obligations as of such date, would have been reflected on the SpinCo Business Balance Sheet if prepared in accordance with GAAP applied on a consistent basis, subject to any discharge of such Liabilities subsequent to the date of the SpinCo Business Balance Sheet;

(d) all SpinCo HSE Liabilities;

(e) the Liabilities listed or described on Schedule X;

(f) the obligations related to the SpinCo Portion of any Shared Contract;

(g) all other Liabilities that are expressly provided by this Agreement or any Ancillary Agreement as Liabilities to be assumed or retained by, or allocated to, any member of the SpinCo Group; and

(h) all Liabilities to the extent relating to, arising out of or resulting from any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, with respect to all information contained in, or incorporated by reference into, the Form 10 and any other documents filed with the Commission in connection with the Spin-Off or as contemplated by this Agreement, other than with respect to the Honeywell Disclosure Sections.

Notwithstanding the foregoing, the SpinCo Liabilities shall not include (i) any Honeywell Retained Liabilities or (ii) any Liabilities that are determined by Honeywell, in good faith prior to the Distribution, to be primarily related to the business or operations of the Honeywell Business (unless otherwise expressly provided in this Agreement).

"SpinCo Patents" means the Patents listed on Exhibit A to the Patent License Agreement.

"SpinCo Policy Pre-Separation Insurance Claim" means any (a) claim made against the SpinCo Group or Honeywell Group and reported to the applicable insurer(s) prior to the Distribution Date in respect of an act or omission occurring prior to the Distribution Date that results in a Liability under a "claims-made-based" insurance policy of the SpinCo Group in effect prior to the Distribution Date or any extended reporting period thereof or (b) Action (whether made prior to, on or following the Distribution Date) in respect of a Liability occurring prior to the Distribution Date under an "occurrence-based" insurance policy of any member of the SpinCo Group in effect prior to the Distribution Date.

"SpinCo Portion" has the meaning set forth in Section 2.05(a).

"SpinCo Real Property" means the real property and real property interests identified in Schedule XI, and any fixtures or appurtenances associated therewith.

"SpinCo Trade Secrets" means the Trade Secrets that are owned by any member of the Honeywell Group or SpinCo Group as of immediately prior to the Distribution and that are exclusively used in or related to the SpinCo Business.

"SpinCo Trademarks" means the Trademarks identified on Schedule IX.

"Spin-Off" means the Separation and the Distribution.

"Subsidiary" of any Person means any corporation or other organization whether incorporated or unincorporated of which at least a majority of the securities or interests having by the terms thereof ordinary voting power to elect at least a majority of the board of directors or others performing similar functions with respect to such corporation or other organization, is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Surviving Honeywell Credit Support Instruments" has the meaning set forth in Section 4.01(a).

"Surviving SpinCo Credit Support Instruments" has the meaning set forth in Section 4.02(a).

"Tax Opinion Representations" has the meaning set forth in the Tax Matters Agreement.

"Taxes" has the meaning set forth in the Tax Matters Agreement.

"Third-Party Claim" means any written assertion by a Person (including any Governmental Authority) who is not a member of the Honeywell Group or the SpinCo Group of any claim, or the commencement by any such Person of any Action, against any member of the Honeywell Group or the SpinCo Group.

"Third-Party Proceeds" has the meaning set forth in Section 7.04(a).

"Tax Matters Agreement" means the Tax Matters Agreement dated as of the date of this Agreement by and between Honeywell and SpinCo.

"Trade Secrets" means all (i) confidential or proprietary information and (ii) all other forms and types of financial, business, scientific, technical, economic or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, know-how, programs or codes, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, to the extent that the owner thereof has taken reasonable measures to keep such information secret and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

"Trademark License Agreement" means the Trademark License Agreement dated as of the date of this Agreement between Honeywell and SpinCo.

"TSA" means the Transition Services Agreement, dated as of the date hereof, between Honeywell and Ademco Inc.

"Trademarks" means trademarks, service marks, trade names, logos, slogans, trade dress or other source identifiers, including any registration or any application for registration therefor, together with all goodwill associated therewith.

## ARTICLE II

## THE SEPARATION

Section 2.01 Transfer of Assets and Assumption of Liabilities.

(a) In accordance with the plan and structure set forth on Schedule I (such plan and structure being referred to herein as the "Plan of Reorganization") and to the extent not previously effected pursuant to the steps of the Plan of Reorganization that have been completed prior to the date of this Agreement, subject to Section 2.01(e), prior to the Distribution, the Parties shall, and shall cause their respective Group members to, execute such instruments of assignment or transfer and take such other corporate actions as are necessary to:

(i) transfer and convey to one or more members of the SpinCo Group all of the right, title and interest of the Honeywell Group in, to and under all SpinCo Assets not already owned by the SpinCo Group,

(ii) transfer and convey to one or more members of the Honeywell Group all of the right, title and interest of the SpinCo Group in, to and under all Honeywell Assets not already owned by the Honeywell Group,

(iii) cause one or more members of the SpinCo Group to assume all of the SpinCo Liabilities to the extent such Liabilities would otherwise remain obligations of any member of the Honeywell Group, and

(iv) cause one or more members of the Honeywell Group to assume all of the Honeywell Liabilities to the extent such Liabilities would otherwise remain obligations of any member of the SpinCo Group, in each case of clauses (i) through (iv) in the manner contemplated by the Plan of Reorganization.

Notwithstanding anything to the contrary, neither Party shall be required to transfer any Information except as required by Article VIII or any insurance policies which are the subject of Article IX; provided, that any Information in respect of the Specified Liabilities shall be governed by the Indemnification Agreement.

(b) In the event that it is discovered after the Distribution that there was an omission of (i) the transfer or conveyance by SpinCo (or a member of the SpinCo Group) to, or the acceptance or assumption by, Honeywell (or a member of the Honeywell Group) of any Honeywell Asset or Honeywell Liability, as the case may be, (ii) the transfer or conveyance by Honeywell (or a member of the Honeywell Group) to, or the acceptance or assumption by, SpinCo (or a member of the SpinCo Group) of any SpinCo Asset or SpinCo Liability, as the case may be, or (iii) the transfer or conveyance by one Party (or any other member of its Group) to, or the acceptance or assumption by, the other Party (or any other member of its Group) of any Asset or Liability, as the case may be, that, had the Parties given specific consideration to such Asset or Liability prior

to the Distribution, would have otherwise been so transferred, conveyed, accepted or assumed, as the case may be, pursuant to this Agreement and the Ancillary Agreements the Parties shall use reasonable best efforts to promptly effect such transfer, conveyance, acceptance or assumption of such Asset or Liability, as the case may be. Any transfer, conveyance, acceptance or assumption made pursuant to this Section 2.01(b) shall be treated by the Parties for all purposes as if it had occurred prior to the Distribution, except as otherwise required by applicable Law or a Determination.

(c) In the event that it is discovered after the Distribution that there was a transfer or conveyance (i) by SpinCo (or a member of the SpinCo Group) to, or the acceptance or assumption by, Honeywell (or a member of the Honeywell Group) of any SpinCo Asset or SpinCo Liability, as the case may be, or (ii) by Honeywell (or a member of the Honeywell Group) to, or the acceptance or assumption by, SpinCo (or a member of the SpinCo Group) of any Honeywell Asset or Honeywell Liability, as the case may be, the Parties shall use reasonable best efforts to promptly transfer or convey such Asset or Liability back to the transferring or conveying Party or to rescind any acceptance or assumption of such Asset or Liability, as the case may be. Any transfer or conveyance made or acceptance or assumption rescinded pursuant to this Section 2.01(c) shall be treated by the Parties for all purposes as if such Asset or Liability had never been originally transferred, conveyed, accepted or assumed, as the case may be, except as otherwise required by applicable Law or a Determination.

(d) To the extent that any transfer or conveyance of any Asset (other than Shared Contracts, which are governed solely by Section 2.05; or the leasehold interests, subleasehold interests, license interests or other real property interests under the Real Estate Separation Documents, which are governed solely by Section 2.04); or acceptance or assumption of any Liability (other than Shared Contracts, which are governed solely by Section 2.05; or the leasehold interests, subleasehold interests, license interests or other real property interests under the Real Estate Separation Documents, which are governed solely by Section 2.04) required by this Agreement to be so transferred, conveyed, accepted or assumed shall not have been completed prior to the Distribution, the Parties shall use reasonable best efforts to effect such transfer, conveyance, acceptance or assumption as promptly following the Distribution as shall be practicable. Nothing in this Agreement shall be deemed to require the transfer or conveyance of any Assets or the acceptance or assumption of any Liabilities which by their respective terms (or the terms of any Contract relating to such Asset or Liability) or operation of Law cannot be so transferred, conveyed, accepted or assumed; provided, however, that the Parties shall use reasonable best efforts to obtain any necessary Governmental Approvals and other Consents for the transfer, conveyance, acceptance or assumption (as applicable) of all Assets and Liabilities required by this Agreement to be so transferred, conveyed, accepted or assumed. In the event that any such transfer, conveyance, acceptance or assumption (as applicable) has not been completed effective as of the Distribution, the Party retaining such Asset or Liability (or the member of the Party's Group retaining such Asset or Liability) shall thereafter hold such Asset for the use and benefit of the Party entitled thereto (at the expense of the Party entitled thereto) and retain such Liability for the account, and at the expense, of the Party by whom such Liability should have been assumed or accepted pursuant to this Agreement, and take such other actions as may be reasonably requested by the Party to which (or to the Group of which) such Asset should have been transferred or conveyed, or by whom (or by the Group of whom) such Liability should have been assumed or accepted, as the case may be, in order to place such Party or the member of its Group,

insofar as reasonably possible, in the same position as would have existed had such Asset or Liability been transferred, conveyed, accepted or assumed (as applicable) as and when contemplated by this Agreement, including in respect of possession, use, risk of loss, potential for gain and control over such Asset or Liability, as the case may be. As and when any such Asset or Liability becomes transferable or assumable, as the case may be, each Party shall, and shall cause the members of its Group to, use reasonable best efforts to promptly effect such transfer, conveyance, acceptance or assumption (as applicable). Any transfer, conveyance, acceptance or assumption made pursuant to this Section 2.01(d) shall be treated by the Parties for all purposes as if it had occurred immediately prior to the Distribution, except as otherwise required by applicable Law or a Determination.

(e) The Party retaining any Asset or Liability due to the deferral of the transfer and conveyance of such Asset or the deferral of the acceptance and assumption of such Liability pursuant to this Section 2.01 or otherwise shall not be obligated by this Agreement, in connection with this Section 2.01, to expend any money or take any action that would require the expenditure of money unless and to the extent the Party or the member of the Party's Group entitled to receive such Asset or intended to assume such Liability, as applicable, advances or agrees to reimburse it for the applicable expenditures.

(f) Without limiting any other provision hereof, in connection with the reorganization contemplated by Section 2.01(b), each of Honeywell and SpinCo will take, and will cause each member of its respective Group to take, such actions as are reasonably necessary to consummate the transactions contemplated by the Plan of Reorganization (whether prior to, at or after the Distribution). The Parties agree that the steps described in the Plan of Reorganization shall be effected in the order and manner prescribed in the Plan of Reorganization.

(g) In the event that Honeywell determines to seek novation with respect to any SpinCo Liability, SpinCo shall reasonably cooperate with, and shall cause the members of the SpinCo Group to reasonably cooperate with, Honeywell and the members of the Honeywell Group (including, where necessary, entering into appropriate instruments of assumption and, where necessary, SpinCo providing parent guarantees in support of the obligations of other members of the SpinCo Group) to cause such novation to be obtained, on terms reasonably acceptable to SpinCo, and to have Honeywell and the members of the Honeywell Group released from all liability to third parties arising after the date of such novation and in the event SpinCo determines to seek novation with respect to any Honeywell Liability, Honeywell shall reasonably cooperate with, and shall cause the members of the Honeywell Group to reasonably cooperate with, SpinCo and the members of the SpinCo Group (including, where necessary, entering into appropriate instruments of assumption and, where necessary, Honeywell providing parent guarantees in support of the obligations of other members of the Honeywell Group) to cause such novation to be obtained, on terms reasonably acceptable to Honeywell, and to have SpinCo and the members of the SpinCo Group released from all liability to third parties arising after the date of such novation; provided that neither Party nor any member of its Group shall be required to contribute capital, pay or grant any consideration or concession in any form (including providing any letter of credit, guaranty or other financial accommodation) to any Person in order to cause such novation to be obtained (other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be reimbursed by the Party or the member of the Party's Group entitled to such Asset or intended to assume such Liability, as applicable, as promptly as reasonably practicable).

Section 2.02 Certain Matters Governed Exclusively by Ancillary Agreements. Each of Honeywell and SpinCo agrees on behalf of itself and the members of its Group that, except as explicitly provided in this Agreement or any Ancillary Agreement, (a) the Tax Matters Agreement shall exclusively govern all matters relating to Taxes between such parties (except to the extent that tax matters relating to employee and employee benefits-related matters are addressed in the Employee Matters Agreement), (b) the Employee Matters Agreement shall exclusively govern the allocation of Assets and Liabilities related to employee and employee compensation and benefits-related matters, including the outstanding awards (equity- and cash-based) under existing equity plans with respect to employees and former employees of members of both the Honeywell Group and the SpinCo Group (except to the extent that employee compensation and benefits-related reimbursements are addressed in the TSA) (it being understood that any such Assets and Liabilities, as allocated pursuant to the Employee Matters Agreement, shall constitute SpinCo Assets, SpinCo Liabilities, Honeywell Assets or Honeywell Liabilities, as applicable, hereunder and shall be subject to Article VII hereof), (c) the TSA shall exclusively govern all matters relating to the provision of certain services identified therein to be provided by each Party to the other on a transitional basis following the Distribution, (d) the Ongoing Relationship Agreements shall exclusively govern all matters relating to the provision of certain services and products identified therein to be provided by each Party to the other following the Distribution in accordance with the terms thereof, and (e) the Indemnification Agreement shall exclusively govern all matters relating to indemnification by the SpinCo Group with respect to, management of Actions and dissemination of Information relating to and control of privileges and immunities in connection with or with respect to, the Specified Liabilities. Except as set forth in this Section 2.02, in the event and to the extent that there shall be a conflict between the provisions of this Agreement and the provisions of any Ancillary Agreement or Ongoing Relationship Agreement, the provisions of this Agreement shall control (unless the Ancillary Agreement or Ongoing Relationship Agreement explicitly provides otherwise).

Section 2.03 Termination of Agreements.

(a) Except as set forth in Section 2.03(b) or Section 2.03(c) or as otherwise provided by the Plan of Reorganization, in furtherance of the releases and other provisions of Section 7.01, effective as of the Distribution, SpinCo and each other member of the SpinCo Group, on the one hand, and Honeywell and each other member of the Honeywell Group, on the other hand, hereby terminate any and all Contracts, arrangements, commitments and understandings, oral or written between such parties and in existence as of the Distribution Date ("Intercompany Agreements"), including all intercompany accounts payable or accounts receivable in effect or accrued as of the Distribution Date ("Intercompany Accounts"). No such terminated Intercompany Agreement or Intercompany Account (including any provision thereof that purports to survive termination) shall be of any further force or effect after the Distribution Date. Each Party shall, at the reasonable request of the other Party, take, or cause to be taken, such other actions as may be necessary to effect the foregoing. The Parties, on behalf of the members of their respective Groups, hereby waive any advance notice provision or other termination requirements with respect to any Intercompany Agreement.

(b) The provisions of Section 2.03(a) shall not apply to any of the following Intercompany Agreements or Intercompany Accounts (or to any of the provisions thereof): (i) this Agreement, the Ancillary Agreements and the Ongoing Relationship Agreements (and each other Intercompany Agreement or Intercompany Account expressly contemplated by this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement to be entered into by either Party or any other member of its Group); (ii) any Intercompany Agreements to which any third party is a party, including any Shared Contracts; (iii) any other Intercompany Agreements or Intercompany Accounts that this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement expressly contemplates will survive the Distribution Date; and those Intercompany Agreements and Intercompany Accounts set forth on Schedule XVIII.

(c) In connection with the termination of Intercompany Accounts described in Section 2.03(a), each of Honeywell and SpinCo shall cause each Intercompany Account between a member of the SpinCo Group, on the one hand, and a member of the Honeywell Group, on the other hand, outstanding as of the close of business on the business day immediately prior to the date of the Distribution to be settled on a net basis (whether via a dividend, a capital contribution, a combination of the foregoing or as otherwise agreed), in each case prior to the close of business on the date of the Distribution (except such Intercompany Accounts set forth on Schedule XVIII or any such intercompany payables or receivables arising pursuant to an Ancillary Agreement, an Ongoing Relationship Agreement or any other Intercompany Agreement that this Agreement, any Ancillary Agreement or Ongoing Relationship Agreement expressly contemplates will survive the Distribution Date, which shall instead be settled in accordance with the terms of Schedule XVIII, such Ancillary Agreement, such Ongoing Relationship Agreement or other Intercompany Agreement); provided that all intercompany balances set forth on Schedule XXVI shall be forgiven without any settlement or other action on the part of either of the Parties or the respective members of their respective Groups.

(d) (i) Honeywell and SpinCo each agrees to take, or cause the respective members of their respective Groups to take, prior to the Distribution (or as promptly as reasonably practicable thereafter), all actions necessary to amend all contracts or agreements governing (x) the Honeywell Accounts so that such Honeywell Accounts, if linked (whether by automatic withdrawal, automatic deposit or any other authorization to transfer funds from or to, hereinafter "linked") to any SpinCo Account, are de-linked from such SpinCo Accounts and (y) the SpinCo Accounts so that such SpinCo Accounts, if linked to any Honeywell Account, are de-linked from such Honeywell Accounts.

(ii) With respect to any outstanding checks issued by, or payments made by, Honeywell, SpinCo or any of their respective Subsidiaries prior to the Distribution, such outstanding checks shall be honored from and after the Distribution by the Person or Group owning the account on which the check is drawn, without limiting the ultimate allocation of Liability for such amounts under this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement.

(iii) As between Honeywell and SpinCo (and the members of their respective Groups), except to the extent prohibited by applicable Law or a Determination, all payments and reimbursements received after the Distribution by either Party (or a member of its Group) to which the other Party (or a member of its Group) is entitled under this Agreement, shall be held by such Party (or the applicable member of its Group) in trust for the use and benefit of the Person entitled thereto and, within 60 days of receipt by such Party (or the applicable member of its Group) of any such payment or reimbursement, such Party shall pay over, or shall cause the applicable member of its Group to pay over to the other Party (or the applicable member of its Group), the amount of such payment or reimbursement without right of setoff.

(e) Each of Honeywell and SpinCo shall, and shall cause their respective Subsidiaries to, take all necessary actions to remove each of SpinCo and SpinCo's Subsidiaries from all Cash Management Arrangements to which it is a party, in each case prior to the close of business on the business day immediately prior to the Distribution Date.

Section 2.04 Real Estate Separation Documents. Prior to the Distribution, the Parties shall, and shall cause their respective applicable Group members to, use reasonable best efforts to obtain and make any necessary Consents and enter into the Real Estate Separation Documents to make the Real Estate Separation Documents effective at or prior to the Distribution; provided, however, that nothing in this Agreement shall be deemed to require entering into any Real Estate Separation Document unless and until any necessary Consents are obtained or made, as applicable; provided further that neither Party nor any member of its Group shall be required to contribute capital, pay or grant any consideration or concession in any form (including providing any letter of credit, guaranty or other financial accommodation or the relinquishment or forbearance of any rights) to any Person in order to obtain or make any such Consent (other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees). In the event any such Consents have not been obtained prior to the Distribution, the Parties shall use reasonable best efforts to obtain or make such Consent as promptly as reasonably practicable following the Distribution and, upon receipt of such Consent, shall execute the applicable Real Estate Separation Document. If any Real Estate Separation Document is not effective prior to the Distribution, then the Parties shall, and shall cause their respective Group members to, cooperate in any reasonable and permissible arrangement to provide that, following the Distribution and until such time as the effectiveness of the applicable Real Estate Separation Document shall cease (or, with respect to any Lease Assignment, until the expiration or earlier termination of the real property lease subject to such Lease Assignment), a member of the SpinCo Group shall receive the interest in the benefits and obligations of SpinCo or the applicable member of the SpinCo Group under the proposed terms of such Real Estate Separation Document and a member of the Honeywell Group shall receive the interest in the benefits and obligations of Honeywell or the applicable member of the Honeywell Group under the proposed terms of such Real Estate Separation Document. In the event of a conflict between this Agreement and any Real Estate Separation Document, the applicable Real Estate Separation Document shall govern. To the extent any matter is not addressed in a Real Estate Separation Document, but is addressed in this Agreement, the terms of this Agreement shall control as to such matter.

Section 2.05 Shared Contracts.

(a) Except as set forth on Schedule XIII, the Parties shall, and shall cause the members of their respective Groups to, use their respective reasonable best efforts to work together (and, if necessary and desirable, to work with the third party to such Shared Contract) in an effort to divide, partially assign, modify or replicate (in whole or in part) the respective rights and obligations under and in respect of any Shared Contract, such that (a) a member of the SpinCo Group is the beneficiary of the rights and is responsible for the obligations related to that portion of such Shared Contract relating to the SpinCo Business (the "SpinCo Portion"), which rights shall be a SpinCo Asset and which obligations shall be a SpinCo Liability, and (b) a member of the Honeywell Group is the beneficiary of the rights and is responsible for the obligations related to such Shared Contract not relating to the SpinCo Business (the "Honeywell Portion"), which rights shall be a Honeywell Asset and which obligations shall be a Honeywell Liability. Nothing in this Agreement shall require the division, partial assignment, modification or replication of a Shared Contract unless and until any necessary Consents are obtained or made, as applicable. If the Parties, or their respective Group members, as applicable, are not able to enter into an arrangement to formally divide, partially assign, modify or replicate such Shared Contract prior to the Distribution as contemplated by the previous sentence, then the Parties shall, and shall cause their respective Group members to, cooperate in any reasonable and permissible arrangement to provide that, following the Distribution and until the earlier of one year after the Distribution Date and such time as the formal division, partial assignment, modification or replication of such Shared Contract as contemplated by the previous sentence is effected, a member of the SpinCo Group shall receive the interest in the benefits and obligations of the SpinCo Portion under such Shared Contract and a member of the Honeywell Group shall receive the interest in the benefits and obligations of the Honeywell Portion under such Shared Contract, it being understood that no Party shall have Liability to the other Party for the failure of any third party to perform its obligations under any such Shared Contract.

(b) Nothing in this Section 2.05 shall require either Party or any member of their respective Groups to contribute capital, pay or grant any consideration or concession in any form (including providing any letter of credit, guaranty or other financial accommodation) to any Person (other than reasonable out-of-pocket expenses, attorneys' fees and recording or similar fees, all of which shall be reimbursed by the Party or the member of the Party's Group entitled to such Asset or intended to assume such Liability, as applicable, as promptly as reasonably practicable). For avoidance of doubt, reasonable out-of-pocket expenses, and recording or similar fees shall not include any purchase price, license fee or other payment or compensation for the procurement of any asset secured to replace an Asset in the course of a Party's obligation under Section 2.05(a).

Section 2.06 Disclaimer of Representations and Warranties. Each of Honeywell (on behalf of itself and each other member of the Honeywell Group) and SpinCo (on behalf of itself and each other member of the SpinCo Group) understands and agrees that, except as expressly set forth in this Agreement, any Ancillary Agreement or the Tax Opinion Representations, no party to this Agreement, any Ancillary Agreement or any other agreement or document contemplated by this Agreement or any Ancillary Agreement is representing or warranting in any way as to any Assets or Liabilities transferred or assumed as contemplated hereby or thereby, as to the sufficiency of the Assets or Liabilities transferred or assumed hereby or thereby for the conduct and operations of the SpinCo Business or the Honeywell Business, as applicable, as to any Governmental Approvals or other Consents required in connection therewith or in connection with any past transfers of the Assets or assumptions of the Liabilities, as to the value or freedom from any Security Interests of, or any other matter concerning, any Assets or Liabilities of such party, or as to the absence of any defenses or rights of setoff or freedom from counterclaim with respect to any claim or other Asset, including any accounts receivable, of any such party, or as to the legal sufficiency of any assignment, document or instrument delivered hereunder to convey title to any Asset or thing of value upon the execution, delivery and filing hereof or thereof, and each of Honeywell (on behalf of itself and each other member of the Honeywell Group) and SpinCo (on behalf of itself and each other member of the SpinCo Group) has relied only on the representations and warranties expressly contained in Section 12.01(c), in any Ancillary Agreement or the Tax Opinion Representations. Except as may expressly be set forth herein or in any Ancillary Agreement, any such Assets are being transferred on an "as is," "where is" basis and the respective transferees shall bear the economic and legal risks that (a) any conveyance shall prove to be insufficient to vest in the transferee good and marketable title, free and clear of any Security Interest and (b) any necessary Governmental Approvals or other Consents are not obtained or that any requirements of Laws or judgments are not complied with.

Section 2.07 Waiver of Bulk-Sale and Bulk-Transfer Laws. SpinCo hereby waives compliance by each and every member of the Honeywell Group with the requirements and provisions of any "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the SpinCo Assets to any member of the SpinCo Group. Honeywell hereby waives compliance by each and every member of the SpinCo Group with the requirements and provisions of any "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the Honeywell Assets to any member of the Honeywell Group.

Section 2.08 Cash Adjustment. Each of Honeywell and SpinCo agrees to take the actions set forth on Schedule XVI.

## ARTICLE III

## RECORDATION OF INTELLECTUAL PROPERTY RIGHTS ASSIGNMENT AGREEMENTS

Section 3.01 Recordation. Each Party, as an assignee of Intellectual Property Rights pursuant to this Agreement or the Plan of Reorganization, shall have the sole responsibility, at its sole cost and expense (including any expenses associated with obtaining any required notarizations, certifications or apostilles, or with any other local requirements), to prepare and file any applicable Intellectual Property Rights assignment agreements and any other forms or documents with the appropriate Governmental Authorities as required to record the transfer of any registrations or applications of Honeywell IP or SpinCo IP that is allocated under this Agreement or the Plan of Reorganization, as applicable, and the relevant assignor Party hereby consents to such recordation of any such documents, forms and agreements provided to it for approval.

## ARTICLE IV

## CREDIT SUPPORT

Section 4.01 Replacement of Honeywell Credit Support.

(a) SpinCo shall use reasonable best efforts to arrange, at its sole cost and expense and effective on or prior to the Distribution Date, the termination or replacement of all guarantees, covenants, indemnities, surety bonds, letters of credit or similar assurances or credit support ("Credit Support Instruments") provided by or through Honeywell or any other member of the Honeywell Group for the benefit of SpinCo or any other member of the SpinCo Group ("Honeywell Credit Support Instruments"), other than any of the Honeywell Credit Support Instruments set forth on Schedule XIX (the "Surviving Honeywell Credit Support Instruments"), with alternate arrangements that do not require any credit support from Honeywell or any other member of the Honeywell Group, and shall use reasonable best efforts to obtain from the beneficiaries of such Credit Support Instruments written releases (which in the case of a letter of credit or bank guarantee would be effective upon surrender of the original Honeywell Credit Support Instrument to the originating bank and such bank's confirmation to Honeywell of cancelation thereof) indicating that Honeywell or such other member of the Honeywell Group will, effective upon the consummation of the Distribution, have no liability with respect to such Credit Support Instruments, in each case reasonably satisfactory to Honeywell.

(b) In furtherance of Section 4.01(a), to the extent required to obtain a removal or release from a Honeywell Credit Support Instrument, SpinCo or an appropriate member of the SpinCo Group shall execute an agreement substantially in the form of the existing Honeywell Credit Support Instrument or such other form as is agreed to by the relevant parties to such agreement, except to the extent that such existing Honeywell Credit Support Instrument contains representations, covenants or other terms or provisions (i) with which SpinCo or the appropriate member of the SpinCo Group would be reasonably unable to comply or (ii) which would be reasonably expected to be breached by SpinCo or the appropriate member of the SpinCo Group.

(c) If SpinCo is unable to obtain, or to cause to be obtained, all releases from Honeywell Credit Support Instruments pursuant to Section 4.01(a) and Section 4.01(b) on or prior to the Distribution, (i) without limiting SpinCo's obligations under Article VII, SpinCo shall cause the relevant member of the SpinCo Group that has assumed the Liability with respect to such Credit Support Instrument to indemnify and hold harmless the guarantor or obligor for any Liability arising from or relating thereto in accordance with the provisions of Article VII and to, as agent or subcontractor for such guarantor or obligor, pay, perform and discharge fully all the obligations or other Liabilities of such guarantor or obligor thereunder, (ii) with respect to such Credit Support Instruments that are in the form of a letter of credit or bank guarantee, SpinCo shall provide Honeywell with letters of credit or guarantees, in each case issued by a bank reasonably acceptable to Honeywell, against losses arising from all such Credit Support Instruments, or if Honeywell agrees in writing, cash collateralize the full amount of any outstanding Credit Support Instrument with respect to which such release has not been obtained, (iii) except as set forth in Schedule XIX, with respect to such Credit Support Instrument, each of Honeywell and SpinCo, on behalf of themselves and the members of their respective Groups, agree, except as otherwise expressly required by the terms of a Contract with a third party in effect as of the Distribution, not to renew or extend the term of, increase its obligations under or transfer to a third Person, any loan, guarantee, lease, sublease, license, Contract or other obligation for which the other Party or any member of the other Party's Group is or may be liable under such Credit Support Instrument unless all obligations of the other Party and the other members of the other Party's Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the other Party and (iv) with respect to the Expected Surviving Guarantees, Honeywell and SpinCo shall take the actions set forth on Schedule XXV. The provisions of clauses (i), (ii) and (iii) of the foregoing sentence shall also apply to all Surviving Honeywell Credit Support Instruments.

Section 4.02 Replacement of SpinCo Credit Support.

(a) Honeywell shall use reasonable best efforts to arrange, at its sole cost and expense and effective on or prior to the Distribution Date, the termination or replacement of all Credit Support Instruments provided by or through SpinCo or any other member of the SpinCo Group for the benefit of Honeywell or any other member of the Honeywell Group ("SpinCo Credit Support Instruments"), other than any of the SpinCo Credit Support Instruments set forth on Schedule XX (the "Surviving SpinCo Credit Support Instruments"), with alternate arrangements that do not require any credit support from SpinCo or any other member of the SpinCo Group, and shall use reasonable best efforts to obtain from the beneficiaries of such Credit Support Instruments written releases (which in the case of a letter of credit or bank guarantee would be effective upon surrender of the original SpinCo Credit Support Instrument to the originating bank and such bank's confirmation to SpinCo of cancelation thereof) indicating that SpinCo or such other member of the SpinCo Group will, effective upon the consummation of the Distribution, have no liability with respect to such Credit Support Instruments, in each case reasonably satisfactory to SpinCo.

(b) In furtherance of Section 4.02(a), to the extent required to obtain a removal or release from a SpinCo Credit Support Instrument, Honeywell or an appropriate member of the Honeywell Group shall execute an agreement substantially in the form of the existing SpinCo Credit Support Instrument or such other form as is agreed to by the relevant parties to such agreement, except to the extent that such existing SpinCo Credit Support Instrument contains representations, covenants or other terms or provisions (i) with which Honeywell or the appropriate member of the Honeywell Group would be reasonably unable to comply or (ii) which would be reasonably expected to be breached by Honeywell or the appropriate member of the Honeywell Group.

(c) If Honeywell is unable to obtain, or to cause to be obtained, all releases from SpinCo Credit Support Instruments pursuant to Section 4.02(a) and Section 4.02(b) on or prior to the Distribution, (i) without limiting Honeywell's obligations under Article VII, Honeywell shall cause the relevant member of the Honeywell Group that has assumed the Liability with respect to such Credit Support Instrument to indemnify and hold harmless the guarantor or obligor for any Liability arising from or relating thereto in accordance with the provisions of Article VII and to, as agent or subcontractor for such guarantor or obligor, pay, perform and discharge fully all the obligations or other Liabilities of such guarantor or obligor

thereunder, (ii) with respect to such Credit Support Instruments that are in the form of a letter of credit or bank guarantee, Honeywell shall provide SpinCo with letters of credit or guarantees, in each case issued by a bank reasonably acceptable to SpinCo, against losses arising from all such Credit Support Instruments, or if SpinCo agrees in writing, cash collateralize the full amount of any outstanding Credit Support Instrument with respect to which such release has not been obtained and (iii) except as set forth in Schedule XV, with respect to such Credit Support Instrument, each of Honeywell and SpinCo, on behalf of themselves and the members of their respective Groups, agree, except as otherwise expressly required by the terms of a Contract with a third party in effect as of the Distribution, not to renew or extend the term of, increase its obligations under or transfer to a third Person, any loan, guarantee, lease, sublease, license, Contract or other obligation for which the other Party or any member of the other Party's Group is or may be liable under such Credit Support Instrument unless all obligations of the other Party and the other members of the other Party's Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the other Party. The provisions of clauses (i), (ii) and (iii) of the foregoing sentence shall also apply to all Surviving SpinCo Credit Support Instruments.

Section 4.03 Manner of Indemnification. Any claims for indemnification under this Article IV shall be made in the manner set forth in Section 7.05 and Section 7.06 and are subject to the provisions set forth in Section 7.07, Section 7.08 and Section 7.09.

## ARTICLE V

## ACTIONS PENDING THE DISTRIBUTION

Section 5.01 Actions Prior to the Distribution.

(a) Subject to the conditions specified in Section 5.02 and subject to Section 6.03, Honeywell and SpinCo shall use reasonable best efforts to consummate the Distribution. Such efforts shall include taking the actions specified in this Section 5.01.

(b) Prior to the Distribution, Honeywell shall mail notice of Internet availability of the Information Statement or the Information Statement to the Record Holders.

(c) SpinCo shall prepare, file with the Commission and use its reasonable best efforts to cause to become effective any registration statements or amendments thereto required to effect the establishment of, or amendments to, any employee benefit and other plans necessary or appropriate in connection with the transactions contemplated by this Agreement, any of the Ancillary Agreements or any of the Ongoing Relationship Agreements.

(d) Honeywell and SpinCo shall take all such action as may be necessary or appropriate under the securities or blue sky laws of the states or other political subdivisions of the United States or of other foreign jurisdictions in connection with the Distribution.

(e) SpinCo shall prepare and file, and shall use reasonable best efforts to have approved prior to the Distribution, an application for the listing of the SpinCo Common Stock to be distributed in the Distribution on the Exchange, subject to official notice of distribution.

(f) Prior to the Distribution, Honeywell, in its capacity as sole stockholder of SpinCo, shall have duly elected to the SpinCo board of directors the individuals listed as members of the SpinCo board of directors in the Information Statement, and such individuals shall be the members of the SpinCo board of directors effective as of immediately after the Distribution; provided, however, that to the extent required by any Law or requirement of the Exchange or any other national securities exchange, as applicable, one independent director shall be appointed by the existing board of directors of SpinCo prior to the date on which "when-issued" trading of the SpinCo Common Stock begins on the Exchange and begin his or her term prior to the Distribution and shall serve on SpinCo's Audit Committee, Compensation Committee and Nominating and Governance Committee.

(g) Prior to the Distribution, Honeywell shall deliver or cause to be delivered to SpinCo resignations, effective as of immediately after the Distribution, of each individual who will be an employee of any member of the Honeywell Group after the Distribution and who is an officer or director of any member of the SpinCo Group immediately prior to the Distribution.

(h) Immediately prior to the Distribution, the Amended and Restated Certificate of Incorporation and the Amended and Restated By-laws of SpinCo, each in substantially the form filed as an exhibit to the Form 10, shall be in effect.

(i) Honeywell and SpinCo shall, subject to Section 6.03, take all reasonable steps necessary and appropriate to cause the conditions set forth in Section 5.02 to be satisfied and to effect the Distribution on the Distribution Date.

(j) Prior to the Distribution, SpinCo shall make capital and other expenditures and operate its cash management, accounts payable and receivables collection systems in the ordinary course of business consistent with prior practice except as required in connection with the transactions contemplated by this Agreement, the Ancillary Agreements and the Ongoing Relationship Agreements.

Section 5.02 Conditions Precedent to Consummation of the Distribution. Subject to Section 6.03, as soon as practicable after the date of this Agreement, the Parties shall use reasonable best efforts to satisfy the following conditions prior to the consummation of the Distribution. The obligations of the Parties to consummate the Distribution shall be conditioned on the satisfaction, or waiver by Honeywell, of the following conditions:

(a) The board of directors of Honeywell shall have authorized and approved the Separation and Distribution and not withdrawn such authorization and approval, and shall have declared the dividend of SpinCo Common Stock to Honeywell shareholders.

(b) Each Ancillary Agreement and each Ongoing Relationship Agreement shall have been executed by each party to such agreement.

(c) The SpinCo Common Stock shall have been accepted for listing on the Exchange or another national securities exchange approved by Honeywell, subject to official notice of issuance.

(d) The Commission shall have declared effective the Form 10, no stop order suspending the effectiveness of the Form 10 shall be in effect and no proceedings for that purpose shall be pending before or threatened by the Commission.

(e) Honeywell shall have received the written opinion of each of Cleary Gottlieb Steen & Hamilton LLP and KPMG LLP, each of which shall remain in full force and effect, that, subject to the accuracy of and compliance with the relevant Tax Opinion Representations, the Distribution will qualify for its Intended Tax Treatment.

(f) The Reorganization shall have been completed in accordance with the Plan of Reorganization (other than those steps that are expressly contemplated to occur at or after the Distribution).

(g) No order, injunction or decree issued by any Governmental Authority of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Distribution shall be in effect, and no other event outside the control of Honeywell shall have occurred or failed to occur that prevents the consummation of the Distribution.

(h) No other events or developments shall have occurred prior to the Distribution that, in the judgment of the board of directors of Honeywell, would result in the Distribution having a material adverse effect on Honeywell or the shareholders of Honeywell.

(i) The actions set forth in Section 5.01(b), (f), (g) and (h) shall have been completed.

The foregoing conditions are for the sole benefit of Honeywell and shall not give rise to or create any duty on the part of Honeywell or the Honeywell board of directors to waive or not waive such conditions or in any way limit the right of Honeywell to terminate this Agreement as set forth in Article XII or alter the consequences of any such termination from those specified in such Article. Any determination made by the Honeywell board of directors prior to the Distribution concerning the satisfaction or waiver of any or all of the conditions set forth in this Section 5.02 shall be conclusive.

## ARTICLE VI

## THE DISTRIBUTION

Section 6.01 The Distribution.

(a) SpinCo shall cooperate with Honeywell to accomplish the Distribution and shall, at the direction of Honeywell, use its reasonable best efforts to promptly take any and all actions necessary or desirable to effect the Distribution. Honeywell shall select any investment bank or manager in connection with the Distribution, as well as any financial printer,

distribution agent and financial, legal, accounting and other advisors for Honeywell. Honeywell or SpinCo, as the case may be, will provide, or cause the applicable member of its Group to provide, to the Agent all share certificates and any information required in order to complete the Distribution.

(b) Subject to the terms and conditions set forth in this Agreement, (i) after completion of the Reorganization and on or prior to the Distribution Date, for the benefit of and distribution to the holders of Honeywell Common Stock as of the Record Date ("Record Holders"), Honeywell will deliver to the Agent all of the issued and outstanding shares of SpinCo Common Stock then owned by Honeywell or any other member of the Honeywell Group and book-entry authorizations for such shares and (ii) on the Distribution Date, Honeywell shall instruct the Agent to distribute, by means of a pro rata dividend based on the aggregate number of shares of Honeywell Common Stock held by each applicable Record Holder, to each Record Holder (or such Record Holder's bank or brokerage firm on such Record Holder's behalf) electronically, by direct registration in book-entry form, the number of shares of SpinCo Common Stock to which such Record Holder is entitled based on a distribution ratio determined by Honeywell in its sole discretion. The Distribution shall be effective at 11:59 p.m. New York City time on the Distribution Date. On or as soon as practicable after the Distribution Date, the Agent will mail to each Record Holder an account statement indicating the number of shares of SpinCo Common Stock that have been registered in book-entry form in the name of such Record Holder.

Section 6.02 Fractional Shares. Record Holders holding a number of shares of Honeywell Common Stock on the Record Date that would entitle such holders to receive less than one whole share (in addition to any whole shares) of SpinCo Common Stock in the Distribution will receive cash in lieu of such fractional share. Fractional shares of SpinCo Common Stock will not be distributed in the Distribution nor credited to book-entry accounts. The Agent and Honeywell shall, as soon as practicable after the Distribution Date, (a) determine the number of whole shares and fractional shares of SpinCo Common Stock allocable to each Record Holder, (b) aggregate all fractional shares into whole shares and sell the whole shares obtained thereby in open market transactions at then prevailing trading prices on behalf of holders who would otherwise be entitled to fractional share interests and (c) distribute to each such holder, or for the benefit of each beneficial owner, such holder's or owner's ratable share of the net proceeds of such sale, based upon the average gross selling price per share of SpinCo Common Stock after making appropriate deductions for any amount required to be withheld under applicable Tax Law and less any brokers' charges, commissions or transfer Taxes. The Agent, in its sole discretion, will determine the timing and method of selling such fractional shares, the selling price of such fractional shares and the broker-dealer through which such fractional shares will be sold; provided, however, that the designated broker-dealer is not an Affiliate of Honeywell or SpinCo. Neither Honeywell nor SpinCo will pay any interest on the proceeds from the sale of fractional shares.

Section 6.03 Sole Discretion of Honeywell. Honeywell shall, in its sole and absolute discretion, determine the Record Date, the Distribution Date and all terms of the Distribution, including the form, structure and terms of any transactions or offerings to effect the Distribution and the timing of and conditions to the consummation thereof. In addition and notwithstanding anything to the contrary set forth below, Honeywell may at any time and from time to time until

the Distribution decide to abandon the Distribution or modify or change the terms of the Distribution, including by accelerating or delaying the timing of the consummation of all or part of the Distribution.

## ARTICLE VII

## MUTUAL RELEASES; INDEMNIFICATION

Section 7.01 Release of Pre-Distribution Claims.

(a) Except as provided in Section 7.01(c) or elsewhere in this Agreement, the Ancillary Agreements or the Ongoing Relationship Agreements, effective as of the Distribution, SpinCo does hereby, for itself and each other member of the SpinCo Group, their respective Affiliates, and to the extent it may legally do so, successors and assigns and all Persons who at any time on or prior to the Distribution have been shareholders, directors, officers, agents or employees of any member of the SpinCo Group (in each case, in their respective capacities as such), remise, release and forever discharge Honeywell and the other members of the Honeywell Group, their respective Affiliates, successors and assigns, and all Persons who at any time on or prior to the Distribution have been shareholders, directors, officers, agents or employees of any member of the Honeywell Group (in each case, in their respective capacities as such), and their respective heirs, executors, administrators, successors and assigns, from any and all SpinCo Liabilities whatsoever, whether at Law or in equity (including any right of contribution), whether arising under any Contract, by operation of Law or otherwise, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the Distribution, including in connection with the Spin-Off and all other activities to implement the Spin-Off. This Section 7.01(a) shall not affect Honeywell's indemnification obligations with respect to Liabilities arising on or before the Distribution Date under Article IX of its Amended and Restated Certificate of Incorporation, as in effect on the date on which the event or circumstances giving rise to such indemnification obligation occur.

(b) Except as provided in Section 7.01(c) or elsewhere in this Agreement, the Ancillary Agreements or the Ongoing Relationship Agreements, effective as of the Distribution, Honeywell does hereby, for itself and each other member of the Honeywell Group, their respective Affiliates, and to the extent it may legally do so, successors and assigns and all Persons who at any time on or prior to the Distribution have been shareholders, directors, officers, agents or employees of any member of the Honeywell Group (in each case, in their respective capacities as such), remise, release and forever discharge SpinCo, the other members of the SpinCo Group, their respective Affiliates, successors and assigns, and all Persons who at any time on or prior to the Distribution have been shareholders, directors, officers, agents or employees of any member of the SpinCo Group (in each case, in their respective capacities as such), and their respective heirs, executors, administrators, successors and assigns, from any and all Honeywell Liabilities whatsoever, whether at Law or in equity (including any right of contribution), whether arising under any Contract, by operation of Law or otherwise, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the Distribution, including in connection with the Spin-Off and all other activities to implement the Spin-Off.

(c) Nothing contained in Section 7.01(a) or (b) shall impair any right of any Person to enforce this Agreement, any Ancillary Agreement, any Ongoing Relationship Agreement, or any Intercompany Agreement or Intercompany Account that is specified in Section 2.03(b) not to terminate as of the Distribution, in each case in accordance with its terms. Nothing contained in Section 7.01(a) or (b) shall release:

(i) any Person from any Liability provided in or resulting from any Contract among any members of the Honeywell Group or the SpinCo Group that is specified in Section 2.03(b) as not to terminate as of the Distribution, or any other Liability specified in such Section 2.03(b) as not to terminate as of the Distribution;

(ii) any Person from any Liability, contingent or otherwise, assumed, transferred, assigned or allocated to the Group of which such Person is a member in accordance with, or any other Liability of any member of any Group under, this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement;

(iii) any Person from any Liability provided in or resulting from any other Contract that is entered into after the Distribution between one Party (or a member of such Party's Group), on the one hand, and the other Party (or a member of such Party's Group), on the other hand;

(iv) any Person from any Liability that the Parties may have with respect to indemnification or contribution pursuant to this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement for claims brought against the Parties, the members of their respective Groups or any of their respective directors, officers, employees or agents, by third Persons, which Liability shall be governed by the provisions of this Article VII or, if applicable, the appropriate provisions of the relevant Ancillary Agreement or Ongoing Relationship Agreement; or

(v) any Person from any Liability the release of which would result in the release of any Person not otherwise intended to be released pursuant to this Section 7.01.

(d) SpinCo shall not make, and shall not permit any other member of the SpinCo Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against Honeywell or any other member of the Honeywell Group, or any other Person released pursuant to Section 7.01(a), with respect to any Liabilities released pursuant to Section 7.01(a). Honeywell shall not make, and shall not permit any other member of the Honeywell Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification against SpinCo or any other member of the SpinCo Group, or any other Person released pursuant to Section 7.01 (b), with respect to any Liabilities released pursuant to Section 7.01(b).

(e) It is the intent of each of Honeywell and SpinCo, by virtue of the provisions of this Section 7.01, to provide for a full and complete release and discharge of all Liabilities existing or arising from all acts and events occurring or failing to occur or alleged to have occurred or to have failed to occur and all conditions existing or alleged to have existed on or before the Distribution Date, between or among SpinCo or any other member of the SpinCo Group, on the one hand, and Honeywell or any other member of the Honeywell Group, on the other hand (including any contractual agreements or arrangements existing or alleged to exist between or among any such members on or before the Distribution Date), except as set forth in Section 7.01(c) or elsewhere in this Agreement or in any Ancillary Agreement or Ongoing Relationship Agreement. At any time, at the request of the other Party, each Party shall cause each member of its respective Group to execute and deliver releases reflecting the provisions hereof.

Section 7.02 Indemnification by SpinCo. Subject to Section 7.04, and without limiting any indemnification obligation of SpinCo or its Affiliates under the Trademark License Agreement or any other Ancillary Agreement, SpinCo shall indemnify, defend and hold harmless Honeywell, each other member of the Honeywell Group and each of their respective former and current directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "Honeywell Indemnitees"), from and against any and all Liabilities of the Honeywell Indemnitees relating to, arising out of or resulting from any of the following items (without duplication):

(a) the SpinCo Liabilities, including the failure of SpinCo or any other member of the SpinCo Group or any other Person to pay, perform or otherwise promptly discharge any SpinCo Liability in accordance with its terms (including, for the avoidance of doubt, all such Actions and Third-Party Claims set forth in Article VII to the extent they are SpinCo Liabilities);

(b) any breach by SpinCo or any other member of the SpinCo Group of this Agreement or any Ancillary Agreement unless such Ancillary Agreement expressly provides for separate indemnification therein (which shall be controlling); and

(c) any breach by SpinCo of any of the representations and warranties made by SpinCo on behalf of itself and the members of the SpinCo Group in Section 12.01(c).

Section 7.03 Indemnification by Honeywell. Subject to Section 7.04, and except to the extent SpinCo or its Affiliates are obligated to indemnify Honeywell or its Affiliates under the Trademark License or any other Ancillary Agreement, Honeywell shall indemnify, defend and hold harmless SpinCo, each other member of the SpinCo Group and each of their respective former and current directors, officers and employees, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "SpinCo Indemnitees"), from and against any and all Liabilities of the SpinCo Indemnitees relating to, arising out of or resulting from any of the following items (without duplication):

(a) the Honeywell Liabilities, including the failure of Honeywell or any other member of the Honeywell Group or any other Person to pay, perform or otherwise promptly discharge any Honeywell Liability in accordance with its terms (including, for the avoidance of doubt, all such Actions or Third-Party Claims set forth in Article VII to the extent they are Honeywell Liabilities);

(b) any breach by Honeywell or any other member of the Honeywell Group of this Agreement or any Ancillary Agreement unless such Ancillary Agreement expressly provides for separate indemnification therein (which shall be controlling); and

(c) any breach by Honeywell of any of the representations and warranties made by Honeywell on behalf of itself and the members of the Honeywell Group in Section 12.01(c).

Notwithstanding anything to the contrary herein, the payment of any amount pursuant to the Indemnification Agreement shall not be indemnified pursuant to this Article VII.

Section 7.04 Indemnification Obligations Net of Insurance Proceeds and Third-Party Proceeds.

(a) The Parties intend that any Liability subject to indemnification or reimbursement pursuant to this Agreement will be net of (i) Insurance Proceeds that actually reduce the amount of, or are paid to the applicable Indemnitee in respect of, such Liability or (ii) other amounts recovered from any third party that actually reduce the amount of, or are paid to the applicable Indemnitee in respect of, such Liability ("Third-Party Proceeds"). Accordingly, the amount that either Party (an "Indemnifying Party") is required to pay to any Person entitled to indemnification or reimbursement pursuant to this Agreement (an "Indemnitee") will be reduced by any Insurance Proceeds or Third-Party Proceeds theretofore actually recovered by or on behalf of the Indemnitee from a third party in respect of the related Liability. If an Indemnitee receives a payment required by this Agreement from an Indemnifying Party in respect of any Liability (an "Indemnity Payment") and subsequently receives Insurance Proceeds or Third-Party Proceeds in respect of such Liability, then the Indemnitee will pay to the Indemnifying Party an amount equal to the excess of the Indemnity Payment received over the amount of the Indemnity Payment that would have been due if such Insurance Proceeds or Third-Party Proceeds had been received, realized or recovered before the Indemnity Payment was made.

(b) An insurer that would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto or have any subrogation rights with respect thereto by virtue of the indemnification provisions hereof, it being expressly understood and agreed that no insurer or any other third party shall be entitled to a "wind-fall" (i.e., a benefit they would not be entitled to receive in the absence of the indemnification provisions) by virtue of the indemnification provisions hereof. Subject to Section 7.10, each member of the Honeywell Group and SpinCo Group shall use reasonable best efforts to seek to collect or recover any Insurance Proceeds and any Third-Party Proceeds to which such Person is entitled in connection with any Liability for which such Person seeks indemnification pursuant to this Article VII; provided, however, that such Person's inability to collect or recover any such Insurance Proceeds or Third-Party Proceeds shall not limit the Indemnifying Party's obligations hereunder.

(c) The calculation of any Indemnity Payments required by this Agreement shall be subject to Section 5.04 of the Tax Matters Agreement.

Section 7.05 Procedures for Indemnification of Third-Party Claims.

(a) If an Indemnitee shall receive notice or otherwise learn of a Third-Party Claim with respect to which an Indemnifying Party may be obligated to provide indemnification to such Indemnitee pursuant to this Agreement (including Article IV), such Indemnitee shall give such Indemnifying Party written notice thereof as soon as reasonably practicable, but no later than thirty (30) days after becoming aware of such Third-Party Claim. Any such notice shall describe the Third-Party Claim in reasonable detail and shall include, (i) the basis for, and nature of, such Third-Party Claim, including the facts constituting the basis for such Third-Party Claim, (ii) the estimated amount of Losses that have been or may be sustained by the Indemnitee in connection with such Third-Party Claim and (iii) copies of all notices and documents (including court papers) received by the Indemnitee relating to the Third-Party Claim; provided, however, that any such notice need only specify such information to the knowledge of the Indemnitee as of the date of such notice and shall not limit or prejudice any of the rights or remedies of any Indemnitee on the basis of any limitations on the information included in such notice, including any such limitations made in good faith to preserve the attorney-client privilege, work product doctrine or any other privilege. Notwithstanding the foregoing, the failure of any Indemnitee or other Person to give notice as provided in this Section 7.05(a) shall not relieve the related Indemnifying Party of its obligations under this Article VII, except to the extent that such Indemnifying Party is actually prejudiced by such failure to give notice in accordance with this Section 7.05(a). Each Party shall be deemed to have been provided written notice pursuant to this Section 7.05(a) with respect to Third-Party Claims set forth in Schedules XXII – XXIV for which such Party is an Indemnifying Party.

(b) Except with respect to such Third-Party Claims set forth in Schedules XXII – XXIV, the Indemnifying Party shall have the right, exercisable by written notice to the Indemnitee within thirty (30) calendar days after receipt of notice from an Indemnitee in accordance with Section 7.05(a) (or sooner, if the nature of such Third-Party Claim so requires), to assume and conduct the defense of such Third-Party Claim in accordance with the limits set forth in this Agreement with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnitee; provided, however, that (x) SpinCo shall not be entitled to control the defense of any Third-Party Claim in respect of a Mixed Action and (y) the Indemnifying Party shall not have the right to control the defense of any Third-Party Claim to the extent such Third-Party Claim seeks criminal penalties or injunctive or other equitable relief (other than any such injunctive or other equitable relief that is solely incidental to the granting of money damages).

(c) If the Indemnifying Party elects not to assume the defense of a Third-Party Claim (or is not permitted to assume the defense of such Third-Party Claim) in accordance with this Agreement, or fails to notify an Indemnitee of its election as provided in Section 7.05(b), such Indemnitee may defend such Third-Party Claim. If the Indemnifying Party elects (and is permitted) to assume the defense of a Third-Party Claim in accordance with the terms of this Agreement, the Indemnitees shall, subject to the terms of this Agreement, cooperate with the Indemnifying Party with respect to the defense of such Third-Party Claim.

(d) If the Indemnifying Party elects (and is permitted) to assume the defense of a Third-Party Claim in accordance with the terms of this Agreement, the Indemnifying Party will not be liable for any additional legal expenses subsequently incurred by the Indemnitee in connection with the defense of the Third-Party Claim; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third-Party Claim, or the nature of such Third-Party Claim changes such that the Indemnifying Party would no longer be entitled to assume the defense of such Third-Party Claim pursuant to Section 7.05 (b), the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense. The Indemnifying Party or the Indemnitee, as the case may be, shall have the right to participate in (but, subject to the prior sentence, not control), at its own expense, the defense of any Third-Party Claim that the other is defending as provided in this Agreement. In the event, however, that such Indemnitee reasonably determines that representation by counsel to the Indemnifying Party of both such Indemnifying Party and the Indemnitee could reasonably be expected to present such counsel with a conflict of interest, then the Indemnitee may employ separate counsel to represent or defend it in any such action or proceeding and the Indemnifying Party will pay the reasonable fees and expenses of such counsel.

(e) No Indemnifying Party shall consent to entry of any judgment or enter into any settlement of any Third-Party Claim without the consent of the applicable Indemnitee or Indemnitees; provided, however, that such Indemnitee(s) shall be required to consent to such entry of judgment or to such settlement that the Indemnifying Party may recommend if the judgment or settlement (i) contains no finding or admission of any violation of Law or any violation of the rights of any Person, (ii) involves only monetary relief which the Indemnifying Party has agreed to pay and (iii) includes a full and unconditional release of the Indemnitee. Notwithstanding the foregoing, in no event shall an Indemnitee be required to consent to any entry of judgment or settlement if the effect thereof is to permit any injunction, declaratory judgment, other order or other nonmonetary relief to be entered, directly or indirectly, against any Indemnitee.

(f) Whether or not the Indemnifying Party assumes the defense of a Third-Party Claim, no Indemnitee shall admit any liability with respect to, or settle, compromise or discharge, such Third-Party Claim without the Indemnifying Party's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

Section 7.06 Additional Matters.

(a) Any claim on account of a Liability that does not result from a Third-Party Claim shall be asserted by written notice given by the Indemnitee to the related Indemnifying Party. Any failure by an Indemnitee to give notice shall not relieve the Indemnifying Party's indemnification obligations under this Agreement, except to the extent that the Indemnifying Party shall have been actually prejudiced by such failure. Such Indemnifying Party shall have a period of sixty (60) days after the receipt of such notice within which to respond thereto. If such Indemnifying Party does not respond within such 60-day period, such Indemnifying Party shall be deemed to have refused to accept responsibility to make payment. If such Indemnifying Party does not respond within such sixty-day (60-day) period or rejects such claim in whole or in part, such Indemnitee shall be free to pursue such remedies as may be available to such Party as contemplated by this Agreement.

(b) In the event of payment by or on behalf of any Indemnifying Party to any Indemnitee in connection with any Third-Party Claim, such Indemnifying Party shall be subrogated to and shall stand in the place of such Indemnitee as to any events or circumstances in respect of which such Indemnitee may have any right, defense or claim relating to such Third-Party Claim against any claimant or plaintiff asserting such Third-Party Claim or against any other Person. Such Indemnitee shall cooperate with such Indemnifying Party in a reasonable manner, and at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right, defense or claim.

Section 7.07 Remedies Cumulative. The remedies provided in this Article VII shall be cumulative and, subject to the provisions of Article XI, shall not preclude assertion by any Indemnitee of any other rights or the seeking of any and all other remedies against any Indemnifying Party.

Section 7.08 Survival of Indemnities. The rights and obligations of each of Honeywell and SpinCo and their respective Indemnitees under this Article VII shall survive the sale or other transfer by any Party or its Affiliates of any Assets or businesses or the assignment by it of any Liabilities.

Section 7.09 Limitation on Liability. Except as may expressly be set forth in this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement, none of Honeywell, SpinCo or any other member of either Group shall in any event have any Liability to the other or to any other member of the other's Group, or to any other Honeywell Indemnitee or SpinCo Indemnitee, as applicable, under this Agreement for any indirect, special, punitive or consequential damages, whether or not caused by or resulting from negligence or breach of obligations hereunder and whether or not informed of the possibility of the existence of such damages; provided, however, that the provisions of this Section 7.09 shall not limit an Indemnifying Party's indemnification obligations hereunder with respect to any Liability any Indemnitee may have to any third party not affiliated with any member of the Honeywell Group or the SpinCo Group for any indirect, special, punitive or consequential damages. Notwithstanding the foregoing, nothing in this Section 7.09 shall limit the Liability of Honeywell, SpinCo or any other member of either Group to the other or to any other member of the other's Group, or to any other Honeywell Indemnitee or SpinCo Indemnitee, as applicable, with respect to breaches of Section 8.01, Section 8.04, Section 8.05, Section 8.07 or Section 8.09.

Section 7.10 Management of Existing Actions. This Section 7.10 shall govern the management and direction of pending Actions or existing Third-Party Claims set forth in Schedule XXII, Schedule XXIII or Schedule XXIV, in which members of the Honeywell Group or the SpinCo Group are named as parties, but shall not alter the allocation of Liabilities set forth in Article II unless otherwise expressly set forth in this Section 7.10.

(a) From and after the Distribution, the SpinCo Group shall direct the defense or prosecution of any Actions or Third-Party Claims set forth on Schedule XXII.

(b) From and after the Distribution, the Honeywell Group shall direct the defense or prosecution of any Actions or Third-Party Claims set forth on Schedule XXIII.

(c) From and after the Distribution, the Parties shall separately but cooperatively manage (whether as co-defendants or co-plaintiffs) any Actions or Third-Party Claims set forth in Schedule XXIV ("Joint Actions"). The Parties shall reasonably cooperate and consult with each other, and to the extent permissible and necessary or advisable, maintain a joint defense in a manner that would preserve for both Parties and their respective Affiliates any attorney-client privilege, joint defense or other privilege with respect to any Joint Action. Notwithstanding anything to the contrary herein, and except as set forth in Schedule XXIV, the Parties may jointly retain counsel (in which case the cost of counsel shall be shared by the Parties in accordance with the allocation of Liabilities set forth in Article II) or retain separate counsel (in which case each Party will bear the cost of its separate counsel) with respect to any Joint Action; provided that the Parties shall bear their own discovery costs and shall share joint litigation costs in accordance with the allocation of Liabilities set forth in Article II. In any Joint Action, each of Honeywell and SpinCo may pursue separate defenses, claims, counterclaims or settlements to those claims relating to the Honeywell Business or the SpinCo Business, respectively; provided that each Party shall in good faith make reasonable best efforts to avoid adverse effects on the other Party.

(d) To the maximum extent permitted by applicable Law, the rights to recovery of each Party's Subsidiaries in respect of any past, present or future Action or Third-Party Claim is hereby delegated to such Party. It is the intent of the Parties that the foregoing delegation shall satisfy any Law requiring such delegation to be effected pursuant to a power of attorney or similar instrument. The Parties and their respective Subsidiaries shall execute such further instruments or documents as may be necessary to effect such delegation.

(e) No Party managing an Action or Third-Party Claim pursuant to Section 7.10 shall consent to entry of any judgment or enter into any settlement of any such Action or Third-Party Claim without the prior written consent of the other Party (not to be unreasonably withheld, conditioned or delayed); provided, however, that such non-managing Party shall be required to consent to such entry of judgment or to such settlement that the managing Party may recommend if the judgment or settlement (i) contains no finding or admission of any violation of Law or any violation of the rights of any Person, (ii) involves only monetary relief which the managing Party has agreed to pay and (iii) includes a full and unconditional release of the non-managing Party. Notwithstanding the foregoing, in no event shall a non-managing Party be required to consent to an entry of judgment or settlement if the effect thereof is to permit any injunction, declaratory judgment, other order or other nonmonetary relief to be entered, directly or indirectly, against the non-managing Party's Group.

## ARTICLE VIII

## ACCESS TO INFORMATION; PRIVILEGE; CONFIDENTIALITY

Section 8.01 Agreement for Exchange of Information; Archives

(a) Except in the case of an Adversarial Action or threatened Adversarial Action, and subject to Section 8.01 (b), each of Honeywell and SpinCo, on behalf of its respective Group, shall provide, or cause to be provided, to the other Party, at any time after the Distribution, as soon as reasonably practicable after written request therefor, (i) any Information relating to time periods on or prior to the Distribution Date in the possession or under the control of such respective Group, which Honeywell or SpinCo, or any member of its respective Group, as applicable, reasonably needs (A) to comply with reporting, disclosure, filing or other requirements imposed on Honeywell or SpinCo, or any member of its respective Group, as applicable (including under applicable securities Laws), by any national securities exchange or any Governmental Authority having jurisdiction over Honeywell or SpinCo, or any member of its respective Group, as applicable, (B) for use in any other judicial, regulatory, administrative or other proceeding or in order to satisfy audit, accounting, regulatory, litigation or other similar requirements or (C) to comply with its obligations under this Agreement (other than with respect to those obligations in Section 2.01(a)), any Ancillary Agreement or any Ongoing Relationship Agreement and (ii) all tangible embodiments of any Intellectual Property Rights that are assigned or licensed to such other Party under this Agreement or any Ancillary Agreement (other than the Intellectual Property License Agreement), and all Information related thereto, including Software source code and object code in a form reasonably acceptable to the other Party; in each case, that, as of immediately following the Distribution, are in existence and in the reasonable possession or control of the assigning or licensing Party or one of its Group members, as applicable, and except to the extent already in the possession of the receiving Party or one of its Group members. The receiving Party shall use any Information received pursuant to Section 8.01(a)(i) solely to the extent reasonably necessary to satisfy the applicable obligations or requirements described in clause (A), (B) or (C) of the immediately preceding sentence.

(b) Subject to the Data Transfer Agreement, in the event that either Honeywell or SpinCo determines that the disclosure of any Information or other materials pursuant to Section 8.01(a) could be commercially detrimental, violate any Law or Contract or waive or jeopardize any attorney-client privilege or attorney work product protection, such Party shall not be required to provide access to or furnish such Information or other materials to the other Party; provided, however, that both Honeywell and SpinCo shall take all commercially reasonable measures to permit compliance with Section 8.01(a) in a manner that avoids any such harm or consequence. Both Honeywell and SpinCo intend that any provision of access to or the furnishing of Information or other materials pursuant to this Section 8.01 that would otherwise be within the ambit of any legal privilege shall not operate as waiver of such privilege.

(c) Honeywell and SpinCo each agrees that it will only process personal data provided to it by the other Group in accordance with the Data Transfer Agreement.

Section 8.02 Ownership of Information. Any Information or other materials owned by one Group that is provided to the requesting Party hereunder shall be deemed to remain the property of the providing Party. Except as specifically set forth herein, nothing herein shall be construed as granting or conferring rights of license or otherwise in any such Information or other materials.

Section 8.03 Compensation for Providing Information. Honeywell and SpinCo shall reimburse each other for the reasonable costs, if any, in complying with a request for Information pursuant to this Article VIII. Except as may be otherwise specifically provided elsewhere in this Agreement, such costs shall be computed in accordance with SpinCo's or Honeywell's, as applicable, standard methodology and procedures, but shall not include any mark-up above actual costs.

Section 8.04 Record Retention. To facilitate the possible exchange of Information pursuant to this Article VIII and other provisions of this Agreement, each Party shall use its reasonable best efforts to retain all Information in such Party's possession relating to the other Party or its businesses, Assets or Liabilities, this Agreement or the Ancillary Agreements in accordance with its respective record retention policies or such longer period as required by Law, this Agreement or the Ancillary Agreements. Each of Honeywell and SpinCo shall use their reasonable best efforts to maintain and continue their respective Group's compliance with all "litigation holds" applicable to any Information in its possession for the pendency of the applicable matter.

Section 8.05 Accounting Information. Without limiting the generality of Section 8.01 but subject to Section 8.01(b):

(a) Until the end of the first full fiscal year occurring after the Distribution Date (and for a reasonable period of time afterwards or as required by Law for Honeywell to prepare consolidated financial statements or complete a financial statement audit for any period during which the financial results of the SpinCo Group were consolidated with those of Honeywell), SpinCo shall use its reasonable best efforts to enable Honeywell to meet its timetable for dissemination of its financial statements and to enable Honeywell's auditors to timely complete their annual audit and quarterly reviews of financial statements. As part of such efforts, to the extent reasonably necessary for the preparation of financial statements or completing an audit or review of financial statements or an audit of internal control over financial reporting, (i) SpinCo shall authorize and direct its auditors to make available to Honeywell's auditors, within a reasonable time prior to the date of Honeywell's auditors' opinion or review report, both (x) the personnel who performed or will perform the annual audits and quarterly reviews of SpinCo and (y) work papers related to such annual audits and quarterly reviews, to enable Honeywell's auditors to perform any procedures they consider reasonably necessary to take responsibility for the work of SpinCo's auditors as it relates to Honeywell's auditors' opinion or report and (ii) until all governmental audits are complete, SpinCo shall provide reasonable access during normal business hours for Honeywell's internal auditors, counsel and other designated representatives to (x) the premises of SpinCo and its Subsidiaries and all Information (and duplicating rights) within the knowledge, possession or control of SpinCo and its Subsidiaries and (y) the officers and employees of SpinCo and its Subsidiaries, so that Honeywell may conduct reasonable audits relating to the financial statements provided by SpinCo and its Subsidiaries; provided, however, that such access shall not be unreasonably disruptive to the business and affairs of the SpinCo Group.

(b) Until the end of the first full fiscal year occurring after the Distribution Date (and for a reasonable period of time afterwards or as required by Law), Honeywell shall use its reasonable best efforts to enable SpinCo to meet its timetable for dissemination of its financial statements and to enable SpinCo's auditors to timely complete their annual audit and quarterly reviews of financial statements. As part of such efforts, to the extent reasonably necessary for the preparation of financial statements or completing an audit or review of financial statements or an audit of internal control over financial reporting, (i) Honeywell shall authorize and direct its auditors to make available to SpinCo's auditors, within a reasonable time prior to the date of SpinCo's auditors' opinion or review report, both (x) the personnel who performed or will perform the annual audits and quarterly reviews of Honeywell and (y) work papers related to such annual audits and quarterly reviews, to enable SpinCo's auditors to perform any procedures they consider reasonably necessary to take responsibility for the work of Honeywell's auditors as it relates to SpinCo's auditors' opinion or report and (ii) until all governmental audits are complete, Honeywell shall provide reasonable access during normal business hours for SpinCo's internal auditors, counsel and other designated representatives to (x) the premises of Honeywell and its Subsidiaries and all Information (and duplicating rights) within the knowledge, possession or control of Honeywell and its Subsidiaries and (y) the officers and employees of Honeywell and its Subsidiaries, so that SpinCo may conduct reasonable audits relating to the financial statements provided by Honeywell and its Subsidiaries; provided, however, that such access shall not be unreasonably disruptive to the business and affairs of the Honeywell Group.

(c) In order to enable the principal executive officer(s) and principal financial officer(s) (as such terms are defined in the rules and regulations of the Commission) of Honeywell to make any certifications required of them under Section 302 or 906 of the Sarbanes-Oxley Act of 2002, SpinCo shall, within a reasonable period of time following a request from Honeywell in anticipation of filing such reports, cause its principal executive officer(s) and principal financial officer(s) to provide Honeywell with certifications of such officers in support of the certifications of Honeywell's principal executive officer(s) and principal financial officer(s) required under Section 302 or 906 of the Sarbanes-Oxley Act of 2002 with respect to Honeywell's Quarterly Report on Form 10-Q filed with respect to the fiscal quarter during which the Distribution Date occurs (unless such quarter is the fourth fiscal quarter), each subsequent fiscal quarter through the third fiscal quarter of the year in which the Distribution Date occurs and Honeywell's Annual Report on Form 10-K filed with respect to the fiscal year during which the Distribution Date occurs. Such certifications shall be provided in substantially the same form and manner as such SpinCo officers provided prior to the Distribution (reflecting any changes in certifications necessitated by the Spin-Off or any other transactions related thereto) or as otherwise agreed upon between Honeywell and SpinCo.

Section 8.06 Limitations of Liability.

(a) Each of Honeywell (on behalf of itself and each other member of the Honeywell Group) and SpinCo (on behalf of itself and each other member of the SpinCo Group) understands and agrees that neither Party is representing or warranting in any way as to the accuracy or sufficiency of any Information exchanged or disclosed under this Agreement.

(b) Neither Honeywell nor SpinCo shall have any Liability to the other Party in the event that any Information exchanged or provided pursuant to this Agreement that is an estimate or forecast, or that is based on an estimate or forecast, is found to be inaccurate in the absence of wilful misconduct by the providing Person. Neither Honeywell nor SpinCo shall have any Liability to the other Party if any Information is destroyed after reasonable best efforts by SpinCo or Honeywell, as applicable, to comply with the provisions of Section 8.04.

Section 8.07 Production of Witnesses; Records; Cooperation.

(a) Without limiting any of the rights or obligations of the Parties pursuant to Section 8.01 or Section 8.04, after the Distribution Date, except in the case of an Adversarial Action or threatened or contemplated Adversarial Action, each of Honeywell and SpinCo shall use their reasonable best efforts to make available, upon written request, (i) the former, current and future directors, officers, employees, other personnel and agents of the Persons in its respective Group (whether as witnesses or otherwise) and (ii) any books, records or other documents within its control or that it otherwise has the ability to make available, in each case, to the extent that such Person (giving consideration to business demands of such directors, officers, employees, other personnel and agents) or books, records or other documents may reasonably be required in connection with any Action, Commission comment or review or threatened or contemplated Action, Commission comment or review (including preparation for any such Action, Commission comment or review) in which either Honeywell or SpinCo or any Person or Persons in its Group, as applicable, may from time to time be involved, regardless of whether such Action, Commission comment or review or threatened or contemplated Action, Commission comment or review is a matter with respect to which indemnification may be sought hereunder. The requesting Party shall bear all reasonable out-of-pocket costs and expenses in connection therewith.

(b) Without limiting the foregoing, Honeywell and SpinCo shall use their reasonable best efforts to cooperate and consult with each other to the extent reasonably necessary with respect to any Actions or threatened or contemplated Actions (including in connection with preparation for any such Action), other than an Adversarial Action or threatened or contemplated Adversarial Action.

(c) The obligation of Honeywell and SpinCo, pursuant to this Section 8.07, to use their reasonable best efforts to make available former, current and future directors, officers, employees and other personnel and agents or provide witnesses and experts, except in the case of an Adversarial Action or threatened or contemplated Adversarial Action, is intended to be interpreted in a manner so as to facilitate cooperation and shall include the obligation to make available employees and other officers without regard to whether such individual or the employer of such individual could assert a possible business conflict. Without limiting the foregoing, each of Honeywell and SpinCo agrees that neither it nor any Person or Persons in its respective Group will take any adverse action against any employee of its Group based on such employee's provision of assistance or information to each other pursuant to this Section 8.07.

Section 8.08 Privileged Matters.

(a) The Parties recognize that legal and other professional services that have been and will be provided prior to the Distribution (whether by outside counsel, in-house counsel or other legal professionals) have been and will be rendered for the collective benefit of each of the members of the Honeywell Group and the SpinCo Group, and that each of the members of the Honeywell Group and the SpinCo Group shall be deemed to be the client with respect to such services for the purposes of asserting all privileges which may be asserted under applicable Law in connection therewith. The Parties recognize that legal and other professional services will be provided following the Distribution, which services will be rendered solely for the benefit of the Honeywell Group or the SpinCo Group, as the case may be.

(b) The Parties agree as follows:

(i) Honeywell shall be entitled, in perpetuity, to control the assertion or waiver of all privileges and immunities in connection with any privileged Information that relates solely to the Honeywell Business and not to the SpinCo Business, whether or not the privileged Information is in the possession or under the control of any member of the Honeywell Group or any member of the SpinCo Group. Honeywell shall also be entitled, in perpetuity, to control the assertion or waiver of all privileges and immunities in connection with any privileged Information that relates solely to any Honeywell Assets or Honeywell Liabilities and not any SpinCo Assets or SpinCo Liabilities in connection with any Actions that are now pending or may be asserted in the future, whether or not the privileged Information is in the possession or under the control of any member of the Honeywell Group or any member of the SpinCo Group.

(ii) SpinCo shall be entitled, in perpetuity, to control the assertion or waiver of all privileges and immunities in connection with any privileged Information that relates solely to the SpinCo Business and not to the Honeywell Business, whether or not the privileged Information is in the possession or under the control of any member of the SpinCo Group or any member of the Honeywell Group. SpinCo shall also be entitled, in perpetuity, to control the assertion or waiver of all privileges and immunities in connection with any privileged Information that relates solely to any SpinCo Assets or SpinCo Liabilities and not any Honeywell Assets or Honeywell Liabilities in connection with any Actions that are now pending or may be asserted in the future, whether or not the privileged Information is in the possession or under the control of any member of the SpinCo Group or any member of the Honeywell Group.

(iii) If the Parties do not agree as to whether certain information is privileged Information, then such Information shall be treated as privileged Information, and the Party that believes that such information is privileged Information shall be entitled to control the assertion or waiver of all privileges and immunities in connection with any such information until such time as it is finally judicially determined that such information is not privileged Information or unless the Parties otherwise agree.

(c) Subject to the remaining provisions of this Section 8.08, the Parties agree that Honeywell shall be entitled, in perpetuity, to control the assertion or waiver of all privileges and immunities not allocated pursuant to Section 8.08(b) in connection with any Actions or threatened or contemplated Actions or other matters that involve both Parties (or one or more members of their respective Groups) and in respect of which both Parties have Liabilities under this Agreement. Honeywell agrees, on behalf of itself and each member of the Honeywell Group, not to intentionally disclose or otherwise intentionally waive any such privilege or protection without consulting SpinCo. Upon the reasonable request of Honeywell or SpinCo, in connection with any Action or threatened or contemplated Action contemplated by this Article VIII, other than any Adversarial Action or threatened or contemplated Adversarial Action, Honeywell and SpinCo will enter into a mutually acceptable common interest agreement so as to maintain to the extent practicable any applicable attorney-client privilege or work product immunity of any member of either Group.

(d) If any dispute arises between the Parties or any members of their respective Group regarding whether a privilege or immunity should be waived to protect or advance the interests of either Party or any member of their respective Groups, each Party agrees that it shall (i) negotiate with the other Party in good faith, (ii) endeavor to minimize any prejudice to the rights of the other Party and the members of its Group and (iii) not unreasonably withhold, delay or condition consent to any request for waiver by the other Party.

(e) Upon receipt by either Party, or by any member of its respective Group, of any subpoena, discovery or other request (or of written notice that it will or has received such subpoena, discovery or other request) that may reasonably be expected to result in the production or disclosure of privileged Information subject to a shared privilege or immunity or as to which the other Party has the sole right hereunder to assert a privilege or immunity, or if either Party obtains knowledge or becomes aware that any of its, or any member of its respective Group's, current or former directors, officers, agents or employees have received any subpoena, discovery or other requests (or have received written notice that they will or have received such subpoena, discovery or other requests) that may reasonably be expected to result in the production or disclosure of such privileged Information, such Party shall promptly notify the other Party of the existence of any such subpoena, discovery or other request and shall provide the other Party a reasonable opportunity to review the privileged Information and to assert any rights it or they may have, under this Section 8.08 or otherwise, to prevent the production or disclosure of such privileged Information; provided that if such Party is prohibited by applicable Law from disclosing the existence of such subpoena, discovery or other request, such Party shall provide written notice of such related information for which disclosure is not prohibited by applicable Law and use reasonable best efforts to inform the other Party of any related information such Party reasonably determines is necessary or appropriate for the other Party to be informed of to enable the other Party to review the privileged Information and to assert its rights, under this Section 8.08 or otherwise, to prevent the production or disclosure of such privileged Information.

(f) The Parties agree that their respective rights to any access to Information, witnesses and other Persons, the furnishing of notices and documents and other cooperative efforts between the Parties contemplated by this Agreement, and the transfer of privileged Information between the Parties and members of their respective Groups pursuant to this Agreement, shall not be deemed a waiver of any privilege that has been or may be asserted under this Agreement or otherwise. The Parties further agree that (i) the exchange by one Party to the other Party of any Information that should not have been exchanged pursuant to the terms of Section 8.09 shall not be deemed to constitute a waiver of any privilege or immunity that has been or may be asserted under this Agreement or otherwise with respect to such privileged Information and (ii) the Party receiving such privileged Information shall promptly return such privileged Information to the Party who has the right to assert the privilege or immunity.

Section 8.09 Confidential Information.

(a) Each of Honeywell and SpinCo, on behalf of itself and each Person in its respective Group, shall hold, and cause its respective directors, officers, employees, agents, accountants, subcontractors, counsel and other advisors and representatives (each, a "Representative") to hold, in strict confidence, not release or disclose and protect with at least the same degree of care, but no less than a reasonable degree of care, that it applies to its own confidential and proprietary information pursuant to policies in effect as of the Distribution Date, all proprietary or confidential Information concerning the other Group or its business (other than such Information that also relates to any business of such first Party or its Group) that is either in its possession (including such Information in its possession prior to the Distribution) or furnished by the other Group or its respective Representatives at any time pursuant to this Agreement, and shall not use any such Information other than for such purposes as shall be expressly permitted hereunder, except, in each case, to the extent that such Information is (i) in the public domain through no fault of any member of the Honeywell Group or the SpinCo Group, as applicable, or any of its respective Representatives, (ii) later lawfully acquired from other sources by any of Honeywell, SpinCo or its respective Group, Representatives, as applicable, which sources are not themselves bound by a confidentiality obligation to the knowledge of any of Honeywell, SpinCo or Persons in its respective Group, as applicable, (iii) independently generated after the date hereof without reference to any proprietary or confidential Information of the Honeywell Group or the SpinCo Group, as applicable, or (iv) required to be disclosed by Law; provided, however, that the Person required to disclose such Information gives the applicable Person prompt, and to the extent reasonably practicable and legally permissible, prior notice of such disclosure and an opportunity to contest such disclosure and shall use reasonable best efforts to cooperate, at the expense of the requesting Person, in seeking any reasonable protective arrangements requested by such Person. In the event that such appropriate protective order or other remedy is not obtained, the Person that is required to disclose such Information shall furnish, or cause to be furnished, only that portion of such Information that is legally required to be disclosed and shall use reasonable best efforts to ensure that confidential treatment is accorded such Information. Notwithstanding the foregoing, each of Honeywell and SpinCo may release or disclose, or permit to be released or disclosed, any such proprietary or confidential Information exclusively concerning the other Group (x) to their respective Representatives who need to know such Information (who shall be advised of the obligations hereunder with respect to such Information), and (y) to any nationally recognized statistical rating organization as it reasonably deems necessary, solely for the purpose of obtaining a rating of securities or other debt instruments upon normal terms and conditions; provided, however, that, with respect to clause (x) hereof, (i) such Representatives shall keep such Information confidential and will not disclose such Information to any other Person, (ii) such Representatives shall not use such non-public information in a manner that is detrimental to the interests of the Party whose Information is being disclosed and (iii) each Party agrees that it is responsible to the other Party for any action or failure to act that would constitute a breach or violation of this Section 8.09(a) by any such Representative; and, with respect to clause (y) hereof, the Party whose Information is being disclosed or released to such rating organization is promptly notified thereof.

(b) Without limiting the foregoing, when any proprietary or confidential Information exclusively concerning the other Group or its business is no longer needed for the purposes contemplated by this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement, each of Honeywell and SpinCo will, promptly after the request of the other Party, either return all such Information in a tangible form (including all copies thereof and all notes, extracts or summaries based thereon) or certify to the other Party, as applicable, that it has destroyed such Information, other than, in each case, any such Information electronically preserved or recorded within any computerized data storage device or component (including any hard-drive or database) pursuant to automatic or routine backup procedures generally accessible only by legal, IT or compliance personnel.

# ARTICLE IX

# INSURANCE

Section 9.01 Maintenance of Insurance. Until the Distribution Date, Honeywell shall (i) cause the members of the SpinCo Group and their respective employees, officers and directors to continue to be covered as insured parties under Honeywell's policies of insurance in a manner which is no less favorable than the coverage provided for the Honeywell Group and (ii) permit the members of the SpinCo Group and their respective employees, officers and directors to submit claims arising from or relating to facts, circumstances, events or matters that occurred prior to the Distribution Date to the extent permitted under such policies. With respect to policies currently procured by SpinCo for the sole benefit of the SpinCo Group, SpinCo shall continue to maintain such insurance coverage through the Distribution Date in a manner no less favorable than currently provided. Except as otherwise expressly permitted in this Article IX, Honeywell and SpinCo acknowledge that, as of immediately prior to the Distribution Date, Honeywell intends to take such action as it may deem necessary or desirable to remove the members of the SpinCo Group and their respective employees, officers and directors as insured parties under any policy of insurance issued to any member of the Honeywell Group by any insurance carrier effective immediately prior to the Distribution Date. Subject to Section 9.02, the SpinCo Group will not be entitled, on or following the Distribution Date, absent mutual agreement otherwise, to make any claims for insurance thereunder to the extent such claims are based upon facts, circumstances, events or matters occurring on or after the Distribution Date or to the extent any claims are made pursuant to any Honeywell claims-made policies on or after the Distribution Date. No member of the Honeywell Group shall be deemed to have made any representation or warranty as to the availability of any coverage under any such insurance policy. Notwithstanding the foregoing, Honeywell shall, and shall cause the other members of the Honeywell Group to, use reasonable best efforts to take such actions as are necessary to cause all insurance policies of the Honeywell Group that immediately prior to the Distribution provide coverage to or with respect to the members of the SpinCo Group and their respective employees, officers and directors to continue to provide such coverage with respect to acts, omissions or events occurring prior to the Distribution in accordance with their terms as if the Distribution had not occurred; provided, however, that in no event shall Honeywell be required to extend or maintain coverage under claims-made policies with respect to any claims first made against a member of the SpinCo Group or first reported to the insurer on or after the Distribution.

Section 9.02 Claims Under Honeywell Insurance Policies.

(a) On and after the Distribution Date, the members of each of the Honeywell Group and the SpinCo Group shall have the right to assert Honeywell Policy Pre-Separation Insurance Claims and the members of the SpinCo Group shall have the right to participate with Honeywell to resolve Honeywell Policy Pre-Separation Insurance Claims under the applicable Honeywell insurance policies up to the full extent of the applicable and available limits of liability of such policy. Honeywell shall have primary control over those Honeywell Policy Pre-Separation Insurance Claims for which the Honeywell Group or the SpinCo Group, respectively, bears the underlying loss, subject to the terms and conditions of the relevant policy of insurance governing such control. If a member of the SpinCo Group is unable to assert a Honeywell Policy Pre-Separation

Insurance Claim because it is no longer an "insured" under a Honeywell insurance policy, then Honeywell shall, to the extent permitted by applicable Law and the terms of such insurance policy, assert such claim in its own name and deliver the Insurance Proceeds to SpinCo.

(b) With respect to Honeywell Policy Pre-Separation Insurance Claims, whether or not known or reported on or prior to the Distribution Date, SpinCo shall, or shall cause the applicable member of the SpinCo Group to, report such claims arising from the SpinCo Business as soon as practicable to each of Honeywell and the applicable insurer(s), and SpinCo shall, or shall cause the applicable member of SpinCo Group to, individually, and not jointly, assume and be responsible (including, upon the request of Honeywell, by reimbursement to Honeywell for amounts paid or payable by it) for the reimbursement liability (including any deductible, coinsurance or retention payment) related to its portion of the liability, unless otherwise agreed in writing by Honeywell. Each of Honeywell and SpinCo shall, and shall cause each member of the Honeywell Group and SpinCo Group, respectively, to, cooperate and assist the applicable member of the SpinCo Group and the Honeywell Group, as applicable, with respect to such claims. The applicable member of the SpinCo Group shall provide to Honeywell any collateral (or a letter of credit in an amount equal to the value of such collateral) in respect of the reimbursement obligations as may reasonably be requested by the insurers and, upon the request of Honeywell, any other collateral required by the insurers in respect of insurance policies under which Honeywell Policy Pre-Separation Insurance Claims may be recoverable based upon Honeywell's reasonable estimate of the proportion of the requested collateral attributable to claims that may be made by the SpinCo Group. Honeywell agrees that Honeywell Policy Pre-Separation Insurance Claims of members of the SpinCo Group shall receive the same priority as Honeywell Policy Pre-Separation Insurance Claims of members of the Honeywell Group and be treated equitably in all respects, including in connection with deductibles, retentions and coinsurance.

Section 9.03 Claims Under SpinCo Insurance Policies.

(a) On and after the Distribution Date, the members of each of the SpinCo Group and the Honeywell Group shall have the right to assert SpinCo Policy Pre-Separation Insurance Claims and the members of the Honeywell Group shall have the right to participate with SpinCo to resolve SpinCo Policy Pre-Separation Insurance Claims under the applicable SpinCo insurance policies up to the full extent of the applicable and available limits of liability of such policy. SpinCo or Honeywell, as the case may be, shall have primary control over those SpinCo Policy Pre-Separation Insurance Claims for which the SpinCo Group or the Honeywell Group, respectively, bears the underlying loss, subject to the terms and conditions of the relevant policy of insurance governing such control. If a member of the Honeywell Group is unable to assert a SpinCo Policy Pre-Separation Insurance Claim because it is no longer an "insured" under a SpinCo insurance policy, then SpinCo shall, to the extent permitted by applicable Law and the terms of such insurance policy, assert such claim in its own name and deliver the Insurance Proceeds to Honeywell.

(b) With respect to SpinCo Policy Pre-Separation Insurance Claims, whether or not known or reported on or prior to the Distribution Date, Honeywell shall, or shall cause the applicable member of the Honeywell Group to, report such claims arising from the Honeywell Business as soon as practicable to each of SpinCo and the applicable insurer(s), and Honeywell shall, or shall cause the applicable member of Honeywell Group to, individually, and not jointly, assume and be responsible (including, upon the request of SpinCo, by reimbursement to SpinCo for amounts paid or payable by it) for the reimbursement liability (including any deductible, coinsurance or retention payment) related to its portion of the liability, unless otherwise agreed in writing by SpinCo. Each of SpinCo and Honeywell shall, and shall cause each member of the SpinCo Group and Honeywell Group, respectively, to, cooperate and assist the applicable member of the Honeywell Group and the SpinCo Group, as applicable, with respect to such claims. The applicable member of the Honeywell Group shall provide to SpinCo any collateral (or a letter of credit in an amount equal to the value of such collateral) in respect of the reimbursement obligations as may reasonably be requested by the insurers and, upon the request of SpinCo, any other collateral required by the insurers in respect of insurance policies under which SpinCo Policy Pre-Separation Insurance Claims may be recoverable based upon SpinCo's reasonable estimate of the proportion of the requested collateral attributable to claims that may be made by the Honeywell Group. SpinCo agrees that SpinCo Policy Pre-Separation Insurance Claims of members of the Honeywell Group shall receive the same priority as SpinCo Policy Pre-Separation Insurance Claims of members of the SpinCo Group and be treated equitably in all respects, including in connection with deductibles, retentions and coinsurance.

Section 9.04 Insurance Proceeds. Any Insurance Proceeds received by the Honeywell Group for members of the SpinCo Group or by the SpinCo Group for members of the Honeywell Group shall be for the benefit, respectively, of the SpinCo Group and the Honeywell Group. Any Insurance Proceeds received for the benefit of both the Honeywell Group and the SpinCo Group shall be distributed pro rata based on the respective share of the underlying loss.

Section 9.05 Claims Not Reimbursed. Honeywell shall not be liable to SpinCo for claims, or portions of claims, not reimbursed by insurers under any policy for any reason, including coinsurance provisions, deductibles, quota share deductibles, self-insured retentions, bankruptcy or insolvency of any insurance carrier(s), policy limitations or restrictions (including exhaustion of limits), any coverage disputes, any failure to timely file a claim by any member of the Honeywell Group or any member of the SpinCo Group or any defect in such claim or its processing. In the event that insurable claims of both Honeywell and SpinCo (or the members of their respective Groups) exist relating to the same occurrence, the Parties shall jointly defend and waive any conflict of interest necessary to the conduct of the joint defense and shall not settle or compromise any such claim without the consent of the other (which consent shall not be unreasonably withheld, conditioned or delayed subject to the terms and conditions of the applicable insurance policy). Nothing in this Section 9.05 shall be construed to limit or otherwise alter in any way the obligations of the Parties, including those created by this Agreement, by operation of Law or otherwise.

Section 9.06 D&O Policies. On and after the Distribution Date, Honeywell shall not, and shall cause the members of the Honeywell Group not to, take any action that would limit the coverage of the individuals who acted as directors or officers of SpinCo (or members of the SpinCo Group) prior to the Distribution Date under any directors and officers liability insurance policies or fiduciary liability insurance policies (collectively, "D&O Policies") maintained by the members of the Honeywell Group in respect of claims relating to a period prior to the Distribution Date. Honeywell shall, and shall cause the members of the Honeywell Group to, reasonably cooperate with the individuals who acted as directors or officers of SpinCo (or members of the SpinCo Group) prior to the Distribution Date in their pursuit of any coverage claims under such D&O Policies which could inure to the benefit of such individuals. Honeywell shall, and shall cause members of the Honeywell Group to, allow SpinCo and its agents and representatives, upon reasonable prior notice and during regular business hours, to examine the relevant D&O Policies maintained by Honeywell and members of the Honeywell Group pursuant to this Section 9.06. Honeywell shall provide, and shall cause other members of the Honeywell Group to provide, such cooperation as is reasonably requested by SpinCo in order for SpinCo to have in effect on and after the Distribution Date such new D&O Policies as SpinCo deems appropriate with respect to claims reported on or after the Distribution Date. Except as provided in this Section 9.06, the Honeywell Group may, at any time, without liability or obligation to the SpinCo Group, amend, commute, terminate, buy-out, extinguish liability under or otherwise modify any "occurrence-based" insurance policy or "claims-made-based" insurance policy (and such claims will be subject to any such amendments, commutations, terminations, buy-outs, extinguishments and modifications); provided, however, that Honeywell will notify SpinCo of any termination of any insurance policy.

Section 9.07 Insurance Cooperation. The Parties shall use reasonable best efforts to cooperate with respect to the various insurance matters contemplated by this Article IX.

## ARTICLE X

## FURTHER ASSURANCES AND ADDITIONAL COVENANTS

Section 10.01 Further Assurances.

(a) In addition to the actions specifically provided for elsewhere in this Agreement, each of the Parties shall, subject to Section 6.03, use reasonable best efforts, prior to, on and after the Distribution Date, to take, or cause to be taken, all actions, and to do, or cause to be done, all things, reasonably necessary, proper or advisable under applicable Laws and agreements to consummate and make effective the transactions contemplated by this Agreement.

(b) Without limiting the foregoing, prior to, on and after the Distribution Date, each Party shall cooperate with the other Party, without any further consideration, but at the expense of the requesting Party, (i) to execute and deliver, or use reasonable best efforts to execute and deliver, or cause to be executed and delivered, all instruments, including any instruments of conveyance, assignment and transfer as such Party may reasonably be requested to execute and deliver by the other Party, (ii) to make, or cause to be made, all filings with, and to obtain, or cause to be obtained, all Consents of any Governmental Authority or any other Person under any permit, license, Contract, indenture or other instrument, (iii) to obtain, or cause to be obtained, any Governmental Approvals or other Consents required to effect the Spin-Off and (iv) to take, or cause to be taken, all such other actions as such Party may reasonably be requested to take by the other Party from time to time, consistent with the terms of this Agreement and the Ancillary Agreements, in order to effectuate the provisions and purposes of this Agreement, the Ancillary Agreements and any transfers of Assets or assignments and assumptions of Liabilities hereunder and the other transactions contemplated hereby.

(c) On or prior to the Distribution Date, Honeywell and SpinCo, in their respective capacities as direct and indirect shareholders of their respective Subsidiaries, shall each ratify any actions that are reasonably necessary or desirable to be taken by SpinCo or any other Subsidiary of Honeywell, as the case may be, to effectuate the transactions contemplated by this Agreement.

(d) Prior to the Distribution, if either Party identifies any commercial or other service that is needed to ensure a smooth and orderly transition of its business in connection with the consummation of the transactions contemplated hereby, and that is not otherwise governed by the provisions of this Agreement or any Ancillary Agreement, the Parties will cooperate in determining whether there is a mutually acceptable arm's-length basis on which the other Party will provide such service.

Section 10.02 Non-Solicit.

(a) SpinCo agrees that, for a period of 18 months following the Distribution Date, it shall not, and shall cause its Subsidiaries and Affiliates not to, without the prior written consent of Honeywell, directly or indirectly, on its own behalf or in the service or on behalf of others, hire or attempt to hire, whether as an employee, consultant, independent contractor or otherwise, any (i) employee of the Honeywell Group employed in an executive managerial or functional capacity or a key technical or sales capacity (each of such roles, a "Key Role") or (ii) former employee of the Honeywell Group employed in a Key Role who was on the payroll of the Honeywell Group within 6 months of the date of such hiring or attempted hiring by SpinCo or any SpinCo Subsidiary or Affiliate; provided that SpinCo and its Subsidiaries and Affiliates may hire any employee or former employee of the Honeywell Group, including any employee or former employee of the Honeywell Group employed in a Key Role, if such employee or former employee is hired more than 6 months after the Distribution Date in response to a general solicitation for employment by use of advertisements in the media that are not specifically directed at employees of Honeywell.

(b) Honeywell agrees that, for a period of 18 months following the Distribution Date, it shall not, and shall cause its Subsidiaries and Affiliates not to, without the prior written consent of SpinCo, directly or indirectly, on its own behalf or in the service or on behalf of others, hire or attempt to hire, whether as an employee, consultant, independent contractor or otherwise, any (i) employee of the SpinCo Group employed in a Key Role or (ii) former employee of the SpinCo Group employed in a Key Role who was on the payroll of the SpinCo Group within 6 months of the date of such hiring or attempted hiring by Honeywell or any Honeywell Subsidiary or Affiliate; provided that Honeywell and its Subsidiaries and Affiliates may hire any employee or former employee of the SpinCo Group, including any employee or former employee of the SpinCo Group employed in a Key Role, if such employee or former employee is hired more than 6 months after the Distribution Date in response to a general solicitation for employment by use of advertisements in the media that are not specifically directed at employees of SpinCo.

(c) If a final and non-appealable judicial determination is made that any provision of this Section 10.02 constitutes an unreasonable or otherwise unenforceable restriction with respect to any particular jurisdiction, the provisions of this Section 10.02 will not be rendered void but will be deemed to be modified solely with respect to the applicable jurisdiction to the minimum extent necessary to remain in force and effect for the greatest period and to the greatest extent that such court determines constitutes a reasonable restriction under the circumstances.

## ARTICLE XI

## TERMINATION

Section 11.01 Termination. This Agreement may be terminated by Honeywell at any time, in its sole discretion, prior to the Distribution.

Section 11.02 Effect of Termination. In the event of any termination of this Agreement prior to the Distribution, neither Party (nor any member of their Group or any of their respective directors or officers) shall have any Liability or further obligation to the other Party or any member of its Group under this Agreement, the Ancillary Agreements or the Ongoing Relationship Agreements.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01 Counterparts; Entire Agreement; Corporate Power.

(a) This Agreement may be executed in one or more counterparts, all of which counterparts shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each Party and delivered to the other Party. This Agreement may be executed by facsimile or PDF signature and scanned and exchanged by electronic mail, and such facsimile or PDF signature or scanned and exchanged copies shall constitute an original for all purposes.

(b) This Agreement, the Ancillary Agreements, the Ongoing Relationship Agreements and the Appendices, Exhibits and Schedules hereto and thereto contain the entire agreement between the Parties with respect to the subject matter hereof and supersede all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter, and there are no agreements or understandings between the Parties with respect to the subject matter hereof other than those set forth or referred to herein or therein. In the event of conflict or inconsistency between the provisions of this Agreement or any Ancillary Agreement and the provisions of any Local Transfer Agreement, the provisions of this Agreement and any such Ancillary Agreement shall prevail and remain in full force and effect; without limiting the foregoing, no Assets or Liabilities, other than SpinCo Assets and SpinCo Liabilities (in each case, as defined in this Agreement), shall be transferred by Seller (as defined in the Local Transfer Agreements) or accepted by Buyer (as defined in the Local Transfer Agreements) under the Local Transfer Agreements notwithstanding anything to the contrary therein (including the definition of SpinCo Assets and SpinCo Liabilities (in each case, as defined in the Local Transfer Agreements) therein). Each Party hereto shall, and shall cause each of its Subsidiaries to, implement the provisions of and the transactions contemplated by the Local Transfer Agreement in accordance with the immediately preceding sentence.

(c) Honeywell represents on behalf of itself and each other member of the Honeywell Group, and SpinCo represents on behalf of itself and each other member of the SpinCo Group, as follows:

(i) each such Person has the requisite corporate or other power and authority and has taken all corporate or other action necessary in order to execute, deliver and perform each of this Agreement, each Ancillary Agreement and each Ongoing Relationship Agreement to which it is a party and to consummate the transactions contemplated hereby and thereby; and

(ii) this Agreement, each Ancillary Agreement and each Ongoing Relationship Agreement to which it is a party has been (or, in the case of any Ancillary Agreement or Ongoing Relationship Agreement, will be on or prior to the Distribution Date) duly executed and delivered by it and constitutes, or will constitute, a valid and binding agreement of it enforceable in accordance with the terms thereof.

Section 12.02 Dispute Resolution. In the event that either Party, acting reasonably, forms the view that another Party has caused a material breach of the terms of this Agreement, then the Party that forms such a view shall serve written notice of the alleged breach on the other Parties and the Parties shall work together in good faith to resolve any such alleged breach within thirty (30) days of such notice (a "Dispute"). If any such alleged breach is not so resolved, then a senior executive of each Party shall, in good faith, attempt to resolve any such alleged breach within the following thirty (30) days of the referral of the matter to the senior executives. If no resolution is reached with respect to any such alleged breach in accordance with the procedures contained in this Section 12.02, then the Parties may seek to resolve such matter in accordance with Section 12.03, Section 12.04 and Section 12.06.

Section 12.03 Governing Law; Jurisdiction. Any disputes arising out of or relating to this Agreement, including, without limitation, to its execution, performance, or enforcement, shall be governed by, and construed in accordance with, the Laws of the State of New York, regardless of the Laws that might otherwise govern under applicable principles of conflicts of Laws thereof. Each Party irrevocably consents to the exclusive jurisdiction, forum and venue of any state or federal court sitting in New York City in the State of New York over any and all claims, disputes, controversies or disagreements between the Parties or any of their respective Affiliates, successors and assigns under or related to this Agreement or any of the transactions contemplated hereby, including, without limitation, to their execution, performance or enforcement, whether in contract, tort or otherwise. Each of the Parties hereby agrees that it shall not assert and shall hereby waive any claim or right or defense that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. Each Party agrees that a final judgment in any legal proceeding resolved in accordance with this Section 12.03, Section 12.04, Section 12.05 and Section 12.06 shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

Section 12.04 Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY INCLUDING, WITHOUT LIMITATION, THEIR EXECUTION, PERFORMANCE OR ENFORCEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.

Section 12.05 Court-Ordered Interim Relief. In accordance with Section 12.03 and Section 12.04, at any time after giving notice of a Dispute, each Party shall be entitled to interim measures of protection duly granted by a court of competent jurisdiction: (1) to preserve the status quo pending resolution of the Dispute; (2) to prevent the destruction or loss of documents and other information or things relating to the Dispute; or (3) to prevent the transfer, disposition or hiding of assets. Any such interim measure (or a request therefor to a court of competent jurisdiction) shall not be deemed incompatible with the provisions of Section 12.02, Section 12.03 and Section 12.04. Until such Dispute is resolved in accordance with Section 12.02 or final judgment is rendered in accordance with Section 12.03 and Section 12.04, each Party agrees that such Party shall continue to perform its obligations under this Agreement and that such obligations shall not be subject to any defense or set-off, counterclaim, recoupment or termination.

Section 12.06 Specific Performance. Subject to Section 12.02 and Section 12.05, in the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the affected Party shall have the right to specific performance and injunctive or other equitable relief of its rights under this Agreement, in addition to any and all other rights and remedies at Law or in equity, and all such rights and remedies shall be cumulative. The other Party shall not oppose the granting of such relief on the basis that money damages are an adequate remedy. The Parties agree that the remedies at Law for any breach or threatened breach hereof, including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at Law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived.

Section 12.07 Assignability. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of Law or otherwise by either Party without the prior written consent of the other Party. Any purported assignment without such consent shall be void. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns. Notwithstanding the foregoing, if any party to this Agreement (or any of its successors or permitted assigns) (a) shall enter into a consolidation or merger transaction in which such party is not the surviving entity and the surviving entity acquires or assumes all or substantially all of such party's Assets, or (b) shall transfer all or substantially all of such party's Assets to any Person, then, in each such case, the assigning party (or its successors or permitted assigns, as applicable) shall ensure that the assignee or successor-in-interest expressly assumes in writing all of the obligations of the assigning party under this Agreement, and the assigning party shall not be required to seek consent, however, shall provide written notice and evidence of such assignment, assumption or succession to the non-assigning Party. No assignment permitted by this Section 12.07 shall release the assigning Party from liability for the full performance of its obligations under this Agreement.

Section 12.08 Third-Party Beneficiaries. Except for the indemnification rights under this Agreement of any Honeywell Indemnitee or SpinCo Indemnitee in his, her or its respective capacities as such, (a) the provisions of this Agreement are solely for the benefit of the Parties hereto and are not intended to confer upon any Person except the Parties hereto any rights or remedies hereunder and (b) there are no third-party beneficiaries of this Agreement and this Agreement shall not provide any third person with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement.

Section 12.09 Notices. All notices or other communications under this Agreement shall be in writing and shall be deemed to be duly given when (a) delivered in person, (b) on the date received, if sent by a nationally recognized delivery or courier service or (c) upon the earlier of confirmed receipt or the fifth (5th) business day following the date of mailing if sent by registered or certified mail, return receipt requested, postage prepaid and addressed as follows:

If to Honeywell, to:

Honeywell International Inc.
115 Tabor Road
Morris Plains, NJ 07950
Attn: Senior Vice President and General Counsel
Email: [ ]

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Craig B. Brod
Kimberly R. Spoerri
Fax: (212) 225-3999
Email: cbrod@cgsh.com
kspoerri@cgsh.com

If to SpinCo, to:

Resideo Technologies, Inc.
[ ]
Attn: [ ]
Email: [ ]

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Craig B. Brod
Kimberly R. Spoerri
Fax: (212) 225-3999
Email: cbrod@cgsh.com
kspoerri@cgsh.com

Either Party may, by notice to the other Party, change the address to which such notices are to be given. Each Party agrees that nothing in this Agreement shall affect the other Parties' right to serve process in any other manner permitted by Law (including pursuant to the rules for foreign service of process authorized by the Hague Convention).

Section 12.10 Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Party. Upon any such determination, any such provision, to the extent determined to be invalid, void or unenforceable, shall be deemed replaced by a provision that such court determines is valid and enforceable and that comes closest to expressing the intention of the invalid, void or unenforceable provision.

Section 12.11 Publicity. Each of Honeywell and SpinCo shall consult with the other, and shall, subject to the requirements of Section 8.09, provide the other Party the opportunity to review and comment upon, any press releases or other public statements in connection with effecting the Spin-Off or any of the other transactions contemplated hereby and any filings with any Governmental Authority or national securities exchange with respect thereto, in each case prior to the issuance or filing thereof, as applicable (including the Information Statement, the Parties' respective Current Reports on Form 8-K to be filed on the Distribution Date, the Parties' respective Quarterly Reports on Form 10-Q filed with respect to the fiscal quarter during which the Distribution Date occurs, or if such quarter is the fourth fiscal quarter, the Parties' respective Annual Reports on Form 10-K filed with respect to the fiscal year during which the Distribution Date occurs (each such Quarterly Report on Form 10-Q or Annual Report on Form 10-K, a "First Post-Distribution Report")). Each Party's obligations pursuant to this Section 12.11 shall terminate on the date on which such Party's First Post-Distribution Report is filed with the Commission.

Section 12.12 Expenses. Except as otherwise expressly provided in this Agreement or in any Ancillary Agreement or Ongoing Relationship Agreement, (i) all third-party fees, costs and expenses incurred by either the Honeywell Group or the SpinCo Group in connection with effecting the Spin-Off prior to or on the Distribution Date, whether payable

prior to, on or following the Distribution Date (but excluding, for the avoidance of doubt, any financing fees or interest payable in respect of any indebtedness incurred pursuant to the Debt Incurrence), will be borne and paid by Honeywell and (ii) all third-party fees, costs and expenses incurred by either the Honeywell Group or the SpinCo Group in connection with the Spin-Off following the Distribution Date, whether payable prior to, on or following the Distribution Date, will be borne and paid by the Party incurring such fee, cost or expense. For the avoidance of doubt, this Section 12.12 shall not affect each Party's responsibility to indemnify Honeywell Liabilities or SpinCo Liabilities, as applicable, arising from the transactions contemplated by the Distribution.

Section 12.13 Headings. The article, section and paragraph headings contained in this Agreement, including in the table of contents of this Agreement, are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 12.14 Survival of Covenants. Except as expressly set forth in this Agreement, the covenants in this Agreement and the Liabilities for the breach of any obligations in this Agreement shall survive the Spin-Off and shall remain in full force and effect.

Section 12.15 Waivers of Default. No failure or delay of any Party (or the applicable member of its Group) in exercising any right or remedy under this Agreement, any Ancillary Agreement or any Ongoing Relationship Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Waiver by any Party of any default by the other Party of any provision of this Agreement shall not be deemed a waiver by the waiving Party of any subsequent or other default.

Section 12.16 Amendments. No provisions of this Agreement shall be deemed waived, amended, supplemented or modified by any Party, unless such waiver, amendment, supplement or modification is in writing and signed by the authorized representative of each Party.

Section 12.17 Interpretation. Words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires. The terms "hereof," "herein," "herewith" and words of similar import, unless otherwise stated, shall be construed to refer to this Agreement as a whole (including all of the schedules hereto) and not to any particular provision of this Agreement. Article, Section or Schedule references are to the articles, sections and schedules of or to this Agreement unless otherwise specified. Any capitalized terms used in any Schedule to this Agreement or to any Ancillary Agreement or Ongoing Relationship Agreement but not otherwise defined therein shall have the meaning as defined in this Agreement, the Ancillary Agreement or the Ongoing Relationship Agreement to which such Schedule is attached, as applicable. Any definition of or reference to any agreement, instrument or other document herein (including any reference herein to this Agreement) shall, unless otherwise stated, be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth therein, including in Section 12.16 above). The word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless the context otherwise requires or unless otherwise specified. The word "or" shall not be exclusive. All references to "$" or dollar amounts are to lawful currency of the United States of America. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of the authorship of any provisions hereof.

IN WITNESS WHEREOF, the Parties have caused this Separation and Distribution Agreement to be executed by their duly authorized representatives.

HONEYWELL INTERNATIONAL INC.

By: ______________________________
Name:
Title:

RESIDEO TECHNOLOGIES, INC.

By: ______________________________
Name:
Title:

(Back To Top)

# Section 3: EX-2.3 (EX-2.3)

**Exhibit 2.3**

**FORM OF TAX MATTERS AGREEMENT** (this "Agreement"), dated as of [ ], 2018, by and between **HONEYWELL INTERNATIONAL INC.**, a Delaware corporation ("HII"), and **RESIDEO TECHNOLOGIES, INC.**, a Delaware corporation ("SpinCo", and HII and SpinCo, collectively, the "Parties").

W I T N E S S E T H:

**WHEREAS**, as of the date of this Agreement, SpinCo is a wholly-owned subsidiary of HII and a member of the affiliated group of which HII is the common parent;

**WHEREAS**, pursuant to the Separation Agreement, HII and SpinCo have effected or agreed to effect (i) the Reorganization (the steps of which are described in Schedule I of the Separation Agreement) and (ii) the Distribution (together, the "Transactions");

**WHEREAS**, the Parties believe the Distribution will provide greater flexibility for management, capital requirements and growth of the SpinCo Business and will enable HII senior management to focus its time and resources on the development of the HII retained businesses;

**WHEREAS**, the Parties intend that each of the applicable Transactions qualify for its Intended Tax Treatment;

**WHEREAS**, as a result of and upon the Distribution, SpinCo and its Subsidiaries will cease to be members of the Honeywell Group; and

**WHEREAS**, the Parties desire to allocate the Tax responsibilities, liabilities and benefits of transactions that occur on or prior to, and that may occur after, the Distribution Date and to provide for and address certain other Tax matters.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the Parties hereby agree as follows:

**ARTICLE I**

**Definitions**

SECTION 1.01. Definition of Terms. The following terms shall have the following meanings. Capitalized terms used but not defined in this Agreement shall have the meanings ascribed to them in the Separation Agreement.

"10% Acquisition Transaction" has the meaning set forth in Section 4.06.

"Accounting Firm" has the meaning set forth in Section 3.01(d).

"Active Trade or Business" means the active conduct (determined in accordance with Section 355(b) of the Code) of the trades or businesses described in the Tax Opinion Representations for purposes of satisfying the requirements of Section 355(b) of the Code as it applies to the Transactions with respect to the businesses conducted by members of the SpinCo Group that are the ATB Entities.

"Agreement" has the meaning set forth in the preamble.

"ATB Entities" means the entities listed on Schedule [ ].

"Code" means the Internal Revenue Code of 1986, as amended.

"Determination" means (i) any final determination of liability in respect of a Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise (including as a result of the expiration of a statute of limitations or period for the filing of claims for refunds, amended Tax Returns or appeals from adverse determinations), including a "determination" as defined in Section 1313(a) of the Code or execution of an IRS Form 870AD, or (ii) the payment of Tax by a Party (or its Subsidiary) that is responsible for payment of that Tax under applicable Law, with respect to any item disallowed or adjusted by a Taxing Authority, as long as the responsible Party determines that no action should be taken to recoup that payment and the other Party agrees.

"E&P" has the meaning set forth in Section 2.02(b)(iv).

"Gain Recognition Agreement" means any agreement to recognize gain that is described in Treasury Regulation Section 1.367(a)-8 and entered into in connection with the Transactions and to which any member of the Honeywell Group or the SpinCo Group is a party.

"Honeywell Group" means HII and each of its Subsidiaries, including any Person that becomes a Subsidiary of Honeywell as a result of transactions that occur following the Distribution in accordance with the Plan of Reorganization, but excluding any member of the SpinCo Group.

"Honeywell Separate Return" means a Tax Return of any member of the Honeywell Group (including any consolidated, combined, affiliated, unitary or similar Tax Return) that does not include, for all or any portion of the relevant taxable period, any member of the SpinCo Group.

"HII" has the meaning set forth in the preamble.

"HII Consolidated Group" means any consolidated, combined, affiliated, unitary or similar group of which (i) any member of the Honeywell Group is or was a member and (ii) any member of the SpinCo Group is or was a member.

"Indemnification Agreement" means the Indemnification and Reimbursement Agreement, dated as of [ ], 2018, by and among New HAPI Inc. and HII.

"Indemnifying Party" means a Party that has an obligation to make an Indemnity Payment.

"Indemnitee" means a Party that is entitled to receive an Indemnity Payment.

"Indemnity Payment" means an indemnity payment contemplated by this Agreement and the Separation Agreement. For the avoidance of doubt, any payments under the Indemnification Agreement shall not be treated as an Indemnity Payment hereunder.

"Intended Tax Treatment" means, with respect to each of the applicable Transactions, the tax treatment set forth for such Transaction in Appendix A.

"IRS" means the U.S. Internal Revenue Service.

"Joint Return" means any Tax Return (i) that includes both a member of the Honeywell Group and a member of the SpinCo Group or (ii) of an entity that reflects items attributable to both the Honeywell Business and the SpinCo Business.

"Ordinary Taxes" means Taxes other than (i) Transaction Taxes and (ii) Transfer Taxes incurred as a result of the Transactions.

"Parties" has the meaning set forth in the preamble.

"Post-Distribution Tax Period" means any taxable period (or portion thereof) beginning after the Distribution Date.

"Pre-Distribution Tax Period" means any taxable period (or portion thereof) that ends on or before the Distribution Date.

"Prime Rate" means the "prime rate" as published in The Wall Street Journal, Eastern Edition.

"Privilege" means all privileges, immunities or other protections from disclosure which may be asserted under applicable Law, including attorney-client privilege, business strategy privilege, joint defense privilege, common interest privilege and protection under the work-product doctrine.

"Proposed Acquisition Transaction" has the meaning set forth in Section 4.03(b).

"Protective Section 336(e) Election" means, with respect to an entity, a protective election under Section 336(e) of the Code and Section 1.336-2(j) of the Regulations (and any similar provision of U.S. state, local or non-U.S. Law for such jurisdictions as HII shall determine at its sole discretion) to treat the disposition of the Stock of such entity, pursuant to the Reorganization or the Distribution, as a deemed sale of the assets of such entity in accordance with Section 1.336-2(h) of the Regulations (or any similar provision of U.S. state, local or non-U.S. Law).

"Records" has the meaning set forth in Section 5.01.

"Refund Recipient" has the meaning set forth in Section 2.03.

"Regulations" means the Treasury regulations promulgated under the Code.

"Reportable Transaction" means a reportable or listed transaction as defined in Section 6011 of the Code or the Regulations promulgated thereunder, other than a loss transaction as defined in Regulations Section 1.6011-4(b)(5).

"Restricted Period" has the meaning set forth in Section 4.03(a).

"Ruling" means a private letter ruling (including any supplemental ruling) sought or issued by the IRS in connection with the Transactions, including in connection with the actions prohibited under Section 4.03(a) of this Agreement, whether granted prior to, on or after the date hereof.

"Satisfactory Guidance" has the meaning set forth in Section 4.04(c).

"Section 355 Entities" means the entities listed on Schedule [ ].

"Separation Agreement" means the Separation and Distribution Agreement dated as of the date of this Agreement by and between HII and SpinCo, including the Schedules thereto.

"SpinCo" has the meaning set forth in the preamble.

"SpinCo Group" means (a) SpinCo, (b) each Person that will be a Subsidiary of SpinCo immediately prior to the Distribution, including the entities set forth on Schedule IV of the Separation Agreement under the caption "Subsidiaries", and (c) each Person that becomes an Affiliate of SpinCo after the Distribution, including in each case any Person that is merged or consolidated with or into SpinCo or any Affiliate of SpinCo and any Person that becomes an Affiliate of SpinCo as a result of transactions that occur following the Distribution in accordance with the Plan of Reorganization.

"SpinCo SAG" has the meaning set forth in Section 4.03(a)(v).

"SpinCo Separate Return" means a Tax Return of any member of the SpinCo Group (including any consolidated, combined, affiliated or unitary Return) that does not include, for all or any portion of the relevant taxable period, any member of the Honeywell Group.

"SpinCo Stock" means (i) all classes or series of stock or other equity interests of SpinCo and (ii) all other instruments properly treated as stock of SpinCo for U.S. Federal income Tax purposes.

"Straddle Period" has the meaning set forth in Section 2.05(b).

"Subsidiary" means, with respect to any Person, a corporation, partnership, association, limited liability company, trust or other form of legal entity in which such Person and/or one or more Subsidiaries of such Person has either (i) a majority ownership in the equity thereof; (ii) the power to elect, or to direct the election of, a majority of the board of directors or other analogous governing body of such entity; or (iii) the title or function of general partner or manager, or the right to designate the Person having such title or function.

"Tax Advisor" means a Tax counsel or other Tax advisor of recognized national standing in the relevant jurisdiction.

"Tax Attribute" has the meaning set forth in Section 2.04.

"Tax Contest" means an audit, review, examination or other administrative or judicial proceeding, in each case by any Taxing Authority.

"Tax Dispute" has the meaning set forth in Section 5.06.

"Tax Item" means any item of income, gain, loss, deduction, credit, recapture of credit, previously taxed income or any other item (including the basis or adjusted basis of property) which increases or decreases Taxes paid or payable in any taxable period.

"Tax Opinion Representations" means representations regarding certain facts in existence at the applicable time made by HII and SpinCo that serve as a basis for the Tax Opinions.

"Tax Opinion" means either or both of the written opinions of Cleary Gottlieb Steen & Hamilton LLP and KPMG LLP, issued to HII to the effect that each of the applicable Transactions will qualify for its Intended Tax Treatment.

"Tax Opinions/Rulings" means (i) any Ruling and (ii) any opinion of a Tax Advisor relating to the Transactions, including those issued on the Distribution Date or to allow a party to take actions otherwise prohibited under Section 4.03(a) of this Agreement.

"Tax Return" means any return, declaration, statement, report, form, estimate or information return relating to, (i) for purposes of Article III, Taxes other than payroll and employment related Taxes and (ii) for all other purposes of this Agreement, Taxes, in each case, including any amendments thereto and any related or supporting information, required or permitted to be filed with any Taxing Authority.

"Tax Return Preparer" means with respect to a Tax Return, the Party that is required to prepare any such Tax Return pursuant to Section 3.01(a) or (b), as applicable.

"Taxes" means all forms of taxation or duties imposed by any Governmental Authority, or required by any Governmental Authority to be collected or withheld, including in each case, charges in the nature of a tax, together with any related interest, penalties and other additional amounts.

"Taxing Authority" means any Governmental Authority charged with the determination, collection or imposition of Taxes.

"Transaction Tax Contest" means a Tax Contest with the purpose or effect of determining or redetermining Transaction Taxes.

"Transaction Taxes" means all (i) Taxes imposed on any member of the Honeywell Group or any member of the SpinCo Group resulting from the failure of any step of the Transactions to qualify for its Intended Tax Treatment, (ii) Taxes imposed on any third party resulting from the failure of any step of the Transactions to qualify for its Intended Tax Treatment for which any member of the Honeywell Group or any member of the SpinCo Group is or becomes liable for any reason and (iii) reasonable, out-of-pocket legal, accounting and other advisory costs or court fees incurred in connection with liability for Taxes described in clause (i) or (ii).

"Transactions" has the meaning set forth in the recitals.

"Transfer Taxes" means all transfer, sales, use, excise, stock, stamp, stamp duty, stamp duty reserve, stamp duty land, documentary, filing, recording, registration, net value-added and other similar Taxes (excluding, for the avoidance of doubt, any income, gains, profit or similar Taxes, however assessed).

"Unqualified Tax Opinion" has the meaning set forth in Section 4.04(d).

**ARTICLE II**

**Allocation of Tax Liabilities and Tax Benefits**

SECTION 2.01. HII Indemnification of the SpinCo Group. After the Distribution, HII shall be liable for, and shall indemnify and hold the members of the SpinCo Group harmless from, the following Taxes:

(a) Ordinary Taxes of members of the Honeywell Group for any taxable period; and

(b) Transaction Taxes;

in each case, other than Taxes for which SpinCo is liable under Section 2.02.

SECTION 2.02. SpinCo Indemnification of the Honeywell Group. After the Distribution, SpinCo shall be liable for, and shall indemnify and hold the members of the Honeywell Group harmless from, the following Taxes:

(a) Ordinary Taxes, in each case, for any taxable period incurred by or attributable to (i) the entities set forth on Schedule 2.02(a) or (ii) any other member of the Honeywell Group or the SpinCo Group to the extent attributable to the SpinCo Business as reasonably determined by HII;

(b) Transaction Taxes attributable in whole or in part to:

(i) the failure to be true when made or deemed made of (A) any statement or representation of fact or intent (or omission to state a material fact) in Section 4.01 that relates to the SpinCo Group, (B) any Tax Opinion Representation made by SpinCo or (C) any representation made by SpinCo, any Subsidiary or controlling shareholder of SpinCo, any counterparty to any Proposed Acquisition Transaction or any of such counterparty's Affiliates for purposes of obtaining a Ruling or an Unqualified Tax Opinion intended to be Satisfactory Guidance;

(ii) any action or omission by any member of the SpinCo Group in breach of the covenants set forth herein (including those in Section 4.03), in any other Ancillary Agreement or in the Separation Agreement;

(iii) the application of Section 355(e) or 355(f) of the Code to any of the Transactions by virtue of any acquisition (or deemed acquisition) of SpinCo Stock (including newly issued SpinCo Stock) or assets of any member of the SpinCo Group;

(iv) a determination that the Distribution was used principally as a device for the distribution of earnings and profits ("E&P") within the meaning of Section 355(a)(1)(B) of the Code if such determination was based in whole or in part on any sale or exchange of SpinCo Stock or on any distribution on SpinCo Stock occurring after the Distribution in excess of SpinCo's E&P; or

(v) any other action or omission taken after the Distribution by SpinCo or any member of the SpinCo Group, except to the extent such action or omission is otherwise expressly required or permitted by this Agreement (other than under Section 4.04), any other Ancillary Agreement or the Separation Agreement;

(c) Any and all Transfer Taxes incurred by the Honeywell Group or the SpinCo Group as a result of the Transactions; and

(d) Notwithstanding anything in Section 2.01 or this Section 2.02 to the contrary, any and all Taxes incurred by the Honeywell Group or the SpinCo Group as a result of the Reorganization transactions that result in a Tax benefit for any member of the SpinCo Group, as determined by HII in its sole discretion.

SECTION 2.03. Refunds, Credits and Offsets.

(a) Subject to Section 2.04, if any member of the Honeywell Group or any member of the SpinCo Group receives any refund of any Taxes or any amount of value-added Tax for which the other Party is liable under Sections 2.01 or 2.02 (a "Refund Recipient"), such Refund Recipient shall pay to the other Party the entire amount of the refund (including interest, but net of any Taxes imposed with respect to receipt of such refund) or value-added Tax within 10 business days of receipt or accrual; provided, however, that the other Party, upon the request of such Refund Recipient, shall repay the amount paid to the other Party (plus any penalties, interest or other charges imposed by the relevant Taxing Authority) in the event such Refund Recipient is required to repay such refund. In the event a Party would be a Refund Recipient but for the fact it applied a refund to which it would otherwise have been entitled against a Tax liability arising in a subsequent taxable period, then such Party shall be treated as a Refund Recipient and the economic benefit of so applying the refund shall be treated as a refund, and shall be paid within 10 business days of the due date of the Tax Return to which such refund is applied to reduce the subsequent Tax liability.

(b) If one Party reasonably so requests, the other Party (at the first Party's expense) shall file for and pursue any refund to which the first Party is entitled under this Section; provided that the other Party need not pursue any refund on behalf of the first Party unless the first Party provides the other Party a certification by an appropriate officer of the first

Party setting forth the first Party's belief (together with supporting analysis) that the Tax treatment of the Tax Items on which the entitlement to such Refund is based is more likely than not correct, and is not a Tax Item arising from a Reportable Transaction.

SECTION 2.04. Carrybacks. If a Tax Return of any member of the SpinCo Group for any taxable period ending after the Distribution Date reflects any net operating loss, net capital loss, excess Tax credit or other Tax attribute (a "Tax Attribute"), then the applicable member of the SpinCo Group shall waive the right to carry back any such Tax Attribute to a Tax Return described in Section 3.01(a) for a Pre-Distribution Tax Period to the extent permissible under applicable Law. In the event that any member of the SpinCo Group is required to carry back a Tax Attribute to a Tax Return described in Section 3.01(a) for a Pre-Distribution Tax Period, then (i) no payment with respect to such carryback shall be due to any member of the SpinCo Group from HII and (ii) if any member of the SpinCo Group receives any refund, credit or offset of any Taxes in connection with such carryback, SpinCo shall promptly pay to HII the full amount of such refund or the economic benefit of the credit or offset (including interest, but net of any Taxes imposed with respect to such refund).

SECTION 2.05. Allocation of Certain Income Taxes and Income Tax Items.

(a) If HII determines, in its sole discretion, to close the taxable year of any member of the SpinCo Group for all Tax purposes as of the end of the Distribution Date, HII and SpinCo shall take all commercially reasonable actions necessary or appropriate to so close such taxable year, to the extent permitted by applicable Law.

(b) For any taxable period that includes (but does not end on) the Distribution Date (a "Straddle Period"), Taxes for the Pre-Distribution Tax Period shall be computed (i) in the case of Taxes imposed on a periodic basis (such as real, personal and intangible property Taxes), on a daily pro rata basis and (ii) in the case of other Taxes generally, as if the taxable period ended as of the close of business on the Distribution Date and, in the case of any such other Taxes that are attributable to the ownership of any equity interest in a partnership, other "flowthrough" entity or "controlled foreign corporation" (within the meaning of Section 957(a) of the Code or any comparable U.S. state, local or non-U.S. Law), as if the taxable period of that entity ended as of the close of business on the Distribution Date (whether or not such Taxes arise in a Straddle Period of the applicable owner); provided that HII may elect to allocate Tax Items (other than any extraordinary Tax Items) ratably in the month in which the Distribution occurs (and if HII so elects, SpinCo shall so elect) as described in Treasury Regulation Section 1.1502–76(b)(2)(iii) and corresponding provisions of U.S. state, local or non-U.S. Tax Laws.

(c) Transactions occurring, or actions taken, on the Distribution Date but after the Distribution outside the ordinary course of business by, or with respect to, SpinCo or any of its Affiliates shall be deemed subject to the "next day rule" of Treasury Regulation Section 1.1502–76(b)(1)(ii)(B) (and any comparable or similar provision under U.S. state, local or non-U.S. Laws or regulations, provided that if there is no comparable or similar provision under U.S. state, local or non-U.S. Laws or regulations, then the transaction will be deemed subject to the "next day rule" of Treasury Regulation Section 1.1502–76(b)(1)(ii)(B)) and as such shall for purposes of this Agreement be treated (and consistently reported by the Parties) as occurring in a Post-Distribution Tax Period of SpinCo or an Affiliate of SpinCo, as appropriate.

(d) Tax Attributes determined on a consolidated or combined basis for taxable periods ending before or including the Distribution Date (or such earlier date as may be appropriate with respect to any portion of the Reorganization occurring prior to the Distribution Date) shall be allocated to HII and its Affiliates, and SpinCo and its Affiliates, in accordance with the Code and the Regulations (and any applicable U.S. state, local, or non-U.S. Law or regulation). HII shall reasonably determine the amounts and proper allocation of such attributes, and the Tax basis of the assets and liabilities transferred to SpinCo in connection with the Transactions, as of the Distribution Date or such other relevant date of a Reorganization transaction. HII and SpinCo agree to compute their Tax liabilities for taxable periods after the Distribution Date (or other relevant date) consistent with that determination and allocation, and treat the Tax Attributes and Tax Items as reflected on any federal (or applicable U.S. state, local or non-U.S.) Tax Return filed by the Parties as presumptively correct.

(e) If either Party would have been responsible for the payment of any Transaction Taxes pursuant to Section 2.01 or Section 2.02 but for the use of the Tax Attributes of the other Party (or its Subsidiaries), the Party that would have been responsible for such Transaction Taxes shall pay to the other Party the amount of Transaction Taxes that would have been due and payable without taking into account such Tax Attributes.

(f) HII shall reasonably determine the amount of Ordinary Taxes attributable to any entity, group or business by assuming that a Tax Return would be prepared and filed with respect to the relevant entity, group or business on a standalone basis, without regard to any Joint Return that will actually be filed, utilizing only the Tax Attributes allocated to the relevant entity, group or business and not any Tax Attributes allocated to any other entity, group or business.

(g) Except as otherwise provided in this Agreement, HII shall be permitted to make all decisions, determinations and allocations relating to the matters set forth in this Agreement in its reasonable discretion and shall not be limited by past practice.

## ARTICLE III

## Tax Returns, Tax Contests and Other Administrative Matters

SECTION 3.01. Responsibility for Preparing Tax Returns.

(a) HII shall make all determinations with respect to and have ultimate control over the preparation of all (i) Honeywell Separate Returns for all taxable periods and (ii) Joint Returns. If SpinCo is responsible for filing any such Tax Return described in Section 3.01(a)(ii) under Section 3.02(a), HII shall, subject to Section 3.01(d), promptly deliver such prepared Tax Return to SpinCo reasonably in advance of the applicable filing deadline.

(b) Except as provided in Section 3.01(a), SpinCo shall have ultimate control over the preparation of all SpinCo Separate Returns for all taxable periods. If HII is responsible for filing any such Tax Return under Section 3.02(a), SpinCo shall, subject to Section 3.01(d), promptly deliver such prepared Tax Return to HII reasonably in advance of the applicable filing deadline.

(c) To the extent that any Tax Return described in Section 3.01(a) or (b) is required to be filed by a Party other than the Tax Return Preparer or directly relates to matters for which another Party may have an indemnification obligation to the Tax Return Preparer or that may give rise to a refund to which that other Party would be entitled, under this Agreement, the Tax Return Preparer shall (i) prepare the relevant portions of the Tax Return on a basis consistent with past practice, except (A) as required by applicable Law or to correct any clear error, (B) as a result of changes or elections made on any Tax Return of a HII Consolidated Group that do not relate primarily to the SpinCo Group or (C) as mutually agreed by the Parties; (ii) notify the other Party of any such portions not prepared on a basis consistent with past practice; (iii) provide the other Party a reasonable opportunity to review the relevant portions of the Tax Return; (iv) consider in good faith any reasonable comments made by the other Party; and (v) not file any such Tax Return without the consent of the other Party (which consent not to be unreasonably withheld, conditioned or delayed).

(d) The Parties shall attempt in good faith to resolve any issues arising out of the review of any such Tax Return as soon as practically possible. If the Parties are unable to resolve their differences, then the Parties shall collectively select an independent accounting firm (the "Accounting Firm") and shall instruct the Accounting Firm to use its best efforts to prepare the relevant portions of the Tax Return on behalf of the Tax Return Preparer in compliance with Section 3.01(c) as promptly as practically possible. All determinations of the Accounting Firm relating to the disputed items, absent fraud, shall be final and binding on the Parties.

(e) SpinCo shall provide to HII all information related to members of the SpinCo Group that is reasonably requested by HII and required to complete any Tax Return which is the responsibility of HII pursuant to Section 3.01(a), in the format reasonably requested by HII, and at least 60 days prior to the due date (including extensions) of the relevant Tax Return. In particular, the SpinCo Group tax department will support HII with respect to data collection and compilation requirements. The dates for submissions to HII required in this section may be modified by mutual agreement of HII and SpinCo.

(f) Each Party shall bear its own expenses in connection with the preparation of Tax Returns pursuant to this Section 3.01; provided that expenses incurred with respect to Tax Returns under Section 3.01(a)(ii) shall be borne by the Parties as determined by HII in its sole discretion.

SECTION 3.02. Filing of Tax Returns and Payment of Taxes.

(a) Each Party shall execute and timely file each Tax Return that it is responsible for filing under applicable Law and shall timely pay to the relevant Taxing Authority any amount shown as due on each such Tax Return. The obligation to make payments pursuant to this Section 3.02(a) shall not affect a Party's right, if any, to receive payments under Section 3.02(b) or otherwise be indemnified under this Agreement.

(b) In addition to its obligations under Section 3.01(c), the Tax Return Preparer shall, no later than 5 business days before the due date (including extensions) of any Tax Return described in Section 3.01(a) or (b), notify the other Party of any amount (or any portion of any such amount) shown as due on that Tax Return (i) if the Tax Return Preparer is

responsible for filing such Tax Return under Section 3.02(a), for which the other Party must indemnify the Tax Return Preparer under this Agreement or (ii) if the other Party is responsible for filing such Tax Return under Section 3.02(a), which the other Party must so pay, as the case may be. The other Party shall pay any amounts described under Section 3.02(b)(i) to the Tax Return Preparer no later than five days before the due date (including extensions timely applied for) of the relevant Tax Return. A failure by an Indemnitee to give notice as provided in this Section 3.02(b) shall not relieve the Indemnifying Party's indemnification obligations under this Agreement, except to the extent that the Indemnifying Party shall have been actually prejudiced by such failure.

(c) No member of the SpinCo Group shall file, amend, withdraw, revoke or otherwise alter any Tax Return of any HII Consolidated Group.

(d) No member of the SpinCo Group shall file, amend, withdraw, revoke or otherwise alter any Tax Return of the SpinCo Group or any member thereof to the extent such Tax Return relates to the Pre-Distribution Tax Period without the prior written consent of HII, which consent shall not be unreasonably withheld or delayed.

(e) Subject to Section 3.03, in the case of any adjustment pursuant to a Determination with respect to any such Tax Return, the party that filed such Tax Return under Section 3.02(a) shall pay to the applicable Taxing Authority when due any additional Tax due with respect to such Tax Return required to be paid as a result of such adjustment pursuant to a Determination. The Tax Return Preparer shall compute the amount attributable to the SpinCo Group in accordance with Section 2 of this Agreement and SpinCo shall pay to HII any amount due to HII (or HII shall pay SpinCo any amount due to SpinCo) under Section 2 of this Agreement within thirty business days from the later of (i) the date the additional Tax was paid by the relevant Party or, in an instance where no cash payment is due to a Taxing Authority, the date of such Determination, or (ii) the date of receipt of a written notice and demand from the relevant Party for payment of the amount due, accompanied by evidence of payment and a statement detailing the Taxes paid and describing in reasonable detail the particulars relating thereto. Any payments required under this Section 3.02(e) shall include interest computed at the Prime Rate based on the number of days from the date the additional Tax was paid by the relevant Party (or, in an instance where no cash payment is due to a Taxing Authority, the date of such Determination) to the date of the payment under this Section 3.02(e).

(f) The Parties shall report the Transactions for all Tax purposes in a manner consistent with the Tax Opinions/Rulings, unless, and only to the extent, a different position is required pursuant to a Final Determination. HII shall determine the Tax treatment to be reported on any Tax Return of any Tax issue relating to the Transactions that is not covered by the Tax Opinions/Rulings.

SECTION 3.03. Tax Contests.

(a) HII or SpinCo, as applicable, shall, within 10 business days of becoming aware of any Tax Contest (including a Transaction Tax Contest) that could reasonably be expected to cause the other Party to have an indemnification obligation under this Agreement, notify the other Party of such Tax Contest and thereafter promptly forward or make available to the Indemnifying Party copies of notices and communications relating to the relevant portions of such Tax Contest. A failure by an Indemnitee to give notice as provided in this Section 3.03(a) (or to promptly forward any such notices or communications) shall not relieve the Indemnifying Party's indemnification obligations under this Agreement, except to the extent that the Indemnifying Party shall have been actually prejudiced by such failure.

(b) HII shall have the exclusive right to control the conduct and settlement of any Tax Contest (including a Transaction Tax Contest) (i) that relates solely or primarily to Taxes that are the responsibility of HII pursuant to Article II, (ii) that relates to the "net tax liability" of HII under Section 965(h)(6)(A), or (iii) at HII's election, that may reasonably be expected to materially affect amounts for which both HII and SpinCo are liable under Article II; provided that SpinCo shall have the right, at its sole expense, to participate in and advise on all aspects of any Tax Contest HII elects to control under clause (iii) above, but only in connection with matters relating to potential material liability of a member the SpinCo Group, and, if SpinCo would have liability for a material amount of Taxes as a result of the proposed settlement of any such Tax Contest, HII shall not settle such Tax Contest without the consent of SpinCo (not to be unreasonably withheld, conditioned or delayed). HII shall notify SpinCo within 10 days of becoming aware of a Tax Contest under Section 3.03(b)(iii) if HII does not elect to control such Tax Contest; provided that HII shall have the right to assume control of any such Tax Contest and to settle, compromise and/or concede such Tax Contest, if HII reasonably determines that (i) as a result of subsequent developments the expected Tax liability exposure of any member of the Honeywell Group resulting from such Tax Contest has materially increased; (ii) SpinCo has failed to adequately and properly manage the conduct of such Tax Contest or (iii) an event has occurred during such Tax Contest that could adversely affect HII in any material respect.

(c) SpinCo shall have the exclusive right to control the conduct and settlement of any Tax Contest (including a Transaction Tax Contest) (i) that relates solely to Taxes that are the responsibility of SpinCo pursuant to Article II, (ii) that could not reasonably be expected to materially affect amounts for which HII is liable under Article II, or (iii) that HII does not elect to control under Section 3.03(b)(iii); provided that HII shall have the right, at its sole expense, to participate in and advise on all aspects of such Tax Contests and may coordinate discussions with the relevant Taxing Authority with respect thereto, and, with respect to Tax Contests under clause (iii) above, SpinCo shall not settle any such Tax Contest without the consent of HII (not to be unreasonably withheld, conditioned or delayed).

SECTION 3.04. Expenses. Each Party shall bear its own expenses in the course of any Tax Contest, other than expenses included in the definition of Transaction Taxes, which shall be governed by Article II.

## ARTICLE IV

## Tax Matters Relating to the Transactions

SECTION 4.01. Mutual Representations. Each Party represents that it knows of no fact, and has no plan or intention to take any action, that it knows or reasonably should expect, after consultation with a Tax Advisor, is inconsistent with the qualification of any step of the

Transactions for its Intended Tax Treatment, the Tax Opinions/Rulings or the covenants set forth in this Agreement.

SECTION 4.02. Mutual Covenants.

(a) Each Party shall use its reasonable best efforts to cause the Tax Opinions to be issued, including by executing the Tax Opinion Representations requested by Cleary Gottlieb Steen & Hamilton LLP and KPMG LLP, that are true and correct.

(b) Except as otherwise expressly required or permitted by the Separation Agreement, this Agreement or any other Ancillary Agreement, after the Distribution neither Party shall take or fail to take, or cause or permit its respective Subsidiaries to take or fail to take, any action, if such action or omission would (i) violate, be inconsistent with or cause to be untrue any covenant, representation, information or statement in any Tax Opinions/Rulings or a letter or certificate that forms the basis therefor, or (ii) adversely affect, or be reasonably likely to adversely affect, or be inconsistent with, the Intended Tax Treatment of the Transactions.

SECTION 4.03. Restricted Actions.

(a) Subject to Section 4.04, during the period beginning on the Distribution Date and ending on, and including, the last day of the two-year period following the Distribution Date (the "Restricted Period"), SpinCo shall not (and shall not cause or permit any member of the SpinCo Group to), in a single transaction or a series of transactions:

(i) enter into any Proposed Acquisition Transaction;

(ii) take any affirmative action that permits a Proposed Acquisition Transaction to occur by means of an agreement to which no member of the SpinCo Group is a party (including by (A) redeeming rights under a shareholder rights plan, (B) making a determination that a tender offer is a "permitted offer" under any such plan or otherwise causing any such plan to be inapplicable or neutralized with respect to any Proposed Acquisition Transaction or (C) approving any Proposed Acquisition Transaction, whether for purposes of Section 203 of the Delaware General Corporate Law or any similar corporate statute, any "fair price" or other provision of SpinCo's charter or bylaws or otherwise);

(iii) liquidate or partially liquidate SpinCo, any Section 355 Entity, or any ATB Entity, whether by merger, consolidation or otherwise (provided that, for the avoidance of doubt, a merger of another entity into a member of the SpinCo Group shall not constitute an action described in this Section 4.03(a)(iii));

(iv) cause or permit any ATB Entity to cease to engage in the Active Trade or Business;

(v) sell or transfer (A) 50% or more of the gross assets that are held by any ATB Entity and are used in the Active Trade or Business, (B) 50% or more of the gross assets of the "separate affiliated group" (within the meaning of Section 355 (b) (3)(B) of the Code) of SpinCo (the "SpinCo SAG") held immediately before the Distribution (provided, however, that the foregoing shall not apply to sales, transfers or dispositions of assets to any

member of the SpinCo SAG) or (C) any lesser amount if that sale or transfer could reasonably be expected to result in a significant and material change to, or termination of, the Active Trade or Business immediately after the Distribution Date;

(vi) dispose of or permit an Affiliate of SpinCo to dispose of, directly or indirectly, any interest in any ATB Entity or permit any such ATB Entity to make or revoke any election under Regulations Section 301.7701-3;

(vii) redeem or otherwise repurchase (directly or indirectly) any SpinCo Stock, except to the extent such redemptions or repurchases meet the following requirements: (A) those redemptions or purchases are for business reasons unrelated to the Distribution, (B) SpinCo Stock to be purchased is widely held, (C) those redemptions or purchases will be made on the open market and (D) the aggregate amount of those redemptions or purchases will be less than 20% of the total value of the outstanding SpinCo Stock; or

(viii) amend its certificate of incorporation (or other organizational documents), or take any other action, affecting the relative voting rights of the separate classes of SpinCo Stock; provided, however, that this clause (viii) shall not be deemed to be violated upon SpinCo's adoption of a shareholder rights plan that meets the requirements of IRS Revenue Ruling 90-11.

(b) (i) For purposes of this Agreement, "Proposed Acquisition Transaction" means any transaction or series of transactions (or any agreement, understanding or arrangement to enter into a transaction or series of transactions, whether any such transaction is to occur during or after the Restricted Period) as determined for purposes of Section 355(e) of the Code, in connection with which (A) any member of the SpinCo Group would merge or consolidate with any Person other than any other member of the SpinCo Group, (B) any member of the SpinCo Group would form one or more joint ventures with any Person other than any other member of the SpinCo Group in which, in the aggregate, more than 40% of the gross assets of the SpinCo Group are transferred to such joint ventures or (C) one or more Persons would (directly or indirectly) acquire, or have the right to acquire (including pursuant to an option, warrant or other conversion right), from any other Person or Persons, an interest in the equity of any Section 355 Entity that, when combined with any other acquisitions of any such Section 355 Entity that occur after the Distribution (but excluding any other acquisition described in clause (ii)) comprises 40% or more of the value or the total combined voting power of all interests that are treated as outstanding equity in such Section 355 Entity for U.S. Federal income tax purposes immediately after such transaction or, in the case of a series of related transactions, immediately after any transaction in such series. For this purpose, any recapitalization, repurchase or redemption of equity in any Section 355 Entity and any amendment to the certificate of incorporation (or other organizational documents) of such Section 355 Entity shall be treated as an indirect acquisition of such stock by any shareholder to the extent such shareholder's percentage interest in the issuer for U.S. Federal income tax purposes increases by vote or value.

(ii) Notwithstanding the foregoing, a Proposed Acquisition Transaction shall not include (x) the adoption by SpinCo of a shareholder rights plan that meets the requirements of IRS Revenue Ruling 90-11, (y) transfers on an established market of SpinCo Stock that are described in Safe Harbor VII of Section 1.355-7(d) of the Regulations or

(z) issuances of SpinCo Stock that satisfy Safe Harbor VIII (relating to acquisitions in connection with a Person's performance of services) or Safe Harbor IX (relating to acquisitions by a retirement plan of an employer) of Section 1.355-7(d) of the Regulations; provided, however, that such transaction or series of transactions shall constitute a Proposed Acquisition Transaction if meaningful factual diligence is necessary to establish that Section 4.03(b)(ii)(x), (y) or (z) applies.

(c) SpinCo shall not take or fail to take any action (including any Internal Restructuring described in Section 4.03(d)), during the Restricted Period, that would reasonably be expected to increase the Tax liability of the Honeywell Group in connection with the Transactions and shall not undertake any transaction that is not in the ordinary course of business and that would result in any member of the Honeywell Group reporting additional income under Sections 951 or 951A of the Code.

(d) If SpinCo, any Section 355 Entity or any ATB Entity merges or consolidates with another entity to form a new entity, references in this Agreement to SpinCo, a Section 355 Entity or an ATB Entity, as applicable, shall be to that new entity and references in this Agreement to SpinCo Stock or interests in a Section 355 Entity or an ATB Entity, as applicable, shall be to the capital stock or other relevant instruments or rights of that new entity.

(e) The provisions of this Section 4.03, including the definition of a "Proposed Acquisition Transaction", are intended to monitor compliance with Section 355 of the Code and shall be interpreted accordingly. Any clarification of, or change in, Section 355 of the Code or the Regulations thereunder shall be incorporated into this Section 4.03 and its interpretation.

SECTION 4.04. Consent to Take Certain Restricted Actions.

(a) SpinCo may (and may cause or permit a member of the SpinCo Group to) take an action otherwise prohibited under Section 4.03(a) if HII consents in writing, which consent shall be at HII's sole discretion. For the avoidance of doubt, HII's written consent pursuant to this Section 4.04(a) shall not in any way relieve SpinCo of its indemnification obligations under Section 2.02 (b).

(b) HII may, at its sole discretion and as a condition to granting its written consent pursuant to Section 4.04(a), require SpinCo to provide Satisfactory Guidance; provided, however, the provision of Satisfactory Guidance shall not obligate HII to grant its written consent pursuant to Section 4.04(a).

(c) For purposes of this Agreement, "Satisfactory Guidance" means either a Ruling or an Unqualified Tax Opinion concluding that the proposed action will not cause any step of the Transactions to fail to qualify for its Intended Tax Treatment. Such Ruling or Unqualified Tax Opinion will constitute Satisfactory Guidance only if they are satisfactory to HII at its sole discretion in both form and substance, including with respect to any underlying assumptions or representations and any legal analysis contained therein.

(d) For purposes of this Agreement, "Unqualified Tax Opinion" means an unqualified "will" opinion of a Tax Advisor that permits reliance by HII. The Tax Advisor, in issuing its opinion, shall be permitted to rely on the validity and correctness, as of the date given, of any previously issued Tax Opinions/Rulings, unless such reliance would be unreasonable

under the circumstances, and shall assume that each of the applicable Transactions would have qualified for its Intended Tax Treatment if the action in question did not occur.

SECTION 4.05. Procedures Regarding Opinions and Rulings.

(a) If SpinCo notifies HII that it desires to take a restricted action described in Section 4.03(a) and HII requires Satisfactory Guidance as a condition to consenting to such restricted action pursuant to Section 4.04(b), HII shall use commercially reasonable efforts to expeditiously obtain, or assist SpinCo in obtaining, such Satisfactory Guidance. Notwithstanding the foregoing, HII shall not be required to take any action pursuant to this Section 4.05(a) if, upon request, SpinCo fails to certify that all information and representations relating to SpinCo or any member of the SpinCo Group in the relevant documents are true, correct and complete or fails to obtain certification from any counterparty to any Proposed Acquisition Transaction that all information and representations relating to such counterparty in the relevant documents are true, correct and complete. SpinCo shall bear all costs and expenses of securing any such Satisfactory Guidance and shall reimburse HII for all reasonable out-of-pocket costs and expenses incurred by HII or any Subsidiary of HII in obtaining Satisfactory Guidance within 10 business days after receiving an invoice from HII therefor.

(b) Notwithstanding anything herein to the contrary, SpinCo shall not seek a Ruling (whether or not relating to the Transactions) if HII determines that there is a reasonable possibility that such action could have a significant adverse impact on HII or any Subsidiary of HII.

(c) HII shall have exclusive control over the process of obtaining any Ruling relating to the Transactions and neither SpinCo nor any of its Affiliates shall independently seek any guidance concerning the Transactions from any Taxing Authority at any time. In connection with any Ruling relating to the Transactions that can reasonably be expected to affect SpinCo's liabilities under this Agreement, HII shall (i) keep SpinCo informed of all material actions taken or proposed to be taken by HII, (ii) reasonably in advance of the submission of any Ruling request provide SpinCo with a draft thereof, consider SpinCo's comments on such draft, and provide SpinCo with a final copy, and (iii) provide SpinCo with notice reasonably in advance of, and permit SpinCo to attend, any formally scheduled meetings with the IRS or other relevant Taxing Authority (subject to the approval of the IRS or other relevant Taxing Authority, as applicable) that relate to such Ruling.

SECTION 4.06. Notification and Certification Regarding Certain Acquisition Transactions. If SpinCo proposes to enter into any 10% Acquisition Transaction or take any affirmative action to permit any 10% Acquisition Transaction to occur at any time during the 30-month period following the Distribution Date, SpinCo shall undertake in good faith to provide HII, no later than 10 business days following the signing of any written agreement with respect to such 10% Acquisition Transaction or obtaining knowledge of the occurrence of any such 10% Acquisition Transaction that takes place without written agreement, with a written description of such transaction (including the type and amount of SpinCo Stock to be acquired) and a brief explanation as to why SpinCo believes that such transaction, considered together with any related transactions, does not result in the application of Section 355(e) or 355(f) of the Code to the Transactions. For purposes of this Section 4.06, "10% Acquisition Transaction" means any

transaction or series of transactions that would be a Proposed Acquisition Transaction if the percentage specified in the definition of Proposed Acquisition Transaction were 10% instead of 40%.

SECTION 4.07. Reporting. HII and SpinCo shall (i) timely file any appropriate information and statements (including as required by Section 6045B of the Code and Section 1.355-5 and, to the extent applicable, Section 1.368-3 of the Regulations) to report each of the applicable Transactions as qualifying for its Intended Tax Treatment and (ii) absent a change of Law or an applicable Determination, otherwise not take any position on any Tax Return that is inconsistent with such qualification.

SECTION 4.08. Tax Treatment of Certain Amounts Paid Pursuant to the EMA. Amounts paid pursuant to the EMA shall be treated in the manner described in the EMA.

SECTION 4.09. Protective Section 336(e) Election.

(a) HII will make a Protective Section 336(e) Election with respect to the Distribution. Accordingly, the Parties agree that this Agreement constitutes a written, binding agreement to make a Protective Section 336(e) Election as contemplated by Section 1.336-2(h)(1)(i) of the Regulations. SpinCo will cooperate with HII to facilitate the making of such election.

(b) If SpinCo realizes a Tax benefit from the step-up in Tax basis resulting from a failure of the Distribution to qualify (in whole or in part) for its Intended Tax Treatment and the election described in Section 4.09(a), unless SpinCo has indemnified HII for the resulting Transaction Taxes under Section 2.02(b), SpinCo shall make quarterly payments to HII in an amount equal to 100 percent of the actual Tax savings arising from the step-up in Tax basis resulting from the Protective Section 336(e) Election , as and when realized and determined on a “with and without” basis (treating any deductions or amortization attributable to the step-up in Tax basis resulting from the Protective Section 336(e) Election as the last items claimed for any taxable period, including after the utilization of any available net operating loss carryforwards), net of any reasonable out-of-pocket expenses necessary to secure such Tax savings.

SECTION 4.10. Gain Recognition Agreements. SpinCo will not take any action (including the sale or disposition of any stock, securities or other assets), or permit its Affiliates to take any such action, and SpinCo will not fail to take any action or permit its Affiliates to fail to take any action that would cause HII or any of its Affiliates or SpinCo or any of its Affiliates to recognize gain under any Gain Recognition Agreement.

## ARTICLE V

## Procedural Matters

SECTION 5.01. Cooperation.

(a) Each Party shall cooperate with reasonable requests from the other Party in matters covered by this Agreement, including in connection with the preparation and filing of Tax Returns, the calculation of Taxes, the determination of the proper financial accounting treatment of Tax items and the conduct and settlement of Tax Contests. Such cooperation shall include:

(i) retaining until the expiration of the relevant statute of limitations (including extensions) of records, documents, accounting data, computer data and other information ("Records") necessary for the preparation, filing, review, audit or defense of all Tax Returns relevant to an obligation, right or liability of either Party under this Agreement;

(ii) the execution of any document that may be necessary or reasonably helpful in connection with any Tax Contest or the filing of a Tax Return, obtaining a Tax opinion or private letter ruling (except as otherwise provided in Section 4.05 (b)), or other matters covered by this Agreement, including certification (provided in such form as may be required by applicable law or reasonably requested and made to the best of a Party's knowledge) of the accuracy and completeness of the information it has supplied;

(iii) the use of the Parties' reasonable best efforts to obtain any documentation that may be necessary or reasonably helpful in connection with any of the foregoing;

(iv) providing the other Party reasonable access to Records and to its current or former personnel (ensuring their cooperation) and premises during normal business hours to the extent relevant to an obligation, right or liability of the other Party under this Agreement or otherwise reasonably required by the other Party to complete Tax Returns or to compute the amount of any payment contemplated by this Agreement;

(v) making determinations with respect to actions described in Section 4.03(a) as promptly as practicable; and

(vi) notifying the other Party prior to disposing of any relevant Records and affording the other Party the opportunity to take possession or make copies of such Records at its discretion.

(b) SpinCo shall cooperate with HII and take any and all actions reasonably requested by HII in connection with obtaining the Tax Opinions (including, without limitation, by making any new representation or covenant, confirming any previously made representation or covenant or providing any materials or information requested by any Tax Advisor; provided, that SpinCo shall not be required to make or confirm any representation or covenant that is inconsistent with historical facts or as to future matters or events over which it has no control).

(c) Any information or documents provided under this Section 5.01 shall be kept confidential by the Party receiving the information or documents, except as may otherwise be necessary in connection with the filing of Tax Returns or in connection with any Tax Contest. Notwithstanding any other provision of this Agreement, the Separation Agreement or any Ancillary Agreement, (i) neither HII nor any Affiliate of HII shall be required to provide SpinCo or any Affiliate of SpinCo or any other Person access to or copies of any information, documents or procedures (including the proceedings of any Tax Contest) other than information, documents or procedures that relate solely to SpinCo, the business or assets of SpinCo or any Affiliate of SpinCo, (ii) in no event shall HII or any Affiliate of HII be required to provide SpinCo, any

Affiliate of SpinCo or any other Person access to or copies of any information or documents if such action could reasonably be expected to result in the waiver of any Privilege, and (iii) in no event shall SpinCo or any Affiliate of SpinCo be required to provide HII, any Affiliate of HII or any other Person access to or copies of any information or documents if such action could reasonably be expected to result in the waiver of any Privilege. In addition, in the event that HII determines that the provision of any information or documents to SpinCo or any Affiliate of SpinCo, or SpinCo determines that the provision of any information or documents to HII or any Affiliate of HII, could be commercially detrimental, violate any Law or agreement or waive any Privilege, the Parties shall use reasonable best efforts to permit compliance with its obligations under this Section 5.01 in a manner that avoids any such harm or consequence.

(d) If any member of the SpinCo Group supplies information to a member of the Honeywell Group in connection with a Tax liability and an officer of a member of the Honeywell Group signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information, then upon the written request of such member of the Honeywell Group identifying the information being so relied upon, the chief financial officer of SpinCo (or any officer of SpinCo as designated by the chief financial officer of SpinCo) shall certify in writing that to his or her knowledge (based upon consultation with appropriate employees) the information so supplied is accurate and complete.

(e) If any member of the Honeywell Group supplies information to a member of the SpinCo Group in connection with a Tax liability and an officer of a member of the SpinCo Group signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information, then upon the written request of such member of the SpinCo Group identifying the information being so relied upon, the chief financial officer of HII (or any officer of HII as designated by the chief financial officer of HII) shall certify in writing that to his or her knowledge (based upon consultation with appropriate employees) the information so supplied is accurate and complete.

(f) If a Party fails to comply with any of its obligations set forth in this Section 5.01 upon reasonable request and notice by the other Party, and such failure results in the imposition of additional Taxes, the nonperforming Party shall be liable in full for such additional Taxes.

(g) To the extent that SpinCo makes a request pursuant to this Section 5.01 that requires HII to incur any costs and expenses (including costs and expenses related to employee time to respond to such request, and, for the avoidance of doubt, any costs and expenses incurred by HII for services of any third party engaged by HII to assist with such request), SpinCo shall reimburse the HII for all such costs and expenses, including a reasonable hourly charge for employee time. To the extent HII obtains the services of any third party to assist with such a request, HII shall select such third party in its sole discretion. Nothing contained in this Agreement, including this Section 5.01, shall be construed to permit SpinCo access to Honeywell Separate Returns.

SECTION 5.02. Interest. Any payments required pursuant to this Agreement that are not made within the time period specified in this Agreement shall bear interest from the end of that period. Interest required to be paid pursuant to this Agreement shall, unless otherwise

specified, be computed at the rate and in the manner provided in the Code for interest on underpayments and overpayments, as applicable, for the relevant period.

SECTION 5.03. Indemnification Claims and Payments.

(a) An Indemnitee shall be entitled to make a claim for payment with respect to Taxes under this Agreement when the Indemnitee determines that it is entitled to such payment and is able to calculate with reasonable accuracy the amount of such payment (including as a result of the finalization of a Tax Return before filing). Except as otherwise provided in Sections 3.02(b) and 3.03, the Indemnitee shall provide to the Indemnifying Party notice of such claim within 60 business days of the first date on which it so becomes entitled to make such claim. Such notice shall include a description of such claim and a detailed calculation of the amount claimed.

(b) Except as otherwise provided in Sections 3.02(b) and 3.03, the Indemnifying Party shall make the claimed payment to the Indemnitee within 30 business days after receiving such notice, unless the Indemnifying Party reasonably disputes its liability for, or the amount of, such payment.

(c) A failure by an Indemnitee to give notice as provided in Section 3.02(b), 3.03 or 5.03(a) shall not relieve the Indemnifying Party's indemnification obligations under this Agreement, except to the extent that the Indemnifying Party shall have been actually prejudiced by such failure.

(d) Nothing in this Section 5.03 shall prejudice a Party's right to receive payments pursuant to Section 3.02(b) or 3.03.

SECTION 5.04. Amount of Indemnity Payments. The amount of any Indemnity Payment shall be (i) reduced to take into account any Tax benefit actually realized by the Indemnitee resulting from the incurrence of the liability in respect of which the Indemnity Payment is made and (ii) increased to take into account any Tax cost actually incurred by the Indemnitee resulting from the receipt of the Indemnity Payment, including any Tax cost arising from such Indemnity Payment having resulted in income or gain to either Party, for example, under Section 1.1502-19 of the Regulations, and any Taxes imposed on additional amounts payable pursuant to this clause (ii). For purposes of calculating the amount of any Tax benefit or Tax cost, the applicable Indemnitee shall be deemed to be subject to the maximum applicable statutory Tax rate in the applicable jurisdiction in the taxable year in which such Tax benefit or Tax cost was realized and any Tax attributes of such Indemnitee shall be disregarded.

SECTION 5.05. Treatment of Indemnity Payments. Except as provided herein, any Indemnity Payment (other than any portion of a payment that represents interest accruing after the Distribution Date) shall be treated by HII and SpinCo for all Tax purposes as a distribution from SpinCo to HII immediately prior to the Distribution (if such payment is made by SpinCo to HII) or as a contribution from HII to SpinCo immediately prior to the Distribution (if such payment is made by HII to SpinCo), except as otherwise required by applicable Law or a Determination. For the avoidance of doubt, amounts paid pursuant to the Indemnification Agreement shall be treated in the manner described in the Indemnification Agreement. All

Parties hereto shall, and shall cause their Affiliates to, file all Tax returns on a basis consistent with the foregoing, and neither any Party nor an Affiliate shall take any Tax position inconsistent with this Section 5.05.

SECTION 5.06. Tax Disputes. Notwithstanding anything to the contrary in Article VI, this Section 5.06 shall govern the resolution of any dispute arising between the Parties in connection with this Agreement (a "Tax Dispute"), other than a dispute (i) relating to liability for Transaction Taxes (ii) in which the amount of liability in dispute exceeds $20 million or (iii) relating to a Tax Return as described in Section 3.01(d). The Parties shall negotiate in good faith to resolve any Tax Dispute for 45 calendar days (unless earlier resolved). Upon notice of either Party after 45 calendar days, the matter will be referred to an Accounting Firm acceptable to both Parties. The Accounting Firm may, in its discretion, obtain the services of any third party necessary to assist it in resolving the Tax Dispute. The Parties shall instruct the Accounting Firm to furnish notice to each Party of its resolution of the Tax Dispute as soon as practicable, but in any event no later than 60 calendar days after its acceptance of the matter for resolution. Any such resolution by the Accounting Firm will be binding on the Parties and the Parties shall take, or cause to be taken, any action necessary to implement the resolution. All fees and expenses of the Accounting Firm shall be shared equally by the Parties.

## ARTICLE VI

## Miscellaneous

SECTION 6.01. Disposition of SpinCo Subsidiaries. In the event that SpinCo disposes of the stock of a Subsidiary that is not a Party to this Agreement (i) without receiving compensation equal to the fair market value of such Subsidiary, prior to the disposition, such Subsidiary shall deliver to HII an executed agreement, in a form reasonably acceptable to HII, agreeing to be bound by this Agreement as if it had been an original Party hereto or (ii) in an exchange intended to result in the receipt of compensation equal to the fair market value of such Subsidiary, prior to the disposition, such Subsidiary shall deliver to HII an executed agreement, in a form reasonably acceptable to HII, agreeing to be bound by Section 5.01 and Article VI of this Agreement as if it had been an original Party hereto.

SECTION 6.02. Termination. This Agreement will terminate without further action at any time before the Distribution upon termination of the Separation Agreement. If terminated, no Party will have any Liability of any kind to the other Party or any other Person on account of this Agreement, except as provided in the Separation Agreement.

SECTION 6.03. Applicability. This Agreement shall not apply before the Distribution.

SECTION 6.04. Survival. Except as expressly set forth in this Agreement, the covenants and indemnification obligations in this Agreement shall survive the Spin-Off and shall remain in full force and effect.

SECTION 6.05. Separation Agreement. The Parties agree that, in the event of a conflict between the terms of this Agreement and the Separation Agreement with respect to the subject matter hereof, the terms of this Agreement shall govern.

SECTION 6.06. Confidentiality. Each Party hereby acknowledges that confidential Information of such Party or its Subsidiaries may be exposed to employees and agents of the other Party or its Subsidiaries who have a need to know such confidential Information as a result of, or in connection with, the activities contemplated by this Agreement. Each Party agrees, on behalf of itself and its Affiliates, that such Party's obligation (and the obligation of its Subsidiaries) to use and keep confidential such Information of the other Party or its Subsidiaries shall be governed by Sections 8.01(c) and 8.09 of the Separation Agreement.

SECTION 6.07. Counterparts; Entire Agreement.

(a) This Agreement may be executed in one or more counterparts, all of which counterparts shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each Party and delivered to the other Party. This Agreement may be executed by facsimile or PDF signature and scanned and exchanged by electronic mail, and such facsimile or PDF signature or scanned and exchanged copies shall constitute an original for all purposes.

(b) This Agreement, the Separation Agreement, the other Ancillary Agreements and the Exhibits and Schedules hereto and thereto contain the entire agreement between the Parties with respect to the subject matter hereof and supersede all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter, and there are no agreements or understandings between the Parties with respect to the subject matter hereof other than those set forth or referred to herein or therein.

SECTION 6.08. Dispute Resolutions. Subject to Section 5.06, in the event that any Party, acting reasonably, forms the view that another Party has caused a material breach of the terms of this Agreement, then the Party that forms such a view shall serve written notice of the alleged breach on the other Parties and the Parties shall work together in good faith to resolve any such alleged breach within thirty (30) days of such notice (a "Dispute"). If any such alleged breach is not so resolved, then a senior executive of each Party shall, in good faith, attempt to resolve any such alleged breach within the following thirty (30) days of the referral of the matter to the senior executives. If no resolution is reached with respect to any such alleged breach in accordance with the procedures contained in this Section 6.08, then the Parties may seek to resolve such matter in accordance with Section 6.09, Section 6.10 and Section 6.17.

SECTION 6.09. Governing Law; Jurisdiction. Any disputes arising out of or relating to this Agreement, including, without limitation, to its execution, performance, or enforcement, shall be governed by, and construed in accordance with, the Laws of the State of New York, regardless of the Laws that might otherwise govern under applicable principles of conflicts of Laws thereof. Subject to Section 5.06, each Party irrevocably consents to the exclusive jurisdiction, forum and venue of any state or federal court sitting in New York City in the State of New York over any and all claims, disputes, controversies or disagreements between the Parties or any of their respective Affiliates, successors and assigns under or related to this Agreement or any of the transactions contemplated hereby, including, without limitation, to their execution, performance or enforcement, whether in contract, tort or otherwise. Each of the Parties hereby agrees that it shall not assert and shall hereby waive any claim or right or defense that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. Each Party agrees that a final judgment in any legal proceeding resolved in accordance with Section 5.06, this Section 6.09, Section 6.10, Section 6.17 and Section 6.18 shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

SECTION 6.10. WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY INCLUDING, WITHOUT LIMITATION, THEIR EXECUTION, PERFORMANCE OR ENFORCEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.

SECTION 6.11. Assignability. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of law or otherwise by either Party without the prior written consent of the other Party. Any purported assignment without such consent shall be void. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns. Notwithstanding the foregoing, either Party may assign this Agreement without consent in connection with (a) a merger transaction in which such Party is not the surviving entity and the surviving entity acquires or assumes all or substantially all of such Party's assets, or (b) the sale of all or substantially all of such Party's assets; provided, however, that the assignee expressly assumes in writing all of the obligations of the assigning Party under this Agreement, and the assigning Party provides written notice and evidence of such assignment and assumption to the non-assigning Party. No assignment permitted by this Section 6.10 shall release the assigning Party from liability for the full performance of its obligations under this Agreement.

SECTION 6.12. Third-Party Beneficiaries.

(a) The provisions of this Agreement are solely for the benefit of the Parties hereto and are not intended to confer upon any Person except the Parties hereto any rights or remedies hereunder and (b) there are no third-party beneficiaries of this Agreement and this Agreement shall not provide any third Person with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement.

SECTION 6.13. Notices. All notices or other communications under this Agreement shall be in writing and shall be deemed to be duly given when (a) delivered in person, (b) on the date received, if sent by a nationally recognized delivery or courier service or (c) upon the earlier of confirmed receipt or the fifth (5th) business day following the date of mailing if sent by registered or certified mail, return receipt requested, postage prepaid and addressed as follows:

If to HII, to:

Honeywell International Inc.
115 Tabor Road
Morris Plains, NJ 07950
Attn: Vice President, Tax and General Tax Counsel
e-mail: Jamie.DiStefano@honeywell.com

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn: Jason R. Factor, Esq.
e-mail: jfactor@cgsh.com

If to SpinCo, to:
Resideo Technologies, Inc.
[ ]
Attn: General Counsel
e-mail: [ ]

with a copy to: [ ]

Either Party may, by notice to the other Party, change the address to which such notices are to be given.

SECTION 6.14. Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Party. Upon any such determination, any such provision, to the extent determined to be invalid, void or unenforceable, shall be deemed replaced by a provision that such court determines is valid and enforceable and that comes closest to expressing the intention of the invalid, void or unenforceable provision.

SECTION 6.15. Headings. The article, section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 6.16. Waivers of Default. No failure or delay of either Party (or the applicable member of its Group) in exercising any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Waiver by either Party of any default by the other Party of any provision of this Agreement shall not be deemed a waiver by the waiving Party of any subsequent or other default.

SECTION 6.17. Specific Performance. In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, HII shall have the right to specific performance and injunctive or other equitable relief of its rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. SpinCo shall not oppose the granting of such relief on the basis that money damages are an adequate remedy. The Parties agree that the remedies at law for any breach or threatened breach hereof, including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived.

SECTION 6.18. Court-Ordered Interim Relief. In accordance with Section 6.09 and Section 6.10, at any time after giving notice of a Dispute, each Party shall be entitled to interim measures of protection duly granted by a court of competent jurisdiction: (1) to preserve the status quo pending resolution of the Dispute; (2) to prevent the destruction or loss of documents and other information or things relating to the Dispute; or (3) to prevent the transfer, disposition or hiding of assets. Any such interim measure (or a request therefor to a court of competent jurisdiction) shall not be deemed incompatible with the provisions of Section 6.08, Section 6.09 and Section 6.10. Until such Dispute is resolved in accordance with Section 6.08 or final judgment is rendered in accordance with Section 6.09 and Section 6.10, each Party agrees that such Party shall continue to perform its obligations under this Agreement and that such obligations shall not be subject to any defense or set-off, counterclaim, recoupment or termination.

SECTION 6.19. Amendments. No provisions of this Agreement shall be deemed waived, amended, supplemented or modified by either Party, unless such waiver, amendment, supplement or modification is in writing and signed by the authorized representative of each Party.

SECTION 6.20. Interpretation. The rules of interpretation set forth in Section 12.17 of the Separation Agreement shall be incorporated by reference to this Agreement, *mutatis mutandis*. NOTWITHSTANDING THE FOREGOING, THE PURPOSE OF ARTICLE IV IS TO ENSURE THAT EACH OF THE APPLICABLE TRANSACTIONS QUALIFIES FOR ITS INTENDED TAX TREATMENT AND, ACCORDINGLY, THE PARTIES AGREE THAT THE LANGUAGE THEREOF SHALL BE INTERPRETED IN A MANNER THAT SERVES THIS PURPOSE TO THE GREATEST EXTENT POSSIBLE.

SECTION 6.21. Compliance by Subsidiaries. The Parties shall cause their respective Subsidiaries to comply with this Agreement.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**HONEYWELL INTERNATIONAL INC.,**

By:____________________________________
Name:
Title:

**RESIDEO TECHNOLOGIES, INC.,**

By:____________________________________
Name:
Title:

(Back To Top)

## Section 4: EX-2.6 (EX-2.6)

**Exhibit 2.6**

FORM OF

TRADEMARK LICENSE AGREEMENT

BY AND BETWEEN

HONEYWELL INTERNATIONAL INC.

AND

RESIDEO TECHNOLOGIES, INC.

**Table of Contents**


| | | Pages |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 2 |
| ARTICLE 2 | TRADEMARK LICENSE | 9 |
| ARTICLE 3 | ROYALTY AND VOLUME PROVISIONS | 13 |
| ARTICLE 4 | USE OF TRADEMARKS ON LICENSED PRODUCTS AND PACKAGING AND RELATED PERFORMANCE OBLIGATIONS | 18 |
| ARTICLE 5 | INFRINGEMENTS AND LITIGATION | 23 |
| ARTICLE 6 | LICENSEES' ACTIVITIES AND QUALITY OF LICENSED PRODUCTS | 24 |
| ARTICLE 7 | CUSTOMER SERVICE REQUIREMENTS | 30 |
| ARTICLE 8 | DURATION | 31 |
| ARTICLE 9 | IMMEDIATE TERMINATION | 31 |
| ARTICLE 10 | TERMINATION ON BREACH AFTER CURE PERIOD | 34 |
| ARTICLE 11 | REMEDIES AND LIMITATIONS OF LIABILITY | 35 |
| ARTICLE 12 | CONSEQUENCES OF TERMINATION | 37 |
| ARTICLE 13 | WARRANTIES | 39 |
| ARTICLE 14 | INDEMNIFICATION AND INSURANCE | 40 |
| ARTICLE 15 | ASSIGNMENT AND CHANGE OF CONTROL | 42 |
| ARTICLE 16 | UNDERSTANDINGS IN THE EVENT OF BANKRUPTCY | 43 |
| ARTICLE 17 | NO RIGHT OF SET-OFF | 44 |
| ARTICLE 18 | MISCELLANEOUS | 44 |

# TRADEMARK LICENSE AGREEMENT

AGREEMENT is made and entered into as of the _____ day of _________, 2018, between Honeywell International Inc., a corporation of the state of Delaware, U.S.A., having offices located at 115 Tabor Road, Morris Plains, NJ 07950 ("Licensor") and Resideo Technologies, Inc., located at 1985 Douglas Drive North, Golden Valley, Minnesota 55422 ("Resideo"), on behalf of itself and its wholly-owned Subsidiaries (as hereafter defined) that are listed on **Attachment A** (each of Resideo and such wholly-owned Subsidiaries, a "Licensee") and shall become effective as of the Distribution Date (as hereafter defined).

W I T N E S S E T H:

WHEREAS, pursuant to the Separation and Distribution Agreement by and between Licensor and Resideo, dated as of October 29, 2018 (the "Separation Agreement"), Licensor has agreed to divest its SpinCo Business (as hereafter defined) and Resideo has agreed to separate from Licensor and, following the separation, Licensor will distribute Licensor's entire interest in Resideo, by way of a dividend of stock to be made to the holders of Licensor common stock, after which Resideo will continue to operate such SpinCo Business (the "Distribution"),

WHEREAS, Licensor is the owner of valuable Licensed Trademarks (as hereafter defined) in the Territory (as hereafter defined), and

WHEREAS, Licensee desires to use the Licensed Trademarks in the operation of the SpinCo Business for the advertising, sale and distribution of Licensed Products (as hereafter defined) in the Territory, and Licensor is willing to authorize the Licensee's use subject to the terms and conditions herein.

NOW THEREFORE, the Parties hereby agree as follows:

ARTICLE 1 DEFINITIONS

Any defined terms, unless the context otherwise requires, may be used in the singular or the plural or the present or past tense, depending upon the reference. The use of the singular form of any word includes the plural and vice versa. All monetary amounts referred to herein are in United States Dollars unless otherwise stated.

1.1 “Affiliate” of any entity means an entity that controls, is controlled by or is under common control with such entity. As used herein, “control” of any entity means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such entity, whether through ownership of voting securities or other interests, by contract or otherwise; provided, however, that (i) each Licensee and its Subsidiaries shall not be considered Affiliates of Licensor or any of the other members of the Honeywell Group and (ii) Licensor and the other members of the Honeywell Group shall not be considered Affiliates of any Licensee or any of its Subsidiaries.

1.2 “Change of Control” means, with respect to any entity, (i) the sale of all or substantially all of the assets of, or the ownership interests in, such entity in a single transaction or a series of related transactions to a third party (that is not, prior to such transaction, an Affiliate of such entity), (ii) any direct or indirect acquisition of control, consolidation or merger of such entity by, with or into any third party (that is not, prior to such transaction, an Affiliate of such entity), or (iii) any other corporate transaction or series of related transactions in which control of such entity is directly or indirectly transferred to a third party (that is not, prior to such transaction, an Affiliate of such entity), including by transferring in excess of fifty percent (50%) of such entity’s voting power, shares or equity, through a merger, consolidation, tender offer or similar transaction, to one or more third parties.

1.3 “Complaint” shall mean a telephone call or communication of any kind from a customer notifying a Licensee or any of its Affiliates of a problem relating to or a question about any or all of the following: the Licensed Products; a Licensee’s advertising or other business practice; the conduct of an employee of a Licensee or an employee of any Affiliate of Licensee in connection with this Agreement.

1.4 “Distribution Date” shall mean the date on which the Distribution occurs.

1.5 “Home Trademark” shall mean the trademark and service mark “HONEYWELL HOME” (but not any variations thereof) in the form and manner as further specified in **Attachment B**, when used without any additional words, letters or designs, to the extent owned by Licensor.

1.6 “Honeywell Group” means Licensor and each of its Affiliates, including any entity that becomes an Affiliate of Licensor as a result of transactions that occur following the Distribution, but excluding Licensee and its Subsidiaries.

1.7 “Honeywell Trademark” shall mean the trademark and service mark “HONEYWELL” (but not any variations thereof) in the form and manner as further specified in **Attachment C**, when used without any additional words, letters or designs, to the extent owned by Licensor.

1.8 “Including” shall mean including without limitation.

1.9 “Licensed Product(s)” shall mean (i) any product identified in **Attachment D** that, as of the Distribution Date or in the six (6) months prior thereto, is or was manufactured by or for the Honeywell Group and marketed, sold or distributed by the SpinCo Business (the “Existing Products”) and (ii) any products that are manufactured by or for Licensee after the Distribution Date and are either (x) identical to the Existing Products or (y) constitute extensions or

derivatives of Existing Products that are not materially different in functionality from the Existing Products; provided, however, that "Licensed Products" shall not include those products identified in **Attachment E** even if they could also fall within the definition of Existing Products or are covered by the foregoing clause (ii). The definition of Licensed Products shall also mean such other products as may be agreed to, via amendment, between the Parties from time to time. In addition, Resideo may delete any products from the definition of Licensed Products effective, for all Licensees, as of twelve (12) months from the date of notice of this deletion to Licensor, and during such twelve- (12) month period, Licensees will not have to meet the obligations of Section 6.9 with respect to such deleted products. Following such twelve- (12) month period, such deleted products shall be excluded from Licensed Products.

1.10 "Licensed Trademarks" shall mean, collectively, the Home Trademark, the Honeywell Trademark and the POC Trademark.

1.11 "Net Sales" shall mean, subject to Section 3.3, all of Licensees' gross sales (including, for the avoidance of doubt, all sales on all Licensees' behalf) of Licensed Products that bear a Licensed Trademark (defined as the number of units of such Licensed Products sold, multiplied by Licensees' invoiced unit price of such Licensed Products to its customers), less only:

(a) reasonable trade discounts (defined as reductions in the list wholesale selling price that are customary in the trade) that Licensees actually grant in writing prior to delivery;

(b) returns that Licensees actually authorize and receive or have verified proof from their customer of returns with a corresponding request for credit;

(c) defective allowances granted to the customer;

(d) reasonable credits to a customer after delivery that Licensees actually grant in writing;

(e) unrelated freight billed separately on the invoice; and

(f) free samples of Licensed Products given to existing or potential new customers for marketing, product demo or promotional purposes or given to agencies for testing (but not for personal use).

For the purpose of computing Net Sales, the above deductions from gross sales shall not exceed twenty percent (20%) of gross sales shipped in any calendar year during which Royalties are calculated unless agreed to in writing for specific customers by both the Licensor and Resideo; moreover, the total deductions for a particular royalty period shall never exceed the Net Sales for such period. Net Sales shall be determined without deducting uncollectible accounts or financial discounts. Net Sales shall include all transactions of Licensed Products distributed by or on behalf of Licensees to customers even if such transactions are not billed. Net Sales of Licensed Products to the ADI global distribution business (“ADI”) of Resideo shall be calculated based on Licensees’ sales price to ADI less guaranteed margin adjustment (the details of such adjustment will be demonstrated to Licensor upon request).

1.12 “Party” or “Parties” shall mean (i) Honeywell International Inc. and/or (ii) Resideo Technologies, Inc. and its wholly-owned Subsidiaries, depending on the context.

1.13 “POC Trademark” shall mean the trademark and service mark “THE POWER OF CONNECTED” (but not any variations thereof) in the form and manner as further specified in **Attachment F**, when used without any additional words, letters or designs, to the extent owned by Licensor.

1.14 "SpinCo Business" shall mean the business and operations constituting Licensor's residential Comfort & Care and Security & Safety product portfolio and ADI businesses, as conducted by Licensor and its Affiliates prior to the Distribution; provided that the SpinCo Business shall not include any terminated, divested or discontinued businesses, operations or properties of any of the Honeywell Group, Licensee and Licensee's Subsidiaries, any of their respective members or any of their respective predecessors, in each case, prior to the Distribution.

1.15 "Subsidiary" of any entity shall mean any corporation or other organization whether incorporated or unincorporated of which at least a majority of the securities or interests having by the terms thereof ordinary voting power to elect at least a majority of the board of directors or others performing similar functions with respect to such corporation or other organization, is directly or indirectly owned or controlled by such entity or by any one or more of its Subsidiaries, or by such entity and one or more of its Subsidiaries; provided that such corporation or other organization shall be a "Subsidiary" solely during the period of such ownership or control.

1.16 "Term" shall mean a period of forty (40) years, commencing on the Distribution Date.

1.17 "Territory" shall mean worldwide, except (i) with respect to all Licensed Products, the territories set forth in **Attachment G(2)(i)** and (ii) with respect to products falling within the Connected Living Solutions Product Category, the territories set forth in **Attachment G(2)(ii)**.

1.18 "Third Party" shall mean any entity other than Licensees, Licensor and their respective Affiliates.

1.19 Table of Defined Terms. Except as otherwise set forth in this Agreement, the following terms have the meanings set forth in the Sections referenced below:

| TERM | SECTION |
|---|---|
| Additional Royalties | 6.9 |
| ADI | 1.11 |
| Average Speed to Answer Calls | Attachment T |
| Average Speed to Answer Web Contacts | Attachment T |
| Call Abandonment Rate | Attachment T |
| Call Centers | Attachment T |
| Call Service Level Rate | Attachment T |
| Calls | Attachment T |
| Connected Living Solutions Product Category | Attachment G(1) |
| Copy | 4.4 |
| Distribution | Recitals |
| Existing Products | 1.7 |
| Extended Term | 8.2 |
| First Call Resolution Rate | Attachment T |
| First Web Contact Resolution Rate | Attachment T |
| Guaranteed Sales Percentage | 6.9 |
| Inventory | Attachment I |
| Licensed Products | 1.7 |
| Licensee | Preamble |
| Licensor | Preamble |
| Log | Attachment T |
| Minimum Guaranteed Net Sales | 3.3 |
| Minimum Guaranteed Royalty Payments | 3.2 |
| NPS | 6.4 |
| Packaging | 4.4 |
| Pantone Matching System | Attachment T |
| Payment | 12.4 |
| prevailing party | 11.4 |
| Product Category | 3.6(a) |
| Product Manuals | Attachment T |
| Royalties | 3.1 |

| TERM | SECTION |
| --- | --- |
| Royalty Report | 3.6 |
| Score | 6.4 |
| Sell-off Period | 12.2 |
| Separation Agreement | Recitals |
| Trademark Use Guidelines | 4.6 |
| Web Contact Service Level Rate | Attachment T |
| Web Services | Attachment T |

ARTICLE 2 TRADEMARK LICENSE

2.1 License to Home Trademark. Subject to the terms and conditions of this Agreement, Licensor hereby grants to each Licensee, solely in the Territory, during the Term and, if applicable, the Extended Term, an exclusive (subject to Section 4.9), personal, non-transferable (except as set forth in Section 15.1), royalty-bearing license, without the right to sublicense (except as set forth in Section 2.5), to use the Home Trademark under the conditions further described below:

(a) each Licensee may use the Home Trademark (but no other intellectual property rights of Licensor) solely in connection with the manufacturing, advertising, sale and distribution of Licensed Products, including in advertising and promotional materials for such Licensed Products;

(b) Licensor shall have the full right to use the Honeywell Trademark in connection with any Licensed Products (including through contract manufacturing);

(c) Licensor shall have the full right to grant any licenses to its Affiliates or any Third Party under the Honeywell Trademark in connection with the Licensed Products in the Connected Living Solutions Product Category;

(d) with respect to any Licensed Products other than the Licensed Products in the Connected Living Solutions Product Category, during the Term and, if applicable the Extended Term, Licensor shall only grant licenses under the Honeywell Trademark (x) to its Affiliates or, to the extent not an Affiliate, any joint venture in which Licensor or its Affiliates possess any ownership interest, in each instance, for such entity's own use of any such Licensed Products, but not to further sublicense to any Third Party and (y) in connection with such Licensed Products manufactured by or for the Honeywell Group, to any Third Party (including OEM/ODM/private label situations and to distributors/dealers/partners to sell such Licensed Products supplied to them).

2.2 Domain Name License. Subject to the terms and conditions of this Agreement, Licensor hereby grants to each Licensee, solely in the Territory, an exclusive, personal, non-transferable (except as set forth in Section 15.1) license, without the right to sublicense (except as set forth in Section 2.5(a)), to use the Home Trademark as part of the domain names on **Attachment H** during the Term and the Extended Term, if applicable, provided that (i) such domain names may be used only in connection with Licensees' SpinCo Business; (ii) Licensees will bear all costs or expenses associated with registration or renewal of such domain names, which costs or expenses shall be credited against Royalties; and (iii) Licensor shall have the full right to use and license the name "Honeywell" and the Honeywell Trademark in connection with any domain names which do not contain "HONEYWELLHOME."

2.3 Transition License to Honeywell Trademark and POC Trademark. Subject to the terms and conditions of this Agreement, Licensor hereby grants to each Licensee, solely in the Territory, a transitional license to the Honeywell Trademark and POC Trademark, pursuant to the terms set forth on **Attachment I**.

2.4 Change of Trade Name. As soon as practicable after the Distribution Date, but no later than six (6) months after the Distribution Date, with respect to the entities set forth in **Attachment R**, and twenty-four (24) months after the Distribution Date, with respect to the dormant entities set forth in **Attachment J**, Resideo shall cause each of its Subsidiaries to change its name to another name that does not include the name the "Honeywell" the Honeywell Trademark or any other trademarks owned by Licensor, or any other trademarks or service marks confusingly similar thereto, including making all filings with the appropriate governmental entities in any applicable jurisdiction, as necessary to effect these changes; provided, however, that should any entity set forth in **Attachment J** become operational at any point during the twenty-four (24) month transitional period, such entity must change its name as set forth in this Section 2.4 as promptly as practicable, but no later than three (3) months from the date on which such entity becomes operational.

2.5 Sublicensing.

(a) Subsidiaries. Upon execution and delivery to Licensor of a sublicensing agreement in the form set forth on **Attachment K**, Resideo may grant sublicenses, solely within the scope of the licenses granted in

Sections 2.1, 2.2 or 2.3, as applicable, solely to any wholly-owned Subsidiary of Resideo that is not then a Licensee, and upon such grant, such wholly-owned Subsidiary shall be deemed a "Licensee."

(b) Dealers and Customers. Each Licensee may grant non-exclusive, non-transferable, non-sublicensable sublicenses, solely within the scope of the licenses granted in Sections 2.1 or 2.3, as applicable, to dealers and customers of such Licensee who are in the business of selling the Licensed Products to use the Home Trademark solely in connection with the resale of Licensed Products purchased from such Licensee; provided that such Licensee enters into written, signed agreements with such dealers and customers which contain the sublicense language set forth on **Attachment L** (each such sublicensed dealers or customers, a "Sublicensee").

2.6 Enforcement Against Licensed Parties. Without limiting Licensor's remedies under this Agreement to enforce any breach of this Agreement directly against a Licensee that is not Resideo, Resideo shall be responsible and liable for any breach of this Agreement by any Licensee that is not Resideo or any breach of any authorized sublicensing agreement (pursuant to Section 2.5(b)), or any infringement, misappropriation or other violation of the Licensed Trademarks, by any Sublicensee.

2.7 Historical References Using the Honeywell Trademark. Licensee acknowledges Licensor's longstanding legacy of using the Honeywell Trademark and the goodwill from such use that has inured to Licensor. Licensee agrees not to use the name "Honeywell" or the Honeywell Trademark in reference to its product or company history, except as part of the approved description set forth in **Attachment M** or as otherwise approved by Licensor.

2.8 Home Trademark Jurisdictions. Licensee acknowledges that, as of the Distribution Date, the Honeywell Trademark is only registered by Licensor in connection with the Licensed Products in certain jurisdictions that are set forth on **Attachment N**. To the extent that a Licensee wishes Licensor to register the Home Trademark in any jurisdiction that is not at that time listed (or has been subsequently added pursuant to this Section 2.8) on **Attachment N**, Resideo shall notify Licensor and, upon registration, such jurisdiction shall be deemed added to **Attachment N**. Resideo shall bear the cost of any registrations and filings (and related prosecution activities) for the Home Trademark in each added jurisdiction, which cost shall be credited against Royalties owed for sales in such added jurisdiction. For the avoidance of doubt, Licensor shall maintain and bear the cost of any ongoing maintenance activities with respect to the Licensed Trademark in the jurisdictions set forth in (or subsequently added to) **Attachment N**.

2.9 Honeywell Ownership of Licensed Trademarks. The Licensed Trademarks are the sole and exclusive property of Licensor. Except for the license granted under this Agreement and subject to the terms and conditions stated in this Agreement, no Licensee or its Sublicensees shall have any right, title or interest, express or implied, in the Licensed Trademarks and their use, and no Licensee or its Sublicensees shall at any time, either during the Term, Extended Term (if applicable) or after expiration of this Agreement, contest the validity of such Licensed Trademarks or assert or claim any other right to manufacture, sell or offer for sale products under the Licensed Trademarks, or any trademark confusingly similar thereto.

2.10 Reservation of Rights. No license, either express or implied, is granted by Licensor to any Licensee hereunder with respect to any trademark except as specifically stated herein.

2.11 Infringement. While Licensor has no information or reason to believe that the Licensed Trademarks or any registrations for the Licensed Trademarks infringe the rights of any third person, it makes no representation, warranty or guarantee to that effect. If a Licensee receives notice or knowledge that its use of the Licensed Trademarks may infringe trademark or other rights of any third person in the Territory, such Licensee shall, as soon as possible and in no event longer than fifteen (15) business days, report to Licensor in writing the details relating to the potential infringement.

2.12 Use Solely in Territory. No Licensee or Sublicensee shall make or authorize any use, direct or indirect, of the Licensed Products in any other country outside the Territory and will not knowingly sell the Licensed Products to persons who intend or are likely to resell them in any country outside the Territory. Each Licensee shall use reasonable commercial efforts to ensure that neither such Licensee nor any Third Party acting on behalf of such Licensee (including its Sublicensees) is selling, marketing or distributing Licensed Products outside of the Territory and shall take action at such Licensee's own costs to prevent any such activities known to such Licensee.

2.13 No Other Trademarks. During the Term of this Agreement, and the Extended Term if applicable, no Licensee shall license or use any other trademark in connection with products that compete with or are similar to the Licensed Products, other than its own trademarks and third party trademarks pursuant to ODM/OEM arrangements with such Licensee.

2.14 Recordation of Agreement. If Licensor decides in its sole but reasonable discretion that this Agreement (or any short-form version of this Agreement) should be recorded with any governmental authorities within the Territory, or if any such prior recordation or application should be amended or updated in any manner, each applicable Licensee shall promptly provide or secure all reasonable assistance requested by Licensor, such as the furnishing of documents and information and the execution of all reasonably necessary documents, as Licensor may reasonably request. Any such costs associated with Licensor's requests for a Licensee's assistance shall be borne by Licensor.

ARTICLE 3 ROYALTY AND VOLUME PROVISIONS

3.1 Running Royalties. Resideo shall pay to Licensor running royalties in the amount set forth on **Attachment O** ("Royalties").

3.2 Minimum Royalties Following Assignment or Change of Control. In the event of a Change of Control of Resideo or Resideo's assignment of this Agreement, in each case, that is approved by Licensor in accordance with Section 15.1, Resideo (in the event of a Change of Control) or the assignee (in the event of assignment) shall pay to Licensor a minimum annual royalty equal to ninety (90) percent of the average Royalties owed by Resideo per calendar year during the three (3) full calendar years immediately preceding the Change of Control or assignment, as applicable (the "Minimum Guaranteed Royalty Payments"). Such Minimum Guaranteed Royalty Payments will be owed each calendar year whether or not Resideo and the other Licensees (or the assignee) make sufficient sales of Licensed Products to owe those amounts in Royalties pursuant to Section 3.1 based upon Net Sales during each specified calendar year. Resideo's or the assignee's, as applicable, obligation to pay Minimum Guaranteed Royalty Payments are guaranteed to Licensor, shall survive termination and expiration of this Agreement for the calendar year during which such termination or expiration occurs (except in the case of a termination under Sections 9.1(g), 9.1(h), 9.1(j), 9.1(k), 9.1(l), 9.1(n) or Sections 10.1 or 10.2), in which case the obligation shall survive until the end of the third (3rd) calendar year after the date of such termination) and must be paid according to Section 12.3, except if termination is due to Licensor's breach pursuant to Section 10.1 or pursuant to Section 9.2.

3.3 Net Sales Following Assignment or Change of Control. In the event of a Change of Control of Resideo or Resideo's assignment of this Agreement, in each case, that is approved by Licensor in accordance with Section 15.1, Resideo (in the event of a Change of Control) or the assignee (in the event of assignment) shall, following such Change of Control or assignment, be required, for each calendar year during the remainder of the Term, to achieve Net Sales of Licensed Products equal to the greater of (i) ninety (90) percent of the per-year average Net Sales of Licensed Products by all Licensees in the three (3) calendar years immediately preceding such Change of Control or assignment, as applicable ("Minimum Guaranteed Net Sales") and (ii) the actual Net Sales during such calendar year.

3.4 Timing. Royalties and Additional Royalties, if applicable, must be received by Licensor within sixty (60) days after the end of each calendar quarter following the Distribution Date in U.S. Dollars based on Net Sales of Licensed Products during the preceding quarter. All payments of Royalties and Additional Royalties, if applicable, shall be made as provided in **Attachment P**.

3.5 Minimum Guaranteed Royalty Payments. If the Royalties owed in any calendar year are less than the Minimum Guaranteed Royalty Payments in any given year, then Resideo shall also pay Licensor the difference between the Minimum Guaranteed Royalty Payments and the Royalties for such calendar year. Such difference payment shall be paid to Licensor in U.S. Dollars within thirty (30) days after the end of each calendar year following the applicable Change of Control, to the extent that such payments are due. Such payments shall be paid in the same manner set forth above for the payment of Royalties.

3.6 Royalty Report. Each payment of Royalties and Additional Royalties, if applicable, shall be accompanied by a report ("Royalty Report"), in a form substantially similar to **Attachment Q** and approved by Licensor in Licensor's reasonable discretion, showing for such quarter:

(a) the total quantity of Licensed Products sold on a sku basis broken down according to geographic region and product category as indicated on **Attachment D** ("Product Category") (with descriptions so that each individual Licensed Product can be identified by sku);

(b) the total Net Sales value of Licensed Products on a sku basis broken down according to geographic region and Product Category (with descriptions so that each individual Licensed Product can be identified by sku); and

(c) the amount of Royalties payable to Licensor from the foregoing information.

3.7 Interest. On any and all amounts that are at any time overdue and payable to Licensor under this Agreement, Resideo shall pay interest to Licensor at the prime lending rate for commercial transactions as printed in *The Wall Street Journal* on the first day that any payment owed to Licensor is overdue. The payment of such interest shall not replace any of Licensor's other rights under this Agreement resulting from Resideo's default by failure to pay any amounts due hereunder. The acceptance of any overdue payments by Licensor at any time does not foreclose or impair Licensor's ability to collect the owed interest on such payments pursuant to this Section 3.7.

3.8 Records. Resideo further shall:

(a) preserve and maintain in the ordinary course of business in a facility in the United States accurate and up-to-date records which will contain the data from which amounts due to Licensor under this Agreement can be readily calculated including all inventory and sales records involving the Licensed Products (with manufacturing records maintained in the locations where Licensed Products are manufactured);

(b) no more than once annually during the Term of this Agreement, and for two (2) years after termination of this Agreement, permit examination of such records at Resideo's corporate offices during normal business hours and upon reasonable notice by Licensor or Licensor's representatives at reasonable intervals and under reasonable conditions at Licensor's expense;

(c) permit Licensor or Licensor's representative, once per calendar year, to review at Resideo's corporate offices and manufacturing facilities during normal business hours and upon reasonable notice, solely those books and records necessary in making a proper audit and verification of Resideo's performance of its obligations under this Agreement. Resideo shall, and shall cause the other Licensees to, fully cooperate with Licensor or Licensor's representative in the course of such audit or investigation and permit Licensor or Licensor's representative to make copies of such records. Licensor agrees to enter into a confidentiality agreement with respect to such information as the applicable Licensee may reasonably request. In the event that such inspection reveals a discrepancy in the amount of Royalties owed Licensor from what was actually paid, Resideo shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. In the event that such discrepancy is in excess of ONE HUNDRED FIFTY THOUSAND UNITED STATES DOLLARS ($150,000), Resideo shall reimburse Licensor for the reasonable out of pocket cost of such inspection (*i.e.*, auditor's fees), but not including any attorney's fees incurred in connection therewith, and Licensor may conduct a second audit of Licensee's records in that same calendar year.

3.9 Confidential Treatment. Any information furnished by a Licensee to Licensor under this Agreement shall remain such Licensee's property. All copies of such information in written, graphic or other tangible form shall be destroyed or returned to such Licensee at its request, except that Licensor may retain one copy for archival, audit or dispute resolution purposes. Unless such information was previously known to Licensor free of any obligation to keep it confidential, or has been or is subsequently made public by Licensee or a third party, or provided to Licensor by a third party, without breach of any agreement, it shall be kept confidential by Licensor and shall be used only in performing under this Agreement, and may not be used for other purposes. Notwithstanding the foregoing, Licensor may disclose information furnished by a Licensee as required by its auditors, or in connection with a legal or governmental process, and Licensor agrees to take all reasonable steps to protect the confidential nature of any such information disclosed. Only employees of Licensor who are not involved in the manufacturing, advertising or sale of Licensed Products may take part in the audit provided for in 3.8(c), and all information provided by Licensee to Licensor in connection with obligations in Articles 3, 6 or 7 may not be shared with employees of Licensor who are involved in the manufacturing, advertising or sale of Licensed Products without prior consent from Licensee.

3.10 Most Favored Nations Pricing. Other than with respect to sales by ADI to Licensor, each Licensee shall provide Licensor most favored nations pricing on all Licensed Products purchased by/sold to Licensor or any of Licensor's Affiliates. Any such sales of Licensed Products to Licensor or any of Licensor's Affiliates shall not be subject to Royalties if tracked on the report of Royalties required herein.

ARTICLE 4 USE OF TRADEMARKS ON LICENSED PRODUCTS AND PACKAGING AND RELATED PERFORMANCE OBLIGATIONS

4.1 Use of Licensed Trademarks. Except as otherwise provided in this Agreement, each Licensee shall, and shall cause its Sublicensees to, use the Licensed Trademarks (but no other intellectual property rights of Licensor) only on the Licensed Products or in the manufacturing, advertising, distribution and sale of the Licensed Products. For the avoidance of doubt, a Licensee must obtain Licensor's prior written consent to use of the Licensed Trademarks in connection with any new product not identified in **Attachment D** and any product identified in **Attachment D** that has a material change in functionality.

4.2 Restrictions. Neither a Licensee nor any agent of a Licensee shall, without the prior written consent of Licensor, use any of the Licensed Trademarks:

(a) on or in connection with any products other than the Licensed Products or in the advertising, distribution and sale of any products other than the Licensed Products;

(b) in close proximity to or in conjunction with any other trademarks or ornamentation, including slogans or taglines, or on the outside label of any package with any other trademarks, other than its own trademarks, except for use by ADI when such business is advertising the fact that is distributes products from multiple manufacturers;

(c) as part of a corporate, business or trading name (except as set forth in **Attachment R**); or

(d) attempt to register, register or own in any country:

(i) the Licensed Trademarks;

(ii) any domain name incorporating in whole or in part the Licensed Trademarks; or

(iii) any name, trade name, domain name, keyword, mark or social or business networking/media account or identification name confusingly similar to the Licensed Trademarks, including translations or transliterations of the Licensed Trademarks in other languages.

4.3 Approval. All advertising and promotional materials, including marketing collateral, business cards and Internet web pages or design incorporating any of the Licensed Trademarks ("Copy") and all trade dress, labels, containers, packaging, tags and displays incorporating the Licensed Trademarks ("Packaging") must be provided by a Licensee in advance to Licensor for review and approval in writing, not to be unreasonably withheld or delayed by Licensor; provided, however, that:

(a) Copy and Packaging that are (i) in use by Licensor or its Affiliates in connection with the Licensed Products as of the Distribution Date, (ii) substantially similar to such Copy or Packaging in use by Licensor or its Affiliates in connection with the Licensed Products as of the Distribution Date or (iii) substantially similar to Copy or Packaging that has been approved by Licensor in accordance with this Section 4.3 will be, in each case of (i), (ii) and (iii), deemed approved; and

(b) such Copy or Packaging shall be deemed approved by Licensor if Licensor does not provide any comments or objections within ten (10) days of Licensor's receipt of such proposed Copy or Packaging.

Licensor refusal to approve any Copy or Packaging shall be deemed reasonable in the case of any materials containing or referring to the Licensed Trademarks that in Licensor's opinion are likely to derogate, erode or tarnish the Licensed Trademarks, or otherwise diminish the value of the Licensed Trademarks. Each Licensee agrees to comply with all reasonable comments and changes required by Licensor in connection with any approval granted by Licensor under this Section 4.3.

4.4 Trademark Use. On all visible Packaging and advertising, the Licensed Trademarks shall be emphasized in relation to the surrounding material, and any use of the Licensed Trademarks shall conform to Licensor's Corporate Identity Standards, which shall be provided from time to time by Licensor to Licensees. The current version of Licensor's Corporate Identity Standards is located at http://brand.honeywell.com/. Upon request, a Licensee may obtain a password from Licensor to access these standards. Wherever appropriate, the Licensed Trademarks shall be used as a proper adjective, and the common noun for the product shall be used in conjunction with the Licensed Trademarks. All Packaging shall contain the name, trademark or trade name, and physical address, phone number and main URL of Resideo. Licensees shall refrain from making any statements about the quality, efficiency, or effectiveness of any of the Licensed Products on any product packaging or advertising materials unless Licensees have established the validity of such statements through industry appropriate research and substantiation.

4.5 Trademark Notice. Licensees shall, and shall cause their Sublicensees to, use the Licensed Trademarks only in accordance with good trademark practice and Licensor's trademark use guidelines and, if applicable, social media guidelines, annexed hereto as **Attachment S**, which Licensor may update from time to time upon notice to Licensees (the "Trademark Use Guidelines"). Licensees shall, and shall cause their Sublicensees to, use best commercial efforts to display on all Licensed Products, Packaging and advertising the license notice required by Licensor's written instructions in effect as of the date of manufacture. Such instructions are provided to Licensee in **Attachment T** hereof.

4.6 Safety of Licensed Products. All Licensed Products shall be listed and approved by all required listing and approval agencies and shall meet all applicable and then in-effect industry standards and governmental regulations, including, without limitation, SAE and ISO standards. Upon request, any Licensee must promptly submit copies of certificates or other documents confirming that the Licensed Products hereunder meet then in-effect industry standards and government regulations. Under no circumstance is a Licensee permitted to sell under any Licensed Trademarks such Licensed Products which do not meet such standards and/or regulations in connection with the Licensed Products.

4.7 Goodwill. All goodwill resulting from the use of the Licensed Trademarks by Licensees or any Sublicensees, including any additional goodwill that may develop because of Licensees' or Sublicensees' use of the Licensed Trademarks, shall inure solely to the benefit of Licensor, and no Licensee or Sublicensee shall acquire any rights in the Licensed Trademarks except those rights specifically granted in the Agreement.

4.8 No Tarnishment. Licensees shall, and shall cause their Sublicensees to, not take any action or omit to take any action which may reasonably be expected to derogate, erode or tarnish the Licensed Trademarks, or otherwise diminish the value of the Licensed Trademarks.

4.9 Product Promotion. Licensees shall, and shall cause their Sublicensees to, use commercially reasonable efforts to promote, market and sell all categories of Licensed Products in commercial quantities into every

country within the Territory. Licensor reserves the right to convert the license rights granted to all Licensees in Section 2.1 from an exclusive license to a non-exclusive license with respect to any specific Licensed Products in a country within the Territory in the event that no Licensee is selling commercially viable quantities of such Licensed Products into that country within five (5) years of the Distribution Date. Whether sales of Licensed Products rise to the level of commercially viable quantities shall be determined in good faith by the Parties upon review and consideration of current Net Sales, future projected Net Sales provided to Licensor and specific sales plans shared with Licensor for the specific products within the Territory.

4.10 Warranty. Licensees shall offer and honor a warranty on all Licensed Products that is competitive to competing products in the marketplace. Licensees may not make any material changes to limit or lessen such warranties for Licensed Products without prior written approval from Licensor (such approval not unreasonably to be withheld or delayed); no approval from Licensor is needed if Licensees extend the warranty term or conditions for any Licensed Products. Upon request, Licensees shall provide all terms and conditions of their warranty program for the Licensed Products to Licensor for Licensor's review. Licensees will make any reasonable changes to such warranties suggested by Licensor if reasonably necessary to protect the integrity of the Licensed Trademarks. Licensees may not remove any such changes to the terms of its warranty after approved by Licensor without Licensor's written approval. The failure by Licensees to honor their warranty terms shall constitute a breach of this Agreement, provided, however, that Licensees reserve the rights to manage their warranty program, including the right to determine whether any particular failure or alleged defect of a Licensed Product is within the scope of the relevant warranty.

ARTICLE 5 INFRINGEMENTS AND LITIGATION

5.1 Infringement Notice. Licensees agree to give notice promptly in writing to Licensor of any infringement or suspected or threatened infringement by a third party of the Licensed Trademarks in the Territory that it learns of at any time while this Agreement is in effect. Licensees shall take no further steps with respect to such infringement pending instructions from Licensor.

5.2 Initiating Infringement Proceedings. Licensor may decide in its sole discretion whether and what steps should be taken to prevent or terminate infringement of the Licensed Trademarks in the Territory, including the institution of legal proceedings and settlement of any claim or proceeding. Licensor agrees to notify Licensees in writing of Licensor's decision and course of action as soon as reasonably possible following the receipt of any notice from the Licensees under Section 5.1, above.

5.3 Conducting Infringement Proceedings. Licensor will solely conduct and control any action(s) taken against infringers. Upon Licensor's request, each applicable Licensee shall join as a party in any such legal proceedings where necessary for the conduct thereof at Licensor's cost and expense, except for any costs incurred by such Licensee if it retains its own attorneys which shall be paid by such Licensee. Each applicable Licensee will provide or procure reasonable assistance, such as the furnishing of documents and information and the execution of all reasonably necessary documents, as Licensor may reasonably request. Any recovery received from any such infringer or counterfeiter shall be retained solely by Licensor and each Licensee expressly waives any claim therefor; provided, however, that if Licensor recovers money in excess of Licensor's total costs and expenses, then Licensor shall pay such excess to each applicable Licensee to the extent necessary to offset any verifiable losses such Licensee incurred as a result of the infringement.

ARTICLE 6 LICENSEES' ACTIVITIES AND QUALITY OF LICENSED PRODUCTS

6.1 Sole Responsibility. Subject to Section 6.7, Resideo represents and warrants that it or other Licensees that are not Resideo shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products and will bear all related costs associated therewith.

6.2 Product Quality. Each Licensee shall conduct its business in a dignified manner consistent with the general reputation and importance of the Licensed Trademarks. Each Licensee is familiar both with the recognition and goodwill associated with the Licensed Trademarks and with the high standards of quality and performance associated with the products manufactured and distributed by Licensor under the Licensed Trademarks. Each Licensee shall use reasonable and good faith commercial efforts to safeguard the established goodwill symbolized by the Licensed Trademarks and to maintain the quality and performance standards with respect to its design, manufacture, sale and distribution of the Licensed Products pursuant to this Agreement. Licensed Products shall be of high quality, which is at least comparable to the quality of products sold by the SpinCo Business bearing the Honeywell Trademark prior to the Distribution Date, with which each Licensee is familiar. Each Licensee shall only sell or distribute products under the Licensed Products that in Licensor's reasonable opinion, do not tarnish, derogate or detract from the good reputation of Licensor or the Licensed Trademarks. All of the Licensed Products manufactured and/or distributed hereunder shall comply with all applicable laws, regulations and established industry standards of the countries in which the Licensed Products are sold or distributed and shall incorporate quality components. Each Licensee shall not sell or distribute any used or sub-standard products or "seconds" under the Licensed Trademarks.

6.3 Product Samples. From time to time throughout the term of this Agreement, as reasonable, but no more frequently than every other calendar year after the Distribution Date, each Licensee shall, upon Licensor's request, furnish to Licensor for approval, up to two (2) samples of each different Licensed Product within each Product Category that are manufactured under this Agreement, together with product packaging, so that Licensor can ensure that proper trademark usage is being made by such Licensee. Each Licensee agrees to make available at no charge such additional samples (not to exceed ten (10)) of each Licensed Product as Licensor may from time to time reasonably request for the purpose of comparison with earlier samples to maintain consistent trademark usage. All submissions by a Licensee pursuant to this Section 6.3 shall be at such Licensee's cost.

6.4 Net Promotor Score. Licensees must obtain a net promotor score with respect to the Licensed Products (the "NPS") to be calculated on an annual basis. The NPS must be derived in good faith by Licensees based on established methodology and validated by a third party service provider in the field familiar with the methodology for calculating a Net Promotor Score consistent with past practice. The validated NPS must be provided to Licensor within thirty (30) days after receipt, along with summary supporting documentation showing the questions from which the score was derived, summary details about customers who were surveyed, including number of customers and summary responses, and the required third party validation. Licensees will promptly provide Licensor further details about the NPS if reasonably requested by Licensor. Licensees must maintain an annual NPS that is equal to or higher than zero (0), or if higher, the average of the three most recent net promoter scores previously derived by the relevant business (the "Score"). If the NPS is below the Score in any year, then Resideo will meet with Licensor in good faith to discuss and form a plan to raise the next NPS to a level at or above the Score. If the NPS is more than one (1) point below the Score for any two consecutive years, then Licensor will have the right to terminate the Agreement upon notice to Licensees.

6.5 Quality Audit. Licensor shall have a continuing right to audit and examine the manufacturing steps and processes utilized by Licensees or any permitted third party manufacturers in the manufacture of the Licensed Products as well as their adherence to Licensor's trademark utilization criteria. No more than once per year at each facility, Licensor's authorized representatives shall have the right, upon reasonable notice and during normal business hours, to inspect the facilities of Licensees or any permitted third party manufacturers to assure Licensor that the Licensed Products are being produced and utilized in accordance with the requirements of this Agreement and all applicable laws. If Licensor has good cause to believe that issues exist at any facility which may harm its goodwill in the Licensed Trademarks or affect the quality of the Licensed Products, then Licensor or its authorized representatives shall have the right, upon reasonable notice and during normal business hours, to conduct additional inspections of such facilities to confirm that the Licensed Products are being produced and utilized in accordance with the requirements of this Agreement and all applicable laws. Such inspectors and the inspection reports shall be subject to the same confidentiality obligations as described in the audit process in Section 3.9.

6.6 Compliance with Laws. Licensees shall comply with, and assume all costs and responsibilities associated with, all laws, regulations, ordinances and standards anywhere in the Territory relating to or pertaining to the manufacture, sale, distribution, recycling, take-backs, disposal and/or advertising of the Licensed Products (including Proposition 65 in the State of California) or use of the Licensed Trademarks applicable to the Licensed Products. Licensees shall further comply with all ISO, ASTM/SAE and UL Standards as may be legally required for sale and otherwise applicable to the Licensed Products. Licensees shall ensure through inspection and audit that both it and its vendors comply with all laws and other applicable legal, regulatory and safety requirements anywhere in the Territory related to the Licensed Products and to the manufacture, sale, distribution, recycling, take-backs, disposal and/or advertising of the Licensed Products or use of the Licensed Trademarks applicable to the Licensed Products.

6.7 Third-Party Manufacturers' Approval. Prior to the use of a third party for the manufacture of any Licensed Products or components thereof, each Licensee must (a) notify Licensor of the name and address of any such manufacturer, the specific Licensed Products or components thereof to be manufactured by such manufacturer and any other information reasonably requested by Licensor relating to such manufacturer or Licensed Products or components thereof, (b) if requested by Licensor, obtain a signed agreement from such manufacturer confirming Licensor's rights in the Licensed Trademarks and (c) obtain Licensor's written permission, not to be unreasonably withheld or delayed, to use such manufacturer. Any third party manufacturer in use by the SpinCo Business as of the Distribution Date is hereby approved; provided that a Licensee furnishes the information set forth in this Section 6.7(a) in writing and the agreement required in Section 6.7(b) no later than six (6) months following the Distribution Date. Licensor shall have the right to visit and inspect the facilities of any approved third party manufacturer no more than once per year to confirm that such manufacturer is in compliance with all terms of this Agreement.

6.8 Third-Party Manufacturers' Conduct. Each Licensee shall require that all third party manufacturers employed by such Licensee in the manufacture of the Licensed Products shall comply with all applicable laws and regulations relating to the manufacture of such Licensed Products and meet or exceed such specifications set forth for the Licensed Products while this Agreement is in effect.

(a) Each Licensee shall remain fully responsible for ensuring that the Licensed Products are manufactured in accordance with the terms of the Agreement, and such Licensee shall take the steps necessary to ensure that the third party manufacturer:

(i) Produces the Licensed Products only as and when directed by such Licensee;

(ii) Does not distribute, sell or supply the Licensed Product to any person or entity other than a Licensee; and

(iii) Does not delegate in any manner whatsoever its obligations with respect to the Licensed Products.

(b) In the event that any such manufacturer utilizes the Licensed Trademarks for any unauthorized purpose, the applicable Licensee shall cooperate fully in bringing such utilization to an immediate halt at such Licensee's sole expense. If, by reason of such Licensee's not having supplied the above mentioned agreements to Licensor or not having given Licensor the name of any supplier, Licensor makes any representation or takes any action and is thereby subjected to any penalty or expense, such Licensee will compensate Licensor for any such cost or loss sustained.

(c) Any and all reasonable costs incurred by Licensor that are associated with Licensor's investigation, seizure and/or detention of Licensed Products manufactured, transported or shipped by a third party used by such Licensee (or any agent of such third party) but unknown to Licensor shall be borne by such Licensee, and such Licensee shall repay such amounts within ten (10) days of receipt of written details of such costs.

6.9 Home Trademark Predominant Brand. Each Licensee agrees to use the Home Trademark as its predominant brand in connection with the sale of each Product Category of Licensed Products sold by such Licensee. Starting with calendar year 2020, each Licensee guarantees that no less than seventy-five (75) percent of sales of Licensed Products by such Licensee in each Product Category in each calendar year during the Term and, if applicable, Extended Term, excluding sales of Licensed Products within the territories in **Attachment G(ii)**, shall be of Licensed Products bearing the Home Trademark (the "Guaranteed Sales Percentage"). In addition to the other remedies set forth in this Agreement, in the event total sales by a Licensee of Licensed Products bearing the Home Trademark is below the Guaranteed Sales Percentage in any Product Category in any calendar year during the Term and the Extended Term, if applicable, such Licensee shall pay to Licensor three (3) percent of the difference between (a) seventy-five (75) percent of such Licensee's total net sales of all products within the specific License Products listed in such calendar year and (b) Licensee's Net Sales in the same Product Category of Licensed Products bearing the Home Trademark in such calendar year ("Additional Royalties"). In the event that any Licensed Products are deleted as provided herein or by mutual agreement of the Parties, the "Guaranteed Sales Percentage" will be correspondingly reduced to omit such deleted Licensed Products as of the date of notice that such Licensed Products are deleted. The calculation of Guaranteed Sales Percentage shall not apply to Licensed Products: (i) which a Licensee brands with third party trademarks or are manufactured through ODM/OEM arrangements; (ii) branded with Resideo's GENESIS trademark; or (iii) sales of third party products by ADI. Notwithstanding the above, in the event of a Change of Control of Resideo or Resideo's assignment of this Agreement, in each case, that is approved by Licensor in accordance with Section 15.1, then the requirements in this Section 6.9 will no longer apply and shall be replaced by the requirements of Section 3.2 and 3.3 pertaining to Minimum Guaranteed Royalty Payments and Minimum Guaranteed Net Sales.

6.10 Licensor's Remedies. Each Licensee acknowledges and agrees that its selling of, or failure to cease sales of, Licensed Products not in substantial compliance with the standards set forth in this Article 6 may cause irreparable injury to Licensor. Any action taken pursuant to this Article 6 shall be without prejudice to any Party's right to the remedies set forth in Article 9 herein. In addition, Licensor reserves its rights with respect to all equitable remedies in the event of any failure by a Licensee to comply with the terms of this Article 6, including the sale or distribution of products not in compliance with the quality control provisions stated herein. Without limiting the foregoing, Licensor shall have the right to (i) require a Licensee to suspend sale, distribution and

marketing of any Licensed Products that are, in Licensor's sole but reasonable discretion, not in substantial compliance with the standards set forth in this Article 6, and such Licensee shall immediately comply with any such instruction and (ii) have such Licensee declare a recall of any line of Licensed Products if Licensor reasonably determines that such recall is necessary to prevent further damage or destruction of property and/or to prevent or eliminate any threat to the health or safety of consumers. Such Licensee shall bear all reasonable costs (but excluding Licensor's internal time and efforts) related to any such recall of Licensed Products, whether voluntary, required by government, or by Licensor. In the event of such a recall, such Licensee will consult with Licensor, regarding all aspects of handling such recall including media releases.

6.11 Licensor's Conduct.

Licensor shall conduct its business in a dignified manner consistent with the general reputation and importance of the Licensed Trademarks.

ARTICLE 7 CUSTOMER SERVICE REQUIREMENTS

7.1 Customer Service Requirements. Licensees shall provide responsive and high quality customer service related to the Licensed Products. All employees of Licensees shall be knowledgeable and courteous in answering customer service inquiries and resolving Complaints regarding the Licensed Products. Licensees' Customer Service will also meet the requirements and metrics set forth on **Attachment U**.

7.2 If in Licensor's sole but reasonable opinion, any Licensee is not meeting the customer service requirements as reflected in **Attachment U**, Licensor shall notify Resideo in writing. Such notification shall constitute notice that Licensees are in breach of the Agreement and that the Agreement may be terminated in accordance with Article 9 if such breach is not cured within sixty (60) days to Licensor's reasonable satisfaction.

ARTICLE 8 DURATION

8.1 Term. This Agreement shall become effective pursuant to the terms of Section 18.15 and, unless sooner terminated under the provisions herein, will continue in force for the Term.

8.2 Extended Term. This Agreement may be extended for an additional period of time determined by the Parties ("Extended Term") upon mutual consent of the Parties.

ARTICLE 9 IMMEDIATE TERMINATION

9.1 Termination by Licensor. On the occurrence of any of the following breach events, this Agreement or individual Licensed Products may be terminated by the Licensor for all Licensees, effective on delivery to Resideo of notice in accordance with Section 18.9 of this Agreement:

(a) The attempted assignment by any Licensee of this Agreement or any right or license granted under it in contravention of the terms of Article 15 of this Agreement;

(b) Any Licensee knowingly conceals revenue, knowingly maintains false books or records, falsifies information or otherwise defrauds or makes false representations to Licensor or knowingly submits any reports or documentation, including Royalty Reports, to Licensor which contain misrepresentations or omissions of material facts;

(c) Resideo fails, for any two (2) consecutive calendar quarters, to pay Royalties or Additional Royalties, as applicable, within the time frame specified above (even if payment of such Royalties or Applicable Royalties for such calendar quarters is subsequently made, with or without interest), except in the event of a provable and purely administrative error for any one quarter which was cured by Resideo within fourteen (14) days of receiving notice from Licensor;

(d) Resideo fails, for any two (2) consecutive calendar quarters, to make any report any Royalties or Additional Royalties, as applicable, except in the event of a provable and purely administrative error which is substantiated by Resideo and cured within fourteen (14) days of receiving notice from Licensor;

(e) If applicable pursuant to Section 3.3, Licensee (in the event of a Change of Control) or the assignee (in the event of an assignment) fail to achieve Minimum Guaranteed Net Sales for all Licensed Products in aggregate for two (2) consecutive calendar years;

(f) Resideo's Subsidiary, New HAPI Inc. (or its successors or assigns), fails to comply with all material obligations, including the payment obligations, set forth in the Indemnification and Reimbursement Agreement by and between New HAPI Inc. and Licensor;

(g) Any Licensee fails to pay its vendors or suppliers in a timely manner on ten (10) occasions within any twelve (12) month period, absent a bona fide dispute with respect to amounts due and owing to such distributors, vendors or suppliers;

(h) An auditor issues a "going concern opinion" about any Licensee at any time;

(i) Licensees fail to meet the Minimum Guaranteed Net Sales, if applicable, in any two (2) consecutive calendar years;

(j) If the NPS is more than one (1) point below the Score for any two consecutive years;

(k) Any Licensee incurs: (i) recalls of Licensed Products which are materially greater than its past history regarding such products and which created a substantial product hazard or an unreasonable risk of serious injury or death that demonstrably caused serious harm or death to a consumer; or (ii) incurs a recall of Licensed Products which was directly related to a catastrophic loss of life or harm to consumers, and further that in either case, Licensor in its sole but reasonable opinion decides that termination of the Agreement is necessary to protect the Honeywell Trademark or the Home Trademark following good faith discussions with such Licensee;

(l) The repeated mandating of a ban or recall of any Licensed Products by any governmental agency for product safety or quality issues and which are materially greater than its past history regarding such products; provided, however, that Licensor may only exercise the termination right granted in this Section with respect to the associated lines of Licensed Products that are the subject of such bans or recalls;

(m) All Licensees' cessation or termination of its business operations related to the Licensed Products; or

(n) The declaration of insolvency by any Licensee or the seeking of protection under any bankruptcy, receivership, creditors arrangement or comparable proceeding by such Licensee, or if any such proceeding is instituted against such Licensee.

9.2 Change of Control.

(a) Upon a Change of Control of Resideo, this Agreement shall immediately and automatically terminate for all Licensees, unless Resideo has obtained prior written consent to such Change of Control from Licensor.

(b) If any wholly-owned Subsidiary of Resideo's ceases to be wholly-owned by Resideo (including upon a Change of Control of such Subsidiary), this Agreement shall immediately and automatically terminate with respect to such Subsidiary and it will no longer be a Licensee.

ARTICLE 10 TERMINATION ON BREACH AFTER CURE PERIOD

10.1 In addition to any right of termination which either Party may have by virtue of law, and in addition to the right to terminate this Agreement under Article 9 of this Agreement, if either Party commits any material breach of the Agreement and fails to cure the breach to the non-breaching Party's reasonable satisfaction within a period of thirty (30) days after receipt of written notice specifying the nature of the breach, the Parties agree to negotiate in good faith to resolve such dispute prior to seeking alternative relief (except in the event that a continuing breach will cause irreparable harm to the Honeywell Trademark, in which case Licensor is free to seek alternative relief other than termination). Either Party may at any time deliver a written notice to the other Party that it wishes to refer a dispute for discussion between senior executives of the Parties. Following receipt of such notice each Party shall promptly designate one of its senior executives to negotiate in good faith to resolve such dispute within sixty (60) business days (or such longer period of time as such officers may agree in writing) of receipt of such notice. If at the end of such sixty (60) days (or longer if mutually extended) the designated executives have not fully resolved the dispute to their mutual satisfaction, the complaining Party is free to seek an alternative remedy consistent with the terms of this Agreement. For the avoidance of doubt, each of the Parties commits to negotiate in good faith in an attempt to avoid termination of the Agreement resulting from a breach. If after the expiration of the cure period and the period of negotiation between senior executives (if requested), the defaulting Party has failed or refused to fully remedy the breach, this Agreement may be terminated upon giving of notice by the terminating Party to the defaulting Party. For purposes of this Section, a breach of any of the following shall be deemed to be a material breach: Sections 2.1-2.13; Sections 3.1-3.9; Article 4; Article 5; Article 6; Article 7; Sections 9.1 and 9.2; Article 14; and Article 15. With respect to other provisions of this Agreement, a material breach is a breach which would have a material adverse effect, as is reasonably defined based on industry standards.

10.2 Notwithstanding Section 10.1 and for the avoidance of doubt, in the event of a breach involving the payment of money, except in the situation where the payment amount is in dispute as the result of an audit, the Party in breach will have ten (10) business days to cure such breach. If after the expiration of such period the defaulting Party has failed or refused to fully remedy the breach, this Agreement may be terminated upon giving of notice by the terminating Party to the defaulting Party.

ARTICLE 11 REMEDIES AND LIMITATIONS OF LIABILITY

11.1 Good Faith Resolution. Without limiting any rights or remedies of any Party under this Agreement, the Parties agree to work in good faith to resolve any disputes relating to the ongoing or historical use of the Licensed Trademarks.

11.2 Remedies Cumulative. The right of either Party to terminate this Agreement is not an exclusive remedy and either Party shall be entitled alternatively or cumulatively to damages and claims for breach of this Agreement or to any other remedy available under the laws of the applicable jurisdiction.

11.3 Irreparable Harm. Each Licensee acknowledges that a breach by it of this Agreement may cause Licensor irreparable damage which cannot be remedied in monetary damages in an action at law and may also constitute infringement of the Home Trademark. In the event of any breach that could cause irreparable harm to Licensor, or cause some impairment or dilution of its reputation, goodwill or the Home Trademark, Licensor shall be entitled to an immediate injunction to cease or prevent such irreparable harm, without being required to show actual damage or post an injunction bond, in addition to any other legal or equitable remedies available at law.

11.4 Prevailing Party in Dispute. In the event of a dispute between the Parties, the prevailing party shall be entitled to recover its costs, expenses and attorneys' fees incurred in connection with enforcing the terms of this Agreement

or preventing misuse of the Home Trademark. A "prevailing party" shall mean a Party who receives all or substantially all of the relief sought by such Party in an adjudication of its claims arising out of or related to this Agreement before a court of law or other agreed upon tribunal.

11.5 Survival. No expiration or termination of this Agreement for whatever cause shall affect any right or obligation of either Party:

(a) which is vested pursuant to this Agreement as of the effective date of such expiration or termination; or

(b) which is intended to survive expiration or termination of this Agreement, including Licensee's ongoing obligation to abide by Article 1, Section 2.4, Section 2.6, Section 2.7, Section 2.9, Articles 3 through 6, Articles 11 through 14 and Articles 17 through 18. In addition, nothing herein shall be construed as granting any Licensee any vested rights in the Home Trademark.

11.6 **IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOST PROFITS, LOST SAVINGS, OR ANY OTHER SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, ARISING IN ANY WAY OUT OF THIS AGREEMENT OR ANY MATERIALS PROVIDED HEREUNDER EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF, OR COULD HAVE FORESEEN, SUCH DAMAGES. THE ABOVE DISCLAIMER OF LIABILITY DOES NOT APPLY TO ANY PAYMENT OBLIGATIONS OWED TO LICENSOR HEREUNDER, INCLUDING PAYMENT OF ROYALTIES, ADDITIONAL ROYALTIES AND MINIMUM GUARANTEED ROYALTY PAYMENTS.**

ARTICLE 12 CONSEQUENCES OF TERMINATION

12.1 Consequences. Upon the expiration of this Agreement or upon the termination of this Agreement by either Party for whatever reason, each Licensee shall, and shall cause its Sublicensees to:

(a) Other than as set forth in section 12.2 below, immediately cease all use of the Licensed Trademarks in any manner whatsoever and shall not thereafter use any word, expression, design, or symbol as a trademark, trade name, domain name or otherwise which is confusingly similar thereto, which may constitute a colorable imitation thereof or in any other manner whatsoever;

(b) thereafter refrain from indicating or representing that such Licensee or Sublicensee, as applicable, is a trademark licensee or Sublicensee, as applicable, of Licensor; and

(c) thereafter refrain from directly or indirectly using or displaying any advertising or promotional material or performing any other act which might reasonably cause anyone to believe such Licensee or Sublicensee, as applicable, to be a trademark licensee or Sublicensee, as applicable, of Licensor including ceasing use of Copy, Packaging and/or any advertising, promotional or packaging material that is similar to any such material used in connection with the Licensed Products.

12.2 Sell-off Period. Provided that Resideo has paid all Royalties, Additional Royalties and the difference between the Minimum Guaranteed Royalty Payments and the Royalties (pursuant to Section 3.5), each as applicable, owed to Licensor through the date of termination of this Agreement, then for a period of not more than one (1) year following termination of this Agreement (the "Sell-off Period"), except for termination arising out of any breach of this Agreement by any Licensee or pursuant to Section 9.1 or Article 10, each Licensee may deliver for sale, but solely at ordinary prices, any Licensed Products bearing the Home Trademark in the possession or under the control of such Licensee at the date of termination, subject to the payments called for in Article 3 and the provisions of Article 6. For the avoidance of doubt, the Sell-off Period shall not apply to the Honeywell Trademark or the POC Trademark.

12.3 Unpaid Minimum Guaranteed Royalty Payments. Upon termination of this Agreement for whatever reason, other than Licensor's breach or solely pursuant to Section 9.2, three (3) calendar years' worth of unpaid Minimum Guaranteed Royalty Payments as set forth in Section 3.2 shall become immediately due and payable. The requirement by Licensor of the payment of such unpaid Minimum Guaranteed Royalty Payments specified in this Section shall not limit any other relief to which Licensor may be entitled in law or equity.

12.4 Nature of Payment. In connection with the payment required in Section 12.3 in the event of termination (the "Payment"), the Parties acknowledge that:

(a) any actual loss to Licensor from termination of this Agreement prior to the end of the Term is inherently uncertain, not readily ascertainable, and incapable of precise quantification as of the execution hereof;

(b) the Payment represents only the minimum amount that Licensor would have received had the Agreement not been terminated, rather than the actual amount that Licensor would have received, and therefore represents a compromise by Licensor;

(c) the Payment is intended solely to compensate Licensor and not as a penalty;

(d) the Parties believe the Payment is not disproportionate to the anticipated likely loss to be suffered by Licensor;

(e) the Payment agreed to knowingly by Licensee, a sophisticated party represented by experienced counsel; and

(f) Licensor is not obligated to seek to mitigate the damage sustained by Licensor.

12.5 The provisions in Sections 12.3 and 12.4 shall supersede any contrary provision herein relating to payment due to Licensor upon termination of this Agreement.

ARTICLE 13 WARRANTIES

13.1 WARRANTY DISCLAIMER BY LICENSOR. ALL OF THE RIGHTS PROVIDED IN THIS AGREEMENT ARE PROVIDED ON AN AS-IS, WHERE-IS BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE HEREBY DISCLAIMED.

13.2 Warranty by Resideo. Resideo has all necessary corporate power and authority to execute and deliver this Agreement on behalf of itself and its wholly-owned Subsidiaries, to perform its obligations hereunder and to cause its wholly-owned Subsidiaries to perform their obligations hereunder, and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement by Resideo and the consummation by Resideo of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Resideo and no other corporate proceedings on the part of Resideo are necessary to approve this Agreement or to consummate the transactions contemplated hereby on its own behalf or on behalf of any of its wholly-owned Subsidiaries. This Agreement has been duly executed and delivered by Resideo and, assuming the due authorization, execution and delivery by Licensor, constitutes a valid and binding obligation of Resideo and its wholly-owned Subsidiaries, enforceable against each of Resideo and its wholly-owned Subsidiaries in accordance with its terms.

ARTICLE 14 INDEMNIFICATION AND INSURANCE

14.1 Indemnity by Licensor. Licensor shall indemnify, defend and hold harmless each Licensee from any and all liability, claims, demands, expenses (including reasonable attorney fees), direct losses or damages, fines, penalties, judgments and costs, but not including consequential, incidental or punitive damages or lost profits, in each case, arising from: (a) any allegation that such Licensee's proper use of the Licensed Trademarks in accordance with this Agreement infringes the trademark rights of any Third Party; (b) Licensor's negligence in the advertising, sale, installation or maintenance of Licensed Products; or (c) any violation of law by Licensor or its employees or agents related to the Licensed Products (collectively, "Licensor Indemnity Claim"). If a Licensee receives notice or knowledge of a Licensor Indemnity Claim, such Licensee shall, as soon as possible, report to Licensor in writing the details of such claim and take no further steps with respect to such matter pending instructions from Licensor. Licensor shall not be liable to indemnify any Licensee for any settlement of any Licensor Indemnity Claim effected without the Licensor's express prior written consent. With respect to matters within clause (a) above, Licensor may decide in its sole discretion what steps should be taken to address such matter and will solely conduct and control any action(s) taken in response to such matter. Any applicable Licensee shall join as a party in any such legal proceedings where necessary for the conduct thereof at Licensor's cost and expense, except for any costs incurred by such Licensee if it retains its own attorneys which shall be paid by such Licensee. Such Licensee will provide or procure reasonable assistance as Licensor may reasonably request in defense of any Licensor Indemnity Claim.

14.2 Indemnity by Licensee. As between Licensor and Licensees and regardless of the termination or expiration of this Agreement, each Licensee assumes full responsibility for all liability, claims, demands, expenses (including reasonable attorney fees) and damages, including claims for defective products

as well as damages to property or injury to persons (including death) arising out of or otherwise in relation to the manufacture, sale or use of the Licensed Products (excluding actions solely involving claims relating to the Licensed Trademarks infringing the rights of others in the Territory or any actions arising out of Licensor's required indemnities as set forth in Section 14.1 above) and/or any actions of its employees, including product liability, liability arising out of alleged defects or deficiencies in the Licensed Products, patent infringement, product recycling or take-backs, negligence, false advertising, breach of warranty, fraud, misrepresentation, breach of obligations to third parties and/or violation of any law in any country (collectively, "Indemnified Claims"). Each Licensee agrees to defend, indemnify, save and hold harmless Licensor, its successors, assigns, officers, directors, agents and employees, against any and all claims, costs, (including court costs and attorneys' fees), proceedings, liabilities, loss, damage, injury or death arising out of or relating to any Indemnified Claims. Licensor will provide or procure reasonable assistance as such Licensee may reasonably request in defense of any Indemnified Claims.

14.3 Insurance. In addition to the foregoing indemnification as set forth in Section 14.2, while this Agreement is in effect, and for a period of three (3) years after termination or expiration of this Agreement, each Licensee shall maintain, comprehensive general liability and product liability insurance in an amount no less than five (5) million U.S. Dollars ($5 million) combined single limit, with a deductible that is reasonably standard for the business, for each single occurrence for bodily injury and/or for property damage. In addition:

(a) Each Licensee shall have Licensor, its partners, partnerships, joint ventures, parents, Subsidiaries, and affiliated companies and their respective employees, officers and agents listed as additional insured parties therein in its insurance policies, except worker's compensation insurance.

(b) Promptly upon request, each Licensee shall furnish written certificates establishing that said insurance has been procured and is being properly maintained and that the premiums therefore are paid, and specifying the names of the insurers and the respective policy numbers and expiration dates.

(c) Members of Licensor's Finance, Licensing and Legal departments may examine true and actual copies of the policies. Insurance carriers providing coverage are to be AM Best "A" rated.

(d) Each policy shall provide that thirty (30) days prior written notice shall be given to Licensor in the event of cancellation or material change of insurance coverage or endorsements required hereunder.

14.4 The obligations required in this Article 14 shall survive expiration or termination of this Agreement solely with respect to Licensed Products sold under this Agreement.

ARTICLE 15 ASSIGNMENT AND CHANGE OF CONTROL

15.1 No Assignment or Change of Control.

(a) The rights granted to Resideo pursuant to this Agreement are personal to Resideo and may not be assigned, by operation of law or otherwise, nor may Resideo delegate its obligations hereunder without the written consent of Licensor.

(b) The rights granted to Resideo's wholly-owned Subsidiaries pursuant to this Agreement are personal to each such Subsidiary and may not be assigned, by operation of law or otherwise, nor may such Subsidiary delegate its obligations hereunder.

(c) Any attempted assignment in violation of this Article 15 shall be null, void and of no effect.

15.2 Consent not Unreasonably Withheld. Licensor agrees not to unreasonably withhold its consent to the assignment of this Agreement in the event of the sale of all or substantially all of the business of Resideo and all of its

Subsidiaries that are associated with the Licensed Products, or a Change of Control of Resideo and all of its Subsidiaries, in each case to (i) a financial sponsor or private equity firm with total assets under management of at least $10 billion or (ii) any entity set forth on **Attachment V**.

15.3 Assignment by Licensor. Licensor may assign its rights and obligations in this Agreement, in whole or in part without restriction; provided that any such assignment will be subject to, this Agreement and the rights granted herein to Licensee. In the event of an assignment of Licensor's rights and obligations in this Agreement to a purchaser of all or substantially all of the assets or ownership interests of Honeywell Group, Resideo will have the right to terminate this Agreement by providing written notice of Resideo's intention to terminate to Licensor no later than thirty (30) days after the closing date of the sale of such assets or ownership interests of Honeywell Group. Such termination will be effective as of six (6) months after the closing date of the sale of such assets or ownership interests of Honeywell Group and otherwise be subject to the requirements herein.

ARTICLE 16 UNDERSTANDINGS IN THE EVENT OF BANKRUPTCY

16.1 In the event that any Licensee seeks protection under any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding, or if any such proceeding is instituted against any Licensee, while the Agreement is active, such Licensee acknowledges and agrees that:

(a) For purposes of 11 U.S.C. Section 365(c)(1) and Sections 365(e)(2)(A)(i) and 365(e)(2)(A)(ii), the term "applicable law" is federal trademark law - i.e., the Lanham Act (15 U.S.C. Section 1051, et seq.), and such Licensee's right to use the Licensed Trademarks is personal to such Licensee and is non-assumable or assignable without Licensor's consent;

(b) Notwithstanding anything set forth herein to the contrary, Licensor does not consent to such Licensee's continued use of the Licensed Trademarks, such Licensee's exercise of any rights provided in this Agreement or such Licensee's assignment and/or assumption (including assumption and assignment) of the Agreement;

(c) Such Licensee will not oppose any motion by Licensor for relief from the automatic stay of 11 U.S.C. Section 362(a) so that Licensor may terminate this Agreement, for cause; it is further agreed and acknowledged that "cause" includes such Licensee's inability to assume and/or assign the Agreement; and

(d) Such Licensee will not oppose any motion, including on shortened notice, by Licensor to compel rejection of this Agreement under 11 U.S.C. Section 365(d).

ARTICLE 17 NO RIGHT OF SET-OFF

17.1 Neither party shall have the right to set off any money owed by one to the other with respect to obligations within this Agreement.

ARTICLE 18 MISCELLANEOUS

18.1 Separation Agreement. The Parties agree that, in the event of a conflict between the terms of this Agreement and the Separation Agreement with respect to the subject matter hereof, the terms of this Agreement shall govern.

18.2 Relationship of Parties. Nothing in this Agreement shall be deemed or construed by the Parties or any third party as creating a relationship of principal and agent, partnership or joint venture between the Parties, it being understood and agreed that no provision contained herein, and no act of any Party or any of such Party's Affiliates, shall be deemed to create any relationship between the Parties or their respective Affiliates, other than the relationship set forth herein. Each Party shall act under this Agreement solely as an independent

contractor and not as an agent or employee of any other Party or any of such Party's Affiliates. This Agreement further does not create any right to an exclusive commercial agent relationship with respect to the Licensed Trademarks nor any right to appoint an exclusive commercial agent with respect to the Licensed Trademarks in any country or territory in the world, including within the Territory.

18.3 Press Releases. Neither Party will make any public statement or other announcement (including issuing a press release) relating to this Agreement or the relationship between the Parties, including the termination of this Agreement, without the prior written approval of the other Party. Any joint announcement or press release shall be issued only after both Parties agree in writing to the timing and wording of the announcement or press release.

18.4 Counterparts; Entire Agreement.

(a) This Agreement may be executed in one or more counterparts, all of which counterparts shall be considered one and the same agreement, and shall become effective only after one or more counterparts have been signed by each Party and delivered to the other Party. This Agreement may be executed by facsimile or PDF signature and scanned and exchanged by electronic mail, and such facsimile or PDF signature or scanned and exchanged copies shall constitute an original for all purposes.

(b) This Agreement, the Separation Agreement, the other Ancillary Agreements as defined in the Separation Agreement and the Exhibits, Schedules and Attachments hereto and thereto contain the entire agreement between the Parties with respect to the subject matter hereof and supersede all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter, and there are no agreements or understandings between the Parties with respect to the subject matter hereof other than those set forth or referred to herein or therein.

18.5 Governing Law; Jurisdiction. Any disputes arising out of or relating to this Agreement, including, without limitation, to its execution, performance, or enforcement, shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each Party irrevocably consents to the exclusive jurisdiction, forum and venue of any state or federal court sitting in New York City in the State of New York over any and all claims, disputes, controversies or disagreements between the Parties or any of their respective Affiliates, successors and assigns under or related to this Agreement or any of the transactions contemplated hereby, including, without limitation, to their execution, performance or enforcement, whether in contract, tort or otherwise. Each of the Parties hereby agrees that it shall not assert and shall hereby waive any claim or right or defense that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. Each Party agrees that a final judgment in any legal proceeding resolved in accordance with this Section 18.5, Section 18.6 and Section 18.7 shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

18.6 WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY INCLUDING, WITHOUT LIMITATION, THEIR EXECUTION, PERFORMANCE OR ENFORCEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED

BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.

18.7 Specific Performance. Subject to Section 10.1, in the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the affected Party shall have the right to specific performance and injunctive or other equitable relief of its rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The other Party shall not oppose the granting of such relief on the basis that money damages are an adequate remedy. The Parties agree that the remedies at law for any breach or threatened breach hereof, including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived.

18.8 Third-Party Beneficiaries. The provisions of this Agreement are solely for the benefit of the Parties hereto and are not intended to confer upon any Person except the Parties hereto any rights or remedies hereunder and there are no third-party beneficiaries of this Agreement and this Agreement shall not provide any third person with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement.

18.9 Notices. All notices or other communications under this Agreement shall be in writing and shall be provided in the manner set forth in the Separation Agreement. The record address of Licensor is:

Honeywell International Inc.
115 Tabor Road
Morris Plains, NJ 07950
Attention: Vice President and General Counsel

with copies to:

Honeywell International Inc.
115 Tabor Road
Morris Plains, NJ 07950
Attention: Trademark Counsel

The record address for Resideo (which shall receive every notice required or contemplated by this Agreement on its own behalf and on behalf of its wholly-owned Subsidiaries) for this purpose is:

__________________
__________________
__________________
Attention: _______________

with a copy to:
__________________
__________________
__________________
Attention: _______________

Either Party may, at any time, substitute for its previous record address any other address by giving written notice of the substitution. Without prejudice to the notice obligations set forth in this Section 18.9, to the extent Licensee wishes to contact Licensor regarding certain specified topics, a list of such topics and the applicable contact information (which may be updated by Licensor from time to time) is set forth on **Attachment W**.

18.10 Severability. If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Party. Upon any such determination, any such provision, to the extent determined to be invalid, void or unenforceable, shall be deemed replaced by a provision that such court determines is valid and enforceable and that comes closest to expressing the intention of the invalid, void or unenforceable provision.

18.11 Headings. The article, section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

18.12 Waivers of Default. No failure or delay of any Party in exercising any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Waiver by any Party of any default by the other Party of any provision of this Agreement shall not be deemed a waiver by the waiving Party of any subsequent or other default.

18.13 Amendments. No provisions of this Agreement shall be deemed waived, amended, supplemented or modified by any Party, unless such waiver, amendment, supplement or modification is in writing and signed by the authorized representative of each Party.

18.14 Joint Preparation and Drafting. This Agreement shall be deemed to have been drafted and prepared jointly by the Parties so that any ambiguity in this Agreement shall not be construed against either Party on that basis alone.

18.15 Effect. This Agreement shall take effect only upon satisfaction of the following:

(a) Due execution of the Agreement by all Parties; and

(b) Delivery of a fully signed version of the Agreement to Licensor.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their respective officers thereunto duly authorized.

Resideo Technologies, Inc., on behalf of itself and its wholly-owned Subsidiaries

By______________________________

Name___________________________

Title_____________________________

Honeywell International Inc.

By______________________________

Name___________________________

Title_____________________________

Division_________________________



(Back To Top)

## Section 5: EX-2.7 (EX-2.7)

**Exhibit 2.7**

---

FORM OF

INDEMNIFICATION AND REIMBURSEMENT AGREEMENT

BY AND AMONG

NEW HAPI INC.,

AND

HONEYWELL INTERNATIONAL INC.

Dated as of [ ], 2018

# TABLE OF CONTENTS


| | | Page(s) |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| Section 1.1 | Definitions | 2 |
| ARTICLE II | INDEMNIFICATION | 14 |
| Section 2.1 | Indemnification and Reimbursement by Indemnitor | 14 |
| Section 2.2 | Estimates; Statements; and Reports | 14 |
| Section 2.3 | Payments to Indemnitee | 15 |
| Section 2.4 | Payment Deferrals | 16 |
| Section 2.5 | Manner of Payment | 17 |
| Section 2.6 | Limitations to Indemnification and Reimbursement | 18 |
| Section 2.7 | Illustrative Examples | 18 |
| Section 2.8 | Management of Claims | 18 |
| Section 2.9 | Covenants | 18 |
| Section 2.10 | Restricted Payment Capacity | 19 |
| Section 2.11 | No Acts to Impair Rights | 19 |
| Section 2.12 | Default | 20 |
| Section 2.13 | Guarantee | 21 |
| Section 2.14 | Subordination | 21 |
| Section 2.15 | Confidentiality; Privilege | 24 |
| Section 2.16 | Tax Treatment | 26 |
| ARTICLE III | TERM AND TERMINATION | 26 |
| Section 3.1 | Term | 26 |
| Section 3.2 | Termination | 26 |
| Section 3.3 | Effect of Termination | 26 |
| ARTICLE IV | MISCELLANEOUS | 27 |
| Section 4.1 | Counterparts; Entire Agreement | 27 |
| Section 4.2 | Representations and Warranties | 27 |
| Section 4.3 | Dispute Resolution | 28 |
| Section 4.4 | Governing Law; Jurisdiction | 28 |
| Section 4.5 | Waiver of Jury Trial | 28 |

**TABLE OF CONTENTS**
**(continued)**


| | | Page(s) |
|---|---|---|
| Section 4.6 | Court-Ordered Interim Relief | 29 |
| Section 4.7 | Assignability; Transfer | 29 |
| Section 4.8 | Notices | 30 |
| Section 4.9 | Severability | 31 |
| Section 4.10 | Fees and Expenses | 31 |
| Section 4.11 | Headings | 31 |
| Section 4.12 | Waivers of Default | 31 |
| Section 4.13 | Amendments | 31 |
| Section 4.14 | Interpretation | 32 |

Exhibits

| | |
|---|---|
| Exhibit A | Estimated Annual Loss Statement |
| Exhibit B | Initial Prior Year Aggregate Loss Statement |
| Exhibit C | Quarterly Report |
| Exhibit D | Prior Year Aggregate Loss Statement |
| Exhibit E | Specified Sites |
| Exhibit F | Excluded Sites |
| Exhibit G | Covenants |
| Exhibit H | Guarantee |

# INDEMNIFICATION AND REIMBURSEMENT AGREEMENT

This INDEMNIFICATION AND REIMBURSEMENT AGREEMENT (as may be amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), dated October [●], 2018, by and among (i) Honeywell International Inc., a corporation organized under the Laws of the State of Delaware ("**Indemnitee**" or "**Honeywell**") and (ii) New HAPI Inc., a corporation organized under the Laws of the State of Delaware and a direct wholly owned subsidiary of Indemnitee ("**Indemnitor**" and, together with Indemnitee, the "**Parties**" and each, a "**Party**").

W I T N E S S E T H:

WHEREAS the board of directors of Honeywell has determined that it is in the best interests of Honeywell and its shareholders to create a new publicly-traded company that will operate the Homes Business;

WHEREAS Honeywell and Resideo Technologies, Inc., a corporation organized under the Laws of the State of Delaware ("**Homes**"), intend to enter into a Separation and Distribution Agreement (the "**Separation Agreement**");

WHEREAS, pursuant to and in accordance with the Separation Agreement, prior to the Distribution, (i) Indemnitor will assign the obligations hereunder to Resideo Intermediate Holding Inc. ("**New HAPI 2**") (an indirect wholly owned subsidiary of Indemnitee) and (ii) shares of New HAPI 2 and certain other assets relating to the Homes Business will be contributed to the Homes Group and, following the Distribution, (a) New HAPI 2 will be Indemnitor for all purposes under this Agreement and (b) a substantial portion of the Homes Business and certain related assets and liabilities will be held by New HAPI 2 (which will be an indirect wholly owned subsidiary of Homes) and its subsidiaries;

WHEREAS, Honeywell historically operated certain businesses whose activities have resulted in certain environmental remediation liabilities subject to indemnification by the Honeywell Group (and, indirectly, Indemnitor Group), which have been identified as Specified Sites on Exhibit E hereto;

WHEREAS, in light of Indemnitor's ownership of the equity interests in certain of the other entities comprising the Homes Group, Indemnitor has determined that it is appropriate and desirable for Indemnitor to agree to pay to Indemnitee the Environmental Obligation and, because of its recognized experience with and efficient management of such matters, for Indemnitee to manage such Claims as more fully described in this Agreement; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, the parties hereto, intending to be legally bound, agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1 Definitions. When used in this Agreement, the following terms shall have the respective meanings specified below.

"**Accrued Amounts**" shall have the meaning set forth in Section 2.4(b).

"**Adverse Change**" shall have the meaning set forth in Section 2.11(a).

"**Affiliate**" of any Person shall mean a Person that controls, is controlled by or is under common control with such Person. As used herein, "**control**" of any entity shall mean the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of such entity, whether through ownership of voting securities or other interests, by contract or otherwise; *provided*, *however*, that (i) Homes and the other members of the Homes Group shall not be considered Affiliates of Honeywell or any of the other members of the Honeywell Group and (ii) Honeywell and the other members of the Honeywell Group shall not be considered Affiliates of Homes or any of the other members of the Homes Group.

"**Aggregate Annual Obligation**" shall mean, in respect of any calendar year, *the sum of* (i) the Environmental Obligation in respect of such calendar year, *plus* (ii) any Disallowance Payment calculated as of December 31 of such year, *plus* (iii) any Cumulative Outstanding Liability Transfer Losses, calculated as of December 1 of such year.

"**Agreement**" shall have the meaning given to it in the preamble to this Agreement.

"**Agreement Amendment**" shall have the meaning set forth in Section 2.12(a).

"**Ancillary Agreement**" shall mean the instruments, assignments, documents and agreements executed in connection with the implementation of the transactions contemplated by the Separation Agreement.

"**Annual Cash Deficiency Payment**" shall have the meaning set forth in Section 2.3(d)(ii).

"**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized by Law to close in New York City, New York.

"**Cap**" shall mean $140,000,000.

"**Cash Amounts**" shall mean, in respect of any Person (i) amounts of cash actually paid by such Person to any other Person or (ii) amounts to be paid by such person to any other Person that are classified as accounts payable; *provided*, for the avoidance of doubt, that any amount previously counted as a Cash Amount pursuant to clause (ii) may not be counted as a Cash Amount pursuant to clause (i) in a subsequent year's calculation of the Aggregate Annual Obligation.

"**Cash True-Up Payments**" shall have the meaning set forth in Section 2.3(d)(ii).

"**Claims**" shall mean (i) any and all claims asserted, made or alleged against any member of the Honeywell Group or the Homes Group or their respective Representatives, or any of the heirs, executors, successors and assigns of any of the foregoing, regardless of when they are made, arise or arose, alleging any injury, harm, risk, damage, cost or expense of any kind or nature, which are asserted to be related in any way, directly or indirectly, to (A) any violation of, noncompliance with, or liability under any HSE Laws associated with the Specified Sites, including, without limitation, response to, investigation and remediation of Releases, (B) the Release or exposure to Hazardous Materials associated with the Specified Sites (excluding any such current non-remediation claims asserted, made or alleged related to matters listed on Schedule 1.1 hereto, including, without limitation, personal injury and loss of property value claims), or (C) any natural resource damages with respect to the Specified Sites, and (ii) any investigation and remediation of Releases with respect to the Specified Sites unrelated, or in addition, to any claim. For the avoidance of doubt, "Claims" shall not include any SpinCo HSE Liabilities (as defined under the Separation Agreement).

"**Cumulative Outstanding Liability Transfer Losses**" shall mean an amount equal to: (i) 90% of the Liability Transfer Resolution Amount, *less* (ii) 90% of the Insurance Receipts received in respect of a Liability Transfer Resolution Event, *less* (iii) 90% of Affirmative Environmental Litigation Proceeds received in respect of a Liability Transfer Resolution Event, *less* (iv) 90% of Property Sales Proceeds received in respect of a Liability Transfer Resolution Event, *less* (v) 90% of Co-Contributions Proceeds received in respect of a Liability Transfer Resolution Event, and *less* (vi) the aggregate amount of all Liability Transfer Allocations, calculated in each case, as of December 1 of any year.

"**Current Credit Agreement**" shall mean the Credit Agreement to be entered into by and among, *inter alia*, Homes, the Homes Borrower, the lenders from time to time party thereto and JPMORGAN CHASE BANK, N.A., as administrative agent.

"**Default**" shall have the meaning set forth in Section 2.12(a).

"**Default Date**" shall have the meaning set forth in the proviso in Section 2.12(a).

"**Default Deferral**" shall have the meaning set forth in Section 2.4(a).

"**Deficiency Amount**" shall mean, in respect of any calendar year, the amount, if any, by which (i) the Estimated Annual Obligation for such year *is less than* (ii) the lesser of: (A) the Aggregate Annual Obligation and (B) the Cap.

"**Disallowance Payment**" shall mean, as of any date, 90% of Insurance Disallowances during the term of this Agreement that Indemnitor has not already paid to Indemnitee pursuant to this Agreement; *provided* that if any Disallowance Payment would result in an amount in excess of the Cap being paid in respect of the year the related Insurance Receipt was applied, then such Disallowance Payment shall be limited to the difference between the Cap and the amount of the Aggregate Annual Obligation for such year.

"**Dispute**" shall have the meaning set forth in Section 4.3.

"**Distribution**" shall mean the distribution by Honeywell to Record Holders, on a pro rata basis, of all of the outstanding shares of common stock of Homes owned by Honeywell.

"**Distribution Date**" shall mean the date, determined by Honeywell in accordance with the Separation Agreement, on which the Distribution occurs.

"**Environmental Obligation**" shall mean, in respect of any period, an amount *equal to* (i) 90% of the Losses incurred by Indemnified Parties related to Claims (other than any Losses that are included in the calculation of a Liability Transfer Resolution Amount) in such period, *less* (ii) 90% of the Insurance Receipts for such period, *less* (iii) 90% of amounts received by any member of the Honeywell Group resulting from affirmative litigation relating to Claims in such period, net of any costs or expenses of whatever kind in respect of Managing, investigating, responding to, prosecuting, settling, compromising or resolving claims relating to such affirmative litigation, including attorneys' fees and costs (including, but not limited to, the costs of experts and vendors necessary to prosecute, compromise and manage such affirmative litigation) ("**Affirmative Environmental Litigation Proceeds**"), *less* (iv) 90% of the net proceeds received in such period by any member of the Honeywell Group in respect of sales of any property comprising the Specified Sites in such period ("**Property Sales Proceeds**"), and *less* (v) 90% of any other amounts contributed to or otherwise paid to or on behalf of any member of the Honeywell Group by other Persons not within the Honeywell Group relating to Claims in such period, net of any costs to the Honeywell Group in connection with recovering such amounts ("**Co-Contributions Proceeds**"), in each of clauses (ii), (iii), (iv) and (v), excluding such amounts in respect of a Liability Transfer Resolution Event.

"**Estimated Annual Loss Statement**" shall mean, in respect of any calendar year, an annual written statement, a form of which is attached hereto as Exhibit A, setting forth the Estimated Annual Obligation in respect of such year.

"**Estimated Annual Obligation**" shall mean, in respect of any calendar year, (i) 90% of the amount of estimated Losses incurred by the Indemnified Parties in respect of Claims (other than any Losses that are included in the calculation of a Liability Transfer Resolution Amount), *less* (ii) 90% of the amount of estimated Insurance Receipts, *less* (iii) 90% of the amount of estimated Affirmative Environmental Litigation Proceeds, *less* (iv) 90% of the amount of estimated Property Sales Proceeds and *less* (v) 90% of the amount of estimated Co-Contributions Proceeds, in each case, as such estimate is set forth in the Estimated Annual Loss Statement and, in each of clauses (ii), (iii), (iv) and (v), excluding such amounts in respect of a Liability Transfer Resolution Event.

"**Estimated Initial Obligation**" shall mean, in respect of the Initial Period, (i) 90% of the amount of estimated Losses incurred by the Indemnified Parties in respect of Claims (other than any Losses that are included in the calculation of a Liability Transfer Resolution Amount), *less* (ii) 90% of the amount of estimated Insurance Receipts, *less* (iii) 90% of the amount of estimated Affirmative Environmental Litigation Proceeds, *less* (iv) 90% of the amount of estimated Property Sales Proceeds, and *less* (v) 90% of the amount of estimated Co-Contributions Proceeds, in each of clauses (ii), (iii), (iv) and (v), excluding such amounts in respect of a Liability Transfer Resolution Event.

"**FCCR Test**" shall have the meaning set forth in Section 2.4(a).

"**Financial Covenant Deferral**" shall have the meaning set forth in Section 2.4(a).

"**Financial Indebtedness**" shall mean, for any Person, all obligations of such Person under the applicable governing documentation to pay principal, interest, penalties, fees, guarantees, reimbursements, damages, costs of unwinding and other liabilities with respect to (a) indebtedness for borrowed money, whether current or funded, fixed or contingent, secured or unsecured or (b) indebtedness evidenced by bonds, debentures, notes, mortgages or similar instruments or debt securities.

"**Financial Representative**" shall mean any arranger, collateral agent, administrative agent, indenture trustee or other agent trustee or representative for any holder of Senior Indebtedness.

"**Fiscal Quarter**" shall mean the fiscal quarter of Indemnitee, it being understood that for purposes hereof, the fourth Fiscal Quarter of any calendar year shall mean the Fiscal Quarter ending on December 31st; *provided* that if Indemnitee changes its fiscal year, the Parties shall work together in good faith to amend this Agreement as may be necessary.

"**General RP Basket**" shall have the meaning set forth in Section 2.10.

"**Governmental Approvals**" shall mean any notices, reports or other filings to be given to or made with, or any consents, registrations or permits to be obtained from, any Governmental Authority.

"**Governmental Authority**" shall mean any federal, state, local, foreign or international court, government, department, commission, board, bureau, agency, official or other legislative, judicial, regulatory, administrative or governmental authority.

"**Guarantee**" shall have the meaning set forth in Section 2.13.

"**Hazardous Materials**" means (i) any natural or artificial substance (whether solid, liquid, gas or other form of matter, noise, microorganism or electromagnetic field) that could cause harm to human health or the environment, including petroleum, petroleum products and byproducts, asbestos-containing materials, perfluoroalkyl substances, urea formaldehyde foam insulation, carcinogens, endocrine disrupters, lead-based paint, electronic, medical or infectious wastes, polychlorinated biphenyls, radon gas, radioactive substances, greenhouse gases and ozone-depleting substances and (ii) any other chemical, material, substance or waste that could result in liability under, or that is prohibited, limited or regulated by or pursuant to, any HSE Law.

"**Homes**" shall have the meaning given to it in the recitals to this Agreement.

"**Homes Borrower**" shall mean Resideo Funding Inc.

"**Homes Business**" shall mean the provision of products, solutions, and technologies that control residential energy efficiency, safety, and security, with a portfolio of connected devices and software, as well as wholesale distribution of security and low voltage products, in each case, as conducted by Honeywell and its Affiliates prior to the Distribution, including as described in the Information Statement.

"**Homes Group**" shall mean (a) Homes, (b) each Person that will be a Subsidiary of Homes immediately prior to the Distribution and (c) each Person that becomes a Subsidiary of Homes after the Distribution, including in each case any Person that is merged or consolidated with or into Homes or any Subsidiary of Homes and any Person that becomes a Subsidiary of Homes following the Distribution.

"**Homes Issuer**" shall mean Resideo Funding Inc.

"**Homes Newco**" shall have the meaning set forth in Section 4.7(c).

"**Homes Restricted Group**" shall mean the Homes Group, excluding any Unrestricted Subsidiary of Homes.

"**Honeywell**" shall have the meaning given to it in the preamble to this Agreement.

"**Honeywell Group**" shall mean Honeywell and each of its Subsidiaries, including any Person that becomes a Subsidiary of Honeywell following the Distribution, but excluding any member of the Homes Group.

"**HSE Law**" shall mean any Law or Governmental Approvals, or any standard used by a Governmental Authority pursuant to any Law or Governmental Approvals, relating to (i) pollution, (ii) protection or restoration of the indoor or outdoor environment or natural resources, (iii) the transportation, treatment, storage or Release of, or exposure to, hazardous or toxic materials, (iv) the registration, manufacturing, sale, labeling or distribution of hazardous or toxic materials or products containing such materials (including the REACH Regulation and similar requirements), (v) process safety management or (vi) the protection of the public, worker health and safety or threatened or endangered species.

"**Indemnified Parties**" shall mean any member of the Honeywell Group or its Representatives, or any of the heirs, executors, successors and assigns of any of the foregoing.

"**Indemnitee**" shall have the meaning given to it in the preamble to this Agreement.

"**Indemnitor**" shall have the meaning given to it in the preamble to this Agreement.

"**Indemnitor Group**" shall mean (a) Indemnitor, (b) each Person that will be a Subsidiary of Indemnitor immediately prior to the Distribution and (c) each Person that is or becomes a Subsidiary of Indemnitor after the Distribution, including, in each case, any Person that is merged or consolidated with and/or into Indemnitor or any Subsidiary of Indemnitor and any Person that becomes a Subsidiary of Indemnitor as a result of transactions that occur following the Distribution.

"**Indemnity Default Notice**" shall have the meaning set forth in the proviso in Section 2.12(a).

"**Indenture**" shall mean the Indenture to be entered into prior to the Distribution by and among the Homes Issuer, the guarantors named therein and the trustee named therein.

"**Information Statement**" means the Information Statement sent to the holders of common stock of Honeywell in connection with the Distribution, as such Information Statement may be amended from time to time.

"**Initial Cap**" shall mean *the product of* (x) the Cap *multiplied by* (y) *the quotient represented by* (1) the number of days between the Distribution Date and December 31, 2018 (inclusive of such dates), *divided by* (2) 365.

"**Initial Cash Deficiency Payment**" shall have the meaning set forth in Section 2.3(b)(ii).

"**Initial Deficiency Amount**" shall mean the amount, if any, by which the Estimated Initial Obligation *is less than* the lesser of: (i) the Initial Cap and (ii) the Initial Obligation.

"**Initial Environmental Obligation**" shall mean an amount *equal to*: (i) 90% of Losses incurred by Indemnified Parties in respect of Claims incurred during the Initial Period (other than any Losses that are included in the calculation of a Liability Transfer Resolution Amount), *less* (ii) 90% of (A) Insurance Receipts, (B) Affirmative Environmental Litigation Proceeds, (C) Co-Contributions Proceeds, and (D) Property Sales Proceeds, in each of clauses (A), (B) and (C), in respect of Losses incurred during the Initial Period, and in the case of (D), in respect of property sales consummated during the Initial Period. For purposes of this definition, in each of clauses (A), (B), (C) and (D), excluding such amounts in respect of a Liability Transfer Resolution Event.

"**Initial Obligation**" shall mean, in respect of the Initial Period, *the sum of* (i) the Initial Environmental Obligation in respect of the Initial Period, *plus* (ii) any Disallowance Payment as of the Initial Period, *plus* (iii) any Cumulative Outstanding Liability Transfer Losses, calculated as of December 1, 2018.

"**Initial Overage Amount**" shall mean the amount, if any, by which the Initial Obligation is less than the lesser of: (i) the Estimated Initial Obligation and (ii) the Initial Cap.

"**Initial Period**" shall have the meaning set forth in Section 2.2(a).

"**Initial Prior Year Aggregate Loss Statement**" shall mean a written statement, a form of which is attached hereto as Exhibit B, setting forth (i) the Initial Obligation, (ii) the Initial Deficiency Amount or the Initial Overage Amount, as applicable, (iii) if applicable, the Cumulative Outstanding Liability Transfer Losses as of December 1, 2018, (iv) any Liability Transfer Resolution Events that have occurred from (and including) the Distribution Date to December 1, 2018 and (v) the Liability Transfer Resolution Amounts in respect of such Liability Transfer Resolution Events.

"**Insolvency Proceeding**" shall mean, with respect to any Person, any distribution to creditors of such Person in (a) any liquidation or dissolution of such Person; (b) any bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to such Person or such Person's property; (c) any assignment by such Person for the benefit of its creditors; or (d) any marshalling of such Person's assets and liabilities.

"**Insurance Disallowances**" shall mean the amount of any insurance disallowances relating to Insurance Receipts actually paid to the Honeywell Group (not disputed by Indemnitee at the time of calculating the Initial Obligation or the Aggregate Annual Obligation).

"**Insurance Receipts**" shall mean, for any calendar period for which an Environmental Obligation is owed, as applicable, the amount of cash actually received by Indemnitee or its Affiliates in such period with respect to any casualty insurance policies of Indemnitee or its Affiliates in respect of Losses related to Claims, *less* all costs and expenses (including attorneys' fees and costs) incurred by Indemnitee or its Affiliates in connection with the collection of such proceeds.

"**Law**" shall mean any statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, government approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing by, any Governmental Authority, whether now or hereinafter in effect and, in each case, as amended.

"**Liability Transfer Allocation**" shall have the meaning set forth in Section 2.3(e).

"**Liability Transfer Resolution Amount**" shall mean the aggregate amounts paid or payable by the Honeywell Group at any time following the date of this Agreement in satisfaction of all Liability Transfer Resolution Events occurring after the date hereof.

"**Liability Transfer Resolution Event**" shall mean the contractual transfer of liabilities to a third party of all or a portion of current or future Claims or Losses.

"**Losses**" shall mean Cash Amounts in respect of losses, damages, liabilities, deficiencies, judgments, interest, awards, penalties, fines, costs, financial assurance or expenses of whatever kind in respect of Managing, investigating, responding to, remediating, defending, settling, compromising or resolving Claims, including attorneys' fees and costs (including, but not limited to, the costs of experts, consultants, and vendors necessary to defend, compromise and Manage the Claims, security costs and real estate Taxes) and including, without limitation, punitive, incidental, consequential, special or indirect Losses (or any other Cash Amounts paid or to be paid to any Person).

"**Loss Statement Date**" shall have the meaning set forth in Section 2.2(d).

"**Management**" or "**Managing**" shall mean, with respect to any Claim, the defense, settlement and payment of such Claim, including the management of insurance claims relating thereto (and the defense, settlement, payment and receipt of amounts in respect thereof).

"**Material Indebtedness**" shall have the meaning set forth in the Current Credit Agreement.

"**New HAPI 2**" shall have the meaning given to it in the recitals to this Agreement.

"**New Loan Parties**" shall have the meaning set forth in Section 2.13.

"**Obligations**" shall mean any principal, interest, premiums, penalties, fees, indemnifications, reimbursements, fees and expenses, damages and other liabilities payable under the documentation governing any Financial Indebtedness.

"**Order**" shall mean any judgment, order, injunction, decision, determination, award, ruling, writ, stipulation, restriction, assessment or decree of, or entered by, with or under the supervision of, any Governmental Authority.

"**Ordinary Course of Business**" shall mean the ordinary course of business (including with respect to nature, scope, magnitude, quantity and frequency) that does not require any board of director or shareholder approval or any other separate or special authorization of any nature and similar in nature, scope and magnitude to actions customarily taken in the ordinary course of the normal day-to-day operations of other persons that are in the same line of business acting in good faith; *provided* that, for the avoidance of doubt, the payment of reasonable and customary corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses payable to third parties), the payment of taxes and the payment of costs and expenses in connection with litigation matters shall be deemed to be in the ordinary course of business.

"**Overage Amount**" shall mean, in respect of any calendar year, the amount, if any, by which (i) the Aggregate Annual Obligation *is less than* (ii) the lesser of: (A) the Estimated Annual Obligation for such year and (B) the Cap.

"**Overage Credit**" shall have the meaning set forth in Section 2.3(b)(i).

"**Party**" and "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

"**Payment Blockage Notice**" shall have the meaning set forth in Section 2.14(c)(ii).

"**Payment Blockage Period**" shall have the meaning set forth in Section 2.14(c)(ii).

"**Payment Deferral**" shall have the meaning set forth in Section 2.4(a).

"**Payment in Full**" or "**Paid in Full**" shall mean, with respect to any Financial Indebtedness, payment in full in cash, cash collateralization of all letters of credit, hedging and cash management obligations and the termination of all commitments to lend, as applicable pursuant to the documents evidencing such Financial Indebtedness.

"**Person**" shall mean an individual, a general or limited partnership, a corporation, a trust, a joint venture, an unincorporated organization, a limited liability company, any other entity and any Governmental Authority.

"**Principal Credit Agreement**" shall mean the Current Credit Agreement; *provided*, that, if, as of any date, the Current Credit Agreement shall not be the credit facility of Homes Group with the largest aggregate amount of revolving commitments and revolving loans outstanding (or, if no revolving commitments or revolving loans are outstanding, the largest aggregate amount of commitments and loans outstanding), the Principal Credit Agreement shall be the credit facility of Homes with the largest aggregate amount of revolving commitments and revolving loans outstanding as of such date (or, if no revolving commitments or revolving loans are outstanding, the largest aggregate amount of commitments and loans outstanding).

"**Prior Year Aggregate Loss Statement**" shall mean an annual written statement, a form of which is attached hereto as Exhibit D, setting forth (i) the Aggregate Annual Obligation for the immediately preceding year, (ii) if applicable, the Cumulative Outstanding Liability Transfer Losses as of December 1 of such immediately preceding year, (iii) the Deficiency Amount or the Overage Amount, as applicable, in respect of such immediately preceding year, (iv) any Liability Transfer Resolution Events that occurred from (and including) the date Cumulative Outstanding Liability Transfer Losses were previously calculated to December 1 of the year immediately preceding delivery of the Prior Year Aggregate Loss Statement and (v) the Liability Transfer Resolution Amounts in respect of such Liability Transfer Resolution Events.

"**Quarterly Cap**" shall have the meaning set forth in Section 2.3(c).

"**Quarterly Payment**" shall have the meaning set forth in Section 2.3(c).

"**Quarterly Payment Date**" shall have the meaning set forth in Section 2.3(c).

"**Quarterly Report**" shall mean the report, a form of which is attached hereto as Exhibit C, delivered to Indemnitor providing year-to-date information regarding the amount of Losses that have been incurred by the Indemnified Parties in respect of Claims, (ii) the amount of Insurance Receipts that Indemnitee or any member of the Honeywell Group has received, (iii) the amount of Affirmative Environmental Litigation Proceeds that Indemnitee or any member of the Honeywell Group has received, (iv) the amount of Property Sales Proceeds that Indemnitee or any member of the Honeywell Group has received, (v) the amount of Co-Contributions Proceeds that Indemnitee or any member of the Honeywell Group has received and (vi) any Liability Transfer Resolution Events that have occurred since (and including) the prior Loss Statement Date and the Liability Transfer Resolution Amounts in respect of such Liability Transfer Resolution Events.

"**REACH Regulation**" shall mean Regulation (EC) No. 1907/2006 on the Registration, Evaluation, Authorisation and Restriction of Chemicals, including any implementing legislation or regulations, in each case as may be amended.

"**Record Holders**" shall mean holders of common stock of Honeywell as of the close of business on the date determined by the Honeywell board of directors as the record date for determining the shares of common stock of Honeywell in respect of which shares of common stock of Homes will be distributed pursuant to the Distribution.

"**Release**" shall mean any actual or threatened release, spill, emission, discharge, flow (whether through constructed or natural ditches, pipes, watercourses, overland flows or other means of conveyance), leaking, pumping, pouring, dumping, injection, deposit, disposal, dispersal, leaching or migration into or through the indoor or outdoor environment (including ambient air, surface water, groundwater and surface or subsurface strata) of a Hazardous Material; *provided* that, for the avoidance of doubt, mere vehicular transportation from an initial location to an offsite location, without more, shall not be deemed to constitute a Release from that initial location to the offsite location.

"**Reorganization**" shall mean the transactions described on Schedule I to the Separation Agreement.

"**Representatives**" shall mean the directors, officers, employees, investment bankers, consultants, attorneys, accountants and other advisors and representatives of a Person.

"**Restricted Subsidiary**" means any subsidiary of Homes that is a "Restricted Subsidiary" under the Principal Credit Agreement.

"**SEC**" shall mean the U.S. Securities and Exchange Commission.

"**Senior Agent**" shall mean such Person acting as administrative agent for the lenders party to the Principal Credit Agreement or, if there is only one lender thereunder, such lender.

"**Senior Indebtedness**" shall mean, collectively, the principal of, premium, if any, and interest (including all interest accruing subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding) payable pursuant to the terms of all agreements, documents and instruments governing Financial Indebtedness of Indemnitor Group (together with all fees, costs, expenses and other amounts accrued or due on or in connection therewith) whether outstanding on the date of this Agreement or subsequently created, incurred, assumed, guaranteed or in effect guaranteed by Indemnitor (including all deferrals, refinancings, renewals, extensions or refundings of, or amendments, restatements, modifications, waivers or supplements to, or deferrals to, the foregoing), except for: (i) any Financial Indebtedness that by its terms expressly provides that such Financial Indebtedness shall not be senior in right of payment to payments made by Indemnitor to Indemnitee hereunder or expressly provides that such Financial Indebtedness is equal with or junior in right of payment with payments made by Indemnitor to Indemnitee hereunder; (ii) any Financial Indebtedness between or among the members of Indemnitor Group, other than, for the avoidance of doubt, Financial Indebtedness incurred for the benefit of Affiliates arising by reason of guaranties by Affiliates of Financial Indebtedness of such Affiliate to a Person that is not a member of Indemnitor Group; (iii) any liability for federal, state, local or other taxes owed or owing by Indemnitor; or (iv) Indemnitor's trade payables and accrued expenses (including, without limitation, accrued compensation and accrued restructuring charges) or deferred purchase prices for goods, services or materials purchased or provided in the ordinary course of business. For the avoidance of doubt, Financial Indebtedness under the Principal Credit Agreement or the Indenture constitutes Senior Indebtedness.

"**Senior Payment Default**" shall have the meaning set forth in Section 2.14(c)(i).

"**Separation**" shall mean (a) the Reorganization and (b) any other transfers of assets and assumptions of liabilities, in each case, between a member of the Honeywell Group, on the one hand, and a member of the other Homes Group, on the other hand, provided for in the Separation Agreement or in any Ancillary Agreement.

"**Separation Agreement**" shall have the meaning given to it in the recitals to this Agreement.

"**Separation Transaction**" shall mean any spin-off, split-off, carve-out, demerger, recapitalization or similar transaction.

"**Specified Event of Default**" shall mean, with respect to any Senior Indebtedness having commitments or an outstanding principal amount of at least $25,000,000, (a) a payment or bankruptcy event of default thereunder or (b) if a financial maintenance covenant exists under such Senior Indebtedness, an event of default resulting from a breach of such financial maintenance covenant.

"**Specified Sites**" shall mean the sites listed on Exhibit E hereto or any other sites formerly owned, formerly operated or formerly used for disposal by Honeywell Group; *provided*, that "Specified Sites" shall not include those sites listed on (i) Exhibit F hereto or (ii) Schedule XII of the Separation Agreement.

"**Subsidiary**" of any Person shall mean any corporation or other organization, whether incorporated or unincorporated, of which at least a majority of the securities or interests, having, by the terms thereof, ordinary voting power to elect at least a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"**Tax**" or "**Taxes**" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges, including all United States or other federal, state, provincial, territorial, local, foreign and other income, gross receipts, franchise, profits, capital gains, capital stock, capital, transfer, sales, use, value added, goods and services, harmonized sales, occupation, employer health, property, excise, severance, windfall profits, stamp, license, payroll, employment, customs, social security (or similar), pension plan, unemployment, disability, workers' compensation, real property, personal property, registration, alternative or add-on minimum, withholding and other taxes, assessments, charges, duties, fees, levies, premiums or other governmental charges of any kind whatsoever, including all installments of tax, estimated taxes, deficiency assessments, additions to tax, penalties and interest, and indemnity obligations in respect of tax, in each case whether disputed or not.

"**Termination Date**" shall have the meaning set forth in Section 3.1.

"**True-Up Payment Date**" shall mean the dates identified as such in Section 2.3(b) and Section 2.3(d).

"**Unrestricted Subsidiary**" shall mean any subsidiary of Homes that is an "Unrestricted Subsidiary" under the Principal Credit Agreement.

# ARTICLE II
# INDEMNIFICATION

Section 2.1 Indemnification and Reimbursement by Indemnitor. From and after the Distribution Date, Indemnitor hereby agrees to, and shall, indemnify and hold harmless or reimburse Indemnitee from and against, and in respect of, its liability for Losses incurred by Indemnified Parties in respect of Claims in accordance with the terms and subject to the conditions set forth in this Agreement.

Section 2.2 Estimates; Statements; and Reports.

(a) Indemnitee shall deliver to Indemnitor, prior to the Distribution Date, a written estimate of the Estimated Initial Obligation for the period (the "**Initial Period**") commencing on the Distribution Date through December 31, 2018. On March 1, 2019, Indemnitee shall deliver to Indemnitor the Initial Prior Year Aggregate Loss Statement.

(b) Beginning no later than December 14, 2018, and thereafter on or prior to December 15 of each year, Indemnitee shall deliver to Indemnitor an Estimated Annual Loss Statement in respect of the following calendar year.

(c) On March 29, 2019 and each subsequent date that is forty-five (45) days following the end of each Fiscal Quarter, Indemnitee shall deliver to Indemnitor the Quarterly Reports, updated in respect of the prior Fiscal Quarter.

(d) On March 2, 2020, and on or before March 1 of each year thereafter until the Termination Date, Indemnitee shall deliver to Indemnitor the Prior Year Aggregate Loss Statement (the "**Loss Statement Date**").

(e) If any report is due under this Agreement on a date that is not a Business Day, such report shall be due on the next following Business Day.

(f) In the event that any member of the Honeywell Group is notified of, and is required to pay any amount in respect of, an Insurance Disallowance, Indemnitee shall reasonably promptly notify Indemnitor of such Insurance Disallowance.

(g) If a Liability Transfer Resolution Event occurs, Indemnitee shall reasonably promptly notify Indemnitor of such Liability Transfer Resolution Event and the Liability Transfer Resolution Amount relating to such Liability Transfer Resolution Event.

(h) Upon reasonable request, Indemnitee shall provide such additional information from time to time as may be necessary for Indemnitor to satisfy its obligations as an SEC registrant, in accordance with, and giving due regard to the principles of confidentiality and legal privilege identified in, Section 2.15 hereof.

(i) Indemnitee shall have no obligation to provide information to Homes or Indemnitor or any of their respective Affiliates other than as set forth in this Section 2.2, Section 2.8 and Section 3.3(a).

(j) To the extent not already provided under Section 2.9, Indemnitor shall provide to Indemnitee any financial statements and other information (in each case other than information regarding collateral matters) provided by Indemnitor to the lenders under the Principal Credit Agreement or other Senior Indebtedness reasonably promptly after such information is required to be delivered to such lenders.

Section 2.3 Payments to Indemnitee. Indemnitor shall make the payments to Indemnitee set forth in this Section 2.3.

(a) *Payment of the Estimated Initial Obligation*. Thirty (30) days following the Distribution Date, Indemnitor shall pay to Indemnitee the Estimated Initial Obligation; *provided*, that, in the event that the Estimated Initial Obligation exceeds the Initial Cap, Indemnitor shall pay to Indemnitee an amount equal to the Initial Cap.

(b) *Initial Obligation True-Up*. On March 20, 2019 (which shall be a True-Up Payment Date):

(i) if there is an Initial Overage Amount, then such Initial Overage Amount shall be applied as a credit (an "**Overage Credit**") to the next Quarterly Payment and, to the extent any portion of such Overage Credit remains, to any subsequent Quarterly Payments or Cash True-Up Payments, and the amount of the Overage Credit shall be reduced by the amount thereof applied as a credit in respect of such payments until the Overage Credit is equal to zero; and

(ii) if there is an Initial Deficiency Amount, then such Initial Deficiency Amount shall be paid by payment of cash from Indemnitor to Indemnitee (any such cash payment, the "**Initial Cash Deficiency Payment**").

(c) *Quarterly Payments*. On January 30, 2019, and each subsequent date that is thirty (30) days following the start of each Fiscal Quarter until the Termination Date (each, a "**Quarterly Payment Date**"), Indemnitor shall pay Indemnitee an amount equal to one-fourth (1/4) of the Estimated Annual Obligation for such year (each such payment, a "**Quarterly Payment**"); *provided*, *however*, that, if the Estimated Annual Obligation for such year exceeds the Cap, then each Quarterly Payment for purposes of this Agreement shall be $35,000,000 (the "**Quarterly Cap**").

(d) *Annual True-Up of Estimated Payments*. On the second Quarterly Payment Date of each calendar year until the Termination Date (each such date shall be a True-Up Payment Date):

(i) if there is an Overage Amount set forth in the Prior Year Aggregate Loss Statement, then such Overage Amount shall be applied as an Overage Credit to the next Quarterly Payment and, to the extent any portion of such Overage Credit remains, to any subsequent Quarterly Payments or Cash True-Up Payments, and the amount of the Overage Credit shall be reduced by the amount thereof applied as a credit in respect of such payments until the Overage Credit is equal to zero;

(ii) if there is a Deficiency Amount set forth in the Prior Year Aggregate Loss Statement, then such Deficiency Amount shall be paid first by reducing the amount of any remaining Overage Credit and then, if such Overage Credit has been reduced to zero, by payment of cash from Indemnitor to Indemnitee (any such cash payment, a "**Annual Cash Deficiency Payment**" and, together with the Initial Cash Deficiency Payment, the "**Cash True-Up Payments**").

(e) If the amount of the Cash True-Up Payment set forth on the Prior Year Aggregate Loss Statement exceeds $30,000,000, then the Cash True-Up Payment shall be paid in eight (8) equal installments; the first of such payments shall be made on the True-Up Payment Date and the seven (7) subsequent payments shall be made on the first calendar day of each subsequent month. For the avoidance of doubt, such Cash True-Up Payments will not be included in, or subject to, the Cap in respect of the calendar year in which such payments are made.

(f) As of the Loss Statement Date of each year, the aggregate annual payments made under this Section 2.3 (including payable by reduction in Overage Credit), which, for the avoidance of doubt, shall be adjusted to reflect any Overage Amount or Deficiency Amount, shall be allocated as follows: (i) first to satisfy the Environmental Obligation, then (ii) to satisfy any Disallowance Payment, and then (iii) to satisfy any Cumulative Outstanding Liability Transfer Losses (the amount of any payment made in respect of the Cumulative Outstanding Liability Transfer Losses, a "**Liability Transfer Allocation**"). In respect of any calendar year the amounts of such allocations shall be included in the Prior Year Aggregate Loss Statement or Initial Prior Year Aggregate Loss Statement delivered in the following year under Section 2.2(d) or Section 2.2(a). For the avoidance of doubt, the Cumulative Outstanding Liability Transfer Losses shall be carried over year-to-year and recalculated as of December 1 of each calendar year following a Liability Transfer Resolution Event, until the earlier of (i) the year that there are no Cumulative Outstanding Liability Transfer Losses or (ii) the Termination Date.

Section 2.4 Payment Deferrals.

(a) Indemnitor shall defer any Quarterly Payment, any Cash True-Up Payment, or payment of Accrued Amounts to the extent that, as of a Quarterly Payment Date or, as applicable, a True-Up Payment Date: (i) a Specified Event of Default has occurred and is continuing under the Principal Credit Agreement or any other Senior Indebtedness (a "**Default Deferral**") or (ii) if, after giving effect to any such cash payment due and payable, (x) the Homes Restricted Group, on a consolidated basis, would fail to be in compliance with any financial maintenance covenant under the Principal Credit Agreement or (y) the Homes Restricted Group, on a consolidated basis, would fail to maintain a Fixed Charge Coverage Ratio (as defined in the Indenture) of at least 2:00 to 1:00 (the "**FCCR Test**"); *provided* that this clause (y) shall only apply in the event that at the time such cash payment is due and payable, (1) no Principal Credit Agreement exists, (2) no financial maintenance covenant exists under the terms of any Senior Indebtedness and (3) the Indenture (or a replacement indenture that constitutes Senior Indebtedness) exists and the FCCR Test remains applicable (a "**Financial Covenant Deferral**" and, together with a Default Deferral, a "**Payment Deferral**"). For the avoidance of doubt, Indemnitor shall pay such portion of any Quarterly Payment, Cash True-Up Payment or Accrued Amounts subject to a Financial Covenant Deferral to the extent that payment would not result in a Financial Covenant Deferral.

(b) If Indemnitor shall defer any cash payments in accordance with Section 2.4(a), any amounts so deferred ("**Accrued Amounts**") shall be paid in accordance with this Section 2.4(b).

(i) On each True-Up Payment Date, if any Accrued Amounts have accrued and remain unpaid, then Indemnitor shall pay such Accrued Amounts, subject to Payment Deferral pursuant to Section 2.4(a), *provided* that, if *the sum of* (A) that amount of the Aggregate Annual Obligation that was due and payable (including payable by reduction in Overage Credit) in respect of the preceding calendar year, *plus* (B) such Accrued Amounts exceeds the Cap, then Indemnitor shall only pay such Accrued Amounts exceeding the Cap that Indemnitor is permitted to pay under Section [ ] (Limitations on Restricted Payments) of the Principal Credit Agreement (or any successor provision).

(ii) Any Accrued Amounts that remain unpaid following any True-Up Payment Date shall be paid on the next succeeding True-Up Payment Date as provided in this Section 2.4.

(c) In any Fiscal Quarter, unless and until all amounts due in such Fiscal Quarter in respect of Quarterly Payments, Cash True-Up Payments and Accrued Amounts have been paid in full:

(i) no member of Indemnitor Group shall declare, make or commit to make or pay any dividend or other distribution on, or redeem, purchase or otherwise acquire, the equity of any member of Indemnitor Group, directly or indirectly (other than dividends or distributions by a wholly owned Subsidiary to its parent; *provided*, that no such dividend or distribution may be made by Indemnitor to its parent unless such dividend or distribution is (x) used to pay obligations owing under Senior Indebtedness that are due and payable or (y) permitted under Section 2.4(c)(ii)); and

(ii) other than in the Ordinary Course of Business, no member of Indemnitor Group shall assume or enter into any intercompany transactions resulting in the payment of any amount by a member of Indemnitor Group to any member of the Homes Group that is not a member of Indemnitor Group.

Section 2.5 Manner of Payment.

(a) All payments to Indemnitee to be made hereunder shall be made by wire transfer of immediately available funds, to an account specified by Indemnitee in writing, and Indemnitor shall send a payment confirmation to Indemnitee by fax or e-mail.

(b) In addition to any other amounts payable hereunder (including those payable pursuant to Section 4.10 and Section 3.3(a)(i)) and any other rights Indemnitee may have hereunder, Indemnitor shall pay Indemnitee a late payment fee of five percent (5%) per annum on all payments that are more than thirty (30) days past due, with such late payment fee accruing as of such date thirty (30) days following the missed payment. For the avoidance of doubt, (i) any late payment fees made pursuant to this Section 2.5 shall not be included in, or subject to, the Cap and (ii) Accrued Amounts shall not accrue any late payment fee hereunder unless such amounts are required to be paid pursuant to Section 2.4 and are not so paid.

(c) If any payment is due and payable under this Agreement on a date that is not a Business Day, such payment shall be due and payable on the next following Business Day.

Section 2.6 Limitations to Indemnification and Reimbursement. For the avoidance of doubt, (i) payments of Accrued Amounts are not subject to the Cap and shall be payable as provided in Section 2.4(b), and (ii) except as set forth in Section 2.3(e), any amounts payable under this Agreement that are not paid due to the Cap shall not be applied to another year.

Section 2.7 Illustrative Examples. Set forth on Schedule 2.7 hereto are examples of the payments that may be made pursuant to Sections 2.3 and 2.4, which are being provided for illustrative purposes only and are not the sole examples of a particular concept or intended to be a representation as to any future payments.

Section 2.8 Management of Claims. Indemnitee shall be solely responsible for, and shall have sole discretion with respect to, the Management of all Claims. Indemnitor shall have the right to meet with Indemnitee's remediation management team, including outside litigation or environmental counsel if necessary, once each Fiscal Quarter to discuss the Quarterly Reports; provided, that (a) Indemnitee shall have no obligation to implement or adopt Indemnitor's requests during such meeting or otherwise consult, seek the consent of, cooperate with or otherwise inform (except pursuant to this sentence, Section 2.2 and Section 3.3(a)) Indemnitor or any of its Affiliates or their respective Representatives regarding the investigation, defense, compromise, settlement or resolution of any Claim, regardless of the party against whom any such Claim may be asserted, (b) the content of such meetings shall be limited to the information contained in the Quarterly Reports, and (c) Indemnitor shall pay all fees and expenses of any outside counsel or consultant relating to such quarterly meetings. All Claims brought against any Indemnified Party subject to indemnification or reimbursement hereunder shall be referred to Indemnitee for Management promptly and, in any event, within fifteen (15) days of notice thereof. Notwithstanding the above, in no event shall Indemnitee or Indemnitee's counsel be under any obligation to share privileged information with Indemnitor or Indemnitor's Representatives. Indemnitor shall reasonably cooperate with Indemnitee in connection with the defense of any Claim, including by retaining and providing to Indemnitee records and information that are reasonably relevant to such Claim and making available employees on a mutually convenient basis for providing additional information and explanation of any material provided hereunder.

Section 2.9 Covenants. The provisions of Article [V] (Affirmative Covenants) (other than Section [5.03, 5.12, 5.13, 5.14 and 5.15]) and Article [VI] (Negative Covenants) (other than Section 6.15) of the Current Credit Agreement shall be incorporated herein and shall apply mutatis mutandis with changes thereto as set forth in Exhibit G (such exhibit to be agreed following the date hereof and prior to the Distribution Date); *provided* that members of Indemnitor Group may enter into intercompany transactions with members of the Homes Group in the Ordinary Course of Business.

Section 2.10 Restricted Payment Capacity. Indemnitor shall, and shall cause its Restricted Subsidiaries to, preserve at least $45,000,000 of the payment capacity under Section [6.08(a)(xii)(A)] (Limitations on Restricted Payments) (or any successor provision) of the Principal Credit Agreement (the "**General RP Basket**") solely for the purpose of paying Accrued Amounts; *provided* that such General RP Basket shall be reduced by the amount of any Accrued Amounts paid pursuant to Section 2.4(b).

Section 2.11 No Acts to Impair Rights.

(a) Indemnitor shall not, and shall not permit its Subsidiaries or Affiliates that are members of the Homes Group to, take any action intended to, or which would reasonably be expected to, prohibit, restrict, circumvent, diminish or impair (or have the effect, directly or indirectly, of prohibiting, restricting, circumventing, diminishing or impairing) in any material respect (i) the ability of Indemnitor to make any payments under this Agreement, (ii) the rights of Indemnitee under this Agreement or (iii) the ability of Indemnitee to enforce its rights under this Agreement; *provided* that this Section 2.11(a) shall not prohibit the repayment of any Senior Indebtedness that has become due and payable. Without limiting the foregoing, Indemnitor agrees that it shall not, and it shall not permit its Subsidiaries or Affiliates that are members of the Homes Group to, amend or enter into waivers under the Current Credit Agreement or the Indenture, or enter into another Principal Credit Agreement or indenture or other agreements (including other agreements relating to Senior Indebtedness) or make amendments or waivers thereto (any such amendment or waiver or entry into a new agreement, an "**Agreement Amendment**"), in each case, in a manner that would (x) adversely affect the rights of Indemnitee hereunder or (y) reasonably be expected to (I) prohibit, restrict, circumvent, diminish or impair (or have the effect, directly or indirectly, of prohibiting, restricting, circumventing, diminishing or impairing) the ability of Indemnitor to satisfy its obligations hereunder or (II) trigger a Payment Deferral (an "**Adverse Change**") without Indemnitee's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned). Indemnitor agrees that it shall not, and it shall not permit its Subsidiaries to, effect any Agreement Amendment with respect to the Current Credit Agreement or the Indenture, or any Principal Credit Agreement or indenture or similar agreement, in each case without providing prior written notice to Indemnitee at least ten (10) Business Days prior to effecting such Agreement Amendment.

(b) Without limiting the foregoing, the Parties agree that it is understood that (i) any amendment or waiver of the negative covenants of the Current Credit Agreement or the Indenture resulting in such negative covenants being less restrictive to Homes and its subsidiaries than the Current Credit Agreement or the Indenture, respectively, shall not constitute an Adverse Change and (ii) any amendment or waiver of the provisions of [clauses (a)(ii), (a)(iii), (a)(v), (a)(xi) and (a)(xii) of Section 6.08 and Sections 6.11 (as it relates to this Agreement), 6.12, 6.13, 6.15 and 6.17] of the Current Credit Agreement or the corresponding provisions of the Indenture or any Principal Credit Agreement or other indenture, if any that is more restrictive (or any amendment or waiver that has the effect, directly or indirectly, of making such provisions more restrictive) to Homes and its subsidiaries than the Current Credit Agreement or the Indenture, respectively, shall, in each case, without limitation, be deemed to be an "Adverse Change". In the event of any Agreement Amendment (including any Adverse Change) permitted to be made pursuant to the terms hereunder that is more restrictive to Homes and its Subsidiaries than the Current Credit Agreement, any Principal Credit Agreement or any indenture (including the Indenture), the provisions of such Agreement Amendment shall, unless otherwise agreed in writing by Homes and Indemnitee, also apply (or be deemed to apply automatically) to the corresponding covenant incorporated herein under Section 2.9, *mutatis mutandis*, such that Indemnitee shall receive the same benefit of such more restrictive terms as the financing sources under the Current Credit Agreement or such Principal Credit Agreement or such indenture, as applicable.

Section 2.12 Default.

(a) Notwithstanding anything to the contrary contained in this Agreement, the occurrence of the following events shall constitute a default under, and a breach of, this Agreement (a "**Default**"):

(i) any failure to make a Quarterly Payment, a Cash True-Up Payment or Accrued Amount when due and payable (except any such amount subject to a Financial Covenant Deferral or a Default Deferral);

(ii) any material breach of this Agreement that is not curable or, if curable, is not cured within thirty (30) days of written notice thereof;

(iii) the failure by Homes or any of its Restricted Subsidiaries to make any payment when due (after giving effect to any applicable grace period) under any Material Indebtedness; or

(iv) any default in the performance of any agreement or condition contained in the Principal Credit Agreement, or any other event or condition, the effect of which default or other event or condition is to cause, or to permit the creditors under the Principal Credit Agreement to cause, the indebtedness under the Principal Credit Agreement to become due prior to its stated maturity or to be required to be repurchased, prepaid, redeemed or deferred prior to its stated maturity;

*provided*, that, (A) in the case of clause (iv) above, any such Default shall be deemed to have occurred only if (x) sixty (60) calendar days have passed since the first date on which a Default would otherwise have been deemed to occur thereunder (such date, the "**Default Date**") and (y) thirty (30) calendar days have passed since Indemnitee provides written notice (an "**Indemnity Default Notice**") of such default to the Senior Agent (and each Financial Representative for any other Senior Indebtedness having commitments or an outstanding principal amount of at least $25,000,000), which such Indemnity Default Notice may be delivered on or after the Default Date, and during such sixty (60) calendar day and thirty (30) calendar day periods, the relevant creditors under the Principal Credit Agreement have not waived such default and (B) in the case of clauses (i), (ii) and (iii) above, any such Default shall be deemed to have occurred only if thirty (30) days have passed since Indemnitee provides an Indemnity Default Notice to the Senior Agent (and each Financial Representative for any other Senior Indebtedness having commitments or outstanding principal amount of at least $25,000,000) and during such thirty (30) calendar day period, Indemnitee has not waived such default.

(b) Promptly, and in any event within five (5) Business Days, upon obtaining knowledge of any Default, Indemnitor shall deliver notice of such Default to Indemnitee in accordance with Section 4.8, specifying the nature of such Default and what actions Indemnitor has taken, is taking or proposes to take with respect thereto.

Section 2.13 Guarantee. Indemnitor and each Restricted Subsidiary of Indemnitor that is a Loan Party (as defined in the Principal Credit Agreement) shall, on the Distribution Date, enter into a guarantee, which shall be set forth as Exhibit H on the Distribution Date (the "**Guarantee**"). In the event that any additional Persons shall become a Restricted Subsidiary of Indemnitor and a Loan Party under the Principal Credit Agreement ("**New Loan Parties**"), Indemnitor shall promptly, and, in any event, within ten (10) Business Days after becoming a Loan Party under the Principal Credit Agreement, cause such New Loan Parties to enter into the Guarantee. The joinder to the Guarantee, and execution and delivery thereof by such New Loan Parties, shall not require the consent of any other party to the Guarantee.

Section 2.14 Subordination.

(a) Indemnitee agrees that all amounts payable by Indemnitor to Indemnitee hereunder shall be subordinated in right of payment to the prior Payment in Full of all Senior Indebtedness (whether outstanding on the date hereof or hereafter created, incurred, assumed or guaranteed) as provided in this Section 2.14.

(b) In the event of any payment or distribution of assets during any Insolvency Proceeding of Indemnitor or any Person providing a Guarantee:

(i) holders of Senior Indebtedness shall first be entitled to receive Payment in Full of all Obligations due in respect of such Senior Indebtedness (including interest after the commencement of any such Insolvency Proceeding at the rate specified in the documentation for the applicable Senior Indebtedness) or provision shall be made for such amount in cash, or other payments satisfactory to all of the holders of Senior Indebtedness (such satisfaction to be evidenced in writing by such holders of Senior Indebtedness), before Indemnitee shall be entitled to receive any payment hereunder; and

(ii) until all Obligations with respect to Senior Indebtedness (as provided in clause (i) above) are Paid in Full, any distribution to which Indemnitee would be entitled but for this Section 2.14 shall be made to the Senior Agent (or if there is no Senior Agent, the applicable Financial Representative in accordance with the terms of the Senior Indebtedness and any intercreditor agreement applicable thereto).

(c) *Default on Senior Indebtedness*.

(i) No payment may be made hereunder, directly or indirectly, if a default in payment of the principal of, premium, if any, or interest on, or other Obligations with respect to any Senior Indebtedness, occurs (each, a "**Senior Payment Default**"), by reason of acceleration or otherwise, until all Senior Payment Defaults have been cured or waived in accordance with the terms of the agreement, indenture or other document governing such Senior Indebtedness (as evidenced by a written waiver from the holders (or a Financial Representative thereof) of the applicable Senior Indebtedness).

(ii) During the continuance of any event of default with respect to any Senior Indebtedness (other than a Senior Payment Default), permitting the holders thereof (or their Financial Representative) to accelerate the maturity thereof, no payment may be made hereunder, directly or indirectly, for a period (a "**Payment Blockage Period**") commencing upon the receipt by Indemnitor of written notice (a "**Payment Blockage Notice**") of such event of default from Persons entitled to give such notice under any agreement pursuant to which that Senior Indebtedness may have been issued, that such an event of default has occurred and is continuing and ending on the earliest of: (1) one hundred and eighty (180) days from the date of receipt of the Payment Blockage Notice; (2) the date such event of default has been cured or waived in accordance with the terms of such Senior Indebtedness; or (3) the date such Payment Blockage Period shall have been terminated by written notice from the Person initiating such Payment Blockage Period. Notwithstanding any of the foregoing, until the Obligations under the Principal Credit Agreement are Paid in Full, (x) only the Senior Agent shall have the right to give a Payment Blockage Notice and (y) any Payment Blockage Notice given by a holder of any Senior Indebtedness that is not the Senior Agent shall not be effective for any purposes. Homes shall deliver any Payment Blockage Notice promptly to Indemnitee.

(iii) Indemnitor may resume payments hereunder at the end of the Payment Blockage Period unless a Senior Payment Default then exists.

(iv) Until all Obligations with respect to Senior Indebtedness are Paid in Full, so long as a Senior Payment Default has occurred and is continuing or a Payment Blockage Period has commenced and is continuing, Indemnitee shall not (and shall not permit any member of the Honeywell Group to) make, sue for, ask or demand from any member of the Homes Group payment of all or any of the obligations hereunder, or commence, or join with any creditor other than the Senior Agent in commencing, directly or indirectly cause any member of the Homes Group, or assist any member of the Homes Group in commencing, any Insolvency Proceeding; *provided*, *however*, that nothing herein shall restrict Indemnitee from filing a proof of claim with respect to obligations hereunder in any Insolvency Proceeding.

(v) Indemnitor shall promptly provide written notice to Indemnitee regarding the occurrence or termination of a Senior Payment Default.

(d) In the event that Indemnitee receives any payment hereunder, whether in cash, property or securities (including, without limitation, by way of setoff, recovery from a judgment lien or otherwise), at a time when such payment or distribution is prohibited by this Section 2.14, such payment or distribution shall be held by Indemnitee, in trust for the benefit of, and shall be paid forthwith over and delivered to the Senior Agent (or if there is no Senior Agent, the applicable Financial Representative in accordance with the terms of the Senior Indebtedness and any intercreditor agreement applicable thereto).

(e) Indemnitor shall promptly notify Indemnitee of any facts known to Indemnitor that would cause a payment hereunder to violate this Section 2.14, but failure to give such notice shall not affect the subordination of payments hereunder to the Senior Indebtedness as provided in this Section 2.14.

(f) After (and only after) all Senior Indebtedness is Paid in Full in cash or other payment satisfactory to the holders of the Senior Indebtedness (such satisfaction to be evidenced in writing by such holders of Senior Indebtedness), Indemnitee shall be subrogated (equally and ratably with all other indebtedness pari passu with Indemnitee and entitled to similar rights of subrogation) to the rights of holders of Senior Indebtedness to receive payments or distributions applicable to Senior Indebtedness to the extent that payments or distributions otherwise payable to Indemnitee have been applied to the payment of Senior Indebtedness. A distribution made under this Section 2.14 to holders of Senior Indebtedness that otherwise would have been made to Indemnitee is not, as between Indemnitor and Indemnitee, a payment on amounts due hereunder.

(g) This Section 2.14 defines the relative rights of, on the one hand, Indemnitee and, on the other hand, the holders of Senior Indebtedness. Nothing in this Section 2.14 shall:

(i) impair, as between Indemnitor and Indemnitee, the obligation of Indemnitor, which is absolute and unconditional, to pay amounts payable by Indemnitor to Indemnitee hereunder;

(ii) affect the relative rights of Indemnitee and creditors of Indemnitor Group other than their rights in relation to holders of Senior Indebtedness; or

(iii) subject to Section 2.14(c)(iv), prevent Indemnitee from exercising its available remedies upon the occurrence of a Default, subject to the rights of holders and owners of Senior Indebtedness under this Section 2.14 to receive distributions and payments otherwise payable to Indemnitee.

If Indemnitor fails, because of this Section 2.14, to pay any amounts due and payable to Indemnitee hereunder on the due date, the failure shall still constitute a Default.

(h) No right of any holder of Senior Indebtedness to enforce the subordination of the amounts payable by Indemnitor to Indemnitee hereunder shall be impaired by any act, or failure to act, by Indemnitor, Homes or Indemnitee or by the failure of Homes, Indemnitor or Indemnitee to comply with this Section 2.14 or any other provision of this Agreement.

(i) Whenever a distribution is to be made or a notice given to holders of Senior Indebtedness, the distribution may be made and the notice given to their Financial Representative. Upon any payment or distribution of assets of any member of Indemnitor Group referred to in this Section 2.14, Indemnitee shall be entitled to rely upon any order or decree made by any court of competent jurisdiction or upon any certificate of a Financial Representative of a holder of Senior Indebtedness or of the liquidating trustee or agent or other person making any distribution to Indemnitee for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Indebtedness and other indebtedness of Indemnitor Group, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Section 2.14.

(j) The provisions of this Section 2.14 and related definitions in Section 1.1 shall not be amended or modified in any manner adverse to the holders of Senior Indebtedness without the written consent of the holders of all Senior Indebtedness (or, in the case of any holders of Senior Indebtedness represented by a Financial Representative, without the written consent of such Financial Representative acting on behalf of such holders pursuant to the terms of the agreement, indenture or other document governing such Senior Indebtedness).

(k) To the fullest extent permitted by law, the provisions of this Section 2.14 and the obligations under this Agreement shall remain in full force and effect irrespective of (i) any amendment, modification or supplement of, or any rescission, waiver or consent to, any of the terms of the Senior Indebtedness or the agreement or instrument governing the Senior Indebtedness, this Agreement or any other agreement, (ii) the taking, exchange, release or non-perfection of any collateral securing the Senior Indebtedness, or the taking, release or amendment or waiver of or consent to departure from any guaranty of the Senior Indebtedness, (iii) the manner of sale or other disposition of the collateral securing the Senior Indebtedness or the application of the proceeds upon such sale, (iv) the failure of any holder of the Senior Indebtedness or any other Person to assert any claim or demand or to enforce any right or remedy under the provisions of the agreement or instrument governing the Senior Indebtedness, this Agreement or otherwise, (v) any illegality, lack of validity or lack of enforceability of any of the terms of the Senior Indebtedness or the agreement or instrument governing the Senior Indebtedness or this Agreement, (vi) any change in the corporate existence, structure or ownership of Indemnitor or any member of Indemnitor Group, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any such Person or its assets, (vii) any action permitted or authorized hereunder, or (viii) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Indemnitor, any member of Indemnitor Group, Indemnitee or any other subordinated creditor. Indemnitee and Indemnitor each hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Senior Indebtedness and any requirement that any holder of the Senior Indebtedness or Financial Representative of any holders of Senior Indebtedness secure, perfect or insure any security interest or lien or any property or exhaust any right or take any action against Indemnitor, any member of Indemnitor Group or any other person or entity or any collateral. The holders of the Senior Indebtedness (and each Financial Representative of the holders of Senior Indebtedness) are hereby authorized to demand specific performance of this Agreement. Indemnitee and Indemnitor each hereby irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

(l) The holders of the Senior Indebtedness (and each Financial Representative of the holders of Senior Indebtedness) shall be third-party beneficiaries of this Section 2.14 and shall be entitled to enforce the provisions hereof directly against Indemnitee and Indemnitor.

Section 2.15 Confidentiality; Privilege.

(a) From and after the Distribution Date until two (2) years following the date of termination of this Agreement, Indemnitor Group shall, and shall cause its Affiliates that are members of the Homes Group and Representatives to, keep confidential any and all non-public information provided pursuant to Section 2.2 and Section 3.3(a); *provided*, *however*, that Indemnitor shall not be liable hereunder with respect to any disclosure to the extent such disclosure is determined by Indemnitor (with the advice of counsel) to be required

by any applicable Law or Order, including applicable rules of any securities exchange. In the event that Indemnitor or any of its Affiliates or Representatives are required by any applicable Law or Order to disclose any such non-public information, Indemnitor shall, (i) to the extent permissible by such applicable Law or Order, provide Indemnitee with prompt written notice of such requirement, (ii) disclose only that information that Indemnitor determines (with the advice of counsel) is required by such applicable Law or Order to be disclosed and (iii) use reasonable efforts to preserve the confidentiality of such non-public information, including by, at the request of Indemnitee, reasonably cooperating with Indemnitee to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such non-public information. Notwithstanding the foregoing, such non-public information shall not include information that (A) is or becomes available to the public after the Distribution Date other than as a result of a disclosure by Indemnitor or any of its Affiliates or Representatives in breach of this Section 2.15 or (B) becomes available to Indemnitor or any of its Affiliates or Representatives after the Distribution Date from a source other than Indemnitee or its Affiliates or Representatives if the source of such information is not known by Indemnitor or its Affiliates or Representatives to be bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, Indemnitee or its Affiliates with respect to such information. Notwithstanding anything to the contrary in this Agreement, any member of Indemnitor Group may share such non-public information with its Affiliates and Representatives, *provided* that: (i) such Representatives or Affiliate (where such Affiliate is not a member of Indemnitor Group) shall enter into a confidentiality agreement with such member of Indemnitor Group on terms substantially similar to this Section 2.15 to keep such non-public information confidential and will not disclose such information to any other Person; (ii) such Representatives shall not use such non-public information in any manner that is detrimental to the interests of Indemnitee or its Affiliates; and (iii) Indemnitor agrees that it is responsible to Indemnitee for any action, or failure to act, that would constitute a breach or violation of this Section 2.15 by any such Representative or Affiliate.

(b) Indemnitee shall be entitled, in perpetuity, to control the assertion or waiver of all privileges and immunities in connection with any privileged information that relates solely or primarily to the Claims, whether or not the privileged information is in the possession or under the control of any Affiliate of Indemnitor or any Affiliate of Indemnitee. Indemnitee shall also be entitled, in perpetuity, to control the assertion or waiver of all privileges and immunities in connection with any privileged information that relates solely or primarily to any Claims in connection with any legal proceedings that are now pending or may be asserted in the future, whether or not the privileged information is in the possession or under the control of any Affiliate of Indemnitor or any Affiliate of Indemnitee.

(c) If the Parties do not agree as to whether certain information is privileged information, then such information shall be treated as privileged information, and Indemnitee shall be entitled to control the assertion or waiver of all privileges and immunities in connection with any such information until such time as it is finally judicially determined that such information is not privileged information or unless the Parties otherwise agree.

(d) The Parties agree that their respective rights to access information, witnesses and other Persons, the furnishing of notices and documents and other cooperative efforts between the Parties contemplated by this Agreement and the transfer of privileged information between the Parties pursuant to this Agreement, shall not be deemed a waiver of any privilege that has been or may be asserted under this Agreement or otherwise.

Section 2.16 Tax Treatment. Payments under this Agreement shall be treated for U.S. federal income tax purposes as being made immediately prior to the distribution of Homes by Honeywell, in accordance with the Separation Agreement. Neither Indemnitor nor any of its Affiliates shall claim any deduction for U.S. federal income tax purposes in respect of such payments other than any portion of such payments treated as interest under applicable U.S. federal income tax rules. Honeywell shall be the only person entitled to claim deductions for U.S. federal, state or local income tax purposes in respect of any Losses relating to Claims. All Parties hereto shall and shall cause their Affiliates to file all Tax returns on a basis consistent with the foregoing, and neither any Party nor an Affiliate shall take any Tax position inconsistent with this Section 2.16.

## ARTICLE III
## TERM AND TERMINATION

Section 3.1 Term. This Agreement shall be effective as of the date hereof and, *unless* the Agreement is terminated earlier as provided herein, shall continue until the earliest to occur of (x) December 31, 2043 or (y) December 31st of the third consecutive year during which *the sum of* (i) the Aggregate Annual Obligation, *plus* (ii) any Accrued Amounts has been less than $25,000,000 (the "**Termination Date**").

Section 3.2 Termination. This Agreement may be terminated prior to the Termination Date by mutual written agreement of the Parties (in which case, the date of such termination shall be the "Termination Date" for all other purposes under this Agreement).

Section 3.3 Effect of Termination.

(a) Upon the termination of this Agreement, no Party shall have any liability or further obligation to any other Party or any of such Party's Affiliates under this Agreement; *provided*, *however*, that on February 15 of the calendar year following the Termination Date, Indemnitee shall deliver to Indemnitor a Prior Year Aggregate Loss Statement and:

(i) if there is a Deficiency Amount set forth in the Prior Year Aggregate Loss Statement, then such Deficiency Amount shall be due and payable;

(ii) any Accrued Amounts outstanding as of such date shall be due and payable;

(iii) any payments of such Deficiency Amount and any remaining Accrued Amount shall first be paid by reducing the amount of any Overage Amount and any remaining Overage Credit and then, if any such Overage Amount and Overage Credit has been reduced to zero, by payment of cash from Indemnitor to Indemnitee; and

(iv) if there is an Overage Amount set forth in the Prior Year Aggregate Loss Statement and/or any remaining Overage Credit following any payments contemplated by Section 3.3(a)(iii), Indemnitee shall pay to Indemnitor *the sum of* such Overage Amount, *plus* any such remaining Overage Credit.

Any payment made hereunder shall be made promptly following delivery of the Prior Year Aggregate Loss Statement and, in any event, within twenty (20) days thereof, in cash, by wire transfer of immediately available funds, to an account specified by the receiving Party in writing and the paying Party shall send a payment confirmation to the receiving Party by fax or e-mail.

(b) Notwithstanding any expiration or termination of this Agreement, Sections 2.5, 2.14 and 2.15, this Section 3.3, and Article IV shall survive and remain in effect in accordance with their terms. Any termination of this Agreement shall be without prejudice to any other rights or remedies available under this Agreement or at Law.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1 Counterparts; Entire Agreement. This Agreement may be executed in one or more counterparts, all of which counterparts shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each Party and delivered to the other Party. This Agreement may be executed by facsimile or PDF signature and scanned and exchanged by electronic mail, and such facsimile or PDF signature or scanned and exchanged copies shall constitute an original for all purposes. This Agreement, the Exhibits hereto and the Separation Agreement contain the entire agreement between the Parties with respect to the subject matter hereof and supersede all previous agreements, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter, and there are no agreements or understandings between the Parties with respect to the subject matter hereof other than those set forth or referred to herein or therein.

Section 4.2 Representations and Warranties. Each Party, severally as to itself only, and not jointly or jointly and severally, hereby represents and warrants to each other Party hereto as of the date of this Agreement as follows:

(a) each such Person has the requisite corporate or other power and authority and has taken all corporate or other action necessary in order to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby and thereby;

(b) this Agreement has been duly executed and delivered by it and constitutes a valid and binding agreement of it enforceable in accordance with the terms thereof;

(c) neither the execution, delivery or performance by each such Person of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) result in a material violation or material breach of, or material default under, any provision of the organizational documents of such Party or (ii) conflict with or result in a violation of, or give any Governmental Authority or other Person the right to challenge any of the transactions contemplated hereby under, any Law or Order applicable to such Party; and

(d) both (i) immediately after entering into this Agreement and (ii) upon the payment of the Estimated Initial Obligation, Indemnitor shall be solvent and shall (a) be able to pay its debts as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities) and (c) have adequate capital to carry on its businesses.

Section 4.3 Dispute Resolution. In the event that any Party, acting reasonably, forms the view that another Party has caused a material breach of the terms of this Agreement, then the Party that forms such a view shall serve written notice of the alleged breach on the other Parties and the Parties shall work together in good faith to resolve any such alleged breach within thirty (30) days of such notice (a "**Dispute**"). If any such alleged breach is not so resolved, then a senior executive of each Party shall, in good faith, attempt to resolve any such alleged breach within the following thirty (30) days of the referral of the matter to the senior executives. If no resolution is reached with respect to any such alleged breach in accordance with the procedures contained in this Section 4.3, then the Parties may seek to resolve such matter in accordance with Section 4.4 and Section 4.5.

Section 4.4 Governing Law; Jurisdiction. Any disputes arising out of or relating to this Agreement, including, without limitation, to its execution, performance, or enforcement, shall be governed by, and construed in accordance with, the Laws of the State of New York, regardless of the Laws that might otherwise govern under applicable principles of conflicts of Laws thereof. Each Party irrevocably consents to the exclusive jurisdiction, forum and venue of any state or federal court sitting in New York City in the State of New York over any and all claims, disputes, controversies or disagreements between the Parties or any of their respective Affiliates, successors and assigns under or related to this Agreement or any of the transactions contemplated hereby, including, without limitation, to their execution, performance or enforcement, whether in contract, tort or otherwise. Each of the Parties hereby agrees that it shall not assert and shall hereby waive any claim or right or defense that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. Each Party agrees that a final judgment in any legal proceeding resolved in accordance with this Section 4.4, Section 4.5 and Section 4.6 shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

Section 4.5 Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY INCLUDING, WITHOUT LIMITATION, THEIR EXECUTION, PERFORMANCE OR ENFORCEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.

Section 4.6 Court-Ordered Interim Relief. In accordance with Section 4.4 and Section 4.5, at any time after giving notice of a Dispute, each Party shall be entitled to interim measures of protection duly granted by a court of competent jurisdiction: (1) to preserve the status quo pending resolution of the dispute; (2) to prevent the destruction or loss of documents and other information or things relating to the dispute; or (3) to prevent the transfer, disposition or hiding of assets. Any such interim measure (or a request therefor to a court of competent jurisdiction) shall not be deemed incompatible with the provisions of Section 4.3, Section 4.4, or Section 4.5. Until such Dispute is resolved in accordance with Section 4.3 or final judgment is rendered in accordance with Section 4.4 and Section 4.5, each Party agrees that such Party shall continue to perform its obligations under this Agreement and that such obligations shall not be subject to any defense or set-off, counterclaim, recoupment or termination.

Section 4.7 Assignability; Transfer.

(a) Except as set forth in Section 4.7(b), (c), (d) and (e), neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by operation of Law or otherwise by either Party without the prior written consent of the other Party (consent to be provided in such Party's sole discretion); *provided* that Indemnitee may assign this Agreement to any Affiliate, in whole or in part, without the consent of any other Party hereto.

(b) Any Party may assign this Agreement without prior written consent if: (i) such assignment is pursuant to (a) a merger transaction in which the surviving entity acquires or assumes all, or substantially all, of such Party's assets or (b) the sale of all, or substantially all, of such Party's assets; and (ii) other than in respect of an assignment by Honeywell pursuant to clause (b)(i) above, (A) the assignee or successor-in-interest shall have corporate credit ratings assigned to it by Moody's Corporation and S&P Global Inc. (or any respective successors thereof) of no less than Baa2/BBB, respectively; and (B) it shall not be reasonably foreseeable as of the date of such assignment that such assignee or successor-in-interest will be downgraded as a result of the contemplated transaction with Indemnitor or otherwise. Notwithstanding the foregoing, in no event shall an assignment occur under this Section 4.7(b) unless the assignee or successor-in-interest expressly assumes in writing all of the obligations of the assigning Party under this Agreement, and such assigning Party provides written notice and evidence of such assignment, assumption or succession to the non-assigning Party.

(c) In the event that Indemnitor Group effects a separation of a substantial portion of its business into one or more entities (each a "**Homes Newco**"), whether existing or newly-formed, including by way of a Separation Transaction, prior to such separation, Indemnitor shall cause any such Homes Newco to enter into an agreement with Indemnitee that contains rights and obligations that are substantially similar to those set forth in this Agreement and under which Homes Newco and Indemnitor shall be jointly and severally responsible for the indemnification and reimbursement obligations set forth in this Agreement. For the avoidance of doubt, any sale of equity interests or assets for consideration is not subject to this Section 4.7(c). Notwithstanding the foregoing, Indemnitor Group may not enter into any Separation Transaction unless Homes Newco shall have corporate credit ratings assigned to it by Moody's and S&P of no less than Baa2/BBB, respectively, and it shall not be reasonably foreseeable, as of the date of such Separation Transaction, that Homes Newco will be downgraded.

(d) Notwithstanding the foregoing, Indemnitee may assign this Agreement without the consent of any other Party hereto to Honeywell or any of its Subsidiaries and any such transferees or assignees shall thereafter be treated as "**Indemnitee**" for all purposes under this Agreement.

(e) Notwithstanding the foregoing, Indemnitor may assign this Agreement without the consent of any other Party hereto to New HAPI 2, and New HAPI 2 shall assume all liability hereunder, in connection with the transactions contemplated by the Separation Agreement. Following such assignment and assumption, New HAPI 2 shall be treated as "**Indemnitor**" for all purposes under this Agreement and New HAPI Inc. shall be relieved of all liability hereunder.

(f) Any purported assignment in contravention of this Section 4.7 shall be void. Subject to this Section 4.7, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 4.8 Notices. All notices or other communications under this Agreement shall be in writing and shall be deemed to be duly given when (a) delivered in person, (b) on the date received, if sent by a nationally recognized delivery or courier service or (c) upon the earlier of confirmed receipt or the fifth business day following the date of mailing if sent by registered or certified mail, return receipt requested, postage prepaid and addressed as follows:

(a) if to Indemnitor:

New HAPI Inc.
115 Tabor Road
Morris Plains, NJ 07950
Attention: [Senior Vice President and General Counsel]
Fax: [ ]
Email: [ ]

(b) if to Indemnitee,

Honeywell International Inc.
115 Tabor Road
Morris Plains, NJ 07950
Attention: [Senior Vice President and General Counsel]
Fax: [ ]
Email: [ ]

(c) with a copy of any such notice sent to Indemnitee or Indemnitor (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Craig B. Brod
Kimberly R. Spoerri
Fax: (212) 225-3999
Email: cbrod@cgsh.com
kspoerri@cgsh.com

Either Party may, by notice to the other Party, change the address to which such notices are to be given. Each Party agrees that nothing in this Agreement shall effect the other Parties' right to serve process in any other manner permitted by Law.

Section 4.9 Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Party. Upon any such determination, any such provision, to the extent determined to be invalid, void or unenforceable, shall be deemed replaced by a provision that such court determines is valid and enforceable and that comes closest to expressing the intention of the invalid, void or unenforceable provision.

Section 4.10 Fees and Expenses. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses. Notwithstanding the foregoing, if any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party attorneys' fees and other costs and expenses incurred in connection with any such action in addition to any other relief to which such Party may be entitled. For the avoidance of doubt, any such costs and expenses shall not be included in, or subject to, the Cap.

Section 4.11 Headings. The article, section and paragraph headings contained in this Agreement, including in the table of contents of this Agreement, are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 4.12 Waivers of Default. No failure or delay of any Party in exercising any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Waiver by any Party of any default by the other Party of any provision of this Agreement shall not be deemed a waiver by the waiving Party of any subsequent or other default.

Section 4.13 Amendments. No provisions of this Agreement shall be deemed waived, amended, supplemented or modified by any Party, unless such waiver, amendment, supplement or modification is in writing and signed by the authorized representative of each Party; *provided* that no amendment resulting in the increase of the late payment fee set forth in Section 2.5(b) shall be effective without the written consent of the "Required Lenders" (as defined in the Principal Credit Agreement) under the Principal Credit Agreement. The lenders under the Principal Credit Agreement shall be third-party beneficiaries of this Section 4.13 and shall be entitled to enforce the provisions hereof directly against Indemnitee and Indemnitor.

Section 4.14 Interpretation. Words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires. The terms "hereof," "herein," "herewith" and words of similar import, unless otherwise stated, shall be construed to refer to this Agreement as a whole (including all of the schedules hereto) and not to any particular provision of this Agreement. Article, Section or Exhibit references are to the articles, sections and Exhibits of or to this Agreement unless otherwise specified. Any capitalized terms used in any Exhibit to this Agreement but not otherwise defined therein shall have the meaning as defined in this Agreement. Any definition of or reference to any agreement, instrument or other document herein (including any reference herein to this Agreement) shall, unless otherwise stated, be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth therein, including in Section 4.13 above). The word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless the context otherwise requires or unless otherwise specified. The word "or" shall not be exclusive. All references to "$" or dollar amounts are to lawful currency of the United States of America. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of the authorship of any provisions hereof.

* * * * *

IN WITNESS WHEREOF, each of the Parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

HONEYWELL INTERNATIONAL INC.

By: ________________________________
Name:
Title:

NEW HAPI INC.

By: ________________________________
Name:
Title:

(Back To Top)

# Section 6: EX-3.1 (EX-3.1)

**Exhibit 3.1**

**FORM OF**

**AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**RESIDEO TECHNOLOGIES, INC.**

RESIDEO TECHNOLOGIES, INC., a corporation organized and existing under the laws of the State of Delaware, DOES HEREBY CERTIFY AS FOLLOWS:

1. The name of the corporation is Resideo Technologies, Inc. The original Certificate of Incorporation of the corporation was filed with the Secretary of State of the State of Delaware on April 24, 2018 (as amended and in effect immediately prior to the adoption and effectiveness hereof, the "Original Certificate of Incorporation").

2. This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware (the "DGCL"), and by the written consent of its sole stockholder in accordance with Section 228 of the DGCL, and shall be effective as of 11:59 p.m., New York City time, on [ ], 2018.

3. The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as follows:

ARTICLE I

The name of the corporation (hereinafter called the "Corporation") is Resideo Technologies, Inc.

ARTICLE II

The address of the Corporation's registered office in the State of Delaware is 251 Little Falls Drive, Wilmington, New Castle County, Delaware 19808. The name of the Corporation's registered agent at such address is Corporation Service Company.

ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

ARTICLE IV

SECTION 1. The total number of shares of all classes of stock which the Corporation shall have authority to issue is 800,000,000 shares of capital stock, consisting of (1) 100,000,000 shares of Preferred Stock, par value $0.001 per share ("Preferred Stock"), and (2) 700,000,000 shares of Common Stock, par value $0.001 per share ("Common Stock"). The number of authorized shares of either the Preferred Stock or the Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority in voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL (or any successor provision thereto), voting as a single class, and no vote of the holders of either the Preferred Stock or the Common Stock voting separately as a class shall be required therefor.

SECTION 2. The Board of Directors of the Corporation (the "Board of Directors") is hereby expressly authorized, by resolution or resolutions and without stockholder approval, to provide, out of the unissued shares of Preferred Stock, for series of Preferred Stock and, with respect to each such series, to fix the number of shares constituting such series and the designation of such series, the voting powers (if any) of the shares of such series, and the preferences and relative, participating, optional or other special rights, if any, and any qualifications, limitations or restrictions thereof, of the shares of such series. The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding.

SECTION 3. (a) Each holder of Common Stock, as such, shall be entitled to one vote for each share of Common Stock held of record by such holder on all matters on which stockholders generally are entitled to vote; provided, however, that, except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock) or pursuant to the DGCL.

(b) Except as otherwise required by law, holders of a series of Preferred Stock, as such, shall be entitled only to such voting rights, if any, as shall expressly be granted to such holders by this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to such series).

(c) Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock, dividends may be declared and paid on the Common Stock at such times and in such amounts as the Board of Directors in its discretion shall determine.

(d) Upon the dissolution, liquidation or winding up of the Corporation, subject to the rights, if any, of the holders of any outstanding series of Preferred Stock, the holders of the Common Stock, as such, shall be entitled to receive the assets of the Corporation available for distribution to its stockholders ratably in proportion to the number of shares held by them. For the avoidance of doubt, a dissolution, liquidation or winding up shall not be deemed to be occasioned by or to include, without limitation, any voluntary consolidation, reorganization, conversion or merger of the Corporation with or into any other corporation or entity or other corporation or entities or a sale, lease, transfer, exchange or conveyance of all or a part of the Corporation's assets.

(e) Shares of Common Stock shall not entitle any holder thereof to any pre-emptive, subscription, redemption or conversion rights.

ARTICLE V

SECTION 1. (a) The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. Except as otherwise fixed pursuant to the terms of any outstanding series of Preferred Stock pursuant to this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to such series of Preferred Stock), the number of directors of the Corporation shall be fixed from time to time by the Board of Directors. In no event shall a decrease in the number of directors constituting the Board of Directors shorten the term of any incumbent director.

(b) The directors, other than those who may be elected by the holders of any series of Preferred Stock voting separately pursuant to this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to such series of Preferred Stock), shall be elected by the stockholders entitled to vote thereon at each annual meeting of the stockholders. From the effective date of this Amended and Restated Certificate of Incorporation until the election of the directors at the 2022 annual meeting of stockholders, the directors of the Corporation shall be divided into three classes, designated Class I, Class II and Class III. Each class shall consist, as nearly as may be possible, of one-third of the total number of directors constituting the entire Board of Directors. If the number of directors has changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, and any additional director of any class elected to fill a vacancy resulting from an increase in such class shall hold office for a term that shall coincide with the remaining term of that class. The initial assignment of directors to each such class shall be made by the Board of Directors. The term of office of the initial Class I directors shall expire at the 2019 annual meeting of stockholders, the term of office of the initial Class II directors shall expire at the 2020 annual meeting of stockholders and the term of office of the initial Class III directors shall expire at the 2021 annual meeting of stockholders. Each director elected at the 2019, 2020 or 2021 annual meeting of stockholders shall belong to the same class as the director whose term shall have then expired and who is being succeeded by such director. Each Class I director elected at the 2019 annual meeting of stockholders, each Class II director elected at the 2020 annual meeting of stockholders and each Class III director elected at the 2021 annual meeting of stockholders shall hold office until the 2022 annual meeting of stockholders and, in each case, until his or her respective successor shall have been duly elected and qualified or until his or her earlier resignation or removal. Commencing with the 2022 annual meeting of stockholders, each director shall be elected annually and shall hold office until the next annual meeting of stockholders and until his or her respective successor shall have been duly elected and qualified or until his or her earlier resignation or removal. Pursuant to such procedures, effective as of the conclusion of the 2022 annual meeting of stockholders, the Board of Directors will no longer be classified under Section 141(d) of the DGCL and directors shall no longer be divided into three classes. The election of directors need not be by written ballot.

SECTION 2. Advance notice of nominations for the election of directors shall be given in the manner and to the extent provided in the By-laws of the Corporation.

SECTION 3. (a) Except as otherwise provided for or fixed by or pursuant to the provisions of this Amended and Restated Certificate of Incorporation relating to the rights of the holders of any outstanding series of Preferred Stock (including any Certificate of Designation relating to such series of Preferred Stock), newly created directorships resulting from any increase in the number of directors and any vacancies on the Board of Directors resulting from death, resignation, removal or other cause shall only be filled by the Board of Directors by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum of the Board of Directors, or by a sole remaining director, or if not so filled, by the stockholders at the next annual meeting thereof. Any director elected in accordance with the first sentence of this Section 3 shall hold office for a term that shall coincide with the remaining term of the class such director is elected to and until such director's successor shall have been duly elected and qualified or until his or her earlier resignation or removal.

(b) From the effective date of this Amended and Restated Certificate of Incorporation until the election of directors at the 2022 annual meeting of stockholders, any director or the entire Board of Directors may only be removed for cause, such removal to require the affirmative vote of shares representing at least a majority of the votes entitled to be cast by the then outstanding shares of all classes and series of capital stock of the Corporation entitled generally to vote on the election of directors of the Corporation. From and after the 2022 annual meeting of stockholders, any director or the entire Board of Directors may be removed with or without cause, and, in either case, such removal shall require the affirmative vote of shares representing at least a majority of the votes entitled to be cast by the then outstanding shares of all classes and series of capital stock of the Corporation entitled generally to vote on the election of directors of the Corporation. Notwithstanding the foregoing, whenever holders of outstanding shares of one or more series of Preferred Stock voting separately are entitled to elect directors of the Corporation pursuant to the provisions of this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to such series of Preferred Stock), any such director of the Corporation so elected may be removed in accordance with this Amended and Restated Certificate of Incorporation (including such Certificate of Designation).

ARTICLE VI

Subject to the rights of the holders of any outstanding series of Preferred Stock, any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by such stockholders. Except as otherwise required by law and subject to the rights of the holders of any outstanding series of Preferred Stock, special meetings of stockholders of the Corporation may only be called by the Chairman of the Board of Directors or the Board of Directors pursuant to a resolution approved by a majority of the entire Board of Directors (the entire Board of Directors being the total number of authorized directors, whether or not there exist any vacancies or unfilled previously authorized directorships) or as otherwise provided in the By-laws of the Corporation.

ARTICLE VII

In furtherance and not in limitation of the powers conferred upon it by law, the Board of Directors is expressly authorized to adopt, repeal, alter or amend the By-laws of the Corporation by the vote of a majority of the entire Board of Directors. In addition to any requirements of law and any other provision of this Amended and Restated Certificate of Incorporation (and notwithstanding the fact that a lesser percentage may be specified by law), the affirmative vote of the holders of at least a majority of the combined voting power of the then outstanding shares of all classes and series of capital stock of the Corporation entitled generally to vote in the election of directors of the Corporation, voting together as a single class, shall be required for stockholders to adopt, amend, alter or repeal any provision of the By-laws of the Corporation.

ARTICLE VIII

The Corporation reserves the right to amend, alter or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are subject to this reservation.

ARTICLE IX

SECTION 1. To the fullest extent that the DGCL or any other law of the State of Delaware as it exists or as it may hereafter be amended permits the limitation or elimination of the liability of directors, no director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

SECTION 2. To the fullest extent that the DGCL or any other law of the State of Delaware as it exists or as it may hereafter be amended permits, including to the extent that such law or amendment permits the Corporation to provide broader indemnification rights than permitted prior to such law or amendment, the Corporation may provide indemnification of (and advancement of expenses to) its current and former directors, officers and agents (and any other persons to which the DGCL permits the Corporation to provide indemnification) through By-law provisions, agreements with such agents or other persons, votes of stockholders or disinterested directors or otherwise.

SECTION 3. No amendment to or repeal of any Section of this Article IX, nor the adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this Article IX, shall eliminate or reduce the effect of this Article IX in respect of any matter occurring, or any action or proceeding accruing or arising, prior to such amendment, repeal or adoption of an inconsistent provision.

ARTICLE X

Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL (or any successor provision thereto) or as to which the DGCL (or any successor provision thereto) confers jurisdiction on the Court of Chancery of the State of Delaware, (d) any action asserting a claim governed by the internal affairs doctrine or (e) any other action asserting an "internal corporate claim" as that term is defined in Section 115 of the DGCL shall be the Court of Chancery of the State of Delaware, in all cases to the fullest extent permitted by law, or, if the Court of Chancery of the State of Delaware does not have jurisdiction, any other state or federal court located within the State of Delaware.

ARTICLE XI

The Corporation is to have perpetual existence.

ARTICLE XII

If any provision (or any part thereof) of this Amended and Restated Certificate of Incorporation shall be held invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Amended and Restated Certificate of Incorporation (including, without limitation, each portion of any section of this Amended and Restated Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (ii) to the fullest extent possible, the provisions of this Amended and Restated Certificate of Incorporation (including, without limitation, each such portion of any section containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service or for the benefit of the Corporation to the fullest extent permitted by law.

(Back To Top)

# Section 7: EX-99.1 (EX-99.1)

**Table of Contents**

**Exhibit 99.1**




, 2018

Dear Honeywell Shareowner:

On October 10, 2017, we announced our intention to spin our Homes and ADI global distribution business. I am pleased to confirm that we expect to distribute shares in the new company, Resideo Technologies, Inc., before the end of the year. We will provide more details on this distribution as the effective spin date is finalized.

Honeywell has been helping homeowners stay comfortable since 1885 and has one of the broadest home security and safety and comfort portfolios in the industry, with approximately 3,000 active and pending patents worldwide and sales in approximately 40 countries. Thanks to its outstanding set of offerings, Resideo will be a leader in the home heating, ventilation and air conditioning (HVAC) controls and security markets, and a leading global distributor of security and fire protection products.

Resideo will enter a long-term license agreement with Honeywell for use of the Honeywell Home brand, which will give its offerings credibility with customers around the world. In addition, its pipeline of innovative products and software, unparalleled presence in the home and low-voltage product distribution markets, large network of professional partners and customers, and strong leadership team and Board of Directors will position this company extremely well for future success.

I encourage you to read the attached information statement about Resideo, as well as the supplemental information on Honeywell's investor relations website. The information statement describes the spin in detail and contains important business and financial information. Once the spin is effective, each Honeywell shareowner will receive shares of Resideo Technologies, Inc. based on the number of shares of Honeywell common stock held by the shareowner as of the record date.

Today's announcement reflects our continued commitment to generate shareowner value as Honeywell becomes the premier software-industrial company. I am confident that Resideo will be successful following its separation from Honeywell, and look forward to the bright futures of both companies.

Sincerely,

Darius Adamczyk

Chairman and CEO
Honeywell

Table of Contents



resideo

, 2018

To Our Future Resideo Shareowners:

Thank you for your interest in Resideo, Honeywell's planned spin company that is focused on technology for the residential homeowner. We understand that a house is the biggest investment most of us will ever make. While technology makes it possible to have a home that is smarter, more energy efficient, more secure, and easier to control, consumers face overwhelming choices when it comes to modernizing their home. We believe there's a great opportunity for a company like Resideo to offer simple solutions to connect the systems and accessories that make a home smart.

When we launch Resideo as a standalone, publicly traded company, we will be uniquely positioned to lead the global smart home market for four key reasons:

1) We are a global leader in professionally installed residential comfort and security and the leading global wholesale distributor of security and low voltage products. We delivered more than $4.5 billion of sales in 2017, and that size allows us to achieve economies of scale in production, distribution and speed to market, while maintaining our status as the partner of choice in the smart home ecosystem. As a standalone company, we will be agile enough to respond to our dynamic markets and well-positioned to make strategic investments in our future.

2) We have a long-term agreement with Honeywell to license the Honeywell Home brand. That is an important ingredient to our success, but also an important recognition of our heritage. Resideo begins with more than 100 years of domain knowledge and expertise connecting the home. The Honeywell brand is in more than 150 million homes and reflects decades of trust built with dealers and installers, and a promise of reliability for consumers. More than one-third of our product sales come from connected devices, which unlock data to provide millions of consumers with better insights along with peace of mind knowing technology is making their home a better place to live.

3) We expect to benefit from major trends influencing consumer decisions around the globe. There are expected to be about 75 billion connected devices globally by 2025, up from just 20 billion in 2017. We currently have approximately 4.7 million connected customers and more than 30 million sensor points – and we expect these numbers to grow rapidly.

4) Our customers include professional contractors, service provider partners, and those who prefer to do it themselves (DIY). They want a smart home that integrates seamlessly, with devices that are compatible regardless of who manufactured them. This is why our products work effectively with the most widely used home automation systems – Amazon Alexa™, Apple HomeKit™, Google Home™, and Samsung SmartThings™. Our commitment to working well with others makes us an attractive and highly sought-after partner – in fact, it's why we currently have 3,000 third party developers creating mobile apps to integrate with our solutions.

We are excited about the company Resideo will be on Day 1 and the ways we intend to advance the smart home industry in the years to come. We are passionate about improving lives around the globe through leading home technologies. We have assembled a world-class team of talent to lead Resideo with the know-how to make our spin successful. The attached information statement details our strategy and plans for near and long-term growth to generate value for our shareowners.

Sincerely,

Mike Nefkens
President and CEO
Resideo Technologies, Inc.

Table of Contents



resideo

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A REGISTRATION STATEMENT ON FORM 10 RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED

SUBJECT TO COMPLETION—DATED OCTOBER 2, 2018

## INFORMATION STATEMENT

# Resideo Technologies, Inc.

## Common Stock

(par value $.001 per share)

---

We are sending you this Information Statement in connection with the spin-off by Honeywell International Inc. ("Honeywell") of its wholly owned subsidiary, Resideo Technologies, Inc. (the "Company" or "SpinCo"). To effect the spin-off, Honeywell will distribute all of the shares of SpinCo common stock on a *pro rata* basis to the holders of Honeywell common stock. We expect that the distribution of SpinCo common stock will be tax-free to holders of Honeywell common stock for U.S. federal income tax purposes, except for cash that stockholders may receive (if any) in lieu of fractional shares.

If you are a record holder of Honeywell common stock as of the close of business on October 16, 2018, which is the record date for the distribution, you will be entitled to receive one share of SpinCo common stock for every six shares of Honeywell common stock that you hold on that date. Honeywell will distribute the shares of SpinCo common stock in book-entry form, which means that we will not issue physical stock certificates. The distribution agent will not distribute any fractional shares of SpinCo common stock.

The distribution will be effective as of 12:01 a.m., New York City time, on October 29, 2018. Immediately after the distribution becomes effective, SpinCo will be an independent, publicly traded company.

Honeywell's stockholders are not required to vote on or take any other action to approve the spin-off. We are not asking you for a proxy, and request that you do not send us a proxy. Honeywell stockholders will not be required to pay any consideration for the shares of SpinCo common stock they receive in the spin-off, and they will not be required to surrender or exchange their shares of Honeywell common stock or take any other action in connection with the spin-off.

No trading market for SpinCo common stock currently exists. We expect, however, that a limited trading market for SpinCo common stock, commonly known as a "when-issued" trading market, will develop on or shortly before the record date for the distribution, and we expect "regular-way" trading of SpinCo common stock will begin on the first trading day after the distribution date. We intend to list SpinCo common stock on the New York Stock Exchange, under the ticker symbol "REZI."

**In reviewing this Information Statement, you should carefully consider the matters described in the section entitled "Risk Factors" beginning on page 25 of this Information Statement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or determined if this Information Statement is truthful or complete. Any representation to the contrary is a criminal offense.**

This Information Statement is not an offer to sell, or a solicitation of an offer to buy, any securities.

**The date of this Information Statement is October , 2018.**

Table of Contents

TABLE OF CONTENTS


| | Page |
|---|---|
| Trademarks and Copyrights | ii |
| Industry and Market Data | ii |
| Non-GAAP Financial Information | ii |
| Information Statement Summary | 1 |
| Risk Factors | 25 |
| Cautionary Statement Concerning Forward-Looking Statements | 57 |
| The Spin-Off | 59 |
| Dividend Policy | 68 |
| Capitalization | 69 |
| Selected Historical and Unaudited Pro Forma Combined Financial Data | 70 |
| Unaudited Pro Forma Combined Financial Statements | 75 |
| Business | 83 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 106 |
| Management and Board of Directors | 125 |
| Compensation Discussion and Analysis | 132 |
| Security Ownership of Certain Beneficial Owners and Management | 137 |
| Certain Relationships and Related Party Transactions | 139 |
| Description of Our Capital Stock | 148 |
| Where You Can Find More Information | 152 |
| Index to Combined Financial Statements | F-1 |

Table of Contents

## TRADEMARKS AND COPYRIGHTS

We own or have rights to various trademarks, logos, service marks and trade names that we use in connection with the operation of our business (including the Honeywell trademarks, logos, service marks and trade names, which are used under license from Honeywell International Inc.). We also own or have the rights to copyrights that protect the content of our products. Solely for convenience, certain of our trademarks, service marks, trade names and copyrights referred to in this Information Statement are listed without the ™, ® or © symbols, but such references do not constitute a waiver of any rights that might be associated with the respective trademarks, service marks, trade names and copyrights included or referred to in this Information Statement.

## INDUSTRY AND MARKET DATA

This Information Statement includes industry and market data that we obtained from various third party industry and market data sources. While we believe the projections of the industry sources referenced in this Information Statement are reasonable, forecasts based upon such data involve inherent uncertainties, and actual results are subject to change based upon various factors beyond our control. These third party sources include but are not limited to the Building Services Research and Information Association ("BSRIA"), the Bureau of Economic Analysis ("BEA"), the U.S. Census Bureau, Gartner Inc. ("Gartner"), International Data Corporation ("IDC"), IHS Markit ("IHS"), the National Association of Home Builders ("NAHB"), Parks Associates, Inc. ("Parks Associates"), Statista.com ("Statista") and Navigant Consulting ("Navigant"). All such industry data is available publicly or for purchase and was not commissioned specifically for us. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, forecasts based upon such data involve inherent uncertainties, and actual results regarding the subject matter of such forecasts are subject to change based upon various factors, including those beyond our control and those discussed under the headings "Risk Factors" and "Cautionary Statement Concerning Forward-Looking Statements" in this Information Statement.

## NON-GAAP FINANCIAL INFORMATION

We provide financial information not in accordance with accounting principles generally accepted in the United States ("non-GAAP" financial information) to enhance the understanding of our financial information prepared in accordance with accounting principles generally accepted in the United States ("GAAP"), and it should be considered by the reader in addition to, but not instead of, the financial statements prepared in accordance with GAAP. The non-GAAP financial information presented may be determined or calculated differently by other companies. See "Selected Historical and Unaudited Pro Forma Combined Financial Data" for more information.

Table of Contents

## INFORMATION STATEMENT SUMMARY

In this Information Statement, unless the context otherwise requires:

- The "Company," "Resideo," "SpinCo," "we," "our" and "us" refer to Resideo Technologies, Inc. and its consolidated subsidiaries after giving effect to the Spin-Off; and
- "Honeywell" or "Parent" refers to Honeywell International Inc. and its consolidated subsidiaries.

The transaction in which Honeywell will distribute to its stockholders all of the shares of our common stock is referred to in this Information Statement as the "Share Distribution" or the "Spin-Off." Prior to Honeywell's Share Distribution of the shares of our common stock to its stockholders, Honeywell will undertake a series of internal reorganization transactions, following which SpinCo will hold, directly or through its subsidiaries, Honeywell's residential Comfort & Care and Security & Safety product portfolio and ADI Global Distribution businesses, which we refer to as the "Business." We refer to this series of internal reorganization transactions as the "Reorganization Transactions."

**The Spin-Off**

On October 10, 2017, Honeywell announced plans for the complete legal and structural separation of our Business from Honeywell. In reaching the decision to pursue the Spin-Off, Honeywell considered a range of potential structural alternatives for the Business and concluded that the Spin-Off is the most attractive alternative for enhancing stockholder value.

To effect the separation, first, Honeywell will undertake the series of Reorganization Transactions. Honeywell will subsequently distribute all of our common stock to Honeywell's stockholders, and following the Share Distribution, SpinCo, holding the Business, will become an independent, publicly traded company.

Prior to completion of the Spin-Off, we intend to enter into a Separation and Distribution Agreement and several other agreements with Honeywell related to the Spin-Off. These agreements including Transition Services, Tax Matters, Employee Matters, Trademark License, Patent Cross-License and Indemnification and Reimbursement Agreements, will govern the relationship between Honeywell and SpinCo up to and after completion of the Spin-Off and allocate between Honeywell and SpinCo various assets, liabilities and obligations, including employee benefits, intellectual property, environmental and tax-related assets and liabilities and in certain cases will result in certain significant ongoing payments from SpinCo to Honeywell. See "Certain Relationships and Related Party Transactions" for more information.

Completion of the Spin-Off is subject to the satisfaction or waiver of a number of conditions. In addition, Honeywell has the right not to complete the Spin-Off if, at any time, Honeywell's board of directors (the "Honeywell Board") determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Honeywell or its stockholders, or is otherwise not advisable. See "The Spin-Off—Conditions to the Spin-Off" for more information.

Following the Spin-Off, SpinCo and Honeywell will each have a more focused business better positioned to invest in growth opportunities through tailored capital allocation and will be better able to execute on each company's specific strategic plans. SpinCo primarily serves residential end markets through its Products segment and non-residential end markets through its Distribution segment. SpinCo will specifically focus on the professional installer and OEM channels while developing innovative consumer solutions. SpinCo also plans to target investments to grow in attractive distribution markets and invest selectively in growth areas including connected home solutions. Further, the Spin-Off will allow our management team to devote its time and attention to corporate strategies and policies that are based specifically on the needs of our Business and its dynamic end

markets. We plan to create incentives for our management and employees that are more closely tied to business performance and our stockholders' expectations, which we believe will help us attract and retain highly qualified personnel. Additionally, we believe the Spin-Off will help align our stockholder base with the characteristics and risk profile of our business. See "The Spin-Off—Reasons for the Spin-Off" for more information.

Aspects of the Spin-Off may increase the risks associated with ownership of shares of SpinCo. In connection with the Spin-Off, we expect to incur substantial indebtedness in an aggregate principal amount of approximately $1,225 million in the form of senior secured term loans and senior unsecured notes, the net proceeds of which will be received by Honeywell substantially concurrently with the consummation of the Spin-Off. We also intend to enter into a revolving credit facility to be available for our working capital and other cash needs from time to time in an aggregate committed amount as of the date of the Spin-Off of $350 million. The terms of such indebtedness are subject to change and will be finalized prior to the closing of the Spin-Off. See "Capitalization" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for more information. In addition, we intend to enter into an Indemnification and Reimbursement Agreement, pursuant to which we will have an obligation to make cash payments to Honeywell related to certain of Honeywell's environmental-related liabilities (as defined herein). See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement." Furthermore, as an independent entity we may lose some of the benefits of purchasing power, borrowing leverage and available capital for investments associated with being a larger entity. See "Risk Factors" in this Information Statement. As a consequence of the foregoing, there is no guarantee that any dividends will be declared on our common stock by our board of directors (our "Board"), or if so declared, will be continued in the future. For more information, see "Dividend Policy."

Following the Spin-Off, we expect our common stock to trade on the New York Stock Exchange under the ticker symbol "REZI."

On October 10, 2017, together with the announcement of the Spin-Off, Honeywell announced plans for the complete legal and structural separation of its Transportation Systems business, which business will be operated under the company name Garrett Motion Inc. We refer to this potential transaction as the "Garrett Spin-Off." The Garrett Spin-Off is separate from the Spin-Off of our Company and neither spin-off is conditioned upon completion of the other.

Table of Contents

*When it's really important to your family and home, it's Resideo*



Table of Contents



Table of Contents



Table of Contents

**Our Company**

We are a leading global provider of critical comfort and security solutions primarily in residential environments, with a presence in over 150 million homes globally. Our products, which benefit from the trusted, well-established Honeywell brand, are installed in over 15 million homes annually, allowing SpinCo to launch innovative technologies and services at scale. After the Spin-Off, these products will be marketed and sold under the Honeywell Home brand pursuant to a 40 year license agreement with Honeywell. We have a long-standing leadership position in the traditional/non-connected products space that contributes significantly to our net sales. Our growing portfolio of connected home solutions is one of the largest and most comprehensive in the market. Our connected solutions are supported by software platforms (which we expect to consolidate in a single platform and mobile application) that allow consumers and channel partners to easily install, use and maintain our solutions and third party devices. These platforms interact with other ecosystems to control SpinCo's and others' home automation devices. Over 4.7 million of our customers are connected, providing access to control, monitoring and alerts, and we have approximately 30 million installed sensors generating more than 250 billion data transmissions annually. Our broad portfolio of innovative products is supported by approximately 3,000 worldwide active and pending patents, delivered through a comprehensive network of over 110,000 professional contractors, more than 3,000 distributors and over 1,200 original equipment manufacturers ("OEMs"), as well as major retailers and online merchants.

Our ADI Global Distribution business ("ADI") is the leading wholesale distributor of security products, and is independently recognized for superior customer service. Through over 200 stocking locations in 17 countries, ADI distributes more than 350,000 products from over 1,000 manufacturers to a customer base of over 100,000 contractors. We believe this global footprint gives us distinct scale and network advantages in our core products over our competitors. Further, we believe our customers derive great value from the advice and recommendations of our knowledgeable design specialists allowing our customers to better meet the technical and systems integration expertise requirements to install and service professional security systems. We continue to transform the industry with value-added services such as presales system design and 24/7 order pick-up, and the selective introduction of new product categories such as professional audio visual. Additionally, ADI has long been an important channel to market for our security products, providing a level of end-customer intimacy that drives our ability to develop successful new products at an accelerated rate and insights into current market trends that help us quickly adapt our product portfolio to meet evolving customer needs. Similarly, ADI is an important channel to market for third party manufacturers, whose products represent a significant majority of ADI's net sales.

We intend to expand and market our extensive portfolio and distribution base in several ways. We view our long-standing, mutually beneficial relationships with professional contractors and OEM channels as a key differentiator in our Products segment and plan to continue to invest in and grow with these channel partners. We believe the global connected home market is in the early stages of broad consumer adoption, with Gartner projecting the installed base of "connected things" in the consumer segment to grow from approximately four billion in 2016 to more than 12 billion in 2020 and we intend to expand our connected solutions and services offerings to capitalize on this trend. We also intend to expand ADI's geographic footprint, product categories and services to drive overall sales, including SpinCo's security products business.

**Segments**

We manage our business operations through two segments, Products and Distribution, which contributed 49% and 51%, respectively, of our net sales before intersegment eliminations for the year ended December 31, 2017.

Table of Contents

**Products**

Our Products segment had net sales before intersegment eliminations of $2,379 million for the year ended December 31, 2017, of which $337 million were sold to ADI. Management estimates that net sales generated from our Products segment are primarily from residential end-markets. Included in our Products segment are traditional products, as well as connected products, which we define as any device with the capability to be monitored or controlled from a remote location by an end-user or service provider. Products consist of solutions in the following Comfort & Care and Security & Safety categories:

- ***Comfort & Care:*** Our Comfort & Care solutions have historically been marketed and sold primarily under the Honeywell brand, and after the Spin-Off, these products and solutions will be marketed and sold under the Honeywell Home brand pursuant to a 40 year license agreement with Honeywell. These solutions include home products, services and technologies including:

  - *Temperature and Humidity Control Solutions:* Devices to control air conditioners and heating equipment, thermostats and zoning devices, control panels, dampers and actuators, through brands and product families such as Lyric, Prestige, RedLINK, T-Series, TrueZone, FocusPro and VisionPro.

  - *Thermal Solutions:* Devices to control heating and cooling equipment, such as water heaters, boilers, furnaces, heat pumps and air heaters and combustion critical components such as electronic controls, actuators, gas valves and ignition controls, through brands and product families such as SCOT and Ermaf.

  - *Water Solutions:* Devices to control hydronic heating, cooling, and potable water solutions, including control panels, zone valves, balancing valves, thermostatic radiator valves, temperature valves, floor temperature sensors and accessories, pressure regulators, backflow preventers and potable water care products to filter, clean and soften water, through brands and product families such as SmartT and Aquatrol.

  - *Air Solutions:* Devices to control air quality, such as whole home humidifiers and dehumidifiers, air filters, air purification and odor control solutions and ventilation systems and controls, through brands and product families such as TrueEASE, Micro Defense and TrueDRY.

  - *Remote Patient Monitoring Software Solutions (telehealth):* Systems that record, organize and transmit patient health data to health service providers to monitor patient well-being, helping patients continue treatment and recovery in their homes under remote supervision, through brands and product families such as Life Stream and Life Care Solutions.

  - *Software Solutions:* Global software platforms and mobile applications that provide contractors and consumers with access to services such as demand response, energy management, auto-replenishment services and predictive appliance diagnostics, through brands and product families such as Lyric and Total Connect Comfort.

- ***Security & Safety:*** Our Security & Safety solutions have historically been marketed and sold primarily under the Honeywell brand and after the Spin-Off will be sold under the Honeywell brand. They include professionally-installed and monitored intrusion and life safety detection and alarm systems, as well as self-installed and self-monitored awareness solutions including:

  - *Security Panels:* Control devices that communicate with sensors that receive event or condition signals and send those signals to a monitoring station and cloud infrastructure, through brands and product families such as Vista, Lyric and Lynx.

  - *Sensors:* Devices that detect intrusion (for example, motion, opening of doors and windows and breaking of glass), smoke, carbon monoxide and water and transmit a signal to a security panel, through brands and product families such as 5800 and SiX.

Table of Contents

- *Peripherals:* Accessories that interact with security systems, such as keypads and key-fobs, through brands and product families such as 5800 and Videofied.
- *Wire and Cable:* Low voltage electrical wiring and category cable, through brands and product families such as Genesis Series.
- *Software Solutions:* Global software platforms and mobile applications that provide contractors and consumers with access to services such as alarm monitoring, communication, automation and video services. In addition, we provide our contractors with data analytics tools, through our AlarmNet 360 software suite. These solutions are sold through brands and product families such as Total Connect 2.0 and AlarmNet 360.
- *Communication Devices:* Devices that transmit notifications and security information from security systems to monitoring stations, such as cellular radios and internet and telephone line communicators, through brands and product families such as LTE radio.
- *Video Cameras:* Battery-operated indoor and outdoor video motion viewers that detect motion and enable live "look-in" remotely, and Wi-Fi cameras for indoor and outdoor use, through brands and product families such as Videofied and Total Connect cameras.
- *Awareness Solutions:* Self-installed and self-monitored systems that include a home gateway/hub, cameras and awareness sensors to detect motion and sounds, opening and closing of doors, entry and exit of known users of the system (facial recognition) and provide alerts to the user via a mobile app, through brands and product families such as Honeywell Smart Home System and Lyric.
- *Cloud Infrastructure:* Network operating center that routes signals between home and monitoring station and enables secured, remote data transmissions, through brands and product families such as AlarmNet and Total Connect.
- *Installation and Maintenance Tools:* Software tools and applications to enable security contractors to install, program and maintain security systems, through brands and product families such as AlarmNet 360 and Compass.

Eleven of the top twelve most appealing smart home use cases reported by Parks Associates concern comfort, security and safety solutions that are directly addressed by our product offerings, and a number of our end-to-end solutions have applications across Comfort & Care and Security & Safety products. We are strongly positioned to provide products that enhance consumers' comfort, convenience and sense of security and work together to contribute to a connected home ecosystem. Some of these cross-product offerings are discussed in greater detail in "Business—Products."

Table of Contents




(1) Includes external and intercompany sales.

(2) Americas represents North and South America. EMEA represents Europe, the Middle East and Africa. Other principally represents Australia, China, New Zealand and South Korea.

(3) Connected is defined as any device with the capability to be monitored or controlled from a remote location by an end-user or service provider.

**Distribution**

ADI, our Distribution segment, is the leading wholesale distributor of security and low voltage electronics products, which include security, safety and audio visual products and related accessories. These products, which are commonly referred to as "low voltage", are traditionally defined as products operating at or below 24 volts. According to IHS data, ADI has the leading global market share in security equipment distribution. ADI operates through a distribution network of over 200 stocking locations throughout the world, delivering to over 100,000 contractors. The Distribution segment had net sales of $2,477 million for the year ended December 31, 2017.

ADI distributes a broad selection of SpinCo and third party products to meet customer needs, including:

- ***Security products***
  - *Video Surveillance*: Internet protocol ("IP") and high-definition analog cameras, recording and storage devices, video management and analytics software, and related system accessories.
  - *Intrusion*: Residential and commercial alarm systems, keypads, detection and sensing devices, alarm communication equipment, and related systems accessories.
  - *Access Control*: Access control panels and software, readers, credentials, locking hardware, gate control, intercoms and related system accessories.
- ***Other products***
  - *Fire and Life Safety*: Fire alarm control panels, fire detection equipment, fire notification equipment, manual call points/stations and related system accessories.
  - *Wire, networking and professional audio visual systems*.

In addition to our own Security & Safety products, ADI distributes products from industry-leading manufacturers including Assa Abloy, Axis Communications, Honeywell and Nortek Security & Control, and

Table of Contents

ADI also carries a line of private label products. ADI sells these products to contractors that service non-residential and residential end-users. Management estimates that in 2017 approximately two-thirds of ADI net sales were attributed to non-residential end markets and one-third to residential end markets.

**Distribution Segment: Net Sales for the year ended December 31, 2017**




(1) Americas represents North and South America. EMEA represents Europe, the Middle East and Africa. Other principally represents India.
(2) Other includes fire and life safety, wire, networking and professional audio visual systems.

**History of Innovation**

We have a long history of innovation and industry firsts in our Comfort & Care and Security & Safety markets and have a reputation for providing trusted, tested and proven products and solutions. We trace some of our innovations as far back as the 1880s when we invented the predecessor to the modern thermostat. From the first clock thermostats to the world's first gas burner control, we have consistently driven progress and innovation in home comfort and security, including the introduction of the iconic T-86 "Round" thermostat in 1952. In 2000, we acquired the ADEMCO business, a leader in monitored burglary and fire alarm systems with roots back to 1929 and the early days of wired burglar alarms, expanding our presence in fire and security systems.

In the 1980s, ADEMCO developed the first reliable wireless security system and sensor and the AlarmNet radio technology that served as the first affordable back-up and alternative to alarm transmission over telephone lines. Through ADI, we introduced large-scale wholesale security products distribution, and now contractors of all sizes count on ADI for convenient access to low voltage security products, local inventory, e-commerce ordering, as well as product training and the extension of credit.

SpinCo was the first company to introduce professionally-monitored residential smoke and carbon monoxide detection systems. We also invented the popular Dual Tech detector to detect both motion and heat from an intruder, and we were the first to widely deploy an alarm platform with cloud services to consumers and a mobile app for home security monitoring. As the world becomes more connected and mobile, we believe we are well positioned to extend our track record of delivering leading solutions for the home, combining our experience and expertise in hardware and sensor technology with a focus on world-class excellence in software.

Table of Contents

**Our Strengths**

We believe we benefit from the following competitive strengths:

**I. Global Leader with Iconic Brand and Unparalleled Presence in the Home**

Our iconic Honeywell brand is globally recognized for quality, innovation, security and reliability. Our products and solutions are present in over 150 million homes worldwide and we believe, based on management estimates, that we have the leading global market position in thermostats and residential security products and in security products distribution. Our solutions are installed in more than 15 million homes annually, allowing SpinCo to launch innovative technologies and services at scale. Our leading position extends to our connected platform, where we currently have over 4.7 million connected customers and 30 million sensors generating over 250 billion data transmissions annually.

The brand recognition associated with our installed base provides an additional opportunity for expansion with new connected products and solutions, and after the Spin-Off, we will retain the right to market and sell these products under the Honeywell Home brand pursuant to a 40 year license agreement with Honeywell. We are actively facilitating the transition of our customers and end-users from traditional to connected products by transforming our product portfolio, educating professional installers, creating value for OEMs and engaging consumers. Through these efforts, we have increased the portion of our product sales generated by connected solutions to approximately 37% in 2017. Gartner projects the connected things consumer segment will grow from approximately four billion in 2016 to more than 12 billion in 2020.

**II. Broadest Portfolio Providing Innovative End-to-End Solutions Across Comfort & Care and Security & Safety with Domain and Regulatory Standards Expertise and Differentiated Technology**

Our comprehensive Products portfolio provides end-to-end solutions that focus on critical needs within the home, where product reliability and ease of use are of utmost importance. This portfolio is comprised of traditional product offerings as well as a growing connected offering. Our deep domain expertise allows us to consistently provide trusted, tested and proven solutions that meet robust standards for cybersecurity and regulatory, as well as certification standards for devices addressing critical life safety needs. Our portfolio distinguishes us from our competitors, most of whom focus on niche solutions within the home. We provide solutions that address multiple consumer connected home needs under a common platform. As new devices and use-cases emerge, we believe the continuing development of our common platform across devices and all levels of connectivity (device, software, cloud, analytics and consumer interface) will become vital to ensure a seamless and reliable experience. Our broad portfolio also enables us to achieve profitable economies of scale in production, distribution and speed to market while making us a "go to" partner in the smart home ecosystem. However, after the Spin-Off our economies of scale with respect to the Products segment may be diminished with respect to certain purchasing activities, such as IT infrastructure and other support services, as compared to when we were a part of Honeywell.

Our innovation is supported by the SpinCo User Experience design group, which creates value by understanding and translating the needs of consumers and channel partners to develop intuitive, desirable and brand differentiated end-to-end experiences. Our products are regularly recognized in professionally judged international design competitions, winning the highly coveted iF Design Award, Red Dot Design Award and the IDEA Design Award over a dozen times since 2015.

We believe our product quality philosophy, which combines rigorous internal testing with external certification of our products, gives us a competitive advantage. Our laboratories are certified for testing to meet various industry standards, such as Underwriters Laboratories ("UL"), CSA Group and Intertek, combining

Table of Contents

SpinCo's internal testing resources with these agencies' global recognition to substantially reduce time-to-market for new solutions and to help ensure quality and reliability.

Our Secure Software Development Lifecycle initiative sets a robust protocol for establishing and enhancing product and system cybersecurity at the outset of, and throughout, product development and for responding to potential vulnerabilities in existing products.

We have over 1,300 engineers creating innovative solutions in dedicated software centers of excellence located in Atlanta, Georgia, Bengaluru and Madurai, India and other locations. Our deep domain expertise, proprietary technology and brands are protected by a combination of patents, trademarks, copyrights, trade secrets, non-disclosure agreements and contractual provisions. We own approximately 3,000 proprietary worldwide active patents and pending patent applications.

**III. Major Player in the Connected Home, Providing Solutions that Seamlessly Integrate with Leading Smart Home Players**

Our broad suite of connected solutions allows end customers to use mobile apps to control their thermostats, security systems, cameras and home automation devices such as electronic locks, lights and garage doors. We currently service over 4.7 million connected customers and transmit over 40 million consumer notifications, including more than two million security panel signals, every day. Adoption rates of our connected home solutions in the future will depend on a number of factors, including development of competitive and attractive products and the cost to customers of installation of new solutions or upgrade or renovation from older connected platforms or products. We are well positioned to leverage the growing demand for connected home solutions with our innovative products that are easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio. We expect to benefit from the over 17% compound annual growth rate ("CAGR") projected by IDC for connected thermostats over the next five years. Beyond that, our expanding portfolio of self-installed and self-monitored solutions such as the Smart Home Security System and Lyric Cameras are well positioned to participate in the growth of DIY solutions unit sales which according to IHS are expected to grow at a rate of over 20% per year from 2015 through 2020. In security, we continue to see strong support for our professionally-installed and monitored solutions.

Our systems integrate easily with the most widely used home automation systems, including Amazon Alexa®, Apple HomeKit®, Google Home®, and Samsung SmartThings®. We have one of the widest portfolios of Apple HomeKit enabled connected products and were the first company whose security system communicated with the Apple HomeKit ecosystem. We plan to continue to expand the range of our ecosystem partners through, among other things, the "Works with Honeywell" program which currently has 3,000 third party developers creating mobile apps that integrate with our solutions. Approximately one in six of our users already connect their systems to partner APIs (application programming interfaces) or solutions from other manufacturers through this program, and we believe that the openness of our architecture and adaptability of our products reduce contractor training and installation time, which further enhances end-user demand for our products.

**IV. Well Positioned to Serve Professional, OEM and Consumer Channels**

We have a multi-channel strategy to serve end-users through our professional contractors, OEMs, retail and e-commerce partners that allow end-users and consumers to purchase our products in ways that suit their needs, whether directly for DIY or through a professional installer.

Our security and Comfort & Care solutions are generally installed professionally, and our channel partners rely on our high-quality OEM parts for repair and remodel services to meet their customers' needs. We have deep and long-standing relationships, many of which extend over 20 years, with our global contractor base and we continually strengthen and renew these relationships through various channel management and training

Table of Contents

programs. For example, Contractor Pro (loyalty program) has over 29,000 participants and has been a leading industry program for 14 years. Our training programs include Homes University (technical training) and S.T.E.P.S. (sales training). In 2017, through our trainings, we educated more than 31,000 contractors and distributors.

We also have long-standing relationships with important OEMs and service providers such as ADT Security Services, United Technologies and A.O. Smith Corporation. A number of these relationships extend more than 25 years, including some spanning over 40 years. These deep partnerships are possible because OEMs value our design capabilities, innovation, domain expertise, supply chain capabilities and product quality.

Our DIY and self-install products are sold through retail channels including direct-to-consumer, e-commerce and brick and mortar locations, such as The Home Depot, Lowe's, Amazon.com, Walmart and Kingfisher. Our award-winning, best-selling thermostats are our most recognizable products and we market certain models directly to end consumers. Growth of the retail market, including the self-installed or do-it-yourself and e-commerce markets could affect our business by attracting new competitors. In addition, growth of these retail markets relative to the professional installation markets may negatively impact our margins.

**V. Pre-eminent Global Distributor of Security, Safety and Other Low Voltage Products**

According to IHS, ADI has the leading global market share in security equipment distribution. ADI distributes a wide offering of low voltage product categories comprised of over 350,000 products from over 1,000 manufacturers, all supported by a disciplined category management process to ensure our offerings are comprehensive and meet the needs of important customer segments. ADI's sizable market share, coupled with its breadth of inventory, creates opportunities for security contractors in particular to identify and purchase complementary ADI product offerings. ADI has over 200 stocking locations across 17 countries, supplemented by a customer friendly e-commerce platform that serves a customer base of over 100,000 contractors. Our extensive global footprint, combined with our strategic supplier relationships and focus on customer service, enables ADI to effectively serve both local and national customers with a range of product and service solutions. Additionally, we believe being the largest distributor of security equipment results in meaningful procurement efficiencies and that ADI's offering of a line of private label products further enhances our margin profile. However, after the Spin-Off our economies of scale with respect to the ADI business may be diminished with respect to certain purchasing activities, such as IT infrastructure and other support services, as compared to when we were a part of Honeywell.

*Manufacturers/Suppliers*

ADI is an important channel to market for third party manufacturers, whose products represent a significant majority of ADI's net sales. Through our global network of branches, inventory stocking programs and over 1,000 sales representatives, each of whom are highly trained in the brands and products that we distribute, we help manufacturers grow their business by facilitating direct and relevant engagement with our customers. We provide manufacturers the ability to offer in-store selling tools, such as interactive product displays and demonstration equipment, that help contractors evaluate products before purchase. We also offer branch stocking programs, which manufacturers use to make their products available in local markets, and provide local market inventory to serve contractors who require same day fulfillment. We believe this strong value proposition supports our position as a preferred channel to the market for leading industry manufacturers.

*Contractors/Customers*

ADI's global presence enables the delivery of supply chain services that help contractors reduce their procurement costs, better manage working capital through the advancement of credit, and operate more

Table of Contents

efficiently. For example, we offer services such as job kitting and staging, IP device programming, 24/7 pick-up anytime lockers and one-hour pick up service at ADI branches for online orders. We also offer convenient electronic ordering options, which accounted for approximately 17% of our ADI net sales for the fiscal year ended December 31, 2017.

These services and convenient ordering options, combined with our global presence of more than 200 stocking locations, allow us to serve a range of customers across geographies and be a single source of supply for contractors in the industry. We also help our customers grow their businesses through services such as pre-sales technical support, product certifications and trainings, project support and knowledgeable sales specialists including third party certified systems design specialists. In 2017, we offered more than 1,500 manufacturer and industry association led training opportunities. Many of our trainings were conducted at ADI Expos, which are the largest series of one-day product showcase and training events in the security industry where manufacturers present the latest technology to our customers. In 2017, we held more than 80 ADI Expos globally, delivering more than 300 Continuing Education Unit accredited programs.

**Inside an ADI Branch**




**VI. Consistent Revenue Growth and Strong Segment Performance Supported by Best-in-Class Honeywell Operating System ("HOS")**

We believe we have an attractive financial profile highlighted by our diversified revenue streams, strong segment profits and limited capital expenditure needs. We have delivered strong net sales growth over the period from 2013 to 2017, during which our net sales grew at a CAGR of 3.7%. In addition, the overall nature of our business is not capital intensive. For the years 2015 to 2017, our capital expenditures averaged 1.3% of our net sales.

Our financial performance is underpinned by the foundation of the Honeywell Operating System ("HOS"). HOS is ingrained in our organization and was founded on the lean and six sigma principles of continuous improvement in quality, delivery, cost, growth and innovation, and we plan to continue the HOS model after the

Table of Contents

Spin-Off. Our commitment to HOS has resulted in improved manufacturing productivity, more rapid product innovation and increased cost efficiencies. Important parts of our supply chain are strategically positioned in low cost regions that are located in or near key markets, consistent with a strategy of optimizing our supply chain and reducing delivery times. We have extended HOS concepts beyond lean manufacturing to our Distribution business, customer service and product development areas. We are applying these practices to develop global platforms to drive standardization for scale and cost efficiency, while at the same time incorporating key technologies and functionalities to drive speed and faster innovation for customers.

The Company's future growth may be limited due to the substantial indebtedness we expect to incur in connection with the Spin-Off and our payments under and the terms of the Indemnification and Reimbursement Agreement, as well as other risks which we may be presently unable to predict. See "Risk Factors."

## Our Growth Strategies

### I. Continue to Develop Innovative New Products and Solutions

We are developing new, innovative products and solutions across Comfort & Care and Security & Safety to grow our core business and differentiate ourselves from our competitors. Over the past three years, we have launched over 200 new products such as the Lyric family of connected home solutions, which includes thermostats, water leak detectors and awareness cameras. Our next generation alarm systems are expected to launch in late 2018. We have also launched cloud service offerings such as AlarmNet 360 and Total Connect 2.0 that allow consumers to control their systems remotely and contractors to provide efficient installation, maintenance and support services. We plan to further expand our portfolio by bringing to market an extensive set of new solutions for everyday problems, including remote furnace and boiler monitoring, smart vents, shut-off valve solutions, battery-operated video motion cameras and a residential global intrusion system. While we believe we are well positioned to capitalize on future trends and opportunities for innovation, the constantly evolving needs of our customers make it difficult to predict the pace or scope of future technological developments and our business may be affected if our new products or upgrades are not adopted by consumers.

We collaborate with consumer driven technology companies that have market-leading, complementary offerings such as August (door lock) to provide our customers with a seamless experience, which in turn supports customer acquisition and retention. Our systems are compatible with the most widely used home automation systems, including Amazon Alexa®, Apple HomeKit®, Google Home® and Samsung SmartThings®. Our compatibility with these platforms, some of which are owned by competitors and may compete with our solutions, has helped anchor our devices in millions of homes around the world, and we expect these relationships to continue to drive growth.

We employ Agile methods for software development, and are developing a single mobile application which, together with our global platforms, is designed to enable faster introduction of new products and implementation of new features while driving cost efficiencies through our global scale. At the same time, our Secure Software Development Lifecycle initiative sets a robust protocol for establishing and enhancing product and system cybersecurity at the outset of, and throughout, product development and for responding to potential vulnerabilities in existing products.

### II. Continue to Invest in and Grow with Professional and OEM Channel Partners

Our professional channel partners are an integral part of our sales and go to market strategy, and we invest in their growth to help drive our product sales. While the DIY and e-commerce markets for our solutions continue to grow, the vast majority of our products are installed professionally through our contractor and OEM channels. We plan to continue to extend growth in these professional channels through channel partner marketing

Table of Contents

programs, designing solutions with simplified installation and maintenance, and by helping contractors provide better service to the end customer. We plan to continue investment in these programs, as well as to provide enhanced sales and technical training, hiring and talent development for our contractors. For example, we host the annual CONNECT national conference, the largest independent dealer event in the security industry which gives security contractor partners the opportunity to share best practices and participate in specialized trainings. In addition, our plan is to continue to develop new relationships with leading channel partners, using these strategies to expand our presence in the market in all regions. We plan to continue to collaborate with OEM channel partners to provide design services, bring to market new technologies and deliver innovative, connected solutions that increase the lifetime value of their equipment. For example, we plan to deliver remote diagnostic capabilities for furnaces and water heaters that will enable technicians to resolve problems quickly and improve equipment uptime.

**III. Leverage Connected Home Expertise to Grow Software and Services Revenue**

We believe we are well positioned to benefit from the growing demand for connected solutions in homes due to our breadth of offerings, customer reach and strong brand. As consumer preferences drive increasing demand for connected home solutions, we believe our portfolio of end-to-end solutions will become increasingly important. Compelling connected home use cases require careful orchestration of multiple solutions to create an ecosystem that can be reliably accessed by consumers on a common platform. A seamless experience is a key differentiator relative to single-purpose product providers.

We plan to further enhance the customer value proposition by expanding remote functionality and real-time access to information and analytics that help the end-user control their home environment. We also intend to support this effort by extending our suite of proprietary service offerings as well as the range of options for controlling our devices in conjunction with third party systems. These innovations require that we navigate a complex and changing technological and regulatory landscape.

We have recently launched Software as a Service (“SaaS”) subscription services to consumers and intend to grow through services such as video storage, energy management and automated replenishment services. We also provide Platform as a Service (“PaaS”) offerings such as AlarmNet and Total Connect as fee-based services to the professional channel to enable remote management, control and monitoring of security systems, and plan to provide Honeywell Home, a global cloud and application platform for use by consumers and professional channel partners. We intend to consolidate our service offerings under Honeywell Home to increase scale efficiencies and improve speed to market with new features and enhancements and to drive global expansion of connected offerings and services. This platform is expected to make it easier for partners to integrate with our solutions, and allow SpinCo to host third party connected products in our cloud as well as enable faster implementation of new connected device products and services such as demand response and security monitoring services, allowing them to use the ecosystem of their choice and providing customers with energy savings, security and peace of mind. This platform will enable meaningful new services for our professional channels, our connected consumers and third parties that value the insights derived from data. Connectivity also enables data analytics and Data-as-a-Service (“DaaS”), which allows service technicians to provide after-sales services in the form of remote diagnostics and preventive maintenance and also enables them to resolve more problems on the first service call. Furthermore, our LifeCare telehealth DaaS enables remote patient monitoring and assists hospitals in significantly reducing readmission rates. We believe analytics provide a growing service revenue opportunity.

**IV. Expand Presence of Product Portfolio Through Alternative Channels and Geographies**

According to IHS, DIY and self-installed solutions unit sales are expected to grow by over 20% per year from 2015 through 2020. We are increasing our presence in retail and e-commerce channels by expanding our

Table of Contents

range of partners and the breadth of products with self-install capabilities, such as Lyric Thermostats and Cameras and the Honeywell Smart Home Security System.

We are developing new relationships with utilities, insurance providers, telecom and cable companies, homebuilders and property managers for multifamily residences, all of which are looking to provide value-added services to their customer base. For example, utilities offer our connected thermostats for energy demand management and insurance companies offer water leak detectors for risk mitigation of property damage and to reduce claims. Our connected home solutions help property managers remotely manage heating and cooling to reduce energy costs and help homebuilders improve the commercial value of new homes.

We plan to expand our presence in certain high growth regions ("HGRs") as favorable macro trends such as urbanization, improving living standards and growing internet and smartphone usage support adoption of our solutions. As large, growing markets, China and India present near-term opportunities to grow with our professional and OEM channel partners. Local legislation, driven by safety and security concerns, should also provide an opportunity to expand our presence in the Middle East and Latin American regions. We expect to localize our portfolio in HGRs, primarily by investing in tailored solutions to be competitive in local markets. However, competition in HGRs is often intense, which may affect our ability to execute our strategy.

**V. Grow ADI by Expanding Geographic Footprint, Product Categories and Services**

We intend to increase our geographic footprint for distribution by expanding our presence in markets where we already operate and entering selected new geographies within established distribution markets. We plan to implement this by opening new branches, deploying field sales and telesales teams, and taking advantage of e-commerce opportunities. For example, we have established a strong foundation in India, where according to IHS we already have a market share of approximately 18% and the distribution market is expected to grow at an approximate 11% CAGR from 2016 through 2021.

We intend to continue expanding our portfolio of core and adjacent products that are relevant and attractive to our customers to drive incremental sales across our existing footprint. In 2016, we added professional audio visual products, a growing and attractive product category to respond to customer demand and since then we have added many well-recognized brands to supplement our core product lines, including Kantech access control systems, Code Blue emergency communications, Seagate storage solutions, Sonos wireless audio, and LG professional displays. We have also added a line of new ADI private label products.

We intend to continue to introduce new value-added services and electronic ordering options to deepen relationships with our contractors. Recently, we launched a feature called "Shop My Branch", which allows customers to shop and place orders for products that are specifically available in their local branch, along with a one-hour pick up service for orders placed online or through the ADI app. We also plan to continue to improve our capabilities in electronic data interchange ("EDI") through our customized integration with SedonaOffice, a leading business management software for security companies, which allows contractors to establish electronic data transmission with ADI without requiring significant IT support.

**VI. Accelerate Growth Through Selective Strategic Acquisitions**

We intend to selectively pursue acquisitions that will broaden our product portfolio, gain access to new technologies, expand our geographic footprint and enhance our position in strategic market segments. For example, our acquisition in 2016 of RSI Video Technologies, a company that manufactures battery-powered cameras, allowed us to offer security solutions that combine video clips and motion sensors to provide video alarm verification, which mitigates false alarms, a key differentiator in our security platform. The substantial indebtedness we expect to incur in connection with the Spin-Off and our payments under and the terms of the Indemnification and Reimbursement Agreement may limit our ability to successfully pursue certain transactions.

Table of Contents

## Industry Overview

### Our Markets

Our business operations are conducted through two segments, Products and Distribution, serving multiple customer segments through multiple channels. We separate our Products segment into Comfort & Care and Security & Safety. Through ADI, we are a distributor of security and low voltage products such as video surveillance, intrusion, access control, and fire and life safety.

### Trends and Drivers

We believe our addressable markets benefit from several favorable trends:

- **Growth in Residential Construction and Renovation and Remodeling ("R&R").** Recent years in the U.S. have been characterized by rising new housing starts and an increase in investment in residential construction. According to the U.S. Census Bureau, new housing starts reached 1.2 million units in 2017, growing at a CAGR of approximately 10% since 2009. However, new housing starts remain significantly below the long term annual median of 1.5 million units since 1960, and we believe this represents significant growth potential over the next several years. The NAHB projects that new housing starts will grow at a CAGR of approximately 4% through 2019. Additionally, per the BEA, R&R spend, as measured by U.S. residential private fixed investment ("RPFI"), has grown at a CAGR of approximately 8% since 2009 to reach approximately $748 million in 2017. U.S. RPFI as a percentage of U.S. gross domestic product ("GDP") reached 3.9% in 2017, but remains below the long term median of 4.5% since 1960, which we believe represents significant growth potential over the next several years. Continued growth in residential housing spending has the potential to generate increased demand for home comfort and security products and services.
- **Energy Efficiency and Safety Megatrends.** Higher energy efficiency standards, driven by legislation, industry and consumer preferences, are leading to faster adoption of advanced energy control devices for furnaces, boilers and cooling equipment. Similarly, legislation in the area of fire safety is driving greater use of smoke and carbon monoxide detection and monitoring.
- **Internet of Things and Proliferation of Connected Devices.** The connectivity driven by the Internet and various communication protocols and technologies, such as Wi-Fi, Bluetooth, Z-Wave and Zigbee, has led to a massive expansion in the number of connected devices and enables the expansion of DIY solutions available to homeowners. According to Statista, the Internet of Things ("IoT") installed base worldwide is expected to grow from 20 billion connected devices in 2017 to over 75 billion connected devices in 2025. The desire to monitor and control devices remotely through cloud based applications is creating a growing market for connected solutions.
- **Mobile Lifestyle and Ubiquity of Broadband.** The proliferation of smartphones, tablets, and high speed, high bandwidth data networks including 4G, LTE, next generation 5G and other wireless technologies have changed the way people communicate, use information and manage various applications in their lives. Consumers are increasingly expecting a similarly convenient and mobile experience to manage their homes and businesses.
- **Cloud and Connectivity Infrastructure.** Advances in cloud technologies, software and wireless technologies have improved reliability and enabled efficient scale in a way that facilitates delivery of connected home services at an exponential rate. The ability to provide such services at an affordable price is helping grow the connected solution market.
- **Big Data and Data Analytics Capabilities**. The increasing number of connected devices, combined with the decreasing cost of connectivity, results in the generation of vast amounts of data related to

Table of Contents

equipment operation and consumer interaction with these devices. Synthesizing this information provides useful insight for manufacturers, contractors and service providers to diagnose and fix problems quickly, schedule preventive maintenance, and provide better customer service.

- **Need for Technical Expertise and Training.** New technologies, fueled by the proliferation of connected devices, require greater technical know-how to design, install and maintain. Contractors, therefore, increasingly rely on distribution partners and manufacturers to provide design services, product and services consultation and training to support their business needs.
- **Demand for Same Day Order Fulfillment**. Contractors are increasingly being asked to install complex inter-connected systems. As a result, they tend to place frequent orders across a broad range of low voltage technologies and depend on distributors and manufacturers to stock these products locally for immediate fulfillment.
- **Non-Residential Construction and Equipment Replacement**. The majority of our distribution sales are to non-residential end markets, driven by investment in construction and equipment replacement. Adjusted for inflation, total non-residential construction remains 14% below peak levels. According to JP Morgan estimates, annual non-residential construction is expected to grow at a CAGR of approximately 3 to 4% through 2019. Sustained strength and further growth in new and replacement non-residential construction could lead to increased demand for low voltage products.

**Addressable Markets**

*Products and Solutions*

The elements of the addressable market for Comfort & Care products and solutions are analyzed by IHS, Navigant and BSRIA. Based on management analysis of these sources, we believe that the total addressable market is approximately $10 billion in annual sales for 2018, of which $0.6 billion is comprised of services associated with Comfort & Care solutions which includes demand management and telehealth.

The elements of the addressable market for Security & Safety products and solutions are analyzed by IHS and management estimates. Based on management analysis of this source, we believe that the total addressable market is approximately $4.5 billion in annual sales for 2018, of which $1.1 billion is comprised of services associated with Security & Safety solutions which includes security monitoring services and remote video services.

*Distribution*

Based on IHS, we estimate that the global total addressable market for the security and low voltage products (which includes video surveillance, intrusion, access control and fire and life safety) distribution market is approximately $20 billion in sales in 2018.

**Corporate Information**

We are a Delaware corporation that was incorporated on April 24, 2018. Our principal executive offices are located at 1985 Douglas Drive North, Golden Valley, Minnesota 55422. Our telephone number is (763) 954-5204. Our website address is https://www.resideo.com. Information contained on, or connected to, our website or Honeywell's website does not and will not constitute part of this Information Statement or the Registration Statement on Form 10 of which this Information Statement is a part. We have included our website address only as an inactive textual reference and do not intend it to be an active link to our website. On July 24, 2018 the Company was renamed Resideo Technologies, Inc.

Table of Contents

**Risk Factors**

You should carefully consider all of the information in this Information Statement and each of the risks described in this Information Statement, which we believe are the principal risks that we face, including but not limited to:

- Risks relating to our business, as described in "Risk Factors—Risks Relating to Our Business,"
- Risks relating to the Spin-Off, as described in "Risk Factors—Risks Relating to the Spin-Off,"
- Risks relating to ownership of our common stock and the securities markets, as described in "Risk Factors—Risks Relating to Our Common Stock and the Securities Market."

Among the factors included in these risk factors are risks related to the substantial indebtedness expected to be incurred in connection with the Spin-Off, our payments under the Indemnification and Reimbursement Agreement, and the benefits associated with Honeywell's size, reputation and purchasing power that will not be available to us following the Spin-Off.

**Questions and Answers about the Spin-Off**

The following provides only a summary of certain information regarding the Spin-Off. You should read this Information Statement in its entirety for a more detailed description of the matters described below.

***Q: What is the Spin-Off?***

A: The Spin-Off is the method by which we will separate from Honeywell. In the Spin-Off, Honeywell will distribute to its stockholders all the outstanding shares of our common stock. Following the Spin-Off, we will be an independent, publicly traded company, and Honeywell will not retain any ownership interest in our Company.

***Q: What are the reasons for the Spin-Off?***

A: The Honeywell Board believes that the separation of the residential Comfort & Care and Security & Safety product portfolio and ADI Global Distribution from Honeywell is in the best interests of Honeywell stockholders and for the success of the Business for a number of reasons. Primarily, Honeywell and SpinCo will each have a more focused business and be better able to dedicate financial, management and other resources to leverage their respective areas of strength and differentiation once the Spin-Off occurs. See "The Spin-Off—Reasons for the Spin-Off" for more information.

***Q: Is the completion of the Spin-Off subject to the satisfaction or waiver of any conditions?***

A: Yes, the completion of the Spin-Off is subject to the satisfaction, or the Honeywell Board's waiver, of certain conditions. Any of these conditions may be waived by the Honeywell Board to the extent such waiver is permitted by law. In addition, Honeywell may at any time until the Share Distribution decide to abandon the Share Distribution or modify or change the terms of the Share Distribution. See "The Spin-Off—Conditions to the Spin-Off" for more information.

***Q: Will the number of Honeywell shares I own change as a result of the Spin-Off?***

A: No, the number of shares of Honeywell common stock you own will not change as a result of the Spin-Off.

Table of Contents

***Q: Will the Spin-Off affect the trading price of my Honeywell common stock?***

A: We expect the trading price of shares of Honeywell common stock immediately following the Share Distribution to be lower than the trading price immediately prior to the Share Distribution because the trading price will no longer reflect the value of SpinCo. There can be no assurance that, following the Share Distribution, the combined trading prices of the Honeywell common stock and our common stock will equal or exceed what the trading price of Honeywell common stock would have been in the absence of the Spin-Off.

It is possible that after the Spin-Off, the combined equity value of Honeywell and SpinCo will be less than Honeywell's equity value before the Spin-Off.

***Q: What will I receive in the Spin-Off in respect of my Honeywell common stock?***

A: As a holder of Honeywell common stock, you will receive a dividend of one share of our common stock for every six shares of Honeywell common stock you hold on the Record Date (as defined below). The distribution agent will distribute only whole shares of our common stock in the Spin-Off. See "The Spin-Off—Treatment of Fractional Shares" for more information on the treatment of the fractional share you may be entitled to receive in the Share Distribution. Your proportionate interest in Honeywell will not change as a result of the Spin-Off. For a more detailed description, see "The Spin-Off."

***Q: What is being distributed in the Spin-Off?***

A: Honeywell will distribute approximately 123,451,420 shares of our common stock in the Spin-Off, based on the approximately 740,708,523 shares of Honeywell common stock outstanding as of September 18, 2018. The actual number of shares of our common stock that Honeywell will distribute will depend on the total number of shares of Honeywell common stock outstanding on the Record Date. The shares of our common stock that Honeywell distributes will constitute all of the issued and outstanding shares of our common stock immediately prior to the Share Distribution. For more information on the shares being distributed in the Spin-Off, see "Description of Our Capital Stock—Common Stock."

***Q: What is the record date for the Share Distribution?***

A: Honeywell will determine record ownership as of the close of business on October 16, 2018, which we refer to as the "Record Date."

***Q: When and how will the Share Distribution occur?***

A: The Share Distribution will be effective as of 12:01 a.m., New York City time, on October 29, 2018, which we refer to as the "Share Distribution Date." On the Share Distribution Date, Honeywell will release the shares of our common stock to the distribution agent to distribute to Honeywell stockholders. The whole shares of our common stock will be credited in book-entry accounts for Honeywell stockholders entitled to receive the shares in the Share Distribution.

***Q: What do I have to do to participate in the Share Distribution?***

A: You are not required to take any action in order to participate, but we urge you to read this Information Statement carefully. All holders of Honeywell's common stock as of the Record Date will participate in the Share Distribution. Holders of Honeywell common stock on the Record Date will not need to pay any cash or deliver any other consideration, including any shares of Honeywell common stock, in order to receive shares of our common stock in the Share Distribution. In addition, no stockholder approval of the Share Distribution is required. We are not asking you for a vote and request that you do not send us a proxy card.

Table of Contents

***Q: If I sell my shares of Honeywell common stock on or before the Share Distribution Date, will I still be entitled to receive shares of SpinCo common stock in the Share Distribution?***

A: If you sell your shares of Honeywell common stock before the Record Date, you will not be entitled to receive shares of SpinCo common stock in the Share Distribution. If you hold shares of Honeywell common stock on the Record Date and you decide to sell them on or before the Share Distribution Date, you may have the ability to choose to sell your Honeywell common stock with or without your entitlement to receive our common stock in the Share Distribution. You should discuss the available options in this regard with your bank, broker or other nominee. See "The Spin-Off—Trading Prior to the Share Distribution Date" for more information.

***Q: How will fractional shares be treated in the Share Distribution?***

A: The distribution agent will not distribute any fractional shares of our common stock in connection with the Spin-Off. Instead, the distribution agent will aggregate all fractional shares into whole shares and sell the whole shares in the open market at prevailing market prices on behalf of Honeywell stockholders entitled to receive a fractional share. The distribution agent will then distribute the aggregate cash proceeds of the sales, net of brokerage fees, transfer taxes and other costs, pro rata to these holders (net of any required withholding for taxes applicable to each holder). We anticipate that the distribution agent will make these sales in the "when-issued" market, and "when-issued" trades will generally settle within two trading days following the Share Distribution Date. See "How will our common stock trade?" for additional information regarding "when-issued" trading and "The Spin-Off—Treatment of Fractional Shares" for a more detailed explanation of the treatment of fractional shares. The distribution agent will, in its sole discretion, without any influence by Honeywell or us, determine when, how, through which broker-dealer and at what price to sell the whole shares of our common stock. The distribution agent is not, and any broker-dealer used by the distribution agent will not be, an affiliate of either Honeywell or us.

***Q: What are the U.S. federal income tax consequences to me of the Share Distribution?***

A: For U.S. federal income tax purposes, no gain or loss will be recognized by, or be includible in the income of, a Holder (as defined in "The Spin-Off—Material U.S. Federal Income Tax Consequences of the Spin-Off") as a result of the Share Distribution, except with respect to any cash (if any) received by Honeywell stockholders in lieu of fractional shares. After the Share Distribution, Honeywell stockholders will allocate their basis in their Honeywell common stock held immediately before the Share Distribution between their Honeywell common stock and our common stock in proportion to their relative fair market values on the date of Share Distribution.

***Q: Does SpinCo intend to pay cash dividends?***

A: Subject to the sole discretion of our Board and the considerations discussed below, once the Spin-Off is effective, we anticipate paying cash dividends on our common stock, in an amount yet to be determined. Among the items we will consider when establishing a dividend policy will be the capital needs of our business and opportunities to retain future earnings for use in the operation of our business and to fund future growth. Additionally, the terms of the indebtedness we intend to incur in connection with the Spin-Off and of the Indemnification and Reimbursement Agreement each will limit our ability to pay cash dividends. We will also be subject to certain cash payment obligations, including under the Indemnification and Reimbursement Agreement with Honeywell. There is no guarantee that any dividends will be declared by our Board, or if so declared, will be continued in the future. See "Dividend Policy" for more information.

Table of Contents

***Q: Will SpinCo incur any debt prior to or at the time of the Share Distribution?***

A: In connection with the Spin-Off, we expect to incur substantial indebtedness in an aggregate principal amount of approximately $1,225 million in the form of senior secured term loans and senior unsecured notes, the net proceeds of which will be received by Honeywell substantially concurrently with the consummation of the Spin-Off. We also intend to enter into a revolving credit facility to be available for our working capital and other cash needs from time to time in an aggregate committed amount of $350 million. The terms of such indebtedness are subject to change and will be finalized prior to the closing of the Spin-Off. See "Capitalization" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for more information.

***Q: How will our common stock trade?***

A: We intend to apply to list our common stock on the New York Stock Exchange under the symbol "REZI." Currently, there is no public market for our common stock.

We cannot predict the trading prices for our common stock before, on or after the Share Distribution Date. We anticipate that trading in our common stock will begin on a "when-issued" basis as early as one trading day prior to the Record Date for the Share Distribution and will continue up to and including the Share Distribution Date. "When-issued" trading in the context of a spin-off refers to a sale or purchase made conditionally on or before the Share Distribution Date because the securities of the spun-off entity have not yet been distributed. "When-issued" trades generally settle within two trading days after the Share Distribution Date. On the first trading day following the Share Distribution Date, any "when-issued" trading of our common stock will end and "regular-way" trading will begin. Regular-way trading refers to trading after the security has been distributed and typically involves a trade that settles on the second full trading day following the date of the trade. See "The Spin-Off—Trading Prior to the Share Distribution Date" for more information.

***Q: Do I have appraisal rights in connection with the Spin-Off?***

A: No. Holders of Honeywell common stock are not entitled to appraisal rights in connection with the Spin-Off.

***Q: Who is the transfer agent and registrar for SpinCo common stock?***

A: Equiniti Trust Company is the transfer agent and registrar for SpinCo common stock.

***Q: Are there risks associated with owning shares of SpinCo common stock?***

A: Yes, there are substantial risks associated with owning shares of SpinCo common stock. Accordingly, you should read carefully the information set forth under "Risk Factors" in this Information Statement.

Table of Contents

***Q: Where can I get more information?***

A: If you have any questions relating to the mechanics of the Share Distribution, you should contact the distribution agent at:

Equiniti Trust Company
1110 Centre Pointe Curve Suite 101
Mendota Heights, Minnesota 55120

Before the Spin-Off, if you have any questions relating to the Spin-Off, you should contact Honeywell at:

Investor Relations
Honeywell International Inc.
115 Tabor Road
Morris Plains, New Jersey 07950

After the Spin-Off, if you have any questions relating to SpinCo, you should contact us at:

Investor Relations
Resideo Technologies, Inc.
1985 Douglas Drive North
Golden Valley, Minnesota 55422
(763) 954-5204

Table of Contents

## RISK FACTORS

You should carefully consider all of the information in this Information Statement and each of the risks described below, which we believe are the principal risks that we face. Some of the risks relate to our business, others to the Spin-Off. Some risks relate principally to the securities markets and ownership of our common stock.

Any of the following risks, as well as other risks not currently known to us or that we currently consider immaterial, could materially and adversely affect our business, financial condition, results of operations and cash flows and the actual outcome of matters as to which forward-looking statements are made in this Information Statement.

The following risk factors are not necessarily presented in order of relative importance and should not be considered to represent a complete set of all potential risks that could affect us.

### Risks Relating to Our Business

***We have no operating history as an independent, publicly traded company, and our historical combined financial information is not necessarily representative of the results we would have achieved as an independent, publicly traded company and may not be a reliable indicator of our future results.***

We derived the historical combined financial information included in this Information Statement from Honeywell's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent, publicly traded company during the periods presented, or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Honeywell's broader corporate organization, and Honeywell performed various corporate functions for us. Our historical combined financial information reflects allocations of corporate expenses from Honeywell for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent publicly traded company.
- We will enter into transactions with Honeywell that did not exist prior to the Spin-Off, such as Honeywell's provision of transition and other services and brand licensing agreements, and undertake indemnification obligations, which will cause us to incur new costs. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell."
- Our historical combined financial information does not reflect changes that we expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our business. As part of Honeywell, we enjoyed certain benefits from Honeywell's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we may lose these benefits after the Spin-Off. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses, or access capital markets on terms as favorable to us as those we obtained as part of Honeywell prior to the Spin-Off, and our business, financial condition, results of operations and cash flows may be adversely affected. In addition, our historical combined financial data do not include an allocation of interest expense comparable to the interest expense we will incur as a result of the Reorganization Transactions and the Spin-Off, including interest expense in connection with the incurrence of indebtedness at the Company.

We have no operating history as an independent, publicly traded company. Furthermore, while the individualized businesses or their predecessors have a history of product development going back over 100 years, we have neither operated with a residential Comfort & Care, Security & Safety, or home solutions business focus, nor combined that with a distribution business in the past, and we may not be successful in continuing to operate and grow our business with a narrower focus and outside the broader Honeywell operating environment.

We may face operational inefficiencies as we continue to integrate our business after the Spin-Off. Following the Spin-Off, we will also face additional costs and demands on management's time associated with being an independent, publicly traded company, including costs and demands related to corporate governance, investor and public relations and public reporting. In addition, while we have been profitable as part of Honeywell, we cannot assure you that our profits will continue at a similar level when we are an independent, publicly traded company. For additional information about our past financial performance and the basis of presentation of our Combined Financial Statements, see "Selected Historical and Unaudited Pro Forma Combined Financial Data," "Unaudited Pro Forma Combined Financial Statements," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical Combined Financial Statements, and the Notes thereto, included elsewhere in this Information Statement.

***We operate in highly competitive markets.***

We operate in highly competitive markets and compete directly with global, national, regional and local providers of our products, services and solutions including manufacturers, distributors, service providers, retailers and online commerce providers. The most significant competitive factors we face are product and service innovation, reputation of our Company and brands, sales and marketing programs, product performance, quality of product training and events, product availability, speed and accuracy of delivery, service and price, technical support, furnishing of customer credit and product reliability and warranty, with the relative importance of these factors varying among our two segments and products. In addition to current competitive factors, there may be new market entrants with non-traditional business and customer service models or disruptive technologies and products, resulting in increased competition and changing business dynamics. See "Risks Relating to Our Business—The market for connected home solutions is fragmented, highly competitive, continually evolving and subject to disruptive technologies." Existing or future competitors may seek to gain or retain market share by reducing prices, and we may be required to lower our prices or may lose business, which could adversely affect our business, financial condition, results of operations and cash flows. Also, to the extent that we do not meet changing customer preferences or demands or other market changes, or if one or more of our competitors introduces new products, becomes more successful with private label products, online offerings or establishes exclusive supply relationships, our ability to attract and retain customers could be adversely affected.

To remain competitive, we will need to invest continually in product development, marketing, customer service and support, manufacturing and our distribution networks. We may not have sufficient resources to continue to make such investments and we may be unable to maintain our competitive position. In addition, we anticipate that we may have to reduce the prices of some of our products to stay competitive, potentially resulting in a reduction in the profit margin for, and inventory valuation of, these products. It is possible that competitive pressures resulting from consolidation, including customers taking manufacturing or distribution in house and consolidation among our customers, could affect our growth and profit margins. In addition, competitors in certain high growth regions may have lower costs than we do due to lower local labor costs and favorable government regulation. Countries in high growth regions may have differing codes and standards impacting the cost of doing business and may have fewer protections for, or offer less ability to utilize, existing intellectual property. We may not be able to compete effectively with new competitors from such regions. Existing or future competitors also may seek to compete with us for acquisitions, which could have the effect of increasing the price for, and reducing the number of, suitable acquisitions.

***Our competitors may have more substantial resources than we do.***

Our current and potential competitors may have greater resources, access to capital, including greater research and development or sales and marketing funds, more customers, and more advanced technology platforms, particularly with our newly-launched products and services in connected services and in our newer geographic regions. Many of our competitors may be able to develop offerings that have alternate income streams such as data and advertising revenue which we may not have, and therefore may be able to offer their service products for a lower price or for free and offset any business losses with profits from the rest of their

Table of Contents

broad product portfolios. Some of our competitors may also be able to deliver their service solutions more quickly to market than we can by capitalizing on technology developed in connection with their substantial existing service models. In addition, some of our competitors have significant bases of customer adoption in other services and in online content, which they could use as a competitive advantage in the growing connected home solutions services market or otherwise in our product or distribution businesses. New entrants into the wholesale distribution business or products business could include companies with significant presence in Homes and could put us at a competitive disadvantage if they enter the market. Current and future competitive pressures may cause us to reduce our prices or lose market share, or could negatively affect our cash flow, all of which could have an adverse effect on our business, financial condition, results of operations and cash flows.

***The market for connected home solutions is fragmented, highly competitive, continually evolving and subject to disruptive technologies.***

The market for connected home solutions is fragmented, highly competitive, continually evolving and subject to disruptive technologies. Cable and telecommunications companies actively focusing on competing in connected home solutions and expanding into the monitored security space, and large technology companies expanding into connected home solutions, could result in pricing pressure, a shift in customer preferences towards the services of these companies and a reduction in our market share. Many of these companies already have significant presence in residential environments and may be able to leverage this presence into the connected home solution. New market entrants with non-traditional business and customer service models or disruptive technologies and products could result in increased competition and changing business dynamics. Continued pricing pressure from these competitors or other new entrants, failure to successfully partner with these companies or failure to achieve pricing based on competitive advantages could prevent us from maintaining competitive price points for our products and services resulting in loss of customers or in our inability to attract new customers and have an adverse effect on our business, financial condition, results of operations and cash flows. Based on these or other factors described herein, we may not be able to grow our connected home solutions business as anticipated.

***Competition in the distribution business is significant.***

If end customers of our distribution business are not convinced of the reputation of our Company and brands and of our ability to compete on product performance, quality of product training and events, product availability, speed and accuracy of delivery, service and price, technical support, credit availability and product reliability and warranty, we could lose business, which could have an adverse effect on our business, financial condition, results of operations and cash flows. In addition, most of our products are available from several sources and our customers tend to have relationships with several distributors. Furthermore, if retail outlets, including online commerce or big box stores were to increase their participation in wholesale distribution markets, or if buying patterns for our products become more retail or e-commerce based through these outlets, we may not be able to effectively compete, which could have an adverse effect on our business, financial condition, results of operations and cash flows. Also, other sources of competition are buying groups that consolidate purchasing power, which if successful could have an adverse effect of our business, financial condition, results of operations and cash flows. The security industry is also undergoing consolidation as many residential and commercially-focused companies combine to leverage product and vertical market expertise and expand their service footprint. In recent years, this trend of consolidation has accelerated, and many of our customers have combined with companies with whom we have little or no prior relationship. In addition, if manufacturers of products sold through our distribution business increase their direct-to-customer or retail distribution, it could have an adverse effect on our business, financial condition, results of operations and cash flows.

***Growth of the retail market and e-commerce market could adversely affect our business.***

Our solutions are primarily sold through a network of professional contractors, distributors, OEMs, retailers and online merchants. Growth of the retail market, including the self-installed or do-it-yourself retail markets and

Table of Contents

e-commerce markets could affect our business by attracting new competitors, some of whom may be larger and have more resources than we do. In addition, growth of these retail markets relative to the professional installation markets may negatively impact our margins, which could negatively affect our cash flow and have an adverse effect on our business, financial condition and results of operations and cash flows.

***Technology in our markets is changing rapidly and our future results and growth are largely dependent upon our ability to develop new technologies and introduce new products that achieve market acceptance.***

Technology in our markets is in a continuing and often rapid state of change as new technologies and enhancements to existing technologies continue to be introduced both in our traditional and connected product markets. There is increasing customer demand for connected home solutions and the development of new technologies as well as increasing emphasis on product efficiency in our traditional products. Our future results depend upon a number of factors, including our ability to (i) identify emerging technological trends, (ii) develop and maintain competitive products, in part by adding innovative features that differentiate our products from those of our competitors and prevent commoditization of our products, (iii) grow our market share, (iv) develop, manufacture and bring compelling new products to market quickly and cost-effectively, (v) find and effectively partner with home connected device platforms and (vi) attract, develop and retain individuals with the requisite technical expertise and understanding of customers' needs to develop new technologies and introduce new products.

We can offer no assurance that we will be able to keep pace with technological developments. It is also possible that one or more of our competitors could develop a significant technical advantage or breakthrough that allows them to provide additional or superior products or services, or to lower their price for similar products or services, that could put us at a competitive disadvantage. Our inability to predict the growth of and respond in a timely way to customer preferences and other developments could have an adverse effect on our business, financial condition, results of operations and cash flows.

Our customer service model has historically been based largely around individualized product support, primarily through telephone communications. Although this allows a high degree of personalized and interactive dialogue, it differs from the highly-scalable and rapid electronic response systems pioneered by technology companies that operate in or may enter our markets. As such, we may be disadvantaged in terms of cost and overall customer satisfaction if we are unable to successfully adapt our support model to changes in customer expectations for our products.

Our connected solutions platform allows for integration and connection to third party solutions and for application designs. This interoperability is designed to reduce the barriers to using our software and panels with different devices, but could also have the effect of encouraging competitors to produce devices that operate on our platform, which could lower sales of our products. Adoption rates of our connected home solutions will also depend on a number of factors, including development of competitive and attractive products and the cost to customers of installation of new solutions or upgrade or renovation from older connected platforms or products. In addition to our application products, we rely on third party designers to create applications connecting our products to other platforms. If developers choose not to develop on our system, the accessibility of our solutions across other systems, devices and platforms might not expand in line with our competitors.

In addition, if we are unable to effectively protect our trade secreted or proprietary technology from third parties or other competitors that may have access to our technology through our open architecture model, our business and competitive position may be harmed.

We expect that the growth of our business may depend on our development of new technologies in response to legislation and regulation related to efficiency standards, safety and security and environmental concerns. Agreement on legislation and regulation may be slow and implementation of any such reforms may take many years. As a result, any growth related to solutions that are responsive to such reforms may be delayed.

Table of Contents

***Our connected solutions and other products and services rely on enabling technology, connectivity, software and intellectual property that in certain instances we do not own or control.***

Our operations depend upon third party technologies, software and intellectual property. Additionally, our connected solutions and our security monitoring services may be accessed through the Internet and using connectivity infrastructures (for example, 4G, LTE and next generation 5G and other wireless technologies) and cloud-based technologies. We rely on cellular and other telecommunications and network providers to communicate signals to and from customers using our connected solution applications in a timely, cost-efficient and consistent manner.

The failure of one or more of these providers or technologies to transmit and communicate signals in a timely manner could affect our ability to provide services to our customers or for our connected solution products to work as designed. There can be no assurance that third party telecommunications and network providers and signal-processing centers will continue to transmit and communicate signals to or from our third party providers and the monitoring stations without disruption. Any such disruption, particularly one of a prolonged duration, could have an adverse effect on our business, financial condition, results of operations and cash flows. In addition, failure to renew contracts with existing providers or licensors of technology, software, intellectual property or connectivity solutions, or to contract with other providers or licensors on commercially acceptable terms or at all may adversely impact our business, financial condition, results of operations and cash flows.

***Market and economic conditions may adversely affect the economic conditions of our customers, demand for our products and services and our results of operations.***

As a global provider of Comfort & Care and Security & Safety products, services and technologies for the home, as well as a worldwide wholesale distributor of security and low voltage electronics products, our business is affected by the performance of the global new and repair and remodel construction industry. Our markets are sensitive to changes in the regions in which we operate and are also influenced by cyclical factors such as interest rates, inflation, availability of financing, consumer spending habits and confidence, employment rates and other macroeconomic factors over which we have no control and which could adversely affect our business, financial condition, results of operations and cash flows. For example, downward changes in the housing market would be expected to depress sales to professional contractors and result in substantially all of our professional contractor and OEM customers lowering production schedules, which would have a direct impact on our business, financial condition, results of operations and cash flows.

Our sales are also affected by fluctuations in demand for Internet-connected devices. If the market for connected home solutions grows more slowly than anticipated, whether as a result of unfavorable economic conditions, uncertain geopolitical environments, budgetary constraints of our consumers or other factors, we may not be able to increase our revenue and earnings.

***Portions of our revenue and cash flow are seasonal, which could cause our financial results and liquidity to fluctuate.***

A portion of our revenue is seasonal, which impacts the comparison of our financial condition and results of operations on a quarter-by-quarter basis. Sales activity is generally lowest during the first calendar quarter when it is winter in the majority of our geographical markets.

***Global climate change could negatively affect our business.***

Responses to climate change may cause a shift away from fossil fuels to alternative power sources. Many of our thermal solutions are designed for application with oil and gas systems. A shift away from fossil fuels could affect our OEM customers business and result in a loss of business for them and for us. If we fail to adapt our solutions to alternative power sources, it could have an adverse effect on our business, financial condition, results of operations and cash flows.

Table of Contents

Cooler than normal summers and warmer than normal winters may depress our sales. In addition, stable temperatures may result in less wear and tear on cooling and heating equipment which may depress Comfort & Care sales. Demand for our products and our services, particularly our products and solutions geared toward the home construction repair and remodel industry, including our Comfort & Care business, is seasonal and strongly affected by the weather. Cooler than normal summers depress our sales of replacement controls for heating, ventilation, cooling and water heating equipment in certain larger markets. Similarly, warmer than normal winters have the same effect on our heating products and services. Increased public awareness and concern regarding global climate change have led to our development of social responsibility, sustainability and other business policies, which in some instances are more restrictive than current laws and regulations. In light of the current regulatory environment, we also face uncertainty with respect to future climate change initiatives, including regional and/or federal requirements to reduce greenhouse gas emissions.

Moreover, climate change itself creates financial risk to our business. Unseasonable weather conditions may impact the availability and cost of materials needed for manufacturing and increase insurance and other operating costs and, especially in the case of disruptions at our ADI stores, our ability to make sales during the pendency of site closures. These factors may influence our decisions to construct new facilities or maintain existing facilities in areas that are prone to physical climate risks. We could also face indirect financial risks passed through the supply chain, and process disruptions due to physical climate changes could result in price modifications for our products and the resources needed to produce them.

***Failure to achieve and maintain a high level of product and service quality could damage our image with customers and negatively impact our results.***

Product and service quality issues could result in a negative impact on customer confidence in our Company and our brand image. If our product and service offerings do not meet applicable safety standards or our customers' expectations regarding safety or quality, we could experience lost sales and increased costs and be exposed to legal, financial and reputational risks. Actual, potential or perceived product safety concerns could expose us to litigation as well as government enforcement action. In addition, in the event that any of our products fail to perform as expected, we may face direct exposure to warranty and product liability claims or may be required to participate in a government or self-imposed recall involving such products which could result in costly product recalls and other liabilities. As a result, our reputation as a manufacturer and distributor of high quality products and services could suffer and impact customer loyalty.

We maintain strict quality controls and procedures, including the testing of raw materials and safety testing of selected finished products. However, we cannot be certain that our testing will reveal latent defects in our products or the materials from which they are made, which may not become apparent until after the products have been sold into the market. We also cannot be certain that our suppliers will always eliminate latent defects in products we purchase from them. Accordingly, there is a risk that product defects will occur, which could require a product recall. Product recalls can be expensive to implement, and, if a product recall occurs during the product's warranty period, we may be required to replace the defective product. In addition, a product recall may damage our relationship with our customers and we may lose market share with our customers.

In many jurisdictions, product liability claims are not limited to any specified amount of recovery. If any such claims or contribution requests exceed our available insurance or if there is a product recall, there could be an adverse impact on our results of operations. In addition, a recall claim could require us to review our entire product portfolio to assess whether similar issues are present in other product lines, which could result in significant disruption to our business and could have a further adverse impact on our business, financial condition, results of operations and cash flows. We cannot assure you that we will not experience any material warranty or product liability claim losses in the future or that we will not incur significant costs to defend such claims. There can be no assurance that we will have adequate reserves to cover any recalls, repair and replacement costs. Our customers that are not end-users of our products, including our OEM customers, may face similar claims or be obliged to conduct recalls of their own, which could result in lost business to us, or these customers may seek contribution from us for defects.

Table of Contents

***As an independent, publicly traded company, we may not enjoy the same benefits that we did as a segment of Honeywell.***

Currently, our business is integrated with the other businesses of Honeywell. Thus, we have benefitted from Honeywell's size, brand, reputation and purchasing power in procuring various goods and services and have shared economies of scope and scale in costs, employees, supplier relationships and customer relationships. Following the Spin-Off, we will be a smaller and less diversified company than Honeywell, and will not have access to financial and other resources comparable to those of Honeywell prior to the Spin-Off. As a stand-alone company, we will not have the same product diversity or scale and may not have similar purchasing power or access to capital markets, and we may be unable to obtain goods and services at the prices and terms obtained prior to the Spin-Off, which could decrease our overall profitability. Uncertainty related to the Spin-Off may lead customers and other parties with which we currently do business or may do business in the future to terminate or attempt to negotiate changes in our existing business relationships, or cause them to consider entering into business relationships with parties other than us.

***Our business is dependent upon substantial investment in information technology.***

The efficient operation of our business will require substantial investment in technology infrastructure systems, including enterprise resource planning ("ERP") systems, supply chain management systems, digital commerce systems and connected solutions platforms. The inability to fund, acquire and implement these systems may impact our ability to respond effectively to changing customer expectations, manage our business, scale our solutions effectively or impact our customer service levels, which may put us at a competitive disadvantage and negatively impact our financial results. Repeated or prolonged interruptions of service, due to problems with our systems or third party technologies, whether or not in our control, could have a significant negative impact on our reputation and our ability to sell products and services.

We are highly dependent upon a variety of internal computer and telecommunication systems to operate our business. In order to support our continued operational ability and growth, we must maintain and continuously upgrade our ERP and other information systems, which are critical to our operational, accounting and financial functions. Failure to properly or adequately invest in and maintain these systems could result in the diversion of management's attention and resources and could materially adversely affect our operating results and impact our ability to efficiently manage our business. Our existing information systems may become obsolete, requiring us to transition our systems to a new platform. Such a transition would be time consuming and costly, and would require management resources in excess of those we currently have.

Further, as we are dependent upon our ability to gather and promptly transmit accurate information to key decision makers, our business, results of operations, financial condition and cash flows may be adversely affected if our information systems do not allow us to transmit accurate information, even for a short period of time. Failure to properly or adequately address these issues could impact our ability to perform necessary business operations, which could adversely affect our reputation, competitive position, business, results of operations, financial condition and cash flows.

We must attract and retain qualified people to operate our systems, expand and improve them, integrate new programs effectively with our existing programs, and convert to new systems efficiently when required. Any disruption to our business due to such issues, or an increase in our costs to cover these issues that is greater than what we have anticipated, could have an adverse effect on business, financial condition, results of operations and cash flows. Our customers rely increasingly on our electronic ordering and information systems as a source for product information, including availability and pricing. There can be no assurance that our systems will not fail or experience disruptions, and any significant failure or disruption of these systems could prevent us from making sales, ordering and delivering products and otherwise conducting our business. Many of our customers use our website to check real-time product availability, see their customized pricing and place orders, and to access our connected solution platforms. Any material disruption of our website, our connected solution applications, or the Internet in general could impair our order processing or prevent our manufacturers and customers from accessing information and cause us to lose business or damage our reputation.

Table of Contents

***Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial conditions, results of operations and cash flows.***

Our business depends on the processing of data (some of which contains personal data), including the transfer of data between our affiliated entities, to and from our business partners and customers, and with third-party service providers. The laws and regulations relating to personal data constantly evolve, as federal, state and foreign governments continue to adopt new measures addressing data privacy and processing (including collection, storage, transfer, disposal and use) of personal data. Moreover, the interpretation and application of many existing or recently enacted privacy and data protection laws and regulations in the European Union, the U.S. and elsewhere are uncertain and fluid, and it is possible that such laws and regulations may be interpreted or applied in a manner that is inconsistent with our existing data management practices or the features of our products and services. Any such new laws or regulations, any changes to existing laws and regulations and any such interpretation or application may affect demand for our products and services, impact our ability to effectively transfer data across borders in support of our business operations, or increase the cost of providing our products and services. Additionally, any actual or perceived breach of such laws or regulations may subject us to claims and may lead to administrative, civil or criminal liability, as well as reputational harm to SpinCo or our employees. We could also be required to fundamentally change our business activities and practices, or modify our products and services, which could have an adverse effect on our business, financial condition, results of operations and cash flows.

In the U.S., various laws and regulations apply to the collection, processing, transfer, disposal, unauthorized disclosure and security of personal data. For example, data protection laws passed by most states within the U.S. require notification to users when there is a security breach for personal data. Additionally, the Federal Trade Commission ("FTC") and many state attorneys general are interpreting federal and state consumer protection laws as imposing standards for the online collection, use, transfer and security of personal data. In particular, our privacy policy and other statements we publish provide promises and assurances about privacy and security that could subject us to potential regulatory action or other liabilities if such statements are found to be deceptive or misrepresentative of our privacy and data security practices. The U.S. Congress and state legislatures, along with federal regulatory authorities have recently increased their attention to matters concerning personal data, and this may result in new legislation which could increase the cost of compliance. In addition to government regulation, privacy advocacy and industry groups may propose new and different self-regulatory standards that either legally or contractually apply to us or our customers.

In the European Union, some of our operations are subject to the European Union's General Data Protection Regulation ("GDPR"), which took effect from May 25, 2018. The GDPR introduces a number of new obligations for subject companies and we will need to continue dedicating financial resources and management time to GDPR compliance in the future. The GDPR enhances the obligations placed on companies that control or process personal data of residents of the European Union including, for example, expanded disclosures about how personal data is to be used, new mechanisms for obtaining consent from data subjects, new controls for data subjects with respect to their personal data (including by enabling them to exercise rights to erasure and data portability), limitations on retention of personal data and mandatory data breach notifications. Additionally, the GDPR places companies under new obligations relating to data transfers and the security of the personal data they process, as well as in relation to third-party data processors they use. The GDPR provides that supervisory authorities in the European Union may impose administrative fines for certain infringements of the GDPR of up to EUR 20,000,000 or 4% of a company's total, worldwide, annual turnover of the preceding financial year, whichever is higher. Individuals who have suffered damage as a result of a subject company's non-compliance with the GDPR also have the right to seek compensation from such company. Given the breadth of the GDPR, compliance with its requirements is likely to continue to require significant expenditure of resources on an ongoing basis, and there can be no assurance that the measures we have taken for the purposes of compliance will be successful in preventing breach of the GDPR. Given the potential fines, liabilities and damage to our reputation in the event of an actual or perceived breach of the GDPR, such a breach may have an adverse effect on our business, financial condition, results of operations and cash flows.

Table of Contents

Outside of the U.S. and the European Union, many jurisdictions have adopted or are adopting new data privacy laws that may impose further onerous compliance requirements, such as data localization, which prohibits companies from storing outside the jurisdiction data relating to resident individuals. The proliferation of such laws within the jurisdictions in which we operate may result in conflicting and contradictory requirements, particularly in relation to evolving technologies. Any failure to successfully navigate the changing regulatory landscape could result in legal liability or impairment to our reputation in the marketplace, which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

Privacy-related claims or lawsuits initiated by governmental bodies, customers or other third parties, whether meritorious or not, could be time consuming, result in costly regulatory proceedings, litigation, penalties and fines, or require us to change our business practices, sometimes in expensive ways, or other potential liabilities. Unfavorable publicity regarding our privacy practices could injure our reputation, harm our ability to keep existing customers or attract new customers or otherwise adversely affect our business, assets, revenue, brands and reputation which may have an adverse effect on our business, financial condition, results of operations and cash flows.

***Internal system or service failures, including as a result of cyber or other security incidents, could disrupt business operations, result in the loss of critical and confidential information, and adversely impact our reputation, our business, financial condition, results of operations and cash flows. Our connected products potentially expose our business to cybersecurity threats.***

We create, deploy and maintain information technology ("IT") and engineering systems, some of which involve sensitive information, including personal data, trade secrets and other proprietary information. In addition, our connected products potentially expose our business to cybersecurity threats. As a result, we are subject to systems, service or product failures, not only resulting from our own failures or the failures of third party service providers, natural disasters, power shortages or terrorist attacks, but also from exposure to cyber or other security threats. Most of the jurisdictions in which we operate have laws and regulations relating to data security and protection of information. See "Risks Relating to Our Business—Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial condition, results of operations and cash flows." We have certain measures to protect our information systems against unauthorized access and disclosure of personal information and of our confidential information and trade secrets and confidential information and trade secrets belonging to our customers. However, there is no assurance that the security measures we have put in place will be effective in every case.

Global cybersecurity threats and incidents can range from uncoordinated individual attempts to gain unauthorized access to IT systems to sophisticated and targeted measures known as advanced persistent threats directed at our products, our customers, vendors and/or our third party service providers, including cloud providers. There has been an increase in the frequency and sophistication of cyber and other security threats we face, and our customers are increasingly requiring cyber and other security protections and standards in our products, and we may incur additional costs to comply with such demands. While we have experienced, and expect to continue to experience, these types of threats and incidents, none of them to date have been material to our business.

We sell security and life safety solutions, which are designed to secure the safety of our subscribers and their residences or commercial properties. If these solutions fail for any reason, including due to defects in our software, a carrier outage, a failure of our network operating center, a failure on the part of one of our service provider partners, user error or cybersecurity incident, we could be subject to liability and reputational damage for such failures and our business could suffer.

We seek to deploy comprehensive measures to deter, prevent, detect, respond to and mitigate these threats, including identity and access controls, data protection, vulnerability assessments, product software designs that we believe are less susceptible to cyber-attacks, continuous monitoring of our IT networks and systems and

maintenance of backup and protective systems. Despite these efforts, cyber and other security incidents, depending on their nature and scope, could potentially result in the misappropriation, destruction, corruption, misuse or unavailability of personal data, critical data and confidential or proprietary information (our own or that of third parties), product failure and the disruption of business operations. Moreover, employee error or malfeasance, faulty password management or other intentional or inadvertent non-compliance with our security protocols may result in a breach of our information systems. Our efforts to protect our company data and the information we receive may also be unsuccessful due to software "bugs," system errors or other technical deficiencies, or vulnerabilities of our vendors and service providers. Cyber and other security incidents aimed at the software embedded in our products could lead to third party claims that our product failures have caused a similar range of damages to our customers, and this risk is enhanced by the increasingly connected nature of our products.

The potential consequences of a material cyber or other security incident include financial loss, reputational damage, negative media coverage, litigation with third parties, including class-action litigation, regulatory investigations or actions, theft of intellectual property, fines, diminution in the value of our investment in research, development and engineering, and increased cyber and other security protection and remediation costs due to the increasing sophistication and proliferation of threats, which in turn could adversely affect our competitiveness, business, financial condition, results of operations and cash flows. In addition to any costs resulting from contract performance or required corrective action, these incidents could generate increased costs or loss of revenue if our customers choose to postpone or cancel previously scheduled orders or decide not to renew any of our existing contracts. Breaches in security could also result in a negative impact for our customers and thus affect our relations with our customers, injure our reputation and harm our ability to keep existing customers and to attract new customers. Some jurisdictions have enacted law requiring companies to notify individuals of data security breaches involving certain types of personal data. Such mandatory disclosures could lead to negative publicity and may cause our current and prospective customers to lose confidence in the effectiveness of our data security measures.

We could incur significant costs in protecting our data centers and servers against, or remediating, security vulnerabilities or breaches and cyber-attacks. Additionally, the costs related to cyber or other security incidents may not be fully insured or indemnified by other means. The successful assertion of a large claim against us with respect to a cyber or other security incident could seriously harm our business. Even if not successful, these claims could result in significant legal and other costs and may be a distraction to our management and harm our customer relationships and reputation.

***The failure of our network operations centers and data back-up systems could put our users at risk.***

Many of our solutions operate with a hosted architecture, and we update our solutions regularly while our solutions are operating. If our solutions and/or upgrades fail to operate properly, our solutions could stop functioning for a period of time, which could put our users at risk. Our ability to keep our business operating is highly dependent on the proper and efficient operation of our network operations centers and data back-up systems. Although our network operations centers have back-up computer and power systems, if there is a catastrophic event, adverse weather conditions, natural disaster, terrorist attack, security breach or other extraordinary event, we may be unable to provide our subscribers with uninterrupted monitoring service. Furthermore, because data back-up systems are susceptible to malfunctions and interruptions (including those due to equipment damage, power outages, human error, computer viruses, computer hacking, data corruption and a range of other hardware, software and network problems), we cannot guarantee that we will not experience data back-up failures in the future. A significant or large-scale, security breach, malfunction or interruption of our network operations centers or data back-up systems could adversely affect our ability to keep our operations running efficiently. If a malfunction or security breach results in a wider or sustained disruption, it could have an adverse effect on our reputation, business, financial condition, results of operations or cash flows. See "Risks Relating to Our Business—Internal system or service failures, including as a result of cyber or other security incidents, could disrupt business operations, result in the loss of critical and confidential information, and

Table of Contents

adversely impact our reputation, our business, financial condition, results of operations and cash flows. Our connected products potentially expose our business to cybersecurity threats."

***Disruptions, or the need to relocate any of our facilities, could significantly disrupt our business.***

We manufacture many of products at single-location production facilities and rely on certain suppliers who also may concentrate production in single locations. A disruption, including work stoppage, supply chain failures, natural disasters, weather-related disruptions, or other disruptions at one or more of our production facilities could have adverse effects on our business, financial condition, results of operations and cash flows. Moreover, due to unforeseen circumstances or factors beyond our control, we may be forced to relocate our operations from one or more of our existing facilities to new facilities and may incur substantial costs, experience program delays and sacrifice proximity to customers and geographic markets as a result, potentially for an extended period of time. Any significant interruption in production at one or more of these facilities could negatively impact our ability to deliver our products to our customers.

A significant disruption in the supply of a key component due to a work stoppage or other disruption at one of our suppliers or any other supplier could impact our ability to make timely deliveries to our customers and, accordingly, have an adverse effect on our business, financial condition, results of operations and cash flows. Where a manufacturer halts production because of another supplier failing to deliver on time, or as a result of a work stoppage or other disruption, it is unlikely we will be fully compensated, if at all.

***We rely on certain suppliers of materials and components for our products.***

Certain of the materials and components for products we manufacture and those manufactured on our behalf are supplied by single or limited source suppliers. Our business, results of operations, financial condition and cash flows could be adversely affected by disruptions in supply from our third party suppliers, whether from supply chain disruptions or if suppliers lack sufficient quality control or if there are significant changes in their financial or business condition. See "Business—Materials and Suppliers."

If our third party suppliers and manufacturers fail to deliver products, parts and components of sufficient quality on time and at reasonable prices, we could have difficulties fulfilling our orders or stocking our distribution centers on similar terms or at all, sales and profits could decline, and our commercial reputation could be damaged. Our ability to manage inventory and meet delivery requirements may be constrained by our suppliers' inability to scale production and adjust delivery of long-lead-time products during times of volatile demand. Our inability to fill our supply needs would jeopardize our ability to fulfill obligations which could, in turn, result in reduced sales and profits, contract penalties or terminations, and damage to customer relationships.

If we fail to adequately assess the creditworthiness and operational reliability of existing or future suppliers, if there is any unanticipated deterioration in their creditworthiness and operational reliability, or if our suppliers do not perform or adhere to our existing or future contractual arrangements, any resulting inability to otherwise obtain the supplies or our inability to enforce the terms of the contract or seek other remedies could have an adverse effect on our financial condition and results of operations and could cause us to incur significant liabilities.

***We obtain many of the products for our ADI distribution business from third parties.***

Most of the low voltage products we distribute through our ADI business are manufactured by third parties. As a result, terminations of supply or services agreements or a change in terms or conditions of sale from one or more of our key manufacturers could negatively affect our operating margins, net sales or the level of capital required to fund our operations. We have standard distribution contracts with our manufacturers which are subject to renegotiation or non-renewal. Our dependence on third party manufacturers leaves us vulnerable to having an inadequate supply of demanded products, price increases, late deliveries and poor product quality.

Table of Contents

Our ability to obtain particular products or product lines in the required quantities and our ability to fulfill customer orders on a timely basis is critical to our success. Our manufacturers have experienced product supply shortages from time to time due to the inability of certain of their suppliers to supply certain products on a timely basis. As a result, we have experienced, and may in the future continue to experience, short-term shortages of specific products. We cannot provide any assurances that manufacturers will be able to maintain an adequate supply of products to fulfill all of our customer orders on a timely basis. Our reputation, sales and profitability may suffer if manufacturers are not able to provide us with an adequate supply of products to fulfill our customer orders on a timely basis or if we cannot otherwise obtain particular products or a product lines.

Manufacturers who currently distribute their products through us may decide to shift to or substantially increase their existing distribution with other distributors, their own dealer networks, or directly to resellers or end-users. Increasingly, our manufacturers are combining, leaving us with fewer alternative sources. This could result in more intense competition as distributors strive to secure distribution rights with these manufacturers, which could have an adverse impact on our business, financial condition, results of operations and cash flows. If we are unable to maintain an adequate supply of products, or if manufacturers do not regularly invest in, introduce to us, and/or make new products available to us for distribution, our net sales and gross profit could suffer considerably.

***Raw material price fluctuations, the ability of key suppliers to meet quality and delivery requirements, or catastrophic events can increase the cost of our products and services, impact our ability to meet commitments to customers and cause us to incur significant liabilities.***

The cost and availability of raw materials (such as copper, steel, aluminum, plastics, printed circuit boards, semiconductors and passive electronics) is a key factor in the cost of our products. Our inability to offset material price inflation through increased prices to customers, formula or long-term fixed price contracts with suppliers, productivity actions or through commodity hedges could adversely affect our business, financial condition, results of operations and cash flows. Supply interruptions could arise from shortages of raw materials, effects of economic, political or financial market conditions on a supplier's operations, labor disputes or weather conditions affecting products or shipments, transportation disruptions, information system disruptions or other reasons beyond our control.

The profitability of our business is also dependent upon the efficiency of our supply chain. An inefficient or ineffective supply chain strategy or operations could increase operational costs, reduce profit margins and adversely affect our business, financial condition, results of operations and cash flows. Short- or long-term capacity constraints or financial distress at any point in our supply chain could disrupt our operations and adversely affect our financial performance, particularly when the affected suppliers and manufacturers are the sole sources of products that we require or that have unique capabilities, or when our customers have directed us to use those specific suppliers and manufacturers. We incur significant freight expenses related to the purchase of products for distribution and fluctuations in fuel costs may cause us to incur additional expense.

***We are subject to the economic, political, regulatory, foreign exchange and other risks of international operations.***

Our international sales are approximately 32% of our net sales for the year ended December 31, 2017. Our international geographic footprint subjects us to many risks including: exchange control regulations; wage and price controls; antitrust/competition and environmental regulations; employment regulations; foreign investment laws; monetary and fiscal policies and protectionist measures that may prohibit acquisitions or joint ventures, establish local content requirements, or impact trade volumes; import, export and other trade restrictions (such as embargoes); violations by our employees of anti-corruption laws (despite our efforts to mitigate these risks); changes in regulations regarding transactions with state-owned enterprises; nationalization of private enterprises; natural and man-made disasters, hazards and losses; backlash from foreign labor organizations related to our repositioning or restructuring actions; violence, civil and labor unrest; acts of terrorism; and our ability to hire and maintain qualified staff and maintain the safety of our employees in these regions. For more information on

our international footprint, see "Business—Properties." Additionally, certain of the markets in which we operate have adopted increasingly strict data privacy and data protection requirements or may require local storage and processing of data or similar requirements. See "Risks Relating to Our Business—Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial condition, results of operations and cash flows."

Instabilities and uncertainties arising from the global geopolitical environment can negatively impact our business. The U.K.'s referendum to leave the European Union, commonly known as "Brexit," has caused and may continue to cause interest rate, exchange rate and other market and economic volatility. As negotiations relating to the future terms of the U.K.'s relationship with the European Union proceed, our manufacturing operations and the businesses of our customers and suppliers could be negatively impacted if tariffs, new compliance requirements or other restrictions (such as embargoes) are imposed on the free flow of goods to and from the U.K. Similarly, the implementation of more restrictive trade policies or the renegotiation of existing trade agreements in the U.S. or other countries where we sell or manufacture large quantities of products and services or procure supplies and other materials incorporated into our products could negatively impact our business results of operations, cash flows and financial condition. For example, a government's adoption of "buy national" policies or retaliation by another government against such policies, such as tariffs or quotas, could have a negative impact on our results of operations.

Tariffs, quotas and other barriers to trade could adversely affect the business of our customers and suppliers, which could in turn negatively impact our net sales and results of operations. In addition, a substantial volume of our Comfort & Care products benefit from the favorable tariff rates established under the North American Free Trade Agreement, renegotiation of which is the subject of on-going discussion among the parties thereto. These and other instabilities and uncertainties arising from the global geopolitical environment, along with the cost of compliance with increasingly complex and often conflicting regulations worldwide, can impair our flexibility in modifying product, marketing, pricing or other strategies for growing our businesses, as well as our ability to improve productivity and maintain acceptable operating margins.

As a result of our global presence, a portion of our net sales are denominated in currencies other than the U.S. Dollar, whereas a significant amount of our payment obligations, including pursuant to the Indemnification and Reimbursement Agreement and Tax Matters Agreement are denominated in U.S. Dollars, which exposes us to foreign exchange risk. We monitor and seek to reduce such risk through hedging activities; however, foreign exchange hedging activities bear a financial cost and may not always be available to us or be successful in eliminating such volatility. Finally, we generate significant amounts of cash outside of the United States that is invested with financial and non-financial counterparties. While we employ comprehensive controls regarding global cash management to guard against cash or investment loss and to ensure our ability to fund our operations and commitments, a material disruption to the counterparties with whom we transact business could expose us to financial loss.

We operate in many high-growth regions that require modifications to our products based on local building codes, regulations, standards, certifications and other factors, which may impact our cost to serve and profitability as we continue our penetration into these regions.

***We operate in regulated markets.***

Many of our products, technologies and services, in particular products implicating life safety, are subject to regulatory agency oversight, such as the U.S. Consumer Product Safety Commission, the FTC, the Federal Communications Commission ("FCC"), the U.S. Environmental Protection Agency, the European Union's CE mark ("CE"), the European Community directive "Waste Electrical and Electronic Equipment Directive" ("WEEE Directive"), the regulation Registration, Evaluation, Authorization and Restriction of Chemicals ("REACH"), the Gulf Mark standard for low voltage electric products required in Gulf Member States ("G Mark"), the EurAsian Conformity Mark for member countries of Customs Union ("EAC"), the China Compulsory Certification ("CCC") and the Regulatory Compliance Mark for Australia which may contribute to

Table of Contents

our compliance expenses. Many state regulators, such as the California Department of Toxic Substances Control, also have an impact on our markets. For example, 23 states have specific mercury thermostat regulations which require business compliance due to decades of sales of thermostats containing mercury. Mandatory collection requirements, penalties and federal legislation can have an impact on the expense. It is also important that our products comply with various third party standards, such as those of UL.

In addition, the FCC recently repealed net neutrality rules. Because the repeal is recent, we do not yet know the impact it may have on our business. Interference with our services or higher charges to customers by broadband service providers for using our products and services could cause us to lose existing subscribers, impair our ability to attract new subscribers and adversely affect our business, financial condition, results of operations and cash flows.

In addition, telecommunication service providers are subject to extensive regulation in the markets where we operate or may expand in the future. The FTC and the FCC have issued regulations that place restrictions on, among other things, unsolicited automated telephone calls to residential and wireless telephone subscribers by means of automatic telephone dialing systems and the use of prerecorded or artificial voice messages. If our service provider partners were to take actions in violation of these regulations, such as telemarketing to individuals on the "Do Not Call" registry, we could be subject to fines, penalties, private actions or enforcement actions by government regulators. Although we have taken steps to insulate ourselves from any such wrongful conduct by our service provider partners and require our service provider partners to comply with these laws and regulations, no assurance can be given that we will not be exposed to liability as result of our service provider partners' conduct. Changes in the applicable laws, regulations and technology affecting telecommunication services could require us to change the way we operate, which could increase costs or otherwise disrupt our operations, which in turn could adversely affect our business, financial condition, results of operations and cash flows.

Some local governments impose assessments, fines, penalties and limitations on either customers or companies for false alarms. Certain municipalities have adopted ordinances under which both permit and alarm dispatch fees are charged directly to companies. Service providers generally pass these charges on to customers but may not be able to collect if customers are unwilling or unable to pay them, and this may require the service provider to suspend or terminate service and as a result adversely affect our business, financial condition, results of operations and cash flows. Furthermore, our customers may elect to terminate or not renew services if assessments, fines, or penalties for false alarms become significant. If more local governments were to impose assessments, fines or penalties or requirements for response such as video verification, it could adversely affect our customer base, business, financial condition, results of operations and cash flows.

The net sales and margins of our business are directly impacted by government regulations, including safety, performance and product certification regulations, particularly those driven by customer demands and national approvals, as well as changes in trade agreements and environmental and energy efficiency standards. Growth within emerging markets may be adversely impacted by the inability to acquire and retain qualified employees where local employment law mandates may be restrictive.

***Our growth strategy is dependent on expanding our distribution business.***

Part of our growth strategy is to expand our geographic footprint and to increase the types and number of products sold through ADI. Our ability to open new ADI locations in both existing and new markets could be affected by local regulations and the availability of suitable real estate. We may not be able to acquire from manufacturers certain product lines that we are interested in adding to our distribution business, and if we are able to add products, they may not result in sales as expected and may not be profitable. If we are unable to execute on any part of our growth strategy, our business, financial condition, results of operations and cash flows could be adversely affected.

Table of Contents

***Our profitability and results of operations may be adversely affected by a significant failure or inability to comply with the specifications and manufacturing requirements of our OEM customers.***

We generally have to qualify, and are required to maintain our status, as a supplier for each of our OEM customers. This is a lengthy process that involves the inspection and approval by a customer of our engineering, documentation, manufacturing and quality control procedures before that customer will place volume orders. If we are successful in qualifying, there is no assurance that any OEM will purchase products from us. Given the length of this qualification process, the risk that our business, operating results and financial condition would be adversely affected by the loss of, or any reduction in orders by, any of our significant OEM customers is increased. Accordingly, the success of our business depends on OEMs continuing to outsource the manufacturing of critical products to us. It would be difficult to replace lost revenue resulting from the loss of, or the reduction, cancellation or delay in purchase orders by, any one of these customers, whether due to their decision to not continue to outsource all or a portion of their critical parts for their capital equipment, their giving market share to our competitors or otherwise. A significant failure or inability to comply with customer specifications and manufacturing requirements or delays or other problems with existing or new products (including program launch difficulties) could result in financial penalties, cancelled orders, increased costs, loss of sales, loss of customers or potential breaches of customer contracts, which could have an adverse effect on our profitability and results of operations. We have in the past lost business from OEM customers who have taken the manufacturing of our products in-house or given market share to our competitors. If we are unable to replace revenue from lost OEM customers it could have an adverse impact on our financial position, results of operation and cash flows. In addition, if we are unable to obtain additional business from OEMs the potential growth of our business results could be adversely affected.

***We may not be able to retain or expand relationships with certain large customers.***

A number of our customers are large and contribute significantly to our net sales and operating income. Consolidation or change of control, particularly among our OEM customers, or a decision by any one or more of our customers to outsource all or most manufacturing work to a single equipment manufacturer, may concentrate our business in a limited number of customers and expose us to increased risks relating to dependence on a smaller number of customers. By virtue of our largest customers' size and the significant portion of revenue that we derive from them, they are able to exert significant influence in the negotiation of our commercial agreements and the conduct of our business with them. Furthermore, there is significant consolidation of companies focused on security products, and we have had customers combine with companies with whom we have little or no prior relationship, putting us at risk of loss of sales. If we are unable to retain and expand our business with these large customers on favorable terms, our business, financial condition, results of operations and cash flows will be adversely affected.

***We have credit exposure to our customers.***

Any adverse trends in our customers' businesses could cause us to suffer credit losses. As is customary in our markets, we extend credit to our customers. A portion of our customers are small contractors with inconsistent cash flow. As such, they rely on us to provide their businesses with credit and to carry specified inventory to support their operations. We may be unable to collect on receivables if our customers experience decreases in demand for their products and services, do not manage their businesses adequately, or otherwise become less able to pay due to adverse economic conditions or refinancing events. While we evaluate our customers' qualifications for credit and monitor our extensions of credit, these efforts cannot prevent all credit losses, and credit losses negatively impact our performance. In addition, for financial reporting purposes, we establish reserves based on our historical experience of credit losses. To the extent that our credit losses exceed those reserves, our financial performance will be negatively impacted beyond what is expected. If there is deterioration in the collectability of our receivables, or we fail to take other actions to adequately mitigate such credit risk, our earnings, cash flows and our ability to utilize receivable-based financing could deteriorate. In addition, if we are unable to extend credit to our customers, we may experience loss of certain contracts or business.

Table of Contents

In addition, extending credit to international customers involves additional risks. It is often more difficult to evaluate credit of a customer or obtain credit protections in our international operations. Also, credit cycles and collection periods are typically longer in our international operations. We are also subject to credit risk associated with customer concentration. If one or more of our largest customers were to become bankrupt or insolvent, or otherwise were unable to pay for our products, we may incur significant write-offs of accounts that may have an adverse effect on our business, financial condition, results of operations and cash flows. As a result of these factors and other challenges in extending credit to international customers, we generally face greater credit risk from sales internationally compared to domestic sales.

***Failure to protect our intellectual property could adversely affect our business, financial condition and results of operations and cash flows.***

We rely on a combination of patents, copyrights, trademarks, tradenames, trade secrets and other proprietary rights, as well as contractual arrangements, including licenses, to establish, maintain and protect our intellectual property rights. Effective intellectual property protection may not be available in every country in which we do business. We may not be able to acquire or maintain appropriate registered or unregistered intellectual property in all countries in which we do business. Companies that license intellectual property we own or use, especially, the Honeywell brand, also may take actions that diminish the value of our intellectual property or harm our reputation.

Our intellectual property rights may not be sufficient to permit us to take advantage of some business opportunities. As a result, we may be required to change our plans or acquire the necessary intellectual property rights, which could be costly. Furthermore, our ability to enforce our intellectual property rights in emerging markets may be limited by legal or practical considerations that have not historically affected our business in markets with more established intellectual property protection systems.

The protection of our intellectual property may be expensive and time-consuming. There can be no assurance that the steps we take to maintain and protect our intellectual property will be adequate, or that third parties will not infringe, circumvent, misappropriate or violate our intellectual property. If our efforts to protect our intellectual property are not adequate, the value of our goods and services may be harmed, which could have an adverse effect on our business, financial condition, results of operations and cash flows. Any impairment of our intellectual property, including due to changes in U.S. or worldwide intellectual property laws or the absence of effective legal protection or enforcement measures, could adversely impact our business, financial condition, results of operations and cash flows.

***We may incur material losses and costs as a result of intellectual property infringement actions that may be brought against us.***

As we adopt new technology, we face an inherent risk of exposure to the claims of others that we have allegedly violated their intellectual property rights. Successful claims that we infringe on the intellectual property rights of others could require us to enter into royalty or licensing agreements on unfavorable terms, incur substantial monetary liability, be prohibited preliminarily or permanently from further use of the intellectual property in question or require us to change our business practices to stop the infringing use, which could limit our ability to compete effectively. In addition, our customer agreements can require us to indemnify the customer for infringement. The time and expense of defending against these claims, whether meritorious or not, may have a material and adverse impact on our profitability and can be time-consuming and costly and divert management’s attention and resources away from our businesses. Furthermore, the publicity we may receive as a result of infringing intellectual property rights may damage our reputation and adversely impact our existing customer relationships and our ability to develop new business.

We cannot assure you that we will not experience any material intellectual property claim losses in the future or that we will not incur significant costs to defend such claims.

Table of Contents

***Failure to increase productivity through sustainable operational improvements, as well as an inability to successfully execute repositioning projects or to effectively manage our workforce, may reduce our profitability or adversely impact our businesses.***

Our profitability and margin growth are dependent upon our ability to drive sustainable improvements. In addition, we seek productivity and cost savings benefits through repositioning and other projects, such as consolidation of manufacturing facilities, transitions to cost-competitive regions, workforce reductions, asset impairments, product line rationalizations and other cost-saving initiatives. Risks associated with these actions include delays in execution of the planned initiatives, additional unexpected costs, realization of fewer than estimated productivity improvements and adverse effects on employee morale. We may not realize the full operational or financial benefits we expect and the recognition of these benefits may be delayed and these actions may potentially disrupt our operations. In addition, organizational changes, attrition, labor relations difficulties, or workforce stoppage could have an adverse effect on our business, reputation, financial condition, results of operations and cash flows.

***We may not be able to successfully acquire and integrate other products, technologies or businesses or realize the anticipated benefits of acquisitions.***

As part of our strategy, we expect to evaluate acquisitions and strategic investments in products or technologies and businesses that could complement or expand our business or otherwise offer growth or cost-saving opportunities. An investment in, or acquisition of, complementary products or technologies or businesses in the future could materially decrease the amount of our available cash or require us to seek additional equity or debt financing, particularly if we face competition for acquisition opportunities in the various markets in which we operate.

In connection with any acquisitions we complete, we may have difficulty integrating the acquired business, may not achieve the synergies or other benefits we expected to achieve, and we may incur unanticipated expenses, write-downs, impairment charges or unforeseen liabilities that could negatively affect our business, financial condition, results of operations and cash flows. Further, contemplating or completing an acquisition and integrating an acquired product or technology or business could divert management and employee time and resources from other matters.

***We depend on the recruitment and retention of qualified personnel, and our failure to attract and retain such personnel could adversely affect our business, financial condition, results of operations and cash flows.***

Due to the complex nature of our business, our future performance is highly dependent upon the continued services of our employees and management who have significant industry expertise, including our engineering and design personnel and trained sales force. Our performance is also dependent on the development of additional personnel and the hiring of new qualified engineering, design, manufacturing, marketing, sales and management personnel for our operations. Competition for qualified personnel in our markets is intense, and we may not be successful in attracting or retaining qualified personnel. The loss of key employees, our inability to attract new qualified employees or adequately train employees, or the delay in hiring key personnel could negatively affect our business, financial condition, results of operations and cash flows.

***We may not be able to obtain additional capital that we need in the future on favorable terms or at all.***

We may require additional capital in the future to finance our growth and development, upgrade and improve our manufacturing capabilities, implement further marketing and sales activities, fund ongoing R&D activities, satisfy regulatory and environmental compliance obligations and national approvals requirements, satisfy post-Spin-Off indemnity obligations to Honeywell, and meet general working capital needs. Our capital requirements will depend on many factors, including acceptance of and demand for our solutions, the extent to which we invest in new technology and R&D projects and the status and timing of these developments. If our access to capital were to become constrained significantly, or if costs of capital increased significantly, due to

Table of Contents

lowered credit ratings, prevailing business conditions, the volatility of the capital markets or other factors, our business, financial condition, results of operations and cash flows could be adversely affected.

Moreover, we have historically relied on Honeywell for assistance in satisfying our capital requirements. After the Spin-Off, we will not be able to rely on the earnings, assets or cash flow of Honeywell, and Honeywell will not provide funds to finance our capital requirements. As a result, after the Share Distribution, we will be responsible for obtaining and maintaining sufficient working capital and other funds to satisfy our cash requirements independent of Honeywell, and debt or equity financing may not be available to us on terms we find acceptable, if at all. Even if we are able to obtain financing or access the capital markets, incurring additional debt may significantly increase our interest expense and financial leverage, and our level of indebtedness could restrict our ability to fund future development and acquisition activities. Also, regardless of the terms of our debt or equity financing, our agreements and obligations under the Tax Matters Agreement that address compliance with Section 355 of the Internal Revenue Code of 1986, as amended (the "Code"), may limit our ability to issue stock. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Tax Matters Agreement." We believe that, at the time of the Spin-Off, we will have adequate capital resources to meet our projected operating needs, capital expenditures and other cash requirements, including payments to Honeywell under the Indemnification and Reimbursement Agreement. However, we may need additional capital resources in the future and if we are unable to obtain sufficient resources for our operating needs, capital expenditures and other cash requirements for any reason, our business, financial condition and results of operations could be adversely affected. See "—Risks Relating to the Spin-Off—We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent, publicly traded company, and we may experience increased costs after the Spin-Off."

***We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities.***

In connection with the Spin-Off, we intend to enter into an Indemnification and Reimbursement Agreement (as defined below), pursuant to which we will have an obligation to make cash payments to Honeywell in amounts equal to 90% of payments, which include amounts billed ("payments"), with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages (the "liabilities") in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales (the "recoveries"). The amount payable by the Company in respect of such liabilities arising in respect of any given year will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). Payments in respect of the liabilities arising in a given year will be made quarterly throughout such year on the basis of an estimate of the liabilities and recoveries provided by Honeywell. Following the end of any such year, Honeywell will provide us with a calculation of the amount of payments and the recoveries actually received. Subject to the aforementioned cap, if the amount of payments (net of recoveries) is greater than the previously provided estimate, we will pay Honeywell the amount of such difference (the "true-up payment") and, if the amount of the previously provided estimate is greater than the amount of payments (net of recoveries), we will receive a credit in the amount of such difference that will be applied to future payments. If a true-up payment exceeds $30 million, such true-up payment will be made in equal installments, payable on a monthly basis following the date the true-up payment is due.

For example, if in any given year, Honeywell's estimated annual payments that are within the scope of the Indemnification and Reimbursement Agreement totaled $140 million, and if Honeywell's estimated associated recoveries totaled $20 million, then our quarterly payment obligations in respect of that year would be 90% of the net amount (or $108 million) divided by four, or $27 million. If, for such year, Honeywell's annual payments

Table of Contents

actually totaled $165 million, and if Honeywell's associated recoveries actually totaled $10 million, our additional true-up payment obligation in respect of that year would be 90% of the net amount (or $139.5 million) minus the sum of our quarterly payments, or $108 million, resulting in an aggregate payment in respect of such year of $31.5 million, which, because it exceeds $30 million, would be made in equal installments, payable on the true-up date and on a monthly basis following the date the true-up payment is due. However, if in any given year, Honeywell's estimated annual payments totaled $175 million, and the estimated associated recoveries totaled $5 million, then our quarterly payment obligations in respect of that year would be capped at $35 million even though 90% of the net amount (or $153 million) divided by four is higher at $38.25 million, resulting in an aggregate maximum payment for such year equal to the cap of $140 million (regardless of whether or not actual liabilities (net of recoveries) exceeded the previously provided estimates).

Historically, Honeywell's environmental claim and remediation payments in respect of the sites that are within the scope of the Indemnification and Reimbursement Agreement for the years 2017, 2016 and 2015, including any legal fees, were approximately $200 million, $221 million and $259 million, respectively, and Honeywell's associated receipts for insurance and amounts received by Honeywell in connection with affirmative claims, contributions and property sales for 2017, 2016 and 2015 were approximately $2 million, $10 million and $18 million, respectively.

In the event that Honeywell completes a transfer to a third party in respect of a portion of the remediation liabilities that are within the scope of the Indemnification and Reimbursement Agreement, the Company will be obligated to pay 90% of the amount paid or payable by Honeywell in connection with such liability transfer, less any applicable recoveries. Amounts payable in respect of liability transfers for any given year are paid in the year following the year in which they occur, at the time that the true-up payment is made. If the amounts payable in respect of a liability transfer, together with any true-up payment, exceeds $30 million, such amounts will be made in equal installments, payable on the true-up date and on a monthly basis following the date the true-up payment is due. While any amount in respect of a liability transfer is outstanding, the annual payment by us to Honeywell will be first allocated towards the liabilities described above relating to environmental claims, remediation, hazardous exposure and toxic tort claims arising outside of the scope of the liability transfer, and then towards the liability transfer payment. The amount payable by the Company in respect of (i) any such liability transfers and (ii) the liabilities described above relating to environmental claims, remediation, hazardous exposure and toxic tort claims arising in any given year, will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum).

The scope of our current environmental remediation obligations subject to the Indemnification and Reimbursement Agreement relates to approximately 230 sites or groups of sites that are undergoing environmental remediation under U.S. federal or state law and agency oversight for contamination associated with Honeywell legacy business operations. The ongoing environmental remediation is designed to address contaminants at upland and sediment sites, which include, among others, metals, organic compounds and polychlorinated biphenyls, through a variety of methods, which include, among others, excavation, capping, in-situ stabilization, groundwater treatment and dredging. In addition, our obligations subject to the Indemnification and Reimbursement Agreement will include certain liability with respect to (i) hazardous exposure or toxic tort claims associated with the specified sites that arise after the Spin-Off, if any, (ii) currently unidentified releases of hazardous substances at or associated with the specified sites, (iii) other environmental claims associated with the specified sites and (iv) consequential damages.

Payment amounts under the Indemnification and Reimbursement Agreement will be deferred to the extent that a specified event of default has occurred and is continuing under certain indebtedness, including under our principal credit agreement, or the payment thereof causes us to not be compliant with certain financial covenants in certain indebtedness, including our principal credit agreement on a pro forma basis, including the maximum total leverage ratio (ratio of consolidated debt to consolidated EBITDA, which excludes any amounts owed to Honeywell under the Indemnification and Reimbursement Agreement), and the minimum interest coverage ratio. A 5% late payment fee will accrue on all amounts that are not otherwise entitled to be deferred under the terms of

Table of Contents

the Indemnification and Reimbursement Agreement, without prejudice to any other rights that Honeywell may have for late payments. In each calendar quarter, our ability to pay dividends and repurchase capital stock in such calendar quarter will be restricted until any amounts payable under the Indemnification and Reimbursement Agreement in such quarter (including any deferred payment amounts) are paid to Honeywell and we will be required to use available restricted payment capacity under our debt agreements to make payments in respect of any such deferred amounts. Payment of deferred amounts and certain other amounts could cause the amount we are required to pay under the Indemnification and Reimbursement Agreement in respect of liabilities arising in any given calendar year to exceed $140 million (exclusive of any late payment fees up to 5% per annum). All amounts payable under the Indemnification and Reimbursement Agreement will be guaranteed by certain of our subsidiaries that act as guarantors under our principal credit agreement, subject to certain exceptions. Under the Indemnification and Reimbursement Agreement, we will also be subject to certain of the affirmative and negative covenants to which we are subject under our principal credit agreement. Further, pursuant to the Indemnification and Reimbursement Agreement, our ability to (i) amend or replace our principal credit agreement, (ii) enter into another credit agreement and make amendments or waivers thereto, or (iii) enter into or amend or waive any provisions under other agreements, in each case, in a manner that would adversely affect the rights of Honeywell under the Indemnification and Reimbursement Agreement, will be subject to Honeywell's prior written consent. This consent right will significantly limit our ability to engage in many types of significant transactions on favorable terms (or at all), including, but not limited to, equity and debt financings, liability management transactions, refinancing transactions, mergers, acquisitions, joint ventures and other strategic transactions. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement."

The Indemnification and Reimbursement Agreement may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The Indemnification and Reimbursement Agreement may also require us to accrue significant long-term liabilities on our consolidated balance sheet, the amounts of which will be dependent on factors outside our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. This may have a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations may be materially adversely affected and the value of your investment in our company may decline. The Indemnification and Reimbursement Agreement also includes other obligations that may impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement." Moreover, the payments that we will be required to make to Honeywell pursuant to the Indemnification and Reimbursement Agreement will not be deductible for U.S. federal income tax purposes.

Although we will have access to information regarding these liabilities as we may reasonably request for certain purposes, as well as the ability to participate in periodic standing meetings with Honeywell's remediation management team responsible for management of the underlying claims, including outside litigation or environmental counsel if necessary, the payment obligations under the Indemnification and Reimbursement Agreement relate to legal proceedings and remediation efforts that we will not control, and we accordingly do not expect to be able to make definitive decisions regarding settlements or other outcomes that could influence our potential related exposure.

Independent of our payments under the Indemnification and Reimbursement Agreement, we will have ongoing liability for certain environmental claims which are part of SpinCo's going forward business. For the year ended December 31, 2017, these payments totaled $1.1 million.

Table of Contents

***Our operations and the prior operations of predecessor companies expose us to the risk of material environmental liabilities.***

We are subject to potentially material liabilities related to the investigation and cleanup of environmental hazards and to claims of personal injuries or property damages that may arise from hazardous substance releases and exposures. These liabilities arise out of our current and past operations and the operations and properties of predecessor companies (including offsite waste disposal). In connection with the Spin-Off, we intend to enter into an Indemnification and Reimbursement Agreement, pursuant to which we will have an obligation to make cash payments to Honeywell related to certain of Honeywell's environmental-related liabilities. See "Risks Relating to Our Business—We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities."

We are also subject to potentially material liabilities related to the compliance of our operations with the requirements of various federal, state, local and foreign governments that regulate the discharge of materials into the environment and the generation, handling, storage, treatment and disposal of and exposure to hazardous substances. We believe that, as a general matter, our policies, practices and procedures are properly designed to prevent unreasonable risk of environmental damage and personal injury and that our handling, manufacture, use and disposal of hazardous substances are in accordance with environmental and safety laws and regulations. However, if we are found to be in violation of these laws and regulations, we may be subject to substantial fines, criminal sanctions, trade restrictions, product recalls, public exposure and be required to install costly equipment or make operational changes to achieve compliance with such laws and regulations.

In addition, changes in laws, regulations or government enforcement of policies concerning the environment, the discovery of previously unknown contamination or new technology or information related to individual contaminated sites, the establishment of stricter state or federal toxicity standards with respect to certain contaminants, or the imposition of new clean-up requirements or remedial techniques, could require us to incur additional currently unanticipated costs in the future that would have a negative effect on our business, financial condition, results of operations and cash flows.

***We cannot predict with certainty the outcome of litigation matters, government proceedings and other contingencies and uncertainties.***

In the ordinary course of business, we may make certain commitments, including representations, warranties and indemnities relating to current and past operations, including those related to divested businesses, and issue guarantees of third party obligations. We are subject to various lawsuits, investigations and disputes arising out of the conduct of our business, including matters relating to commercial transactions, government contracts, product liability, prior acquisitions and divestitures, employee benefit plans, intellectual property, and environmental, health and safety matters. Our potential liabilities are subject to change over time due to new developments, changes in settlement strategy or the impact of evidentiary requirements, and we may become subject to or be required to pay damage awards or settlements that could have an adverse effect on our business, financial condition, results of operations and cash flows. If we were required to make payments, such payments could be significant and could exceed the amounts we have accrued with respect thereto, adversely affecting our business, financial condition, results of operations and cash flows. While we maintain insurance for certain risks, the amount of our insurance coverage may not be adequate to cover the total amount of all insured claims and liabilities. The incurrence of significant liabilities for which there is no or insufficient insurance coverage could adversely affect our liquidity and financial condition, results of operations and cash flows.

***Our effective tax rate will be affected by factors including changes in tax rules, and in the interpretation and application of those rules, in the countries in which we operate.***

Our future results of operations could be adversely affected by changes in the effective tax rate as a result of a change in the mix of earnings in countries with differing statutory tax rates, changes in tax laws, regulations

Table of Contents

and judicial rulings (or changes in the interpretation thereof), changes in generally accepted accounting principles, changes in the valuation of deferred tax assets and liabilities, changes in the amount of earnings permanently reinvested offshore, the results of audits and examinations of previously filed tax returns and continuing assessments of our tax exposures and various other governmental enforcement initiatives. Our tax expense includes estimates of tax reserves and reflects other estimates and assumptions, including assessments of future earnings of the Company which could impact the valuation of our deferred tax assets. Changes in tax laws or regulations, including multi-jurisdictional changes enacted in response to the guidelines provided by the Organization for Economic Co-operation and Development ("OECD") to address base erosion and profit shifting, and the interpretation and application of comprehensive U.S. tax reform legislation enacted in December of 2017, commonly referred to as the Tax Cuts and Jobs Act (the "TCJA"), will increase tax uncertainty and may adversely impact our provision for income taxes. As noted under "—Risks Relating to Our Business—We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured by reference to estimates by Honeywell of certain of its liabilities," the payments that we will be required to make to Honeywell pursuant to the Indemnification and Reimbursement Agreement will not be deductible for U.S. federal income tax purposes.

***U.S. federal income tax reform could adversely affect us.***

The TCJA made fundamental changes to the U.S. taxation of multinational corporations. Significant changes include the provision of an exemption for certain active foreign earnings (subject to a cap determined by reference to a specified return on tangible assets), a minimum tax on foreign earnings in excess of the cap, expansion of the current anti-deferral rules, and new measures to deter base erosion. The TCJA also introduced a reduction in the corporate tax rate to 21%, repeal of the corporate alternative minimum tax, expensing of certain capital investment, and limitation of the deduction for interest expense. Although the TCJA is generally effective January 1, 2018, U.S. GAAP requires recognition of the tax effects of new legislation during the reporting period that includes the enactment date, which was December 22, 2017. The impact on the year ended December 31, 2017 was, and the impact on future years may be, material to our financial statements. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Years Ended December 31, 2017, 2016 and 2015—Tax Expense." We continue to examine the impact this tax reform legislation may have on our business.

***We may be required to make significant cash contributions to the defined benefit pension plans that we intend to sponsor after the Spin-Off.***

After the Spin-Off, we intend to sponsor defined benefit pension plans under which certain eligible Company employees will earn pension benefits following the Spin-Off. Plans will be established in several countries including the U.S. The Federal Pension Protection Act of 2006, which is generally applicable to U.S. defined benefit pension plans, generally requires that defined benefit pension plans maintain certain capitalization levels. We are currently still in negotiations related to the U.S. defined benefit pension plan and are not able to estimate the timing or amount of the cash contributions we will be required to make in the future to meet the requirements of applicable law. However, we expect that, as pension liabilities accrue under this defined benefit pension plan, we may be required by law to make future plan contributions that may be material and could adversely affect our business, financial condition, results of operations and cash flows.

**Risks Relating to the Spin-Off**

***If the Spin-Off does not qualify for its intended U.S. tax treatment, Honeywell and its stockholders could incur significant costs.***

Completion of the Spin-Off is conditioned on Honeywell's receipt of separate written opinions from Cleary Gottlieb Steen & Hamilton LLP and KPMG LLP to the effect that the Share Distribution will qualify for

Table of Contents

non-recognition of gain and loss under Section 355 and related provisions of the Code. Honeywell can waive receipt of either or both tax opinions as a condition to the completion of the Spin-Off.

The opinions do not address any U.S. state or local or foreign tax consequences of the Spin-Off. The opinions assume that the Spin-Off will be completed according to the terms of the Separation and Distribution Agreement and rely on the facts as stated in the Separation and Distribution Agreement, the Tax Matters Agreement, the other ancillary agreements, this Information Statement and a number of other documents. In addition, the opinions are based on certain representations as to factual matters from, and certain covenants by, Honeywell and us. The opinions cannot be relied on if any of the assumptions, representations or covenants are incorrect, incomplete or inaccurate or are violated in any material respect.

The opinions are not binding on the Internal Revenue Service (the "IRS") or the courts, and there can be no assurance that the IRS or a court will not take a contrary position. If the conclusions expressed in the opinions are challenged by the IRS, and if the IRS prevails in such challenge, the tax consequences of the Spin-Off could be materially less favorable. Honeywell has not requested, and does not intend to request, a ruling from the IRS regarding the U.S. federal income tax consequences of the Spin-Off.

If the Spin-Off were determined not to qualify for non-recognition of gain or loss under Section 355 and related provisions of the Code, then a U.S. Holder who receives our common stock in the Share Distribution generally would be treated as receiving a distribution in an amount equal to the fair market value of our common stock received. The distribution would be treated as: (1) a taxable dividend to the extent of the holder's *pro rata* share of Honeywell's current or accumulated earnings and profits; (2) a reduction in the holder's basis (but not below zero) in Honeywell common stock to the extent the amount received exceeds the holder's share of Honeywell's earnings and profits; and (3) taxable gain from the exchange of Honeywell common stock to the extent the amount received exceeds the sum of the holder's share of Honeywell's earnings and profits and its basis in its Honeywell common stock. See below and "The Spin-Off—Material U.S. Federal Income Tax Consequences of the Spin-Off."

***We will agree in the Tax Matters Agreement not to take actions that could affect Honeywell's tax treatment. The need to comply with these provisions of the Tax Matters Agreement could reduce our strategic and operating flexibility. If we fail to comply with them, or breach representations or covenants made in the Tax Matters Agreement or in connection with the receipt of the tax opinion, we could incur material indemnification obligations to Honeywell, which could adversely affect our business, financial condition, results of operations and cash flows.***

If one or more persons acquire a 50% or greater interest (measured by vote or value) in the stock of Honeywell or SpinCo, directly or indirectly (including through acquisitions of stock after the completion of the Transactions), as part of a plan or series of related transactions that includes the Share Distribution, then the Share Distribution would be taxable to Honeywell, but not to Honeywell stockholders. Current law generally creates a presumption that any direct or indirect acquisition of stock of Honeywell or SpinCo within two years before or after the Share Distribution is part of a plan that includes the Share Distribution, although the parties may be able to rebut that presumption in certain circumstances. The process for determining whether an acquisition is part of a plan under these rules is complex, inherently factual in nature, and subject to a comprehensive analysis of the facts and circumstances of the particular case. We have entered into covenants not to engage in specified transactions for two years after the Share Distribution without Honeywell's prior consent (which Honeywell may grant or withhold in its sole discretion), and have agreed to indemnify Honeywell for any costs that it may incur as a result of our failure to comply with those covenants. These obligations may limit our ability to pursue strategic transactions or engage in new business or other transactions, such as a share repurchase program, that may maximize the value of our business, and may discourage or delay a strategic transaction that our shareholders may consider favorable, including limiting our ability to use our equity to raise capital or fund acquisitions. Any payments required under these obligations could be significant and could materially adversely affect our business, financial condition, results of operations and cash flows. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Tax Matters Agreement."

Table of Contents

***We intend to agree to numerous restrictions to preserve the non-recognition treatment of the Spin-Off, which may reduce our strategic and operating flexibility.***

We intend to agree in the Tax Matters Agreement to covenants and indemnification obligations that address compliance with Section 355 of the Code and are intended to preserve the tax-free nature of the Spin-Off. These covenants will include certain restrictions on our activity for a period of two years following the Spin-Off, unless Honeywell gives its consent for us to take a restricted action, which Honeywell is permitted to grant or withhold at its sole discretion. These covenants and indemnification obligations may limit our ability to pursue strategic transactions or engage in new businesses or other transactions that may maximize the value of our business, and might discourage or delay a strategic transaction that our stockholders may consider favorable. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Tax Matters Agreement."

***Until the separation occurs, Honeywell has sole discretion to change the terms of the separation in ways that may be unfavorable to us.***

Until the Spin-Off occurs, the Company will be a wholly-owned subsidiary of Honeywell. Accordingly, Honeywell will effectively have the sole and absolute discretion to determine and change the terms of the separation, including the establishment of the record date for the Share Distribution and the Share Distribution Date. These changes could be unfavorable to us. In addition, the separation and Share Distribution and related transactions are subject to the satisfaction or waiver by Honeywell in its sole discretion of a number of conditions. We cannot assure you that any or all of these conditions will be met. Honeywell may also decide at any time not to proceed with the separation and Share Distribution.

***We may be unable to achieve some or all of the benefits that we expect to achieve from the Spin-Off.***

We believe that, as an independent, publicly traded company, we will be able to, among other things, design and implement corporate strategies and policies that are better targeted to our business's areas of strength and differentiation, better focus our financial and operational resources on those specific strategies, create effective incentives for our management and employees that are more closely tied to our business performance, provide investors more flexibility and enable us to achieve alignment with a more natural stockholder base and implement and maintain a capital structure designed to meet our specific needs. We may be unable to achieve some or all of the benefits that we expect to achieve as an independent company in the time we expect, if at all, for a variety of reasons, including: (i) the completion of the Spin-Off will require significant amounts of our management's time and effort, which may divert management's attention from operating and growing our business; (ii) following the Spin-Off, we may be more susceptible to market fluctuations and other adverse events than if it were still a part of Honeywell; and (iii) following the Spin-Off, our businesses will be less diversified than Honeywell's businesses prior to the separation. If we fail to achieve some or all of the benefits that we expect to achieve as an independent company, or do not achieve them in the time we expect, our business, financial condition, results of operations and cash flows could be adversely affected.

***We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent, publicly traded company, and we may experience increased costs after the Spin-Off.***

We have historically operated as part of Honeywell's corporate organization, and Honeywell has provided us with various corporate functions. Following the Spin-Off, Honeywell will have no obligation to provide us with assistance other than the transition and other services described under "Certain Relationships and Related Party Transactions—Agreements with Honeywell ." These services do not include every service that we have received from Honeywell in the past, and Honeywell is only obligated to provide the transition services for limited periods following completion of the Spin-Off. The agreements relating to such transition services and to the Spin-Off more generally will be negotiated prior to the Spin-Off, at a time when our business will still be operated by Honeywell. In entering into these agreements the Company will not have an independent board of directors or a management team independent of Honeywell representing its interests while the agreements are

Table of Contents

being negotiated. It is possible that we might have been able to achieve more favorable terms if the circumstances differed. We will rely on Honeywell to satisfy its performance and payment obligations under any transition services agreements and other agreements related to the Spin-Off, and if Honeywell does not satisfy such obligations, we could incur operational difficulties or losses.

Following the Spin-Off and the cessation of any transition services agreements, we will need to provide internally or obtain from unaffiliated third parties the services we will no longer receive from Honeywell. These services include legal, accounting, information technology, software development, human resources, investor relations and other infrastructure support, the effective and appropriate performance of which are critical to our operations. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we receive from Honeywell. Because our business has historically operated as part of the wider Honeywell organization, we may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently, or may incur additional costs that could adversely affect our business. In particular, our ability to position and market ourselves as a provider of connected home technology could be adversely affected by our loss of access to Honeywell's development platforms. If we fail to obtain the quality of services necessary to operate effectively or incur greater costs in obtaining these services, our business, financial condition, results of operations and cash flows may be adversely affected.

***As we build our information technology infrastructure and transition our data to our own systems, we could incur substantial additional costs and experience temporary business interruptions, and our accounting and other management systems and resources may not be adequately prepared to meet the financial reporting and other requirements to which we will be subject following the Spin-Off.***

Following the Spin-Off, we will install and implement information technology infrastructure to support certain of our business functions, including payment systems, ERP systems, accounting and reporting, manufacturing process control, customer service, inventory control and distribution. We may incur substantially higher costs than currently anticipated as we transition from the existing transactional and operational systems and data centers we currently use as part of Honeywell. Such transition must also comply with applicable personal data privacy laws. See "Risks Relating to Our Business—Risks associated with data privacy issues, including evolving laws and regulations and associated compliance efforts, could adversely affect our business, financial condition, results of operations and cash flows." If we are unable to transition effectively, we may incur temporary interruptions in business operations. Any delay in implementing, or operational interruptions suffered while implementing, our new information technology infrastructure could disrupt our business and have an adverse effect on our business, financial condition, results of operations and cash flows.

In addition, if we are unable to replicate or transition certain systems, our ability to comply with regulatory requirements could be impaired. As a result of the Spin-Off, we will be directly subject to reporting and other obligations under the U.S. Securities and Exchange Act of 1934, as amended (the "Exchange Act"). Beginning with our second required Annual Report on Form 10-K, we intend to comply with Section 404 of the Sarbanes Oxley Act of 2002, as amended (the "Sarbanes Oxley Act"), which will require annual management assessments of the effectiveness of our internal control over financial reporting and a report by our independent registered public accounting firm addressing these assessments. These reporting and other obligations may place significant demands on management, administrative and operational resources, including accounting systems and resources.

The Exchange Act requires that we file annual, quarterly and current reports with respect to our business and financial condition. Under the Sarbanes Oxley Act, we are required to maintain effective disclosure controls and procedures and internal controls over financial reporting. To comply with these requirements, we may need to upgrade our systems, implement additional financial and management controls, reporting systems and procedures and hire additional accounting and finance staff. We expect to incur additional annual expenses for the purpose of addressing these, and other public-company reporting, requirements. If we are unable to upgrade our financial and management controls, reporting systems, information technology systems and procedures in a timely and effective fashion, our ability to comply with financial reporting requirements and other rules that

Table of Contents

apply to reporting companies under the Exchange Act could be impaired. Any failure to achieve and maintain effective internal controls could have an adverse effect on our business, financial condition, results of operations and cash flow. See "—Risks Relating to Our Common Stock and the Securities Market."

***We expect to incur new indebtedness concurrently with or prior to the Share Distribution, and the degree to which we will be leveraged following completion of the Share Distribution could adversely affect our business, financial condition and results of operations.***

In connection with the Spin-Off, we expect to incur substantial indebtedness in an aggregate principal amount of approximately $1,225 million in the form of senior secured term loans and senior unsecured notes, the net proceeds of which will be received by Honeywell substantially concurrently with the consummation of the Spin-Off. We also intend to enter into a revolving credit facility to be available for our working capital and other cash needs from time to time in an aggregate committed amount of $350 million.

We have historically relied upon Honeywell to fund our working capital requirements and other cash requirements. After the Share Distribution, we will not be able to rely on the earnings, assets or cash flow of Honeywell, and Honeywell will not provide funds to finance our working capital or other cash requirements. As a result, after the Share Distribution, we will be responsible for servicing our own debt and obtaining and maintaining sufficient working capital and other funds to satisfy our cash requirements. After the Spin-Off, our access to and cost of debt financing will be different than it would have been as a part of Honeywell. Differences in access to and cost of debt financing may result in differences in the interest rate charged to us on financings, as well as the amount of indebtedness, types of financing structures and debt markets that may be available to us.

Our ability to make payments on and to refinance our indebtedness, including the debt incurred in connection with the Spin-Off, as well as any future debt that we may incur, will depend on our ability to generate cash in the future from operations, financings or asset sales. Our ability to generate cash is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control, as well as the risk factors set forth herein.

***The terms of the new indebtedness we expect to incur concurrently in connection with the Share Distribution will restrict our current and future operations, particularly our ability to incur debt that we may need to fund initiatives in response to changes in our business, the industries in which we operate, the economy and governmental regulations.***

We expect that the terms of the indebtedness we expect to incur in connection with the Share Distribution will include a number of restrictive covenants that impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests. These may restrict our and our subsidiaries' ability to take some or all of the following actions:

- incur or guarantee additional indebtedness or sell disqualified or preferred stock;
- pay dividends on, make distributions in respect of, repurchase or redeem capital stock;
- make investments or acquisitions;
- sell, transfer or otherwise dispose of certain assets;
- create liens;
- enter into sale/leaseback transactions;
- enter into agreements restricting the ability to pay dividends or make other intercompany transfers;
- consolidate, merge, sell or otherwise dispose of all or substantially all of our or our subsidiaries' assets;
- enter into transactions with affiliates;
- prepay, repurchase or redeem certain kinds of indebtedness;

Table of Contents

- issue or sell stock of our subsidiaries; and/or
- significantly change the nature of our business.

Furthermore, the lenders of this indebtedness may require that we pledge our assets as collateral as security for our repayment obligations or that we abide by certain financial or operational covenants. Our ability to comply with such covenants and restrictions may be affected by events beyond our control, including prevailing economic, financial and industry conditions. If market or other economic conditions deteriorate, our ability to comply with these covenants may be impaired. A breach of any of these covenants, if applicable, could result in an event of default under the terms of this indebtedness. If an event of default occurred, the lenders would have the right to accelerate the repayment of such debt, and the event of default or acceleration could result in the acceleration of the repayment of any other debt to which a cross-default or cross-acceleration provision applies. We might not have, or be able to obtain, sufficient funds to make these accelerated payments, and lenders could then proceed against any collateral. Any subsequent replacement of the agreements governing such indebtedness or any new indebtedness could have similar or greater restrictions. The occurrence and ramifications of an event of default could adversely affect our business, financial condition, results of operations and cash flows. Moreover, as a result of all of these restrictions, we may be limited in how we conduct our business and pursue our strategy, unable to raise additional debt financing to operate during general economic or business downturns or unable to compete effectively or to take advantage of new business opportunities.

***The commercial and credit environment may adversely affect our access to capital.***

Our ability to issue debt or enter into other financing arrangements on acceptable terms could be adversely affected if there is a material decline in the demand for our products or in the solvency of our customers or suppliers or if there are other significantly unfavorable changes in economic conditions. Volatility in the world financial markets could increase borrowing costs or affect our ability to access the capital markets. These conditions may adversely affect our ability to obtain targeted credit ratings prior to and following the Spin-Off.

***Our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that our financial stability on a stand-alone basis is sufficient to satisfy their requirements for doing or continuing to do business with them.***

Some of our customers, prospective customers, suppliers or other companies with whom we conduct business may need assurances that the Company's financial stability on a stand-alone basis is sufficient to satisfy their requirements for doing or continuing to do business with them. Any failure of parties to be satisfied with our financial stability could have an adverse effect on our business, financial condition, results of operations and cash flows.

***We may have potential business conflicts of interest with Honeywell with respect to our past and ongoing relationships.***

Conflicts of interest may arise with Honeywell in a number of areas relating to our past and ongoing relationships, including:

- labor, tax, employee benefit, indemnification and other matters arising from our separation from Honeywell;
- intellectual property matters;
- employee recruiting and retention; and
- business combinations involving our Company.

Table of Contents

We may not be able to resolve any potential conflicts, and, even if we do so, the resolution may be less favorable to us than if we were dealing with an unaffiliated party

***Following the Spin-Off, certain of our directors and employees may have actual or potential conflicts of interest because of their financial interests in Honeywell.***

Because of their current or former positions with Honeywell, certain of our expected executive officers and directors, including the chairman of the Board, own equity interests in Honeywell. Continuing ownership of Honeywell shares and equity awards could create, or appear to create, potential conflicts of interest if the Company and Honeywell face decisions that could have implications for both the Company and Honeywell.

**Risks Relating to Our Common Stock and the Securities Market**

***No market for our common stock currently exists and an active trading market may not develop or be sustained after the Spin-Off. Following the Spin-Off our stock price may fluctuate significantly.***

There is currently no public market for our common stock. Following the Spin-Off, we intend to list our common stock on a national securities exchange. We anticipate that before the Share Distribution Date, trading of shares of our common stock will begin on a "when-issued" basis and this trading will continue up to and including the Share Distribution Date. However, an active trading market for our common stock may not develop as a result of the Spin-Off or may not be sustained in the future. The lack of an active market may make it more difficult for stockholders to sell our shares and could lead to our share price being depressed or volatile.

We cannot predict the prices at which our common stock may trade after the Spin-Off or whether the combined market value of a share of our common stock and a share of Honeywell's common stock will be less than, equal to or greater than the market value of a share of Honeywell common stock prior to the Spin-Off. The market price of our common stock may fluctuate widely, depending on many factors, some of which may be beyond our control, including:

- actual or anticipated fluctuations in our results of operations due to factors related to our business;
- success or failure of our business strategies;
- competition and industry capacity;
- changes in interest rates and other factors that affect earnings and cash flow;
- our level of indebtedness, our ability to make payments on or service our indebtedness and our ability to obtain financing as needed;
- our indemnification obligations to Honeywell;
- our ability to retain and recruit qualified personnel;
- our quarterly or annual earnings, or those of other companies in our industry;
- announcements by us or our competitors of significant acquisitions or dispositions;
- changes in accounting standards, policies, guidance, interpretations or principles;
- the failure of securities analysts to cover, or positively cover, our common stock after the Spin-Off;
- changes in earnings estimates by securities analysts or our ability to meet those estimates;
- the operating and stock price performance of other comparable companies;
- investor perception of our Company and our industry;
- overall market fluctuations unrelated to our operating performance;
- results from any material litigation or government investigation;
- changes in laws and regulations (including tax laws and regulations) affecting our business;

Table of Contents

- changes in capital gains taxes and taxes on dividends affecting stockholders; and
- general economic conditions and other external factors.

Furthermore, our business profile and market capitalization may not fit the investment objectives of some Honeywell stockholders and, as a result, these Honeywell stockholders may sell their shares of our common stock after the Share Distribution. See "—Substantial sales of our common stock may occur in connection with the Spin-Off, which could cause our stock price to decline." Low trading volume for our stock, which may occur if an active trading market does not develop, among other reasons, would amplify the effect of the above factors on our stock price volatility.

Should the market price of our shares drop significantly, stockholders may institute securities class action lawsuits against the Company. A lawsuit against us could cause us to incur substantial costs and could divert the time and attention of our management and other resources.

***Substantial sales of our common stock may occur in connection with the Spin-Off, which could cause our stock price to decline.***

Honeywell stockholders receiving shares of our common stock in the Share Distribution generally may sell those shares immediately in the public market. It is likely that some Honeywell stockholders, including some of its larger stockholders, will sell their shares of our common stock received in the Share Distribution if, for reasons such as our business profile or market capitalization as an independent company, we do not fit their investment objectives, or, in the case of index funds, we are not a participant in the index in which they are investing. The sales of significant amounts of our common stock or the perception in the market that such sales might occur may decrease the market price of our common stock.

***Our ability to pay cash dividends to our stockholders is subject to the discretion of our Board and may be limited by the terms of our indebtedness and the Indemnification and Reimbursement Agreement; there is no guarantee we will initiate dividends, or that once initiated, that we will continue paying dividends.***

Subject to the sole discretion of our Board and the considerations discussed below, once the Spin-Off is effective, we anticipate paying cash dividends on our common stock. However, our Board may in its sole discretion, change the amount or frequency of dividends or discontinue the payment of dividends entirely. The Board's decisions regarding the payment of dividends will depend on consideration of many factors, such as our financial condition, earnings, sufficiency of distributable reserves, opportunities to retain future earnings for use in the operation of our business and to fund future growth, capital requirements, debt service obligations, obligations under the Indemnification and Reimbursement Agreement, legal requirements, regulatory constraints and other factors that the Board deems relevant. Additionally, the terms of the indebtedness we intend to incur in connection with the Spin-Off, obligations under the Indemnification and Reimbursement Agreement and other amounts owed to Honeywell under the Transition Services, Tax Matters, Employee Matters, Trademark License and Patent Cross-License Agreements, will limit our ability to pay cash dividends. As a consequence, there is no guarantee that any dividends will be declared on our common stock by our Board, or if so declared, will be continued in the future. For more information, see "Dividend Policy."

***Your percentage ownership in the Company may be diluted in the future.***

Your percentage ownership in the Company may be diluted in the future because of equity issuances for acquisitions, capital market transactions or otherwise, including equity awards that we will be granting to our directors, officers and other employees. We expect to have one or more equity compensation plans that will provide for the grant of common stock-based equity awards to our directors, officers and other employees. Such awards will have a dilutive effect on our earnings per share, which could adversely affect the market price of our common stock. In particular, prior to the Spin-Off, we expect our Board to adopt, and Honeywell, as our sole

Table of Contents

shareholder, to approve, the 2018 Stock Incentive Plan of SpinCo and its Affiliates (the "Equity Plan") for the benefit of certain of our current and future employees and other service providers, as well as an equity plan for our non-employee directors.

In addition, our Amended and Restated Certificate of Incorporation will authorize us to issue, without the approval of our stockholders, one or more classes or series of preferred stock having such designation, powers, preferences and relative, participating, optional and other special rights, including preferences over our common stock with respect to dividends and distributions, as our Board may generally determine. The terms of one or more classes or series of preferred stock could dilute the voting power or reduce the value of our common stock. For example, we could grant the holders of preferred stock the right to elect some number of the members of our Board in all events or upon the happening of specified events, or the right to veto specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences that we could assign to holders of preferred stock could affect the residual value of our common stock. See "Description of Our Capital Stock."

From time-to-time, SpinCo may opportunistically evaluate and pursue acquisition opportunities, including acquisitions for which the consideration thereof may consist partially or entirely of newly-issued shares of SpinCo common stock and, therefore, such transactions, if consummated, would dilute the voting power and/or reduce the value of our common stock. We intend to issue debt securities in connection with the Spin-Off that will not be convertible into equity securities of SpinCo and therefore will not have a dilutive effect on SpinCo common stockholders' percentage ownership in SpinCo.

***The rights associated with the Company's common stock will differ from the rights associated with Honeywell common stock.***

Upon completion of the Share Distribution, the rights of Honeywell stockholders who become Company stockholders will be governed by the Amended and Restated Certificate of Incorporation of the Company and by Delaware law. The rights associated with Honeywell shares are different from the rights associated with Company shares. Material differences between the rights of stockholders of Honeywell and the rights of stockholders of the Company include differences with respect to, among other things, the removal of directors, the convening of annual meetings of stockholders and special stockholder meetings, stockholder approval of certain transactions, anti-takeover measures and provisions relating to the ability to amend the certificate of incorporation. See "Description of Our Capital Stock—Certain Provisions of Delaware Law, Our Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws" for more information.

***Certain provisions in our Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws and Delaware law may discourage takeovers.***

Several provisions of our Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Delaware law may discourage, delay or prevent a merger or acquisition. These include, among others, provisions that:

- provide for staggered terms for directors on our board for a period following the Spin-Off;
- do not permit our stockholders to act by written consent and require that stockholder action must take place at an annual or special meeting of our stockholders, in each case except as such rights may otherwise be provided to holders of preferred stock;
- establish advance notice requirements for stockholder nominations and proposals;
- limit the persons who may call special meetings of stockholders; and
- limit our ability to enter into business combination transactions.

These and other provisions of our Amended and Restated Certificate of Incorporation, Amended and Restated By-Laws and Delaware law may discourage, delay or prevent certain types of transactions involving an

Table of Contents

actual or a threatened acquisition or change in control of the Company, including unsolicited takeover attempts, even though the transaction may offer our stockholders the opportunity to sell their shares of our common stock at a price above the prevailing market price. See “Description of Our Capital Stock” for more information.

***Our Amended and Restated Certificate of Incorporation will designate the courts of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, which could limit our stockholders’ ability to obtain a favorable judicial forum for disputes with us or our directors, officers or other employees.***

Our Amended and Restated Certificate of Incorporation will provide that, in all cases to the fullest extent permitted by law, unless we consent in writing to the selection of an alternative forum, the Court of Chancery located within the State of Delaware will be the sole and exclusive forum for any derivative action or proceeding brought on behalf of the Company, any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or stockholder of the Company to the Company or the Company’s stockholders, any action asserting a claim arising pursuant to the Delaware General Corporate Law (“DGCL”) or as to which the DGCL confers jurisdiction on the Court of Chancery located in the State of Delaware or any action asserting a claim governed by the internal affairs doctrine or any other action asserting an “internal corporate claim” as that term is defined in Section 115 of the DGCL. However, if the Court of Chancery within the State of Delaware does not have jurisdiction, the action may be brought in any other state or federal court located within the State of Delaware. Any person or entity purchasing or otherwise acquiring or holding any interest in shares of our capital stock will be deemed to have notice of and to have consented to these provisions. This provision may limit a stockholder’s ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits. Alternatively, if a court were to find this provision of our Amended and Restated Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions.

***If we fail to maintain proper and effective internal controls, our ability to produce accurate and timely financial statements could be impaired and investors’ views of us could be harmed.***

The Sarbanes-Oxley Act requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. In particular, we must perform system and process evaluation and testing of our internal control over financial reporting to allow management and our independent registered public accounting firm to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, with auditor attestation of the effectiveness of our internal controls, beginning with our second required annual report on Form 10-K. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our independent registered public accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of shares of common stock could decline and we could be subject to sanctions or investigations by the U.S. Securities and Exchange Commission (the “SEC”) or other regulatory authorities, which would require additional financial and management resources.

Our ability to successfully implement our business plan and comply with Section 404 requires us to be able to prepare timely and accurate financial statements. Any delay in the implementation of, or disruption in the transition to, new or enhanced systems, procedures or controls, may cause our operations to suffer, and we may be unable to conclude that our internal control over financial reporting is effective and to obtain an unqualified report on internal controls from our auditors as required under Section 404 of the Sarbanes-Oxley Act. Moreover, we cannot be certain that these measures would ensure that we implement and maintain adequate controls over our financial processes and reporting in the future. Even if we were to conclude, and our auditors were to concur, that our internal control over financial reporting provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, because of its inherent limitations, internal control over financial reporting might not prevent or detect fraud or

Table of Contents

misstatements. This, in turn, could have an adverse impact on trading prices for our shares of common stock, and could adversely affect our ability to access the capital markets. See "—Risks Relating to the Spin-Off—As we build our information technology infrastructure and transition our data to our own systems, we could incur substantial additional costs and experience temporary business interruptions, and our accounting and other management systems and resources may not be adequately prepared to meet the financial reporting and other requirements to which we will be subject following the Spin-Off."

Table of Contents

**CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS**

This Information Statement contains "forward-looking statements" that involve risks and uncertainties. These statements can be identified by the fact that they do not relate strictly to historical or current facts, but rather are based on current expectations, estimates, assumptions and projections about our industry and our business and financial results. Forward-looking statements often include words such as "anticipates," "estimates," "expects," "projects," "forecasts," "intends," "plans," "continues," "believes," "may," "will," "goals" and words and terms of similar substance in connection with discussions of future operating or financial performance. As with any projection or forecast, forward-looking statements are inherently susceptible to uncertainty and changes in circumstances. Our actual results may vary materially from those expressed or implied in our forward-looking statements. Accordingly, undue reliance should not be placed on any forward-looking statement made by us or on our behalf. Although we believe that the forward-looking statements contained in this Information Statement are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in such forward-looking statements, including but not limited to:

- lack of operating history as an independent, publicly traded company and unreliability of historical combined financial information as an indicator of our future results;
- the level of competition from other companies;
- ability to successfully develop new technologies and introduce new products;
- changes in prevailing global and regional economic conditions;
- natural disasters or inclement or hazardous weather conditions, including, but not limited to cold weather, flooding, tornadoes and the physical impacts of climate change;
- failure to achieve and maintain a high level of product and service quality;
- ability to operate as an independent publicly traded company without certain benefits available to us as a part of Honeywell;
- dependence upon investment in information technology;
- failure or inability to comply with the GDPR;
- technical difficulties or failures;
- work stoppages, other disruptions, or the need to relocate any of our facilities;
- economic, political, regulatory, foreign exchange and other risks of international operations;
- changes in legislation or government regulations or policies;
- our growth strategy is dependent on expanding our distribution business;
- inability to obtain necessary production equipment or replacement parts;
- the significant failure or inability to comply with the specifications and manufacturing requirements of our OEM customers or by increases or decreases to the inventory levels maintained by our customers;
- difficulty collecting receivables;
- the failure to protect our intellectual property or allegations that we have infringed the intellectual property of others;
- our inability to maintain intellectual property agreements;
- the failure to increase productivity through sustainable operational improvements;
- inability to grow successfully through future acquisitions;
- inability to recruit and retain qualified personnel;

Table of Contents

- the operational constraints and financial distress of third parties;
- changes in the price and availability of raw materials that we use to produce our products;
- labor disputes;
- our ability to borrow funds and access capital markets;
- the amount of our obligations pursuant to the Indemnification and Reimbursement Agreement;
- potential material environmental liabilities;
- potential material losses and costs as a result of warranty claims, including product recalls, and product liability actions that may be brought against us;
- potential material litigation matters;
- unforeseen U.S. federal income tax and foreign tax liabilities;
- U.S. federal income tax reform;
- the potential suspension in the future of our dividend program; and
- certain factors discussed elsewhere in this Information Statement.

These and other factors are more fully discussed in the “Risk Factors” and “Management’s Discussion and Analysis of Financial Condition and Results of Operations” sections and elsewhere in this Information Statement. These risks could cause actual results to differ materially from those implied by forward-looking statements in this Information Statement. Even if our results of operations, financial condition and liquidity and the development of the industry in which we operate are consistent with the forward-looking statements contained in this Information Statement, those results or developments may not be indicative of results or developments in subsequent periods.

Any forward-looking statements made by us in this Information Statement speak only as of the date on which they are made. We are under no obligation to, and expressly disclaim any obligation to, update or alter our forward-looking statements, whether as a result of new information, subsequent events or otherwise.

Table of Contents

## THE SPIN-OFF

### Background

On October 10, 2017, Honeywell announced plans for the complete legal and structural separation of the Business from Honeywell. To effect the separation, Honeywell is undertaking the Reorganization Transactions described under "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Separation and Distribution Agreement."

Following the Reorganization Transactions, Honeywell will distribute all of its equity interest in us, consisting of all of the outstanding shares of our common stock, to holders of Honeywell's common stock on a *pro rata* basis. Following the Spin-Off, Honeywell will not own any equity interest in us, and we will operate independently from Honeywell. No approval of Honeywell's stockholders is required in connection with the Spin-Off, and Honeywell's stockholders will not have any appraisal rights in connection with the Spin-Off.

Completion of the Spin-Off is subject to the satisfaction, or the Honeywell Board's waiver, to the extent permitted by law, of a number of conditions. In addition, Honeywell may at any time until the Share Distribution decide to abandon the Share Distribution or modify or change the terms of the Share Distribution. For a more detailed discussion, see "The Spin-Off —Conditions to the Spin-Off."

Aspects of the Spin-Off may increase the risks associated with ownership of shares of SpinCo. In connection with the Spin-Off, we expect to incur substantial indebtedness in an aggregate principal amount of approximately $1,225 million in the form of senior secured term loans and senior unsecured notes, the net proceeds of which will be received by Honeywell substantially concurrently with the consummation of the Spin-Off. We also intend to enter into a revolving credit facility to be available for our working capital and other cash needs from time to time in an aggregate committed amount of $350 million. In addition, we intend to enter into an Indemnification and Reimbursement Agreement, pursuant to which we will have an obligation to make cash payments to Honeywell related to certain of Honeywell's environmental-related liabilities. Furthermore, as an independent entity we may lose some of the benefits of purchasing power, borrowing leverage and available capital for investments associated with being part of a larger entity. See "Risk Factors" in this Information Statement.

### Reasons for the Spin-Off

In 2017, the Honeywell Board authorized a review of Honeywell's business portfolio and capital allocation options, with the goal of enhancing stockholder value. As part of its review process, Honeywell evaluated a range of potential structural alternatives in addition to the Spin-Off, including opportunities for dispositions, acquisitions, business combinations and separations. Honeywell considered a number of factors, including the strategic clarity and flexibility for Honeywell and SpinCo after the Spin-Off, the ability of SpinCo to compete and operate efficiently and effectively (including SpinCo's ability to retain and attract management talent) after the Spin-Off, the financial profile of SpinCo and the potential reaction of investors. As a result of this review, Honeywell identified differences in operations, strategic focus and growth drivers of Honeywell's business and the Business, including that the Business would not fully utilize synergies across the Honeywell portfolio in areas such as shared technology platforms, operational levers and Honeywell business and corporate synergies. In addition, a number of the characteristics of the SpinCo businesses differ significantly from those of the remaining Honeywell operations. Products is one of the few businesses within Honeywell focused on individual consumer markets and primarily serves the residential market, while Distribution is the only business in Honeywell entirely focused on distribution. As a result of the focus on these end markets, SpinCo utilizes a different business model than Honeywell, which includes targeted investments in consumer marketing for the Products segment and investments in expanding product categories and geographies in the Distribution business. In reaching the decision to separate the Business, the Honeywell Board concluded that the separation of the Business from the remainder of Honeywell as a stand-alone, public company is the most attractive alternative for enhancing stockholder value.

Table of Contents

As a result of this evaluation, Honeywell determined that proceeding with the Spin-Off would be in the best interests of Honeywell and its stockholders. Honeywell considered the following potential benefits of this approach:

- ***Enhanced Strategic and Operational Focus.*** Following the Spin-Off, Honeywell and SpinCo will each have a more focused business and be better able to dedicate financial, management and other resources to leverage their respective areas of strength and differentiation. Each company will pursue appropriate growth opportunities and execute strategic plans best suited to address the distinct market trends and opportunities for its business. SpinCo plans to focus on leadership in attractive products invest selectively in growth areas, ensure continued operational discipline and capture transformative productivity.
- ***Simplified Organizational Structure and Resources.*** The Spin-Off will allow the management of each of Honeywell and SpinCo to devote their time and attention to the development and implementation of corporate strategies and policies that are based primarily on the specific business characteristics of their respective companies. Each company will be able to adapt faster to clients' changing needs, address specific market dynamics, target innovation and investments in select growth areas and accelerate decision-making processes.
- ***Distinct and Clear Financial Profiles and Compelling Investment Cases.*** Investment in one company or the other may appeal to investors with different goals, interests and concerns. The Spin-Off will allow investors to make independent investment decisions with respect to Honeywell and SpinCo and may result in greater alignment between the interests of SpinCo's stockholder base and the characteristics of SpinCo's business, capital structure and financial results.
- ***Performance Incentives.*** We believe that the Spin-Off will enable SpinCo to create incentives for its management and employees that are more closely tied to its business performance and stockholder expectations. SpinCo's equity-based compensation arrangements will more closely align the interests of SpinCo's management and employees with the interests of its stockholders and should increase SpinCo's ability to attract and retain personnel.
- ***Capital Structure.*** The Spin-Off will enable each of Honeywell and SpinCo to leverage its distinct growth profile and cash flow characteristics to optimize its capital structure and capital allocation strategy.

In determining whether to effect the Spin-Off, Honeywell considered the costs and risks associated with the transaction, including the costs associated with preparing SpinCo to become an independent, publicly traded company, the risk of volatility in our stock price immediately following the Spin-Off due to sales by Honeywell's stockholders whose investment objectives may not be met by our common stock, the time it may take for us to attract our optimal stockholder base, the possibility of disruptions in our business as a result of the Spin-Off, the risk that the combined trading prices of our common stock and Honeywell's common stock after the Spin-Off may drop below the trading price of Honeywell's common stock before the Spin-Off and the loss of synergies and scale from operating as one company. Notwithstanding these costs and risks, taking into account the factors discussed above, Honeywell determined that the Spin-Off provided the best opportunity to achieve the above benefits and enhance stockholder value. Except with respect to taxes, which will be addressed by the Tax Matters Agreement, Honeywell will pay substantially all of the third party fees, costs and expenses associated with the Spin-Off incurred before and in connection with the consummation of the Spin-Off, and each of Honeywell and the Company generally will bear its own third party fees, costs and expenses associated with the Spin-Off incurred after the consummation of the Spin-Off.

Also as a result of this evaluation, Honeywell determined that proceeding with the Garrett Spin-Off would be in the best interests of Honeywell and its stockholders. The Garrett Spin-Off is being undertaken independently from the Spin-Off of our Company and you should receive a separate Information Statement with respect to the Garrett Spin-Off. The Garrett Spin-Off is separate from the Spin-Off of our Company and neither spin-off is conditioned upon completion of the other.

Table of Contents

**When and How You Will Receive SpinCo Shares**

Honeywell will distribute to its stockholders, as a *pro rata* dividend, one share of our common stock for every six shares of Honeywell common stock outstanding as of October 16, 2018, the Record Date of the Share Distribution.

Prior to the Share Distribution, Honeywell will deliver all of the issued and outstanding shares of our common stock to the distribution agent. Equiniti Trust Company will serve as distribution agent in connection with the Share Distribution and as transfer agent and registrar for our common stock.

If you own Honeywell common stock as of the close of business on October 16, 2018, the shares of our common stock that you are entitled to receive in the Share Distribution will be issued to your account as follows:

- ***Registered stockholders.*** If you own your shares of Honeywell common stock directly through Honeywell's transfer agent, you are a registered stockholder. In this case, the distribution agent will credit the whole shares of our common stock you receive in the Share Distribution by way of direct registration in book-entry form to a new account with our transfer agent. Registration in book-entry form refers to a method of recording share ownership where no physical stock certificates are issued to stockholders, as is the case in the Share Distribution. You will be able to access information regarding your book-entry account for SpinCo shares at www.shareowneronline.com or by calling Equiniti Trust Company at 1-800-468-9716.

Commencing on or shortly after the Share Distribution Date, the distribution agent will mail to you an account statement that indicates the number of whole shares of our common stock that have been registered in book-entry form in your name. We expect it will take the distribution agent up to two weeks after the Share Distribution Date to complete the distribution of the shares of our common stock and mail statements of holding to all registered stockholders.

- ***"Street name" or beneficial stockholders.*** If you own your shares of Honeywell common stock beneficially through a bank, broker or other nominee, the bank, broker or other nominee holds the shares in "street name" and records your ownership on its books. In this case, your bank, broker or other nominee will credit your account with the whole shares of our common stock that you receive in the Share Distribution on or shortly after the Share Distribution Date. We encourage you to contact your bank, broker or other nominee if you have any questions concerning the mechanics of having shares held in "street name."

If you sell any of your shares of Honeywell common stock on or before the Share Distribution Date, the buyer of those shares may in some circumstances be entitled to receive the shares of our common stock to be distributed in respect of the Honeywell shares you sold. See "The Spin-Off—Trading Prior to the Share Distribution Date" for more information.

We are not asking Honeywell stockholders to take any action in connection with the Spin-Off. We are not asking you for a proxy and request that you not send us a proxy. We are also not asking you to make any payment or surrender or exchange any of your shares of Honeywell common stock for shares of our common stock. The number of outstanding shares of Honeywell common stock will not change as a result of the Spin-Off.

**Treatment of Fractional Shares**

The distribution agent will not distribute any fractional shares of our common stock in connection with the Spin-Off. Instead, the distribution agent will aggregate all fractional shares into whole shares and sell the whole shares in the open market at prevailing market prices on behalf of Honeywell stockholders entitled to receive a fractional share. The distribution agent will then distribute the aggregate cash proceeds of the sales, net of brokerage fees, transfer taxes and other costs, *pro rata* to these holders (net of any required withholding for taxes

Table of Contents

applicable to each holder). We anticipate that the distribution agent will make these sales in the "when-issued" market, and "when-issued" trades will generally settle within two trading days following the Share Distribution Date. See "The Spin-Off—Trading Prior to the Share Distribution Date" for additional information regarding "when-issued" trading. The distribution agent will, in its sole discretion, without any influence by Honeywell or us, determine when, how, through which broker-dealer and at what price to sell the whole shares. The distribution agent is not, and any broker-dealer used by the distribution agent will not be, an affiliate of either Honeywell or us.

The distribution agent will send a check to each registered holder of Honeywell common stock entitled to a fractional share in the cash amount deliverable in lieu of that holder's fractional share as soon as practicable following the Share Distribution Date. We expect the distribution agent to take about two weeks after the Share Distribution Date to complete the distribution of cash in lieu of fractional shares to Honeywell stockholders. If you hold your shares through a bank, broker or other nominee, your bank, broker or nominee will receive, on your behalf, your *pro rata* share of the aggregate net cash proceeds of the sales. No interest will be paid on any cash you receive in lieu of a fractional share. The cash you receive in lieu of a fractional share will generally be taxable to you for U.S. federal income tax purposes. See "The Spin-Off—Material U.S. Federal Income Tax Consequences of the Spin-Off" below for more information.

**Material U.S. Federal Income Tax Consequences of the Spin-Off**

***Consequences to Holders of Honeywell common stock***

The following is a summary of the material U.S. federal income tax consequences to holders of Honeywell common stock in connection with the Distribution. This summary is based on the Code, the Treasury Regulations promulgated under the Code and judicial and administrative interpretations of those laws, in each case as in effect and available as of the date of this Information Statement and all of which are subject to change at any time, possibly with retroactive effect. Any such change could affect the tax consequences described below.

This summary does not discuss all tax considerations that may be relevant to stockholders in light of their particular circumstances, nor does it address the consequences to stockholders subject to special treatment under the U.S. federal income tax laws, such as:

- dealers or traders in securities or currencies;
- tax-exempt entities;
- banks, financial institutions or insurance companies;
- real estate investment trusts, regulated investment companies or grantor trusts;
- persons who acquired Honeywell common stock pursuant to the exercise of employee stock options or otherwise as compensation;
- stockholders who own, or are deemed to own, 10% or more, by voting power or value, of Honeywell equity;
- stockholders owning Honeywell common stock as part of a position in a straddle or as part of a hedging, conversion or other risk reduction transaction for U.S. federal income tax purposes;
- certain former citizens or long-term residents of the United States;
- stockholders who are subject to the alternative minimum tax;
- persons who are subject to special accounting rules under Section 451(b) of the Code;
- persons who own Honeywell common stock through partnerships or other pass-through entities; or
- persons who hold Honeywell common stock through a tax-qualified retirement plan.

Table of Contents

This summary does not address any U.S. state or local or foreign tax consequences or any estate, gift or other non-income tax consequences.

If a partnership, or any other entity treated as a partnership for U.S. federal income tax purposes, holds Honeywell common stock, the tax treatment of a partner in that partnership will generally depend on the status of the partner and the activities of the partnership. Such a partner or partnership is urged to consult its own tax advisor as to its tax consequences.

YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE AND LOCAL AND FOREIGN TAX CONSEQUENCES OF THE SHARE DISTRIBUTION.

***General***

Completion of the Spin-Off is conditioned upon Honeywell's receipt of written opinions from Cleary Gottlieb Steen & Hamilton LLP and KPMG LLP to the effect that the Distribution will qualify for non-recognition of gain or loss under Section 355 and related provisions of the Code. The opinions will be based on the assumption that, among other things, the representations made, and information submitted, in connection with it are accurate. If the Distribution qualifies for this treatment and subject to the qualifications and limitations set forth herein (including the discussion below relating to the receipt of cash in lieu of fractional shares), for U.S. federal income tax purposes:

- no gain or loss will be recognized by, or be includible in the income of, a holder as a result of the Distribution, except with respect to any cash received in lieu of fractional shares;
- the aggregate tax basis of the Honeywell common stock and our common stock held by each holder immediately after the Distribution will be the same as the aggregate tax basis of the Honeywell common stock held by that holder immediately before the Distribution, allocated between the Honeywell common stock and our common stock in proportion to their relative fair market values on the date of the Distribution (subject to reduction upon the deemed sale of any fractional shares, as described below); and
- the holding period of our common stock received by each Holder will include the holding period of its Honeywell common stock.

The opinions will not address any U.S. state or local or foreign tax consequences of the Spin-Off. The opinions will assume that the Spin-Off will be completed according to the terms of the Separation and Distribution Agreement and will rely on the facts as stated in the Separation and Distribution Agreement, the Tax Matters Agreement, the other ancillary agreements, this Information Statement and a number of other documents. In addition, the opinions will be based on certain representations as to factual matters from, and certain covenants by, Honeywell and us. The opinions cannot be relied on if any of the assumptions, representations or covenants is incorrect, incomplete or inaccurate or are violated in any material respect.

The opinions will not be binding on the IRS or the courts, and there can be no assurance that the IRS or a court will not take a contrary position. If the conclusions expressed in the opinions are challenged by the IRS, and if the IRS prevails in that challenge, the tax consequences of the Spin-Off could be materially less favorable. Honeywell has not requested, and does not intend to request, a ruling from the IRS regarding the U.S. federal income tax consequences of the Spin-Off.

If the Distribution were determined not to qualify for non-recognition of gain or loss, the above consequences would not apply and each holder who receives our common stock in the Distribution would generally be treated as receiving a distribution in an amount equal to the fair market value of our common stock received, which would generally result in:

- a taxable dividend to the extent of the holder's *pro rata* share of Honeywell's current or accumulated earnings and profits;

Table of Contents

- a reduction in the holder's basis (but not below zero) in Honeywell common stock to the extent the amount received exceeds the holder's share of Honeywell's earnings and profits; and
- a taxable gain from the exchange of Honeywell common stock to the extent the amount received exceeds the sum of the holder's share of Honeywell's earnings and profits and its basis in its Honeywell common stock.

***Cash in Lieu of Fractional Shares***

If a holder receives cash in lieu of a fractional share of common stock as part of the Distribution, the holder will be treated as though it first received a distribution of the fractional share in the Distribution and then sold it for the amount of cash actually received. The holder generally will recognize capital gain or loss measured by the difference between the cash received for such fractional share and the holder's tax basis in that fractional share, as determined above. Such capital gain or loss will be long-term capital gain or loss if the holder's holding period for the Honeywell common stock is more than one year on the date of the Distribution.

Payments of cash in lieu of a fractional share of our common stock may, under certain circumstances, be subject to "backup withholding," unless a holder provides proof of an applicable exemption or a correct taxpayer identification number, and otherwise complies with the requirements of the backup withholding rules. Corporations will generally be exempt from backup withholding, but may be required to provide a certification to establish their entitlement to the exemption. Backup withholding is not an additional tax, and it may be refunded or credited against a holder's U.S. federal income tax liability if the required information is timely supplied to the IRS.

***Consequences to Honeywell***

The following is a summary of the material U.S. federal income tax consequences to Honeywell in connection with the Spin-Off that may be relevant to holders of Honeywell common stock.

As discussed above, completion of the Spin-Off is conditioned upon Honeywell's receipt of written opinions from Cleary Gottlieb Steen & Hamilton LLP and KPMG LLP to the effect that the Distribution will qualify for nonrecognition of gain or loss under Section 355 and related provisions of the Code. If the Distribution qualifies for nonrecognition of gain or loss under Section 355 and related provisions of the Code, then Honeywell generally will not recognize gain or loss as a result of the Distribution. The opinions are subject to the qualifications and limitations as are set forth above under "—Consequences to U.S. Holders of Honeywell common stock."

If the Distribution were determined not to qualify for non-recognition of gain or loss under Section 355 and related provisions of the Code, then Honeywell would recognize gain equal to the excess of the fair market value of our common stock distributed to Honeywell stockholders over Honeywell's tax basis in our common stock.

**Results of the Spin-Off**

After the Spin-Off, we will be an independent, publicly traded company. Immediately following the Spin-Off, we expect to have approximately 123,451,420 shares of our common stock outstanding, based on the number of Honeywell stockholders and shares of Honeywell common stock outstanding on September 18, 2018. The actual number of shares of our common stock Honeywell will distribute in the Spin-Off will depend on the actual number of shares of Honeywell common stock outstanding on the Record Date, which will reflect any issuance of new shares or exercises of outstanding options pursuant to Honeywell's equity plans, and any repurchase of Honeywell shares by Honeywell under its common stock repurchase program, on or prior to the Record Date. Shares of Honeywell common stock held by Honeywell as treasury shares will not be considered outstanding for purposes of, and will not be entitled to participate in the Share Distribution. The Spin-Off will not

Table of Contents

affect the number of outstanding shares of Honeywell common stock or any rights of Honeywell stockholders. However, following the Share Distribution, the equity value of Honeywell will no longer reflect the value of the Business. There can be no assurance that the combined trading prices of the Honeywell common stock and our common stock will equal or exceed what the trading price of Honeywell common stock would have been in absence of the Spin-Off.

Before our separation from Honeywell, we intend to enter into a Separation and Distribution Agreement and several other agreements with Honeywell related to the Spin-Off. These agreements will govern the relationship between us and Honeywell up to and after completion of the Spin-Off and allocate between us and Honeywell various assets, liabilities, rights and obligations, including employee benefits, environmental, intellectual property and tax-related assets and liabilities. We describe these arrangements in greater detail under "Certain Relationships And Related Party Transactions—Agreements with Honeywell."

**Listing and Trading of Our Common Stock**

As of the date of this Information Statement, we are a wholly owned subsidiary of Honeywell. Accordingly, no public market for our common stock currently exists, although a "when-issued" market in our common stock may develop prior to the Share Distribution. See "The Spin-Off—Trading Prior to the Share Distribution Date" below for an explanation of a "when-issued" market. We intend to apply to list our shares of common stock on the New York Stock Exchange under the symbol "REZI." Following the Spin-Off, Honeywell common stock will continue to trade on the New York Stock Exchange under the symbol "HON."

Neither we nor Honeywell can assure you as to the trading price of Honeywell common stock or our common stock after the Spin-Off, or as to whether the combined trading prices of our common stock and the Honeywell common stock after the Spin-Off will equal or exceed the trading prices of Honeywell common stock prior to the Spin-Off. The trading price of our common stock may fluctuate significantly following the Spin-Off.

The shares of our common stock distributed to Honeywell stockholders will be freely transferable, except for shares received by individuals who are our affiliates. Individuals who may be considered our affiliates after the Spin-Off include individuals who control, are controlled by or are under common control with us, as those terms generally are interpreted for federal securities law purposes. These individuals may include some or all of our directors and executive officers. Individuals who are our affiliates will be permitted to sell their shares of our common stock only pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act"), or an exemption from the registration requirements of the Securities Act, such as those afforded by Section 4(a)(1) of the Securities Act or Rule 144 thereunder.

**Trading Prior to the Share Distribution Date**

We expect a "when-issued" market in our common stock to develop as early as one trading day prior to the Record Date for the Share Distribution and continue up to and including the Share Distribution Date. "When-issued" trading refers to a sale or purchase made conditionally on or before the Share Distribution Date because the securities of the spun-off entity have not yet been distributed. If you own shares of Honeywell common stock at the close of business on the Record Date, you will be entitled to receive shares of our common stock in the Share Distribution. You may trade this entitlement to receive shares of our common stock, without the shares of Honeywell common stock you own, on the "when-issued" market. We expect "when-issued" trades of our common stock to settle within two trading days after the Share Distribution Date. On the first trading day following the Share Distribution Date, we expect that "when-issued" trading of our common stock will end and "regular-way" trading will begin.

We also anticipate that, as early as one trading day prior to the Record Date and continuing up to and including the Share Distribution Date, there will be two markets in Honeywell common stock: a "regular-way" market and an "ex-distribution" market. Shares of Honeywell common stock that trade on the regular-way

Table of Contents

market will trade with an entitlement to receive shares of our common stock in the Share Distribution. Shares that trade on the ex-distribution market will trade without an entitlement to receive shares of our common stock in the Share Distribution. Therefore, if you sell shares of Honeywell common stock in the regular-way market up to and including the Share Distribution Date, you will be selling your right to receive shares of our common stock in the Share Distribution. However, if you own shares of Honeywell common stock at the close of business on the Record Date and sell those shares on the ex-distribution market up to and including the Share Distribution Date, you will still receive the shares of our common stock that you would otherwise be entitled to receive in the Share Distribution.

If "when-issued" trading occurs, the listing for our common stock is expected to be under a trading symbol different from our regular-way trading symbol. We will announce our "when-issued" trading symbol when and if it becomes available. If the Spin-Off does not occur, all "when-issued" trading will be null and void.

**Conditions to the Spin-Off**

We expect that the Spin-Off will be effective on the Share Distribution Date, provided that the following conditions shall have been satisfied or waived by Honeywell:

- the Honeywell Board shall have approved the Reorganization Transactions and Share Distribution and not withdrawn such approval, and shall have declared the dividend of our common stock to Honeywell stockholders;
- the ancillary agreements contemplated by the Separation and Distribution Agreement shall have been executed by each party to those agreements;
- the SEC shall have declared effective our Registration Statement on Form 10, of which this Information Statement is a part, under the Exchange Act, and no stop order suspending the effectiveness of the Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;
- our common stock shall have been accepted for listing on a national securities exchange approved by Honeywell, subject to official notice of issuance;
- Honeywell shall have received the written opinion of Cleary Gottlieb Steen & Hamilton LLP, which shall remain in full force and effect, regarding the intended treatment of the Share Distribution under the Code;
- Honeywell shall have received the written opinion of KPMG LLP, which shall remain in full force and effect, regarding the intended treatment of the Share Distribution under the Code;
- the Reorganization Transactions shall have been completed (other than those steps that are expressly contemplated to occur at or after the Share Distribution);
- no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Share Distribution shall be in effect, and no other event outside the control of Honeywell shall have occurred or failed to occur that prevents the consummation of the Share Distribution;
- no other events or developments shall have occurred prior to the Share Distribution that, in the judgment of the Honeywell Board, would result in the Share Distribution having a material adverse effect on Honeywell or its stockholders;
- prior to the Share Distribution Date, notice of Internet availability of this Information Statement or this Information Statement shall have been mailed to the holders of Honeywell common stock as of the Record Date; and
- certain other conditions set forth in the Separation and Distribution Agreement.

Table of Contents

Any of the above conditions may be waived by the Honeywell Board to the extent such waiver is permitted by law. If the Honeywell Board waives any condition prior to the effectiveness of the Registration Statement on Form 10, of which this Information Statement Forms a part, and the result of such waiver is material to Honeywell stockholders, we will file an amendment to the Registration Statement on Form 10, of which this Information Statement forms a part, to revise the disclosure in the Information Statement accordingly. In the event that Honeywell waives a condition after this Registration Statement becomes effective and such waiver is material, we would communicate such change to Honeywell's stockholders by filing a Form 8-K describing the change.

The fulfillment of the above conditions will not create any obligation on Honeywell's part to complete the Spin-Off. We are not aware of any material federal, foreign or state regulatory requirements with which we must comply, other than SEC rules and regulations, or any material approvals that we must obtain, other than the approval for listing of our common stock and the SEC's declaration of the effectiveness of the Registration Statement, in connection with the Share Distribution. Honeywell may at any time until the Share Distribution decide to abandon the Share Distribution or modify or change the terms of the Share Distribution.

**Reasons for Furnishing this Information Statement**

We are furnishing this Information Statement solely to provide information to Honeywell's stockholders who will receive shares of our common stock in the Share Distribution. You should not construe this Information Statement as an inducement or encouragement to buy, hold or sell any of our securities or any securities of Honeywell. We believe that the information contained in this Information Statement is accurate as of the date set forth on the cover. Changes to the information contained in this Information Statement may occur after that date, and neither we nor Honeywell undertakes any obligation to update the information except in the normal course of our and Honeywell's public disclosure obligations and practices.

Table of Contents

**DIVIDEND POLICY**

Subject to the sole discretion of our Board and the considerations discussed below, once the Spin-Off is effective, we anticipate paying cash dividends on our common stock, in an amount yet to be determined. We expect, but do not guarantee, that we will be in a position to declare a dividend for the first time in 2019.

The Board's decisions regarding the payment of dividends will depend on consideration of many factors, such as our financial condition, earnings, opportunities to retain future earnings for use in the operation of our business and to fund future growth, capital requirements, debt service obligations, obligations under the Indemnification and Reimbursement Agreement, legal requirements, availability of surplus, regulatory constraints and other factors that the Board deems relevant. Additionally, the terms of the indebtedness we intend to incur in connection with the Spin-Off, obligations under the Indemnification and Reimbursement Agreement and other amounts owed to Honeywell under the Transition Services, Tax Matters, Employee Matters, Trademark License and Patent Cross-License Agreements, will limit our ability to pay cash dividends. As a consequence, there is no guarantee that any dividends will be declared on our common stock by our Board, or if so declared, will be continued in the future. See "Risk Factors—Our ability to pay cash dividends to our stockholders is subject to the discretion of our Board and may be limited by the terms of our indebtedness and the Indemnification and Reimbursement Agreement; there is no guarantee we will initiate dividends, or that once initiated, that we will continue paying dividends."

Table of Contents

# CAPITALIZATION

The following table sets forth our cash and cash equivalents and capitalization as of June 30, 2018, on a historical basis and on an as adjusted basis to give effect to the Spin-Off and the transactions related to the Spin-Off, as if they occurred on June 30, 2018. You should review the following table in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations," our historical Combined Financial Statements and the accompanying Notes thereto and our unaudited pro forma financial statements and the accompanying Notes thereto included elsewhere in this Information Statement. For information on how each adjustment in the following table was computed, including a discussion of significant assumptions and estimates used to arrive at such adjustments, refer to the indicated note in the notes accompanying our pro forma combined financial statements included elsewhere in this Information Statement. See "Unaudited Pro Forma Combined Financial Statements."

| | As of June 30, 2018 | | |
|---|---|---|---|
| | Historical as Reported | Notes | As Adjusted |
| | (Dollars in millions) | | |
| Cash and cash equivalents | $ 93 | (c,e,f) | $ 75 |
| Capitalization | | | |
| Indebtedness: | | | |
| Term loans(1) | $ — | (c) | $ 825 |
| Senior unsecured notes(2) | — | (c) | 400 |
| Total indebtedness(3) | — | | 1,225 |
| Equity: | | | |
| Invested equity | $ 2,599 | (b,d,f,g,h) | $ — |
| Common Stock, par value $0.001 | — | (h) | |
| Additional paid in capital | — | (h) | 1,380 |
| Accumulated other comprehensive income | (119) | | (119) |
| Total equity | 2,480 | | 1,261 |
| Total capitalization | $ 2,480 | | $ 2,486 |

(1) We expect to enter into senior secured term loans of $825 million aggregate principal amount outstanding without giving effect to financing fees of approximately $17.7 million. Term loans are expected to be secured by certain assets of the borrower and the guarantors, including a perfected first-priority pledge of all of the equity securities of the borrower and each wholly-owned subsidiary of SpinCo held by any loan party, subject to certain customary exceptions and limitations.

(2) We expect to enter into senior unsecured notes of $400 million aggregate principal amount outstanding without giving effect to financing fees of approximately $7.8 million.

(3) We expect to enter into secured revolving credit facility in a committed amount of $350 million for which we expect to pay $4.7 million of financing fees.

**Table of Contents**

**SELECTED HISTORICAL AND UNAUDITED PRO FORMA COMBINED FINANCIAL DATA**

The following tables present certain selected historical combined financial information as of and for each of the years in the five-year period ended December 31, 2017 and as of June 30, 2018 and for the three months ended June 30, 2018 and 2017 and six months ended June 30, 2018 and 2017. The selected historical combined financial data as of December 31, 2017 and 2016, and for each of the years in the three-year period ended December 31, 2017, are derived from our historical audited Combined Financial Statements included elsewhere in this Information Statement. The selected historical combined financial data as of December 31, 2015, 2014 and 2013 and for the years ended December 31, 2014 and 2013 are derived from our unaudited combined financial information that is not included in this Information Statement. The selected historical combined financial data as of June 30, 2018 and for the three months ended June 30, 2018 and 2017 and six months ended June 30, 2018 and 2017 are derived from our unaudited Combined Financial Statements included elsewhere in this Information Statement. The results of operations and cash flows for the three months ended June 30, 2018 and six months ended June 30, 2018 should not necessarily be taken as indicative of the entire year. The unaudited Combined Financial Statements have been prepared on the same basis as the audited Combined Financial Statements and, in the opinion of our management, include all adjustments, consisting of only ordinary recurring adjustments, necessary for a fair statement of the information set forth in this Information Statement.

The selected historical combined financial data presented below should be read in conjunction with “Management’s Discussion and Analysis of Financial Condition and Results of Operations” and our historical Combined Financial Statements and the accompanying Notes thereto included elsewhere in this Information Statement. For each of the periods presented, our business was wholly owned by Honeywell. The financial information included herein may not necessarily reflect our financial position, results of operations and cash flows in the future or what our financial position, results of operations and cash flows would have been had we been an independent, publicly traded company during the periods presented. In addition, our historical combined financial information does not reflect changes that we expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, operations, cost structure and personnel needs of our business. Further, the historical combined financial information includes allocations of certain Honeywell corporate expenses, as described in Note 3. Related Party Transactions with Honeywell to the historical Combined Financial Statements. We believe the assumptions and methodologies underlying the allocation of these expenses are reasonable. However, such expenses may not be indicative of the actual level of expense that we would have incurred if we had operated as an independent, publicly traded company or of the costs expected to be incurred in the future.

Table of Contents

The following tables also present certain unaudited pro forma combined financial information of SpinCo for the six months ended June 30, 2018 and the year ended December 31, 2017 and an unaudited pro forma combined balance sheet as of June 30, 2018. The unaudited pro forma combined financial statements are derived from our historical Combined Financial Statements included elsewhere in this Information Statement, and are not intended to be a complete presentation of our financial position or results of operations had the transactions contemplated by the Separation and Distribution Agreement and related agreements occurred as of the dates indicated. The unaudited pro forma combined financial statements should be read in conjunction with our "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical Combined Financial Statements and the accompanying Notes included elsewhere in this Information Statement. The unaudited pro forma combined statements of operations for the six months ended June 30, 2018 and the year ended December 31, 2017 reflect our results as if the Spin-Off and related transactions had occurred as of January 1, 2017. The unaudited pro forma combined balance sheet as of June 30, 2018 reflects our results as if the Spin-Off and related transactions had occurred as of such date. Refer to the "Unaudited Pro Forma Combined Financial Statements" for further information about the Spin-Off transactions.

| | Three Months Ended June 30, | | Pro Forma Six Months Ended June 30, | Six Months Ended June 30, | | Pro Forma Year Ended December 31, | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2018 | 2017 | 2017 | 2017 | 2016 | 2015 | 2014 | 2013 |
| | (Dollars in millions) | | | | | | | | | | |
| **Selected Statement of Operations Information:** | | | | | | | | | | | |
| Net sales | $1,196 | $1,096 | $ 2,361 | $2,361 | $2,158 | $ 4,519 | $4,519 | $4,455 | $4,154 | $4,125 | $3,910 |
| Net income (loss) | $ 33 | $ 16 | $ 58 | $ 78 | $ 32 | $ (425) | $ (394) | $ 177 | $ 147 | $ 112 | $ 93 |
| Adjusted net income (Non-GAAP)(1)(2) | $ 141 | $ 84 | $ 207 | $ 247 | $ 155 | $ 322 | $ 385 | $ 388 | $ 315 | | |
| Adjusted net income including environmental indemnification payments (Non-GAAP)(1)(2) | $ 106 | $ 49 | $ 137 | $ 177 | $ 85 | $ 182 | $ 245 | $ 248 | $ 175 | | |
| EBITDA (Non-GAAP)(1) | $ 20 | $ 55 | $ 122 | $ 116 | $ 117 | $ 233 | $ 230 | $ 371 | $ 314 | $ 288 | $ 246 |
| Adjusted EBITDA (Non-GAAP)(1)(2) | $ 154 | $ 132 | $ 300 | $ 314 | $ 253 | $ 554 | $ 583 | $ 599 | $ 485 | | |
| Adjusted EBITDA including environmental indemnification payments (Non-GAAP)(1)(2) | $ 119 | $ 97 | $ 230 | $ 244 | $ 183 | $ 414 | $ 443 | $ 459 | $ 345 | | |

| | Pro Forma as of June 30, | As of June 30, | As of December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| | (Dollars in millions) | | | | | | |
| **Selected Balance Sheet Information:** | | | | | | | |
| Total assets | $ 4,467 | $ 4,507 | $4,473 | $4,294 | $4,096 | $3,922 | $3,983 |
| Long-term obligations | $ 2,088 | $ 794 | $ 723 | $ 338 | $ 335 | $ 347 | $ 360 |
| Total liabilities | $ 3,206 | $ 2,027 | $1,870 | $1,420 | $1,377 | $1,432 | $1,483 |
| Total equity | $ 1,261 | $ 2,480 | $2,603 | $2,874 | $2,719 | $2,490 | $2,500 |

(1) See below "—Net Income, EBITDA, Adjusted EBITDA and Further Adjusted EBITDA."

(2) This non-GAAP financial measure is being included only for the periods covered by the Combined Financial Statements included elsewhere in this Information Statement.

Table of Contents

*Net Income, EBITDA, Adjusted EBITDA and Further Adjusted EBITDA[1]*

It is management's intent to provide non-GAAP financial information to enhance the understanding of our GAAP financial information, and it should be considered by the reader in addition to, but not instead of, the financial statements prepared in accordance with GAAP. Each non-GAAP financial measure is presented along with the corresponding most directly comparable GAAP measure so as not to imply that more emphasis should be placed on the non-GAAP measure. The non-GAAP financial information presented may be determined or calculated differently by other companies.

| | Three Months Ended June 30, | | Pro Forma Six Months Ended June 30, | Six Months Ended June 30, | | Pro Forma Year Ended December 31, | Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2018 | 2017 | 2017 | 2017 | 2016 | 2015 |
| **Net income (loss) - GAAP** | **$ 33** | **$ 16** | **$ 58** | **$ 78** | **$ 32** | **$ (425)** | **$(394)** | **$177** | **$147** |
| Environmental expense (2) | 123 | 51 | 158 | 176 | 100 | 254 | 282 | 190 | 173 |
| Estimated stand-alone costs (3) | 2 | 1 | 4 | 4 | 4 | 24 | 24 | (1) | (23) |
| Stock compensation expense (4) | 5 | 4 | 9 | 9 | 8 | 16 | 16 | 13 | 10 |
| Repositioning charges | — | 18 | 5 | 5 | 19 | 23 | 23 | 19 | 10 |
| Non-Operating (income) expense (5) | 2 | 1 | (1) | 1 | 2 | (3) | 1 | — | (6) |
| Income tax adjustment (6) | (24) | (7) | (26) | (26) | (10) | 433 | 433 | (10) | 4 |
| **Adjusted net income (Non-GAAP)** | **$ 141** | **$ 84** | **$ 207** | **$247** | **$155** | **$ 322** | **$ 385** | **$388** | **$315** |
| Assumed cash payments related to Indemnification and Reimbursement Agreement obligations (7) | (35) | (35) | (70) | (70) | (70) | (140) | (140) | (140) | (140) |
| **Adjusted net income** including environmental indemnification payments **(Non-GAAP)** | **$ 106** | **$ 49** | **$ 137** | **$177** | **$ 85** | **$ 182** | **$ 245** | **$248** | **$175** |

| | Three Months Ended June 30, | | Pro Forma Six Months Ended June 30, | Six Months Ended June 30, | | Pro Forma Year Ended December 31 | Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2018 | 2017 | 2017 | 2017 | 2016 | 2015 |
| **Net income (loss) - GAAP** | **$ 33** | **$ 16** | **$ 58** | **$ 78** | **$ 32** | **$ (425)** | **$(394)** | **$177** | **$147** |
| Net interest (income) expense | (1) | (1) | 37 | (1) | (2) | 71 | (3) | (3) | (1) |
| Tax expense | (28) | 23 | (6) | 6 | 54 | 520 | 560 | 133 | 110 |
| Depreciation | 13 | 14 | 27 | 27 | 28 | 57 | 57 | 57 | 54 |
| Amortization | 3 | 3 | 6 | 6 | 5 | 10 | 10 | 7 | 4 |
| **EBITDA (Non-GAAP)** | **$ 20** | **$ 55** | **$ 122** | **$116** | **$117** | **$ 233** | **$ 230** | **$371** | **$314** |
| Environmental expense (2) | 123 | 51 | 158 | 176 | 100 | 254 | 282 | 190 | 173 |
| Estimated stand-alone costs (8) | 4 | 3 | 7 | 7 | 7 | 31 | 31 | 6 | (16) |
| Stock compensation expense (4) | 5 | 4 | 9 | 9 | 8 | 16 | 16 | 13 | 10 |
| Non-Operating (income) expense (5) | 2 | 1 | (1) | 1 | 2 | (3) | 1 | — | (6) |
| Repositioning charges | — | 18 | 5 | 5 | 19 | 23 | 23 | 19 | 10 |
| **Adjusted EBITDA (Non-GAAP)** | **$154** | **$132** | **$ 300** | **$314** | **$253** | **$ 554** | **$ 583** | **$599** | **$485** |
| Assumed cash payments related to Indemnification and Reimbursement Agreement obligations (7) | (35) | (35) | (70) | (70) | (70) | (140) | (140) | (140) | (140) |
| **Adjusted EBITDA** including environmental indemnification payments **(Non-GAAP)** | **$119** | **$ 97** | **$ 230** | **$244** | **$183** | **$ 414** | **$ 443** | **$459** | **$345** |

(1) We define "Adjusted net income" as Net income (loss) adjusted for environmental expense, the difference between our estimate of costs as a stand-alone company and historical allocated costs, stock compensation

Table of Contents

expense, repositioning charges, non-operating (income) expense (which primarily consists of foreign transaction gains and losses and hedging gains and losses) and the tax effect of the pre-tax items. We define "Adjusted net income including environmental indemnification payments" as Adjusted net income less the assumed cash paid for environmental obligations subject to the cap of $140 million in respect of a year in accordance with the terms of the Indemnification and Reimbursement Agreement as described in pro forma notes (2) and (7) below (referred to in the captions in the above tables as "environmental indemnification payments"). We define "EBITDA" as our net income (loss) calculated in accordance with U.S. GAAP, plus the sum of net interest (income) expense, tax expense, depreciation and amortization. We define "Adjusted EBITDA" as EBITDA adjusted for environmental expense, the difference between our estimate of costs as a stand-alone company and historical allocated costs, non-operating (income) expense (which primarily consists of foreign transaction gains and losses and hedging gains and losses), stock compensation expense and repositioning charges. We define "Adjusted EBITDA including environmental indemnification payments" as Adjusted EBITDA less the assumed cash paid for environmental obligations subject to the cap of $140 million in respect of a year in accordance with the terms of the Indemnification and Reimbursement Agreement as described in pro forma notes (2) and (7) below. We believe that Adjusted net income, Adjusted net income including environmental indemnification payments, EBITDA, Adjusted EBITDA, and Adjusted EBITDA including environmental indemnification payments are important indicators of operating performance because:

- EBITDA, Adjusted EBITDA and Adjusted EBITDA including environmental indemnification payments exclude the effects of income taxes, as well as the effects of financing and investing activities by eliminating the effects of interest and depreciation expenses and therefore more closely measure our operational performance;
- we may use Adjusted EBITDA in setting performance incentive targets in order to align performance measurement with operational performance;
- certain adjustment items, while periodically affecting our results, may vary significantly from period to period and have disproportionate effect in a given period, which affects comparability of our results; and
- Adjusted net income, Adjusted net income including environmental indemnification payments, and Adjusted EBITDA including environmental indemnification payments are expected to be used as part of our calculations with respect to compliance with certain debt covenants expected to be included in our future credit agreements.

We may also utilize for analysis purposes an Adjusted EBITDA Margin, which is our Adjusted EBITDA divided by our net sales after intersegment eliminations, with the comparable GAAP measure being net income (loss) divided by our net sales after intersegment eliminations.

(2) Represents historical environmental expenses as reported under 100% carryover basis.
(3) Represents the difference between our estimate of Selling, general and administrative costs as a stand-alone company and historical allocated costs, which includes corporate depreciation charges. The preliminary estimates at this time for the costs on a stand-alone basis would be approximately $265 million on an annual basis, which replaces the historical allocations on a carve-out basis of presentation.
(4) Stock compensation expense adjustment includes only non-cash expenses.
(5) Non-operating (income) expense adjustment excludes net interest (income).
(6) Represents the tax effect of pre-tax items excluded from Adjusted Net Income and the removal of discrete tax items, including the income tax impacts of the Tax Act. The tax effect of pre-tax items excluded from Adjusted Net Income is computed using the statutory rate related to the jurisdiction that was impacted by the adjustment after taking into account the impact of permanent differences and valuation allowances. The year-ended December 31, 2017 and the Pro Forma year-ended December 31, 2017 amounts include a net charge of $454 million, respectively, recognized as a result of the Tax Act.

Table of Contents

(7) On a going forward basis, pursuant to the Indemnification and Reimbursement Agreement, we expect to be responsible to indemnify Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales; such payments will be subject to a cap of $140 million in respect of liabilities arising in any given year (exclusive of any late payment fees up to 5% per annum).

(8) Represents the difference between our estimate of Selling, general and administrative costs as a stand-alone company and historical allocated costs, which excludes corporate depreciation charges. The preliminary estimates at this time for the costs on a stand-alone basis would be approximately $265 million on an annual basis, which replaces the historical allocations on a carve-out basis of presentation.

Refer to the Unaudited Pro Forma Combined Financial Statements for additional information.

Table of Contents

**UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS**

The unaudited pro forma combined financial statements of SpinCo consist of the unaudited pro forma combined statements of operations for the six months ended June 30, 2018 and the year ended December 31, 2017 and an unaudited pro forma combined balance sheet as of June 30, 2018. The unaudited pro forma combined financial statements are derived from our historical Combined Financial Statements included elsewhere in this Information Statement, and are not intended to be a complete presentation of our financial position or results of operations had the transactions contemplated by the Separation and Distribution Agreement and related agreements occurred as of the dates indicated. The unaudited pro forma combined financial statements should be read in conjunction with our "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical Combined Financial Statements and the accompanying Notes included elsewhere in this Information Statement.

The unaudited pro forma combined statements of operations for the six months ended June 30, 2018 and the year ended December 31, 2017 reflect our results as if the Spin-Off and related transactions described below had occurred as of January 1, 2017. The unaudited pro forma combined balance sheet as of June 30, 2018 reflects our results as if the Spin-Off and related transactions described below had occurred as of such date.

The unaudited pro forma combined financial statements will give effect to the following:

- the contribution by Honeywell to us of all the assets and liabilities that comprise our business pursuant to the Separation and Distribution Agreement;
- the anticipated post-Distribution capital structure, including: (i) the incurrence of indebtedness and the making of a cash transfer to Honeywell; and (ii) the issuance of our common stock to holders of Honeywell common stock;
- the impact of certain pension liabilities related to certain of our employees that we will assume after the Spin-Off and which will be paid by us at a future date; and
- the impact of, and transactions contemplated by, the Separation and Distribution Agreement, Trademark License Agreement, Employee Matters Agreement, the Indemnification and Reimbursement Agreement and other agreements related to the Distribution between us and Honeywell and the provisions contained therein.

The unaudited pro forma combined financial statements are subject to the assumptions and adjustments described in the accompanying Notes that reflect the expected impacts of events directly attributable to the Spin-Off and that are factually supportable and, for purposes of statements of operations, are expected to have a continuing impact on us. However, these adjustments are subject to change as we and Honeywell finalize the terms of the Separation and Distribution Agreement and the other agreements related to the Share Distribution. The unaudited pro forma combined financial statements are provided for illustrative and informational purposes only and are not necessarily indicative of our future results of operations or financial condition as an independent, publicly traded company.

The operating expenses reported in our historical combined statements of operations include allocations of certain Honeywell costs. These costs include the allocation of all Honeywell corporate costs, shared services and other related costs that benefit us.

As a stand-alone public company, we expect to incur additional recurring costs of being a stand-alone public company. The significant assumptions involved in determining our estimates of recurring costs of being a stand-alone public company include:

- costs to perform financial reporting, tax, regulatory compliance, corporate governance, treasury, legal, internal audit and investor relations activities;

Table of Contents

- insurance premiums;
- changes in our overall facility costs;
- depreciation and amortization related to information technology infrastructure investments; and
- the type and level of other costs expected to be incurred.

The preliminary estimates at this time for the costs on a stand-alone basis would be approximately $265 million on an annual basis, which differs from the historical allocations on a carve-out basis of presentation. The pro forma impact of such costs has not been reflected herein as many of the costs expected to comprise these amounts are estimates. Actual expenses could vary from this range estimate and such variations could be material.

We currently estimate that we will incur substantial non-recurring costs associated with becoming a stand-alone public company within 24 months of the Distribution. The accompanying unaudited pro forma combined statements of operations are not adjusted for these estimated expenses as they are also projected amounts based on estimates and would not be factually supportable. These expenses primarily relate to the following:

- relocation costs;
- recruiting and relocation costs associated with hiring key senior management personnel new to our company;
- costs related to establishing our new brand in the marketplace;
- costs to separate information systems; and
- costs of retention bonuses.

Due to the scope and complexity of these activities, the amount of these costs could increase or decrease materially and the timing of incurrence could change.

The accompanying pro forma combined statements of operations are also not adjusted for any potential dividends SpinCo may pay in the future should the Board determine to declare any such dividends.

Table of Contents

**UNAUDITED PRO FORMA COMBINED STATEMENT OF OPERATIONS**
**FOR THE SIX MONTHS ENDED JUNE 30, 2018**

**(Dollars in millions, except per share data)**

| | Historical As Reported | Pro Forma Adjustments(1) | Notes | As Adjusted |
|---|---|---|---|---|
| Net sales | $ 2,361 | $ — | | $ 2,361 |
| Costs of goods sold | 1,672 | — | | 1,672 |
| Gross profit | 689 | — | | 689 |
| Selling, general and administrative expenses | 429 | 14 | (a) | 443 |
| Other expense | 176 | (18) | (b) | 158 |
| Interest and other charges, net | — | 36 | (c,e,g) | 36 |
| Income before taxes | 84 | (32) | | 52 |
| Tax expense (income) | 6 | (12) | (d) | (6) |
| Net income | $ 78 | $ (20) | | $ 58 |
| Unaudited Pro Forma Earnings Per Share | | | | |
| Basic | | | (i) | $ 0.47 |
| Diluted | | | (j) | $ 0.47 |
| Weighted-average number of shares outstanding | | | (i) | |
| Basic | | | (j) | 124.7 |
| Diluted | | | | 124.7 |

(1) The change in our cost structure related to our Company becoming an independent, publicly traded company is not reflected above.

See accompanying Notes to the unaudited pro forma combined financial statements.

Table of Contents

**UNAUDITED PRO FORMA COMBINED STATEMENT OF OPERATIONS**
**FOR THE YEAR ENDED DECEMBER 31, 2017**

**(Dollars in millions, except per share data)**

| | Historical As Reported | Pro Forma Adjustments(1) | Notes | As Adjusted |
|---|---|---|---|---|
| Net sales | $ 4,519 | $ — | | $ 4,519 |
| Costs of goods sold | 3,203 | — | | 3,203 |
| Gross profit | 1,316 | — | | 1,316 |
| Selling, general and administrative expenses | 871 | 29 | (a) | 900 |
| Other expense | 281 | (28) | (b) | 253 |
| Interest and other charges, net | (2) | 70 | (c,g) | 68 |
| Income before taxes | 166 | (71) | | 95 |
| Tax expense (income) | 560 | (40) | (d) | 520 |
| Net (loss) income | $ (394) | $ (31) | | $ (425) |
| Unaudited Pro Forma Earnings Per Share | | | | |
| Basic | | | (i) | $ (3.35) |
| Diluted | | | (j) | $ (3.35) |
| Weighted-average number of shares outstanding | | | | |
| Basic | | | (i) | 127.0 |
| Diluted | | | (j) | 127.0 |

(1) The change in our cost structure related to our Company becoming an independent, publicly traded company is not reflected above.

See accompanying Notes to the unaudited pro forma combined financial statements.

Table of Contents

**UNAUDITED PRO FORMA COMBINED BALANCE SHEET**
**AS OF JUNE 30, 2018**
**(Dollars in millions)**

| | Historical As Reported | Pro Forma Adjustments[1] | Notes | As Adjusted |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 93 | $ (18) | (f) | $ 75 |
| Due from related parties, current | 20 | (20) | (e) | — |
| Accounts, notes and other receivables—net | 746 | 6 | (e) | 752 |
| Inventories | 523 | — | | 523 |
| Other current assets | 74 | — | | 74 |
| Total current assets | 1,456 | (32) | | 1,424 |
| Property, plant and equipment—net | 264 | — | | 264 |
| Goodwill | 2,637 | — | | 2,637 |
| Other intangible assets—net | 129 | — | | 129 |
| Deferred income taxes | 4 | — | | 4 |
| Other assets | 17 | (8) | (b,c) | 9 |
| Total assets | $ 4,507 | $ (40) | | $ 4,467 |
| **LIABILITIES** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ 774 | $ 14 | (b,e) | $ 788 |
| Due to related parties, current | 64 | (64) | (e) | — |
| Accrued liabilities | 395 | (205) | (b) | 190 |
| Obligations payable to Honeywell, current | — | 140 | (b) | 140 |
| Total current liabilities | 1,233 | (115) | | 1,118 |
| Long-term debt | — | 1,200 | (c) | 1,200 |
| Deferred income taxes | 351 | (23) | (d,g) | 328 |
| Obligations payable to Honeywell | — | 467 | (b) | 467 |
| Other liabilities | 443 | (350) | (b,g) | 93 |
| Total liabilities | 2,027 | 1,179 | | 3,206 |
| **COMMITMENTS AND CONTINGENCIES** | | | | |
| **EQUITY** | | | | |
| Common Stock, par value $0.001 | — | — | (h) | — |
| Additional paid in capital | — | 1,380 | (h) | 1,380 |
| Invested Equity | 2,599 | (2,599) | (b,d,f,g,h) | — |
| Accumulated other comprehensive income | (119) | — | | (119) |
| Total equity | 2,480 | (1,219) | | 1,261 |
| Total liabilities and equity | $ 4,507 | $ (40) | | $ 4,467 |

(1) The change in our cost structure related to our Company becoming an independent, publicly traded company is not reflected above.

See accompanying Notes to the unaudited pro forma combined financial statements.

Table of Contents

**NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS**

a) Reflects the impact of the Trademark License Agreement with Honeywell in respect of certain Products segment sales.

b) Reflects the impact of the Indemnification and Reimbursement Agreement with Honeywell pursuant to which we will have an obligation to make cash payments to Honeywell in amounts equal to 90% of Honeywell's certain environmental-related liabilities, net of recoveries, in each case related to legacy elements of the Business, including the legal costs of defending and resolving such liabilities. The amount payable by the Company in respect of such liabilities arising in any given calendar year will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement."

As of June 30, 2018, SpinCo would have a $588 million liability under the Indemnification and Reimbursement Agreement, calculated as 90% of the historical amounts reported for environmental liabilities. Such obligations payable to Honeywell have been presented as current and non-current liabilities based on the proportionate classifications of the historical amounts reported. Accordingly, the following historical amounts reported will be reversed and replaced by the obligations payable to Honeywell as follows as of June 30, 2018:

| | As of June 30, 2018 | |
|---|---|---|
| | As Reported | As Adjusted |
| | (Dollars in millions) | |
| Other assets | $ 13 | $ — |
| Accounts payable | $ 30 | $ — |
| Accrued liabilities | $ 206 | $ 1 |
| Other liabilities | $ 434 | $ 3 |
| Obligations payable to Honeywell, current | $ — | $ 140 |
| Obligations payable to Honeywell | $ — | $ 448 |

In addition, Other expense, net will decrease $18 million and $28 million for six months ended June 30, 2018 and year ended December 31, 2017, respectively, which is the difference between historical expense as reported under 100% carryover basis for such environmental expenses and the indemnified expense pursuant to the Indemnification and Reimbursement Agreement. The adjustment assumes that cash payments made by Honeywell related to indemnified environmental liabilities during a given year will not exceed $156 million in which case the cap on payments ($156 million x 90% = $140 million) to be made by SpinCo to Honeywell would not be exceeded.

c) Adjustments reflect interest expense and commitment fees related to indebtedness in an aggregate principal amount of $1,225 million that we expect will be incurred by us in connection with the consummation of the Spin-Off and that will be used primarily to repay an obligation incurred as part of the separation from Honeywell or a subsidiary of Honeywell. The adjustments assume that the indebtedness will comprise one or more senior secured term loan facilities in an aggregate principal amount of $825 million and senior unsecured notes in an aggregate principal amount of $400 million. The terms of such indebtedness are subject to change and will be finalized prior to the closing of the Spin-Off, and the pro forma adjustments may change accordingly. The adjustments also assume that we will enter into a secured revolving credit facility in an aggregate committed amount of $350 million. The terms of the revolving credit facility are subject to change and will be finalized prior to the closing of the Spin-Off, and the pro forma adjustments may change accordingly.

Table of Contents

| | For the Six Months Ended June 30, 2018 | For the Year Ended December 31, 2017 |
|---|---|---|
| | (Dollars in millions) | |
| Interest expense and commitment fees on our total assumed indebtedness with an estimated weighted average interest rate of 6.04% | $ 37 | $ 73 |
| Amortization of debt issuance costs | — | 1 |
| Total pro forma adjustment to interest expense | $ 37 | $ 74 |

A 1/8% variance in the assumed interest rate on the debt incurrence would change the annual interest expense by $1 million.

d) For six months ended June 30, 2018 and year ended December 31, 2017 income tax expense decreased by $12 million and $40 million, respectively, as a result of the income tax effects on adjustments included in pro forma notes a), c), e) and g).

Pursuant to the Tax Matters Agreement, we have agreed to make payments to a subsidiary of Honeywell in case of any adjustment pursuant to a Determination (as defined in the Tax Matters Agreement) with respect to any tax return filed by Honeywell attributable to the SpinCo group or other tax costs incurred by Honeywell in connection with transactions undertaken in anticipation of the Spin-Off as determined by Honeywell. For purposes of the pro forma financial statements, we assume the payments will be $19 million. The associated liability for these payments has been included in Obligations payable to Honeywell as of June 30, 2018. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Tax Matters Agreement."

e) Reflects the impact of the settlement of cash pooling and short-term notes receivables and payables. In connection with the Spin-Off, we will settle or reclassify the following related party transactions in the unaudited pro forma Combined Balance Sheet as of June 30, 2018.

*Due from related parties, current:*

| (Dollars in millions) | As of June 30, 2018 |
|---|---|
| Cash pooling and short-term notes receivables (settled) | $ 14 |
| Receivables from related parties (reclassified to accounts receivable) | 6 |
| | $ 20 |

*Due to related parties, current:*

| (Dollars in millions) | As of June 30, 2018 |
|---|---|
| Cash pooling and short-term notes payables (settled) | $ 19 |
| Related party notes payables, current (settled) | 1 |
| Payables to related parties (reclassified to accounts payable) | 44 |
| | $ 64 |

Table of Contents

In connection with the Spin-Off, we will reclassify the following related party transactions to third-party accounts payable and accounts receivables, as reflected in the unaudited pro forma Combined Balance Sheet as of June 30, 2018:

| | As of June 30, 2018 |
|---|---|
| Accounts Receivable | $ 6 |
| Accounts Payable | $ 44 |

f) Represents adjustments to cash as follows:

| | (Dollars in millions) |
|---|---|
| Cash received from incurrence of term loans | $ 825 |
| Cash received from incurrence of senior unsecured notes | 400 |
| Cash payment to Honeywell at Spin distribution | (1,195) |
| Cash distribution to Honeywell prior to Spin distribution | (12) |
| Cash paid for debt issuance costs | (25) |
| Cash paid for deferred financing fees | (5) |
| Cash paid for net settlement of due from (to) related parties | (6) |
| Total pro forma adjustments to cash | $ (18) |

g) Reflects the impact of our assumption of certain pension assets and liabilities for employees who are eligible for benefits under defined benefit pension plans that are currently sponsored by Honeywell. For these employees we intend to sponsor a defined benefit pension plan after the Spin-Off with terms and benefits consistent with the existing Honeywell plans. The annual expense related to our employees for these defined benefit pension plans was allocated to us by Honeywell and such allocation is reflected in our historical Combined Financial Statements. As of June 30, 2018, the total pension assets to be contributed to us amounted to $303 million and total projected benefit obligation amounted to $384 million. We recorded a net pension plan liability as of June 30, 2018 as follows: $(74) million in Germany, $(3) million in Switzerland, $(2) million in Austria, $(1) million in Belgium, $(1) million in Netherlands, and nil in United States. The unaudited pro forma financial statements reflect an estimate of interest costs and expected return on plan assets for the defined benefit pension plans of $(2) million and $(4) million for the six months ended June 30, 2018 and year ended December 31, 2017, respectively.

h) Reflects the reclassification of Honeywell's net investment in us, which was recorded in invested equity, into additional paid-in-capital and common stock to reflect the assumed issuance of 123.8 million shares of our common stock at a par value of $0.001 per share pursuant to the Separation and Distribution Agreement immediately prior to the Spin-Off. We have assumed the number of outstanding shares of our common stock based on the number of shares of Honeywell common stock outstanding on June 30, 2018 and a distribution ratio of one share of our common stock for every six shares of Honeywell common stock.

i) Pro forma basic earnings per share ("EPS") and pro forma weighted-average basic number of shares outstanding are based on the number of Honeywell basic weighted-average shares outstanding for the six months ended June 30, 2018 and for the year ended December 31, 2017, respectively, adjusted for a distribution ratio of one share of the Company's common stock for every six shares of Honeywell common stock outstanding.

j) Pro forma diluted EPS and pro forma weighted-average diluted shares outstanding are based on the number of basic shares of our common stock as described in Note (i) above. The actual dilutive effect following the completion of the Spin-Off will depend on various factors, including employees who may change employment between the Company and Honeywell. We cannot fully estimate the dilutive effects at this time.

Table of Contents

## BUSINESS

### Our Company

We are a leading global provider of critical comfort and security solutions primarily in residential environments, with a presence in over 150 million homes globally. Our products, which benefit from the trusted, well-established Honeywell brand, are installed in over 15 million homes annually, allowing SpinCo to launch innovative technologies and services at scale. After the Spin-Off, these products will be marketed and sold under the Honeywell Home brand pursuant to a 40 year license agreement with Honeywell. We have a long-standing leadership position in the traditional/non-connected products space that contributes significantly to our net sales. Our growing portfolio of connected home solutions is one of the largest and most comprehensive in the market. Our connected solutions are supported by software platforms (which we expect to consolidate in a single platform and mobile application) that allow consumers and channel partners to easily install, use and maintain our solutions and third party devices. These platforms interact with other ecosystems to control SpinCo's and others' home automation devices. Over 4.7 million of our customers are connected, providing access to control, monitoring and alerts, and we have approximately 30 million installed sensors generating more than 250 billion data transmissions annually. Our broad portfolio of innovative products is supported by approximately 3,000 worldwide active and pending patents, delivered through a comprehensive network of over 110,000 professional contractors, more than 3,000 distributors and over 1,200 original equipment manufacturers ("OEMs"), as well as major retailers and online merchants.

ADI is the leading wholesale distributor of security products, and is independently recognized for superior customer service. Through over 200 stocking locations in 17 countries, ADI distributes more than 350,000 products from over 1,000 manufacturers to a customer base of over 100,000 contractors. We believe this global footprint gives us distinct scale and network advantages in our core products over our competitors. Further, we believe our customers derive great value from the advice and recommendations of our knowledgeable design specialists allowing our customers to better meet the technical and systems integration expertise requirements to install and service professional security systems. We continue to transform the industry with value-added services such as presales system design and 24/7 order pick-up, and the selective introduction of new product categories such as professional audio visual. Additionally, ADI has long been an important channel to market for our security products, providing a level of end-customer intimacy that drives our ability to develop successful new products at an accelerated rate and insights into current market trends that help us quickly adapt our product portfolio to meet evolving customer needs. Similarly, ADI is an important channel to market for third party manufacturers, whose products represent a significant majority of ADI's net sales.

We intend to expand and market our extensive portfolio and distribution base in several ways. We view our long-standing, mutually beneficial relationships with professional contractors and OEM channels as a key differentiator in our Products segment and plan to continue to invest in and grow with these channel partners. We believe the global connected home market is in the early stages of broad consumer adoption, with Gartner projecting the installed base of "connected things" in the consumer segment to grow from approximately four billion in 2016 to more than 12 billion in 2020 and we intend to expand our connected solutions and services offerings to capitalize on this trend. We also intend to expand ADI's geographic footprint, product categories and services to drive overall sales, including SpinCo's security products business.

### Segments

We manage our business operations through two segments, Products and Distribution, which contributed 49% and 51%, respectively, of our net sales before intersegment eliminations for the year ended December 31, 2017.

### Products

Our Products segment had net sales before intersegment eliminations of $2,379 million for the year ended December 31, 2017, of which $337 million were sold to ADI. Management estimates that net sales generated

Table of Contents

from our Products segment are primarily from residential end-markets. Included in our Products segment are traditional products, as well as connected products, which we define as any device with the capability to be monitored or controlled from a remote location by an end-user or service provider. Products consist of solutions in the following Comfort & Care and Security & Safety categories:

- ***Comfort & Care***: Our Comfort & Care solutions have historically been marketed and sold primarily under the Honeywell brand, and after the Spin-Off, these products and solutions will be marketed and sold under the Honeywell Home brand pursuant to a 40 year license agreement with Honeywell. These solutions include home products, services and technologies including:
    - *Temperature and Humidity Control Solutions*: Devices to control air conditioners and heating equipment, thermostats and zoning devices, control panels, dampers and actuators, through brands and product families such as Lyric, Prestige, RedLINK, T-Series, TrueZone, FocusPro and VisionPro.
    - *Thermal Solutions:* Devices to control heating and cooling equipment, such as water heaters, boilers, furnaces, heat pumps and air heaters and combustion critical components such as electronic controls, actuators, gas valves and ignition controls, through brands and product families such as SCOT and Ermaf.
    - *Water Solutions:* Devices to control hydronic heating, cooling, and potable water solutions, including control panels, zone valves, balancing valves, thermostatic radiator valves, temperature valves, floor temperature sensors and accessories, pressure regulators, backflow preventers and potable water care products to filter, clean and soften water, through brands and product families such as SmartT and Aquatrol.
    - *Air Solutions:* Devices to control air quality, such as whole home humidifiers and dehumidifiers, air filters, air purification and odor control solutions and ventilation systems and controls, through brands and product families such as TrueEASE, Micro Defense and TrueDRY.
    - *Remote Patient Monitoring Software Solutions (telehealth):* Systems that record, organize and transmit patient health data to health service providers to monitor patient well-being, helping patients continue treatment and recovery in their homes under remote supervision, through brands and product families such as Life Stream and Life Care Solutions.
    - *Software Solutions:* Global software platforms and mobile applications that provide contractors and consumers with access to services such as demand response, energy management, auto-replenishment services and predictive appliance diagnostics, through brands and product families such as Lyric and Total Connect Comfort.
- ***Security & Safety:*** Our Security & Safety solutions have historically been marketed and sold primarily under the Honeywell brand and after the Spin-Off will be sold under the Honeywell brand. They include professionally-installed and monitored intrusion and life safety detection and alarm systems, as well as self-installed and self-monitored awareness solutions including:
    - *Security Panels:* Control devices that communicate with sensors that receive event or condition signals and send those signals to a monitoring station and cloud infrastructure, through brands and product families such as Vista, Lyric and Lynx.
    - *Sensors:* Devices that detect intrusion (for example, motion, opening of doors and windows and breaking of glass), smoke, carbon monoxide and water and transmit a signal to a security panel, through brands and product families such as 5800 and SiX.
    - *Peripherals*: Accessories that interact with security systems, such as keypads and key-fobs, through brands and product families such as 5800 and Videofied.
    - *Wire and Cable*: Low voltage electrical wiring and category cable, through brands and product families such as Genesis Series.

- *Software Solutions:* Global software platforms and mobile applications that provide contractors and consumers with access to services such as alarm monitoring, communication, automation and video services. In addition, we provide our contractors with data analytics tools, through our AlarmNet 360 software suite. These solutions are sold through brands and product families such as Total Connect 2.0 and AlarmNet 360.
- *Communication Devices:* Devices that transmit notifications and security information from security systems to monitoring stations, such as cellular radios and internet and telephone line communicators, through brands and product families such as LTE radio.
- *Video Cameras:* Battery-operated indoor and outdoor video motion viewers that detect motion and enable live "look-in" remotely, and Wi-Fi cameras for indoor and outdoor use, through brands and product families such as Videofied and Total Connect cameras.
- *Awareness Solutions:* Self-installed and self-monitored systems that include a home gateway/hub, cameras and awareness sensors to detect motion and sounds, opening and closing of doors, entry and exit of known users of the system (facial recognition) and provide alerts to the user via a mobile app, through brands and product families such as Honeywell Smart Home System and Lyric.
- *Cloud Infrastructure:* Network operating center that routes signals between home and monitoring station and enables secured, remote data transmissions, through brands and product families such as AlarmNet and Total Connect.
- *Installation and Maintenance Tools:* Software tools and applications to enable security contractors to install, program and maintain security systems, through brands and product families such as AlarmNet 360 and Compass.

Table of Contents

Eleven of the top twelve most appealing smart home use cases reported by Parks Associates concern comfort, security and safety solutions that are directly addressed by our product offerings and a number of our end-to-end solutions have applications across Comfort & Care and Security & Safety products. We are strongly positioned to provide products that enhance consumers' comfort, convenience and sense of security and work together to contribute to a connected home ecosystem. Certain of these cross-product offerings include:

**Home Comfort: Total Connect Comfort App and RedLINK Wireless Products**

From the WiFi 8000 Thermostat to the RedLINK Prestige IAQ suite of products, the Total Connect Comfort ("TCC") platform offers global solutions for comfort with a large portfolio of products for both professional installers and DIYers.



RedLINK Technology uses a proprietary wireless system to help professional contractors solve home comfort challenges wirelessly. Beyond just thermostats, RedLINK includes a wide variety of wireless accessories like the remote temperature monitor, ventilation boost and the Residential Internet Gateway.




The TCC app can be managed through the TCC experience, which can be found on the iOS and Android™ app stores as well as through a web portal and enables users to:

- View and change their Comfort & Care system settings (Heat, Cool, Off, Fan, Auto, Emergency/Back-Up Heat, Dehumidifier, Humidifier).
- View and change their Comfort & Care system settings (Heat, Cool, Off, Fan, Auto, Emergency/Back-Up Heat, Dehumidifier, Humidifier).
- View and set the temperature.
- View indoor humidity.
- View outdoor temperature and humidity.
- Access multiple thermostats if the system is zoned.
- Access multiple locations if more than one system is connected.
- Receive temperature and humidity alerts via e-mail.
- Access over 90 system alerts via the web.
- Get automatic upgrades as new features are available

Table of Contents

**Home Security: Total Connect Remote Services**







Total Connect 2.0 is an interactive security solution for home and business that provides a user control of a security system, the ability to receive push notifications, email, SMS/text and video alerts, the ability to view live video and control such features as video doorbell activity, view events, control thermostats, lighting and locks. This solution works with AlarmNet's Cloud Infrastructure to offer 24/7 emergency response through monitoring centers. The capabilities associated with this solution include:

- **Mobile Control:** Remote security system management and control through the web, iOS or Android™ mobile apps for users.
- **Real-Time Awareness:** Geofence alert and real-time status of events through push notifications, emails, SMS/text messaging and video alerts. Users may view past events and search for specific occurrences.
- **Event History:** System event notifications with 90-day history and 7 or 30-day video storage plans.
- **Multi-Site and Enhanced User Management:** View 100+ locations with a single login, add multiple users and assign access rights, customize settings and notification preferences.
- **Secure Platform:** Personal data encryption, secure password rules, arming and disarming with user codes, fingerprint biometric login on iOS and Android™ devices.

Table of Contents

**Automation and Energy Management Solutions**







Remote control of Z-Wave® or Wi-Fi automation devices such as thermostats, locks, lights, shades, garage doors, water, leak detectors and video doorbells, bringing all connected home and business solutions into one platform.

- **Smart Scenes:** Highly flexible rules, triggers and schedules allow customization and personalization of all the connected devices in the home or business. Users may create automation rules by device, user, time of day and day of week to fit any schedule or lifestyle.
- **Energy Savings:** Maximize comfort, save money on energy and utility bills, conserve resources by creating smart heating, cooling, shades and lighting schedules.
- **Mobile Control:** Remotely control doors, locks, temperature, garage door, lights for security and convenience.

**Video Solutions: Remotely view high definition live and recorded video events**





- **Live Streaming:** Access live video through the mobile apps.
- **HD Cameras:** Include up to eight cameras per location, indoor or outdoor.
- **Video Doorbell Service:** Control video doorbell activity on the Total Connect 2.0 iOS app and Android™ app.

- **Video Notifications:** Receive video notifications via email, SMS/text messaging or push notifications based on security system events, motion detection or time of day.
- **Cloud Storage:** 7-day storage plan or 30-day storage plans.
- **Recorded Events:** 30-second video clips with no gaps between video clips.
- **Video Alarm Verification:** Cloud-based central station video interface that allows monitoring personnel to view video clips and see what caused an alarm.

Table of Contents

**Monitoring Stations and Security Dealers Solutions with AlarmNet 360**

AlarmNet 360 is a business management cloud platform that helps improve monitoring stations and security dealers operational customer service and account creation efforts through programming security and software accounts, remote knowledge of hardware and software diagnostics and detailed data analytics.

**Business Management**




Our programming, support tools and apps help our service providers more efficiently install and service their connected home and business customers.

- **Cloud-Based:** Remotely access AlarmNet 360 from any PC or mobile device, onsite or remotely.
- **Programming:** Quick total account creation for software and hardware accounts.
- **Control Employee Access:** Manage and control employee access rights to secure who accesses customer accounts.
- **Customer Service:** Easily support all customer accounts from a single user interface with account maintenance, system health checks and remote updates.

**Business Analytics**



- **Interactive:** Dashboard that offers insight into customer behavior to improve operational efficiency, grow business, find complementary services and generate more recurring monthly revenue.
- **Filter Data:** Pinpoint critical issues and service customers quickly and efficiently. Easily sort data by account age and period of time and export it to a spreadsheet.
- **Map View:** Interactive map provides account status and location making service calls and sales more efficient.
- **Engagement:** Analyze customer account engagement to learn customer behaviors. Use these metrics to improve customer retention and reduce attrition.

Table of Contents

**Products Segment: Net Sales for the year ended December 31, 2017(1)**




(1) Includes external and intercompany sales.
(2) Americas represents North and South America. EMEA represents Europe, the Middle East and Africa. Other principally represents Australia, China, New Zealand and South Korea.
(3) Connected is defined as any device with the capability to be monitored or controlled from a remote location by an end-user or service provider.

**Distribution**

ADI, our Distribution segment, is the leading wholesale distributor of security and low voltage electronics products, which include security, safety and audio visual products and related accessories. These products, which are commonly referred to as “low voltage”, are traditionally defined as products operating at or below 24 volts. According to IHS data, ADI has the leading global market share in security equipment distribution. ADI operates through a distribution network of over 200 stocking locations throughout the world, delivering to over 100,000 contractors. The Distribution segment had net sales of $2,477 million for the year ended December 31, 2017.

ADI distributes a broad selection of SpinCo and third party products to meet customer needs, including:

- ***Security products***
    - *Video Surveillance*: IP and high-definition analog cameras, recording and storage devices, video management and analytics software, and related system accessories.
    - *Intrusion*: Residential and commercial alarm systems, keypads, detection and sensing devices, alarm communication equipment, and related systems accessories.
    - *Access Control*: Access control panels and software, readers, credentials, locking hardware, gate control, intercoms and related system accessories.
- ***Other products***
    - *Fire and Life Safety*: Fire alarm control panels, fire detection equipment, fire notification equipment, manual call points/stations and related system accessories.
    - *Wire, networking and professional audio visual systems.*

In addition to our own Security & Safety products, ADI distributes products from industry-leading manufacturers including Assa Abloy, Axis Communications, Honeywell and Nortek Security & Control, and ADI also carries a line of private label products. ADI sells these products to contractors that service non-residential and residential end-users. Management estimates that in 2017 approximately two-thirds of ADI net sales were attributed to non-residential end markets and one-third to residential end markets.

Table of Contents

**Distribution Segment: Net Sales for the year ended December 31, 2017**




(1) Americas represents North and South America. EMEA represents Europe, the Middle East and Africa. Other principally represents India.
(2) Other includes fire and life safety, wire, networking and professional audio visual systems.

**History of Innovation**

We have a long history of innovation and industry firsts in our Comfort & Care and Security & Safety markets and have a reputation for providing trusted, tested and proven products and solutions. We trace some of our innovations as far back as the 1880s when we invented the predecessor to the modern thermostat. From the first clock thermostats to the world's first gas burner control, we have consistently driven progress and innovation in home comfort and security, including the introduction of the iconic T-86 "Round" thermostat in 1952. In 2000, we acquired the ADEMCO business, a leader in monitored burglary and fire alarm systems with roots back to 1929 and the early days of wired burglar alarms, expanding our presence in fire and security systems.

In the 1980s, ADEMCO developed the first reliable wireless security system and sensor and the AlarmNet radio technology that served as the first affordable back-up and alternative to alarm transmission over telephone lines. Through ADI, we introduced large-scale wholesale security products distribution, and now contractors of all sizes count on ADI for convenient access to low voltage security products, local inventory, e-commerce ordering, as well as product training and the extension of credit.

SpinCo was the first company to introduce professionally-monitored residential smoke and carbon monoxide detection systems. We also invented the popular Dual Tech detector to detect both motion and heat from an intruder, and we were the first to widely deploy an alarm platform with cloud services to consumers and a mobile app for home security monitoring. As the world becomes more connected and mobile, we believe we are well positioned to extend our track record of delivering leading solutions for the home, combining our experience and expertise in hardware and sensor technology with a focus on world-class excellence in software.

## Our Strengths

We believe we benefit from the following competitive strengths:

**I. Global Leader with Iconic Brand and Unparalleled Presence in the Home**

Our iconic Honeywell brand is globally recognized for quality, innovation, security and reliability. Our products and solutions are present in over 150 million homes worldwide and we believe, based on management

Table of Contents

estimates, that we have the leading global market position in thermostats and residential security products and in security products distribution. Our solutions are installed in more than 15 million homes annually, allowing SpinCo to launch innovative technologies and services at scale. Our leading position extends to our connected platform, where we currently have over 4.7 million connected customers and 30 million sensors generating over 250 billion data transmissions annually.

The brand recognition associated with our installed base provides an additional opportunity for expansion with new connected products and solutions, and after the Spin-Off, we will retain the right to market and sell these products under the Honeywell Home brand pursuant to a 40 year license agreement with Honeywell. We are actively facilitating the transition of our customers and end-users from traditional to connected products by transforming our product portfolio, educating professional installers, creating value for OEMs and engaging consumers. Through these efforts, we have increased the portion of our product sales generated by connected solutions to approximately 37% in 2017. Gartner projects the connected things consumer segment will grow from approximately four billion in 2016 to more than 12 billion in 2020.

**II. Broadest Portfolio Providing Innovative End-to-End Solutions Across Comfort & Care and Security & Safety with Domain and Regulatory Standards Expertise and Differentiated Technology**

Our comprehensive Products portfolio provides end-to-end solutions that focus on critical needs within the home, where product reliability and ease of use are of utmost importance. This portfolio is comprised of traditional product offerings as well as a growing connected offering. Our deep domain expertise allows us to consistently provide trusted, tested and proven solutions that meet robust standards for cybersecurity and regulatory, as well as certification standards for devices addressing critical life safety needs. Our portfolio distinguishes us from our competitors, most of whom focus on niche solutions within the home. We provide solutions that address multiple consumer connected home needs under a common platform. As new devices and use-cases emerge, we believe the continuing development of our common platform across devices and all levels of connectivity (device, software, cloud, analytics and consumer interface) will become vital to ensure a seamless and reliable experience. Our broad portfolio also enables us to achieve profitable economies of scale in production, distribution and speed to market while making us a “go to” partner in the smart home ecosystem. However, after the Spin-Off our economies of scale with respect to the Products segment may be diminished with respect to certain purchasing activities, such as IT infrastructure and other support services, as compared to when we were a part of Honeywell.

Our innovation is supported by the SpinCo User Experience design group, which creates value by understanding and translating the needs of consumers and channel partners to develop intuitive, desirable and brand differentiated end-to-end experiences. Our products are regularly recognized in professionally judged international design competitions, winning the highly coveted iF Design Award, Red Dot Design Award and the IDEA Design Award over a dozen times since 2015.

We believe our product quality philosophy, which combines rigorous internal testing with external certification of our products, gives us a competitive advantage. Our laboratories are certified for testing to meet various industry standards, such as UL, CSA Group and Intertek, combining SpinCo’s internal testing resources with these agencies’ global recognition to substantially reduce time-to-market for new solutions and to help ensure quality and reliability.

Our Secure Software Development Lifecycle initiative sets a robust protocol for establishing and enhancing product and system cybersecurity at the outset of, and throughout, product development and for responding to potential vulnerabilities in existing products.

We have over 1,300 engineers creating innovative solutions in dedicated software centers of excellence located in Atlanta, Georgia, Bengaluru and Madurai, India and other locations. Our deep domain expertise, proprietary technology and brands are protected by a combination of patents, trademarks, copyrights, trade

Table of Contents

secrets, non-disclosure agreements and contractual provisions. We own approximately 3,000 proprietary worldwide active patents and pending patent applications.

**III. Major Player in the Connected Home, Providing Solutions that Seamlessly Integrate with Leading Smart Home Players**

Our broad suite of connected solutions allows end customers to use mobile apps to control their thermostats, security systems, cameras and home automation devices such as electronic locks, lights and garage doors. We currently service over 4.7 million connected customers and transmit over 40 million consumer notifications, including more than two million security panel signals, every day. Adoption rates of our connected home solutions in the future will depend on a number of factors, including development of competitive and attractive products and the cost to customers of installation of new solutions or upgrade or renovation from older connected platforms or products. We are well positioned to leverage the growing demand for connected home solutions with our innovative products that are easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio. We expect to benefit from the over 17% CAGR projected by IDC for connected thermostats over the next five years. Beyond that, our expanding portfolio of self-installed and self-monitored solutions such as the Smart Home Security System and Lyric Cameras are well positioned to participate in the growth of DIY solutions unit sales which according to IHS are expected to grow at a rate of over 20% per year from 2015 through 2020. In security, we continue to see strong support for our professionally-installed and monitored solutions.

Our systems integrate easily with the most widely used home automation systems, including Amazon Alexa®, Apple HomeKit®, Google Home® and Samsung SmartThings®. We have one of the widest portfolios of Apple HomeKit enabled connected products and were the first company whose security system communicated with the Apple HomeKit ecosystem. We plan to continue to expand the range of our ecosystem partners through, among other things, the “Works with Honeywell” program which currently has 3,000 third party developers creating mobile apps that integrate with our solutions. Approximately one in six of our users already connect their systems to partner APIs (application programming interfaces) or solutions from other manufacturers through this program, and we believe that the openness of our architecture and adaptability of our products reduce contractor training and installation time, which further enhances end-user demand for our products.

**IV. Well Positioned to Serve Professional, OEM and Consumer Channels**

We have a multi-channel strategy to serve end-users through our professional contractors, OEMs, retail and e-commerce partners that allow end-users and consumers to purchase our products in ways that suit their needs, whether directly for DIY or through a professional installer.

Our security and Comfort & Care solutions are generally installed professionally, and our channel partners rely on our high-quality OEM parts for repair and remodel services to meet their customers’ needs. We have deep and long-standing relationships, many of which extend over 20 years, with our global contractor base and we continually strengthen and renew these relationships through various channel management and training programs. For example, Contractor Pro (loyalty program) has over 29,000 participants and has been a leading industry program for 14 years. Our training programs include Homes University (technical training) and S.T.E.P.S. (sales training). In 2017, through our trainings, we educated more than 31,000 contractors and distributors.

Table of Contents

Some of these training offerings include:

| Selected Programs | Description |
|---|---|
| CONNECT2018 A Honeywell Authorized Dealer Event | CONNECT is the largest independent dealer event in the security market. For more than 25 years, we have hosted this event to bring together independent dealers from around the Americas to take part in education, networking and celebration. With hundreds of customers in attendance, CONNECT is an important annual dealer event. Our Authorized Dealers look forward to this event each year and depend on it to keep them informed of the latest trends in our industry, solutions and best practices from security companies from around the country. |
| LiveWell | LiveWell is an indoor air quality training program for Comfort & Care contractors. The program, focused on indoor air quality thought leadership, is designed to train contractors not only on indoor air quality ("IAQ") but also deliver comfort for the whole home using our products and services. The program includes on-line training courses, videos, demonstrations and eLearning, designed to enable contractors to provide expert advice and solutions to customers to improve IAQ and comfort in the home, ultimately driving better engagement with customers and growing their business. |
| Honeywell Authorized Security Dealer | The Honeywell Authorized Dealer ("HAD") program is the largest independent network of security and fire dealers, with over 300 member companies across the U.S., Canada and Latin America. Structured with a tiered reward program, HAD rewards dealers based on their commitment to the program and our portfolio of products. From the power of the Honeywell brand, to specially designed training, networking events, co-op advertising, and marketing development funds, members receive extensive support and the opportunity to network with the foremost independent security dealers. |
| ADI Global Distribution expo training series 25 YEARS | Now in its twenty-fifth year, the ADI Expo program is the industry's largest one-day educational and sales event dedicated to providing ADI customers with the tools, education and resources they need to grow their business. Free of charge to all industry professionals, ADI Expos provide the opportunity for our customers to meet and learn from a broad range of industry vendors, attend seminars, and earn continuing education credits. In 2017, ADI held over 80 Expos, providing a full day of educational seminars, product exhibits, networking opportunities and Expo day-only specials on technology from leading industry manufacturers. |
| ***S.T.E.P.S. to Success Sales Training Program*** | S.T.E.P.S. is a sales-focused program designed to teach residential and light commercial contractor professionals how to engage their customer base by providing customized product and service offerings that their customers want, need and will pay for. The objective of the S.T.E.P.S. to Success Program is increased accessory sales, higher-end system installations and more service enhancements, as well as to assist contractors that attend the program with generating more business, increasing their average ticket price and securing long-lasting customer relationships. |

Table of Contents

| | |
|---|---|
|   | Contractor Pro is a loyalty program for contractors. Members of Contractor PRO earn rebate points on every qualifying SpinCo product purchase. With Contractor PRO, contractors enjoy a variety of benefits including: exclusive tech support, online referrals, free sales literature, personal use product discounts, regular communications about promotions and account upgrades. This program is designed to enable contractors to drive engagement and generate more revenue. |
| ***Homes University*** | Homes University is a three day, hands-on training course designed to show contractors and distributors the benefits of our products. The course educates managers, sales representatives, counter staff, and installers about selling the appropriate product features and benefits, install and wire product solutions, and identify opportunities to meet the needs of consumers. The course is taught by experienced instructors including our technical product specialists and Comfort & Care industry experts and consists of lecture-discussion, hands-on lab exercises and advanced multimedia presentations for maximum learning effectiveness. |

We also have long-standing relationships with important OEMs and service providers such as ADT Security Services, United Technologies and A.O. Smith Corporation. A number of these relationships extend more than 25 years, including some spanning over 40 years. These deep partnerships are possible because OEMs value our design capabilities, innovation, domain expertise, supply chain capabilities and product quality.

Our DIY and self-install products are sold through retail channels including direct-to-consumer, e-commerce and brick and mortar locations, such as The Home Depot, Lowe's, Amazon.com, Walmart and Kingfisher. Our award-winning, best-selling thermostats are our most recognizable products and we market certain models directly to end consumers. Growth of the retail market, including the self-installed or do-it-yourself and e-commerce markets could affect our business by attracting new competitors. In addition, growth of these retail markets relative to the professional installation markets may negatively impact our margins.

**V. Pre-eminent Global Distributor of Security, Safety and Other Low Voltage Products**

According to IHS, ADI has the leading global market share in security equipment distribution. ADI distributes a wide offering of low voltage product categories comprised of over 350,000 products from over 1,000 manufacturers, all supported by a disciplined category management process to ensure our offerings are comprehensive and meet the needs of important customer segments. ADI's sizable market share, coupled with its breadth of inventory, creates opportunities for security contractors in particular to identify and purchase complementary ADI product offerings. ADI has over 200 stocking locations across 17 countries, supplemented by a customer friendly e-commerce platform that serves a customer base of over 100,000 contractors. Our extensive global footprint, combined with our strategic supplier relationships and focus on customer service, enables ADI to effectively serve both local and national customers with a range of product and service solutions. Additionally, we believe being the largest distributor of security equipment results in meaningful procurement efficiencies and that ADI's offering of a line of private label products further enhances our margin profile. However, after the Spin-Off our economies of scale with respect to the ADI business may be diminished with respect to certain purchasing activities, such as IT infrastructure and other support services, as compared to when we were a part of Honeywell.

*Manufacturers/Suppliers*

ADI is an important channel to market for third party manufacturers, whose products represent a significant majority of ADI's net sales. Through our global network of branches, inventory stocking programs and over

Table of Contents

1,000 sales representatives, each of whom are highly trained in the brands and products that we distribute, we help manufacturers grow their business by facilitating direct and relevant engagement with our customers. We provide manufacturers the ability to offer in-store selling tools, such as interactive product displays and demonstration equipment, that help contractors evaluate products before purchase. We also offer branch stocking programs, which manufacturers use to make their products available in local markets, and provide local market inventory to serve contractors who require same day fulfillment. We believe this strong value proposition supports our position as a preferred channel to the market for leading industry manufacturers.

*Contractors/Customers*

ADI's global presence enables the delivery of supply chain services that help contractors reduce their procurement costs, better manage working capital through the advancement of credit, and operate more efficiently. For example, we offer services such as job kitting and staging, IP device programming, 24/7 pick-up anytime lockers and one-hour pick up service at ADI branches for online orders. We also offer convenient electronic ordering options, which accounted for approximately 17% of our ADI net sales for the fiscal year ended December 31, 2017.

These services and convenient ordering options, combined with our global presence of more than 200 stocking locations, allow us to serve a range of customers across geographies and be a single source of supply for contractors in the industry. We also help our customers grow their businesses through services such as pre-sales technical support, product certifications and trainings, project support and knowledgeable sales specialists including third party certified systems design specialists. In 2017, we offered more than 1,500 manufacturer and industry association led training opportunities. Many of our trainings were conducted at ADI Expos, which are the largest series of one-day product showcase and training events in the security industry where manufacturers present the latest technology to our customers. In 2017, we held more than 80 ADI Expos globally, delivering more than 300 Continuing Education Unit accredited programs.

**Inside an ADI Branch**



Table of Contents

**VI. Consistent Revenue Growth and Strong Segment Performance Supported by Best-in-Class Honeywell Operating System ("HOS")**

We believe we have an attractive financial profile highlighted by our diversified revenue streams, strong segment profits and limited capital expenditure needs. We have delivered strong net sales growth over the period from 2013 to 2017, during which our net sales grew at a CAGR of 3.7%. In addition, the overall nature of our business is not capital intensive. For the years 2015 to 2017, our capital expenditures averaged 1.3% of our net sales.

Our financial performance is underpinned by the foundation of the Honeywell Operating System ("HOS"). HOS is ingrained in our organization and was founded on the lean and six sigma principles of continuous improvement in quality, delivery, cost, growth and innovation, and we plan to continue the HOS model after the Spin-Off. Our commitment to HOS has resulted in improved manufacturing productivity, more rapid product innovation and increased cost efficiencies. Important parts of our supply chain are strategically positioned in low cost regions that are located in or near key markets, consistent with a strategy of optimizing our supply chain and reducing delivery times. We have extended HOS concepts beyond lean manufacturing to our Distribution business, customer service and product development areas. We are applying these practices to develop global platforms to drive standardization for scale and cost efficiency, while at the same time incorporating key technologies and functionalities to drive speed and faster innovation for customers.

The Company's future growth may be limited due to the substantial indebtedness we expect to incur in connection with the Spin-Off and our payments under and the terms of the Indemnification and Reimbursement Agreement, as well as other risks which we may be presently unable to predict. See "Risk Factors."

## Our Growth Strategies

**I. Continue to Develop Innovative New Products and Solutions**

We are developing new, innovative products and solutions across Comfort & Care and Security & Safety to grow our core business and differentiate ourselves from our competitors. Over the past three years, we have launched over 200 new products such as the Lyric family of connected home solutions, which includes thermostats, water leak detectors and awareness cameras. Our next generation alarm systems are expected to launch in late 2018. We have also launched cloud service offerings such as AlarmNet 360 and Total Connect 2.0 that allow consumers to control their systems remotely and contractors to provide efficient installation, maintenance and support services. We plan to further expand our portfolio by bringing to market an extensive set of new solutions for everyday problems, including remote furnace and boiler monitoring, smart vents, shut-off valve solutions, battery-operated video motion cameras and a residential global intrusion system. While we believe we are well positioned to capitalize on future trends and opportunities for innovation, the constantly evolving needs of our customers make it difficult to predict the pace or scope of future technological developments and our business may be affected if our new products or upgrades are not adopted by consumers. We collaborate with consumer driven technology companies that have market-leading, complementary offerings such as August (door lock) to provide our customers with a seamless experience, which in turn supports customer acquisition and retention. Our systems are compatible with the most widely used home automation systems, including Amazon Alexa®, Apple HomeKit®, Google Home® and Samsung SmartThings®. Our compatibility with these platforms, some of which are owned by competitors and may compete with our solutions, has helped anchor our devices in millions of homes around the world, and we expect these relationships to continue to drive growth.

We employ Agile methods for software development, and are developing a single mobile application which, together with our global platforms, is designed to enable faster introduction of new products and implementation of new features while driving cost efficiencies through our global scale. At the same time, our Secure Software Development Lifecycle initiative sets a robust protocol for establishing and enhancing product and system cybersecurity at the outset of, and throughout, product development and for responding to potential vulnerabilities in existing products.

Table of Contents

### II. Continue to Invest in and Grow with Professional and OEM Channel Partners

Our professional channel partners are an integral part of our sales and go to market strategy, and we invest in their growth to help drive our product sales. While the DIY and e-commerce markets for our solutions continue to grow, the vast majority of our products are installed professionally through our contractor and OEM channels. We plan to continue to extend growth in these professional channels through channel partner marketing programs, designing solutions with simplified installation and maintenance, and by helping contractors provide better service to the end customer. We plan to continue investment in these programs, as well as to provide enhanced sales and technical training, hiring and talent development for our contractors. For example, we host the annual CONNECT national conference, the largest independent dealer event in the security industry which gives security contractor partners the opportunity to share best practices and participate in specialized trainings. In addition, our plan is to continue to develop new relationships with leading channel partners, using these strategies to expand our presence in the market in all regions. We plan to continue to collaborate with OEM channel partners to provide design services, bring to market new technologies and deliver innovative, connected solutions that increase the lifetime value of their equipment. For example, we plan to deliver remote diagnostic capabilities for furnaces and water heaters that will enable technicians to resolve problems quickly and improve equipment uptime.

### III. Leverage Connected Home Expertise to Grow Software and Services Revenue

We believe we are well positioned to benefit from the growing demand for connected solutions in homes due to our breadth of offerings, customer reach and strong brand. As consumer preferences drive increasing demand for connected home solutions, we believe our portfolio of end-to-end solutions will become increasingly important. Compelling connected home use cases require careful orchestration of multiple solutions to create an ecosystem that can be reliably accessed by consumers on a common platform. A seamless experience is a key differentiator relative to single-purpose product providers.

We plan to further enhance the customer value proposition by expanding remote functionality and real-time access to information and analytics that help the end-user control their home environment. We also intend to support this effort by extending our suite of proprietary service offerings as well as the range of options for controlling our devices in conjunction with third party systems. These innovations require that we navigate a complex and changing technological and regulatory landscape.

We have recently launched SaaS subscription services to consumers and intend to grow through services such as video storage, energy management and automated replenishment services. We also provide PaaS offerings such as AlarmNet and Total Connect as fee-based services to the professional channel to enable remote management, control and monitoring of security systems, and plan to provide Honeywell Home, a global cloud and application platform for use by consumers and professional channel partners. We intend to consolidate our service offerings under Honeywell Home to increase scale efficiencies and improve speed to market with new features and enhancements and to drive global expansion of connected offerings and services. This platform is expected to make it easier for partners to integrate with our solutions, and allow SpinCo to host third party connected products in our cloud as well as enable faster implementation of new connected device products and services such as demand response and security monitoring services, allowing them to use the ecosystem of their choice and providing customers with energy savings, security and peace of mind. This platform will enable meaningful new services for our professional channels, our connected consumers and third parties that value the insights derived from data. Connectivity also enables data analytics and DaaS, which allows service technicians to provide after-sales services in the form of remote diagnostics and preventive maintenance and also enables them to resolve more problems on the first service call. Furthermore, our LifeCare telehealth DaaS enables remote patient monitoring and assists hospitals in significantly reducing readmission rates. We believe analytics provide a growing service revenue opportunity.

Table of Contents

**IV. Expand Presence of Product Portfolio Through Alternative Channels and Geographies**

According to IHS, DIY and self-installed solutions unit sales are expected to grow by over 20% per year from 2015 through 2020. We are increasing our presence in retail and e-commerce channels by expanding our range of partners and the breadth of products with self-install capabilities, such as Lyric Thermostats and Cameras and the Honeywell Smart Home Security System.

We are developing new relationships with utilities, insurance providers, telecom and cable companies, homebuilders and property managers for multifamily residences, all of which are looking to provide value-added services to their customer base. For example, utilities offer our connected thermostats for energy demand management and insurance companies offer water leak detectors for risk mitigation of property damage and to reduce claims. Our connected home solutions help property managers remotely manage heating and cooling to reduce energy costs and help homebuilders improve the commercial value of new homes.

We plan to expand our presence in certain HGRs as favorable macro trends such as urbanization, improving living standards and growing internet and smartphone usage support adoption of our solutions. As large, growing markets, China and India present near-term opportunities to grow with our professional and OEM channel partners. Local legislation, driven by safety and security concerns, should also provide an opportunity to expand our presence in the Middle East and Latin American regions. We expect to localize our portfolio in HGRs, primarily by investing in tailored solutions to be competitive in local markets. However, competition in HGRs is often intense, which may affect our ability to execute our strategy.

**V. Grow ADI by Expanding Geographic Footprint, Product Categories and Services**

We intend to increase our geographic footprint for distribution by expanding our presence in markets where we already operate and entering selected new geographies within established distribution markets. We plan to implement this by opening new branches, deploying field sales and telesales teams, and taking advantage of e-commerce opportunities. For example, we have established a strong foundation in India, where according to IHS we already have a market share of approximately 18% and the distribution market is expected to grow at an approximate 11% CAGR from 2016 through 2021.

We intend to continue expanding our portfolio of core and adjacent products that are relevant and attractive to our customers to drive incremental sales across our existing footprint. In 2016, we added professional audio visual products, a growing and attractive product category to respond to customer demand and since then we have added many well-recognized brands to supplement our core product lines, including Kantech access control systems, Code Blue emergency communications, Seagate storage solutions, Sonos wireless audio, and LG professional displays. We have also added a line of new ADI private label products.

We intend to continue to introduce new value-added services and electronic ordering options to deepen relationships with our contractors. Recently, we launched a feature called “Shop My Branch”, which allows customers to shop and place orders for products that are specifically available in their local branch, along with a one-hour pick up service for orders placed online or through the ADI app. We also plan to continue to improve our capabilities in electronic data interchange (“EDI”) through our customized integration with SedonaOffice, a leading business management software for security companies, which allows contractors to establish electronic data transmission with ADI without requiring significant IT support.

**VI. Accelerate Growth Through Selective Strategic Acquisitions**

We intend to selectively pursue acquisitions that will broaden our product portfolio, gain access to new technologies, expand our geographic footprint and enhance our position in strategic market segments. For example, our acquisition in 2016 of RSI Video Technologies, a company that manufactures battery-powered cameras, allowed us to offer security solutions that combine video clips and motion sensors to provide video

Table of Contents

alarm verification, which mitigates false alarms, a key differentiator in our security platform. The substantial indebtedness we expect to incur in connection with the Spin-Off and our payments under and the terms of the Indemnification and Reimbursement Agreement may limit our ability to successfully pursue certain transactions.

## Industry Overview

### Our Markets

Our business operations are conducted through two segments, Products and Distribution, serving multiple customer segments through multiple channels. We separate our Products segment into Comfort & Care and Security & Safety. Through ADI, we are a distributor of security and low voltage products such as video surveillance, intrusion, access control, and fire and life safety.

### Trends and Drivers

We believe our addressable markets benefit from several favorable trends:

- **Growth in Residential Construction and R&R.** Recent years in the U.S. have been characterized by rising new housing starts and an increase in investment in residential construction. According to the U.S. Census Bureau, new housing starts reached 1.2 million units in 2017, growing at a CAGR of approximately 10% since 2009. However, new housing starts remain significantly below the long term annual median of 1.5 million units since 1960, and we believe this represents significant growth potential over the next several years. The NAHB projects that new housing starts will grow at a CAGR of approximately 4% through 2019. Additionally, per the BEA, R&R spend, as measured by U.S. RPFI, has grown at a CAGR of approximately 8% since 2009 to reach approximately $748 million in 2017. U.S. RPFI as a percentage of U.S. GDP reached 3.9% in 2017, but remains below the long term median of 4.5% since 1960, which we believe represents significant growth potential over the next several years. Continued growth in residential housing spending has the potential to generate increased demand for home comfort and security products and services.
- **Energy Efficiency and Safety Megatrends.** Higher energy efficiency standards, driven by legislation, industry and consumer preferences, are leading to faster adoption of advanced energy control devices for furnaces, boilers and cooling equipment. Similarly, legislation in the area of fire safety is driving greater use of smoke and carbon monoxide detection and monitoring.
- **IoT and Proliferation of Connected Devices.** The connectivity driven by the Internet and various communication protocols and technologies, such as Wi-Fi, Bluetooth, Z-Wave and Zigbee, has led to a massive expansion in the number of connected devices and enables the expansion of DIY solutions available to homeowners. According to Statista, the IoT installed base worldwide is expected to grow from 20 billion connected devices in 2017 to over 75 billion connected devices in 2025. The desire to monitor and control devices remotely through cloud based applications is creating a growing market for connected solutions.
- **Mobile Lifestyle and Ubiquity of Broadband.** The proliferation of smartphones, tablets, and high speed, high bandwidth data networks including 4G, LTE, next generation 5G and other wireless technologies have changed the way people communicate, use information and manage various applications in their lives. Consumers are increasingly expecting a similarly convenient and mobile experience to manage their homes and businesses.
- **Cloud and Connectivity Infrastructure.** Advances in cloud technologies, software and wireless technologies have improved reliability and enabled efficient scale in a way that facilitates delivery of connected home services at an exponential rate. The ability to provide such services at an affordable price is helping grow the connected solution market.
- **Big Data and Data Analytics Capabilities.** The increasing number of connected devices combined with the decreasing cost of connectivity, results in the generation of vast amounts of data related to

Table of Contents

equipment operation and consumer interaction with these devices. Synthesizing this information provides useful insight for manufacturers, contractors and service providers to diagnose and fix problems quickly, schedule preventive maintenance, and provide better customer service.

- **Need for Technical Expertise and Training.** New technologies, fueled by the proliferation of connected devices, require greater technical know-how to design, install and maintain. Contractors, therefore, increasingly rely on distribution partners and manufacturers to provide design services, product and services consultation and training to support their business needs.
- **Demand for Same Day Order Fulfillment.** Contractors are increasingly being asked to install complex inter-connected systems. As a result, they tend to place frequent orders across a broad range of low voltage technologies and depend on distributors and manufacturers to stock these products locally for immediate fulfillment.
- **Non-Residential Construction and Equipment Replacement.** The majority of our distribution sales are to non-residential end markets, driven by investment in construction and equipment replacement. Adjusted for inflation, total non-residential construction remains 14% below peak levels. According to JP Morgan estimates, annual non-residential construction is expected to grow at a CAGR of approximately 3 to 4% through 2019. Sustained strength and further growth in new and replacement non-residential construction could lead to increased demand for low voltage products.

**Addressable Markets**

*Products and Solutions*

The elements of the addressable market for Comfort & Care products and solutions are analyzed by IHS, Navigant and BSRIA. Based on management analysis of these sources, we believe that the total addressable market is approximately $10 billion in annual sales for 2018, of which $0.6 billion is comprised of services associated with Comfort & Care solutions which includes demand management and telehealth.

The elements of the addressable market for Security & Safety products and solutions are analyzed by IHS and management estimates. Based on management analysis of this source, we believe that the total addressable market is approximately $4.5 billion in annual sales for 2018, of which $1.1 billion is comprised of services associated with Security & Safety solutions which includes security monitoring services and remote video services.

*Distribution*

Based on IHS, we estimate that the global total addressable market for the security and low voltage products (which includes video surveillance, intrusion, access control and fire and life safety) distribution market is approximately $20 billion in sales in 2018.

*Materials and Suppliers*

The most significant purchased materials used in the manufacture of our products are copper, steel, aluminum, plastics, printed circuit boards, semiconductors and passive electronics. Purchased materials cover a wide range of supplier value-add from raw materials and single components to subassemblies and complete finished goods, and there is considerable expenditure on both commercial off-the-shelf and make-to-print items. Although execution of material substitutions or supplier changes may be resource intensive, there are few instances of sole-source materials. Alternatives usually exist in the event that a supplier becomes unable to provide material. Unforeseen shortages and supply disruptions occur from time to time but are typically manageable such that adverse impact to customers can be avoided. At the same time, raw material price fluctuations, the ability of key suppliers to meet quality and delivery requirements, or catastrophic events can increase the cost of our products and services, impact our ability to meet commitments to customers and could

Table of Contents

have an adverse effect on our business, financial condition, results of operations and cash flows. See "Risks Relating to Our Business—Raw material price fluctuations, the ability of key suppliers to meet quality and delivery requirements, or catastrophic events can increase the cost of our products and services, impact our ability to meet commitments to customers and cause us to incur significant liabilities."

**Inventory**

Our inventory levels vary by distribution channel. We typically maintain approximately three to five weeks of inventory for retail distribution, one to two weeks of inventory for professional installer and distributors and two to four weeks of inventory for OEMs. In addition, ADI operates over 200 stocking locations globally and is contractually obligated to maintain four weeks of inventory for certain customers.

**Customers**

The end-users for our products are residential and commercial consumers throughout the world. We reach these end-users through sales to professional installers and OEMs, and through retail distribution including e-commerce. The global customer base for the Products segment includes over 150 million homes globally, with over 15 million installations annually. Our products and solutions are carried by major distributors in our relevant industries across North America and Western Europe, including our ADI business. Our retail products are carried by the top retailers in their respective markets, including, in the Americas, The Home Depot, Lowe's and Amazon.com, and in EMEA, Kingfisher and Pflieger. We also have relationships with over 1,200 OEMs.

In the distribution segment, ADI has a customer base of over 100,000 contractors and covers a variety of product categories comprising of over 350,000 products from over 1,000 leading manufacturers.

**Regulatory and Environmental Compliance**

We are subject to various federal, state, local and foreign government requirements relating to the protection of the environment. We believe that, as a general matter, our policies, practices and procedures are properly designed to prevent unreasonable risk of environmental damage and personal injury and that our handling, manufacture, use and disposal of hazardous substances are in accordance with environmental and safety laws and regulations. However, mainly because of past operations and operations of predecessor companies, we, like other companies engaged in similar businesses, have incurred remedial response and voluntary cleanup costs for site contamination and are a party to lawsuits and claims associated with environmental and safety matters, including past production of products containing hazardous substances. Additional lawsuits, claims and costs involving environmental matters are likely to continue to arise in the future.

As of December 31, 2017, we have recorded a liability for environmental investigation and remediation of approximately $537 million. We do not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and we cannot determine either the timing or the amount of the ultimate costs associated with environmental matters, which could be material to our combined results of operations and operating cash flows in the periods recognized or paid. However, considering our past experience and existing reserves, we do not expect that environmental matters will have a material adverse effect on our combined financial position.

Furthermore, we will be required to indemnify Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement" for more information.

Table of Contents

### Employees

We estimate that as of the effective date of the Spin-Off, we will have approximately 14,500 employees. As of December 31, 2017 approximately 12% of our employees were covered by collective bargaining agreements and represented worldwide by numerous unions and works councils. We believe that our relations with our employees and labor unions have generally been good.

### Seasonality

Our business experiences a moderate level of seasonality. Sales activity is generally lowest during the first calendar quarter when it is winter in the majority of our geographical markets.

### Properties

Our corporate headquarters will be located in Golden Valley, Minnesota.

We own or lease 18 manufacturing sites, 37 other sites, including offices, engineering and lab sites, 201 stocking locations and three warehouses. The following table shows the regional distribution of these sites:

| | Americas | Asia Pacific | EMEA | India | Total |
|---|---|---|---|---|---|
| Manufacturing | 8 | 1 | 8 | 1 | 18 |
| Other (Including Offices, Engineering and Labs) | 12 | 5 | 17 | 3 | 37 |
| Stocking Location | 115 | — | 71 | 15 | 201 |
| Warehouse | 1 | — | 2 | — | 3 |

We also lease or sub-lease one manufacturing site, ten other sites, including offices, engineering, and lab sites and two warehouses from Honeywell. The following table shows the regional distribution of these sites:

| | Americas | Asia Pacific | EMEA | India | Total |
|---|---|---|---|---|---|
| Manufacturing | — | — | 1 | — | 1 |
| Other (Including Offices, Engineering and Labs) | 1 | — | 8 | 1 | 10 |
| Warehouse | 2 | — | — | — | 2 |

We also contract with fourteen warehouses that are owned and operated by third parties. The following table shows the regional distribution of these sites:

| | Americas | Asia Pacific | EMEA | India | Total |
|---|---|---|---|---|---|
| Warehouse | — | — | 1 | 13 | 14 |

In addition, Honeywell leases or subleases four manufacturing sites and three other sites, including offices and engineering sites, from us. The following table shows the regional distribution of these sites:

| | Americas | Asia Pacific | EMEA | India | Total |
|---|---|---|---|---|---|
| Manufacturing | 2 | — | 2 | — | 4 |
| Other (Including Offices and Engineering) | 2 | — | 1 | — | 3 |

In addition, Honeywell is expected to use certain limited space in certain of our facilities under one or more services agreements.

Table of Contents

For information on the lease by our ADI business of an administrative office building in Melville, New York, see "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Other Arrangements."

We believe our properties are adequate and suitable for our business as presently conducted and are adequately maintained.

**Research and Development ("R&D") and Intellectual Property**

We have dedicated software centers of excellence in Atlanta, Georgia and Bengaluru and Madurai, India. In addition, our laboratories are certified to meet various industry standards, such as through UL, enabling us to test products internally. We also have a user experience design group, that consists of researchers and product and user experience designers across three studios in Golden Valley, Minnesota; Bracknell, United Kingdom; and Bengaluru, India. As of December 31, 2017, we employed over 1,300 engineers. Our total R&D expenses were approximately $120 million, $106 million and $110 million for the years ended December 31, 2017, 2016 and 2015, respectively.

Our deep domain expertise, proprietary technology and brands are protected by a combination of patents, trademarks, copyrights, trade secrets, non-disclosure agreements and contractual provisions. We own approximately 3,000 worldwide active patents and pending patent applications to protect our R&D investments in new products and services. We have and will continue to protect our products and technology by asserting our intellectual property rights against third party infringers. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Agreements Governing Intellectual Property."

**Acquisitions**

In March 2016, we completed the acquisition of RSI Video Technologies ("RSI"), a leading provider of wireless battery-powered motion detectors, for an aggregate price of $124 million in cash and $2 million in contingent consideration. RSI was acquired to enhance our ability to meet increasing global customer need for video verification and also provides a DIY offering combined with professional monitoring. RSI identifiable intangible assets are being amortized over their estimated lives ranging from 10 to 14 years using straight line and accelerated amortization methods. See Note 4. Acquisitions to our historical Combined Financial Statements.

In December 2015, Honeywell completed the acquisition of the Elster Division of Melrose Industries plc ("Elster"), a leading provider of thermal gas solutions for commercial, industrial and residential heating systems and gas, water and electricity meters, including smart meters and software and data analytics solutions for an aggregate value, net of cash acquired, of approximately $4,899 million. As part of this transaction, we acquired the residential thermal business of Elster for an aggregate value of $196 million in cash. See Note 4. Acquisitions to our historical Combined Financial Statements.

**Competition**

Our industries and markets are highly competitive. In our Products segment we compete with global, national, regional and local providers of our products, services and solutions, including established manufacturers, distributors and service providers, as well as new entrants in particular in connected home and smart products. In our Distribution segment we compete against manufacturer direct sales, other distributors and other sellers, including retail and e-commerce. The most significant competitive factors we face are product and service innovation, reputation of our Company and brands, sales and marketing programs, product performance, quality of product training and events, product availability, speed and accuracy of delivery, service and price, technical support, credit availability and product reliability and warranty.

In addition to current competitive factors, there may be new market entrants with non-traditional business and customer service models or disruptive technologies and products, resulting in increased competition and

Table of Contents

changing industry dynamics. See “Risk Factors—Risks Relating to Our Business—The market for connected home solutions is fragmented, highly competitive, continually evolving and subject to disruptive technologies.”

**Legal Proceedings**

We are subject to various lawsuits, investigations and disputes arising out of the conduct of our business, including matters relating to commercial transactions, government contracts, product liability, prior acquisitions and divestitures, employee benefit plans, intellectual property, and environmental, health and safety matters. We recognize a liability for any contingency that is probable of occurrence and reasonably estimable. We continually assess the likelihood of adverse judgments of outcomes in these matters, as well as potential ranges of possible losses (taking into consideration any insurance recoveries), based on a careful analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts. We do not currently believe that such matters are material to our results of operations.

Additionally, in connection with our entry into the Indemnification and Reimbursement Agreement, we will be required to make payments to Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell’s net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. See “Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement” for more information.

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following Management's Discussion and Analysis of Financial Condition and Results of Operations is intended to help you understand the results of operations and financial condition of the Business for the three and six months ended June 30, 2018 and 2017 and for the three years ended December 31, 2017.

### Overview and Business Trends

We are a leading global provider of critical comfort and security solutions primarily in residential environments. Our products consist of solutions in Comfort & Care and Security & Safety categories and include temperature and humidity control, thermal, water and air solutions and remote patient monitoring software solutions as well as security panels, sensors, peripherals, wire and cable, communications devices, video cameras, awareness solutions, cloud infrastructure, installation and maintenance tools and related software. Our ADI Global Distribution business is the leading wholesale distributor of security and low voltage electronic products which include video surveillance, intrusion, access control, fire and life safety, wire, networking and professional audio visual systems. We manage our business operations through two segments, Products and Distribution. The Products segment offerings include our Comfort & Care and Security & Safety products, which, consistent with our industry, has a higher margin profile in comparison to the Distribution segment.

Our financial performance over the last three years has been supported by several macro trends. Steady growth in residential and non-residential construction and growth in renovation and remodeling in the United States has had a positive impact on the growth of our Products and Distribution businesses. The financial performance of our Products business has further benefited from increasing penetration of wireless connectivity and the proliferation of connected devices. The financial performance of our Distribution business has been further aided by increasing contractor needs for training and technical expertise, and increasing demand for same day order fulfilment.

We are entering into certain agreements with Honeywell that did not exist prior to the Spin-Off, such as the Indemnification and Reimbursement Agreement, the Trademark License Agreement, Tax Matters Agreement and Transition Services Agreement, which will cause us to incur new costs. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell," "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources," "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement," "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Trademark License Agreement," "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Tax Matters Agreement" and "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Transition Services Agreement" for a description of the material terms thereof.

### Basis of Presentation

The accompanying historical Combined Financial Statements included in this Information Statement were derived from the consolidated financial statements and accounting records of Honeywell. These Combined Financial Statements reflect the combined historical results of operations, financial position and cash flows of Homes as they were historically managed in conformity with U.S. GAAP. Therefore, the historical combined financial information may not be indicative of our future performance and does not necessarily reflect what our combined results of operations, financial condition and cash flows would have been had the Business operated as a separate, publicly traded company during the periods presented, particularly because of changes that we expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our Business.

The Combined Financial Statements include certain assets and liabilities that have historically been held at the Honeywell corporate level but are specifically identifiable or otherwise allocable to the Business.

Table of Contents

Additionally, Honeywell provides certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Business. The cost of these services has been allocated to the Business on the basis of the proportion of net sales. The Business and Honeywell consider these allocations to be a reasonable reflection of the benefits received by the Business. Actual costs that would have been incurred if the Business had been a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Both we and Honeywell consider the basis on which the expenses have been allocated to be a reasonable reflection of the utilization of services provided to or the benefits received by the Business during the periods presented.

Subsequent to the completion of the Spin-Off, we expect to incur expenditures consisting of employee-related costs, costs to start up certain stand-alone functions and information technology systems and other one-time transaction related costs. Recurring stand-alone costs include establishing the internal audit, treasury, investor relations, tax and corporate secretary functions as well as the annual expenses associated with running an independent publicly traded company including listing fees, compensation of non-employee directors, related board of director fees and other fees and expenses related to insurance, legal and external audit.

Our environmental expenses are primarily reported within Other expense in our Combined Statement of Operations, which reflect an estimated liability for resolution of pending and future environmental-related liabilities, calculated as if we were responsible for 100% of the environmental-liability payments associated with certain sites. See Environmental Matters in Note 18. Commitments and Contingencies of Notes to Combined Financial Statements for additional information. In conjunction with the Business's separation from Honeywell, we plan to enter an Indemnification and Reimbursement Agreement pursuant to which we will agree to indemnify Honeywell in amounts equal to 90% of payments which include amounts billed with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. Pursuant to this Indemnification and Reimbursement Agreement, we will be responsible for paying to Honeywell such amounts, up to a cap of $140 million in respect of liabilities arising in any given calendar year (exclusive of any late payment fees up to 5% per annum). The payments that the Business will be required to make to Honeywell pursuant to this agreement will not be deductible for U.S. federal income tax purposes. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement."

**Results of Operations for the three and six months ended June 30, 2018 compared with the three and six months ended June 30, 2017**

***Net Sales***

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| | (Dollars in millions) | | | |
| Net sales | $ 1,196 | $ 1,096 | $ 2,361 | $ 2,158 |
| % change compared with prior period | 9.1% | | 9.4% | |

Table of Contents

The change in net sales compared to prior year period is attributable to the following:

| | Three months | Year to Date |
|---|---|---|
| Volume | 5.1% | 4.8% |
| Price | 1.9% | 1.5% |
| Foreign Currency Translation | 2.1% | 3.1% |
| Changed compared with prior period (%) | 9.1% | 9.4% |

A discussion of net sales by segment can be found in the Review of Business Segments section of this Management's Discussion and Analysis of Financial Condition and Results of Operations.

The foreign currency translation impact for the three and six months ending June 30, 2018 compared to the prior year period was favorable due to the strengthening of both the Euro and British Pound against the U.S. Dollar.

***Cost of Goods Sold***

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| | (Dollars in millions) | | | |
| Cost of goods sold | $ 850 | $ 788 | $ 1,672 | $ 1,539 |
| % change compared with prior period | 7.9% | | 8.6% | |
| Gross profit percentage | 28.9% | 28.1% | 29.2% | 28.7% |

***Three months ended***

Costs of goods sold for the three months ended June 30, 2018 was $850 million, an increase of $62 million, or approximately 7.9%, from $788 million for the three months ended June 30, 2017.

This increase was primarily driven by $51 million in higher product cost in the Distribution segment driven by the increase in sales volume.

The increase in gross profit percentage was primarily due to the impact of higher selling prices (approximately 1.3 percentage point impact) and reduced repositioning charges (approximately 1.0 percentage point impact), partially offset by the impact of material inflation, net of productivity (approximately 1.1 percentage point impact) and higher freight cost (approximately 0.5 percentage point impact).

***Six months ended***

Costs of goods sold for the six months ended June 30, 2018 was $1,672 million, an increase of $133 million, or approximately 8.6%, from $1,539 million for the six months ended June 30, 2017.

This increase was primarily driven by $84 million in higher product cost in the Distribution segment and $53 million in higher direct material cost in the Products segment driven by the increase in sales volume and the strengthening of both the Euro and British Pound against the U.S. Dollar.

The increase in gross profit percentage was primarily due to the impact of higher selling prices (approximately 1.0 percentage point impact), partially offset by the impact of higher inflation, net of material productivity (approximately 0.4 percentage point impact) and unfavorable product mix (approximately 0.4 percentage point impact).

Table of Contents

*Selling, General and Administrative Expenses*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| | (Dollars in millions) | | | |
| Selling, general and administrative expense | $ 217 | $ 218 | $ 429 | $ 433 |
| % of sales | 18.1% | 19.9% | 18.2% | 20.1% |

***Three months ended***

Selling, general and administrative expenses for the three months ended June 30, 2018 was $217 million, a decrease of $1 million, or 0.5%, from $218 million for the three months ended June 30, 2017.

The decline in expenses as a percentage of sales was primarily due to the impact of lower selling costs on higher sales volume.

***Six months ended***

Selling, general and administrative expenses for the six months ended June 30, 2018 was $429 million, a decrease of $4 million, or 0.9%, from $433 million for the six months ended June 30, 2017.

The decline in expenses as a percentage of sales was primarily due to the impact of lower selling costs on higher sales volume.

***Other Expense***

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| | (Dollars in millions) | | | |
| Other expense | $ 123 | $ 51 | $ 176 | $ 100 |

***Three months ended***

Other expense for the three months ended June 30, 2018 was $123 million, an increase of $72 million, or 141.2%, from $51 million for the three months ended June 30, 2017 driven by higher environmental-related expenses.

***Six months ended***

Other expense for the six months ended June 30, 2018 was $176 million, an increase of $76 million, or 76.0%, from $100 million for the six months ended June 30, 2017 driven by higher environmental-related expenses.

***Tax Expense***

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| | (Dollars in millions) | | | |
| Tax expense (benefit) | $ (28) | $ 23 | $ 6 | $ 54 |
| Effective tax rate | (560.0)% | 59.0% | 7.1% | 62.8% |

Table of Contents

***Three months ended***

The effective tax rate decreased for the quarter year-over-year primarily due to increased tax benefits attributable to currency impacts for withholding taxes on undistributed foreign earnings, adjustments to the provisional tax amount related to U.S. tax reform and decreased income before taxes.

The effective tax rate for the three months ended June 30, 2018 was lower than the U.S. federal statutory rate of 21% from tax benefits related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off that resulted in an $18 million reduction in tax expense, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. tax reform.

The effective tax rate for the three months ended in 2017 was higher than the U.S. federal statutory rate of 35% as a result of non-deductible expenses.

***Six months ended***

The effective tax rate decreased for the quarter year-over-year primarily due to increased tax benefits attributable to currency impacts for withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. tax reform.

The effective tax rate for the six months ended in 2018 was lower than the U.S. federal statutory rate of 21% primarily from tax benefits related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off that resulted in an $18 million reduction in tax expense, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. tax reform.

The effective tax rate for the six months ended June 30, 2017 was higher than the U.S. federal statutory rate of 35% as a result of non-deductible expenses.

On December 22, 2017, the U.S. enacted tax reform that instituted fundamental changes to the taxation of multinational corporations. As a result of the tax reform, we recorded a provisional tax charge at December 31, 2017 of $156 million related to the mandatory transition tax and $314 million related to taxes on undistributed foreign earnings that are no longer intended to be permanently reinvested. We recorded a provisional amount because certain information related to the computation of earnings and profits, distributable reserves, and foreign exchange gains and losses is not readily available; some of the testing dates to determine taxable amounts have not yet occurred; and there is limited information from federal and state taxing authorities regarding the application and interpretation of the recently enacted legislation. In accordance with current SEC guidance, the Company will report the impact of final provisional amounts in the reporting period in which the accounting is completed, which will not exceed one year from the date of enactment of tax reform.

The impact of legal entity restructuring activities during the second quarter of fiscal 2018 resulted in a reduction to income tax expense of $18 million. Further legal entity restructuring and other actions will be completed prior to or simultaneous with the Spin-Off, which are expected to further reduce deferred tax liabilities by approximately $291 million. These deferred tax liabilities had been recorded as a result of the fact that the Company no longer intends to permanently reinvest the historical undistributed earnings of its foreign affiliates. The reduction of deferred tax liabilities primarily consists of non-U.S. withholding taxes that were recorded in 2017 as part of the provisional tax charge related to U.S. tax reform. The legal entity restructuring has and will continue to change the legal ownership structure resulting in future repatriated earnings not being subject to withholding taxes and, thereby, changes the amount of withholding taxes SpinCo will ultimately be required to pay.

As described in our Combined Financial Statements for the year ended December 31, 2017, we reasonably estimated certain effects of the tax legislation and, therefore, recorded provisional amounts, including the deemed

Table of Contents

repatriation transition tax and withholding taxes on undistributed earnings. During the three months ended June 30, 2018, the Company recorded an adjustment to the provisional tax amount related to the deemed repatriation transition tax of $3 million. This adjustment results in a decrease to the effective tax rate for the six months ended June 30, 2018 of 3.6%. The Company has not finalized the accounting for the tax effects of the tax legislation as we are continuing to gather additional information and expect to complete our accounting within the prescribed measurement period.

The effective tax rate can vary from quarter to quarter for unusual or infrequently occurring items, such as the tax impacts from the resolution of income tax audits, changes in tax laws, revisions to the provisional amounts from U.S. tax reform or internal restructurings.

***Review of Business Segments***

We operate two segments: Products and Distribution. Management evaluates segment performance based on segment profit. Segment profit is measured as segment income (loss) before taxes excluding other expense (primarily environmental costs), interest and other charges, net, pension expense and repositioning charges.

***Products***

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | % Change | 2018 | 2017 | % Change |
| Total sales | $ 598 | $ 563 | | $1,200 | $1,116 | |
| Less: Intersegment sales | 80 | 84 | | 159 | 174 | |
| External sales | 518 | 479 | 8% | 1,041 | 942 | 11% |
| Cost of products and services sold | 291 | 268 | | 584 | 528 | |
| Selling, general and administrative and other expenses | 131 | 132 | | 259 | 265 | |
| Segment profit | $ 96 | $ 79 | 22% | $ 198 | $ 149 | 33% |

| | 2018 vs. 2017 | | | |
|---|---|---|---|---|
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| Factors Contributing to Year-Over-Year Change | Sales | Segment Profit | Sales | Segment Profit |
| Organic growth/ Operational segment profit | 5% | 18% | 7% | 27% |
| Foreign currency translation | 3% | 4% | 4% | 6% |
| Total % Change | 8% | 22% | 11% | 33% |

***Three months ended***

Products sales increased by 8% primarily due to an increase in external sales volume in the Comfort & Care product line, the impact of favorable currency translation and the impact of higher prices.

Products segment profit increased by 22% primarily due to external sales volume, higher prices and higher inflation, net of productivity.

***Six months ended***

Products sales increased by 11% primarily due to an increase in external sales volume in both the Comfort & Care and Security and Safety product lines, the impact of favorable currency translation and the impact of higher prices.

Table of Contents

Products segment profit increased by 33% primarily due to external sales volume and higher selling prices, partially offset by higher product costs on that higher sales volume.

***Distribution***

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | % Change | 2018 | 2017 | % Change |
| Total sales | $ 678 | $ 617 | | $ 1,320 | $ 1,216 | |
| Less: Intersegment sales | — | — | | — | — | |
| External sales | 678 | 617 | 10% | 1,320 | 1,216 | 9% |
| Cost of products and services sold | 557 | 506 | | 1,081 | 995 | |
| Selling, general and administrative and other expenses | 84 | 78 | | 165 | 157 | |
| Segment profit | $ 37 | $ 33 | 12% | $ 74 | $ 64 | 16% |

| | 2018 vs. 2017 | | | |
|---|---|---|---|---|
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| Factors Contributing to Year-Over-Year Change | Sales | Segment Profit | Sales | Segment Profit |
| Organic growth/ Operational segment profit | 8% | 11% | 7% | 15% |
| Foreign currency translation | 2% | 1% | 2% | 1% |
| Total % Change | 10% | 12% | 9% | 16% |

***Three months ended***

Distribution sales increased by 10% primarily due to volume growth across all of our key geographic markets and the favorable impact of foreign currency translation.

Distribution segment profit increased by 12% primarily driven by an increase in sales volume.

***Six months ended***

Distribution sales increased by 9% primarily due to volume growth across all of our key geographic markets and the favorable impact of foreign currency translation.

Distribution segment profit increased by 16% primarily driven by an increase in sales volume.

**Results of Operations for the Years Ended December 31, 2017, 2016 and 2015**

***Net Sales***

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (Dollars in millions) | | |
| Net sales | $4,519 | $4,455 | $4,154 |
| % change compared with prior period | 1.4% | 7.2% | |

Table of Contents

The change in net sales compared to prior year period is attributable to the following:

| | 2017 | 2016 |
|---|---|---|
| Volume | 0.9% | 5.4% |
| Price | 0.2% | 0.2% |
| Acquisitions | 0.2% | 2.9% |
| Foreign Currency Translation | 0.1% | (1.3)% |
| | 1.4% | 7.2% |

A discussion of net sales by segment can be found in the Review of Business Segments section of this Management's Discussion and Analysis of Financial Condition and Results of Operations.

The foreign currency translation impact in 2017 compared with 2016 was essentially flat. The strengthening of both the Euro and the Canadian Dollar against the U.S. Dollar was offset by the weakening of the British Pound against the U.S. Dollar.

The foreign currency translation impact in 2016 compared with 2015 was principally driven by the weakening of the British Pound and the Canadian Dollar against the U.S. Dollar.

***Cost of Goods Sold***

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | | (Dollars in millions) | |
| Cost of goods sold | $3,203 | $3,090 | $2,925 |
| % change compared with prior period | 3.7% | 5.6% | |
| Gross profit percentage | 29.1% | 30.6% | 29.6% |

***2017 compared with 2016***

Cost of goods sold for 2017 was $3,203 million, an increase of $113 million, or 3.7%, from $3,090 million in 2016.

This increase was primarily driven by $92 million in higher direct material costs in the Distribution Segment (driven by higher sales of $122 million) and approximately $25 million in investments in research and development, primarily in the connected homes product offerings.

The decrease in gross profit percentage was primarily driven by the impact of unfavorable mix (approximately 1.3 percentage point impact) and investments in research and development (approximately 0.5 percentage point impact), partially offset by price (approximately 0.2 percentage point impact).

***2016 compared with 2015***

Cost of goods sold for 2016 was $3,090 million, an increase of $165 million, or 5.6%, from $2,925 million in 2015.

This increase was primarily driven by higher direct material cost of approximately $170 million due to the impact of higher sales of $301 million in the Distribution and in the Product segments, $69 million due to the impact of acquisitions for the residential thermal business of Elster and RSI, partially offset by $22 million in repositioning benefits and $42 million due to the favorable impact of foreign currency translation.

Gross profit percentage increased primarily due to the favorable impact of productivity, net of labor and overhead inflation (approximately 1.1 percentage point impact), the favorable impact of higher sales volumes

Table of Contents

(approximately 0.6 percentage point impact), and the favorable impact of acquisitions (approximately 0.4 percentage point impact), partially offset by unfavorable impacts of sales mix (approximately 0.7 percentage point impact) and direct material inflation (approximately 0.3 percentage point impact).

***Selling, General and Administrative Expenses***

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (Dollars in millions) | | |
| Selling, general and administrative expense | $ 871 | $ 870 | $ 810 |
| % of sales | 19.3% | 19.5% | 19.5% |

***2017 compared with 2016***

Selling, general and administrative expense for 2017 was $871 million, essentially flat from $870 million in 2016, with the impact of higher corporate allocations, labor inflation and investment being offset by repositioning benefits and lower selling costs.

***2016 compared with 2015***

Selling, general and administrative expense for 2016 was $870 million, an increase of $60 million, from $810 million in 2015. This increase was primarily driven by $22 million of higher corporate allocations from investment in cybersecurity and development of connected platforms, $16 million in additional costs from acquisitions, and $9 million of investments primarily in sales census additions.

***Other Expense***

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (Dollars in millions) | | |
| Other expense | $281 | $188 | $170 |

***2017 compared with 2016***

Other expense for 2017, was $281 million, an increase of $93 million from $188 million in 2016. This increase mainly relates to the cost of certain environmental remedial actions agreed to by the regulators.

***2016 compared with 2015***

Other expense for 2016, was $188 million, an increase of $18 million from $170 million in 2015, which reflects the variability in the timing of charges for the ongoing environmental remediation.

***Tax Expense***

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (Dollars in millions) | | |
| Tax expense | $ 560 | $ 133 | $ 110 |
| Effective tax rate | 337.3% | 42.9% | 42.8% |

***2017 compared with 2016***

The effective tax rate increased by 294.4 percentage points in 2017 compared to 2016. The increase was primarily attributable to the provisional impact of U.S. tax reform (see “the Tax Act” further discussed below)

Table of Contents

and an increase in non-deductible environmental expenses. The Company's non-U.S. effective tax rate was 128.6%, an increase of approximately 112.3 percentage points compared to 2016. The year-over-year increase in the non-U.S. effective tax rate was primarily driven by the Company's change in assertion regarding foreign unremitted earnings in connection with the Tax Act. On December 22, 2017, the U.S. enacted H.R.1, formerly known as the TCJA, that instituted fundamental changes to the taxation of multinational corporations. The TCJA includes changes to the taxation of foreign earnings by implementing a dividend exemption system, expansion of the current anti-deferral rules, a minimum tax on low-taxed foreign earnings and new measures to deter base erosion. The TCJA also permanently reduces the corporate tax rate from 35% to 21%, imposes a one-time mandatory transition tax on the historical earnings of foreign affiliates and implements a territorial-style tax system. The primary changes, which are reflected in the 2017 tax expense, resulted from provisional charges of approximately $314 million due to the Company's change in assertion regarding foreign unremitted earnings and $156 million due to the mandatory transition tax. These charges are subject to adjustment given the provisional nature of the charges. The TCJA provisional charges were the primary driver of the increase in the effective tax rate in 2017.

Most of the $314 million provisional charge described above relates to non-U.S. withholding taxes that will be payable at the time of the actual cash distribution and is based on the legal entity structure that existed at December 31, 2017. Changes to the legal entity structure or changes in future management's intent whether to permanently reinvest its foreign undistributed earnings could result in a significantly different tax liability.

***2016 compared with 2015***

The effective tax rate increased by 0.1 percentage points in 2016 compared to 2015. The increase was primarily attributable to higher earnings taxed at higher rates. The Company's non-U.S effective tax rate was 16.3%, an increase of approximately 1.2 percentage points compared to 2015. The year-over-year increase in the non-U.S. effective tax rate was primarily driven by higher earnings taxed at higher rates.

For further discussion of changes in the effective tax rate, see Note 7. Income Taxes of Notes to Combined Financial Statements.

***Review of Business Segments***

We operate two segments: Products and Distribution. Management evaluates segment performance based on segment profit. Segment profit is measured as segment income (loss) before taxes excluding other expense (primarily environmental costs), interest and other charges, net, pension expense and repositioning charges.

***Products***

| | 2017 | 2016 | Change | 2015 | Change |
|---|---|---|---|---|---|
| Total sales | 2,379 | 2,471 | | 2,338 | |
| Less: Intersegment sales | 337 | 371 | | 372 | |
| External sales | 2,042 | 2,100 | (3)% | 1,966 | 7% |
| Cost of products and services sold | 1,149 | 1,145 | | 1,109 | |
| Selling, general and administrative and other expenses | 540 | 529 | | 490 | |
| Segment profit | 353 | 426 | (17)% | 367 | 16% |

Table of Contents

| Factors Contributing to Year-Over-Year Change | 2017 vs. 2016 Sales | 2017 vs. 2016 Segment Profit | 2016 vs. 2015 Sales | 2016 vs. 2015 Segment Profit |
|---|---|---|---|---|
| Organic growth/ Operational segment profit | (3)% | (18)% | 2% | 8% |
| Foreign currency translation | — % | 1% | (1)% | (1)% |
| Acquisitions, divestitures and other, net | — % | — % | 6% | 9% |
| Total % Change | (3)% | (17)% | 7% | 16% |

***2017 compared with 2016***

Products sales decreased by 3% primarily due to a decrease in external sales volume in the Comfort & Care product line, partially offset by the impacts of higher prices.

Products segment profit decreased by 17% due to a decrease in sales volume, investment in research and development, higher corporate allocations and unfavorable product mix driven by lower sales in the Comfort & Care product line, partially offset by productivity net of inflation and higher price.

***2016 compared with 2015***

Products sales increased by 7% primarily due to the impact of the RSI and Elster acquisitions and higher sales volume in both the Comfort & Care and Security & Safety product lines, partially offset by the unfavorable impact of foreign currency translation.

Products segment profit increased by 16% due to the impact of the RSI and Elster acquisitions, productivity net of inflation, and higher sales volumes, partially offset by higher selling, general and administrative expenses and the unfavorable impact of foreign currency translation.

***Distribution***

| | 2017 | 2016 | Change | 2015 | Change |
|---|---|---|---|---|---|
| Total sales | 2,477 | 2,355 | | 2,188 | |
| Less: Intersegment sales | — | — | — | | |
| External sales | 2,477 | 2,355 | 5% | 2,188 | 8% |
| Cost of products and services sold | 2,032 | 1,939 | | 1,806 | |
| Selling, general and administrative and other expenses | 314 | 312 | | 305 | |
| Segment profit | 131 | 104 | 26% | 77 | 35% |

| Factors Contributing to Year-Over-Year Change | 2017 vs. 2016 Sales | 2017 vs. 2016 Segment Profit | 2016 vs. 2015 Sales | 2016 vs. 2015 Segment Profit |
|---|---|---|---|---|
| Organic growth/ Operational segment profit | 5% | 26% | 9% | 38% |
| Foreign currency translation | — % | — % | (1)% | (3)% |
| Total % Change | 5% | 26% | 8% | 35% |

***2017 compared with 2016***

Distribution sales increased by 5% primarily due to volume growth across all of our key geographic markets.

Distribution segment profit increased by 26% primarily due to higher sales volumes, and productivity net of inflation, partially offset by higher corporate allocations.

Table of Contents

*2016 compared with 2015*

Distribution sales increased by 8% primarily due to higher sales volumes across all of our key geographies, the positive impact of price, partially offset by the unfavorable impact of foreign currency translation.

Distribution segment profit increased by 35% primarily due to higher sales volumes and the positive impacts of price, partially offset by an increase in selling expense which was driven by investment from census increases associated with geographic expansion and the opening of additional stores, inflation, and the unfavorable impact of foreign currency translation.

**Repositioning Charges**

See Note 5. Repositioning Charges of Notes to Combined Financial Statements for a discussion of our repositioning actions and related charges incurred in 2017, 2016 and 2015, and Note 4. Repositioning Charges of Notes to Combined Interim Financial Statements for a discussion of our repositioning charges incurred in the three and six months ended June 30, 2018 and 2017. These repositioning actions are expected to generate an additional $24 million in pre-tax savings in 2018 compared with 2017 principally from planned workforce reductions. Cash spending related to our repositioning actions was $17 million, $18 million and $5 million in 2017, 2016 and 2015, respectively, $2 million and $6 million for the three and six months ended June 30, 2018, respectively and was funded through operating cash flows. For the full year 2018, we expect cash spending for repositioning actions to be approximately $11 million and to be funded through operating cash flows.

**Liquidity and Capital Resources**

***Historical Liquidity***

Historically, we have generated positive cash flows from operations.

As part of the Parent, the Company has been dependent upon Honeywell for all of its working capital and financing requirements. Honeywell uses a centralized approach to cash management and financing of its operations. The majority of the Business's cash is transferred to Honeywell daily and Honeywell funds its operating and investing activities as needed. This arrangement is not reflective of the manner in which the Business would have been able to finance its operations had it been a stand-alone business separate from Honeywell during the periods presented. Cash transfers to and from Honeywell's cash management accounts are reflected within cash and cash equivalents.

All intracompany transactions have been eliminated. All significant transactions between the Business and Honeywell have been included in these Combined Financial Statements and are expected to be settled for cash prior to the Spin-Off. These transactions which are expected to be settled for cash prior to the Spin-Off are reflected in the Combined Balance Sheets as Due from related parties, current or Due to related parties, current. In the Combined Statements of Cash Flows, the cash flows related to related party notes receivables presented in the Combined Balance Sheets in Due from related parties, current are reflected as investing activities since these balances represent amounts loaned to Parent. The cash flows related to related party notes payables presented in the Combined Balance Sheets in Due to related parties, current are reflected as financing activities since these balances represent amounts financed by Parent.

The cash and cash equivalents held by Honeywell at the corporate level are not specifically identifiable to the Business and therefore were not allocated for any of the periods presented. Honeywell third party debt and the related interest expense have not been allocated for any of the periods presented as Honeywell's borrowings were not directly attributable to the Business.

In addition, the Company had related party notes receivables of $7 million and $6 million as of December 31, 2017 and 2016, respectively, and $0 million and $7 million as of June 30, 2018 and 2017,

Table of Contents

respectively, which are presented in Due from related parties, current within the Combined Balance Sheets. The Company received interest income for related party notes receivables of $1 million, $1 million and $0 million for the years ended December 31, 2017, 2016 and 2015, respectively, and of $0 million and $0 million for the six months ended June 30, 2018 and 2017, respectively.

***Future Liquidity***

On a recurring basis, our primary future cash needs will be centered on operating activities, working capital, capital expenditures and environmental compliance costs, payments under the Indemnification and the Reimbursement Agreement, and interest payments. Our ability to fund these needs will depend, in part, on our ability to generate or raise cash in the future, which is subject to general economic, financial, competitive, regulatory and other factors that are beyond our control.

Following the separation from Parent, our capital structure and sources of liquidity will change from its historical capital structure because we will no longer participate in Parent's centralized cash management program. Our ability to fund our operating needs will depend on our future ability to continue to generate positive cash flow from operations and raise capital in the capital markets. Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs. We believe we will meet known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. We expect that our primary cash requirements in 2018 will primarily be to fund capital expenditures and to meet our obligations under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement.

If these sources of liquidity need to be augmented, additional cash requirements would likely need to be financed through the issuance of debt or equity securities; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms, or at all, in the future.

*Senior Credit Facilities*

In connection with the Spin-Off, we expect to incur substantial indebtedness in the form of term loans in an aggregate principal amount of approximately $825 million, and we also intend to enter into an approximately $350 million committed revolving credit facility. The definitive terms (including finalization of the amounts) are subject to change and will be finalized prior to the closing of the Spin-Off.

We expect the borrower of the senior credit facilities to be a wholly-owned subsidiary of SpinCo. This indebtedness is intended to be available to finance, in part, the cash transfer to Honeywell or a subsidiary of Honeywell substantially concurrently with the consummation of the Spin-Off, subject to the satisfaction of certain closing conditions customary for financings of this type, including the Spin-Off and the issuance of the senior notes discussed below, and the payment of certain upfront fees and/or original issue discount in respect of the senior credit facilities. After the effective date, availability under the revolving credit facility from time to time will be subject to the satisfaction of certain conditions precedent customary for financings of this type.

We expect to be obligated to make quarterly principal payments throughout the term of the term loan facility according to the amortization provisions in the credit agreement. Borrowings under the credit agreement are expected to be prepayable at our option without premium or penalty other than a 1.00% prepayment premium that may be payable in connection with certain repricing transactions within a certain period of time after the closing date. We may request to extend the maturity date of all or a portion of the senior credit facilities subject to certain conditions customary for financings of this type. The credit agreement may also contain certain mandatory prepayment provisions in the event that we incur certain types of indebtedness or receive net cash proceeds from certain non-ordinary course asset sales or other dispositions of property, in each case subject to terms, conditions and exceptions customary for financings of this type.

**Table of Contents**

The credit agreement is expected to contain certain affirmative and negative covenants customary for financings of this type that, among other things, limit our and our subsidiaries' ability to incur additional indebtedness or liens, to dispose of assets, to make certain fundamental changes, to designate subsidiaries as unrestricted, to make certain investments, to prepay certain indebtedness and to pay dividends, or to make other distributions or redemptions and/or repurchases, in respect of our and our subsidiaries' equity interests. In addition, the credit agreement may require that we maintain a maximum consolidated total leverage ratio and a minimum consolidated interest coverage ratio. The credit agreement also is expected to contain events of default customary for financings of this type, including certain customary change of control events.

We anticipate that the obligations of the borrower under the credit agreement will be jointly and severally guaranteed by SpinCo and certain of our existing and future direct and indirect wholly owned subsidiaries, subject to certain exceptions customary for financings of this type. All obligations of the borrower and the guarantors will be secured by certain assets of the borrower and such guarantors, including a perfected first-priority pledge of all of the equity securities of the borrower and each wholly-owned subsidiary of SpinCo held by any loan party, subject to certain customary exceptions and limitations.

*Senior Notes*

We anticipate that the borrower of the senior credit facilities will also issue an aggregate principal amount of unsecured senior notes of approximately $400 million in connection with the Spin-Off. It is expected that the senior notes will bear interest at a fixed annual interest rate and mature on the eighth anniversary of their issuance. The definitive terms (including finalization of the amount) are subject to change and will be finalized prior to the closing of the Spin-Off.

We anticipate that SpinCo and each of SpinCo's subsidiaries that provides a guarantee under the senior credit facilities will initially jointly and severally guarantee the senior notes on a senior unsecured basis. The senior notes will be a senior unsecured debt obligation of the senior notes issuer. The senior notes guarantees will be unsecured senior debt obligations of the senior notes guarantors.

The indenture governing the senior notes, among other things, is expected to limit our ability and the ability of our restricted subsidiaries to: (i) incur or guarantee additional indebtedness, (ii) pay dividends or distributions on, or redeem or repurchase, capital stock and make other restricted payments, (iii) make investments, (iv) consummate certain asset sales, (v) engage in certain transactions with affiliates, (vi) grant or assume certain liens and (vii) consolidate, merge or transfer all or substantially all of our assets.

The net proceeds from the borrowings under the senior credit facilities and the offering of the senior notes will be used as part of the financing for the Spin-Off of SpinCo from Honeywell.

In connection with the separation from Honeywell, we plan to enter into an Indemnification and Reimbursement Agreement to make certain payments to Honeywell in amounts equal to 90% of payments, which include amounts billed with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement."

At June 30, 2018, a portion of the Company's cash and cash equivalents were held by foreign subsidiaries. As a result of the TCJA, the Company no longer intends to permanently reinvest its historical foreign earnings.

Table of Contents

***Cash Flow Summary for the Six Months ended June 30, 2018 and 2017***

Our cash flows from operating, investing and financing activities for the six months ended June 30, 2018 and 2017, as reflected in the unaudited Combined Interim Financial Statements included elsewhere in this Information Statement, are summarized as follows:

| | Six Months Ended June 30, | |
|---|---|---|
| | 2018 | 2017 |
| | (Dollars in millions) | |
| Cash provided by (used for): | | |
| Operating activities | $ 258 | $ 69 |
| Investing activities | (17) | (23) |
| Financing activities | (201) | (48) |
| Effect of exchange rate changes on cash | (3) | 2 |
| Net increase (decrease) in cash and cash equivalents | $ 37 | $ — |

***Six months ended***

Cash provided by operating activities increased by $189 million, primarily driven by an increase in segment profit of $59 million, and favorable impacts from working capital of $86 million driven by increased inventory related payables balances and improved payment terms, partially offset by higher uses of cash for inventory builds period over period driven by the introduction of new product lines in the Product segment. However, we note that our inventory turnover ratios are consistent year over year for this period. Our inventory turnover ratios are typically lower as of the end of the second quarter compared to year-end due to the timing of inventory builds.

Cash used for investing activities decreased by $6 million, primarily due to a decrease in payments related to amounts due from related parties of $6 million.

Cash used for financing activities increased by $153 million primarily due to a decrease in invested equity of $142 million.

***Cash Flow Summary for the Years Ended December 31, 2017, 2016 and 2015***

Our cash flows from operating, investing and financing activities for the years ended December 31, 2017, 2016 and 2015, as reflected in the audited Combined Financial Statements included elsewhere in this Information Statement, are summarized as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | (Dollars in millions) | | |
| Cash provided by (used for): | | | |
| Operating activities | $ 37 | $ 151 | $ 128 |
| Investing activities | (51) | (191) | (268) |
| Financing activities | 21 | 4 | 145 |
| Effect of exchange rate changes on cash | 2 | 1 | (10) |
| Net increase (decrease) in cash and cash equivalents | $ 9 | $ (35) | $ (5) |

Table of Contents

***2017 compared with 2016***

Cash provided by operating activities decreased by $114 million, primarily driven by payments to Honeywell in relation to the provisional impact of U.S. tax reform which was settled as part of our cash pooling arrangements and an increase in non-deductible expenses offset by favorable impacts from working capital of approximately $57 million, with reduced purchases of raw materials and finished goods inventory for Products due to sales of inventory build in the prior period for new product launches, and higher receivables collections on increased sales volumes.

Cash used for investing activities decreased by $140 million, primarily due to a decrease in cash paid in 2016 for the RSI acquisition of $120 million net of cash acquired of $4 million and a decrease of cash used for expenditures on property, plant and equipment of $11 million.

Net cash provided by financing activities increased by $17 million. The increase in usage was primarily due to an increase in invested equity of $18 million.

***2016 compared with 2015***

Cash provided by operating activities increased by $23 million, primarily driven by higher net income of $177 million compared to $147 million in 2016, the favorable impact of changes in accrued and other liabilities of approximately $36 million, and the favorable impact in other current assets of $17 million offset by unfavorable impacts from working capital of approximately $64 million. Receivables contributed to the unfavorable impact due to higher sales volumes in the fourth quarter of 2016 compared to 2015, which remained uncollected at the end of the period. Inventory also contributed to the unfavorable impact due to higher raw material purchases and finished goods inventory balances for new Product launches and higher Distribution inventory balances due to strategic purchasing decisions.

Cash used for investing activities decreased by $77 million, primarily due to the difference in cash paid for the RSI acquisition of $120 million net of cash acquired of $4 million in 2016 compared to cash paid for the residential thermal business acquired as part of the Elster acquisition in 2015 of $196 million.

Net cash provided by financing activities decreased by $141 million due to a decrease of net invested equity of $144 million and an increase of cash received from parent's cash pools of $3 million.

***Contractual Obligations and Probable Liability Payments***

Following is a summary of our significant contractual obligations and probable liability payments at December 31, 2017:

| | | Payments by Period | | | |
|---|---|---|---|---|---|
| | Total(1) | 2018 | 2019-2020 | 2021-2022 | Thereafter |
| | (Dollars in millions) | | | | |
| Estimated environmental liability payments(2) | $ 537 | $205 | $ 244 | $ 80 | $ 8 |
| Minimum operating lease payments | 109 | 34 | 43 | 23 | 9 |
| Purchase obligations(3) | 18 | 17 | 1 | — | — |
| | $ 664 | $256 | $ 288 | $ 103 | $ 17 |

(1) The table excludes tax liability payments, including those for unrecognized tax benefits. The table also excludes related party notes payable as they will be cash settled prior to the Spin-Off. See Note 7. Income Taxes and Note 3. Related Party Transactions with Honeywell of Notes to Combined Financial Statements for additional information.

Table of Contents

(2) These amounts are estimates of environmental remediation payments based on our environmental-related liabilities which are probable and reasonably estimable as of December 31, 2017, calculated as if we were responsible for 100% of the environmental-related liability losses associated with certain sites. See Environmental Matters in Note 18. Commitments and Contingencies of Notes to Combined Financial Statements for additional information. On a going forward basis, pursuant to the Indemnification and Reimbursement Agreement, we will be responsible for 90% of payments which include amounts billed with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. The payments will be subject to a cap of $140 million in respect of liabilities arising in any given calendar year (exclusive of any late payment fees up to 5% per annum). See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement."

(3) Purchase obligations are entered into with various vendors in the normal course of business and are consistent with our expected requirements.

***Environmental Matters***

Expenses for environmental matters deemed probable and reasonably estimable were $282 million, $190 million and $173 million in 2017, 2016 and 2015, respectively, and $176 million for the six months ended June 30, 2018. In addition, in 2017, 2016 and 2015 we incurred operating costs for ongoing businesses of approximately $1 million, $2 million, and $3 million, respectively, relating to compliance with environmental regulations.

Spending related to environmental matters was $198 million, $211 million and $241 million in 2017, 2016 and 2015, respectively, and $73 million for the six months ended June 30, 2018. We do not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our combined results of operations and operating cash flows in the periods recognized or paid.

See Note 18. Commitments and Contingencies of Notes to Combined Financial Statements and Note 11. Commitments and Contingencies of Notes to Combined Interim Financial Statements for further discussion of our environmental matters.

***Capital Expenditures***

We believe our capital spending in recent years has been sufficient to maintain efficient production capacity, to implement important product and process redesigns and to expand capacity to meet increased demand. Productivity projects have freed up capacity in our manufacturing facilities and are expected to continue to do so. We expect to continue investing to expand and modernize our existing facilities and to create capacity for new product development. We expect capital expenditures for full year 2018 to be approximately $55 million.

***Off-Balance Sheet Arrangements***

We do not engage in any off-balance sheet financial arrangements that have or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, net sales or expenses, results of operations, liquidity, capital expenditures or capital resources.

Table of Contents

***Critical Accounting Policies***

The preparation of our Combined Financial Statements in accordance with generally accepted accounting principles is based on the selection and application of accounting policies that require us to make significant estimates and assumptions about the effects of matters that are inherently uncertain. We consider the accounting policies discussed below to be critical to the understanding of our Combined Financial Statements. Actual results could differ from our estimates and assumptions, and any such differences could be material to our Combined Financial Statements.

***Environmental***—We accrue costs related to environmental matters when it is probable that we have incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental-related expenses are presented within Cost of goods sold for operating sites and Other expense for non-operating sites in the Combined Statements of Operations. For additional information, see Note 18. Commitments and Contingencies of Notes to Combined Financial Statements included herein for additional detail.

***Goodwill***—Goodwill has an indefinite life and is not amortized, but is subject to annual, or more frequent if necessary, impairment testing. In testing goodwill, the fair value is estimated utilizing a discounted cash flow approach utilizing cash flow forecasts in our five year strategic and annual operating plans adjusted for terminal value assumptions. These impairment tests involve the use of accounting estimates and assumptions, changes in which could materially impact our financial condition or operating performance if actual results differ from such estimates and assumptions. To address this uncertainty we perform sensitivity analysis on key estimates and assumptions.

***Income Taxes***—The tax provision is presented on a separate company basis as if we were a separate filer. The effects of tax adjustments and settlements from taxing authorities are presented in our Combined Financial Statements in the period to which they relate as if we were a separate filer. Our current obligations for taxes are settled with our Parent on an estimated basis. All income taxes due to or due from our Parent that have not been settled or recovered by the end of the period are reflected in invested equity within the Combined Financial Statements. We are subject to income tax in the United States (federal, state and local) as well as other jurisdictions in which we operate.

Our provision for income tax expense is based on our income, the statutory tax rates and other provisions of the tax laws applicable to us in each of these various jurisdictions. These laws are complex, and their application to our facts is at times open to interpretation. The process of determining our combined income tax expense includes significant judgments and estimates, including judgments regarding the interpretation of those laws. Our provision for income taxes and our deferred tax assets and liabilities incorporate those judgments and estimates, and reflect management’s best estimate of current and future income taxes to be paid.

Deferred tax assets and liabilities relate to temporary differences between the financial reporting and income tax bases of our assets and liabilities, as well as the impact of tax loss carryforwards or carrybacks. Deferred income tax expense or benefit represents the expected increase or decrease to future tax payments as these temporary differences reverse over time. Deferred tax assets are specific to the jurisdiction in which they arise, and are recognized subject to management’s judgment that realization of those assets is “more likely than not.” In making decisions regarding our ability to realize tax assets, we evaluate all positive and negative evidence, including projected future taxable income, taxable income in carryback periods, expected reversal of deferred tax liabilities, and the implementation of available tax planning strategies.

Significant judgment is required in evaluating tax positions. We establish additional reserves for income taxes when, despite the belief that tax positions are fully supportable, there remain certain positions that do not meet the minimum recognition threshold. The approach for evaluating certain and uncertain tax positions is defined by the authoritative guidance which determines when a tax position is more likely than not to be sustained upon examination by the applicable taxing authority. In the normal course of business, Honeywell and its subsidiaries are examined by various federal, state and foreign tax authorities. We regularly assess the

Table of Contents

potential outcomes of these examinations and any future examinations for the current or prior years in determining the adequacy of our provision for income taxes. We continually assess the likelihood and amount of potential adjustments and adjust the income tax provision, the current tax liability and deferred taxes in the period in which the facts that give rise to a change in estimate become known.

The tax provision has been calculated as if the carve-out entity was operating on a stand-alone basis and filed separate tax returns in the jurisdiction in which it operates. Therefore, cash tax payments and items of current and deferred taxes may not be reflective of the actual tax balances had the Business been a stand-alone company during the periods presented.

***Market Risk Management***

We are exposed to market risks from changes in currency exchange rates. These exposures may impact future earnings and/or operating cash flows. Our exposure to market risk for changes in foreign currency exchange rates arises from international financing activities between subsidiaries, foreign currency denominated monetary assets and liabilities and transactions arising from international trade. Our primary objective is to preserve the U.S. Dollar value of foreign currency denominated cash flows and earnings. We attempt to hedge currency exposures with natural offsets to the fullest extent possible and, once these opportunities have been exhausted, through foreign currency exchange forward and option contracts (foreign currency exchange contracts).

We hedge monetary assets and liabilities denominated in non-functional currencies. Prior to conversion into U.S. Dollars, these assets and liabilities are re-measured at spot exchange rates in effect on the balance sheet date. The effects of changes in spot rates are recognized in earnings and included in Non-operating (income) expense. We partially hedge forecasted sales and purchases, which occur in the next twelve months and are denominated in non-functional currencies, with foreign currency exchange contracts. Changes in the forecasted non-functional currency cash flows due to movements in exchange rates are substantially offset by changes in the fair value of the foreign currency exchange contracts designated as hedges. Market value gains and losses on these contracts are recognized in earnings when the hedged transaction is recognized. Open foreign currency exchange contracts mature in the next twelve months. At June 30, 2018 and December 31, 2017, we had contracts with notional amounts of $26 million and $25 million, respectively, to exchange foreign currencies, principally the Canadian Dollar and British Pound.

While we are exposed to commodity price risk, we attempt to pass through abnormal changes in component and raw material costs to our customers based on the contractual terms of our arrangements. In limited situations, we may not be fully compensated for such changes in costs.

**Other Matters**

***Litigation and Environmental Matters***

See Note 18. Commitments and Contingencies of Notes to Combined Financial Statements and Note 11. Commitments and Contingencies of Notes to Combined Interim Financial Statements for a discussion of environmental and other litigation matters.

We are entering into certain agreements with Honeywell that did not exist prior to the Spin-Off, such as Honeywell's provision of transition and other services and undertaking indemnification obligations, and agreeing to certain intellectual property arrangements, which will cause us to incur new costs. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell" for a description of the material terms thereof.

***Recent Accounting Pronouncements***

See Note 2. Summary of Significant Accounting Policies of Notes to Combined Financial Statements and Note 2. Recent Accounting Pronouncements of Notes to Combined Interim Financial Statements for a discussion of recent accounting pronouncements.

Table of Contents

## MANAGEMENT AND BOARD OF DIRECTORS

The following table presents information concerning our executive officers and board of directors following the Spin-Off as of September 30, 2018, including a five-year employment history.

| Name | Age | Position |
|---|---|---|
| Roger B. Fradin | 65 | Chairman of the Board |
| Michael G. Nefkens | 48 | President and Chief Executive Officer, Director |
| Paul F. Deninger | 60 | Director |
| Niccolo Mcleod De Masi | 37 | Director |
| Jack R. Lazar | 53 | Director |
| Nina L. Richardson | 59 | Director |
| Andrew C. Teich | 57 | Director |
| Sharon Wienbar | 56 | Director |
| Robert B. Aarnes | 49 | President, ADI |
| Michael D. Flink | 58 | Executive Vice-President and Chief Sales and Marketing Officer |
| Stephen M. Kelly | 50 | Executive Vice-President and Chief Human Resources Officer |
| Jeannine J. Lane | 57 | Executive Vice-President, General Counsel and Corporate Secretary |
| Joseph D. Ragan III | 57 | Executive Vice-President and Chief Financial Officer |

### Our Directors

**Roger B. Fradin**

Mr. Fradin joined Honeywell in 2000 when Honeywell acquired Pittway Corporation, where he served as president and chief executive officer of the Security and Fire Solutions segment. Mr. Fradin served as president and chief executive officer of Honeywell's Automation and Control Solutions business from January 2004 to April 2014 and served as vice chairman of Honeywell from April 2014 to February 2017. Mr. Fradin has served as an independent contractor to Honeywell since March 2018. He is also an operating executive with The Carlyle Group since 2016 and an advisor to Seal Rock Partners since 2014. Mr. Fradin received his M.B.A. and B.S. degrees from The Wharton School at the University of Pennsylvania. While a student at Wharton, Mr. Fradin also served as a member of its faculty from 1976 to 1977. He is a director at MSC Industrial Direct, Pitney Bowes, Harris Corporation and GS Acquisition Holdings. Mr. Fradin was chosen as Chairman of our Board because of his extensive experience as an executive at Honeywell, his background in the fire solutions and the automation and control solutions industries and his strong leadership abilities.

**Michael G. Nefkens**

See "—Our Executive Officers" below for additional information.

**Paul F. Deninger**

Mr. Deninger has served as executive chairman of IDL Development, Inc., a private company engaged in advanced material science research, since June 2016. Mr. Deninger also serves as a senior advisor to Evercore Inc., a publicly held investment banking advisory firm. Between February 2011 and June 2016, Mr. Deninger served as a senior managing director with Evercore. From December 2003 until October 2010, Mr. Deninger served as a vice chairman at Jefferies Group LLC, a wholly-owned subsidiary of Jefferies Financial Group Inc., a diversified financial services company. Prior to that he served as chairman and chief executive officer of Broadview International LLC, a mergers and acquisitions advisory firm focused on the technology industry.

Table of Contents

Mr. Deninger received his B.S. from Boston College and his M.B.A. from Harvard Business School. He is a director at Iron Mountain Inc. Mr. Deninger will provide the Board with significant expertise in capital markets and the technology sector.

**Niccolo Mcleod De Masi**

Mr. Niccolo M. de Masi has served as executive chairman of Glu Mobile, Inc. since November 2016, as president and chief executive officer from January 2010 to November 2016, as a director since January 2010, as interim chairman of the board of directors from July 2014 to December 2014 and as the chairman of the board of directors since December 2014. Mr. de Masi also has served as the president of Essential Products, Inc., a mobile phone hardware company since November 2016. Mr. de Masi received his B.A. and M.A. degrees in physics from Cambridge University and his M.S. degree in electronic engineering from Cambridge University. Mr. de Masi previously served as a director of Xura, Inc. from November 2015 until its sale in August 2016. Mr. de Masi will provide the Board with extensive experience in managing the operations of a technology business.

**Jack R. Lazar**

Mr. Lazar has been an independent business consultant since March 2016. From January 2014 to March 2016, he served as the chief financial officer of GoPro, Inc., a provider of wearable and mountable capture devices. From January 2013 to January 2014, he was an independent business consultant. From May 2011 to January 2013, Mr. Lazar served as senior vice president, corporate development and general manager of Qualcomm Atheros, Inc., a developer of communications semiconductor solutions. Mr. Lazar is a certified public accountant (inactive) and received his B.S. degree in commerce with an emphasis in accounting from Santa Clara University. He is a director at Mellanox Technologies, Quantenna Communications and Silicon Laboratories, Inc. He previously served as a director at TubeMogul, Inc. (2013-2016). Mr. Lazar offers the board valuable expertise in best practices for a public company on a global scale, as well as financial management given his background as a chief financial officer and a certified public accountant.

**Nina L. Richardson**

Ms. Richardson serves as managing director of Three Rivers Energy, Inc., a company she co-founded in 2004, and has been an independent consultant since March 2015. From February 2013 to February 2015, Ms. Richardson served as chief operating officer of GoPro, Inc. She has also held several executive positions of increasing responsibility at Flextronics, Inc., a global electronics and manufacturing service provider. Ms. Richardson received her B.S. degree in industrial engineering from Purdue University and an executive M.B.A. from Pepperdine University. She is a director at Zayo Group Holdings, Inc. and Silicon Laboratories Inc. She previously served as a director at Callidus Software, Inc. (2017-2018) and Silicon Graphics International Corp. (2016). Ms. Richardson provides operational expertise from a global perspective and strengthens the Board's experience within the consumer technology sector.

**Andrew C. Teich**

Mr. Teich has been a private technology consultant since June 2017. From May 2013 until June 2017, he served as the chief executive officer and president of FLIR Systems, Inc., a public multinational imaging and sensing company, and a director from July 2013 to June 2017. Mr. Teich joined FLIR Systems, Inc. in 1999 and has held various positions of increasing responsibility within the company including president of the Commercial Systems, Commercial Vision Systems and Thermography divisions. Mr. Teich received his B.S. degree in marketing from Arizona State University and is an alumnus of the Harvard Business School Advanced Management Program. He is a director at Sensata Technologies Holding PLC. Mr. Teich offers the Board experience in acquisitions and operational integration and the Board will benefit from his experience as chief executive officer and director of a public multinational company.

Table of Contents

**Sharon Wienbar**

Ms. Wienbar was chief executive officer of Hackbright Academy, a technology training firm, from 2015 to 2016. From 2007 to 2015, she served as a partner at Scale Venture Partners, a technology and healthcare venture capital firm. Ms. Wienbar received her A.B. and A.M. degrees in engineering from Harvard University and her M.B.A. from Stanford University. She is a director at Colfax Corporation. She previously served on Microsoft Inc.'s venture advisory committee and as a director of Everyday Health, Inc. (2007-2016) and Glu Mobile Inc. (2004-2008). Ms. Wienbar offers the Board extensive experience as an operating executive and strategist in the software and technology fields, as well as experience as a director of a public multinational company.

**Our Executive Officers**

**Michael G. Nefkens**

Mr. Nefkens has served as the President and chief executive officer of Honeywell's Homes Business since May 2018 and will serve as a member of the Board following the Spin-Off. Mr. Nefkens served as executive vice president and general manager of Regions & Industries at DXC Technology Company from April 2017 to February 2018. Mr. Nefkens served as executive vice president and general manager of Enterprise Services at Hewlett Packard Enterprise Company since November 2015. Prior to that, Mr. Nefkens performed a similar role at Hewlett-Packard Co. ("HP Co.") from December 2012 to November 2015, having been appointed to the role in an acting capacity in August 2012. Previously, Mr. Nefkens served as senior vice president and general manager of Enterprise Services in the EMEA region at HP Co. from November 2009 to August 2012. Mr. Nefkens received his bachelor's degree in finance from Texas Christian University and his M.B.A. from Duke University's Fuqua School of Business. He served as a Director of Riverbed Technology, Inc. from September 2014 to April 2015. Mr. Nefkens was chosen to lead Resideo and serve as a member of the Board because of his background in the technology sector, his extensive experience running complex multinational organizations, his strong leadership abilities and his record of delivering innovative solutions and shareholder value.

**Robert B. Aarnes**

Mr. Aarnes served as president of Honeywell's ADI Global Distribution business from January 2017 until the Spin-Off. Mr. Aarnes served as vice president and general manager of Honeywell's ADI North America business from November 2014 to January 2017. Mr. Aarnes served as vice president of operations of Honeywell's ADI North America business from January 2013 to November 2014. Prior to joining Honeywell, Mr. Aarnes served as president and chief executive officer of GUNNAR Optiks, LLC, a company that specializes in developing and manufacturing digital eyewear, from September 2008 to November 2012. Mr. Aarnes received his bachelor's degree in political science from the United States Naval Academy and his M.B.A. in management from San Diego State University.

**Michael D. Flink**

Mr. Flink served as president of Honeywell Homes Products from June 2018 until the Spin-Off. Mr. Flink served as president of Honeywell's Homes Business from January until May 2018. Prior to this, he served as President of Honeywell Security and Fire from January 2017 until December 2017. Mr. Flink served as president of Honeywell's ADI Global Distribution business from December 2014 to January 2017. Mr. Flink served as president of Honeywell's ADI Americas business from September 2010 to December 2014. He was managing director of Honeywell's Security division, Middle East region, from September 2006 to September 2010. He was managing director of Honeywell's ADI Global Distribution business, EMEA region, from December 2004 to September 2006. Mr. Flink served as vice president of marketing and operations of Honeywell from March 2003 to December 2004. Mr. Flink received his bachelor's degree in communications from North Carolina State University.

Table of Contents

**Stephen M. Kelly**

Mr. Kelly served as vice president of Human Resources, Communications for Honeywell's aerospace business from 2014 until 2018. Mr. Kelly was the vice president of Corporate Human Resources, Organizational Development & Learning at Honeywell from 2013 to 2014. Mr. Kelly joined Honeywell in 2008 and has served in various human resources leadership positions for Honeywell's aerospace business. He was vice president of Human Resources for Honeywell's aerospace business's commercial segment in 2013. Previously, Mr. Kelly was vice president of Human Resources for Honeywell's Aerospace Defense & Space unit from 2011 to 2013. He was vice president of Human Resources for Honeywell's aerospace Engineering & Marketing unit from 2008 to 2011. Prior to joining Honeywell, Mr. Kelly was vice president of Human Resources for the Dental business at Danaher Corporation ("Danaher") from 2007 to 2008. Mr. Kelly was Vice President of the EMEA region and global head of staffing and talent management of the Industrial Technologies business at Danaher from 2005 to 2007. Prior to joining Danaher, Mr. Kelly was the head of Human Resources for BHA Group, Inc. Mr. Kelly received his bachelor's degree in personnel administration from the University of Kansas and a master's degree in organizational development from Ottawa University.

**Jeannine J. Lane**

Ms. Lane was appointed our Executive Vice-President, General Counsel and Corporate Secretary in July, 2018. From January 2018 to such appointment, Ms. Lane was the Vice President and General Counsel of Honeywell Homes. She was the Vice President and General Counsel of Honeywell Security and Fire from 2015 to 2017, Honeywell Fire Business and Honeywell Safety Business from 2014 to 2015, Honeywell Life Safety Business from 2013 to 2014 and Honeywell Security from 2004 to 2013. Ms. Lane holds a bachelor's degree in political science from SUNY University at Albany and a Doctorate of Law from Albany Law School.

**Joseph D. Ragan III**

Mr. Ragan served as chief financial officer of Honeywell Homes from August 2018 until the Spin-Off. From May 2013 to July 2018, he served as chief financial officer of Ferroglobe PLC and Globe Specialty Metals, Inc. (which combined with Grupo FerroAtlántica, S.A. in 2015 to form Ferroglobe PLC.). Prior to that, he served as chief financial officer of Boart Longyear Limited from 2008 to 2013. Before his civilian career, Mr. Ragan was a U.S. Army military intelligence officer. He was a licensed certified public accountant in the State of Virginia for over 20 years and trained as a CPA with Deloitte & Touche. Mr. Ragan received his bachelor's degree in accounting from the University of the State of New York and his master's degree in accounting from George Mason University.

**Our Board of Directors Following the Spin-Off and Director Independence**

Immediately following the Spin-Off, we expect that our Board will comprise eight directors. A majority of our directors will meet the independence requirements set forth in the listing standards of the New York Stock Exchange at the time of the Spin-Off.

**Committees of the Board**

Effective upon the completion of the Spin-Off, our Board will have the following committees, each of which will operate under a written charter that will be posted on our website prior to the Spin-Off.

***Audit Committee***

The Audit Committee will be established in accordance with Section 3(a)(58)(A) and Rule 10A-3 under the Exchange Act. The responsibilities of our Audit Committee will be more fully described in our Audit Committee charter. We anticipate that our Audit Committee, among other duties, will oversee:

- management's conduct of our financial reporting process (including the development and maintenance of systems of internal accounting and financial controls);

Table of Contents

- the integrity of our financial statements;
- our compliance with legal and regulatory requirements;
- the qualifications and independence of our outside auditor;
- the performance of our internal audit function;
- the outside auditor's annual audit of our financial statements;
- the Company's compliance with legal and regulatory requirements;
- the Company's risk management assessment; and
- the preparation of certain reports required by the rules and regulations of the SEC.

The Audit Committee will have at least three members and will consist entirely of independent directors, each of whom will meet the independence requirements set forth in the listing standards of the New York Stock Exchange, Rule 10A-3 under the Exchange Act and our Audit Committee charter. Each member of the Audit Committee will be financially literate, and at least one member of the Audit Committee will have accounting and related financial management expertise and satisfy the criteria to be an "audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment. The initial members of the Audit Committee will be determined prior to the Spin-Off.

***Compensation Committee***

The responsibilities of our Compensation Committee will be more fully described in our Compensation Committee charter, and we anticipate that they will include, among other duties:

- determining and approving the compensation of our Chief Executive Officer;
- reviewing and approving the compensation of our other executives;
- overseeing the Chief Executive Officer succession planning process, including an emergency succession plan;
- reviewing the operation and structure of the Company's compensation program; and
- preparing any report on executive compensation required by the rules and regulations of the SEC.

The Compensation Committee will have at least three members and will consist entirely of independent directors, each of whom will meet the independence requirements set forth in the listing standards of the New York Stock Exchange, Rule 10C-1 under the Exchange Act and our Compensation Committee charter. The members of our Compensation Committee will be "non-employee directors" (within the meaning of Rule 16b-3 under the Exchange Act) and "outside directors" (within the meaning of Section 162(m) of the Code). The initial members of our Compensation Committee will be determined prior to the Spin-Off.

***Nominating and Governance Committee***

The responsibilities of our Nominating and Governance Committee will be more fully described in our Nominating and Governance Committee charter, and we anticipate that they will include, among other duties:

- identifying, reviewing and recommending to our Board individuals for election to the Board;
- adopting and reviewing policies regarding the consideration of candidates for our Board proposed by stockholders and other criteria for membership on our Board;
- developing and recommending to the Board a set of Corporate Governance Guidelines applicable to the Company and reviewing and reporting on the Company's policies and programs relating to health, safety and environmental matters, equal employment opportunity and other similar matters; and
- overseeing our Board's annual self-evaluation.

Table of Contents

The Nominating and Governance Committee will consist entirely of independent directors, each of whom will meet the independence requirements set forth in the listing standards of the New York Stock Exchange and our Nominating and Governance Committee charter. The initial members of the Nominating and Governance Committee will be determined prior to the Spin-Off.

***Finance Committee***

The responsibilities of our Finance Committee will be more fully described in our Finance Committee charter, and we anticipate that they will include, among other duties, assisting the Board in reviewing the Company's capital structure, liquidity risk, financial strategies, investment and hedging policies, material capital allocation decisions, strategic investments and dispositions and other opportunities for maximizing shareholder value. The initial members of the Finance Committee will be determined prior to the Spin-Off.

***Technology Committee***

The responsibilities of our Technology Committee will be more fully described in our Technology Committee charter, and we anticipate that they will include, among other duties, assisting the Board in reviewing and overseeing the Company's overall strategic direction and investment in research and development and technology initiatives, reviewing and identifying specific technology and innovation matters that could have a significant impact on Company operations and assessing the scope and quality of the Company's intellectual property. The initial members of the Technology Committee will be determined prior to the Spin-Off.

***Code of Business Ethics***

Prior to the completion of the Spin-Off, we will adopt a written code of business ethics that is designed to deter wrongdoing and to promote, among other things:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- the protection of the confidentiality of our non-public information;
- the responsible use of and control over our assets and resources;
- full, fair, accurate, timely and understandable disclosure in reports and documents that we file with the SEC and other regulators and in our other public communications;
- compliance with applicable laws, rules and regulations; and
- accountability for adherence to the code and prompt internal reporting of any possible violation of the code.

**Director Nomination Process**

Our initial Board will be selected through a process involving both Honeywell and us. The initial directors who will serve after the Spin-Off will begin their terms at the time of the Share Distribution, with the exception of one independent director who will begin his or her term prior to the date on which "when-issued" trading of our common stock commences and will serve on our Audit Committee, Compensation Committee and Nominating and Governance Committee.

**Lead Director**

We expect to appoint a Lead Independent Director in accordance with our governance guidelines.

**Communications with Non-Management Members of the Board of Directors**

Generally, it is the responsibility of our management to speak for us in communications with outside parties, but we intend to set forth, in our corporate governance policies, certain processes by which stockholders and other interested third parties may communicate with non-management members of our Board.

Table of Contents

## DIRECTOR COMPENSATION

Following the Spin-Off, we expect that our Compensation Committee will periodically review and make recommendations to our Board regarding the form and amount of compensation for non-employee directors. Directors who are also our employees are expected to receive no compensation for service on our Board. Honeywell has approved an initial director compensation program for the Company that is designed to enable continued attraction and retention of highly qualified directors and to address the time, effort, expertise and accountability required of active Board membership. This program is described in further detail below.

### Annual Compensation

In general, we believe that annual compensation for non-employee directors should consist of both a cash component, designed to compensate members for their service on the Board and its committees, and an equity component, designed to align the interests of directors and stockholders and, by vesting over time, to create an incentive for continued service on the Board.

| **Board of Directors' Annual Compensation** | |
|---|---|
| **Cash Retainer** | $90,000 |
| **Board Chairman – Additional Cash Retainer** | $175,000 |
| **Board Committee Membership – Additional Cash Retainer** | Audit Committee Chair: $25,000<br>Audit Committee Member: $10,000<br>Compensation Committee Chair: $15,000<br>Compensation Committee Member: $7,500<br>Nominating and Governance Committee Chair: $10,000<br>Nominating and Governance Committee Member: $5,000<br>Other Committee Chair: $10,000<br>Other Committee Member: $5,000 |
| **Lead Director – Additional Cash Retainer** | $25,000 |
| **Annual Equity Grants**<br>RSUs vest on the earliest of the first anniversary of the date of grant, the director's death or disability, or removal from the Board coincident with the occurrence of a change in control. | Each non-employee director receives an annual restricted stock unit grant with a target value of $120,000 on the date of the Annual Meeting of Stockholders. New directors in 2018 will receive a prorated award for the partial year commencing on the Spin-Off. |

Cash elements are paid in quarterly installments and prorated for partial years of service.

### Other Benefits

Non-employee directors will also be provided with $350,000 in business travel accident insurance.

### Stock Ownership Guidelines

We expect to adopt a stock ownership policy pursuant to which each non-employee director, while serving as a director of the Company, must hold Company common stock (including unvested RSUs) with a market value of at least five times the annual cash retainer (or $450,000) before being permitted to sell any SpinCo common stock holdings, including net shares from vesting of restricted stock unit grants (i.e., shares vested less shares required to pay applicable taxes).

Table of Contents

### COMPENSATION DISCUSSION AND ANALYSIS

As discussed above, we are currently part of Honeywell and not an independent company, and our Compensation Committee has not yet been formed. Decisions about the compensation and benefits payable to the individuals who will become our executive officers have been made by Honeywell senior management. Following the Spin-Off, we expect that our Compensation Committee will review our executive compensation and benefit programs and determine the appropriate compensation and benefits for our executives.

For purposes of this Compensation Discussion and Analysis and the disclosure that follows, we do not have any “Named Executive Officers” for 2017. All of our executive officers will have joined the Business after year end 2017 and, therefore, they will not have been executive officers of the Business in 2017. None of the tabular compensation disclosure requirements of the SEC’s compensation disclosure rules are applicable in our situation. Detailed information on the compensation arrangements of our Named Executive Officers for 2018 will be provided in our first proxy statement following the Spin-Off.

We are currently in the process of identifying the individuals who will serve as our executive officers following completion of the Spin-Off. As of the date of this filing, we have identified the following individuals who are expected to serve in executive officer positions:

Robert B. Aarnes, President, ADI

Michael D. Flink, Executive Vice-President and Chief Sales and Marketing Officer

Stephen M. Kelly, Executive Vice-President and Chief Human Resources Officer

Jeannine J. Lane, Executive Vice-President, General Counsel and Corporate Secretary

Michael G. Nefkens, President and Chief Executive Officer

Joseph D. Ragan III, Executive Vice-President Chief Financial Officer

While Ms. Lane and Messrs. Aarnes, Flink and Kelly were employed by Honeywell in 2017, none of them was an executive officer of Honeywell. In addition, since all of the individuals listed above were not employed by the Business in 2017, they are not Named Executive Officers of the Business for 2017.

The terms of Mr. Nefkens’s and Mr. Ragan’s offer letters and the compensation arrangements for our other executive officers are summarized in the section entitled “Offer Letters and Employment Agreements of our Executive Officers.”

#### *Long-Term Incentive Compensation—Treatment of Awards in Spin-Off*

*Treatment of Honeywell Stock Options*. In connection with the Spin-Off, any Honeywell stock options held by SpinCo employees that are vested as of the Distribution Date will remain outstanding with Honeywell until exercised by the employee or normal expiration, subject to the terms of the applicable Honeywell equity incentive plan and related grant agreement under which such options were granted. Stock options held by SpinCo employees that are unvested as of the Distribution Date will be cancelled as of the Distribution Date and, in respect of such canceled stock options, SpinCo will issue RSUs (“SpinCo RSUs”) that will vest in accordance with the same vesting schedule that applied to the corresponding Honeywell stock options. In respect of stock options held by SpinCo employees that were granted prior to 2018 and remain unvested as of the Distribution Date, the initial value of the new SpinCo RSUs will be determined based on the excess of the “regular way” closing price of Honeywell common stock subject to each such option immediately prior to the Distribution Date less the exercise price of the applicable option, while the replacement value in respect of unvested Honeywell stock options held by SpinCo employees that were granted in 2018 will be based on the formula used to determine the value of the Honeywell stock options at the time of grant. The number of SpinCo RSUs issued will be determined based on the “when issued” closing price of SpinCo shares immediately prior to the Distribution Date.

Table of Contents

*Treatment of Honeywell RSUs*. In connection with the Spin-Off, any Honeywell RSUs held by SpinCo employees that are outstanding and unvested as of the Distribution Date will be canceled and, in respect of each such canceled Honeywell RSU award, SpinCo will replace the economic value by issuing SpinCo RSUs that will vest in accordance with the same vesting schedule that applied to the corresponding Honeywell RSUs. The initial value of the SpinCo RSUs will be determined based on the "regular way" closing price of Honeywell common stock subject to each corresponding Honeywell RSU immediately prior to the Distribution Date, with the number of SpinCo RSUs determined based on the "when issued" closing price of SpinCo shares immediately prior to the Distribution Date.

*Treatment of Honeywell Performance Plan Awards.* In connection with the Spin-Off, Honeywell Performance Plan awards for both the 2017-2019 and 2018-2020 performance periods that are held by SpinCo employees as of the Distribution Date will be canceled. With respect to the 2017-2019 performance period only, SpinCo will replace the economic value of such canceled awards by issuing SpinCo RSUs that will vest in March 2020, consistent with the vesting schedule that applied to the corresponding Honeywell Performance Plan PSUs or cash units, as applicable. The initial value of the SpinCo RSUs will be determined based on Honeywell's latest estimate of performance against plan metrics for the performance period in progress as of the Distribution Date, with the number of SpinCo RSUs determined based on the "when issued" closing price of SpinCo shares immediately prior to the Distribution Date. SpinCo has no obligation to replace the canceled awards for the 2018-2020 performance period.

*Treatment of Remaining Growth Plan Payment*. The liability for the final earned payment for the 2016-2017 Growth Plan performance cycle will be assumed by SpinCo and paid to eligible SpinCo executives in the first quarter of 2019, subject to each such executive remaining employed by SpinCo as of the date of payment.

**SpinCo's Anticipated Executive Compensation Programs**

***Overview***

As described above, our Compensation Committee will not be established until the Spin-Off and therefore has not established a specific set of objectives or principles for our compensation programs following the Spin-Off. The executive compensation programs in place at the time of the Spin-Off will be those established by Honeywell on our behalf. Following the Spin-Off, our Compensation Committee will review each of the elements of our compensation programs. We believe that the Spin-Off will enable us to offer our key employees compensation directly linked to the performance of our business, which we expect will enhance our ability to attract, retain and motivate qualified personnel and serve the interests of our stockholders.

***Offer Letters and Employment Agreements of Our Executive Officers***

*President and Chief Executive Officer Offer Letter*

Honeywell entered into an offer letter with Mr. Nefkens appointing him as president and chief executive officer of Honeywell Homes (and ultimately the Company). The letter provides Mr. Nefkens with an annual base salary of $880,000 and an annual cash incentive target opportunity equal to 125% of his annual cash base salary. Mr. Nefkens is also eligible for annual long-term incentive awards with an initial target opportunity of 375% of annual base salary. In addition, upon the Spin-Off, Mr. Nefkens will be awarded a founders grant made up of SpinCo RSUs valued at $4,300,000, which shall vest in two equal 50% installments on each of the third and fourth anniversaries of the Spin-Off, subject to continued employment through each vesting date. The offer letter also provides that upon a termination of Mr. Nefkens' employment by the Company without cause, Mr. Nefkens will be entitled to 24 months of base salary continuation and incentive compensation (at target), which will be extended to 36 months in the case of such termination within two years of a change in control that occurs within two years of the Spin-Off. In the event that the Spin-Off has not been effectuated by June 30, 2019, the offer letter provides that Mr. Nefkens will have the option of remaining with Honeywell or triggering his severance entitlement by treating his resignation as an involuntary termination of employment. The offer of employment is

**Table of Contents**

contingent upon Mr. Nefkens' execution of the Company's intellectual property and non-competition agreements, which include a two-year post-employment non-competition and non-solicitation provision.

*Chief Financial Officer Offer Letter*

Honeywell entered into an offer letter with Mr. Ragan appointing him as chief financial officer of Honeywell Homes (and ultimately the Company). The letter provides Mr. Ragan with an annual base salary of $550,000 and an annual cash incentive target opportunity equal to 80% of his annual cash base salary. Mr. Ragan is also eligible for annual long-term incentive awards with an initial target opportunity of 180% of annual base salary. In addition, upon the Spin-Off, Mr. Ragan will be awarded a founders grant made up of SpinCo RSUs valued at $1,100,000, which shall vest in two equal 50% installments on each of the third and fourth anniversaries of the Spin-Off, subject to continued employment through each vesting date. The offer letter also provides that upon a termination of Mr. Ragan's employment by the Company without cause, Mr. Ragan will be entitled to nine months of base salary continuation. The offer of employment is contingent upon Mr. Ragan's execution of the Company's intellectual property and non-competition agreements, which include a two-year post-employment non-competition and non-solicitation provision.

*Other Arrangements*

The compensation arrangements for our other executive officers generally provide for the following primary elements of compensation: (i) annual base salary, (ii) an annual cash incentive opportunity, (iii) eligibility for annual long-term incentive awards, and (iv) severance entitlement and participation in retirement and benefits plans commensurate with those provided to other executives of the Business. For those executive officers who were previously employed by Honeywell, the arrangements provide that equity awards will be equitably adjusted in connection with the Spin-Off, as further described above in the section entitled "Long-Term Incentive Compensation—Treatment of Awards in Spin-Off." Certain executive officers may also be eligible for the award of a founders grant of SpinCo RSUs, to be made upon the spinoff, or a sign-on make whole award (in the case of an external hire). In all cases, the offer of employment is contingent upon the executive's execution of the Company's intellectual property and non-competition agreements.

***2018 Stock Incentive Plan***

Prior to the Spin-Off, we expect our Board to adopt, and Honeywell, as our sole shareholder, to approve, the 2018 Stock Incentive Plan of SpinCo and its Affiliates (the "Equity Plan") for the benefit of certain of our current and future employees and other service providers. The following summary describes what we anticipate to be the material terms of the Equity Plan.

When approved by Honeywell, as our sole shareholder, and our Board, the full text of the Equity Plan will be included as an exhibit to a Current Report on Form 8-K filed with the SEC, and the following discussion is qualified in its entirety by reference to such text.

*Purpose of the Equity Plan*. The purpose of the Equity Plan would be to aid SpinCo in recruiting and retaining highly qualified employees and other service providers who are capable of assuring the future success of SpinCo. We expect that awards of stock-based compensation and opportunities for stock ownership in SpinCo will provide incentives to our employees and other service providers to exert their best efforts for the success of our business and thereby align their interests with those of our stockholders.

*Shares Available for Awards*. If the Equity Plan is approved by Honeywell, as our sole shareholder, and our Board, it is expected that the maximum aggregate number of shares of our common stock that may be issued under all stock-based awards granted under the Equity Plan would be 15,000,000. In addition, it is expected that the Equity Plan will contain a limit on the number of shares of common stock available for grant in the form of incentive stock options to 7,500,000.

Table of Contents

Under the Equity Plan, it is expected that SpinCo will have the flexibility to grant different types of equity compensation awards, including stock options, stock appreciation rights, restricted stock, RSUs and other awards based, in whole or in part, on the value of SpinCo equity, as well as cash-based awards. The grant, vesting, exercise and settlement of awards granted under the Equity Plan may be subject to the satisfaction of time- or performance-based conditions, as determined at or after the date of grant of an award under the Equity Plan.

In the event of any change in corporate structure that affects our outstanding common stock (e.g., a cash or stock dividend, stock split, reverse stock split, spin-off, recapitalization, merger, reorganization, etc.), our Compensation Committee shall make adjustments that it deems equitable or appropriate, in its sole discretion, including adjustments to the share limits described above, the number and type of shares subject to outstanding awards, or the purchase or exercise price of outstanding awards. In the case of any unusual or nonrecurring event (including events described in the preceding sentence) affecting the Company or changes in applicable laws, regulations, or accounting principles, our Compensation Committee may make adjustments to outstanding awards in order to prevent dilution or enlargement of the benefits intended to be provided under the Equity Plan.

Shares that are subject to awards that are paid in cash, terminate, lapse or are canceled or forfeited would be available again for grant under the Equity Plan and would not be counted for purposes of the limits above. Shares that are reacquired by SpinCo with cash tendered in payment of the exercise price of an award and shares that are tendered or withheld in payment of all or part of the exercise price or tax withholding amount relating to an award will not be added back to the number of shares authorized under the Equity Plan. In addition, if stock appreciation rights are settled in shares upon exercise, the total number of shares actually issued upon exercise rather than the number of shares subject to the award would be counted against the number of shares authorized under the Equity Plan.

*Eligibility*. It is expected that employees and other service providers of SpinCo or its affiliates would be eligible to receive awards under the Equity Plan. Our non-employee directors will be eligible to participate in the 2018 Stock Incentive Plan for Non-Employee Directors of SpinCo.

*Administration*. It is expected that our Compensation Committee would have the authority to administer the Equity Plan, including the authority to select the persons who receive awards, determine the number of shares subject to the awards and establish the terms and conditions of the awards, consistent with the terms of the Equity Plan. Subject to the expected provisions of the Equity Plan, our Compensation Committee may specify the circumstances under which the exercisability or vesting of awards may be accelerated or whether awards or amounts payable under awards may be deferred. Our Compensation Committee may waive or amend the terms of an award, consistent with the terms of the Equity Plan, but may not reprice a stock option or stock appreciation right, whether through amendment, cancelation and replacement, or exchange for cash or any other awards. Our Compensation Committee would have the authority to interpret the Equity Plan and establish rules for the administration of the Equity Plan. It is expected that the Equity Plan will provide that our Compensation Committee may delegate its powers and duties under the Equity Plan to one or more directors or other individuals as the committee deems to be advisable, except that only our Compensation Committee or our Board would have authority to grant and administer awards to executive officers.

The Board may also exercise the powers of our Compensation Committee with respect to the Equity Plan and awards granted thereunder at any time.

*Tax Consequences of Awards*. The following is a brief summary of the principal United States federal income tax consequences of awards and transactions under the Equity Plan for the employees and other service providers selected to participate in the Equity Plan (the "Participants") and the Company. This summary is not intended to be exhaustive and, among other things, does not describe local, state or foreign tax consequences.

*Options and Stock Appreciation Rights*. A Participant will not recognize any income at the time a stock option or stock appreciation right is granted, nor will the Company be entitled to a deduction at that time. When a

Table of Contents

stock option is exercised, the Participant will recognize ordinary income in an amount equal to the excess of the fair market value of the shares received as of the date of exercise over the exercise price of the option. When a stock appreciation right is exercised, the Participant will recognize ordinary income in an amount equal to the cash received or, if the stock appreciation right is settled in shares, the shares received as of the date of exercise. The Company generally will be entitled to a corresponding tax deduction in the same time period and amount as the Participant recognizes income.

*Restricted Stock and RSUs*. A Participant will not recognize any income at the time of grant of a restricted stock unit or share of restricted stock (whether subject to time-based vesting or performance-based vesting), and the Company will not be entitled to a deduction at that time. The Participant will recognize ordinary income in an amount equal to the fair market value of the shares received or, if the restricted stock unit is paid in cash, the amount payable, upon settlement of a restricted stock unit. In the year in which shares of restricted stock are no longer subject to a substantial risk of forfeiture (i.e., in the year that the shares vest), the Participant will recognize ordinary income in an amount equal to the excess of the fair market value of the shares on the date of vesting over the amount, if any, the Participant paid for the shares. Under certain circumstances and if permitted by an individual award, a Participant may elect (within 30 days after being granted restricted stock) to recognize ordinary income in the year of receipt instead of the year of vesting. If such an election is made, the amount of income recognized by the Participant will be equal to the excess of the fair market value of the shares on the date of receipt over the amount, if any, the Participant paid for the shares. The Company generally will be entitled to a corresponding tax deduction in the same time period and amount as the Participant recognizes income.

*Other Types of Awards*. If other awards are granted under the Equity Plan, the tax consequences may differ from those described above for stock options, stock appreciation rights, restricted stock and RSUs. As a general matter, the Company typically would be entitled to a tax deduction in respect of any such compensatory awards in the same time period and amount as the Participant recognizes income in respect of such awards.

*Withholding of Taxes*. The Company has the right to require, prior to the issuance or delivery of shares in settlement of any award, the Participant to pay any taxes required by law.

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

As of the date of this Information Statement, Honeywell beneficially owns all of the outstanding shares of our common stock. After the Spin-Off, Honeywell will not own any shares of our common stock. The following table provides information regarding the anticipated beneficial ownership of our common stock at the time of the Share Distribution by:

- each of our stockholders whom we believe (based on the assumptions described below) will beneficially own more than 5% of our outstanding common stock;
- each of our directors;
- each of our named executive officers; and
- all of our directors and executive officers as a group.

Except as otherwise noted below, we based the share amounts on each person's beneficial ownership of Honeywell common stock on September 18, 2018, giving effect to a Share Distribution ratio of one share of our common stock for every six shares of Honeywell common stock.

Except as otherwise noted in the footnotes below, each person or entity identified in the table has sole voting and investment power with respect to the securities beneficially owned.

Immediately following the Spin-Off, we estimate that 123,451,420 shares of our common stock will be issued and outstanding, based on the approximately 740,708,523 shares of Honeywell common stock outstanding on September 18, 2018. The actual number of shares of our common stock that will be outstanding following the completion of the Spin-Off will be determined on October 29, 2018.

| Name | Amount and Nature of Beneficial Ownership | Percentage of Class |
|---|---|---|
| **Directors and Named Executive Officers:** | | |
| Roger B. Fradin | 410,000 | * |
| Michael G. Nefkens | — | — |
| Paul F. Deninger | — | — |
| Niccolo Mcleod De Masi | — | — |
| Jack R. Lazar | 162 | * |
| Joseph D. Ragan III | — | — |
| Nina L. Richardson | — | — |
| Andrew C. Teich | — | — |
| Sharon Wienbar | — | — |
| Joseph D. Ragan III | — | — |
| Directors and Executive Officers as a Group (12 persons) | 410,162 | * |
| **Principal Stockholders:** | | |
| The Vanguard Group[(1)]<br>100 Vanguard Blvd.<br>Malvern, Pennsylvania 19355 | | 6.74% |
| BlackRock, Inc.[(2)]<br>55 East 52nd Street<br>New York, New York 10055 | | 6.30% |

* Represents beneficial ownership of less than one percent of the outstanding common stock.

(1) Based on the most recently available Schedule 13G filed with the SEC on February 9, 2018 by The Vanguard Group with respect to Honeywell common stock. According to its Schedule 13G, The Vanguard Group and certain related entities have sole voting power in respect of 1,054,244 shares of Honeywell common stock, shared voting power in respect of 160,683 shares of Honeywell common stock, sole

Table of Contents

dispositive power in respect of 50,153,579 shares of Honeywell common stock and shared dispositive power in respect of 1,203,804 shares of Honeywell common stock.

(2) Based on the most recently available Schedule 13G filed with the SEC on January 25, 2018 by BlackRock, Inc. with respect to Honeywell common stock. According to its Schedule 13G, BlackRock, Inc. has sole voting power in respect of 41,087,639 shares of Honeywell common stock and sole dispositive power in respect of 47,575,018 shares of Honeywell common stock.

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Agreements with Honeywell**

In order to govern the ongoing relationships between us and Honeywell after the Spin-Off and to facilitate an orderly transition, we and Honeywell intend to enter into agreements providing for various services and rights following the Spin-Off, and under which we and Honeywell will agree to indemnify each other against certain liabilities arising from our respective businesses. The following summarizes the terms of the material agreements we expect to enter into with Honeywell.

***Separation and Distribution Agreement***

We intend to enter into a Separation and Distribution Agreement with Honeywell before the Share Distribution. The Separation and Distribution Agreement will set forth our agreements with Honeywell regarding the principal actions to be taken in connection with the Spin-Off. It will also set forth other agreements that govern aspects of our relationship with Honeywell following the Spin-Off.

***Transfer of Assets and Assumption of Liabilities***

The Separation and Distribution Agreement will identify certain transfers of assets and assumptions of liabilities that are necessary in advance of our separation from Honeywell so that we and Honeywell retain the assets of, and the liabilities associated with, our respective businesses. The Separation and Distribution Agreement generally provides that the assets comprising our business will consist of those owned or held by us or those primarily related to our current business and operations. The liabilities we will assume in connection with the Spin-Off will generally consist of those related to the past and future operations of our business, including our manufacturing locations and the other locations used in our current operations. Honeywell will retain certain assets and assume liabilities related to former business locations or the operation of our former business. The Separation and Distribution Agreement will also provide for the settlement or extinguishment of certain liabilities and other obligations between us and Honeywell. Honeywell and the Company have agreed that, upon completion of the Spin-Off and the related retirement of certain intercompany liabilities between Honeywell and the Company on or shortly after the Distribution Date, the Company will have an aggregate amount of cash-on-hand equal to approximately $75 million.

***Reorganization***

The Separation and Distribution Agreement will describe certain actions related to our separation from Honeywell that will occur prior to the Distribution such as the formation of our subsidiaries and certain other internal restructuring actions to be taken by us and Honeywell, including the contribution by Honeywell to us of the assets and liabilities that comprise our business.

***Intercompany Arrangements***

All agreements, arrangements, commitments and understandings, including most intercompany accounts payable or accounts receivable, between us, on the one hand, and Honeywell, on the other hand, will terminate effective as of the Share Distribution Date, except specified agreements and arrangements that are intended to survive the Share Distribution.

***Credit Support***

We will agree to use reasonable best efforts to arrange, prior to the Share Distribution, for the replacement of all guarantees, covenants, indemnities, surety bonds, letters of credit or similar assurances of credit support, other than certain specified credit support instruments, currently provided by or through Honeywell or any of its affiliates for the benefit of us or any of our affiliates.

***Representations and Warranties***

In general, neither we nor Honeywell will make any representations or warranties regarding any assets or liabilities transferred or assumed, any consents or approvals that may be required in connection with these

Table of Contents

transfers or assumptions, the value or freedom from any lien or other security interest of any assets transferred, the absence of any defenses relating to any claim of either party or the legal sufficiency of any conveyance documents. Except as expressly set forth in the Separation and Distribution Agreement, all assets will be transferred on an “as-is,” “where-is” basis.

***Further Assurances***

The parties will use reasonable best efforts to effect any transfers contemplated by the Separation and Distribution Agreement that have not been consummated prior to the Share Distribution as promptly as practicable following the Share Distribution Date. In addition, the parties will use reasonable best efforts to effect any transfer or re-transfer of any asset or liability that was improperly transferred or retained as promptly as practicable following the Share Distribution.

***The Distribution***

The Separation and Distribution Agreement will govern Honeywell’s and our respective rights and obligations regarding the proposed Share Distribution. Prior to the Share Distribution, Honeywell will deliver all the issued and outstanding shares of our common stock to the distribution agent. Following the Share Distribution Date, the distribution agent will electronically deliver the shares of our common stock to Honeywell stockholders based on the distribution ratio. The Honeywell Board may, in its sole and absolute discretion, determine the Record Date, the Share Distribution Date and the terms of the Spin-Off. In addition, Honeywell may, at any time until the Share Distribution, decide to abandon the Share Distribution or modify or change the terms of the Share Distribution.

***Conditions***

The Separation and Distribution Agreement will also provide that several conditions must be satisfied or, to the extent permitted by law, waived by Honeywell, in its sole and absolute discretion, before the Share Distribution can occur. For further information about these conditions, see “The Spin-Off—Conditions to the Spin-Off.”

***Exchange of Information***

We and Honeywell will agree to provide each other with information reasonably necessary to comply with reporting, disclosure, filing or other requirements of any national securities exchange or governmental authority having appropriate jurisdiction, for use in judicial, regulatory, administrative and other proceedings and to satisfy audit, accounting, litigation and other similar requirements. We and Honeywell will also agree to use reasonable best efforts to retain such information in accordance with our respective record retention policies as in effect on the date of the Separation and Distribution Agreement or for such longer period as required by law. Each party will also agree to use its reasonable best efforts to assist the other with its financial reporting and audit obligations.

***Termination***

Honeywell, in its sole and absolute discretion, may terminate the Separation and Distribution Agreement at any time prior to the Share Distribution.

***Release of Claims***

We and Honeywell will each agree to release the other and its affiliates, successors and assigns, and all persons that prior to the Share Distribution have been the other’s stockholders, directors, officers, members, agents and employees, and their respective heirs, executors, administrators, successors and assigns, from any

Table of Contents

claims against any such other party that arise out of or relate to events, circumstances or actions occurring or failing to occur or any conditions existing at or prior to the time of the Share Distribution. These releases will be subject to exceptions set forth in the Separation and Distribution Agreement.

*Indemnification*

We and Honeywell will each agree to indemnify the other and each of the other's current, former and future directors, officers and employees, and each of the heirs, administrators, executors, successors and assigns of any of them, against certain liabilities incurred in connection with the Spin-Off and our and Honeywell's respective businesses. The amount of either Honeywell's or our indemnification obligations will be reduced by any insurance proceeds or amounts recovered from third parties that the party being indemnified receives in respect of the related liability. The Separation and Distribution Agreement will also specify procedures regarding claims subject to indemnification.

### *Transition Services Agreement*

We intend to enter into a Transition Services Agreement pursuant to which Honeywell will provide us, and we will provide Honeywell, with specified services, including information technology, financial, human resources and labor, health, safety and environmental, sales, product stewardship, operational and manufacturing support, procurement, customer support and supply chain and logistics and other specified services, for a limited time to help ensure an orderly transition following the Share Distribution. For a limited time after the Spin-Off, we may request that additional services in the same functional categories as the specified services be provided by Honeywell to us so long as such additional services were provided historically by Honeywell to our business. The services are generally intended to be provided for a period no longer than twelve months following the Share Distribution, with a possibility to extend the term of each service up to an additional twelve months. Each party may terminate the agreement in its entirety in the event of a material breach of the agreement by the other party that is not cured within a specified time period. Each recipient party may also terminate the services on an individual basis upon prior written notice to the party providing the service.

The service recipient is required to pay to the service provider a fee equal to the cost of service specified for each service, which is billed on a monthly basis.

We have agreed to hold Honeywell harmless from any damages arising out of Honeywell's provision of the services unless such damages are the result of Honeywell's willful misconduct, gross negligence, breach of certain provisions of the agreement or violation of law or third party rights in providing services. Additionally, Honeywell's liability is generally subject to a cap in the amount of fees actually received by Honeywell from us in connection with the provision of the services. We also generally indemnify Honeywell for all liabilities arising out of Honeywell's provision of the services unless such liabilities are the result of Honeywell's willful misconduct or gross negligence, in which case, Honeywell indemnifies us for such liabilities. These indemnification and liability terms are customary for agreements of this type.

Given the short-term nature of the Transition Services Agreement, we are in the process of increasing our internal capabilities to eliminate reliance on Honeywell for the transition services it will provide us as quickly as possible following the Spin-Off.

The foregoing description of the Transition Services Agreement is a summary, is not complete, and is qualified entirely by reference to the full text of such agreement, which is filed as an exhibit to SpinCo's Registration Statement on Form 10, of which this Information Statement forms a part.

### *Tax Matters Agreement*

We intend to enter into a Tax Matters Agreement with Honeywell that will govern the respective rights, responsibilities and obligations of Honeywell and us after the Share Distribution with respect to all tax matters (including tax liabilities, tax attributes, tax returns and tax contests).

Table of Contents

The Tax Matters Agreement will generally provide that we will be responsible and will indemnify Honeywell for all taxes, including income taxes, sales taxes, VAT and payroll taxes, relating to the Business for all periods, including periods prior to the Share Distribution. In addition, the Tax Matters Agreement will address the allocation of liability for taxes that are incurred as a result of restructuring activities undertaken to effectuate the Spin-Off. We will have the right to control any audit or contest relating to any of these taxes for which we are solely liable, but Honeywell will have the right to review and comment on our conduct of any such audit or contest, and Honeywell will control any other audit or contest.

In addition, the Tax Matters Agreement will provide that we will be required to indemnify Honeywell for any taxes (and reasonable expenses) resulting from the failure of the Spin-Off and related internal transactions to qualify for their intended tax treatment under U.S. federal, state and local income tax law, as well as foreign tax law, where such taxes result from (a) breaches of covenants and representations we make and agree to in connection with the Spin-Off, (b) the application of certain provisions of U.S. federal income tax law to these transactions or (c) any other action or omission (other than actions expressly required or permitted by the Separation and Distribution Agreement, the Tax Matters Agreement or other ancillary agreements) we take after the Share Distribution that gives rise to these taxes. Honeywell will have the exclusive right to control the conduct of any audit or contest relating to these taxes, but will not be permitted to settle any such audit or contest to the extent we are liable for such underlying taxes without our consent (which we may not unreasonably withhold, condition or delay).

The Tax Matters Agreement will impose certain restrictions on us and our subsidiaries (including restrictions on share issuances, redemptions or repurchases, business combinations, sales of assets and similar transactions) that will be designed to address compliance with Section 355 of the Code and are intended to preserve the tax-free nature of the Spin-Off. Under the Tax Matters Agreement, these restrictions will apply for two years following the Share Distribution, unless Honeywell gives its consent for us to take a restricted action, which it is permitted to grant or withhold at its sole discretion. Even if Honeywell does consent to our taking an otherwise restricted action, we will remain liable to indemnify Honeywell in the event such restricted action gives rise to an otherwise indemnifiable liability. These restrictions may limit our ability to pursue strategic transactions or engage in new businesses or other transactions that may maximize the value of our business, and might discourage or delay a strategic transaction that our stockholders may consider favorable.

The foregoing description of the Tax Matters Agreement is a summary, is not complete, and is qualified entirely by reference to the full text of such agreement, which is filed as an exhibit to SpinCo's Registration Statement on Form 10, of which this Information Statement forms a part.

***Employee Matters Agreement***

We intend to enter into an Employee Matters Agreement with Honeywell that will address employment and employee compensation and benefits matters. The Employee Matters Agreement will address the allocation and treatment of assets and liabilities relating to employees and compensation and benefit plans and programs in which our employees participated prior to the Spin-Off. Except as specifically provided in the Employee Matters Agreement, we will generally be responsible for all employment and employee compensation and benefits-related liabilities relating to our employees, former employees and other service providers. In particular, we will assume certain assets and liabilities with respect to our current and former employees under certain of Honeywell's U.S. and non-U.S. (i) defined benefit pension plans (with assets and liabilities generally allocated based on formulas specified in the Employee Matters Agreement for each pension plan) and (ii) life insurance programs and nonqualified deferred compensation plans. Generally, except as may be provided in the Transition Services Agreement, each of our employees will cease active participation in Honeywell compensation and benefit plans as of the Spin-Off. The Employee Matters Agreement also provides that we will establish certain compensation and benefit plans for the benefit of our employees following the Spin-Off, including a 401(k) savings plan for U.S. employees, which will accept direct rollovers of account balances from the Honeywell 401(k) savings plan for any of our employees who elect to do so. Generally, following the Spin-Off, we will

Table of Contents

assume and be responsible for any annual bonus payments, including with respect to the year in which the Spin-Off occurs, and any other cash-based incentive or retention awards to our current and former employees. Honeywell long-term incentive compensation awards, including stock options, RSUs Growth Plan units and Performance Plan units, held by SpinCo employees will be treated as described in "Compensation Discussion and Analysis—Details on Program Elements and Related 2017 Compensation Decisions—Long-Term Incentive Compensation." The Employee Matters Agreement incorporates the indemnification provisions contained in the Separation and Distribution Agreement and described above. In addition, the Employee Matters Agreement provides that we will indemnify Honeywell for certain employee-related liabilities associated with the Transition Services Agreement.

The foregoing description of the Employee Matters Agreement is a summary, is not complete, and is qualified entirely by reference to the full text of such agreement, which is filed as an exhibit to SpinCo's Registration Statement on Form 10, of which this Information Statement forms a part.

***Agreements Governing Intellectual Property***

***Separation and Distribution Agreement***

The Separation and Distribution Agreement will provide for (i) us to own certain patents that, based on the scope of their claims, were allocated to the Business, as well as non-patent intellectual property rights exclusively related to the Business and we will also assume the liabilities relating to, arising out of or resulting therefrom, and (ii) Honeywell to retain any patents not allocated to the Business, as well as all of its other intellectual property rights not exclusively related to the Business and the liabilities relating to, arising out of or resulting therefrom.

The foregoing description of the Separation and Distribution Agreement is a summary, is not complete, and is qualified entirely by reference to the full text of such agreement, which is filed as an exhibit to SpinCo's Registration Statement on Form 10, of which this Information Statement forms a part.

***Trademark License Agreement***

We intend to enter into a Trademark License Agreement with Honeywell pursuant to which Honeywell will grant us a license to use the "Honeywell Home" trademark, subject to standard quality controls. The license to use the "Honeywell Home" trademark (but not "Honeywell" alone or in combination with any words other than "Home") will be exclusive in connection with certain products and markets that have historically been part of Honeywell's SpinCo business. The license is expected to be royalty bearing. The term of the license will not exceed forty (40) years following the Distribution Date. The license will be terminable in certain circumstances upon our change of control, as well as other customary grounds, such as a material uncured breach. There will be a standard wind-down period for use of the "Honeywell Home" trademark following termination of the Trademark License Agreement in some cases. In addition, the Trademark License Agreement will also provide a short-term license for us to transition away from use of the trademark "Honeywell" (alone).

The foregoing description of the Trademark License Agreement is a summary, is not complete, and is qualified entirely by reference to the full text of such agreement, which is filed as an exhibit to SpinCo's Registration Statement on Form 10, of which this Information Statement forms a part.

***Patent Cross-License Agreement***

We intend to enter into a Patent Cross-License Agreement with Honeywell, pursuant to which we will grant to Honeywell, and Honeywell will grant to us, a perpetual, royalty-free, worldwide license to certain patents that have historically been part of Honeywell's Home and Building Technologies business. In addition, Honeywell will grant us a perpetual, royalty-free, worldwide license to certain other patents that are currently practiced by

Table of Contents

us. Any future exclusive licenses or transfers of our and Honeywell's patents will be subject to the licenses granted under the Patent Cross-License Agreement. The licenses will be transferable in connection with certain future transactions, subject to certain customary limitations. We also agreed with Honeywell on cooperation in connection with patent enforcement.

The foregoing description of the Patent Cross-License Agreement is a summary, is not complete, and is qualified entirely by reference to the full text of such agreement, which is filed as an exhibit to SpinCo's Registration Statement on Form 10, of which this Information Statement forms a part.

***Indemnification and Reimbursement Agreement***

In connection with the Spin-Off, we intend to enter into an indemnification and reimbursement agreement with Honeywell (the "Indemnification and Reimbursement Agreement") pursuant to which we will have an obligation to make cash payments to Honeywell in amounts equal to 90% of payments, which include amounts billed ("payments"), with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages (the "liabilities") in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales (the "recoveries"). The amount payable by the Company in respect of such liabilities arising in respect of any given year will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). Payments in respect of the liabilities arising in a given year will be made quarterly throughout such year on the basis of an estimate of the liabilities and recoveries provided by Honeywell. Following the end of any such year, Honeywell will provide us with a calculation of the amount of payments and the recoveries actually received. Subject to the aforementioned cap, if the amount of payments (net of recoveries) is greater than the previously provided estimate, we will pay Honeywell the amount of such difference (the "true-up payment") and, if the amount of the previously provided estimate is greater than the amount of payments (net of recoveries) actually incurred, we will receive a credit in the amount of such difference that will be applied to future payments. If a true-up payment exceeds $30 million, such true-up payment will be made in equal installments, payable on a monthly basis following the date the true-up payment is due.

For example, if in any given year, Honeywell's estimated annual payments that are within the scope of the Indemnification and Reimbursement Agreement totaled $140 million, and if Honeywell's estimated associated recoveries totaled $20 million, then our quarterly payment obligations in respect of that year would be 90% of the net amount (or $108 million) divided by four, or $27 million. If, for such year, Honeywell's annual payments actually totaled $165 million, and if Honeywell's associated recoveries actually totaled $10 million, our additional true-up payment obligation in respect of that year would be 90% of the net amount (or $139.5 million) minus the sum of our quarterly payments, or $108 million, resulting in an aggregate payment in respect of such year of $31.5 million, which, because it exceeds $30 million, would be made in equal installments, payable on the true-up date and on a monthly basis following the date the true-up payment is due. However, if in any given year, Honeywell's estimated annual payments totaled $175 million, and the estimated associated recoveries totaled $5 million, then our quarterly payment obligations in respect of that year would be capped at $35 million even though 90% of the net amount (or $153 million) divided by four is higher at $38.25 million, resulting in an aggregate maximum payment for such year equal to the cap of $140 million (regardless of whether or not actual liabilities (net of recoveries) exceeded the previously provided estimates).

Historically, Honeywell's environmental claim and remediation payments in respect of the sites that are within the scope of the Indemnification and Reimbursement Agreement for the years 2017, 2016 and 2015, including any legal fees, were approximately $200 million, $221 million and $259 million, respectively, and Honeywell's associated receipts for insurance and amounts received by Honeywell in connection with affirmative claims, contributions and property sales for 2017, 2016 and 2015 were approximately $2 million, $10 million and $18 million, respectively.

Table of Contents

In the event that Honeywell completes a transfer to a third party in respect of a portion of the remediation liabilities that are within the scope of the Indemnification and Reimbursement Agreement, the Company will be obligated to pay 90% of the amount paid or payable by Honeywell in connection with such liability transfer, less any applicable recoveries. Amounts payable in respect of liability transfers for any given year are paid in the year following the year in which they occur, at the time that the true-up payment is made. If the amounts payable in respect of a liability transfer, together with any true-up payment, exceeds $30 million, such amounts will be made in equal installments, payable on the true-up date and on a monthly basis following the date the true-up payment is due. While any amount in respect of a liability transfer is outstanding, the annual payment by us to Honeywell will be first allocated towards the liabilities described above relating to environmental claims, remediation, hazardous exposure and toxic tort claims and arising outside of the scope of the liability transfer, and then towards the liability transfer payment. The amount payable by the Company in respect of (i) any such liability transfers and (ii) the liabilities described above relating to environmental claims, remediation, hazardous exposure and toxic tort claims arising in any given year, will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). To the extent that any amount in respect of liability transfers remains outstanding following such allocation and application of the $140 million cap, such amount will be carried forward and paid in the following year, but only to the extent there is room available under the $140 million cap in the year preceding the date of payment.

The scope of our current environmental remediation obligations subject to the Indemnification and Reimbursement Agreement relates to approximately 230 sites or groups of sites that are undergoing environmental remediation under U.S. federal or state law and agency oversight for contamination associated with Honeywell legacy business operations. The ongoing environmental remediation is designed to address contaminants at upland and sediment sites, which include, among others, metals, organic compounds and polychlorinated biphenyls, through a variety of methods, which include, among others, excavation, capping, in-situ stabilization, groundwater treatment and dredging. In addition, our obligations subject to the Indemnification and Reimbursement Agreement will include certain liability with respect to (i) hazardous exposure or toxic tort claims associated with the specified sites that arise after the Spin-Off, if any, (ii) currently unidentified releases of hazardous substances at or associated with the specified sites, (iii) other environmental claims associated with the specified sites and (iv) consequential damages.

Payment amounts under the Indemnification and Reimbursement Agreement will be deferred to the extent that a specified event of default has occurred and is continuing under certain indebtedness, including under our principal credit agreement, or the payment thereof causes us to not be compliant with certain financial covenants in certain indebtedness, including our principal credit agreement on a pro forma basis, including the maximum total leverage ratio (ratio of consolidated debt to consolidated EBITDA, which excludes any amounts owed to Honeywell under the Indemnification and Reimbursement Agreement), and the minimum interest coverage ratio. A 5% late payment fee will accrue on all amounts that are not otherwise entitled to be deferred under the terms of the Indemnification and Reimbursement Agreement, without prejudice to any other rights that Honeywell may have for late payments. In each calendar quarter, our ability to pay dividends and repurchase capital stock in such calendar quarter will be restricted until any amounts payable under the Indemnification and Reimbursement Agreement in such quarter (including any deferred payment amounts) are paid to Honeywell and we will be required to use available restricted payment capacity under our debt agreements to make payments in respect of any such deferred amounts. Payment of deferred amounts and certain other amounts could cause the amount we are required to pay under the Indemnification and Reimbursement Agreement in respect of liabilities arising in any given calendar year to exceed $140 million (exclusive of any late payment fees up to 5% per annum). All amounts payable under the Indemnification and Reimbursement Agreement will be guaranteed by certain of our subsidiaries that act as guarantors under our principal credit agreement, subject to certain exceptions. The ability for certain of our subsidiaries to make distributions in respect of and/or provide guarantees under the Indemnification and Reimbursement Agreement will be limited by any defenses generally available to guarantors (including, without limitation, those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, thin capitalization, distributable reserves, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other legal requirements under

Table of Contents

applicable law. Further, pursuant to the Indemnification and Reimbursement Agreement, our ability to (i) amend or replace our principal credit agreement, (ii) enter into another credit agreement and make amendments or waivers thereto, or (iii) enter into or amend or waive any provisions under other agreements, in each case, in a manner that would adversely affect the rights of Honeywell under the Indemnification and Reimbursement Agreement, will be subject to Honeywell's prior written consent. This consent right will significantly limit our ability to engage in many types of significant transactions on favorable terms (or at all), including, but not limited to, equity and debt financings, liability management transactions, refinancing transactions, mergers, acquisitions, joint ventures and other strategic transactions. The Indemnification and Reimbursement Agreement also includes other obligations that may impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests. Moreover, the payments that we will be required to make to Honeywell pursuant to the Indemnification and Reimbursement Agreement will not be deductible for U.S. federal income tax purposes.

The obligation will continue until the earlier of: (1) December 31, 2043; or (2) December 31 of the third consecutive year during which the annual indemnification obligation (including in respect of deferred payment amounts) has been less than $25 million.

Independent of our payments under the Indemnification and Reimbursement Agreement, we will have ongoing liability for certain environmental claims which are part of SpinCo's going forward business. For the year ended December 31, 2017 these payments totaled $1.1 million.

For additional discussion of the Indemnification and Reimbursement Agreement, see "Risk Factors—Risks Relating to Our Business—We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities."

The foregoing description of the Indemnification and Reimbursement Agreement is a summary, is not complete, and is qualified entirely by reference to the full text of such agreement, which is filed as an exhibit to SpinCo's Registration Statement on Form 10, of which this Information Statement forms a part.

***Agreements Governing Certain Ongoing Relationships***

We intend to enter into a non-exclusive ADI Supply Agreement with Honeywell pursuant to which we will receive the right to market, distribute, license and sublicense certain Honeywell products for distribution after purchase from Honeywell through ADI. With respect to some products, the rights will be worldwide, while for others the rights will be specific to a defined territory. The initial term of the agreement will run for three years. Thereafter, the agreement will be automatically renewed for subsequent one year terms, unless either party provides written notice of its intention not to renew the agreement. Honeywell may terminate the agreement upon a change of control of the Company.

We intend to enter into a Transition Manufacturing Agreement and a Products Supply Agreement with Honeywell which will each be non-exclusive, except with respect to supply of certain limited products, and provide for certain reciprocal manufacturing and supply arrangements. SpinCo will not require additional production equipment or expansions in order to supply any of the products under these arrangements.

The Transition Manufacturing Agreement will govern the manufacture and supply of both component parts and finished goods. The services provided under this agreement will each have a term of no more than two years. The products to be manufactured by SpinCo are currently manufactured in certain locations, including Mexico, the Netherlands, Scotland and the United States.

The Products Supply Agreement will govern the manufacture and supply of certain consumer products (including HVAC and security products, component parts and finished goods). The agreements will each have an

Table of Contents

initial term of three years. Thereafter, each agreement will be automatically renewed for subsequent one year terms, unless either party provides written notice of its intention not to renew the agreement. The products to be supplied by SpinCo are currently manufactured in certain locations, including Mexico, the Netherlands and the United States.

We also intend to enter into limited term transitional Services Agreements with Honeywell pursuant to which Honeywell will provide certain laboratory engineering, information technology and/or similar services to SpinCo and/or SpinCo will provide certain engineering, information technology and/or similar services to Honeywell. Separate agreements will be entered into for each location, including in China, the Czech Republic, India, the Netherlands and Switzerland.

***Other Arrangements***

Prior to the Spin-Off, we have had various other arrangements with Honeywell, including arrangements whereby Honeywell has provided us with finance, human resources, legal, information technology, general insurance, risk management and other corporate functions as described in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Basis of Presentation." As described in more detail in "—Separation and Distribution Agreement" above, these arrangements, other than those contemplated pursuant to the Transition Services Agreement, will generally be terminated in connection with the Spin-Off.

In addition, we intend to enter into certain other arm's-length arrangements regarding certain real estate matters and, in some cases, associated services.

Our ADI business leases its administrative office building in Melville, New York at a current rent of approximately $1,100,000 per year through 2023 and reimburses the landlord for certain real estate taxes and insurance premiums paid on the property, the future value of which cannot be determined through 2023. ADI has the right to prematurely terminate the lease after March 2022 for a termination fee of $150,000. After ADI entered into this lease, the property was acquired by a partnership known as "New Island Holdings." There have been no material amendments to the lease since the property was acquired by New Island Holdings. Mr. Fradin, the Chairman of our Board, is a limited partner in New Island Holdings, holding a 12% ownership interest. The value of the aggregate payments allocable to Mr. Fradin's share of New Island Holdings from January 1, 2017 through the expiration of the lease in March 2023 is approximately $839,000. The limited partners of New Island Holdings receive distributions based on total lease payments generated from the portfolio of buildings that the partnership owns, less applicable mortgage and other expenses.

**Policy and Procedures Governing Related Party Transactions**

Prior to the completion of the Spin-Off, our Board will adopt a written policy regarding the review, approval and ratification of transactions with related persons. We anticipate that this policy will provide that our Nominating and Governance Committee review each of SpinCo's transactions involving an amount exceeding $120,000 and in which any "related person" had, has or will have a direct or indirect material interest. In general, "related persons" are our directors, director nominees, executive officers and stockholders beneficially owning more than 5% of our outstanding common stock and immediate family members or certain affiliated entities of any of the foregoing persons. We expect that our Nominating and Governance Committee will approve or ratify only those transactions that are fair and reasonable to SpinCo and in our and our stockholders' best interests.

Table of Contents

## DESCRIPTION OF OUR CAPITAL STOCK

### General

Prior to the Share Distribution, Honeywell, as our sole stockholder, will approve and adopt our Amended and Restated Certificate of Incorporation, and our Board will approve and adopt our Amended and Restated By-Laws. The following summarizes information concerning our capital stock, including material provisions of our Amended and Restated Certificate of Incorporation, our Amended and Restated By-Laws and certain provisions of Delaware law. You are encouraged to read the forms of our Amended and Restated Certificate of Incorporation and our Amended and Restated By-Laws, which are filed as exhibits to our Registration Statement on Form 10, of which this Information Statement is a part, for greater detail with respect to these provisions.

### Distribution of Securities

During the past three years, we have not sold any securities, including sales of reacquired securities, new issues, securities issued in exchange for property, services or other securities, and new securities resulting from the modification of outstanding securities that were not registered under the Securities Act.

### Authorized Capital Stock

Immediately following the Spin-Off, our authorized capital stock will consist of 700,000,000 shares of common stock, par value $0.001 per share, and 100,000,000 shares of preferred stock, par value $0.001 per share.

### Common Stock

#### *Shares Outstanding*

Immediately following the Spin-Off, we estimate that approximately 123,451,420 shares of our common stock will be issued and outstanding, based on 740,708,523 shares of Honeywell common stock outstanding as of September 18, 2018. The actual number of shares of our common stock outstanding immediately following the Spin-Off will depend on the actual number of shares of Honeywell common stock outstanding on the Record Date, and will reflect any issuance of new shares or exercise of outstanding options pursuant to Honeywell's equity plans and any repurchases of Honeywell shares by Honeywell pursuant to its common stock repurchase program, in each case on or prior to the Record Date.

#### *Dividends*

Holders of shares of our common stock will be entitled to receive dividends when, as and if declared by our Board at its discretion out of funds legally available for that purpose, subject to the preferential rights of any preferred stock that may be outstanding. The timing, declaration, amount and payment of future dividends will depend on our financial condition, earnings, capital requirements and debt service obligations, as well as legal requirements, regulatory constraints, industry practice and other factors that our Board deems relevant. Additionally, the terms of the indebtedness we intend to incur in connection with the Spin-Off and our obligations under the Indemnification and Reimbursement Agreement each will limit our ability to pay cash dividends. Our Board will make all decisions regarding our payment of dividends from time to time in accordance with applicable law. See "Dividend Policy."

#### *Voting Rights*

The holders of our common stock will be entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders.

Table of Contents

***Other Rights***

Subject to the preferential liquidation rights of any preferred stock that may be outstanding, upon our liquidation, dissolution or winding-up, the holders of our common stock will be entitled to share ratably in our assets legally available for distribution to our stockholders.

***Fully Paid***

The issued and outstanding shares of our common stock are fully paid and non-assessable. Any additional shares of common stock that we may issue in the future will also be fully paid and non-assessable.

The holders of our common stock will not have preemptive rights or preferential rights to subscribe for shares of our capital stock or rights to redeem or convert their shares of common stock.

**Preferred Stock**

Our Amended and Restated Certificate of Incorporation will authorize our Board to designate and issue from time to time one or more series of preferred stock without stockholder approval. Our Board may fix and determine the preferences, limitations and relative rights of each series of preferred stock. There are no present plans to issue any shares of preferred stock.

**Certain Provisions of Delaware Law, Our Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws**

***Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws***

Certain provisions in our proposed Amended and Restated Certificate of Incorporation and our proposed Amended and Restated By-Laws summarized below may be deemed to have an anti-takeover effect and may delay, deter or prevent a tender offer or takeover attempt that a stockholder might consider to be in its best interests, including attempts that might result in a premium being paid over the market price for the shares held by stockholders. These provisions are intended to enhance the likelihood of continuity and stability in the composition of our Board and in the policies formulated by our Board and to discourage certain types of transactions that may involve an actual or threatened change of control.

- *Classified Board.* Our Amended and Restated Certificate of Incorporation will provide that, until the annual stockholder meeting in 2022, our Board will be divided into three classes, with each class consisting, as nearly as may be possible, of one-third of the total number of directors. The directors designated as Class I directors will have terms expiring at the first annual meeting of stockholders following the Share Distribution in 2019. The directors designated as Class II directors will have terms expiring at the following year's annual meeting in 2020, and the directors designated as Class III directors will have terms expiring at the following year's annual meeting in 2021. Commencing with the first annual meeting following the Share Distribution in 2019, directors elected to succeed those directors whose terms then expire will be elected for a term of office to expire at the 2022 annual meeting. Beginning at the 2022 annual meeting, all of our directors will stand for election each year for annual terms, and our Board will therefore no longer be divided into three classes. Before our Board is declassified, it would take at least two elections of directors for any individual or group to gain control of our Board. Accordingly, while the classified board is in effect, these provisions could discourage a third party from initiating a proxy contest, making a tender offer or otherwise attempting to control us.
- *Removal.* Our Amended and Restated Certificate of Incorporation will provide that (i) prior to our Board being declassified as discussed above, our stockholders may remove directors only for cause and (ii) after our Board has been fully declassified, our stockholders may remove directors with or without cause. Removal will require the affirmative vote of holders of at least a majority of our voting stock.

Table of Contents

- *Blank Check Preferred Stock.* Our Amended and Restated Certificate of Incorporation will authorize our Board to designate and issue, without any further vote or action by the stockholders, up to 100 million shares of preferred stock from time to time in one or more series and, with respect to each such series, to fix the number of shares constituting the series and the designation of the series, the voting powers (if any) of the shares of the series, and the preferences and relative, participating, optional and other rights, if any, and any qualifications, limitations or restrictions, of the shares of such series. The ability to issue such preferred stock could discourage potential acquisition proposals and could delay or prevent a change in control.
- *No Stockholder Action by Written Consent.* Our Amended and Restated Certificate of Incorporation will expressly exclude the right of our stockholders to act by written consent. Stockholder action must take place at an annual meeting or at a special meeting of our stockholders.
- *Special Stockholder Meetings.* Our Amended and Restated Certificate of Incorporation and our Amended and Restated By-Laws will provide that only our Chairman of our Board or a majority of our Board will be able to call a special meeting of stockholders. Stockholders will not be permitted to call a special meeting or to require our Board to call a special meeting.
- *Requirements for Advance Notification of Stockholder Nominations and Proposals.* Under our Amended and Restated By-Laws, stockholders of record will be able to nominate persons for election to our Board or bring other business constituting a proper matter for stockholder action only by providing proper notice to our secretary. In the case of annual meetings, proper notice must be given, generally between 90 and 120 days prior to the first anniversary of the prior year's annual meeting as first specified in the notice of meeting (without regard to any postponements or adjournments of such meeting after such notice was first sent). In the case of special meetings, proper notice must be given no earlier than the 90th day prior to the relevant meeting and no later than the later of the 60th day prior to such meeting or the 10th day following the public announcement of the meeting. Such notice must include, among other information, certain information with respect to each stockholder nominating persons for election to the Board (including, the name and address, the number of shares directly or indirectly held by such stockholder, a description of any agreement with respect to the business to be brought before the annual meeting, a description of any derivative instruments based on or linked to the value of or return on our securities as of the date of the notice, a description of any proxy, contract or other relationship pursuant to which such stockholder has a right to vote any shares of our stock and any profit-sharing or performance-related fees that such stockholder is entitled to, based on any increase or decrease in the value of our securities, as of the date of such notice), a representation that such stockholder is a holder of record of our common stock as of the date of the notice, each stockholder nominee's written consent to being named as a nominee and to serving as a director if elected, a completed questionnaire and representation that such person has not and will not give any commitment as to how such person will act or vote if elected as a director, become a party to any agreement with respect to any compensation, reimbursement or indemnification in connection with service as a director, and such person will comply with all policies applicable to directors, a description of all compensation and other monetary agreements during the past three years and a representation as to whether such stockholder intends to solicit proxies.
- *Cumulative Voting.* The DGCL provides that stockholders are denied the right to cumulate votes in the election of directors unless the company's certificate of incorporation provides otherwise. Our Amended and Restated Certificate of Incorporation will not provide for cumulative voting.
- *Amendments to Certificate of Incorporation and By-Laws.* The DGCL provides that the affirmative vote of holders of a majority of a company's voting stock then outstanding is required to amend the company's certificate of incorporation unless the company's certificate of incorporation provides a higher threshold, and our Amended and Restated Certificate of Incorporation will not provide for a higher threshold. Our Amended and Restated Certificate of Incorporation will provide that our Amended and Restated By-Laws may be amended by our Board or by the affirmative vote of holders of at least a majority of our voting stock.

Table of Contents

***Delaware Takeover Statute***

We are subject to Section 203 of the DGCL, which, subject to certain exceptions, prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years following the date that such stockholder became an interested stockholder.

***Limitation on Liability of Directors and Indemnification of Directors and Officers***

Delaware law authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for certain breaches of directors' fiduciary duties as directors, and our Amended and Restated Certificate of Incorporation will include such an exculpation provision. Our Amended and Restated By-Laws and Amended and Restated Certificate of Incorporation will include provisions that require us to indemnify, to the fullest extent allowable under the DGCL, the personal liability of directors and officers for monetary damages for actions taken as a director, officer or agent of SpinCo, or for serving at SpinCo's request as a director, officer or agent at another corporation or enterprise, as the case may be. Our Amended and Restated By-Laws and Amended and Restated Certificate of Incorporation will also provide that we must indemnify and advance reasonable expenses to our directors and officers subject to our receipt of an undertaking from the indemnified party as may be required under the DGCL. Our Amended and Restated By-Laws will expressly authorize us to carry directors' and officers' insurance to protect SpinCo, its directors, officers and agents for certain liabilities.

The limitation of liability and indemnification provisions that will be included in our Amended and Restated By-Laws and Amended and Restated Certificate of Incorporation may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation against our directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. However, these provisions will not limit or eliminate our rights, or those of any stockholder, to seek non-monetary relief such as injunction or rescission in the event of a breach of a director's duty of care. The provisions will not alter the liability of directors under the federal securities laws. In addition, your investment may be adversely affected to the extent that in a class action, derivative, or direct suit, we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions. There is currently no pending material litigation or proceeding against any of our directors, officers or employees for which indemnification is sought.

***Exclusive Forum***

Our Amended and Restated Certificate of Incorporation will provide, in all cases to the fullest extent permitted by law, that unless we consent in writing to the selection of an alternative forum, the Court of Chancery located within the State of Delaware will be the sole and exclusive forum for any derivative action or proceeding brought on behalf of SpinCo, any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or stockholder of SpinCo to SpinCo or SpinCo's stockholders, any action asserting a claim arising pursuant to the DGCL or as to which the DGCL confers jurisdiction on the Court of Chancery located in the State of Delaware, any action asserting a claim governed by the internal affairs doctrine or any other action asserting an "internal corporate claim" as that term is defined in Section 115 of the DGCL. However, if the Court of Chancery within the State of Delaware does not have jurisdiction, the action may be brought in any other state or federal court located within the State of Delaware.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock will be Equiniti Trust Company.

**Listing**

We have applied to list our common stock on the New York Stock Exchange, under the ticker symbol "REZI."

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed a Registration Statement on Form 10 with the SEC with respect to the shares of our common stock that Honeywell's stockholders will receive in the Share Distribution as contemplated by this Information Statement. This Information Statement is a part of, and does not contain all the information set forth in, the Registration Statement and the other exhibits and schedules to the Registration Statement. For further information with respect to us and our common stock, please refer to the Registration Statement, including its other exhibits and schedules. Statements we make in this Information Statement relating to any contract or other document are not necessarily complete, and you should refer to the exhibits attached to the Registration Statement for copies of the actual contract or document. You may review a copy of the Registration Statement, including its exhibits and schedules, at the SEC's public reference room, located at 100 F Street, N.E., Washington, D.C. 20549, as well as on the Internet website maintained by the SEC at www.sec.gov. Please call the SEC at 1-800-SEC-0330 for more information on the public reference room. Information contained on any website we refer to in this Information Statement does not and will not constitute a part of this Information Statement or the Registration Statement on Form 10 of which this Information Statement is a part and such references are intended to be inactive textual references only.

As a result of the Spin-Off, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with the Exchange Act, we will file periodic reports, proxy statements and other information with the SEC.

You may request a copy of any of our filings with the SEC at no cost by writing us at the following address:

Investor Relations
Resideo Technologies, Inc.
1985 Douglas Drive North, Golden Valley, Minnesota 55422
(763) 954-5204

We also intend to maintain a website at https://www.resideo.com, at which you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Our investor relations website provides notifications of news or announcements regarding our financial performance, including SEC filings, investor events, press and earnings releases, and blogs.

We intend to furnish holders of our common stock with annual reports containing financial statements prepared in accordance with U.S. GAAP and audited and reported on by an independent registered public accounting firm.

**Table of Contents**

**INDEX TO COMBINED FINANCIAL STATEMENTS**


| Item | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Combined Statements of Operations for the Three Years Ended December 31, 2017 | F-3 |
| Combined Statements of Comprehensive Income for the Three Years Ended December 31, 2017 | F-4 |
| Combined Balance Sheets as of December 31, 2017 and 2016 | F-5 |
| Combined Statements of Cash Flows for the Three Years Ended December 31, 2017 | F-6 |
| Combined Statements of Equity for the Three Years Ended December 31, 2017 | F-7 |
| Notes to Combined Financial Statements | F-8 |
| Unaudited Combined Interim Financial Statements | |
| Combined Interim Statements of Operations for the Three and Six Months Ended June 30, 2018 and 2017 | F-33 |
| Combined Interim Statements of Comprehensive Income for the Three and Six Months Ended June 30, 2018 and 2017 | F-34 |
| Combined Interim Balance Sheets as of June 30, 2018 and December 31, 2017 | F-35 |
| Combined Interim Statements of Cash Flows for the Six Months Ended June 30, 2018 and 2017 | F-36 |
| Notes to Combined Interim Financial Statements | F-37 |

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareowners and Board of Directors of Honeywell International Inc.
Morris Plains, New Jersey

**Opinion on the Financial Statements**

We have audited the accompanying combined balance sheets of Homes Business of Honeywell International Inc. and subsidiaries (the "Company") as of December 31, 2017 and 2016, and the related combined statements of operations, comprehensive income, equity, and cash flows for each of the three years in the period ended December 31, 2017, and the related notes (collectively referred to as the "financial statements"). In our opinion, such combined financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States) and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the combined financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of a Matter**

As described in Note 1. to the combined financial statements, the accompanying combined financial statements have been derived from the separate records maintained by Honeywell International Inc. The combined financial statements also include expense allocations for certain corporate functions historically provided by Honeywell International Inc. These allocations may not be reflective of the actual expense that would have been incurred had the Company operated as a separate entity apart from Honeywell International Inc. A summary of transactions with related parties is included in Note 3. to the combined financial statements.

/s/ DELOITTE & TOUCHE LLP

Minneapolis, Minnesota
June 13, 2018

We have served as the Company's auditor since 2018.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED STATEMENTS OF OPERATIONS**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | (Dollars in millions) | | |
| Net sales | $ 4,519 | $ 4,455 | $ 4,154 |
| Cost of goods sold | 3,203 | 3,090 | 2,925 |
| Gross profit | 1,316 | 1,365 | 1,229 |
| Selling, general and administrative expenses | 871 | 870 | 810 |
| Other expense | 281 | 188 | 170 |
| Interest and other charges, net | (2) | (3) | (8) |
| | 1,150 | 1,055 | 972 |
| Income before taxes | 166 | 310 | 257 |
| Tax expense | 560 | 133 | 110 |
| Net income (loss) | $ (394) | $ 177 | $ 147 |

The Notes to Combined Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED STATEMENTS OF COMPREHENSIVE INCOME**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | | (Dollars in millions) | |
| Net income (loss) | $ (394) | $ 177 | $ 147 |
| Other comprehensive income (loss), net of tax: | | | |
| Foreign exchange translation adjustment | 70 | (46) | (67) |
| Changes in fair value of effective cash flow hedges | (1) | — | — |
| Total other comprehensive (loss) income, net of tax | 69 | (46) | (67) |
| Comprehensive income (loss) | $ (325) | $ 131 | $ 80 |

The Notes to Combined Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED BALANCE SHEETS**

| | December 31, | |
|---|---|---|
| | 2017 | 2016 |
| | (Dollars in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 56 | $ 47 |
| Due from related parties, current | 23 | 17 |
| Accounts, notes and other receivables—net | 779 | 723 |
| Inventories | 465 | 435 |
| Other current assets | 69 | 50 |
| Total current assets | 1,392 | 1,272 |
| Property, plant and equipment—net | 265 | 261 |
| Goodwill | 2,648 | 2,594 |
| Other intangible assets—net | 140 | 139 |
| Deferred income taxes | 5 | 6 |
| Other assets | 23 | 22 |
| Total assets | $ 4,473 | $ 4,294 |
| **LIABILITIES** | | |
| Current liabilities: | | |
| Accounts payable | $ 678 | $ 641 |
| Due to related parties, current | 60 | 46 |
| Accrued liabilities | 409 | 395 |
| Total current liabilities | 1,147 | 1,082 |
| Deferred income taxes | 377 | 70 |
| Other liabilities | 346 | 268 |
| **EQUITY** | | |
| Invested equity | 2,703 | 3,043 |
| Accumulated other comprehensive loss | (100) | (169) |
| Total equity | 2,603 | 2,874 |
| Total liabilities and equity | $ 4,473 | $ 4,294 |

The Notes to Combined Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED STATEMENTS OF CASH FLOWS**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | (Dollars in millions) | | |
| **Cash flows from operating activities:** | | | |
| Net income | $ (394) | $ 177 | $ 147 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation | 57 | 57 | 54 |
| Amortization | 10 | 7 | 4 |
| Repositioning charges | 23 | 19 | 10 |
| Net payments for repositioning charges | (17) | (18) | (5) |
| Stock compensation expense | 16 | 13 | 10 |
| Pension expense | 16 | 16 | 15 |
| Deferred income taxes | 297 | (4) | (1) |
| Other | 3 | 4 | 7 |
| Changes in assets and liabilities: | | | |
| Accounts, notes and other receivables | (31) | (106) | (32) |
| Inventories | (17) | (49) | (28) |
| Other current assets | (17) | 1 | (16) |
| Other assets | — | 2 | (2) |
| Accounts payable | 11 | 61 | 30 |
| Accrued liabilities | (5) | (11) | (48) |
| Other liabilities | 85 | (18) | (17) |
| Net cash provided by operating activities | 37 | 151 | 128 |
| **Cash flows from investing activities:** | | | |
| Expenditures for property, plant and equipment | (49) | (60) | (68) |
| Proceeds received related to amounts due from related parties | 13 | 12 | 13 |
| Payments related to amounts due from related parties | (13) | (12) | (12) |
| Cash paid for acquisitions, net of cash acquired | — | (120) | (196) |
| Other | (2) | (11) | (5) |
| Net cash used for investing activities | (51) | (191) | (268) |
| **Cash flows from financing activities:** | | | |
| Net increase (decrease) in invested equity | 19 | 1 | 145 |
| Proceeds received related to amounts due to related parties | 1 | 2 | — |
| Payments related to amounts due to related parties | (4) | (2) | — |
| Net cash flows from cash pooling | 5 | 3 | — |
| Net cash provided by financing activities | 21 | 4 | 145 |
| Effect of foreign exchange rate changes on cash and cash equivalents | 2 | 1 | (10) |
| Net increase (decrease) in cash and cash equivalents | 9 | (35) | (5) |
| Cash and cash equivalents at beginning of period | 47 | 82 | 87 |
| Cash and cash equivalents at end of period | $ 56 | $ 47 | $ 82 |
| **Supplemental cash flow disclosures:** | | | |
| Income taxes paid (net of refunds) | 261 | 136 | 107 |

The Notes to Combined Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED STATEMENTS OF EQUITY**

| | Invested Equity | Accumulated Other Comprehensive Income (Loss) | Total Equity |
|---|---|---|---|
| | (Dollars in millions) | | |
| Balance at December 31, 2014 | $ 2,546 | $ (56) | $ 2,490 |
| Net income | 147 | — | 147 |
| Other comprehensive income (loss), net of tax | — | (67) | (67) |
| Change in invested equity | 149 | — | 149 |
| Balance at December 31, 2015 | 2,842 | (123) | 2,719 |
| Net income | 177 | — | 177 |
| Other comprehensive income (loss), net of tax | — | (46) | (46) |
| Change in invested equity | 24 | — | 24 |
| Balance at December 31, 2016 | 3,043 | (169) | 2,874 |
| Net loss | (394) | — | (394) |
| Other comprehensive income (loss), net of tax | — | 69 | 69 |
| Change in invested equity | 54 | — | 54 |
| Balance at December 31, 2017 | $ 2,703 | $ (100) | $ 2,603 |

The Notes to Combined Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.
NOTES TO COMBINED FINANCIAL STATEMENTS
(Dollars in millions, unless otherwise noted)**

**Note 1. Organization, Operations and Basis of Presentation**

In October 2017, Honeywell International Inc. (“Honeywell” or the “Parent”) announced its plan to spin-off its Homes and ADI Global Distribution business into a stand-alone publicly traded company.

The Homes and ADI Global Distribution business (“Homes”, “Homes Business”, the “Business”, the “Company”, “we” or “our”) of Honeywell is a leading global provider of products, software, solutions and technologies that help owners of homes stay connected and in control of their comfort, security and energy use. We are a leader in the home heating, ventilation and air conditioning controls and security markets, and a leading global distributor of security and fire protection products.

These Combined Financial Statements were derived from the consolidated financial statements and accounting records of Honeywell. These Combined Financial Statements reflect the combined historical results of operations, financial position and cash flows of Homes as they were historically managed in conformity with accounting principles generally accepted in the United States of America (“U.S. GAAP”).

We evaluated segment reporting in accordance with Accounting Standards Codification (“ASC”) 280 Segment Reporting. We concluded that Homes operates in two operating segments and two reportable segments, Products and Distribution, based on the operating results available and evaluated regularly by the chief operating decision maker (“CODM”) to make decisions about resource allocation and performance assessment.

All intracompany transactions have been eliminated. As described in Note 3. Related Party Transactions with Honeywell, all significant transactions between the Business and Honeywell have been included in these Combined Financial Statements and are expected to be settled for cash prior to the spin-off. These transactions which are expected to be settled for cash prior to the spin-off are reflected in the Combined Balance Sheets as Due from related parties or Due to related parties. In the Combined Statements of Cash Flows, the cash flows related to related party notes receivables presented in the Combined Balance Sheets in Due from related parties are reflected as investing activities since these balances represent amounts loaned to Parent. The cash flows related to related party notes payables presented in the Combined Balances in Due to related parties are reflected as financing activities since these balances represent amounts financed by Parent.

Honeywell uses a centralized approach to cash management and financing of its operations. The majority of the Business’s cash is transferred to Honeywell daily and Honeywell funds the Business’s operating and investing activities as needed. This arrangement is not reflective of the manner in which the Business would have been able to finance its operations had it been a stand-alone business separate from Honeywell during the periods presented. Cash transfers to and from Honeywell’s cash management accounts are reflected in the Combined Balance Sheet as Due to and Due from related parties, current and in the Combined Statements of Cash Flows as net financing activities.

The Combined Financial Statements include certain assets and liabilities that have historically been held at the Honeywell corporate level but are specifically identifiable or otherwise attributable to Homes. The cash and cash equivalents held by Honeywell at the corporate level are not specifically identifiable to Homes and therefore were not attributed for any of the periods presented. Honeywell third party debt and the related interest expense have not been allocated for any of the periods presented as Honeywell’s borrowings were not directly attributable to Homes Honeywell provides certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Business. The cost of these services has been allocated to the Business on the basis of the proportion of net sales. The Business and Honeywell consider these allocations to be a reasonable reflection of the benefits received by the Business. However, the financial

information presented in these Combined Financial Statements may not reflect the combined financial position, operating results and cash flows of the Business had the Business been a separate stand-alone entity during the periods presented. Actual costs that would have been incurred if the Business had been a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. We consider the basis on which the expenses have been allocated to be a reasonable reflection of the utilization of services provided to or the benefits received by the Business during the periods presented.

**Note 2. Summary of Significant Accounting Policies.**

***Principles of Combination***—The Homes Combined Financial Statements have been prepared on a stand-alone basis and include business units of Homes and wholly owned direct and indirect subsidiaries and entities in which Homes has a controlling financial interest.

***Cash and Cash Equivalents***—Cash and cash equivalents include cash on hand and highly liquid investments having an original maturity of three months or less.

***Trade Receivables and Allowance for Doubtful Accounts***—Trade accounts receivable are recorded at the invoiced amount as a result of transactions with customers. The Business maintains allowances for doubtful accounts for estimated losses as a result of customers' inability to make required payments. The Business estimates anticipated losses from doubtful accounts based on days past due as measured from the contractual due date and historical collection history. The Business also takes into consideration changes in economic conditions that may not be reflected in historical trends, for example customers in bankruptcy, liquidation or reorganization. Receivables are written-off against the allowance for doubtful accounts when they are determined uncollectible. Such determination includes analysis and consideration of the particular conditions of the account, including time intervals since last collection, customer performance against agreed upon payment plans, solvency of customer and any bankruptcy proceedings.

***Inventories***—Inventories are stated at the lower of cost or market, determined on a first-in, first-out basis, including direct material costs and direct and indirect manufacturing costs, or net realizable value. Reserves are maintained for obsolete, inactive and surplus items.

***Property, Plant and Equipment***—Property, plant and equipment are recorded at cost, including any asset retirement obligations, less accumulated depreciation. For financial reporting, the straight-line method of depreciation is used over the estimated useful lives of 10 to 50 years for buildings and improvements, 3 to 16 years for machinery and equipment, 3 to 10 years for tooling equipment and 5 to 7 years for software. Recognition of the fair value of obligations associated with the retirement of tangible long-lived assets is required when there is a legal obligation to incur such costs. Upon initial recognition of a liability, the cost is capitalized as part of the related long-lived asset and depreciated over the corresponding asset's useful life.

***Goodwill***—Goodwill is subject to impairment testing annually as of March 31, and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. This testing compares carrying values to fair values and, when necessary, the carrying value of these assets is impaired.

***Other Intangible Assets with Determinable Lives***—Other intangible assets with determinable lives consist of customer lists, technology, patents and trademarks and other intangibles and are amortized over their estimated useful lives, ranging from 4 to 15 years.

***Warranties and Guarantees***—Expected warranty costs for products sold are recognized based on an estimate of the amount that eventually will be required to settle such obligations. These accruals are based on

Table of Contents



factors such as past experience, length of the warranty and various other considerations. Costs of product recalls, which may include the cost of the product being replaced as well as the customer's cost of the recall, including labor to remove and replace the recalled part, are accrued as part of our warranty accrual at the time an obligation becomes probable and can be reasonably estimated. These estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

***Sales Recognition***—Product and service sales are recognized when there is evidence of a sales agreement, delivery of goods has occurred or services have been rendered, the sales price is fixed or determinable, and the collectability of revenue is reasonably assured. Service sales, principally representing network subscription services, are recognized over the contractual period or as services are rendered. Revenues from contracts with multiple element arrangements are recognized as each element is earned based on the relative fair value of each element provided the delivered elements have value to customers on a stand-alone basis. Amounts allocated to each element are based on its objectively determined fair value, such as the sales price for the product or service when it is sold separately or competitor prices for similar products or services.

Sales incentives and allowances are recognized as a reduction to revenue at the time of the related sale.

Sales, use and value added taxes collected by the Company and remitted to various government authorities are not recognized as revenues and are reported on a net basis.

Shipping and handling fees billed to customers are included in Cost of goods sold.

***Environmental***—We accrue costs related to environmental matters when it is probable that we have incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental costs are presented within Cost of goods sold for operating sites and Other expense for non-operating sites in the Combined Statements of Operations. For additional information, see Note 18. Commitments and Contingencies.

***Research and Development***—The Business conducts research and development ("R&D") activities, which consist primarily of the development of new products and product applications. R&D costs are charged to expense as incurred. Such costs are included in Cost of goods sold and amount to $120 million, $106 million and $110 million for the years ended December 31, 2017, 2016 and 2015, respectively.

***Stock-Based Compensation Plans***—Certain Homes employees participate in stock-based compensation plans sponsored by Parent. Awards granted under the plans primarily consist of stock options and restricted stock units ("RSUs") and are based on Parent's common shares and, as such, are reflected in Invested equity within the Combined Statements of Equity. The cost for such awards is measured at the grant date based on the fair value of the award. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods (generally the vesting period of the equity award) and is included in Selling, general and administrative expenses in the Combined Statements of Operations.

***Pension Benefits***—Certain of our employees participate in defined benefit pension plans (the "Shared Plans") sponsored by Honeywell which includes participants of other Honeywell businesses. We account for our participation in the Shared Plans as a multiemployer benefit plan. Accordingly, we do not record an asset or liability to recognize the funded status of the Shared Plans. The related pension expense is based on annual service cost of active Homes participants and reported within Cost of goods sold and Selling, general and administrative expenses as applicable in the Combined Statements of Operations. The pension expense attributable to active Homes participants in the Shared Plans for the years ended December 31, 2017, 2016 and 2015 was $16 million, $16 million and $15 million, respectively.

Table of Contents



***Foreign Currency Translation***—Assets and liabilities of operations outside the United States with a functional currency other than U.S. Dollars are translated into U.S. Dollars using year-end exchange rates. Sales, costs and expenses are translated at the average exchange rates in effect during the year. Foreign currency translation gains and losses are included as a component of Accumulated other comprehensive income (loss).

***Derivative Financial Instruments***—We minimize our risks from foreign currency exchange rate fluctuations through our normal operating and financing activities and, when deemed appropriate through the use of derivative financial instruments. Derivative financial instruments are used to manage risk and are not used for trading or other speculative purposes. Derivative financial instruments that qualify for hedge accounting must be designated and effective as a hedge of the identified risk exposure at the inception of the contract. Accordingly, changes in fair value of the derivative contract must be highly correlated with changes in fair value of the underlying hedged item at inception of the hedge and over the life of the hedge contract.

All derivatives are recorded on the balance sheet as assets or liabilities and measured at fair value. For derivatives designated as cash flow hedges, the effective portion of the changes in fair value of the derivatives are recorded in Accumulated other comprehensive income (loss) and subsequently recognized in earnings when the hedged items impact earnings. Cash flows of such derivative financial instruments are classified consistent with the underlying hedged item.

***Income Taxes***—The tax provision is presented on a separate company basis as if we were a separate filer. The effects of tax adjustments and settlements from taxing authorities are presented in our Combined Financial Statements in the period to which they relate as if we were a separate filer. Our current obligations for taxes are settled with our Parent on an estimated basis and adjusted in later periods as appropriate. All income taxes due to or due from our Parent that have not settled or recovered by the end of the period are reflected in Invested equity within the Combined Financial Statements. We are subject to income tax in the United States (federal, state and local) as well as other jurisdictions in which we operate.

The provision for income tax expense is based on our income, the statutory tax rates and other provisions of the tax laws applicable to us in each of these various jurisdictions. These laws are complex, and their application to our facts is at times open to interpretation. The process of determining our combined income tax expense includes significant judgments and estimates, including judgments regarding the interpretation of those laws. Our provision for income taxes and our deferred tax assets and liabilities incorporate those judgments and estimates, and reflect management's best estimate of current and future income taxes to be paid.

Deferred tax assets and liabilities relate to temporary differences between the financial reporting and income tax bases of our assets and liabilities, as well as the impact of tax loss carryforwards or carrybacks. Deferred income tax expense or benefit represents the expected increase or decrease to future tax payments as these temporary differences reverse over time. Deferred tax assets are specific to the jurisdiction in which they arise, and are recognized subject to management's judgment that realization of those assets is "more likely than not." In making decisions regarding our ability to realize tax assets, we evaluate all positive and negative evidence, including projected future taxable income, taxable income in carryback periods, expected reversal of deferred tax liabilities, and the implementation of available tax planning strategies.

Significant judgment is required in evaluating tax positions. We establish additional reserves for income taxes when, despite the belief that tax positions are fully supportable, there remain certain positions that do not meet the minimum recognition threshold. The approach for evaluating certain and uncertain tax positions is defined by the authoritative guidance which determines when a tax position is more likely than not to be sustained upon examination by the applicable taxing authority. In the normal course of business, Honeywell and its subsidiaries are examined by various federal, state and foreign tax authorities. We regularly assess the

Table of Contents



potential outcomes of these examinations and any future examinations for the current or prior years in determining the adequacy of our provision for income taxes. We continually assess the likelihood and amount of potential adjustments and adjust the income tax provision, the current tax liability and deferred taxes in the period in which the facts that give rise to a change in estimate become known.

The tax provision has been calculated as if the carve-out entity was operating on a stand-alone basis and filed separate tax returns in the jurisdiction in which it operates. Therefore, cash tax payments and items of current and deferred taxes may not be reflective of the actual tax balances prior to or subsequent to the carve-out.

***Use of Estimates***—The preparation of the Business's Combined Financial Statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts in the Combined Financial Statements and related disclosures in the accompanying Notes. Actual results could differ from those estimates. Estimates and assumptions are periodically reviewed and the effects of changes are reflected in the Combined Financial Statements in the period they are determined to be necessary.

***Recent Accounting Pronouncements***—In May 2014, and in following related amendments, the Financial Accounting Standards Board ("FASB") issued guidance on revenue from contracts with customers that will supersede most current revenue recognition guidance, including industry-specific guidance. The underlying principle is that an entity will recognize revenue to depict the transfer of goods or services to customers at an amount that the entity expects to be entitled to in exchange for those goods or services. The guidance provides a five-step analysis of transactions to determine when and how revenue is recognized. Other major provisions include capitalization of certain contract costs, consideration of time value of money in the transaction price, and allowing estimates of variable consideration to be recognized before contingencies are resolved in certain circumstances. The guidance also requires enhanced disclosures regarding the nature, amount, timing and uncertainty of revenue and cash flows arising from an entity's contracts with customers.

The company adopted the new standard effective January 1, 2018 using the modified retrospective transition method. The Company determined there are no material impacts on the Combined Financial Statements as the Company's current revenue recognition is consistent with the new standard.

The Company is still finalizing the impact of the new revenue recognition standard on its disclosures and expects the disclosures to be enhanced in the first quarter of 2018.

In July 2015, the FASB issued amendments to inventory guidance. This guidance requires an entity to measure inventory at the lower of cost and net realizable value, rather than at the lower of cost or market. The guidance is effective for interim and annual periods beginning after December 15, 2016, and is to be applied prospectively. The Company adopted this guidance in the first quarter of 2017 on a prospective basis. The adoption of this guidance did not have a significant impact on the Company's Combined Financial Statements.

In February 2016, the FASB issued guidance on accounting for leases which requires lessees to recognize most leases on their balance sheets for the rights and obligations created by those leases. The guidance requires enhanced disclosures regarding the amount, timing and uncertainty of cash flows arising from leases that will be effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. We expect to adopt the requirements of the new standard effective January 1, 2019. The guidance requires the use of a modified retrospective approach. We are currently evaluating the impact of the guidance on our Combined Balance Sheets, Statements of Operations, and related Notes to Combined Financial Statements.

In March 2016, the FASB issued amended guidance related to employee share-based payment accounting. The guidance requires all income tax effect of awards to be recognized in the income statement, which were

Table of Contents



previously presented as a component of invested equity, on a prospective basis. The guidance also requires presentation of excess tax benefits as an operating activity on the statement of cash flows rather than as a financing activity. We have elected to early adopt the standard in the quarter ended September 30, 2016, which requires adoption effective as of the beginning of the fiscal year. The adoption resulted in an immaterial impact to the Combined Financial Statements and related income tax provision.

In October 2016, the FASB issued an accounting standard update which requires an entity to recognize the income tax consequences of an intra-entity transfer of an asset, other than inventory, at the time the entity transfer occurs rather than when the asset is ultimately transferred to a third party, as required under current U.S. GAAP. The guidance is intended to reduce diversity in practice, particularly for transfers involving intellectual property. Subsequent to 2017 fiscal year, we adopted the accounting standard update as of January 1, 2018. The guidance requires application on a modified retrospective basis. The adoption of this guidance increases our deferred tax assets by approximately $0.2 million with a cumulative-effect adjustment to retained earnings of the same amount.

In August 2017, the FASB issued amendments to hedge accounting guidance. These amendments are intended to better align a company’s risk management strategies and financial reporting for hedging relationships. Under the new guidance, more hedging strategies will be eligible for hedge accounting and the application of hedge accounting is simplified. In addition, the new guidance amends presentation and disclosure requirements. The guidance is effective for fiscal years beginning after December 15, 2018 with early adoption permitted, including the interim periods within those years. The guidance requires the use of a modified retrospective approach. We are currently evaluating the impact of the guidance on our Combined Financial Statements and whether we will early adopt this guidance.

In February 2018, the FASB issued guidance that allows for an entity to elect to reclassify the income tax effects on items within accumulated other comprehensive income resulting from U.S. tax reform to retained earnings. The guidance is effective for fiscal years beginning after December 15, 2018 with early adoption permitted, including interim periods within those years. We are currently evaluating the impact of this standard on our Combined Financial Statements and whether we will make the allowed election.

**Note 3. Related Party Transactions with Honeywell**

The Combined Financial Statements have been prepared on a stand-alone basis and are derived from the Consolidated Financial Statements and accounting records of Honeywell.

Honeywell provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Business. The cost of these services has been allocated to the Business on the basis of the proportion of net sales. The Business and Honeywell consider the allocations to be a reasonable reflection of the benefits received by the Business. During the years ended December 31, 2017, 2016 and 2015, Homes was allocated $289 million, $264 million and $242 million, respectively, of general corporate expenses incurred by Honeywell and such amounts are included within Selling, general and administrative expenses in the Combined Statements of Operations. As certain expenses reflected in the Combined Financial Statements include allocations of corporate expenses from Honeywell, these statements could differ from those that would have been prepared had Homes operated on a stand-alone basis.

All significant intercompany transactions between the Business and Honeywell have been included in these Combined Financial Statements and are considered to have been effectively settled or are expected to be settled for cash. Sales to Honeywell during the years ended December 31, 2017, 2016 and 2015 were $36 million, $50 million and $54 million, respectively. Costs of goods sold to Honeywell during the years ended

Table of Contents



December 31, 2017, 2016 and 2015 were $29 million, $38 million and $42 million, respectively. Purchases from Honeywell during the years ended 2017, 2016 and 2015 were $213 million, $205 million and $199 million, respectively.

The total net effect of the settlement of these intercompany transactions is reflected in the Combined Statements of Cash Flows as a financing activity and in the Combined Balance Sheets as invested equity. Honeywell uses a centralized approach for the purpose of cash management and financing of its operations. The Business's cash is transferred to Honeywell daily and Honeywell funds the Business's operating and investing activities as needed. The Company operates a centralized non-interest-bearing cash pool in the U.S. and regional interest-bearing cash pools outside of the U.S.

Honeywell centrally hedges its exposure to changes in foreign exchange rates principally with forward contracts. Certain contracts are specifically designated to and entered on behalf of the Business with the Parent as a counterparty and are used to hedge known or probable anticipated foreign currency sales and purchases. The Business designates these hedges as cash flow hedges. These hedges are marked-to-market with the effective portion of the changes in fair value of the derivatives recorded in Accumulated other comprehensive income (loss) and subsequently recognized in earnings when the hedged items impact earnings. See Note 6. Interest and Other Charges, Net and Note 16. Accumulated Other Comprehensive Income (Loss), for the net impact of these economic foreign currency hedges in Interest and Other Charges, Net and Accumulated Other Comprehensive Income, respectively, and Note 14. Financial Instruments and Fair Value Measures, for further details of these financial instruments.

Due from related parties, current consists of the following:

| | December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Cash pooling and short-term notes receivables | $ 10 | $ 3 |
| Related party notes receivables, current | 7 | 6 |
| Receivables from related parties | 6 | 7 |
| Foreign currency exchange contracts | — | 1 |
| | $ 23 | $ 17 |

Due to related parties, current consists of the following:

| | December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Cash pooling and short-term notes payable | $ 23 | $ 12 |
| Related party notes payables, current | 1 | — |
| Payables to related parties | 36 | 34 |
| | $ 60 | $ 46 |

The Company had related party notes payable of $4 million, which is presented in Other liabilities within the Combined Balance Sheets as of December 31, 2016.

Table of Contents



Net transfers to and from Honeywell are included within invested equity on the Combined Statements of Equity. The components of the net transfers to and from Honeywell as of December 31, 2017, 2016 and 2015 are as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| General financing activities | $(547) | $(384) | $(231) |
| Unbilled corporate allocations | 260 | 240 | 224 |
| Purchases from Honeywell | 168 | 160 | 151 |
| Mandatory transition tax | 156 | — | — |
| Sales to Honeywell | (13) | (18) | (16) |
| Stock compensation expense and other compensation awards | 16 | 13 | 10 |
| Unbilled pension expense | 14 | 13 | 11 |
| Net increase in invested equity | $ 54 | $ 24 | $ 149 |

**Note 4. Acquisitions**

In March 2016, the Company completed the acquisition of RSI Video Technologies ("RSI"), a leading provider of wireless battery-powered motion detectors, for an aggregate value of $124 million in cash and $2 million in contingent consideration. RSI was acquired to enhance the Company's ability to meet increasing global customer need for video verification and also provides a do-it-yourself ("DIY") offering combined with professional monitoring.

RSI identifiable intangible assets are being amortized over their estimated lives ranging from 10 to 14 years using straight line and accelerated amortization methods.

| | Fair Value (in millions) | Weighted Average Useful Lives (in Years) |
|---|---|---|
| Trade Name | 3 | 10 |
| Technology | 15 | 10 |
| Customer Relationship | 20 | 14 |
| Total amortizable intangible assets | $ 38 | |

Fair value estimates are based on a complex series of judgments about future events and uncertainties and rely heavily on estimates and assumptions. The judgments used to determine the estimated fair value assigned to each class of assets acquired and liabilities assumed, as well as asset lives and the expected future cash flows and related discount rates, can materially impact our results of operations. Significant inputs used included the amount of cash flows, the expected period of the cash flows and the discount rates.

Table of Contents



The following table summarizes the fair values of the assets and liabilities assumed at the acquisition date (in millions):

| | 2016 |
|---|---|
| **Assets Acquired:** | |
| Cash and cash equivalents | $ 4 |
| Accounts, notes and other receivables | 13 |
| Inventories | 12 |
| Investments and other current assets | 1 |
| Property, plant and equipment | 3 |
| Other intangible assets | 38 |
| Other assets | 1 |
| Total assets acquired | 72 |
| **Liabilities assumed:** | |
| Accounts payable | (8) |
| Accrued liabilities | (2) |
| Other liabilities | (20) |
| Total liabilities assumed | (30) |
| Net assets acquired | 42 |
| Products goodwill | 84 |
| Total purchase price | $126 |

In December 2015, Honeywell completed the acquisition of the Elster Division of Melrose Industries plc ("Elster"), a leading provider of thermal gas solutions for commercial, industrial and residential heating systems and gas, water and electricity meters, including smart meters and software and data analytics solutions. As part of this transaction, Homes acquired the residential thermal business of Elster for an aggregate value of $196 million in cash. The residential thermal business of Elster was acquired to provide access to new technologies, well-recognized brands, energy efficiency know-how, and add a global presence to the Company's portfolio. Elster identifiable intangible assets relate to customer relationships that are being amortized over their estimated lives of 15 years using the accelerated amortization method. In aggregate, $59 million was attributed to intangible assets, $1 million was attributed to net tangible assets and $136 million was attributed to Products goodwill, which was not tax-deductible.

Pro forma results of operations for these acquisitions have not been presented because they are not material to the combined results of operations, either individually or in aggregate.

**Note 5. Repositioning Charges**

A summary of repositioning charge follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Severance | $ 23 | $ 21 | $ 10 |
| Asset impairments | 1 | — | 1 |
| Reserve adjustments | (1) | (2) | (1) |
| Total net repositioning charge | $ 23 | $ 19 | $ 10 |

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED FINANCIAL STATEMENTS (Continued)**

The following table summarizes the pretax distribution of total net repositioning charges by statement of operations classification:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Cost of goods sold | $ 17 | $ — | $ 7 |
| Selling, general and administrative expenses | 6 | 19 | 3 |
| | $ 23 | $ 19 | $ 10 |

All of the pretax impact of total net repositioning charges are related to the Products segment for the years ended December 31, 2017, 2016 and 2015.

In 2017, the Company recognized repositioning charges totaling $24 million mainly for severance costs related to workforce reductions of 512 manufacturing and administrative positions. The workforce reductions were primarily related to cost savings actions taken in connection with our productivity and ongoing functional transformation initiatives; factory transitions to more cost-effective locations; and achieving acquisition-related synergies.

In 2016, the Company recognized repositioning charges totaling $21 million mainly for severance costs related to workforce reductions of 707 manufacturing and administrative positions. The workforce reductions were primarily related to cost savings actions taken in connection with our productivity and ongoing functional transformation initiatives.

In 2015, the Company recognized repositioning charges totaling $11 million mainly for severance costs related to workforce reductions of 651 manufacturing and administrative positions. The workforce reductions were primarily related to cost savings actions taken in connection with our productivity and ongoing functional transformation initiatives; factory transitions to more cost-effective locations and site consolidations and organizational realignments.

Table of Contents



The following table summarizes the status of our total repositioning reserves:

| | Severance Costs | Asset Impairments | Total |
|---|---|---|---|
| Balance at December 31, 2014 | $ 11 | $ — | $ 11 |
| 2015 charges | 10 | 1 | 11 |
| 2015 usage—cash | (5) | — | (5) |
| 2015 usage—noncash | — | (1) | (1) |
| Adjustments | (1) | — | (1) |
| Foreign currency translation | (2) | — | (2) |
| Balance at December 31, 2015 | 13 | — | 13 |
| 2016 charges | 21 | — | 21 |
| 2016 usage—cash | (18) | — | (18) |
| 2016 usage—noncash | — | — | — |
| Adjustments | (2) | — | (2) |
| Foreign currency translation | 1 | — | 1 |
| Balance at December 31, 2016 | 15 | — | 15 |
| 2017 charges | 23 | 1 | 24 |
| 2017 usage—cash | (17) | — | (17) |
| 2017 usage—noncash | — | (1) | (1) |
| Adjustments | (1) | — | (1) |
| Foreign currency translation | 2 | — | 2 |
| Balance at December 31, 2017 | $ 22 | $ — | $ 22 |

Certain repositioning projects in each of our reportable operating segments in 2017, 2016 and 2015 included exit or disposal activities, the costs related to which will be recognized in future periods when the actual liability is incurred. The remaining exit and disposal costs relating to repositioning actions as of December 31, 2017 is expected to be $4 million.

## Note 6. Interest and Other Charges, Net

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Foreign exchange | $ 1 | $ — | $ (5) |
| Other non-operating interest (income) expense | (3) | (3) | (3) |
| | $ (2) | $ (3) | $ (8) |

## Note 7. Income Taxes

### Income before taxes

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| U.S. | $ (107) | $ 47 | $ 13 |
| Non-U.S. | 273 | 263 | 244 |
| | $ 166 | $ 310 | $ 257 |

Table of Contents



**Tax expense (benefit)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Tax expense (benefit) consists of: | | | |
| **Current**: | | | |
| U.S. Federal | $ 207 | $ 80 | $ 66 |
| U.S. State | 8 | 8 | 6 |
| Non-U.S. | 48 | 49 | 39 |
| | $ 263 | $ 137 | $ 111 |
| **Deferred**: | | | |
| U.S. Federal | $ (13) | $ 2 | $ 1 |
| U.S. State | 7 | — | — |
| Non-U.S. | 303 | (6) | (2) |
| | 297 | (4) | (1) |
| | $ 560 | $ 133 | $ 110 |

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| The U.S. federal statutory income tax rate is reconciled to our effective income tax rate as follows: | | | |
| U.S. federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| Taxes on non-U.S. earnings below U.S. tax rate[1] | (33.4) | (15.2) | (17.4) |
| U.S. state income taxes | 3.4 | 2.5 | 2.3 |
| Reserves for tax contingencies | 3.2 | 0.8 | 1.3 |
| Enactment of the Tax Act | 273.1 | — | — |
| Non-deductible expenses | 58.8 | 20.5 | 23.1 |
| All other items—net | (2.8) | (0.7) | (1.5) |
| | 337.3% | 42.9% | 42.8% |

(1) Net of changes in valuation allowance

The effective tax rate increased by 294.4 percentage points in 2017 compared to 2016. The increase was primarily attributable to the provisional impact of U.S. tax reform (see "the Tax Act" further discussed below) and an increase in non-deductible environmental expenses. The Company's non-U.S. effective tax rate was 128.6%, an increase of approximately 112.3 percentage points compared to 2016. The year-over-year increase in the non-U.S. effective tax rate was primarily driven by the Company's change in assertion regarding foreign unremitted earnings in connection with the Tax Act.

The effective tax rate increased by 0.1 percentage points in 2016 compared to 2015. The increase was primarily attributable to higher earnings taxed at higher rates. The Company's non-U.S effective tax rate was 16.3%, an increase of approximately 1.2 percentage points compared to 2015. The year-over-year increase in the non-U.S. effective tax rate was primarily driven by higher earnings taxed at higher rates.

Table of Contents



**Deferred tax assets (liabilities)**

The tax effects of temporary differences and tax carryforwards which give rise to future income tax benefits and payables are as follows:

| | December 31, | |
|---|---|---|
| | **2017** | **2016** |
| **Deferred tax assets:** | | |
| Accruals and reserves | $ 11 | $ 19 |
| Net operating and capital losses | 38 | 34 |
| Gross deferred tax assets | 49 | 53 |
| Valuation allowance | (36) | (32) |
| Total deferred tax assets | $ 13 | $ 21 |
| **Deferred tax liabilities:** | | |
| Intangibles | $ (55) | $ (63) |
| Property, plant and equipment | (14) | (20) |
| Unremitted earnings of foreign subsidiaries | (314) | — |
| Other | (2) | (2) |
| Total deferred tax liabilities | (385) | (85) |
| Net deferred tax (liability) asset | $ (372) | $ (64) |

As discussed further below, under "the Tax Act", the Company no longer intends to reinvest the historical earnings of its foreign subsidiaries as of December 31, 2017 and has recorded a provisional deferred tax liability, mainly comprised of non-U.S. withholding taxes of approximately $314 million.

Our gross deferred tax assets include $38 million related to non-U.S. operations comprised principally of net operating losses carryforwards (mainly in China, France, India, Italy and Mexico) and deductible temporary differences. We maintain a valuation allowance of $36 million against a portion of the non-U.S. gross deferred tax assets. The change in the valuation allowance resulted in increases of $4 million, $9 million and $5 million to tax expense in 2017, 2016 and 2015, respectively. In the event we determine that we will not be able to realize our net deferred tax assets in the future, we will reduce such amounts through an increase to tax expense in the period such determination is made. Conversely, if we determine that we will be able to realize net deferred tax assets in excess of the carrying amounts, we will decrease the recorded valuation allowance through a reduction to Tax expense in the period that such determination is made.

As of December 31, 2017, our net operating loss, capital loss and tax credit carryforwards were as follows:

| Jurisdiction | Expiration Period | Net Operating Loss Carryforwards |
|---|---|---|
| Non-U.S. | 2027 | $ 78 |
| Non-U.S. | Indefinite | 68 |
| | | $ 146 |

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED FINANCIAL STATEMENTS (Continued)**

Many jurisdictions impose limitations on the timing and utilization of net operating loss carryforwards. In those instances where the net operating loss or tax credit carryforward will not be utilized in the carryforward period due to the limitation, the deferred tax asset and amount of the carryforward have been reduced.

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Change in unrecognized tax benefits: | | | |
| Balance at beginning of year | $ 20 | $ 19 | $ 13 |
| Gross increases related to current period tax positions | 2 | 2 | 3 |
| Gross increases related to prior periods tax positions | 4 | 1 | 4 |
| Gross decreases related to prior periods tax positions | (3) | — | — |
| Decrease related to resolutions of audits with tax authorities | (4) | (1) | — |
| Expiration of the statute of limitations for the assessment of taxes | — | (1) | — |
| Foreign Currency Translation | 1 | — | (1) |
| Balance at end of year | $ 20 | $ 20 | $ 19 |

As of December 31, 2017, 2016 and 2015 there were $20 million, $20 million and $19 million of unrecognized tax benefits, respectively, that if recognized would be recorded as a component of income tax expense.

The following table summarizes tax years that remain subject to examination by major tax jurisdictions as of December 31, 2017:

| | Open Tax Years Based on Originally Filed Returns | |
|---|---|---|
| Jurisdiction | Examination in Progress | Examination Not Yet Initiated |
| U.S. Federal | 2013-2016 | 2017 |
| U.S. State | 2011-2016 | 2012-2017 |
| Canada(1) | 2012-2014, 2016 | 2015-2017 |
| China | 2013-2017 | N/A |
| France | 2012-2017 | 2006-2011 |
| Germany(1) | 2008-2015 | 2016-2017 |
| India | 1999-2015 | 2016-2017 |
| Switzerland(1) | 2012-2016 | 2017 |
| United Kingdom | 2013-2015 | 2016-2017 |

(1) Includes provincial or similar local jurisdictions, as applicable.

Based on the outcome of these examinations, or as a result of the expiration of statute of limitations for specific jurisdictions, it is reasonably possible that certain unrecognized tax benefits for tax positions taken on previously filed tax returns will materially change from those recorded as liabilities in our Combined Financial Statements. In addition, the outcome of these examinations may impact the valuation of certain deferred tax assets (such as net operating losses) in future periods.

Unrecognized tax benefits for examinations in progress were $7 million, $8 million and $7 million, as of December 31, 2017, 2016 and 2015, respectively. Estimated interest and penalties related to the underpayment of

Table of Contents



income taxes are classified as a component of Tax expense in the Combined Statement of Operations and totaled $1 million of expense, $2 million of expense and $1 million expense for the years ended December 31, 2017, 2016 and 2015, respectively. Accrued interest and penalties were $7 million, $7 million and $5 million, as of December 31, 2017, 2016 and 2015, respectively.

**The Tax Act**

On December 22, 2017, the U.S. enacted H.R.1, formerly known as the Tax Cuts and Jobs Act ("Tax Act"), that instituted fundamental changes to the taxation of multinational corporations. The Tax Act includes changes to the taxation of foreign earnings by implementing a dividend exemption system, expansion of the current anti-deferral rules, a minimum tax on low-taxed foreign earnings and new measures to deter base erosion. The Tax Act also includes a permanent reduction in the corporate tax rate to 21%, repeal of the corporate alternative minimum tax, expensing of capital investment, and limitation of the deduction for interest expense. Furthermore, as part of the transition to the new tax system, a one-time transition tax is imposed on a U.S. shareholder's historical undistributed earnings of foreign affiliates. Although the Tax Act is generally effective January 1, 2018, U.S. GAAP requires recognition of the tax effects of new legislation during the reporting period that includes the enactment date, which was December 22, 2017.

As a result of the impacts of the Tax Act, the SEC provided guidance that allows the Company to record provisional amounts for those impacts, with the requirement that the accounting be completed in a period not to exceed one year from the date of enactment. As of December 31, 2017, the Company has not completed the accounting for the tax effects of the Tax Act. Therefore, we have recorded provisional amounts for the effects of the Tax Act. The primary impacts of the Tax Act relate to the re-measurement of deferred tax assets and liabilities resulting from the change in the corporate tax rate ("Corporate Tax Rate Change"); the one-time mandatory transition tax on undistributed earnings of foreign affiliates ("Mandatory Transition Tax"); and deferred taxes in connection with a change in the Company's intent to permanently reinvest the historical undistributed earnings of its foreign affiliates ("Undistributed Foreign Earnings").

***Corporate Tax Rate Change***—For the year ended December 31, 2017, we recorded a tax benefit of $17 million due to the decrease in the corporate tax rate from 35% to 21%.

At the date of enactment, the Company had a deferred tax liability for the excess of its net book value over tax basis of its U.S. assets and liabilities that will generate future taxable income in excess of book. Due to the Tax Act, this additional taxable income will be subject to tax at a lower corporate tax rate, consequently reducing the Company's deferred tax liability as of the date of enactment.

***Mandatory Transition Tax***—For the year ended December 31, 2017, we recorded a provisional tax charge of approximately $156 million due to the imposition of the mandatory transition tax ("MTT") on the deemed repatriation of undistributed foreign earnings.

The Tax Act imposes a one-time tax on undistributed and previously untaxed post-1986 foreign earnings and profits ("E&P") as determined in accordance with U.S. tax principles of certain foreign corporations owned by U.S. shareholders. In general, we have estimated $2.2 billion of E&P related to our foreign affiliates that is subject to the MTT. The MTT is imposed at a rate of 15.5% to the extent of the cash and cash equivalents that are held by the foreign affiliates at certain testing dates; the remaining E&P is taxed at a rate of 8.0%. As of December 31, 2017, the Company has recorded a provisional amount because certain information related to the computation of E&P is not readily available, and there is limited information from federal and state taxing authorities regarding the application and interpretation of the recently enacted legislation. The Company will disclose the impact to the provisional amount in the reporting period in which the accounting is completed, which will not exceed one year from the date of enactment of the Tax Act.

Table of Contents



***Undistributed Foreign Earnings***—For the year ended December 31, 2017, we recorded a provisional tax charge of $314 million due to the Company's intent to no longer permanently reinvest the historical undistributed earnings of its foreign affiliates. The provisional amount was calculated as if the Company was operating on a stand-alone basis and filed separate tax returns in the jurisdictions in which it operates. Therefore, the deferred taxes may not be reflective of the actual tax balances prior to or subsequent to the Spin-Off.

We previously considered substantially all of the earnings in our non-U.S. subsidiaries to be permanently reinvested and, accordingly, recorded no deferred income taxes on such earnings. As a result of the fundamental changes to the taxation of multinational corporations created by the Tax Act, the Company no longer intends to permanently reinvest the historical undistributed earnings of its foreign affiliates which amount to approximately $2.2 billion as of December 31, 2017. U.S. GAAP requires recognition of a deferred tax liability in the reporting period in which its intent to no longer permanently reinvest its historical undistributed foreign earnings is made. Although no U.S. federal taxes will be imposed on such future distributions of foreign earnings, in many cases the cash transfer will be subject to foreign withholding and other local taxes. Accordingly, at December 31, 2017 the Company has included a provisional deferred tax liability, mostly related to non-U.S. withholding taxes. The Company has recorded a provisional amount because certain information related to the computation of E&P, distributable reserves and foreign exchange gains and losses is not readily available. The Company will disclose any change to the provisional amount in the reporting period in which the accounting is completed, which will not exceed one year from the date of enactment of the Tax Act.

***Global Intangible Low Taxed Income***—In addition to the changes described above, the Tax Act imposes a U.S. tax on global intangible low taxed income ("GILTI") that is earned by certain foreign affiliates owned by a U.S. shareholder. The computation of GILTI is still subject to interpretation and additional clarifying guidance is expected, but is generally intended to impose tax on earnings of a foreign corporation that are deemed to exceed a certain a threshold return relative to the underlying business investment. For purposes of the Combined Financial Statements, future taxes related to GILTI have not been included as they will be recorded as a current period expense in the reporting period in which the tax is incurred.

***Supplemental Cash Flow Information***—Included in Income taxes paid, net of refunds on the 2017 Combined Statements of Cash Flows is the provisional tax charge settled with the Parent of $156 million due to the imposition of the mandatory transition tax on the deemed repatriation of certain undistributed foreign earnings. Additionally, included within the change in deferred income taxes is the provisional tax charge of $314 million related to the estimated foreign and state taxes on undistributed earnings of its foreign affiliates.

**Note 8. Accounts, Notes and Other Receivables—Net**

| | December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Accounts, notes and other receivables | $ 792 | $ 739 |
| Less—Allowance for doubtful accounts | (13) | (16) |
| | $ 779 | $ 723 |

Table of Contents

HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.
NOTES TO COMBINED FINANCIAL STATEMENTS (Continued)

**Note 9. Inventories**

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Raw materials | $ 108 | $ 100 |
| Work in process | 21 | 24 |
| Finished products | 336 | 311 |
| | $ 465 | $ 435 |

**Note 10. Property, Plant and Equipment—Net**

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Land and improvements | $ 6 | $ 6 |
| Machinery and equipment | 512 | 490 |
| Buildings and improvements | 214 | 202 |
| Construction in progress | 39 | 37 |
| Others | 67 | 65 |
| | 838 | 800 |
| Less—Accumulated depreciation | (573) | (539) |
| | $ 265 | $ 261 |

Depreciation expense was $57 million, $57 million and $54 million in 2017, 2016 and 2015, respectively.

**Note 11. Goodwill and Other Intangible Assets—Net**

The change in the carrying amount of goodwill for the years ended December 31, 2017 and 2016 by segment is as follows:

| | December 31, 2015 | Acquisitions/ Divestitures | Currency Translation Adjustment | December 31, 2016 | Acquisitions/ Divestitures | Currency Translation Adjustment | December 31, 2017 |
|---|---|---|---|---|---|---|---|
| Distribution Goodwill | $ 639 | $ — | $ (10) | $ 629 | $ — | $ 16 | $ 645 |
| Products Goodwill | 1,914 | 81 | (30) | 1,965 | 4 | 34 | 2,003 |
| | $ 2,553 | $ 81 | $ (40) | $ 2,594 | $ 4 | $ 50 | $ 2,648 |

Other intangible assets with finite lives are comprised of:

| | December 31, 2017 | | | December 31, 2016 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Determinable life intangibles: | | | | | | |
| Patents and technology | $ 25 | $ (11) | $ 14 | $ 22 | $ (9) | $ 13 |
| Customer relationships | 178 | (89) | 89 | 162 | (76) | 86 |
| Trademarks | 9 | (6) | 3 | 8 | (5) | 3 |
| | $ 212 | $ (106) | $ 106 | $ 192 | $ (90) | $ 102 |

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED FINANCIAL STATEMENTS (Continued)**

Intangible assets amortization expense was $10 million, $7 million and $4 million in 2017, 2016 and 2015, respectively. Estimated intangible asset amortization expense for each of the next five years approximates $12 million in 2018, $12 million in 2019, $12 million in 2020, $10 million in 2021 and $8 million in 2022.

**Note 12. Accrued Liabilities**

| | December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Environmental costs | $ 204 | $ 199 |
| Compensation, benefit and other employee related | 65 | 63 |
| Customer rebate reserve | 49 | 45 |
| Repositioning | 22 | 15 |
| Product warranties and performance guarantees | 17 | 24 |
| Customer advances and deferred income | 3 | 3 |
| Other (primarily operating expenses) | 49 | 46 |
| | $ 409 | $ 395 |

**Note 13. Lease Commitments**

Future minimum lease payments under operating leases having initial or remaining noncancellable lease terms in excess of one year are as follows:

| | At December 31, 2017 |
|---|---|
| 2018 | $ 34 |
| 2019 | 25 |
| 2020 | 18 |
| 2021 | 13 |
| 2022 | 10 |
| Thereafter | 9 |
| | $ 109 |

Rent expense was $39 million, $38 million and $37 million in 2017, 2016 and 2015, respectively.

**Note 14. Financial Instruments and Fair Value Measures**

***Credit and Market Risk—***We continually monitor the creditworthiness of our customers to which we grant credit terms in the normal course of business. The terms and conditions of our credit sales are designed to mitigate or eliminate concentrations of credit risk with any single customer.

***Foreign Currency Risk Management—***We conduct our business on a multinational basis in a wide variety of foreign currencies. Our exposure to market risk for changes in foreign currency exchange rates arises from international financing activities between subsidiaries, foreign currency denominated monetary assets and liabilities and transactions arising from international trade. Our primary objective is to preserve the U.S. Dollar value of foreign currency denominated cash flows and earnings. We attempt to hedge currency exposures with natural offsets to the fullest extent possible and, once these opportunities have been exhausted, through foreign currency exchange forward and option contracts (foreign currency exchange contracts) with Honeywell.

Table of Contents



We hedge monetary assets and liabilities denominated in non-functional currencies. Prior to conversion into U.S. Dollars, these assets and liabilities are remeasured at spot exchange rates in effect on the balance sheet date. The effects of changes in spot rates are recognized in earnings and included in Non-operating (income) expense. We partially hedge forecasted sales and purchases, which occur in the next twelve months and are denominated in non-functional currencies, with foreign currency exchange contracts. Changes in the forecasted non-functional currency cash flows due to movements in exchange rates are substantially offset by changes in the fair value of the foreign currency exchange contracts designated as hedges. Market value gains and losses on these contracts are recognized in earnings when the hedged transaction is recognized. Open foreign currency exchange contracts mature in the next twelve months. At December 31, 2017, we had contracts with notional amounts of $25 million to exchange foreign currencies, principally the Canadian Dollar, Euro and British Pound.

***Fair Value of Financial Instruments—***The FASB's accounting guidance defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (exit price).

Financial and nonfinancial assets and liabilities are classified in their entirety based on the lowest level of input that is significant to the fair value measurement. The following table sets forth the Company's financial assets and liabilities that were accounted for at fair value on a recurring basis as of December 31, 2017 and 2016:

| | December 31, | |
|---|---|---|
| | **2017** | **2016** |
| **Assets:** | | |
| Foreign currency exchange contracts | $ — | $ 1 |

The foreign currency exchange contracts are valued using quoted prices for similar assets or liabilities in active markets. As such, these derivative instruments are classified within Level 2.

The carrying value of cash and cash equivalents, account, notes and other receivables, due from related parties, account payables and due to related parties contained in the Combined Balance Sheet approximates fair value.

**Note 15. Other Liabilities**

| | Years Ended December 31, | |
|---|---|---|
| | **2017** | **2016** |
| Environmental | $ 333 | $ 254 |
| Deferred compensation | 3 | 2 |
| Income Taxes | 2 | 2 |
| Other | 8 | 10 |
| | $ 346 | $ 268 |

Table of Contents

HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.
NOTES TO COMBINED FINANCIAL STATEMENTS (Continued)

**Note 16. Accumulated Other Comprehensive Income (Loss)**

The changes in Accumulated other comprehensive income (loss) are provided in the tables below.

| | Pre-Tax | Tax | After-Tax |
|---|---|---|---|
| **Year Ended December 31, 2017** | | | |
| Foreign exchange translation adjustment | $ 70 | $— | $ 70 |
| Changes in fair value of effective cash flow hedges | (1) | — | (1) |
| | $ 69 | $— | $ 69 |
| **Year Ended December 31, 2016** | | | |
| Foreign exchange translation adjustment | $ (46) | $— | $ (46) |
| Changes in fair value of effective cash flow hedges | 1 | (1) | — |
| | $ (45) | $ (1) | $ (46) |
| **Year Ended December 31, 2015** | | | |
| Foreign exchange translation adjustment | $ (67) | $— | $ (67) |
| Changes in fair value of effective cash flow hedges | — | — | — |
| | $ (67) | $— | $ (67) |

**Changes in Accumulated Other Comprehensive Income (Loss) by Component**

| | Foreign Exchange Translation Adjustment | Changes in Fair Value of Effective Cash Flow Hedges | Total Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|
| Balance at December 31, 2015 | $ (124) | $ 1 | $ (123) |
| Other comprehensive income (loss) before reclassifications | (46) | — | (46) |
| Amounts reclassified from accumulated other comprehensive income (loss) | — | — | — |
| Net current period other comprehensive income (loss) | (46) | — | (46) |
| Balance at December 31, 2016 | $ (170) | $ 1 | $ (169) |
| Other comprehensive income(loss) before reclassifications | 70 | (3) | 67 |
| Amounts reclassified from accumulated other comprehensive income | — | 2 | 2 |
| Net current period other comprehensive income (loss) | 70 | (1) | 69 |
| Balance at December 31, 2017 | $ (100) | $ — | $ (100) |

**Note 17. Stock-Based Compensation Plans**

Honeywell maintains stock-based compensation plans for the benefit of its officers, directors and employees. The following disclosures represent stock-based compensation expenses attributable to Homes based on the awards and terms previously granted under the Parent's stock-based compensation plans to Homes employees and an allocation of Parent's corporate and shared functional employee stock-based compensation expenses. Accordingly, the amounts presented are not necessarily indicative of future awards and do not necessarily reflect the results that Homes would have experienced as an independent company for the periods presented.

Table of Contents



***Stock-Based Awards Granted by Honeywell***—The stock-based awards granted by Honeywell to Homes employees for the year ended December 31, 2017 consisted of the following:

| | RSUs | | Options | |
|---|---|---|---|---|
| | Number of RSUs | Weighted Average Grant Date Fair Value | Number of Options | Weighted Average Exercise Price |
| Balance as of December 31, 2016 | 114,247 | $ 96 | 287,464 | $ 90 |
| Granted(1) | 36,956 | 131 | 92,900 | 125 |
| Vested/exercised | (25,665) | 83 | (74,524) | 84 |
| Balance as of December 31, 2017 | 125,538(2)(3) | $ 109 | 305,840(4) | $ 102 |

(1) Primarily represents awards granted by Honeywell in February and July 2017.
(2) Aggregate unrecognized compensation expense related to RSUs was $7 million as of December 31, 2017, which is expected to be recognized over a weighted average period of 3.5 years.
(3) Substantially all RSUs outstanding as of December 31, 2017 are expected to vest over time.
(4) Aggregate unrecognized compensation expense related to stock options was $3 million as of December 31, 2017, which is expected to be recognized over a weighted average period of 2.4 years.

***Stock-Based Compensation Expense***

Stock-based compensation expense recognized in the Combined Statements of Operations amounted to $16 million, $13 million and $10 million for the years ended December 31, 2017, 2016 and 2015, respectively, of which approximately $5 million, $3 million and $3 million, respectively, are specifically identifiable to Homes employees, and $11 million, $10 million and $7 million, respectively, are attributable to shared employees not specifically identifiable to Homes.

**Note 18. Commitments and Contingencies**

***Environmental Matters***

We are subject to various federal, state, local and foreign government requirements relating to the protection of the environment. We believe that, as a general matter, our policies, practices and procedures are properly designed to prevent unreasonable risk of environmental damage and personal injury and that our handling, manufacture, use and disposal of hazardous substances are in accordance with environmental and safety laws and regulations. We have incurred remedial response and voluntary cleanup costs for site contamination and are a party to lawsuits and claims associated with environmental and safety matters, including products containing hazardous substances. Additional lawsuits, claims and costs involving environmental matters are likely to continue to arise in the future.

With respect to environmental matters involving site contamination, we continually conduct studies, individually or jointly with other potentially responsible parties, to determine the feasibility of various remedial techniques. It is our policy to record appropriate liabilities for environmental matters when remedial efforts or damage claim payments are probable and the costs can be reasonably estimated. Such liabilities are based on our best estimate of the undiscounted future costs required to complete the remedial work. The recorded liabilities are adjusted periodically as remediation efforts progress or as additional technical, regulatory or legal information becomes available. Given the uncertainties regarding the status of laws, regulations, enforcement policies, the impact of other potentially responsible parties, technology and information related to individual sites, we do not believe it is possible to develop an estimate of the range of reasonably possible environmental

Table of Contents



loss in excess of our recorded liabilities. We expect to fund expenditures for these matters from operating cash flow. The timing of cash expenditures depends on a number of factors, including the timing of remedial investigations and feasibility studies, the timing of litigation and settlements of remediation liability, personal injury and property damage claims, regulatory approval of cleanup projects, remedial techniques to be utilized and agreements with other parties.

We accrue costs related to environmental matters when it is probable that we have incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental-related expenses are presented within Cost of goods sold for operating sites and Other expense, net for non-operating sites in the Combined Statements of Operations.

The following table summarizes information concerning our recorded liabilities for environmental costs:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Beginning of year | $ 453 | $ 474 | $ 542 |
| Accruals for environmental matters deemed probable and reasonably estimable | 282 | 190 | 173 |
| Environmental liability remediated | (198) | (211) | (241) |
| End of year | $ 537 | $ 453 | $ 474 |

Environmental liabilities are included in the following balance sheet accounts:

| | December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Accrued liabilities | $ 204 | $ 199 |
| Other liabilities | 333 | 254 |
| | $ 537 | $ 453 |

We do not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our combined results of operations and operating cash flows in the periods recognized or paid.

***Other Matters***

We are subject to other lawsuits, investigations and disputes arising out of the conduct of our business, including matters relating to commercial transactions, government contracts, product liability, prior acquisitions and divestitures, employee benefit plans, intellectual property, and environmental, health and safety matters. We recognize a liability for any contingency that is probable of occurrence and reasonably estimable. We continually assess the likelihood of adverse judgments of outcomes in these matters, as well as potential ranges of possible losses (taking into consideration any insurance recoveries), based on a careful analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts. To date, no such matters are material to the Combined Statements of Operations.

***Warranties and Guarantees***

In the normal course of business we issue product warranties and product performance guarantees. We accrue for the estimated cost of product warranties and performance guarantees based on contract terms and

Table of Contents



historical experience at the time of sale. Adjustments to initial obligations for warranties and guarantees are made as changes to the obligations become reasonably estimable. Product warranties and product performance guarantees are included in Accrued liabilities. The following table summarizes information concerning our recorded obligations for product warranties and product performance guarantees

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Beginning of year | $ 24 | $ 27 | $ 27 |
| Accruals for warranties/guarantees issued during the year | 10 | 7 | 10 |
| Adjustment of pre-existing warranties/guarantees | (4) | — | 1 |
| Settlement of warranty/guarantee claims | (13) | (10) | (11) |
| End of year | $ 17 | $ 24 | $ 27 |

**Note 19. Segment Financial Data**

We globally manage our business operations through two reportable operating segments, Products and Distribution:

**Products**—Our Products business is a leading global provider of residential security and intrusion products, consumer thermostats, consumer HVAC and consumer awareness systems, residential thermal solutions and residential water controls that allow owners of homes to stay connected and in control of their comfort, security and energy use.

**Distribution**—Our Distribution business is a leading global distributor of security and low voltage fire protection products.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED FINANCIAL STATEMENTS (Continued)**

Segment information is consistent with how management reviews the businesses, makes investing and resource allocation decisions and assesses operating performance. Homes' CODM evaluates segment performance based on segment profit. Segment profit is measured as segment income (loss) before taxes excluding pension expense, repositioning charges, other expense, and interest and other charges, net.

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Sales | | | |
| Total Products sales | $2,379 | $2,471 | $2,338 |
| Less: intersegment sales | 337 | 371 | 372 |
| External Products sales | 2,042 | 2,100 | 1,966 |
| External Distribution sales | 2,477 | 2,355 | 2,188 |
| Total sales | $4,519 | $4,455 | $4,154 |
| Depreciation and amortization | | | |
| Products | $ 57 | $ 53 | $ 48 |
| Distribution | 10 | 11 | 10 |
| Total | $ 67 | $ 64 | $ 58 |
| Segment profit | | | |
| Products | $ 353 | $ 426 | $ 367 |
| Distribution | 131 | 104 | 77 |
| Total | $ 484 | $ 530 | $ 444 |

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Capital expenditures | | | |
| Products | $ 42 | $ 51 | $ 60 |
| Distribution | 7 | 9 | 8 |
| Total | $ 49 | $ 60 | $ 68 |

| | December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Total assets | | | |
| Products | $3,152 | $3,081 | $2,910 |
| Distribution | 1,321 | 1,213 | 1,186 |
| Total | $4,473 | $4,294 | $4,096 |

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED FINANCIAL STATEMENTS (Continued)**

A reconciliation of segment profit to combined income from continuing operations before taxes is as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Segment profit | $ 484 | $ 530 | $ 444 |
| Pension Expense | (16) | (16) | (15) |
| Repositioning charges | (23) | (19) | (10) |
| Other expense | (281) | (188) | (170) |
| Interest and other charges, net | 2 | 3 | 8 |
| Income before taxes | $ 166 | $ 310 | $ 257 |

**Note 20. Geographic Areas—Financial Data**

| | Net Sales(1) Years Ended December 31, | | | Long-lived Assets(2) December 31, | | |
|---|---|---|---|---|---|---|
| | 2017 | 2016 | 2015 | 2017 | 2016 | 2015 |
| United States | $ 3,074 | $ 3,047 | $ 2,905 | $ 162 | $ 163 | $ 155 |
| Europe | 1,063 | 1,051 | 914 | 82 | 70 | 65 |
| Other International | 382 | 357 | 335 | 21 | 28 | 31 |
| | $ 4,519 | $ 4,455 | $ 4,154 | $ 265 | $ 261 | $ 251 |

(1) Sales between geographic areas approximate market and are not significant. Net sales are classified according to their country of origin. Included in United States net sales are export sales of $29 million, $43 million and $45 million in 2017, 2016 and 2015, respectively.
(2) Long-lived assets are comprised of property, plant and equipment—net.

**Note 21. Subsequent Events**

The Business evaluated subsequent events for recognition or disclosure through June 13, 2018, the date the Combined Financial Statements were available to be issued. No significant subsequent events were noted.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED INTERIM STATEMENTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| | (Dollars in millions) | | | |
| Net sales | $ 1,196 | $ 1,096 | $ 2,361 | $ 2,158 |
| Cost of goods sold | 850 | 788 | 1,672 | 1,539 |
| Gross profit | 346 | 308 | 689 | 619 |
| Selling, general and administrative expenses | 217 | 218 | 429 | 433 |
| Other expense | 123 | 51 | 176 | 100 |
| Interest and other charges, net | 1 | — | — | — |
| | 341 | 269 | 605 | 533 |
| Income before taxes | 5 | 39 | 84 | 86 |
| Tax expense (benefit) | (28) | 23 | 6 | 54 |
| Net Income | $ 33 | $ 16 | $ 78 | $ 32 |

The Notes to Combined Interim Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED INTERIM STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2018** | **2017** | **2018** | **2017** |
| Net income | $ 33 | $ 16 | $ 78 | $ 32 |
| Other comprehensive income (loss), net of tax | | | | |
| Foreign exchange translation adjustment | (49) | 39 | (18) | 50 |
| Changes in fair value of effective cash flow hedges | — | — | (1) | (2) |
| Total other comprehensive income (loss), net of tax | (49) | 39 | (19) | 48 |
| Comprehensive income (loss) | $ (16) | $ 55 | $ 59 | $ 80 |

The Notes to Combined Interim Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED INTERIM BALANCE SHEETS**
**(Unaudited)**

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| | (Dollars in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 93 | $ 56 |
| Due from related parties, current | 20 | 23 |
| Accounts, notes and other receivables—net | 746 | 779 |
| Inventories | 523 | 465 |
| Other current assets | 74 | 69 |
| Total current assets | 1,456 | 1,392 |
| Property, plant and equipment—net | 264 | 265 |
| Goodwill | 2,637 | 2,648 |
| Other intangible assets—net | 129 | 140 |
| Deferred income taxes | 4 | 5 |
| Other assets | 17 | 23 |
| Total assets | $ 4,507 | $ 4,473 |
| **LIABILITIES** | | |
| Current liabilities: | | |
| Accounts payable | $ 774 | $ 678 |
| Due to related parties, current | 64 | 60 |
| Accrued liabilities | 395 | 409 |
| Total current liabilities | 1,233 | 1,147 |
| Deferred income taxes | 351 | 377 |
| Other liabilities | 443 | 346 |
| **EQUITY** | | |
| Invested equity | 2,599 | 2,703 |
| Accumulated other comprehensive loss | (119) | (100) |
| Total equity | 2,480 | 2,603 |
| Total liabilities and equity | $ 4,507 | $ 4,473 |

The Notes to Combined Interim Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**COMBINED INTERIM STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2018 | 2017 |
| | (Dollars in millions) | |
| **Cash flows from operating activities:** | | |
| Net income | $ 78 | $ 32 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 27 | 28 |
| Amortization | 6 | 5 |
| Repositioning | 5 | 19 |
| Net payments for repositioning | (6) | (7) |
| Stock compensation expense | 9 | 8 |
| Pension expense | 7 | 8 |
| Deferred income taxes | (23) | (1) |
| Other | 4 | 1 |
| Changes in assets and liabilities: | | |
| Accounts, notes and other receivables | 21 | 18 |
| Inventories | (63) | (49) |
| Other current assets | (6) | (10) |
| Other assets | 6 | — |
| Accounts payable | 106 | 9 |
| Accrued liabilities | (10) | (3) |
| Other liabilities | 97 | 11 |
| Net cash provided by operating activities | 258 | 69 |
| **Cash flows from investing activities:** | | |
| Expenditures for property, plant and equipment | (23) | (22) |
| Proceeds received related to amounts due from related parties | 7 | 6 |
| Payments related to amounts due from related parties | — | (6) |
| Other | (1) | (1) |
| Net cash used for investing activities | (17) | (23) |
| **Cash flows from financing activities:** | | |
| Net increase (decrease) in invested equity | (193) | (51) |
| Proceeds received related to amounts due to related parties | 1 | — |
| Payments related to amounts due from related parties | (1) | (4) |
| Net cash flows from cash pooling | (8) | 7 |
| Net cash used for financing activities | (201) | (48) |
| Effects of foreign exchange rate changes on cash and cash equivalents | (3) | 2 |
| Net increase (decrease) in cash and cash equivalents | 37 | — |
| Cash and cash equivalents at beginning of period | 56 | 47 |
| Cash and cash equivalents at end of period | $ 93 | $ 47 |
| **Supplemental cash flow disclosures:** | | |
| Income taxes paid (net of refunds) | 28 | 52 |

The Notes to Combined Interim Financial Statements are an integral part of this statement.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED INTERIM FINANCIAL STATEMENTS**
**(Unaudited)**
**(Dollars in millions, unless otherwise noted)**

**Note 1. Organization, Operations and Basis of Presentation**

In October 2017, Honeywell International Inc. ("Honeywell" or the "Parent") announced its plan to spin-off its Homes and ADI Global Distribution business into a stand-alone publicly-traded company.

The Homes and ADI Global Distribution business ("Homes", "Homes Business", the "Business", the "Company", "we" or "our") of Honeywell is a leading global provider of products, software, solutions and technologies that help owners of homes stay connected and in control of their comfort, security and energy use. We are a leader in the home heating, ventilation and air conditioning controls and security markets, and a leading global distributor of security and fire protection products.

These unaudited Combined Interim Financial Statements were derived from the consolidated financial statements and accounting records of Honeywell. These unaudited Combined Interim Financial Statements reflect the combined historical results of operations, financial position and cash flows of Homes as they were historically managed in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP").

The Combined Interim Financial Statements are unaudited; however, in the opinion of management, they contain all the adjustments (consisting of those of a normal recurring nature) considered necessary to state fairly the financial position, results of operations and cash flows for the periods presented in conformity with U.S. GAAP applicable to interim periods. The unaudited Combined Interim Financial Statements should be read in conjunction with the audited Combined Financial Statements of the Homes business included herein. The results of operations for the three and six months ended June 30, 2018 and the cash flows for the six months ended June 30, 2018 should not necessarily be taken as indicative of the entire year.

All intracompany transactions have been eliminated. As described in Note 3. Related Party Transactions with Honeywell, all significant transactions between the Business and Honeywell have been included in these unaudited Combined Interim Financial Statements and are expected to be settled for cash prior to the spin-off. These transactions which are expected to be settled for cash prior to the spin-off are reflected in the Combined Interim Balance Sheets as Due from related parties, current or Due to related parties, current. In the Combined Interim Statements of Cash Flows, the cash flows related to related party notes receivables presented in the Combined Interim Balance Sheets in Due from related parties, current are reflected as investing activities since these balances represent amounts loaned to Parent. The cash flows related to related party notes payables presented in the Combined Interim Balance Sheets in Due to related parties, current are reflected as financing activities since these balances represent amounts financed by Parent.

Honeywell uses a centralized approach to cash management and financing of its operations. The majority of the Business's cash is transferred to Honeywell daily and Honeywell funds the Business's operating and investing activities as needed. This arrangement is not reflective of the manner in which the Business would have been able to finance its operations had it been a stand-alone business separate from Honeywell during the periods presented. Cash transfers to and from Honeywell's cash management accounts are reflected in the Combined Interim Balance Sheet as Due to and Due from related parties, current and in the Combined Interim Statements of Cash Flows as net financing activities.

The unaudited Combined Interim Financial Statements include certain assets and liabilities that have historically been held at the Honeywell corporate level but are specifically identifiable or otherwise attributable to Homes. The cash and cash equivalents held by Honeywell at the corporate level are not specifically

Table of Contents



identifiable to Homes and therefore were not attributed for any of the periods presented. Honeywell third-party debt and the related interest expense have not been allocated for any of the periods presented as Honeywell's borrowings were not directly attributable to Homes.

Honeywell provides certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Business. The cost of these services has been allocated to the Business on the basis of the proportion of revenues. The Business and Honeywell consider these allocations to be a reasonable reflection of the benefits received by the Business. However, the financial information presented in these unaudited Combined Interim Financial Statements may not reflect the combined financial position, operating results and cash flows of the Business had the Business been a separate stand-alone entity during the periods presented. Actual costs that would have been incurred if the Business had been a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. We consider the basis on which the expenses have been allocated to be a reasonable reflection of the utilization of services provided to or the benefits received by the Business during the periods presented.

**Note 2. Recent Accounting Pronouncements**

The accounting policies of the Business are set forth in Note 2. Summary of Significant Accounting Policies to the Combined Financial Statements contained in the Business's Combined Financial Statements for the year ended December 31, 2017. We include herein certain updates to those policies.

***Sales Recognition***—Product and service sales are recognized when or as we transfer control of the promised products or services to our customer. Revenue is measured as the amount of consideration we expect to receive in exchange for transferring goods or providing services.

In the sale of products, the terms of a contract or the historical business practice can give rise to variable consideration due to, but not limited to, discounts and bonuses. We estimate variable consideration at the most likely amount we will receive from customers and reduce revenues recognized accordingly. We include estimated amounts in the transaction price to the extent it is probable that a significant reversal of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is resolved. Our estimates of variable consideration and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of our anticipated performance and all information (historical, current and forecasted) that is reasonably available to us.

***Recent Accounting Pronouncements***—We consider the applicability and impact of all recent accounting standards updates ("ASUs") issued by the Financial Accounting Standards Board (FASB). ASUs not listed below were assessed and determined to be either not applicable or are expected to have an immaterial impact on the combined financial position or results of operations.

In February 2016, the "FASB" issued guidance on accounting for leases which requires lessees to recognize most leases on their balance sheets for the rights and obligations created by those leases. The guidance requires enhanced disclosures regarding the amount, timing, and uncertainty of cash flows arising from leases that will be effective for interim and annual periods beginning after December 15, 2018, with early adoption permitted. We expect to adopt the requirements of the new standard effective January 1, 2019. The guidance requires the use of a modified retrospective approach. We are currently evaluating our lease portfolio to assess the impact to the unaudited Combined Interim Financial Statements as well as planning for adoption and implementation of this standard, which includes assessing the impact on information systems and internal controls.

Table of Contents



In August 2017, the FASB issued amendments to hedge accounting guidance. These amendments are intended to better align a company's risk management strategies and financial reporting for hedging relationships. Under the new guidance, more hedging strategies will be eligible for hedge accounting and the application of hedge accounting is simplified. In addition, the new guidance amends presentation and disclosure requirements. The guidance is effective for fiscal years beginning after December 15, 2018 with early adoption permitted, including the interim periods within those years. The guidance requires the use of a modified retrospective approach. We are currently evaluating the impact of the guidance on our unaudited Combined Interim Financial Statements and whether we will early adopt this guidance.

In February 2018, the FASB issued guidance that allows for an entity to elect to reclassify the income tax effects on items within accumulated other comprehensive income resulting from U.S. tax reform to retained earnings. The guidance is effective for fiscal years beginning after December 15, 2018 with early adoption permitted, including interim periods within those years. We are currently evaluating the impact of this standard on our unaudited Combined Interim Financial Statements and whether we will make the allowed election.

**Note 3. Related Party Transactions with Honeywell**

The unaudited Combined Interim Financial Statements have been prepared on a stand-alone basis and are derived from the consolidated financial statements and accounting records of Honeywell.

Honeywell provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Business. The cost of these services has been allocated to the Business on the basis of the proportion of revenues. The Business and Honeywell consider the allocations to be a reasonable reflection of the benefits received by the Business. During the three months ended June 30, 2018 and 2017, Homes was allocated $69 million and $67 million, respectively, of general corporate expenses incurred by Honeywell. During the six months ended June 30, 2018 and 2017, Homes was allocated $137 million and $137 million, respectively, of general corporate expenses incurred by Honeywell. Such amounts are included within Selling, general and administrative expenses in the Combined Interim Statements of Operations. As certain expenses reflected in the unaudited Combined Interim Financial Statements include allocations of corporate expenses from Honeywell, these statements could differ from those that would have been prepared had Homes operated on a stand-alone basis.

All significant intercompany transactions between the Business and Honeywell have been included in these unaudited Combined Interim Financial Statements and are considered to have been effectively settled or are expected to be settled for cash at the time the transaction is recorded. Sales to Honeywell during the three and six months ended June 30, 2018 were $8 million and $15 million, respectively. Costs of goods sold to Honeywell during the three and six months ended June 30, 2018 were $8 million and $13 million, respectively. Purchases from Honeywell during the three and six months ended June 30, 2018 were $66 million and $117 million, respectively.

Sales to Honeywell during the three and six months ended June 30, 2017 were $11 million and $19 million, respectively. Costs of goods sold to Honeywell during the three and six months ended June 30, 2017 were $8 million and $15 million, respectively. Purchases from Honeywell during the three and six months ended June 30, 2017 were $53 million and $105 million, respectively.

The total net effect of the settlement of these intercompany transactions is reflected in the Combined Interim Statements of Cash Flows as a financing activity and in the Combined Interim Balance Sheets as invested equity. Honeywell uses a centralized approach for the purpose of cash management and financing of its operations. The

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED INTERIM FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

Business's cash is transferred to Honeywell daily and Honeywell funds the Business's operating and investing activities as needed. The Company operates a centralized non-interest-bearing cash pool in the U.S. and regional interest-bearing cash pools outside of the U.S.

Honeywell centrally hedges its exposure to changes in foreign exchange rates principally with forward contracts. Certain contracts are specifically designated to and entered on behalf of the Business with the Parent as a counterparty and are used to hedge known or probable anticipated foreign currency sales and purchases. The Business designates these hedges as cash flow hedges. These hedges are marked-to-market with the effective portion of the changes in fair value of the derivatives recorded in Accumulated other comprehensive income (loss) and subsequently recognized in earnings when the hedged items impact earnings.

Due from related parties, current consists of the following:

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Cash pooling and short-term notes receivables | $ 14 | $ 10 |
| Related party notes receivables | — | 7 |
| Receivables from related parties | 6 | 6 |
| | $ 20 | $ 23 |

Due to related parties, current consists of the following:

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Cash pooling and short-term notes payable | $ 19 | $ 23 |
| Related party notes payables | 1 | 1 |
| Payables to related parties | 44 | 36 |
| | $ 64 | $ 60 |

Net transfers to and from Honeywell are included within invested equity on the Combined Interim Statements of Equity. The components of the net transfers to and from Honeywell for the three and six months ended June 30, 2018 and 2017 are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| General financing activities | $ (233) | $ (145) | $ (418) | $ (266) |
| Sales to Honeywell | (4) | (3) | (7) | (7) |
| Purchases from Honeywell | 52 | 42 | 92 | 82 |
| Unbilled corporate allocations | 85 | 67 | 137 | 137 |
| Stock compensation expense and other compensation awards | 3 | 3 | 7 | 8 |
| Unbilled pension expense | 4 | 4 | 7 | 8 |
| Net increase (decrease) in invested equity | $ (93) | $ (32) | $ (182) | $ (38) |

Table of Contents



**Note 4. Repositioning Charges**

A summary of repositioning charge follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Severance | $ — | $ 18 | $ 4 | $ 19 |
| Asset impairments | — | — | 1 | 1 |
| Reserve adjustments | — | — | — | (1) |
| Total net repositioning charge | $ — | $ 18 | $ 5 | $ 19 |

The following table summarizes the pretax distribution of total net repositioning charges by statement of operations classification:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Cost of goods sold | $ — | $ 12 | $ 4 | $ 14 |
| Selling, general and administrative expenses | — | 6 | 1 | 5 |
| | $ — | $ 18 | $ 5 | $ 19 |

All of the pretax impact of total net repositioning charges are related to the Products segment for the three and six months ending June 30, 2018, and June 30, 2017.

In the three and six months ended June 30, 2018, the Company recognized repositioning charges totaling $0 million and $5 million, respectively, mainly for severance costs related to separation activities.

In the three months and six months ended June 30, 2017, the Company recognized repositioning charges totaling $18 million and $19 million, respectively, for both severance costs and asset impairment costs. The severance costs were related to workforce reductions of 317 manufacturing and administrative positions and 402 manufacturing and administrative positions for the three and six months ended June 30, 2017, respectively. The workforce reductions were primarily related to cost saving actions taken in connection with our productivity and ongoing functional transformation initiatives; factory transitions to more cost-effective locations; and achieving acquisition related synergies.

Table of Contents



The following table summarizes the status of our total repositioning reserves:

| | Severance Costs | Asset Impairments | Total |
|---|---|---|---|
| Balance at December 31, 2017 | $ 22 | $ — | $ 22 |
| Charges | 4 | 1 | 5 |
| Usage—cash | (4) | — | (4) |
| Usage—noncash | — | (1) | (1) |
| Balance at March 31, 2018 | 22 | — | 22 |
| Charges | — | — | — |
| Usage—cash | (2) | — | (2) |
| Usage—noncash | — | — | — |
| Balance at June 30, 2018 | $ 20 | $ — | $ 20 |

Certain repositioning projects in each of our reportable operating segments included exit or disposal activities, the costs related to which will be recognized in future periods when the actual liability is incurred. The remaining exit and disposal costs relating to repositioning actions as of June 30, 2018 is expected to be $13 million.

**Note 5. Income Taxes**

The effective tax rate decreased for the three months ended June 30, 2018, as compared to the three months ended June 30, 2017, primarily due to internal restructuring of Resideo’s business in advance of its anticipated Spin-Off that resulted in an $18 million reduction in tax expense, increased tax benefits attributable to currency impacts for withholding taxes on undistributed foreign earnings, adjustments to the provisional tax amount related to the Tax Act and decreased income before taxes.

The effective tax rate decreased for the six months ended June 30, 2018, as compared to the six months ended June 30, 2017, primarily due to increased tax benefits attributable to internal restructuring of Resideo’s business in advance of its anticipated Spin-Off that resulted in an $18 million reduction in tax expense, currency impacts for withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to the Tax Act.

The effective tax rate for the quarter and six months ended June 30, 2018 was lower than the U.S. federal statutory rate of 21% primarily from tax benefits related to the internal restructuring of Resideo’s business in advance of its anticipated Spin-Off that resulted in an $18 million reduction in tax expense, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to the Tax Act.

The effective tax rate for the quarter and six months ended in June 30, 2017 was higher than the U.S. federal statutory rate of 35% as a result of non-deductible expenses.

On December 22, 2017, the U.S. government enacted the Tax Act, which included changes to the taxation of foreign earnings by implementing a dividend exemption system, expansion of the current anti-deferral rules, a minimum tax on low-taxed foreign earnings and new measures to deter base erosion. The Tax Act also included a permanent reduction in the corporate tax rate to 21%, repeal of the corporate alternative minimum tax, expensing

Table of Contents



of capital investment and limitation of the deduction for interest expense. Furthermore, as part of the transition to the new tax system, a one-time transition tax was imposed on a U.S. shareholder's historical undistributed earnings of foreign affiliates.

As described in our Combined Financial Statements for the year ended December 31, 2017, we reasonably estimated certain effects of the Tax Act and, therefore, recorded provisional amounts, including the deemed repatriation transition tax and withholding taxes on undistributed earnings. During the quarter, the Company recorded an adjustment to the provisional tax amount related to the deemed repatriation transition tax of $3 million. This adjustment results in a decrease to the effective tax rate for the six months ended June 30, 2018 of 3.6%. The Company has not finalized the accounting for the tax effects of the Tax Act as we are continuing to gather additional information and expect to complete our accounting within the prescribed measurement period.

On August 1, 2018, the Treasury department released proposed regulations regarding the deemed repatriation transition tax. The Company is evaluating the impact of the proposed regulations as part of its overall analysis of the impacts of the Tax Act pursuant to SAB 118.

**Note 6. Revenue Recognition and Contracts with Customers**

**Adoption**

On January 1, 2018, the Company adopted new guidance on revenue from contracts with customers using the modified retrospective method applied to contracts that were not completed as of January 1, 2018. As a result of adopting the new guidance, the Company determined there are no material impacts on the unaudited Combined Interim Financial Statements as the Company's previous revenue recognition was consistent with the new standard.

**Disaggregated Revenue**

Sales by channel are as follows:

| | Three Months Ended June 30, 2018 | Six Months Ended June 30, 2018 |
|---|---|---|
| U.S. and Canada | $ 546 | $ 1,054 |
| EMEA | 115 | 231 |
| India | 14 | 29 |
| Distribution | 675 | 1,314 |
| Comfort and Care | 396 | 808 |
| Safety and Security | 125 | 239 |
| Products | 521 | 1,047 |
| | $ 1,196 | $ 2,361 |

We recognize the majority of our revenue from performance obligations outlined in contracts with our customers that are satisfied at a point in time. Less than 3% of our revenue is satisfied over time.

**Contract Balances**

The timing of revenue recognition, billings and cash collections results in billed accounts receivable and unbilled receivables (contract assets), reported in Accounts, notes and other receivables—net, and customer

Table of Contents



advances and deposits (contract liabilities), reported in Accrued Liabilities, on the Combined Interim Balance Sheet. Contract assets arise when situations exist where the timing of cash collected from customers that differs from the timing of revenue recognition. Contract assets are recognized when the revenue associated with the contract is recognized prior to billing and derecognized once invoiced in accordance with the terms of the contract. Contract liabilities are recorded in scenarios where we enter into arrangements where customers are contractually obligated to remit cash payments in advance of us satisfying performance obligations and recognizing revenue. Contract liabilities are derecognized when revenue is recognized, a milestone is met triggering the contractual right to bill, or the performance obligation is satisfied.

These assets and liabilities are reported on the Combined Interim Balance Sheet on a contract-by-contract basis at the end of each reporting period.

The following table summarizes our contract assets and liabilities balances:

| | 2018 |
|---|---|
| Contract Assets—January 1 | $ 1 |
| Contract Assets—June 30 | 1 |
| Change in Contract Assets—increase/(decrease) | $— |
| Contract Liabilities—January 1 | $ 3 |
| Contract Liabilities—June 30 | 2 |
| Change in Contract Liabilities—increase/(decrease) | $ (1) |

The decrease in contract liabilities from January 1, 2018 to June 30, 2018 is primarily due to recognition of income from the beginning balance.

**Performance Obligations**

A performance obligation is a promise in a contract to transfer a distinct good or service to the customer, and is defined as the unit of account. A contract's transaction price is allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied. For product sales, typically each product sold to a customer represents a distinct performance obligation.

The majority of our performance obligations are satisfied as of a point in time. Performance obligations are supported by contracts with customers, providing a framework for the nature of the distinct goods, services or bundle of goods and services. The timing of satisfying the performance obligation is typically indicated by the terms of the contract. All performance obligations are expected to be satisfied within one year.

The timing of satisfaction of our performance obligations does not significantly vary from the typical timing of payment. For some contracts, we may be entitled to receive an advance payment.

We have applied the practical expedient to not disclose the value of remaining performance obligations for (i) contracts with an original expected term of one year or less or (ii) contracts for which we recognize revenue in proportion to the amount we have the right to invoice for services performed.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED INTERIM FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

**Note 7. Accounts, Notes and Other Receivables—Net**

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Accounts, notes and other receivables | $ 759 | $ 792 |
| Less–Allowance for doubtful accounts | (13) | (13) |
| | $ 746 | $ 779 |

**Note 8. Inventories**

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Raw materials | $ 101 | $ 108 |
| Work in process | 22 | 21 |
| Finished products | 400 | 336 |
| | $ 523 | $ 465 |

**Note 9. Accrued Liabilities**

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Environmental costs | $ 206 | $ 204 |
| Compensation, benefit and other employee related | 56 | 65 |
| Customer rebate reserve | 42 | 49 |
| Repositioning | 20 | 22 |
| Product warranties and performance guarantees | 16 | 17 |
| Customer advances and deferred income | 2 | 3 |
| Other (primarily operating expenses) | 53 | 49 |
| | $ 395 | $ 409 |

Table of Contents



**Note 10. Accumulated Other Comprehensive Income (Loss)**

**Changes in Accumulated Other Comprehensive Income (Loss) by Component**

| | Foreign Exchange Translation Adjustment | Changes in Fair Value of Effective Cash Flow Hedges | Total Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|
| Balance at December 31, 2016 | $ (170) | $ 1 | $ (169) |
| Other comprehensive income (loss) before reclassifications | 50 | (4) | 46 |
| Amounts reclassified from accumulated other comprehensive income (loss) | — | 2 | 2 |
| Net current period other comprehensive income (loss) | 50 | (2) | 48 |
| Balance at June 30, 2017 | $ (120) | $ (1) | $ (121) |
| Balance at December 31, 2017 | $ (100) | $ — | $ (100) |
| Other comprehensive income (loss) before reclassifications | (18) | (1) | (19) |
| Amounts reclassified from accumulated other comprehensive income | — | — | — |
| Net current period other comprehensive income (loss) | (18) | (1) | (19) |
| Balance at June 30, 2018 | $ (118) | $ (1) | $ (119) |

**Note 11. Commitments and Contingencies**

***Environmental Matters***

We are subject to various federal, state, local and foreign government requirements relating to the protection of the environment. We believe that, as a general matter, our policies, practices and procedures are properly designed to prevent unreasonable risk of environmental damage and personal injury and that our handling, manufacture, use and disposal of hazardous substances are in accordance with environmental and safety laws and regulations. We have incurred remedial response and voluntary cleanup costs for site contamination and are a party to lawsuits and claims associated with environmental and safety matters, including products containing hazardous substances. Additional lawsuits, claims and costs involving environmental matters are likely to continue to arise in the future.

With respect to environmental matters involving site contamination, we continually conduct studies, individually or jointly with other potentially responsible parties, to determine the feasibility of various remedial techniques. It is our policy to record appropriate liabilities for environmental matters when remedial efforts or damage claim payments are probable and the costs can be reasonably estimated. Such liabilities are based on our best estimate of the undiscounted future costs required to complete the remedial work. The recorded liabilities are adjusted periodically as remediation efforts progress or as additional technical, regulatory or legal information becomes available. Given the uncertainties regarding the status of laws, regulations, enforcement policies, the impact of other potentially responsible parties, technology and information related to individual sites, we do not believe it is possible to develop an estimate of the range of reasonably possible environmental loss in excess of our recorded liabilities. We expect to fund expenditures for these matters from operating cash flow. The timing of cash expenditures depends on a number of factors, including the timing of remedial investigations and feasibility studies, the timing of litigation and settlements of remediation liability, personal injury and property damage claims, regulatory approval of cleanup projects, remedial techniques to be utilized and agreements with other parties.

Table of Contents



We accrue costs related to environmental matters when it is probable that we have incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental-related expenses are presented within Cost of goods sold for operating sites and Other expense for non-operating sites in the Combined Interim Statements of Operations.

The following table summarizes information concerning our recorded liabilities for environmental costs:

| | |
|---|---|
| December 31, 2017 | $537 |
| Accruals for environmental matters deemed probable and reasonably estimable | 176 |
| Environmental liability remediated | (73) |
| June 30, 2018 | $640 |

Environmental liabilities are included in the following balance sheet accounts:

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Accrued liabilities | $ 206 | $ 204 |
| Other liabilities | 434 | 333 |
| | $ 640 | $ 537 |

We do not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our combined results of operations and operating cash flows in the periods recognized or paid.

***Other Matters***

We are subject to other lawsuits, investigations and disputes arising out of the conduct of our business, including matters relating to commercial transactions, government contracts, product liability, prior acquisitions and divestitures, employee benefit plans, intellectual property, and environmental, health and safety matters. We recognize a liability for any contingency that is probable of occurrence and reasonably estimable. We continually assess the likelihood of adverse judgments of outcomes in these matters, as well as potential ranges of possible losses (taking into consideration any insurance recoveries), based on a careful analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts. To date, no such matters are material to the Combined Interim Statements of Operations.

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED INTERIM FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

***Warranties and Guarantees***

In the normal course of business we issue product warranties and product performance guarantees. We accrue for the estimated cost of product warranties and performance guarantees based on contract terms and historical experience at the time of sale. Adjustments to initial obligations for warranties and guarantees are made as changes to the obligations become reasonably estimable. Products warranties and product performance guarantees are included in Accrued liabilities. The following table summarizes information concerning our recorded obligations for product warranties and product performance guarantees.

| | |
|---|---|
| December 31, 2017 | $17 |
| Accruals for warranties/guarantees issued during the year | 6 |
| Adjustment of pre-existing warranties/guarantees | (1) |
| Settlement of warranty/guarantee claims | (6) |
| June 30, 2018 | $16 |

**Note 12. Segment Financial Data**

We globally manage our business operations through two reportable operating segments, Products and Distribution:

**Products**—Our Products business is a leading global provider of residential security and intrusion products, consumer thermostats, consumer HVAC and consumer awareness systems, residential thermal solutions and residential water controls that allow owners of homes to stay connected and in control of their comfort, security and energy use.

**Distribution**—Our Distribution business is a leading global distributor of security and low voltage fire protection products.

Segment information is consistent with how management reviews the businesses, makes investing and resource allocation decisions and assesses operating performance. Homes' CODM evaluates segment performance based on segment profit. Segment profit is measured as segment income (loss) before taxes excluding, pension expense, repositioning and other charges, other expense, and interest and other charges, net.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Sales | | | | |
| Total products sales | $ 598 | $ 563 | $1,200 | $1,116 |
| Less: intersegment sales | 80 | 84 | 159 | 174 |
| External product sales | 518 | 479 | 1,041 | 942 |
| External distribution sales | 678 | 617 | 1,320 | 1,216 |
| Total Sales | $ 1,196 | $ 1,096 | $2,361 | $2,158 |

Table of Contents

**HOMES BUSINESS OF HONEYWELL INTERNATIONAL INC.**
**NOTES TO COMBINED INTERIM FINANCIAL STATEMENTS (Continued)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Segment profit | | | | |
| Products | $ 96 | $ 79 | $ 198 | $ 149 |
| Distribution | 37 | 33 | 74 | 64 |
| Total | $ 133 | $ 112 | $ 272 | $ 213 |

A reconciliation of segment profit to combined income (loss) from continuing operations before taxes are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Segments profit | $ 133 | $ 112 | $ 272 | $ 213 |
| Pension expense | (4) | (4) | (7) | (8) |
| Repositioning | — | (18) | (5) | (19) |
| Other expense | (123) | (51) | (176) | (100) |
| Interest and other charges, net | (1) | — | — | — |
| Income before taxes | $ 5 | $ 39 | $ 84 | $ 86 |

**Note 13. Subsequent Events**

The Business evaluated subsequent events for recognition or disclosure through August 16, 2018, the date the Unaudited Combined Interim Financial Statements were available to be issued. No significant subsequent events were noted.

Table of Contents



resideo

# Resideo Technologies, Inc.

(Back To Top)