# EXHIBIT DD

Toggle SGML Header (+)

## Section 1: 10-Q (10-Q)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2019**

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number 001-38635**

# Resideo Technologies, Inc.

**(Exact name of registrant as specified in its charter)**

| Delaware | 82-5318796 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **901 E 6th Street** **Austin, Texas** | **78702** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(763) 954-5204**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class: | Trading Symbol: | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, par value $0.001 per share | REZI | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
|---|---|---|---|---|
| Non-accelerated filer | ☒ | | Smaller reporting company | ☐ |
| | | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of shares outstanding of the Registrant's common stock, par value $0.001 per share as of August 1st, 2019 was 122,779,163 shares.

**TABLE OF CONTENTS**

| | Item | | Page |
|---|---|---|---|
| **Part I.** | | **Item 1. Financial Statements** | 5 |
| | **1.** | **Financial Statements** | 5 |
| | | **Consolidated and Combined Interim Statement of Operations (unaudited) – Three and Six Months Ended June 30, 2019 and 2018** | 5 |
| | | **Consolidated and Combined Interim Statement of Comprehensive (Loss) Income (unaudited) – Three and Six Months Ended June 30, 2019 and 2018** | 6 |
| | | **Consolidated Interim Balance Sheet (unaudited) – June 30, 2019 and December 31, 2018** | 7 |
| | | **Consolidated and Combined Interim Statement of Cash Flows (unaudited) – Six Months Ended June 30, 2019 and 2018** | 8 |
| | | **Consolidated and Combined Interim Statement of Equity (unaudited) – Three and Six Months Ended June 30, 2019 and 2018** | 9 |
| | | **Notes to the Consolidated and Combined Interim Financial Statements (unaudited)** | 10 |
| | **2.** | **Management's Discussion and Analysis of Financial Condition and Results of Operations** | 28 |
| | **3.** | **Quantitative and Qualitative Disclosures About Market Risk** | 39 |
| | **4.** | **Controls and Procedures** | 40 |
| **Part II.** | **1.** | **Legal Proceedings** | 41 |
| | **1A.** | **Risk Factors** | 41 |
| | **5.** | **Other Information** | 41 |
| | **6.** | **Exhibits** | 42 |
| | | **Signatures** | 43 |

**RESIDEO TECHNOLOGIES, INC.**

Cautionary Statement about Forward-Looking Statements

This Quarterly Report on Form 10-Q (this "Form 10-Q") contains "forward-looking statements" that involve risks and uncertainties. These statements can be identified by the fact that they do not relate strictly to historical or current facts, but rather are based on current expectations, estimates, assumptions and projections about our industries and our business and financial results. Forward-looking statements often include words such as "anticipates," "estimates," "expects," "projects," "forecasts," "intends," "plans," "continues," "believes," "may," "will," "goals" and words and terms of similar substance in connection with discussions of future operating or financial performance. As with any projection or forecast, forward-looking statements are inherently susceptible to uncertainty and changes in circumstances. Our actual results may vary materially from those expressed or implied in our forward-looking statements. Accordingly, undue reliance should not be placed on any forward-looking statement made by us or on our behalf. Although we believe that the forward-looking statements contained in this Form 10-Q are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in such forward-looking statements, including but not limited to:

- lack of operating history as an independent publicly traded company and unreliability of historical combined financial information as an indicator of our future results;
- the level of competition from other companies;
- ability to successfully develop new technologies and introduce new products;
- changes in prevailing global and regional economic conditions;
- natural disasters or inclement or hazardous weather conditions, including, but not limited to cold weather, flooding, tornadoes and the physical impacts of climate change;
- failure to achieve and maintain a high level of product and service quality;
- ability to operate as an independent publicly traded company without certain benefits available to us as a part of Honeywell;
- dependence upon investment in information technology;
- failure or inability to comply with relevant data privacy legislation or regulations, including the European Union's General Data Protection Regulation;
- technical difficulties or failures;
- work stoppages, other disruptions, or the need to relocate any of our facilities;
- economic, political, regulatory, foreign exchange and other risks of international operations, including the impact of tariffs and the recently negotiated USMCA, which, when legislatively approved by each of the US, Mexico and Canada, will serve to replace NAFTA;
- changes in legislation or government regulations or policies;
- our growth strategy is dependent on expanding our distribution business;
- inability to obtain necessary production equipment or replacement parts;
- the significant failure or inability to comply with the specifications and manufacturing requirements of our original equipment manufacturers ("OEMs") customers;
- increases or decreases to the inventory levels maintained by our customers;
- difficulty collecting receivables;
- the failure to protect our intellectual property or allegations that we have infringed the intellectual property of others;
- our inability to maintain intellectual property agreements;
- the failure to increase productivity through sustainable operational improvements;
- inability to grow successfully through future acquisitions;
- inability to recruit and retain qualified personnel;
- the operational constraints and financial distress of third parties;
- changes in the price and availability of raw materials that we use to produce our products;
- labor disputes;
- our ability to borrow funds and access capital markets;
- the amount of our obligations pursuant to the Honeywell Reimbursement Agreement;
- potential material environmental liabilities;

3

**RESIDEO TECHNOLOGIES, INC.**

- potential material losses and costs as a result of warranty claims, including product recalls, and product liability actions that may be brought against us;
- potential material litigation matters;
- unforeseen U.S. federal income tax and foreign tax liabilities;
- U.S. federal income tax reform;
- the inception or suspension in the future of any dividend program; and
- certain factors discussed elsewhere in this Form 10-Q.

These and other factors are more fully discussed in the "Risk Factors" section in our 2018 Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Annual Report on Form 10-K") and "Management's Discussion and Analysis of Financial Condition and Results of Operations" section in this Form 10-Q. There have been no material changes to the risk factors described in our 2018 Annual Report on Form 10-K. These risks could cause actual results to differ materially from those implied by forward-looking statements in this Form 10-Q. Even if our results of operations, financial condition and liquidity and the development of the industry in which we operate are consistent with the forward-looking statements contained in this Form 10-Q, those results or developments may not be indicative of results or developments in subsequent periods.

Any forward-looking statements made by us in this Form 10-Q speak only as of the date on which they are made. We are under no obligation to, and expressly disclaim any obligation to, update or alter our forward-looking statements, whether as a result of new information, subsequent events or otherwise.

**PART I**

The financial statements and related footnotes as of June 30, 2019 should be read in conjunction with the financial statements for the year ended December 31, 2018 contained in our 2018 Annual Report on Form 10-K.

4

**RESIDEO TECHNOLOGIES, INC.**

**Item 1.**          **Financial Statements**

**CONSOLIDATED AND COMBINED INTERIM STATEMENT OF OPERATIONS**
**(Dollars in millions except share and per share data)**
**(Unaudited)**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2019** | | **2018** | |
| Net revenue | $ | 1,242 | $ | 1,196 | $ | 2,458 | $ | 2,361 |
| Cost of goods sold | | 946 | | 850 | | 1,849 | | 1,672 |
| Gross profit | | 296 | | 346 | | 609 | | 689 |
| Selling, general and administrative expenses | | 254 | | 217 | | 482 | | 429 |
| Operating profit | | 42 | | 129 | | 127 | | 260 |
| Other expense, net | | 35 | | 124 | | 19 | | 176 |
| Interest expense | | 18 | | - | | 35 | | - |
| (Loss) income before taxes | | (11) | | 5 | | 73 | | 84 |
| Tax expense (benefit) | | - | | (28) | | 36 | | 6 |
| Net (loss) income | $ | (11) | $ | 33 | $ | 37 | $ | 78 |
| **Weighted Average Number of Common Shares Outstanding (in thousands)** | | | | | | | | |
| Basic | | 122,700 | | 122,499 | | 122,635 | | 122,499 |
| Diluted | | 122,700 | | 122,499 | | 123,490 | | 122,499 |
| **(Loss) Earnings Per Share** | | | | | | | | |
| Basic | $ | (0.09) | $ | 0.27 | $ | 0.30 | $ | 0.64 |
| Diluted | $ | (0.09) | $ | 0.27 | $ | 0.30 | $ | 0.64 |

The Notes to unaudited Consolidated and Combined Interim Financial Statements are an integral part of this statement.

5

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED**
**INTERIM STATEMENT OF COMPREHENSIVE (LOSS) INCOME**
**(Dollars in millions)**
**(Unaudited)**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2019** | | **2018** | | **2019** | | **2018** | |
| Net (loss) income | $ | (11) | $ | 33 | $ | 37 | $ | 78 |
| Other comprehensive (loss) income, net of tax | | | | | | | | |
| Foreign exchange translation adjustment | | (4) | | (49) | | 2 | | (18) |
| Changes in fair value of effective cash flow hedges | | - | | - | | - | | (1) |
| Total other comprehensive (loss) income, net of tax | | (4) | | (49) | | 2 | | (19) |
| Comprehensive (loss) income | $ | (15) | $ | (16) | $ | 39 | $ | 59 |

The Notes to unaudited Consolidated and Combined Interim Financial Statements are an integral part of this statement.

6

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED INTERIM BALANCE SHEET**
**(Dollars in millions, shares in thousands)**
**(Unaudited)**

| | June 30, 2019 | | December 31, 2018 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 142 | $ | 265 |
| Accounts receivable | 835 | | 821 |
| Inventories | 722 | | 628 |
| Other current assets | 147 | | 95 |
| Total current assets | 1,846 | | 1,809 |
| Property, plant and equipment – net | 304 | | 300 |
| Goodwill | 2,650 | | 2,634 |
| Other intangible assets – net | 127 | | 133 |
| Other assets | 233 | | 96 |
| Total assets | $ 5,160 | $ | 4,972 |
| **LIABILITIES** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 1,009 | $ | 964 |
| Current maturities of long-term debt | 22 | | 22 |
| Accrued liabilities | 528 | | 503 |
| Total current liabilities | 1,559 | | 1,489 |
| Long-term debt | 1,169 | | 1,179 |
| Obligations payable to Honeywell | 581 | | 629 |
| Other liabilities | 258 | | 142 |
| **COMMITMENTS AND CONTINGENCIES (Note 15)** | | | |
| **EQUITY** | | | |
| Common stock, $0.001 par value, 700,000 shares authorized, 123,268 and 122,967 shares issued and 122,710 and 122,499 shares outstanding as of June 30, 2019 and December 31, 2018, respectively | - | | - |
| Additional paid-in capital | 1,743 | | 1,720 |
| Treasury stock, at cost | (2) | | - |
| Retained earnings | 39 | | 2 |
| Accumulated other comprehensive loss | (187) | | (189) |
| Total equity | 1,593 | | 1,533 |
| Total liabilities and equity | $ 5,160 | $ | 4,972 |

The Notes to unaudited Consolidated and Combined Interim Financial Statements are an integral part of this statement.

7

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED INTERIM STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Cash flows (used for) provided by operating activities:** | | |
| Net income | $ 37 | $ 78 |
| Adjustments to reconcile net income to net cash (used for) provided by operating activities: | | |
| Depreciation and amortization | 36 | 33 |
| Repositioning charges, net of payments | 14 | (1) |
| Stock compensation expense | 14 | 9 |
| Other noncash expense (income) | 6 | (12) |
| Changes in assets and liabilities: | | |
| Accounts, notes and other receivables | (7) | 21 |
| Inventories | (95) | (63) |
| Other current assets | (8) | (6) |
| Other assets | (8) | 6 |
| Accounts payable | 25 | 106 |
| Accrued liabilities | (17) | (10) |
| Obligations payable to Honeywell | (48) | - |
| Other liabilities | 14 | 97 |
| Net cash (used for) provided by operating activities | (37) | 258 |
| **Cash flows used for investing activities:** | | |
| Expenditures for property, plant, equipment and software | (38) | (24) |
| Cash paid for acquisitions, net of cash acquired | (17) | - |
| Proceeds received related to amounts due from related parties | - | 7 |
| Net cash used for investing activities | (55) | (17) |
| **Cash flows used for financing activities:** | | |
| Repayment of long-term debt | (11) | - |
| Non-operating obligations paid to Honeywell, net | (18) | - |
| Tax payments related to stock vestings | (2) | - |
| Net decrease in invested equity | - | (193) |
| Cashflow used by cash pooling | - | (8) |
| Net cash used for financing activities | (31) | (201) |
| Effect of foreign exchange rate changes on cash and cash equivalents | - | (3) |
| Net (decrease) increase in cash and cash equivalents | (123) | 37 |
| Cash and cash equivalents at beginning of period | 265 | 56 |
| Cash and cash equivalents at end of period | $ 142 | $ 93 |

The Notes to unaudited Consolidated and Combined Interim Financial Statements are an integral part of this statement.

8

**RESIDEO TECHNOLOGIES, INC.**

**CONSOLIDATED AND COMBINED INTERIM STATEMENT OF EQUITY**
**(Dollars in millions, shares in thousands)**
**(Unaudited)**

| | Common Shares | Treasury Shares | Common Stock | Treasury Stock | Additional Paid-In Capital | Retained Earnings | Invested Equity | Accumulated Other Comprehensive Loss | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2017 | - | - | $ - | $ - | $ - | $ - | $ 2,703 | $ (100) | $ 2,603 |
| Net income | - | - | - | - | - | - | 45 | - | 45 |
| Other comprehensive income, net of tax | - | - | - | - | - | - | - | 30 | 30 |
| Change in invested equity | - | - | - | - | - | - | (89) | - | (89) |
| Balance at March 31, 2018 | - | - | $ - | $ - | $ - | $ - | $ 2,659 | $ (70) | $ 2,589 |
| Net income | - | - | - | - | - | - | 33 | - | 33 |
| Other comprehensive loss, net of tax | - | - | - | - | - | - | - | (49) | (49) |
| Change in invested equity | - | - | - | - | - | - | (93) | - | (93) |
| Balance at June 30, 2018 | - | - | $ - | $ - | $ - | $ - | $ 2,599 | $ (119) | $ 2,480 |
| | | | | | | | | | |
| Balance at December 31, 2018 | 122,499 | 468 | $ - | $ - | $ 1,720 | $ 2 | $ - | $ (189) | $ 1,533 |
| Net income | - | - | - | - | - | 48 | - | - | 48 |
| Other comprehensive income, net of tax | - | - | - | - | - | - | - | 6 | 6 |
| Shares issued for employee stock plans | 271 | - | - | - | - | - | - | - | - |
| Stock-based compensation | - | - | - | - | 7 | - | - | - | 7 |
| Shares withheld for employees' taxes | (84) | 84 | - | (2) | - | - | - | - | (2) |
| Balance at March 31, 2019 | 122,686 | 552 | $ - | $ (2) | $ 1,727 | $ 50 | $ - | $ (183) | $ 1,592 |
| Net loss | - | - | - | - | - | (11) | - | - | (11) |
| Other comprehensive loss, net of tax | - | - | - | - | - | - | - | (4) | (4) |
| Shares issued for employee stock plans | 30 | - | - | - | - | - | - | - | - |
| Stock-based compensation | - | - | - | - | 7 | - | - | - | 7 |
| Shares withheld for employees' taxes | (6) | 6 | - | - | - | - | - | - | - |
| Adjustments due to Spin-Off | - | - | - | - | 9 | - | - | - | 9 |
| Balance at June 30, 2019 | 122,710 | 558 | $ - | $ (2) | $ 1,743 | $ 39 | $ - | $ (187) | $ 1,593 |

The Notes to unaudited Consolidated and Combined Interim Financial Statements are an integral part of this statement.

9

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

**Note 1. Organization, Operations and Basis of Presentation**

*Business Description*

      Resideo Technologies, Inc. ("Resideo" or "the Company"), is a global provider of products, software, solutions and technologies that help homeowners stay connected and in control of their comfort, security and energy use. The Company is a leader in the home heating, ventilation and air conditioning controls and security markets, and a leading global distributor of low-voltage electronic and security products.

*Separation from Honeywell*

      The Company was incorporated in Delaware on April 24, 2018. The Company separated from Honeywell International Inc. ("Honeywell") on October 29, 2018, becoming an independent publicly traded company as a result of a pro rata distribution of the Company's common stock to shareholders of Honeywell (the "Spin-Off"). On October 3, 2018, Exhibit 99.1 to Amendment No. 2 to the Company's Registration Statement on Form 10 as filed with the Securities and Exchange Commission ("SEC") on October 2, 2018 was declared effective by the SEC. On October 29, 2018, Honeywell's shareholders of record as of October 16, 2018 ("Record Date") received one share of the Company's common stock, par value $0.001 per share, for every six shares of Honeywell's common stock, par value $1.00 per share, held as of the Record Date, and cash for any fractional shares of the Company's common stock. The Company began trading "regular way" under the ticker symbol "REZI" on the New York Stock Exchange on October 29, 2018.

      In connection with the separation, Resideo and Honeywell entered into a Separation and Distribution Agreement, an Employee Matters Agreement, a Tax Matters Agreement, a Transition Services Agreement, a Trademark License Agreement and a Patent Cross-License Agreement. The agreements govern the relationship between Resideo and Honeywell following the separation and provide for the allocation of various assets, liabilities, rights and obligations. These agreements also include arrangements for transition services to be provided by Honeywell to Resideo and by Resideo to Honeywell.

*Basis of Presentation*

      Prior to the Spin-Off on October 29, 2018, the Company's historical financial statements were prepared on a stand-alone combined basis and were derived from the consolidated financial statements and accounting records of Honeywell. Accordingly, for periods prior to October 29, 2018, these financial statements are presented on a combined basis and for the periods subsequent to October 29, 2018 are presented on a consolidated basis (collectively, the historical financial statements for all periods presented are referred to as "Consolidated and Combined Interim Financial Statements"). The Consolidated and Combined Interim Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The Consolidated and Combined Interim Financial Statements are unaudited; however, in the opinion of management, they contain all the adjustments (consisting of those of a normal recurring nature) considered necessary to state fairly the financial position, results of operations and cash flows for the periods presented in conformity with U.S. GAAP applicable to interim periods.

      All intercompany transactions have been eliminated for all periods presented. As described in "Note 5. Related Party Transactions with Honeywell" of Notes to unaudited Consolidated and Combined Interim Financial Statements of this Form 10-Q, all significant transactions between the Company and Honeywell occurring prior to the Spin-Off have been included in the unaudited Combined Interim Financial Statements for the period ended June 30, 2018.

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

Prior to the Spin-Off, transactions between the Company and Honeywell were reflected in the Combined Balance Sheet as Due from related parties, current or Due to related parties, current. In the unaudited Combined Interim Statement of Cash Flows, the cash flows related to related party notes receivables presented in the Combined Balance Sheet in Due from related parties, current are reflected as investing activities since these balances represent amounts loaned to Honeywell. The cash flows related to related party notes payables presented in the Combined Balance Sheet in Due to related parties, current are reflected as financing activities since these balances represent amounts financed by Honeywell.

While the Company was owned by Honeywell, a centralized approach to cash management and financing was used. Prior to the consummation of the Spin-Off, the majority of the Company's cash was transferred to Honeywell daily and Honeywell funded the Company's operating and investing activities as needed. Cash transfers to and from Honeywell's cash management accounts are reflected in the Combined Balance Sheet as Due to and Due from related parties, current and in the unaudited Combined Interim Statement of Cash Flows as net financing activities.

The unaudited Combined Interim Financial Statements prior to the Spin-Off include certain assets and liabilities that have historically been held at the Honeywell corporate level but were specifically identifiable or otherwise attributable to the Company. The cash and cash equivalents held by Honeywell at the corporate level were not specifically identifiable to the Company and therefore were not attributed for any of the periods presented. Honeywell third-party debt and the related interest expense were not allocated for any of the periods presented as Honeywell's borrowings were not directly attributable to the Company. In periods subsequent to the Spin-Off, we may have made and may continue to make adjustments to balances transferred at the Spin-Off, including adjustments to the classification of assets or liabilities transferred. Any such adjustments are recorded directly to equity in Adjustments due to Spin-off and are considered immaterial.

Prior to the Spin-Off, Honeywell provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Company. The cost of these services has been allocated to the Company on the basis of the proportion of net revenue. The Company and Honeywell consider these allocations to be a reasonable reflection of the benefits received by the Company. However, the financial information presented in these unaudited Consolidated and Combined Interim Financial Statements may not reflect the consolidated and combined financial position, operating results and cash flows of the Company had the Company been a separate stand-alone entity during the periods presented. Actual costs that would have been incurred if the Company had been a stand-alone company would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Both Resideo and Honeywell consider the basis on which the expenses have been allocated to be a reasonable reflection of the utilization of services provided to or the benefits received by the Company during the periods presented. After the Spin-Off, a number of the above services have continued under a Transition Services Agreement with Honeywell, which the Company expenses as incurred based on the contractual pricing terms.

The Company reports its quarterly financial information using a calendar convention; the first, second and third quarters are consistently reported as ending on March 31, June 30 and September 30. It is the Company's practice to establish actual quarterly closing dates using a predetermined fiscal calendar, which requires its businesses to close their books on the last Saturday of the month in order to minimize the potentially disruptive effects of quarterly closing on business processes. The effects of this practice are generally not significant to reported results for any quarter and only exist within a reporting year. In the event that differences in actual closing dates are material to year-over-year comparisons of quarterly or year-to-date results, the Company will provide appropriate disclosures. Actual closing dates for the three and six months ended June 30, 2019 and 2018 were June 29, 2019 and June 30, 2018, respectively.

11

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

**Note 2. Summary of Significant Accounting Policies**

The Company's accounting policies are set forth in "Note 2. Summary of Significant Accounting Policies" of the Company's Notes to Consolidated and Combined Financial Statements included in the 2018 Annual Report on Form 10-K. Included herein are certain updates to those policies.

*Leases*—Effective January 1, 2019, arrangements containing leases are evaluated as an operating or finance lease at lease inception. For operating leases, the Company recognizes an operating right-of-use asset and operating lease liability at lease commencement based on the present value of lease payments over the lease term.

Since an implicit rate of return is not readily determinable for the Company's leases, an incremental borrowing rate is used in determining the present value of lease payments, and is calculated based on information available at the lease commencement date. Most leases include renewal options; however, generally it is not reasonably certain that these options will be exercised at lease commencement. Lease expense is recognized on a straight-line basis over the lease term. Leases with an initial term of 12 months or less are not recognized on the Company's balance sheet. The Company does not separate lease and non-lease components for its real estate and automobile leases

*Recent Accounting Pronouncements*—The Company considers the applicability and impact of all recent accounting standards updates ("ASUs") issued by the Financial Accounting Standards Board ("FASB"). ASUs not listed below were assessed and determined to be either not applicable or are expected to have an immaterial impact on the consolidated and combined financial position or results of operations.

The Company adopted ASU No. 2016-02, Leases (Topic 842), effective January 1, 2019, and applied the changes prospectively, recognizing a cumulative-effect adjustment to the beginning balance of retained earnings as of the adoption date. As permitted by the new guidance, the Company elected the package of practical expedients, which among other things, allowed historical lease classification to be carried forward.

Upon adoption of ASU No. 2016-02, the Company recognized an aggregate lease liability of $115 million, calculated based on the present value of the remaining minimum lease payments for qualifying leases as of January 1, 2019, with a corresponding right-of-use asset of $112 million. The cumulative-effect adjustment recognized to opening retained earnings was not material. The adoption of the new guidance did not impact the Company's unaudited consolidated interim statement of operations or cash flows.

In February 2018, the FASB issued guidance that allows for an entity to elect to reclassify the income tax effects on items within accumulated other comprehensive income resulting from the U.S. Tax Cuts and Jobs Act ("U.S. Tax Reform") to retained earnings. The guidance is effective for fiscal years beginning after December 15, 2018 with early adoption permitted, including interim periods within those years. The Company adopted the standard on January 1, 2019 and has not reclassified the income tax effects of U.S. Tax Reform from accumulated other comprehensive income to retained earnings. The Company has adopted the aggregate portfolio accounting policy for recognizing the disproportionate income tax effects in accumulated other comprehensive income.

On June 16, 2016, the FASB issued ASU 2016-13, Financial Instruments - Credit Losses (Topic 326), which provides guidance designed to provide financial statement users with more information about the expected credit losses on financial instruments and other commitments to extend credit held by a reporting entity at each reporting date. From November 2018 to April 2019, amendments to Topic 326 were issued to clarify numerous accounting topics. When determining such expected credit losses, the guidance requires companies to apply a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. The amendment is effective on a modified retrospective basis for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted for fiscal years and interim periods beginning after December 15, 2018. The Company is currently assessing the impact this pronouncement may have on our trade receivables and notes receivables.

12

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

In August 2018, the FASB issued guidance which amends the current disclosure requirements regarding defined benefit pensions and other post retirement plans and allows for the removal of certain disclosures, while adding certain new disclosure requirements. This standard is effective for fiscal years beginning after December 15, 2020 and allows for early adoption. The Company does not expect this new standard to have a significant impact to its disclosures.

**Note 3. (Loss) Earnings Per Share**

On October 29, 2018, the date of consummation of the Spin-Off, 122,498,794 shares of the Company's Common Stock, par value $0.001 per share, were distributed to Honeywell shareholders of record as of October 16, 2018. This share amount is being utilized for the calculation of basic and diluted earnings per share for all periods presented prior to the Spin-Off as no common stock was outstanding prior to the date of the Spin-Off. For the 2018 year to date calculation, these shares are treated as issued and outstanding from January 1, 2018 for purposes of calculating historical basic earnings per share. For June 30, 2019 and June 30, 2018, this calculation excludes 557,585 and 467,764 of treasury shares, respectively.

The details of the (loss) earnings per share calculations for the three and six months ended June 30, 2019 and 2018 are as follows:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| **Basic:** | **2019** | | **2018** | | **2019** | | **2018** | |
| Net (loss) income | $ | (11) | $ | 33 | $ | 37 | $ | 78 |
| Weighted average common shares outstanding (in thousands) | | 122,700 | | 122,499 | | 122,635 | | 122,499 |
| (Loss) earnings per share - Basic | $ | (0.09) | $ | 0.27 | $ | 0.30 | $ | 0.64 |

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| **Diluted:** | **2019** | | **2018** | | **2019** | | **2018** | |
| Net (loss) income | $ | (11) | $ | 33 | $ | 37 | $ | 78 |
| Weighted average common shares outstanding - Basic (in thousands) | | 122,700 | | 122,499 | | 122,635 | | 122,499 |
| Dilutive effect of unvested RSUs | | - | | - | | 855 | | - |
| Weighted average common shares outstanding - Diluted (in thousands) | | 122,700 | | 122,499 | | 123,490 | | 122,499 |
| (Loss) earnings per share - Diluted | $ | (0.09) | $ | 0.27 | $ | 0.30 | $ | 0.64 |

Diluted (loss) earnings per share is computed based upon the weighted average number of common shares outstanding for the period plus the dilutive effect of common stock equivalents using the treasury stock method and the average market price of our common stock for the three and six months ended June 30, 2019. In periods where the Company has a net loss, no dilutive common shares are included in the calculation for diluted shares as they are considered anti-dilutive. For the six months ended June 30, 2019, average options and other rights to purchase approximately 1.4 million shares of common stock were outstanding, all of which were anti-dilutive during the six months ended June 30, 2019, and therefore excluded from the computation of diluted earnings per common share. Additionally, an average of approximately 0.2 million shares of performance based unit awards are excluded from the computation of diluted earnings per common share for the six months ended June 30, 2019 as the contingency has not been satisfied at June 30, 2019.

13

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

**Note 4. Acquisitions**

On March 28, 2019 the Company acquired all of the capital stock of Buoy Labs, for $6 million, which has been integrated into our Products & Solutions segment. Buoy Labs provides innovative Wi-Fi enabled solutions that tracks the amount of water used in a home, integrating smart software and hardware that can help consumers identify potential leaks and allow consumers to act to prevent them through its subscription-based app services. In connection with the acquisition, the Company recognized preliminary goodwill and intangible assets of $6 million. The acquisition agreement includes deferred payments for certain individuals that are contingent upon employment as well as financial performance. The Company determined that these deferred payments are accounted for as compensation expense over the requisite service period. The Company is still assessing the final allocation of the purchase price to the assets and liabilities of the business.

On May 21, 2019 the Company acquired certain assets relating to innovative energy efficiency from Whisker Labs, for $5 million, which has been integrated into our Products & Solutions segment. The acquired technology creates a thermodynamic model of a home to accurately predict home heating and air conditioning run time and energy use to enable a homeowner to use less energy while maintaining comfort. In connection with the acquisition, the Company recognized preliminary goodwill and intangible assets of $5 million. The Company is still assessing the final allocation of the purchase price to the assets and liabilities of the business.

On June 27, 2019 the Company acquired all of the membership interests of LifeWhere for $6 million, which has been integrated into our Products & Solutions segment. LifeWhere uses machine learning and analytics to predict potential failure on critical home appliances, such as water heaters, furnaces and air conditioners. This service provides the detailed analytics required for professional contractors to dispatch technicians with the right skills to quickly repair the appliance before it causes a catastrophic failure. In connection with the acquisition, the Company recognized preliminary goodwill and intangible assets of $6 million. The Company is still assessing the final allocation of the purchase price to the assets and liabilities of the business.

These acquisitions have an immaterial financial statement impact on both an individual basis and when considered in the aggregate.

**Note 5. Related Party Transactions with Honeywell**

Prior to the Spin-Off, the unaudited Combined Interim Financial Statements were derived from the unaudited Consolidated Interim Financial Statements and accounting records of Honeywell. Prior to the Spin-Off, Honeywell was a related party that provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of the Company. The costs of these services were allocated to the Company on the basis of the proportion of net revenue. The Company and Honeywell consider the allocations to be a reasonable reflection of the benefits received by the Company.

During the three and six months ended June 30, 2018, the Company was allocated $69 million and $137 million, respectively, of general corporate expenses incurred by Honeywell and such amounts are included within Selling, general and administrative expenses in the unaudited Combined Interim Statement of Operations for the six months ended June 30, 2018 As certain expenses reflected in the unaudited Combined Interim Financial Statements include allocations of corporate expenses from Honeywell, these statements could differ from those that would have been prepared had the Company operated on a stand-alone basis.

14

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

All significant intercompany transactions between the Company and Honeywell have been included in these unaudited Combined Interim Financial Statements. Sales to Honeywell during the three and six months ended June 30, 2018 were $8 million and $15 million, respectively. Costs of goods sold to Honeywell during the three and six months ended June 30, 2018 were $8 million and $13 million, respectively. Purchases from Honeywell during the three and six months ended June 30, 2018 were $66 million and $117 million, respectively. The total net effect of the settlement of these intercompany transactions is reflected in unaudited Combined Interim Statement of Cash Flows as a financing activity.

While the Company was owned by Honeywell, a centralized approach to cash management and financing of operations was used. Prior to consummation of the Spin-Off, the Company's cash was transferred to Honeywell daily and Honeywell funded the Company's operating and investing activities as needed.

Subsequent to the Spin-Off on October 29, 2018, transactions with Honeywell were not considered related party transactions. Accordingly, no related party transactions with Honeywell were recorded for the three and six months ended June 30, 2019.

**Note 6. Repositioning and Other Charges**

During the second quarter of 2019, management began a repositioning plan to reduce operating costs and better align the Company's workforce with the needs of the business going forward. Repositioning and related expenses were $25 million for the second quarter of fiscal 2019 and primarily related to severance.

A summary of repositioning charges follows:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Severance | $ | 26 | $ | - | $ | 26 | $ | 4 |
| Asset impairments | | - | | - | | - | | 1 |
| Reserve adjustments | | (1) | | - | | (1) | | - |
| Total net repositioning charges | $ | 25 | $ | - | $ | 25 | $ | 5 |

The following table summarizes the pretax distribution of total net repositioning charges by unaudited Consolidated and Combined Statement of Operations classification:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Cost of goods sold | $ | 13 | $ | - | $ | 13 | $ | 4 |
| Selling, general and administrative expenses | | 12 | | - | | 12 | | 1 |
| | $ | 25 | $ | - | $ | 25 | $ | 5 |

The following table summarizes the pretax impact of total net repositioning charges by segment:

15

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Products & Solutions | $ 19 | $ - | $ 19 | $ 5 |
| ADI Global Distribution | 6 | - | 6 | - |
| | $ 25 | $ - | $ 25 | $ 5 |

In both the three and six months ended June 30, 2019, the Company recognized repositioning charges totaling $26 million, mainly for severance costs related to separation activities.

In the six months ended June 30, 2018, the Company recognized repositioning charges totaling $5 million, mainly for severance costs related to separation activities.

The following table summarized the status of total repositioning reserves related to severance cost included in Accrued liabilities in the unaudited Consolidated Balance Sheet:

| | Total |
| --- | --- |
| Balance at December 31, 2018 | $ 13 |
| Charges | 26 |
| Usage – cash | (11) |
| Adjustments | (1) |
| Balance at June 30, 2019 | $ 27 |

**Note 7. Revenue Recognition**

**Disaggregated Revenue**

Revenues by channel are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| U.S. and Canada | $ 579 | $ 548 | $ 1,115 | $ 1,058 |
| EMEA [1] | 112 | 115 | 227 | 232 |
| India | 14 | 15 | 28 | 30 |
| ADI Global Distribution | 705 | 678 | 1,370 | 1,320 |
| Comfort | 271 | 261 | 543 | 523 |
| Security | 137 | 122 | 269 | 232 |
| RTS | 129 | 135 | 276 | 286 |
| Products & Solutions [2] | 537 | 518 | 1,088 | 1,041 |
| Net revenue | $ 1,242 | $ 1,196 | $ 2,458 | $ 2,361 |

(1)   EMEA represents Europe, the Middle East and Africa.
(2)   Products & Solutions sales channel naming convention changed from what was disclosed in our quarterly report for the quarter ended September 30, 2018. Comfort & Care was broken out into Comfort and Residential Thermal Solutions ("RTS").

16

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

The Company recognizes the majority of its revenue from performance obligations outlined in contracts with its customers that are satisfied at a point in time. Less than 3% of the Company's revenue is satisfied over time. As of June 30, 2019, contract assets and liabilities are not material.

**Note 8. Income Taxes**

The effective tax rate increased from (560)% for the three months ended June 30, 2018 to 0% for the three months ended June 30, 2019.  The increase is primarily the result of tax benefits generated in 2018 related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. Tax Reform.

The effective tax rate for the three months ended June 30, 2019 was lower than the U.S. federal statutory rate of 21% due to a net loss in the quarter.

The effective tax rate for the six months ended June 30, 2019 was higher than the U.S. federal statutory rate of 21% primarily attributable to non-deductible expenses and U.S. taxation of foreign earnings.

The effective tax rate for the three months ended June 30, 2018 was lower than the U.S. federal statutory rate of 21% primarily from tax benefits related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. Tax Reform.

The effective tax rate for the six months ended June 30, 2018 was lower than the U.S. federal statutory rate of 21% primarily from tax benefits related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. Tax Reform.

**Note 9. Inventories**

|  | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Raw materials | $ | 163 | $ | 167 |
| Work in process | | 21 | | 34 |
| Finished products | | 538 | | 427 |
| | $ | 722 | $ | 628 |

**Note 10. Accrued Liabilities**

|  | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Obligations payable to Honeywell | $ | 140 | $ | 140 |
| Taxes payable | | 57 | | 76 |
| Compensation, benefit and other employee related | | 73 | | 73 |
| Other | | 258 | | 214 |
| | $ | 528 | $ | 503 |

Refer to "Note 15. Commitments and Contingencies" of this Form 10-Q for further details on Obligations payable to Honeywell.

17

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

**Note 11. Long-term Debt and Credit Agreement**

The Company's debt at June 30, 2019 and December 31, 2018 consisted of the following:

| | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| 6.125% notes due 2026 | $ | 400 | $ | 400 |
| Five-year variable rate term loan A due 2023 | | 341 | | 350 |
| Seven-year variable rate term loan B due 2025 | | 473 | | 475 |
| Unamortized debt issuance costs | | (23) | | (24) |
| Total outstanding indebtedness | | 1,191 | | 1,201 |
| Less: amounts due within one year | | 22 | | 22 |
| Total long-term debt due after one year | $ | 1,169 | $ | 1,179 |

In October of 2018, the Company issued $400 million in principal amount of its 6.125% senior unsecured notes (the "Senior Notes"), entered into term loan facilities in the form of a seven-year LIBOR plus 2.00% senior secured first-lien term B loan facility in an aggregate principal amount of $475 million and a five-year LIBOR plus 2.00% senior secured first-lien term A loan facility in an aggregate principal amount of $350 million (the "Term Loans") and established a five-year senior secured first-lien revolving credit facility in an aggregate principal amount of $350 million (the "Revolving Credit Facility"). At June 30, 2019, the interest rate for the Term Loans was 4.33% and there were no borrowings and no of letters of credit issued under the $350 million Revolving Credit Facility. For more information, please refer to "Note 15. Long-term Debt" in our 2018 Annual Report on Form 10-K.

As of June 30, 2019, the Company assessed the amount recorded under the Term Loans, the Senior Notes, and the Revolving Credit Facility and determined the Term Loans and the Revolving Credit Facility approximated fair value, and the Senior Notes' fair value is approximately $417 million. The fair values of the debt are based on the quoted inactive prices and are therefore classified as Level 2 within the valuation hierarchy.

The net proceeds from the borrowings under the Revolving Credit Facility, Term Loans and the offering of the Senior Notes were used as part of the financing for the Spin-Off. The interest expense for the Revolving Credit Facility, Term Loans and Senior Notes during the three and six months ended June 30, 2019 was $18 million and $35 million, respectively, which includes the amortization of debt issuance cost and debt discounts.

**Note 12. Leases**

As discussed in Note 2, the Company adopted ASU No. 2016-02, Leases (Topic 842), effective January 1, 2019. The Company is party to operating leases for the majority of its manufacturing sites, offices, engineering and lab sites, stocking locations, warehouses, automobiles, and certain equipment. Certain of the Company's real estate leases include variable rental payments which adjust periodically based on inflation, and certain automobile lease agreements include rental payments which fluctuate based on mileage. Generally, the Company's lease agreements do not contain any material residual value guarantees or material restrictive covenants.

The Company's operating lease costs for the three and six months ended June 30, 2019 consisted of the following:

18

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

| | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
|---|---|---|---|---|
| Operating Lease Costs | | | | |
| Selling, general & administrative | $ | 9 | $ | 17 |
| Cost of goods sold | | 4 | | 8 |
| Total operating lease costs | $ | 13 | $ | 25 |

Total operating lease costs include costs associated with short-term leases and variable lease costs as follows:

| | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
|---|---|---|---|---|
| Components of Operating Lease Cost | | | | |
| Short-term lease costs | $ | 1 | $ | 2 |
| Variable lease costs | $ | 2 | $ | 5 |

The Company subleases one manufacturing site and three other sites to a third party. The leases have terms of 3 to 5 years and include renewal options. Sublease income for the three and six months ended June 30, 2019 related to these sites was not material.

The Company recognized the following related to its operating leases:

| | Financial Statement Line Item | At June 30, 2019 | |
|---|---|---|---|
| Operating right-of-use assets | Other assets | $ | 132 |
| Operating lease liabilities - current | Accrued liabilities | $ | 30 |
| Operating lease liabilities - noncurrent | Other liabilities | $ | 105 |

19

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

Maturities of the Company's operating lease liabilities were as follows:

|  | At June 30, 2019 |
| --- | ---: |
| 2019 | $ 20 |
| 2020 | 34 |
| 2021 | 31 |
| 2022 | 26 |
| 2023 | 19 |
| Thereafter | 30 |
| Total lease payments | 160 |
| Less: imputed interest | 25 |
| Present value of operating lease liabilities | $ 135 |
| Weighted-average remaining lease term (years) | 5.45 |
| Weighted-average discount rate | 6.23 |

Future minimum lease payments under operating leases having initial or remaining non-cancellable lease terms in excess of one year as of December 31, 2018 were as follows:

|  | At December 31, 2018 |
| --- | ---: |
| 2019 | $ 39 |
| 2020 | 33 |
| 2021 | 28 |
| 2022 | 22 |
| 2023 | 15 |
| Thereafter | 17 |
|  | $ 154 |

Supplemental cash flow information related to the Company's operating leases was as follows:

|  | Six Months Ended June 30, 2019 |
| --- | ---: |
| Operating cash flows | $ 18 |
| Operating right-of-use assets obtained in exchange for operating lease liabilities | $ 38 |

As of June 30, 2019, the Company has additional operating leases that have not yet commenced. Obligations under these leases are not material. The Company's obligations relating to finance leases as of June 30, 2019, and associated costs for the three and six months then ended, were not material.

Additionally, as a lessor, the Company leases all or a portion of four of its owned manufacturing sites to a third party under operating leases. The leases have terms of 3 to 5 years and include renewal options. Rental income for the three and six months ended June 30, 2019 was not material.

20

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

**Note 13. Accumulated Other Comprehensive Loss**

The changes in Accumulated other comprehensive loss are provided in the tables below.

*Changes in Accumulated Other Comprehensive Loss by Component*

| | Foreign Exchange Translation Adjustment | Pension Adjustments | Changes in Fair Value of Effective Cash Flow Hedges | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|
| Balance at December 31, 2017 | $ (100) | $ - | $ - | $ (100) |
| Other comprehensive income before reclassifications | 31 | - | - | 31 |
| Amounts reclassified from accumulated other comprehensive income | - | - | (1) | (1) |
| Net current period other comprehensive income | 31 | - | (1) | 30 |
| Balance at March 31, 2018 | $ (69) | $ - | $ (1) | $ (70) |
| Other comprehensive loss before reclassifications | (49) | - | - | (49) |
| Balance at June 30, 2018 | $ (118) | $ - | $ (1) | $ (119) |
| | | | | |
| Balance at December 31, 2018 | $ (177) | $ (12) | $ - | $ (189) |
| Other comprehensive income before reclassifications | 6 | - | - | 6 |
| Balance at March 31, 2019 | $ (171) | $ (12) | $ - | $ (183) |
| Other comprehensive loss before reclassifications | (4) | - | - | (4) |
| Balance at June 30, 2019 | $ (175) | $ (12) | $ - | $ (187) |

**Note 14. Stock-Based Compensation Plans**

*Restricted Stock Units ("RSUs")*

During the six months ended June 30, 2019, as part of the Company's annual long-term compensation under the 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Stock Incentive Plan"), it granted 319,771 performance-based RSUs and 1,186,759 time-based RSUs to eligible employees. The weighted average grant date fair value per share for these shares was $22.32.

*Stock Options*

During the six months ended June 30, 2019, as part of the Company's annual long-term compensation under the Stock Incentive Plan, 1,155,566 stock options were granted to eligible employees at a weighted average exercise price per share of $24.37 and weighted average fair value of $6.71.

21

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

**Note 15. Commitments and Contingencies**

*Environmental Matters*

The Company is subject to various federal, state, local and foreign government requirements relating to the protection of the environment and accrues costs related to environmental matters when it is probable that it has incurred a liability related to a contaminated site and the amount can be reasonably estimated. Environmental-related expenses are presented within Cost of goods sold for operating sites, which are the Company's owned sites. For the three and six months ended June 30, 2019 and June 30, 2018, environmental expenses related to these operating sites were not material. On October 29, 2018, upon consummation of the Spin-Off, certain environmental liabilities became subject to the Honeywell Reimbursement Agreement (defined below) and were reclassified to Obligations payable to Honeywell. The expenses related to these sites were recorded within Other expense, net in the unaudited Consolidated and Combined Interim Statement of Operations. For the three and six months ended June 30, 2018, environmental expense within Other expense, net was $123 million and $176 million, respectively. Liabilities for environmental cost were $21 million and $640 million as of June 30, 2019 and June 30, 2018, respectively. For additional information, see Honeywell Reimbursement Agreement below.

The Company does not currently possess sufficient information to reasonably estimate the amounts of environmental liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our unaudited consolidated and combined results of operations and operating cash flows in the periods recognized or paid.

*Honeywell Reimbursement Agreement*

On October 29, 2018, in connection with the Spin-Off, the Company entered into an indemnification and reimbursement agreement with Honeywell (the "Honeywell Reimbursement Agreement") pursuant to which the Company has an obligation to make cash payments to Honeywell in amounts equal to 90% of payments for certain Honeywell environmental-liability payments, which include amounts billed ("payments"), less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales (the "recoveries"). The amount payable by the Company in respect of such liabilities arising in respect of any given year will be subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). The scope of the Company's current environmental remediation obligations subject to the Honeywell Reimbursement Agreement relates to approximately 230 sites or groups of sites that are undergoing environmental remediation under U.S. federal or state law and agency oversight for contamination associated with Honeywell legacy business operations. The ongoing environmental remediation is designed to address contaminants at upland and sediment sites, which include, among others, metals, organic compounds and polychlorinated biphenyls, through a variety of methods, which include, among others, excavation, capping, in-situ stabilization, groundwater treatment and dredging. In addition, the Company obligations subject to the Honeywell Reimbursement Agreement will include certain liability with respect to (i) hazardous exposure or toxic tort claims associated with the specified sites that arise after the Spin-Off, if any, (ii) currently unidentified releases of hazardous substances at or associated with the specified sites, (iii) other environmental claims associated with the specified sites and (iv) consequential damages.

Payments in respect of the liabilities arising in a given year will be made quarterly throughout such year on the basis of an estimate of the liabilities and recoveries provided by Honeywell. Following the end of any such year, Honeywell will provide the Company with a calculation of the amount of payments and the recoveries actually received.

22

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

Payment amounts under the Honeywell Reimbursement Agreement will be deferred to the extent that a specified event of default has occurred and is continuing under certain indebtedness, including under the Company's principal credit agreement, or the payment thereof causes the Company to not be compliant with certain financial covenants in certain indebtedness, including the Company's principal credit agreement on a pro forma basis, including the maximum total leverage ratio (ratio of consolidated debt to consolidated EBITDA, which excludes any amounts owed to Honeywell under the Honeywell Reimbursement Agreement), and the minimum interest coverage ratio. A 5% late payment fee will accrue on all amounts that are not otherwise entitled to be deferred under the terms of the Honeywell Reimbursement Agreement, without prejudice to any other rights that Honeywell may have for late payments.

The obligations under the Honeywell Reimbursement Agreement will continue until the earlier of: (1) December 31, 2043; or (2) December 31 of the third consecutive year during which the annual reimbursement obligation (including in respect of deferred payment amounts) has been less than $25 million.

The following table summarizes information concerning our Honeywell Reimbursement Agreement liabilities:

|  | June 30, 2019 | |
|---|---|---|
| Beginning of period | $ | 616 |
| Accruals for indemnification liabilities deemed probable and reasonably estimable | | 103 |
| Reduction [1] | | (81) |
| Indemnification payment | | (70) |
| End of period | $ | 568 |

(1)    Reduction in indemnification liabilities relates to a provision in the Honeywell Reimbursement Agreement that reduces the obligation due to Honeywell for any proceeds received by Honeywell from a property sale of a site under the agreement.

For the three and six months ended June 30, 2019 expenses related to the Honeywell Reimbursement Agreement were $36 million and $22 million, respectively and are recorded in Other expense, net. Honeywell Reimbursement Agreement liabilities are included in the following balance sheet accounts:

|  | June 30, 2019 | |
|---|---|---|
| Accrued liabilities | $ | 140 |
| Obligations payable to Honeywell | | 428 |
|  | $ | 568 |

The Company does not currently possess sufficient information to reasonably estimate the amounts of indemnification liabilities to be recorded upon future completion of studies, litigation or settlements, and neither the timing nor the amount of the ultimate costs associated with environmental matters can be determined although they could be material to our unaudited consolidated and combined results of operations and operating cash flows in the periods recognized or paid.

23

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

*Tax Matters Agreement*

In connection with the Spin-Off, the Company entered into a tax matters agreement (the "Tax Matters Agreement") with Honeywell pursuant to which it is responsible and will indemnify Honeywell for all taxes, including income taxes, sales taxes, VAT and payroll taxes, relating to the business for all periods, including periods prior to the consummation of the Spin-Off. As of June 30, 2019, the Company has indemnified Honeywell for $153 million, which is included in Obligations payable to Honeywell.

*Trademark Agreements*

The Company and Honeywell entered into a 40-year Trademark License Agreement ("the Trademark Agreement") that authorizes the Company's use of certain license trademarks in the operation of Resideo's business for the advertising, sale and distribution of certain licensed products. In exchange, the Company will pay a royalty fee of 1.5% on net revenue to Honeywell related to such licensed products which is recorded in Selling, general and administrative expense on the unaudited Consolidated and Combined Interim Statement of Operations. For the three and six months ended June 30, 2019, royalty fees were $6 million and $13 million, respectively.

*Other Matters*

The Company is subject to other lawsuits, investigations and disputes arising out of the conduct of its business, including matters relating to commercial transactions, settlement agreements, government contracts, product liability, prior acquisitions and divestitures, employee matters, intellectual property, antitrust and environmental, health and safety matters. The Company recognizes a liability for any contingency that is probable of occurrence and reasonably estimable. The Company continually assesses the likelihood of adverse judgments of outcomes in these matters, as well as potential ranges of possible losses (taking into consideration any insurance recoveries), based on a careful analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts.  The Company recorded legal expense of $15 million and $19 million for the three and six months ended June 30, 2019, respectively. Prior to the Spin-off, legal expenses were paid by Honeywell and then allocated to the Company as part of a corporate expense allocation that did not separately identify the specific expenses. As of June 30, 2019 and December 31, 2018, the Company has a legal reserve of $20 million and $7 million, respectively.

*Warranties and Guarantees*

In the normal course of business, the Company issues product warranties and product performance guarantees. It accrues for the estimated cost of product warranties and performance guarantees based on contract terms and historical experience at the time of sale. Adjustments to initial obligations for warranties and guarantees are made as changes to the obligations become reasonably estimable. Product warranties and product performance guarantees are included in Accrued liabilities. The following table summarizes information concerning recorded obligations for product warranties and product performance guarantees.

| | June 30, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | **2018** | |
| Beginning of period | $ | 26 | $ | 17 |
| Accruals for warranties/guarantees issued during the year | | 7 | | 6 |
| Adjustment of pre-existing warranties/guarantees | | (2) | | (1) |
| Settlement of warranty/guarantee claims | | (8) | | (6) |
| End of period | $ | 23 | $ | 16 |

24

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

**Note 16. Pension**

Prior to the Spin-Off, certain of Resideo's employees participated in multiple U.S. and non-U.S. defined benefit pension plans (the "Shared Plans") sponsored by Honeywell which includes participants from other Honeywell subsidiaries and operations. The Company accounted for participation in the Shared Plans as a multiemployer benefit plan. Accordingly, it did not record an asset or liability to recognize the funded status of the Shared Plans. The related pension expense was allocated based on annual service cost of active participants and reported within Costs of goods sold and Selling, general and administrative expenses in the unaudited Combined Interim Statement of Operations. The pension expense related to participation in the Shared Plan for the three and six months ended June 30, 2018 were $4 million and $7 million, respectively.

As of the date of separation from Honeywell, these employees' and certain former Honeywell employees' entitlement to benefits in Honeywell's plans were transferred to Resideo sponsored plans.

The Resideo defined benefit pension plans have substantially similar benefit formulas as the Honeywell defined benefit pension plans. Moreover, vesting service, benefit accrual service and compensation credited under the Honeywell defined benefit pension plans apply to the determination of pension benefits under the Resideo defined benefit pension plan.

The Company sponsors multiple funded and unfunded U.S. and non-U.S. defined benefit pension plans. Pension benefits for many of its U.S. employees are provided through non-contributory, qualified and non-qualified defined benefit plans. It also sponsors defined benefit pension plans which cover non-U.S. employees who are not U.S. citizens, in certain jurisdictions, principally Germany, Austria, Belgium and Switzerland. The pension obligations as of June 30, 2019 and December 31, 2018 were $92 million and $88 million, respectively, and are included in Other liabilities in the unaudited Consolidated Balance Sheet. Net periodic benefit cost recognized in Comprehensive income the three and six months ended June 30, 2019 is $2 million and $4 million, respectively.

The components of net periodic benefit costs other than the service cost are included in Other expense, net in the unaudited Consolidated and Combined Interim Statement of Operations for the three and six months ended June 30, 2019 and 2018.

**Note 17. Segment Financial Data**

The Company globally manages its business operations through two reportable operating segments, Products & Solutions and ADI Global Distribution:

**Products & Solutions**—The Products & Solutions business is a leading global provider of products, software solutions and technologies that help homeowners stay connected and in control of their comfort, security and energy use.

**ADI Global Distribution**—The ADI Global Distribution business is a leading global distributor of low-voltage electronic and security products. Segment information is consistent with how management reviews the businesses, makes investing and resource allocation decisions and assesses operating performance.

25

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

Prior to the first quarter of 2019, the Company's Chief Operating Decision Maker ("CODM") managed and evaluated its segment performance based on segment profit defined as segment income (loss) before taxes excluding Other expense, net (primarily environmental cost now subject to the Honeywell Reimbursement Agreement), interest expense, pension expense, environmental expense related to Resideo's owned sites and repositioning charges. Beginning in the first quarter of 2019, the Company's CODM changed the way segment performance is evaluated by making financial decisions and allocating resources based on Segment Adjusted EBITDA. Segment Adjusted EBITDA is defined as segment net income before income taxes, net interest (income) expense, depreciation and amortization plus environmental expense, Honeywell Reimbursement Agreement expense, stock compensation expense, repositioning charges and other adjustments.

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Revenue | | | | | | | | |
| Total Products & Solutions revenue | $ | 611 | $ | 598 | $ | 1,233 | $ | 1,200 |
| Less: Intersegment revenue | | 74 | | 80 | | 145 | | 159 |
| External Products & Solutions revenue | | 537 | | 518 | | 1,088 | | 1,041 |
| External ADI Global Distribution revenue | | 705 | | 678 | | 1,370 | | 1,320 |
| Total revenue | $ | 1,242 | $ | 1,196 | $ | 2,458 | $ | 2,361 |

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Segment adjusted EBITDA | | | | | | | | |
| Products & Solutions | $ | 70 | $ | 109 | $ | 151 | $ | 226 |
| ADI Global Distribution | | 46 | | 41 | | 92 | | 81 |
| Segment Adjusted EBITDA | $ | 116 | $ | 150 | $ | 243 | $ | 307 |

The table below provides a reconciliation of net income to Segment Adjusted EBITDA:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | 2019 | | 2018 | |
| **Net (loss) income** | $ | (11) | $ | 33 | $ | 37 | $ | 78 |
| Net interest expense (income) | | 17 | | (1) | | 33 | | (1) |
| Tax expense (benefit) | | - | | (28) | | 36 | | 6 |
| Depreciation and amortization | | 20 | | 16 | | 36 | | 33 |
| Environmental expense [1] | | - | | 123 | | - | | 176 |
| Honeywell reimbursement agreement expense [2] | | 36 | | - | | 22 | | - |
| Stock compensation expense [3] | | 7 | | 5 | | 14 | | 9 |
| Repositioning charges | | 25 | | - | | 25 | | 5 |
| Other [4] | | 22 | | 2 | | 40 | | 1 |
| **Segment Adjusted EBITDA** | $ | 116 | $ | 150 | $ | 243 | $ | 307 |

26

**RESIDEO TECHNOLOGIES, INC.**

**NOTES TO CONSOLIDATED AND COMBINED INTERIM FINANCIAL STATEMENTS**
**(Dollars in millions, unless otherwise noted)**
**(Unaudited)**

(1)     Represents historical environmental expenses as reported under 100% carryover basis.
(2)     Represents recorded expenses related to the Honeywell Reimbursement Agreement.
(3)     Stock compensation expense adjustment includes only non-cash expenses.
(4)     Represents $10 million and $28 million in costs directly related to the Spin-Off, $12 million and $13 million related to legal claims that arose prior to Spin-off, and ($0) million and ($1) million in non-operating (income) expense adjustment which excludes net interest (income) for the three and six months ended June 30, 2019, respectively. For the three and six months ended June 30, 2018 Other represents other non-operating (income) expense.

The Company's CODM does not use segment assets information to allocate resources or to assess performance of the segments and therefore, total segment assets have not been disclosed.

27

Item 2.          **Management's Discussion and Analysis of Financial Condition and Results of Operations**

**(Dollars in millions, except per share amounts)**

The following Management's Discussion and Analysis of Financial Condition and Results of Operations is intended to help you understand the results of operations and financial condition of Resideo Technologies, Inc. and its consolidated subsidiaries ("Resideo" or "the Company", "we", "us" or "our") for the three and six months ended June 30, 2019 and should be read in conjunction with the unaudited Consolidated and Combined Interim Financial Statements and the notes thereto contained elsewhere in this Form 10-Q. The financial information as of June 30, 2019 should be read in conjunction with the consolidated and combined financial statements for the year ended December 31, 2018 contained in our 2018 Annual Report on Form 10-K (the "2018 Annual Report on Form 10-K").

**Overview and Business Trends**

We are a leading global provider of products, software solutions and technologies that help homeowners stay connected and in control of their comfort, security and energy use. We are a leader in the home heating, ventilation and air conditioning controls and security markets. Our products consist of solutions in Comfort, Residential Thermal Solutions and Security categories and include temperature and humidity control, thermal, water and air solutions and remote patient monitoring software solutions as well as security panels, sensors, peripherals, wire and cable, communications devices, video cameras, awareness solutions, cloud infrastructure, installation and maintenance tools and related software. Our ADI Global Distribution business is the leading wholesale distributor of low-voltage electronic and security products which include video surveillance, intrusion, access control, fire and life safety, wire, networking and professional audio visual systems. We manage our business operations through two segments, Products & Solutions and ADI Global Distribution. The Products & Solutions segment offerings include our Comfort, Residential Thermal Solutions and Security products, which, consistent with our industry, has a higher gross and operating margin profile in comparison to the ADI Global Distribution segment.

Our financial performance over the last three years has been supported by several macro trends. Steady growth in residential and non-residential construction and growth in renovation and remodeling in the United States has had a positive impact on the growth of our Products & Solutions and ADI Global Distribution businesses. The financial performance of our Products & Solutions business has further benefited from increasing penetration of wireless connectivity and the proliferation of connected devices. The financial performance of our ADI Global Distribution business has been further aided by increasing contractor needs for training and technical expertise and increasing demand for same day order fulfilment.

**Second Quarter Highlights**

Net revenues increased $46 million in the recent quarter compared to the second quarter of fiscal 2018, primarily due to increased volume and price offset by foreign exchange translation. Gross profit as a percent of net revenues decreased to 24%, or $50 million, in the recent quarter compared to 29% in the second quarter of fiscal 2018. The primary drivers to the decrease in gross profit percentage were a 200 bps impact from sales mix changes, 100 bps impact from material and labor inflation and fixed production costs, 100 bps impact from repositioning costs, and 100 bps impact from headquarter allocations previously classified in selling, general and administrative expense in the carve-out financials with. Second-quarter net loss was $11 million for the three months ended June 30, 2019.

Selling, general, and administrative expenses increased by $37 million in the recent quarter compared to the second quarter of fiscal 2018. The increase was driven by spin related costs, license fees associated with the Trademark License Agreement, legal expenses, impact of acquisitions, repositioning costs, and labor cost inflation totaling $56 million. These increases were partially offset by a change in headquarter cost allocation now partially classified in cost of goods sold, foreign currency translation, and miscellaneous cost reductions totaling $19 million.

We ended the second quarter with $142 million in cash and cash equivalents. Net cash used in operating activities was $37 million for the six months ended June 30, 2019. Accounts receivable was $835 million at June 30, 2019, representing 60 days sales outstanding ("DSO"). Inventory was $722 million at June 30, 2019, representing 69 days of inventory ("DOI").

28

During the second quarter of 2019, we completed two acquisitions.  In May, we acquired certain assets from Whisker Labs and in June, we acquired all of the membership interests of LifeWhere.  See Note 4, Acquisitions, to the Consolidated and Combined Interim Financial Statements for additional information.

**Recent Developments**

*Separation from Honeywell*

The Company was incorporated in Delaware on April 24, 2018. We separated from Honeywell International Inc. ("Honeywell") on October 29, 2018, becoming an independent publicly traded company as a result of a pro rata distribution of our common stock to shareholders of Honeywell (the "Spin-Off"). On October 29, 2018, Honeywell's shareholders of record as of October 16, 2018 (the "Record Date") received one share of our common stock, par value $0.001 per share, for every six shares of Honeywell's common stock, par value $1.00 per share, held as of the Record Date. We began trading "regular way" under the ticker symbol "REZI" on the New York Stock Exchange on October 29, 2018.

In connection with the Spin-Off, we entered into certain agreements with Honeywell, such as the Honeywell Reimbursement Agreement, the Trademark License Agreement, Tax Matters Agreement, Employee Matters Agreement, Patent Cross-License Agreement and Transition Services Agreement, which caused us to incur new costs. See our 2018 Annual Report on Form 10-K for a description of the material terms thereof.

**Basis of Presentation**

Prior to the Spin-Off on October 29, 2018, our historical financial statements were prepared on a stand-alone combined basis and were derived from the consolidated financial statements and accounting records of Honeywell. Accordingly, for periods prior to October 29, 2018, our financial statements are presented on a combined basis and for the periods subsequent to October 29, 2018 are presented on a consolidated basis (collectively, the historical financial statements for all periods presented are referred to as "Consolidated and Combined Interim Financial Statements"). The Consolidated and Combined Interim Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The historical combined financial information prior to the Spin-Off may not be indicative of our future performance and does not necessarily reflect what our consolidated and combined results of operations, financial condition and cash flows would have been had we operated as a separate, publicly traded company during the periods presented, particularly because of changes that we have experienced and may continue to experience as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our Company.

The unaudited Combined Interim Financial Statements prior to the Spin-Off include certain assets and liabilities that were held at the Honeywell corporate level but were specifically identifiable or otherwise attributable to us. Additionally, Honeywell historically provided certain services, such as legal, accounting, information technology, human resources and other infrastructure support, on behalf of us. The cost of these services were allocated to us on the basis of the proportion of net revenue. Actual costs that would have been incurred if we had been a stand-alone company for the entire period being presented would depend on multiple factors, including organizational structure and strategic decisions made in various areas, including information technology and infrastructure. Both we and Honeywell consider the basis on which the expenses were allocated during the period before the Spin-Off to be a reasonable reflection of the utilization of services provided to or the benefits received by us during the periods presented.

Since the completion of the Spin-Off, we have incurred and expect to continue to incur expenditures consisting of employee-related costs, costs to start up certain stand-alone functions and information technology systems and other one-time transaction related costs. Recurring stand-alone costs include establishing the internal audit, treasury, investor relations, tax and corporate secretary functions as well as the annual expenses associated with running an independent publicly traded company including listing fees, compensation of non-employee directors, related board of director fees and other fees and expenses related to insurance, legal and external audit.

Our environmental expenses prior to Spin-Off and our Honeywell reimbursement expenses are reported within Other expense, net in our unaudited Consolidated and Combined Interim Statement of Operations, which reflect an estimated liability for resolution of pending and future environmental-related liabilities. Prior to the Spin-Off, this estimated liability was calculated as if we were responsible for 100% of the environmental-liability payments associated with certain sites. See our 2018 Annual Report on Form 10-K for additional information. In connection with our separation from Honeywell, we became a party to the Honeywell Reimbursement Agreement, which was entered into on October 14, 2018, pursuant to which we agreed to indemnify Honeywell in amounts equal to 90% of payments which include amounts billed with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages (the "liabilities"), in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. Pursuant to the Honeywell Reimbursement Agreement, we are responsible for paying to Honeywell such amounts, up to a cap of $140 million in respect of liabilities arising in any given calendar year (exclusive of any late payment fees up to 5% per annum).

**Components of Operating Results**

Our fiscal quarter ends on June 30. The key elements of our operating results include:

*Net Revenue*

We globally manage our business operations through two reportable segments, Products & Solutions and ADI Global Distribution:

*Products & Solutions.* We generate the majority of our Product net revenue primarily from residential end-markets. Our Products & Solutions segment includes traditional products, as well as connected products, which we define as any device with the capability to be monitored or controlled from a remote location by an end-user or service provider. Our products are sold through a network of distributors (e.g. HVAC, Plumbing, Security, Electrical), original equipment manufacturers ("OEMs"), and service providers such as HVAC contractors, Security dealers and Plumbers including our ADI business. We also sell some products via retail and online channels.

*ADI Global Distribution.* We generate revenue through the distribution of low-voltage electronic and security products that are delivered through a comprehensive network of professional contractors, distributors and OEMs, as well as major retailers and online merchants. In addition to our own Security products, ADI distributes products from industry-leading manufacturers including Assa Abloy, Axis Communications, Honeywell and Nortek Security & Control, and ADI also carries a line of private label products. We sell these products to contractors that service non-residential and residential end-users. 13% of ADI's net revenue is supplied by our Products & Solutions Segment. Management estimates that in 2018 approximately two-thirds of ADI's net revenue were attributed to non-residential end markets and one-third to residential end markets.

30

**Cost of Goods Sold**

*Products & Solutions:* Cost of goods sold includes costs associated with raw materials, assembly, shipping and handling of those products; costs of personnel-related expenses, including pension benefits, and equipment associated with manufacturing support, logistics and quality assurance; costs of certain intangible assets; and costs of research and development. Research and development expense consists primarily of development of new products and product applications.

*ADI Global Distribution:* Cost of goods sold consists primarily of inventory-related costs and includes labor and personnel-related expenses.

**Selling, General, and Administrative Expense**

Selling, general and administrative expense includes trademark royalty expenses, sales incentives and commissions, professional fees, legal fees, promotional and advertising expenses, and personnel-related expenses, including stock based compensation and pension benefits. In addition, prior to the Spin-Off our selling, general and administrative expense included an allocated portion of general corporate expenses.

**Other Expense, Net**

Other expense, net consists primarily of Honeywell reimbursement expenses (partially offset by certain reductions) for certain environmental claims related to approximately 230 sites or groups of sites that are undergoing environmental remediation under U.S. federal or state law and agency oversight for contamination associated with Honeywell legacy business operations. Prior to the Spin-Off other expenses also included the environmental expenses related to these same sites. For further information see "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations Honeywell Reimbursement Agreement" and "Note 15. Commitments and Contingencies" of Notes to unaudited Consolidated and Combined Interim Financial Statements of this Form 10-Q.

**Interest Expense**

Interest expense consists of interest on our short and long-term obligations, including our senior notes and term credit facility. Interest expense on our obligations includes contractual interest, amortization of the debt discount and amortization of debt issuance costs.

**Tax Expense (Benefit)**

Provision for income taxes includes both domestic and foreign income taxes at the applicable tax rates adjusted for U.S. taxation of foreign earnings and other non-deductible expenses.

31

**Results of Operations**

The following table sets forth our selected unaudited consolidated interim statement of operations for the periods presented:

**Unaudited Consolidated Interim Statement of Operations**
**(Dollars in millions except share and per share data)**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2018 | | 2019 | | 2018 |
| Net revenue | $ | 1,242 | $ | 1,196 | $ | 2,458 | $ | 2,361 |
| Cost of goods sold | | 946 | | 850 | | 1,849 | | 1,672 |
| Gross profit | | 296 | | 346 | | 609 | | 689 |
| Selling, general and administrative expenses | | 254 | | 217 | | 482 | | 429 |
| Operating profit | | 42 | | 129 | | 127 | | 260 |
| Other expense, net | | 35 | | 124 | | 19 | | 176 |
| Interest expense | | 18 | | - | | 35 | | - |
| (Loss) income before taxes | | (11) | | 5 | | 73 | | 84 |
| Tax expense (benefit) | | - | | (28) | | 36 | | 6 |
| Net (loss) income | $ | (11) | $ | 33 | $ | 37 | $ | 78 |
| **Weighted Average Number of Common Shares Outstanding (in thousands)** | | | | | | | | |
| Basic | | 122,700 | | 122,499 | | 122,635 | | 122,499 |
| Diluted | | 122,700 | | 122,499 | | 123,490 | | 122,499 |
| **(Loss) Earnings Per Share** | | | | | | | | |
| Basic | $ | (0.09) | $ | 0.27 | $ | 0.30 | $ | 0.64 |
| Diluted | $ | (0.09) | $ | 0.27 | $ | 0.30 | $ | 0.64 |

**Results of Operations for the Three and Six Months ended June 30, 2019 and 2018**

**Net Revenue**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2018 | | 2019 | | 2018 |
| Net revenue | $ | 1,242 | $ | 1,196 | $ | 2,458 | $ | 2,361 |
| % change compared with prior period | | 4% | | | | 4% | | |

The change in net revenue compared to prior year period is attributable to the following:

| | Three Months Ended June 30, 2019 | Six Months Ended June 30, 2019 |
| --- | --- | --- |
| Volume | 4% | 4% |
| Price | 2% | 2% |
| Foreign currency translation | -2% | -2% |
| % change compared with prior period | 4% | 4% |

A discussion of net revenue by segment can be found in the Review of Business Segments section of this Management's Discussion and Analysis of Financial Condition and Results of Operations.

32

*Cost of Goods Sold*

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Cost of goods sold | $ | 946 | $ | 850 | $ | 1,849 | $ | 1,672 |
| % change compared with prior period | | 11% | | | | 11% | | |
| Gross profit percentage | | 24% | | 29% | | 25% | | 29% |

### *Three months ended*

Cost of goods sold for the three months ended June 30, 2019 was $946 million, an increase of $96 million, or 11%, from $850 million for the three months ended June 30, 2018.

This increase in cost of goods sold was primarily driven by higher revenue in both the ADI Global Distribution and Products & Solutions segments, material and labor inflation and increased fixed production costs, changes in sales mix, headquarter allocations previously classified in selling, general and administrative expense in the carve-out financials, repositioning costs, and spin related costs totaling $112 million. The increased costs were partially offset by foreign currency translation and other miscellaneous costs of goods sold totaling $16 million.

The primary drivers to the decrease in gross profit percentage were a 200 bps impact from sales mix changes, 100 bps impact from material and labor inflation and fixed production costs,100 bps impact from repositioning costs and 100 bps impact from headquarter allocations previously classified in selling, general and administrative expense in the carve-out financials.

### *Six months ended*

Cost of goods sold for the six months ended June 30, 2019 was $1,849 million, an increase of $177 million, or 11%, from $1,672 million for the six months ended June 30, 2018.

This increase in cost of goods sold was primarily driven by higher revenue in both the ADI Global Distribution and Products & Solutions segments, material and labor inflation and increased fixed production costs, changes in sales mix, headquarter allocations previously classified in selling, general and administrative expense in the carve-out financials, repositioning costs and spin related costs totaling $215 million. The increased costs were partially offset by foreign currency translation and other miscellaneous costs of goods sold totaling $38 million.

The primary drivers to the decrease in gross profit percentage were a 200 bps impact from material and labor inflation and fixed production costs, with a 100 bps impact from headquarter allocations previously classified in selling, general and administrative expense in the carve-out financials and 100 bps impact from sales mix changes.

## Selling, General and Administrative Expense

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Selling, general and administrative expense | $ | 254 | $ | 217 | $ | 482 | $ | 429 |
| % of revenue | | 20% | | 18% | | 20% | | 18% |

### *Three months ended*

Selling, general and administrative expense for the three months ended June 30, 2019 was $254 million, an increase of $37 million, from $217 million for the three months ended June 30, 2019. The increase was driven by repositioning costs, spin related costs, license fees associated with the Trademark License Agreement, legal expenses, impact of acquisitions and labor cost inflation totaling $56 million. These increases were partially offset by headquarter cost allocation now partially classified in cost of goods sold, foreign currency translation, and miscellaneous cost reductions totaling $19 million.

33

***Six months ended***

Selling, general and administrative expense for the six months ended June 30, 2019 was $482 million, an increase of $53 million, from $429 million for the six months ended June 30, 2018. The increase was driven by spin related costs, license fees associated with the Trademark License Agreement, legal expenses, impact of acquisitions, repositioning costs, and labor cost inflation totaling $93 million. These increases were partially offset by headquarter cost allocation now partially classified in cost of goods sold, foreign currency translation, and miscellaneous cost reductions totaling $40 million.

***Other Expense, Net***

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Other expense, net | $ 35 | $ 124 | $ 19 | $ 176 |

***Three months ended***

Other expense, net for the three months ended June 30, 2019, was $35 million, a decrease of $89 million from $124 million for the three months ended June 30, 2018. The decrease is due to lower remediation expenses in 2019 resulting from the Honeywell Reimbursement Agreement as compared to environmental expense prior to Spin-off. Following the Spin-off, these environmental expenses are now subject to the Honeywell Reimbursement Agreement where cash payments are capped at $140 million per year.

***Six months ended***

Other expense, net for the six months ended June 30, 2019, was $19 million, a decrease of $157 million from $176 million for the six months ended June 30, 2018. The decrease is due to lower remediation costs during the period as well as an $81 million gain related to a provision in the Honeywell Reimbursement Agreement that reduces the obligation due to Honeywell for any proceeds received from a property sale of a site under the agreement.

***Tax Expense (Benefit)***

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Tax expense (benefit) | $ - | $ (28) | $ 36 | $ 6 |
| Effective tax rate | 0% | (560)% | 49% | 7% |

***Three months ended***

The effective tax rate increased from (560)% for the three months ended June 30, 2018 to 0% for the three months ended June 30, 2019.  The increase is primarily the result of tax benefits generated in 2018 related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. Tax Reform.

The effective tax rate for the three months ended June 30, 2019 was lower than the U.S. federal statutory rate of 21% due to a net loss in the quarter.

The effective tax rate for the three months ended June 30, 2018 was lower than the U.S. federal statutory rate of 21% from tax benefits related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. Tax Reform.

34

***Six months ended***

The effective tax rate for the six months ended June 30, 2019 was higher than the U.S. federal statutory rate of 21% which is primarily attributable to non-deductible expenses and U.S. taxation of foreign earnings.

The effective tax rate for the six months ended June 30, 2018 was lower than the U.S. federal statutory rate of 21% primarily from tax benefits related to the internal restructuring of Resideo's business in advance of its anticipated Spin-Off, currency impacts on withholding taxes on undistributed foreign earnings and adjustments to the provisional tax amount related to U.S. Tax Reform.

The effective tax rate can vary from quarter to quarter for unusual or infrequently occurring items, such as the tax impacts from the resolution of income tax audits, changes in tax laws, revisions to the amounts from U.S. Tax Reform, or internal restructurings.

***Review of Business Segments***

We operate two segments: Products & Solutions and ADI Global Distribution. Our Chief Operating Decision Maker evaluates segment performance based on Segment Adjusted EBITDA. Segment Adjusted EBITDA is defined as segment net income before income taxes, net interest (income) expense, depreciation and amortization plus or minus, environmental expense, Honeywell Reimbursement Agreement expense, stock compensation expense, repositioning charges and other adjustments.

***Products & Solutions***

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | % Change | 2019 | 2018 | % Change |
| Total revenue | $ 611 | $ 598 | | $ 1,233 | $ 1,200 | |
| Less: Intersegment revenue | 74 | 80 | | 145 | 159 | |
| External revenue | 537 | 518 | 4% | 1,088 | 1,041 | 5% |
| Segment Adjusted EBITDA | $ 70 | $ 109 | (36)% | $ 151 | $ 226 | (33)% |

**2019 vs. 2018**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | Revenue (%) | Segment Adjusted EBITDA (%) | Revenue (%) | Segment Adjusted EBITDA (%) |
| Factors Contributing to Year-Over-Year Change | | | | |
| Constant Currency Growth (Decline) | 6% | (32)% | 8% | (29)% |
| Acquisitions | - | (2)% | - | (1)% |
| Foreign currency translation | (2)% | (2)% | (3)% | (3)% |
| Total % Change | 4% | (36)% | 5% | (33)% |

35

*Three months ended*

Products & Solutions revenue increased 4% driven primarily by the Security business. Segment Adjusted EBITDA declined from $109 million to $70 million, or 36%. Segment Adjusted EBITDA was negatively impacted $60 million from unfavorable product mix, production cost increases, impact of acquisitions expenses and the license fee paid to Honeywell associated with the Trademark License Agreement. These negative impacts were offset $21 million by profit from increased volume, increased selling prices and material productivity.

*Six months ended*

Products & Solutions revenue increased 5% driven primarily by the Security business and the first quarter launch of a new residential intrusion security platform. Segment Adjusted EBITDA declined from $226 million to $151 million, or 33%. Segment Adjusted EBITDA was negatively impacted $118 million from unfavorable product mix, inventory variances in the first quarter, production cost increases, impact of acquisitions in the second quarter and the license fee paid to Honeywell associated with the Trademark License Agreement. These negative impacts were offset $43 million by profit from increased volume, increased selling prices and material productivity.

### ADI Global Distribution

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | % Change | 2019 | 2018 | % Change |
| External revenue | $ 705 | $ 678 | 4% | $ 1,370 | $ 1,320 | 4% |
| Segment Adjusted EBITDA | $ 46 | $ 41 | 12% | $ 92 | $ 81 | 14% |

**2019 vs. 2018**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | Revenue (%) | Segment Adjusted EBITDA (%) | Revenue (%) | Segment Adjusted EBITDA (%) |
| Factors Contributing to Year-Over-Year Change | | | | |
| Constant Currency Growth | 6% | 13% | 6% | 15% |
| Foreign currency translation | (2)% | (1)% | (2)% | (1)% |
| Total % Change | 4% | 12% | 4% | 14% |

*Three months ended*

ADI Global Distribution revenue increased 4% on a reported basis, and 6% on a constant currency basis. ADI Global Distribution segment constant currency performance was driven by increased sales volume in the Americas and EMEA regions. Segment Adjusted EBITDA increased from $41 million to $46 million, or 12%. This increase was due to increased volume and productivity, net of inflation which was partially offset by unfavorable foreign exchange rates.

*Six months ended*

ADI Global Distribution revenue increased 4% on a reported basis, and 6% on a constant currency basis. ADI Global Distribution segment constant currency performance was driven by increased sales volume primarily in the Americas and EMEA regions, partly impacted by one less selling day year over year in the first quarter. Segment Adjusted EBITDA increased from $81 million to $92 million, or 14%. This increase was due to increased volume and productivity, net of inflation which was partially offset by unfavorable foreign exchange rates.

**Repositioning Charges**

During the second quarter of 2019, management began a repositioning plan to reduce operating costs and better align our workforce with the needs of the business going forward. Net repositioning and related expenses were $25 million for the second quarter of fiscal 2019 and primarily related to severance.

These repositioning actions are expected to generate incremental pre-tax savings of $10 million in 2019 compared with 2018 principally from planned workforce reductions. Cash spending related to our repositioning actions was $11 million for the three and six months ended June 30, 2019 and was funded through operating cash flows.  We expect to incur an additional $11 million of repositioning expense in 2019. For further discussion of repositioning activities, refer to Note 6. Repositioning Charges of Notes to Combined Interim Financial Statements.

**Capital Resources and Liquidity**

Our liquidity is primarily dependent on our ability to continue to generate positive cash flows from operations. Additional liquidity may also be provided through access to the financial capital markets and a committed global credit facility.

- Operating cash flows from continuing operations was an outflow of $37 million for the six months ended June 30, 2019 and was an inflow of $258 million for the six months ended June 30, 2018.
- As of June 30, 2019, total cash and cash equivalents were $142 million.
- At June 30, 2019, there were no borrowings and no letters of credit issued under our $350 million Credit Facility.

Our future capital requirements will depend on many factors, including the rate of sales growth, market acceptance of our products, the timing and extent of research and development projects, potential acquisitions of companies or technologies and the expansion of our sales and marketing activities. We believe our existing cash, cash equivalents, investments and credit under our Credit Facilities are sufficient to meet our capital requirements through at least the next 12 months, although we could be required, or could elect, to seek additional funding prior to that time. We may enter into acquisitions or strategic arrangements in the future which also could require us to seek additional equity or debt financing.

*Honeywell Reimbursement Agreement*

In connection with the Spin-Off, we entered into the Honeywell Reimbursement Agreement, pursuant to which we have an obligation to make cash payments to Honeywell in amounts equal to 90% of payments for certain Honeywell environmental-liability payments, which include amounts billed, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. The amount payable by us in respect of such liabilities arising in any given year is subject to a cap of $140 million (exclusive of any late payment fees up to 5% per annum). The amount paid during the six months ended June 30, 2019 was $70 million. See "Note 21. Commitments and Contingencies" of Notes to Consolidated and Combined Financial Statements in our 2018 Annual Report on Form 10-K for further discussion.

***Cash Flow Summary for the Six Months Ended June 30, 2019 and 2018***

      Our cash flows from operating, investing and financing activities for the six months ended June 30, 2019 and 2018, as reflected in the unaudited Consolidated and Combined Interim Financial Statements are summarized as follows:

| | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | **2018** | |
| Cash (used for) provided by: | | | | |
| Operating activities | $ | (37) | $ | 258 |
| Investing activities | | (55) | | (17) |
| Financing activities | | (31) | | (201) |
| Effect of exchange rate changes on cash and cash equivalents | | - | | (3) |
| Net (decrease) increase in cash and cash equivalents | $ | (123) | $ | 37 |

      Cash used for operating activities for the six months ended June 30, 2019 increased by $295 million, primarily due to lower margins on higher sales volume.  This drove a $109 million increase in cash usage as a result of an increase in accounts receivable and a decrease in inventory payables.  Additional increases in cash usage of $55 million are due to increased levels of inventory purchases as we rebuilt safety stocks to improve customer delivery performance and to support growth initiatives as well as we paid more taxes in 2019 compared to June 30, 2018.

      Cash used for investing activities increased by $38 million, primarily due to an increase of $17 million cash paid for the acquisitions, an increase of $14 million cash paid for capital expenditures, and a decrease of $7 million in proceeds received related to amounts due from related parties.

      Net cash used for financing activities decreased by $170 million. The decrease in usage was primarily due to $201 million in pre-spin activity related to cash outflows of invested equity to Honeywell and cash pooling during the six months ended June 30, 2018 that is no longer applicable to the post Spin off period. The decrease in cash used for financing activities due to pre-spin-off activity was partially offset by $18 million of non-operating obligations paid to Honeywell and $11 million of long-term debt repayments during the six months ended June 30, 2019.

***Capital Expenditures***

      We believe our capital spending in recent years has been sufficient to maintain efficient production capacity, to implement important product and process redesigns and to expand capacity to meet increased demand. Productivity projects have freed up capacity in our manufacturing facilities and are expected to continue to do so. We expect to continue investing to expand and modernize our existing facilities and to create capacity for new product development. Capital expenditures for full year 2019 are expected to be $104 million of which, $45 million relates to costs associated with investments in infrastructure as a stand-alone company.

***Off-Balance Sheet Arrangements***

      We do not engage in any off-balance sheet financial arrangements that have or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, net revenue or expenses, results of operations, liquidity, capital expenditures or capital resources.

***Critical Accounting Policies***

      The preparation of our unaudited Consolidated and Combined Interim Financial Statements in accordance with generally accepted accounting principles is based on the selection and application of accounting policies that require us to make significant estimates and assumptions about the effects of matters that are inherently uncertain. We consider the accounting policies discussed in our 2018 Annual Report on Form 10-K for the year ended December 31, 2018, to be critical to the understanding of our unaudited Consolidated and Combined Interim Financial Statements. There have been no changes in our critical accounting policies as compared to what was

disclosed in the 2018 Annual Report on Form 10-K for the year ended December 31, 2018. Actual results could differ from our estimates and assumptions, and any such differences could be material to our unaudited Consolidated and Combined Interim Financial Statements.

**Other Matters**

*Litigation and Environmental Matters*

See "Note 15. Commitments and Contingencies" of Notes to unaudited Consolidated and Combined Interim Financial Statements of this Form 10-Q for a discussion of environmental and other litigation matters.

*Recent Accounting Pronouncements*

See "Note 2. Summary of Significant Accounting Policies" of Notes to unaudited Consolidated and Combined Interim Financial Statements of this Form 10-Q for a discussion of recent accounting pronouncements.

**Item 3.**          **Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risk from foreign currency exchange rates and interest rates, which could affect operating results, financial position and cash flows. We manage our exposure to these market risks through our regular operating and financing activities and, when appropriate, through the use of derivative financial instruments.

*Interest Rate Risk*

As of June 30, 2019, $814 million of our total debt of $1.2 billion carried variable interest rates. The fair market values of our fixed-rate financial instruments are sensitive to changes in interest rates. At June 30, 2019, an increase or decrease in interest rate on our Term Loans by 100 basis points does not have a material impact on our annual interest expense on long-term debt.

*Foreign Currency Exchange Rate Risk*

We are exposed to market risks from changes in currency exchange rates. While we primarily transact with customers in the U.S. Dollar, we also transact in foreign currencies, primarily including the Euro, British Pound, Canadian Dollar, and Czech Koruna. These exposures may impact total assets, liabilities, future earnings and/or operating cash flows. Our exposure to market risk for changes in foreign currency exchange rates arises from transactions arising from international trade, foreign currency denominated monetary assets and liabilities, and international financing activities between subsidiaries. We rely primarily on natural offsets to address our exposures and may supplement this approach from time to time by entering into forward and option hedging contracts. As of June 30, 2019, we have no outstanding hedging arrangements.

*Commodity Price Risk*

While we are exposed to commodity price risk, we attempt to pass through significant changes in component and raw material costs to our customers based on the contractual terms of our arrangements. In limited situations, we may not be fully compensated for such changes in costs.

**Item 4.**                    **Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

We maintain a system of disclosure controls and procedures designed to give reasonable assurance that information required to be disclosed in the Company's reports filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to management to allow timely decisions regarding required disclosures.

Management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives. Because there are inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud have been or will be detected.

Our Chief Executive Officer and Chief Financial Officer, with the assistance of other members of our management, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable assurance level as of the end of the period covered by this Quarterly Report on Form 10-Q.

*Changes in Internal Control Over Financial Reporting*

There was no change in our internal control over financial reporting that occurred during the quarter ended June 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We have implemented, and continue to refine, internal controls and key system functionality to enable the preparation of financial information related to the new lease standard (ASU No. 2016-02) upon adoption on January 1, 2019. There were no significant changes to our internal control over financial reporting due to the adoption of the new lease standard.

40

**PART II**

**Item 1. Legal Proceedings**

We are subject to various lawsuits, investigations and disputes arising out of the conduct of our business, including matters relating to commercial transactions, settlement agreements, government contracts, product liability, prior acquisitions and divestitures, employee matters, intellectual property, antitrust and environmental, health and safety matters. We recognize a liability for any contingency that is probable of occurrence and reasonably estimable. We continually assess the likelihood of adverse judgments of outcomes in these matters, as well as potential ranges of possible losses (taking into consideration any insurance recoveries), based on a careful analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts.

Additionally, in connection with our entry into the Honeywell Reimbursement Agreement, we will be required to make payments to Honeywell in amounts equal to 90% of payments, which include amounts billed, with respect to certain environmental claims, remediation and, to the extent arising after the Spin-Off, hazardous exposure or toxic tort claims, in each case including consequential damages in respect of specified properties contaminated through historical business operations, including the legal and other costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts relating to such liabilities, and less 90% of the net proceeds received by Honeywell in connection with (i) affirmative claims relating to such liabilities, (ii) contributions by other parties relating to such liabilities and (iii) certain property sales. For further information, see "Note 15. Commitments and Contingencies" of Notes to unaudited Consolidated and Combined Financial Statements of this Form 10-Q.

**Item 1A. Risk Factors**

We face a variety of risks that are inherent in our business and our industry, including operational, legal and regulatory risks. Such risks could cause our actual results to differ materially from our forward-looking statements, expectations and historical trends. There have been no material changes to the risk factors described in our 2018 Annual Report on Form 10-K.

**Item 5. Other Information**

At the Company's Annual Meeting of Shareholders on June 12, 2019, 96.9% of the shares voted on the non-binding advisory vote on the frequency of the advisory vote on executive compensation selected an annual vote.  In light of this result, the Board of Directors of the Company has determined to hold an annual advisory vote on executive compensation.

41

**Item 6.**       **Exhibits**

The Exhibits listed below on the Exhibit Index are filed or incorporated by reference as part of this Form 10-Q.

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Description |
|---|---|
| 10.1 | Resideo Amended and Restated 2018 Stock Incentive Plan |
| 31.1 | Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 31.2 | Certification of Principal Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 32.1 | Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 32.2 | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 101.INS | XBRL Instance Document (filed herewith) |
| 101.SCH | XBRL Taxonomy Extension Schema (filed herewith) |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase (filed herewith) |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase (filed herewith) |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase (filed herewith) |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase (filed herewith) |

| | |
|---|---|
| * | Certain schedules and similar attachments have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company hereby undertakes to furnish copies of any of the omitted schedules and similar attachments upon request by the U.S. Securities and Exchange Commission. |
| ‡ | Indicates management contracts or compensatory plans or arrangements. |

42

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Resideo Technologies, Inc.

Date: August 7th, 2019

By:/s/ Joseph D. Ragan III
        Joseph D. Ragan III
        Executive Vice President and Chief Financial
        Officer (on behalf of the Registrant and as the
        Registrant's Principal Financial and Accounting Officer)

43

([Back To Top](#))

# Section 2: EX-10.1 (EX-10.1)

**Exhibit 10.1**

*AMENDED AND RESTATED 2018 STOCK INCENTIVE PLAN*
*OF*
*RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES*

**ARTICLE I**
**ESTABLISHMENT AND PURPOSE**

1.1 ***Purpose***. The purpose of this Amended and Restated 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (as amended and restated, the "Plan") is to enable the Company to achieve superior financial performance, as reflected in the performance of its Common Stock and other key financial or operating indicators by (a) providing incentives and rewards to certain Employees and Other Service Providers who are in a position to contribute materially to the success and long-term objectives of the Company, (b) aiding in the recruitment and retention of Employees and Other Service Providers of exceptional ability, (c) providing Employees and Other Service Providers an opportunity to acquire or expand equity interests in the Company, and (d) promoting the growth and success of the Company's business by aligning the financial interests of Employees and Other Service Providers with that of the other stockholders of the Company. Towards these objectives, the Plan provides for the grant of Stock Options, Stock Appreciation Rights, Restricted Stock Units, Restricted Stock, Other Stock-Based Awards and Cash-Based Awards.

1.2 ***Original Plan; Effective Date***. The original 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Original Plan") was effective as of the effective date of the Company's Registration Statement on Form 10 filed with the Securities and Exchange Commission in connection with the distribution of its Shares by Honeywell International Inc. (the "Effective Date"). The Board adopted an amended and restated Plan on December 21, 2018 (the "Initial Restatement Date") and hereby adopts this amended and restated Plan on June 12, 2019 (the "Restatement Date"). References contained herein to the "Plan" shall refer to the Original Plan, as amended and restated effective the Restatement Date.

**ARTICLE II**
**DEFINITIONS**

For purposes of the Plan, the following terms have the following meanings:

2.1 "***1933 Act***" means the Securities Act of 1933, as amended, and the regulations and interpretations thereunder.

2.2 "***Affiliate***" means (a) any subsidiary of the Company of which at least 50 percent of the aggregate outstanding voting common stock or capital stock is owned directly or indirectly by the Company, (b) any other parent of a subsidiary described in clause (a), or (c) any other entity in which the Company has a substantial ownership interest and which has been designated as an Affiliate by the Committee in its sole discretion.

2.3 "***Award***" means any form of incentive or performance award granted under the Plan, whether singly or in combination, to a Participant by the Committee pursuant to any terms and conditions that the Committee may establish and set forth in the applicable Award Agreement. Awards granted under the Plan may consist of: (a) "Stock Options" awarded pursuant to Section 4.3; (b) "Stock Appreciation Rights" awarded pursuant to Section 4.3; (c) "Restricted Stock Units" awarded pursuant to Section 4.4; (d) "Restricted Stock" awarded pursuant to Section 4.4; (e) "Other Stock-Based Awards" awarded pursuant to Section 4.5; and (f) "Cash-Based Awards" awarded pursuant to Section 4.6.

2.4 "***Award Agreement***" means the document issued, either in writing or an electronic medium, to a Participant evidencing the grant of an Award and that sets out the terms and conditions of such Award.

2.5 "***Board***" means the Board of Directors of the Company.

2.6 "***Cash-Based Award***" means an award issued pursuant to Section 4.6.

US.123088230.01

2.7 *"Cause"* has the meaning assigned to such term in any severance plan of the Company or an Affiliate, in each case, that is applicable to such Participant as of immediately prior to the Termination of Service; *provided*, that if no such agreement exists, or if such term is not defined in such agreement, "Cause" means any of the following: (i) clear evidence of a significant violation of the Company's Code of Business Conduct; (ii) a fraud committed against the Company; (iii) the misappropriation, embezzlement or reckless or willful destruction of Company property; (iv) the willful failure to perform, or gross negligence in the performance of, duties; (v) the conviction (treating a nolo contendere plea as a conviction) of a felony (whether or not any right to appeal has been or may be exercised); (vi) the knowing falsification of any records or documents of the Company; (vii) a significant breach of any statutory or common law duty of loyalty to the Company; (viii) intentional and improper conduct significantly prejudicial to the business of the Company; (ix) the failure to cooperate fully in a Company investigation or the failure to be fully truthful when providing evidence or testimony in such investigation; or (x) the violation of Company rules and policies that, based on a single occurrence, might not meet the significance thresholds of (i), (vii) or (viii) above, but that shall, for purposes of such significance thresholds, be deemed to constitute a violation thereof in the event any such violation occurs more than once. Cause shall be determined by the Committee for Reporting Persons or by the Company for all other Participants, in its sole and absolute discretion.

2.8 *"Change in Control"* means (a) any one person, or more than one person acting as a group (as defined under U.S. Department of Treasury Regulation ("Treasury Regulation") § 1.409A-3(i)(5)(v)(B)) acquires ownership of stock of the Company that, together with stock held by such person or group, constitutes more than 50 percent of the total fair market value or total voting power of the stock of the Company; or (b) any one person, or more than one person acting as a group (as defined under Treasury Regulation § 1.409A-3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) ownership of stock of the Company possessing 30 percent or more of the total voting power of the stock of the Company; or (c) a majority of members of the Board is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the members of the Board before the date of the appointment or election; or (d) any one person, or more than one person acting as a group (as defined in Treasury Regulation § 1.409A-3(i)(5)(v)(B)) acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets from the Company and its subsidiaries on a consolidated basis that have a total gross fair market value equal to or more than 40 percent of the total gross fair market value of all of the assets of the Company and its subsidiaries on a consolidated basis immediately before such acquisition or acquisitions. For purposes of clause (d), "gross fair market value" means the value of the assets of the Company and its subsidiaries on a consolidated basis, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets. The foregoing clauses (a) through (d) shall be interpreted in a manner that is consistent with the Treasury Regulations promulgated pursuant to Section 409A of the Code so that all, and only, such transactions or events that could qualify as a "change in control event" within the meaning of Treasury Regulation § 1.409A-3(i)(5)(i) shall be deemed to be a Change in Control for purposes of this Plan.

2.9 *"Code"* means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

2.10 *"Committee"* means the compensation committee of the Board or any successor committee or subcommittee of the Board or other committee or subcommittee designated by the Board, which committee or subcommittee is comprised solely of two or more persons who are Non-Employee Directors within the meaning of Rule 16b-3(b)(3) under the Exchange Act.

2.11 *"Common Stock"* means the common stock of the Company.

2.12 *"Company"* means Resideo Technologies, Inc. and its successors.

2.13 *"Disabled"* and *"Disability,"* with respect to a Participant, have the meanings assigned to such terms under the long-term disability plan maintained by the Company or an Affiliate in which such Participant is covered at the time the determination is made, and if there is no such plan, mean the permanent inability as a result of accident or sickness to perform any and every duty pertaining to such Participant's occupation or employment for which the Participant is suited by reason of the Participant's previous training, education and experience; *provided*, that, to the extent an Award subject to Section 409A of the Code shall become payable upon a Participant's Disability, a Disability shall not be deemed to have occurred for such purposes unless the circumstances would also result in a "disability" within the meaning of Section 409A of the Code, unless otherwise provided in an Award Agreement.

2

2.14 *"Dividend Equivalent"* means an amount equal to the cash dividend or the Fair Market Value of the stock dividend that would be paid on each Share underlying an Award if the Share were duly issued and outstanding on the date on which the dividend is payable.

2.15 *"Employee"* means any individual who performs services as an employee of the Company or an Affiliate.

2.16 *"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the regulations and interpretations thereunder.

2.17 *"Executive Level Employee"* means any individual who is designated as an officer of the Company by the Board, whether or not that individual is in a direct reporting relationship to the Company's Chief Executive Officer.

2.18 *"Exercise Price"* means the price of a Share, as fixed by the Committee, that may be purchased under a Stock Option or with respect to which the amount of any payment pursuant to a Stock Appreciation Right is determined.

2.19 *"Fair Market Value"* means, except as otherwise provided in the applicable Award Agreement, (a) with respect to any property other than Shares, the fair market value of such property determined by such methods or procedures as shall be established from time to time by the Committee and (b) with respect to Shares, as of any date, (i) the average (mean) of the highest and lowest sales prices of a Share, as reported on the New York Stock Exchange (or any other reporting system selected by the Committee, in its sole discretion) on the date as of which the determination is being made or, if no sale of Shares is reported on this date, on the most recent preceding day on which there were sales of Shares reported or (ii) in the event there shall be no public market for the Shares on such date, the fair market value of the Shares as determined in good faith by the Committee.

2.20 *"GAAP"* means U.S. generally accepted accounting principles.

2.21 *"Good Reason"* has the meaning assigned to such term in any written individual agreement between the Company or an Affiliate and the Participant in which such term is defined and in the absence of any such written agreement, has the meaning assigned to such term in any severance plan of the Company or an Affiliate, in each case, that is applicable to such Participant, in each case, as of immediately prior to the Change in Control (but assuming that a Change in Control has occurred for purposes of such agreement or plan); *provided*, that if no such agreement exists, or if such term is not defined in such agreement, "Good Reason" means, without the Participant's consent, (a) a material reduction in the Participant's base salary and, as to a Participant who is an Executive Level Employee, annual target bonus in effect immediately prior to the Change in Control (other than a reduction that is generally applicable to all salaried and non-union hourly employees of the Company); (b) the permanent elimination of the Participant's position, not including a transfer pursuant to the sale of a facility or line of business, *provided* the Participant is offered substantially comparable employment with the successor employer; (c) in the case of a Participant who is an Executive Level Employee, a material adverse change to the Participant's position, function, responsibilities or reporting level, or in the standard of performance required of the Participant, as determined immediately prior to a Change in Control; (d) a material change in the geographic location at which the Participant must perform his or her services from the location the Participant was required to perform such services immediately prior to a Change in Control; or (e) an action by the Company that under applicable law constitutes constructive discharge. Notwithstanding the foregoing, Good Reason shall not be deemed to have occurred unless the Participant provides written notice to the Company identifying the event or omission constituting the reason for a Good Reason termination within ninety (90) days following the first occurrence of such event or omission. Within thirty (30) days after such notice has been provided to the Company, the Company shall have the opportunity, but shall have no obligation, to cure such event or conditions that give rise to a Good Reason termination. If the Company fails to cure the events or conditions giving rise to a Participant's Good Reason termination by the end of the thirty (30) day cure period, the Participant's employment shall be terminated effective as of the expiration of such thirty (30) day cure period unless the Participant has withdrawn such Good Reason termination notice.

2.22 *"Incentive Stock Option"* means a Stock Option granted under Section 4.3 of the Plan that meets the requirements of Section 422 of the Code and is designated in the Award Agreement to be an Incentive Stock Option.

3

US.123088230.01

2.23 *"Non-Employee Director"* means any member of the Board, elected or appointed, who is not an Employee. An individual who is elected to the Board at a meeting of the stockholders of the Company shall be deemed to be a member of the Board as of the date of the meeting.

2.24 *"Nonqualified Stock Option"* means any Stock Option granted under Section 4.3 of the Plan that is not an Incentive Stock Option.

2.25 *"Other Service Provider"* means an individual providing services to the Company as an independent contractor or consultant and who is not an Employee or a Non-Employee Director.

2.26 *"Other Stock-Based Award"* means an Award granted under Section 4.5 and denominated in Shares.

2.27 *"Participant"* means an Employee or Other Service Provider who has been granted an Award under the Plan.

2.28 *"Reporting Person"* means an Employee who is subject to the reporting requirements of Section 16(a) of the Exchange Act.

2.29 *"Restricted Stock"* means Shares issued pursuant to Section 4.4 that are subject to any restrictions that the Committee, in its discretion, may impose.

2.30 *"Restricted Stock Unit"* means a right granted under Section 4.4 to acquire Shares or an equivalent amount in cash that is subject to any restrictions that the Committee, in its discretion, may impose.

2.31 *"Retirement"* means, except as otherwise determined by the Committee or as required by local law applicable to a Participant, the Termination of Service on or after attainment of age 55 with 10 years of service with the Company and its Affiliates, other than on account of an involuntary Termination of Service for Cause, provided however, that the Participant has advised the Company's corporate secretary in writing no less than six (6) months prior to such Retirement that he or she is considering retirement. For purposes of this Section, "years of service" is determined using the Participant's most-recent adjusted service date, as reflected at the Participant's Termination of Service in the Company's records. Notwithstanding any provision to the contrary in this Plan or any Award Agreement, any continued or extended vesting and/or exercise period that would otherwise be available upon a Participant's Retirement under an Award granted on or after the Initial Restatement Date shall not apply to any such Awards granted to any Participant resident in any country where a continued or extended vesting and/or exercise period due to Retirement would violate age discrimination rules and regulations.

2.32 *"Share"* means a share of Common Stock.

2.33 *"Stock Appreciation Right"* means a right granted under Section 4.3 to an amount in cash or a number of Shares with a Fair Market Value equal to the excess of the Fair Market Value of the Shares on the date on which the Stock Appreciation Right is exercised over the applicable Exercise Price (with any fractional Shares treated in accordance with Section 5.5).

2.34 *"Stock Option"* means a right granted under Section 4.3 to purchase from the Company a stated number of Shares at the applicable Exercise Price. Stock Options awarded under the Plan may be in the form of Incentive Stock Options or Nonqualified Stock Options.

2.35 *"Termination of Service"* means the date of cessation of a Participant's provision of services to the Company and its Affiliates for any reason, with or without Cause, as determined by the Company; *provided*, that a Participant will be deemed to have incurred a Termination of Service on the date that such Participant provides notice of termination to the Company and its Affiliates. Except as otherwise provided in an Award Agreement, (a) termination of service shall be determined without regard to any statutory or contractual notice periods for termination of employment, dismissal, redundancy, and similar events, and (b) if an Employee's employment is terminated under circumstances that entitle the Employee to severance benefits pursuant to any applicable severance plan of the

US.123088230.01

Company or an Affiliate in which the Employee participates, the Employee's employment relationship with the Company and its Affiliates shall cease on the day prior to the date that severance benefits become payable under the terms of the applicable severance plan without regard to any delay in payment required by Section 409A of the Code. Notwithstanding the foregoing, (x) if an Affiliate ceases to be an Affiliate while an Award granted to a Participant who provides services to such Affiliate is outstanding, the Committee may, in its discretion, deem such Participant to have a Termination of Service on the date the Affiliate ceases to be an Affiliate or on a later date specified by the Committee; (y) the Committee shall make any determination described in clause (x) before or not more than a reasonable period after the date the Affiliate ceases to be an Affiliate; and (z) each such Participant's Termination of Service shall be treated as an involuntary termination not for Cause. For purposes of clarification, any non-qualified deferred compensation (within the meaning of Section 409A of the Code) payable to the Participant upon a Termination of Service pursuant to the terms and conditions of this Plan shall be paid to the Participant upon a "separation from service" as determined in accordance with Section 409A of the Code without the imposition of additional taxes or penalties.

## ARTICLE III
## ADMINISTRATION

3.1 *The Committee*. The Plan shall be administered by the Committee.

3.2 *Authority of the Committee*. The Committee shall have authority, in its sole and absolute discretion and subject to the terms of the Plan, to (a) interpret the Plan; (b) prescribe the rules and regulations that it deems necessary for the proper operation and administration of the Plan, and amend or rescind any existing rules or regulations relating to the Plan; (c) select Employees and Other Service Providers to receive Awards under the Plan; (d) determine the form of Awards, the number of Shares subject to each Award, all the terms and conditions of an Award including, without limitation, the conditions on exercise or vesting, the designation of Stock Options as Incentive Stock Options or Nonqualified Stock Options and the terms of Award Agreements; (e) determine whether Awards shall be granted singly, in combination or in tandem; (f) establish and administer performance criteria in respect of any Awards that are subject to performance-based vesting or settlement; (g) waive or amend any terms, conditions, restrictions or limitations on an Award, except that the prohibition on the repricing of Stock Options and Stock Appreciation Rights, as described in Section 4.3(g), may not be waived; (h) in accordance with Article V, make any adjustments to the Plan (including but not limited to adjustment of the number of Shares available under the Plan or any Award) and any Award granted under the Plan that may be appropriate; (i) provide for the deferred payment of Awards and the extent to which payment shall be credited with Dividend Equivalents; (j) determine whether Awards may be transferable to family members, a family trust, a family partnership or otherwise; (k) determine whether, to what extent and under what circumstances Awards may be settled in cash, Shares or other property; (l) interpret, administer, reconcile any inconsistency in, correct any default in and/or supply any omission in, the Plan and any instrument or agreement relating to (including any Award Agreement), or Award made under, the Plan; (m) waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate any Award; (n) accelerate the vesting or exercisability of, payment for or lapse of restrictions on, Awards; (o) establish any provisions that the Committee may determine to be necessary in order to implement and administer the Plan in foreign countries; and (p) take any and all other actions it deems necessary or advisable for the proper operation or administration of the Plan.

3.3 *Effect of Determinations*. All determinations of the Committee shall be final, binding and conclusive on all persons having an interest in the Plan.

3.4 *Delegation of Authority*. The Committee, in its discretion and consistent with applicable law and regulations, may delegate its authority and duties under the Plan to one or more subcommittees of the Committee or to the Chief Executive Officer of the Company or any other individual or committee as it deems to be advisable, under any conditions and subject to any limitations that the Committee may establish. Only the Committee (or a subset thereof), however, shall have authority to grant and administer Awards to Reporting Persons and any delegate of the Committee.

3.5 *Employment of Advisors*. The Committee may select and employ attorneys, consultants, accountants and other advisors at the Company's expense (and may determine the compensation thereof), and the Committee, the Company, and the officers and directors of the Company may rely upon the advice, opinions or valuations of the advisors employed.

5

US.123088230.01

3.6 *No Liability*. No member of the Committee, nor any person acting as a delegate of the Committee with respect to the Plan, shall be liable for any losses resulting from any action taken or omitted to be taken, interpretation or construction made in good faith with respect to the Plan or any Award granted under the Plan.

**ARTICLE IV**
**AWARDS**

4.1 *Eligibility*. All Employees, and such Other Service Providers as may be designated by the Committee from time to time, are eligible to receive Awards granted under the Plan, except as otherwise provided in this Article IV.

4.2 *Form of Awards*. Awards shall be in the form determined by the Committee, in its discretion, and shall be evidenced by an Award Agreement. Awards may be granted singly or in combination or in tandem with other Awards.

4.3 *Stock Options and Stock Appreciation Rights*. The Committee may grant Stock Options and Stock Appreciation Rights under the Plan to those Employees and Other Service Providers whom the Committee may from time to time select, in the amounts and pursuant to the other terms and conditions that the Committee, in its discretion, may determine and set forth in the Award Agreement, subject to the provisions below:

(a) *Form*. Stock Options granted under the Plan shall, at the discretion of the Committee and as set forth in the Award Agreement, be in the form of Incentive Stock Options, Nonqualified Stock Options, or a combination of the two. If an Incentive Stock Option and a Nonqualified Stock Option are granted to the same Participant under the Plan at the same time, the form of each shall be clearly identified, and they shall be deemed to have been granted in separate grants. In no event shall the exercise of one Award affect the right to exercise the other Award. Stock Appreciation Rights may be granted either alone or in connection with concurrently or previously issued Nonqualified Stock Options.

(b) *Exercise Price*. Other than with respect to Stock Options that are assumed, converted or substituted as a result of the acquisition of another company by the Company or an Affiliate or a combination of the Company or an Affiliate with another company, the Committee shall set the Exercise Price of Stock Options or Stock Appreciation Rights granted under the Plan at a price that is equal to or greater than the Fair Market Value of a Share on the date of grant, subject to adjustment as provided in Section 5.3. The Exercise Price of Incentive Stock Options, however, shall be equal to or greater than 110 percent of the Fair Market Value of a Share on the date of grant if the Participant receiving the Stock Options owns stock possessing more than 10 percent of the total combined voting power of all classes of stock of the Company or of any subsidiary or parent corporation of the Company, as defined in Section 424 of the Code. The Exercise Price of a Stock Appreciation Right granted in tandem with a Stock Option shall be equal to the Exercise Price of the related Stock Option. The Exercise Price of a Stock Option or Stock Appreciation Right shall be set forth in the Award Agreement.

(c) *Term and Timing of Exercise*. Except as otherwise provided in an Award Agreement, Stock Options and Stock Appreciation Rights shall lapse not later than 10 years after the date of grant, as determined by the Committee at the time of grant. Except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, each Stock Option or Stock Appreciation Right granted under the Plan shall be exercisable in whole or in part, subject to the following conditions:

(i) The date on which any Award of Stock Options or Stock Appreciation Rights to a Participant may first be exercised shall be set forth in the Award Agreement.

(ii) A Stock Appreciation Right granted in tandem with a Stock Option shall be subject to the same terms and conditions as the related Stock Option and shall be exercisable only to the extent that the related Stock Option is exercisable.

6

US.123088230.01

(iii)     Stock Options and Stock Appreciation Rights shall vest and remain exercisable as follows, subject to Section 5.4:

| Event | Vesting | Exercise Period for Vested Awards |
|---|---|---|
| Death | Immediate vesting as of death (in the case of Awards made on or after the Initial Restatement Date, including if death occurs during any post-Retirement continued vesting period). | Expires earlier of (i) original expiration date, or (ii) 3 years after death (in the case of Awards made on or after the Initial Restatement Date, clause (ii) shall include instances where death occurs during any post-Retirement continued vesting period). |
| Disability | Immediate vesting as of Termination of Service due to the incurrence of Disability. | Expires earlier of (i) original expiration date, or (ii) 3 years after Termination of Service due to Disability. |
| Retirement<br><br>(Applicable to Awards granted prior to the Initial Restatement Date) | Unvested Awards forfeited as of Retirement. | Expires earlier of (i) original expiration date or (ii) 3 years after Retirement. |
| Retirement*<br><br>(Applicable to Awards granted on or after Initial Restatement Date) | Unvested Awards continue to vest in accordance with original vesting schedule following Retirement. | Expires on the earlier of (i) original expiration date or (ii) 3 years after Retirement. |
| Voluntary Termination of Service (other than covered by Retirement) | Unvested Awards forfeited as of Termination of Service. | Expires earlier of (i) original expiration date, or (ii) 30 days after Termination of Service. |
| Involuntary Termination of Service not for Cause | Unvested Awards forfeited as of Termination of Service | Expires earlier of (i) original expiration date, or (ii) 1 year after Termination of Service. |
| Involuntary Termination of Service for Cause | Unvested Awards forfeited as of Termination of Service | Vested Awards immediately cancelled. |

* Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in the continued vesting of such Award, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

(iv)     Stock Options and Stock Appreciation Rights of a deceased Participant may be exercised only by the estate of the Participant or by the person given authority to exercise the Stock Options or Stock Appreciation Rights by the Participant's will or by applicable laws of descent and distribution. If a Stock Option or Stock Appreciation Right is exercised by the executor or administrator of a deceased Participant's estate, or by the person or persons to whom the Stock Option or Stock Appreciation Right has been transferred by the

7

Participant's will or the applicable laws of descent and distribution, the Company shall be under no obligation to deliver Shares or cash until the Company is satisfied that the person exercising the Stock Option or Stock Appreciation Right is the duly appointed executor or administrator of the deceased Participant's estate or the person to whom the Stock Option or Stock Appreciation Right has been transferred by the Participant's will or by applicable laws of descent and distribution.

(d)    *Payment of Exercise Price*. The Exercise Price of a Stock Option must be paid in full when the Stock Option is exercised. Stock certificates shall be registered and delivered only upon receipt of payment. Payment of the Exercise Price may be made in cash or by certified check, bank draft, wire transfer, or postal or express money order. No portion of the Exercise Price of a Stock Option may be paid from the proceeds of a loan of cash from the Company to the Participant. In addition, the Committee may also permit payment of all or a portion of the Exercise Price to be made by any other method, *provided*, that, for Awards to Reporting Persons, permissible methods shall be set forth in the applicable Award Agreement, including:

(i)    Delivering a properly executed exercise notice to the Company or its agent, together with irrevocable instructions to a broker to deliver promptly to the Company the amount of sale proceeds with respect to the portion of the Shares to be acquired having a Fair Market Value on the date of exercise equal to the sum of the applicable portion of the Exercise Price being so paid; or

(ii)    Tendering (actually or by attestation) to the Company previously acquired Shares that have been held by the Participant for at least six months, subject to paragraph (d)(v), and that have a Fair Market Value on the day prior to the date of exercise equal to the applicable portion of the Exercise Price being so paid; or

(iii)    Instructing the Company to withhold Shares that would otherwise be issued having a Fair Market Value on the date of exercise equal to the applicable portion of the Exercise Price being so paid (*provided* such withholding has been expressly authorized by the Committee); or

(iv)    Any combination of the methods described in paragraphs (i), (ii), and (iii).

(v)    The Committee, in consideration of applicable accounting standards, may waive any holding period on Shares required to tender pursuant to paragraph (d)(ii) or prohibit withholding pursuant to paragraph (d)(iii).

(e)    *Incentive Stock Options*. Incentive Stock Options granted under the Plan shall be subject to the following additional conditions, limitations, and restrictions:

(i)    *Eligibility*. Incentive Stock Options may be granted only to Employees of the Company or an Affiliate that is a subsidiary or parent corporation of the Company, within the meaning of Section 424 of the Code.

(ii)    *Timing of Grant*. No Incentive Stock Option shall be granted under the Plan after the 10-year anniversary of the date on which the Plan is adopted by the Board or, if earlier, the date on which the Plan is approved by the Company's shareowners.

(iii)    *Amount of Award*. The aggregate Fair Market Value as of the date of grant of the Shares with respect to which the Incentive Stock Options awarded to any Participant first become exercisable during any calendar year may not exceed $100,000. For purposes of this $100,000 limit, the Participant's Incentive Stock Options under this Plan and all other plans maintained by the Company and its Affiliates shall be aggregated. To the extent any Incentive Stock Option would exceed the $100,000 limit, the Incentive Stock Option shall afterwards be treated as a Nonqualified Stock Option for all purposes.

8

US.123088230.01

(iv)     *Timing of Exercise*. If the Committee exercises its discretion in the Award Agreement to permit an Incentive Stock Option to be exercised by a Participant more than three months after the Participant has ceased being an Employee (or more than 12 months if the Participant is permanently and totally disabled, within the meaning of Section 22(e) of the Code), the Incentive Stock Option shall be treated as a Nonqualified Stock Option for all purposes following the date that is three months after the Participant has ceased being an Employee (or 12 months after the Participant is determined to be permanently and totally disabled, within the meaning of Section 22(e) of the Code). For purposes of this paragraph (e)(iv), an Employee's employment relationship shall be treated as continuing intact while the Employee is on military leave, sick leave, or another approved leave of absence if the period of leave does not exceed 90 days, or a longer period to the extent that the Employee's right to reemployment with the Company or an Affiliate is guaranteed by statute or by contract. Where the period of leave exceeds 90 days and the Employee's right to reemployment is not guaranteed by statute or contract, the employment relationship shall be deemed to have ceased on the 91st day of the leave.

(v)      *Transfer Restrictions*. In no event shall the Committee permit an Incentive Stock Option to be transferred by a Participant other than by will or the applicable laws of descent and distribution, and any Incentive Stock Option awarded under this Plan shall be exercisable only by the Participant during the Participant's lifetime.

(f)      *Exercise of Stock Appreciation Rights*. Upon exercise, Stock Appreciation Rights may be redeemed for cash or Shares or a combination of cash and Shares, in the discretion of the Committee, and as described in the Award Agreement. Cash payments shall be equal to the excess of the Fair Market Value of a Share on the date of exercise over the Exercise Price for each Share for which a Stock Appreciation Rights was exercised. If the Stock Appreciation Right is redeemed for Shares, the Participant shall receive a number of Shares equal to the quotient of the cash payment amount divided by the Fair Market Value of a Share on the date of exercise (with any fractional Shares to be treated in accordance with Section 5.5).

(g)      *Certain Prohibitions*. The following terms or actions shall not be permitted with respect to any Award of Stock Options or Stock Appreciation Rights:

(i)      *No Repricing*. Except as otherwise provided in Section 5.3, in no event shall the Committee decrease the Exercise Price of a Stock Option or Stock Appreciation Right after the date of grant, or cancel outstanding Stock Options or Stock Appreciation Rights and grant replacement Stock Options or Stock Appreciation Rights with a lower Exercise Price than that of the replaced Stock Options or Stock Appreciation Rights or other Awards, or purchase underwater Stock Options from a Participant for cash or replacement Awards without first obtaining the approval of the Company's stockholders in a manner that complies with the rules of the New York Stock Exchange.

(ii)     *No Dividend Equivalents*. The Committee shall not provide for the payment of Dividend Equivalents with respect to Stock Options or Stock Appreciation Rights.

(iii)    *No Reload Options*. The Committee shall not grant Stock Options or Stock Appreciation Rights that have reload features under which the exercise of a Stock Option or Stock Appreciation Right by a Participant automatically entitles the Participant to a new Stock Option or Stock Appreciation Right.

(iv)     *No Additional Deferral Features*. The Committee shall not grant Stock Options or Stock Appreciation Rights that have "additional deferral features" as described in Section 409A of the Code, thereby subjecting the Stock Option or Stock Appreciation Right to the requirements of Section 409A.

9

4.4 **Restricted Stock Units and Restricted Stock**. The Committee may grant Restricted Stock Units and Restricted Stock under the Plan to those Employees and Other Service Providers whom the Committee may from time to time select, in the amounts and pursuant to the terms and conditions that the Committee, in its discretion, may determine and set forth in the Award Agreement, subject to the provisions below:

(a) *Grant of Restricted Stock Units*. The Committee may grant Restricted Stock Units to any Employee or Other Service Provider, which are denominated in, valued in whole or in part by reference to, or otherwise related to, Shares. The Committee shall determine, in its discretion, the terms and conditions that apply to Restricted Stock Units granted pursuant to this Section 4.4, including whether and how Dividend Equivalents shall be credited with respect to any Award. The terms and conditions of the Restricted Stock Units shall be set forth in the applicable Award Agreement.

(b) *Grant of Restricted Stock*. As soon as practicable after Restricted Stock has been granted, certificates for all Shares of Restricted Stock shall be registered in the name of the Participant and held for the Participant by the Company. The Participant shall have all rights of a stockholder with respect to the Shares, including the right to vote and to receive dividends or other distributions, except that the Shares may be subject to a vesting schedule and forfeiture and, except as otherwise provided in Section 7.1, may not be sold, transferred, assigned, pledged or otherwise encumbered or disposed until the restrictions are satisfied or lapse.

(c) *Dividends and Dividend Equivalents*. At the discretion of the Committee and as described in the Award Agreement, dividends issued on Shares of Restricted Stock may be paid immediately or withheld and deferred in the Participant's account. In the event of a payment of dividends on Common Stock, to the extent permissible under Section 409A of the Code, the Committee may credit Restricted Stock Units with Dividend Equivalents. Except as otherwise described in the Award Agreement or determined by the Committee, Dividend Equivalents may be withheld and deferred in the Participant's account subject to a vesting schedule, or used to credit additional Restricted Stock Units that vest on the same schedule and subject to any other conditions as the underlying Restricted Stock Units. The Committee shall determine any terms and conditions on deferral of Dividend Equivalents.

(d) *Vesting and Forfeiture*. The Committee may, in its discretion and as set forth in the Award Agreement, impose any restrictions on Restricted Stock Units and/or their related Dividend Equivalents or Restricted Stock that it deems to be appropriate, including conditioning the vesting or settlement of all or part of any such Awards on the achievement or satisfaction of performance criteria (any such Award, a "Performance Stock Unit" or "Performance Restricted Stock"). Except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, the Restricted Stock Units, related Dividend Equivalents and Restricted Stock granted to Participants shall be subject to the following restrictions:

(i) *Vesting and Forfeiture*. Subject to Section 5.4, if the restrictions have not lapsed or been satisfied as of the Participant's Termination of Service, the Restricted Stock Units or Restricted Stock shall be forfeited by the Participant if the termination is for any reason other than death, Disability or, if the Restricted Stock Unit or Restricted Stock Award is granted on or after the Initial Restatement Date, Retirement.

(ii) *Death or Disability*. Except for Restricted Stock Units and Restricted Stock granted subject to performance-based vesting conditions, all restrictions on Restricted Stock Units and any related Dividend Equivalents or Restricted Stock granted pursuant to this Section 4.4 shall lapse upon the Participant's death or Termination of Service due to Disability.

10

US.123088230.01

(iii)    *Retirement.* Restricted Stock Units and Restricted Stock granted on or after the Initial Restatement Date are subject to the following provisions:

i.   Except for Restricted Stock Units and Restricted Stock granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions on Restricted Stock Units and any related Dividend Equivalents or Restricted Stock granted pursuant to this Section 4.4 shall lapse in accordance with the original vesting schedule of the Award, subject to the immediate lapse of all restrictions upon a Participant's death.

ii.  With respect to Restricted Stock Units and Restricted Stock granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions will lapse on a pro rata portion of the Restricted Stock Units and any related Dividend Equivalents or Restricted Stock granted pursuant to this Section 4.4 that would otherwise have been determined by the Committee to have been earned as of the end of the applicable performance period if the Participant's service had continued, with such pro rata portion determined by dividing the number of days between the first day of the performance period and the Retirement date, by the number of days in the applicable performance period.

iii. Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in an Award's continued vesting or pro rata vesting based on the Company's actual levels of achievement of the applicable performance metrics at the end of the performance period, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period or actual performance period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

(iv)   *Legend.* To enforce any restrictions that the Committee may impose on Restricted Stock, the Committee shall cause a legend referring to the restrictions to be placed on all certificates for Shares of Restricted Stock. When restrictions lapse or are satisfied, a new certificate, without the legend, for the number of Shares with respect to which restrictions have lapsed or been satisfied shall be issued and delivered to the Participant.

(e)   *Redemption of Restricted Stock Units.* Restricted Stock Units may be redeemed for cash or whole Shares, or a combination of cash and whole Shares, in the discretion of the Committee, when the restrictions lapse and any other conditions set forth in the Award Agreement have been satisfied; *provided,* that with respect to any Restricted Stock Units subject to Section 409A of the Code such redemption shall occur in a manner that complies with Section 409A of the Code. Each Restricted Stock Unit may be redeemed for one Share or an amount in cash equal to the Fair Market Value of a Share as of the date on which the Restricted Stock Unit vests.

(f)   *Deferred Units.* Subject to Section 7.14 and to the extent determined by the Committee, Participants may be permitted to request the deferral of payment of vested Restricted Stock Units (including the value of related Dividend Equivalents) to a date later than the payment date specified in the Award Agreement, *provided,* that any such election be made in accordance with Section 409A of the Code. The Committee shall determine any terms and conditions on deferral.

4.5 **Other Stock-Based Awards**. The Committee may, from time to time, grant Awards (other than Stock Options, Stock Appreciation Rights, Restricted Stock Units or Restricted Stock) to any Employee or Other Service Provider that consist of, or are denominated in, payable in, valued in whole or in part by reference to, or otherwise related to, Shares. These Awards may include, among other things, phantom or hypothetical Shares. The Committee

11

US.123088230.01

shall determine, in its discretion and subject to Section 7.14, the terms and conditions that will apply to Other Stock-Based Awards granted pursuant to this Section 4.5, including whether Dividend Equivalents will be credited with respect to any such Award in the event of a payment of dividends on Common Stock, and whether such Awards will be settled in cash or whole Shares, or a combination of cash and whole Shares, when the restrictions lapse and any other conditions set forth in the Award Agreement have been satisfied. The terms and conditions of Other Stock-Based Awards shall be set forth in the applicable Award Agreement and except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, the Other Stock-Based Awards granted to Participants shall be subject to the following restrictions:

(a)   *Vesting*. Subject to Section 5.4, if the restrictions on Other Stock-Based Awards have not lapsed or been satisfied as of the Participant's Termination of Service, the Shares shall be forfeited by the Participant if the termination is for any reason other than death, Disability or, if the Other Stock-Based Award is granted on or after the Initial Restatement Date, Retirement.

(b)   *Death or Disability*. Except for Other Stock-Based Awards granted subject to performance-based vesting conditions, restrictions on Other Stock-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 shall lapse upon the Participant's death or Termination of Service due to Disability.

(c)   *Retirement*. Other Stock-Based Awards granted on or after the Initial Restatement Date are subject to the following provisions:

(i)   Except for Other Stock-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions on Other Stock-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 shall lapse in accordance with the original vesting schedule of the Award, subject to the immediate lapse of all restrictions upon a Participant's death.

(ii)   With respect to Other Stock-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions will lapse on a pro rata portion of the Other Stock-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 that would otherwise have been determined by the Committee to have been earned as of the end of the applicable performance period if the Participant's service had continued, with such pro rata portion determined by dividing the number of days between the first day of the performance period and the Retirement date, by the number of days in the applicable performance period.

(iii)   Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in an Award's continued vesting or pro rata vesting based on the Company's actual levels of achievement of the applicable performance metrics at the end of the performance period, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period or actual performance period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

12

US.123088230.01

4.6 **Cash-Based Awards**. The Committee may, from time to time, grant Awards to any Employee or Other Service Provider that are designated as Cash-Based Awards, with the expectation that these Awards will be settled in cash, however, such Cash-Based Awards may be settled in cash or whole Shares or a combination of cash and whole Shares, as determined by the Committee. The value of these Awards may be based in whole or in part or by reference to, or otherwise related to, Shares, and may be granted subject to the achievement of one or more performance goals as determined by the Committee from time to time. The Committee shall determine, in its discretion and subject to Section 7.14, the terms and conditions that will apply to Cash-Based Awards granted pursuant to this Section 4.6. The terms and conditions of Cash-Based Awards shall be set forth in the applicable Award Agreement and except as otherwise provided in an Award Agreement or other subsequent agreement between a Participant and the Company or an Affiliate, the Cash-Based Awards granted to Participants shall be subject to the following restrictions:

(a) *Vesting*. Subject to Section 5.4, if the restrictions on Cash-Based Awards have not lapsed or been satisfied as of the Participant's Termination of Service, the Cash-Based Awards shall be forfeited by the Participant if the termination is for any reason other than death, Disability or, if the Cash-Based Award is granted on or after the Initial Restatement Date, Retirement.

(b) *Death or Disability*. Except for Cash-Based Awards granted subject to performance-based vesting conditions, restrictions on Cash-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.6 shall lapse upon the Participant's death or Termination of Service due to Disability.

(c) *Retirement*. Cash-Based Awards granted on or after the Initial Restatement Date are subject to the following provisions:

(i) Except for Cash-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions on Cash-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 shall lapse in accordance with the original vesting schedule of the Award, subject to the immediate lapse of all restrictions upon a Participant's death.

(ii) With respect to Cash-Based Awards granted subject to performance-based vesting conditions, upon a Participant's Retirement, all restrictions will lapse on a pro rata portion of the Cash-Based Awards and any related Dividend Equivalents granted pursuant to this Section 4.5 that would otherwise have been determined by the Committee to have been earned as of the end of the applicable performance period if the Participant's service had continued, with such pro rata portion determined by dividing the number of days between the first day of the performance period and the Retirement date, by the number of days in the applicable performance period.

(iii) Except as otherwise provided in an Award Agreement, if a Participant's Retirement results in an Award's continued vesting or pro rata vesting based on the Company's actual levels of achievement of the applicable performance metrics at the end of the performance period, as a condition thereof the Participant agrees that for the remainder of any applicable continued vesting period or actual performance period, he or she shall: (x) remain available to provide service to the Company on an as-requested basis (which service, for purposes of compliance with Section 409A of the Code, shall not exceed 20% of the Participant's pre-Termination of Service level of Service to the Company) and (y) execute, in the discretion of the Company, a non-competition agreement in favor of the Company in the form provided by the Company.

4.7 **Termination for Cause**. If a Participant incurs a Termination of Service for Cause, then all outstanding Awards shall immediately be cancelled, except as otherwise provided in an Award Agreement.

13

US.123088230.01

**ARTICLE V**
**SHARES SUBJECT TO THE PLAN; ADJUSTMENTS**

5.1 ***Shares Available***. The Shares issuable under the Plan shall be authorized but unissued Shares or Shares held in the Company's treasury. The total number of Shares with respect to which Awards may be issued under the Plan may equal but may not exceed 15,000,000, subject to adjustment in accordance with Section 5.3; *provided*, however, that from the aggregate limit, no more than 7,500,000 Shares may be available for grant in the form of Incentive Stock Options.

5.2 ***Counting Rules***.

(a)     The following Shares related to Awards to be issued under this Plan shall not count against the limits set forth in Section 5.1:

(i)     Shares related to Awards paid in cash; and

(ii)     Shares related to Awards that expire, are forfeited or cancelled or terminate for any other reason without issuance of Shares; and

(iii)     Any Shares issued in connection with Awards that are assumed, converted or substituted as a result of the acquisition of another company by the Company or an Affiliate or a combination of the Company or an Affiliate with another company.

(b)     For purposes of clarity, Shares that are tendered or withheld in payment of all or part of the Exercise Price of an Award or in satisfaction of withholding tax obligations, and Shares that are reacquired with cash tendered in payment of the Exercise Price of an Award, shall not be reincluded in or added back to the number of Shares available for issuance under the Plan. Upon the settlement of any Stock Appreciation Right issued under the Plan, only the gross number of Shares issued to the Participant or used to determine the settlement value will count against the number of Shares available for issuance under the Plan.

5.3 ***Adjustment Upon Certain Changes***.

(a)     *Adjustments*. In the event of any change in corporate structure affecting outstanding Shares or the value thereof, including any dividend or distribution (whether in cash, Shares or other property), stock split, reverse stock split, spin-off, recapitalization, merger, reorganization, consolidation, combination or exchange of shares or similar transaction, such adjustments and other substitutions shall be made to the Plan and to outstanding Awards as the Committee, in its sole discretion, deems equitable or appropriate, including such adjustments in (i) the limitations set forth in Section 5.1, including the maximum aggregate number, class and kind of securities that may be delivered under the Plan, and (ii) the number, class, kind and Exercise Price of securities subject to outstanding Awards granted under the Plan (including, if the Committee deems appropriate, the full or partial substitution of similar options to purchase the shares of, or other awards denominated in the shares of, another company).

(b)     *Other Changes*. The Committee may make other adjustments in the terms and conditions of Awards in recognition of unusual or nonrecurring events (including, without limitation, the events described in Section 5.3(a)) affecting the Company, any Affiliate, or the financial statements of the Company or any Affiliate, or of changes in applicable laws, regulations, or accounting principles, whenever the Committee determines that such adjustments are appropriate in order to prevent dilution or enlargement of the benefits to be made available under the Plan.

14

US.123088230.01

(c)    *No Other Rights or Changes*. Except as expressly provided in the Plan, no Participant shall have any rights by reason of any subdivision or consolidation of shares of stock of any class, the payment of any dividend, any increase or decrease in the number of shares of stock of any class or any dissolution, liquidation, merger or consolidation of the Company or any other corporation. Except as expressly provided in the Plan, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of shares or amount of other property subject to, or the terms related to, any Award. Except as expressly provided by this Section 5.3, and without limiting the generality of Section 6.1, no material adverse change may be made to the terms of an Award granted to a Participant as a result of an event described in this Section 5.3 without the consent of the Participant.

5.4 ***Change in Control***.

(a)    *Assumption Upon Change in Control; Accelerated Vesting Upon Certain Termination Events*. Unless otherwise provided in the applicable Award Agreement, in the event of a Change in Control, if the successor company assumes or substitutes for an outstanding Award (or in which the Company is the ultimate parent corporation and continues the Award), then such Award shall be continued in accordance with its applicable terms and vesting shall not be accelerated as described in Section 5.4(b). For the purposes of this Section 5.4(a), an Award shall be considered assumed or substituted for if, following the Change in Control, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the Change in Control, the consideration (whether stock, cash or other securities or property) received in the transaction constituting a Change in Control by holders of Shares for each Share held on the effective date of such transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); *provided*, however, that if such consideration received in the transaction constituting a Change in Control is not solely common stock of the successor company, the Committee may, with the consent of the successor company, provide that the consideration to be received upon the exercise or vesting of an Award, for each Share subject thereto, will be solely common stock of the successor company or cash, in each case, substantially equal in fair market value (determined as of the date of the Change in Control) to the per share consideration received by holders of Shares in the transaction constituting a Change in Control. The determination of such substantial equality of value of consideration shall be made by the Committee in its sole discretion and its determination shall be conclusive and binding. Notwithstanding the foregoing, in the event of a Participant's Termination of Service involuntarily without Cause or voluntarily by the Participant for Good Reason in such successor company within two years following such Change in Control, the vesting of each Award held by such Participant at the time of the Change in Control shall be accelerated as described in Section 5.4(b) at such time. Notwithstanding the foregoing, no Award shall be assumed or substituted pursuant to this Section 5.4(a) to the extent such action would cause an Award not otherwise "deferred compensation" within the meaning of Section 409A of the Code to become "deferred compensation" within the meaning of Section 409A of the Code.

(b)    *Acceleration of Vesting Upon Change in Control.* In the event of a Change in Control after the date of the adoption of the Plan, unless provision is made in connection with the Change in Control for the assumption, substitution or continuation of an outstanding Award in accordance with Section 5.4(a), then the vesting of such Award shall accelerate and all restrictions shall lapse as of immediately prior to the Change in Control, and (i) in the case of an outstanding Stock Option or Stock Appreciation Right, such Award shall be exercisable as of immediately prior to such Change in Control, or (ii) in the case of an Award other than a Stock Option or a Stock Appreciation Right, such Award shall be settled or otherwise paid to the applicable Participant as soon as practicable following such vesting. For purposes of determining vesting and payment under this Section 5.4(b), all performance criteria (i) if the performance period has been completed, shall be deemed achieved at actual levels of achievement determined by the Committee in its sole discretion as of the date of the Change in Control and (ii) otherwise, shall be deemed achieved at the target level of achievement. Notwithstanding any provision of this Section 5.4(b), unless otherwise provided in the applicable Award Agreement, if any amount payable pursuant to an Award constitutes deferred

15

compensation within the meaning of Section 409A of the Code, in the event of a Change in Control that does not qualify as an event described in Section 409A(a)(2)(A)(v) of the Code, such Award (and any other Awards that constitute deferred compensation that vested prior to the date of such Change in Control but are outstanding as of such date) shall vest and cease to be forfeitable but shall not be settled until the earliest permissible payment event under Section 409A of the Code following such Change in Control. Notwithstanding any other provision of the Plan, the Committee, in its discretion, may determine that, upon the occurrence of a Change in Control, (i) each Stock Option and Stock Appreciation Right outstanding shall terminate within a specified number of days after notice to the Participant, and such Participant shall receive, with respect to each Share subject to such Stock Option or Stock Appreciation Right, an amount equal to the excess of the fair market value (as determined by the Committee, in its discretion, in a manner that complies with Section 409A of the Code) of such Share immediately prior to the occurrence of such Change in Control over the Exercise Price, as applicable, per Share of such Stock Option and/or Stock Appreciation Right; such amount to be payable in cash, in one or more kinds of stock or property (including the stock or property, if any, payable in the transaction) or in a combination thereof, as the Committee, in its discretion, shall determine and (ii) each Stock Option and Stock Appreciation Right outstanding at such time with an Exercise Price per Share that exceeds the fair market value (as determined by the Committee, in its discretion, in a manner that complies with Section 409A of the Code) of such Share immediately prior to the occurrence of such Change in Control shall be canceled for no consideration.

5.5 *Fractional Shares*. No fractional Shares shall be issued under the Plan, and unless the Committee determines otherwise, an amount in cash equal to the Fair Market Value of any fractional Shares that would otherwise be issuable shall be paid in lieu of such fractional Shares. The Committee may, in its sole discretion, cancel, terminate, otherwise eliminate or transfer or pay other securities or other property in lieu of issuing any fractional Shares.

**ARTICLE VI**
**AMENDMENT AND TERMINATION**

6.1 *Amendment*. The Plan may be amended at any time and from time to time by the Board without the approval of stockholders of the Company, except that no revision to the terms of the Plan shall be effective until the amendment is approved by the stockholders of the Company if such approval is required by the rules of the New York Stock Exchange or such amendment materially increases the number of Shares that may be issued under the Plan (other than an increase pursuant to Section 5.3 of the Plan). No amendment of the Plan made without the Participant's written consent may materially adversely affect any right of a Participant with respect to an outstanding Award unless such amendment is necessary to comply with applicable law. The Plan may not be amended in any manner adverse to the interests of Participants during the two-year period following a Change in Control, unless such amendment is necessary to comply with applicable law.

6.2 *Termination*. The Plan shall terminate upon the adoption of a resolution of the Board terminating the Plan.

No Awards shall be granted under the Plan after it has terminated. The termination of the Plan, however, shall not alter or impair any of the rights or obligations of any Participant without such Participant's written consent under any Award previously granted under the Plan. After the termination of the Plan, any previously granted Awards shall remain in effect and shall continue to be governed by the terms of the Plan and the applicable Award Agreement.

**ARTICLE VII**
**GENERAL PROVISIONS**

7.1 *Nontransferability of Awards*. No Award under the Plan shall be subject in any manner to alienation, anticipation, sale, assignment, pledge, encumbrance or transfer, and no other persons shall otherwise acquire any rights therein, except as provided below.

(a)    Any Award may be transferred by will or by the applicable laws of descent or distribution.

16

US.123088230.01

(b)    The Committee may provide in the applicable Award Agreement that all or any part of an Award (other than an Incentive Stock Option) may, subject to the prior written consent of the Committee, be transferred to one or more of the following classes of donees: a family member; a trust for the benefit of a family member; a limited partnership whose partners are solely family members; or any other legal entity set up for the benefit of family members. For purposes of this Section 7.1(b), a family member means a Participant and/or the Participant's spouse, children, grandchildren, parents, grandparents, siblings, nieces, nephews and grandnieces and grandnephews, including adopted, in-laws and step family members.

(c)    Except as otherwise provided in the applicable Award Agreement, any Nonqualified Stock Option or Stock Appreciation Right transferred by a Participant pursuant to Section 7.1(b) may be exercised by the transferee only to the extent that the Award would have been exercisable by the Participant had no transfer occurred. Any transferred Award shall be subject to all of the same terms and conditions as provided in the Plan and in the applicable Award Agreement. The Participant or the Participant's estate shall remain liable for any withholding tax that may be imposed by any federal, state or local tax authority, and the transfer of Shares upon exercise of the Award shall be conditioned on the payment of any withholding tax. The Committee may, in its discretion, disallow all or a part of any transfer of an Award pursuant to Section 7.1(b) unless and until the Participant makes arrangements satisfactory to the Committee for the payment of any withholding tax. The Participant must immediately notify the Committee, in the form and manner required by the Committee, of any proposed transfer of an Award pursuant to Section 7.1(b). No transfer shall be effective until the Committee consents to the transfer in writing.

(d)    Unless otherwise restricted by Company policy for Reporting Persons, Restricted Stock may be freely transferred after the restrictions lapse or are satisfied and the Shares are delivered; *provided*, however, that Restricted Stock awarded to an affiliate of the Company may be transferred only pursuant to Rule 144 under the 1933 Act, or pursuant to an effective registration for resale under the 1933 Act. For purposes of this Section 7.1(d), "affiliate" shall have the meaning assigned to that term under Rule 144.

(e)    In no event may a Participant transfer an Incentive Stock Option other than by will or the applicable laws of descent and distribution.

7.2 *Withholding of Taxes*.

(a)    *Stock Options and Stock Appreciation Rights*. Subject to Section 7.2(d), as a condition to the delivery of Shares pursuant to the exercise of a Stock Option or Stock Appreciation Right, the Committee may require that the Participant, at the time of exercise, pay to the Company by cash, certified check, bank draft, wire transfer or postal or express money order an amount sufficient to satisfy any applicable tax withholding obligations. The Committee may also, in its discretion, accept payment of tax withholding obligations through any of the Exercise Price payment methods described in Section 4.3(d).

(b)    *Other Awards Payable in Shares*. Subject to Section 7.2(d), the Company shall satisfy a Participant's tax withholding obligations arising in connection with the release of restrictions on Restricted Stock Units, Restricted Stock and Other Stock-Based Awards by withholding Shares that would otherwise be available for delivery. The Company may also allow the Participant to satisfy the Participant's tax withholding obligations by payment to the Company in cash or by certified check, bank draft, wire transfer, or postal or express money order.

(c)    *Cash Awards*. The Company shall satisfy a Participant's tax withholding obligation arising in connection with the payment of any Award in cash by withholding cash from such payment.

(d)    *Withholding Amount*. The Committee, in consideration of applicable accounting standards, has full discretion to either (i) allow Participants to elect, or (ii) otherwise direct as a general rule, to have the Company withhold Shares for taxes at an amount that is not less than the applicable minimum statutory amount and not more than the applicable maximum statutory amount.

17

7.3 *Forfeiture Provisions*. The Committee may, in its discretion, provide in an Award Agreement that an Award granted thereunder shall be canceled if the Participant, without the consent of the Company, while employed by or providing services to the Company or any Affiliate or for a period after Termination of Service, (a) violates a noncompetition, non-solicitation, non-disclosure, confidentiality, or non-disparagement covenant or agreement, (b) otherwise engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, as determined by the Committee in its sole discretion, or (c) to the extent applicable to the Participant, otherwise violates any policy adopted by the Company or any Affiliate relating to the recovery of compensation granted, paid, delivered, awarded or otherwise provided to any Participant by the Company or any Affiliate as such policy is in effect on the date of grant of the applicable Award or, to the extent necessary to address the requirements of applicable law (including Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as codified in Section 10D of the Exchange Act, Section 304 of the Sarbanes-Oxley Act of 2002 or any other applicable law), as may be amended from time to time. The Committee may also provide in an Award Agreement that (i) a Participant will forfeit any gain realized on the vesting or exercise of such Award if the Participant engages in any activity referred to in the preceding sentence, or (ii) a Participant must repay the gain to the Company realized under a previously paid Award if the Participant engages in any activity referred to in the preceding sentence or a financial restatement reduces the amount that would have been earned under such Award. Notwithstanding the foregoing, none of the non-disclosure restrictions in this Section 7.3 or in any Award Agreement shall, or shall be interpreted to, impair the Participant from exercising any legally protected whistleblower rights (including under Rule 21F under the Exchange Act).

7.4 *Code Section 83(b) Elections*. The Company, the Affiliates, and the Committee have no responsibility for a Participant's election, attempt to elect or failure to elect to include the value of an Award of Restricted Stock or other Award subject to Section 83 of the Code in the Participant's gross income for the year of grant pursuant to Section 83(b) of the Code. Any Participant who makes an election pursuant to Section 83(b) of the Code shall promptly provide the Committee with a copy of the election form.

7.5 *No Implied Rights*. The establishment and operation of the Plan, including the eligibility of a Participant to participate in the Plan, shall not be construed as conferring any legal or other right upon any Participant for the continuation of service through the end of any vesting period or other applicable period. The Company and the Affiliates expressly reserve the right, which may be exercised at any time and in the Company's or an Affiliate's sole discretion, to discharge any individual or treat him or her without regard to the effect that discharge might have upon him or her as a Participant in the Plan. There is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards. The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant and may be made selectively among Participants, whether or not such Participants are similarly situated.

7.6 *No Obligation to Exercise Awards; No Right to Notice of Expiration Date*. The grant of a Stock Option or Stock Appreciation Right shall impose no obligation upon the Participant to exercise the Award. The Company, the Affiliates, and the Committee have no obligation to inform a Participant of the date on which a Stock Option or Stock Appreciation Right lapses except in the Award Agreement.

7.7 *No Rights as Stockholders*. A Participant granted an Award under the Plan shall have no rights as a stockholder of the Company with respect to the Award unless and until certificates for the Shares underlying the Award are registered in the Participant's name and delivered to the Participant. The right of any Participant to receive an Award by virtue of participation in the Plan shall be no greater than the right of any unsecured general creditor of the Company.

7.8 *Indemnification of Committee*. The Company shall indemnify, to the fullest extent permitted by law, each person made or threatened to be made a party to any civil or criminal action or proceeding by reason of the fact that the person, or the executor or administrator of the person's estate, is or was a member of the Committee or a delegate of the Committee.

7.9 *No Required Segregation of Assets*. Neither the Company nor any Affiliate shall be required to segregate any assets that may at any time be represented by Awards granted pursuant to the Plan.

18

US.123088230.01

7.10 *Nature of Payments*. All Awards made pursuant to the Plan are in consideration of services for the Company or an Affiliate. Any gain realized pursuant to Awards under the Plan constitutes a special incentive payment to the Participant and shall not be taken into account as compensation for purposes of any other employee benefit plan of the Company or any Affiliate, except as the employee benefit plan otherwise provides. The adoption of the Plan shall have no effect on Awards made or to be made under any other benefit plan covering an employee of the Company or an Affiliate or any predecessor or successor of the Company or an Affiliate.

7.11 *Awards in Foreign Countries*. The Committee has the authority to grant Awards to Employees and Other Service Providers who are foreign nationals or employed outside the United States on any different terms and conditions than those specified in the Plan that the Committee, in its discretion, believes to be necessary or desirable to accommodate differences in applicable law, tax policy, or custom, while furthering the purposes of the Plan. The Committee may also approve any supplements to the Plan or alternative versions of the Plan as it believes to be necessary or appropriate for these purposes without altering the terms of the Plan in effect for other Participants; *provided*, however, that the Committee may not make any supplemental or alternative version that (a) increases limitations contained in Section 4.3(e); (b) increases the number of Shares available under the Plan, as set forth in Section 5.1; (c) causes the Plan to cease to satisfy any conditions under Rule 16b-3 under the Exchange Act or (d) otherwise contains terms that would require approval by the stockholders of the Company under the rules of the New York Stock Exchange. A supplement to the Plan for grants of Restricted Stock Units to French employees is attached to, and made a part of this Plan, as Attachment A.

7.12 *Securities Matters*.

(a)    The Company shall be under no obligation to effect the registration pursuant to the 1933 Act of any Shares to be issued hereunder or to effect similar compliance under any state laws. Notwithstanding anything herein to the contrary, the Company shall not be obligated to cause to be issued or delivered any certificates evidencing Shares pursuant to the Plan unless and until the Company is advised by its counsel that the issuance and delivery of such certificates is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which Shares are traded. The Committee may require, as a condition to the issuance and delivery of certificates evidencing Shares pursuant to the terms hereof, that the recipient of such Shares make such covenants, agreements and representations, and that such certificates bear such legends, as the Committee deems necessary or desirable.

(b)    The exercise of any Award granted hereunder shall only be effective at such time as counsel to the Company shall have determined that the issuance and delivery of Shares pursuant to such exercise is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which Shares are traded. The Company may, in its sole discretion, defer the effectiveness of an exercise of an Award hereunder or the issuance or transfer of Shares pursuant to any Award pending or to ensure compliance under federal or state securities laws. The Company shall inform the Participant in writing of its decision to defer the effectiveness of the exercise of an Award or the issuance or transfer of Shares pursuant to any Award. During the period that the effectiveness of the exercise of an Award has been deferred, the Participant may, by written notice, withdraw such exercise and obtain the refund of any amount paid with respect thereto.

7.13 *Governing Law; Severability*. The Plan and all determinations made and actions taken under the Plan shall be governed by the internal substantive laws, and not the choice of law rules, of the State of Delaware and construed accordingly, to the extent not superseded by applicable U.S. federal law. If any provision of the Plan is held unlawful or otherwise invalid or unenforceable in whole or in part, the unlawfulness, invalidity or unenforceability shall not affect any other parts of the Plan, which shall remain in full force and effect.

7.14 *Section 409A of the Code*. With respect to Awards subject to Section 409A of the Code, this Plan is intended to comply with the requirements of such Section, and the provisions hereof shall be interpreted in a manner that satisfies the requirements of such Section, and the Plan shall be operated accordingly. If any provision of this Plan or any term or condition of any Award would otherwise frustrate or conflict with this intent, the provision, term or

19

US.123088230.01

condition shall be interpreted and deemed amended so as to avoid this conflict. Any reservation of rights or discretion by the Company or the Committee hereunder affecting the timing of payment of any Award subject to Section 409A of the Code shall only be as broad as is permitted by Section 409A of the Code.

7.15 ***Payments to Specified Employees***. Notwithstanding anything herein or in any Award Agreement to the contrary, if a Participant is a "specified employee" (within the meaning of Section 409A(2)(B) of the Code) as of the date of such Participant's separation from service (as determined pursuant to Section 409A of the Code), any Awards subject to Section 409A of the Code payable to such Participant as a result of his or her separation from service, shall be paid on the first business day of the first calendar month that begins after the six-month anniversary of the date of the separation from service, or, if earlier, the date of the Participant's death.

20

US.123088230.01

ATTACHMENT A

**2018 STOCK INCENTIVE PLAN**
**OF**
**RESIDEO TECHNOLOGIES, INC. AND ITS AFFILIATES**

**French Sub-Plan for Restricted Stock Units**

This Sub-Plan to the 2018 Stock Incentive Plan of Resideo Technologies, Inc. and its Affiliates (the "Plan"), contains the rules which, together with the provisions of the Plan, govern the operation of the Plan insofar as it applies to Awards made to Employees of the Company or its affiliates in France provided the award document evidencing such Award refers to this Sub-Plan.

The terms and conditions of the Plan are modified by this Sub-Plan for France in order to comply with the provisions of Articles L. 225-197-1 to L. 225-197-6 of the French Commercial Code. This Sub-Plan shall be construed and operated with that intention.

Under this Sub-Plan, the Participants shall be awarded only Restricted Stock Units as defined hereinafter in Section 1.

This Sub-Plan has been established to enable the Restricted Stock Units to qualify for the favorable French income tax and social security regime set out in the French tax code (article 80 quaterdecies) and in the French social security code (article L. 242-1) applicable in France to "qualified" free-shares plan implemented after August 7, 2015 in accordance with the provisions of "*La loi pour la croissance, l'activité et l'égalité des chances économiques*", however nothing in this Sub-Plan shall be construed as a guarantee or an undertaking by the Company or any of its subsidiaries that such regime will effectively apply.

This Sub-Plan should be read in conjunction with the rules of the Plan and Awards granted under this Sub-Plan are subject to the terms and conditions of the Plan applicable to Restricted Stock Units except to the extent that the terms and conditions of the Plan differ from or conflict with the terms and conditions set out in this Sub-Plan, in which event, the terms set out in this Sub-Plan shall prevail.

Initially capitalized terms used herein and which are not defined in Section 1 below shall have the meanings ascribed to such terms in the Plan. Reference to the singular shall include reference to the plural.

An Award of Restricted Stock Units shall be subject to the terms of this Sub-Plan provided the applicable Award Agreement notifying of such Award refer specifically to this Sub-Plan.

The terms and conditions applicable to the Awards granted under this Sub-Plan are the terms and conditions set out in the rules of the Plan, modified as follows.

1.    **DEFINITIONS**

   1.1.    **Award**

The term "*Award*" shall mean Restricted Stock Units granted pursuant to the terms and conditions of this Sub-Plan.

   1.2.    **Restricted Stock Units**

The term "*Restricted Stock Units*" shall mean conditional rights to receive, for no consideration, Shares granted under the Plan as amended by this Sub-Plan.

Attachment A-1

**1.3.    Disability**

The term "*Disability*" shall mean a disability corresponding to the second or the third categories of Article L. 341-4 of the French Social Security Code.

**1.4.    Employee**

The term "*Employee*" shall mean a current salaried employee, as defined by French labor law.

**1.5.    Participant**

The term "*Participant*" shall mean an Employee of the Company or an Affiliate having a capital link as defined in Article L. 225-197-2 of the French Commercial Code.

Restricted Stock Units shall not be awarded to any Participant who is holding Shares representing 10% or more of the Company's capital at the date of the award or who may hold Shares representing 10% or more of the Company's capital due to the award of Restricted Stock Units.

**2.    NUMBER OF SHARES GRANTED**

Notwithstanding any other provision of the Plan, the total number of Shares granted freely under this Sub-Plan shall not exceed 10% of the Company's share capital.

**3.    SETTLEMENT OF AWARDS**

Notwithstanding any other provision of the Plan, the Awards shall only be settled by delivery of Shares and no cash shall be paid to Participants in connection with the settlement of an Award even in consideration of fractional shares.

**4.    DIVIDEND EQUIVALENTS**

Notwithstanding any other provision of the Plan and notably Section 4.4, the Awards granted under this Sub-Plan shall not give rise to the right to any Dividend Equivalent.

**5.    MINIMUM PERIOD BEFORE WHICH THE TRANSFER OF PROPERTY OF SHARES CANNOT OCCUR**

Notwithstanding any other provision of the Plan, the Restricted Stock Units granted pursuant to this Sub-Plan shall not vest and the Shares underlying the Awards shall not be delivered to Participants before the end of a minimum one-year period as from the grant date, except in the event of death as described below in Section 9.

**6.    SALE RESTRICTIONS**

Notwithstanding any other provisions of the Plan, and in the event the Shares are delivered to the Participant before the second anniversary of the grant date, the sale of Shares underlying the Restricted Stock Units granted under this Sub-Plan shall not occur prior to the second anniversary of the grant date, except in any event provided for under French law as an exception to this minimum time period before which the shares cannot be sold, and notably in the event of Disability and death as described below in Sections 8 and 9.

**7.    SPECIFIC CLOSED PERIODS DURING WHICH THE SHARES CANNOT BE DISPOSED OF**

Notwithstanding any other provision of the Plan, once definitively delivered, Shares may not be disposed of within the periods as set forth in Article L. 225-197-1, I of the French Commercial Code.

Attachment A-2

US.123088230.01

**8.      DISABILITY**

Notwithstanding any other provision of the Plan, in the event of Disability of a Participant during the restriction on sale restriction period, if any, Shares delivered shall become immediately disposable.

**9.      TRANSFER TO HEIRS**

Notwithstanding any other provision of the Plan, in the event of death of a Participant, his/her heirs are entitled to request that the numbers of Shares corresponding to the unvested Restricted Stock Units at the date of death be delivered, provided such request is made within six months as from the date of death. Shares delivered shall become immediately disposable.

**10.      ADJUSTMENT OF THE AWARD**

Notwithstanding any other provision of the Plan, the number of Awards, as well as the number of Shares to be delivered cannot be adjusted or modified except:

      (i)      in cases which would be authorized or rendered compulsory under French law

     (ii)      in the event of operations performed on the share capital of the Company before the delivery of the Shares; in which cases the Committee is authorized to adjust the number of Shares to be delivered but only in order to protect the rights of the Participant and to guarantee the neutrality of such operations.

**11.      EXCHANGE OF SHARES DURING THE SALE RESTRICTION PERIOD**

In the event of an exchange of Shares resulting from a public offer, a merger, a spin-off, a stock-split or a reverse stock split operation performed during the sale restrictions period described in Section 6 above, such sale restrictions, if any, remain applicable to the Shares received in the exchange for the time period remaining at the date of the exchange.

**12.      DEFINITIVE DELIVERY OF THE SHARES**

Notwithstanding any other provision of the Plan, once delivered to the Participant (or to his or her heirs), the Shares are definitively delivered and cannot be cancelled or rescinded and a Participant cannot be forced to return the Shares.

**13.      NO SHARES WITHHOLDING**

Notwithstanding any other provision of the Plan and notably Section 7.2, no Shares available for delivery shall be withheld to cover taxes.

**14.      VOLUNTARY DEFERRAL OF THE AWARD**

Notwithstanding any other provision of the Plan, the Committee cannot require or permit the Participants to defer the receipt or issuance or Shares.

**15.      CHANGES TO THE PLAN AND SUB-PLAN**

The Committee or the Board may at any time amend the Plan and Sub-Plan, provided that no such amendment shall adversely affect the rights of any Participant with respect to an Award granted under this Sub-Plan without such Participant's consent and provided that such amendments are not inconsistent with French law and, in particular, French legislation regarding the granting of free shares, as defined in Articles L. 225-197-1 to L. 225-197-6 of the French Commercial Code and French Labor law.

In the event the amendments are not permitted by French law and notably French legislation applicable to the grant of free shares as set forth, in Articles L. 225-197-1 to L. 225-197-6 of the French Commercial Code, such amendments shall not apply to Restricted Stock Units previously granted.

Attachment A-3

US.123088230.01

**16.   PERIOD DURING WHICH RESTRICTED STOCK UNITS CAN BE GRANTED UNDER THIS SUB-PLAN**

No Awards can be granted under this Sub-Plan more than 76 months after the date on which this Sub-Plan is approved.

**17.   PARTICIPANT ACCOUNT**

The Shares delivered under this Sub-Plan shall be recorded in an account in the name of the Participant with the Company or a broker or in such manner as the Committee may otherwise determine to ensure compliance with this Sub-Plan.

**18.   NON-TRANSFERABILITY OF THE AWARD**

Notwithstanding any other provision of the Plan, Awards shall not be transferred or otherwise disposed of, except in the event of death as described above in Section 9.

**19.   SEVERABILITY**

The terms and conditions provided in the Sub-Plan are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable under French law, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Attachment A-4

US.123088230.01
([Back To Top](#))

# Section 3: EX-31.1 (EX-31.1)

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO
SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Michael G. Nefkens, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Resideo Technologies, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 7th, 2019

By:   /s/Michael G. Nefkens
      Michael G. Nefkens
      President and Chief Executive Officer

([Back To Top](#))

# Section 4: EX-31.2 (EX-31.2)

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO
SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Joseph D. Ragan III, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Resideo Technologies, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's

board of directors (or persons performing the equivalent functions):

a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 7th, 2019                                                                      By:    /s/Joseph D. Ragan III
                                                                                                          Joseph D. Ragan III
                                                                                                          Executive Vice President and Chief
                                                                                                          Financial Officer

(Back To Top)

## Section 5: EX-32.1 (EX-32.1)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Resideo Technologies, Inc. (the Company) on Form 10-Q for the period ending  June 30, 2019 as  filed with the Securities and Exchange Commission on the date hereof (the Report), I, Michael G. Nefkens, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 7th, 2019                                                                      By:    /s/ Michael G. Nefkens
                                                                                                          Michael G. Nefkens
                                                                                                          President and Chief Executive
                                                                                                          Officer

(Back To Top)

## Section 6: EX-32.2 (EX-32.2)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Resideo Technologies, Inc. (the Company) on Form 10-Q for the period ending  June 30, 2019 as filed with the Securities and Exchange Commission on the date hereof (the Report), I, Joseph D. Ragan III, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 7th, 2019                                                                      By:    /s/ Joseph D. Ragan III
                                                                                                          Joseph D. Ragan III
                                                                                                          Executive Vice President and Chief
                                                                                                          Financial Officer

(Back To Top)