UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                )
 In re Resideo Technologies,    )   File No. 19-CV-2863
 Inc. Securities Litigation     )            (WMW/KMM)
                                )
                                )
                                )   St. Paul, Minnesota
                                )   December 1, 2020
                                )   1:06 p.m.
                                )
------------------------------------------------------------


BEFORE THE HONORABLE WILHELMINA M. WRIGHT
UNITED STATES DISTRICT COURT JUDGE


**(MOTIONS HEARING)**


Proceedings reported by court reporter; transcript produced by computer.

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

APPEARANCES (All counsel appeared via teleconference)

For the Plaintiffs:      Entwistle & Cappucci, LLP
                         ANDREW ENTWISTLE, ESQ.
                         Suite 1170
                         401 Congress Avenue
                         Austin, Texas 78701

                         Chestnut & Cambronne, PA
                         BRYAN L. BLEICHNER, ESQ.
                         Suite 1700
                         100 Washington Avenue South
                         Minneapolis, Minnesota 55401

                         Labaton Sucharow, LLP
                         IRA A. SCHOCHET, ESQ.
                         140 Broadway
                         New York, New York 10005

For the Defendants:      Willkie, Farr & Gallagher, LLP
                         CHARLES D. CORDING, ESQ.
                         TARIQ MUNDIYA, ESQ.
                         787 7th Avenue
                         New York, New York 10019

                         Willkie, Farr & Gallagher, LLP
                         NICHOLAS M.H. REDDICK, ESQ.
                         1875 K Street Northwest
                         Washington, D.C. 20006

                         Blackwell Burke, PA
                         JERRY W. BLACKWELL, ESQ.
                         GURDIP S. ATWAL, ESQ.
                         Suite 2500
                         431 South Seventh Street
                         Minneapolis, Minnesota 55415

For the Movant:          Robbins, Geller, Rudman & Dowd, LLP
                         X. JAY ALVAREZ, ESQ.
                         Suite 1900
                         655 West Broadway
                         San Diego, California 92101

Court Reporter:          LORI A. SIMPSON, RMR-CRR
                         Suite 146
                         316 North Robert Street
                         St. Paul, Minnesota 55101

**P R O C E E D I N G S**

**IN OPEN COURT**

**(VIA TELECONFERENCE)**

LAW CLERK:  The United States District Court for the District of Minnesota is now in session.  The Honorable Wilhelmina Wright is presiding.  The case is St. Clair County Employees' Retirement Systems v. Resideo Technologies, Case No. 19-CV-2863.

I'm going to take roll call.  Please indicate your presence after your name is called.

On behalf of the plaintiffs, Andrew Entwistle?

MR. ENTWISTLE:  Present.

LAW CLERK:  On behalf of plaintiffs, Ira Schochet?

MR. SCHOCHET:  Schochet, yes.

LAW CLERK:  On behalf of plaintiffs, Bryan Bleichner?

MR. BLEICHNER:  Yes, sir.

LAW CLERK:  Movant, Jay Alvarez?

MR. ALVAREZ:  Yes.

LAW CLERK:  On behalf of defendants, Jerry Blackwell?

MR. BLACKWELL:  Here.

LAW CLERK:  On behalf of defendants, Tony Atwal?

MR. ATWAL:  Here.

LAW CLERK:  Also on behalf of defendants, Charles

Cording?

MR. CORDING:  Present.

LAW CLERK:  On behalf of defendants, Tariq Mundiya?

MR. MUNDIYA:  Here.

LAW CLERK:  And last, on behalf of defendants, Nicholas Reddick?

MR. REDDICK:  Here.

THE COURT:  Good afternoon, Counsel.  This is Judge Wright, and we are presently conducting this hearing by telephone because of the restrictions that are resulting from the COVID pandemic.  Because this hearing is being conducted remotely, I will review some of the ground rules that everyone must follow.

Our court reporter, Lori Simpson, is taking the record today.  And because all of us are not in the same location, it is important for all of us to be mindful of this fact and to remember that the visual cues that we ordinarily rely on will not help us under these circumstances.

As a result, every time that you begin to speak, you will need to state your name.  And even if you think we should recognize your voice, please state your name before you speak.

Also, please speak clearly into your device.  And

if possible, please use a headset rather than speaking into a speakerphone or using a wireless device, such as AirPods. We've determined that there is a big difference in the quality of the sound, and that makes a difference in our court reporter's ability to transcribe an accurate record of these proceedings.  It also helps the rest of us with our ability to hear and to understand what you are saying.

Now, if you are not speaking, please mute your device.  You may do this by either pressing star 6 or by using the mute on your own device.  But please remember to mute your devices.

(Audio interference due to external noise)

THE COURT:  Please mute your devices.  We've learned from experience that no matter how quiet you think it is on your end, you must mute your device when you are not speaking.

Now, when you are speaking, please speak slowly and enunciate clearly.  I cannot overemphasize how important this requirement is.  And it's particularly important to remember that if you are reading something, you must speak slowly.  That is because we all have a tendency to speed up and speak faster when we are reading and, simply put, it becomes too fast.  So always speak slowly, always enunciate, and particularly if you are about to read something, please remind yourself to read it slowly.

Also, please pause between long sentences or before you move on to the next point you plan to make.  Now, this is important for at least two reasons.  First, it gives me a chance to interject if I have a question; and second, if I've heard enough on a particular matter, it gives me the opportunity to let you know that I'd like you to move on.

Now, when we're not in the courtroom together, if we talk over each other, our court reporter will not be able to understand either one of us.  So as a reminder for me and for you, we cannot talk over each other.  And by pausing between points, you give me an opportunity to interject and help direct traffic if necessary.  In addition, pausing gives our court reporter an opportunity to let us know if she is having difficulty hearing you or understanding you.

Now, if you are the counsel who is not speaking, no matter what you hear that you feel you need to respond to, please remember to wait your turn.  You will have your opportunity.  But we cannot have counsel interrupting each other during oral argument here today.

Now, there may be instances when our court reporter notices something that one of us is doing that makes it harder for her to obtain a good record.  She has my permission to break in at any time that is happening.  So if you hear our court reporter break in, stop talking immediately because we need to know what it is that is

making it difficult for her to transcribe a good, clean, accurate record.

Now, I realize that under these circumstances it is more challenging to meet these requirements than it is when we are all in the courtroom together and have the benefit of visual cues, but we must make the best record that we can with the technology that we have.

I also remind you that this is a public hearing and the record that we make will be a public record. I do not know, but I believe there are members of the public on this call. So if you are addressing confidential information that is at issue today, you'll need to allude to it without disclosing it because this is a public record.

Now, if for some reason you simply cannot make your point that you need to make without explicitly referring to confidential information, let me know that before you disclose that confidential information and we'll discuss how best to address that need. Otherwise you must assume that anything that is said on the record will be disclosed to the public.

I also remind everyone that pursuant to General Order No. 15 that Chief Judge John R. Tunheim issued on June 24, 2020, it is strictly prohibited for anyone to record or broadcast any hearing in whole or in part in any fashion, and that prohibition applies to this hearing.

Are there any questions about our process?  I'll ask Mr. Entwistle.

MR. ENTWISTLE:  Thank you, Your Honor.  Good afternoon.  No, I think I understand all of that.  Can you hear me okay?

THE COURT:  I can hear you.  Did I pronounce your name properly?  I have written your name down, and I want to make sure I wrote it correctly so that I do pronounce it properly.

MR. ENTWISTLE:  Thank you.  Ent-wis-el is exactly right.

THE COURT:  Okay.  Thank you, Mr. Entwistle.

And Mr. Cording?

MR. CORDING:  Good afternoon.  Charles Cording speaking, counsel for the defendants.  No questions, Your Honor.

THE COURT:  Very well.  Then let us proceed.

MR. CORDING:  This is Charles Cording, counsel for the defendants beginning.  Before we start, as the moving side here and consistent with the Court's practice pointers, I would like to reserve at the outset five minutes for rebuttal.

THE COURT:  You may do so.

MR. CORDING:  Thank you, Your Honor.

May it please the Court.  This is a putative

securities class action lawsuit brought against Resideo, a leading provider of temperature control, security, and other in-home and business technology solutions, arising from its disappointing earnings in 2019 following its spin-off from nonparty Honeywell in October 2018.

At its core, plaintiffs' allegations amount to a theory of fraud by hindsight, which the Eighth Circuit recently affirmed in the *Target* case is prohibited by the PSLRA.

Prior to the spin-off Honeywell, not Resideo, issued financial guidance that set a market expectation that Resideo would earn $500 million in EBITDA in 2019. Over the course of 2019 Resideo struggled, twice reducing guidance, first to a range of 410 to 430 million dollars in March 2019 and then to a range of 330 to 350 million dollars in October 2019. That alleged corrective disclosure in October 2019 prompted a stock drop, changes to Resideo's management team, and this lawsuit.

The Complaint seizes upon the fact that following this disappointing performance Resideo conducted a comprehensive review of its operations; and in conjunction with this review several executives, including Defendant Mr. Nefkens and former interim CFO Bob Ryder, provided explanations for the company's struggles that year.

As in *Target*, the plaintiff then cited back these

explanations, copying and pasting them into, among other places, paragraph 6 of the Amended Complaint and allege that they amounted to undisclosed company-wide issues that contradicted 45 different statements that Resideo made about its business and prospects during the class period.

This pleading tactic does not meet the heightened standards for pleading falsity and scienter with particularity imposed by Congress under the PSLRA.  Indeed, Congress imposed heightened pleading standards, quote, in an attempt to curb abuses of securities fraud litigation, one of those abuses being, quote, the practice of pleading fraud by hindsight.  That's a quote taken from the recent *Target* decision from the Eighth Circuit.

THE COURT:  So when I think about what we need to have here to establish the pleading standard for a fraud by hindsight or a fraudulent statement here, tell me what is required and then match up what is required with what we have here.  So is there a misleading statement?  Is there a false statement?  Is the statement material?  Would you address those questions.

MR. CORDING:  Yes, Your Honor.  And I think to get at that very issue, it's important to keep in mind that predominantly what's at issue in this case are forward-looking statements.  Those are statements that have a special classification under the securities laws, because

as part of the PSLRA, Congress passed a safe harbor that says, in essence, that if a forward-looking statement is accompanied by meaningful cautionary language, that forward-looking statement is absolutely protected and cannot give rise to liability under the securities laws.  Our position --

THE COURT:  Yes, but the safe harbor does not provide protection to defendants if the defendant knew of actual material issues when the defendant disclosed that those issues could occur.  Is that correct?

MR. CORDING:  I'm so sorry, Your Honor.  You broke up there a little bit at the beginning of your question, so I had some difficulty hearing you.

THE COURT:  Okay.  I'll repeat it.  When we think about the safe harbor theory, it does not provide protection to defendants if defendants knew of actual material issues when the defendants disclosed that those issues could occur.  Isn't that correct and isn't that the case here?

MR. CORDING:  Thank you, Your Honor.  I understand your question now.

The Eighth Circuit has actually addressed this issue expressly and I think the -- getting to the root of your question, they have held specifically in the *K-V Pharma* case that when, quote, a forward-looking statement is accompanied by meaningful cautionary language, it is not

actionable as a basis for securities fraud regardless of scienter.

And so the plaintiffs have argued that the forward-looking statements that are challenged in the Complaint are still actionable because Resideo lacked a reasonable basis for its forward-looking projections or made those statements with knowing falsity.  However, those arguments simply rest on a legal error per the *K-V Pharmaceutical* case.

THE COURT:  And what is the meaningful cautionary language that you would point to?

MR. CORDING:  Thank you, Your Honor.  The meaningful cautionary language that I would point to is detailed at length in a chart in our opening brief, which sets out predominantly from the Form 10 that was issued by Honeywell, which is contained in Exhibit M in the record.

And the meaningful cautionary language in the form talks about the risks that, broadly speaking, did materialize here and cause Resideo to miss its 2019 earnings guidance, and those risks, broadly speaking, consist of: The lack of operating history of Resideo prior to the spin-off.  It was part of Honeywell, not an independent company.  Risks that it would lose its sourcing leverage as an independent company, not part of Resideo [sic].  We highlighted in our disclosures the risk of failure to attain

qualified personnel, which is consistent with the risk here that materialized as to lack of product engineering.  And they also flagged, as a potential risk, supply chain disruptions.

And then really after this spin-off and virtually every time that Resideo spoke to the public market [audio distortion] November of 2018, it flagged supply chain [audio distortion] --

THE COURT:  We are having some -- I am so sorry to interrupt you mid speech, but we're having you break up at this time.  I don't know whether you've moved in some way or whether you are moving your hands or whether there's any difference in the way that you were presenting, but suddenly you are breaking up in a way that you had not been before.

MR. CORDING:  My apologies, Your Honor.  Hopefully that is better, and I will endeavor to remain as still as possible.  Are you able to hear me now?

THE COURT:  This is slightly better.  So whatever you are doing, just do more of it.

MR. CORDING:  Will do, Your Honor.

THE COURT:  You may proceed.

MR. CORDING:  Yes, Your Honor.  So just to complete the thought, not only were these risks highlighted in the Form 10 prior to the spin-off, the major risks that ultimately materialized here, supply chain disruptions as

well as adverse product mix between different kinds of Honeywell thermostats, were flagged at virtually every time Resideo spoke to the public market following the spin-off, particularly their earnings announcements in March, May, and August of 2019.

And really the plaintiffs in their papers, in my reading, offer no meaningful opposition to our contention that there was meaningful cautionary language here, precisely because the disclosures that were highlighted were the ones that ultimately materialized later in October of 2019, and really their position here rests on a legal argument that we think was squarely addressed by the Eleventh Circuit in the *K-V Pharma* decision.

While we are on the topic of forward-looking statements, the other point that the plaintiffs make in their papers is that some of the forward-looking statements at issue in the Complaint also represent so-called hybrid statements, meaning that they straddle the line between being forward-looking statements and statements of present condition.

There was a lot of discussion about this in the papers regarding one statement in particular. It was a statement that Mr. Nefkens made on November 13, 2018, which is referenced in paragraph 216 of the Complaint, and that particular statement was that Resideo was, quote, on track

to deliver continued growth in 2018 and beyond.

Plaintiffs here, in our view, erroneously rely on the *Best Buy* decision to argue that the language "on track" makes this a statement of present fact or current condition rather than a forward-looking statement.  However, Mr. Nefkens' statement is distinctly different than the statement at issue in the *Best Buy* case that the company was, quote, on track to deliver and exceed its annual EPS guidance.

Let me break down into two parts exactly what Mr. Nefkens said here to illustrate this point.  First, he said that Resideo was on track to deliver continued growth in 2018, and that part of it is essentially the same statement that was at issue in the *Best Buy* case.  But here, unlike in the *Best Buy* case, that was true.  Unlike in 2019, in 2018 Resideo met its guidance both for revenue growth and earnings growth.

THE COURT:  And the date of this statement was when?

MR. CORDING:  The statement was in November 2018. So he said shortly before the end of 2018 we're on track to deliver continued growth in 2018 and beyond.  So for the 2018 piece of that, that was true and Resideo did deliver growth, as reflected in Exhibit Q in the record, since when they announced their 2018 as opposed to their 2019 guidance,

they exceeded their revenue and earnings growth numbers that they had put out previously.

THE COURT:  And what's the triggering date that we compare that to?  Is it the end of 2018?

MR. CORDING:  So that's a great question, Your Honor.  And I think Mr. Nefkens' statement is not actually precise on that point.  I think probably the fairest reading of that as to 2018 would be for fiscal year 2018 and the --

THE COURT:  Why is that the fairest reading?

MR. CORDING:  The company announced --

THE COURT:  Why is the fiscal 2018 number or time frame a fair interpretation?

MR. CORDING:  Since the particular phraseology was "in 2018 and beyond."  So I think from an investor's perspective, there is typically a cadence to announcing financial results, and generally the results here for 2018 were announced in March of 2019.

THE COURT:  And does ambiguity benefit the defendant, then, in this case?

MR. CORDING:  My apologies, Your Honor.  You broke up on that one.

THE COURT:  I asked if ambiguity benefits your client in this case.

MR. CORDING:  Well, I think, Your Honor, this is unlike most civil litigations where Congress has imposed a

heightened pleading standard on the plaintiffs.  And so as a result of the PSLRA, the plaintiffs bear the burden of establishing that they have pled fraud with particularity.

THE COURT:  And so was your answer yes, then, ambiguity benefits --

MR. CORDING:  Yes, Your Honor.

THE COURT:  -- your party's position?

MR. CORDING:  I believe that's correct, Your Honor.  I believe that if there -- if the plaintiffs fail to specify why that statement was false as to 2018, then they fail to meet their burden of pleading fraud with particularity under the PSLRA.

Subject to any further questions Your Honor has on that particular point, I want to say a word briefly about the confidential witnesses in the Complaint here.

Courts have been rightly suspicious of allegations attributed to confidential witnesses.  And unlike other statements in a Complaint, the allegations of unnamed witnesses need not be accepted as true at the pleading stage.

As the Eighth Court [sic] held in the *NVE* decision, the court may consider the level of detail alleged, the basis of the allegation, the reliability of the sources, and whether the allegations are corroborated.  And on that basis, the 15 confidential witnesses alleged here in

the Complaint, in our position, are entitled to little weight, if any, for several primary reasons.

First, seven of those 15 witnesses worked for the [indiscernible] --

THE COURT:  I didn't hear you.  You said seven of those were what?

MR. CORDING:  Seven of the 15 worked for the ADI business unit, not the P&S business unit, and that's important because the P&S business unit was the relevant business unit here, per the Complaint.  And so the seven who worked for ADI have, at bottom, nothing to say that's relevant to the issues in the case.

Second, every confidential witness, other than Confidential Witness Number 9, was fired or left Resideo during the class period.  So, for example, Confidential Witness 3 was fired in March 2019.  So not only might those witnesses have, in the words of the *Minneapolis Firefighters* decision, axes to grind, but also they lack personal knowledge of events that transpired later in the class period, such as updates to Projects GRIP and STORM.

Third, in a company of over 13,000 employees, not one of the confidential witnesses rose above the ranks of lower tier management.  None were in regular contact with the individual defendants.

Fourth, and maybe most importantly, the

allegations here are too localized and anecdotal to implicate the veracity of company-wide disclosures.  So maybe a good example of that is Confidential Witness Number 1, who was described as a local territory representative, who alleged in paragraph 58 of the Complaint, quote, personally dealt with upset customers during her time at Resideo.

But the plaintiffs never put that allegation into perspective and alleged how these allegedly upset customers impacted Resideo's sales or projections.  And that deficiency, the failure to connect plaintiffs' allegations to specific statements made by Resideo, pervades the Complaint here.

The very same thing happened in the Eighth Circuit's *Hutchinson* decision, where the court concluded that allegations by several confidential witnesses pertaining to excessive customer returns at a particular plant should be disregarded because, quote, events at one specific plant with one individual customer are not enough to meet the PSLRA's heightened standard.

And, finally, the confidential witness allegations here are speculative and unreliable.  Maybe the best example of that is the plaintiffs' headline scienter allegation from Confidential Witness Number 3, the supposed directive to some employees to use the WhatsApp application.

And our position, Your Honor, is that that allegation is the quintessential kind of confidential witness allegation calling for a deep discount.  It amounts to triple hearsay.  It rests on nothing more than speculation as to who issued the supposed directive.  It is uncorroborated by anyone who attended this meeting.  And CW3's description of when that statement was made, a breakout meeting at the company's annual meeting in January or February 2019, is demonstrably inaccurate.  It has already been walked back to a large extent by the plaintiffs.  So we think that the Court is well within its rights to disregard that allegation.

THE COURT:  So let me ask you:  What is deficient?  As we look to the confidential witnesses, is it their job title, their time of employment, their responsibilities, those types of matters that are deficient?  What's deficient here?

MR. CORDING:  Thank you, Your Honor.  I think the primary deficiency is that the confidential witness allegations to some extent exceed the job -- exceed what those employees, by virtue of their job titles that were included in the Complaint, would have actually been able to observe.

So, for instance, particularly with respect to scienter, the Complaint is riddled with phrases like these

issues should have been visible upfront -- that's in paragraph 116 -- that the confidential witnesses believe or strongly believe that executives were made aware of issues, or that a senior executive likely knew.  These are, at bottom, junior employees who had virtually no interaction with the individual defendants, who were the highest-ranking tier of management at Resideo and --

THE COURT:  And can that determination be made and relied upon at this early stage in the proceedings?

MR. CORDING:  Yes, Your Honor.  I think the Eighth Circuit, particularly in the *NVE* case, has been crystal clear on that point.  And, really, when you take a step back, what the courts seem to be saying is you can rely on confidential witnesses to attempt to meet your pleading standards under the PSLRA, but the consequence of that is that the court is going to perform or play what's in essence a gatekeeper role with respect to those allegations and not determine at this stage of the case whether they're true or false, but determine are they corroborated, are they speculative, are they the kinds of things that an employee at that level of seniority could observe, are they connected to the disclosures at issue in the case such that they actually falsify them.

THE COURT:  And it is your representation that the Complaint itself should indicate their basis for being able

to be relied upon for their beliefs; is that correct?

MR. CORDING:  That's correct, Your Honor.  And I think if it doesn't, that further undermines any weight to be given to those kinds of allegations, and the *Hutchinson* case maybe being the best example of that.

And just to finish briefly, Your Honor, subject to further questions, putting aside the WhatsApp allegation that we touched on before, I think this Complaint is noticeably weak and thin on allegations of scienter, which, again, must be pled with particularity under the PSLRA.

First, scienter cannot be shown through fraud by hindsight.  That was one of the precise holdings of the Eighth Circuit in the recent *Target* case, where that court rejected nearly identical claims, quote, based on a fraud based on later statements describing the response to problems with Target Canada's supply chain and IT infrastructure as they became more apparent.

And as the court -- or as courts are instructed to do by the Supreme Court in the *Tellabs* decision, the scienter inquiry here is inherently comparative and so the approach is to consider the allegations in their totality, not in isolation, to see whether the inference of fraud or nonfraudulent intent is more plausible here.

And really on that point, this case lacks many of the traditional hallmarks of a fraud.  There are no

allegations of insider trading by Resideo executives. There's no allegations of a corporate motive. If anything, the motive pled here was that Honeywell structured the spin-off to advantage its interests, which may speak to the motive of Honeywell, but not Resideo.

And if you look at the stock price chart, which we included in Exhibit P, it is not the typical chart you see in a Rule 10b-5 case. The stock price here went steadily down following the spin-off. It didn't go all the way up based on optimistic disclosures and then come crashing down.

And so when you put all of those pieces together, we think the much more plausible inference here is that Honeywell [sic] simply struggled in its first year as a public company following the spin-off. And exactly as in the *Target* case, Resideo management was -- at worst, quote, understated the seriousness of its problems, overstated its ability to correct them, and made unrealistic projections about its profitability. And that's again a quote from the *Target* decision. And none of that, while it may amount to poor execution or mismanagement, supports a finding of an intent to defraud.

With that, Your Honor, subject to any further questions on your end, I reserve the remainder of my time for rebuttal.

THE COURT: Thank you, Counsel.

MR. ENTWISTLE:  Your Honor, this is Andrew Entwistle.  May it please the Court and may I proceed?

THE COURT:  Yes, you may, Mr. Entwistle.

MR. ENTWISTLE:  Thank you, Your Honor.  And can the court reporter still hear me okay?

THE COURT:  Yes, she can.  Thank you for asking.

MR. ENTWISTLE:  I appreciate that.  And it's easier in the courtroom when the court reporter can just hold up a hand or maybe even reach over and hit me in the head if I start to go too fast, so we will just have to do that virtually under the circumstances, but I will try and abide by all of Your Honor's requests.

Let me, if I may, start perhaps where Mr. Cording ended with confidential witnesses.  Your Honor asked exactly the right question, which is what does the Complaint specify.  Well, under the Eighth Circuit law -- and I commend, Your Honor, by the way, to two decisions that are recently from this court.  One is -- and we cited both on brief.  One is the *St. Jude Medical Securities Litigation* case at 836 F.Supp. 878, and that's Judge Nelson's decision; and Judge Davis's decision in *In re CenturyLink Sales Practices Security Litigation*, 403 F.Supp.3d 712, and that's out of this district in 2019.

Both of those cases and cases somewhat similar to this one specifically involve confidential witnesses.  In

the *St. Jude* case there were 15 or so confidential witnesses.  In the *CenturyLink* case there were actually 20 confidential witnesses.  And in both cases the allegations relating to the confidential witnesses were substantially similar to those here and both cases approved of the use of the confidential witnesses.

In both of those cases, as here, the job descriptions of the confidential witnesses are detailed at length.  All of the allegations are made on the confidential witnesses' personal knowledge.  So the confidential witnesses do, in fact, corroborate one another in terms of the different areas of inquiry, and all of the areas that they speak to were well within their function.  What the --

THE COURT:  Do --

MR. ENTWISTLE:  -- defendants have --

THE COURT:  Please go ahead.

MR. ENTWISTLE:  Okay.  Thank you.  And we also see the same thing in the *Nash* decision out of this court at 502 F.Supp. 874.

And we can see when we look at these issues, what the defendants have tried to do, and you heard Mr. Cording speak to this, is essentially wipe the confidential witnesses out of the case as if they didn't exist, saying roughly half of them worked in the ADI half of the business and half of them worked in the products side of the

business, which is the side where most of the issues arose here.

But even the ADI-related witnesses had direct knowledge of two important pieces, one, supply chain issues and, two, the customer-related issues that pervaded the problems that they were having -- that Resideo was having here but wasn't disclosing.

And Mr. Cording suggested that there were no allegations in the Complaint that tied the customer issues that Resideo was having to the other allegations at issue here.  But there are, in fact, very specific allegations in the Complaint that address issues related to the fact that Resideo was losing channel partners, major channel partners. In fact, it lost Ackerman during this period, which was at the time apparently its number two channel partner.  None of that was being disclosed to the public.

And, in fact, it's those allegations relating to supply chain issues and the loss of channel partners and the loss of value engineering and related product problems in terms of delays and development, including Project STORM, which I will come to in a minute, that were specifically discussed at the breakout meeting that -- at the company annual meeting, that was described by Confidential Witness 3, in January of 2019.

THE COURT:  Let me stop you here, because it seems

to me, even at this stage of the proceedings, the scienter inquiry requires consideration of plausible, nonculpable explanations, like as offered here, the normal struggles of a spin-off company.  What makes the struggles here exceptional?

MR. ENTWISTLE:  And that's a great question, Your Honor, and really what makes this so exceptional are a couple of factors.

The first is that this is the classic pattern or what the *CenturyLink* and the *Navarre* case out of this circuit refer to as the classic pattern of scienter, where the defendants made statements when they knew or had access to information suggesting or actually showing that they were false.

In this case we now know, by the defendants' own admission, which is a critical piece -- and these are admissions that go back to the spin.  They're not, as counsel suggested, something that was only discovered because they did an operational review in October of 2019, but rather by their own mouth.

And we look at what Defendant Nefkens said.  Defendant Nefkens said that most of the value engineering stopped prior to the spin-off from Honeywell, and that's referred to -- and this is again in November of 2019.  And that's an allegation that goes all the way back to the

spin-off from Honeywell.  These are facts that Defendants Nefkens and Ragan and de Masi knew from day one.

In fact, it shouldn't be lost on the Court that Defendants Ragan and Nefkens were put in place by Honeywell prior to the spin.  They participated in structuring the company and they were intimately familiar with the fact here that Honeywell stripped the manufacturing facilities of engineers.

And it's important to note, by the way, and defendants mentioned this point in passing in their briefing, that Honeywell -- you know, that there were certain disclosures relating to what component pieces of Honeywell were being amalgamated into Resideo.

And it is true that there were some general disclosures, including the fact that -- and there is a chart in our brief and in the Complaint that ultimately shows how the businesses were split in general terms.

But what's telling there is that when Honeywell put this company together -- and put it together they did, because Resideo had no independent existence before the spin-off and there's no dispute that Resideo was not an operating -- a separate operating business within Honeywell, just as there is no dispute, and there can't be --

THE COURT:  I am really hoping that we can get to the point.  I'm really trying to address scienter and how

the pleading requirement is met here and what you point to to establish that scienter.

MR. ENTWISTLE:  And so let me speak directly to that, Your Honor.  The first is defendants' -- or are defendants' admissions.  Defendants have specifically admitted that they knew from or actually prior to the spin in many cases that the company lacked value engineering; that the manufacturing was stripped by Honeywell; that value engineering, which should have been done 12 to 24 months before, was not done; and that it would take at least 12 to 24 months to hire a new team and begin to realize those benefits.

And what does that mean?  Without value engineers, the company couldn't properly source product, it couldn't go ahead and develop new products, and there were all kinds of manufacturing issues, but most importantly, it created havoc with regard to the company's margins.

These are all facts that were known to defendants -- to the defendants at the time or before the time of the spin and they knew they would have a direct impact on all of the financial projections and other information that was put out to the public that they embraced immediately post-spin, but they knew or recklessly disregarded the fact that with those types of issues in the supply chain, dramatically impacting margins, that there was

no way that the company's results would be sustained.

And therefore statements like those that Your Honor questioned Mr. Cording about about the fiscal year 2018 statement made by Mr. Nefkens at paragraph 216 are demonstrably false because we know when Resideo actually released its fourth quarter results, which happened in March of 2019, that the 2018 results that Mr. Nefkens was saying in November, just after -- just a week or two after the spin, we're going to -- were on track to deliver continued growth through 2018 and beyond, we know that when Resideo reported those earnings, those actual 2018 earnings were nowhere close.  In fact, those earnings had fallen by more than -- forecasts were lowered from 4 percent to 2 to 5 percent and there was a 20 percent decline in profit, a 20 percent decline in 2018.

THE COURT:  So let me ask you to crystallize for me by addressing whether the defendants had motive.

MR. ENTWISTLE:  And so, Your Honor, that's a very good question here, and this is an interesting case on that issue.  The defendants -- we believe that the facts in the Complaint show that the defendants had motive.  Even though motive is not required, we do know that the defendants, particularly and specifically Defendant Nefkens and Defendant Ragan, received founders' restricted shares that had a four-year vest, in other words, they had to stay with

Resideo for four years to realize a benefit from them.  And those two grants -- one was 1 million -- 1.1 million to Defendant Ragan and the other was $4.3 million to Defendant Nefkens -- were made at the time of the spin and they would only vest if they stayed with the company for four years. So there was a motive or a rationale economically for these defendants to realize the benefit of their founders' shares.

But the real core issues here when we talk about scienter here, you can show scienter, as Your Honor is aware from the authority in this circuit, including the *Ceridian Securities Litigation* at 542 F.3d 240 at 244, either by facts demonstrating a mental state embracing an intent to deceive or manipulate, conduct rising to the level of severe recklessness, or motive and opportunity.

THE COURT:  And so help me get to the conduct resulting or the result of severe recklessness, because it seems to me there has to be consideration of plausible, nonculpable explanations, like the normal struggles of a spin-off company.  What -- and that seems to me one piece of the argument that's being presented to me.  What makes these struggles exceptional?  What facts give rise to a strong inference that defendants acted with the necessary scienter?

MR. ENTWISTLE:  And, Your Honor, that's a very good question.  And as a practical matter, it is true that in certain cases spin-offs will struggle, but in this case

the reasons this spin-off struggled were all known and not disclosed to the public from before the spin.

THE COURT:  And so that's what makes these struggles exceptional?

MR. ENTWISTLE:  What makes these struggles exceptional, Your Honor, is that on the one hand these defendants knew that they had no value engineering and no ability to produce these products.  They knew that they couldn't deliver the products on time.  They knew that they had no sourcing.  They had lost all sourcing.  They had lost all manufacturing.  So their supply chain was in complete shambles.  They had all kinds of issues regarding post-spin inventory.  They had lost and were losing channel partners. They had massive failures in their connected products that they knew about pre-spin.

Pre-spin they did a study to determine whether this TCC connected app could handle the increasing load as they moved or cut over to these new connected products, and the study that was done -- and Confidential Witness 3 participated in the study -- predicted that it would crash in September of 2018 pre-spin.  Well, that crash actually happened for the first time in November of 2018.  But none of that was being disclosed to the public, but these defendants knew it.

On the other hand, the defendants were touting the

portfolio product, the stability of the supply chain and management, a history which did not exist, a history of operating results that did not exist, a business history that did not exist, a lucrative portfolio of contracts that did not exist and was rapidly deteriorating, again, not disclosed.

One of those contracts was the ADT contract related to Product GRIP, and the Complaint is replete with allegations regarding Product GRIP, that the defendants knew it was not delivered on time.  They specifically misrepresented the delivery of product as happening in December of 2018 when, in fact, it was only in beta and it wasn't even delivered until February in --

THE COURT:  Why isn't that protected forward-looking statements?  Why aren't they protected forward-looking statements which would -- you would be protected under the safe harbor provisions in this case?  Why don't they apply?

MR. ENTWISTLE:  Well, and there are two reasons, Your Honor.  One is that it's not a forward-looking statement.  The statement they made was at most -- well, was actually a current statement of fact.  They said in -- what they said was that Product GRIP, and this is statements made in March, had delivered in December of 2018 and then they made additional present statements about it that were

knowingly false when made.  It was in beta.  It wasn't delivered in 2018.  It wasn't -- the first delivery in beta didn't happen until February of 2019 and it wasn't in any shape -- and this is the ADT part of it, not even the cloud piece of it -- to deliver that would be operational.

And there are a number of allegations in the Complaint that speak to the issues of what was actually happening in the company, meaning that Resideo couldn't deliver a saleable version of the GRIP product to ADT because it had not yet manufactured it.  It hadn't solved the software issues and it was in beta.  And as far as the cloud --

THE COURT:  If it's making a representation about what can be produced, even though it's at the beta stage now, isn't that a forward-looking statement?

MR. ENTWISTLE:  Not if you're telling the public, Your Honor, that -- they never told the public that it was in beta or the problems they were having with it.  They said to the public that it had been delivered and that there was -- that it was on track and that there was robust adoption and similar statements during this critical period, when, in fact, all that had been delivered was a beta version, it wasn't being rolled out, it hadn't been adopted, and there were major issues between it and ADT that the Complaint pleads they came to lose later with contract

penalties and the like.

Now, the defendant disputes that there were contract penalties and call them rebates, and that will be a fact issue that we deal with when we get to discovery later in this case.

But the reality is that there were major issues with regard to the rollout of Product GRIP and major delays that were not disclosed to the public, A; and B, the statements that were made to the public were directly contradicted by what the defendants knew was happening within the company.

And the same is true for, for example, Product STORM, which the defendant didn't mention at all in their presentation.  And Product STORM, which was the next generation, the defendants made a number of statements about when that product would be rolled out and delivered to the marketplace, but internally they knew specifically that Product STORM was essentially a fake product, that it had no software, no hardware, and no likelihood of being put together for years, but they were talking about rolling it out in very short order.

THE COURT:  Let me ask you -- I did not hear you.  You said that Product STORM was essentially a what?

MR. ENTWISTLE:  It was a sham product.

THE COURT:  Sham product.  Okay.

MR. ENTWISTLE:  It didn't exist.  There were people looking at it, but the software engineers that were involved with it had specifically told the defendants that there was no hardware, there was no software.  They hadn't even developed the housings for the hardware and that it would be years, some estimates as long as five years, others more than two years, before that product would ever be ready for market.

THE COURT:  And where do we get those estimates from?

MR. ENTWISTLE:  Those estimates, those come from conversations that the confidential witnesses had and meetings that were had that the confidential witnesses actually attended.

THE COURT:  Okay.

MR. ENTWISTLE:  Relatedly, we know that in this regard, and I'm only -- and the Complaint goes into great detail on these product-related issues, just as it goes into great detail with regard to the value engineering.

The defendants -- what we learn in November of 2019, by the defendants' admission, is that all of the value engineering were stripped prior to the spin-off by Honeywell.  Honeywell stripped the value engineers and stripped product engineering out.  And as Defendant Nefkens said, talent in value engineering were very small compared

to what was required.

Now, that had a direct and adverse impact on margin and product delivery and everything that goes into making any type of financial projection, but the defendants made no adjustments to any of that until after the fact.

THE COURT:  So why aren't these reasonable business decisions made and therefore protected?

MR. ENTWISTLE:  Your Honor, that's a very good question.  It's not a reasonable business decision to make a disclosure that is directly contradicted by facts that you know.  While it's very true that there are many corporate executives that act in good faith and are transparent, they make disclosures that are made in good faith under the circumstances, but here these defendants knew from before the spin-off, so from day one of the class period, they knew and understood that the projections were inherently unreliable because, one, there was no operating history and, two, there were no value engineers or product engineers that would allow for the maintenance of margins.

And how do we know that they knew that?  We know it because at the end of the class period they admit it.  Defendant Nefkens admits that.  And you can't in good faith as a corporate officer, when you're speaking -- and we understand, under the law in the Eighth Circuit, that once you speak, you have an obligation to speak truthfully and to

provide all of the information that's necessary so that the statements you make are not misleading.

But that's not what the defendants did here.  At no time did they, until we get to the end of the class period admission, did they ever admit that Honeywell had stripped out all their value engineers, that they were having radical sourcing issues.

We know what happens in the disclosures made at the end of October and in November by the -- the admissions by the defendant.  They point to, for example, problems with the RTS product.  Well, those margin issues related to RTS specifically related to the problems with sourcing microprocessors and the fact that those costs had gone from 80 cents to $2.50 up to $9 to $15 in cost.

The defendants knew about those problems pre-spin. They started having those problems back in September of 2018 before the spin-off.  This isn't something that was discovered in October.  And so they knew throughout the dramatic impact that the problems with sourcing and the costs and margin related to those chips would have; and, again, it falls back into this problem with the value engineering.

And each of the issues that the Complaint alleges were ultimately admitted by the defendants go to the heart of Your Honor's question, because when Your Honor asked,

well, how do we know that's not a normal struggle or how do we know that that's not a normal issue, the reality here is that, yes, on the one hand this is the boat that Honeywell left this company in, but the problem is that no one told the investors, and that's at the heart here.  No one told the investors when the defendants knew and that --

THE COURT:  And so it's your position that failure to disclose to investors is evidence of the intent to conceal and mislead?

MR. ENTWISTLE:  Exactly, Your Honor.  And when you fail to make those disclosures when you know the truth, that undercuts all of the defendants' arguments.

First, it's the classic pattern of an intent to deceive or conceal, and that's even without the WhatsApp allegation.  I mean, here we have the defendants actively trying to conceal the very issues you and I have been talking about for the last few minutes about channel partners and value engineering and sourcing and product delivery problems and the TCC cloud failures that early on in the class period the senior engineers claim could not be solved.  They threw up their hands and said that they couldn't be solved.

And the defendants at this breakout meeting tell the vice presidents and general managers at Resideo that they shouldn't talk publicly about any of these issues and

that if they have to talk about them, don't use the company e-mail, use WhatsApp because it's much more difficult to discover in any lawsuit.  Now, that is -- I think the defendants have it exactly wrong.  That's the quintessential allegation of concealment.  And Confidential Witness 3 was at that meeting.  He heard this direction.  And it's not surprising that at this point, pre-discovery, we don't have lots of other corroboration of that fact.

THE COURT:  Counsel, you may use your last minute to wrap up at this time.

MR. ENTWISTLE:  Okay.  Thank you, Your Honor.

And just, again, on -- wrapping up on the safe harbor issues, Your Honor had it exactly right, that the safe harbor offers no protection to defendants when they know of actual material issues that could occur.

And the defendants' reference to the *Rand-Heart* case and *K-V Pharma* is just wrong.  *Rand-Heart*, which came after *K-V Pharma*, makes it very, very clear that a confidential witness that knows the statements are false can't take advantage of cautionary language and cautionary language cannot be meaningful where the defendants know that the assertions are false.

Thank you, Your Honor.

THE COURT:  Thank you, Counsel.

MR. CORDING:  Your Honor, the --

THE COURT:  Let me just -- I am taking some notes. You would see this if you were in the courtroom.  So if you will just pause while I finish writing up those notes very quickly.

(Pause)

THE COURT:  Okay.  Counsel, you may proceed.

MR. CORDING:  Charles Cording again for the defendants.

Your Honor, I want to begin a little bit out of order here.  First on the topic of scienter, and I think what we've heard from Mr. Entwistle is that the primary argument that the plaintiffs are relying on here for scienter is the claim that at the end of the class period Resideo here admitted to all of these problems dating back to the spin-off and they knew as far back as the spin-off that there were all of these underlying business problems, the lack of value engineering, sourcing issues.  And simply put, those are the words, respectfully, of Mr. Entwistle, not of Resideo.

These disclosures are all in the record, Mr. Nefkens' statement at paragraph 37, Mr. Ryder's statements in paragraph -- I'm sorry, Exhibit FF.  And the exhibits speak to themselves, but I think they state very clearly nothing to the effect that anyone at Resideo knew of these issues going back to the spin-off.

It is one thing when, as here, a company misses its earnings guidance to get questions from investors to explain the results and say, you know, in retrospect we didn't have enough value engineering in place.  It is quite another to say that we knew from day one that we didn't have enough value engineering in place and we were never going to make our numbers.

And I think just a cursory review of the disclosures in this case show that what Mr. Nefkens and what Mr. Ryder said here were after-the-fact assessments of performance, not admissions.  And really that goes to our central point about fraud by hindsight and the *Target* case, because so often when companies have disappointing results, they undertake, as Resideo did here, a retrospective assessment of what went wrong and explain that to investors. If every time a company did so it amounted to admissions of securities fraud, it would discourage that very kind of conduct that serves the interests of investors.

THE COURT:  Let me stop you there, though.  How are these allegations fraud by hindsight when plaintiffs have pled that the Resideo executives knew or should have known that their statements were false and materially misleading?  It seems to me --

MR. CORDING:  Yes, Your Honor.

THE COURT:  -- your counterargument goes to a

genuine issue of material fact.  It does not negate the allegations.

MR. CORDING:  Your Honor, I think this is an issue that's resolvable on the face of the pleadings, simply put, by reading what Mr. Nefkens said and what Mr. Ryder said. The plaintiffs characterize those statements as admissions that they knew; and those statements, simply put, don't say that.  And these are issues -- these are documents that are in the record.  They can be judicially noticed.  And it's simply a question of whether plaintiffs' characterization of those statements is correct or not.  It would really be quite something --

THE COURT:  The question of whether the characterization is correct or not, is that a genuine issue of material fact or a fact that can be determined by the Court at this stage?

MR. CORDING:  Your Honor, it's the latter and it's the kind of determination that courts make in these securities cases all the time because, simply put, their characterization is determinable from the face of the documents in the record.  And if there's -- if that's not determinable from the pleadings, then it's a fact issue.

But these statements say what they say, and they are not admissions and the Court can notice that they are not admissions and that -- if the Court makes that finding,

it defeats the entire theory of scienter in the case and supports a dismissal on that basis.

Next, just very briefly, we heard Mr. Entwistle reference statements made by Honeywell prior to the spin-off and whether Honeywell was transparent about the business lines that were being spun off to fund or to form Resideo and the chart in paragraph 91 of their Complaint.

I would just emphasize that Honeywell is not a defendant in this lawsuit and when you look at the summary chart that the plaintiffs included in their Exhibit A summarizing all of the different statements they're challenging here, Honeywell was the -- ten of those statements were made by Honeywell prior to the start of the class period.

And per the *Target* case, it's a matter of black-letter law that only statements made during the class period can be the basis for a Rule 10b-5 claim. So, simply put, I think all of the back and forth on what Honeywell said or didn't say prior to the spin-off should be out of the case.

And there's history here. Honeywell initially was named as a defendant in the Complaint filed by this lead plaintiff, but when they amended that Complaint, they dropped Honeywell as a defendant. If they wanted to --

THE COURT: Let me stop you there. You said ten

of those statements.  Are there other statements beyond those ten?

MR. CORDING:  I don't believe so, Your Honor.  If you look at Exhibit A, there is -- which is their summary chart, the first four statements on page 1 are all statements that were made by Honeywell prior to the spin-off and then there are another six statements, by my tally, that predate the date of the spin-off, which was October 26, 2018.

THE COURT:  And you conclude from that?

MR. CORDING:  We conclude from that, Your Honor -- and just to give you the language from the *Target* decision, where this issue came up before, the district court in that case said, quote, a defendant is liable only for those statements made during the class period.

So these statements by Honeywell definitionally predate the class period, which began on October 27, 2018, and indeed actually predate Resideo's existence as a company.  At the time these statements were made, the plaintiffs here didn't hold stock in Resideo.  Resideo was still a part of Honeywell.  If anything, they had Honeywell stock.  And that is fatal to Rule 10b-5 standing as to those statements.  And I think, frankly, if the plaintiffs here wanted to pursue those claims, they could have left Honeywell in the case, but they chose to drop them as a

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

defendant.

Next, very briefly, Your Honor, Mr. Entwistle referenced the *Rand-Heart* decision and this dispute over whether forward-looking statements that were made with actual knowledge of falsity are protected under the safe harbor.  So the *Rand-Heart* decision is not an Eighth Circuit case, to be clear, but more importantly, it's a case where the district court specifically found that the forward-looking statements were not accompanied by meaningful cautionary language; and because the statements were not accompanied by meaningful cautionary language, it became relevant, under the safe harbor, whether those statements were made with scienter or not.

But prior to *Rand-Heart*, in *K-V Pharmaceuticals* the Eighth Circuit made crystal clear that if the statement is accompanied by meaningful cautionary language, you end the inquiry there and don't get to the next step of whether or not the statement was made with scienter.

Next, just briefly on Project STORM, we heard from plaintiffs' counsel, based on the allegations of Confidential Witness Number 3, that it was a sham product and it would be years away.  And really this harkens back to a point I made before and that Your Honor asked about before, which is that the plaintiffs' basis for knowledge must be pled in the Complaint.  And here the plaintiffs --

the confidential witness that the plaintiffs relies on, Confidential Witness Number 3, was fired in March 2019 before all of these issues came to a head. And, indeed, parenthetically, Project STORM launched in January of 2020 and actually won an award at the Consumer Electronics Show in January of 2020.

So the idea that this was a sham product that was years away is just a confidential witness speaking to events that substantially predate his time at the company and thus need not be accepted by the Court at this stage of the case.

Next, going back to the point about confidential witnesses, the two cases cited by plaintiff, *CenturyLink* and *St. Jude*, are very different cases. In the *CenturyLink* case and in *St. Jude* fraudulent practices were alleged, in *CenturyLink* that there was cramming activity and in *St. Jude* that there was channel stuffing. And in both of those cases the confidential witnesses actually corroborated with each other. In the *CenturyLink* case the witnesses said, you know, we were trained to cram at sessions held by CenturyLink. So they attended the same meetings and had the same characterizations of those meetings. That's simply not the case here.

And to go back to Your Honor's question, what's missing in terms of the allegations in the Complaint about the basis for the confidential witnesses's knowledge here is

there's nothing in the Complaint that establishes that these witnesses would have known anything about the company's company-wide earnings or projections.  None of these employees had anything to do with projecting EBITDA or preparing forecasts from EBITDA or could say, as you might imagine in another case, that they knew the defendants here had been told that they are being provided with forecasts that were different than the statements that were released publicly.

And so those cases where the confidential witnesses were credited are fundamentally different in kind from the kinds of confidential witness allegations that we have here.

THE COURT:  We are very early in the proceedings here.  So am I wrong?  There were interviews with confidential witnesses, correct?

MR. CORDING:  Yes, Your Honor, based on the representations in the Complaint.

THE COURT:  And they did attest to the knowledge of relevant information that the defendants did not disclose to the public; is that correct?

MR. CORDING:  They attested, I believe, Your Honor, to specific problems that are detailed in the Complaint, but none of the witnesses attested or really had a foundation for attesting to the truth or accuracy or the

reliability of the company's projections.  That's an issue that was -- that is entirely appropriate for the Court to consider at this stage.

And just to read from the Eighth Circuit's decision in the *Hutchinson* case, this again is talking about production issues at a particular plant.  (As read) "Allegations that production and errors were up at certain plants is not enough to support a claim that Hutchinson knew their company-wide EPS statements were false.  We agree with the district court that without allegations showing the basis of CW1's knowledge, that the defendants' claim that return allowances were inadequate is not sufficient under the PSLRA."

And that issue from the *Hutchinson* case is exactly the issue we have here, which are anecdotal, localized allegations by specific confidential witnesses who largely worked in the ADI business division that had nothing to do with the financial performance of Resideo in 2019.

THE COURT:  So if we look at factors such as job title, time of employment, employment responsibilities, personal knowledge, corroboration among a group of confidential witnesses, which would be the *St. Jude* standard here, what's wrong, what's missing?

MR. CORDING:  I think the one item, respectfully, Your Honor, that's missing from that list is basis of

knowledge.  And the fundamental deficiency here is that the confidential witnesses lacked a basis of knowledge as to the company's earnings -- or the company-wide earnings statements or projections and thus lack any basis to speak to the fundamental issue in the case, which is whether the projections are reliable or unreliable, whether the statements in the public disclosures were correct or not correct.  And so it's on the basis of knowledge elements of the test that these confidential witnesses are lacking.

And then, finally, on Project GRIP, where Your Honor asked about the allegations of beta testing and whether or not these are forward-looking statements or not, and really, to my ear, the only nonforward-looking statements we heard here with respect to Projet GRIP were statements about when Projet GRIP pulled out.

And the plaintiffs have alleged that there was a contradiction, that at one point Mr. Nefkens said it had been rolled out in December of 2018.  Another point in time he said it had been rolled out in the first quarter of 2019.  Now, as to those two statements, those periods are separated by only a day.  So to the extent that there was indeed a contradiction, I think there are no allegations that that contradiction was in any way material.  But more fundamentally, nearly all of the statements about Projet GRIP were forward-looking statements.

And on the point about contractual penalties --

THE COURT:  And which ones were not forward looking?

MR. CORDING:  I think the ones that were not forward looking were the statements made about historic issues, so when the project rolled out, when volume shipments began with respect to GRIP ADT.  And I think those -- we would concede that a representation of a historical fact as to when a product was rolled out is not a forward-looking statement.

But the issue, as we detailed at length in our papers, is that there's no material misrepresentation alleged and really all we have here is the plaintiffs conflating different terms between rollouts and volume shipments and kind of splitting hairs as to whether the first rollout happened as to GRIP ADT in December 2018 or the first quarter of 2019, which is a distinction that is not alleged to be material.

And then just finally on the contractual rebates point, there is an allegation by Confidential Witness Number 3, that Resideo was forced to pay to ADT significant contractual penalties because of production issues with GRIP.

And the issue with Projet GRIP was actually 100 percent the opposite.  The problem was not that there

were production delays that it was in beta testing, but that the project was actually so popular and performing so well that that triggered significant contractual rebates under the contract with ADT, and all of this was explained by Mr. Nefkens and is quoted at length in paragraph 372 of the Complaint.

And so, again, this is a confidential witness, Confidential Witness Number 3, who was a software developer, opining as to the operation of this contract and speaking to issues that post-date his time at the company and that run up flatly against the disclosures that the company made explaining that, yes, there was an issue with Projet GRIP, but the issue was that we had to pay out these significant rebates, which cut down on our EBITDA margin.

THE COURT:  Thank you, Counsel.

MR. CORDING:  Thank you, Your Honor.

THE COURT:  Your time has expired.

MR. ENTWISTLE:  Your Honor, this is Andrew Entwistle.  May it please the Court, I thought I had reserved just two or three minutes, if I may have the Court's indulgence?

THE COURT:  I don't recall you reserving two to three minutes, sir.

MR. ENTWISTLE:  When I originally requested, I had asked to reserve a couple of minutes.  I think I actually

said a few minutes, but I won't be any longer than two minutes, if I might have the Court's indulgence?

THE COURT:  Very well.  You may have two minutes.

MR. ENTWISTLE:  Thank you, Your Honor.  I appreciate that.  I know it's been a long argument.  Just a couple of very quick points.

Counsel suggested that the *Rand-Heart* decision is not an Eighth Circuit decision.  It is, in fact, an Eighth Circuit decision which was issued on February -- in February of 2016 at 812 F.3d 1172, and it's important because it speaks directly to the *K-V Pharmaceutical* decision that counsel cited and it speaks directly to the fact that forward-looking statements with meaningful cautionary language is not meaningful where the facts are known to the defendant.  I won't belabor that point, we talked about it, but I thought it should be mentioned.

And two other points.  One --

THE COURT:  I don't believe you have time for two more points.  You may make one more quickly.  Your time has expired.

MR. ENTWISTLE:  Okay.  One more very quick point, then, Your Honor.  I would just note that, Your Honor, the question Your Honor asked about questions of material fact is precisely the point.  In the Eighth Circuit, whether a public statement or statement that's made is misleading is a

question of law in fact and it is only subject to resolution where meaningful minds can't differ, and that's out of the *Campbell* case at 916 F.3d 1121, 1124, an Eighth Circuit case from 2019 that we've cited on brief.  That's precisely the issue here.  The defendants have tried to raise any number of factual arguments.  Those are appropriately left for a later stage of the case.

I thank Your Honor and your staff for your indulgence today, for your time and patience on a telephone argument of this complexity.  Thank you very much.

THE COURT:  Counsel for the parties, thank you for your arguments.  We are concluding our hearing at this time. The matter is taken under advisement.

(Court adjourned at 2:30 p.m.)

\*         \*         \*

I, Lori A. Simpson, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by:  *s/ Lori A. Simpson*

Lori A. Simpson, RMR-CRR