**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| IN RE RESIDEO TECHNOLOGIES, INC. SECURITIES LITIGATION | Civil Action No. 0:19-cv-02863-(WMW/BRT) |

**JOINT DECLARATION OF ANDREW J. ENTWISTLE AND IRA A. SCHOCHET IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND FOR FINAL CERTIFICATION OF THE SETTLEMENT CLASS; AND (II) CO-LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES AND <u>AWARDS PURSUANT TO 15 U.S.C. ¶78u-4(a)(4)</u>**

## TABLE OF CONTENTS

I.      INDEX OF EXHIBITS HERETO ...........................................................................3

II.     PRELIMINARY STATEMENT .............................................................................4

III.    THE OUTSTANDING RESULT ...........................................................................6

IV.     HISTORY OF THE ACTION..................................................................................9

      A.      Appointment of Lead Plaintiffs and the Amended Complaint.....................9

      B.      Defendants' Motion to Dismiss................................................................. 18

      C.      The Court Denies Defendants' Motion to Dismiss .................................... 19

      D.      Discovery................................................................................................... 21

            1.      Lead Plaintiffs' Document Requests Directed at Defendants.......... 22

            2.      Non-Party Discovery....................................................................... 24

            3.      Defendants' Discovery Requests .................................................... 25

            4.      Document Review ........................................................................... 26

V.      SETTLEMENT NEGOTIATIONS...................................................................... 27

VI.     RISKS OF CONTINUED LITIGATION ............................................................ 30

      A.      Risks of Proving Liability ........................................................................ 30

      B.      Risks of Establishing Loss Causation and Damages................................. 34

      C.      Risks of Class Certification...................................................................... 36

VII.    NOTICE TO THE SETTLEMENT CLASS MEETS THE
        REQUIREMENTS OF DUE PROCESS AND RULE 23 OF THE
        FEDERAL RULES OF CIVIL PROCEDURE....................................................... 37

VIII.   PLAN OF ALLOCATION.................................................................................... 39

IX.     CO-LEAD COUNSEL'S APPLICATION FOR AN AWARD OF
        ATTORNEYS' FEES AND REIMBURSMENT OF LITIGATION
        EXPENSES ......................................................................................................... 42

      A.      Lead Plaintiffs Support the Fee and Expense Application......................... 42

      B.      The Favorable Settlement Achieved .......................................................... 43

      C.      The Risks and Unique Complexities of Contingent Class Action
          Litigation .................................................................................................. 44

i

     D.      The Time and Labor of Plaintiffs' Counsel ................................................ 47

     E.      The Skill Required and Quality of the Work .............................................. 49

X.     CO-LEAD COUNSEL'S REQUEST FOR LITIGATION EXPENSES ............... 53

XI.    LEAD PLAINTIFFS' REIMBURSEMENT PURSUANT TO THE PSLRA ....... 55

XII.   THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION ........................................................................... 57

XIII.  CONCLUSION ........................................................................................... 57

We, ANDREW J. ENTWISTLE and IRA A. SCHOCHET, declare as follows:

1.    I, Andrew J. Entwistle, am a partner at Entwistle & Cappucci LLP ("Entwistle & Cappucci"), counsel for the Court-appointed Lead Plaintiff The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Focused Growth and Income Fund f/k/a The Gabelli Focus Five Fund, The Gabelli Multimedia Trust Inc., The Gabelli Value 25 Fund Inc., GAMCO International SICAV, and GAMCO Asset Management Inc. (collectively, the "Gabelli Group").

2.    I, Ira A. Schochet, am a partner at Labaton Sucharow LLP ("Labaton Sucharow"), counsel for the Court-appointed Lead Plaintiff Naya 1740 Fund Ltd., Naya Coldwater Fund Ltd., Naya Master Fund LP, and Nayawood LP (collectively, the "Naya Group" and, with the Gabelli Group, "Lead Plaintiffs").

3.    Entwistle & Cappucci and Labaton Sucharow are, together, the Court-appointed Co-Lead Counsel in this securities class action (the "Action") filed against Defendants Resideo Technologies, Inc. ("Resideo" or the "Company"), Michael G. Nefkens ("Nefkens"), Joseph D. Ragan III ("Ragan"), and Niccolo de Masi ("de Masi") (together, the "Defendants").[1]

4.    We have personal knowledge of the matters set forth herein based on our active, day-to-day supervision and participation in the prosecution and settlement of the

---

[1] All terms with initial capitalization not otherwise defined herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated August 17, 2021 ("Stipulation") (ECF 127-1).

claims asserted on behalf of Plaintiffs and the Settlement Class, as defined below, in the Action.

5.    We respectfully submit this joint declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and for Final Certification of the Settlement Class (the "Final Approval Motion"). The Settlement will resolve all claims asserted in the Action against Defendants on behalf of the Settlement Class, stipulated to by the Parties for settlement purposes only, that consists of: all persons and entities who or which purchased or otherwise acquired the common stock of Resideo during the period from October 15, 2018 through November 6, 2019, inclusive (the "Class Period"), and were damaged thereby.[2] The Court preliminarily approved the Settlement by Order entered October 21, 2021 (the "Preliminary Approval Order") (ECF 135).

6.    We also respectfully submit this Joint Declaration in support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses and Awards Pursuant to 15 U.S.C. ¶78u-4(a)(4) (the "Fee and Expense Application"). The Fee and Expense Application is made on behalf of all counsel in the Action, including (i) Co-Lead Counsel, (ii) Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and (iii)

---

[2] Excluded from the Settlement Class are: (i) Defendants; (ii) Honeywell; (iii) the officers and directors of Defendants and Honeywell during the Class Period; (iv) Immediate Family of the Individual Defendants and of the excluded officers and directors; (v) any entity in which any Defendant, any excluded officer or director, or any member of their Immediate Family has or had a controlling interest; (vi) any affiliates, parents, or subsidiaries of the Defendants and Honeywell; (vii) the legal representatives, agent, affiliates, heirs, successor, or assigns of any of the foregoing, in their capacities as such; and (viii) those who timely and validly request exclusion from the Settlement Class in accordance with the requirements that were set forth in the Notice, *see* ECF 127-1, or who are otherwise excluded by the Court.

Chestnut Cambronne PA ("Chestnut Cambronne") (together, "Plaintiffs' Counsel") and additional counsel.[3]

## I.   INDEX OF EXHIBITS HERETO

7.   Submitted as exhibits hereto are true and correct copies of the following:

| Exhibit 1 | Declaration of Layn R. Phillips in Support of Motion for Final Approval of Class Action Settlement ("Phillips Decl.") |
|---|---|
| Exhibit 2 | Declaration of Luiggy Segura Regarding (A) Mailing of the Notice Packet; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Declaration" or "Segura Decl.") |
| Exhibit 3 | Summary of Plaintiffs' Counsel's Time and Expenses |
| Exhibit 4 | Declaration of Andrew J. Entwistle on Behalf of Entwistle & Cappucci LLP in Support of Application for an Award of Attorneys' Fees and Expenses |
| Exhibit 5 | Declaration of Ira A. Schochet on Behalf of Labaton Sucharow LLP in Support of Application for an Award of Attorneys' Fees and Expenses |
| Exhibit 6 | Declaration of Steven W. Pepich Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| Exhibit 7 | Declaration of Jeffrey D. Bores on Behalf of Chestnut Cambronne PA in Support of Application for an Award of Attorneys' Fees and Expenses |
| Exhibit 8 | Declaration of David Goldman in Support of Motions for (I) Final Approval of Class Action Settlement and Plan of Allocation; And (II) Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Goldman Declaration" or "Goldman Decl.") |
| Exhibit 9 | Declaration of Ian Wylie in Support of Motions for (I) Final Approval of Class Action Settlement and Plan of Allocation; and (II) Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Wylie Declaration" or "Wylie Decl.") |
| Exhibit 10 | Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2020 Review and Analysis* (Cornerstone Research 2021) |
| Exhibit 11 | McIntosh and Starykh, *Recent Trends in Securities Class Action Litig.: 2020 Full-Year Review*, NERA Economic Consulting (Jan. 25, 2021) |
| Exhibit 12 | Table of Hourly Rates Compiled from Bankruptcy Fee Motions |

---

[3] Additional counsel consists of the firms (a) Berman Tabacco, (b) Vanoverbeke, Michaud & Timmony, P.C., and (c) Derryberry & Naifeh, LLP.

| Exhibit 13 | A copy of the unreported order from *In re Pemstar, Inc. Sec. Litig.*, No. 02-1821 (DWF/SRN), slip op. at 2 (D. Minn. May 27, 2005), cited in the Fee and Expense Brief. |

## II.    PRELIMINARY STATEMENT

8.    The result achieved in this case is exceptional and is the product of creative and tenacious litigation efforts and protracted, hard-fought settlement negotiations. The Settlement Class agrees. To date, there have been no objections to the Settlement, the proposed Plan of Allocation, or the request for fees and expenses, and only two requests for exclusion submitted by potential class members. This Joint Declaration sets forth in detail how Plaintiffs and Plaintiffs' Counsel were able to achieve this outstanding result on behalf of the Settlement Class, and the risks and uncertainties they overcame to do so.

9.    We also believe the proposed Plan of Allocation, developed by Lead Plaintiffs' consulting damages expert, is fair and reasonable. The plan provides formulas for calculating "Recognized Loss" amounts for each purchase or acquisition of Resideo common stock, based on the days a prospective Settlement Class Member purchased or otherwise acquired (including by means of the Spin Off, discussed below) and sold Resideo stock during the Class Period (or held it thereafter). Lead Plaintiffs' expert calculated the amount of artificial inflation in the prices of Resideo's common stock on each day during the time span that was allegedly proximately caused by Defendants' materially false and misleading statements and omissions of material facts. Under the proposed Plan of Allocation, the Settlement Fund (after deduction of Notice and Administration Expenses, Court-approved expenses and attorneys' fees) will be distributed on a *pro rata* basis to

4

Members of the Settlement Class that submit timely and valid Claim Forms, based on their calculated Recognized Loss amounts.

10.     Altogether, Co-Lead Counsel are applying for a fee award of 25% of the Settlement Fund, *i.e.* $13,750,000, plus any accrued interest, and for reimbursement of Plaintiffs' Counsel's litigation expenses, which are reported at the cost actually incurred by counsel, in the amount of $349,575.75. The application also seeks $22,500, in the aggregate, to be paid to Lead Plaintiffs to reimburse them for their time spent prosecuting the Action, as permitted by the PSLRA, 15 U.S.C. § 78u-4(a)(4).

11.     Co-Lead Counsel respectfully submit that the request for attorneys' fees and reimbursement of litigation expenses is justified in light of the significant benefits conferred on the Settlement Class, the substantial risks undertaken by Plaintiffs' Counsel, the quality of representation, and the nature and extent of the legal services provided. As explained in the accompanying memorandum of law in support of Co-Lead Counsel's request, the requested fee of 25% of the Settlement Fund is consistent with fees awarded in similar actions.

12.     Both the Final Approval Motion and the Fee and Expense Application have the full support of Lead Plaintiffs — large and sophisticated institutional investors that participated in and supervised all aspects of the litigation and remained informed throughout the settlement negotiations. *See* Declaration of David Goldman, attached hereto as Exhibit 8; Declaration of Ian Wylie, attached hereto as Exhibit 9.[4]

---

[4] Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Joint Declaration. For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."

5

13.    This Joint Declaration provides the Court with highlights of the litigation, the events leading to the Settlement, and the basis upon which Plaintiffs and Co-Lead Counsel recommend its approval and seek an award of attorneys' fees and payment of expenses.

## III.    THE OUTSTANDING RESULT

14.    Plaintiffs have succeeded in obtaining a highly valuable recovery for the Settlement Class in the amount of $55,000,000.00 in cash (the "Settlement Amount"), which has been deposited in an interest-bearing escrow account. Importantly, according to analyses prepared by Lead Plaintiffs' consulting damages expert, the most likely aggregate damages the proposed class could have obtained at trial, assuming that liability and all corrective disclosure dates were proven, are estimated to be in the approximate range of $493 to $602 million, based on various other assumptions and modeling.[5] Accordingly, the $55 million Settlement Amount represents between 9% and 11% of damages. It also falls significantly above the median settlement amount of $9 million for securities class actions between 1996 and 2019, is higher than the median recovery in 2020 of $10.1 million and is well above the $10 million median recovery for securities class actions prosecuted and settled within the Eighth Circuit from 2011 to 2020. *See* Laarni T. Bulan and Laura E.

The first numerical reference refers to the designation of the entire exhibit attached hereto, and the second alphabetical reference refers to the exhibit designation within the exhibit itself.

[5] As discussed, *infra*, Defendants strongly contest this estimation and believe damages to be significantly lower, even assuming that liability and—as to some of their arguments—loss causation, were established.

6

Simmons, *Securities Class Action Settlements – 2020 Review and Analysis*, at 1 and 20 (Cornerstone Research 2021), attached as Exhibit 10 hereto. The Settlement is also among the largest recoveries in a securities class action, ever, in this District.

15.     This is an excellent outcome for the Settlement Class, particularly in light of the current posture of the litigation. Indeed, this case — which was litigated efficiently and aggressively from initial complaint to agreement to settle — spanned over 20 months and was in the midst of substantial document review when it settled. It is also a superb result in light of the significant risks inherent in complex securities class actions generally, and this case's specific risks, particularly with regard to proving the elements of falsity, scienter, and loss causation, as discussed *infra*.

16.     While Plaintiffs are confident in their ability to establish Defendants' liability in this case, the outcome of a jury trial, especially in a highly complex case such as this, could not be predicted with reasonable certainty. In addition, had Plaintiffs prevailed at trial, there is still no assurance that the recovery would have been any greater than the proposed Settlement Amount. Further, any potential greater recovery would have been at least partially offset by the expenses incurred by Plaintiffs' Counsel at trial, and during the subsequent appeal process. Further still, even a positive outcome at trial would not guarantee a positive result for the class. Indeed, there are numerous instances of plaintiffs' verdicts in securities fraud cases that were reversed by the trial court or on appeal.

17.     In entering into the Settlement with Defendants, Plaintiffs and Co-Lead Counsel were fully informed about the strengths and weaknesses of the case. Following extensive arm's-length negotiations over a period of seven months, including a full-day

videophonic mediation session conducted by a highly respected and experienced retired federal judge who has for many years specialized in mediation of complex cases, on July 27, 2021, the Parties reached an agreement in principle to settle the Action — more than a year and a half after the commencement of the Action and only after extensive investigation, litigation and negotiation. As set forth more fully below, Plaintiffs' Counsel: (i) conducted a thorough and wide-ranging pre-suit investigation, including interviewing numerous former employees of Resideo and obtaining more than 55,000 contemporaneous internal Resideo email documents, all of which counsel reviewed prior to the commencement of formal discovery; (ii) prepared and filed a comprehensive Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Complaint")[6] based on their investigation; (iii) thoroughly briefed, argued, and successfully opposed a motion to dismiss filed by Defendants; (iv) aggressively pursued fact discovery from both Defendants and third-parties, including review of the approximately 167,000 documents that Defendants produced,[7] comprised of over one million pages, which consisted of emails, WhatsApp and SMS messages, meeting minutes, draft public disclosures and investor presentations, timelines for the projects at issue, and other types of documents; (v) retained and worked with experts; (vi) prepared extensively for the filing of their class

---

[6] Citations to the Complaint are referred to herein as "¶ __."

[7] Plaintiffs' Counsel applied automated parameters (*e.g.*, search terms, custodians and dates) to identify the most relevant documents in Defendants' voluminous production for priority review and had manually reviewed tens of thousands of those high-priority documents at the time the Settlement was entered into.

certification motion, and (vii) engaged in mediation and extensive follow-on negotiations with Defendants in an effort to resolve the Action.

## IV.    HISTORY OF THE ACTION

### A.    Appointment of Lead Plaintiffs and the Amended Complaint

18.    On November 8, 2019, a putative securities class action was commenced in the United States District Court for the District of Minnesota, styled *St. Clair County Employees' Retirement System v. Resideo Technologies, Inc., et al.*, No. 0:19-cv-02863 ("*St. Clair*"). ECF 1. That complaint alleged that Resideo — and Resideo's Chief Executive Officer Michael G. Nefkins, and Chief Financial Officer Joseph D. Ragan, III — violated Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by making false and misleading statements and omissions of material facts in connection with Resideo's corporate spin-off from Honeywell International Inc. ("Honeywell"), whereby Resideo became a wholly independent and separate entity (the "Spin Off").

19.    The *St. Clair* action was assigned to Judge Wilhelmina M. Wright and referred to Magistrate Judge Katherine M. Menendez on the same day. The following related actions were then filed: *Hollywood Firefighters' Pension Fund v. Resideo Technologies, Inc., et al.*, No. 19-cv-02889; *Frampton Living Trust v. Resideo Technologies, Inc., et al.*, No. 19-cv-03133; and *Gabelli Asset Fund v. Resideo Technologies, Inc., et al.*, No. 20-cv-00094.

20.    By Order dated January 27, 2020, this Court, *inter alia*, consolidated the *St. Clair* action and related actions; ordered that the case be re-captioned as *In re Resideo*

9

*Technologies, Inc. Securities Litigation*, Civil Action No. 19-cv-2863-WMW/KMM (the "Action"); appointed the Gabelli Group and the Naya Group as co-lead plaintiffs; and appointed Entwistle & Cappucci and Labaton Sucharow as Co-Lead Counsel. ECF 38. The Order also instructed that Plaintiff Oklahoma Firefighters Pension and Retirement System, or a member of its applicant group, would serve as an additional representative, Robbins Geller would serve as additional plaintiffs' counsel, and that Chestnut Cambronne would serve as Liaison Counsel. *Id.*

21.     Following their appointment, Co-Lead Counsel continued their investigation to supplement the allegations in the initial complaint. These efforts included, among other things, a review and analysis of: (i) SEC filings by Resideo, Honeywell, the Individual Defendants, and their affiliates; (ii) securities analysts' reports and advisories about Resideo, Honeywell, and the Spin Off; (iii) press releases, investor presentations, and other public statements issued by Resideo, Honeywell, and their affiliates; (iv) transcripts of Resideo and Honeywell conference calls; and (v) media reports about Resideo, Honeywell, and their affiliates. Co-Lead Counsel also identified and interviewed numerous former Resideo employees and other persons with relevant knowledge of the underlying allegations, fifteen of whom provided information as Confidential Witnesses, and one of whom provided Co-Lead Counsel with approximately 57,000 internal Resideo company documents, comprised of more than 100,000 pages, all of which Co-Lead Counsel reviewed. Co-Lead Counsel also consulted experts on damages and loss causation issues. Based on this comprehensive investigation, Plaintiffs' Counsel prepared the Complaint. ECF 51.

22.    The Complaint, which was filed on April 10, 2020, added former director and Chief Innovation Officer of Resideo, Niccolo de Masi, as a Defendant. It asserts claims against all of the Defendants under Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and against all Defendants except Resideo (together, the "Individual Defendants") under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The Complaint alleges that Honeywell combined certain unrelated pieces of existing business units and aging products and transferred them to Resideo, a transaction that was completed on October 29, 2018. It further alleges that at the same time, and throughout the Class Period, Defendants made materially misleading statements and omissions of material facts as to the quality of those lines of business and how they were aggregated to form Resideo, and of Resideo's internal operations, financial condition and resources.

23.    Indeed, as the Complaint alleges, before and during the Class Period, Defendants represented that Resideo's businesses would purportedly benefit from the Company's legacy relationship to Honeywell from a product, sourcing, and manufacturing standpoint, and that Resideo's "performance as part of Honeywell over the past three years demonstrates a well-run business that [was] on track to deliver continued growth in 2018 and beyond." ¶21.

24.    The Complaint also alleges that Defendants claimed that the independent Resideo was positioned to excel due to a claimed agility in new-product development and "speed to market." ¶192. The Complaint alleges that Defendants repeatedly touted Resideo's prior "operating history" as part of Honeywell, its "strong management

11

operating system and attractive financial profile," and its "revolutionary" new products and technology purportedly ready to roll out to customers. ¶¶192; 257. Plaintiffs also allege Defendants made detailed misleading statements about certain legacy products, such as the "T-Series" line of thermostats and purported launches of innovative new products, such as "Project GRIP," a home security platform, and "Project STORM," a platform intended to "integrate all dimensions of home wellness." ¶¶4; 147.

25.     Moreover, the Complaint alleges that based on Resideo's purported strengths, the Company issued aggressive earnings guidance that allayed investor fears that financial liabilities to Honeywell and lenders arising from the Spin Off would adversely impact the Company. ¶¶26, 90. Plaintiffs allege that issuing and reaffirming such aggressive earnings guidance during the Class Period was misleading, based upon undisclosed factors that made hitting earnings projects virtually impossible. *Id.*

26.     Plaintiffs also allege that Defendants' statements and omissions detailed in the Complaint were materially misleading because they failed to disclose, *inter alia*, (i) problems caused by Resideo's formation from "unrelated businesses that lacked both operating history together and individual [Profit & Loss] statements from which management could reasonably estimate performance or earnings"; (ii) Honeywell's retention of Resideo's "value engineers" (and, therefore, Resideo's lack of value engineering in the stand-alone entity) which prevented Resideo from reducing costs and expanding profit margins; (iii) pervasive supply chain issues and "slow moving products"; (iv) a significant decline in "sourcing leverage" after the Spin Off; (v) aging or failing technology affecting its thermostat and security products; (vi) chronic failures in the "Total

12

Connect Comfort" ("TCC") application, the software that supported 85% of its digitally connected products; (vii) failure to deliver on obligations to large Original Equipment Manufacturers ("OEM") customers and related contractual penalties; and (viii) the lack of technology or expertise to correct these problems or to deliver on new products being touted to investors. ¶6.

27.    The Complaint further details how the truth about Resideo's stand-alone viability became publicly known through a series of partial revelations and disclosures. Indeed, on March 7, 2019, just five months after the Spin Off, when public trading of Resideo common stock began, Defendants were forced to lower 2019 earnings guidance and announced a 20% decrease in profit for Resideo's Products & Solutions division. Resideo's common stock price immediately plunged, falling more than 23% on this news. Nonetheless, Defendant Nefkins, Resideo's Chief Executive Office, allegedly falsely claimed that the "disruption from the spin is mostly behind us" and "we are having all of our costs under our control." ¶397.

28.    The truth was further partially disclosed on August 7, 2019, when Resideo released its financial results for the second quarter of 2019, disclosing an EBITDA[8] drop of 36%. On the earnings call held the following day, Resideo's management revealed that Resideo was experiencing "margin pressures due to product mix headwinds," including the sale of lower margin connected thermostats. In response to these disclosures, the price of

---

[8] Earnings Before Interest, Tax, Depreciation, & Amortization.

13

Resideo's common stock declined by 2.4% from its opening price of $17.50 to close at $17.08 per share on unusually high volume.

29.    Nevertheless, the Complaint alleges that Defendants continued to conceal the truth from investors. Indeed, in the same earnings call, Nefkens allegedly attempted to deflect attention from the precipitous drop in EBITDA by misleadingly referring to Resideo's purported "new supply chain leadership and process changes," stating "we're delivering more on time than ever before and our delivery metrics are the best they've been in 5 years," while assuring the market that the Project GRIP product for retail consumers would be delivered in "Q4." ¶403. Defendants also emphasized that margins for the year would in fact improve because at the end of 2019 there "is going to be some improvement that we're going to see on the security margins from where they currently are." ¶405.

30.    Resideo's stock price continued to decline in the following trading days as the market digested the disclosures. Specifically, the price of Resideo's common stock decreased by approximately 3.7 percent on August 9, 2019, to close at $16.42 per share, and declined by approximately 5.2 percent the following trading day, to close at $15.59 per share on August 12, 2019.

31.    After market close on August 12, 2019, Oppenheimer issued an analyst report in which it lowered Resideo's price target from $30 to $20. Among other things, the report reflected discussions it had with Resideo management, revealing that the security business "has seen ~800bps of margin compression since the launch of the new security platform" and that "management also acknowledged there is a 'new normal' in security and margins should settle in 500bps lower." ¶404. These lower long-term security margins

14

belied the prior promises of margin improvement resulting from the purported near-term launches of high-volume products like Project GRIP for the retail market. On this news, the price of Resideo's common stock declined from $15.59 per share on August 12, 2019 to close at $15.31 per share on August 13, 2019. Resideo's stock price continued to decline the following day, from $15.31 per share on August 13, 2019 to $14.64 per share the next day.

32.     Nevertheless, Oppenheimer kept its OUTPERFORM rating, based on Resideo's reiteration of its 2019 guidance and an intended initiative to increase margins by cutting costs. ¶407. Of course, such reassurances continued to conceal all of the factors contributing to compressed margins, as bad news from the Company escalated in the following months.

33.     The Complaint further alleges that, on October 22, 2019, Resideo publicly disclosed, among other things: (i) preliminary third quarter EBITDA results of $77-$79 million, missing analyst expectations of $98-$101 million, or over $20 million for the single quarter; (ii) downward revisions of its 2019 full year EBITDA guidance to a range of $330-$350 million from $410-$430 million; (iii) Resideo's Products & Solutions segment experienced significant revenue decline; and (iv) the replacement of its then Chief Financial Officer ("CFO"), Defendant Ragan. These disclosures caused the price of Resideo's common stock to decline by over 37%, or $5.37 per share. But the causes of this bad news, reflecting pervasive Company-wide problems, were only fully disclosed later.

34.     Thereafter, at the end of the Class Period, during Resideo's November 7, 2019 announcement of third quarter financial results, and related earnings call, Defendants

made additional disclosures, which the Complaint alleges were effectively admissions of facts they knew but had nevertheless hidden from investors from the inception of the Spin Off, including, among other things: (i) during the Spin-Off, Honeywell kept for itself value engineers needed to control costs, which had a serious and sustained impact on EBITDA margins, ¶¶181-182; (ii) the problems with Resideo's products had existed prior to the Spin Off and pervaded Resideo's business at all times thereafter, referring to "inventory write-downs and slow-moving products" that began "postspin," ¶184; (iii) the Company suffered not just a paucity of value engineering, but that "the talent . . . engineering that came over was very small compared to what was required" (¶181), causing delays in the development and launch of new products and chronic product performance failures in Resideo's connected products; and (iv) lower sales volume in non-connected thermostats was attributable to poor "pre-spin cutover" from the prior generation – meaning that whatever market share Resideo's products had was based on an outdated generation soon to be discontinued, ¶176. Following the earnings call held on November 7, 2019, the price of Resideo's common stock declined in the ensuing three trading days by 10%, falling from its closing price of $10.02 per share on November 6, 2019 to $9.02 per share on November 11, 2019.

35.    Finally, the Complaint alleges other disclosures after the end of the Class Period that Plaintiffs also claim are effectively admissions. For instance, at a December 11, 2019 investor conference, the Complaint alleges that Resideo's new CFO Bob Ryder immediately cut Resideo's guidance by 35%, and revealed that: (i) Resideo's Products & Solutions business was nothing more than "various businesses within divisions of

16

Honeywell" and Honeywell "kind of picked individual pieces up and kind of threw them together;" (ii) Resideo's supply chain suffered terminal problems from Honeywell's retention of the key manufacturing facilities and that there were "too many [products]" in "too many places;" and (iii) Resideo's new products were "not completely launched," "weren't really accepted by customers" and "weren't really competitive." ¶188.

36.    In addition, as noted above, Plaintiffs' allegations include information obtained in interviews with fifteen confidential witnesses, all of whom provided detailed accounts of undisclosed problems at Resideo inconsistent with Defendants' contemporaneous statements (and consistent with Defendants' subsequent public admissions). These allegations included: (i) the lack of competitiveness of the Company's products, (*e.g.,* ¶¶163, 165, 168, 170); (ii) extensive power outages relating to the TCC application, (¶¶120-133), (iii) the belated introduction of a product as to which the competition had already obtained superior market share, (¶¶151, 158), along with extensive delays in the introduction of other promised new products, including Project GRIP and Project STORM, (¶¶141, 143, 146-150, 259); and (iv) pervasive backorder and inventory problems that continued or intensified following the Spin Off (¶¶104-116). Moreover, as Plaintiffs allege, one of the confidential witnesses stated that Defendants instructed employees to communicate via WhatsApp rather than Company email explicitly to conceal information about known problems from later discovery in litigation. ¶166.

37.    All told, Plaintiffs allege that the corrective disclosures in March, August, October, and November of 2019 caused Resideo stock price to drop by $12.16 per share – or more than 39% of its $28.00 per share opening price on the October 29, 2018 Spin Off

17

day. Meanwhile, Honeywell's stock price during the class period grew by more than 32 percent.

## B.   Defendants' Motion to Dismiss

38.   On July 10, 2020, Defendants filed their motion to dismiss the Complaint. ECF 71. Defendants argued that there were comprehensive and multiple grounds for dismissal of the Action, including Plaintiffs' purported: (i) failure to plead fraud in compliance with the PSLRA; (ii) failure to plead a viable Section 10(b) claim because the Complaint merely alleged "fraud by hindsight;" (iii) failure to plead material misstatements and omissions unprotected by the PSLRA safe harbor because such statements were forward-looking and accompanied by meaningful cautionary language; (iv) failure to plead misstatements and omissions because what was purportedly undisclosed was, in fact, disclosed to investors through detailed Risk Disclosures; (v) failure to plead misstatements and omissions because the statements amounted to no more than corporate optimism and opinion, which are nonactionable under the securities laws; (vi) failure to plead materiality of the remaining challenged statements; (vii) failure to plead scienter as required under Section 10(b) of the Exchange Act; and (viii) failure to plead control person liability under Section 20(a) of the Exchange Act. ECF 71.

39.   In addition, Defendants filed a Request for Judicial Notice, ECF 74, arguing that the Court should consider and take judicial notice of certain Exhibits attached to Defendants' declarations.

40.   On October 9, 2020, Plaintiffs filed a comprehensive 66-page opposition to Defendants' motion to dismiss, rebutting each argument raised by Defendants. *See* ECF 80.

18

Lead Plaintiffs contemporaneously submitted an elaborate set of color-coded charts, to which the Court referred during oral argument and in its Opinion and Order, including: (a) a chart of the alleged misstatements and the reasons why each was misleading and not subject to the statutory safe harbor; (b) a chart of Defendants' purported risk disclosures explaining why each was inadequate; (c) a chart summarizing the evidence of Defendants' scienter; and (d) a chart summarizing the employment dates and positions of the confidential witnesses and the information each provided. Lead Plaintiffs also filed a separate Opposition to Defendants' Motion Requesting Judicial Notice, ECF 78-81.

41.    Defendants filed their reply brief in further support of their motion to dismiss on November 9, 2020, taking issue with each of Lead Plaintiffs' arguments. *See* ECF 89-94. Oral argument on the motions was heard on December 1, 2020.

**C.    The Court Denies Defendants' Motion to Dismiss**

42.    On March 30, 2021, the Court issued an Opinion and Order denying Defendants' motion to dismiss. ECF 99 ("MTD Opinion").

43.    The Court also denied in part Defendants' motion requesting judicial notice, and took notice only of certain uncontroversial exhibits.

44.    The Court found, as Co-Lead Counsel had argued, that any cautionary language purported to be stated by Defendants "was not meaningful because it contradicted Defendants' actual knowledge." MTD Opinion at 11. The Court also held that Plaintiffs plausibly alleged Defendants knew material issues existed when they only warned that those issues might occur, and that the PSLRA safe harbor provision does not bar such claims. *Id.*

19

45.     The Court also found that, contrary to Defendants' assertions, Plaintiffs' claims were not seeking to plead "fraud by hindsight," because Plaintiffs "allege that Resideo's executives knew or should have known that Resideo's statements were false," and that such allegations were supported by "confidential witnesses who attest to Defendants' knowledge that Resideo's statements were false or materially misleading when Defendants made them." *Id.* at 11-12.

46.     With respect to scienter, the Court found that the statements of the confidential witnesses, including the allegations of active concealment and the rapid discovery of Resideo's undisclosed problems by Resideo's new CFO — which occurred immediately after the Individual Defendants' departure from Resideo — were "cogent and compelling reasons to conclude that Lead Plaintiffs have plausibly alleged scienter." *Id.* at 13.

47.     The Court further found that the "testimony of confidential witnesses may be reliable if the witness statements corroborate one another, and the complaint includes, for each confidential witness, the job title, the period of employment, employment responsibilities, and personal knowledge of the information provided." *Id.* at 14. The Court found that Lead Plaintiffs adequately pled such "indicia of reliability" for "each of the confidential witness." *Id.* at n.5. Accordingly, the Court found that "Plaintiffs' use of confidential witnesses satisfies the PSLRA's particularity requirement." *Id.*

48.     The Court listed three reasons why Plaintiffs' allegations of scienter are more compelling than the arguments Defendants advanced in support of their contrary inference: (1) the allegations as to the manner in which Resideo was created, from random parts of

20

existing Honeywell businesses, created an inference contrary to Resideo's "reported optimistic EBIDTA projections," MTD Opinion at 15, (2) Defendants failed to provide a plausible inference to rebut Plaintiffs' "allegations suggesting concealment and severe recklessness," *id.*, and (3) the value of Honeywell's stock rose by 32 percent during the class period, while Resideo's fell by more than 60 percent, notwithstanding representations that Resideo "would excel as a new company because of its agility in new-product development." *Id*.

49.     Finally, the Court rejected Defendants' contentions that Plaintiffs' control person allegations against the individual defendants should be dismissed, because in that regard Defendants argued only that Plaintiffs had failed to plead an underlying claim of securities fraud under Section 10(b) of the Exchange Act, an argument the Court rejected as set forth above.

## D.     Discovery

50.     Discovery proceeded swiftly following the Court's Order and Opinion on Defendants' motion to dismiss (and the resultant lifting of the PSLRA's automatic stay):

- On April 26, 2021, the Parties conducted a Rule 26(f) conference concerning a proposed plan of discovery. On April 29, 2021, Lead Plaintiffs served their first set of document requests on Defendants pursuant to Rule 34.

- On May 13, 2021, Lead Plaintiffs and Defendants entered into and filed with the Court a Stipulation regarding the Discovery of Electronically Stored Information ("ESI Protocol") and a Protective Order governing the exchange of confidential documents. ECF 103, 104.

- On May 18, 2021, the Court granted both the ESI Protocol and the Protective Order. ECF 110, 111.

- On May 25, 2021, following the Parties' conference before Magistrate Judge Menendez, the Court entered its Pretrial Scheduling Order setting deadlines for amended pleadings, close of fact discovery and expert discovery, and class certification discovery and briefing. ECF 114.

- On July 14, 2021, the Parties stipulated to and entered into an agreed Proposed Order regarding the identity of Confidential Witnesses, which enabled defense counsel to immediately obtain the witnesses' identities through interrogatories while protecting those identities from broader disclosure. (The Court signed the Order on July 16, 2021. ECF 122.)

51.    Plaintiffs' Counsel conducted extensive discovery including: the review of written material, which included Defendants' production of more than one million pages of responsive documents, including substantially all documents previously produced by Resideo to the SEC; drafting and reviewing initial disclosures, drafting and responding to document requests, drafting and responding to interrogatories, and ensuring prompt and complete responses to their discovery requests through a series of correspondence and meet-and-confers, including propounding a ready-to-file draft letter motion to compel on defense counsel to obtain their compliance on several issues, including Defendants' production of the SEC Documents and their withdrawal of another key objection. Plaintiffs also issued and served nonparty subpoenas pursuant to Fed. R. Civ. P. 45 to various entities.

### 1.    Lead Plaintiffs' Document Requests Directed at Defendants

52.    To prove the alleged violations of the federal securities laws, Plaintiffs undertook robust document discovery efforts. Plaintiffs' Counsel ultimately obtained and analyzed approximately 167,000 documents, totaling over one million pages, in connection with formal discovery, in addition to the approximately 57,000 documents they obtained and reviewed prior to formal discovery.

53. Formal discovery began pursuant to the Court's Scheduling Order and, on April 29, 2021, Lead Plaintiffs served their first set of document requests for the production of documents on Defendants ("Lead Plaintiffs' First RFP"), which consisted of 54 document requests.

54. Lead Plaintiffs' First RFP was particularized and targeted, yet broad enough to encompass the core relevant documents Plaintiffs needed to test the claims and defenses. Notably, Lead Plaintiffs' RFP No. 1 requested all documents that were already reviewed and produced by Resideo to the SEC in connection with its investigations in the Spin Off (the "SEC Documents").

55. On June 1, 2021, Defendants served their objections and responses to Lead Plaintiffs' First RFP ("Defendants' First R&O"), asserting sweeping objections.

56. Over the subsequent six weeks, Co-Lead Counsel initiated a series of meet and confers and extensive correspondence aimed at overcoming or narrowing Defendants' objections. Ultimately, Co-Lead Counsel sent a file-ready draft motion to compel to defense counsel on July 11, 2021, dated for the following day, thereby finally obtaining Defendants' agreement to withdraw critical disputed objections and to immediately begin rolling productions of responsive documents. Defendants' concessions in this regard enabled the development of the evidence in the case and demonstrated to Defendants the tenacity of their opponents, thereby enabling Plaintiffs to enter into an informed and favorable Settlement.

57. On July 15, 2021, Defendants made their first large installment of their document production, consisting of approximately 106,000 documents, or 720,000 pages,

that were previously produced to the SEC as part of the SEC's investigation into Resideo. Plaintiffs' Counsel subsequently worked to review and synthesize these documents in preparation for later briefing and depositions.  On July 27, 2021, Resideo made a second production of over 61,000 documents, or approximately 331,000 pages, and confirmed that its production of the SEC Documents was substantially complete.

58.     On July 20, 2021, Lead Plaintiffs served on Defendants their second set of requests for documents ("Lead Plaintiffs' Second RFP"), and Lead Plaintiffs' first set of interrogatories ("Lead Plaintiffs' First Int.").

### 2.     Non-Party Discovery

59.     Lead Plaintiffs also diligently pursued discovery from third parties, including Honeywell. On May 19, 2021, Lead Plaintiffs served a Non-Party Subpoena on Honeywell, and Honeywell thereafter responded with its own responses and objections. The Parties subsequently met and conferred on July 20, 2021. Counsel for Honeywell and counsel for Lead Plaintiffs were in discussion as to the best format and scope of Honeywell's document production when the Parties reached an agreement in principle to settle the case on July 27, 2021.

60.     Lead Plaintiffs also served a Non-Party Subpoena on ADT Inc., one of Resideo's largest OEM customers, which allegedly charged Resideo penalties for undisclosed breaches in a key contract, *see* ¶236. Lead Plaintiffs were also in the process of drafting and serving a Non-Party Subpoena on Ackerman Security Systems, Inc., a major channel partner that Plaintiffs allege Resideo had lost to a competitor during the

Class Period, *id.* at ¶164, prior to the Parties reaching an agreement in principle to settle the Action.

### 3. Defendants' Discovery Requests

61. Concurrent with Plaintiffs' efforts to obtain and review documents relevant to their case, on May 13, 2021, Defendants served on Plaintiffs their first request for production of documents, consisting of 35 document requests concerning, *inter alia*, Plaintiffs' investment practices and strategies, risk assessment, trading history, and knowledge of Resideo and Resideo securities ("Defendants' First RFP"). Defendants' First RFP also sought documents related to the Confidential Witnesses used in the Complaint, including Confidential Witnesses referenced in Appendix B of the Complaint, and including communications between Plaintiffs' Counsel and Confidential Witnesses.

62. On the same day, Defendants served their first set of interrogatories ("Defendants' First Int."). Among other things, Defendants' First Int. sought identification of and information for all of the Confidential Witnesses as well as any other current or former employee of Resideo or Honeywell with whom Plaintiffs communicated concerning or in support of the allegations in the Complaint.

63. Contemporaneously with an exchange of correspondence and a series of telephonic conversations limiting the scope of Defendants' First RFP, Plaintiffs searched their own files and began to compile and review responsive documents within their files. Co-Lead Counsel also prepared to produce non-privileged documents related to their investigation, including certain documents concerning information provided by confidential witnesses.

64.     In addition, and in response to Defendants' First Int., Plaintiffs served their initial response and objections, followed by a Supplementary Response to Defendants' First Set of Interrogatories, dated July 19, 2021, which revealed the identity of the Confidential Witnesses to defense counsel only. Prior to doing so, for the protection of the Confidential Witnesses, on July 14, 2021, Lead Plaintiffs insisted upon and obtained a stipulation and an agreed upon Proposed Order limiting disclosure and use of the Confidential Witnesses' identities, which the Court signed on July 16, 2021. ECF 122.

### 4.     Document Review

65.     Co-Lead Counsel developed and employed an effective and efficient process to review documents produced by Defendants and nonparties.

66.     First, the documents were placed in an electronic database that was created by and maintained by a third-party vendor. The database allowed Plaintiffs' Counsel to locate documents through Boolean-type searches, as well as by multiple categories, such as author and/or recipients, file type (*e.g.*, emails, reports, presentations), date, etc. These searches were employed to create "batches" of several hundred documents each. The process was designed such that each batch contained documents from the same custodian and time period, to facilitate review and help reviewers understand the context of the documents they reviewed. The process also prioritized batches of documents based on the expected importance of each custodian to the claim and search terms developed by Co-Lead Counsel through an iterative process of searches and preliminary review. This way, the most important documents were generally expected to be reviewed first.

67.     Second, a team of attorneys was assembled from Plaintiffs' Counsel's firms, which was comprised of associates, staff attorneys and partners. The team then began to manually review the batches, starting with the highest priority batches, to identify documents for use in connection with depositions, expert discovery, summary judgment, and trial, as well as evaluation of then-pending offers of settlement and use in further settlement negotiations.

## V.    SETTLEMENT NEGOTIATIONS

68.     The Parties began to explore the possibility of a settlement in January 2021, following the hearing on the motion to dismiss with the Court in December 2020. Negotiations began while the motion was pending; the Court issued its ruling on March 30, 2021.

69.     The Parties retained retired United States District Court Judge Layn R. Phillips ("Judge Phillips" or the "Mediator") to act as a mediator in the Action. Judge Phillips is one of the nation's most preeminent mediators and has significant experience mediating complex securities class actions such as this one. *See* Ex. 1, Declaration of Layn R. Phillips in Support of Motion for Final Approval of Class Action Settlement ("Phillips Decl.").

70.     On February 25, 2021, Co-Lead Counsel and Defendants' Counsel participated in a full day videophonic mediation session before Judge Phillips. In anticipation of this mediation session, each side prepared and exchanged detailed written submissions addressing liability and damages for the Mediator's review. Lead Plaintiffs

and Defendants exchanged opening mediation statements on January 29, 2021, and reply mediation statements on February 12, 2021.

71.     The Parties then responded to detailed written merits and damages related questions from Judge Phillips and his staff, both in advance of and during the mediation session. Among other things, the submissions and Mediator questions probed the strengths and weaknesses of Lead Plaintiffs' claims, the likelihood of Defendants prevailing in their motion to dismiss and the Parties' anticipated arguments at class certification, summary judgment, and trial.

72.     Although the Parties were unable to reach a resolution of the Action at the mediation session, the discussions narrowed the differences between Lead Plaintiffs and Defendants and allowed each Party to better understand the others' position during further settlement discussions.

73.     Following the Court's denial in full of Defendants' motion to dismiss, on March 30, 2021, the Parties continued their extensive arm's-length negotiations over the following three months.

74.     While negotiations were ongoing, discovery was aggressively pursued by both Parties, as highlighted in Section II.D herein. Separately, Plaintiffs prepared extensively for the filing of their class certification motion. In this regard, Lead Plaintiffs retained an expert economist to perform an analysis and draft a related expert report to opine on whether the Resideo common stock at issue in this case traded in an efficient market. The expert's work was ongoing when the Settlement was reached.

75.     During the negotiations over the course of three months, the Parties challenged one another's arguments and extended (and declined) multiple rounds of demands and offers. On July 27, 2021, the Parties reached an agreement in principle to settle the case. At the time the Settlement was reached, Lead Plaintiffs were in the midst of a fast-paced review of Defendants' document production and preparing their motion to certify the class and supporting documents.

76.     The Parties then executed a Term Sheet on July 30, 2021, summarizing the material terms of the Settlement, subject to the execution of a Stipulation and Agreement of Settlement and related documents. Following further negotiations regarding the specific terms of the Settlement, the Stipulation was executed on August 17, 2021. ECF 127-1.

77.     On August 18, 2021, Plaintiffs filed the Stipulation, their unopposed motion for preliminary approval of the Settlement, and supporting memorandum of law, declaration, and exhibits. ECF 124-127.

78.     On October 21, 2021, the Court entered the Preliminary Approval Order. ECF 135. The Court preliminarily approved the Settlement, as embodied in the Stipulation, and authorized that notice of the Settlement be published and mailed to potential Settlement Class Members. The Court scheduled the Settlement Hearing for January 27, 2022, at 9:00 a.m., to consider whether to grant final approval to the Settlement. ECF 137. As detailed in Section VII, *infra*, notice was provided in accordance with the Preliminary Approval Order.

## VI.   RISKS OF CONTINUED LITIGATION

79.     Based on their experience and intimate knowledge of the facts and applicable laws, Plaintiffs and Plaintiffs' Counsel determined that the Settlement was in the best interests of the Settlement Class. As described herein, at the time of settlement, there were significant risks facing Plaintiffs with respect to establishing both liability and damages, as well as in obtaining certification of the class they seek to represent.

### A.      Risks of Proving Liability

80.     While Plaintiffs believe the claims against Defendants are strong, they nonetheless would have faced significant hurdles in proving liability. Litigation of the claims alleged was expected to raise complex questions regarding falsity, scienter, loss causation and damages that would require substantial efforts and present substantial risks to Plaintiffs' case. Assuming the claims survived a motion for summary judgment, a jury trial (which Plaintiffs and Defendants both demanded) would have required substantial factual and expert testimony, which is always uncertain. And, whatever the outcome at trial, it is virtually certain that an appeal would have been taken. All of the foregoing would have posed considerable expense to the Parties and would have delayed the potential recovery for several years.

81.     Although it is not seriously disputed that at least one Defendant made each of the statements alleged in the Complaint, Plaintiffs would, as an initial matter, have been required to prove the falsity of the statements, which Defendants vigorously contested in their motion to dismiss and their answer and would no doubt continue to contest throughout the litigation. For example, Defendants argued statements about having commenced

30

shipping a key product were not false because a "beta" version had indeed shipped; that a different, "fake project," was actually real and simply behind schedule — factual disputes that would have pitted the testimony of current Resideo insiders against Plaintiffs and other outsiders.

82.    Moreover, there was a risk Plaintiffs would not be able to adduce sufficient evidence to carry their burden on these points because, *inter alia*, many of these allegations were derived from information provided by Confidential Witnesses. Plaintiffs' Counsel had taken numerous steps to ensure the veracity of the witnesses and the information they provided (including finding multiple witnesses where possible as to various issues who corroborated each other's statements, ensuring that each witness had sufficient responsibility in their respective roles at Resideo to provide them with a vantage point with which to both view relevant facts and to assess their materiality, and engaging in rounds of verification with all the witnesses regarding their statements provided in the Complaint). However, there remained a possibility that the jury would determine these witnesses were mistaken in their trial testimony, which would occur years after the events and be subject to cross examination by skilled defense counsel. Thus, absent additional corroborative evidence, the discovery of which was not guaranteed, Plaintiffs might have been unable to prove these allegations.

83.    Additionally, Defendants continued to maintain that their statements regarding the state of their supply chain and the cohesive nature of Resideo's business prior to the Spin Off were neither literally false nor misleading to a reasonable investor,

31

questions which would ultimately require the jury (with the benefit of hindsight) to apply their own analysis and judgment.

84.    Indeed, Defendants made these arguments and repeatedly attempted to introduce facts not in the Complaint in support thereof. Whereas the Court correctly declined to consider matters outside the pleadings at the motion to dismiss stage, Defendants would not face such an impediment going forward.

85.    Further, Plaintiffs would need to prove that Defendants acted with scienter, that is, that they made the alleged misstatements knowingly or in reckless disregard of their falsity or with the intent to mislead. In connection with the motion to dismiss, which was framed by Plaintiffs' unanswered allegations taken as true, the Court found the inference of scienter at least as compelling as the competing non-culpable inferences that Defendants urged. Prominent in the Court's reasoning were: (1) the statements of confidential witnesses regarding discussions within Resideo about the undisclosed problems, including Resideo's management's instruction to use WhatsApp rather than company email for discussions of those problems; (2) the rapid discovery of the truth by Resideo's new CFO; and (3) Honeywell's positive performance following the Spin Off compared to Resideo's disastrous first year. ECF 99 at 13-15. Defendants, however, had fact-based arguments as to all of these points.

86.    On the last point, Defendants would undoubtedly tout at trial Resideo's success in its second and third year. Plaintiffs would argue these results were driven by increased demand for home solutions with the increase in work-from-home during 2020 and irrelevant in any event, and on that basis would seek through *in limine* motion practice

32

to exclude the introduction of such evidence at trial. However, to the extent Defendants were successful in defeating those motions, their evidence in this regard might sway the jury.

87.     Regarding the new CFO's rapid discovery of certain facts that were extant throughout the Class Period, the key witnesses are all either controlled by Resideo as current officers, or are themselves defendants, portending recalcitrance in their testimony to facts supporting Plaintiffs' theory. Indeed, in line with their purported "fraud by hindsight" defense, Defendants' Counsel at the motion to dismiss hearing argued that the CFO's statements were "after-the-fact assessments of performance, not admissions." MTD Hearing Transcript at 42:10-11. Lead Plaintiffs believe they have strong counterarguments, but they cannot be assured that they would have persuaded the jury on the issue of scienter, on which they have the burden of proof, including providing support for the necessary claim that such knowledge could be traced to the Individual Defendants.

88.     While the allegations about active concealment are damning as pleaded, Defendants would undoubtedly offer alternate explanations, and determining the true reasons for the concealment would require a jury to weigh the testimony of the confidential witness who provided Plaintiffs with this information (and any others they may find during their continuing discovery and investigation). Those who Plaintiffs presented to testify about these events and conversations, by then several years in the past, would be subject to cross-examination.

B.    **Risks of Establishing Loss Causation and Damages**

89.    Assuming Lead Plaintiffs overcame the above risks and successfully established liability, Defendants could be expected to vigorously challenge Plaintiffs' ability to establish loss causation and damages at every point possible had the Action continued — resulting in lengthy and expensive expert driven summary judgment and *in limine* motion practice. While Defendants did not address loss causation issues in their Motion to Dismiss, that is likely because this element is subject only to Rule 8 notice pleading, and they could not find fault with how Lead Plaintiffs pled it. But Defendants denied these allegations and were expected to present a robust defense on those issues.

90.    Among other things, both the alleged misstatements and the alleged corrective disclosures occurred contemporaneously with other news about Resideo (such as in a quarterly report or earnings call) which Defendants would argue were responsible for the movement in Resideo's stock price and unrelated to the alleged fraud. Plaintiffs believe they have good counterarguments, including the reality that all of Resideo's problems were, at least, exacerbated by the facts that Resideo had no history operating as a unit, and that Honeywell had stripped it of personnel, facilities, and intellectual property. However, Plaintiffs recognize that disentangling losses attributable to fraud from those that would have occurred absent fraud is typically a challenging task that involves a battle of expert economists and a parsing of contemporaneous technical and economic records in front of a lay jury.

91.    Pursuant to Plaintiffs' expert's analysis and calculations, Lead Plaintiffs believe that the maximum likely recoverable damages are in the range of $493 to $602

34

million. Therefore, the Settlement Amount represents 9 to 11 percent of these likely recoverable damages. However, based on Co-Lead Counsel's discussions with Defendants' Counsel, Defendants would likely seek to significantly reduce any damage award by arguing the following points, among others.

92.     Defendants' first argument would be that a significant portion of the stock drops was caused by the materialization of known risks. That is, Defendants would insist Resideo was merely struggling to shake off the initial supply chain and other difficulties inherent in any spin off, and adequately disclosed the extent of these problems and risks in SEC filings and other public statements on a recurrent basis throughout and before the Class Period. Lead Plaintiffs disagree, noting, for example, that in each instance the Company discussed its supply chain issues, it falsely suggested that they had been largely overcome. Nonetheless, a jury may be convinced by the volume of the Company's references to particular problems throughout the Class Period to accept some or all of Defendants' arguments on this issue. To the extent this occurs, disaggregation of these disclosures from the damages range may substantially lower the cap on the quantum of damages recoverable.

93.     Moreover, Defendants would argue that certain of the alleged disclosures did not result in a statistically significant price decline as a matter of law because they did not meet a 95% statistical confidence level (i.e., there is a greater-than-five percent chance that a price decline of the observed magnitude would occur on that date in the absence of the alleged corrective disclosure). Lead Plaintiffs have robust counterarguments that are well

35

supported by decisional authority and academic literature, but they recognize that they faced uncertainty on this issue as well.

94.    Because most of the above issues would involve a "battle of experts" regarding whether Plaintiffs could establish causation and the extent of damages, the outcome of trial was and remains difficult to predict. If the jury were to credit Defendants' damages evidence over that of Plaintiffs, this could significantly reduce the recovery for the Settlement Class, even assuming liability was proven.

### C.    Risks of Class Certification

95.    At the time the Parties agreed to settle the Action, Plaintiffs' Counsel were preparing their motion for class certification, but it had not yet been filed with the Court. While Plaintiffs believe the motion would have succeeded, there was no guarantee that the proposed class would have been certified — in whole or in part — or that certification could have been retained through summary judgment and trial. Moreover, the likelihood of appeal from any ruling was high. Additionally, Defendants would likely challenge Plaintiffs' proposed class definition and argue for a shorter class period (or additional exclusions) which would potentially reduce the overall recovery. Ultimately, while Plaintiffs and Plaintiffs' Counsel believe certification of their proposed class is appropriate and fully supported by law, they nonetheless acknowledge that Defendants' anticipated arguments posed credible threats to Plaintiffs' ability to recover more than that offered by the Settlement.

## VII.    NOTICE TO THE SETTLEMENT CLASS MEETS THE REQUIREMENTS OF DUE PROCESS AND RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

96.    On October 21, 2021, the Court granted Plaintiffs' unopposed motion for preliminary approval of the Settlement (the "Preliminary Approval Order"). ECF 135. Pursuant to the Preliminary Approval Order, the Court, among other things, (i) certified the Settlement Class for settlement purposes; (ii) directed that notice be disseminated to the Settlement Class; (iii) set January 6, 2022, as the deadline for receipt of requests for exclusion and objections to the Settlement, Plan of Allocation and/or the request for attorneys' fees and expenses; and (iv) set January 27, 2022 at 9:00 a.m. as the date and time for the Settlement Hearing. *Id*.

97.    Pursuant to the Preliminary Approval Order, the Court appointed JND Legal Administration ("JND") as the Claims Administrator and instructed JND to disseminate copies of the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses and Proof of Claim Form (collectively the "Notice Packet") by mail to potential Settlement Class Members and to publish the Summary Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses. Prior to selecting JND, Co-Lead Counsel received bids from other highly regarded and experienced claims administration firms and ultimately selected JND based on its fee proposal and Co-Lead Counsel's track record in cases in which JND was employed.

98.    The Notice is attached as Exhibit A to the Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice Packet; (B) Publication of the Summary Notice; and

37

(C) Report on Requests for Exclusion to Date (the "Segura Declaration" or "Segura Decl.", Ex. 2). The Notice, the form of which was approved by the Court in the Preliminary Approval Order, provides potential Settlement Class Members with material information about the terms of the Settlement and, among other things: their right to opt-out of the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Claim Form to be eligible for a payment from the net proceeds of the Settlement. The Notice also informs Settlement Class Members of Co-Lead Counsel's intention to apply for an award of attorneys' fees of no more than 25% of the Settlement Fund, *i.e.*, $13,750,000, plus any accrued interest, and for reimbursement of litigation expenses in an amount not to exceed $500,000. Ex. 2-A at 12.

99.    As detailed in the Segura Declaration, Ex. 2, on November 4, 2021, JND began mailing Notice Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third-party nominees whose clients may be Settlement Class Members. Ex. 2 at ¶¶4-6. In total, to date, JND has mailed 468,104 Notice Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid. *Id.* at ¶14.

100.    On November 18, 2021, and again on November 26, 2021, JND caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over *PR Newswire* for dissemination across the internet. *Id*. at ¶15 and Ex. 2-B.

101.    JND also maintains and posts information regarding the Settlement on www.ResideoTechnologiesSettlement.com, a dedicated website established for the

38

Settlement, to provide Settlement Class Members with information, including downloadable copies of the Notice Packet and the Stipulation. *Id*. at ¶17.

102.   Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to request exclusion from the Settlement Class is January 6, 2022. To date, no objections to the Settlement and only two requests for exclusion from the Settlement Class have been received. *Id*. at ¶18.

103.   Plaintiffs' Counsel will respond to any future objections and exclusion requests in their reply papers, which are due on January 20, 2022.

## VIII.  PLAN OF ALLOCATION

104.   Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members that wish to receive proceeds from the Settlement Fund must submit a valid Claim Form, including all required information, no later than March 4, 2022. As provided in the Notice, after the deduction of Court-awarded attorneys' fees and litigation expenses, Notice and Administration Expenses, Taxes, and any other fees or expenses approved by the Court, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

105.   The proposed Plan of Allocation, which was set forth in full in the Notice (Ex. 2-A), is designed to achieve an equitable and rational distribution of the Net Settlement Fund. Lead Plaintiffs' consulting expert economist developed the Plan of Allocation after careful consideration of the Settlement Class's theories of liability and

39

damages, and Plaintiffs' Counsel believe that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

106. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Claims," calculated according to the Plan's formulas, which are consistent with Plaintiffs' theories of liability and damages under the Exchange Act. These formulas consider the amount of alleged artificial inflation in the prices of Resideo publicly traded common stock, as estimated by Plaintiffs' consulting expert, who analyzed the movement in the prices of Resideo common stock and accounted for the portion of the price drops allegedly attributable to fraud. Plaintiffs will receive the same type of *pro rata* recovery as all other Settlement Class Members under the Plan of Allocation based on their investment losses (Lead Plaintiffs are separately seeking a modest award pursuant to the PSLRA for their time expended, upon which the Settlement is not contingent).

107. Claimants will be eligible for a payment based on when they acquired and sold their Resideo stock. The Court-approved Claims Administrator, JND, will, under Co-Lead Counsel's direction, calculate claimants' Recognized Loss Amounts using the transactional information provided in their Claim Forms. Claims may be submitted to the Claims Administrator through the mail, online using the case website or, for large investors with hundreds or thousands of transactions, through email to JND's electronic filing team. (Neither the Parties nor the Claims Administrator independently have claimants' transactional information.). Plaintiffs' losses will be calculated in the same manner.

40

108. After the Effective Date of the Settlement, in accordance with the terms of the Stipulation, the Plan of Allocation, or such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund will be distributed to Authorized Claimants. After the distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of the distribution, the Claims Administrator will, if feasible and economical after payment of any outstanding Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, redistribute the balance among Authorized Claimants who have cashed their checks in an equitable and economic fashion. Once it is no longer economical to make further distributions, any balance that still remains in the Net Settlement Fund after re-distribution(s) and after payment of any outstanding Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, will be contributed to a non-sectarian, not-for-profit charitable organization(s) serving the public interest designated by Lead Plaintiffs and approved by the Court.

109. To date, there have been no objections to the proposed Plan of Allocation.

110. In sum, the proposed Plan of Allocation, developed by Lead Plaintiffs' consulting expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Co-Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

41

**IX.   CO-LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSMENT OF LITIGATION EXPENSES**

111.   For the significant efforts of Plaintiffs' Counsel on behalf of the Settlement Class, Co-Lead Counsel are applying for compensation from the Settlement Fund on a percentage basis. As explained in the Memorandum of Law in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses and Awards Pursuant to 15 U.S.C. §78u-4(a)-(4) (the "Fee and Expense Brief"), courts within the Eighth Circuit recognize that the percentage method is the appropriate method of fee recovery and the prevailing method of determining attorneys' fees.

112.   Consistent with the Notice, Co-Lead Counsel seek a fee award of 25% of the Settlement Fund, *i.e.,* $13,750,000, plus any accrued interest. Co-Lead Counsel also request payment of Plaintiffs' Counsel's expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $349,575.75, plus Lead Plaintiffs' request for $22,500, in the aggregate, pursuant to the PSLRA. Co-Lead Counsel submit that, for the reasons discussed below and in the accompanying Fee and Expense Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

**A.   Lead Plaintiffs Support the Fee and Expense Application**

113.   Lead Plaintiffs are sophisticated institutional investors that played a central role in monitoring and participating in the Action by, among other things, (i) regularly communicating with counsel regarding the posture and progress of the Action; (ii) reviewing and/or discussing significant pleadings, motions, and briefs filed in the Action;

42

(iii) reviewing and/or discussing significant decisions in the Action; (iv) coordinating and reviewing written discovery responses and beginning the collection of documents for production to Defendants before the Settlement was reached; and (v) evaluating and approving the proposed Settlement. *See* Goldman Decl., Ex. 8 at ¶3-7; Wylie Decl., Ex. 9 at ¶¶ 4-5.

114. Lead Plaintiffs have evaluated and fully support the Fee and Expense Application. *See* Exs. 8-9. In reaching this conclusion, Lead Plaintiffs considered the recovery obtained, as well as Plaintiffs' Counsel's substantial effort in obtaining the recovery. Particularly in light of the considerable risks of the litigation, of which Lead Plaintiffs were well aware, Lead Plaintiffs agreed to allow Co-Lead Counsel to apply for an award of fees equal to 25% of the Settlement Fund on behalf of all Plaintiffs' Counsel and additional counsel. *See id.*

**B.     The Favorable Settlement Achieved**

115. As described above, the $55,000,000 Settlement is a very favorable result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action were to continue through class certification and summary judgment, to trial, and through likely post-trial motions and appeals.

116. As set forth in detail above, the recovery obtained for the Settlement Class was the result of thorough and diligent prosecutorial and investigative efforts, motion practice, and extensive discovery efforts. As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid

the very substantial risk of no recovery (or significantly less recovery) in the absence of a settlement.

### C. The Risks and Unique Complexities of Contingent Class Action Litigation

117. This Action presented substantial challenges from the outset of the case. The specific complexities and risks Plaintiffs faced in proving Defendants' liability and damages are detailed in Section VI, above.

118. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex and expensive litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and cover the considerable costs that a case such as this requires. With no promise of recovery, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action but have dedicated 11,708.55 hours of time with a lodestar value of $10,615,215 and have incurred $349,575.75 in expenses in prosecuting the Action for the benefit of the Settlement Class. *See* Ex. 3 (summarizing) and Exs. 4-7 (providing additional detail).

119. Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured. Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it

44

takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint, win at trial, or convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Plaintiffs' Counsel are aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case was commenced — like those that existed in the Action — or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. Additionally, in this case, at the time Plaintiffs' Counsel agreed to prosecute the Action, there appeared to be a risk that Resideo, then in crisis, might seek the protection of the bankruptcy laws and become partially or wholly judgment proof before any recovery could be collected.

120.    The Federal appellate reporters are filled with opinions affirming dismissals with prejudice in securities cases. The many appellate decisions affirming summary judgment and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *In re Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

121.    Successfully certifying the class for the full as-pled class period and successfully opposing a motion for summary judgment are also not guarantees that

45

plaintiffs will prevail at trial. Indeed, while only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), litigated at great expense by Labaton Sucharow, or partially lost, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

122.    Even plaintiffs who succeed at trial may find their verdict overturned. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.*, No. 07-cv-61542 (S.D. Fla. 2010) (in case tried by Labaton Sucharow, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd*, 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation). And, even where the plaintiffs maintain a favorable jury verdict through appeals, the process is arduous and time consuming. For example, in *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) *cert*. denied, 131 S. Ct. 1602 (2011)), the trial court

46

reversed a unanimous verdict for plaintiffs, the appellate court reinstated, and an unsuccessful petition to the Supreme Court for certiorari followed. Losses such as those described above are exceedingly expensive for plaintiffs' counsel to bear.

123.   Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws can only occur if private plaintiffs can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

124.   As discussed in detail above, this case was fraught with significant risk factors concerning liability and damages. Were this Settlement not achieved, and even if Plaintiffs prevailed at trial, Plaintiffs and Plaintiffs' Counsel faced potentially years of costly and risky appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery significant. Co-Lead Counsel therefore respectfully submit that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### D.    The Time and Labor of Plaintiffs' Counsel

125.   The work undertaken by Plaintiffs' Counsel in investigating and prosecuting this case and arriving at the present Settlement in the face of serious hurdles has been time-consuming and challenging. As explained above, Plaintiffs' Counsel conducted a robust

47

investigation into the class's claims, including multiple interviews with numerous confidential witnesses, fifteen of whom provided information and documents that were used to buttress their Complaint; researched and prepared a comprehensive amended complaint; briefed a persuasive, thorough and successful opposition to Defendants' motion to dismiss the Complaint; prepared for and participated in a hearing on that motion; engaged in thorough discovery efforts that led to obtaining more than one million pages of documents from Defendants and confidential witnesses; engaged in numerous meet and confers with Defendants' Counsel and exchanged significant correspondence regarding several contentious discovery issues; retained and consulted extensively with several experts; prepared a motion for class certification; and prepared for and participated in mediation, including drafting detailed written submissions and consulting with Lead Plaintiffs' damages expert.

126. At all times throughout the pendency of the Action, Plaintiffs' Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial, by the most efficient means possible.

127. Attached as Exhibits 4-7 are declarations detailing Plaintiffs' Counsel's time and expenses. Included with these declarations are schedules that report the amount of time spent by the attorneys and professional staff of each firm and the "lodestar" calculations, *i.e.,* their hours multiplied by their current hourly rates. *See* Exs. 4-A, 5-A, 6-A and 7-A. As explained in the declarations, they were prepared from contemporaneous time records regularly maintained by Plaintiffs' Counsel. *See* Exs. 4-7.

128.   The hourly rates of Plaintiffs' Counsel here range from $525 to $1,575 for partners, $565 to $1,080 for of counsels, $400 to $875 for associates, and $175 to $425 for paralegals. *See* Exs. 4-7. It is respectfully submitted that the hourly rates for Plaintiffs' Counsel included in the schedules are reasonable and customary for this type of complex commercial litigation. A table of hourly rates for defense firms compiled by Co-Lead Counsel from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2020 is attached as Exhibit 12. The analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates are consistent with, or lower than, the firms surveyed.

129.   Plaintiffs' Counsel have expended 11,708.55 hours in the prosecution and investigation of the Action through December 16, 2021. *See* Ex. 3. The resulting lodestar is $10,615,215, which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, and assisting Settlement Class Members during administration. *Id*. Pursuant to a lodestar "cross-check," applied within the Eight Circuit, the requested fee of 25% of the Settlement Fund results in a modest "multiplier" of 1.3 times the lodestar.

**E.     The Skill Required and Quality of the Work**

130.   Entwistle & Cappucci, Labaton Sucharow and Robbins Geller are among the most experienced and skilled securities litigation law firms in the field. The expertise and experience of their attorneys are described in Exhibits 4-C, 5-C, and 6-C, respectively.

131.   Entwistle & Cappucci is among the preeminent securities class action law firms in the country, with offices in New York and Texas. The firm has extensive experience successfully prosecuting some of the largest and most complex class actions in

history and has distinguished itself as one of the nation's premier complex litigation firms, regularly pursuing multi-jurisdictional cases against well-funded opponents, including large corporations and financial institutions. The firm has served in a leadership capacity in some of the highest-profile securities litigation matters in recent years, recovering over $4 billion for its clients and other investors. For example, in *In re Royal Ahold Securities Litigation,* No. 03-md-01539-CCB (D. Md.), Entwistle & Cappucci served as lead counsel representing the Public Employees' Retirement Association of Colorado as lead plaintiff, recovering a $1.1 billion partial settlement of the action, representing approximately 40% of estimated provable damages, and in *In re MF Global Holdings Ltd. Investment Litigation*, No. 12-md-2338-VM (S.D.N.Y.), Entwistle & Cappucci — appointed co-lead counsel for the worldwide class of commodities investors — worked with the trustee appointed under the Securities Investor Protection Act to recover all $1.6 billion in net equity lost by commodity customers after the collapse of MF Global. More recently, in *In re Cobalt International Energy, Inc. Securities Litigation*, No. 14-cv-3428 (S.D. Tex.), Entwistle & Cappucci prosecuted securities claims as co-lead counsel against oil and gas company Cobalt International Energy, Inc. and related defendants and recovered $169.35 million in cash, in addition to $220 million payable from director and officer liability policies on behalf of a class of investors and in *In re Allergan, Inc. Proxy Violation Derivatives Litigation*, No. 17-cv-04776 DOC(KESx) (C.D. Cal.), Entwistle & Cappucci, as co-lead counsel on behalf of investors in derivative securities of Allergan, Inc., negotiated a $40 million settlement of claims that Valeant Pharmaceuticals International,

50

Inc. and certain officers shared material non-public information with Pershing Square Capital Management, L.P. and certain affiliated individuals and entities. Ex. 4-C.

132.    Since the passage of the PSLRA, Labaton Sucharow has been approved by courts to serve as lead counsel in numerous notable securities class actions throughout the United States, and has taken three of the approximately 21 post-PSLRA securities class actions to trial. Here, Labaton Sucharow attorneys have devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience. For example, Labaton Sucharow has served as lead counsel in a number of high profile matters: *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1501 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million). *See* Ex. 5-C.

133.    Robbins Geller is a 200-lawyer firm with offices in Boca Raton, Chicago, Manhattan, Melville, NY, Nashville, San Diego, San Francisco, Philadelphia and Washington, D.C. Robbins Geller is actively engaged in complex litigation, emphasizing

51

securities, consumer, antitrust, insurance, healthcare, human rights, and employment discrimination class actions. Robbins Geller's reputation for excellence has been repeatedly noted by courts and has resulted in the firm being appointed to lead roles in hundreds of complex class-action securities and other cases. The firm has been responsible for the largest securities class action recovery in history: *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) ($7.2 billion); the largest settlement ever following a securities fraud class action trial: *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.) ($1.575 billion); the highest percentage of damages of any major PSLRA case prior to trial and the largest personal contributions by individual defendants: *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040 (S.D.N.Y.) ($1.025 billion); the largest stock option backdating recovery ever: *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.) ($895 million). Ex. 6-C.

F.      **Standing and Caliber of Defendants' Counsel**

134.    The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Willkie Farr & Gallagher LLP, one of the country's most prestigious and experienced defense firms, which vigorously represents its clients. Key witness Honeywell, which is aligned with Resideo due to ongoing business relations, entered into a tolling agreement to avoid being named in the Complaint, and asserted a joint privilege with Defendants, was represented by Kirkland & Ellis LLP, which is also an excellent law firm. In the face of this experienced, formidable, and well-financed

opposition, Co-Lead Counsel were nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

## X.   CO-LEAD COUNSEL'S REQUEST FOR LITIGATION EXPENSES

135.   Co-Lead Counsel seek reimbursement from the Settlement Fund of $349,575.75 in litigation expenses reasonably and necessarily incurred in connection with prosecuting the claims against Defendants. The Notice informs the Settlement Class that Co-Lead Counsel will apply for payment of litigation expenses of no more than $500,000, which includes Plaintiffs' reimbursement of expenses directly related to their representation of the Settlement Class. *See* Ex. 2-A at ¶¶4, 40. The amount requested is below this cap. To date, no objection to Co-Lead Counsel's request for expenses has been raised.

136.   As set forth in the expense schedules, Plaintiffs' Counsel have incurred a total of $349,575.75 in litigation expenses in connection with the prosecution of the Action. *See* Exs. 3, 4-B, 5-B, 6-B and 7-B. These expenses are reflected on the books and records maintained in the ordinary course by Plaintiffs' Counsel. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. Plaintiffs' Counsel's declarations identify the specific category of expense – *e.g.*, testifying and consulting expert fees, outside investigative firm fees, document management and storage system(s), electronic research, service of process fees, court reporting fees, duplicating, and overnight delivery expenses.

137.   Computerized electronic research totaled $137,022.84 or approximately 39% of aggregate expenses. These are the costs of computerized factual and legal research

services, including PACER, Thomson West (Westlaw) and Lexis/Nexis, Thomson T1 Research, and Bloomberg. These services allowed counsel to perform media searches on Resideo, obtain analysts' reports and financial data for Resideo, and conduct legal research. *See* Ex. 3.

138.    A significant component of Plaintiffs' Counsel's expenses is the cost of experts and consultants, which totals $123,039.35, or approximately 35% of total expenses. Lead Plaintiffs retained a consulting economist to evaluate damages and loss causation issues in connection with mediation, entirely separately from their market efficiency expert who would testify regarding class certification.[9] Lead Counsel spent numerous hours meeting (remotely) with each of the retained experts. These professionals were essential to the prosecution of the Action. *Id.*

139.    Expenses for electronic document discovery management and storage totaled $39,950.39 or approximately 11% of aggregate expenses. *Id.*

140.    Plaintiffs' costs incurred in connection with the Mediation totaled $36,107.50. *Id.*

141.    Plaintiffs incurred expenses of $6,249.50 in connection with the retention of an outside investigator, who assisted in the investigation of the claims prior to the commencement of formal discovery, as set forth in Exhibit 6 ¶ 6(c).

---

[9] Such arrangements are not uncommon, in part because they avoid discovery by opponents of counsel's privileged deliberations regarding settlement during the deposition or cross examination of the testifying expert.

142.   The other expenses for which Co-Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged by firms with clients who pay by the hour. These expenses include, among others, duplicating/printing costs, service and filing fees, and overnight delivery expenses.

143.   All of the litigation expenses incurred, which total $349,575.75, were necessary to the successful prosecution and resolution of the claims against Defendants.

144.   In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class. Accordingly, it is respectfully submitted that the expenses incurred by Plaintiffs' Counsel should be paid in full from the Settlement Fund.

## XI.   LEAD PLAINTIFFS' REIMBURSEMENT PURSUANT TO THE PSLRA

145.   Additionally, in accordance with 15 U.S.C. § 78u-4(a)(4), Lead Plaintiffs the Gabelli Group and the Naya Group seek reimbursement of their reasonable costs and expenses (including lost wages) incurred in connection with their work representing the Settlement Class in the aggregate amount of $22,500, which, when included with Co-Lead Counsel's expenses, is below the $500,000 that the Notice informed the Settlement Class would be the cap on litigation expenses. The amount of time and effort devoted to this Action by Lead Plaintiffs is detailed in the accompanying Declarations of David Goldman and Ian Wylie, attached as Exhibits 8 and 9. The Gabelli Group seeks $12,500 in connection with the time it dedicated to the litigation, which it estimates as being at least 65 hours (Ex. 8 ¶ 7). The Naya Group seeks $10,000 in connection with the time it dedicated to the litigation, which it estimates as being at least 40 hours (Ex. 9 ¶ 6). Co-

55

Lead Counsel respectfully submit that the amounts requested by Lead Plaintiffs are consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional investors to take an active role in commencing and supervising private securities litigation.

146. As discussed in the Fee and Expense Brief and in Lead Plaintiffs' supporting declarations, Lead Plaintiffs have been committed to pursuing the class's claims since they became involved in the litigation. As large institutional investors, Lead Plaintiffs actively and effectively fulfilled their obligations as representatives of the class, complying with all of the demands placed upon them during the litigation and settlement of the Action, and providing valuable assistance to Co-Lead Counsel. For instance, Lead Plaintiffs: (i) regularly communicated with counsel regarding the posture and progress of the Action; (ii) reviewed and/or discussed significant pleadings, motions, and briefs filed in the Action; (iii) reviewed and/or discussed significant decisions in the Action; (iv) coordinated and reviewed discovery responses to Defendants and began efforts to collect documents for production to Defendants before the Settlement was reached; and (v) evaluated settlement demands and offers and approved the proposed Settlement. Goldman Decl., Ex. 8 at ¶¶ 4-7; Wylie Decl., Ex. 9 at ¶¶ 4-5. These efforts required employees of Lead Plaintiffs to dedicate time and resources to the Action that they would have otherwise devoted to its regular duties.

147. The efforts expended by Lead Plaintiffs during the course of the Action are precisely the types of activities courts have found support reimbursement to class representatives, and support Lead Plaintiffs' request for reimbursement.

## XII.   THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

148.   As mentioned above, consistent with the Preliminary Approval Order, a total of 468,104 Notices have been mailed to potential Settlement Class Members advising them that Co-Lead Counsel would seek an award of attorneys' fees not to exceed 25% of the Settlement Fund, *i.e.*, $13,750,000, plus any accrued interest, and payment of expenses in an amount not greater than $500,000, which includes Lead Plaintiffs' reimbursement of expenses directly related to their representation of the Settlement Class. *See* Ex. 2-A at ¶¶4, 40. Additionally, the Summary Notice was published twice in *The Wall Street Journal* and transmitted twice over *PR Newswire*. *See* Ex. 2 ¶ 15; Ex. 2-B. The Notice has also been available on the settlement website maintained by the Claims Administrator (Ex. 2 ¶ 17) and on Co-Lead Counsel's websites.[10]

149.   While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date, no one has objected to the fee or expense request. Co-Lead Counsel will respond to any objections that may be received in its reply papers, if such papers are necessary.

## XIII.  CONCLUSION

150.   In view of the very favorable recovery for the Settlement Class, the very substantial risks of this litigation, the efforts of Plaintiffs' Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case and the standing

---

[10] Plaintiffs' motion for approval of the Settlement and Co-Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the case website and Co-Lead Counsel's websites.

and experience of counsel, Co-Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved as fair and reasonable; that the Settlement Class should be finally certified pursuant to Fed. R. Civ. P. 23 for the purpose of entering judgment on the Settlement; that attorneys' fees in the amount of 25% of the Settlement Fund, *i.e.* $13,750,000, plus any accrued interest be awarded; that $349,575.75 in litigation expenses incurred by Plaintiffs' Counsel be reimbursed; and that Lead Plaintiffs the Gabelli Group and the Naya Group be awarded $12,500 and $10,000, respectively, pursuant to the PSLRA.

I declare, under penalty of perjury, that the foregoing facts are true and correct.

Dated: December 22, 2021

/s/ Andrew J. Entwistle
Andrew J. Entwistle

/s/ Ira A, Schochet
Ira A. Schochet

58